**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**

|  |  |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>PERDUE FARMS, INC. and PERDUE FOODS, LLC,<br><br>*Defendants.* | CIVIL ACTION NO. |

## CLASS ACTION COMPLAINT

1.      Plaintiff Roger Parker, on behalf of himself and all others similarly situated, brings this action against Defendants Perdue Farms, Inc. and Perdue Foods, LLC (collectively, "Perdue") for damages and other appropriate relief related to their misclassification of Parker as an "independent contractor."  Despite inducing chicken farmers (known in the industry as "growers") to contract to raise chickens with Perdue through promises of independence, Perdue treated Parker and all of its growers as controlled employees under both federal and Georgia law.  As an employee, Parker was entitled to various federal and state wages, benefits, and other payments that Perdue did not provide, even though Perdue knew that Parker should have been classified as an employee based on the level of control Perdue exercised over Parker's chicken growing operation.  Perdue treats all of its growers across the country in the same fashion, using the same restrictive contracts and guidelines with all of them to dictate nearly every aspect of how they run their farms.

2.      Through this and other conduct described herein, Perdue violated various state and federal laws regarding the wages and benefits that it was obligated to offer its growers as

employees, and also defrauded its growers, breached the contracts it entered into with its growers, and unjustly enriched itself at its growers' expense.

3. Perdue also terminated Parker's grower contract due to Parker contacting the U.S. Department of Agriculture ("USDA") about a potential violation by Perdue of the Packers & Stockyards Act ("PSA"). After Perdue became aware that Parker had contacted the USDA, his Perdue supervisor told him he should not have talked to the government and made clear that Perdue was angry with him for having done so. Perdue subsequently retaliated against Parker by, among other things, denying routine lines of credit while requiring him to make expensive and burdensome upgrades to his farm and, ultimately, terminating his contract by refusing to deliver him flocks. Because these actions were taken not because of Parker's performance as a grower but because he reported a potential violation of law to the appropriate authorities, Perdue's retaliation against Parker violated the PSA's prohibition against unfair, discriminatory, and unduly prejudicial treatment of farmers. Thus, Parker brings a claim under the PSA on behalf of himself for this wrongful conduct.

## PARTIES

4. Plaintiff Roger Parker is a resident of Abbeville, South Carolina who worked under contract as a grower for Defendants Perdue Farms, Inc. and Perdue Foods, LLC in Milledgeville, Georgia.

5. Defendant Perdue Farms, Inc. is a Delaware corporation with its principal place of business in Salisbury, Maryland.

6. Defendant Perdue Foods, LLC is a limited liability company with its principal place of business in Salisbury, Maryland. Perdue Foods, LLC is a wholly owned subsidiary of Perdue Farms, Inc.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because Plaintiff's federal wage claims and PSA claim arise under federal law. The Court has supplemental jurisdiction over Parker's state-law claims under 28 U.S.C. § 1367, because they arise out of the same transactions and occurrences as Parker's federal claims.

8.     Moreover, the Court has jurisdiction over this class action under 28 U.S.C. § 1332(d) (the Class Action Fairness Act), because the amount in controversy is greater than $5,000,000, and some members of the class (including Parker) are citizens of a different state than Perdue.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants transact business in, are found in, and/or have agents in this judicial district, and because some of the actions giving rise to this Complaint took place within this district.

10.     The Court has personal jurisdiction over both Perdue entities.  Defendants have transacted business and maintained substantial contacts in this judicial district, and much of the conduct underlying this controversy took place in this jurisdiction.

## FACTUAL BACKGROUND

11.     "Broilers" are chickens raised for meat consumption. Modern broilers are generally slaughtered when they are about six weeks old.

12.     After the 1950s, the U.S. broiler industry began to shift away from individual farmers raising chickens and selling them to live poultry dealers or poultry processors.  Between 1950 and 1960, the percentage of independent poultry farmers relative to contract farmers (farmers under exclusive contracts with a single chicken processing company) dropped from 95% to 5%.

During this time, large companies known as "integrators" began to combine the various stages of production, a process known as vertical integration.

13.     Several decades ago, these contract growers were actually independent—they relied on their skills and knowledge to grow the most high-quality birds they could while managing their own input costs and growing conditions.  When they delivered a premium product to the poultry processor they were rewarded with higher prices or bonuses.  In sum, growers were fairly compensated for the skill, expertise, and labor they provided.  Today, growers working for Perdue have a very different relationship.

14.     Perdue is the third largest broiler chicken company in the country.  Perdue is highly vertically integrated, with its employees overseeing almost every aspect of the process. As discussed further below, this includes, among other things, growing the chicken feed, hatching the chicks, veterinary care, transportation, slaughtering, marketing, and selling of the final product.

15.     While Perdue now directly owns almost all of its broiler supply chain, it has generally not purchased the farms where its chicks are raised to full weight.  Instead, Perdue outsources the process of raising birds to broiler growers that Perdue calls "independent farmers"—but in truth, the growers are anything but independent.

16.     Perdue's growers raise chickens that Perdue owns from shortly after hatching for about six weeks until they are large enough to slaughter.  Perdue recruits growers by promising them independence and financial success.   In recruitment materials, Perdue promises "independence" and claims: "As a poultry farm owner, you'll never punch a time clock, and you'll have the satisfaction of leading your own business[.]"

17.     But Perdue refuses to grant growers the independence they were promised or the compensation they are entitled to.

18.     In reality, Perdue controls virtually every aspect of growers' operations.  There is no "independence" for growers under contract with Perdue, despite the growers shouldering most of the financial risk—including the large investment necessary to build barns (to Perdue's specifications), and the risk of loss if a flock is lost due to a power outage or disease.  Indeed, this financial risk—and Perdue's unwillingness to compensate growers with the wages and benefits to which employees are entitled—is why Perdue falsely classifies its growers as "independent."  In reality, however, Perdue's growers are employees entirely under the control of Perdue.  Perdue knows the level of control it exercises over growers entitles them to treatment under the law as employees, but it does not treat them as such in order to boost its profits.

