# EXHIBIT A

2158

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made 12/16/16____, between PERDUE FOODS LLC, a Maryland limited liability company, of Salisbury, Maryland, hereafter referred to as PERDUE, and Roger D. Parker & Linda G. Parker dba Hazel Lee Farm___ of 897 Hwy. 24 East Milledgeville, GA 31061_____, hereafter referred to as PRODUCER. In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.

*ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.*

I.  **PERDUE AGREES:**

A.  To consign available birds to PRODUCER to be raised for PERDUE.

B.  To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned.

C.  To provide PRODUCER with an accounting of birds consigned and supplies provided under the terms of this Agreement.

D.  To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE," set forth in **Attachment A**.

E.  To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

II.  **PRODUCER AGREES:**

A.  To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm.

B.  To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

C.  To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned.

D.  To provide an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the alarm system in operable condition at all times.

E.  To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local laws, regulations and codes.

F.  To properly handle all used poultry litter in a manner meeting the requirements of federal, state and local laws, regulations and codes.

G.  To keep all records and other information required for the efficient and proper care of the birds consigned hereby including, but not limited to, records of mortality, water readings, generator logs and other audit requirements.

H.  To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds. Furthermore, PRODUCER and PRODUCER's employees will not maintain, own or care for any other flocks, birds or poultry on any other premises unless approved by PERDUE.

I.  To notify PERDUE Flock Advisor immediately (within 24 hours) if any birds, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

J.  To notify PERDUE Flock Advisor within 48 hours of any damage to PRODUCER's poultry houses or poultry house equipment caused by PERDUE.

K.  To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

L.  To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

M.  To be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.

N. To comply with any bio-security policies, audits, measures or guidelines required by PERDUE.

O. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the birds consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

P. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

Q. To adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock.

R. To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs.

## III.    OTHER TERMS

A. PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE.  Specifically, PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE. If PERDUE incurs any loss, cost, expense or damage arising out of or related to PRODUCER's violation of this section, including, but not limited to expense of destroying live birds and the expense of recalling processed poultry meat PRODUCER will reimburse PERDUE for such loss, cost ,expense or damage. Such damages may be offset against any payment due to PRODUCER by PERDUE.

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities.  If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock,

or this Agreement has been terminated in accordance with its terms, PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit. In such event, PERDUE will be entitled to damages as set forth in Section III(B).

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to assuring the proper health and welfare of the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes.

F. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

G. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any birds raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

H. PERDUE has a performance improvement program ("PIP") and PRODUCER is subject to the PIP as provided herein. The terms and the performance improvement guidelines of the PIP, including, without limitation, factors considered when placing PRODUCER in the PIP, factors considered in determining if and when the PRODUCER is removed from the PIP (and placed back in good standing), and when the Agreement will be terminated as a result of the PIP, are set forth in **Attachment B**.

I. PRODUCER understands and agrees that PERDUE will determine, in its sole and absolute discretion:

   a. the breed of chickens PRODUCER will receive;
   b. the number and density of chickens in each flock delivered to PRODUCER's farm;
   c. the size, weight and age of the chicken to be produced;
   d. the time for processing of each flock; and
   e. the date, time and estimated interval of placement for future flocks.

Notwithstanding the foregoing, if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock, PRODUCER shall notify the PERDUE Flock Advisor as set forth in Section II(1).

J.  PRODUCER acknowledges and agrees that this Agreement will be retained by PERDUE in electronic file format only.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS

A.  PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B.  PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

## V. TERM; TERMINATION

A.  For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B.  Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party. The parties further agree that once written notice of termination is provided, PERDUE shall not be required to deliver chicks to PRODUCER'S farm during the 90-day time period once a flock is removed from PRODUCER'S farm.

