# Exhibit 3

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
2                    MACON DIVISION

3

4    ROGER PARKER on his own
     behalf and on behalf of
5    all others similarly
     situated,                    CIVIL ACTION FILE
6
              Plaintiffs,      NO. 5:22-cv-00268-TES
7
     vs.
8

9    PERDUE FOODS, LLC,

10            Defendants.

11          VIDEO 30(b)(6) DEPOSITION OF

12                PERDUE FOODS, LLC

13            MICHAEL KEITH LEVINGOOD

14

15             November 14, 2023

16                 9:02 a.m.

17

18                Suite 4800

19           191 Peachtree Street, N.E.
                 Atlanta, Georgia

20

21         Tracy A. Warner, B-2168, RPR

22

23         David Ramirez, Videographer

24

25

Page 16

1      Q.    So let's talk about that.  You said east

2   coast farms, you use this agreement with all growers

3   for the east coast farms?

4      A.    Yes.

5      Q.    And then you listed, I think, two other

6   areas.  Could you say those one more time?

7      A.    Yeah, Draper Valley Farms.  It's in

8   Washington State.

9      Q.    And the other?

10     A.    Petaluma Poultry.  It's in California.

11     Q.    So aside from Draper Valley Farms and

12  Peddelton Poultry?

13     A.    Petaluma Poultry.

14     Q.    -- Petaluma Poultry, Perdue uses this

15  agreement with all growers outside of those two

16  contacts?

17     A.    This, along with other documents.

18     Q.    Right.  But this is one of the documents

19  that it uses with all growers outside Draper Valley

20  and Petaluma Poultry?

21     A.    Yes.

22     Q.    You said east coast farms.  So that's

23  everywhere else outside of, I think, Washington and

24  California, those two --

25     A.    The majority of our farms are all on the

1    east coast.  When I say "east coast," east of the

2    Mississippi.  Does that help.

3        Q.    That's helpful.  I just wanted to make

4    sure I was understanding the, kind of, universe of

5    what we're talking about.

6              And how many farmers are in Draper Valley?

7        A.    I'm going to guess, estimate, less than

8    20, between 15 and 20.

9        Q.    And Petaluma Poultry?

10             MS. SANTEN:  Real fast, I'm just going to

11       note you can respond in your individual

12       capacity.

13             I think this level of detail goes beyond

14       the scope of the notice, but he can certainly

15       provide a response in his individual capacity.

16             MR. KLORFEIN:  Well, Maggie, I think that

17       if you look back to the notice, one of the

18       topics is "standard or exemplar contracts used

19       with broiler chicken growers."

20             And then 4 is:  the general types of

21       individualized variations that might affect the

22       ways in which generally-applicable policies

23       growers may be implemented.

24             So if I think -- you know, I think I'm

25       entitled to understand which growers use this

Case 5:22-cv-00268-TES   Document 52-4   Filed 12/06/23   Page 5 of 24
30(b)(6) Michael Keith Levingood          November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 19

1       can certainly provide -- he can certainly

2       provide his best guesstimate.

3               MR. KLORFEIN:  Your objection is noted.

4  BY MR. KLORFEIN:

5       Q.    Same question as to Pendulum Poultry

6  [sic], the number of growers operating for that.

7       A.    It's three or less.

8       Q.    And the number of growers that would be

9  subject to this agreement?

10      A.    It's probably -- I don't know the exact

11  number because it changes.  It could be 1300.

12      Q.    So turning to the agreement -- and

13  throughout the day, I'm probably going to be

14  referring to what I refer to as Bates numbers.  If

15  you look at the bottom left-hand corner of the

16  screen, that first page, this document begins at

17  Perdue 001627.

18              Do you see that?

19      A.    Yes.

20      Q.    And for the record, it continues through

21  1639.  But sticking on page Bates 1627, at the very

22  bottom of that screen, it says "June 2016."

23              THE WITNESS:  Can you make this bigger?

24              THE VIDEOGRAPHER:  There should be an

25      option there --

Page 20

1            MS. SANTEN:  If you go to the -- see the

2       100 percent and you click the down arrow there,

3       you should be able to maximize it that way.

4            THE VIDEOGRAPHER:  I can go off the

5       record.

6            THE WITNESS:  It's just really small.  If

7       you want me to read it, I need to be able to see

8       it.

9            THE COURT REPORTER:  Yeah, you just press

10      the little --

11           THE WITNESS:  Okay.  Thank you.

12           So what was your question again?

13  BY MR. KLORFEIN:

14      Q.    Sure.  First, do you see that June 2016 at

15  the very bottom?

16      A.    Yes.

17      Q.    Was this -- is this the agreement that was

18  implemented beginning in June 2016?

