**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

ROGER PARKER, on his own behalf and on
behalf of others similarly situated,

           Plaintiff,

v.

PERDUE FOODS, LLC,

           Defendant.

CIVIL ACTION
NO. 5:22-CV-00268-TES

---

**DEFENDANT PERDUE FOODS, LLC ("PERDUE")'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION**

**I.**     **INTRODUCTION**

Plaintiff Roger Parker ("Plaintiff" or "Parker"), a former independent grower for Perdue who left several years ago now, alleges he and all other growers nationwide were misclassified as independent contractors ("IC") under the Fair Labor Standards Act ("FLSA") and denied overtime. In his Motion, he asks the Court to conditionally certify and send notice of his lawsuit to over 1,340 other independent growers across the country. Plaintiff makes this overly-broad ask based on: (1) his "belief that other growers . . . would be interested in joining"; (2) a showing of interest from one lone opt-in plaintiff (Barbara Tripp), whose claims are currently subject to a motion to dismiss, and her self-serving, conclusory declaration that is a carbon-copy image of his; and (3) conclusory allegations that all growers are bound by the same policies that exercise control in uniform ways, while admitting he doesn't have any personal knowledge to support this either way.

This type of "evidence" has been repeatedly rejected in this Circuit as being sufficient to send any notice—let alone the nationwide notice Plaintiff seeks here. Plaintiff's meager showing of interest from one opt-in is particularly weak given that this case has been pending for 18 months,

the lawsuit has been widely publicized on the internet, and Plaintiff himself has spoken to several other growers about the lawsuit yet none of them expressed any interest in joining. Even Plaintiff's own son, who is an active grower, has not joined.

Moreover, Plaintiff offers no explanation for how the highly-individualized inquiries involved in the economic realities test governing his IC misclassification claims can be adjudicated collectively with "representative proof" applicable to all 1,340 plus growers at once. And to be clear, these types of highly-individualized, fact-intensive claims cannot. Mere citation to a common IC agreement and common policies to show all growers nationwide are "similarly situated" is not sufficient at this juncture, particularly when both Plaintiff and Tripp disclaimed any personal knowledge of how these policies were *actually applied* to other growers *in practice*. Plaintiff claims this is enough for nationwide notice under a lenient standard. But in this Circuit, the lenient standard "disappears" and a heightened, more-stringent standard applies when—as here— the Parties have conducted months of targeted conditional certification discovery beforehand.

In sum, sending notice to over 1,340 growers nationwide given the underlying circumstances here would serve no purpose other than as an improper and unwarranted solicitation for a long-pending lawsuit that has garnered next to no interest on its own. Conditional certification cannot be used for such purposes, and Plaintiff's Motion should be denied accordingly.

## II.    FACTUAL BACKGROUND[1]

### A.    The Parties

Perdue is a poultry producer with eleven different complexes or plants throughout the country in nine different states. (Levengood Decl. ¶ 5).[2] Within this integrated operation, Perdue owns hatcheries and breeding flocks and delivers its chicks to independent growers across the United States who are then responsible for raising the chickens to the desired weight on their own farms. These growers provide the land, facilities, equipment and labor to raise the chicks, using their discretion on how to do so given their experience in the industry and knowledge base. (Levengood Decl. ¶ 6). From July 2019 to the present, Perdue has contracted with approximately 1,345 different growers across the country who raised different types of chickens (both organic and non-organic) of different sizes under different agreements, payment schedules, and management practices, discussed below. (Levengood Decl. ¶¶ 7-13; Levengood Dep. 21:20-23:7, 26:16-27:1). Of these, approximately 121 growers supported the Perry, GA complex and approximately 243 supported the Lewiston, NC complex. (Levengood Decl. ¶ 13).[3]

Parker first entered the business of poultry farming in the 1980s and contracted with Perdue as an independent grower on August 18, 2009, operating a farm with his wife and business partner in Hillsboro, Georgia. (Parker Dep. 57:4-14; *id.* Ex. 2). Parker understood that he would be operating as a sole proprietor during this time (Parker Dep. 70:16-19) and made significant investments in his business, all of which he deducted as business expenses on his tax returns. (*Id.*

---

[1] In support of this Response, Perdue submits Ex. A, excerpts from the deposition of Defendant's Rule 30(b)(6) witness Michael Levengood and corresponding exhibits ("Levengood Dep."); Ex. B, excerpts from the deposition of named Plaintiff Parker  and corresponding exhibits ("Parker Dep."); Ex. C, excerpts from the deposition of opt-in Plaintiff Barbara Tripp ("Tripp Dep.") and corresponding exhibits; Ex. D, Declaration of Margaret Santen ("Santen Decl."); Ex. E, Declaration of Marie Reed ("Reed Decl."); Ex. F, Declaration of Michael Levengood ("Levengood Decl.").
[2] This includes plants in Maryland, Delaware, North Carolina, South Carolina, Kentucky, Georgia, Virginia, Washington, and California. (Levengood Decl. ¶ 5).
[3] Parker supported the Perry, GA complex and Tripp supported the Lewiston, NC complex.

126:3-128:2, 132:14-19, 133:6-134:8, Exs. 11-12). Five years later, Parker and his wife expanded their farming business and took on the operation of an additional farm in Milledgeville, Georgia. (Parker Dep. Ex. 3, 4). While Parker and his wife ran both growing operations under their business "Hazel Lee Farm," Parker also ran an outside business — "Parker Poultry Machine and Equipment Business"— separately from his farm. (Parker Dep. 143:7-13).[4] When operating his farm business, Parker determined the hours he worked (*id.* 160:14-17) and hired multiple employees to assist him with various tasks, including 4-5 employees at a time on placement day, deducting close to $30,000 in labor costs for amounts paid to them in one year alone. (*Id.* at 129:16-131:15, 132:14-19, 145:13-146:11, 147:10-149:18, 150:5-20, 151:21-154:11, 156:8-23). Parker even hired an employee to work and run one of his farms for him because he could not run them both at once. (*Id.* at 147:23-148:14). Parker operated the Hillsboro location until approximately 2018 or 2019, when Parker's son Simon leased the farm and took over the growing operations. Soon thereafter, in 2019, Parker's contract with Perdue for his Milledgeville location was terminated. (*Id.* 148:6-23; 48:14-16).

The lone opt-in, Tripp,[5] first contracted with Perdue as an independent grower in 1999 when she and her husband took over her in-laws' farming operations. (Tripp Dep.58:4-13). Tripp understood she would be an IC under her grower agreement and that she would be responsible for making significant capital investments in her business. (*Id.* 62:2-13; 100:13-101:11). Tripp has only contracted with Perdue in Bertie County, North Carolina. (*Id.* 63:10-25). Tripp admitted she has never spoken with any growers outside of Bertie County and has "no idea" what happens anywhere else. (*Id.* 30:18-31:7). Like Parker, Tripp also hired various employees to assist her with her business, admitting she did not need Perdue's approval beforehand. (*Id.* 41:3-11, 86:8-90:7). In 2021, Tripp participated in a voluntary buyout program, whereby Perdue paid her over $48,000

---

[4] During the time Parker was a grower, he also operated an outside construction business. (Parker Dep. 26:16-19).
[5] Tripp filed her Consent in July of 2023. (ECF 48-1). Her claims are subject to a Motion to Dismiss. (ECF 58).

to cease her farming operations. (Tripp Dep. 49:2-24; *id.* 55:11-23; *id.* Ex. 3). Since that time, Tripp has been working as an employee of another grower, Corris Jenkins, who operates his farm almost exclusively through employees he hires.[6] (*Id.* 11:15-13:3).

