# EXHIBIT 2

DECLARATION OF ROGER DALE PARKER

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ROGER PARKER,

   *Plaintiff*,

v.

PERDUE FOODS, LLC,

   *Defendant*.

Case No. 5:22-cv-00268-TES

## DECLARATION OF ROGER DALE PARKER

I, Roger Dale Parker, declare as follows:

    1.    I worked raising chickens on behalf of poultry companies for most of my life. For approximately 13 years, I worked as a grower for Perdue.

    2.    During the time I worked for Perdue, Perdue characterized me in my contracts with them as an independent contractor and paid me using IRS Form 1099s. Whenever Perdue required me to upgrade or install new equipment, Perdue did not pay for that or reimburse me. Moreover, even as costs went up, Perdue did not give me sufficient pay increases to cover them.

    3.    During the time I was growing for Perdue, I knew other growers in my area. Based on my conversations with them, it was always my understanding that Perdue treated other growers as independent contractors, too.

    4.    Beginning in or around 2015, I noticed what I believed to be mistakes in how Perdue weighed the chickens I grew. The weight of the chickens was a central part of how Perdue calculated pay. I raised my concern to Perdue for the first time in 2015 or 2016. In 2017, after an especially egregious error, I called the USDA on the suggestion of one of Perdue's flock advisors.

1

Even though I did not tell anyone at Perdue I had called USDA, Perdue later told me they were aware of the call. Beginning from the time I first raised the weight concerns, and escalating after I called USDA, Perdue increased its control and scrutiny of me even beyond what it had been. Perdue began to take steps to ensure I could no longer grow for Perdue. Ultimately, in the fall of 2019, Perdue refused to place more chickens at my farm.

5. During the time I worked for Perdue, I was never informed by anyone or understood that I might be entitled to minimum wage or overtime pay, that I might be misclassified as an independent contractor, or that Perdue's control of me might be a violation of Perdue's contract with me that would allow me to seek legal relief. While I didn't like the way Perdue treated me and thought it was wrong, I believed my independent contractor status and Perdue's control and requirements of me was just the way things were and there was nothing the law allowed me to do about it.

6. After the issues with the weights, I started to believe Perdue was purposefully trying to make it so I couldn't grow for them anymore. I thought they were doing this by putting more controls and requirements on me and by refusing to loan me money, as they had done repeatedly before, to pay for additional upgrades they required to the farm.

7. When I believed Perdue was starting to take steps to remove me, I reached out to an attorney to see if there was anything I could do. After talking to an attorney, however, my belief that I had no recourse was even stronger. In fact, it was my understanding at that time that integrators had some laws changed—although I did not know which ones—so that no one could bring legal claims against them.

8. After Perdue stopped allowing me to grow chickens for them, I had no income source other than social security and there were no other integrators in my area who I could seek

work with. But I still had mortgages on two chicken farms. Without a contract, I could not use my chicken farm to earn money.

9. On July 29, 2021, I filed for bankruptcy. This is the only time I've filed for bankruptcy. I hired an attorney that I found by searching online to represent me in the bankruptcy.

10. Even after consultations with my bankruptcy attorney, I still had no understanding that I might have any legal claims against Perdue.

11. At the time of my bankruptcy, I was estranged from my son and ex-wife. Before my bankruptcy, my son had previously removed farm equipment from my Milledgeville, GA, farm and, due to the estrangement, I did not know whether he still possessed it. During my bankruptcy though, my son did tell me he still had my equipment and that he thought I needed to tell my bankruptcy lawyer about it. My bankruptcy lawyer amended my bankruptcy filing to include the equipment.

12. My bankruptcy case was closed on February 2, 2022.

13. Until just in the last few weeks, I did not know or understand that, even after it was closed, I might have to reopen by bankruptcy if I discovered new property, and I never knew or understood that legal claims I might bring later could still be part of my bankruptcy. Until just the last few weeks, it was my understanding that my bankruptcy was over.

14. After my bankruptcy was closed, I was still reeling from the fallout of Perdue ending my work for them. I was broke, divorced from my wife of 40 years, my son had committed suicide in 2019, and my mother had died of sepsis in a retirement home just a few weeks later. My son's death and my mother's illness only occurred because they had been forced to move out of our home on the farm. All of this I believe was a direct result of the financial strain our family had

been under due to Perdue's actions. Trying to come to terms with all of this, I continued trying to look for help or to help others avoid similar treatment.

15. I was connected to Fairmark Partners, LLP, my attorneys in this matter, for the first time on March 9, 2022.

16. It was only after connecting with the attorneys at Fairmark Partners that I understood for the first time that I might have legal claims against Perdue relating to unpaid wages and overtime, misclassification, Perdue's control of me, and Perdue's requirement that I pay for significant upgrades and repairs in order to work for Perdue. I had never heard of the Fair Labor Standards Act or its related rights for workers until after I was connected with Fairmark Partners.

17. Even after I decided to move forward with the pending lawsuit, I did not know or understand that it might have any relationship to my bankruptcy case since this lawsuit occurred after my bankruptcy.

18. It was not until just the last few weeks that I learned for the first time that this case might have any impact on my bankruptcy.

19. When I learned that, I reconnected with my bankruptcy lawyer and reengaged him to take whatever action is required. On June 12, 2025, he filed a motion to reopen my bankruptcy to disclose this case.

20. I have no legal training and, before filing this lawsuit, no prior experience with the Fair Labor Standards Act or other claims that might apply to Perdue's misclassification or treatment of me.

21. In all prior litigation in which I have an attorney, I have relied on them and trusted them entirely to advise me on the law and what it requires of me.

22. If I had understood during my bankruptcy that I had potential legal claims against Perdue and that I was required to disclose them, I, of course, would have done so. I never tried to hide or conceal anything from my bankruptcy attorney and complied with whatever he told me I needed to do. I never tried to hide or conceal anything from the bankruptcy court, and I never intended to file an incorrect disclosure with the bankruptcy court.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 12, 2025, in Abbeville, South Carolina.

_Roger Dale Parker_
Roger Dale Parker