**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

ROGER PARKER,

        Plaintiff,

v.

PERDUE FOODS LLC,

        Defendant.

CIVIL ACTION
NO. 5:22-CV-00268-TES

## **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT[1]**

---

[1] Defendant Perdue Foods LLC ("Perdue" or "Defendant") submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Defendant concurrently submits herewith its Statement of Undisputed Material Facts ("SUMF") pursuant to Local Rule 56. Cites herein to the SUMF refer to the respective paragraph numbers in the SUMF itself.

## I.    <u>INTRODUCTION</u>

Plaintiff was an independent business owner who grew broiler chickens for Perdue with his (ex-wife) business partner. Plaintiff first signed a Poultry Producer Agreement ("PPA") with Perdue in 2006, which set forth the parties' respective rights and responsibilities and created an independent contractor ("IC") relationship. As an independent grower with substantial prior experience in the industry, Plaintiff owned and operated two farms (Hazel Lee and Parker's Poultry) and at one point even operated a third (Roosevelt Farm). During his time as a grower, Plaintiff also simultaneously operated an outside equipment business; employed various individuals to work for him, including on a full-time basis; and made substantial investments in his farming operations, which he deducted on his tax returns and financed through a series of small business loans. Despite these undisputed facts, Plaintiff now claims he knew the relationship with Perdue was inconsistent with IC status "from day one" and that he was subjected to "supervision over everything from the beginning."[2] Yet he waited to file any claims against Perdue until 15 or 16 years later—in July of 2022, close to three full years after he stopped working for Perdue. In his lawsuit, Plaintiff claims that Perdue breached its contract with him, made negligent misrepresentations, and misclassified him as an IC, resulting in unpaid overtime and minimum wages under the Fair Labor Standards Act ("FLSA").

Even if Plaintiff's claims are not time-barred (many should be), the undisputed material facts warrant summary judgment for Perdue. First, Plaintiff's breach of contract claim fails because Plaintiff failed to identify a single paragraph in the PPA that Perdue breached. Nor can he. Each of the things Plaintiff challenges was either expressly permitted by the PPA, required by it, or does not breach any provision of it. Moreover, while testifying that "it's not [his] goal" to seek monetary

---

[2] SUMF 115, 119, 130.

damages in this lawsuit,[3] the only damages Plaintiff clarified he was seeking (loss in value of his farm) and for which he submitted any evidentiary proof are not recoverable. Plaintiff's negligent misrepresentation claim fails for similar and other reasons. And finally, summary judgment is warranted on Plaintiff's FLSA claims[4] because Plaintiff was exempt from overtime and paid much more than minimum wage for the mere two-week period he worked in the three-year statute of limitations, even assuming it applies (which Perdue denies). In the absence of any genuine issues of disputed material facts, which Plaintiff cannot establish, Plaintiff's claims must be dismissed.

## II.    BRIEF SUMMARY OF UNCONTESTED FACTS

### A.    Background Facts

Perdue is a poultry integrator that contracts with chicken farmers (also known as "growers") to raise chickens. (SUMF 1).[5] The growers with whom Perdue contracts are IC business owners who own the land on which they grow chickens and the chicken houses in which the chickens are raised. (SUMF 1-3). As owners of the facilities, and pursuant to the PPA they sign with Perdue, the growers have responsibility to provide "necessary housing and equipment" and "to maintain such housing and equipment in a state of good repair and operable condition," among other things. (SUMF 7). Plaintiff was one such grower who started growing broiler chickens for Perdue in 2006 and hasn't grown any chickens or performed any other work for Perdue since August 5, 2019. (SUMF 2, 26, 100-101).

---

[3] SUMF 134.

[4] Perdue firmly believes that Plaintiff was an IC under the FLSA. However, because there may be genuine issues of material fact under the economic realities test for Plaintiff's FLSA claims given the record in this case, Perdue is not moving on that basis here without waiving any rights to vehemently pursue that defense at trial.

[5] A poultry integrator is a large poultry company which owns and supplies chickens to independent growers who raise the chickens on their own farms, providing the facilities and equipment to do so. (SUMF 1, 3-4). Other poultry integrators include Tyson Foods and Pilgrim's Pride, for example, and use of IC growers with integrators is widely established. (SUMF 4).

The PPAs signed by Perdue and growers like Plaintiff clearly outline the parties' respective rights and obligations, including that it creates an IC relationship, and the relationship between them otherwise contains indicia of IC status. (SUMF 2, 7, 10-11). This includes the right to hire employees to perform all or some of the work; the right to grow other crops or livestock (so long as it isn't poultry) on their farms, which is referred to as "diversified farming"; the right to operate outside businesses; and the right to own multiple farms with multiple chicken houses to increase profits—all of which Plaintiff did.[6] (SUMF 11, 38, 43-49). Growers are paid under a competitive tournament system, which provides opportunities for profit or loss by providing greater compensation to those who grow birds more efficiently through things like tier upgrades to their houses, effective bird husbandry, and other best management practices.  (SUMF 20).

Plaintiff, through his d/b/a businesses Parker's Poultry and Hazel Lee Farms, that he owned and operated with his ex-wife, executed multiple PPAs with Perdue beginning in June 2006, with the last PPAs for these farms being executed in 2014 and 2016, respectively. (SUMF 26, 28, 30, 38). Prior to contracting with Perdue, Plaintiff had extensive experience as a grower with other integrators. (SUMF 27). While a grower with Perdue, Plaintiff first purchased and operated a farm in Hillsboro, Georgia, investing $1.3 million in this property. (SUMF 28-29). Shortly thereafter, he decided to upgrade the chicken houses to a higher tier as a way to increase his profits. (SUMF 29). A few years later, after determining that the "profit-to-loss ratio" would be better on a second property with more chicken houses, Plaintiff decided to buy another farm in Milledgeville, Georgia that had six houses, investing around $980,000 on this farm. (SUMF 30-34). Plaintiff financed the

---

[6] Despite claiming Perdue prohibited growers from working with any other fowl of any kind, Plaintiff also held a full-time manager position at a quail company for approximately one year. (SUMF 47). During that time, like various other times he was a grower with Perdue, he hired someone else to run the farm for him on a full-time basis. (*Id.*). Plaintiff also grew livestock on his farm, which he ultimately sold for over $24,000 (SUMF 43) and operated a separate company, "Parker's Poultry and Equipment," which performed work for other growers with Perdue and other integrators and was listed as an "approved vendor" with Perdue for some time. (SUMF 44-46).

purchase of these farms, and subsequently refinanced or took various loans for additional upgrades or equipment, mostly through First Financial Bank. (SUMF 29, 34-37, 49). Many of these loans were small business loans made under a United States Small Business Administration nationwide program that uses tax dollars to assist small business owners. (SUMF 49). Plaintiff understood that he was responsible for paying these loans in connection with his farming businesses, that he would be responsible upon default, and that he assumed the risk of loss or potential profit with these farms "either way… win or lose." (SUMF 36-37).

