## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

ROGER PARKER,

        Plaintiff,

v.

PERDUE FOODS LLC,

        Defendant.

CIVIL ACTION
NO. 5:22-CV-00268-TES

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56 of the United States District Court for the Middle District of Georgia, Defendant PERDUE FOODS LLC ("Perdue" or "Defendant") files this Statement of Undisputed Material Facts and shows that the following facts are undisputed as established by the pleadings, deposition testimony, discovery responses, and declarations filed in support of Defendant's Motion for Summary Judgment.[1]

### Integrator Model and Well-Established Independent Contractor Relationship With Growers

1.     Perdue is an integrated poultry producer, also referred to in the industry as an "integrator," that contracts with chicken farmers (also known as "growers") to raise chickens for Perdue under a contract entitled a "Poultry Producer Agreement" ("PPA"). (*See* **Exhibit A**, Declaration of Michael Levengood ("Levengood Decl.") at ¶¶ 3-5, 10).

2.     The PPAs entered into between growers and Perdue explicitly provide that the PPA is a "service contract and not a contract of employment" and that "PERDUE and PRODUCER"

---

[1] Defendant accepts these facts as true only for purposes of its Motion for Summary Judgment.

are each independent contractors." (See **Exhibit B**, Excerpts and Exhibits from April 23-24, 2025, Deposition of Roger Dale Parker ("Parker Dep. II") at 277:2-278:1, Ex. 23, Section IV ¶ A at p. 3 [Perdue 002441], p. 10 [Perdue 002455], p. 17 [Perdue 002434], p. 24 [Perdue 002312], p. 33 [Perdue 002493], p. 50 [Perdue 002282], and p. 82 [Perdue 002299]).

3.      Growers, like Plaintiff in this case, who contract with Perdue own and provide the land, facilities, equipment and labor necessary to raise the chicks. (Levengood Decl. at ¶¶ 4, 10).

4.      Most integrators, such as Tyson Foods, Pilgrams Pride, Wayne Sanderson, Cook Foods, Mount Air, and Amick, operate under a similar business model to that used by Perdue, treat their growers as independent contractors, and this independent contractor treatment is recognized by the National Chicken Counsel. (Levengood Decl. at ¶¶ 5-8 and Att. 1).

5.      Under the PPA entered into between Perdue and growers (also referred to as "Producers"), Perdue agrees "[t]o consign available chicks to PRODUCER to be raised for PERDUE" (Parker Dep. II, Ex. 23, Section I ¶ A at p. 1 [Perdue 002430], p. 8 [Perdue 002453], p. 15 [Perdue 002432], p. 22 [Perdue 002310], p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]) and "[t]o provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned." (Parker Dep. II, Ex. 23, Section I ¶ B at p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]).

6.      In exchange, the growers agree "[t]o use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned." (Parker Dep. II, Ex. 23, Section II ¶ C at p. 30 [Perdue 002490], p. 47 [Perdue 002279], and p. 79 [Perdue 002269]).

7.     The PPAs provide that growers have the responsibility to provide "necessary housing and equipment" and "to maintain such housing and equipment in a state of good repair and operable condition," among other things. (ECF 90 at ¶ 22-23; ECF 91 at ¶¶ 22-23; Parker Dep. II, Ex. 23, Section II B at p. 1 [Perdue 002430], p. 8 [Perdue 002453], p. 15 [Perdue 002432], p. 22 [Perdue 002310], p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]; Levengood Decl. at ¶ 10).

8.     The "necessary housing and equipment" growers are required to provide include, in addition to the chicken houses themselves, items such as heaters, feed lines, hoppers (part of the control pans or feed system), feed trays, and fans. (*See* **Exhibit C**, Excerpts and Exhibits from Deposition of Walter Clay Copeland ("Copeland Dep.") at 76:14-79:24, Ex. 6 [Perdue 001669-001670]).

9.     If a grower fails to comply with their contractual obligations to provide the necessary housing and equipment in a state of good repair, which can lead to animal welfare issues, Perdue will generally give the grower a letter saying that the grower needs to fix certain things before Perdue will place more birds with the grower. (Levengood Decl. at ¶¶ 10, 12-13; *see* **Exhibit D**, Excerpts from April 29, 2025, Deposition of Michael Levengood ("Levengood Dep. II") at 31:20-33:14; **Exhibit E**, Excerpts and Exhibits from November 14, 2023, Deposition of Michael Levengood ("Levengood Dep. I") at 68:24-73:11).

10.    The PPA provides that "PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards." (Parker Dep. II, Ex. 23, Section III ¶ A at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]).

11.     Growers can exercise this judgment and discretion in several ways, such as by hiring employees; growing other livestock (so long as it isn't poultry), which is referred to as "diversified farming"; operating outside businesses; owning and operating multiple farms; hiring employees; making housing and equipment improvements and upgrades; building additional chicken houses; and determining how to manage their day-to-day growing operations through discretion over things such as house ventilation, managing bird mortality, and of house walk throughs. (ECF 59-6 at ¶¶ 14-16, Att. 1 (containing survey of growers); Levengood Decl. at ¶¶ 4-8; Levengood Dep. II at 22:6-30:6; 103:10-107:5).

12.     Growers can grow with other integrators without restriction by Perdue so long as they give Perdue a 90-day notice, which is required by law, that they have signed or will sign a contract with another integrator. (Levengood Dep. II at 92:2-93:23).

13.     Under the PPA, growers also agree "[t]o comply with any bio-security policies, audits, measures or guidelines required by PERDUE" (Parker Dep. II, Ex. 23, Sec. II ¶ N at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]) and "[t]o provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs." (Parker Dep. II, Ex. 23, Sec. II ¶ R at p. 80 [Perdue 002297]).

14.     These "bio-security policies, audits, measures or guidelines" include items such as the "Poultry Care Process Verified Program" (or "PVP"), which is part of a USDA verified audit program, based on guidelines and animal welfare standards issued by the National Chicken Counsel. This provides a series of standard operating procedures that growers are audited against pursuant to the USDA program. (ECF 62 at Attachment 3; Levengood Dep. I at 45:21-47:7, 48:2-49:9, 51:7-52:14; 54:4-25; 56:16-23; 181:23-183:5; Levengood Dep. II at 41:17-47:9). Perdue is

"always looking at [its] recommendations for biosecurity" and "learn[s] all the time" "how to prevent high path [avian influenza] from getting in a house." (Levengood Dep. II at 59:5-61:8).