19.     Perdue requires growers to work exclusively for Perdue.  After the contract is signed, Perdue uses onerous guidelines to take this exclusivity to extreme lengths: for example, preventing growers and their "family members" from even *visiting* a farm associated with a different integrator.

20.     By misclassifying growers, Perdue offloads enormous capital costs and financial risks onto them.  Instead of being responsible for the cost of constructing chicken houses, upgrading equipment, managing waste, and potentially losing chickens to natural disasters or other unexpected circumstances, Perdue forces growers to bear these costs by deceptively classifying growers as independent contractors while meticulously controlling virtually every moment and every aspect of their work.

21.     Indeed, this offloading of the responsibility to incur financial liabilities and large, ongoing debt payments is not only a primary financial reason Perdue misclassifies its growers as "independent contractors"—Perdue also uses the investments it repeatedly obligates its growers to make to trap growers into continuing to work for Perdue even after they discover that they were

not given the independence they were promised.  Having taken on large loans to pay for facilities and upgrades—and then being required to take on even more debt for further upgrades and equipment—growers have no meaningful choice but to continue growing for Perdue as long as Perdue permits them to.

22.     Put differently, Perdue has devised a scheme to saddle growers with risk and debt, while at the same time directing and controlling every aspect of the chicken growing process and refusing to compensate growers in the manner that federal law requires.

23.     Growers are a key part of Perdue's chicken business; without growers, Perdue's chicken business would not be able to function.

24.     To begin working as a grower, farmers like Parker must make large investments in barns and equipment, and then ultimately must make upgrades.  A farmer must build "grow out" houses that will hold thousands of chickens.  These houses are expensive to construct and maintain, often requiring growers to take out large loans to finance them.

25.     Perdue requires growers to build houses for the chickens to precise specifications dictated by Perdue.  After the houses are built, Perdue forces growers to pay for costly, highly specific facility or equipment changes.  Perdue threatens to sever grower contracts—which growers rely on to repay their significant loans—if a grower does not make the costly changes to Perdue's exact specifications.  And whenever Perdue decides, those specifications change over time, requiring growers to make even more significant payments and often go further into debt.

26.     Perdue growers are not required to have experience as chicken growers when they enter into their first contract with Perdue.  Perdue trains growers and monitors whether growers are following Perdue's guidelines.

27.     Perdue uses a form contract with its growers ("Poultry Producer Agreement") nationwide.  The contract is not negotiated between Perdue and each grower, as would be expected in a business-to-business relationship.  Instead, every grower must sign the same contract.

28.     The Poultry Producer Agreement attempts to assert that growers (referred to in the Agreement as "producers") are independent contractors, not employees.  The Agreement states that it is "a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors."

29.     The Poultry Producer Agreement states that growers will perform work "using the skills, knowledge, and discretion" that each grower "possesses."  This is false, as becomes clear well after a grower signs the Poultry Producer Agreement.

30.     The Poultry Producer Agreement requires that growers "comply with any bio-security policies, audits, measures or guidelines required by PERDUE."  But, notably, those Perdue "guidelines" and "biosecurity policies" are not provided until *after* a grower signs their contract with Perdue.  In this way, Perdue entices growers with marketing materials and contractual language that promises them independence while knowing that Perdue will subsequently control every material aspect of these growers' work.

31.     The reason Perdue would like to classify growers as independent contractors and not employees is plain: money.  Employees, unlike independent contractors, are entitled to prompt payment of certain financial benefits, such as a minimum wage.  Employees are also entitled to compensation for costs and expenses their employers require them to undertake as part of their employment.

32.     While controlling the method, manner, and timing of growers' work, Perdue simultaneously forces growers to bear economic risks that are the result of Perdue's decisions.

Perdue controls all the inputs that contribute substantially to the size of the chickens (the type and quantity of feed, the breed and size of the chicks delivered and picked up, the temperature, medications, and the method and manner of raising chickens).  But if those inputs controlled by Perdue result in smaller chickens, Perdue reduces growers' pay.

33.    Growers are often unable to make enough money for basic living expenses under the compensation scheme that Perdue has designed, indicating that Perdue's growers are often paid less than the minimum wage for their time worked.

34.    Rather than properly pay its growers, Perdue wants to have its cake and eat it too: have growers that function as controlled employees but compensate them as if they are independent contractors and force them to bear financial burdens that employees should not have to bear.

35.    Parker's experience is emblematic of Perdue growers.  Parker's contract from Georgia is materially identical to a contract that Perdue used in North Carolina and South Carolina in 2016, but for a single provision in the latter restricting photography on the farm.  On information and belief, Perdue has used and continues to use a uniform contract nationwide with all of its growers.

36.    Perdue assigns a supervisor to each grower.  These supervisors are misleadingly called "Flock Advisors," rather than what they actually are: managers.  In fact, Parker's supervisor states in his online resume that his title is "Grower Manager" – a much more accurate job title description than the one Perdue strategically has used in public-facing communications.[1]

---

[1] As discussed below, Perdue uses multiple titles for this position. Whatever title Perdue creates, these individuals act at all times as the manager of the individual growers under their supervision wherever they are located.

37.     These supervisors visit farms with chickens at least weekly to ensure growers are complying with Perdue's requirements.  During these visits, the supervisor conducts an inspection and assigns tasks to the Perdue grower they manage.

38.     In an attempt to obfuscate the level of control the Poultry Producer Agreement gives Perdue over growers, Perdue hides many of its requirements in other guidelines—guidelines that are not provided to growers until *after* they sign the Poultry Producer Agreement.  Perdue requires that growers "adhere to the PERDUE Poultry Welfare and Bio-Security Programs."  It further contractually requires that growers "comply with any bio-security policies, audits, measures, or guidelines required by PERDUE."  Perdue's supervisors evaluate and grade growers' compliance with the company's bio-security guidelines.

39.     The written guidelines issued to growers are incredibly detailed.  Compliance with the guidelines requires following Perdue's directions about every aspect of the growing operation.  And the Poultry Production Agreement states that "[i]n the event the grower is not fulfilling his/her obligations then this agreement may be terminated."