C.  Any termination as a result of a default by a party shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of



this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D.  This Agreement may be immediately terminated by PERDUE at any time upon written notice to PRODUCER for any of the following reasons:

    a.  PRODUCER abandons a flock or neglects to provide feed, water, proper house management or care, which abandonment, neglect or failure to provide care threatens the health and welfare or existence of a flock;

    b.  Death of PRODUCER;

    c.  PRODUCER uses abusive or threatening language to any PERDUE representative or threatens or causes physical harm to any PERDUE representative, or in any other way impedes or interferes with PERDUE representatives in the performance of their duties;

    d.  PRODUCER fails to comply with applicable federal, state or local laws, regulations or codes;

    e.  PRODUCER terminates its business as a producer for PERDUE;

    f.  PRODUCER transfers an ownership interest in its business without PERDUE's consent, has disposed of or attempted to dispose of a flock or attempts to encumber or mortgage a flock;

    g.  PRODUCER uses any feed, medications, vaccinations or other supplies other than those provided by PERDUE in violation of Sections II(C) and/or III(B);

    h.  PRODUCER becomes insolvent or has filed a voluntary petition for bankruptcy or an involuntary bankruptcy has been filed against PRODUCER, which petition has not been promptly discharged;

    i.  PRODUCER makes any public statements or comments regarding PERDUE or its brands that are false or defamatory;

    j.  PRODUCER's farm has been without chickens for more than one hundred eighty (180) days;

    k.  PRODUCER fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs;

    l.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks);

    m.  PRODUCER allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry; or

    n.  PRODUCER creating and/or contributing to a threatened and/or actual bio-security hazard.

E.  This Agreement may be immediately terminated by PRODUCER at any time upon written notice to PERDUE for any of the following reasons:

    a.  PERDUE uses abusive or threatening language towards any of PRODUCER's or threatens or causes physical harm to any of PRODUCER's representatives, or in any other way impedes or interferes with PRODUCER's representatives in the performance of their duties;

    b.  PERDUE fails to comply with applicable federal, state or local laws, regulations or codes related to the performance of this Agreement;

    c.  PERDUE makes any public statements or comments regarding PRODUCER that are false or defamatory; or

    d.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks).

F.  PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement. Notice of cancellation under this Section V(F) shall be given in writing by PRODUCER to PERDUE by certified mail, return receipt requested, which shall be posted before termination of the right to cancel under this Section V(F) to the following address:

    Perdue Foods LLC
    Attn: Live Production /Grow-out Management
    PO Box 1537
    Salisbury, MD 21802-1537

PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, then the Parties have exhausted Section VI's complaint resolution procedure. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B. The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

VII. **MISCELLANEOUS TERMS**

A. Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B. If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

C. **Prior Agreements/Entire Agreement/Release.** This Agreement supersedes, voids and nullifies any and all previous Poultry Producer Agreements and all other previous agreements governing the relationship between PRODUCER and PERDUE. *THE PRODUCER AND PERDUE HEREBY RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S), PERFORMANCE OR LACK THEREOF, AND/OR REPRESENTATIONS MADE BEFORE, DURING OR AFTER ENTERING INTO ANY PREVIOUS POULTRY PRODUCER AGREEMENT.* This Agreement, and any Attachments hereto, constitute the entire

agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. PRODUCER acknowledges that in entering into this Agreement and/or its Attachments, he/she has not relied upon any statements that are not contained in this document, and/or the Attachments hereto.

D.     **No Modification Except in Writing.** The parties agree that this Agreement and the Attachments hereto may not be modified except in writing signed by both PERDUE and PRODUCER.

E.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland except to the extent that doing so is prohibited. Any action or proceeding brought by either party hereto that is related to this Agreement shall be brought in the state or federal courts of the United States located in the county in which the PRODUCER'S farm is located.

F.     By executing this Agreement PRODUCER represents and warrants that he/she has read and acknowledged the terms of this Agreement and has been afforded the opportunity to consult with third-parties including, but not necessarily limited to, attorneys, financial advisors, and family, before entering into this Agreement and Attachments. By signing this Agreement, PRODUCER represents, warrants and agrees that he/she has made an informed decision with respect to the Agreements and Attachments hereto.

G.     An electronic copy of this Agreement (such as a PDF version), when signed by the PRODUCER and PERDUE, will be considered an "original" document for all purposes.

H.     This Agreement is personal to the PRODUCER and is not transferable or assignable by PRODUCER without the written consent of PERDUE. Should PRODUCER sell or lease an ownership interest in his or her business, this Agreement will automatically terminate, unless PERDUE has consented to the assignment of this Agreement, and PRODUCER will make no representation that PERDUE will continue to supply the new owner or lessee with flocks. PERDUE will be under no obligation to supply PRODUCER's successor(s), assign(s), lessee(s) or new owner(s) with flocks. PERDUE may require, as a condition of the approval of the transfer of PRODUCER's farm, by sale, lease or other assignment, that this Agreement is assigned and accepted by PRODUCER's transferee.