19      A.    Yes.

20      Q.    And is it still the operating agreement?

21      A.    I believe so.

22      Q.    And from June 2016 through the present,

23  has this remained the operating agreement that Perdue

24  uses with the growers on the east coast?

25      A.    It's the attachments that change all the

Page 21

1    time.

2        Q.    And I appreciate that answer, and I would

3    like to talk about those attachments.  But before we

4    get to the attachments, this agreement itself, which

5    ranges 1627 -- and please take a look through --

6        A.    It generally -- we don't change this very

7    often.

8        Q.    And I appreciate that answer.  I just --

9    can I get my question out first?  I know I paused.

10   But 1627 through 1639, before you get to the

11   attachments, this agreement is the same agreement

12   that y'all have been using -- that Perdue has been

13   using from June 2016 to the present?

14       A.    To the best of my knowledge, yes.

15       Q.    I appreciate that.  But as Perdue's

16   corporate representative regarding this contract, is

17   this the agreement that Perdue has used from June

18   2016 to the present?

19       A.    Yes.

20       Q.    And you referenced attachments changing

21   frequently.  How frequently would attachments change?

22       A.    They can change all the time.  They're the

23   pay schedules, and there's multiple pay schedules for

24   every location based on multiple factors:  bird

25   weight, bird age.  So they're all tied to the plant,

Page 26

1   within 2019, like an earlier agreement that was

2   still --

3        A.    Say that again.

4        Q.    Sure.  Are there any earlier agreements

5   with growers --

6        A.    Earlier when?

7        Q.    Pre-2016.

8        A.    I would need to see them.

9        Q.    Let me just finish my question.

10            Are there any earlier agreements pre-2016

11   that would have still been enforced in 2019?

12       A.    No.  This is the new agreement.

13       Q.    Right.  But did all growers re-sign in

14   June 2016 if they had an earlier agreement?

15       A.    Yes.

16       Q.    And this agreement, the one that's in

17   front of you, the June 2016, the present agreement,

18   growers who receive a variety of different types of

19   flocks would still be operating under this agreement?

20            MS. SANTEN:  Objection, vague.

21            THE WITNESS:  Everybody signs this

22        agreement, okay?  And then everybody signs an

23        attachment which is part of this agreement on

24        what they're going to get paid.  So what changes

25        is the payment agreements can change all the

30(b)(6) Michael Keith Levingood                November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 27

1        time.  This is still in place since 2016.

2   BY MR. KLORFEIN:

3        Q.    Got it.  So large broilers, small

4   broilers, they're all under that agreement, plus the

5   attachment?

6        A.    All 1300 farmers are under this agreement.

7             (Plaintiffs' Exhibit 3 was marked for

8             identification.)

9   BY MR. KLORFEIN:

10       Q.    It will take a moment to get on your

11  screen, but if you wouldn't mind refreshing, I have

12  marked Plaintiffs' Exhibit 3, which is Perdue 3458

13  through 3657.  Do you see it on your screen?

14       A.    No.  I see the document, but I don't see

15  that number -- oh --

16       Q.    The first page does not have the Bates

17  stamp on it, but if you turn to the second page --

18       A.    You didn't -- you didn't ask that.

19             MS. SANTEN:  Counsel, this document, you

20        have to scroll left and right and up and down to

21        see.  I'll leave to it the witness, but it's

22        difficult for me to follow electronically.

23        Could we possibly get paper copies of this one

24        to review?

25             MR. KLORFEIN:  If you want to go off the

30(b)(6) Michael Keith Levingood                November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 45

1    BY MR. KLORFEIN:

2         Q.    We've turned back to Plaintiff's

3    Exhibit 3.  We now have a paper copy right in front

4    of you, if you wouldn't mind taking a moment to

5    review it.

6              But, again, my first question is:  Do you

7    recognize the document?

8         A.    Yes.

9         Q.    What is it?

10        A.    It's the Poultry Care Process Verified

11   Program.  Want me to explain?

12        Q.    That would be very helpful, please.

13             THE VIDEOGRAPHER:  One moment, please.

14        Let me go off the record.

15             The time is 10:13 a.m.  We are off video

16        record.

17             (Off-the-record discussion.)

18             THE VIDEOGRAPHER:  The time is 10:14 a.m.

19        We are back on video record.

20   BY MR. KLORFEIN:

21        Q.    Right before we went off the record, I

22   believe you were about to explain what the Poultry

23   Care Process Verified Program was.

24        A.    Okay.  So the process verified program is

25   actually a USDA program.  So the best way I always

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 46

1  explain it to people is if you go into a restaurant

2  and you see the health score in a restaurant, that's

3  USDA -- it's called AMS also -- they actually perform

4  those audits in a restaurant and give them a health

5  score, okay?