**B.**    **Procedural Background, Including Extensive Conditional Certification Discovery and Publicity For and Advertising of This Lawsuit**

On July 22, 2022, Plaintiff filed the instant lawsuit contending he was misclassified as an IC and purporting to bring claims on behalf of himself and all other "similarly situated" growers across the country. (ECF 1). After that time, and pursuant to the Scheduling Order the Parties agreed to, the Parties engaged in six months of targeted discovery on conditional certification issues,[7] including extensive written discovery, a 30(b)(6) deposition, and depositions of Plaintiff and Tripp. (ECF 38).[8] On December 6, 2023, Plaintiff filed the instant Motion asking the Court to conditionally certify and send notice of this lawsuit to all current and former growers who operated under a Poultry Producer Agreement ("PPA") with Perdue from three years prior to the date the Court conditionally certifies this action to the present. (ECF 52-1, p.1). The diverse group Parker seeks to represent includes at least 1,345 IC growers nationwide who operated their businesses very differently, for 11 different complexes, under different management with different practices, and under different pay schedules that varied over time, by location, and type of bird they grew.

---

[6] Since January of 2023, Mr. Jenkins has outsourced the poultry farm operations to Mr. Mizell and his son, who operate the farm on a full-time basis. (Tripp Dep. 12:3-14:1). Tripp assists with these operations as well. (*Id.* 11:15-25).

[7] The Parties agreed to two phases of discovery. (ECF 38). Phase I discovery included: (1) standard or exemplar contracts used with growers and general job duties of broiler chicken growers during the relevant time period; (2) general policies and procedures used with broiler chicken growers . . . pertaining to time-keeping, compensation, bonuses, and any other payments or deductions; (3) general policies and procedure relating to inputs . . . , instructions and rules for broiler chicken growers; (4) any other generally-applicable policies and procedures relating to broiler chicken growers . . . ; (5) Plaintiff's file and the files of any opt-in Plaintiffs . . . ; (6) Plaintiff's knowledge of whether "similarly situated" individuals exist who wish to opt in; and (7) general types of individualized variations that might affect the ways in which Perdue's policies and procedures . . . were implemented . . . (ECF 45 at 4). The 30(b)(6) deposition, through four separate topics, covered Categories (1)-(4) and (7) above. Phase II discovery focuses on the merits and other issues after the Court's decision on conditional certification. (*Id.* at 5).

[8] The Parties initially agreed to four months of conditional certification discovery but extended that by two months after Tripp filed her opt-in consent form in July of 2023. (ECF 50).

(Levengood Decl. ¶¶ 7-9, 13). In fact, as discussed below, approximately 15% of these growers hired employees to do all or most of the work for them and raise their chickens. (*Id.* ¶¶ 14-15).

In the 18 months since Plaintiff filed his Complaint, the lawsuit has been widely publicized on multiple different internet websites. (*See* Reed Decl. ¶¶ 6-11). A public interest group, Rural Advancement Foundation International-USA ("RAFI-USA"), also took interest and has called at least one grower (Tripp) to garner interest after Plaintiff's counsel informed them the lawsuit had been filed. (Santen Decl. ¶¶ 4-5, Att. 1). Tripp, the **only grower** to join and submit a declaration in support of Plaintiff's Motion, joined after receiving this call. (Tripp Dep. 19:21-22:6).

### C.    The Diverse Group of Growers Plaintiff Seeks to Represent

Plaintiff contends conditional certification and nationwide notice to growers across the country is appropriate because all growers are subject to "uniform policies and practices" (ECF 52-1, at 3). But the evidence he largely omits paints a much different picture—and one that confirms collective treatment of these individualized claims is wholly improper.

### 1.    Growers Are Subject to Different Agreements, Pay Schedules, and Compensation Provisions.

The relationship between growers and Perdue is generally set forth in: (1) a base agreement; and (2) the attached Payment Schedules. (Levengood Dep. 20:17-23:7, 26:16-27:1).

Growers sign a different base agreement depending on the type of bird they grow. (*Id*). Growers of organic birds, who support the Petaluma, Draper Valley, and Milford complexes, sign one or two forms of a base agreement.[9] Growers of non-organic birds sign another form agreement altogether.[10] The agreements, referred to as PPAs, contain numerous indicia of IC status and provide that the relationship with the growers will be one of IC. (Parker Dep., 87:17-88:8, Ex. 4,

---

[9] Growers of organic birds are also subject to markedly different policies, audits, and certification requirements necessary to grow organic chickens. (Levengood Dep. 82:14-84:2, 173:16-18; Levengood Decl. ¶ 9).
[10] During the relevant time period, there were two different form PPAs used. (Levengood Dep. 187:3-189:18).

p. 5, Section IV). Under the PPAs, Perdue agrees to consign chicks and provide feed, fuel, medications and other supplies to the growers. (Parker Dep., Ex. 4, p. 1, Section I). Growers then agree to raise the chicks, providing "necessary housing, equipment and supplies," among other things. (*Id.*, pp. 1-5, Sections II and III). In doing so, they remain "exclusively responsible for the performance of [their] obligations," including how they care for the consigned chicks. (Parker Dep., Ex. 4, p. 5, Section IV). As Parker explained, while the IC agreements generally outlined the terms of his agreement with Perdue, the actual obligations of running the growing operations regularly changed and the work done every day was different for each of his farms. (Parker Dep. 89:18-90:6, 158:24-159:3).

The varying Payment Schedules, conversely, are attached to the PPAs.[11] These different Payment Schedules govern the compensation arrangement between each grower and Perdue. As Parker admits, these are markedly different. They include different types of pay, bonuses, and supplements for growers, depending on various factors such as the complex, type of bird, whether there is competition in the area, and the standards to which the bird must be grown. (Levengood Dep. 21:20-23:7, 26:16-27:6; Parker Dep. 97:24-98:11, 100:13, 101:22-23). As Perdue's corporate representative testified, "the[se] [Payment Schedules] can change all the time," and there are multiple Payment Schedules for every location. (Levengood Dep. 21:20-22:7). For most locations, the pay rates and structure will differ, and in some circumstances, pay structures for the same location may differ depending upon the type of bird grown. (Levengood Dep. 21:20-23:7, 26:16-27:6, 152:10-155:5; Levengood Decl. ¶¶ 7, 17).

---

[11] These differences in Payment Schedules are directly relevant here for two reasons. First, they impact the economic realities of a grower under the FLSA. Second, it is both the similarity of job duties *and* pay provisions that are relevant when determining whether conditional certification is appropriate, as Plaintiff acknowledges. (*See* 52-1, at 16).