Plaintiff grew at both farms from 2009 until 2015, hiring various employees to operate one of the farms for him full-time while he worked on the other farm with his then wife. (SUMF 38-41). He gave his employees a place to live and paid them a salary. (SUMF 40-41). For a limited time in 2008, Plaintiff also took over the operation of a third farm, Roosevelt Farm, hiring a full-time employee to operate that farm for him as well. (SUMF 48). In 2015, Plaintiff assigned his Hillsboro farm to his son and only grew at his Milledgeville farm from 2015 to 2019. (SUMF 50). As a grower, through his efforts, Plaintiff increased his net worth substantially, from $174,000 to $1,740,000 from 2014 to 2018. (SUMF 52).

While a grower, Plaintiff spent his time growing and caring for Perdue's chickens. (SUMF 53). He also performed various maintenance work around the farm or to the chicken houses themselves, all of which was directly related to the welfare and upkeep of the chickens or was necessary to prepare for the next flock. (SUMF 54). Consistent with his admitted responsibilities, Plaintiff represented that he was primarily engaged in farming and agriculture to the IRS, filing "Profit or Loss from Farming" tax returns, and obtaining an Agricultural Tax Exemption from the State of Georgia for 2012-2017. (SUMF 55).

On or about December 16, 2016, after signing similar PPAs in the interim, Plaintiff signed his final PPA with Perdue (the "2016 PPA"). (SUMF 26). The 2016 PPA, like all other PPAs he signed, explicitly required Plaintiff "to provide the necessary housing and equipment" to grow birds and "to maintain such housing and equipment in a state of good repair and operable condition." (SUMF 56-58). This requirement, along with a notice that this may require large additional capital expenditures by Plaintiff, is set forth in bold, capitalized font on the front page.[7] (SUMF 58). The 2016 PPA, like prior PPAs, also required Plaintiff to perform his services in accordance with "PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards,"[8] to "comply with any bio-security policies, audits, measures or guidelines required by PERDUE"; and to "adhere to the PERDUE Poultry Welfare and Bio-Security Programs," among other things. (SUMF 59). The 2016 PPA also explicitly provided Perdue with various rights, such as the right to enter Plaintiff's property to inspect the flock and facilities to ensure the proper care of the flock, and the obligation to provide the feed, medications, and other supplies for the health and welfare of the birds. (SUMF 6, 60).

Throughout his last several years as a grower, however, Plaintiff repeatedly failed to maintain his equipment and facilities in safe operating condition in direct violation of the PPA,

---

[7] The 2016 and 2014 PPAs state:

**PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

***ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.***

(SUMF 58).

[8] The 2014 and 2016 PPAs also provides: "PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards." (SUMF 59(a)).

which resulted in significant animal welfare concerns, including incidents in November 2014 and January 2017, and several letters and flock summary reports regarding the same. (SUMF 66, 80-81).[9]

On October 16, 2018, Perdue sent Plaintiff a certified letter advising that he was not in compliance with his obligation under the 2016 PPA "[t]o feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition." (SUMF 81). The letter also advised Plaintiff that Perdue would not place more birds at Plaintiff's farm until he made necessary repairs, which was standard procedure in that circumstance. (SUMF 81-83). Plaintiff acknowledged some of these issues and indicated he would complete the requested repairs. (SUMF 84). But the issues continued. (SUMF 88-90). On February 13, 2019, Perdue re-sent the October 16, 2018, letter to Plaintiff along with additional notes regarding the continuing substantial animal welfare issues at his farm. (SUMF 89). Plaintiff subsequently completed some—but not all—of the repairs. (SUMF 90-92).

In the spring of 2019, after believing Plaintiff may have done enough to ensure safe conditions for the birds, Perdue placed two additional flocks with him. (SUMF 91). However, once the birds were in the houses, it became apparent that significant animal welfare issues continued due to ineffective or inoperable equipment or poor housing conditions, including substantial issues with ventilation and heating. (SUMF 91-97). In July 2019, Perdue again advised Plaintiff that it

---

[9] Subsequently, in or about August 2017, Plaintiff believed Perdue misrepresented the weights of two flocks he raised, resulting in underpayments to him. (SUMF 67). By October 1, 2017, at the latest, Plaintiff had reported these alleged misrepresentations to both Perdue and the Stockyards and Packers division of the USDA. (SUMF 69). Perdue investigated and, while it could not identify any wrongdoing, made additional payments to Plaintiff for these flocks. (SUMF 71-75). While Plaintiff claims that after his complaint to the USDA, Perdue imposed other requirements on him, he could not identify any grower who was treated differently. (SUMF 86, 87, 120-122, 124). Moreover, he repeatedly testified that the "unfair treatment" really began in 2015-2016—before the complaint—it just allegedly got "worse" after, belying any contention that Perdue specifically targeted him solely due to the USDA complaint. (SUMF 114, 115, 128-131). Importantly, Plaintiff is not asserting a retaliation claim in this case. *See* ECF 90.

would not place any additional flocks until all of the necessary repairs were actually made, but Plaintiff again failed to make the repairs. (SUMF 98-99). The last flock consigned to Plaintiff was placed with him on June 24, 2019, and collected from him on August 5, 2019. (SUMF 100). Plaintiff performed no work for Perdue after August 5, 2019. (SUMF 101). Plaintiff received a net payment for his last flock of $18,115.12. (SUMF 102).

Approximately two months later, on September 29, 2019, Perdue sent two additional letters to Plaintiff regarding the necessary repairs he needed to make if he wanted to receive more birds or upgrade that would be required if he sold his farm. [10] (SUMF 103). At this time, Plaintiff's farm was in the worst condition of any other farm in the area and extensive repairs or improvements were required before birds could be safely placed there. (SUMF 105). Had Plaintiff made the repairs, he could still be receiving flocks. (SUMF 106-107). However, Plaintiff did not complete the repairs or find another buyer to complete the repairs, claiming they were too expensive and faulting Perdue for not loaning him money. (SUMF 107-109). Instead, Plaintiff defaulted on his loans, and his farm was foreclosed on. (SUMF 108-109). Plaintiff filed for bankruptcy on July 29, 2021, two years after he stopped growing for Perdue. (SUMF 101).