15.    These also include mandatory proper euthanasia techniques for animal welfare (Levengood Dep. II at 41:17-47:9, 57:23-58:12; Levengood Dep. I 59:25-60:2) and a document entitled "Never Evers and Dedicated Tos," which are recommended best management practices (or "BMP"). (Levengood Dep. I at 29:2-35:21, 40:7-42:17, Ex. 4 [Perdue 001580-1591]).

16.    The audits include the 14-step audit process growers are audited against by the government in the event their birds contract high-pathogen avian influenza if the grower wants to get indemnified. (Levengood Dep. I at 41:11-43:24). The "Never Evers and Dedicated Tos" are provided to assist growers in understanding and meeting the requirements of the government's 14-step audit process for indemnification. (Levengood Dep. I at 31:2-36:24, 40:16-43:24).

17.    Perdue recommends that growers attempt to comply with all BMPs because doing so will both reduce the chance that the birds will contract high-path avian influenza in the first place and will ensure that the growers will meet the government's 14-step audit process for indemnification in the event that the birds do get sick. (Levengood Dep. I at 31:2-36:24, 40:16-43:2, 60:17-62:2).

18.    Perdue pays growers an audit readiness bonus if they comply with these various items that are audited. (Levengood Dep. II at 82:5-14).

19.    While Perdue provides growers with a document entitled "Poultry House Management Guidelines," these are recommendations that are "more or less educational materials for growers who may be new to the business or…a starting point" for growers. (Copeland Dep. at 12:14-13:10, Ex. 11 at Perdue 001611). Growers have discretion to determine how to accomplish

certain of these guidelines, such as whether they want to wind row litter or remove it, for example. (Copeland Dep. at 12:14-22:15, Ex. 11 at Perdue 001611-001616).

**Grower Compensation, With Built-In Opportunities for Profit or Loss**

20.    Growers are paid under a competitive tournament system, under which they compete against other growers who settle flocks in the same week. This tournament system provides greater compensation to those who grow birds more efficiently through things like tier upgrades to their houses, effective bird husbandry, other best management practices, and lowering their costs through their own discretional day-to-day decisions. (ECF 59-6 at ¶¶ 17-20, Att. 1; Levengood Decl. at ¶ 9; Levengood Dep. II at 39:2-40:3, 80:14-81:14).

21.    Under the PPA, Perdue agrees "[t]o provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret." (Parker Dep. II, Ex. 23, Section I ¶ E at p. 1 [Perdue 002430], p. 8 [Perdue 002453], p. 15 [Perdue 002432], p. 22 [Perdue 002310], p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]).

22.    The growers' pay terms are set forth in payment schedules, attached to and incorporated into the PPAs. (Levengood Dep. I at 21:20-22:7, 26:16-27:8; Levengood Dep. II at 76:22-77:25).

23.    Growers' chicken houses are graded as Tier 1, 2, 3, or 4 based upon standards established by Perdue in separate tier documents. (Levengood Decl. at ¶ 12; Levengood Dep. II at 84:23-85:10, 91:8-21). Growers may increase their potential pay by "upgrading" their houses to a higher-level tier. (Levengood Decl. at ¶ 11; Levengood. Dep. I at 22:15-17, 100:3-5; Levengood

Dep. II at 82:15-21, 84:23-85:10; *see* **Exhibit F**, Excerpts from Deposition of Linda Gail Burns ("Burns Dep.") at 17:17-18:2).

24.    Perdue provides loans to growers from time to time to assist with tier upgrades and repairs to existing equipment and houses. (Levengood Dep. II at 95:13-97:10).

25.    Perdue may also deduct from a grower's pay repayments of money the grower borrowed from Perdue pursuant to these loans, the grower's mortgage payments if they authorized Perdue to deduct the payments and make the payments to the bank on their behalf, and the grower's portion of cost sharing programs related to equipment. (Levengood Dep. II at 86:5-89:13; Copeland Dep. at 52:16-55:20, Ex. 48 at Perdue 001393 [listing "DEDUCTIONS"]; Parker Dep. II at 62:9-99:12, Exs. 4-9).

**Plaintiff's Relationship with Perdue and Operation of Multiple Farms for Perdue**

26.    Plaintiff Roger Parker ("Plaintiff" or "Parker") is a former grower for Perdue who, individually or together with his then-wife, Linda Gail Parker (née Burns), executed several PPAs with Perdue beginning in June 2006, with the last two being executed on December 29, 2014 (the "2014 PPA") and December 16, 2016 (the "2016 PPA"). (*See* **Exhibit G**, Excerpts and Exhibits from November 9, 2023, Deposition of Roger Dale Parker ("Parker Dep. I") at 105:15-24; Parker Dep. II at 31:13-25, 277:2- 278:14, Ex. 23 at pp. 29-45 [Perdue 002489-002505], pp. 46-62 [Perdue 002278–002294], and pp. 78-92 [Perdue 002295-002309]).

27.    Prior to contracting with Perdue, Plaintiff had at least 15 years of experience as a grower with other integrators, including approximately 10 years as a grower with Seaboard, 5 or 6 years as a grower with Conagra, and approximately 3 years of running his parents' poultry farm. (Parker Dep. I at 57:4-14, 58:11-60:5, 60:18-63:4, 63:25-66:11; Parker Dep. II at 32:10-33:5, 34:18-35:2, 35:20-36:3, 37:21-41:22, 43:16-19; Burns Dep. at 9:5-17, 10:24-11:3, 68:16-18).

28.     From approximately 2006 to 2009, Plaintiff owned and operated a single farm in Hillsboro, Georgia, on which he grew chickens for Perdue and which he operated under the "doing business as" name of "Parker's Poultry." (Parker Dep. I at 71:24-72:17; Parker Dep. II at 31:13-25, 51:20-52:11, Ex. 23 at pp. 1-7 [Perdue 002439-002445], pp. 8-14 [Perdue 002453-002459], and pp. 15-21 [Perdue 002432- 002438]; Burns Dep. at 24:17-19, 33:8-11, 58:8-19).

29.     Shortly after purchasing his farm in Hillsboro, Plaintiff voluntarily decided to upgrade his existing chicken houses to the higher tier, at his own expense and as a way to "try to get a better income." (Parker Dep. II at 116:22-117:19). In total, Plaintiff invested approximately $1,300,000.00 to purchase this farm and took out one or more loans or paid cash to complete upgrades. (Parker Dep. I at 68:24-69:20; Parker Dep. II at 46:4-48:1, 116:22-117:19).