**I.    Perdue's Right to Control**

40.     Perdue exercised its right to control every aspect of the time, method, and manner of Parker's work, whose experience is typical of other Perdue growers.  Using broad language and terms that are not defined for the grower, Perdue lays the groundwork for its scheme in the Poultry Producer Agreement:

> PRODUCER AGREES: To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm…To comply with any bio-security policies, audits, measures or guidelines required by PERDUE…To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Program… PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing

PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock.... PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit.

41.     After contract signing, Perdue then exercises control at a level that could never be anticipated by the contract, both through the use of "guidelines" that are not disclosed at the time of signing and through the use of managers, whose power over growers could not be anticipated by any reading of the Poultry Producer Agreement.  Perdue's actual control over the methods, manner, and timing of growers' work is detailed below.

### a.  Methods

42.     Perdue controls the methods used to raise chickens. Despite promises of independence in the Poultry Producer Agreement and marketing materials, Perdue controls the use of specific methods for raising chickens down to extreme levels of detail.  It does this primarily through two mediums: extensive guidelines that are provided after contract signing and the Perdue managers who are assigned to growers after contract signing.

43.     On a day-to-day basis, Perdue exercises control over methods through each grower's manager.  While the Perdue Poultry Producer Agreement misleadingly defines these supervisors as "Advisors," it becomes clear well after contract signing that it is not optional to accept their advice.  These supervisors oversee, discipline, train, and manage growers like Parker. As noted above, supervisors are referred to as "Flock Advisors," but can also be called "Growout Managers," "Live Production Managers," or other similar terms.  Perdue requires growers to report any issues with chickens to their supervisor within 24 hours and requires growers to produce records to their supervisor on demand.

44.     According to recent job listings in at least four states, a Perdue Flock Advisor "Works directly with assigned contract producers to improve company profitability and competitive position by implementing production programs and documenting producer compliance at each visit to the farm."   Another job listing explains: "The purpose of a Flock Advisor is to protect the Perdue Farms, Inc. brand name.  Improve company profitability by serving as a representative *overseeing the people, poultry and daily operations* on his/her route" (emphasis added.)

45.     A recent job listing by Perdue in Georgia for a "Growout Manager" provides even more detail:

> [A Growout Manager] Provides leadership, training and coaching to associates, as well as producers to ensure all company policies and programs are being met… Drives program compliance and competitive farm performance. In farm management, meets all facility operational plans to ensure scheduling of placements, harvest, health checks and accurate weight projections for bird movements. Reports on progress to include physical farm improvements, performance metrics and safety. As a Housing Manager, works with new prospects and existing growers to add the square footage needed to meet the needs of the complex. Manages the average service cost of the complex to not exceed the current average by strategically locating new farms as close as possible to the plant locations. Facilitates the construction of square footage by evaluating new sites, introducing prospects t[o] lenders, working with builders and equipment companies to provide quotes to prospects, arranging grading bids and manages the scheduling of contractors to attain the most equate footage in the least amount of time. Develops new grading contractors, builders, equipment vendors and electricians to facilitate the additional expansion. Works with lenders, zoning, university staff and extension to help facilitate the expansion project.

46.     Another recent job listing by Perdue for a "Housing Manager" in Indiana explains that in addition to working "directly with assigned contract producers to… implement[] production programs and document[] producer compliance at each visit to the farm," this position is heavily involved in overseeing growers' construction projects:

11

> [A Housing Manager] acts as general contractor for new construction and
> renovation of existing structures. Monitors the day to day work of the
> contracted construction crews. Coordinates with the producers, vendors and
> subcontractors. Works with perspective [sic] farmers laying out the
> construction of new poultry houses and the renovation of aging houses
> ensuring that the environment provided to the flocks meets the requirements
> of the operation. Purchases an[d] transports local materials and equipment
> to the job sites. Provides estimates of the remodeled construction cost of
> existing poultry facilities.

47.     In addition to the day-to-day management by its supervisors, the other primary way
that Perdue controls the methods of growers' work is through written guidelines disclosed after a
grower signs a contract.  The guidelines give Perdue wide-ranging, constant, and nearly unfettered
control over virtually every aspect of its growers' work.  Compliance with these guidelines is
mandated by the Poultry Producer Agreement even though growers are not provided with the
guidelines prior to signing.

48.     These guidelines are incredibly detailed and conveyed in written and verbal
communication from Perdue.  For example, Perdue issues temperature guidelines that provide the
exact degree temperature at which the grow out houses should be kept.  This requirement changes
throughout the day and requires specific humidity levels and ammonia levels.  Perdue further
requires specific methods of operating fans and ventilation.  Perdue requires specific heights for
water drinkers and specific hours for operation of lighting.  Indeed, Perdue even requires grass
*outside* of chicken houses to be cut on a schedule controlled by Perdue's delivery of chicks and
Perdue's supervisors.

49.     Perdue's guidelines require use of both specific methods for euthanizing chickens
and specific timelines for identifying and removing dead chickens.

50.     Perdue's contract also requires growers to comply with Perdue's "Poultry Welfare
and Bio-Security Programs" which contain detailed requirements on housing and feeding

chickens, including on issues not clearly related to animal welfare or bio-security.  (Again, these guidelines are not provided to growers before signing the contract.)  For example, growers are banned from visiting other farms, banned from allowing "unauthorized" visitors on their land (but must permit Perdue supervisors on their land), and required to post Perdue's biosecurity signs on their farm.

51.     Perdue required Parker to report "within 24 hours" to his supervisor "if any birds, for any reason, do not develop normally…"  Each flock includes thousands of birds.  Therefore, on information and belief, this extraordinarily broad requirement is often practically impossible to comply with and serves as both a method of controlling growers like Parker and as a pretext for termination.

52.     Even after it picks up its chickens, Perdue mandates that growers adhere to guidelines for cleaning, maintenance, and preparation for a future delivery of chickens.