I.     Each party agrees that it will not make use of the Confidential Information except in the performance of this Agreement, and will not disclose any of the Confidential Information. Further, each party will take all necessary and appropriate measures to protect and maintain the Confidential Information disclosed to it. As used herein, "Confidential Information" shall mean any and all oral or written information relating to PERDUE's or PRODUCER's processes, methodologies, financial and cost

information, and other related information and data. Confidential Information shall not include (i) information which at the time of disclosure is in the public domain, and (ii) after disclosure becomes part of the public domain through no violation of this section, or (iii) is acquired by the receiving party from a third person, provided that the receiving party does not know or have reason to know that such information was acquired by such third person under an obligation of secrecy involving the disclosing party or (iv) information required to be disclosed by court order or by law, or (v) information independently developed by a party. These obligations shall survive the termination of this Agreement.

J.    If more than one person is identified as the PRODUCER, the obligations of each such person hereunder shall be joint and several.

K.    **Liability and Indemnity of PRODUCER.**  PRODUCER agrees to indemnify, defend, and hold PERDUE, its officers, employees, agents, and representatives harmless against any and all claims, damages, liabilities, losses, actions, and expenses, including injury to any employee of or to any property of PERDUE, proximately caused by negligent acts or omissions of PRODUCER or his agents, employees, sub-contractors or parties under its control, in the performance of PRODUCER's duties hereunder.  PRODUCER further agrees to indemnify, defend and hold PERDUE harmless from and against any and all losses, claims, damages, and actions, including federal, state, or local administrative actions, rulings and all other actions of any nature whatsoever which are in any manner caused by or which result from the presence of the birds on the premises of PRODUCER, including, but not necessarily limited to matters involving emission complaints, disposal complaints, or pollution complaints, violation of law, and any negligent acts or omissions of PRODUCER in the performance of its obligations under this Agreement.

L.    **Liability and Indemnity of PERDUE.**  PERDUE agrees to indemnify, defend, and hold harmless the PRODUCER from and against any claims, damages, liabilities, losses and expenses for personal injury or property damage (to property other than chicks or feed) proximately caused by negligent acts or omissions of PERDUE in the performance of its obligations under this Agreement.

M.    **THIRD PARTY PRODUCTS.  PERDUE PROVIDES ANY THIRD PARTY PRODUCTS, SUCH AS MEDICINES AND VACCINES, "AS IS" AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE EXTENT PROVIDED BY MANUFACTURER.**

N.    **Exclusion of Incidental, Consequential, and Certain Other Damages.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF**

<u>OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ATTACHMENTS.</u>

O.    <u>DISCLAIMER AND WAIVER OF EXTRAORDINARY CLAIMS. SUPPLIER AND PRODUCER MUTUALLY DISCLAIM AND WAIVE THE RIGHT TO PURSUE AGAINST ONE ANOTHER ANY CLASS ACTION CLAIMS OR CAUSES OF ACTION OF WHATEVER NATURE OR KIND. SUPPLIER AND PRODUCER AGREE THAT EACH WILL PURSUE ANY CLAIMS OR CAUSES OF ACTION AGAINST THE OTHER ON AN INDIVIDUAL BASIS, AND WILL NOT LEAD, JOIN, OR SERVE AS A MEMBER OF A CLASS OR GROUP OF PERSONS BRINGING SUCH A CLAIM OR CAUSES OF ACTION.</u>

P.    <u>Choice of Venue</u>.  Any and all litigation between the parties that may be brought, or arise out of, in connection with or by reason of this Agreement and/or its Attachments shall be decided solely and exclusively in the state or federal courts of the United States located in the county in which the farm is located.

**REVISED**

Q.  **JURY WAIVER. IF ANY MATTERS IN DISPUTE ARE TRIED, THEY WILL BE TRIED BY A JUDGE. THE PARTIES WAIVE TRIAL BY JURY AND CONFIM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FOODS LLC

By: _____ (Seal)
Director of Live Operations

WITNESS

_____ (Seal)
Producer

WITNESS

_____ (Seal)
Producer

## ATTACHMENT A

PRODUCER PAYMENT SCHEDULE
PERRY, GEORGIA STRAIGHT RUN BROILER PRODUCTION PROGRAM

Payment to PRODUCER for services rendered under the terms of the POULTRY PRODUCER AGREEMENT between PERDUE FOODS LLC and _____
Roger D. Parker & Linda G. Parker dba Hazel Lee Farm
_____ (PRODUCER) dated
_12/14/16_____ (the "Agreement") shall be determined as set forth herein and shall be applicable for the flocks of poultry moved from PRODUCER'S farm by PERDUE on or after **December 26, 2016**.