6            So those same auditors, that department,

7  if you give them an audit instrument and you say,

8  here's our -- for this one, our poultry care program,

9  they will then come and audit it.  And on their

10 website, they'll go, it's a process verified program

11 audited by USDA.  So this is a USDA third-party

12 audited animal care program for Perdue.

13     Q.    And rather than repeatedly referring to

14 the program, can I refer to it as PVP?  Is that how

15 you --

16     A.    That's how we actually say it, so you're

17 catching on.

18     Q.    So this PVP, you said you submit to -- I

19 think you said USDA?

20     A.    Yes.

21     Q.    And then they audit this PVP?

22     A.    Yes.

23     Q.    And sign it off and say, this is

24 audited -- and you can then say it's audited?

25     A.    Yes.  It's also PAACO-verified, which

Page 47

1    means that's a group that will -- it's not poultry.

2    I forget the actual name of it, but you can look at

3    it.  It's PAACO.  So they certify audits to mean it

4    actually meets industry animal care standards.  And

5    this was the very first one.  This is the very first

6    broiler process -- this was the very first poultry

7    care program that PAACO certified.

8         Q.    Gotcha.  And on that first page, it says

9    "Version 10/9/23"?

10        A.    Yes.

11        Q.    So previous versions were issued; is that

12   accurate?

13        A.    Yes.  If you turn to the first page, we

14   list all the times that there was adjustments to it.

15        Q.    That's on -- beginning Bates 3459?

16        A.    Yes, sir.  And it goes all the way back

17   to -- you can see that the -- if you go to

18   Bates 3460, the very first one was 3/1/11.  So that

19   was -- since then, all those line items are

20   adjustments to the program.

21        Q.    Understood.  So the PVP has been in place

22   in some form or fashion since March 1, 2011?

23        A.    Yes, sir.

24        Q.    And all the changes to the PVP are

25   memorialized in these notations?

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 48

1      A.     Yes.

2      Q.     But I think you said only the most recent

3  version of the PVP has been signed off on by that

4  organization?

5      A.     No.  The whole thing has been signed off.

6  It gets signed off every year.  So they look at it

7  every year.  So when it was first signed off every

8  year, PAACO keeps saying, yep, they get a check box,

9  and USDA audit uses this instrument to audit us.

10      Q.     Gotcha.  And when I say "you are

11  submitting to USDA," I'm referring to Perdue.  Can we

12  have that understanding?

13      A.     Yes, sir.

14      Q.     And although the USDA certifies this is

15  audited, Perdue is the one drafting the words in this

16  PVP?

17      A.     Yes, plus the NCC Broiler Welfare

18  Guidelines are our base.  So we use the National

19  Chicken Council Broiler Welfare Guidelines as a base.

20  And then an example would be lighting.  And the

21  lighting, we do a little more than the NCC

22  guidelines.  So this program is a little stricter on

23  lighting than, say, NCC.  But the base of this

24  program is National Chicken Council Broiler Welfare

25  Guidelines.  And they change every couple of years,

Page 49

1    so some of the changes would be because NCC changed

2    their requirements.

3        Q.    Understood.  So the NCC would maybe set a

4    floor for certain guidelines?

5        A.    Absolutely.

6        Q.    And Perdue would say, we want to be a

7    little bit higher than that, so our guidelines are

8    above that?

9        A.    Yes.

10       Q.    If you turn to Bates 3468.

11       A.    (Witness complies.)

12       Q.    See the table of contents on the far

13   left-hand side, and below that there are a list of

14   locations with alphanumeric numbers to the right of

15   them?

16       A.    Yes.

17       Q.    What are those locations?

18       A.    They are harvest plants.

19       Q.    And does the PVP apply to all the growers

20   that feed into these harvest plants?

21       A.    Yes.

22       Q.    And are these all of the harvest plants

23   that Perdue maintains?

24       A.    For broilers, yes.

25       Q.    And for other chicks?

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 50

1          A.      Turkeys.

2          Q.      Thank you for that clarification.

3                  So with chicken or boilers, this is all

4    harvesting plants.  So the PVP applies to all

5    broilers?

6          A.      Yes.

7          Q.      All growers who maintain broilers?

8          A.      Yes.

9          Q.      Going back to that edit on the second page

10   of the document, I believe it's Bates 3459, that

11   catalog of revisions.

12         A.      Okay.

13         Q.      And then 3460, which is the page that

14   follows that, there's a reviser listed on the

15   right-hand corner, and it has David Shapiro?

16         A.      Yes.

17         Q.      Who is David Shapiro?

18         A.      He was our company veterinarian.  He's no

19   longer with us.

20         Q.      But if you scroll down to Bates 3463 and

21   then 64 -- other direction -- it was David Shapiro

22   going downwards until it hits Rita Harkless?