For example, some growers, like those who grow Cornish birds, are paid based on a flat-rate system. (Levengood Dep. 22:19-23:1, 191:25-192:12; Levengood Decl. ¶ 17). Growers of non-organic birds, conversely, are compensated based on a "tournament system" under which they are paid according to both the quality and quantity of their flock, as well as how efficiently the chickens are raised. (*Id.* ¶¶ 17-20). Under the tournament system, all growers get a base payment rate for the chickens they raise, along with a potential for more or less off an average cost for the week depending on how well they placed against others in the area who began growing chicks at the same time. (*Id.* ¶¶ 17-19). Growers who raise birds most efficiently, managing their costs and mortality most effectively, making improvements to their houses, and putting the most effort into the best management practices to raise their chicks will increase their pay and profits. (Levengood Dep. 34:23-35:21, 41:11-42:17; Levengood Decl. ¶ 20). These growers get rewarded for their efforts and successes through the tournament system and various incentive payments. (*Id.*) The Payment Schedules also provide different forms of additional compensation that vary by Payment Schedule for items such as heating costs, rest pay, audit readiness pay, and/or space pay. (Levengood Dep. 21:20-23:7; Levengood Decl. ¶ 17). Growers can also enter into New House agreements, which provide additional and different incentive payments and terms, which also vary by location and over time. (Levengood Dep. 23:2-11). This includes payment of a guaranteed minimum even if the grower settles less than the floor. (Levengood Decl. ¶ 19).

In some locations, growers may contract with two or three separate Perdue complexes for different flocks at different times, resulting in them being subject to multiple different sets of Payment Schedules with different compensation arrangements. (Levengood Dep. 152:10-155:5; Levengood Decl. ¶ 7). And, Payment Schedules for the same complex often change over time, with each grower often being subject to multiple different Payment Schedules even if they only

work with one complex. (Levengood Dep. 21:20-23:7; Levengood Decl. ¶¶ 7, 17). For example, Parker was subject to over forty different Payment Schedules for his two farms. (*See e.g.,* Parker Dep. 96:5-98:11, 99:8-103:14, Exs. 5-8 and Levengood Decl. ¶ 21 and Att. 2 thereto).

2.    Growers Operate Their Businesses Differently in Material Ways.

The relationship between Perdue and growers contains all fundamental touchstones of a true IC relationship. Growers make a substantial investment in their businesses, owning the land, facilities and equipment. (Parker Dep. 127:10-128:2, 128:16-129:15, 133:18-134:8, Exs. 11-13; Tripp Dep. 62:10-13, 90:19-22, 102:24-103:14, 104:23-105:10, Exs. 10-11). Growers can and do own and operate outside businesses—just as Parker did through his construction and equipment businesses discussed in Section II(A) above. Perdue places no restriction on the growers' ability to pursue other work, have outside businesses, or even grow other livestock—so long as they are not raising other chickens or poultry at the same time.[12] (Levengood Dec. ¶ 16; Parker Dep. 143:7-145:8). Parker admitted a lot of growers subsidize their income through outside businesses. (Parker Dep. 143:7-21). Approximately 50% of growers recently surveyed do run outside businesses, including raising other livestock, growing grain or other produce, or other things. (Levengood Decl. ¶¶ 14-15). Growers also can hire their own employees to assist with their operations, just as Parker and Tripp did. *See* Section II.A above. Approximately 55% of growers surveyed hired employees to assist them. (Levengood Dep. 76:8-15; Levengood Decl. ¶¶ 14-15). In fact, growers do not even have to do any work personally but rather can outsource their growing operations completely to employees they hire, just as the grower Tripp works for has done. *See* fn. 6 above. Approximately 15% of growers do so. (*See* Levengood Dep. 76:8-15; Levengood Decl. ¶¶ 14-15).

---

[12] This is necessary from a biosecurity perspective to avoid cross-contamination. (Levengood Decl. ¶ 6).

3.    <u>Growers Are Subject to Different Management Practices.</u>

While growers remain responsible for determining how to raise their flocks, Perdue assigns a "flock advisor" to each grower (or farmer) who serves as a "liaison to the company." The flock advisor serves as a resource and provides suggestions if the farmer is struggling or "to help the farmer better raise the birds to make them more money." (Levengood Dep. 64:14-65:10). Each complex has different flock advisors. (Levengood Decl. ¶ 7). Flock advisors travel to different farms, look at the birds, and provide feedback and recommendations to growers, which growers are free to accept or reject (unless it involves a significant animal welfare issue). (Levengood Dep. 64:14-68:14). Flock advisors do not provide instruction on day-to day activities, and if no issues arise during a visit, no recommendations are given. (*Id.* 64:14-68:22).[13] While flock advisors generally follow the same schedule of visits, they have discretion at the local level to vary this and may go more or less frequently depending on the success/experience of the grower, weather, or other individualized issues a grower may be facing. (Levengood Dep. 67:15-68:5, 92:23-95:1). From time to time, flock advisors may choose not to visit a farm at all, such as when there is an outbreak of illness in chickens. (*Id.* 67:15-68:5, 92:23-95:1).

Flock advisors have local discretion to determine how to handle issues with a growers' farm and contract compliance. (*Id*. 97:14-98:15; 185:3-186:11). If they discover a history of issues over time, a grower may receive a letter or be placed on a Performance Improvement Plan ("PIP"), if the applicable complex uses PIPs (not all do). (*Id.* 185:3-186:11; Levengood Decl. ¶ 8). While formal written communications are sometimes used, management normally tries to work with

---

[13]Plaintiff claims flock advisors and flock visitation reports dictate various requirements. <u>Yet neither Plaintiff nor Tripp were able to identify a specific instance of when they received mandatory recommendations or instructions from either flock advisors or the reports they issued</u>. *See* Parker Dep. 117:11-16; *id.* 120:7-121:15 (flock visitation paperwork does not establish recommendations as mandatory and he cannot recall a specific instance where someone told him flock visit recommendations were a requirement); Tripp Dep. 81:8-11, 84:9-13 (neither advisor ever instructed her that she had to do something differently to continue receiving chickens); *id.* 80:18-82:24 (other than wind speeds, Tripp could not recall any other recommendations she believed were mandatory).

growers individually, through informal discussions, before any letter is sent. (*Id.* 97:14-98:15). It is "not a black-and-white issue." (Levengood Dep. 78:4-78:18). Perdue wants growers to be successful, so it tries to work with growers individually first. (*Id.* 78:4-78:18).[14]

4.     Growers Are Subject to Different Localized Policies and Practices.

Plaintiff's contentions that growers are all subject to the same "detailed and mandatory instructions regarding execution of growers' duties," such as the Process Verified Program ("PVP") Guidelines and biosecurity standards, are also misplaced. (ECF 52-1, at 11). Rather, the record evidence shows that these guidelines and biosecurity standards are nothing more than a series of best management practices ("BMPs") or recommendations that a grower should adopt if they want to be successful. (Levengood Dep. 29:2-20, 31:4-33:24, 34:23-36:11, 40:16-42:17). Following these BMPs helps growers if, for example, they want to get indemnified by the government if they get high-path Avian Influenza. (*Id.* 43:14-24). Moreover, the PVP guidelines Plaintiff cites are part of a USDA verified audit program. This program is based on the National Chicken Council ("NCC") Broiler Welfare Guidelines, which provide a series of standard operating procedures growers will be audited against pursuant to the USDA program. (*Id.* 45:21-46:22, 48:14-49:5, 54:4-25, 56:16-23, 181:23-183:5, 186:12-187:2, Ex. 3). The NCC Broiler Welfare Guidelines provide recommendations for poultry care, such as litter conditions and procedures for euthanasia. (*Id.*) These guidelines serve as the basis of Perdue's PVP program. The only additional items added by Perdue are certain recommendations for lighting. (*Id.*) As Perdue's corporate representative made clear, the only actual requirement contained in the PVP guidelines is the euthanasia procedure. (*Id.* 54:4-25). While local management also has varying guidelines,