### B.    Plaintiff's Claims in the Present Case

On July 22, 2022, close to full three years after he stopped growing for Perdue, Plaintiff filed his initial Complaint alleging individual and class claims. (SUMF 104-105; ECF 1). This Court later denied conditional certification and dismissed Plaintiff's class claims outside of Georgia, along with his individual claims for unfair and discriminatory practices, unjust

---

[10] Since at least 2015, Perdue has required any new contract growers to have Tier 4 houses. (SUMF 104). When selling a farm, either the selling or purchasing grower can perform the upgrades. (SUMF 104). While Perdue did provide loans to growers from time to time to assist with repairs or upgrades, including Plaintiff on several occasions, Perdue declined to provide Plaintiff with financing in 2018 or for these repairs because it had previously loaned Plaintiff money to upgrade his houses to Tier 4 but Plaintiff had failed to complete that upgrade. (SUMF 24, 76-79).

enrichment, and fraud. (ECF 27, 77, 87).[11] On October 16, 2024, after dropping his Georgia-based class claims, Plaintiff filed his Amended Complaint asserting claims for minimum wage and overtime under the FLSA, breach of contract, and negligent misrepresentation. (ECF 90).[12] As discussed below, the undisputed material facts establish that Plaintiff's claims lack merit, are time-barred, and/or otherwise fail as a matter of law. Summary judgment is warranted appropriately.

## III.    ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quotations and emphasis omitted). "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial." *Demyan v. Sun Life Assurance Co. of Canada*, 148 F. Supp. 2d 1316, 1320 (S.D.Fla.2001) (citing *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991)). Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant summary judgment in such event. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

[11] In the decision dismissing Plaintiff's class claims, the Court determined Maryland law applies to Plaintiff's breach of contract claim and Georgia law applies to his negligent misrepresentation claim. (ECF 87 at pp. 14, 20-21).

[12] Plaintiff also asserts a claim for declaratory relief. (ECF 90 at pp. 24-25). However, this claim also must be dismissed. Plaintiff is a former grower who has not alleged any facts demonstrating that the alleged harm caused by Perdue is ongoing as to him or will be repeated. (*See id.*; SUMF 100-101, 110). Because the court can only award declaratory relief in cases of "actual controversy," this claim must be dismissed. *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).

**B.    Summary Judgment Is Warranted on Breach of Contract.**

First, the undisputed material facts establish that summary judgment on Plaintiff's breach of contract claims is appropriate for several reasons, any one of which independently supports summary judgment here.

1.    <u>Plaintiff's Claims for Breach Based on IC Status and Events Prior to July 2016 Are Time-Barred.</u>

First, Plaintiff's breach of contract claim must be dismissed to the extent it is time-barred. The statute of limitations for this claim is six years. O.C.G.A. § 9-3-24.[13] The limitations period runs from "the time the contract is broken rather than from the time the actual damage results or is ascertained." *Hamburger v. PFM Cap. Mgmt.*, Inc., 286 Ga. App. 382, 385, 649 S.E.2d 779 (2007) (quoting *Moore v. Dept. of Human Res.*, 220 Ga. App. 471, 472, 469 S.E.2d 511 (1996)); *see also Wallace v. Bock*, 279 Ga. 744, 747 (2005) (same). Importantly, "[m]ere ignorance of the facts constituting a cause of action does not prevent the running of the statute of limitation." *Millard Matthews Builders, Inc. v. Plant Improvement Co., Inc.*, 167 Ga. App. 855, 307 S.E.2d 739, 740 (Ga. Ct. App. 1983). In his Amended Complaint, Plaintiff claims Perdue breached the PPA by failing to treat him as an "independent contractor" and not "allowing him to utilize his independent judgment and skill in the performance of his work."[14] (ECF 90 at ¶ 114). But on deposition, after admitting that he "do[esn']t have a clue what all [his lawsuit] alleges," Plaintiff definitively testified that he was never fully able to exercise his skill and independent judgment and that Perdue "pretty much controlled everything" and "supervise[d] every aspect of it" from

---

[13] While Maryland substantive law applies to Plaintiff's breach of contract claim, the forum state's procedural law governs the statute of limitations. *See Beal v. Hartford Fire Ins. Co.*, 2021 U.S. App. LEXIS 20615, at *4 (11th Cir. July 13, 2021) (under Georgia's conflict of law rules, statutes of limitations are procedural and the forum state's statute of limitations will apply absent an express agreement that the statutes of limitation of another jurisdiction will apply).

[14] This claim is also belied by the evidence, which confirms that Plaintiff had the ability to—and did—exercise independent judgment and discretion in myriad ways, including through owning and operating three farms at one point, hiring employees to work for him on a full-time basis, operating an outside business, engaging in diversified farming, making improvements to his facilities to increase his profitability, and others. (SUMF 30-34, 38-49).

the beginning (or from 2006-2007). (SUMF 112, 116-117, 119).[15] Yet Plaintiff did not assert these claims until July 2022. He cannot now, 15-16 years after the fact and in the face of these extensive admissions, assert claims he readily admits arose well outside of the statute of limitations. To the extent his breach claim is based on this allegation, or any other incidents arising prior to July 2016, it is time-barred.[16]

### 2. Plaintiff's Breach Claim Fails Because He Cannot Identify a Single Paragraph That Was Breached.

Second, Plaintiff's breach claim fails because, on deposition, he was unable to point to a contractual obligation that Perdue breached. Under Maryland law, "[t]o prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001) (citation omitted); *see also RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 658, 994 A.2d 430 (2010) (identifying the essential elements of breach of contract as: "(1) the existence of a contractual obligation owed to the plaintiff by the defendant, and (2) a material breach of that obligation by the defendant"). "It is axiomatic that a plaintiff cannot prevail in an action for breach of contract if the defendant did not have a contractual obligation to do what the plaintiff alleges the defendant should have done." *Am. Bank v. Bay Bank, FSB*, 2014 Md. Cir. Ct. LEXIS 139, *21-22. And, it is well-established that "[t]he success of

---

[15] Specifically, Plaintiff testified that when he first sat down to sign an agreement with Perdue "[t]hey basically told [him] that they would come out and show [him] everything to do; what to do, how to do it. And [he] had to abide by the rules [Perdue] had …[and] if [he] didn't comply, basically, [he] got cut off." (SUMF 117). He later testified that at the beginning of the relationship, Perdue was "up front with telling [him]… [h]e had to follow the guidelines and…everything [Perdue] said for daily working the birds and everything," that "[h]e had to abide by the rules that [Perdue] had," and "pretty much – you know, do what we say and when we say to do it and everything will be good." (SUMF 118). These examples are far from exhaustive. (*See* SUMF 70, 114-116, 119, 129-131).