30.     After approximately 3 years of growing for Perdue on his Hillsboro farm, Plaintiff and his ex-wife decided to purchase a second farm in Milledgeville, Georgia, in or about 2009, which had six existing chicken houses. (Parker Dep. II at 51:8-53:24; Burns Dep. at 21:2-20).

31.     Plaintiff did not think about adding any more houses to this farm because he didn't think it needed it; however, he acknowledged he could if he wanted to. (Parker Dep. II at 59:4-16).

32.     Plaintiff decided to buy a second farm after determining the "profit-to-loss ratio" was better on the Milledgeville farm because it already had "six houses with less money to pay on the payment." (Parker Dep. II at 53:17-54:7).

33.     Plaintiff viewed this purchase as a good way to make more money, because he already had the equipment from his other farm that he could use for both farms and because this farm had six houses and "[o]f course six [houses] will bring more in." (Parker Dep. II at 53:25-55:25).

34.     Plaintiff and his ex-wife purchased the Milledgeville farm for around $980,000.00, financing this purchase with First Financial Bank while acknowledging he could have paid cash if he wanted to. (Parker Dep. II at 52:12-53:4).

35.     Plaintiff understood he would be responsible for payment of the loans on both his Hillsboro farm and his Milledgeville farm and for any default. (Parker Dep. II at 52:3-53:16).

36.     Plaintiff also understood his loans for the Milledgeville farm were a mortgage, agreed that "if the property increased in value, [he] would gain the benefit of that increase in value" if he sold it, and explained "[t]hat could go either way on win or lose." (Parker Dep. II at 52:25-53:16, 65:14-66:19).

37.     Plaintiff assumed the potential of risk of loss or potential for profit. (Parker Dep. II at 66:2-19).

38.     From approximately 2009 until 2015, Plaintiff owned and operated both his Hillsboro, Georgia farm and his Milledgeville, Georgia farm, which operated under the "doing business as" name of "Hazel Lee Farms," and grew chickens for Perdue on both. (Parker Dep. I at 82:2-7; 148:10-23; Parker Dep. II at 51:8-52:11, 204:22-205:5, 246:12-247:12, Ex. 23 at pp. 22-28 [Perdue 002310-002316], pp. 29-45 [Perdue 002489-2505], and pp. 46-62 [Perdue 002278-002294]).

39.     As a grower, Plaintiff determined the hours he worked. (Parker Dep. I at 160:14-161:11; Parker Dep. II at 198:14-199:3).

40.     From approximately 2009 until 2015, Plaintiff hired employees to operate one of his farms for him on a full-time basis, paying these employees a salary and giving them a place to live while he personally worked on the other farm with his then wife, Ms. Burns. (Parker Dep. I at

147:10-150:4, 178:8-13; Parker Dep. II at 204:22-208:4, 209:14-211:13; Burns Dep. at 21:2-24:16).

41.    This included, for example, hiring one guy named "Dewey" who ran the Hillsboro farm himself for about two years for Plaintiff. (Parker Dep. I at 178:8-13). Plaintiff paid him a salary and provided a place to live during that time. (Parker Dep. II at 209:14-210:16). During this time, Plaintiff and his ex-wife were operating the Milledgeville farm. (Parker Dep. II at 211:4-7). When Plaintiff was running the Hillsboro farm, "[i]t just reversed" with the employee working Milledgeville while Plaintiff ran the other Farms. (Parker Dep. II at 211:4-13).

42.    Plaintiff also hired other people to help him from time to time with his farms. (Parker Dep. I at 130:19-131:19, 132:14-19, 134:9-14, 137:18-138:1, 145:13-146:11, 150:5-20, 177:17-178:17; Parker Dep. II at 248:13-249:16; Burns Dep. at 24:2-10, 34:23-37:13, 38:18-41:20).

43.    Plaintiff grew calves and cows on his Hillsboro farm for approximately two years and sold the cows for a profit of $24,000, while selling the bulls for a profit of $2,000. (Parker Dep. II at 59:17-62:7, Ex. 3)

44.    While he was a grower for a few years, Plaintiff also operated an outside poultry equipment business, named "Parker's Poultry and Equipment" or "Parker's Poultry Equipment." (Parker Dep. II at 99:13-104:19, 112:21-114:23, 117:20-24, 119:2-7, 141:17-25, 144:8-145:3, 153:7-154:16, 156:2-160:23; Burns Dep. at 33:12-21, 46:13-49:16; *see* **Exhibit H**, Excerpts of Plaintiff Roger Parker's Responses and Objections to Defendant's First Set of Interrogatories at p. 19, Response to Interrogatory No. 19).

45.    Parker's Poultry and Equipment performed equipment repair and maintenance services for growers with Perdue and other integrators, submitting bids for the work to them

beforehand. (Parker Dep. II at 104:2-7, 140:3-9, 143:22-144:3, 147:15-148:5, 159:9-160:2, 263:19-265:6, Ex. 13; Burns Dep. at 46:13-49:16).

46.     For a period of time, Parker's Poultry and Equipment was listed as an approved vendor for equipment construction on Perdue's house specifications for Perry, Georgia. (Parker Dep. II at 117:20-118:2; Copeland Dep. at 57:5-58:17, 137:4-138:15, Ex. 50 at Perdue 007018 and 007029 [listing "Parker's Poultry – Dale Parker" under "Equipment Contractors").

47.     For approximately one year while he was a grower for Perdue, Plaintiff was also employed as a full-time manager for a quail company and someone else – either his wife or someone Plaintiff hired – ran his farm for him on a full-time basis during this period. (Parker Dep. II at 257:16-260:11).

48.     In or about 2008 for several months, in addition to operating his own farm, Plaintiff "took [over another] farm for a short season," referred to as the "Roosevelt farm," that was owned by a third party. (Parker Dep. II at 260:12-261:9; Burns Dep. at 32:23-33:7; Ex. H, at p. 19, Response to Interrogatory No. 19). During this time, he hired someone to run the Roosevelt farm for him, who he found online and who had "grown before" and determined what to pay him. (Parker Dep. II at 261:10-263:18.)

49.     Throughout the time Plaintiff owned and operated both his Hillsboro and Milledgeville farms, in addition to the loans for purchase of the houses themselves, he refinanced or took various loans for additional upgrades to his chicken houses for equipment like water lines. These were small business loans "made under a United States Small Business Administration nationwide program which uses tax dollars to assist small business owners." Plaintiff deducted the payments on his tax returns. (Parker Dep. II at 66:20-70:9, 83:17-89:15, 90:10-94:19, Exs. 5-7 (containing documentation for loans in the amount of $92,000, $935,000, and $1.15 million)).