53.     Per the Poultry Producer Agreement, growers "can be immediately terminated by PERDUE" for failure of "proper house management or care."  On information and belief, determination of "proper house management or care" is entirely at Perdue's discretion and can be used to terminate growers for almost any reason, which is not disclosed to growers at contract signing.

54.     Despite the promises made in the Poultry Producer Agreement, growers are not permitted to use their own "skills, knowledge, and discretion" to implement methods that would improve the growth of the chickens.  For example, lighting changes that Parker believed would improve the growth and welfare of the chickens were barred by Perdue's guidelines.

**b. Manner**

55.     Perdue controls the manner of raising chickens too.  Most obviously it does this by controlling all the inputs used to raise chickens, including the chicks themselves.  Perdue requires the use of specific feed, medication, vaccinations, and "other supplies"—all of which are provided by Perdue and which growers cannot substitute for inputs of their own choosing.  Perdue dictated that Parker only use approved specific types of feed and medication, and Parker "[could] be immediately terminated" by Perdue for using unapproved feed or medication.

56.     According to the Perdue Poultry Producer Agreement, "PERDUE will determine in its sole and absolute discretion: a. the breed of chickens PRODUCER will receive; b. the number and density of chickens in each flock delivered to PRODUCER's farm; c. the size, weight and age of the chicken to be produced; d. the time for processing each flock; and e. the date, time and estimated interval of placement for future flocks."  As discussed further below, Perdue's sole and absolute control of the type, timing, and health of chickens is not only a clear manifestation of its right to control Parker and other growers but also has significant impact on the compensation of growers.

57.     Parker, like all Perdue growers, had to use feed provided by Perdue.  The Poultry Producer Agreement states that growers must "adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock."  Again, growers learned how much control that provision gave Perdue only after signing their contracts.  Growers have no control over the timing of feed deliveries, which can and often do happen in the middle of the night.  Growers must be present at the time of the deliveries and have no right to refuse delivery of feed or to reschedule deliveries.  Perdue also controls the type of feed growers receive, including its nutritional content and which type of feed should be used at different points of the growth cycle.

58.     As is typical for Perdue growers, Perdue controlled the type of materials Parker was allowed to use, down to the type of cleaning supplies, and insisted that use of any chemicals "in or around" barns be approved in writing by Perdue.  According to the Poultry Producer Agreement, "PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE."

59.     For example, Perdue's written instructions to Parker in late September 2019 included specific brands of drinkers to install along with down-to-the-inch requirements on the spacing of water nipples.  Similarly, in May 2019, a Perdue supervisor wrote an email to Parker after a visit to his farm with a litany of changes Perdue required him to make on issues as specific as the number of fans, the height of water lines, and location of feeders.

60.     Perdue requires growers to pay for expensive changes to their chicken houses to comply with Perdue-specific specifications on equipment and facilities.  This includes mandating specific models or brands of equipment to be used.  Forcing growers to work inside facilities that are effectively designed for Perdue is another way that Perdue controls the methods and manner of growers' work.

61.     These changes usually require growers to take out large loans.  These loans further tie the growers to Perdue because a continuing contract is often a requirement of the loan and because of the close relationship between Perdue and banks that lend to its growers.  For example, Perdue automatically deducted payments from Parker's compensation to pay the bank on his behalf, despite Perdue ostensibly not being a party to the loan.

62.     When events outside of a grower's control (like extreme weather) impact a farm, Perdue exercises control over the response to those events.  For example, Perdue dictated to Parker that a barn damaged by extreme weather must be demolished instead of repaired and Perdue insisted that a bulldozer level the barn and crush the live chickens inside over Parker's objections.

63.     Perdue even retains the authority to take over a grower's farm at Perdue's discretion.  Growers are required to assume the cost of Perdue taking over their own farm.  Even without invoking that authority, Perdue and Perdue's designated supervisors acted as though they were entitled to exercise broad control over Parker's farm.  For example, after an unannounced visit to his farm in 2019, Parker's supervisor from Perdue wrote an email to Parker with a detailed list of eleven changes that needed to be made.

### c.  Time

64.     Perdue controls the schedule of its growers' work at every phase of the chicken growing process.

65.     First, Perdue controls the timing for delivery of chicks.  Perdue insists growers have to be available to accept birds "when consigned" and have to "be present or represented when birds are delivered and during the catching and movement of each flock."  While not detailed in the contract, supervisors make clear to growers that having feed, water, heat, and ventilation to Perdue's specific specifications at the time of placement of chicks is mandatory.  In its guidelines, provided after contract signing, Perdue details an extensive list of requirements to be completed on a specific schedule before chick placement (the timing of which is determined by Perdue).  For example, temperature monitoring requirements begin "48 hours prior to" Perdue's arrival and air measurements must be done at a specific time.

66.     Second, Perdue controls the timing of work after it delivers chicks through its detailed guidelines that are provided only after the contract signing.  For example, Perdue dictates ammonia, temperature, and humidity levels must be checked "daily."  Birds must be culled by "approved methods" daily.  Charts on bird mortality must be updated "daily."  Alarms must be checked every day.  Fan guidelines change by the week.  Inspection of the exterior of houses is on a set schedule.  Bait pads must be "check[ed] weekly." During the first week after placement, it mandated that growers walk up and down and inspect each barn a minimum of "4-5 times per day."  Chicken houses are hundreds of feet long with tens of thousands of chickens, meaning these requirements are a mandate for a significant number of hours worked during this specific phase.

67.     Perdue controls the timing of feed deliveries, which can often happen in the middle of the night.

68.     Additionally, growers are expected to be present whenever their Perdue supervisor desires them to be present.  Perdue also insists that it has the right to enter the grower's property at any time.  In Parker's case, as with many other Perdue growers, this often happened without prior notice.  Growers are expected to be on-call for Perdue 24 hours a day.

69.     Perdue's supervisors often require growers to complete tasks on a specific schedule —either in a certain number of days or by the next time the supervisor visits.