This Producer Payment Schedule shall remain in effect from the latest date set forth below unless otherwise terminated by either party in accordance with the Agreement. Any prior Producer Payment Schedules to the Agreement are null and void.

**A. PRODUCER PAYMENT FORMULAS**

    1. Performance Payment

| | | |
|---|---|---|
| Base Payment Rate        **(Base Rate per Pound  \$.0510)** | | \$_____ |
| (Plus) PRODUCER'S Adjusted Prime Cost Rating | + | \$_____ |
| (Equals) Total Performance Payment per Pound of Poultry Moved | = | \$_____ |
| (Times) PRODUCERS' Pounds of Poultry Moved | x | _____ |
| (Equals) Total Performance Payment | = | \$_____ |
| If Negative:  ENTER ZERO | | |

    2. Minimum Performance Payment

| | |
|---|---|
| Minimum Payment Rate      **(\$.0410 per Pound of Poultry Moved)** | \$_____ |
| (Times)  PRODUCERS' Pounds of Poultry Moved | \$_____ |
| (Equals) Minimum Payment per Pound of Poultry Moved | \$_____ |

    3. Housing Premium Payment

| | | | |
|---|---|---|---|
| Tier One Housing Square Footage _____ | X | \$.0000 per Sqft | = \$_____ |
| Tier Two Housing Square Footage _____ | X | \$.0157 per Sqft | = \$_____ |
| Tier Three Housing Square Footage _____ | X | \$.0275 per Sqft | = \$_____ |
| Tier Four Housing Square Footage _____ | X | \$.0375 per Sqft | =\$_____ |
| (Equals) Total Housing Premium Payment | | | = \$_____ |

    4. Heating Fuel Supplement Payment

| | | |
|---|---|---|
| Heating Fuel Supplemental Payment Rate. | | \$_____ |
| (Times) Heating Fuel Supplemental Payment Period Production Days. | x | _____ |
| (Equals) Total Heating Fuel Supplemental Payment per square foot. | = | \$_____ |
| (Times) Square Feet of PRODUCERS' poultry housing. | x | _____ |
| (Equals) Total Heating Fuel Supplemental Payment. | = | \$_____ |

    Heating Fuel Supplement Payment Rate:

\*   \$.00045 [per square foot of poultry housing] per Heating Fuel Supplemental Payment Period Production Day.

\*   NOTE: The Heating Fuel Supplemental Payment Period is November 1 through March 31.

## ATTACHMENT A-1

### PRODUCER PAYMENT SCHEDULE
### PERRY, GEORGIA SMALL STRAIGHT RUN BROILER PRODUCTION PROGRAM

Payment to PRODUCER for services rendered under the terms of the POULTRY PRODUCER AGREEMENT between PERDUE FOODS LLC (PERDUE) and
Roger D.Parker & Linda G. Parker dba Hazel Lee Farm _____ (PRODUCER) dated
_____ 12/16/16 _____ (the "Agreement") shall be determined as set forth herein and shall be applicable/for the flocks of poultry moved on PRODUCER'S farm by PERDUE on or after **December 26, 2016**.

This Producer Payment Schedule shall remain in effect from the latest date set forth below unless otherwise terminated by either party in accordance with the Agreement. Any prior Producer Payment Schedules to the Agreement are null and void.

### A. **PRODUCER PAYMENT FORMULAS**

1. Performance Payment
   Base Payment Rate          **(Base Rate per Pound $.0515)**                              $ _____
   (Plus) PRODUCER'S Adjusted Prime Cost Rating                                  +     $ _____
   (Equals) Total Performance Payment per Pound of Poultry Moved                 =     $ _____
   (Times) PRODUCERS' Pounds of Poultry Moved                                    x           _____
   (Equals) Total Performance Payment                                            =     $ _____
   If Negative:  ENTER ZERO

2. Minimum Performance Payment
   Minimum Payment Rate       **($.0415 per Pound of Poultry Moved)**                     $ _____
   (Times)  PRODUCERS' Pounds of Poultry Moved                                          $ _____
   (Equals) Minimum Payment per Pound of Poultry Moved                                  $ _____