23         A.      Correct.

24         Q.      She's the veterinarian that took over?

25         A.      She's not a veterinarian, but she is the

Page 64

1    the farmers.  They could witness somebody coming on

2    their farm for abuse.

3              We want them to understand what does abuse

4    mean.  We explain that to them.  We don't want them

5    to abuse it, and most likely, they're not going to

6    abuse it because it's their income.  So why would

7    they abuse the birds if it's their income?  But

8    there's other people coming on their farm, and they

9    should be the ones to let us know if they see

10   somebody because, guess what, they're there all the

11   time; we're not.  It's their farm, their property.

12   We don't know who's coming on the farm.  So that's

13   why it's a reminder.  It's educational.

14        Q.    And a couple of things on that answer that

15   I want to follow up on.  What do you -- what does

16   Perdue say a flock advisor's role is?

17        A.    A flock advisor's role, they're the

18   liaison to the company for that farmer.  They are

19   assigned X number of houses, X number of farmers.  So

20   they meet with them all the time and -- not all the

21   time.  Generally, they're scheduled once a week.

22   About an hour a week is all they're on the farm.

23              And they're there to -- they see a lot

24   more chickens than a farmer does, so they can answer

25   the farmer's questions.  If a farmer is concerned

Page 65

1    about this flock's health help, they can help them

2    with the health.  If this flocker -- if this farmer

3    is concerned about -- really struggling with

4    ventilation, it's really cold out, it's wet and damp,

5    I'm really struggling, the flock advisor can provide

6    knowledge of, hey, well, I have some suggestions to

7    help.

8              So a flock advisor provides suggestions to

9    help the farmer better raise the birds to make them

10   more money.

11        Q.    And a flock advisor inspects the houses,

12   right?

13              MS. SANTEN:  Objection, vague.

14              THE WITNESS:  The flock advisor has

15        certain things they look at that would maybe

16        help them with their performance.  That's all.

17        The farmers own the houses; we don't.

18   BY MR. KLORFEIN:

19        Q.    Understood.  But the flock advisor will

20   look at the grower's houses, right?

21        A.    Not the houses.  Generally, they're going

22   to look at the birds.

23        Q.    Okay.  The flock advisor will inspect the

24   birds?

25        A.    The flock advisor will observe the birds

Page 158

```
 1              (Plaintiffs' Exhibit 12 was marked for

 2        identification.)

 3   BY MR. KLORFEIN:

 4        Q.    All right.  Let me introduce -- there's

 5   not going to be a stamp on this because this is a

 6   PowerPoint, and for some reason, it does not allow me

 7   to add Plaintiffs' Exhibit 12 to this document.

 8        A.    So refresh?  You want me to refresh?

 9        Q.    Yes, please.

10        A.    So this is 12.  You got it.

11        Q.    Let me know when you've got it.

12        A.    I've got it.

13        Q.    Do you recognize this document?

14        A.    Yes.

15        Q.    What is it?

16        A.    It's an educational presentation to

17   explain our settlement process.

18        Q.    Does this apply to all growers?

19        A.    This would apply to all growers that are

20   on a competitive contract.  It would also apply to

21   growers that are on a flat-base contract, so, yes.

22        Q.    So it applies to all growers?

23        A.    Yes.  I just had to think through the

24   process, if that's okay.

25        Q.    Totally fair.  I just wanted to make sure
```

Page 160

1    website.  About 30 percent won't give us their e-mail

2    address because it's their individual e-mail address,

3    it's their individual farm, and they don't want us to

4    have it.  And we're okay with that.

5         Q.    Recognizing that not all farmers view this

6    as we've just discussed, the process that it

7    describes applies to all farmers, right?

8         A.    Yes.  It's how we pay farmers.

9              (Plaintiffs' Exhibit 13 was marked for

10        identification.)

11   BY MR. KLORFEIN:

12        Q.    All right.  You should see, when you

13   refresh your browser, Plaintiffs' Exhibit 13, which

14   is Bates Perdue 1395.  Let me know when you have it

15   up.

16        A.    It's up.

17        Q.    Do you recognize this document?

18        A.    Yes.

19        Q.    What is it?

20        A.    It's the farm visitor log.

21        Q.    And what does the farm visitor log

22   provided to do?

23        A.    So if we tie some things together, we said

24   we're going to put a mailbox on every farm.  So that

25   mailbox also has a sign on it that says "Biosecurity

30(b)(6) Michael  Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 172



30(b)(6) Michael Keith Levingood                     November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 173



30(b)(6) Michael  Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 174

30(b)(6) Michael  Keith Levingood
Parker, Roger v. Perdue Foods, LLC

November 14, 2023

Page 175



30(b)(6) Michael Keith Levingood
Parker, Roger v. Perdue Foods, LLC
November 14, 2023

Page 176