---

[14]While Plaintiff makes various allegations regarding Perdue withholding flocks, Perdue typically does not withhold birds unless there is an animal welfare or a significant cost issue. (Levengood Dep. 65:11-74:8). Perdue may also terminate contracts if there is a significant animal welfare issue, although this doesn't happen often. (*Id.* 80:13-81:4).

such as equipment lists and other best practices to assist growers in raising their birds, these are also typically tied to the NCC guidelines and can vary by season, location, and over time.[15] (*Id.* 150:14-152:2; Levengood Decl. ¶¶ 8-9).

Plaintiff's and Tripp's conclusory declaration statements about the alleged uniformity of these policies and procedures are also completely contradicted by their own deposition testimony. Tellingly, under oath, they both *repeatedly disclaimed* any personal knowledge about:

- How or what policies are implemented with growers in practice (*see* Parker Dep. 33:16-18, 113:25-114:6 (no personal knowledge of what growers are subject to PVP Management Guidelines); *Id.* 80:7-81:13 (no personal knowledge of specific terms of other poultry grower's agreements)); Tripp Dep. 22:7-23:19, 31:8-32:14, 34:23-37:20 (no personal knowledge of who received the seasonal guidelines sheet and she did not talk with other growers she knew about Perdue policies); *id.* ("I can only assume but I don't know for sure" what other specifications were given to and used with other growers));

- What payment schedules growers are subject to, whether other growers have been placed on a PIP and why, and what expenses incurred (*see* Parker Dep. 80:7-81:13, 95:11-25; 103:15-17 (no personal knowledge of PIPs or payment schedules for other growers); Tripp Dep. 30:18-31:23, 34:23-35:15, 37:18-38:5, 69:5-13 (no personal knowledge of PIPs or payment schedules for other growers); and (Parker Dep. 136:17-21) (no knowledge of what expenses growers incurred);

- What recommendations were provided to other growers during site visits and what happened if they did not follow them (*see* Parker Dep. 55:6-56:21 (no personal knowledge of other poultry growers' relationship with Perdue and can't recall any specific conversations regarding what Perdue told other growers); *see also* testimony in fn. 13 above;

- How many growers' contracts were terminated for not following recommendations (*see* Parker Dep. 207:22-208:13, 214:22-216:14 (explaining he can't name any other grower who has been terminated); Tripp Dep. 30:21-31:7, 35:16-36:5, 39:11-40:19 (no personal knowledge of what happens with growers outside of Bertie County and no knowledge of any follow-up Perdue had with local farmers she knew));

- What specific hours they work (*see* Parker Dep. 132:10-22; 155:2-9; 169:13-16) (no personal knowledge of hours that growers' helpers or family members work or whether the growers are doing work themselves); *id.* 161:12-165:8 (unable to state specific

---

[15] As Perdue's corporate representative testified, these guidelines also often contain a listing of best practices, or a reminder of "[t]his is what we see working." (*Id.* 150:6-151:22).

hours worked in a week by any other grower), *and* Tripp Dep. 38:13-18 (confirming not knowing whether any other growers work over or under 40 hours in a week)); or

- Whether and to what extent the growers even do any work themselves or are absentee owners like the grower Tripp currently works for. *See* testimony above.

These admissions are fatal to Plaintiff's Motion and the proof upon which it purports to rely.

## III.    **LEGAL ARGUMENT**

### A.    **Conditional Certification Standard**

Under 29 U.S.C. § 216(b), a plaintiff may bring a collective action on behalf of himself and other "similarly situated" individuals. In the first phase, when courts determine whether to conditionally certify and send notice to putative opt-ins, this Circuit requires a plaintiff to show that the individuals in the proposed collective action: (1) are "similarly situated with respect to their job requirements" and "pay provisions;" and (2) desire to join the collective action. *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991). A plaintiff must provide a "reasonable basis" for showing that conditional certification should be granted through "detailed" and "substantial allegations." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (*citing Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996)). Although this burden is not heavy, unsupported, generalized allegations are insufficient. *Beecher v. Steak N Shake Operations, Inc*., 904 F. Supp. 2d 1289, 1297-98 (N.D. Ga. 2012) (Evans, J.) (*citing Hipp*, 252 F.3d at 1219; *Haynes v. Singer Co*., 696 F.2d 884, 887 (11th Cir. 1983)). And, courts will grant conditional certification and issue notice only if both requirements are met. *Anderson,* 488 F.3d at 953.

Plaintiff argues that the court should apply a lenient standard when deciding their Motion. (ECF 52-1, at 13-14). Plaintiff is correct that a lenient standard typically applies when conditional certification is decided without the benefit of discovery. But, that is not the case here where the Parties have agreed to -- and conducted -- six months of targeted conditional certification discovery

on generally-applicable policies and procedures. As courts in this Circuit have regularly recognized, "the rationale [for the lenient standard] disappears . . . once plaintiff[] ha[s] had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Green v. Atlas Senior Living, LLC,* 2022 WL 2007398, at *5 (S.D. Ga. June 6, 2022) (citation omitted). When this initial discovery has occurred, courts have applied a "more exacting standard."

This more exacting standard has been applied even when the parties conducted *less discovery* than the six months of discovery the Parties conducted here prior to conditional certification. *See id.* (applying a heightened standard when the parties had conducted *four months of discovery* before plaintiff's motion for conditional certification and also listing and collecting cases applying a more stringent standard "when plaintiffs had the opportunity to conduct discovery and present their evidence to the [c]ourt prior to a ruling on conditional certification"); *Pickering v. Lorillard Tobacco Co*., 2012 WL 314691, at *8-9 (M.D. Ala. Jan. 30, 2012) (applying a more rigorous standard because the court granted a bifurcated discovery schedule that allowed for *four months* of conditional certification discovery).[16] Nonetheless, whether the lenient or appropriate more exacting standard applies, Plaintiff cannot meet his burden to show nationwide notice is appropriate, and his Motion should be denied.