[16] Plaintiff further testified that his claims regarding the "quality" of chicks consigned arose in 2015, his claims regarding failure to provide "sufficient inputs" arose in 2016, and his claims regarding "information" as to his compensation, arose in 2016 or 2017 as well. (SUMF 114, 115, 127, 128). Each of these claims is time barred to the extent they arose prior to July 2016. And, the undisputed facts show Plaintiff **was not** targeted with bad inputs. (SUMF 128).

[plaintiff's] breach of contract claims hinges on [plaintiff's] ability to point to contract provisions imposing unambiguous duties upon [defendant], which duties [defendant] has breached." *Wootton Enters. v. Subaru of Am., Inc.*, 134 F. Supp. 2d 698, 703 (D. Md. 2001), citing *Continental Masonry Co. v. Verdel Construction Co.*, 279 Md. 476, 369 A.2d 566, 569 (Md. 1977) (holding that plaintiff "must of necessity allege with certainty and definiteness *facts* showing a contractual obligation …and a breach of that obligation by the defendant.") (emphasis in original).

On deposition, Plaintiff was wholly unable to identify any contractual obligation that Perdue breached, despite being asked repeatedly to do so. When asked about the paragraphs of the PPA that he believes Perdue breached, Plaintiff testified: "I don't have the answer to that because I basically shared the story and, you know, with my attorneys, and they would have known what was breached and what wasn't breached, not me. I mean, I don't know all that." (SUMF 113). This is not sufficient. Plaintiff is bringing these claims, and Plaintiff has the affirmative obligation to articulate the factual basis for his claims, including by identifying which paragraph of the contract he claims was breached in the first instance. Merely identifying the factual basis for his claims is not a "legal conclusion," as Plaintiff will argue, and he cannot blindly rely on his lawyers to fill in the blanks.[17] Indeed, in cases like this, where the plaintiff cannot identify a specific contractual provision that was breached, courts have not hesitated to dismiss breach of contract claims outright. *See, e.g., Gooden v. Wells Fargo Home Mortg.*, No. AW-08-2521, 2010 U.S. Dist. LEXIS 25701, at *8 (D. Md. Mar. 17, 2010) (granting summary judgment where plaintiffs failed to

---

[17] While Plaintiff repeatedly asserted that he is "not a lawyer" and Plaintiff's lawyers elicited admissions on cross that he does not know the "legal definition" of various terms, this is inapposite. (SUMF 111-113, 130, 132). At a bare minimum, a plaintiff must be able to articulate the factual basis for his claims in discovery. To hold otherwise would allow plaintiffs to completely stonewall defendants on deposition, claiming "they don't know" the facts to support their claims, only to allow the plaintiff's lawyers to clean it up afterwards without defendant being able to conduct discovery on the same. This is exactly what Plaintiff is trying to do here by repeatedly testifying that he doesn't know what claims he is bringing, what paragraphs were breached, or what damages he is seeking. (SUMF 111-113, 134-136).

identify the contractual provision allegedly breached and noting that "[w]ithout producing this contractual provision, Plaintiffs cannot factually support the first element of their claim."); *Beatty v. BAC Home Loans Servicing, LP*, Civil Action No. RDB 10-2229, 2011 U.S. Dist. LEXIS 66909, at *5-7 (D. Md. June 21, 2011) (granting summary judgment because at deposition plaintiff identified, as the basis for his breach claim, provisions that did impose contractual obligations on defendant).

Rather than pointing to an actual contractual obligation that was breached, Plaintiff repeatedly testified that his breach of contract claim is based on his belief that the PPA "didn't seem fair" and Perdue was "unfair." (SUMF 114 (the "contract …didn't seem to be fair"); SUMF 111 (testifying that his understanding of what he is claiming in this lawsuit is "[u]nfair -- I mean, basically, I was ran out of business" and further testifying that "…the contract was breached by not—I mean, we didn't have a fair system, in my opinion."). The only provision of the PPA that Plaintiff even attempted to identify as having been breached on deposition was Perdue's agreement "to consign available birds." (SUMF 5, 114). But on deposition, Plaintiff admitted Perdue did, in fact, consign birds to him. (SUMF 114). Plaintiff just felt the birds were "not worthy to be even put in the house" or "had lack in quality," which "didn't seem…fair to [him]." (SUMF 114). He also claimed that he received "lesser quality in feed, in chickens." (SUMF 115). Even if true, which is denied, this cannot form the basis for a breach claim. The PPA explicitly provides that Perdue shall have "**sole and absolute discretion**" over the chicks consigned to Plaintiff, that Perdue shall provide the feed, and that Plaintiff shall "use only the feed . . . which Perdue has provided." (SUMF 5-6, 61). Absent pointing to a provision Perdue breached, this claim fails.[18]

---

[18] *See also Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1327 (11th Cir. 2005) (plaintiff did not state breach of contract claim because he could not point to any specific provision in the poultry producer agreement that Cagle breached—the company did not have any obligation to provide a specific number of flocks, they did not intentionally given him inferior feed or birds, and did not intentionally misweigh birds).

3. <u>Plaintiff Cannot Prove His Own Compliance with the Contract.</u>

Third, Plaintiff's breach claim fails because the undisputed material facts establish Plaintiff did not comply with the terms of the PPA himself. Maryland law provides that "[o]n a claim for breach of contract, the plaintiff…asserting the claim…bears the burden of proving all elements of the cause of action, including plaintiff's own performance of all material contractual obligations." *Collins/Snoops Assocs. v. CJF, LLC*, 190 Md. App. 146, 161, 988 A.2d 49, 57-58 (2010), *citing Johnson & Higgins v. Simpson*, 163 Md. 574, 581, 163 A. 832 (1933) ("[O]ne who sues for the breach of a contract which requires him to perform certain acts before he becomes entitled to demand that for which he sues, must allege and prove performance on his part."); *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260-61 (4th Cir. 1981) ("We think it certain that under Maryland law, a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party.").

Here, Plaintiff has not and cannot prove that he complied with his contractual obligation "[t]o feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition." (SUMF 56-57). Rather, the undisputed evidence establishes that Plaintiff: (1) repeatedly breached his obligation to care for the birds consigned by providing the necessary equipment or housing in good operating condition, which resulted in substantial animal welfare concerns; (2) never made the latest repairs Perdue requested in order to comply with his contractual obligations; and (3) could still be growing for Perdue if he had. (SUMF 66, 80-107). In the absence of evidence that Plaintiff himself fully complied with the PPA's terms, which he cannot provide, his breach claims fail.