50.     In or about 2015, Plaintiff assigned his Hillsboro farm to his son, who began operating it on his behalf under a lease purchase option; Plaintiff grew only at his Milledgeville farm, operating under the name Hazel Lee Farm, from that time forward. (Parker Dep. I at 148:10-23; Parker Dep. II at 204:22-205:5, 246:12-248:7; Burns Dep. at 36:11-23).

51.     Plaintiff at times performed above average in the tournament system and at other times fell below average. (Copeland Dep. at 47:23-49:3, 53:6-24).

52.     Plaintiff represented on loan applications that he submitted to First Financial Bank's Agriculture Lending Division, under the penalty of perjury, that his net worth increased from $174,000 in 2014 to $1,740,000 in 2018 while he was a grower. (Parker Dep. II at 71:16-83:14, Ex. 5).

53.     Plaintiff spent his time growing and taking care of Perdue's chickens and performed various maintenance work, such as work getting ready for new flocks, work weeding around the chicken houses, and work cutting the grass or putting rat bins to protect the chickens from rats entering. (Parker Dep. II at 186:7-191:12, 192:24-197:16, 199:5-202:21, 214:15-220:24, 266:13-269:16; Ex. 21).

54.     Plaintiff also performed maintenance to the outside of the chicken houses, for things like repairing the roof, so that water wouldn't get into the chickens. (Parker Dep. II at 212:19-215:14).

55.     Plaintiff represented that he was engaged in farming to the IRS, filing "Profit or Loss from Farming" tax returns while deducting various business-related expenses, and obtained a Georgia Agricultural Tax Exemption Certificate from the State of Georgia. (Parker Dep. II at 163:17-171:25, 178:24-185:19, Exs. 14, 17, 19).

**The Poultry Producer Agreements Signed by Plaintiff and His Ex-Wife**

56.    Plaintiff admitted that by signing all of the PPAs, he agreed to all of the provisions in them. (Parker Dep. II at 283:9-298:1, Ex. 23 at pp. 29-45 [Perdue 002489-002505], pp. 46-62 [Perdue 002278-002294], and pp. 78-92 [Perdue 002295-002309]).

57.    These provision included, for example, his agreement "[t]o feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition" (Parker Dep. II, Ex. 23, Sec. II ¶ B at p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]) and to "not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE. (Parker Dep. II, Ex. 23, Sec. III ¶ B at p. 31 [Perdue 002491], p. 48 [Perdue 00280], and p. 80 [Perdue 002297]).

58.    The first page of the latest PPAs Plaintiff signed also provided:

> **PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**
>
> ***ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT***.

(Parker Dep. II, Ex. 23 at p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]) (emphasis in original).

59.     By signing the PPAs, Plaintiff also agreed that the performance of his services would be "informed by" various policies of Perdue, and agreed:

(a) "[t]o perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards." (Parker Dep. II, Ex. 23, Section III ¶ A at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]);

(b) "[t]o comply with any bio-security policies, audits, measures or guidelines required by PERDUE" (Parker Dep. II, Ex. 23, Section II ¶ N at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]);

(c) "[t]o provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs" (Parker Dep. II, Ex. 23, Section II ¶ R at p. 80 [Perdue 002297]); and

(d) to comply with requirements regarding feed, proper culling of birds, vaccines, proper placement for chicks, alarm systems to monitor temperature levels, and water withdrawal times. (Parker Dep. II, Ex. 23, Section II ¶¶ C-E, G, M, O-Q at pp. 30-31 [Perdue 002490-002491], pp. 47-48 [Perdue 002279-002280], and pp. 79-80 [Perdue 002296-002297]).

60.     The last PPAs Plaintiff signed also provided the explicit right for Perdue to "[t]o enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities" and take various actions if the Producer was not "satisfactorily performing" his or her obligation "to care for, treat and maintain the flock." (Parker Dep. II, Ex. 23, Sec. III ¶ D at pp. 31-32 [Perdue 002491-002492], pp. 48-49 [Perdue 002280-002281], and p. 80-81 [Perdue 002297-002298]).

61.     The last PPAs that Plaintiff signed provided that:

> PRODUCER understands and agrees that PERDUE will
> determine, in its sole and absolute discretion:
> a. the breed of chickens PRODUCER will receive;
> b. the number and density of chickens in each flock delivered to
> PRODUCER's farm;
> c. the size, weight and age of the chicken to be produced;
> d. the time for processing of each flock; and
> e. the date, time and estimated interval of placement for future
> flocks.

(Parker Dep. II, Ex. 23, Sec. III ¶ I at p. 32 [Perdue 002492], p. 49 [Perdue 002281], and p. 81 [Perdue 002298]).

62.    Plaintiff agreed to these provisions as well by signing the PPAs. (Parker Dep. II, Ex. 23, Sec. III ¶ I at p. 32 [Perdue 002492], p. 49 [Perdue 002281], and p. 81 [Perdue 002298]).

63.    Under the PPAs signed by Plaintiff, he agreed that the PPAs were a "service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors" and that "[n]either party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever. (Parker Dep. II, Ex. 23, Section IV ¶ A, at p. 3 [Perdue 002441], p. 10 [Perdue 002455], p. 17 [Perdue 002434], p. 24 [Perdue 002312], p. 33 [Perdue 002493], p. 50 [Perdue 002282], and p. 82 [Perdue 002299]).

64.    Plaintiff agreed that he would be "exclusively responsible" for the performance of his obligations under the Agreement and for the "employment, compensation, and supervision" of any individuals he hired." (Parker Dep. II, Ex. 23, Section IV ¶ B, at p. 3 [Perdue 002441], p. 10 [Perdue 002455], p. 17 [Perdue 002434], p. 24 [Perdue 002312], p. 33 [Perdue 002493], p. 50 [Perdue 002282], and p. 82 [Perdue 002299]).

65.    The latest PPAs signed by Plaintiff also contained a clause entitled "**<u>Exclusion of Incidental, Consequential, and Certain Other Damages</u>**," which provided that "**<u>TO THE MAXIMUM EXTENT PERMITTED BYLAW, NEITHER PERDUE NOR PRODUCER</u>**

**SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ATTACHMENTS.**" (Parker Dep. II, Ex. 23, Section VII ¶ N at p. 42 [Perdue 002502], p. 59 [Perdue 002291], and pp. 88-89 [Perdue 002305-002306]) (emphasis in original).