70.     Perdue requires growers to report "within 24 hours" to their supervisor "if *any* birds, for *any* reason, do not develop normally…" (emphasis added.)  Because of the broad nature of this requirement and the timeline for reporting to supervisors, this requirement results in forcing growers to inspect every one of thousands of birds at least every 24 hours.

## II.   Exclusive Work Arrangement

71.   Under the Poultry Producer Agreement, Perdue requires that growers enter into an exclusive work agreement.

72.   The Poultry Producer Agreement specifies that growers agree "To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises" and states that growers "[could] be immediately terminated" for "allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry."  The Agreement even bans growers or those working for growers from maintaining, owning, or caring for any birds or poultry "on any other premises" unless approved by Perdue.

73.   After the contract is signed, Perdue takes this exclusivity to extreme and unanticipated lengths.  In guidelines provided only after the contract is signed, Perdue bans growers from even *visiting* farms associated with other integrators: "Growers should not visit other poultry producers farms or have contact with any other fowl."  Perdue then extends this broad prohibition to "family members" of the grower—even though those family members may not have been party to the original contract.

74.   Parker, like many Perdue growers, was required by Perdue to place a sign with a Perdue logo at the entrance to his land.  He was also required by Perdue to place signs and documents inside his barns, including documents with Perdue's logo.

## III.   Supplies and Equipment

75.   Under the Poultry Producer Agreement, Perdue provides supplies to Perdue growers.  The Agreement requires that growers "use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for

the health and welfare of the birds consigned."  Using supplies "other than those provided by PERDUE" is grounds for terminating the contract.

76.     Instead of allowing growers to shop for the supplies that they believe would be best for their operations, virtually all supplies are provided by Perdue and the cost of those supplies is then automatically deducted from growers' compensation.

77.     Perdue mandates that growers undergo training provided by Perdue through its supervisors, guidelines, and other materials.

78.     While Perdue requires growers to build their own grow out houses (to Perdue's exact specifications) and pay for upgrades to those facilities (that Perdue demands be implemented), growers take on extensive debt on their own behalf in order to do so.  And that is precisely why Perdue falsely holds growers out to be independent contractors—so that Perdue does not have to bear this financial liability.

## IV.     At Will Employment

79.     Under the Poultry Producer Agreement and in practice, growers are functionally employed at will.

80.     The Agreement claims that either party can terminate the contract on 90 days written notice.  It also allows only Perdue to terminate if "PRODUCER's farm has been without chickens for more than one hundred eighty (180) days."  And Perdue retains the right in its sole discretion to decide whether or not to provide a grower with chickens.  In other words, this provision allows Perdue to simply stop providing chickens and then fire growers for not having been provided chickens.

81.     The Agreement allows Perdue to terminate a grower who "fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs."  On information and belief, Perdue uses its animal welfare and bio-security programs as pretext to terminate growers for almost any reason.

82.     As described previously, the Agreement allows Perdue to terminate growers for lack of "proper house management or care."  On information and belief, determination of "proper house management or care" is entirely at Perdue's discretion and is used to terminate growers for almost any reason.

83.     Furthermore, as explained above, Perdue requires growers to report "within 24 hours" to their supervisor "if *any* birds, for *any* reason, do not develop normally…" (emphasis added.)  Each flock includes thousands of birds and "normally" is not defined, making this requirement extremely broad and often impossible to genuinely comply with.  On information and belief, this unreasonable requirement can be used as a pretext to terminate growers for any reason.

84.     As experienced by Parker, Perdue's supervisors make clear that failure to follow their instructions would also result in termination.

## V.     Payment

85.     Despite being controlled as employees, growers do not receive an hourly wage. Instead, they are paid based on what is known as the "tournament system."

86.     All growers are guaranteed a level of base pay by contract.  This base pay is not tied in any way to the number of hours growers must work to keep their facilities up to Perdue's specifications, and indeed fails to provide a basic wage for the time Perdue's requirements obligate growers to work. And this "guaranteed" pay is not actually guaranteed: Perdue often docks this base pay based on factors outside growers' control, like the type and amount of chemicals, supplies, or materials Perdue mandates that the grower use and pay for.

87.     Growers are also eligible for a performance bonus under the tournament system. The performance bonus is based on the average size of the chickens when Perdue picks them up.

88.     These supposed performance-based bonuses, however, have nothing to do with growers' skills and expertise.  Perdue controls all of the inputs, including the quality of the chicks themselves, the amount and nutritional quality of feed, and medications, as well as dictating all of the conditions the chickens must be kept in, including temperature and light.  As a Perdue grower in South Carolina told an investigative reporter in 2020: "You're penalized if you don't perform and it's not your fault. You listen to your flock supervisor throughout and then do poorly. Why am I at fault if I do everything they want me to do?"

89.     The "bonuses" are also a misnomer—the reason it is called the tournament system is that growers are pitted against each other, and the "bonuses" paid to certain growers come at the expense of other nearby growers, whose compensation is reduced by the extra amount the "winning" grower is paid.

90.     In addition to the hours of work required to complete Perdue's requirements and assignments, Parker was required by Perdue to be on call 24 hours a day while its chickens were being raised.  On information and belief, this is typical of all Perdue growers' experience.

91.     For example, one of Perdue's supervisors told Parker: "I told my wife, I don't mind working for Perdue but I sure wouldn't want to own one of those chicken houses. I mean I can kind of forget about it for a few hours a day or over the weekend, something, but you are babysitting 24 hours a day. And then once them chickens move out, I told people that don't know anything about chickens, I say, well, they move out the birds and then they got 20 days, 14, 16 days. They go, 'Oh, they got 2 weeks vacation.' I said, no, that's when the real work starts. It's a never-ending cycle."

92.     Perdue also routinely and unilaterally docks growers pay for expenses it deems necessary for the work to be conducted in the manner it requires.  For example, an August 2019 settlement report for Parker indicates that Perdue deducted hundreds of dollars for feed trays, bait stations, and chlorine.  These deductions, which are at Perdue's sole discretion, further contribute to compensation that is uncorrelated with skill or hours worked.