3. Housing Premium Payment
   Tier One Housing Square Footage _____ X  $.0000 per Sqft       = $ _____
   Tier Two Housing Square Footage _____ X  $.0157 per Sqft       = $ _____
   Tier Three Housing Square Footage _____ X  $.0275 per Sqft     = $ _____
   Tier Four Housing Square Footage _____ X $.0375 per Sqft       = $ _____
   (Equals) Total Housing Premium Payment                            = $ _____

4. Heating Fuel Supplement Payment
   Heating Fuel Supplemental Payment Rate.                                          $ _____
   (Times) Heating Fuel Supplemental Payment Period Production Days.          x           _____
   (Equals) Total Heating Fuel Supplemental Payment per square foot.          =     $ _____
   (Times) Square Feet of PRODUCERS' poultry housing.                         x           _____
   (Equals) Total Heating Fuel Supplemental Payment.                          =     $ _____

   Heating Fuel Supplement Payment Rate:
   * $.00045 [per square foot of poultry housing] per Heating Fuel Supplemental Payment Period Production Day.
   * NOTE: The Heating Fuel Supplemental Payment Period is November 1 through March 31.



## ATTACHMENT B

### PERFORMANCE IMPROVEMENT PROGRAM

The Producer is subject to the following requirements:

1.  Producer may be placed under the Performance Improvement Program ("PIP") if Producer's flocks fail to achieve Company's minimum standards of competitiveness.

2.  For purposes of evaluating Producer competitiveness, Company will use the average of the Producer's Adjusted Prime Cost ("APC") calculation from the Producer's last six (6) consecutive flocks (the "Six Flock Average"). For purposes of clarification a Six Flock Average is determined before a Producer settles six (6) consecutive flocks. Specifically a Producer must have settled a minimum of three (3) consecutive flocks before a Six Flock Average is calculated and the Six Flock Average calculation is based on the average of the Producer's APC for such three (3) consecutive flocks. Thereafter, and until the Producer settles its sixth flock, an additional flock will be added to the calculation of the Six Flock Average. After the Producer reaches six (6) settled flocks, and thereafter, the Six Flock Average will be calculated based on Producer's last six (6) consecutive flocks.

3.  When a Producer settles a flock and as a result reaches a Six Flock Average of a -0.0050 or worse (lower), the Producer will be placed in the PIP and be given a performance notice regarding Producer's placement into the PIP. Performance notices will be provided by Perdue's Grow Out staff at a meeting with the Producer and explaining Producer's current APC cost. Such meeting is an opportunity for the Producer in discussion with Perdue Grow Out to identify necessary actions for future flocks that may help to improve Producer's cost and flock performance and therefore may assist Producer in being removed from the PIP. These recommendations may include, if appropriate, new or upgraded equipment and other matters which may improve performance. After the meeting the Grow-out Manager and/or Live Production Manager will follow up with a certified letter to the Producer confirming Producer's placement into the PIP.

4.  When a Producer settles a flock and as a result reaches a Six Flock Average of -0.0075 or worse (lower), the Producer will receive notice by certified letter stating that the Producer must meet one or more of the following criteria in order to maintain a Poultry Producer Agreement with Perdue:

    a.  Settle the notice flock with an APC of -0.0025 or better (greater);

    b.  Settle the notice flock so as to improve the Six Flock Average to better (greater) than a -0.0075; or

    c.  Settle the notice flock so that at least three (3) of the flocks within Producer's Six Flock Average settled with an APC of zero or better (greater).

5.    Producer will be subject to termination if Producer fails to meet one or more of the criteria set forth in Paragraph 4 above. All settlements, records, and communications will be reviewed by the Director of Live Operations for the applicable complex before the Agreement is terminated pursuant to the PIP.

6.    Producer will be removed from the PIP when Producer settles a flock and as a result reaches a Six Flock Average better (greater) than -0.0050.

7.    Factors that are considered to be beyond the Producer's control may be reviewed and may not be considered when calculating a Producer's Six Flock Average standing with Perdue. Notwithstanding, any Producer that had a preventable disaster will be held accountable for the flock cost in the Six Flock Average calculation. In addition, and notwithstanding anything to the contrary in the Agreement or the PIP, a certified letter will be sent stating that if another preventable disaster occurs on the Producer's farm within 12 months of the above-referenced preventable disaster, the Poultry Producer Agreement will be terminated.