**B.    Plaintiff Cannot Show Others in the Nationwide Class Want to Join.**

First, Plaintiff's Motion must be denied for the simple reason that he failed to provide sufficient evidence to show that other growers in the nationwide class he seeks to represent,

---

[16] *See also*, *e.g.*, *Heath v. Res. Mgmt. Sys., Inc.*, 2022 WL 1624816, at *2 (M.D. Ga. Feb. 8, 2022) (noting historical use of more rigorous standard of decertification when plaintiff moved for certification after time for discovery); *Tyler v. Payless Shoe Source, Inc.*, 2005 WL 3133763, at *6 (M.D. Ala. Nov. 23, 2005) ("When the parties have conducted extensive discovery, 'it is appropriate to carefully consider the submissions of the parties with respect to the collective action allegations.'"); *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1313 n.2 (M.D. Ala. 2002) (requiring a more robust showing given the amount of discovery conducted); *Ledbetter v. Pruitt Corp.*, 2007 WL 496451, at *2 (M.D. Ga. Feb. 12, 2007) (the basis for a fairly lenient standard "disappears" once a plaintiff has an opportunity to complete discovery and using the "more rigorous standard akin to that called for by *Hipp*").

covering 11 different complexes in 9 different states, wish to opt in. "[P]laintiffs have the burden of demonstrating a reasonable basis for crediting their assertions that aggrieved individuals exist[] in the broad class that they propose[]." *Haynes*, 696 F.2d at 887. <u>In this Circuit, this requirement is not optional.</u> *Haynes v. Willie Lamar Block & Brick Constr.*, 2018 WL 6521476, at *1 (M.D. Ga. Oct. 24, 2018) (Self, J.) ("Plaintiff must show that the employees in the proposed class . . . desire to join the collective action."); *Harp v. Bran Hosp., Inc.*, 2018 WL 3150347, at *2 (M.D. Ga. June 27, 2018) (Self, J.) (same). "If the plaintiff does not satisfy [this] burden, the Court should decline the certification of a collective action to avoid the stirring up of litigation through unwarranted solicitation." *Bedoya v. Aventura Limousine & Transp. Serv., Inc.*, 2012 WL 1933553, at *3 (S.D. Fla. Apr. 10, 2012) (citations omitted); *Hilley v. Tacala, L.L.C.*, 2014 WL 1246364, at *2 (N.D. Ala. Mar. 24, 2014) ("This court takes seriously its 'responsibility to avoid the "stirring up" of litigation through unwarranted solicitation.'") (citation omitted); *accord Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1237 (M.D. Ala. 2003).

This requirement makes good sense because "[c]ertification of a collective action and notice to a potential class is not appropriate to determine whether there are others who desire to join the lawsuit[.] . . . [rather,] the plaintiff must provide evidence of others' interest **before** conditional certification through declarations, affidavits, or consents to join."[17] *Linscheid v. Natus Med. Inc.*, 2012 WL 12861603, at *2 (N.D. Ga. Nov. 15, 2012) (emphasis added); *Dybach*, 942 F.2d at 1567 (a district court should "satisfy itself" that others desire to opt-in before issuing notice); *Holmes v. Swissport Fueling, Inc.*, 2017 WL 8794900, at *6 (M.D. Fla. Sept. 1, 2017) ("Evidence of employees who desire to opt in may be based on affidavits of other employees,

---

[17] Typically, this requires substantial declarations, several opt-ins, or, <u>at a minimum</u>, specific declarations by active plaintiffs identifying conversations with numerous people expressing an interest as sufficient evidence of "desire" to join. *See Kenan v. Glob. Payments, Inc.*, 2023 WL 4033149, at *2 (M.D. Ga. June 15, 2023). <u>None of those exist here</u>.

consents to join the lawsuit filed by other employees, or expert evidence[.]"). Plaintiff has not met this burden here, and his Motion should be denied for this reason alone.

1.    Plaintiff's and Tripp's Conclusory Statements Are Insufficient.

The only "evidence" Plaintiff presents to satisfy this burden is: (1) a single opt-in consent from Tripp, whose claims are currently subject to a motion to dismiss, and (2) his and Tripp's own self-serving, cookie-cutter declaration statements that while they "have not yet heard from additional growers who are presently ready to opt-in . . ., it is [their] *belief* that other growers . . . *would* be interested *if* the Court grants conditional certification." (ECF 52-5 ¶ 8; ECF 52-6 ¶ 8). In the Eleventh Circuit, this is not enough. Courts have regularly held that these same types of allegations are insufficient and there is no question that issuing notice is inappropriate. *Haynes*, 696 F.2d at 887-88 (emphasis added). *See Ward v. Pivotal Retail Grp., LLC*, 2023 WL 6226141, at *3 (N.D. Ga. June 20, 2023) (denying conditional certification because "[p]laintiffs cannot rely on speculative, vague, or conclusory statements that they 'believe' others want to opt in to meet their burden to show there are others interested in joining the lawsuit"); *Kubiak v. S.W. Cowboy, Inc.*, 2014 WL 2625181, at *8 (M.D. Fla. June 12, 2014) (internal quotations omitted) ("The mere anticipation that others may want to join the lawsuit or the mere presence of a uniformly adverse compensation policy is insufficient by itself. . .  Moreover, certification of a collective action and notice to a potential class is not appropriate to determine whether there are others who desire to join the lawsuit."); *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1277 (M.D. Fla. 2004) (denying conditional certification because "plaintiffs must introduce more than their own statements that other potential class members exist" but "have filed no affidavits or consents from these would-be class members"); *Louis-Chares v. Sun-Sentinel Co.*, 2008 U.S. Dist. LEXIS 20030, at *5 (S.D. Fla. Mar. 14, 2008) (plaintiff's opinion that others would opt-in insufficient).

Plaintiff's and Tripp's copycat, conclusory statements are all the more problematic because they both definitively testified, under oath, that they were not aware of any other growers who were actually interested in joining. As Parker bluntly put it, "**Ain't nobody told me they wanted to join as saying yes, I want to join.**" Parker Dep. 180:2-3 (emphasis added); *id.* 45:5-8 (admitting he was not able to identify any other growers interested in joining; Tripp Dep. 33:21-34:1 (admitting she is not aware of any grower who wants to join the lawsuit). These admissions are fatal to Plaintiff's request for notice, particularly given that Parker mentioned the lawsuit to at least five other growers, *including his own son*, and none of them expressed interest in joining. *See* Parker Dep. 178:18-179:18 (advised his son, a current grower, on the nature of the lawsuit, but his son has never expressed an interest in joining); *id.* 20:25-21:6 (discussed being in a lawsuit with Jess Chambers but Chambers only responded "he had heard that)"; *id.* 22:16-25, 29:22-30:5, 43:10-21 (separately told Alonzo, Stevens, and Lu that he was in a lawsuit and they "didn't reply"). Given these facts, Plaintiff cannot satisfy his burden to show others are interested in joining. *See Mackenzie v. Kindred Hospitals East, LLC,* 276 F. Supp. 2d 1211, 1220 (MD Fla. July 24, 2003) (conditional certification denied when plaintiff "admit[ed] he didn't know of anyone who want[ed] to join th[e] action" and "acknowledged [that] he was unsuccessful in interesting two former colleagues to participate in th[e] action.").[18]

### 2.    In Either Event, One Opt-In Alone Is Not Enough.

Even if the Court excused the conclusory nature of Plaintiff's and Tripp's declaration statements and their deposition testimony directly contradicting them, one opt-in alone and her cookie-cutter declaration is not sufficient to warrant notice to over 1,340 growers supporting 11