4.    <u>The PPA's Terms Either Expressly Permit, or Do Not Explicitly Prohibit, the Actions Plaintiff Challenges.</u>

Even if the Court excuses Plaintiff's failure to comply with the PPA himself, his breach claim still fails because he cannot establish that Perdue, in fact, breached any provision of the PPA (whether he could identify it on deposition or not).[19]

First, Plaintiff's breach claim challenging Perdue's alleged failure to allow Plaintiff to utilize his independent judgment and skill is not only time-barred but is also *explicitly qualified* in the PPA itself. The PPA provides that use of this judgment and skill would be "informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards." (SUMF 10, 59). Further, while Plaintiff contends Perdue breached the contract by "subjecting [him] to exhaustive, mandatory guidelines and supervision by Perdue managers" (ECF 90 at ¶ 115), under the PPA, he agreed to: (1) "comply with any bio-security policies, audits, measures or guidelines required by PERDUE;" (2) "adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock;" (3) "provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs;" and (4) "refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE," among other things. (SUMF 56-59). While Plaintiff does not like having to comply with these industry standards or best practices, they were explicitly referenced in the PPA, he agreed to comply with them by signing the PPA,[20] and, as

---

[19] This Court has an "affirmative obligation … to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). At summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

[20] Plaintiff admitted on deposition that several of the requirements he challenged were "Perdue established procedures" that he agreed to comply with in the PPA. (SUMF 125). And, the undisputed evidence establishes that these various procedures are geared towards animal welfare, are required to obtain an audit-readiness bonus, or are otherwise best management practices to help the grower be successful, which are standard in the industry. (SUMF 13-19).

such, they cannot support a breach claim.[21] This is particularly true in light of the substantial, undisputed evidence that Plaintiff did, in fact, exercise significant independent judgment and discretion in the operation of his business otherwise, including whether he even performed the work personally or hired someone else to do it. (SUMF 40-42, 47-48, 64).

Plaintiff's attempt to point to flock visits by his flock supervisor as a breach fares no better because the PPA explicitly provided that "PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities." (SUMF 60). In either event, Plaintiff admitted at deposition that Perdue did not breach the PPA by obligating Plaintiff to permit supervisors on his farm. (SUMF 126). While Plaintiff also claims Perdue breached the PPA by refusing to provide him with "accurate information used to determine …compensation" (ECF 90 at ¶ 117), the PPA merely requires Perdue to "provide to PRODUCER **upon request**…statistical information and data regarding PRODUCER and used by PERDUE to determine compensation." (SUMF 21). And, Plaintiff admitted that Perdue "tried" provide the requested information when he asked, he just could not understand it because there were "too many factors." (SUMF 127). While Plaintiff attempts to show a breach by claiming he was not provided with sufficient inputs, there is no provision in the PPA requiring Perdue to provide Parker with "sufficient inputs for raising chickens" (ECF 90 at ¶ 118) nor can Plaintiff substantiate that he was, in fact, provided with insufficient inputs at any time that remained unaddressed. (SUMF 128).  In either event, he provided no evidence of damages for the same.

---

[21] Plaintiff appears to argue that because Perdue did not provide him with each specific guideline or policy when he signed the contract, and introduced later requirements, Perdue breached the PPA. This fails. There is nothing in the PPA requiring Perdue to provide every specific guideline or requirement at the time of contracting. In fact, the PPA is intentionally open ended on this point, making it clear that it covers any guideline or alleged requirement that may be promulgated in the future. (SUMF 14).

And finally, while Plaintiff claims Perdue breached the PPA by requiring him to provide maintenance to his houses before placing more birds with him, there is nothing in the PPA requiring Perdue to provide Plaintiff with any specific number of flocks per year or birds per house. (*See* SUMF 61). Moreover, Plaintiff explicitly agreed under the PPA to: (1) "provide the necessary housing and equipment, and to maintain such housing and equipment in a state of good repair and operable condition;" and (2) "feed, water, care for and otherwise manage the birds consigned." (SUMF 56-57). When signing the PPA, he also explicitly agreed that "ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED." (SUMF 58).[22] While Plaintiff repeatedly claims he was targeted with the repair lists, he admitted on deposition that he had no idea whether other growers were treated differently regarding repairs or oversight or what other growers may have had listed on their flock reports. (SUMF 86-87, 119-122). Moreover, it is undisputed that Plaintiff's farm was *in far worse condition* than any other growers' farm at the time, necessitating this kind of list. (SUMF 105). Simply stated: Perdue did not breach the PPA by requiring Plaintiff to comply with its terms, and Plaintiff's claim to the contrary fails.

### 5.    Perdue is Not Liable for Plaintiff's Alleged Damages.

Finally, even if Plaintiff can establish breach of contract (he cannot), he hasn't provided any proof of recoverable damages, which is fatal to his claim. The damages recoverable on a breach of contract claim are those "caused by the breach" of the contract. *Simard v. Burson*, 197 Md. App. 396, 415, 14 A.3d 6, 16 (2011). Recoverable general damages are only those "which may fairly and reasonably be considered as arising naturally from the breach" while recoverable special or

---

[22] To the extent Plaintiff claims he was subjected to "more strenuous controls" after he contacted USDA (ECF 90 at ¶ 118, he admits many of these incidents actually started in 2015-2016 *before* the USDA complaint. (SUMF 69, 129). Plaintiff also repeatedly testified he has no personal knowledge of what happened with other growers—meaning, he cannot support that he was treated differently. (SUMF 86-87, 119-122). The only competent evidence Plaintiff can cite for "different treatment" was that he was required to obtain propane, which was justified given he ran out of it previously. (SUMF 123).

consequential damages are only "those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract." *Addressograph-Multigraph Corp. v. Zink*, 273 Md. 277, 286, 329 A.2d 28, 34 (1974). Moreover, private contracts may relinquish the right to recover consequential damages or otherwise limit the judicial remedies available to the parties. *Wolf v. Ford*, 335 Md. 525, 644 A.2d 522, 525 (Md. 1994) (discussing the general rule in Maryland that "[i]n the absence of legislation to the contrary, exculpatory clauses are generally valid, and that the public policy of freedom of contract is best served by enforcing the provisions of the clause").