### Plaintiff's Failure to Maintain Safe and Operable Conditions At His Farm

66.    At various times while Plaintiff was a grower, Perdue had concerns that Plaintiff was not maintaining his farm in a safe and operable condition for his chickens and documented these concerns in flock visit summaries, notes, and letters to him. (Parker Dep. II at 275:7-276:7, and Excerpts of Ex. 22 at Parker_002551; *see* **Exhibit I**, Declaration of Walter Clay Copeland ("Copeland Decl.") at ¶¶ 22-23; *see* **Exhibit J**, Declaration of Kathryn Mizell ("Mizell Decl.") at ¶¶ 8-19 and Exhibits C-F; *see* **Exhibit K**, Declaration of Bradley Bennett ("Bennett Decl.") at ¶¶ 5-8 and Exhibits A-C; *see* **Exhibit L**, Declaration of Daniel Roberts ("Roberts Decl."), at ¶¶ 5-7 and Exhibit A). This included in November 2014, when Perdue discovered equipment that was not kept in safe and good operable condition, and in January 2017 when Plaintiff's inattention to fans in his chicken houses created a serious animal welfare incident. (Roberts Decl., ¶ 12 and Exhibit C; Copeland Decl., ¶ 25 and Exhibit B).

67.    In or about August 2017, Plaintiff believed Perdue misrepresented the weights of two flocks he raised (flocks 46 and 48) on his live-haul tickets, resulting in underpayments to him. (ECF 1 at ¶¶ 95, 166; ECF 90 at ¶ 88; Parker Dep. II at 317:4-318:15; Copeland Dep. at 71:20-

72:19, 84:12-85:11, 90:15-95:16, 98:1-15, Ex. 17 [Perdue 007333], Ex. 19 [Perdue 007373], Ex. 20 [Perdue 007380]).

68.     Live-haul tickets are a record of the weight of the chickens that Perdue catches from the grower's farm, which use a numbering system to track the trucks picking up the chickens. (Copeland Dep. at 43:3-5, 11-44:19).

69.     In or about August 2017, Plaintiff called the Stockyards and Packers division of the USDA (also referred to as "P&S") and made a complaint against Perdue regarding these flock weights and alleged underpayments. (ECF 90 at ¶ 88; Parker Dep. II at 146:4-147:6, 318:6-15; Burns Dep. at 62:19-65:1; Copeland Dep. at 71:20-72:19, 86:1-4). Plaintiff also emailed the USDA regarding his prior complaint on October 1, 2017. (**Exhibit M**, October 1, 2017, Email from Plaintiff to USDA, Subject: Hazel Lee Batch 46 [Parker_000784]).

70.     While Plaintiff had noticed wrong trailer numbers from the 2015 timeframe on, he "d[idn]'t know why they did that," "[didn]'t know the weights," and "never said anything about a grow out to any integrator until that—until that one." (Parker Dep. II at 317:6-318:5).

71.     The USDA called Perdue's employee, Clay Copeland, in or about August 2017 and advised him that Plaintiff had filed a complaint. (Copeland Dep. at 71:20-72:19).

72.     Inaccuracies as to the live haul ticketing process matching up with the grower's settlement have "happened rarely" and "[m]aybe once a year…in the Perry facility." (Copeland Dep. at 45:12-46:10). Perdue's plant maintains audits, which are reviewed whenever a grower raises an issue as to the trailers matching up. (Copeland Dep. at 46:11-25).

73.     Perdue investigated Plaintiff's claims and, while it could not identify any wrongdoing, Perdue elected to pay Plaintiff his six-flock average for both flocks in order to resolve the dispute.  (Copeland Dep. at 71:20-72:19, 84:12-85:11, 86:12-25, 89:7-8, 90:15-94:11, 98:1-

99:18, Exs. 17 [Perdue 007333], 19 [Perdue 007373], and 20 [Perdue 007380]; Levengood Dep. II at 99:6-102:1).

74.     There was no way for Perdue to definitively prove what the tare weight should have been or what caused the error. (Copeland Dep. at 87:8-20, 88:5-89:1, 92:3-17, 93:4-9). Perdue paid Plaintiff the six-flock average accordingly. (Copeland Dep. at 87:8-20).

75.     Other than the incident set forth above, Perdue could not find any other errors with weight tickets following any other complaints by Parker. (Copeland Dep. at 94:3-25, 95:1-12, 97:12-99:25).

76.     On September 17, 2018, Plaintiff requested, via text message to Kathryn Mizell, that Perdue provide financing for new water lines in five of his houses to Tier 4, stating: "I also really hate not performing well. My floors are wet. I'm wanting to replace them before i place back. Will y'all still finance them for me in 5 houses?" (*See* Mizell Decl., ¶¶ 6-7 and Exhibit B, p. 1; **Exhibit N**, Excerpts and Exhibits from Deposition of Kathryn Mizell ("Mizell Dep.") at 139:12-20, Ex. 24 [Perdue 008014-008015]).

77.     Ms. Mizell informed Plaintiff that Perdue would not provide additional financing because it had loaned Plaintiff money to be used for completing the Tier 4 upgrade, but Plaintiff failed to complete the upgrade. (Mizell Decl., ¶¶ 6-7 and Exhibit B; Mizell Dep. at 139:12-20, Ex. 24 [Perdue 008014-008017]).

78.     Plaintiff acknowledged the Tier 4 upgrade was not completed (Mizell Dep. Ex. 24 at Perdue 008016).

79.     Plaintiff admitted he "[didn]'t know how many [farmers] [Perdue] gave [feed and water lines] to." (Parker Dep. II at 276:8-20).

80.    In or around August-September 2018, Perdue identified additional issues with Plaintiff's equipment in his chicken houses in the flock visitation reports. (Bennett Decl., ¶ 5 and Exhibit A, pp. 2-4). These issues included fans not working, ventilation issues, feeder and water lines not being adequately raised, and tunnel doors not opening. (*Id.*) These were problems, that if left unaddressed, could result in animal welfare issues. (Bennett Decl., ¶ 9).

81.    On or about October 16, 2018, Perdue sent a letter to Plaintiff via certified mail advising him that Perdue would only place chickens with him if certain repairs were made and noting that "Flock visitation reports show that you were informed about issues with your fans at least three times, starting at placement." The letter also advised Plaintiff that he was in violation of Section IIB, or his obligation to:

> To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

The letter also provided a number of repairs Plaintiff had to make before the next placement of birds.  (Mizell Dep. at 168:1-169:12, Ex. 5 at Perdue 001364; Mizell Decl., ¶ 8 and Exhibit C; Parker Dep. II at 275:7-15, Excerpts of Ex. 22 at Parker_002551).