## VI.     Additional Facts Regarding the Named Plaintiff

93.     Parker worked as a grower for Perdue through 2019. As a result of Perdue's fraud, Parker continued through at least September 2019 to make significant payments and incur financial obligations in order to make improvements to Perdue's specifications, purchase equipment required by Perdue, and otherwise provide the kinds of equipment necessary for Perdue's processes that, had he been properly classified, would have been the responsibility of Perdue.

94.     Perdue also worked to hide the full scope of its control over Parker's work and the full scope of financial obligations it would force him to incur until well after signing of the contract. Even throughout 2019, Perdue was adding new levels of control and financial requirements onto Parker; Parker did not and could not have discovered the full scope of Perdue's fraud in the exercise of reasonable diligence prior to those new levels of control and financial requirements. On information and belief, this pattern of Perdue withholding the level of control at the beginning of the contractual relationship only to slowly increase control after growers had incurred significant debt and were therefore locked into their contracts was uniform among all Perdue growers.

95.     After developing evidence that Perdue was misrepresenting the weight of chickens he raised on flock settlement reports in summer 2017, Parker spoke to an official at the USDA Packers and Stockyards Division to ask about his rights under the law.

96.     Shortly afterwards, Parker emailed some of his Perdue settlement records to the USDA official.

97.     Perdue later found out that Parker had spoken to a USDA official.  A supervisor from Perdue expressed displeasure that Parker had communicated with the USDA.

98.     A different Perdue supervisor also visited Parker's farm around this time. This Perdue supervisor compared the USDA investigation to an IRS audit that Perdue "[doesn't] want." The supervisor stated to Parker: "Perdue doesn't want Stockers and Packers [sic] thinking that they have that reputation, 'We better check them, they do wrong or they make mistakes.' They want to be 'let's fix it between the grower and Perdue,' they don't want Stockers and Packers [sic] ever even being mentioned or on the radar, you know?"

99.     Prior to speaking to the USDA, Parker generally received high scores from Perdue's "tournament system."

100.    After Perdue became aware of Parker's communication with the USDA, Perdue demanded expensive improvements and changes to Parker's chicken barns while refusing to issue Parker lines-of-credit as it had previously and as it continued to do for other farmers.  Eventually, in late 2019, Perdue communicated in writing that it would not provide additional chickens to Parker unless he made a list of specific upgrades.  The list of upgrades would require more funds than Parker had and a local farm real estate agent told Parker he had never seen such an extensive list of upgrade demands.  On information and belief, Perdue knew that these upgrade demands were unworkable and used them as a pretext to terminate Parker.  Eventually, Parker was forced to declare bankruptcy.

## CLASS ALLEGATIONS

101.    Parker brings this action on behalf of himself and all others similarly situated[2] under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), as representatives of a class (the "Proposed Class") defined as follows:

> All individuals nationwide who worked as broiler chicken growers for Perdue Farms, Inc. or Perdue Foods, LLC at any time between July 21, 2016 and the present.

102.    <u>Numerosity</u>:  The class is composed of thousands of class members, the joinder of whom in one action is impractical.  The class is ascertainable and identifiable from Defendants' records and documents.

103.    <u>Commonality</u>:  Questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class.  These common issues include, but are not limited to:

  a.    Whether class members are/were employees of Perdue;

  b.    Whether Perdue is liable to Parker and class members for breach of contract;

  c.    Whether Perdue is liable to Parker and class members for damages for breach of contract;

  d.    Whether Perdue intentionally withheld information about the level of control it would exercise over growers until after they signed contracts, thereby defrauding class members;

  e.    Whether Perdue unjustly enriched itself at the class members' expense by forcing class members to incur massive debts for equipment, upgrades, and improvements that should, in equity, have been paid for by Perdue, as class members' employer;

  f.    Whether Perdue is liable to Parker and the class for compensatory damages or other legal or equitable relief;

  g.    Whether entry of a declaratory judgment that Parker and the class are/were employees of Perdue at all relevant times is appropriate.

---

[2]    While the Poultry Producer Agreement purported to bar class action claims, Perdue may not enforce that clause due to a recent class action settlement.

104.   <u>Typicality</u>: Parker's claims are typical of the claims of the other class members. Parker and the other class members have been injured by the same wrongful practices, and performed work for Perdue under identical or materially identical contracts (the Poultry Producer Agreement).  Parker's claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

105.   <u>Adequate Representation</u>: Parker will fully and adequately assert and protect the interests of the other class members.  In addition, Parker has retained class counsel who are experienced and qualified in prosecuting class-action cases.  Neither Parker nor his attorneys have any interests conflicting with class members' interests.

106.   <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable.  Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

107.   <u>Injunctive Relief</u>:  The prosecution of the claims of the putative class as a class action pursuant to Rule 23(b)(2) is appropriate because Perdue has acted, or refused to act, on grounds generally applicable to the putative class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the putative class as a whole.

108.   <u>Issue class</u>:  In the alternative, a class should properly be certified with regard to one or more material issues of fact or law herein pursuant to Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

## COUNTS

### COUNT ONE: FEDERAL MINIMUM WAGE
(Fair Labor Standards Act (FLSA) 29 U.S.C. § 201 *et seq.*)
(On Behalf of the Class)

109.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

110.   Parker and the other growers in the putative class were employees of Perdue.

111.   The Fair Labor Standards Act (FLSA) requires Perdue to pay its employees at least the federal minimum wage of $7.25 per hour.

112.   Perdue did not pay Parker what it was required to under the FLSA.  Similarly, it has not paid other members of the putative class what it was required to under the FLSA.

113.   Parker has earned less than the minimum wage due to Perdue's low pay combined with the deductions Perdue automatically took from Parker's pay for expenses Perdue required him to cover, like upgrades to chicken houses and supplies chosen by Perdue.

114.   Plaintiff Parker often worked over 60 hours per week.  He was expected to be on call 24 hours a day.  After paying for expenses, Parker was making a fraction of the minimum wage per hour worked.  This experience was typical of all the growers in the putative class.