---

[18] While Plaintiff may claim others have not come forward for fear of retaliation, no such evidence has been put before the court. Even so, it does not eliminate Plaintiff's burden to show others actually want to opt in, which he has utterly failed to meet.

different complexes across the country as a matter of law.[19] "[F]ederal courts across [the Eleventh Circuit] have routinely denied requests for conditional certification where plaintiffs attempt to certify a broad class based only on the conclusory allegations of a few employees." *Simpkins v. Pulte Home Corp.*, 2008 WL 3927275, at * 2 (M.D. Fla. Aug. 21, 2008); *Gomez v. United Forming, Inc*., 2009 WL 3367165, at *2 (M.D. Fla. Oct. 15, 2009) (denying conditional certification where the only consents and declarations were from plaintiff's family); *Pickering*, 2012 WL 314691, at *12 (finding one consent form was insufficient to show that other individuals wish to join the action).[20]

In fact, courts in this Circuit have refused to conditionally certify and send notice when the plaintiffs showed a much higher percentage of interest than the less than .2% of interest that exists here. *See, e.g., Linscheid*, 2012 WL 12861603, at *2 (interest from one opt-in plaintiff was inadequate, even though three named plaintiffs and one opt-in constituted 16% of the collective); *Pickering*, 2012 WL 314691, at *12 (one consent form was insufficient for 770 person collective); *Delano v. MasTec, Inc.,* 2011 WL 2173864, at *5 (M.D. Fla. June 2, 2011) (three opt-ins insufficient to establish interest in state-wide collective); *Rodgers v. CVS Pharmacy, Inc*., 2006 WL 752831, at *4 (M.D. Fla. Mar. 23, 2006) (two opt-ins from two states insufficient to conditionally certify nationwide class). *See also Gomez*, 2009 WL 3367165, at *2 (three opt-ins insufficient to show interest for 3,200 person collective, particularly where "each affidavit is a

---

[19] As noted above in fn. 2, this includes complexes in nine different states from Pennsylvania to California. Yet Parker and Tripp only supported 2 complexes (in GA and NC).

[20] *See, e.g., Diggs v. Int'l Follies, Inc*., 2022 WL 4596679, at *2 (N.D. Ga. July 7, 2022) (denying conditional certification where named and single opt-in plaintiffs' declarations failed to identify any names or specific number of current or former employees interested in joining); *Bailey v. S. Therapy Servs., Inc*., 2022 WL 16951683, at *3 (N.D. Ga. Mar. 28, 2022) (denying conditional certification where named and single opt-in plaintiffs' declarations contained only conclusory assertions and hearsay that others had a desire to join); *Gouldie v. Trace Staffing Sols., LLC*., 2021 WL 4944800, at *5, fn. 5 (M.D. Ga. Oct. 22, 2021) (denying conditional certification and noting a declaration or consent form of just one other employee "could have *tipped* the outcome" but a "substantial number of consents from other employees" is typically required).

formulaic recitation that mimics Plaintiff's own affidavit"); *Beecher*, 904 F. Supp. 2d at 1299–300 (21 opt-ins from 11 locations in four states insufficient to establish interest of 65,000 nationwide collective).[21] In the absence of a sufficient showing of interest that others wish to participate, which Plaintiff cannot provide, his Motion should be denied.

3.   Plaintiff's Showing of "Interest" is Particularly Weak Given the Underlying Circumstances.

Plaintiff's showing of "interest" is particularly weak given the underlying circumstances. This case has been pending for 18 months and has been widely publicized. (ECF 1; Reed Decl. ¶¶ 4-11). A third-party advocacy group for farmer, RAFI-USA, has even gotten involved, and their Lead Farmer Advocate, Benny Bunting, cold-called Barbara Tripp to ask if she "would . . . be interested in adding her name." (Tripp Dep. 19:21-20:5; Santen Decl. ¶¶ 4-5). Despite this, only one opt-in has joined. It is well-established that "[t]he evidence provided, including the number of plaintiffs who have already opted-in or names of people who have indicated interest in joining the suit, must be considered in light of the size of the proposed class and the publicity of the suit at the time of the motion for conditional certification." *Mason v. Atlanta Beverage Co.*, 2018 WL 3655374, at *6 (N.D. Ga. Aug. 2, 2018) (Thrash, J.). The length of time the lawsuit has been pending must also be considered. *See Yarbrough v. Georgia-Carolina Stucco, Inc.*, 2023 WL

---

[21] While Plaintiff offers some examples of courts finding one consent form to be sufficient, those cases involved either a very small class size and/or no discovery beforehand and application of the "extremely lenient" standard. Neither of those circumstances exists here. *See Kirk v. Dr. Goodroof, Inc.*, 2015 WL 1138445, at *2 (M.D. Fla. Mar. 13, 2015) (motion for conditional certification filed less than two months after complaint and one month after consent forms filed in action against local roofing company); *Wynder v. Applied Card Systems, Inc.*, 2009 WL 3255585, at *3 (S.D. Fla. Oct.7, 2009) (evidence based on named plaintiff and single opt-in plaintiff insufficient to show that labor practices extended beyond shared facility and limiting scope of notice to plaintiffs' location); *Guerra v. Big Johnson Concert Pumping, Inc.*, 2006 WL 2290512, at *3 (S.D. Fla. May 17, 2006) (granting certification based in part on two affidavits where the plaintiff limited the collective to workers in the state of Florida and authorizing plaintiff to issue notice *and proceed with discovery*). Even so, the overwhelming weight of authority is that more than one opt-in consent is required, particularly given the nationwide notice sought here, as discussed above.

5278710, at *6 (S.D. Ga. Aug. 16, 2023) (noting despite limited discovery, one consent form could not be used as evidence of interest to join, particularly where case was pending for over a year).

There can be no question here, given the underlying circumstances, that nationwide notice to 1,345 growers, when only less than .2% have expressed any interest in joining in an entire 18-month period is improper as a matter of law. At the very most, had Plaintiff successfully showed any interest among Georgia growers (he did not), notice should properly be limited to those growers who worked in Georgia[22] only given that Tripp's claims should be subject to dismissal.[23]

**C.    Parker Cannot Show that All 1,345 Growers Are Similarly Situated.**

Plaintiff also cannot meet his burden to show he is "similarly situated" to others in the large group he seek to represent. For one, the evidence confirms growers are not similarly situated with regard to their pay provisions (*see supra* § II.C.1), which is fatal in and of itself to his Motion. *Gouldie, LLC*, 2021 WL 4944800, at *2 (quoting *Dybach*, 942 F.2d at 1567-68) (emphasis added) (explaining that district courts "should satisfy [themselves] that there are other employees of the [employer] who desire to '[opt in]' and who are 'similarly situated' with respect to their job requirements and with regard to ***their pay provisions***.") For another, the only evidence Plaintiff does cite—i.e. that all growers signed a similar PPA, were subject to the same policies (while wholly ignoring their testimony regarding lack of knowledge of any uniform *enforcement in practice*), and were all treated as ICs exempt from overtime—is  insufficient as a matter of law.