Here, Plaintiff testified repeatedly that he wasn't seeking to recover monetary damages.[23] (SUMF 134-136). After realizing how damning of an admission this was, Plaintiff's counsel had Plaintiff clarify that he is seeking damages for his Milledgeville farm becoming "worthless without a working contract" with Perdue. (SUMF 137). But that was it. Nor was any evidence offered in discovery otherwise regarding actual damages arising from any breach. While not completely clear, it appears Plaintiff is claiming his damages equal the value of the farm, which he allegedly lost because Perdue declined to place birds with him unless he made required repairs. (*Id.*) However, any such damages are simply not recoverable even if this was a breach (it was not). This is because Plaintiff specifically waived any right to receive any incidental, indirect, nominal, consequential, exemplary, or non-compensatory damages under the plain and unambiguous terms of the PPA. (SUMF 65). The kind of "lost value" damages Plaintiff is seeking are a textbook example of consequential damages (i.e., as a consequence of Perdue's breach, Plaintiff lost the value of his farm), which Plaintiff specifically waived. (*Id.*).

---

[23] For example, when asked "Are you seeking to recover any money?" Plaintiff answered: "No. I'm seeking to help other farmers not to go through what I went through." (SUMF 134). He also testified "I'm not seeking—its not my goal" to obtain any money in this lawsuit and that "[he doesn't] have dollar figures, no." (SUMF 134, 136). He later testified that "it may be" that he is seeking overtime, but he couldn't say either way. (SUMF 135).

Even if Plaintiff had not waived all claims to consequential damages, he cannot prove that Perdue's actions, rather than his own, proximately caused his alleged losses or that his claimed damages were reasonably contemplated by both parties at the time of making the contract. The PPA clearly provides that Plaintiff was responsible for the facilities and equipment, for making any necessary repairs to maintain the equipment in "good repair and operable condition," and that "additional capital investments may be required." (SUMF 7-8, 56-58, 81). In other words, the parties *never contemplated* that Perdue would be responsible for the cost of repairs, expenses pertaining to the farm, or the cost of the farm itself—they explicitly contracted for the exact opposite. Nor was there any loss in value in the reasonable expectation of the parties. On deposition, Plaintiff agreed that "if the property increased in value [he] would gain the benefit of that increase in value" and further explained "[t]hat could go either way on win or lose." (SUMF 36). He also admitted he was responsible for payment of the loans, would be responsible upon default, and assumed the risk for profit or loss either way. (SUMF 35-37). In sum, even Plaintiff understood he would be on the hook for diminished value. (*Id*.). These damages are simply not recoverable as a matter of law.

### C.    Defendant is Entitled to Summary Judgment on Plaintiff's Negligent Misrepresentation Claim.

Plaintiff's claim for negligent misrepresentation also must be dismissed. First, there is no question that Plaintiff's claims are time-barred. Under Georgia law, actions for negligent misrepresentation must be brought within four years of when the right of action accrues. O.C.G.A. § 9-3-31; *Coe v. Proskauer Rose, LLP*, 314 Ga. 519, 878 S.E.2d 235, 241 (Ga. 2022). The claim accrues on the date the plaintiff first suffers a non-speculative economic loss in reliance on the misrepresentation. *Id.* at 526; *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc*.,

267 Ga. 424, 426 (1), 479 S.E.2d 727, 427 (1997). Here, this means that any claims based on events occurring before July 2018 are time-barred. <u>By Plaintiff's own admissions, they all are.</u>

As discussed above, Plaintiff testified on deposition that Perdue exercised "supervision over everything from the beginning." (SUMF 119). He also testified that Perdue told him he "had to abide by the rules [Perdue] had . . . [and] if [he] didn't comply, basically [he] got cut off" when he first sat down to review the agreement. (SUMF 117-118). Plaintiff testified that Perdue's misrepresentations "got worse" in 2015 or 2016 when Plaintiff alleges Perdue made misrepresentations by "weighing [trailers] from other growers and putting it on [Plaintiff's settlement]," and continued in 2017 when Perdue allegedly misrepresented the weights of chickens Plaintiff raised on flock settlement reports. (SUMF 131). However, through Plaintiff's own text messages and testimony, including the fact he reported this to the USDA by no later than October 1, 2017, there is no question these claims regarding alleged misrepresentations on weight tickets are time-barred. (SUMF 69). Plaintiff also admitted that any claims regarding the quality of chicks arose in 2015 and claims regarding receiving inaccurate information as to his compensation arose in 2016 and 2017 as well. (SUMF 114, 127).

Plaintiff also cannot establish the elements of negligent misrepresentation otherwise. The elements are: (1) the defendant's negligent supply of false information to plaintiff; (2) plaintiff's reasonable reliance upon that false information; and (3) plaintiff's reasonable reliance proximately caused an economic injury to him. *Futch v. Lowndes County,* 297 Ga.App. 308, 312(4), 676 S.E.2d 892 (2009); *Home Depot U.S.A. v. Wabash Nat'l Corp*., 724 S.E.2d 53, 60 (Ga. Ct. App. 2012). The alleged "misrepresentation" must be of a material existing fact or a past event. *Fuller v. Perry,* 223 Ga.App. 129, 131(1), 476 S.E.2d 793 (1996). That is, the claim "cannot be based on mere broken promises, unfulfilled predictions or erroneous conjecture as to future events" and, as such,

negligent misrepresentation "usually cannot result from a mere failure to perform promises made. Otherwise any breach of a contract would amount to [negligent misrepresentation]." *C & C Fam. Tr. 04/04/05 ex rel. Cox-Ott v. AXA Equitable Life Ins. Co.*, 44 F. Supp. 3d 1247, 1256 (N.D. Ga. 2014) (quotations omitted) (*aff'd sub nom. C&C Fam. Tr. 04/04/05 v. AXA Equitable Life Ins. Co.*, 654 F. App'x 429 (11th Cir. 2016).[24] Likewise, "a misrepresentation as to the status of the law, or as to a matter of law, or as to its effect upon the subject matter of a contract…cannot afford a basis for [negligent misrepresentation]." *Gignilliat v. Borg*, 131 Ga. App. 182; 205 S.E.2d 479 (1974).

Courts have recognized that misclassification as an IC or treatment as an employee when the parties' contract calls for IC treatment is not an actionable negligent misrepresentation. *See, e.g., Accord Trucking, Inc. v. FedEx Ground Package System, Inc*., 2024 WL 4602133 (Ariz. App. Oct. 29, 2024) (affirming judgment as a matter of law on negligent misrepresentation claim premised upon defendant's failure to treat plaintiff as an IC as required by the parties' contract because "[e]ven if the contractual relationship ended up resembling an employment relationship…the provisions [regarding IC status] are promises of future conduct between the parties" which cannot be a negligent misrepresentation under Arizona law); *Debnam v. FedEx Home Delivery*, 2011 U.S. Dist. LEXIS 35417 (D. Mass., March 31, 2011) (dismissing negligent misrepresentation claim based on defendant's misclassification of plaintiff as an IC because "[t]he characterization of the relationship is not a statement of 'fact' but rather an assertion of a legal conclusion" and, therefore, "is not properly the basis of a claim for factual misstatements.") The same reasoning rings equally true here.