82.    The issues identified in the October 16, 2018, letter were repairs that were needed, not upgrades. (Mizell Decl., ¶ 8 and Exhibit C; Mizell Dep. at 150:2-151:4, Ex. 29 at Perdue 008026 (stating the letter "should just be repairs" in response to Plaintiff calling it a "letter of upgrades"); *see also* Mizell Dep., Ex. 5 at Perdue 001364 ("The purpose of this letter is to let you know that Perdue will place chickens at your farm, Hazel Lee Farm, as soon as certain repairs are made to the farm.").

83.    The letter's requirement that the necessary repairs be made before additional birds were placed at Plaintiff's farm was Perdue's standard procedure when repair or equipment failures

pose risks for the welfare of the birds. (Mizell Decl., ¶ 8 and Exhibit C; Mizell Dep., Ex. 5 at Perdue 001364; Levengood Decl. at ¶¶ 12-13; Burns Dep. at 54:23-55:19).

84.    On October 22, 2018, Plaintiff sent numerous text messages to Ms. Mizell in response to her October 16, 2018, letter, acknowledging that various items in the October 16, 2018, letter were accurate and needed to be completed. (Mizell Dep. at 156:21-157:11, Ex. 30 at Perdue 008031-008034.

85.    In addition, Gail Burns, Plaintiff's ex-wife, also testified that Hazel Lee Farm had multiple issues in 2018, that the farm needed repairs during this time period, and that Plaintiff never completed the repairs. (Burns Dep. at 54:23-56:12).

86.    Plaintiff's October 22, 2018, text messages asserted that the October 16, 2018, letter and the repairs identified were retaliation against him for his complaints to the USDA. (Mizell Dep., Ex. 30 at Perdue 008032 [under Plaintiff's item 9)].

87.    Plaintiff "[didn]'t know about" other farmers who had similar kinds of repair issues who were not provided with these kinds of letters. (Parker Dep. II at 276:8-12).

88.    On February 4, 2019, flock advisor Bradley Bennett observed the conditions at Hazel Lee Farm and created a list of notes concerning issues with fans, heaters, ventilation, cool cells, and holes in the growing houses. (Bradley Decl., ¶ 6 and Exhibit B).

89.    On February 13, 2019, Perdue re-sent the October 16, 2018, letter to Plaintiff, along with additional notes from Mr. Bennett regarding the equipment issues, including that multiple fans and heaters in his houses were not working.  (Mizell Dep. at 169:14-170:9, Ex. 31 at Perdue 001356-001379; Mizell Decl. at ¶¶ 9-10 and Exhibit E; Bennett Decl. at ¶ 6 and Exhibit B).

90.    On March 19, 2019, Bennett again observed the conditions in the growing houses at Hazel Lee Farm and noted remaining issues and repairs needed. (Bennett Decl., ¶ 7 and Exhibit C).

91.     Perdue subsequently believed Plaintiff had made enough of the repairs to ensure safe conditions for the birds and placed two additional flocks with him. (Copeland Dep. at 118:21-119:14,134:5-135:18; Copeland Decl. at ¶ 14; Mizell Decl. at ¶¶ 11-19).

92.     Once the birds were in the houses, it became apparent to Perdue that all necessary repairs had not been made. (Copeland Dep. at 118:21-119:5, 134:5-135:18; Mizell Decl. at ¶¶ 11-19 and Exhibit F; Bennett Decl., ¶ 8 and Exhibit A).

93.     In late April 2019 and into May 2019, Bennett noted additional issues in the flock visitation reports for Hazel Lee Farm, including issues with feed, cool cells and fans not working, and wet spots in the houses. (Bennett Decl., ¶ 5 and Exhibit A, pp. 6-14).

94.     Plaintiff admitted he had "13 fans out in 29 days" and that he had a "bad batch of motors." He also asked for Perdue's help in replacing the motors. (Copeland Dep., Ex. 54 at Perdue 007767; *see also* Copeland Dep. 106:5-24, 111:3-14).

95.     During subsequent visits in June-August 2019, Bennett noted issues in the flock visitation reports for Hazel Lee Farm, including those involving fans, water lines, tunnel doors, and others. (Bennett Decl., ¶ 5 and Exhibit A, pp. 17-26).

96.     On or about June 28, 2019, Mizell also observed the conditions at Hazel Lee Farm. (Mizell Decl., ¶ 11).

97.     This included issues such as fans not working, drinkers and feeders not working properly, back-ups not working, and grass not being mowed, which can cause animal welfare issues if not addressed. (Mizell Decl., ¶¶ 12-18).

98.     In or about July 2019, Perdue advised Plaintiff that it would pause placing any additional flocks with him until all necessary repairs were made. (Copeland Dep. at 109:2-111:1,

118:16-20; Mizell Dep. at 96:9-99:22, 147:5-14, Ex. 13; Mizell Decl. at ¶¶ 11-19; Copeland Decl. at ¶¶ 18-23).

99.     When Perdue visited Plaintiff's farm again in August 2019, Plaintiff had failed to complete the repairs. (Copeland Dep. at 109:2-111:1, 118:16-20).

100.    The last flock consigned to Plaintiff was placed with him on June 24, 2019, and collected from him on August 5, 2019, a period of six weeks. (Copeland Decl. at ¶¶ 5, 13-14, 18).

101.    Plaintiff performed no further work for Perdue after the last flock was collected on August 5, 2019. (Copeland Dep. at 135:15-18; Copeland Decl. at ¶¶ 5-14, 18).

102.    Plaintiff received a net payment for his last flock of $18,115.12. (Copeland Decl. at ¶¶ 14-15).

103.    On September 29, 2019, Perdue sent two additional letters to Plaintiff regarding necessary repairs if he wanted to receive more birds or necessary upgrades if he wanted to sell his farm. (Mizell Dep. at 181:16-185:5, Exs. 34-35; Roberts Decl. at ¶¶ 5-11 and Exhibits A and B).

104.    Since at least 2015, Perdue has required new contract growers to have Tier Four growing houses, which either the selling or purchasing grower can perform the upgrades for. (Roberts Decl. at ¶ 10; Copeland Decl. ¶ 24; Parker Dep. I at 68:24-70:1; Parker Dep. II at 44:1-9).