115.   Perdue's violations were willful.  As described above, Perdue knew that Parker and its other growers were not independent contractors and were instead employees, and that Perdue should have been paying growers the federal minimum wage required by the FLSA.

116.     Parker, on behalf of himself and other members of the affected class seeks damages under the FLSA in an amount equivalent to the difference between what Perdue paid and what it should have paid to its growers had they been properly classified, as well as any other damages that are appropriate.

117.     Parker asks that the Court conditionally certify an opt-in class of growers to pursue this claim.  *See* 29 U.S.C. § 216(b).

**COUNT TWO: FEDERAL OVERTIME**
**(Fair Labor Standards Act (FLSA) 29 U.S.C. § 201 *et seq.*)**
**(On Behalf of the Class)**

118.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

119.     Parker and the other growers in the putative class were employees of Perdue.

120.     The Fair Labor Standards Act (FLSA) requires Perdue to pay its employees at least one-and-one half times the federal minimum wage for all hours worked in a given week over forty hours.  29 U.S.C. § 207.

121.     Perdue did not pay Parker what it was required to under the FLSA's overtime provision.  Similarly, it has not paid other members of the putative class what it was required to under the FLSA's overtime provision.

122.     Parker and the other members of the putative class were regularly required by Perdue to work in excess of forty hours a week.  For example, Parker was often required by Perdue to work over 60 hours per week.  He was expected to be on call 24 hours a day.  This experience was typical of all the growers in the putative class.

123.     While Parker and the other members of the putative class worked in agriculture as the FLSA defines that term, they were not "employed by a farmer" as that term is defined in the

FLSA's overtime exemption.  *See* 29 U.S.C. § 113(b)(13).  For purposes of the work Perdue required Parker and the other members of the putative class to perform, Perdue was the growers' employer but Perdue was not a "farmer" because it did not own the farms or facilities on which the work was performed.

124.    Perdue's violations were willful.  As described above, Perdue knew that Parker and its other growers are not independent contractors and were instead employees, and that Perdue should have been paying growers the federal overtime wages required by the FLSA.

125.    Parker, on behalf of himself and other members of the affected class seeks damages under the FLSA in an amount equivalent to the overtime Perdue should have paid to its growers had they been properly classified, as well as any other damages that are appropriate.

126.    Parker asks that the Court conditionally certify an opt-in class of growers to pursue this claim.  *See* 29 U.S.C. § 216(b).

**COUNT THREE: BREACH OF CONTRACT**
**(On Behalf of the Class)**

127.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

128.    Parker and Perdue entered into a contract entitled "Poultry Production Agreement." The other growers in the class entered into identical or materially identical Poultry Production Agreements with Perdue.  Those contracts were binding and enforceable and were uniform in all material respects among all class members.

129.    The Poultry Production Agreement repeatedly provides that Perdue will treat growers a independent contractors, capable of exercising independent judgment and utilizing their skills as farmers.

130.    But Perdue breached Parker's and all class members' agreement by failing to treat growers such as Parker as "independent contractors" or allowing them to utilize their independent judgment and skill in the performance of their work as the Poultry Producer Agreement promises they will.

131.    Perdue's breach of the uniform contracts it entered into with the class members was itself uniform: after entering into Poultry Production Agreements with Parker and each member of the class, Perdue then subjected Parker and members of the class to guidelines and supervision by Perdue managers that amounted to virtually unfettered control over the time, method, and manner of their work.  Perdue's oversight amounts to supervision, management, direction, and control of growers' day-to-day operations.

132.    Perdue did so by subjecting Parker and members of the class to exhaustive, mandatory guidelines that  the dictated nearly every aspect of their day-to-day work.

133.    Perdue also obligated Parker and all members of the class to permit supervisors onto their farms at any time Perdue decided, and these supervisors exerted even greater control over the work of Parker and members of the class.

134.    On information and belief, this experience is typical of all Perdue growers, each of whom is regularly visited by a supervisor.

135.    Perdue's breach of its obligations to treat Parker and the class members as independent contractors and allow them to exercise their judgment, experience, and expertise as farmers as it agreed to do in the uniform Poultry Production Agreements it executed with them directly and proximately caused damages to Parker and the class members.  As a result of these breaches, Parker and the putative class have lost money and property as a result of Perdue's breaches of the Poultry Producer Agreement, including but not limited to the benefits of

employment and capital outlays they made that Perdue, had it properly operated as their employer, would otherwise be required to pay.

## COUNT FOUR: DECLARATORY JUDGMENT
### (Federal Declaratory Judgment Act 28 U.S.C. § 2201(a), et seq.)
### (On Behalf of the Class)

136.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

137.   Parker and class members are or were employees of Perdue.

138.   Parker and class members have been misclassified by Defendant throughout the relevant period.  Perdue continues to misclassify its growers as independent contractors rather than employees today.

139.   This creates a controversy, both as to Parker and as to each class member, regarding the nature of their rights and Perdue's ensuing obligations.

140.   Parker and class members are entitled to a declaration that they are or were employees of Perdue and must be treated as such. Perdue would then be free to either modify their business practices to provide independence to future growers or to modify their policies to provide employee pay and benefits to future growers.

## COUNT FIVE: FRAUD
### (On Behalf of the Class)

141.   Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

142.   In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would perform work "using the skills, knowledge, and discretion" that each grower "possesses."

143.    At the time Perdue represented that growers would perform work using the skills, knowledge, and discretion that each grower possesses, the representations were false.

144.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would be treated as independent contractors.

145.    At the time Perdue represented that growers would be treated as independent contractors, the representations were false.

146.    At the time it executed contracts with Parker and the class members, Perdue knew that it would exercise substantial control over Parker and Parker and the class members but withheld that information in order to induce Parker and the class members to execute Poultry Producer Agreements with Perdue.

147.    Perdue deliberately withheld many of the stringent obligations contained in separate handbooks and guidelines and dictated by supervisors that Perdue would ultimately obligate Parker and class members to abide by refusing to disclose those handbooks, guidelines, and other requirements from Parker and the class members until after they signed their contracts with Perdue.