---

[22] *Mason*, 2018 WL 3655374, at *6 (N.D. Ga. Aug. 2, 2018) (noting certification of a nationwide class would require more evidence than a class with a limited geographic area); *White*, 204 F. Supp. 2d at 1318 (limiting certification to state in which named plaintiff worked even where plaintiff provided deposition testimony from workers in separate, foreign action); *Bernardez v. Firstsource Sols. USA, LLC*, 2019 WL 4345986, at *6 (W.D. Ky. Sept. 12, 2019) (denying nationwide certification where plaintiffs failed to provide sufficient evidence relating to other regions and limiting certification to plaintiffs' region).

[23] The Court will also be faced with an additional layer of individualized inquiries regarding jurisdiction to the extent any other out-of-state plaintiffs file opt-in consents for the same reasons as set forth in Perdue's Motion to Dismiss Tripp, further weighing against conditional certification here.

Preliminarily, the mere "policy and practice of classifying a group of [individuals] as exempt is not a basis for proceeding collectively." *Palacios v. Boehringer Ingelheim Pharms.,* 2011 WL 6794438, at *6 (S.D. Fla. Apr. 19, 2011). Although Plaintiffs are correct that the court should not decide the merits of the claim at this stage, it is well-established that "class certification issues cannot be decided in a vacuum" and courts must consider all facts and law, which includes the highly fact-intensive economic realities test factors here. *Demauro v. Limo*, Inc., 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011) (quoting *West v. Verizon, Inc*., 2009 WL 2957963 (M.D. Fla. Sept. 10, 2009)). Plaintiff fails to even cite—let alone discuss—how these economic realities test factors can be established with representative proof that can adjudicate all growers' claims—and the defenses thereto—collectively at once. That is because he cannot.

The highly fact-intensive economic realities test used to determine IC status, which governs Plaintiff's claims here, requires courts to consider and weigh multiple different factors.[24] Individualized analysis of each factor is needed to determine whether each grower is an IC or employee for FLSA purposes. These types of necessarily individualized analyses are wholly inconsistent with collective action treatment, as courts in this Circuit have regularly recognized. *See Yoder v. Fla. Farm Bureau*, 446 F. Supp. 3d 956, 962 (plaintiffs failed to show proposed class was similarly situated such that it was amenable to collective resolution under the economic realities test); *Herrera v. Mattress Firm, Inc.*, 2017 WL 4270619, at *9 (S.D. Fla. Sept. 26, 2017) ("Plaintiffs have not met their burden to show members of the proposed class are similarly situated, as they have not shown . . . that the economic realities test can be applied on a class-wide basis.");

---

[24] Economic realities test factors include: (1) nature and degree of the defendant's control as to the manner in which the work is performed; (2) plaintiff's opportunity for profit or loss depending on his managerial skill; (3) plaintiff's investment in equipment or materials; (4) whether service rendered requires a special skill; (5) degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the defendant's business. *Demauro,* 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011) (citing *Freund v. Hi–Tech Satellite, Inc*., 185 F. App'x 782, 783 (11th Cir. 2006); *Perdomo v. Ask 4 Realty & Mgmt., Inc.*, 298 F. App'x 820, 821 (11th Cir. 2008))). No single factor is dispositive--the totality of the circumstances applies. *Id.*

*Demauro*, 2011 WL 9191, at *3 (citing *West*, 2009 U.S. Dist. LEXIS 82665, at *12) (explaining the need for individualized inquiries contravenes the basic theory of judicial economy upon which collective action certification is based).

Plaintiff fails to even discuss or describe how he and putative class members are similarly situated with regard to those factors. Nor can he. Plaintiff's and Tripp's nearly-identical conclusory declarations, which are contradicted in large part by their deposition testimony, provide insufficient evidence of similarity on these factors on their face. *See Eggnatz v. Coventbridge (USA) Inc.*, 2019 WL 1171455, at *3 (S.D. Fla. Mar. 13, 2019) (denying certification where "allowing conditional certification based on 'a handful of boilerplate declarations' would 'present a ready opportunity for abuse.'"); *Holmes v. Quest Diagnostics*, 2012 WL 12876965, at *2 (S.D. Fla. June 14, 2012) (denying conditional certification; plaintiffs' 23 conclusory, "cookie cutter" declarations did not "successfully engage defendants' evidence to the contrary"); *Ramos v. Burger King Corp.*, 2011 U.S. Dist. LEXIS 115653 (M.D. Fla. 2011) (conclusory allegations that all potential class members were treated the same not sufficient); *Rappaport v. Embarq Mgmt. Co.*, 2007 U.S. Dist. LEXIS 92869, at *4 (M.D. Fla. 2007) (listing cases denying conditional certification based on conclusory allegations). This is particularly true when both Parker and Tripp admitted they do not actually know how these alleged common policies are implemented or enforced for other growers in practice. *See* Section II.C.4 above and testimony cited therein.

The record otherwise provides multiple examples of facts supporting the economic realities test factors, all of which Plaintiff ignores. These include that:

- Growers, including Parker and Tripp, manage and control their own schedules and make independent decisions on how they grow the birds. A large percentage of growers also operate other businesses, including raising other livestock, and can set up their

own corporate entities. (Parker Dep. 26:5-24, 143:7-21, 160:10-161:11, Exhibit 4, p. 5, Section IV; Tripp Dep. 85:1-86:4; Levengood Decl. ¶¶ 14-15);[25]

- Growers can hire employees to do some or all of the work for them, as the grower who Tripp is currently working for has done (Tripp Dep. 11:15-13:3);[26]

- Growers' profits and loss opportunities are based upon how they control and manage their own farms. By accepting more birds, performing more efficiently, hiring employees, and building new houses, for example, growers can earn more money. (Levengood Dep. 23:2-11, 34:23-35:21, 41:11-42:17, 76:8-15; Levengood Decl. ¶ 20);

- Growers make a substantial investment in their businesses, including buying their own equipment and housing for the birds, owning and operating multiple farms, and taking substantial tax deductions for this equipment on their tax returns (Parker Dep. 127:10-128:2, 128:16-129:15 133:18-134:8, Exs. 11-13; Tripp. Dep. 62:10-13, 90:19-22, 102:24-103:14, 104:23-105:10, Exs. 10-11);[27]

- Growers have to use specialized experience and knowledge on how to raise the birds most efficiently to maximize profits (Parker Dep., Exhibit 4, p. 3, Section III.A; Levengood Decl. ¶ 6); and

- Growers choose to take on however many flocks they want and are not obligated to stay with Perdue. (Parker Dep., Exhibit 4, p. 5, Section V).[28]

And, the evidence on each of the above points can vary substantially. Indeed, the entire tournament system through which growers are compensated is based on a competitive system taking into account managerial skill in how growers raise their birds, how well they control costs, and how efficient their houses are, among others, all of which dictates their profits and can vary significantly

---

[25] In analyzing the "control" factor, courts focus on whether the alleged employer controlled the details of the job, including, for example, the worker's schedule, timing of breaks, training, compensation, supervision, and manner and method of the work performed. *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332, 334 (5th Cir. 1993).