---

[24] Additionally, where a plaintiff claims negligent misrepresentation "because of a breach of duty growing out of a contractual relation, the breach must be shown to have been a breach of duty imposed by statute or a duty imposed by a recognized common law principle." *Deacon v. Deacon*, 122 Ga. App. 513, 177 S.E.2d 719 (1970); *see also Bouboulis v. Scottsdale Ins. Co.*, 860 F. Supp. 2d 1364, 1380 (N.D. Ga. 2012) (under Georgia law, "a defendant's breach of contract may give rise to a tort cause of action only if the defendant also breached an independent duty created by statute or common law."). Plaintiff cannot make this showing here.

To the extent Plaintiff claims that Perdue is liable for negligent misrepresentation by failing to disclose certain information, such as the policies and procedures to which he would be subject and/or additional requirements to which he was subject, this too fails. That is because, in Georgia, "a failure to obtain and supply information does not state a claim for negligent misrepresentation." *Futch v. Lowndes Cty.*, 297 Ga. App. 308, 312, 676 S.E.2d 892, 896 (2009); *PHL Variable Ins. Co. v. Jolly*, 800 F. Supp. 2d 1205, 1214 (N.D. Ga. 2011), *aff'd sub nom*, *PHL Variable Ins. Co. v. Faye Keith Jolly Irrevocable Life Ins. Tr. ex rel. Shapiro*, 460 F. App'x 899 (11th Cir. 2012) (holding defendant's alleged failure to disclose information to plaintiff is not actionable as negligent misrepresentation absent proof of a false statement by the defendant).[25]

Finally, Plaintiff cannot recover the damages he seeks under both the breach of contract and negligent misrepresentation claim. While a plaintiff is not barred from pursuing both negligent misrepresentation and breach of contract claims, he cannot recover damages on both claims. *UIV Corp. v. Oswald*, 229 S.E.2d 512, 514 (Ga. Ct. App. 1976). Plaintiff failed to provide any proof of damages suffered in reliance on any alleged false representation by Perdue, separate and apart from the alleged loss in value of his farm associated with his breach of contract claims.[26] Even if he could (he can't), Plaintiff can only recover once.

**D.    Plaintiff's FLSA Claims Are Time-Barred.**

Like many of Plaintiff's other claims, his overtime and minimum wage claims under the FLSA are also time-barred. The FLSA provides "every [FLSA] action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action

---

[25] Nor can Plaintiff show the reasonable reliance necessary to sustain this claim. *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1289-90 (11th Cir. 2007). He likewise has provided no evidence to support punitive damages.
[26] While Plaintiff contends Perdue misrepresented the trailer weights, the undisputed material facts establish that Perdue paid him the 6-flock average for these two settlements. (SUMF 73-74).

arising out of a willful violation may be commenced within three years after the cause of action accrued". 29 U.S.C. § 255.  "The burden rests with [plaintiff] to 'prove by a preponderance of the evidence' that [defendant] acted willfully." *Davila v. Menendez*, 717 F.3d 1179, 1185 (11th Cir. 2013) (*quoting Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150, 1162-63 (11th Cir. 2008)); *see also Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1274 (11th Cir. 2008). If plaintiff fails to present evidence that defendant willfully violated the FLSA, application of the two-year statute of limitations is appropriate, even on summary judgment. *Rodriguez v. M.I. Quality Lawn Maint., Inc.*, 2011 U.S. Dist. LEXIS 22905, at *5 (S.D. Fla. Mar. 7, 2011) (holding that "[b]ecause there is no evidence of willfulness, the two year statute of limitations applies and Defendants are entitled to summary judgment" on plaintiff's FLSA claims); *Underwood v. City of Moultrie*, Civil Action No. 7:13-CV-13 (HL), 2014 U.S. Dist. LEXIS 100782, at *15 (M.D. Ga. July 24, 2014) (finding "the FLSA claims are subject to a two-year statute of limitations because there is no…evidence of willful violations" and granting summary judgment to defendants).

Here, Plaintiff has failed to provide any evidence whatsoever to establish that Perdue acted willfully. Nor can he. Virtually every integrator in the poultry industry utilizes IC growers, and the IC status of growers is well supported, including by the National Chicken Council. (SUMF 4). Despite taking two extensive 30(b)(6) depositions and extensive discovery, Plaintiff did not elicit or obtain any discovery to show Perdue acted with knowing or reckless disregard of the law in treating their growers as ICs. Absent the same, and given the undisputed fact that Plaintiff stopped working for Perdue close to three full years prior to his Complaint, Plaintiff's FLSA claims are "forever barred." (SUMF 100-101; ECF 1).

### E.    The Agricultural Exemption Bars Plaintiff's Overtime Claims.

Even if not barred outright by the statute of limitations, and even assuming, *arguendo*, Plaintiff was an employee (which is denied), the two weeks of overtime remaining in the three-

year period are also barred by the agricultural exemption. Under the FLSA, "any employee engaged in agriculture" is exempt from overtime. *See Ares v. Manuel Diaz Farms, Inc.*, 318 F.3d 1054, 1056 (11th Cir. 2003) ("Title 29 U.S.C. § 213(b)(12) provides that the requirements of section 207 shall not apply to "any employee employed in agriculture."). The FLSA defines agriculture to include "**the raising of** livestock, bees, fur-bearing animals, or **poultry**, **and any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations**, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 29 U.S.C. § 203(f) (emphasis added); *see also Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996) (citing *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 300- 301 (1977)) ("Primary farming includes the raising of poultry" and noting that it was undisputed that growers with poultry integrators are engaged in "agriculture".)