105.    In the June-August 2019 time period, Plaintiff's Milledgeville farm, Hazel Lee, was in worse condition than any other grower's farm in the Perry, Georgia growing area. (Mizell Decl. at ¶ 11; Copeland Decl. at ¶ 22).

106.    Perdue determined that it could not place additional birds with Plaintiff until the repair and equipment issues were fixed. (Copeland Dep. at 109:21-111:10, 118:16-119:5, 134:11-

135:18; Copeland Decl. at ¶¶ 20-22; Levengood Dep. II at 31:20-33:14; Levengood Decl. at ¶¶ 12-13; Mizell Decl. at ¶¶ 11-19; Roberts Decl. at ¶¶ 5-7.).

107.    Plaintiff did not complete the repairs because he could not afford them; if he had done so, he could still be receiving flocks and growing for Perdue. (Copeland Dep. at 109:2-111:1, 118:16-20). Plaintiff also did not sell his farm because the cost of the upgrades was too high. (Parker Dep. II at 375:3-21).

108.    Plaintiff subsequently defaulted on his loans and his Milledgeville farm was foreclosed on. (Parker Dep. I at 138:14-140:3, Ex. 14 at p. 10 [Parker_000082]; Parker Dep. II at 19:10-22, 245:1-17, Ex. 20; Burns Dep. at 60:7-22).

109.    At this time, Plaintiff was under court order to continue poultry operations at his farm, obtain a business appraisal, sell the farm for the highest amount possible, and split any profit with his wife. (Burns Dep. at 59:20-61:2; *see* **Exhibit O**, Final Divorce Decree and Amended Final Divorce Decree Filed in *Parker v. Parker*, C.A. No. SUCV2018049099 (Super. Ct. Baldwin County, Georgia) [Parker_000365-000372 and Parker_002535-002543] at Parker_000370-000371 and Parker_002539-002542). In December 2019, when Plaintiff's ex-wife was granted a court order to take control of the farm, but she could not list it for sale because of its condition. (*Id.*)

110.    Plaintiff filed for Chapter 7 bankruptcy on July 29, 2021, approximately two years after he stopped growing for Perdue, receiving a discharge in bankruptcy of more than $1.3 million. (Parker Dep. I at 138:14-140:3, Ex. 14; ECF 104-7).

### Plaintiff's Claims in this Action

111.    On deposition, when asked about his understanding of what he is claiming in this lawsuit, Plaintiff testified: "Unfair -- I mean, basically, I was ran out of business, I feel. And it

seems, too, that I had upset Perdue and then I was pretty much starved out. That's how I feel." (Parker Dep. II at 298:23-299:7). He also testified: "…I'm not a lawyer in this. But the contract was breached by not—I mean, we didn't have a fair system, in my opinion." (Parker Dep. II at 304:21-24).

112.    When asked if his lawsuit "alleges that [he] believe[s] that [being treated like an employee] breached the agreement," he testified: "I don't have a clue what all it alleges." (Parker Dep. II at 309:14-18; *see also* Parker Dep. II at 308:3-309:13).

113.    When asked about the paragraphs of the PPA that he believes Perdue breached, Plaintiff testified: "I don't have the answer to that because I basically shared the story and, you know, with my attorneys, and they would have known what was breached and what wasn't breached, not me. I mean, I don't know all that." (Parker Dep. II at 337:21-338:3).

114.    Plaintiff believed the PPA was breached through Perdue not consigning birds to him of sufficient quality, which "seemed to start in the early -- just 2015-ish area." (Parker Dep. II at 300:25-301:23). In response to what provision of the contract he believes was breached, Plaintiff testified: "To consign available chicks to a producer to be raised, but when we get them, they are not -- I mean, they are not worthy to be even put in the house." (Parker Dep. II at 301:9-14). Plaintiff also believed Perdue breached the Agreement with him "[w]hen [he] started finding the trailer issues… in that area then [of 2015]," (Parker Dep. II at 302:9-25) and because "they were consigning available birds to him, but the birds … had lack in quality" and that "didn't seem fair to [him]." (Parker Dep. II at 303:1-303:13). Plaintiff believed this violated the contract because "[he] was growing under a … contract that wasn't – didn't been to be fair." (Parker Dep. II at 301:24-302:2).

115.    Plaintiff believed Perdue violated the agreement by not treating him as an independent contractor and that he "didn't feel that way" from day one. (Parker Dep. II at 309:24-310:10). He also claimed Perdue gave him "lesser quality in feed, in chickens," which made it hard for him to make money.  (Parker Dep. II at 310:11-19).

116.    Plaintiff testified that, during the entire time he was a grower for Perdue, he was never fully able to exercise his skill and independent judgment and that "[t]hey pretty much controlled everything" and they "supervise[d] every aspect of it" from the beginning. (Parker Dep. II at 320:10-321:19).

117.    Plaintiff testified that Perdue showed and told him what to do from the time he first sat down to sign an agreement in 2006, claiming: "[t]hey basically told [him] that they would come out and show [him] everything to do; what to do, how to do it. And [he] had to abide by the rules [Perdue] had …[and] if [he] didn't comply, basically, [he] got cut off." (Parker Dep. II at 280:23-281:15).

118.    Plaintiff confirmed this happened "at the very beginning of the relationship" in 2006, that Perdue was "up front with telling [him]… [h]e had to follow the guidelines and…everything [Perdue] said for daily working the birds and everything," that "[h]e had to abide by the rules that [Perdue] had," and "pretty much – you know, do what we say and when we say to do it and everything will be good." (Parker Dep. II at 281:4-282:4).

119.    Plaintiff also testified that Perdue subjected him to "supervision over everything from the beginning" (Parker Dep. II at 321:14-19), including mandatory guidelines beginning in 2006 and through the time he was a grower. (Parker Dep. II at 341:18-24).

120.    Plaintiff is not aware of any other growers who had the kinds of issues that Perdue noted he had who were not provided with repair letters like he received, responding "I'm not—I don't know about other farmers, no." (Parker Dep. II at 275:7-276:12).

121.    Plaintiff admitted he "[didn't] know about other growers. I mean, I don't know what they wrote down on their [flock visit reports]."  (Parker Dep. II at 270:17-23).

122.    Plaintiff has no personal knowledge of other growers who Bradley treated more leniently than him. (Parker Dep. II at 403:5-15).