148.    Perdue made these representations and deliberately withheld this information with the intent to deceive Parker and class members and with the intent to induce Parker and class members to agree to the Poultry Producer Agreement.

149.    Parker and class members reasonably relied on Perdue's misrepresentations in deciding to agree to the Poultry Producer Agreement.

150.    Perdue's misrepresentations proximately caused damages to Parker and class members.

## COUNT SIX: NEGLIGENT MISREPRESENTATION
### (On Behalf of the Class)

151.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

152.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would perform work "using the skills, knowledge, and discretion" that each grower "possesses."

153.    At the time Perdue represented that growers would perform work using the skills, knowledge, and discretion that each grower possesses, the representations were false.

154.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would be treated as independent contractors.

155.    At the time Perdue represented that growers would be treated as independent contractors, the representations were false.

156.    At the time it made these representations, Perdue was at the very least negligent or reckless with respect to the falsity of these representations to Parker and class members, who Perdue knew or should have known would foreseeably rely upon them.

157.    Perdue was also at least negligent or reckless in failing to provide Parker and class members with the stringent obligations contained in separate handbooks and guidelines and in instructions from supervisors that Perdue would ultimately obligate Parker and the class members to follow, and which would render false the independence that Perdue ostensibly promised them under their agreements.

158.    Parker and class members reasonably relied on Perdue's misrepresentations and material omissions in deciding to agree to the Poultry Producer Agreement.

159.    Perdue's misrepresentations proximately caused injury to Parker and class members.

## COUNT SEVEN: UNJUST ENRICHMENT
### (On Behalf of the Class)

160.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

161.    Parker and class members conferred benefits on Perdue.  These benefits included the undertaking of loans and making payments to provide facilities, improvements, and equipment for Perdue's growing operation.

162.    If Parker and the class members had been properly informed of the true relationship that Perdue would establish with Parker and the class members (*i.e.*, an employment relationship), Perdue would have been obligated to bear the costs of providing facilities, improvements, and equipment necessary for Perdue's growing operation.

163.    Permitting Perdue to retain the benefits that Parker and the class members provided without just compensation would be inequitable.

164.    Equity requires that Perdue compensate Parker and class members for the benefits Parker and class members conferred on Perdue.

## COUNT EIGHT: UNFAIR AND DISCRIMINATORY PRACTICES
### (Packers & Stockyards Act, 7 U.S.C. § 192)
### (On Behalf of Parker)

165.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

166.    In the summer of 2017, Perdue inaccurately weighed broiler chickens that Parker grew for Perdue, thereby adversely affecting his compensation.

167.    In response to Perdue's conduct, in September and October 2017, Parker contacted the USDA's Packers and Stockyards Division (the "Division") to report a potential violation of the Packers and Stockyards Act and its implementing regulations.  *See, e.g.*, 9 C.F.R. § 201.55.

168.    It is unknown whether the Division took any action in response to Parker's complaint.  But Perdue learned of Parker's complaint and subsequently retaliated against him for having filed it.

169.    Several months after Parker's complaint was filed, Parker's Flock Supervisor told him that Perdue was displeased with his communication with the Division and that Perdue, "don't want Stockers and Packers [sic] ever even being mentioned or on the radar."

170.    On a separate occasion, another supervisor from Perdue expressed displeasure that Parker had communicated with the Division.

171.    In response to Parker's complaint, Perdue terminated his contract by demanding unreasonably expensive and unnecessary changes to his facilities and then failing to give him new flocks.  On information and belief, and based on Parker's conversation with his Flock Supervisor and other Perdue officials, Perdue would not have terminated Parker's contract had Parker not filed his complaint with the Division.  Prior to Perdue's retaliation, Parker was generally ranked high in Perdue's "tournament system."

172.    Terminating Parker in retaliation for filing a complaint to the Division was an unfair, unjustly discriminatory, and deceptive practice.

173.    Terminating Parker in retaliation for filing a complaint to the Division also unduly and unreasonably prejudiced and disadvantaged Parker.

174.    Because of Perdue's unlawful actions, Parker was harmed in his business and property.

## JURY DEMAND

175.    Pursuant to Federal Rule of Civil Procedure 38, Parker demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Parker prays that this Court enter judgment on his behalf and that of the Proposed Class by adjudging and decreeing that:

A.    This Court certify the Proposed Class, designate the named plaintiff as class representative and the undersigned counsel as class counsel, and order that Parker and class members have trial by jury;

B.    The Court enter judgment against Perdue in favor of Parker and the class;

C.    The Court award Parker and the class compensatory damages in an amount to be determined at trial;

D.    The Court award Parker and the class restitution;

E.    The Court award Parker and the class punitive damages;

F.    The Court award Plaintiff and the class their costs and expenses of suit, and reasonable attorneys' fees as provided by law;

G.    The Court award Parker and the class pre- and post-judgment interest;

H.    The Court enter declaratory judgment affirming that Parker and the other class members are/were employees under the relevant state and federal laws, and not independent contractors;

I.    The Court award equitable, injunctive, and declaratory relief, including a judicial determination of the rights and responsibilities of the parties; and

J.    For such other and further relief as the Court may deem just and proper.

[signature on following page]

Jamie Crooks*
D.C. Bar No. 156005
**FAIRMARK PARTNERS, LLP**
1825 7th St NW, #821
Washington, DC 20001
(617) 721-3587
jamie@fairmarklaw.com
*Pro Hac Vice* applications forthcoming

/s/ T. Brandon Waddell
T. Brandon Waddell
Ga. Bar No. 252639
Jarred A. Klorfein
Ga. Bar No. 562965
**CAPLAN COBB LLC**
75 Fourteenth Street, NE,
Suite 2700
Atlanta, Georgia 30309
(404) 596-5600
(404) 596-5604 (fax)
bwadell@caplancobb.com
jklorfein@caplancobb.com

*Counsel for Plaintiffs and the Putative Class*