[26] Numerous courts have recognized that the ability to hire others to do the work is strong indicia of IC status. *See, e.g., Eberline v. Media Net, L.L.C.*, 636 F. App'x 225 (5th Cir. 2016) (affirming jury verdict of IC status when installers could hire assistants to help with installations, among other factors); *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 77 (2d Cir. 2020)(quoting *Saleem v. Corp. Trans. Grp. Ltd*, 854 F.3d 131, 143 (2d Cir. 2017)) ("the ability to hire others to run the business is the type of 'considerable evidence' that supports a finding of [IC] status"); *Carpenter v. Pepperidge Farm, Inc.*, 2023 WL 4552291, at *6 (E.D. Pa. July 14, 2023) (the ability to "hire others to do the work" is a factor that "strongly indicates an independent contractor arrangement . . .").

[27] This level of investment is strong indicia of IC status. *See e.g., Faludi*, 950 F.3d at 276 (plaintiff who provided his own computer, phone, and continuing education expenses was an IC); *Eberline*, 636 F. App'x. at 229 (installers were ICs when they were "required to provide their own supplies and tools," among other factors); *Krupicki*, 2014 WL 12710353, at *6 ("investment factor" weighed in favor of IC status when driver purchased van, fuel, insurance, etc.).

[28] The sixth factor, whether integral to the business, will likely be similar for growers, but this is not dispositive under the totality of the circumstances. *Demauro*, 2011 WL 9191, at *3 (citing *Perdomo*, 298 F. App'x at 821).

from grower to grower. And, although growers cannot specifically negotiate the terms in the Payment Schedules, this alone is not dispositive. *Freund*, 185 F. App'x 782, 784 (*quoting Chao v. Mid–Atlantic Installation Services, Inc*., 16 Fed. Appx. 104 (4th Cir.2001) (although plaintiffs did not set prices, they were "no less in control of their net profits . . . than typical [IC]s.") Finally, while Plaintiff's and Tripp's conclusory declarations claim that management uniformly controls growers in the same way through flock visit reports and visits, the evidence there too paints a much different picture and one that revolves around individual management practices. *See supra* § II.C.3.

Even if the Court finds these inquiries can be adjudicated with collective proof (they cannot), the Court still needs to conduct other individualized inquiries, including whether each grower even worked overtime given their use of hired labor and employees (facts both Parker and Tripp disclaim any knowledge of) to adjudicate Plaintiff's claims. This, too, relies on highly-individualized evidence given the substantial use of employees by growers, particularly given that approximately 15% or more operate almost exclusively through employees they hire. There is no doubt these individualized inquiries would "contravene the basic theory of judicial economy upon which the certification of collective actions is based." *See Demauro*, 2011 WL 9191, at *3 (citing *West*, 2009 U.S. Dist. LEXIS 82668, at *12). Plaintiff's Motion should be denied accordingly.

    **D.**    **The Scope, Duration, and Form of the Proposed Notice Is Improper.**

Should the Court find some notice is appropriate, which Perdue denies, Plaintiff's proposed notice process and format are improper. For one, a 90-day notice period, with multiple forms of notice, is not warranted here. Rather, a notice period through one means (U.S. Mail) of 60 days with no reminder notice would more than satisfy the limited purpose of court-authorized notice. *Stitt v. Am. Disposal Servs. of Georgia, Inc.*, 2018 WL 6716046, at *4 (N.D. Ga. Dec. 20, 2018) (rejecting requested 90-day notice period as "on the upper bound of notice periods" and restricting opt-in period to sixty days). Moreover, permitting multiple forms of notice is not appropriate here,

particularly where electronic notice is typically reserved for cases with transient work forces or who work away from home, which is not the case here.[29] With respect to Plaintiff's proposed opt-in notice (ECF 52-2), if the Court determines that any notice is warranted, which Perdue denies, Perdue requests that the Court order the parties to meet and confer regarding the form and substance of the notice.

## IV.    **CONCLUSION**

As the discussion above establishes, Plaintiff's Motion must be denied because he has not and cannot meet his burden to show conditional certification and notice to the 1,345 diverse growers across the country is appropriate. First, he has failed to show that others in the broad class he seeks to represent wish to join. One lone consent from an opt-in (Tripp) whose claims are likely subject to dismissal and her own conclusory, cookie-cutter declaration that directly mirrors Plaintiff's is not sufficient. And, even if Tripp's claims were not dismissed, this "evidence" only shows interest from less than .2% of the entire class, which is insufficient as a matter of law. If there was any doubt about whether notice is appropriate—and there is not given case law in this Circuit— the underlying circumstances in this case, including discussions Plaintiff has had with other growers about the lawsuit to no avail, its publicity, and the length of time it has been pending, definitively remove it. And finally, Plaintiff has not shown and cannot show that the growers he seeks to represent are "similarly situated" under the more stringent standard applied here. For these reasons, the Court should deny Plaintiff's Motion.

Respectfully submitted this 22nd day of January, 2024.

*/s/ Margaret Santen*

---

[29] *Compare Kiley v. MedFirst Consulting Healthcare Staffing, LLC*, 297 F. Supp. 3d 1260, 1267 (N.D. Ala. 2018) (permitting e-mail notice when given evidence of transiency and tendency of putative plaintiffs to use electronic communications as they worked away from their home), *with* Tripp Dep. 29:4-5 (she does not own a computer).

Margaret Santen
GA Bar No. 578314
Kevin P. Hishta
GA Bar No. 357410
Michael Oliver Eckard
GA Bar No. 238550
**OGLETREE, DEAKINS, NASH, SMOAK**
    **& STEWART, P.C.**
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone:    404-881-1300
Facsimile:    404-870-1732
maggie.santen@ogletree.com
kevin.hishta@ogletree.com
michael.eckard@ogletree.com


Clayton E. Bailey
Admitted Pro Hac Vice
**BAILEY BRAUER PLLC**
8350 N. Central Expressway, Suite 650
Dallas, Texas 75206
Telephone: (214) 360-7433
Facsimile:  (214) 360-7435
cbailey@baileybrauer.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ROGER PARKER, on his own behalf and on
behalf of others similarly situated,

        Plaintiff,

v.

PERDUE FOODS, LLC,

        Defendant.

CIVIL ACTION
NO. 5:22-CV-00268-TES

## CERTIFICATE OF SERVICE

I certify that on January 22, 2024, I electronically filed the foregoing **DEFENDANTS'**
**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL**
**CERTIFICATION AND TO FACILITATE NOTICE PURSUANT TO 29 U.S.C. § 216(B)**
with the Clerk of Court using the CM/ECF system, which will automatically send e-mail
notification of such filing to the following attorneys of record:

T. Brandon Waddell
Jarred A. Klorfein
CAPLAN COBB LLC
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Telephone: (404) 596-5600
bwadell@caplancobb.com
jklorfein@caplancobb.com

Jamie Crooks
FAIRMARK PARTNERS, LLP
1825 7th St NW, #821
Washington, DC 20001
Telephone: (617) 721-3587
jamie@fairmarklaw.com

/s/ Margaret Santen
Margaret Santen
GA Bar No. 578314
**OGLETREE, DEAKINS, NASH, SMOAK
 & STEWART, P.C.**
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone:    404-881-1300
Facsimile:    404-870-1732
maggie.santen@ogletree.com