The term "agriculture" also includes "practices performed by a farmer or on a farm as incident to or in conjunction with the farming operations" such as "maintenance and protective work." 29 C.F.R. § 780.158(a); *see also Maneja v. Waialua Ag. Co.*, 349 U.S. 254, 270–71, 75 S.Ct. 719, 728–29, 99 L.Ed. 1040 (1955) (holding that the sugar processing exemption under what is now 29 U.S.C. § 213(j) "covers the workmen during the processing season while ... cleaning the equipment during the week-end shut-down, and performing other tasks closely and intimately connected with the processing operation."); *Borja v. Hines Nurseries, Inc.*, 172 F. App'x 927, 928 (11th Cir. 2006) (citing 29 U.S.C. § 213(b)(12); 29 C.F.R. §§ 780. 153, 780.154, 780.155, 780.158) ("Both the Department of Labor and Supreme Court have made clear that activities that are secondary to farming, but supportive of it, are included within the agricultural exemptions to the

FLSA."); *Sariol v. Fla. Crystals Corp.*, 490 F.3d 1277, 1279–80 (11th Cir. 2007) (delivering fuel to farm machinery and maintaining equipment are within secondary agriculture).[27]

Here, Plaintiff was indisputably engaged in the raising and growing of poultry on his property, which is clearly exempt agricultural work. Plaintiff admitted that he spent his time growing and taking care of his chickens. (SUMF 53). While Plaintiff also discussed various maintenance work he performed, all of it was related to the raising of poultry and upkeep, such as mowing grass to keep rodents out and repairing chicken houses, among others. (SUMF 53-54).[28] This, too, is exempt agricultural work because it was performed incidental to and in conjunction with the raising of poultry. By Plaintiff's own admissions to both the IRS and State of Georgia through filing Profit or Loss from Farming tax returns and obtaining an Agricultural Tax exemption, Plaintiff was engaged in agriculture. (SUMF 55).

### F.   Plaintiff's FLSA Minimum Wage Claim is Unsupported and Fails.

Plaintiff's claim for minimum wage likewise fails for the simple reason that he has provided no evidence at all to support it. The FLSA requires, generally, that employers pay their employes at least the statutory minimum wage of $7.25 per hour for all hours worked in a workweek. This requirement is met "if the total wage paid each week divided by the total time worked that week is greater than the minimum wage." *Phillips v. M.I. Quality Lawn Maint., Inc*., No. 10-20698-CIV, 2011 U.S. Dist. LEXIS 161283, at *7-8 (S.D. Fla. Mar. 30, 2011) (collecting cases). An employee who brings a lawsuit under the FLSA for unpaid minimum wages…bears the

---

[27] *Rodriguez v. Pure Beauty Farms, Inc.*, 503 F. App'x 772, 777 (11th Cir. 2013) (agricultural exemption applies because the plaintiffs' work was secondary agriculture, including watering [plants], pruning away dead limbs, leaves and buds and preparing [plants] for market by handling, inspecting and sorting them); *Hedrick v. S. States Co-op. Inc*., 2010 WL 3834631, at *4–5, 7 (E.D.N.C. Sept. 30, 2010) (other tasks such as "pipe fitting," and "electrical work" on fish farm was within secondary meaning of agriculture).

[28] Plaintiff will argue his maintenance work takes him outside of the exemption. But maintenance work only renders the exemption inapplicable when, unlike here, it is *wholly unrelated* to the raising of the animals, such as retiling an indoor pool, painting floors of a retail market, and the like. *See* ECF 23, pp. 10-11 and cases cited therein.

initial burden of proving that she performed the work for which she was not properly compensated." *Del Rosario*, 124 F. Supp. 3d at 1311. If the employer's records of the employee's hours worked are inadequate or inaccurate, the employee may rely on a reasonable estimation of the amount and extent of work but must still provide some evidence to support their claim. *Anderson*, 328 U.S. at 687-88. Once the employee has done so, "[t]he burden then shifts to the employer to come forward…with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Id*.

Even assuming a three-year period applies, which is denied, Plaintiff was paid more than the minimum wage for the two weeks he worked during this period. Plaintiff's last flock was placed with him on June 24, 2019, and collected from him on August 5, 2019. (SUMF 100). Plaintiff's net compensation for this flock was $18,115.12.[29] (SUMF 102). Plaintiff testified that he generally worked 50-60 hours per week when he had chickens. (SUMF 133). Even assuming Plaintiff worked 60 hours per week for the two weeks in the applicable statutory period when he had his last flock, Perdue paid him an effective hourly rate of $50.32 per hour ($18,115.12 ÷ 6 weeks ÷ 60 hours per week = $50.32 per hour). In fact, for Plaintiff's pay to be below minimum wage, Plaintiff would have had to work more than 50 hours ***per day*** for the entire six-week period he had his last flock ($18,115.12 ÷ 42 days ÷ 59 hours per day = $7.31 per hour). Absent any evidence that he did not receive minimum wage, summary judgment is appropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court should enter judgment in Defendant's favor as to each of Plaintiff's claims.

---

[29] In the Amended Complaint, which is the only place he discusses the basis for his minimum wage claim, Plaintiff contends that such claim is based on the fact he didn't receive minimum wage after taking into account the expenses Perdue deducted from his settlement. *See* ECF 90 at ¶ 98. The $18,115.12 figure above is the net after taking into account these expenses that Perdue deducted. (SUMF 102).

Respectfully submitted this 14th day of July, 2025.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

/s/ Margaret Santen
Margaret Santen
GA Bar No. 578314
Kevin P. Hishta
GA Bar No. 357410
Michael Oliver Eckard
GA Bar No. 238550
**OGLETREE, DEAKINS, NASH, SMOAK**
**& STEWART, P.C.**
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone:    404-881-1300
Facsimile:    404-870-1732
margaret.santen@ogletree.com
kevin.hishta@ogletree.com
michael.eckard@ogletree.com

*Attorneys for Defendant Perdue Foods LLC*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

ROGER PARKER,
                Plaintiff,

v.

PERDUE FOODS, LLC,,
                Defendant.

CIVIL ACTION
NO. 5:22-CV-00268-TES

## CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of July 2025, I filed **Defendant's Memorandum Of Points And Authorities In Support Of Motion For Summary Judgement,** with the clerk's office using this Court's CM/ECF system, which will automatically send notice of such filing to the following attorneys of record:

T. Brandon Waddell
Ga. Bar No. 252639
Jarred A. Klorfein
Ga. Bar No. 562965
Emily C. Snow
Ga. Bar No. 837411
CAPLAN COBB LLC
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Telephone: (404) 596-5600
bwadell@caplancobb.com
jklorfein@caplancobb.com
esnow@caplancobb.com

Jamie Crooks*
D.C. Bar No. 156005
Kritika Deb*
Amanda R. Vaughn*
FAIRMARK PARTNERS, LLP
1825 7th St. NW, #821
Washington, DC 20001
Telephone: (617) 721-3587
jamie@fairmarklaw.com
kritika@fairmarklaw.com
*Counsel for Plaintiff*
*admitted pro hac vice*

This 14TH day of July, 2025.

*/s/ Margaret Santen*
Margaret Santen GA Bar No.
578314
Kevin P. Hishta
GA Bar No. 357410
Michael Oliver Eckard GA Bar No.
238550
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone: 404-881-1300
Facsimile: 404-870-1732 margaret.santen@ogletree.com
kevin.hishta@ogletree.com michael.eckard@ogletree.com

*Counsel for Defendant*