123.    After his complaint to the USDA, Perdue required Plaintiff to keep his propane tanks at least 70% full, which Perdue requested because Plaintiff previously ran out of propane. (Parker Dep. II at 368:3-369:14, Excerpts of Ex. 22 at Parker_002551; Mizell Dep. at 150:2-155:24, Ex. 29 at Perdue 008027).

124.    Plaintiff has no knowledge of what requirements other growers had in their letters or what oversight the "field man" exercised over other growers. (Parker Dep. II at 270:17-23, 403:5-15, 405:9-407:10).

125.    Plaintiff admitted that the "Dedicated Tos and Never Evers" (which Plaintiff referred to as "always dos and never dos") and other "bio-security rules" and "bio-security policies," temperature and lighting guidelines for houses, and "all the requirements that Perdue put on [him]" are "Perdue established procedures," which he understood that he agreed to comply with in the PPAs. (Parker Dep. II at 283:9-286:13, 362:12-364:25, 408:24-409:10).

126.    Plaintiff does not believe Perdue breached the PPA when allowing supervisors to come onto his farm. (Parker Dep. II at 340:14-17).

127.    In 2016 or 2017, Plaintiff requested Perdue provide him with information from which he could calculate his compensation and Perdue "tried" to provide this information to him,

but "it is impossible almost for a grower to figure" "because there [are] too many factors." (Parker Dep. II at 338:18-340:12).

128.    Plaintiff "started noticing things [in] 2016-ish regarding insufficient inputs," (Parker Dep. II at 340:18-341:17) but Perdue never targeted Plaintiff with bad feed or chicks. (Copeland Decl. at ¶ 21; Burns Dep. at 65:3-66:8; Copeland Decl. at ¶ 21).

129.    Plaintiff began to notice Perdue "exerting even more strenuous controls, such as with the maintenance and upgrade of his chicken houses" (ECF 90 at ¶ 118) in 2015 or 2016. (Parker Dep. II at 273:10-17).

130.    When asked if he could explain the ways he thinks Perdue misrepresented the relationship, Plaintiff testified: "I don't know, really, how to answer that." (Parker Dep. II at 332:4-10). Plaintiff also testified "I don't understand that" and "I'm not a lawyer, so I'm having trouble with it" when asked whether he was contending Perdue misrepresented the nature of the relationship. (Parker Dep. II at 310:22-311:7). Nonetheless, Plaintiff testified that he first believed that Perdue misrepresented that he was an independent contractor on "day one" and "from day one" but he especially felt this way in 2015. (Parker Dep. II at 312:3-314:1, 317:1-13).

131.    Plaintiff testified that Perdue's misrepresentations "got worse" in 2015 or 2016, when Plaintiff alleges Perdue made misrepresentations by "weighing [trailers] from other growers and putting it on [Plaintiff's settlement]," and continued in 2017 when Perdue allegedly misrepresented the weights of chickens Plaintiff raised on flock settlement reports. (Parker Dep. II at 313:2-314:1).

132.    On deposition, Plaintiff's lawyers also elicited testimony that he does not know the "legal definition" of certain terms, including "negligent misrepresentation," "independent contractor," and "employee." (Parker Dep. II at 371:15-372:7).

**Plaintiff's Alleged Damages**

133.    Plaintiff generally worked 50-60 hours per week when he had chickens. (Parker Dep. II at 185:20-186:12, 226:20-229:4).

134.    When asked what damages he is seeking in this lawsuit, Plaintiff testified "I haven't -- I haven't requested money, that I know of" and, when asked if he was seeking to recover money, responded "No. I am seeking to help other farmers not to go through what I went through." He also said, "it's not my goal" to seek money and that he "do[es]n't have a dollar figure." (Parker Dep. II at 332:12-335:21).

135.    Plaintiff also testified that it "may be" that he is seeking overtime compensation but he's "not putting a number on it" because he "do[esn't] have that." (Parker Dep. II at 335:22-25).

136.    Plaintiff also testified:

> Q. Okay. So, sitting here today you're not able to tell me what money you're looking for from this lawsuit?
> ...
> THE WITNESS: I don't have dollar figures, no.

(Parker Dep. II at 337:6-11).

137.    Plaintiff later testified that he is seeking damages for the Milledgeville farm becoming "worthless without a working contract" with Perdue. (Parker Dep. II at 374:1-375:10).

Respectfully submitted this 14th day of July 2025.

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

/s/ Margaret Santen
Margaret Santen
GA Bar No. 578314
Kevin P. Hishta
GA Bar No. 357410
Michael Oliver Eckard

GA Bar No. 238550
**OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, P.C.**
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone:     404-881-1300
Facsimile:     404-870-1732
margaret.santen@ogletree.com
kevin.hishta@ogletree.com
michael.eckard@ogletree.com

*Attorneys for Defendant Perdue Foods LLC*

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

ROGER PARKER,
            Plaintiff,

v.

PERDUE FOODS, LLC,,
            Defendant.

CIVIL ACTION
NO. 5:22-CV-00268-TES

### CERTIFICATE OF SERVICE

I hereby certify that, on this 14th day of July 2025, I filed **Defendant's Statement of Undisputed Material Facts In Support of Defendant's Motion For Summary Judgement,** with the clerk's office using this Court's CM/ECF system, which will automatically send notice of such filing to the following attorneys of record:

T. Brandon Waddell
Ga. Bar No. 252639
Jarred A. Klorfein
Ga. Bar No. 562965
Emily C. Snow
Ga. Bar No. 837411
CAPLAN COBB LLC
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Telephone: (404) 596-5600
bwadell@caplancobb.com
jklorfein@caplancobb.com
esnow@caplancobb.com

Jamie Crooks*
D.C. Bar No. 156005
Kritika Deb*
Amanda R. Vaughn*
FAIRMARK PARTNERS, LLP
1825 7th St. NW, #821
Washington, DC 20001
Telephone: (617) 721-3587
jamie@fairmarklaw.com
kritika@fairmarklaw.com
*Counsel for Plaintiff*
*admitted pro hac vice*

This 14TH day of July, 2025.

*/s/ Margaret Santen*
Margaret Santen GA Bar No.
578314
Kevin P. Hishta
GA Bar No. 357410
Michael Oliver Eckard GA Bar No.
238550
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
191 Peachtree St. NE, Suite 4800
Atlanta, GA 30303
Telephone: 404-881-1300
Facsimile: 404-870-1732 margaret.santen@ogletree.com
kevin.hishta@ogletree.com michael.eckard@ogletree.com

*Counsel for Defendant*