# **<u>EXHIBIT B</u>**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF GEORGIA

 3                       MACON DIVISION

 4     ROGER PARKER, ON HIS OWN

 5     BEHALF AND ON BEHALF OF ALL     Case No. 5:22-cv-00268-TES

 6     OTHERS SIMILARLY SITUATED,

 7              Plaintiff,

 8         vs.

 9     PERDUE FOODS, LLC,

10              Defendant.

11

12                       VOLUME I

13      VIDEORECORDED 30(b)(6) AND INDIVIDUAL DEPOSITION OF

14         PARKER'S POULTRY EQUIPMENT AND ROGER PARKER,

15                  (Via Videoconference)

16

17     DATE:           Wednesday, April 23, 2025

18     TIME:           10:02 a.m.

19     LOCATION:       Ogletree Deakins Nash

                       Smoak & Stewart

20                     300 North Main Street

                       The Ogletree Building, Suite 500

21                     Greenville, South Carolina

22     TAKEN BY:       Counsel for the Defendant

23     REPORTED BY:    Elaine L. Grove-DeFreitas,

                       Independent Professional Reporter

24                     (Via Videoconference)

       VIDEOTAPED BY:  Kevin Day

25                     (Via Videoconference)
```

Page 19

1          Q.    Have you produced a lot of documents
2     regarding your former growing business with Perdue
3     in this case?
4          A.    I gave them what I had, yes.
5          Q.    Have you reviewed any documents that
6     Perdue has produced in this case?
7          A.    I could have.  I don't really know
8     who -- who sent what.  You know, sometimes -- I
9     remember documents, but I don't know who gave them.
10         Q.    Okay.  Now, other than this lawsuit, you
11    were also a party in a foreclosure action with First
12    Financial Bank.  Is that right?
13         A.    Yeah.  I had to go through being
14    bankrupt.
15         Q.    Okay.  We will talk about the
16    bankruptcy, but do you remember a foreclosure action
17    by First Financial Bank where you were named as a
18    party in the lawsuit when they were foreclosing on
19    your properties?
20         A.    That was, I thought, the bankruptcy
21    part.  But I guess so, yeah.  I didn't know there
22    was a difference.
23         Q.    Were you represented by a lawyer in that
24    action?
25         A.    No.  Not that I know of.  I had a lawyer

30(b)(6) Roger Parker , Vol.I                        April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 31

1          A.    I'm assuming -- I mean, I really don't

2    know.   I honestly don't know.  Because when I left

3    the farm -- she left the farm last, and I really

4    don't know what was left or what was not left.

5          Q.    Okay.  Have you saved -- since you filed

6    your lawsuit, have you saved all documents you

7    believe are relevant to the claims in this case?

8          A.    To my knowledge, yes.

9          Q.    Okay.  Is it your understanding that you

10   have an obligation to save all documents that are

11   relevant to this case?

12         A.    Yes, ma'am.

13         Q.    Okay.  We went over your Poultry

14   Producer Agreements with Perdue last time.  And I

15   will show you those again here shortly.  But just to

16   clarify, do you recall when the first date was when

17   you first signed a Poultry Producer Agreement with

18   Perdue?

19         A.    I know -- I think 2006, if I am -- if I

20   remember right, it's 2006.

21         Q.    And which location was that in

22   connection with?

23         A.    The Hillsboro farm was purchased before

24   the other farm, so that's what I'm thinking, it was

25   2006.

Page 32

1          Q.    Did you first start accepting flocks in

2     2006 or was there a period of time from when you

3     signed the agreement to when you first started

4     taking flocks?

5          A.    I know I met with them and we signed an

6     agreement.  And then I can't remember how long it

7     was, but after that.  It might have been a while, a

8     few months, you know, to close the loan or whatever.

9     I'm sure it was before I grew.

10         Q.    Before you were a grower with Perdue you

11    worked with ConAgra and Seaboard.  Is that right?

12         A.    Yeah.

13         Q.    I know we talked about this a little

14    before.  And you started growing with Seaboard in

15    the 1980s.  Is that right?

16         A.    I believe so, yeah.

17         Q.    Okay.  And I believe you testified

18    before that you were a 1099 independent contractor

19    with them at one point.  Is that right?

20         A.    I believe so, yeah.

21         Q.    Okay.  Did you sign a Poultry Producer

22    Agreement or similar Independent Contractor

23    Agreement with Seaboard when you were a 1099

24    independent contractor?

25         A.    I don't remember an Independent

Page 33

1    Contractor Agreement.  I know I signed a contract.

2         Q.   Do you remember what provisions were in

3    the contract?

4         A.   Just growing -- you know, basically,

5    growing chickens.  I would grow chickens for them.

6         Q.   Were you required to comply with certain

7    biosecurity standards when you were a 1099

8    contractor with Seaboard?

9         A.   Biosecurity.  I don't remember them

10   saying anything about biosecurity back then.

11        Q.   Were you subject to any guidelines --

12   any animal welfare guidelines with Seaboard?

13        A.   I don't think so.  We took care of the

14   chickens, if that's what you're saying.  You know,

15   we --

16        Q.   Did you -- sorry.  Go ahead.

17        A.   I'm sorry.  No.

18        Q.   Do you recall getting any sort of

19   documents regarding animal care, equipment, housing,

20   when you were with Seaboard?

21        A.   Now, I met with the field people, but I

22   don't remember anything coming out, like do this or

23   do that, you know, with -- with Seaboard.

24        Q.   Okay.  When you were with Seaboard did

25   management visit your farm from time to time to

Page 34

1      check on the chickens?

2             A.   Yes, ma'am.

3             Q.   How often did they do that?

4             A.   Sometimes once a month, sometimes twice

5      a month.  It's not -- you know, just different

6      times.

7             Q.   And what was your understanding of why

8      they were coming out to your farm?

9             A.   The field man come by and tested to see

10     how the birds were doing, as far as size and weight

11     and things like that.

12            Q.   If they discovered any issues as a

13     result of their visit, how were those handled?

14            A.   If they discovered any issues, normally

15     they would say something to me, you know, if there

16     was something -- I can't remember a time, but, you

17     know, I'm sure they did.

18            Q.   Do you recall having to make various

19     improvements to your houses back with Seaboard when

20     you were an independent contractor?

21            A.   No.  We grew for them a long time and I

22     don't think --

23            Q.   How many houses did you have when you

24     grew with them?

25            A.   We started with two and then later built

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 35

1      two more.  So it's part of the time two, part of the
2      time four.
3              Q.   Okay.  How were you compensated when you
4      were an independent contractor grower with Seaboard?
5              A.   Yeah.  When I had a contract with them?
6              Q.   Uh-huh.  Yes.
7              A.   Say that again so I make sure I got the
8      question right.
9              Q.   Sure.  I can ask it differently if it
10     would help.
11             A.   All right.
12             Q.   Are you familiar with the term
13     "tournament system"?
14             A.   Yes.
15             Q.   Were you compensated under a similar
16     tournament system when you were with Seaboard?
17             A.   I don't -- I don't know that I was or
18     wasn't.  I don't think so.  It wasn't -- it wasn't
19     anything like Perdue has, I don't think.
20             Q.   Okay.  And at some point you became a
21     grower with ConAgra.  Is that right?
22             A.   Yes, ma'am.
23             Q.   Okay.  And before that, real fast, you
24     grew with Seaboard about ten years.  Is that right?
25             A.   Yeah.  I believe it was, yeah.

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 36

1              Q.    And then you were a grower with ConAgra
2      for five or six years.   Is that right?
3              A.    Yes, ma'am.
4              Q.    How many flocks did you accept when you
5      were with ConAgra?
6              A.    Like per year?   Per --
7              Q.    Per year.
8              A.    Usually five to six, sometimes seven.
9              Q.    Do you recall how you were compensated
10     when you were a grower with ConAgra?
11             A.    I believe, given a check.
12             Q.    Was it based on bird weight?   Or do you
13     recall what the basis for your check was?
14             A.    So much per pound is my understanding.
15             Q.    Did it work similar to your compensation
16     with Perdue?
17             A.    No, ma'am.
18             Q.    Okay.   How was it different?
19             A.    Well, with the tournament system
20     everything is different.   I don't remember ever
21     being pitted against anyone else to grow with them.
22                   And with the system that Perdue has
23     you're given baby birds, sometimes from an old hen
24     to a young hen, and that's a big difference on how
25     they perform.

30(b)(6) Roger Parker , Vol.I                           April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 37

1            You're given different type birds that
2       you don't know what you're growing.  Some like air,
3       some don't like air.  All these factors are going to
4       come into how you grow.
5            Sometimes you're given more feed.  You
6       have got three types of feed, starter, finisher and
7       grower.  And sometimes if you're given -- because I
8       had two farms I could know how much feed of each one
9       was given.  Sometimes you would get better feed,
10      because you would get more of the better feed than
11      other times.
12           And then you were -- as you grew and the
13      birds got larger you then -- you know, it was
14      similar about the catch times and stuff like that
15      was, you know, almost the same, but the rest of it
16      was a good bit different.
17           Q.   Okay.  So my question was, were you
18      compensated similarly, and your answer is "No."  Is
19      that right?
20           A.   Yes, ma'am.
21           Q.   Did you operate as an independent
22      contractor grower with ConAgra?
23           A.   I had a contract with ConAgra.  I didn't
24      feel -- you know, I don't really know how to answer
25      that.  But I had a contract.

30(b)(6) Roger Parker , Vol.I                         April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                    Page 38

1           Q.   Did you feel as though you were treated
2      as an independent contractor with ConAgra?
3                MS. VAUGHN:  Objection to form.
4                THE WITNESS:  Yeah, I don't think so.  I
5      mean, it's a total different field, two different
6      companies.
7      BY MS. SANTEN:
8           Q.   Okay.  And why do you feel like you
9      weren't treated as an independent contractor with
10     ConAgra?
11          A.   I didn't have the -- near the
12     regulations and oversight and daily, you know,
13     things to accomplish as far as the amount of stuff
14     that I needed done.
15          Q.   My question was, why did you feel like
16     you were not treated as an independent contractor
17     with ConAgra?
18          A.   Oh.  I thought you were comparing the
19     two.
20          Q.   No.  ConAgra.
21          A.   Say it again.  Independent contractor
22     with ConAgra.
23          Q.   Yeah.  You said you felt like you
24     weren't treated as an independent contractor with
25     ConAgra.

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 39

1          A.    Oh.  With them.  With ConAgra.  My bad.
2      My bad.  I misunderstood the question.
3                Well, I didn't -- I guess without
4      comparing the two it's hard to get the answer
5      because it was just a different environment.
6          Q.    Do you believe you were not treated as
7      an independent contractor with ConAgra?
8          A.    I didn't feel that way.
9          Q.    Okay.  And with ConAgra only, why do you
10     feel like you weren't treated as an independent
11     contractor?
12         A.    Again, I didn't have somebody -- I
13     didn't have the same regimen, the same -- and back
14     in that situation I just didn't -- I just didn't
15     have anybody on -- you know, on me as far as
16     controlling every little thing, you know?
17         Q.    Okay.  My question is -- and please
18     listen carefully because I want to make sure you're
19     responding to my question -- why do you think you
20     were not treated as an independent contractor with
21     ConAgra?  We are not talking about Perdue.  With
22     ConAgra --
23         A.    With ConAgra, yeah.
24         Q.    -- why did you feel like you weren't
25     treated as an independent contractor?

Page 40

```
 1              A.    Again, it's the oversight difference.   I
 2    didn't have anybody on me every -- you know, like
 3    boom, boom, boom.
 4              Q.    So you didn't feel like you were treated
 5    as an independent contractor with ConAgra because
 6    you didn't have anybody over you?  Is that right?
 7              A.    No.  I wasn't -- in comparison to the
 8    two, looking back, I wasn't -- I didn't have
 9    somebody -- if that's what you're saying, yes.
10              Q.    No.  My question is, why do you feel
11    like you weren't treated as an independent
12    contractor with ConAgra?  We are not talking about
13    Perdue.  We are not talking about comparing the two.
14              A.    I get that.
15              Q.    With ConAgra do you feel like you were
16    treated as an independent contractor?
17              A.    No.  And I don't -- I don't know how an
18    independent contractor is supposed to be treated in
19    the poultry industry, so that's why I'm having
20    trouble answering your questions.
21              Q.    Okay.  Did you ever bring a lawsuit
22    against ConAgra about the way you were treated?
23              A.    No.
24              Q.    Okay.  Were you required to comply with
25    ConAgra -- I'm not talking about Perdue.  When you
```

Page 41

1    were a grower with ConAgra were you required to

2    comply with any sort of animal welfare

3    specifications?

4           A.    They let you grow pretty much, I mean,

5    independently if you -- I mean, they would give you

6    suggestions as field people, you know, to help you,

7    but that was about it.  It wasn't -- it wasn't a

8    mandatory -- you know, it wasn't -- it was just

9    different.

10          Q.    Did you have management come visit your

11   farm when you were a grower with ConAgra?

12          A.    "Management" meaning a field supervisor?

13   Yes, ma'am.

14          Q.    Okay.  And how often did they do that?

15          A.    Once a month, maybe twice a month.

16          Q.    What was your understanding of the

17   purpose of their visits?

18          A.    To check on the birds, the sizes and,

19   you know, turn in numbers, you know, how -- they

20   would tell them how big the bird was going to be for

21   production.  You know -- you know, just general

22   oversight, I guess.  I don't know.

23          Q.    Did you ever have to make any

24   improvements to your houses when you were a grower

25   with ConAgra?

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 43

1    had disease or something inside the house they would

2    bring me medication and stuff for, you know,

3    whatever it was.

4            And issues inside the house, I don't

5    remember having issues inside the house.  But if

6    that did come up, I'm sure that they could have said

7    something to help me, you know?

8        Q.    Did you ever have to make any

9    improvements to your houses before they gave you any

10   additional flocks with ConAgra?

11       A.    No.  Never.

12       Q.    Okay.  So before you --

13       A.    We were their top grower.  I mean -- I'm

14   sorry.  Go ahead.

15       Q.    That's okay.

16            So before you came to work with Perdue

17   you had about fifteen years as a grower.  Is that

18   right?

19       A.    Somewhere in that line, yes.

20       Q.    And in your prior deposition you

21   testified that when you came to Perdue and purchased

22   the Hillsboro farm, the farm was in working order

23   when you took it over.  Is that right?

24       A.    The Hillsboro farm?

25       Q.    Uh-huh.  Correct.

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 44

1              A.   Yeah.   They -- Perdue has people do the

2      upgrade, you know, before purchase.   Or during

3      purchase you have options to do it.   Either way, it

4      has to be done and has to be up to the tier,

5      whatever tier system -- they had a tier system, tier

6      1, 2, 3 and 4.   Well, 4 came later.   But, you know,

7      you had to meet whatever tier it was at that time.

8      And the amount of specific equipment had to be made

9      and all criteria meet that tier.

10             Q.   And did you buy this Hillsboro farm and

11     start working with Perdue with your ex-wife Gail

12     Parker at that time?

13             A.   Yes, ma'am.

14             Q.   Given your experience, did you feel like

15     you had a pretty good idea of what was involved in

16     being a grower?

17                  MS. VAUGHN:   Object to form.

18                  THE WITNESS:   In comparison, I had no

19     idea what I was getting into.

20     BY MS. SANTEN:

21             Q.   Okay.   Your ex-wife testified that given

22     your extensive experience, you all had a pretty good

23     idea of what you were getting into.   Is that not

24     right?

25             A.   That's not right.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 46

1    really.  We were just -- I felt we were there just

2    to, you know, facilitate.

3    BY MS. SANTEN:

4          Q.   Okay.  You talked, in your prior

5    deposition, about needing to make upgrades to that

6    Hillsboro farmhouse pretty shortly after you

7    purchased it.  First of all, do you recall what you

8    purchased the Hillsboro farm for?

9          A.   If I remember, it was 1.3 million.

10         Q.   Okay.  How did you finance the purchase

11    of that?

12         A.   Through the bank, First Financial.

13         Q.   Could you determine what bank you wanted

14    to use to finance?

15         A.   Did I determine --

16         Q.   Could you determine what bank you wanted

17    to use to finance?

18         A.   I could.  They suggested which one I

19    use, but, you know --

20         Q.   Okay.  How many houses were -- how many

21    chicken houses were on the Hillsboro farm when you

22    purchased it?

23         A.   Five.

24         Q.   Five.  Okay.  In your last deposition

25    you talked about needing to make upgrades to those

Page  47

1      houses shortly after you purchased the farm.  What

2      upgrades did you have to make at that time?

3              A.   I had to extend the cool cell and

4      curtain and add -- if I'm remembering, I think it

5      was a fan, add a fan to the back, a 52-inch.

6                   I'm trying to think of what else.  I was

7      thinking it was something else to do with

8      ventilation, but I just can't remember what all was

9      on that list.

10             Q.   Do you recall how much money you had to

11     spend in those upgrades?

12             A.   I would -- I'm thinking around 25,000.

13             Q.   And why did you make those upgrades?

14             A.   Perdue has -- had gone to tier 4 -- or

15     tier 3, I think.  I can't remember which tier.

16     Don't hold me to it.  And that was the only way to

17     get a raise.

18                  When I got my first check it was $7,000

19     and didn't cover the gas, and so I had to do

20     something because I knew I was -- had no -- no other

21     income at the time.

22             Q.   So if you wanted to make more money, you

23     felt you had to go to tier 4.  Is that right?

24             A.   That was the only way with them.  Yeah.

25     I worked twelve years and we never had a

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 48

1    cost-of-living increase.

2          Q.    When you were a grower with Perdue could

3    you grow other livestock on your farm?

4          A.    Yes.

5          Q.    Okay.  Did you do that when you were a

6    grower?

7          A.    I had some cows.  Yes, I did.

8          Q.    Do you recall how long you did that?

9          A.    Four cows came -- or stayed with the

10   farm when the owner left.  And they just -- you

11   know, whatever they had, calves, and then it went

12   from there.  I never bought a cow.

13         Q.    Did you make income from the cows?

14         A.    From selling the cows, I believe we did

15   early on, yeah.

16         Q.    Do you recall how much you made from

17   that?

18         A.    No, ma'am.  It was just -- we would sell

19   them a few hundred dollars apiece, but I don't know

20   what was made.

21         Q.    Let me just look at one thing.  Well, we

22   will look at it later since I don't have it.

23               Okay.  Did you ever add more houses to

24   the Hillsboro farm during the time that you owned

25   it?

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 51

1            Q.   What did the bank say to you?

2            A.   Well, they just looked at the numbers

3     and the cash flow and said it wouldn't cash flow.

4            Q.   Okay.  Did you try to get financing from

5     anywhere else?

6            A.   No.  I couldn't, not without refinancing

7     the whole farm.

8            Q.   Okay.  Then at some point you decided to

9     buy another farm.  Is that right?

10           A.   Yes.  Later, after doing upgrades on the

11    farm, the guy was about to lose the farm, I think.

12    Yeah.  I don't know for sure.  I don't know what the

13    stipulations were with him, but it's my

14    understanding he was -- he hadn't had it but a year

15    or so or two years and was about to lose -- you

16    know, lose the farm.

17           Q.   Did you buy the farm from him directly

18    or did you mortgage with a bank?

19           A.   I mortgaged with a bank.

20           Q.   Okay.  And that was in Milledgeville.

21    Right?

22           A.   Yes, ma'am.

23           Q.   Was that 2014 or 2015?  Is that right?

24           A.   No.  I think it was 2009, if I remember.

25    I don't know.  I'm thinking it was -- I don't know.

Page 52

```
 1    I would have to go back and look at the dates.  I
 2    guess I'm confused on that.
 3            Q.   In your prior deposition you said that
 4    you purchased that around 2014 or 2015.
 5            A.   Yeah.  I don't -- I really, now that I
 6    look back at some of the dates, I think it might
 7    have been '9.
 8            Q.   Okay.  Did you sign a separate contract
 9    in connection with that purchase, a separate Poultry
10    Producer Agreement with Perdue?
11            A.   I believe it was, yeah.
12            Q.   Okay.  And how much did you buy the
13    Milledgeville farm for?
14            A.   I think it was 980-something.  980,000.
15    Right at a million dollars.
16            Q.   Did you finance that purchase with First
17    Financial Bank as well?
18            A.   I did.
19            Q.   Could you have financed that with
20    another bank if you wanted to?
21            A.   Possibly.  I didn't try.
22            Q.   If you had the cash, could you have
23    bought it with cash?
24            A.   Sure.
25            Q.   And that was a mortgage.  Right?  So you
```

30(b)(6) Roger Parker , Vol.I                                  April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 53

```
 1    were responsible for the payments and you were
 2    responsible if there was a default.  Is that
 3    correct?
 4             A.   Yes.
 5             Q.   Was that the same with the prior loan
 6    you took?  It was like a mortgage, so you were
 7    responsible for the payments.  Correct?
 8             A.   Say that again now.  Prior --
 9             Q.   With the Hillsboro house and the loan
10    you took to secure the Hillsboro house, you were
11    responsible for those payments.  Right?
12             A.   Yeah.  I was responsible for payment on
13    both.
14             Q.   Okay.  And if you defaulted, you were
15    responsible for whatever happened.  Is that right?
16             A.   Yes.
17             Q.   Okay.  Did you and Gail purchase both of
18    those farms, both Hillsboro and Milledgeville
19    together?
20             A.   Yes.
21             Q.   And when you purchased Milledgeville, I
22    think, before, you said there were six houses on
23    that property.  Is that right?
24             A.   There were.
25             Q.   Why did you decide to purchase a second
```

Page 54

1    farm?

2         A.   Well, if you -- there was -- like where

3    I had five or four houses and had an income, that

4    was six houses with less money to pay on the

5    payment.  So the income was, you know --

6    profit-to-loss ratio, I guess, was better on that

7    particular farm.

8         Q.   So you viewed it as a way to make some

9    additional money.  Right?

10        A.   Yes, I guess.  Yeah.  And -- well, you

11   have got to have equipment, and I had the equipment,

12   so I didn't have to buy that again.

13        Q.   So did you have the equipment from the

14   other farm?  Or what did you have the equipment

15   from?

16        A.   Yeah.  I had already equipment for both

17   farms.  I would bring it back and forth on my trip.

18        Q.   When you were deciding whether to buy

19   that farm, what factors were you considering?  Were

20   you looking at the potential profitability of that

21   farm and the cost to operate it?

22        A.   I guess just oversight, knowing that the

23   first farm was not making enough money to survive, I

24   was thinking that the other farm, by buying it --

25   being a better deal, I guess, if you want to put it

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 55

1    that way, than the first farm, having six houses

2    versus four after that blew down and -- well, even

3    five.  Because five -- it was really like four and a

4    half houses when I bought it.  It would be -- it

5    would make it to where, you know, I wouldn't go

6    under.

7           Q.   Yeah, I asked, because you said you

8    thought about the profit/loss ratio.  So what did

9    you mean when you said you thought about the

10   profit/loss ratio?

11          A.   Six houses, versus the other farm having

12   less houses.  Of course six will bring more in.

13          Q.   When you said you already had the

14   equipment for both farms, why did you have equipment

15   for both farms when you just owned Hillsboro?

16          A.   I could take -- I put it in my truck and

17   go back and forth.  It was an hour's drive, but I

18   did it.

19          Q.   So you didn't have to reinvest.  So you

20   could use your same equipment from Hillsboro to

21   Milledgeville.

22          A.   Yes, ma'am.

23          Q.   And that was your decision, to go back

24   and forth versus buying new equipment.  Right?

25          A.   Yes, ma'am.  I couldn't afford it.

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 59

1          Q.    Mr. Parker, we are back from a short
2     break.  Do you understand you're still under oath?
3          A.    Yes, ma'am.
4          Q.    Okay.  We were talking about your
5     decision to buy the Milledgeville farm, before the
6     break, and the six houses that were on it.  Did you
7     ever think about adding any more houses to the
8     Milledgeville farm?
9          A.    I don't think so.
10         Q.    Okay.  And why not?
11         A.    Really, I don't think the property
12    needed it, you know?
13         Q.    Could you have tried to build more
14    houses on that property if you felt the property
15    needed it?
16         A.    I believe I could, yeah.
17         Q.    Okay.  We had talked about, and I just
18    want for the record to be clear, when you bought the
19    Hillsboro farm there were some cows or calves and
20    you made certain money when you sold them.  Is that
21    right?
22         A.    Yes, ma'am.
23         Q.    Okay.  I'm going to show you what we are
24    going to mark as Exhibit 3.  And I just want to ask
25    you if this is reflected in this document.

Page 60

1    (Defendant's Exhibit No. 3, Farm Only Balance Sheet,

2    was marked)

3    BY MS. SANTEN:

4         Q.   Okay.  Do you recognize this document

5    here?  And I understand it's not signed, but I will

6    just ask you a few questions about it.  What I have

7    handed as Exhibit 3 which is a Farm Only Balance

8    Sheet, Name, Roger D. and Linda G. Parker.  Do you

9    recognize this document?

10        A.   It looks like a balance sheet off of one

11   of my taxes, I guess.  I don't actually recognize

12   it, but --

13        Q.   Could this be perhaps something that was

14   provided to the bank in connection with your

15   financing?

16             MS. VAUGHN:  Objection to form.

17             THE WITNESS:  I have no clue.

18   BY MS. SANTEN:

19        Q.   Okay.  It says here:  "Cows, Bulls."  Do

20   you kind of see -- actually, let's go up to the top.

21   And you see, "Livestock & Commodities for Sale."

22             On the left-hand column it says,

23   "Calves, $600.  Total, 3,600."  Do you see that?

24        A.   Yes, ma'am.

25        Q.   Does that appear to be an accurate

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 61

1      reflection of the amount of money you made from the

2      sale of the calves?

3              A.    Apparently, yes.

4              Q.    Any reason to believe that's not

5      accurate?

6              A.    No, not really.

7              Q.    And if you go down a little further you

8      see, "Cows, Bulls.  Cows, 20, Unit Value."  Did you

9      have about twenty cows in connection with that farm?

10             A.    I don't know the year I got it.

11                   Is this '13?  I wouldn't think I had

12     twenty cows in '13.  Well, maybe I did.  I don't

13     know.  I really don't know.

14             Q.    Do you recall making some money in

15     connection with the sale of those cows?

16             A.    I sold cows.  I sold them, yeah, I

17     certainly did.

18             Q.    Does 24,000 for the sale of the cows

19     seem accurate?

20             A.    Yeah.  If I sold them all, yeah.

21             Q.    And then it says, "Bulls 2,000."  And

22     then it looks like 2,000 for the sale of the bull.

23     Does that appear to be accurate?

24             A.    Yeah, I would say so.

25             Q.    And that was your money to keep.

Page 62

1    Correct?

2            A.    It was.

3            Q.    And Perdue didn't have a problem with

4    you having cows or bulls on your property.  Right?

5                  MS. VAUGHN:  Objection to form.

6                  THE WITNESS:  We were allowed to have

7    cows.

8    BY MS. SANTEN:

9            Q.    Okay.  So we talked about the loans you

10   took, and I'm going to ask you about those, with

11   First Financial.

12                 Okay.  I'm going to hand you some

13   documents we will mark as Exhibit 4.

14   (Defendant's Exhibit No. 4, Commercial Loan

15   Agreements, was marked)

16   BY MS. SANTEN:

17           Q.    Okay.  Do you recognize these documents?

18           A.    Honestly, I don't.

19           Q.    Well, let's go through them real fast.

20   It says:  "Commercial Loan Agreement."  And then the

21   "Borrower:  Roger Dale Parker," with an address for

22   Milledgeville.  Do you see that?

23           A.    I do at the top.

24           Q.    Okay.  "Linda Gail Parker," with an

25   address for Milledgeville, was that your address?

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 63

1              A.    I'm trying to find it here.

2              Q.    897 Highway 24 East, Milledgeville,

3        Georgia 31061?

4              A.    Yeah.   The Milledgeville farm, yes.

5              Q.    Okay.   And do you see at the bottom --

6        there are some initials at the very bottom right?

7              A.    Yeah.

8              Q.    Are those your initials?

9              A.    I guess so.   I can't hardly make it out,

10       but it looks like it could be.

11             Q.    Okay.   And do you see at the bottom

12       there are some numbers like FFB00467 on the bottom

13       right?

14             A.    Yes, ma'am.

15             Q.    I might refer to those numbers when I'm

16       talking about pages, just to help you find the page

17       that we are talking about.

18             A.    Okay.

19             Q.    So seeing the initials and the address

20       and the Commercial Loan Agreement, let's go to the

21       signature page just to see if you recognize the

22       signature.   Go to the last page of this first staple

23       which is FFB00472.

24             A.    Okay.

25             Q.    And does that appear to be your

Page 64

1    signature there?

2              A.    Yes, ma'am.

3              Q.    Okay.  So does this appear to be an

4    accurate copy of a loan document you signed with

5    First Financial Bank in connection with a purchase

6    of the Milledgeville farm?

7                    MS. VAUGHN:  Objection to form.

8                    THE WITNESS:  It's a Commercial Loan

9    Agreement.  That's what it says.

10   BY MS. SANTEN:

11             Q.    Okay.  So this appears to be a copy of a

12   loan agreement you signed.  Correct?

13             A.    Yes, ma'am.

14             Q.    Okay.  And it was for $20,000.  Is that

15   right?

16             A.    I believe so, yeah.

17             Q.    And this was money you were responsible

18   for that they were loaning you in connection with

19   your farm.  Is that right?

20             A.    Yes, ma'am.

21             Q.    Okay.  Let's go to the second document

22   here.  It says FFB -- sorry.  I'm on the wrong

23   one -- 00378 at the bottom.  Do you see that?

24             A.    Yes, ma'am.

25             Q.    It looks like this was for $935,000, if

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 65

1    you look at the top left, the note amount.  Do you
2    see that?
3            A.   Yes.
4            Q.   Okay.  And it has your address at 288
5    Gordon Road, Hillsboro, Georgia 31038.  Is that
6    right?
7            A.   Yes, ma'am.
8            Q.   Okay.  And go to the last page of this
9    to see if this looks like your signature.
10           A.   Okay.  I know I did this.  Okay.
11                Now, what page?  I'm sorry.
12           Q.   Go to FFB00382.  Is that your signature?
13           A.   It seems to be.
14           Q.   Okay.  So does this appear to be an
15   accurate copy of the loan agreement you signed with
16   First Financial Bank to secure the Hillsboro farm?
17           A.   Hillsboro, yes, ma'am.
18                Well, no.  Not originally, I don't
19   think.  I think this is the second loan.
20           Q.   Okay.  But this is a copy of a loan you
21   had with First Financial Bank?
22           A.   Yes.  Yes.
23           Q.   And this was money you were responsible
24   for paying in connection with that loan.  Is that
25   correct?

30(b)(6) Roger Parker , Vol.I                           April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                        Page 66

1           A.    It was.

2           Q.    Okay.  And if the property increased in

3     value like a mortgage, you would gain the benefit of

4     that increase in value.  Correct?

5           A.    If it increased -- if I sold it, I guess

6     so, yeah.

7           Q.    Okay.  It works like a mortgage.  Right?

8           A.    Yeah.

9           Q.    Okay.  And you believe that this 935 was

10    the second loan.  What do you -- what amount do you

11    think the first loan was for?

12          A.    Can we go back to that last one?

13          Q.    Sure.

14          A.    That could go either way on win or lose.

15    Because there was a loss in this particular one, you

16    know, whenever the stock market fell.

17          Q.    So you assumed the risk or loss -- the

18    risk of loss or potential for profit?

19          A.    Yeah.  Either way, yeah.

20          Q.    Okay.  Let me show you what we are going

21    to mark as Exhibit 5.

22    (Defendant's Exhibit No. 5, First Financial Bank Loan

23    Application, was marked)

24                THE WITNESS:  Are we through with this

25    one (indicating)?

Page 67

1              MS. SANTEN:  Yes, we are through with
2      that one.
3      BY MS. SANTEN:
4          Q.   All right.  Take a minute to look
5      through that and let me know if you recognize that
6      document.
7          A.   Some of the information is blacked out
8      on this one.
9          Q.   Do you recognize your signature on these
10     documents?
11         A.   I have not got that far ahead.
12              Oh.  In this first one, yeah, I see
13     my -- I was looking for my signature.  I did find it
14     here on the front.
15         Q.   Have you looked through it?  Do you
16     recognize the --
17         A.   No, I haven't looked through it all yet.
18     I just saw that.
19         Q.   Okay.  Does that look like your
20     signature on the page that you reviewed?
21         A.   On the front?
22         Q.   Yes.
23         A.   Yes.
24         Q.   Okay.  Let me know if any of the
25     signatures on here -- other than your ex-wife's

Page 68

1    signature, the signature for you looks like your

2    signature.

3              A.    All right.  Okay.

4              Q.    Do those look like your signatures on

5    these various pages in this document that we have

6    marked as Exhibit 5?

7              A.    The ones that had signature, yeah.

8              Q.    Okay.  And it looks like this is, on the

9    first page, a Loan Application with First Financial

10   Bank.  Is that right?

11             A.    Yeah.  That's what it says.

12             Q.    Would this have been an application that

13   you filled out and submitted to First Financial Bank

14   in connection with some financing?

15             It says "Loan Application" at the top.

16   Do you see that?

17             A.    Yeah.  I was looking at some of the

18   things it said in it, like "upgrades" and stuff like

19   that.

20             Q.    Do you remember submitting a loan

21   application to First Financial Bank to seek

22   additional financing for certain upgrades?

23             A.    If I remember right, it was for both

24   farms.  But I can't -- I can't -- I don't -- I don't

25   exactly remember what this particular one is for.

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 69

1          Q.    Okay.  But you do remember submitting
2     the Loan Application to First Financial Bank's
3     Agriculture Lending Division for certain upgrades to
4     chicken houses.  Correct?
5          A.    I'm assuming I did because I have got
6     this paper.
7          Q.    Okay.  Any reason to believe you did not
8     submit this paper?
9          A.    No, ma'am.
10          Q.    Let me ask you about a few things.  On
11     the first page it says:  "Describe Your Loan
12     Request:"  Payoff First Financial Bank loan
13     number -- it has a loan number -- upgrades to six
14     broiler houses, loan in the amount of 92,000.
15               Do you have any reason to believe you
16     did not make that request to First Financial Bank?
17          A.    Which one?  Are we talking about the
18     first one?
19          Q.    Yes, on the very first page.
20          A.    Okay.
21          Q.    After applicant it says:  Describe Your
22     Loan Request.  Refinance.  Payoff First Financial
23     Bank loan number 120030 -- I think it's 263 --
24     upgrade to 6 broiler houses.
25          A.    Yeah.

Page 70

```
 1              Q.    And the total loan request is 92,000.
 2                    Do you have any reason to believe you
 3      did not make that request to First Financial Bank?
 4              A.    If I remember -- what's the date on
 5      this?
 6              Q.    It looks like it was first submitted in
 7      September of 2018, according to the next page.
 8              A.    Yeah.  I was seeking to get water lines.
 9      Yeah.  Yeah.  Okay.
10              Q.    So let's go through some of these on
11      here.  And I'm going to direct your attention to the
12      bottom Bates number, the FB00 number.
13              A.    Okay.
14              Q.    Go to FB00283 at the bottom, if you
15      would.
16              A.    Okay.
17              Q.    And would you -- do you recognize your
18      signature on this?
19              A.    Yes.
20              Q.    Okay.  This is a Loan Application from
21      the Agriculture Lending Division of First Financial
22      Bank dated July 23rd, 2010.  And this was signed by
23      you and your ex-wife.  Correct?
24              A.    Let me see.  I'm trying to see what the
25      amount is.
```

Page 71

1          Q.    Describe Your Loan Request.  It says:

2     Total:  $935,000.  That second box on the page.

3          A.    Yeah, I see the description here now.

4     Six 40 by 500 broiler houses, mobile home.  Yeah, I

5     see that.

6          Q.    Okay.  Does this appear to be an

7     accurate copy of a Loan Application you and your

8     ex-wife submitted to First Financial Bank's

9     Agriculture Lending Division in connection with a

10    mortgage you were attempting to take with them?

11         A.    Yes, ma'am.

12         Q.    Okay.  And the amount was $935,000.

13    Correct?

14         A.    Yeah.  The purchase of that farm, yeah,

15    I think it was.

16         Q.    Okay.  Go down to FB00286.

17         A.    Okay.

18         Q.    It says:  "Balance Sheet - Business."

19              "Name:  Roger Dale Parker & Linda Gail

20    Parker dba Parker Poultry."

21              "Date:  October 28, 2014."

22              Do you recall providing the information

23    on this sheet to First Financial Bank?

24              If you look at "Long Term Assets" there

25    is a number of acres, there is an amount,

Page 72

1    liabilities.  There are some numbers.  Do you recall

2    providing this underlying data to First Financial?

3            A.   I don't recall this one, but they did

4    one yearly, I think.  And at the end did two, I

5    think, but I can't remember how often.

6            Q.   Is this your signature on the bottom of

7    this Balance Sheet - Business?

8            A.   Yes, ma'am.

9            Q.   Okay.  So is it fair to say you reviewed

10   this and signed this, indicating you believed it was

11   accurate?

12           A.   Yeah.  The bank filled it out, but yeah.

13           Q.   Okay.  Do you see right above your

14   signature it says:  "We certify under penalty of

15   criminal prosecution that all information provided

16   on this form is true and complete to the best of my

17   knowledge?"  And then you signed after that

18   statement.

19           A.   Yes.

20           Q.   Do you see that?

21           A.   Yes, ma'am.

22           Q.   Okay.  So if you go to Long Term Assets

23   it lists a number of acres and broiler houses and

24   Present Value under 3.

25               If you go to "Total Assets," which is on

Page 73

1    the left-hand column at the bottom, it says:

2    2.005,545 million dollars.  So by signing, you were

3    attesting that that was an accurate value of your

4    total assets as of the date you signed, which is

5    October 28, 2014.  Correct?

6         A.    Apparently, yes.

7         Q.    Okay.  And the Net Worth that you note

8    here was -- go to the right, right beside that, line

9    9, 174,350.  Do you see that?

10        A.    I see that.

11        Q.    Okay.  So is that an accurate

12   attestation of your net worth as of October 28,

13   2014?

14        A.    Yeah, I guess it is, yes.

15        Q.    Okay.  And then your Total Liabilities

16   right above that, 1.83 million and some change, do

17   you see that?

18        A.    I do.

19        Q.    Okay.  Is that an accurate attestation

20   of your total liabilities as of October 28, 2014?

21        A.    Yeah.  According to the bank, yes.

22        Q.    Okay.  And according to what you signed

23   under the penalty of criminal prosecution as well.

24   Correct?

25        A.    Yeah.  They fill it out.  I just sign

Page 74

1    it.  And I had to every year.

2              Q.    Okay.  But you agree that you signed,

3    under the penalty of criminal prosecution --

4              A.    Apparently.

5              Q.    -- attesting that this is correct.

6    Right?

7              A.    Apparently I did, yes.

8              Q.    And you do not have any reason to

9    believe this is not correct?

10             A.    I don't -- I didn't have all the

11   numbers.  But yes -- I mean, I'm assuming it is.

12             Q.    Okay.  Let's go to the next page,

13   FB00287.  This looks like another Balance Sheet

14   dated January 8, 2016.  Is that your signature

15   below?

16             A.    It looks like it.

17             Q.    Okay.  And do you believe -- do you have

18   any reason to believe the information on this

19   Balance Sheet is not correct?

20             A.    Yeah.  I don't know if it is or isn't.

21             Q.    Do you have any specific reason to

22   believe this information is not correct?

23             A.    No, ma'am, I don't.  But I don't -- it

24   doesn't look like the other one.

25             Q.    Okay.  Let's go to Total Assets.  It

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 75

1    says:  2.5 million and some change.  Do you have any

2    reason to believe that number is not correct as of

3    January 8, 2016?  Line 4.

4         A.   Oh, okay.  Yeah.  Apparently it's what

5    it says.

6         Q.   Okay.  Do you have any reason to believe

7    that number is not correct?

8         A.   I'm not an appraiser, but yes, that's

9    fine.

10        Q.   Okay.  And go to Total Long Term

11   Liabilities, to the right of that it says:

12   1.647,730.  Do you have any reason to believe that

13   number is not correct in terms of your Total Long

14   Term Liabilities as of January 8, 2016?

15        A.   No, ma'am, I don't.

16        Q.   Okay.  And then Total Net Worth on line

17   9 says:  $746,625.  Do you have any reason to

18   believe that that number is not an accurate

19   reflection of your total net worth on January 8,

20   2016?

21        A.   No, ma'am.

22        Q.   Okay.  And that is about 600,000 higher

23   than your net worth on the page we just looked at in

24   2014.  Was that increase in net worth in connection

25   with your farming business with Perdue?

Page 76

1                    MS. VAUGHN:   Object to form.

2                    THE WITNESS:   I have no clue.

3       BY MS. SANTEN:

4            Q.   Did you have any other jobs at that time

5       that could have caused the increase in your net

6       worth?

7                    MS. VAUGHN:   Object to form.

8                    THE WITNESS:   Net worth is based on

9       things you have.   Right?

10      BY MS. SANTEN:

11           Q.   Right.

12           A.   Not jobs.   So I don't quite understand.

13           Q.   So if you go to the prior page we just

14      looked at, your net worth was 174,300.   And you

15      agreed, as of October 28, 2014, that was accurate.

16      Correct?

17           A.   According to the bank it is, yes.

18           Q.   Okay.   And then your net worth two years

19      later, on the next page, FFB00287, is 746,625.   Is

20      that correct?

21           A.   That's what it says.   I don't know what

22      year it was, but they did one and then they brought

23      it back and said this is not right.   Do this one.

24      And I don't know what year it was.

25           Q.   So it's your testimony that the bank

Page 77

1      told you that one of the documents was not correct
2      and had you sign --
3              A.   Well, they did --
4              Q.   -- a modification?
5              A.   They did, yeah.
6                   I done signed it, and they gave it back
7      and they told me this is wrong.  We have got to do
8      another one.  And they sent me another one to sign
9      and I signed it.
10             Q.   Do you remember if the one we just
11     looked at was the wrong version or a correct
12     version?
13             A.   I really can't -- that's what I was
14     trying to find, the dates, you know, and stuff and
15     trying to see, but I don't know which one is what,
16     really.
17             Q.   And who, with the bank, told you that it
18     was not correct and you had to sign a new one?
19             A.   It was one of the ladies in the office.
20     I do not know.  I can't remember her name.
21             Q.   But you have no reason to believe that
22     the one we just looked at from 2014 was incorrect?
23             A.   There again, I don't know.  I can't
24     remember which one they redacted and brought back
25     and had me redo.

Page 78

```
 1              Q.   Okay.  Is it your understanding that
 2      these are documents your bank provided directly to
 3      your lawyers?
 4              A.   I do not know that.
 5              Q.   Okay.  Do you -- what do you believe
 6      caused the increase in your net worth from 2014 to
 7      2016?
 8                   MS. VAUGHN:  Object to form.
 9                   THE WITNESS:  I don't know.  But it
10      should be here.
11      BY MS. SANTEN:
12              Q.   Okay.  We can move on.
13              A.   Personal vehicles and stuff.  I have no
14      clue why it is.
15              Q.   Go to FFB00294 which is several pages
16      back.  Is that your signature on this page?  It's
17      dated December 7th, 2018.
18              A.   Yes.  Apparently it's my signature,
19      yeah.
20              Q.   Okay.  And does the information on here
21      appear true and accurate?
22              A.   Yes.  There again, I'm not -- I don't
23      know which one of these got inverted.  I just don't
24      know.
25              Q.   You don't have any reason to believe
```

Page 79

```
 1      that this specific document was the one that was

 2      inaccurate.  Correct?

 3           A.   Well, a lot of this stuff is blacked

 4      out.  I don't even know what it is.

 5           Q.   Well, you see your signature, and it

 6      says:  "We certify under penalty of criminal

 7      prosecution that all information" --

 8           A.   Yeah.

 9           Q.   -- "provided on this form is true and

10      complete to the best of my knowledge," and then you

11      signed.  Correct?

12           A.   Yeah.  But it wasn't blacked out like

13      that when I signed it.

14           Q.   Okay.  But you would have reviewed this

15      and then signed it, attesting that this information

16      was accurate.  Correct?

17           A.   If I knew what it was, yeah.

18           Q.   Would you have signed with that

19      certification, "under penalty of criminal

20      prosecution," if you did not know what it was?

21           A.   I wouldn't think so.

22           Q.   Okay.  And was it your understanding

23      that the bank prepared these for you based on

24      information that you provided to them?

25           A.   I didn't have to provide anything, that
```

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 80

1    I know of.
2           Q.   Okay.  But it's your understanding this
3    is information pertaining to you and your business
4    with Perdue?
5           A.   Yeah.  It was mandatory every year to
6    sign these papers, yes, ma'am.
7           Q.   But you signed attesting that the
8    information on the form was true and complete.
9    Correct?
10          A.   It has nothing to do with Perdue,
11   though, was it?  This was between me and the bank.
12          Q.   Correct.  I'm just trying to understand
13   whether this is accurate information and whether you
14   reviewed it, certifying that it was accurate.
15          A.   Apparently I did at the time, but there
16   were more information than what's on this.
17          Q.   Is there anything on this sheet that you
18   believe is not accurate?
19          A.   I can't see it.  I don't know.
20          Q.   Okay.  Well, let's go through -- I mean,
21   you see the certain numbers.  Do you have any reason
22   to believe anything on here is not accurate?
23          A.   I have no clue to make a judgment,
24   because can't see what is there.
25          Q.   You see a number, "Owners Equity,"

Page 81

1    percentage, 37 percent.  Do you see that at the very

2    bottom?

3            A.   Yeah.  But every line almost has a

4    blackout on what it is, so it's hard to tell what it

5    is.

6            MS. SANTEN:   And counsel, we would

7    request that you ask First Financial Bank for

8    clearer copies of these documents, and then if we

9    need to reopen the deposition of Mr. Parker for the

10   very limited purpose of confirming certain values,

11   that we will.

12   BY MS. SANTEN:

13           Q.   So you remember each year signing a

14   balance sheet, correct, with the bank?

15           A.   Yes, ma'am.  It was mandatory.

16           Q.   And do you have any understanding of how

17   they prepared the numbers on this Balance Sheet?

18           A.   Not really.

19           Q.   Okay.  Did you ever question any of the

20   numbers with the bank after you signed the forms?

21           A.   Yes.

22           Q.   Okay.  Which did you question with the

23   bank?

24           A.   I can't remember which one that they --

25   they swapped.  And if I remember, it was toward the

Page 82

1    latter part of the growing years.  But they had, you

2    know, asked for another one.  I can't remember.  I

3    just don't remember what it was.

4           Q.   Okay.  Other than that instance, you

5    can't think of any information that was on these

6    that you felt was incorrect?

7           A.   To my knowledge, no.  I mean, it wasn't

8    mine.

9           Q.   Did you experience changes in the amount

10   of money you got from Perdue over the years?

11          A.   Only when I did upgrades and paid for

12   it, the pay increase is the only way you could get a

13   raise usually.

14          Q.   What else happened, during the time that

15   you owned your farms with Perdue, that would have

16   caused your net worth to increase?

17          A.   I would invest -- have to invest money

18   in the farm to get an increase.  Like I said, we

19   never got a cost-of-living increase the twelve years

20   I grew.

21          Q.   But if you invested money in the farm,

22   you could make more money.  Correct?

23               MS. VAUGHN:  Object to form.

24               THE WITNESS:  Well, yes and no.  Yes,

25   you could get a bigger check.  But you had to weigh

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 83

1    the difference if the 20 or $30,000 you spent was

2    going to bring you more income or not.

3    BY MS. SANTEN:

4          Q.   So you had to make that determination.

5    Correct?

6          A.   Well, you know, you tried to, best you

7    could.  But it's a guess.  You don't know.

8          Q.   Did anything else happen from 2014 to

9    2018 that would have caused your net worth to go

10   from 174,000 to 1.74 million?

11              MS. VAUGHN:  Object to form.

12              THE WITNESS:  I -- I don't know.  Like I

13   said, the bank did this.  I don't -- I really don't

14   understand it -- a lot of it, really.

15   BY MS. SANTEN:

16         Q.   Okay.  We can move on.

17              I'm going to hand you what we are going

18   to mark as Exhibit 6.

19   (Defendant's Exhibit No. 6, Supplemental Loan

20   Covenants, was marked)

21   BY MS. SANTEN:

22         Q.   All right.  Take a minute to read

23   through this document and see if you recognize it.

24         A.   Are these part of the loan documents or

25   something?

Page 84

1          Q.   Do you recognize your signature on these
2     pages?
3          A.   I'm trying to find the signature page.
4     Let me look.
5          Q.   There are some initials on the bottom.
6     There is a signature on FFB00060.
7          A.   Okay.
8          Q.   Does that look like your signature?
9          A.   Yes, ma'am.
10         Q.   Okay.  Would you agree that this is a
11    Supplemental Loan Covenant that has your signature,
12    dated June 24th, 2013, between Roger Dale Parker,
13    dba Parker's Poultry, and Linda Gail Parker, dba
14    Parker's Poultry?  It looks like the terms of the
15    loan, under paragraph 11, are 1.115 million with
16    fifteen annual payments.  Do you see that?
17         A.   Yes, ma'am.
18         Q.   Any reason to believe this is not an
19    accurate copy of a Supplemental Loan Covenant?
20         A.   I don't know what it means by
21    "Supplemental."
22         Q.   Do you believe that at one point you
23    took out a loan in the amount of 1.115 million to
24    secure either the Hillsboro farm or the
25    Milledgeville farm?

30(b)(6) Roger Parker , Vol.I                        April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 85

1              MS. VAUGHN:  Object to form.

2              THE WITNESS:  The rates come down.  I

3      can't remember when I did that, but apparently I

4      did.  I signed it, so --

5      BY MS. SANTEN:

6              Q.  Any reason to believe this is not

7      accurate?

8              A.  No, ma'am.

9              Q.  Okay.  And that would have -- this would

10     have been a loan taken in connection with your

11     grower business with Perdue.  Correct?

12             A.  Yes, ma'am.

13             Q.  Okay.  And was that money that you were

14     responsible for paying similar to a mortgage on a

15     house?

16             MS. VAUGHN:  Object to form.

17             THE WITNESS:  Yes.  Apparently, this is

18     some type of upgrade.

19     BY MS. SANTEN:

20             Q.  But that was a loan you were responsible

21     for paying.  Right?

22             A.  Yes.  Apparently, yes.

23             Q.  Okay.  And I'm going to hand you what we

24     are going to mark as Exhibit 7.

25     (Defendant's Exhibit No. 7, Security Agreement, was

Page 86

1      marked)

2      BY MS. SANTEN:

3           Q.    Do you recognize this document?  There

4      are some initials on the bottom and some signatures.

5      Do you recognize these as documents you provided to

6      your lawyers?

7           A.    I'm still looking.

8                 Okay.  I think I went through them.

9           Q.    Do these look like your signatures and

10     your initials on these pages?

11          A.    It does.  It's very confusing, but yes.

12          Q.    Okay.  Are these documents that you

13     provided to your lawyers?

14          A.    I guess I did.

15          Q.    Okay.  Go to the first page.  It says:

16     "Security Agreement."

17                "Secured Party:  First Financial Bank."

18                "Debtor:  Roger Dale Parker, Linda Gail

19     Parker."

20                It looks like "Secured Debts," if you go

21     to paragraph 2, references 92,000 for a loan.  And

22     you signed this document and initialed this

23     document.  Correct?

24          A.    Yes.

25          Q.    Okay.  So paragraph 1, "Small Business

30(b)(6) Roger Parker , Vol.I                     April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 87

1      Administration," it says:  The Secured Debts secured

2      by this lien were made under a United States Small

3      Business Administration nationwide program which

4      uses tax dollars to assist small business owners."

5                   Is it your understanding that this was a

6      small business loan?

7           A.   I understood that they -- yeah, I guess

8      it is.

9           Q.   Okay.  And there is a number of these

10     documents in this stack.  And you have no reason to

11     dispute the accuracy of any of these documents.

12     Correct?

13          A.   The confusing part is the dates.  They

14     are so close.  Why would they do so many so close to

15     the time?  I don't understand it.

16          Q.   Okay.  But you have no reason to think

17     anything in this -- in this packet is not accurate?

18          A.   Well, I really don't know because it's

19     redundant.  I mean, it's -- it's the same thing

20     three times with different dates.

21          Q.   Well, go to Parker 000499 for me.  This

22     is another Security Agreement dated June 24th, 2013

23     with the Small Business Administration.  And would

24     you agree these are your initials and your

25     signatures on this document?

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 88

1          A.   Yes.   This is the third one, I think,
2     that's in this pile with different dates.
3          Q.   And then Parker 000486, that's another
4     secured agreement dated July 23rd, 2010 with the
5     Small Business Administration.  Is that a document
6     you signed as well?
7          A.   Hold on just a second.  What page?
8          Q.   Parker 000486.
9          A.   This still makes no sense.
10         Q.   Would you agree that you signed this
11    document?
12         A.   Apparently I did in three different --
13    for the same thing three times.  That's why I'm
14    having trouble understanding it.
15         Q.   But you don't have any reason to believe
16    anything in here is not accurate.  Correct?
17         A.   I don't know, really.  Like I said, I'm
18    confused as to even why -- and it has been so long I
19    don't remember the exact circumstances.
20         Q.   But you agree you signed these
21    documents.  Correct?
22         A.   Apparently.  It's my signature, yeah.
23         Q.   Okay.  Do you have any reason to believe
24    it's not your signature?
25         A.   No.  It appears to be mine on all three.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 89

1          Q.   Okay.  And you testified earlier you
2    understood that this was a Small Business
3    Administration loan.  Correct?
4          A.   I did.
5               MS. VAUGHN:  Object to the form.
6    BY MS. SANTEN:
7          Q.   We can move on.
8               Did you use those funds for your farms
9    with Perdue?
10         A.   I don't remember what the funds were
11   for, whether it was upgrades or a purchase of a farm
12   or what it was.
13         Q.   But it was something in connection with
14   your farm with Perdue.  Right?
15         A.   Yes.
16         Q.   Okay.  Let's go to --
17              MS. VAUGHN:  Maggie, we have been going
18   about another hour.
19              MS. SANTEN:  Okay.
20              MS. VAUGHN:  Is now a good time for a
21   break?
22              MS. SANTEN:  Yeah, that's fine.  You
23   guys want to take lunch now?
24              MS. VAUGHN:  Yes.
25              THE VIDEOGRAPHER:  The time on camera is

Page 90

1    approximately 12:09, and we are off the record.

2    (Break In Proceedings)

3                    THE VIDEOGRAPHER:  The time on camera is

4    approximately 1:05.  We are back on the record.

5                    Counsel, you may proceed.

6    BY MS. SANTEN:

7            Q.    Okay, Mr. Parker.  We are back from

8    lunch.  Do you understand you're still under oath?

9            A.    Yes, ma'am.

10           Q.    Okay.  We had talked about Exhibit 7

11   before lunch, which is a Security Agreement.  I just

12   want to ask you just a few questions about that.  Go

13   to Parker 000482, which is the first page of this

14   document.

15           A.    Okay.  I'm there.

16           Q.    Do you see paragraph 2, Secured Debts,

17   it says:  "The following debts and extensions,

18   renewals, refinancings, modifications and

19   replacements"?

20                  It talks about a promissory note dated

21   "March 4, 2010, from me to you, in the amount of

22   92,000."

23                  Is it your understanding that this

24   Security Agreement pertains to that loan which was

25   for $92,000?

Page 91

1              A.    Again, I'm confused on these three dates

2        and what they are or what they belong to or where

3        they come from.  Really, I don't understand them.

4        But I'm having trouble with this -- this one because

5        of that.

6              Q.    But you don't have any reason to believe

7        this information is not accurate?

8              A.    Yeah.  But what if these -- okay.  No, I

9        don't.

10             Q.    I'm asking, do you have any reason to

11       believe these documents are not accurate?

12             A.    I question the documents because there's

13       three sets of them.  I don't know which one would

14       have been the one that's actually used.

15             Q.    Well, we can go through them.  There are

16       different dates.

17             A.    I know that.

18             Q.    And these are documents you provided to

19       your lawyer.

20             A.    I don't -- I don't know where everything

21       comes from.  I mean, I will be honest.

22             Q.    Okay.  Well, if your testimony is you

23       have no reason to believe these are not accurate,

24       then we can move on.

25                   MS. VAUGHN:  Objection to form.

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                        Page 92

1                THE WITNESS:  I don't know what's

2       accurate, because there are three sets of them.

3       BY MS. SANTEN:

4                Q.    Okay.  Well, let's go through each one.

5                A.    Okay.

6                Q.    The first one is Parker 000482.  It's

7       dated March 4, 2010.  It's a Small Business

8       Administration loan in the amount of $92,000.  And

9       you testified that those are your initials there and

10      was your signature on the last page, 4, which is

11      Parker 000485.

12               A.    Okay.

13               Q.    Then the next one is Parker 000486.  And

14      that is dated July 23rd, 2010, Small Business

15      Administration loan in the amount of $935,000.  You

16      testified that those are your initials.  And that's

17      your signature on page 4 of that, Parker 000489.  Is

18      that correct?

19               A.    March and July, yes.

20               Q.    Okay.  And the March, go back to the

21      first page, is for $92,000, paragraph 2.

22               A.    Okay.  Same year.  Okay.

23               Q.    Okay.  And then the July is for

24      $935,000.  Do you see that on Parker 000486?

25               A.    I do.

Page 93

1          Q.   Okay.  And then the one we were just

2    looking at is Parker 000499 dated June 24, 2013.

3    And this is a Small Business loan in the amount of,

4    under paragraph 2 --

5               MS. VAUGHN:  Wait.  He is still trying

6    to get there.

7               MS. SANTEN:  Okay.

8               THE WITNESS:  499?

9    BY MS. SANTEN:

10         Q.   Yes.

11         A.   Okay.

12         Q.   Okay.  This is a Small Business loan

13   Security Agreement dated June 24, 2013, under

14   paragraph 2 in the amount of 1.115 million.  And you

15   testified that those are your initials and that's

16   your signature on the fourth page of that document

17   which is Parker 000502.  Is that correct?

18         A.   I -- I believe, yeah, I signed that.

19         Q.   Okay.  Do those loan amounts sound

20   familiar as loans that you took out in connection

21   with your grower business with Perdue?

22         A.   I honestly do not remember.  I honestly

23   don't.  Like I said before, it makes -- I don't

24   know.

25         Q.   But you have no reason to believe you

Page 94

1    did not take out that money?
2            A.    I don't know.  I mean, I don't -- I
3    can't change my answer.  I mean, I don't know what's
4    what with these.
5            Q.    Okay.  But you signed all these
6    documents.  Right?
7            A.    It seems that I did, yes.
8            Q.    Okay.  Do you have any reason to believe
9    you did not sign these documents?
10           A.    No, I -- I don't guess so.
11           Q.    Okay.  And you agree that you signed the
12   documents we looked at earlier pertaining to these
13   loans.  Correct?
14               MS. VAUGHN:  Objection to form.
15               THE WITNESS:  I don't know what we are
16   talking about.
17   BY MS. SANTEN:
18           Q.    Okay.  We will just let that speak for
19   itself.
20               MS. SANTEN:  And Counsel, I will just
21   note for the record that First Financial Bank
22   production did not have a Certificate of
23   Authenticity, so we are going to have to notice
24   their deposition regarding some of his testimony
25   that the documents might not be accurate, or what

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 95

```
 1    have you.
 2              MS. VAUGHN:  I don't think he testified
 3    that they were inaccurate.
 4              MS. SANTEN:  He said that they told him
 5    one of the documents wasn't accurate and they asked
 6    him to sign another document.  And that he wasn't
 7    sure of the derivation of the numbers on those
 8    documents, so we just need to take their deposition.
 9              THE WITNESS:  Not on this one.
10              MS. SANTEN:  We --
11              THE WITNESS:  Excuse me.  Didn't mean to
12    interfere.
13              MS. SANTEN:  Yeah.  Sorry, Mr. Parker.
14    We were talking about other matters.
15              THE WITNESS:  Yeah.
16    BY MS. SANTEN:
17         Q.   Okay.  Let's move on.  Now, when you --
18              MS. VAUGHN:  Sorry.  I will just note
19    for the record we don't necessarily agree that we
20    need to notice their deposition, but we can discuss
21    it at another time.
22              MS. SANTEN:  That's fine.
23    BY MS. SANTEN:
24         Q.   Okay.  When you took out these loans did
25    you pay the bank directly or did you sign a document
```

30(b)(6) Roger Parker , Vol.I                         April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 96

1    with Perdue authorizing them to withhold certain

2    money from your settlement to pay the bank?

3            A.   Everyone signs an agreement with Perdue

4    to have it withdrawn.

5            Q.   Okay.  Could you have paid the bank

6    directly?

7            A.   I really don't know.  I don't know if

8    they had that option.

9            Q.   Okay.  No one ever told you,

10   specifically, that you could not pay the bank --

11               MS. VAUGHN:  Object to form.

12   BY MS. SANTEN:

13           Q.   -- directly.  Is that right?

14           A.   I don't know that that was an option or

15   not an option.  Like I can't answer either way

16   because I don't know the bank's criteria.  I never

17   questioned it.

18           Q.   Yeah.  My question to you is, no one

19   with Purdue ever told you specifically that you

20   could not pay the bank directly.  Correct?

21               MS. VAUGHN:  Object to form.

22               THE WITNESS:  No.  I don't think with

23   Perdue, no.

24   BY MS. SANTEN:

25           Q.   Okay.  I'm going to show you what we

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 97

1       will mark as Exhibit 8.

2       (Defendant's Exhibit No. 8, Assignment Of Funds,

3       was marked)

4       BY MS. SANTEN:

5               Q.    Okay.  Mr. Parker, could you review this

6       document and let me know if this is your signature

7       on the second page which is FFB00016?  Is that your

8       signature?

9               A.    Hang on a second.  Just a moment.  Yes,

10      it is.

11              Q.    Okay.  Is it your understanding that

12      this was a document where you authorized Perdue to

13      withhold the payments for your loan with First

14      Financial Bank and to make those payments on your

15      behalf?

16              A.    I guess it is.

17              Q.    If you look at FFB00017, the second

18      paragraph says:  "Hence, you are fully authorized to

19      release to First Financial Bank."  Do you see that?

20              A.    Yes, ma'am.

21              Q.    Okay.  Do you have any reason to believe

22      this document is not an authorization signed by you

23      authorizing Perdue to make the payments on your

24      behalf?

25              A.    No, ma'am.

Page 98

1           Q.   Okay.  And I will hand you what we are

2    going to mark as Exhibit 9.

3    (Defendant's Exhibit No. 9, Assignment of Funds, was

4    marked)

5    BY MS. SANTEN:

6           Q.   Okay.  Do you recognize this document?

7                MS. VAUGHN:  This seems to be the same

8    document.

9                MS. SANTEN:  Did you get a different --

10   let me see.  What do you have on yours?

11               MS. VAUGHN:  That is a different one.

12   He has the same one, though.

13               MS. SANTEN:  Okay.  Sorry.

14               MS. VAUGHN:  Counsel, I still have a

15   different document than my client has.

16               MS. SANTEN:  Sorry.  Let me see what he

17   has.  My apologies.

18               THE WITNESS:  I have these two.

19               MS. SANTEN:  I'm trying to ask about

20   FFB00108.

21               MS. VAUGHN:  Okay.  That's what this is,

22   but not what we have.  This looks like FFB104.

23               Okay.  Great.

24               I will give you these back.

25               MS. SANTEN:  Sorry.  It looks like

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 99

```
 1    there's two of the same.  Oh.  They are different.
 2    BY MS. SANTEN:
 3         Q.   Mr. Parker, do you recognize this
 4    document?
 5         A.   It looks like another payment document.
 6         Q.   Okay.  Do you recognize your signature
 7    on this document?
 8         A.   Yes, ma'am.
 9         Q.   Okay.  Is it your understanding that
10    this is an authorization signed by you authorizing
11    Perdue to make loan payments on your behalf?
12         A.   Yes, ma'am.
13         Q.   Okay.  Now, when you were the grower,
14    and we talked about this a little bit before, you
15    had -- and this testimony will be pursuant to the
16    30(b)(6) notice, just for the record purposes -- you
17    had your own business called Parker's Poultry And
18    Equipment.  Is that right?
19         A.   Can I ask what 30(b)(6) is?
20         Q.   You testified earlier that you did not
21    understand that you were here to testify in your --
22    as a representative of the business.
23              MS. VAUGHN:  Object to form.
24    BY MS. SANTEN:
25         Q.   But your lawyers have agreed that you
```

Page 100

1    will be testifying as a representative of your

2    business for certain questions, which means that

3    whatever testimony you provide is binding on your

4    business.

5              A.    All right.  I remember.

6              Q.    Okay.  When you were a grower, you also

7    operated an outside business called Parker's Poultry

8    and Equipment.  Is that right?

9              A.    Yeah.  At the early months, yeah --

10   years.

11             Q.    Why did you start that business?

12             A.    I renovated a house.  And Perdue asked

13   me would I do further upgrades for the farms, and I

14   did because I had construction background.  And

15   that's why I did it.

16             Q.    Okay.  When did you start that business?

17             A.    It would have been when I was at

18   Hillsboro, so that would be 2000 -- I don't know.

19   2000, just guessing, 7 or 8, you know?

20             Q.    Okay.  Did you ever incorporate that

21   business or form a separate legal entity?

22             A.    No.

23             Q.    Okay.  How did you come up with the

24   business name?

25             A.    It was my name.

Page 101

1              Q.    Did you have a separate business

2       checking account?

3              A.    From what?

4              Q.    For Parker's Poultry and Equipment.

5              A.    Yeah.  I think so, yeah.

6              Q.    Okay.  Would you deposit any money that

7       Parker's Poultry and Equipment made into the

8       business checking account?

9              A.    Yeah, I should have.

10             Q.    Okay.  Were you --

11             A.    I just -- I don't -- I can't remember if

12      I did it as a separate account.  I believe I did.  I

13      don't --

14             Q.    Okay.  Were you the only person involved

15      in that business, or did your son or wife do some

16      work in that business as well?

17             A.    I had a son that worked for me some.

18             Q.    Okay.  Did you have any other employees

19      for that business?

20             A.    I would -- yeah.  I had a guy that

21      worked for me that helped me do installs.

22             Q.    Okay.  What was his name?

23             A.    Robert Taylor.

24             Q.    How did you pay Mr. Taylor?

25             A.    We would go bid a job together, and then

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 102

1    when we were done he was paid.

2         Q.   Did you pay him by the hour or did you

3    pay a set amount?

4         A.   A set amount.

5         Q.   How did you determine that set amount?

6         A.   Just whatever he thought he needed to do

7    the install.

8         Q.   Would he tell you what price, or would

9    you give him a price that you would be willing to

10   pay?

11        A.   Usually it was common; you know, we

12   agreed on a price.

13        Q.   Did you pay him on a 1099?

14        A.   I believe so.

15        Q.   Okay.  Other than your son and

16   Mr. Taylor did anyone else work for you in your

17   Parker's Poultry and Equipment construction

18   business?

19        A.   I mean, day -- day labor, but I can't

20   remember them all.  You know, they would sometimes

21   give me a hand.

22        Q.   How did you find your day labor?

23        A.   It's just guys in the community usually.

24        Q.   Would you train them?

25        A.   Not necessarily needed training for what

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 103

1      we were doing.
2              Q.    What work would you have them do?
3              A.    Just picking up; you know, clean up,
4      stuff like that.
5              Q.    And you mentioned you had a construction
6      background.  What was your construction background?
7              A.    I used to build spec houses, things.
8              Q.    Okay.  Do you remember how many years
9      you operated that business?
10             A.    Which business?
11             Q.    Parker's Poultry and Equipment.
12             A.    I don't.  I think maybe four, five
13     years.  I'm just guessing.
14             Q.    Okay.  Did you advertise for that
15     business?
16             A.    We had a -- I think we had a website,
17     but I didn't actually advertise.
18             Q.    Okay.  What do you recall about the
19     website?
20             A.    I just remember my son setting one up.
21             Q.    Did you review the website?
22             A.    I mean, I saw it before, yeah.
23             Q.    What was the purpose of the website?
24             A.    People could see what equipment we
25     carried and things like that.  But I didn't sell out

Page 104

```
 1    of it.
 2            Q.    So what business services did Parker's
 3    Poultry and Equipment provide?
 4            A.    Water lines, feed lines, those type.
 5    You know, just poultry equipment for the inside of
 6    the chicken house, and could build new homes if
 7    needed.
 8            Q.    How did you -- would you buy the poultry
 9    equipment and then have some on inventory to sell?
10    Or how did that work?
11            A.    Say that again.  Inventory.
12            Q.    Yeah.  You said that you would sell
13    poultry equipment.
14            A.    Normally -- normally I bought -- had it
15    delivered to the farm.  I didn't carry much
16    inventory.
17            Q.    So you would buy poultry equipment for
18    other people and they would pay you?
19            A.    Yeah, for the farm, whatever job.
20            Q.    So you had a website.  And is it fair to
21    say the purpose of the website was to advertise for
22    business for Parker's Poultry and Equipment?
23            A.    I don't know as much advertisement.  It
24    was just knowledge of what I did carry.  But I guess
25    in a sense it was.
```

Page 112

1    talking about?

2              MS. SANTEN:  I'm starting with the

3    Facebook one.

4              THE WITNESS:  That's what I'm saying,

5    I'm trying to figure out even what this is.  This

6    one, Big Dutchman, it's not Parker's Poultry.

7    BY MS. SANTEN:

8         Q.   706-819-2260, is that your phone number?

9         A.   Yeah.  Yeah.  That was a number I had at

10   the time, yeah.

11        Q.   Okay.  And parker'spoultryequipment.com,

12   was that an email or a website that you used?

13        A.   Yeah.  I think it's the one he set up,

14   yeah.

15        Q.   Let's go to Perdue 007125.  Do you

16   recognize this document?

17        A.   215.

18        Q.   7215.

19        A.   Looking for 7215.  Yeah, this is, I

20   think, in reference to Robert, but yeah.

21        Q.   706-468-2676, was that a phone number

22   you used?

23        A.   It was one of the numbers we had, yeah.

24        Q.   Okay.  So that was connected to Parker's

25   Poultry and Equipment business?

30(b)(6) Roger Parker , Vol.I                                April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                  Page 113

1          A.   Yes, I think so.  I don't know.  It's
2     connected to this website, though.
3          Q.   But that is a number that you used for
4     your business.  Right?
5          A.   One of the numbers that I used, yes.
6          Q.   Okay.  How many different phone numbers
7     did you use for your business?
8          A.   I -- I don't -- I really don't -- can't
9     remember.  I know I had two or three phone numbers.
10         Q.   Okay.  This says that your business
11    employs a staff of approximately four.  Is that
12    correct?
13         A.   This is in reference to someone else,
14    but yes.
15         Q.   Who is that in reference to?
16         A.   Robert.  He did the installs.
17         Q.   Are saying that Robert owned the
18    business, or is this discussing your business?
19         A.   No.  Robert had been in the business for
20    thirty years.
21         Q.   Okay.  So are you saying Robert employed
22    a staff of four or did you employ a staff four?
23         A.   He had a crew that worked for him.
24         Q.   So you employed Robert.  And then how
25    many people did Robert employ?

Page 114

1          A.   I don't really know how many Robert
2     employed.
3          Q.   Did you tell him he could hire -- how
4     did it work?  You employed Robert and then --
5          A.   Well, on a 1099 he can hire as many as
6     he wants.
7          Q.   What would you ask Robert to do?  What
8     jobs would Robert be performing?
9          A.   All the installs.
10         Q.   So then it was up to Robert to hire
11    people, if he wanted to, to help with the installs?
12         A.   He did the installs.
13         Q.   Okay.  And he hired -- it sounds like he
14    hired some people.  Is that right?
15         A.   I'm assuming, yeah.  That's -- or if
16    it's -- according to how big it was.  According to
17    what he had to do, I guess.
18         Q.   Do you believe Robert put this website
19    together?
20         A.   No, I wouldn't think Robert did.
21         Q.   Who did you think put this website
22    together?
23         A.   My son built the website.
24         Q.   Okay.  This one looks to be different
25    than the one we just discussed.  It says monte or

Page 116

1           A.    It wasn't from me.

2           Q.    It says:  "Records show it was

3    established in 2010."  Was Parker's Poultry

4    Equipment established in 2010?

5           A.    No.  It was established earlier than

6    that, I believe.

7           Q.    When do you believe it was established?

8           A.    Well, about 2006, it will be -- I

9    think -- I think it was 2009.  It could have been

10   2010.

11          Q.    Okay.  And you mentioned you engaged in

12   no other advertising efforts on behalf of your

13   business.  Is that right?

14          A.    Yeah, no.  I didn't do these, so no.

15          Q.    Okay.  You mentioned that Perdue

16   suggested that you help with these installs.  How

17   did that conversation come about?  Who did you

18   discuss that with?

19          A.    I can't remember who was over the

20   building at the time, but they come inspected mine

21   and asked would I do others.

22          Q.    Okay.  And what, exactly, did they

23   inspect when they asked you if you did others?

24          A.    The upgrade that I did for my farm,

25   because I had just purchased it and then they

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 117

1    immediately had upgrades.  So I had to do my own.  I
2    could not afford anything else.
3              Q.   When you say you immediately had to do
4    upgrades, was that to get tier 4 compensation?
5              A.   Yeah.  To get more -- try to get a
6    better income, yes.  That's the only way to do it,
7    is invest, because there is no -- no increase.
8              Q.   Okay.  But you made the decision to
9    upgrade to try to get better income.  Is that
10   accurate?
11             A.   That would be.
12             Q.   Okay.  And when you did these upgrades,
13   you would take out loans from First Financial Bank
14   that we looked at the documents for.  Is that right?
15             A.   No.  Well, no, not every time.  You
16   know, I would -- but most of the time.
17             Q.   Okay.  Were there some upgrades that you
18   paid for out of pocket?
19             A.   Yes.  The smaller things I did, yes.
20             Q.   Okay.  So how did you get business for
21   Parker's Poultry and Equipment then?  Did you get
22   referrals from Perdue?
23             A.   Well, yes.  I was on their list of
24   installers.
25             Q.   Okay.  What list are you talking about?

Page 118

1                A.    They made -- they have a list of who

2        is -- who can do it and who can't.

3                Q.    Who would the list go to?

4                A.    What do you mean, "go to"?

5                      MS. VAUGHN:  Object to form.

6        BY MS. SANTEN:

7                Q.    Who would they send that list to?  All

8        growers or growers in Perry?

9                      MS. VAUGHN:  Object to form.

10                     THE WITNESS:  As far as I know, it's

11       stapled on every house at the chicken farm.

12       BY MS. SANTEN:

13               Q.    Okay.  And when you say, "every house,"

14       what geographic region for houses would it be

15       stapled on?

16                     MS. VAUGHN:  Object to form.

17                     THE WITNESS:  I have no -- I have no

18       clue where Perdue puts it.

19       BY MS. SANTEN:

20               Q.    Okay.  Well, you said it was stapled on

21       every house.

22               A.    Yeah.

23               Q.    Do you believe it was on every house in

24       Georgia or on every house beyond Georgia?

25               A.    I can't really answer because I don't

Page 119

1    know how far out they reached with that information.

2              Q.   Okay.  And Perdue -- you were allowed to

3    have this outside business.  Right?

4              A.   Outside business?

5              Q.   This Parker's Poultry and Equipment,

6    that was okay with Perdue for you to do?

7              A.   Yeah.  As far as I know, yeah.

8              Q.   Okay.  And they --

9              A.   For a while.

10             Q.   And was there ever a time when they told

11   you you could not do it?

12             A.   Yes.

13             Q.   When was that?

14             A.   It's after I had -- I believe it was

15   right after I had contacted the USDA.  They -- I had

16   a bid come in wanting me to bid a new poultry farm.

17   And I was contacted by Perdue and asked not to bid

18   that, even though the owner of the farm asked me to

19   bid it.

20             Q.   I'm asking you about doing equipment and

21   installs with Parker's Poultry and Equipment.

22             A.   That's what I'm answering.

23             Q.   Okay.  Who told you that you could not

24   bid the farm?

25             A.   If I remember correctly, it was Dan

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 140

1    really.  I'm not them.
2    BY MS. SANTEN:
3            Q.    Did you perform work -- did Parker's
4    Poultry Equipment do work for other growers?
5            A.    Yes.
6            Q.    Okay.  What is your understanding of how
7    they got your name for that work?
8            A.    Different avenues.  I mean, a lot of
9    times it would just be other farmers.
10           Q.    Do you know whether any of them got your
11   name from one of these sheets?
12           A.    On their wall?
13           Q.    Yes.
14           A.    Probably.  But it wasn't this sheet, you
15   know?
16           Q.    How do you know that?
17           A.    This wasn't on the wall.
18           Q.    Did you go to every single grower's
19   house to see what was on the wall?
20           A.    No, sure didn't.
21           Q.    Okay.  So you don't know one way or the
22   other.
23           A.    I only deal with my chicken houses and
24   the farmers that I work for.
25           Q.    Okay.  How much work -- how much money

Page 141

1    did you make with Parker's Poultry Equipment doing
2    installs and other work?
3          A.    That's -- that's a broad question.  I
4    don't have a clue what you're asking.
5          Q.    How much money, approximately, did this
6    business make when you operated it?
7          A.    I would be afraid to guess.
8          Q.    Okay.  Well, let me show you Exhibit 13
9    and let's talk through it.  And again, this is topic
10   6, directly relevant to it.  So our making an
11   objection for the record that this is directly
12   relevant to a 30(b)(6) notice.  And I don't know,
13   answer means that he was not adequately prepared,
14   and it's not acceptable.
15          MS. VAUGHN:  All right.  We obviously
16   disagree with that characterization.
17          MS. SANTEN:  Okay.  So for the record,
18   topic 6 is:  Revenues and income earned by Parker's
19   Poultry Equipment from July 2012 to January 2020.
20   And then the second part is how those revenues were
21   reported to the Internal Revenue Service.
22   BY MS. SANTEN:
23          Q.    Okay.  And Mr. Parker, do you know the
24   annual revenues for Parker's Poultry and Equipment?
25          A.    I do not.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                              Page 143

1     Equipment.  We have sent a deficiency letter, so we

2     ask that other years be produced, just for the

3     record.

4               MS. VAUGHN:  We have provided you

5     everything we have.

6               MS. SANTEN:  All right.  I will show you

7     Exhibit 13.

8     (Defendant's Exhibit No. 13, Parker's Poultry

9     Equipment Bids, was marked)

10    BY MS. SANTEN:

11         Q.   And Mr. Parker, did you ask your

12    accountant for any copies of any tax returns that

13    you had for your business?

14         A.   I thought I had them all.

15         Q.   Did you ever contact him to ask him for

16    that?

17         A.   Recently?

18         Q.   Him or her?

19         A.   Recently?

20         Q.   Yes.

21         A.   No.  I had no reason to, that I know of.

22         Q.   Okay.  Let's go through this.  Do you

23    recognize this document?

24         A.   Yeah.  These are bids.  When I -- when

25    I -- my machine, when I would -- when I would try to

Page 144

1    create a bid it wouldn't allow me, so it had to go

2    out as invoices on stuff.  So this -- this was --

3    these were bids on jobs.

4         Q.   Which of these jobs did you actually

5    perform?

6         A.   I really can't remember which ones I did

7    and which ones I didn't do.

8         Q.   Do you remember how many jobs you

9    handled for Parker's Poultry and Equipment during

10   the time you owned it?

11        A.   Do what now?  How many jobs I did?

12        Q.   Yes.

13        A.   I did jobs.  I just -- I mean, I don't

14   know the number.

15        Q.   Which records would your business have

16   that would show exactly which jobs you did?

17        A.   I don't have that information.

18        Q.   Certainly, you received payments for

19   these jobs.  Right?

20        A.   Yeah.  But I -- the computer that I

21   actually use for this crashed.  I don't have that

22   computer.  And so the program that I used and the

23   information, I don't have.

24        Q.   Did you -- certainly, you would have

25   deposited money that you made, on behalf of this

Page 145

```
 1     business, in the bank.  Correct?
 2             A.    If I did business I would most likely
 3     have, yes.
 4             Q.    Did you ask the bank for copies of those
 5     statements showing money that your business made?
 6                   MS. VAUGHN:   Now, Maggie, you know banks
 7     don't keep records past seven years.
 8                   MS. SANTEN:   You can absolutely ask them
 9     for them.
10                   THE WITNESS:   Sorry.  Ask that question
11     again.
12     BY MS. SANTEN:
13             Q.    Did you ask your bank for copies of
14     statements showing amounts your business made?
15             A.    No.
16             Q.    Okay.  Do you have any payment ledgers
17     showing amounts your business made?
18             A.    No, I don't.  It was all in that
19     computer.  Everything I carried was in it.
20             Q.    When did your computer crash?
21             A.    It has probably been, I don't know how
22     many years ago it was on that one, because it was
23     right after I quit doing installs, because I needed
24     to go back and find some information and could not.
25     I don't know what year it was, I will be honest.
```

Page 146

1          Q.   Do you know how many installs you did

2     per year with Parker's Poultry and Equipment?

3          A.   No, ma'am.

4          Q.   Do you know how many years you did

5     installs with Parker's Poultry and Equipment?

6          A.   Through -- most of them was through

7     Perdue.  And that went up until they -- up until my

8     call to USDA, I would say was when they really

9     started stopping.

10         Q.   You testified earlier that they started

11    not recommending you in July of 2017.  Is that your

12    testimony?

13              MS. VAUGHN:   Objection to form.

14    Misrepresents the testimony.

15    BY MS. SANTEN:

16         Q.   You indicated, when we looked at Exhibit

17    12, that they had stopped referring you for jobs.

18    Is that right?

19         A.   This job.

20         Q.   Okay.  When did they stop -- so you

21    agree -- do you testify that in July of 2017 they

22    had stopped recommending you for jobs?

23         A.   Yeah.  I don't know when they actually

24    stopped.  I just know they did.

25         Q.   But you believe it was around the time

Page 147

1    that this form went out.  Is that right?

2              A.   No.  I mean, it could have been earlier.

3              Q.   Okay.  But it wasn't later?

4              A.   I wouldn't think so.

5              Q.   Okay.  Thank you.

6              A.   I don't know.  I mean, I really don't.

7              Q.   Because you don't remember anything

8    about it.  Right?

9              MS. VAUGHN:  Objection to form.

10   Misstates testimony.

11              THE WITNESS:  I don't remember how close

12   it was to this (indicating).

13   BY MS. SANTEN:

14             Q.   Okay.  That's fine.

15             So let's go back to Exhibit 13.  Your

16   testimony, then, is these are not accurate

17   reflections of services your businesses performed.

18   They were just what you bid.  Is that right?

19             A.   I really don't know what was done and

20   wasn't done.  I don't know which was which.

21             Q.   What did these invoices represent?

22             A.   These invoices represented bids that was

23   sent out to, apparently, Dennis Fitch, which was

24   here on it.  Yeah.

25             Q.   Okay.  These are invoices that your

30(b)(6) Roger Parker , Vol.I                                  April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                              Page 148

1    business generated.  Correct?

2            A.    I'm assuming it is.  It looks like it.

3            Q.    Or bids that your business generated.

4            A.    Yeah.  It's -- it's the -- it's the bid

5    sheets.

6            Q.    And how would you determine price for

7    these different bids?

8            A.    Well, you would have to -- I would have

9    to get, of course, with Robert and go look and see

10   how much the labor cost was.  And if it was just

11   something minor then I would -- you know, some of it

12   might just be equipment.  I don't know, equipment

13   bids where I didn't need Robert.  Yeah, some of it

14   is just equipment bids where I don't need Robert.

15           Q.    Would you put these bids together?

16   That's what I'm asking.

17           A.    Yeah, I would have done the bids.

18           Q.    And do these bids appear to be accurate,

19   to the best of your recollection?

20           A.    Yeah.

21           Q.    Are these the only copies of bids that

22   your business maintained?

23           A.    No.

24           Q.    Okay.  Did you provide the other bids to

25   your lawyers?

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 153

1    statements and tax returns.  Is that right?

2            A.    As far as I know.

3            Q.    Okay.  But you have not contacted your

4    bank to get copies of any bank statements that would

5    show those amount.  Correct?

6            A.    I have not.

7            Q.    Okay.  How many hours would you spend

8    working for Parker's Poultry and Equipment during

9    the week?

10           A.    The last few years hardly any, because I

11   didn't have any work.

12           Q.    So talk me through when Parker's Poultry

13   and Equipment began performing services and the

14   amount of business from each year respectively.

15           A.    Again, I have no way of pulling up how

16   much business each year.  But when I -- you know, I

17   was in business I started -- I think it was the year

18   after I purchased the farm is when I did the

19   upgrades and started it.

20           Q.    So you believe 2007-ish timeframe?

21           A.    Yeah.  And then -- but when I went --

22   when I went to Milledgeville, you know, that's when

23   things went the other way, where I didn't do much --

24   hardly much work.

25           Q.    So you're saying when you went to

30(b)(6) Roger Parker , Vol.I                                April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 154

1    Milledgeville, which was what, 2000 --
2          A.    Yeah.   I mean, while I was at
3    Milledgeville.  I don't know what year.  I just
4    can't remember what year that all that -- about the
5    trailers and things came up and things started going
6    south.
7          Q.    I believe you testified before you
8    started with Milledgeville in 2014.  Does that sound
9    accurate?
10         A.    No.   I would have to go back and look at
11   my records.  I was thinking '9, but I may be wrong.
12   I will have to -- I will have to look and see the
13   years because I'm not good with years.
14               But there again, you have got me
15   wondering now which year it was.  But I thought I
16   said '9.  Maybe I'm wrong.
17         Q.    So how long after you got to
18   Milledgeville did you say your business died?
19         A.    When I started reporting the trailers
20   and stuff is when it really went south.  I would say
21   I was there at least, you know, a couple years,
22   probably whenever -- just say '10 or '11, '12.  You
23   know, there again, I don't know when the -- a lot of
24   these things transpired.  I didn't keep up with and
25   nor do I have a way to go back and get.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 156

1      memory.

2              Q.    So you were still submitting bids for

3      Parker's Poultry and Equipment in 2017.  Correct?

4              A.    Not for Perdue, no.

5              Q.    We are only talking about Parker's

6      Poultry and Equipment.

7              A.    Yeah.  Yeah.

8              Q.    So were you submitting bids for

9      Parker's --

10             A.    Well, I tried get work, yeah.

11             Q.    Were you submitting it for people

12     outside of Perdue?

13             A.    Yeah.

14             Q.    Okay.  How did you get business for

15     people outside of Perdue with Parker's Poultry and

16     Equipment?

17             A.    I really don't know how they found my

18     name.  I really don't.  I don't know how they get my

19     name outside.  I guess word of mouth, you know,

20     that's all I can think.

21             Q.    How much business, outside of referrals

22     from Perdue, did you get for Parker's Poultry and

23     Equipment?

24             A.    Outside of bids for Perdue.  It wasn't a

25     lot.  I just don't know how much.

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 157

1          Like I said, because I bid it don't mean
2    I do it.  So that's the -- that's the thing.  I
3    could have done a ton of bids and not get the jobs.
4          Q.   Well, let's start from when your
5    business started.  It started in 2006.  Is that
6    right?
7          A.   Somewhere in there, yeah.
8          Q.   What was the source of work for Parker's
9    Poultry and Equipment in 2006?
10         A.   Source work was strictly Perdue houses.
11         Q.   And how much work did you get from
12   referrals from Perdue in 2006?
13         A.   I can't -- I don't know the answer to
14   that.
15         Q.   2007, what was the source of your
16   business for Parker's Poultry and Equipment?
17         A.   I'm sure it was the same.  At the
18   starting point they are the only ones I worked
19   through was Perdue growers.
20         Q.   And do you know how much money you made
21   in 2007?
22         A.   I do not.
23         Q.   Or how many jobs you performed for
24   Parker's Poultry and Equipment in 2007?
25         A.   No, ma'am.  I had all that information.

Page 158

1    I really wish I had it.

2              Q.   So 2008, what was the source of your

3    business Parker's Poultry and Equipment?

4              A.   You know, I can't answer that.  I don't

5    know.

6              Q.   Well, you said at one point the work for

7    Perdue dried up, so I'm trying to figure out when

8    that was.

9              A.   Yeah.  And I can't tell you exactly what

10   year it was.  And I don't know how much each year.

11   You're asking the same thing.  I can't answer.

12             Q.   How many years did you do work for

13   Parker's Poultry and Equipment?

14             A.   Every year up until what, 2016, 2017.

15   Because I did hardly nothing in 2017 that I

16   remember.

17             Q.   But every year -- so 2006 to 2017,

18   beginning of, you did work for Parker's Poultry and

19   Equipment.  Is that correct?

20             A.   Some.  You know, I would do something,

21   yeah.

22             Q.   But you can't remember how much you did

23   for Parker's Poultry and Equipment during that time?

24             A.   I cannot give you an exact number, no.

25             Q.   Did you perform work for Parker's

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                        Page 159

1    Poultry and Equipment each year from 2006 to 2017?

2           A.   I -- I can't confirm that I did every

3    year, no, because I know the latter part I did very

4    little.  I don't know.

5           Q.   Do you know who, through word of mouth,

6    would refer you business outside of Perdue?

7           A.   No.  I don't know who was doing the

8    talking, no.

9           Q.   If you look at Exhibit 13, this Dennis

10   Fitch, is he a grower for Perdue or was he someone

11   outside of Perdue?

12          A.   He was outside of Perdue.

13          Q.   Okay.  So these are all bids that you

14   submitted to someone outside of Perdue.  Is that

15   right?

16          A.   Yes.

17          Q.   Okay.  So Exhibit 13, do these all look

18   true and accurate to you?

19          A.   Bids, they probably are, yeah.  Or

20   something they wanted to know a bid of.  A lot of

21   times people will bid jobs just to get something to

22   give to another guy that does the install to make

23   their bid lower.

24          Q.   But it looks like you bid jobs for

25   Dennis Fitch, who is outside of Perdue, totaling

Page 160

1      $57,000 and some change.  Does that sound right?

2              A.   Yeah.  I guess.  I just don't --

3              Q.   Okay.  Do you have any reason to believe

4      these invoices that were generated by your own

5      business or these bids are not accurate?

6              A.   I think, if I remember -- some of them

7      are in here twice, if I remember right.

8              Q.   You produced these to your lawyers.

9      Right?

10             A.   Yeah.  But some of them are in here

11     twice, same document.

12             Q.   But are the ones that are in there -- if

13     it's in there twice, I understand.  But are the ones

14     that are in there accurate?

15             A.   As far as bids, I'm assuming they are.

16     It's just I don't have anything to compare them

17     with, as far as the program.

18             Q.   Okay.  So let's go through hours.  2006,

19     how many hours a week did you spend working for

20     Parker's Poultry and Equipment?

21             A.   I do not know that answer.  I mean, how

22     would I know how many hours I worked and that many

23     years ago?

24             Q.   Let's start 2012.  How many hours did

25     you work for Parker's Poultry and Equipment then?

Page 163

```
 1              Q.   2015, do you know how many hours a year
 2     you worked for Parker's Poultry and Equipment?
 3              A.   I do not know how many years that --
 4     hours that year I worked, no, ma'am.
 5              Q.   2016, do you know how many hours a year
 6     you worked for Parker's Poultry and Equipment?
 7              A.   I do not know how many hours a year I
 8     worked.
 9              Q.   2017, do you know how many hours a year
10     you worked for Parker's Poultry and Equipment?
11              A.   No, ma'am.
12              Q.   Okay.  I'm going to show you what we are
13     going to mark as Exhibit 14.
14     (Defendant's Exhibit No. 14, 2016 Individual Income
15     Tax Return, was marked)
16     BY MS. SANTEN:
17              Q.   Okay.  Exhibit 14.  Okay.  Mr. Parker,
18     do you recognize this document?
19              A.   I do.
20              Q.   Okay.  And what is this?
21              A.   It looks like taxes.
22              Q.   Okay.  Does it appear to be a true and
23     accurate copy of the taxes you submitted to the IRS
24     in 2016?
25              A.   I'm guessing it is.
```

Page 164

1          Q.   Do you have any reason to believe this

2     is not an accurate copy of the tax return you

3     submitted to the IRS in 2016?

4          A.   No, ma'am.  No, ma'am.

5          Q.   Okay.  Did you provide these documents

6     to your lawyer?

7          A.   Yeah.  I guess so, yeah.

8          Q.   Okay.  Let's go to Parker 000972.

9          A.   Okay.

10         Q.   Is this a -- it says "Profit or Loss

11    From Business, (Sole Proprietorship), Schedule C."

12              And then it says:  "Business name

13    Parkers Poultry and Equipment."  Is it your

14    understanding that you submitted this to the IRS in

15    connection with Parker's Poultry and Equipment

16    business in 2016?

17         A.   It looks like I did.

18         Q.   Okay.  And would you agree that you have

19    no business expenses listed for labor or anything

20    other than depreciation?

21         A.   Yes, ma'am.

22         Q.   Okay.  You have no income listed for

23    Parker's Poultry and Equipment in 2016.

24         A.   It looks like I don't.

25         Q.   Is that accurate?

Page 165

```
 1              A.   I would say it looks that way.  That's
 2        what's there.  I don't -- I'm not a tax person,
 3        but --
 4              Q.   Okay.  Let's go to the next page:
 5        "Profit or Loss From Farming," Parker 000973.  Do
 6        you see that?
 7              A.   Yes, ma'am.
 8              Q.   Okay.  Is this an accurate copy of a
 9        document you submitted to the IRS in 2016 in
10        connection with your farming business?
11              A.   I believe so.
12              Q.   Okay.  And if you go to line 33, you
13        note expenses in the amount of 455,486.  Is that
14        right?
15              A.   Yes.
16              Q.   Line 32a, it looks like you paid
17        employees 53,834 on 1099s.  Is that right?
18              A.   Yeah.
19              Q.   Okay.  And "Depreciation," line 14, is
20        that depreciation of your farming houses?
21                   MS. VAUGHN:  Objection to form.
22                   THE WITNESS:  I don't know.
23        BY MS. SANTEN:
24              Q.   Okay.  Go to Part 1, 4a.  It says:
25        "Agricultural program payments."
```

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 166

1              A.    What now?

2              Q.    Line 4a in Part 1.

3              A.    Part 1, 4a.

4              Q.    Agricultural program payments.  It lists

5       69,384.

6              A.    4a.  4a.  4a.  4a.  Oh, yeah, I see it.

7              Q.    Do you know what that is?

8              A.    I have no clue.

9              MS. VAUGHN:  Objection to form.

10      BY MS. SANTEN:

11             Q.    Okay.  And if you go to the very top it

12      says:  "Name of proprietor, Roger Parker.  Principal

13      crop or activity, chickens."  Is that accurate?

14             MS. VAUGHN:  Objection to form.

15             THE WITNESS:  I'm sorry.  Go back to the

16      other.  I think -- no, I would be guessing, but I

17      think I know what that is.

18      BY MS. SANTEN:

19             Q.    4a, you mean?

20             A.    Yeah.

21             Q.    What is that?

22             A.    I built a stack house, but I --

23      that's -- I don't know -- on the farm.  I don't know

24      if that's it, though.  Don't hold me to it.

25             Q.    Is everything else on this form true and

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                    Page 167

1    accurate?

2                 MS. VAUGHN:  Objection to form.

3                 THE WITNESS:  I'm not a tax person.  And

4    I don't know anything about taxes, but I'm assuming

5    that's what she -- she did, yeah.

6    BY MS. SANTEN:

7         Q.   Okay.  You have no reason to believe

8    anything on this form is not accurate?

9         A.   Like I said, I wouldn't think the woman

10   would do it wrong.

11        Q.   Okay.  Let me show you Exhibit 15.

12   (Defendant's Exhibit No. 15, 2017 Individual Income

13   Tax Return, was marked)

14   BY MS. SANTEN:

15        Q.   Do you recognize these as true and

16   accurate copies of documents you submitted to the

17   IRS in connection with your business with Perdue?

18        A.   Well, it's my tax form, if that's what

19   you're asking, yeah.

20        Q.   You provided these to your lawyers.

21   Correct?

22        A.   I did.

23        Q.   Okay.  Any reason to believe these are

24   not accurate?

25                 MS. VAUGHN:  Objection to form.

30(b)(6) Roger Parker , Vol.I                        April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 168

1              THE WITNESS:  I'm not a -- I'm not a tax
2       person to know the answer to that on accuracy,
3       really, on any of it.  I'm just guessing it is.
4       BY MS. SANTEN:
5              Q.   But these were submitted to the IRS on
6       your behalf.  Correct?
7              A.   Through a tax preparer, yes.
8              Q.   And you had to sign, indicating that
9       these were correct.
10             A.   I signed to the best of my knowledge
11      they were, yeah.
12             Q.   Okay.  If you go to Parker 000975, do
13      you see "Sign Here" that's above the tax preparer
14      line?  It says:  "Under penalties of perjury, I
15      declare that I have examined this return and
16      accompanying schedules and statements, and to best
17      of my knowledge and belief, they are true, correct,
18      and accurately list all amounts and sources of
19      income I received during the tax year."  Do you see
20      that?
21             A.   Yeah.  There is no signature, though.
22             Q.   Do you recall signing this?
23             A.   I don't see a signature.
24             Q.   Well, do you recall signing this?
25      That's what I'm asking you.

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                              Page 169

1              A.   I know that I did.  I don't see a
2       signature.
3              Q.   Okay.  But you authorized your
4       accountant to submit this to the IRS on your behalf.
5       Correct?
6              A.   Don't I have to sign it first?
7              Q.   You provided these to your lawyers.  I'm
8       asking if you authorized your accountant --
9              A.   I'm not a tax person, ma'am.  I don't
10      know.
11             Q.   Were these filed with the IRS on your
12      behalf?
13             A.   I guess they were.  I don't know.  This
14      is not even signed.
15             Q.   You presented these as copies of your
16      tax returns.  I'm merely asking you, do you have any
17      reason to believe these were not filed with the IRS?
18             A.   I have no reason to think they weren't,
19      no.
20             Q.   Okay.  Thank you.  And I don't see
21      anything in here from Parker's Poultry and
22      Equipment, does that seem accurate to you, from
23      2017?
24             A.   It could have, yeah.
25             Q.   And let's go to Exhibit 16.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 170

1        (Defendant's Exhibit No. 16, 2018 Individual Income
2        Tax Return, was marked)
3        BY MS. SANTEN:
4              Q.   Do you recognize these as copies of your
5        tax returns for 2018?
6              A.   That's what it apparently is.
7              Q.   Okay.  Do you have any reason to believe
8        these are not copies of your tax returns from 2018?
9              A.   No, ma'am.
10             Q.   Okay.  Do you have any reason to believe
11       any information in here is not accurate?
12                  MS. VAUGHN:  Objection to form.
13                  THE WITNESS:  I'm not a taxpayer, again,
14       but I would think she would do it correctly.
15       BY MS. SANTEN:
16             Q.   Did you provide her with information
17       that she used to prepare this form on your behalf?
18             A.   Yeah, I would, as far as I know.
19                  Well, I didn't, no.  I would give the
20       stuff to now my ex-wife and she did the taxes every
21       year.
22             Q.   Okay.  So it's your understanding she
23       provided this information to the accountant on your
24       behalf?
25             A.   As far as I know, she did.

Case 5:22-cv-00268-TES    Document 118-5    Filed 07/14/25    Page 101 of 425

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 171

1          Q.   Okay.  And I will show you -- and there
2     is no tax information for Parker's Poultry and
3     Equipment from 2018.  Does that seem accurate to
4     you?
5          A.   Yeah.  That was its last year.  Yeah.
6          Q.   Okay.  Let's go to 2019, Exhibit 17.
7     (Defendant's Exhibit No. 17, 2019 Individual Income
8     Tax Return, was marked)
9     BY MS. SANTEN:
10         Q.   Do you recognize Exhibit 17?
11         A.   17.  17.  Okay.  My bad.  Okay.
12         Q.   Do you recognize Exhibit 17 as true and
13    accurate copies of tax returns that were presented
14    to the -- filed with the IRS on your behalf?
15         A.   Apparently it is.
16         Q.   Okay.  Do you have any reason to believe
17    the information in this return is not accurate?
18              MS. VAUGHN:  Objection to form.
19              THE WITNESS:  Like I said, I'm not a tax
20    person.  So I'm assuming she didn't do it wrong.
21    BY MS. SANTEN:
22         Q.   Okay.  Have you ever tried to amend your
23    tax return since filing the instant -- your lawsuit
24    against Perdue?
25         A.   Not since I did my lawsuit, no.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 178

1      almost everyone got -- you know, did the loan
2      through Perdue.
3              Q.    Okay.  So a grower would do a loan
4      through Perdue.  Some of that loan money would go to
5      pay you to do the equipment installs.  Is that how
6      it would work?
7              A.    Yeah, they would -- they would do the
8      installs.
9              Q.    Do you remember kind of a range of a
10     rate that you would charge for any work with
11     Parker's Poultry and Equipment?
12             A.    There was no flat rate, no.
13             Q.    Okay.  Would you get a check for that
14     work that you did like that, separate and apart from
15     the check you got for your chickens?
16             A.    I don't know if they direct-deposited or
17     sent a check, but it would -- it would -- you know,
18     I would be paid.  I just can't remember how they
19     paid.  But at the end of the year it all showed up,
20     you know?
21             Q.    Do you still have your pay statements
22     from Perdue?
23             A.    I do not.  I wished I did.
24             Q.    Okay.  Let me mark what has been -- what
25     we are going to mark as Exhibit 19.

Page 179

```
 1      (Defendant's Exhibit No. 19, Georgia Agriculture Tax
 2      Exemption Certification, was marked)
 3      BY MS. SANTEN:
 4           Q.   Do you recognize this document?
 5           A.   I do.
 6           Q.   Okay.  And what is this?
 7           A.   It's an Agriculture Exemption for the
 8      poultry farm.
 9           Q.   And what is the purpose of this
10      document?
11           A.   When I would get -- get equipment, if I
12      paid like regular taxes or whatever from a company I
13      could give this, and if I was using it on my farm I
14      could get an exemption.
15           Q.   Okay.  What did you have to do to get
16      this exemption?
17           A.   Well, I mean -- let's see.  Who is this?
18      I'm trying to see -- I'm trying to see, is this the
19      one?  Yeah.  This is -- oh.  To receive the card
20      itself?
21           Q.   Did you have to fill out an application
22      to get this exemption?
23           A.   No.  Well, you would -- you would go to
24      the -- I always called them, you know, and set it
25      up.  But then you could renew it, you know, through
```

Page 180

1      internet.

2              Q.    Well, what information did you have to

3      provide them in order for them to give you an

4      Agricultural Tax Exemption Certificate?

5              A.    I forgot what their criteria was,

6      honestly, to what all the Georgia Agriculture Tax

7      Exemption requires.  Whatever it requires is what I

8      would have to supply.

9              Q.    But I couldn't get one, for example.

10     You would have to be an agricultural business.

11     Correct?

12             A.    Yeah.

13             MS. VAUGHN:  Objection to form.

14             THE WITNESS:  I think you have got to

15     have ten acres or something like that.

16     BY MS. SANTEN:

17             Q.    Okay.  What else is your understanding

18     about what you needed to get an Agriculture Tax

19     Exemption certificate?

20             A.    Like I said, I can't remember all the

21     criteria.  I just know it's a certain amount of

22     acreage and different criteria.

23             Q.    Do you have to be involved in farming?

24             A.    I don't know.  I don't know if you have

25     to be some type of farmer or what kind of farmer

Page 181

1      or -- you know, just a row cropper or what you have

2      to, I really don't know.

3              Q.   Do you remember filling out an

4      application online to get this certificate?

5              A.   I'm sure I had to.

6              Q.   Okay.  And you provided whatever

7      information was requested and then you got the

8      certificate?  Is that right?

9              A.   I did.

10             Q.   Okay.  Did you get the certificate for

11     any years?  It looks like this was issued December

12     6, 2012 and expires December 31st, 2017.  Did you

13     get the certificate for any other years?

14             A.   I think -- I may have got it prior.  I

15     can't -- I think -- I don't know.  I don't know what

16     year I got it for sure.  '12, that would be five

17     years.  That would probably be about the extent of

18     it.  I just don't know if it went before or after.

19     I can't remember renewing it.

20             Q.   How did you hear about this exemption?

21             A.   Through other farmers.  There is -- all

22     farmers' pretty much carry an exemption if you're a

23     poultry farmer.

24             Q.   And what does the exemption get for you

25     again?

30(b)(6) Roger Parker , Vol.I                           April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                    Page 182

1              A.    Just tax exemption.

2              Q.    Okay.  From what?

3              A.    From whatever you use on the farm.

4              Q.    So if I went online to Georgia

5     Department of Agriculture, is that where you would

6     apply for this?

7                    MS. VAUGHN:  Objection to form.

8                    THE WITNESS:  I have no clue if that's

9     the name of it or not.

10    BY MS. SANTEN:

11             Q.    Did you have to submit any documents

12    when applying for this?

13             A.    I can't -- I don't remember if there's

14    documents or -- like I said, I think I told them,

15    but I can't remember if I had to.  It seemed like I

16    did when I originally started, but I can't

17    remember -- I mean, you know, exactly what it was or

18    what I did because it was 2012.

19             Q.    Okay.  You can't remember what you told

20    them that got you the certificate?

21             A.    No.

22             Q.    Okay.  And for the record, you can't

23    remember if you got a certificate after 2017?

24             A.    I don't think I did.  I could have for

25    another year or so.  I just don't remember if I

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 183

1    applied again.  I probably did, I guess.

2            Q.    Would you have record of that in your

3    email if you applied again?

4            A.    I don't have that email anymore because

5    of the -- when the equipment company -- not the

6    equipment company, but the email that I had for the

7    poultry company, growing, I couldn't get back in

8    that once we tried.  And I tried every way to get

9    back in it.

10           Q.    Okay.  Go to Parker 002120.  This looks

11   like an email from somebody talking about the tax

12   exemption certificate we have on file for you

13   expired on January 4, 2011?

14           A.    Yeah.

15           Q.    Does that refresh your recollection of

16   whether you had a tax exemption certificate for the

17   period before 2012?

18           A.    I don't know what they are referring to,

19   really.

20           Q.    They say:  "The sales tax exemption

21   certificate we have on file for you expired January

22   4, 2011."  Is it your understanding they were

23   referring to the Georgia Agriculture Tax Exemption

24   Certificate?

25           A.    I have no clue if that's exactly what

Page 184

```
 1    this was or not.
 2         Q.    Well, go to the next page.  If you look
 3    at the bottom they say:  "Good afternoon!  I wanted
 4    to follow up regarding a current tax exemption
 5    certificate for you."
 6              MS. VAUGHN:  Maggie, are you talking
 7    about the first page?
 8              MS. SANTEN:  The first page.
 9    BY MS. SANTEN:
10         Q.    "The one we have is expired."  And then
11    you sent them --
12         A.    Am I missing something here?
13              MS. VAUGHN:  Are you talking about 2119?
14              MS. SANTEN:  The first page, 2119.
15              THE WITNESS:  Okay.  I'm sorry.
16    BY MS. SANTEN:
17         Q.    This is a follow-up email from them.
18    "Good afternoon!  I wanted to follow up regarding a
19    current tax exemption certificate for you.  The one
20    we have is expired.  We need a valid exemption
21    certificate."  And then you sent the certificate.
22    Correct?
23         A.    Yeah.  The Big Dutchman, they are a
24    major corporation.  So I don't know.  I mean, for
25    them, they would know whether or not this was
```

Page 185

1    acceptable.  Probably it would only be acceptable if
2    I was using it on my farm, I'm guessing.
3          Q.    Was poultryequipment@msn.com your email
4    address?
5          A.    Yeah.  That's the one we can't get in.
6          Q.    Okay.  So you sent this -- you sent this
7    email to them containing a copy of your Georgia
8    Agricultural Tax Exemption Certificate.  Correct?
9          A.    Yeah.  Apparently they had asked for it,
10   which they did.  But to be able to use that
11   through -- through that company.  I mean, we are
12   talking Warren Buffett is a huge company.  It's a
13   solo trade and everything.  They would have to
14   accept it or reject it.  So I don't know if it was
15   accepted or rejected.
16         Q.    Okay.  That's fair.  But you got that
17   with the State of Georgia, that tax exemption
18   certificate.
19         A.    Yes.
20         Q.    Okay.  Let's go through the hours you
21   worked with Perdue and what you were doing from 2016
22   on.  So in 2016, how many hours a week were you
23   working with Perdue?
24         A.    I would, there again, have to guess.  I
25   mean, but it would be -- when we were -- let's see.

Page 186

1    We were, I'm trying to remember, doing the upgrades.
2    I normally would put in like a fifty, sixty-hour
3    week in most of the weeks.
4            Q.   Well, let's talk about January.  So
5    January 2016, on a Monday what would you be doing?
6            A.   I have no clue.  You know I don't know.
7            Q.   Well, you gave me fifty to sixty hours a
8    week, so I'm trying to -- (cross-talking).
9            A.   I'm just guessing.  Yeah, I mean, I
10   would do fifty to sixty hours a week through the
11   growing of the entire -- you know, that's normal for
12   most growers.
13           Q.   Well, let's talk about how you get
14   there.  So on a Monday what would your typical
15   schedule be --
16           A.   Oh.  You mean daily?
17           Q.   -- in January of 2016?
18           A.   Well, I'm just looking back a daily
19   thing, no matter -- I don't know that date, but we
20   would get up and we would go to the chicken house,
21   that would be our first thing, to do a check on the
22   houses.  And after we got through checking them all
23   we would go back and walk them.  That's -- each
24   house is 500-foot long.  You have to walk them four
25   times, four -- four runaways in each house to pick

Page 187

1    up dead chickens.

2              Then you would have to go dump those

3    birds in a pit or incinerator, which I did both.

4    But if you did the incinerator, you had to light the

5    incinerator to get it going.  And, you know,

6    basically you're turning them into powder.

7              And after that, usually we would go grab

8    a bite to eat.  And it would be a few minutes,

9    usually -- maybe thirty minutes or an hour, you go

10   back down, and I would start doing maintenance work

11   on whatever was wrong inside the house.  And that

12   varied from time to time on what that was.

13        Q.   So whatever was wrong in the chicken

14   house?

15        A.   Yes, ma'am.  Whether there was broke

16   feed lines, water lines or whatever had -- every

17   week we had to mow the yard.  I mean, every week we

18   had to -- so there would be -- you know -- you know,

19   you're talking acreage, not just like a yard you

20   would have at home.

21        Q.   I'm talking about a Monday.  What --

22        A.   Twenty-eight -- I mean, these are things

23   that I would do -- I would have to do a little every

24   day.  You ain't going to mow twenty-eight acres in

25   one day.  So, you know, you're going to do a little

30(b)(6) Roger Parker , Vol.I                                April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 188

1    bit every day on doing this stuff.

2            Q.    And for what purpose would you mow

3    acres?

4            A.    Huh?

5            Q.    For what purpose would you mow acres?

6            A.    Because the chicken houses are 500-foot

7    long you have got to mow in between them; you have

8    to mow the outsides, both sides.  And then you have

9    got to mow next to the stack house.  I mean, the

10   entire property, literally.  There is a certain

11   section you can bush hog, but the rest of it we

12   mowed weekly.

13           Q.    And did you mow it so that the chickens

14   would do better?  Or what was the purpose of mowing?

15           A.    Perdue, mandatory, made us mow and keep

16   our yards up.  If we didn't, we got wrote up.

17           Q.    And how did that help the chickens?

18           MS. VAUGHN:  Objection to form.

19           THE WITNESS:  I don't know that it did.

20   BY MS. SANTEN:

21           Q.    Okay.  So when would you wake up on a

22   Monday in 2016?  When would you start?

23           A.    Usually around 7 we would go out.

24           Q.    And then what time would you eat lunch?

25           A.    Usually about, just guessing, maybe 1.

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 189

1     Sometimes I didn't eat lunch.  I mean, it's
2     according to what I had going.
3          Q.   Okay.  And then you would start doing
4     maintenance work on the chicken houses.  How long
5     would you spend mowing each day?
6          A.   I don't know on a daily.  It would take
7     us normally three days to mow the yard.
8          Q.   You said you did a little bit each day.
9          A.   Yeah.  Yeah.
10         Q.   So how much time would you spend each
11    day doing that?
12         A.   I mean, one day I maybe do more than --
13    I just -- I'm just trying to think.  Just say I put,
14    you know, probably three, four hours a day in it.
15    You know, just a guesstimate.
16         Q.   Were you doing all of this --
17         A.   If I divided it up.
18         Q.   -- mowing on your work -- by yourself or
19    was someone else doing that some of the time?
20         A.   Mostly, I did most of the mowing.  I
21    mean, it's not that I -- that she hadn't.  Gail has
22    mowed before, but normally I did that because it was
23    dangerous at places.
24         Q.   Would you spend three or four hours
25    every day mowing?  Is that your testimony?

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                        Page 190

1           A.    Well, I'm thinking, if I divide it out,

2      three days, you know, of a good bit of mowing.  If I

3      divide it out to a daily is what I was trying to get

4      in my head.

5           Q.    How much time per day -- you said you

6      did a little each day.  How much time each day would

7      you spend mowing?

8           A.    No.  I normally do it in three days.

9      But if I have to divide that out, like in a week's

10     time to give it a daily average, then, you know, I

11     figured three or four hours a day by time you --

12     because it's a lot to mow.

13          Q.    So three or four hours a day seven days

14     a week?  Or three or four hours a day how many days

15     a week?

16          A.    Yeah.  I mean in a -- in a -- no, I

17     would be more looking at a five-day week, yeah.

18          Q.    Okay.  So you would go to lunch.  You

19     would come back.  You would start doing maintenance

20     work, feed lines, looking at water lines.  What else

21     would you do after lunch?

22          A.    Well, a lot of times I would have done

23     maintenance a good bit during the day, according to

24     what -- the field man give us a list of things to

25     do; you know, what we had to do.

Page 191

1          Q.    And that was maintenance on the chicken

2     houses?

3          A.    Yeah, sometimes it was.  Sometimes it

4     was yardwork.  Sometimes it's putting stuff into the

5     rat bin -- you know, rat bin.  There is little rat

6     containers around each house that were mandatory, we

7     had to keep those full.

8                We had to weed eat around all the

9     chicken houses.  Just those -- those type things.

10         Q.    And the rat bin was so that rats

11    wouldn't get into the chicken houses.  Right?

12         A.    Yeah.  The containers, yeah.

13         Q.    Okay.  What time would you finish on a

14    Monday?

15         A.    On a normal -- well, I did my last check

16    around 8:00; somewhere in there, 8, 9:00.

17         Q.    So would you work from 6 a.m. to 8 p.m.

18    at night on a Monday in 2016?

19         A.    I worked starting one day and see the

20    morning come up the next day.

21         Q.    I'm asking -- I'm asking about a Monday

22    in 2016, would you work --

23         A.    Yeah.  I'm just --

24         Q.    -- from 6 a.m. to 8 p.m.?

25         A.    Just -- I mean, it's according to the

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 192

1    week.  And I don't know about Monday on that day and

2    that time.  I mean, I'm just saying it's according

3    to what all the field man left us that had to be

4    done because, I mean, everything we did had to fall

5    under their guidelines.  We didn't do anything --

6          Q.  Well, you said you worked fifty, sixty

7    hours a week, so I'm trying to figure out how you're

8    able to say that.

9          A.  Yeah.

10         Q.  So when would you work on a Tuesday?

11         A.  Well, it was seven days a week.

12         Q.  Would you work from 6 a.m. to 8 p.m. --

13         A.  Even eight days is fifty-six, so let me

14   figure.

15         Q.  Well, let's go through each day.  I'm

16   asking, would you take time off for dinner on a

17   Monday?

18         A.  Sometimes I would eat, sometimes I

19   wouldn't eat.  I didn't have a -- it's according to

20   what all I had to get done.

21         Q.  Do you have any records of the hours you

22   would work?

23         A.  No, ma'am.

24         Q.  Okay.  And the maintenance work, you

25   said some of that was yardwork.  Others was

Page 193

1    pertaining to maintenance for the chicken houses?

2              A.    Yardwork is the chicken houses.  I mean,

3    it's mandatory.  It's not an option.

4              Q.    Okay.  So on a Tuesday when would you

5    start to work?

6              A.    Same time every day.

7              Q.    So 6 a.m. to 8 p.m.?

8              A.    Yeah.  At least, yeah.  Like I said,

9    there's days that I saw the daylight come up two

10   days in a row, worked all night.

11             Q.    Well, let's talk about a Tuesday,

12   because you had a hard time figuring out hours and

13   now you're pretty specific.  So let's talk about

14   what you did --

15             MS. VAUGHN:  Objection to form --

16   BY MS. SANTEN:

17             Q.    -- on a Tuesday.

18             MS. VAUGHN:  -- misstates testimony.

19             MS. SANTEN:  That's fine.

20   (cross-talking).

21   BY MS. SANTEN:

22             Q.    What would you do on a Tuesday?  So

23   let's start --

24             A.    What am I specific about?  I don't know.

25             Q.    Well, what would you do on a Tuesday?

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                    Page 194

1      Let's start at the beginning.
2             A.    It would be similar to Monday.
3             Q.    Okay.  When would you wake up and when
4      would you start?
5             A.    Same time.
6             Q.    All right.  What would you do?
7             A.    Same.  I would go to the chicken houses.
8      It's redundant.  I mean --
9             Q.    Well, talk me through it.
10            A.    It's every day, the same thing.
11            Q.    So you would go to the chicken houses.
12     What would you do?
13            A.    Whatever the field man had laid out for
14     us to do.
15            Q.    Which would include things like what?
16            A.    Picking up the birds, whatever they --
17     you know, when they came they would give us -- they
18     were over everything we did.  I mean, there was
19     nothing we did --
20            Q.    I'm asking what you did.  What you did,
21     was it all related to walking the chicken houses,
22     checking on the chickens?
23            A.    No.  It's all related to what Perdue
24     wants done.
25            Q.    I'm asking, was it related to the

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                    Page 195

1        chicken houses?  Were you walking the chicken houses
2        and performing maintenance work regarding the
3        chicken houses when you were walking them?
4               A.    Not when I was walking them, no.
5               Q.    What were you doing when you were
6        walking the chicken houses?
7               A.    Picking up dead chickens.
8               Q.    Okay.  So you would walk them.  On a
9        Tuesday would you walk them four times?
10              A.    You walk them every day.
11              Q.    Okay.  And then what would you do after
12       you would walk the chicken houses on a Tuesday?
13              A.    You would go back and look at -- you
14       look at your list every day and see what they have
15       left you.  Sometimes they would come during the
16       night, when you're not there, and leave another
17       list.
18              Q.    But what sorts of things would you do on
19       a Tuesday after you would walk the chicken houses?
20              A.    Okay.  You had -- you had ten 52-inch
21       fans you had to keep running.  You had side fans
22       that had to run.  You had vent machines that opened
23       on the side of the house that were 500-foot long,
24       you had to keep cabling on those and ropes going to
25       them that wore out.

Page 196

1           You have overhead cables that held the
2    feed lines that broke.  You're continually having to
3    replace those that break.
4           You have ziggity -- you have nipples
5    that -- because my houses had age on them, the
6    drinkers had to -- I had to put new ones in if one
7    is leaking somehow.
8           Q.   So is this maintenance -- maintenance
9    work on the chicken houses?
10          A.   Yes.  That's what we are talking about,
11   yeah.  And then --
12          Q.   And then would you take lunch?
13          A.   And then -- I mean, we are way -- a long
14   way from all we had to do in the chicken house,
15   though.  I mean, you had overhead belts, they
16   control the vent machines, that break.
17          You have got the curtains that hold the
18   vent machines up that come loose.
19          You have got the doors that hold the
20   cool cells.  You have got those that the ropes would
21   break on those.
22          Cool cells, themselves, had to be taken
23   out and cleaned.  And we are talking 80-foot-long
24   cool cells on both sides had to be totally taken
25   out, washed down and put back in.

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                              Page 197

1              I'm trying to think of what else we were

2      doing.  Oh.  The control rooms had to be cleaned on

3      a daily basis.  The field --

4              Q.   Was that maintenance work regarding the

5      chicken houses?

6              A.   Yes.  The field man would make you do

7      that.

8              You had to climb the feed bins every day

9      to make sure that you had adequate feed for those

10     houses.  There again --

11             Q.   Is it your testimony that you would get

12     a list every single day of what you had to do on the

13     chicken houses?

14             A.   We would get one to two a week that

15     would pretty much cover everything we had to do or

16     could do, even.

17             Q.   What would that list look like?

18             A.   I don't know.  Perdue would make the

19     list and it would be left.

20             Q.   What would the list -- what would the

21     name of the list say?

22             A.   I don't -- I don't remember what they

23     put on it, honestly.

24             Q.   And what, exactly, would it have on it?

25             A.   It would just have stuff that we were

Page 198

1    supposed to do.

2            Q.    Would it cover what you were supposed

3    to -- would it give you a specific amount to do each

4    day?

5            A.    Do what now?

6            Q.    Would it give you specific items that

7    you had to do throughout the entire day?

8            A.    A breakdown of items per day, no, I

9    don't think it said that.

10                But you had to do it yourself.  You

11    know, you had to, you know, to be able to accomplish

12    it before they come back.  You had to -- you had to

13    do a daily regimen of it.

14            Q.    Did Perdue give you a schedule?

15            A.    A what now?

16            Q.    Did Perdue give you a schedule --

17    (cross-talking).

18            A.    That was the schedule.  That was the

19    schedule other than, you know, what they already

20    have on the contract that you had to do, which was a

21    daily -- you know, part of the daily regimen.

22            Q.    But they didn't give you a specific

23    schedule of hours you had to work each day.

24    Correct?

25                MS. VAUGHN:  Objection to form.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 199

1             THE WITNESS:  Now, they -- they didn't

2     say:  Come in at 8 and leave at 8.  They didn't say

3     that, but you had to.

4     BY MS. SANTEN:

5             Q.    Okay.  So on a Tuesday what would you do

6     in the afternoon?

7             A.    Well, like I said, I tried to finish

8     what I -- maintenance that I had to do or whatever

9     needed done.

10            Sometimes you had -- you would have

11    times where there was chickens that were sick.  And

12    I have had that quite a few times.  They quit giving

13    them any antibiotics and all of a sudden we are --

14    you know, we are having sick chickens a lot and we

15    had a lot of dead.  And they make us cull -- those

16    that are not dead, basically you had to pull their

17    heads off.  And that was their right way of doing

18    it, they said.  The only way we could do it was

19    their way.

20            And you had to -- you know, to cull them

21    that way.  And that was the hardest part because

22    they were alive.

23            But then you -- if they were ever out of

24    feed and they brought feed back for any amount of

25    time -- one day I was out feed two days, and when

30(b)(6) Roger Parker , Vol.I                     April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 200

1    they come back they claw each other's back trying to
2    get to the feed, and then you have got real diseases
3    in there.  And you're picking up thousands.  I'm
4    talking bucket loads.  Because there's 30,000 you
5    would -- well, later went to 24, 25,000, but we
6    started with 30,000 to the house.
7                    And you're picking up, you know,
8    thousands a day and you can't -- it's hard to keep
9    up with, as far as what you do like here and here
10   and here on a daily basis, because the chickens
11   declare what you have to do, versus -- and Perdue
12   declares, because they tell you, you can't just
13   leave the dead on the floor.  You know, you have got
14   to do what they say.
15          Q.   But your job was looking after the
16   chickens.  Right?
17          A.   Yeah, that's one of them.
18          Q.   What was another job?
19          A.   All the maintenance.
20          Q.   But that was regarding the chicken
21   houses too.  Right?
22          A.   Yeah, yeah.  Yeah.  But I mean, as far
23   as looking at the chickens versus -- and growing
24   them versus the maintenance, it's like -- I guess
25   it's the same but it's a little bit different.

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 201

1          Q.    Okay.   Now, on a -- so you talked about
2    Tuesday.   Wednesday through Friday, are you talking
3    same hours, same types of things you're doing during
4    the day?
5          A.    Yes, ma'am, pretty much every day.
6          Q.    Are there ever days that you work fewer
7    hours?
8          A.    Well, whenever they would catch them we
9    would have a little break.  But sometimes it's
10   according to how much cleanup time we had.
11   Sometimes when they were giving us long cleanup, you
12   know, days -- when I was at Parker's Poultry at one
13   time they were doing a long thirty-day cleanout, you
14   know, had a few days that you could take a break.
15              But normally, on a normal regimen you
16   didn't have those days.  You pretty much went from
17   growing chickens to cleaning out and getting ready
18   for another batch of chickens.
19              But it wasn't as bad when you didn't
20   have birds than when you did, those few days
21   every -- I think two months --
22         Q.    So when you didn't have birds --
23         A.    -- every two months you would get a new
24   batch.
25         Q.    So when you didn't have birds, what was

Page 202

```
 1      your schedule?

 2              A.    Well, there -- you had to clean out

 3      within two days.  It was mandatory.  Perdue gave you

 4      a regimen of what you had to do when you didn't have

 5      chickens then.

 6              Q.    So you had to clean out the chicken

 7      houses?

 8              A.    Yeah.  You had to get all the cake and

 9      wet places where they had pooped and used the

10      bathroom in every day and wet the floors.

11              And sometimes their nipples drip and wet

12      the floor.

13              You had to get all the wet cake out of

14      there and put it -- you had a machine that -- you

15      had to buy a machine that did that.  And you had to

16      put it in a stack house, which I had to have one

17      built while I was there because that farm didn't

18      have one.

19              Q.    And that was to prepare the house for

20      the next flock.  Right?

21              A.    Yes, ma'am.

22              Q.    Okay.  And how long would those days

23      last?

24              A.    Normally, if you just got a week between

25      growouts you really didn't have a day off.  But if
```

Page 204

1     usually on the clipboard.

2          Q.    What sorts of things would be on the

3     list?

4          A.    Well, just -- like if he saw a feed line

5     out or if he saw a water line out.

6               I remember once they had had a bunch of

7     chunks of concrete coming from the feed mill, and we

8     had seventeen feed breaks.  And to pull that line

9     took about three hours, and weld it and put it back

10    together, sometimes more because it's 250 foot long.

11         Q.    So if you had worked to fix the chicken

12    houses.

13         A.    Yeah.  It's whatever.  It's just

14    whatever he found wrong and wanted fixed.  And some

15    of it I would know about, some of it I wouldn't know

16    about.

17         Q.    So but those two weeks in between

18    flocks, you would get two weeks and then you would

19    get a new flock, would you ever get any time in

20    between that?

21         A.    No, ma'am.

22         Q.    Okay.  And you had two farms at one

23    point, so how did you determine -- you didn't

24    mention during here what farm you were doing what

25    on.  How did you determine who would work on which

30(b)(6) Roger Parker , Vol.I                         April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 205

1    farm?

2          A.    I paid someone to work on the

3    Milledgeville farm when I was living in Hillsboro.

4    But then when I wound up in Milledgeville, my son

5    leased the farm in Hillsboro and took it over.

6          Q.    Okay.  So during what period of time did

7    you pay someone to work in Milledgeville while you

8    were in Hillsboro?

9          A.    Well, when I first started, bought

10   Hillsboro, I think -- I think Brian was there.  He

11   was there a few years.  I just don't know how many

12   years Brian was there.

13              And there was a guy, David Odom, I

14   think, was behind him.  And I don't -- I can't tell

15   you how many years David was there but --

16         Q.    Did Brian and David work at the same

17   time or were they --

18         A.    No, no, no.  No.

19         Q.    So was Brian doing everything for the

20   Milledgeville farm when you were in Hillsboro?

21         A.    Yeah.

22         Q.    Would you direct him on what to do?

23         A.    Would I?  No.  No.  He worked for --

24   pretty much worked for Perdue, just like I did when

25   I worked -- lived -- you know, lived in the house,

Page 206

```
 1    even though I owned it.

 2           Q.   Did you pay him, though?  He worked for

 3    you.  Right?

 4           A.   Yeah.  He had a house and -- gave him a

 5    house and stuff to live in and so much a week.  I

 6    can't remember exactly what we paid him.  But it

 7    wasn't -- I remember it wasn't -- you know, at the

 8    time wasn't a lot, but when you add the house and

 9    stuff on to it, it was okay.

10           Q.   So he had -- you gave him a house to

11    live in in Milledgeville while he took care of that

12    farm?

13           A.   Yes, ma'am.

14           Q.   Okay.  And how many years was that?

15           A.   Like I said, I don't remember exactly

16    how many years he worked for us.

17           Q.   If there were --

18           A.   But he was --

19           Q.   Sorry.  Go ahead.

20           A.   He was there a few years.

21           Q.   If there were issues on that farm would

22    they address them with you?

23           A.   No.  He normally addressed them with --

24    with Perdue.

25           Q.   Okay.  Did you set what he was -- what
```

30(b)(6) Roger Parker , Vol.I                     April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 207

1     pay you gave him other than the house?

2          A.   I'm sorry.  I didn't hear that.

3          Q.   Did you set the rate of pay that you

4     paid him for working in Milledgeville?

5          A.   Yeah.  I mean, it was an agreement, you

6     know?

7          Q.   Okay.  Did you provide him with

8     benefits, like health insurance or anything like

9     that?

10         A.   No, ma'am.

11         Q.   And with David, did David live in a

12    house and then do the work in Milledgeville?

13         A.   David.

14         Q.   You said David Odom?

15         A.   Yeah.  David Odom, okay.  Yeah.  Yeah,

16    same as Brian.  He was there when Brian was.

17         Q.   Okay.  So there were a few years.  Was

18    it two, three years when someone else was doing all

19    the work in Milledgeville?

20         A.   Yeah.  At least, yeah, maybe more.

21         Q.   Maybe more?  How many years do you think

22    it was that you had someone working full-time in

23    Milledgeville for you?

24         A.   Well, until we moved there, there was

25    someone there full-time.  And I'm thinking we were

Page 208

```
 1     there -- let's see.  I'd say it was probably --
 2     around -- I'm guessing '13, 2013, somewhere in
 3     there.  Could be '12 when we moved over there.  I
 4     just can't remember when.
 5                MS. VAUGHN:  Maggie, we have been going
 6     a little over an hour.  Can we take a break?
 7                MS. SANTEN:  Yeah.  Just one question.
 8     BY MS. SANTEN:
 9          Q.   So when you -- when you were in
10     Hillsboro were you and Gail splitting up the work?
11     Or when you told me what you were doing each day,
12     was she doing some of it and you were doing some of
13     it?
14          A.   I mean, even on our tax paper she is
15     listed as a homemaker.  She took care of the house.
16     She took care of, you know, a lot of things to do
17     with that.  And pretty much I did most of the -- she
18     didn't know how to do repairs, as far as poultry
19     house repairs and those things.
20                And she would do minimal stuff, but very
21     few -- like when we was walking the birds in the
22     morning, we both did that.
23                But during the day, you know, I then
24     picked up on the maintenance end of it and done my
25     best to.
```

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 209

1              MS. SANTEN:  All right.  We can take a

2       break.

3              THE VIDEOGRAPHER:  The time on camera is

4       approximately 3:41 p.m. and we are off the record.

5       (Break In Proceedings)

6              THE VIDEOGRAPHER:  The time on camera is

7       approximately 3:53 p.m.  We are back on the record.

8              Counsel, you may proceed.

9       BY MS. SANTEN:

10             Q.   Okay.  Mr. Parker, we are back from a

11      short break.  Do you understand you're still under

12      oath?

13             A.   Yes, ma'am.

14             Q.   Okay.  So before the break we were

15      talking about hours you would work each day.  And we

16      talked about how your other farm was run.  When you

17      all moved to Milledgeville, how did that work?  Did

18      you hire someone to run the Hillsboro farm or was

19      that when your son took it over?

20             A.   For a short season we had a guy named

21      Dewey there, that I can't -- you know, he was there,

22      I think, two years, maybe three.  But it wasn't that

23      long.

24             Q.   So he worked at Hillsboro?

25             A.   He ran Hillsboro.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 210

1          Q.   Okay.  And how did you find him?
2          A.   I can't remember.  Probably through a
3     friend, I'm guessing, but I don't really know.
4          Q.   Did you determine what to pay him?
5          A.   Dewey?  There again, it was just an
6     agreement.
7          Q.   Did you give him a place to live as well
8     as a payment?
9          A.   I did.
10         Q.   Okay.  Did you pay him by the hour?
11         A.   I'm sorry.  By the hour?
12         Q.   Did you pay him by the hour?
13         A.   No.  No.  It was a salary.
14         Q.   Okay.  And you said he -- he ran that
15    farm himself for about two years.  Is that right?
16         A.   Yes.
17         Q.   Okay.  When he was running that farm
18    were you still making a profit from it?
19         A.   I don't know that I really -- I don't
20    think I did.  I didn't have a P&L sheet, so I don't
21    really -- I'm guessing at some of it.
22         Q.   When you all were living in Hillsboro
23    and someone was running Milledgeville for you, did
24    you make a profit off Milledgeville?
25         A.   I had more houses there.  I don't

Page 211

1    think -- I think I was a break even.  I don't know.

2    I really don't.  I would just be afraid to say.

3             Q.   Okay.  That's fair.

4             Okay.  So for the two years when Dewey

5    was running Hillsboro, you and your wife were

6    operating Milledgeville?

7             A.   Yes, ma'am.

8             Q.   Okay.  And how did -- did y'all handle

9    that the same way?  Who was doing what at

10   Milledgeville?

11            A.   It just reversed, pretty much, the --

12   you know, he worked with Perdue and ran that farm,

13   and I worked with Perdue and ran the other farm.

14            Q.   Did you still do a lot of the

15   maintenance work for the chickens and things like

16   that in Milledgeville, the same kind of work you

17   were performing at Hillsboro?

18            A.   Well, Milledgeville was what we was

19   talking about earlier.  But yeah, wherever I was I

20   did the maintenance, whether it would be one or the

21   other.

22            Q.   Okay.  So what we were talking about

23   earlier, I guess let's just -- whether you were

24   operating Hillsboro or Milledgeville, you were doing

25   the same kind of work.  Is that fair?

Page 212

1          A.   Yes, ma'am.

2          Q.   Okay.  And your wife was doing the same

3    kind of work, caring for your house, homemaker?

4          A.   Yeah.  She would normally help me pick

5    the birds up in the morning.  And sometimes she

6    would go back and -- like if I was in the middle of

7    something she would check them, you know, during the

8    other two checks, just sticking her head in the door

9    type thing.  And that's -- that's what -- I mean,

10   that's what she did.  She didn't do the maintenance.

11         Q.   But you testified before the break that

12   you did most of the work pertaining to the chickens.

13   Right?

14         A.   Well, as far as the maintenance, yes.

15         Q.   Okay.  And we discussed the different

16   types of maintenance you were doing before the break

17   as well?

18         A.   Yes, ma'am.

19         Q.   Okay.  Is there any other types of

20   maintenance work you were doing for the chickens

21   that we haven't discussed?

22         A.   Yeah.  I didn't make -- I didn't make it

23   all the way through.

24              On the outside of the chicken houses

25   sometimes the, like, screws in the roof, I would

Page 213

1    have to, you know, get up on the roof.  And the

2    nails would come out and stuff, the tin would be

3    loose, I have done that.

4              Q.   And was that so water wouldn't get in to

5    the chickens?

6              A.   Yes, ma'am.

7                   Overhead, in the inside, there is a

8    piece of plastic that runs from end to end of the

9    chicken house, and these staples in that would get

10   loose.  They have got straps and staples in the

11   straps, and I have had to go in and hold those back

12   up because the roof starts coming down.

13             Q.   So that's to prevent the roof from

14   coming down on the chickens?

15             A.   Yes, ma'am.  The corrosiveness of a

16   chicken house -- it's very corrosive, and so we

17   are -- we are -- it's mandatory for any of these

18   things.  You know, we have to keep it up to

19   whatever -- no matter what the equipment is, you

20   know, it's got to be kept up to produce specs.

21             Q.   And is that so that the chickens aren't

22   exposed to rust?  Or what's the --

23             A.   No.  So the equipment will work itself

24   to whatever capacity, whether it be a vent machine,

25   tunnel machine -- vent machine, tunnel machine.  I

Page 214

1    mean, and you have got a computer that controls

2    everything inside the chicken house.

3            Q.   So the vent machine vents into the

4    chicken house.  Right?

5            A.   Yeah.  It opens up vents approximately

6    two -- a little over two foot wide, six inches tall.

7    It leans them in, let's them have air and then

8    closes back automatically.

9            Q.   And the tunnel, is that into the chicken

10   house also?

11           A.   It is.  The tunnel is the very end of

12   the house.  Ours was 5 foot tall, 80 foot long each

13   side and had tunnel doors.  And then right next to

14   that you have some curtains.

15           Q.   So what other maintenance work would you

16   be doing during the day that we haven't already

17   talked about?

18           A.   Let's see.  I think I have covered it.

19   I don't know if I covered water lines, feed lines.

20   I think I said those.  Vent machines, tunnel

21   machines.  I know I'm missing stuff, without a

22   doubt.  Yardwork.  Well, you said inside, though.

23           Q.   Inside or outside maintenance.

24           A.   Yeah.  Yardwork.  You know, feed bins.

25   And sometimes you would get a hole in a feed bin and

Case 5:22-cv-00268-TES    Document 118-5    Filed 07/14/25    Page 138 of 425

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 215

1    you would have to patch the hole.  I have had to put
2    whole new feed bins in before.  And I have done that
3    myself.
4          Q.   When you say "yardwork," is that what
5    you were talking about earlier?
6          A.   Mowing, weed eating, yeah.
7               Just everything in the chicken -- I
8    mean, even the slide doors up front, I have had to
9    rebuild those before so they would open.  They would
10   come off track.  They would get rusted up.
11         Q.   So a lot of maintenance work related to
12   upkeep of the chicken houses?
13         A.   Yeah.  The house, 40 by 500 foot times
14   6, you know, that's -- it's just a lot of work.
15         Q.   Now, during a catch week what would you
16   all be doing?
17         A.   Well, you had to -- well, it was
18   according to what Perdue required.  Sometimes you --
19   they had a -- they had a system set and then they
20   controlled it.  Sometimes you could crust, which is
21   taking out the litter, and sometimes you had to
22   windrow.  W-I-N-D-R-O-W.
23              Windrow means that you go down and take
24   the chicken litter and pile it up in a pile, and
25   come back the other side and make one big pile of

Page 216

1    it.  It has to go through a heat for a couple of

2    days.  And then after it goes through a heat it's

3    supposed to kill the darkling (correct spelling)

4    beetles.  And then you have to spread -- level out

5    all that litter back into the house, perfectly level

6    to where your, you know, feed lines will be all the

7    same on top of it.

8                Then you have to wash those pans that I

9    told you about.  There is -- I think there is 500.

10   And then you have got boxes that are four foot by

11   four foot, they call them lids, but they are

12   pasteboard about this high (indicating).  You have

13   to go get those from Perdue.  And you put those in

14   the house.  I think there is -- I think twelve, if I

15   remember right, in each house.  And if you wash --

16   you wash and dry those pans.  You put them under the

17   feed lines, let the feed -- you have to let the feed

18   lines back down out of the roof.  And you put out

19   those boxes.  And each box has to be filled up by

20   hand.

21                And then we -- we would always let the

22   feed lines actually run and feed the other small

23   pans as much as we could.  But we still had to

24   hand-feed those pans also.

25                Q.  So were you cleaning the feed lines so

30(b)(6) Roger Parker , Vol.I                                April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 217

1     they were clean for the birds, or were you cleaning
2     the pans?
3              A.    We were cleaning the pans.
4              Q.    Okay.  And that's --
5              A.    We had to blow out the entire house too,
6     I didn't say that, with air.  It was -- it's in our
7     contract.
8              Q.    So when you're cleaning the pans for the
9     birds, are those pans that the birds drink out of?
10             A.    No, ma'am.  No.  It's what they eat out
11    of.
12             Q.    Eat out of.  Okay.  So you're cleaning
13    the pans that the birds eat out of.  You windrow
14    which, in essence, involves killing the beetles?
15             A.    The darkling beetles.
16             Q.    Darkling beetles, in litter that will go
17    back in the chicken house.  Right?
18             A.    Exactly.
19             Q.    So that's to prevent the chickens from
20    having litter with beetles?
21             A.    Well, it's from -- it really does away
22    with the moisture too.  It does away with the heat.
23    It goes through a heat and burns all the -- you have
24    to -- you actually have to run heat, keep your
25    chicken houses at 90 degrees winter and summer,

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 218

1    to -- for two days to allow it to go through that

2    heat cycle.  And that kills darkling beetles and

3    gets rid of all the moisture inside that big pile of

4    poop that you have.

5            Q.   And why is it -- and this is -- I don't

6    know much about it, so why is it important to get

7    rid of the moisture in the poop?  Why is that

8    important to the chickens?

9                 MS. VAUGHN:  Objection to form.

10                THE WITNESS:  Well, moisture creates

11   ammonia, and ammonia makes it where they can't

12   breathe.

13   BY MS. SANTEN:

14           Q.   Okay.  So you're, in essence, clarifying

15   the air for the chickens --

16           A.   Yes, ma'am.

17           Q.   -- so they can breathe and they can

18   thrive.

19           A.   Uh-huh.

20           Q.   Okay.  And the boxes, are those in

21   connection with the wash pans also?

22           A.   No.  The feed pans?

23           Q.   You said you had to get boxes and put

24   those in the house?

25           A.   Boxes of feed.  Yeah.  They go down in

Page 219

1    the feed just as well.  You had so much in the

2    front.  They were in the front side of the house for

3    usually -- just say a week to ten days usually.  And

4    then you have to take -- you have dividers in the

5    front of the house that are across the front

6    halfway.  You have half the birds here, half the

7    birds here when you place them in half of the house.

8    And then whenever you open them up to the full

9    house, you know, week to ten days, you take the back

10   half of the birds and remove the center wall.  You

11   have a wall there.  And then you run those birds

12   back to the backside and put your wall back up.

13   That -- you know, this is a good -- I mean, just

14   this job takes a whole day.

15         But you run the birds back to the

16   backside and then you put your center wall back up.

17   And you wait then a few days to make sure that you

18   have the same amount in the front as you do in the

19   back.  And then you have to put another wall up

20   which is halfway at the back, and one in the front

21   which divides then the chicken house into four

22   sections.

23         Q.    And why is it important to have a

24   chicken house separate into four sections?

25         A.    It's just what Perdue does.  I really

Page 220

1   don't know.  I'm saying they all have equal eating

2   and drinking space, I would say.  That's the only

3   thing I can think of.

4         Q.   So during catch week you don't have

5   chickens, but you're doing a lot of things for

6   maintenance on the chicken houses to make the houses

7   more be efficient for when the chickens are

8   delivered.  Is that right?

9               MS. VAUGHN:  Objection to form.

10              THE WITNESS:  Not necessarily more

11  efficient.  It's just -- it's just what they have

12  you do.  But until the birds come you have got to

13  put out what they call PLT, Poultry Litter

14  Treatment, which is supposed to knock down ammonia

15  in the house for three days.

16  BY MS. SANTEN:

17        Q.   What we were talking about during catch

18  week, a lot of that stuff, though, was cleaning wash

19  pans for the chickens --

20        A.   Yeah.

21        Q.   -- feed lines for the chickens, boxes

22  for feed, dealing with heat and moisture issues for

23  the chickens, that sort of thing.  Right?

24        A.   Yes, ma'am.

25        Q.   And how many hours a day were you

30(b)(6) Roger Parker , Vol.I                     April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 226

1      catch, or the crusted or windrowed, one of the two.

2              Q.    Where was that -- how was that

3      communicated, that you had two days to do that?

4              A.    It was in our -- it was -- it was in

5      a -- I don't know.  They gave us a paper.  It's in

6      one of the papers that we have.

7              Q.    Is that the biosecurity standard or --

8              A.    No.  It's the grower -- it's just

9      growers, you know, what they do.  I can't remember

10     which paper it said it was.  Part of the two, part

11     of that -- you don't -- if you don't do it you

12     don't -- it's a P -- what they call, I think, a PVP

13     program or something.  If you don't do it and they

14     come out and see that you haven't started crusting,

15     you don't get -- you don't get the money.

16             Q.    You don't get the PVP bonus.

17             A.    Yeah.  Yeah, you don't get it if you

18     don't do -- if you don't do it in the time they say

19     to do it.

20             Q.    So let me ask, did you work fifty, sixty

21     hours a week the entire time you were a grower, from

22     2009 to 2019?

23             A.    Yeah.  It's -- I would -- it's seven

24     days a week.  Growing is seven days a week.  It

25     doesn't matter.  The chickens don't care if it's

30(b)(6) Roger Parker , Vol.I                                April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 227

1      Sunday or Tuesday.
2              Q.    Did you not have a health issue in 2014
3      that slowed you down for a little bit?
4              A.    Yeah, for a little bit in '14 I did.
5              Q.    Okay.  So how long were you slowed down
6      in 2014?
7              A.    Probably about a month or a little more.
8              Q.    And did you do any work during that
9      time?
10             A.    Yeah, I did.  I didn't actually -- I
11     just had a stent put in.
12             Q.    All right.  And your testimony is after
13     that month you went back to fifty, sixty hours,
14     approximately, each week?
15             A.    Well, I mean, not -- probably not
16     immediately but, you know, within the next couple
17     weeks after that I would say I was back to snuff.
18             Q.    Would you say you were working the same
19     amount after the heart stent in 2014 as you were
20     working before the heart stent?
21             A.    Yeah.  Yeah.  I don't think it held me
22     back too much.  It was -- you know, it was -- it was
23     something to deal with.
24             Q.    Did you keep any records of hours
25     worked?

Page 228

1              A.    No, ma'am.

2              Q.    Could there have been weeks you worked

3       under fifty or sixty a week?

4              A.    Possibly, but I just don't know when

5       that would be.  But I wouldn't think so.

6              Q.    How many weeks of vacation would you

7       take each year?

8              A.    Honestly, we did good to get one.  I

9       remember once requesting a leave or more time off,

10      and it was an anniversary year, to be able to do an

11      anniversary, I remember that.  But other than that I

12      can't remember taking more days off.

13             Q.    Well, you had employees running the farm

14      for you, so you could hire someone -- if you wanted,

15      you could hire someone to run the farm for you so

16      you could take time off.  Right?

17                   MS. VAUGHN:  Objection to form,

18      misstates testimony.

19                   THE WITNESS:  I didn't have anybody

20      running my farm.

21      BY MS. SANTEN:

22             Q.    Well, you had someone running Hillsboro

23      for you full-time when you were in Milledgeville.

24      Right?

25             A.    Right.

Page 229

```
 1            Q.   And you had someone running
    Milledgeville for you full-time when you were in
 2
 3    Hillsboro.  Right?
 4            A.   Yeah, but I was on one or the other.
 5            Q.   If you wanted to hire someone to run
 6    both of them, you could do that, couldn't you?
 7                 MS. VAUGHN:  Objection to form,
 8    misstates --
 9                 THE WITNESS:  You couldn't.
10    BY MS. SANTEN:
11            Q.   Who told you, you couldn't do that?
12            A.   You just couldn't.  I mean, you couldn't
13    trust -- I wouldn't trust leaving somebody that --
14    it takes a long time to understand Perdue's rules of
15    regulation here and what you have got to do.  You
16    would come back to a mess.
17            Q.   I understand you didn't want to do that.
18            A.   I couldn't.
19            Q.   But did anyone with Perdue ever tell
20    you, you cannot hire someone to run the farm for
21    you?
22            A.   They had to be approved by Perdue.  Even
23    to the guys that just -- that run the farm, or just
24    even one guy that -- you know, that -- like any of
25    those guys had to sit before Perdue and be okayed,
```

30(b)(6) Roger Parker , Vol.I                        April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 245

1          Q.   Were the -- were your two farms or just
2    one ultimately foreclosed on by the bank?
3          A.   It's my understanding, my youngest son
4    still has the other farm.  But I bankrupt against --
5    had to bankrupt against both.  Both farms was my
6    understanding, and I had to do it.
7          Q.   Okay.  And when you say you had to
8    bankrupt against both farms, what do you mean?
9          A.   That's what the lawyer said.
10         Q.   Okay.  Why did you file for bankruptcy?
11         A.   Because Perdue cut me off.  I couldn't
12   grow any more birds.
13         Q.   Do you believe that your properties were
14   foreclosed on because Perdue cut you off?
15         A.   Yeah.  I mean, if they would have
16   allowed me to keep growing I could have continued to
17   make payments.
18         Q.   What have you done since you stopped
19   your relationship with Perdue?
20         A.   Basically, I found that I had congestive
21   heart failure and I no longer -- basically, I just
22   get Social Security now.  I'm 66.
23         Q.   Do you recall ever seeing this document
24   that we have marked as Exhibit 20?
25              MS. VAUGHN:  Counsel, it looks like it's

Page 246

```
 1    missing all the odd pages.

 2                  MS. SANTEN:  Oh.  Well, this is how we

 3    got it.  Oh, it is missing it.  Okay.  Never mind.

 4    We will ask about this when my office fixes that.

 5    BY MS. SANTEN:

 6          Q.   And remind me again, were you

 7    represented by a lawyer in connection with the

 8    foreclosure on your properties?

 9          A.   I had a bankruptcy lawyer.  That's the

10    only lawyer I had.  I don't know if that's what

11    you're asking, but I did have that.

12          Q.   How did your son -- which son is your --

13    which farm is your son now running, and how did that

14    happen?

15          A.   Hillsboro.  And there again, I don't

16    know.  He worked up something with the bank to keep

17    that farm.

18                  Of course the bank already knew that he

19    was leasing to purchase the farm.  We had a

20    lease/purchase option, you know, before the

21    bankruptcy.

22          Q.   Did you and he have a lease/purchase

23    option?

24          A.   Yes.

25          Q.   Okay.  And when did you do that?
```

                                                    Page 247

1            A.    He took it over.  And I just don't

2      remember the year.  I would have to look back and

3      try to find that paper, that piece of -- the

4      lease/purchase agreement.

5            Q.    So at some point you and your son

6      discussed him taking over Hillsboro?

7            A.    Yeah.  When we first -- you know, when

8      Dewey was no longer there Simon took it over.

9            Q.    And you don't remember what year that

10     was?

11           A.    I do not.  I'm having trouble

12     remembering the year it was, I am.

13           Q.    Did you have a lawyer help you draft the

14     lease/purchase agreement?

15           A.    I did not.

16           Q.    Okay.  Did you do it yourself?

17           A.    I didn't do it.

18           Q.    Your son?

19           A.    My son -- my son did it.

20           Q.    Okay.  Do you know if he had a lawyer

21     put that together?

22           A.    I don't know.

23           Q.    So how did it work, the lease/purchase

24     option?  Was he making payments to you or was he

25     paying the bank directly?

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 248

1           A.    He got a contract with Perdue, just like

2     I had, similar, I guess, and put it -- everything in

3     his name.  And money come out of that, I guess just

4     like it did for any other farm.

5           Q.    Okay.  And then he was working on that

6     farm since then.

7           A.    Yeah.  Well, yes, ma'am.

8           Q.    I know that you hired people to -- like

9     when you were in Hillsboro, you hired someone to run

10    Milledgeville.  When you were in Milledgeville, you

11    hired someone to run Hillsboro until your son took

12    it over.

13          You had testified in your last

14    deposition about some other people that you hired to

15    help with different items on the farm.  What work

16    were those other people doing?

17          A.    Well, when you, like, place birds.  It

18    would be day labor.  I think that's what you're

19    asking about.

20          Q.    What would the day labor be doing?

21          A.    If you're, like, placing birds you would

22    need somebody to help you one day.

23          Or if you're -- you know, whatever, you

24    know, that you're running behind on as far as what

25    the field man has laid out for you to do, sometimes

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 249

1    he gets you, you know, somebody to help you one day.

2    It's just general stuff that, you know, didn't take

3    any experience to do.  It just takes labor.

4            Q.   And would they have to get approved from

5    Perdue?

6            A.   Not -- not the day labor, no.

7            Q.   How many day laborers did you have?

8            A.   I really can't -- I don't know.  It's

9    just when I need someone.

10           Q.   Okay.  Would you set the pay they were

11   getting?

12           A.   Yeah.  Usually it's, you know, by the

13   day.  And sometimes you could do an hourly rate, you

14   know, if somebody might want that.  I can't remember

15   exactly, you know, who did what or what we paid them

16   or anything.

17           Q.   You said the field man would lay out

18   what you did.  How was that communicated?

19           A.   Well, on our daily or weekly, according

20   to how many times he come a week, whatever, the

21   sheet he left in House 1.

22           Q.   Would that be on a flock summary report?

23           A.   Sometimes, yeah.  Yeah.  Sometimes he

24   left notes.

25           Q.   And would he just leave notes of things

# ERRATA AND ACKNOWLEDGMENT OF DEPONENT

*Parker v. Perdue Foods, LLC*, No. 5:22-cv-00268-TES

Deposition of Parker's Poultry Equipment and Plaintiff Roger Dale Parker, Vol. I
Deposition taken: April 23, 2025

| Page: | Line: | Reads Now: | Should Read: | Reason: |
|---|---|---|---|---|
| 12 | 1 | "I told that I would be testifying, yeah." | "I was told that I would be testifying, yeah." | Transcription error |
| 24 | 18 | "I don't know exact timeframe." | "I don't know the exact timeframe." | Transcription error |
| 30 | 7 | "I just know they was" | "I just know they were" | Transcription error |
| 38 | 5 | "field" | "feel" | Transcription error |
| 40 | 2 | "on me every --" | "on me every day --" | Transcription error |
| 49 | 9 | "I didn't be have that much insurance on it." | "I didn't have that much insurance on it." | Transcription error |
| 50 | 7 | "make it cash flow." | "make cash flow." | Transcription error |
| 141 | 12 | "And I don't know," | "An I don't know" | Typographical error |
| 154 | 11 | "I was thinking '9," | "I was thinking '09," | Typographical error |
| 154 | 16 | "said '9." | "said '09." | Typographical error |
| 185 | 12 | "talking Warren Buffett is" | "talking Warren Buffett-- it's" | Transcription error |
| 211 | 1 | "I think I was a break even." | "I think I was at break even." | Typographical error |
| 226 | 1 | "or the crusted" | "or crusted" | Transcription error |
| 243 | 1 | "the -- it things" | "the -- things" | Transcription error |

/s/ *Roger Dale Parker**                                   May 27, 2025
Roger Dale Parker (*with permission)

Page 253

1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE MIDDLE DISTRICT OF GEORGIA

3                            MACON DIVISION

4      ROGER PARKER, ON HIS OWN          Case

5      BEHALF AND ON BEHALF OF ALL       No. 5:22-cv-00268-TES

6      OTHERS SIMILARLY SITUATED,

7                  Plaintiff,

8          vs.

9      PERDUE FOODS, LLC,

10                 Defendant.

11     _____

12                         VOLUME II

13     CONTINUATION OF VIDEORECORDED

14     30(b)(6) AND PERSONAL

15     DEPOSITION OF:    PARKER'S POULTRY EQUIPMENT

16                       AND ROGER DALE PARKER,

17                       (Via Videoconference)

18     DATE:             Thursday April 24, 2025

19     TIME:             9:04 a.m.

20     LOCATION:         Ogletree Deakins Nash

                         Smoak & Stewart

21                       300 North Main Street

                         The Ogletree Building, Suite 500

22                       Greenville, South Carolina

       TAKEN BY:         Counsel for the Defendant

23     REPORTED BY:      Elaine L. Grove-DeFreitas,

                         Independent Professional Reporter

24                       (Via Videoconference)

       VIDEOTAPED BY:    Kevin Day

25                       (Via Videoconference)

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 257

1          A.   As far as I know, it was, yes.

2          Q.   Is there anything that we have had

3     overnight -- is there anything, after reflecting on

4     yesterday, that you believe you need to change or

5     modify in your testimony?

6          A.   I haven't thought of anything.

7          Q.   Okay.  Did you think of anything you

8     need to clarify from your testimony yesterday?

9          A.   No, ma'am.

10         Q.   Okay.  So let's continue with a few

11    questions on kind of outside business.  I understand

12    you were a preacher for a portion of time when you

13    were a grower with Perdue.  Is that right?

14         A.   I was -- well, it was part-time, but

15    yes.

16         Q.   Okay.  Did you have any other jobs,

17    part-time or otherwise, during the time you were a

18    grower with Perdue, other than what we discussed

19    yesterday?

20         A.   No, ma'am.

21         Q.   Did you ever work for a quail company?

22         A.   Oh, yeah.  I forgot about that.  Yeah.

23    Yeah, I did.  For a short -- a short time I did.

24         Q.   And when was that?

25         A.   I -- Lord.  I cannot -- I honestly

Page 258

1    cannot remember the dates on it.  I'm sorry.  I just

2    can't remember dates on it.

3            Q.    You were a manager for them.  Correct?

4            A.    I was.

5            Q.    Okay.  How long did you hold that

6    position?

7            A.    I don't know if it -- I think it was

8    less than a year.  Or it could have been, you know,

9    right in that.  It wasn't long, though.  I didn't

10   stay there.

11           Q.    Okay.  And how many hours a week did you

12   work there?

13           A.    When I was doing that I don't really

14   know.  But it was -- it was -- I could, you know, go

15   and leave when I wanted to and come when I wanted

16   to.  But the -- if I had to guess, during that time

17   probably forty-ish, maybe, right in there, at weeks.

18   I mean, less, you know, some weeks.  It could be

19   more others.  You know, I just -- it's according to

20   what was going on.

21           Q.    And this is during the time that you

22   owned just one farm or both farms?

23           A.    No, I had both.  I think I had both

24   farms.  Don't hold me to it, but it's in that --

25   right in that timeframe, early on.

Page 259

1          Q.    Okay.  Did your wife primarily manage
2    the farms during this time?
3          A.    During that particular time she was
4    there during the day, yes.  But we had a helper
5    also.  I had hired a helper to be there.
6          Q.    Okay.  Was this after 2012?  After 2015?
7          A.    There again, I can't remember exactly
8    what year, even, it was.  I just know I did it, like
9    you asked.
10          Q.    Okay.  So your wife or a helper were
11    managing the farm.  And you were a manager for this
12    quail company during that time, for perhaps a year
13    working forty --
14          A.    Yeah.
15          Q.    -- or so hours a week.  Correct?
16          A.    Yeah.  Well, the helper was full-time at
17    that time.
18          Q.    Okay.  Did Perdue know that you were
19    working for a quail company during that time?
20          A.    Yeah.  I asked, you know, permission to,
21    because we can't do anything like that without their
22    telling us we can.
23          Q.    Okay.  And you were permitted to do
24    that.  Correct?
25          A.    They told me I could do that because I

30(b)(6) Roger Dale Parker , Vol. II                     April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 260

1      had someone else actually operating the farm at the

2      time.

3            Q.    How many hours were you working on the

4      farm during that time?

5            A.    I would come in and work in the evenings

6      usually and weekends.  But I -- I was probably doing

7      maybe twenty -- twenty hours a week maybe during

8      that season.

9            Q.    During the time you were a manager with

10     the quail company?

11           A.    Yeah, during -- yeah, during that time.

12           Q.    I saw in your interrogatories you had

13     referenced Roosevelt farm.  What's Roosevelt farm?

14           A.    That's a farm in -- I'm trying to think

15     of the name of the little town.  They made Fried

16     Green Tomatoes there, the movie, but I can't

17     remember the name of it.

18                 Anyway, Perdue had contacted me.  The

19     lady that owned the farm, her and her husband, she

20     was -- worked for the government.  And she was an

21     IRS person.  And I was told by them that they

22     basically didn't want to mess with her and asked me,

23     would I consider taking over that farm for them

24     to -- for a while to get it to where -- I think,

25     basically, they was going to shut the farm down.

Page 261

1    And they didn't want to shut it down and deal with

2    her, and so I took the farm for a short season.  And

3    I think that was way early, though.  I can't

4    remember the exact years we were there, but it was

5    when I had -- I didn't have both farms then, I don't

6    think.

7            Q.    Okay.  So you think you just had one

8    farm during that time?

9            A.    Yeah, the Hillsboro.

10           Q.    And how did you manage the Roosevelt

11   farm while you had the Hillsboro farm?

12           A.    Someone ran the farm.

13           Q.    Did you hire someone to run the

14   Roosevelt farm for you?

15           A.    Yes, ma'am.

16           Q.    Okay.  How did you find that person?

17           A.    If I remember right it was online, a

18   guy, that particular guy.  And I can't remember,

19   they were from -- I know they were from Tennessee,

20   but I can't -- I do not remember their name.

21           Q.    Were you getting the income from the

22   Roosevelt farm during that time?  How did that work?

23           A.    Yeah.  It done good to break even, but

24   yeah.  I kept it in -- I can't -- can't remember the

25   length of tenure that I had it, but it was long

Page 262

1    enough for them to shut it -- shut it down,
2    basically.
3            Q.    How many houses were on that farm?
4            A.    Four.
5            Q.    Okay.  So you hired someone.  Do you
6    remember what his name was?
7            A.    I do not.
8            Q.    And what period of time, again, did you
9    run that farm?
10           A.    It was early on.  It was probably -- I
11   started 2006.  I'm guessing '8-ish, but don't hold
12   me to it.
13           Q.    Okay.  So did you do any work on
14   Roosevelt farm during that time or were you just
15   relying on the person you hired to run it?
16           A.    No.  They -- they did it.
17                 We had to -- we had to do -- for Perdue
18   we had to do some upgrades, which Robert did.  But
19   other than that, the guy that operated it, pretty
20   much worked for Perdue, handled it because he had --
21   he had grown before also.
22           Q.    But you paid him.  Right?
23           A.    Huh?
24           Q.    You paid him.  Correct?
25           A.    Yeah.  I -- they -- they paid me and I

Page 263

1    paid him.

2            Q.    Okay.  And you hired him.  Correct?

3            A.    I did.

4            Q.    Okay.  Did you determine what to pay

5    him?

6            A.    Did I determine what to pay him?

7            Q.    Correct.

8            A.    I think it was an agreement, yeah.

9            Q.    Okay.  So you and this individual agreed

10   on what you would pay him to perform the services?

11           A.    Yeah, I guess that's how it was.

12           Q.    Did you have to train him or provide him

13   with any guidance on what he was doing?

14           A.    Not really.  He had done it before.

15           Q.    Okay.  Is that why you hired him,

16   because he had experience?

17           A.    Yeah.  He -- he advertised looking for a

18   position.

19           Q.    Okay.  We talked a little bit about your

20   outside company in the -- Parker's Poultry and

21   Equipment yesterday.  Did you do work for any other

22   integrators on behalf of Parker's Poultry and

23   Equipment?

24           A.    For the integrators?

25           Q.    For any other poultry companies.

Page 264

1              A.    Are you talking about growers that grew

2       for somebody else?

3              Q.    Correct.

4              A.    Yeah, I think -- like the -- if I

5       remember right -- I don't know.  On the south

6       side -- I get confused, because the south side of

7       Georgia is Tyson's and Perdue.  But I don't think I

8       have done Tyson's.

9              Q.    What about Harrison's Poultry?  Did you

10      help any growers with Harrison's Poultry?

11             A.    I'm trying to -- on the north side.  I

12      think -- I think they may have been a grower on the

13      north side that -- that had Harrison's.

14             Q.    All right.  So during that time, on

15      behalf of Parker's Poultry and Equipment you were

16      able to help growers with other poultry companies.

17      Correct?

18             A.    I was able to, yeah, when I -- if -- you

19      know, if -- if I was offered the opportunity, yeah.

20             Q.    Do you recall how many growers for

21      poultry companies other than Perdue you helped when

22      you were operating Parker's Poultry and Equipment?

23             A.    How many growers?

24             Q.    (Ms. Santen nods head).

25             A.    Most always Perdue.  I mean, it was -- I

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 265

1     don't.  You know, it's -- I'm trying to think.  But
2     almost everything I did was, you know, in that area.
3           Q.   Okay.  But you believe that you did work
4     for at least one grower, with Harrison's on the
5     north side of town?
6           A.   Yeah, I did.
7           Q.   Okay.  When you owned Parker's Poultry
8     and Equipment did you ever have any issues with any
9     of your suppliers?
10          A.   I mean, if something didn't arrive or
11    something like that, yeah.  I mean, you have issues.
12          Q.   Did any of your suppliers ever stop
13    working with you, decide to stop working with you?
14          A.   Well, at the end, everybody.  I mean,
15    we -- we -- when I shut the business down I wasn't
16    doing sales.  And, you know, when sales don't sell
17    you don't keep your -- you know, your stuff.
18          Q.   Did you ever receive any complaints,
19    when you had Parker's Poultry and Equipment, about
20    your services from any growers?
21          A.   I don't remember any.  I'm not saying
22    they didn't, but I don't remember any.
23          Q.   We talked yesterday about the
24    agricultural tax exemption you applied for.  And you
25    indicated you thought you had to fill something out

30(b)(6) Roger Dale Parker , Vol. II                     April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 266

1    online.  I just want to show you something to see if

2    this rings a bell.

3                    MS. SANTEN:  Are we on 22?  21?  Okay.

4    (Defendant's Exhibit No. 21 Marked and Withdrawn)

5                    THE WITNESS:  Now, I did mine over the

6    phone.  I think I said that.

7    BY MS. SANTEN:

8            Q.   You didn't have to go online to look at

9    anything?

10           A.   Uh-uh.

11           Q.   Okay.  Then we don't need to mark this

12   one if you didn't see it.

13                Okay.  We talked about flock supervisors

14   coming to the farm from time to time and providing

15   you with lists of items -- maintenance items and

16   otherwise to work on that they noticed when they

17   were there on that visit.  So I would like to show

18   you -- we will mark this as 21 instead.  Sorry.

19   (Defendant's Exhibit No. 21, Perdue Flock Visitation

20   - Week 1, was marked)

21   BY MS. SANTEN:

22           Q.   Mr. Parker, do you recognize this

23   document?

24           A.   It looks like one that I would have

25   gotten on the farm, yeah.

Page 267

1          Q.   Okay.  So this says:  "Hazel Lee," which
2     was your farm.  Right?
3          A.   Yeah.
4          Q.   July 2nd, 2019.  Correct?
5          A.   It looks that way.
6          Q.   Okay.  So was this the document that you
7     were referring to yesterday when you indicated that
8     they would leave lists of things to do?
9          A.   It looks like when they started printing
10    them, yes.
11         Q.   Okay.  And do you remember when they
12    started printing them?
13         A.   I do not remember what year it was.
14         Q.   Okay.  What did they do before they
15    started printing them?
16         A.   They handwrote -- they wrote them by
17    hand and left them there.
18         Q.   Would it contain items similar to what
19    this looks like?
20         A.   Probably so, yeah.
21         Q.   Okay.  So I note here that they have a
22    number of items that you need to work on.  It
23    says -- do you see "bio-security," there is a number
24    of items there?
25         A.   Yeah.

Page 268

1          Q.   "Environmental," there's -- it notes
2     that the grass around the house needs to be cut.  Do
3     you see that?
4          A.   Yes, ma'am.
5          Q.   Was that because with tall grass there
6     might be snakes or rodents that could get the baby
7     chicks?
8          A.   I don't know what their purpose is.  I'm
9     sure it has something to with rodents, but --
10         Q.   Okay.  So would you agree that if there
11    was tall grass there could be rodents or snakes and
12    that could pose a risk to baby chicks?
13              MS. VAUGHN:  Object to form.
14              THE WITNESS:  No.  We had a concrete
15    wall all down the bottom of the chicken house.
16    There is no way a real snake could get in there
17    unless he went through a -- you know, a snake hole
18    or dug in some way.
19              But the only place I ever saw snakes was
20    in the control room.
21    BY MS. SANTEN:
22         Q.   Okay.  Would you agree, with tall grass
23    there could be a possibility for rodents?
24              MS. VAUGHN:  Object to form.
25              THE WITNESS:  That's why we kept the rat

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 269

1    bait stations.  Yes.

2    BY MS. SANTEN:

3         Q.   Okay.  Did you ever use any sort of

4    fertilizer or other substance to help kind of cut

5    the grass or reduce the amount of grass on your

6    property?  Roundup, something like that?

7         A.   I -- I sprayed Roundup before, yeah.

8         Q.   Okay.  And what was the purpose of

9    Roundup?

10         A.   To not have to weed eat so much.

11         Q.   Okay.  Roundup would help with grass

12    growth as well.  Correct?

13              MS. VAUGHN:  Object to form.

14              THE WITNESS:  Well, the weed eating part

15    would be weeds and grass.  You know, whatever grew

16    up beside the chicken house.

17    BY MS. SANTEN:

18         Q.   Okay.  Would the flock supervisor talk

19    with you about what was on the Flock Visitation

20    report, or would you just get this document and then

21    work on the items?

22         A.   Well, this -- this particular document

23    was after I realized -- I mean, I knew they were

24    definitely pushing me out.  I mean, they was getting

25    rid of me.  I already contacted the SBA people.  But

Page 270

1      the -- I mean, some of the things that -- basically,

2      if I had had the feed lines I wouldn't have trouble

3      with the feed.  And I basically asked to do feed

4      lines and I could not -- I mean, they -- they would

5      not help me, toward the end, at all.

6                  They would rather -- it seemed like they

7      would rather see them suffer, and that's what they

8      did.

9            Q.   Are you aware of any other growers who

10     were allowed -- who were treated differently than

11     you in terms of given more favorable treatment on

12     some of this stuff?

13           A.   Oh, yeah.  I had a -- I know people that

14     got water lines and got feed lines and -- yeah.  I

15     mean, quite a few farmers, actually, you know, that

16     I had seen get the same things I was asking for.

17           Q.   Well, on some of these items here that

18     you say they were using to push you out, are you

19     aware of any growers who had these items who didn't

20     have them listed on a Flock Visitation report?

21           A.   Well, I don't know about other growers.

22     I mean, I don't know what they wrote down on

23     their --

24           Q.   And you testified that as of this date,

25     which is July 2nd, 2019, you felt sure they were

Page 271

1      trying to push you out.  Is that right?

2              A.    Without a doubt, yeah.

3              Q.    And why -- why did you feel sure at that

4      time that they were trying to push you out?

5              A.    Well, I had gone through a couple of

6      years at that time of, you know, no help.

7                    I mean, when I started reporting the

8      trailers coming in, it seems like that started the

9      stuff.

10                   And I was really just trying to help

11     them to realize that they were bringing basically

12     a -- they was coming into my farm with an empty

13     trailer, let's say trailer one, and they would stamp

14     a tare weight ticket and put it in my box.  And they

15     would go weigh that truck -- when they left my farm

16     full of chickens and weighed the truck, the truck

17     number then was different on what I sold versus what

18     I was growing.  And I knew we had issues.

19             Q.    So you said this happened a few years --

20     this started happening a few years before 2019.

21     Right?

22             A.    Yeah, it did.

23             Q.    When did it -- when did this treatment

24     start happening that you felt was unfair?

25             A.    I started noticing trailers around 2015,

30(b)(6) Roger Dale Parker , Vol. II                  April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 273

1                    They told me they would do that.  They
2          said they would -- I bought water lines.  But I had
3          asked for the pipe to buy the water lines to put in
4          city water so that after I paid for that I could
5          then get feed lines or water lines because they
6          didn't want two loans at a time on your -- I get
7          that.  But after I paid it off then they turned
8          around and changed the story and wouldn't give me
9          feed lines even then or water lines.
10                   Q.   You said that things started to change
11         when you started reporting it to them.  When did you
12         start reporting it to them?
13                   A.   I thought I said 2015 or '16.
14                   Q.   Okay.  So that's when you believe the,
15         quote, different treatment started happening,
16         different treatment of you.  Is that right?
17                   A.   Well, that's when I noticed it, yes.
18         And it started -- in my opinion, that was the start.
19         But it really -- after I contacted USDA it seemed to
20         elevate.  And that's -- this guy, I believe this
21         particular person that did this report was -- was
22         looked at by growers as the hitman that shut farms
23         down.
24                   Q.   Okay.  So you said that they wouldn't
25         give you feed lines or water lines.  Is it your

Page 275

1          Q.   Okay.  When -- were there times when
2     Perdue visited the farm and noticed some issues and
3     after that point you would get letters?  Would that
4     occur from time to time?
5          A.   Yeah, towards the end, especially when
6     they shut me down.
7          Q.   Okay.  Let me hand you what we will mark
8     as Exhibit 22.
9     (Defendant's Exhibit No. 22, 4-14-17 Letter, 9-19-18
10     Letter, and 10-16-18 Letter, was marked)
11     BY MS. SANTEN:
12          Q.   Do you recognize this document -- this
13     set of documents?
14          A.   Yeah.  Yeah, I think it's something that
15     I got.
16          Q.   Were these examples of letters that you
17     received from Perdue noting different issues that
18     they found on the farm?
19          A.   Yeah.  Like I said, after -- it is.  I
20     mean --
21          Q.   Do you have any reason to believe you
22     didn't receive these letters?
23          A.   Let me see.  I don't -- let me look at
24     all of them.
25               Yeah.  It was -- I felt it was a

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 276

1      starveout.  You know, if they wait long enough they
2      know that -- that you have got to have these things,
3      especially with a system, and they -- if they don't
4      help you do it, then eventually you're going to --
5      and basically, instead of trying to help me like
6      they did other farmers, I got no help and wound up
7      in this issue.
8              Q.    Are you aware of any other farmers who
9      had the kinds of issues that Perdue noted who were
10     not provided with letters like this?
11             A.    I'm not -- I don't know about other
12     farmers, no.
13                   I know other farmers got feed lines and
14     water lines.
15             Q.    Okay.  Which farmers got feed lines and
16     water lines?
17             A.    Well, I mean, I don't know how many they
18     gave them to, but I knew they got feed lines and
19     water lines.  I know -- I just -- I mean, I have
20     actually put them in for them.
21             Q.    Okay.  Is that the only instance you can
22     think of, of other farmers who were treated
23     differently?
24             A.    Say that again now, to make sure I
25     understand.

Page 277

1           Q.    I will strike that.

2                 Okay.  Let's go to your contracts.  I

3       will show you what we are going to mark as Exhibit

4       23.

5       (Defendant's Exhibit No. 23, Poultry Producer

6       Agreements, was marked)

7       BY MS. SANTEN:

8           Q.    All right.  I have handed you a stack of

9       documents here that are various Poultry Producer

10      Agreements that you have signed over time.

11                Could you take a minute to look through

12      these just to see if you recognize your signature

13      and recognize the documents?

14          A.    We were continually getting these things

15      from year -- I mean, not year to year, from -- you

16      would get sometimes three or four times a year.  We

17      had no option, though, I mean, really, that we sign

18      it.

19          Q.    My question was whether you recognize

20      the document and whether it's your signature.  We

21      can talk about the document after that.

22          A.    Okay.  I don't think I signed them all.

23      I don't see a signature.  Maybe I'm looking at the

24      wrong place.

25                Okay.  Yeah.  Revised -- it looks like I

Page 278

1    signed them, yes, ma'am.

2         Q.    Okay.  So I believe yesterday you

3    testified that you believe the first time you signed

4    a part of the Poultry Producer Agreement was 2006.

5    Does this first document in the stack with the Bates

6    label Perdue 002439 to Perdue 002459 appear to be an

7    accurate copy of the first contract that you signed?

8    It's dated June 27th, 2006.

9         A.    I honestly can't remember when I

10   started, the exact date, but I know it was that

11   year.

12              You have agreements that you sign.  Then

13   you have agreements that you sign with them on a

14   flock, which bird you're going to grow.  So I'm --

15        Q.    Are those the payment schedules you're

16   referring to?

17        A.    Yeah.  Yeah, the payment schedules.  You

18   have to have agreements.  But they come out with

19   these like every so often also when something

20   changes.  Like I don't know.  Part of them had

21   different things in them, I noticed, as I went

22   through.

23        Q.    Okay.  Well, let's talk through the

24   first one.  Do you remember who you met with when

25   you signed the first agreement?

Page 280

1          Q.   Okay.  Who said -- who suggested to you

2     to use the name Parker's Poultry?

3          A.   It was just agreed to in that meeting

4     that day.

5          Q.   Which person with Perdue suggested that

6     you should use the word Parker's Poultry?

7          A.   I can't remember which one it was.

8          Q.   Okay.  Let's go to the second agreement,

9     then, if you don't believe that one was in place.

10          This one is Perdue 002453 through 2459.

11     And it's dated May 18, 2007.  Does this contain your

12     signature?

13          A.   It does.

14          Q.   Okay.  Do you believe this is the first

15     agreement that governed the relationship between you

16     and your ex-wife and Perdue?

17          A.   It's one of them.  Like I said, they

18     continually changed it.

19          Q.   I said the first agreement.

20          A.   Oh.  I don't know.  I wouldn't think --

21     I think the first one should be the lesser of the

22     dates, but it's not.

23          Q.   Okay.  Well, what do you -- what do you

24     remember about them telling you -- when you first

25     sat down to sign an agreement with Perdue, what did

Page 281

1    they tell you about how the relationship would work?

2         A.   As in -- what do you mean

3    "relationship"?

4         Q.   What did they explain to you about how

5    it would work?  Did they explain you would be an

6    independent contractor?

7         A.   No.  They basically told me that they

8    would come out and show us everything to do; what to

9    do, how to do it.  And we had to abide by the rules

10   that they had.

11              And whenever we were -- you know, we

12   would -- you know, if something happened, you know,

13   you get written up.  And if you didn't comply,

14   basically, you got cut off.  Of course that wasn't

15   my case, but --

16        Q.   So it's your testimony that they told

17   you that at the very beginning of the relationship?

18        A.   Yeah.  That was -- that was -- I mean,

19   they were up front with telling us, you know, we had

20   everything -- you know, we had to follow the

21   guidelines and, you know, everything they said for

22   daily working the birds and everything, yeah.

23        Q.   Okay.  What else did they tell you when

24   you sat down and first discussed how things would

25   work?

Page 282

```
1              A.   I was just trying to get a loan for the
2    bank.  You know, it's -- that's pretty much -- you
3    know, do what we say and when we say to do it and
4    everything will be good, you know?
5              Q.   What else do you remember Perdue telling
6    you when you first sat down with them to discuss
7    becoming a grower with them?
8              A.   (Cell phone interruption).
9              I'm sorry.  That bothered me.
10             Q.   What else did Perdue -- you remember
11   Perdue talking with you about when you first sat
12   down with them about the opportunity to be a grower?
13             A.   Like I said, just what I said.  I don't
14   think there is -- there is anything else.  The field
15   man would come out and look at everything every week
16   and tell us what to do.
17             Q.   So you testified that they told you they
18   would come out, show you everything.  You had to
19   abide by the rules.  If something happened, you
20   would get written up.  If you didn't comply you
21   would get cut off.  So you began the relationship
22   knowing that information.  Correct?
23             A.   Yeah.  A good bit of it, yeah.  That --
24   I mean, some of it come with time but, you know,
25   it's definitely an understanding, you work for them,
```

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                        Page 283

1      no doubt.

2              Q.    What part of it came with time?

3              A.    Well, you know, you come to see how it

4      works, you know, with your field man and

5      understanding how, you know, you -- how little

6      options you have, I guess, on your end, because I

7      wasn't used to growing that way.  Growing with two

8      other integrators it was totally different.

9              Q.    Let's go through the -- let's go through

10     this 2007 Agreement a little bit.  So you see

11     paragraph II it says:  "Producer Agrees" on the

12     first page?

13             A.    Oh.  Paragraph VII?

14             Q.    Paragraph II, Producer Agrees.  It's

15     section II.  It says:  "Perdue Agrees" and then it

16     says "Producer Agrees."

17             A.    Yes, ma'am.

18             Q.    Do you recall reviewing this Agreement

19     before you signed it and these provisions that you

20     were agreeing to?

21             A.    Yeah.  But there are some things they

22     didn't put in here.  But yeah.

23             Q.    So you were agreeing to, if you look at

24     paragraph B:  Feed, water, care for and otherwise

25     manage the chicks consigned to and provide necessary

Page 284

1    housing, equipment, supplies to maintain equipment

2    and housing, utilities, labor to maintain such

3    housing and equipment in a good a state of repair --

4    or state of good repair and operable condition.

5              You understood that would be part of the

6    agreement?

7         A.   Yeah.  They also said that there was

8    interest-free loans that was available to do that

9    with.

10        Q.   Okay.  But you understood paragraph B

11   was part of the agreement?

12        A.   Yeah.  We had to do that.

13        Q.   Okay.  Did you understand that you were

14   to only use the feed medications, vaccinations and

15   other supplies which Perdue provided under paragraph

16   C?

17        A.   Yes, ma'am.

18        Q.   Okay.  Did you understand under -- or

19   did you understand the rest of these?  So D talks

20   about minders.  E talks about disposal of birds.

21             Did you understand that you would be

22   required to comply with the rest of these

23   paragraphs, so A through M?  And that's section IIA

24   through M on Perdue 002543 to 002534, Producer

25   Agrees.

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 285

1          A.   Yeah, they -- they said that.  But, you
2     know, like I said, they offered help in some of it
3     too.
4          Q.   Okay.  And under IIIA, "Other Terms," it
5     says:  Producer shall perform the services hereunder
6     using Perdue's established procedures and otherwise
7     sound farming and growing practices in accordance
8     with industry standards.  Did you understand that
9     would be one of your obligations under the
10    agreement?
11         A.   Oh, yeah, definitely, you had to do what
12    they said under their guidelines for sure.
13         Q.   Okay.  And go to the next page.  This is
14    Perdue 002455.  You see paragraph D there, it says:
15    Perdue may enter upon the premises of the producer
16    where flock is and shall be located to inspect the
17    flock or facilities.  If producer is not
18    satisfactorily performing producer's obligations
19    under the agreement to care for, treat and maintain
20    the flock, or if this agreement has been terminated
21    in accordance with its terms, Perdue may enter upon
22    the premises of producer where the flock is located.
23              Did you understand, under this
24    paragraph, that they would be entitled to come onto
25    your farm to inspect the flock or the facilities?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                        Page 286

1            A.    Yeah.    The field man came every week,
2       sometimes twice.
3            Q.    Okay.    Did you understand the remaining
4       obligations set forth in paragraph E and F on this
5       page, Perdue 002455?
6            A.    Yeah, they -- they allow you to do the
7       weight, but it was an impossibility, really.    You
8       can't be in two places at once.
9            Q.    And did you understand that under
10      paragraph IVA that the agreement provided that you
11      were to be an independent contractor?
12           A.    It may read that, but it didn't seem --
13      it didn't seem that way at all.
14           Q.    Okay.    We will talk about that in a
15      minute.
16           A.    Okay.
17           Q.    Let's go to -- just so I'm clear, do you
18      believe that this June 2006 Agreement was the first
19      one you signed?
20           A.    I would think it would have been before
21      I got my loan.    And this would have to be after.    I
22      mean, I really don't -- the earlier date would make
23      more sense if she had signed it.    But she didn't
24      sign it.
25                 The first time I met with them and the

30(b)(6) Roger Dale Parker , Vol. II                      April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 287

1    first contract I signed, both of us signed it and we
2    were meeting with them before getting the loan.
3         Q.   Okay.  Do you recall any provisions
4    different than the ones we just went over in Perdue
5    002453 to 2459 in this first contract you believe
6    you signed?
7         A.   I don't -- I don't have -- I mean, if I
8    had -- I don't remember everything that was said and
9    what I agreed on, honestly, that day because, I
10   mean, that was 2006.  I mean, I just don't remember.
11        Q.   After going through these provisions we
12   just discussed, do you recall any of those not being
13   in the agreement you first signed?
14        A.   I -- I can't say.  I don't know.
15        Q.   Well, let's go to the first one, Perdue
16   0002439 to 2445.  Would you look at paragraph --
17        A.   This one?  On the first one?
18        Q.   Yes, let's go to the first one.
19        A.   Okay.
20        Q.   IIA on -- look at section IIA, Producer
21   Agrees, on 002439 through IIM on 2440.  Are these
22   the same things that you agreed to in the contract
23   we just discussed that was dated May 18, 2007?
24        A.   Yeah.  I mean, it's -- it might be
25   what -- you know, what -- I just don't know what the

Page 288

1    first one said, but, you know, this is apparently

2    one that I signed.

3            Q.   What date do you believe you signed the

4    first one?

5            A.   Like I said, I don't know.  I just know

6    that we both signed it, meeting with them that day

7    before I -- and I took it to the bank.  We had to

8    both sign it to get it to the bank.

9            Q.   Okay.  Let's go to Perdue 002432 to

10   2438.  Do you recall signing this version of the

11   agreement?

12           A.   Say it again now, which one?  I'm sorry.

13           Q.   Perdue 002432 to 2438 dated July 3rd,

14   2007.

15           A.   2432.  Mine starts on 2439.  Where am I

16   at?  I'm sorry.  Am I still on the right one?

17           Q.   Do you see the agreement dated July 3rd,

18   2007?

19           A.   Okay.  My bad.  I was still on the other

20   one.  2432.  Okay.  Yeah, I'm here now.

21           Q.   Do you recall signing this version of

22   the agreement?

23           A.   Yeah.  It's the -- and that's the thing.

24   I mean, they were continually coming at us with

25   these things, because this is -- this one was

Page 289

1    5-18-07.  This is 7-3-07.  So I mean, we were

2    continually bombarded with these.

3            Q.   My question was, do you recall signing

4    this agreement?

5            A.   I don't recall, but I'm sure I did.  My

6    signature is on it.

7            Q.   Okay.  So let's go to the next one,

8    which in your last deposition -- the next one dated

9    August 18th, 2009, which on the bottom says Perdue

10   002310 to 002316, which in your last deposition I

11   believe you testified this one governed the

12   Hillsboro farm the entire time you owned it.  Is

13   that right?

14           A.   I have no clue.

15           Q.   Okay.  Well, let's go through this one.

16   Do you recall signing this agreement?

17           A.   I'm trying to get to it.

18                It looks like my signature, yes.

19           Q.   Okay.  So let's go through paragraph IIA

20   through IIM again, which this is Perdue 002310

21   through 002311.

22           A.   Yes, ma'am.

23           Q.   Did you agree to comply with these

24   provisions when you signed this version of the

25   agreement?

Page 290

1          A.   I believe it's the same as the other
2     one.  It looks like it.
3          Q.   Okay.  So that's a yes, you agreed to
4     comply with these terms when you signed this
5     agreement?
6          A.   Well, now, they have terms on here also,
7     yeah.
8          Q.   I'm asking about you.
9          A.   Just my terms?
10         Q.   Yes.  Correct.
11         A.   Okay.  The terms, they didn't do it.
12    But anyway --
13         Q.   I'm asking you.  It's important you
14    answer my question.
15         A.   Yeah.  On II?
16         Q.   Yes.
17         A.   Yeah.
18         Q.   Okay.  Go to "Other Terms," section III.
19         A.   Other Terms.
20         Q.   Did you agree to these terms when you
21    signed this version of the agreement?  So Perdue
22    002311, IIIA through IIIF, to Perdue 002312?
23         A.   Yeah, apparently I did.  But like I
24    said, we were getting these often.
25         Q.   Okay.  And then on paragraph IVA would

Page 291

1    you agree that this paragraph provided that you

2    would be an independent contractor?

3          A.   Yeah.  But if you didn't sign these, you

4    didn't grow.

5          Q.   Okay.  I understand.  But you signed it.

6    Correct?

7          A.   I did, apparently, yeah.

8          Q.   Let's go to the next one.

9          A.   Okay.

10         Q.   And this would be -- and I apologize if

11   these are out of order here for you -- the December

12   29, 2014.  It says 0716 on the top.  And it's Perdue

13   002489 through Perdue 002505.

14              MS. VAUGHN:  Are you talking about the

15   Simon Parker Agreement?

16              MS. SANTEN:  No.  It's a Roger Parker

17   Agreement.

18              MS. VAUGHN:  What's the Bates again?

19              MS. SANTEN:  2489 to 2505.

20              MS. VAUGHN:  I don't see that one in my

21   stack.

22              THE WITNESS:  Is it on the front page?

23   It starts with what now?  I'm sorry.

24              MS. SANTEN:  (Indicating).  This one, it

25   says 2489 at the bottom, December 29th, 2014.

Page 292

```
 1              MS. VAUGHN:  I don't appear to have that
 2      one in this stack.
 3              THE WITNESS:  No.
 4              MS. SANTEN:  Can we go off the record
 5      and I will try to figure out these exhibits?
 6              THE VIDEOGRAPHER:  The time on camera is
 7      approximately 9:55 a.m.  We are off the record.
 8      (Break In Proceedings)
 9              THE VIDEOGRAPHER:  The time on camera is
10      approximately 10:08 a.m.  We are back on the record.
11              Counsel, you may proceed.
12      BY MS. SANTEN:
13          Q.  Okay, Mr. Parker, we are back from a
14      small break.  Do you understand you're still under
15      oath?
16          A.  Yes, ma'am.
17          Q.  Okay.  Is there anything from your
18      testimony today that you have provided so far that
19      you need to clarify or you believe is incorrect?
20          A.  No, ma'am.
21          Q.  Okay.  If there is anything at any
22      point -- if there is anything you believe you need
23      to clarify at any time, please let me know.  Okay?
24          A.  Okay.
25          Q.  So before the break we were talking
```

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 293

1     about the different agreements.  And we took a short
2     break to organize some things here.
3              A.    Okay.
4              Q.    So I would like to ask you about Perdue
5     002489 through 2505, which is an agreement dated
6     December 29, 2014 between you and Linda Parker dba
7     Parker's Poultry.  Do you see that Agreement?
8              A.    Yes, ma'am.
9              Q.    Okay.  It says 01 -- 0716.  Do you know
10    what that refers to?
11             A.    No, ma'am.
12             Q.    Okay.  Are these your initials and is
13    this your signature on this agreement?
14             A.    Yeah.  I have looked at it and I believe
15    it is.
16             Q.    Okay.  So let's go to your -- the
17    provisions you're agreeing to when signing this
18    agreement.  And that's Producer Agrees, section
19    IIA -- IIA through M which goes from 2489 through,
20    actually, R, 2491.
21                   Review section IIA through R and let me
22    know whether you reviewed and agreed to these
23    provisions when signing this agreement.
24             A.    I think it's the same as the other.
25    Yeah.

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 294

1        Q.   I think if you go to 2491 there is N
2   through R.  And I'm not sure we covered these
3   before.  So N is:  "To comply with any bio-security
4   policies, audits, measures or guidelines required by
5   Perdue."  Do you recall reading that provision?
6            A.   I'm sorry.  Say that again.  Which one?
7            Q.   N on 2491.
8            A.   N?  Okay.  Okay.  Yeah.
9            Q.   Do you recall reading and agreeing to
10  that provision?
11           A.   Bio-security, yes, ma'am.
12           Q.   Okay.  And O through R, do you recall
13  reading and agreeing to those provisions?
14           A.   Yes, ma'am.
15           Q.   Okay.  Do you recall reviewing the
16  remainder of this agreement and agreeing to its
17  terms when signing it?
18           A.   I'm sure I did.  I just -- as I said, we
19  continually got these, so this is another one.
20           Q.   Are there any provisions in here that
21  you don't recall reviewing and agreeing to?
22           A.   I don't recall signing it, but it looks
23  like I did.  I mean, to be honest.
24           Q.   Sitting here today, are there any
25  provisions in this agreement that you do not recall

Page 295

1    reviewing and agreeing to?

2            A.    Like I said, I do not remember doing it,

3    but I had to.  So I know it looks -- it's my

4    signature.

5            Q.    And you can't identify any provision in

6    here that you do not recall reading and agreeing to.

7    Is that right?

8                  MS. VAUGHN:  Object to form.

9                  THE WITNESS:  I don't recall any of it.

10   I'm just saying I signed it, so I'm assuming that

11   I -- it was presented to me to sign.

12   BY MS. SANTEN:

13           Q.    Okay.  And that you agreed to it when

14   signing it.  Correct?

15           A.    Well, I couldn't -- yeah.

16           Q.    Okay.  Let's go to the next one.  And

17   this one governed your Milledgeville farm then, it

18   looks like.

19                 And the next one is Perdue 002278

20   through 002294.  And this is a Poultry Producer

21   Agreement dated December 29, 2014.  It looks like it

22   pertains to the Milledgeville farm.  Do you recall

23   reviewing and agreeing to the terms of this

24   agreement?

25           A.    Is this the same date as the other one?

Page 296

1          Q.   Yes.  It looks like this is for

2     Milledgeville, and the other one was Hillsboro.

3          A.   Okay.  Yeah, it would have been the

4     same.

5          Q.   Is that your signature on the end?

6          A.   Yeah.  I looked at it earlier.  Yeah.

7          Q.   Okay.  So the last two, then.  The next

8     one is dated December 16, 2016, Bates number 002474

9     to 2488.  Is this your signature on this agreement?

10         A.   Now, which one again?  I'm sorry.  I

11    didn't --

12         Q.   2474 on the bottom to 2488.  And it's

13    December 16, 2016.

14         A.   Yes, ma'am.

15         Q.   Okay.  Do you recall reviewing -- or is

16    this your signature and are these your initials on

17    this agreement?

18         A.   Yeah, seems to be.

19         Q.   Okay.  Do you recall reviewing and

20    agreeing to the terms of this agreement when you

21    signed it?

22         A.   I really don't remember doing it, but I

23    signed it, it looks like.

24         Q.   Okay.  And then the next agreement is

25    Perdue 002295 through 2309.  And that is an

Page 297

1    agreement dated December 16, 2016 between you and

2    Linda and Perdue.  And this one pertains to the

3    Milledgeville farm.  The one we just looked at

4    pertains to the Hillsboro farm.  Do you recall

5    reviewing and signing this agreement?

6            A.   But all three has the same date.

7            Q.   Is this your signature on here?

8                 MS. VAUGHN:  Which page are you talking

9    about?

10                MS. SANTEN:  The signature on the

11   signature page on 2307.

12                THE WITNESS:  12-16 -- no.  Okay.  My

13   bad.  I see it now.  Okay.  I had two farms.

14                It is my signature.

15   BY MS. SANTEN:

16           Q.   Okay.  And Section IIA through -- and

17   this is Producer Agrees, IIA on 2295 through IIR on

18   2297.  Do you also recall reviewing and agreeing to

19   those provisions?

20           A.   On the same one?

21           Q.   Yes.  On the Producer Agrees paragraphs

22   that we have discussed before.

23           A.   Okay.  It seems to be the same as the

24   others.

25           Q.   Okay.  So you agreed to these as well?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 298

1            A.   I signed this.  Yes.

2            Q.   Okay.  So let's go through some of your

3     claims in this case.  So as I understand it, you are

4     contending -- let me show you the complaint and we

5     can use that.

6                 Okay.  We will mark this as Exhibit --

7     are we on 24?  Okay.

8     (Defendant's Exhibit No. 24, Amended Complaint, was

9     marked)

10                THE WITNESS:  Are we through with this

11    one?

12                MS. SANTEN:  Yes.  We will look at it

13    again, I'm sure, but we are through with it for now.

14    BY MS. SANTEN:

15           Q.   Do you recognize this document?

16           A.   Yes, ma'am.

17           Q.   Okay.  And what is this document?

18           A.   It looks like the Amended Complaint, it

19    says.

20           Q.   And did you review this before it was

21    filed?

22           A.   Yes.  Yes.

23           Q.   Okay.  What is your understanding of

24    what you're claiming in this lawsuit?

25           A.   Basically --

Page 299

1              MS. VAUGHN:  Object to form.

2      WITNESS CONTINUES:

3              A.   Unfair -- I mean, basically, I was ran

4      out of business, I feel.

5                   And it seems, too, that I had upset

6      Perdue and then I was pretty much starved out.

7      That's how I feel.

8              Q.   And you testified yesterday that you

9      believe that that's what -- that this treatment by

10     Perdue is what caused you to file bankruptcy.  Is

11     that right?

12             A.   Yes.  Yeah.  Yeah.  Some of it, yeah.  I

13     mean, it's -- yeah.

14             Q.   Okay.  So let's go through your

15     different claims.  When is -- you are claiming that

16     Perdue breached its contract with you.  When did you

17     first believe Perdue breached a contract with you?

18             MS. VAUGHN:  Object to form.

19             THE WITNESS:  Well, even going back to

20     some of these I notice that -- where it talks about

21     they would place chickens -- we are on the system

22     that if they -- you know, if I don't get the same

23     kind of bird the next farmer does and we are

24     competing against each other, if I get a lesser

25     bird, there is a lot of control in that that they

Page 300

1      have.

2      BY MS. SANTEN:

3            Q.   You said even going back to some of

4      these.  Which agreement are you referring to?

5            A.   I think it's in all of them, first thing

6      on Perdue's side.

7            Q.   So are you looking at the agreement

8      dated June 27, 2006?

9            A.   Let me go back.  Am I looking at the

10     right one (indicating)?  2006, '14, '16.  Okay.  My

11     bad.

12            Okay.  Yeah, the consigning of it.  When

13     you're on the system that we are on, you get

14     consigned these -- these baby chicks.  And if you

15     get, like I said, an older hen, she -- they just --

16     you know, the bird quality is not there.

17            And they -- we get birds from -- we

18     could get birds from Florida.  We could get birds

19     from North Carolina.  We could get birds from

20     different places that Perdue has them, and those

21     birds might have set on a truck for two days,

22     nothing to eat, nothing to drink, before we ever get

23     them, and they get out and all of a sudden you see

24     1,000 or 2,000 a day dying.

25            Q.   So what provision of the -- of this June

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 301

1    2006 agreement are you contending that Perdue

2    breached with that?

3              MS. VAUGHN:  Object to form.

4              THE WITNESS:  They are -- they are

5    assigning birds for the system that we have of

6    growing against each other, to be fair, and the

7    system we are growing don't seem to be fair.

8    BY MS. SANTEN:

9         Q.   Well, what provision in the agreement?

10   You have a breach of contract claim.

11        A.   To consign available chicks to a

12   producer to be raised, but when we get them they are

13   not -- I mean, they are not worthy to be even put in

14   the house.

15        Q.   So you believe the first time Perdue

16   breached a contract with you was with this first

17   contract, is that right, in June 2006?

18        A.   No.  No, I'm not saying it went back

19   that far.

20        Q.   Well, when is it --

21        A.   It seemed -- it seemed to start in the

22   early -- just 2015-ish area is when I started really

23   noticing the difference in what I was getting.

24        Q.   And you believe that violated IA in the

25   contract?

30(b)(6) Roger Dale Parker , Vol. II                     April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                      Page 302

1          A.   Well, yeah.  I was growing under a fair

2     contract that wasn't -- didn't seem to be fair.

3          Q.   So if we go to the agreement in place,

4     if you say 2015, let's go to the one -- just so that

5     I'm clear, for the record, the 2014 agreements for

6     both of your farms -- this was Exhibit 23, and this

7     would be Perdue 002278 through 002294.  And the

8     other one dated 2014, which is 2249 to 2505.

9               So is it your testimony that you first

10    believe Perdue breached its agreement with you --

11    and that would be paragraph IA in these agreements,

12    to consign available birds to producer -- around

13    2015?  That's the first time you believe Perdue

14    breached its contract with you?

15         A.   When I started finding the trailer

16    issues, I went from grower of the year to starting

17    to see this at that time.

18         Q.   So I'm trying to get a timeline.  Was

19    that before 2015 or after?  I'm asking, when is the

20    first time you believe Perdue breached its agreement

21    with you?

22         A.   I'm just saying in that area then.  I

23    don't know exactly when I noticed it right off, but

24    I know what was going on is all I know and what was

25    happening at the time.

30(b)(6) Roger Dale Parker , Vol. II                 April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 303

1           Q.   And so the issue with the consigning
2     chicks, are you testifying that you believe Perdue
3     breached paragraph IA of your agreement?
4           A.   They -- they were consigning available
5     birds to us, but the birds were -- had lack in
6     quality, and I was competing against other people.
7           Q.   So do you believe that violates section
8     IA of your contract?
9                MS. VAUGHN:  Objection to form.
10               MS. SANTEN:  This is his lawsuit.  I'm
11    just trying to understand the basis.
12               THE WITNESS:  I mean, it wouldn't be
13    fair to me -- didn't seem fair to me.
14    BY MS. SANTEN:
15          Q.   Okay.  So we talked -- so you believe
16    this was a breach.  When is the next time you
17    believe Perdue breached its agreement with you?
18               MS. VAUGHN:  Object to form.
19               THE WITNESS:  Say it again.  When did I
20    agree --
21    BY MS. SANTEN:
22          Q.   Well, let's go through.  What other
23    paragraphs of this agreement do you believe Perdue
24    breached?
25               MS. VAUGHN:  Object to form.

Page 304

1    BY MS. SANTEN:

2           Q.    You have a breach of contract claim, so

3    I'm trying to understand the basis for your breach

4    of contract claim.

5           A.    Well --

6                 MS. VAUGHN:   Object to form.

7                 THE WITNESS:   -- the -- I'm not -- I'm

8    not a lawyer, so I don't know a lot of the lingo or

9    whatever that, you know, would define that.  So I

10   mean, I could go back -- and we could go back and if

11   you give me a chance to talk with -- you know, with

12   my counsel, I can have a better answer --

13   (cross-talking).

14   BY MS. SANTEN:

15          Q.    I'm just trying to -- you have brought a

16   breach of contract claim in your lawsuit.

17          A.    Yeah.

18          Q.    So I'm trying to understand when you

19   first felt Perdue breached your contract and how.

20                MS. VAUGHN:   Object to the form.

21                THE WITNESS:   Well, like I said, I'm not

22   a lawyer in this.  But the contract was breached by

23   not -- I mean, we didn't have a fair system, in my

24   opinion.

25   BY MS. SANTEN:

Page 308

```
 1          A.   Yeah.  I mean, it seemed to get more and
 2     more through the years.
 3          Q.   So did you feel like you were treated as
 4     an employee the entire time you were a grower with
 5     Perdue?
 6          A.   More so than any other integrator I had.
 7          Q.   Okay.  So is that a yes?
 8          A.   Yes.
 9          MS. VAUGHN:  Object to form.
10     BY MS. SANTEN:
11          Q.   And do you believe that you should have
12     been paid as an employee the entire time, then, as
13     well?
14          MS. VAUGHN:  Object to form.
15          THE WITNESS:  I'm not -- I don't -- I'm
16     not -- paid, what do you mean as an employee?  Like
17     daily?  Are you talking about working daily?
18     BY MS. SANTEN:
19          Q.   Well, you said you felt like you were an
20     employee.  So are you -- do you believe you should
21     have been paid like an employee as well?
22          A.   Should have, probably.
23          Q.   And is that from day one also?
24          A.   I would -- I would say it goes back --
25     like I said, it was definitely different than any
```

Page 309

```
 1    other integrator that I had grown for.  They didn't
 2    dictate everything.
 3            Q.   Well, I'm trying to get a sense.  So
 4    would you agree, then, that you believe you should
 5    have been paid as an employee from day one also?
 6                 MS. VAUGHN:  Object to form.
 7                 THE WITNESS:  I really don't know the
 8    answer to it other than I definitely wasn't
 9    independent.
10    BY MS. SANTEN:
11            Q.   Okay.  And you felt that from day one?
12            A.   Like I said, more so than anywhere else
13    I had been.
14            Q.   And your lawsuit alleges that you
15    believe that breached the agreement.  Is that right?
16                 MS. VAUGHN:  Object to form.
17                 THE WITNESS:  I don't have a clue what
18    all it alleges.
19    BY MS. SANTEN:
20            Q.   Okay.  Well, your agreement said you
21    would be treated as an independent contractor.
22    Right?
23            A.   What now?
24            Q.   Your agreement provides you would be
25    treated as an independent contractor.  Correct?
```

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 310

1          A.   Well, yes, I think that's what it says,

2     yeah.

3          Q.   But you don't agree that you were from

4     day one.  Correct?

5          A.   I didn't feel that way.

6          Q.   Okay.  And you felt they violated the

7     agreement in that way from day one.  Is that right?

8          A.   Yeah.  I mean, that's one of the things

9     that didn't feel right about growing, the difference

10    in the growing.

11         Q.   What other ways do you think Perdue

12    breached the agreement with you?

13              MS. VAUGHN:  Object to form.

14              THE WITNESS:  Breached the agreement.

15    See, I don't know what all the agreement -- because

16    to me, giving me chickens that I can grow and make

17    them money was the goal for me.  But when I'm

18    getting lesser quality in feed, in chickens, and

19    they controlled all of that, it made it hard for me.

20    BY MS. SANTEN:

21         Q.   So do you understand in this lawsuit you

22    also claim that Perdue negligently misrepresented

23    the nature of your relationship?

24         A.   I don't understand that.

25              MS. VAUGHN:  Object to form.

Page 311

1      BY MS. SANTEN:

2           Q.   Well, they misrepresented your

3      relationship, do you understand you're claiming that

4      in this lawsuit?

5                     MS. VAUGHN:   Object to form.

6                     THE WITNESS:   They misrepresented, I'm

7      not a lawyer, so I'm having trouble with it.

8      BY MS. SANTEN:

9           Q.   Okay.  Well, let's go to your complaint,

10     just so that I'm sure I understand when -- when you

11     first believed these various things.

12                     Okay.  Go to page 25 of your lawsuit.

13          A.   Do I have that?

14          Q.   Yeah.  Do you have the amended complaint

15     in front of you?

16          A.   Yes, ma'am.

17          Q.   Go to page 25 of that.

18          A.   Okay.

19          Q.   Okay.  And this is a claim for negligent

20     misrepresentation.  And so read through these

21     paragraphs and let me know when the first time you

22     felt that was happening was.

23          A.   Basically, on some of these I had told

24     them what had gone on during -- and it was written

25     in lawyer form and, you know, we did go through

Page 312

1    this, but I just honestly can't remember the

2    definition of some of it.

3              Q.   Well, when is the first time you

4    believed Perdue misrepresented something?

5              MS. VAUGHN:  Object to form, calls for

6    legal conclusion.

7    BY MS. SANTEN:

8              Q.   A date is not a legal conclusion.  I'm

9    just trying to understand the basis --

10             MS. VAUGHN:  Misrepresented is a legal

11   term.

12   BY MS. SANTEN:

13             Q.   I'm trying to understand the basis for

14   your claims.  When is the first time you felt this

15   way?

16             A.   Well, when I started, especially

17   after -- when I felt they were starving me out was

18   when --

19             Q.   And you testified earlier you believed

20   that was around 2015.  Is that right?

21             MS. VAUGHN:  Object to form,

22   misstates --

23             THE WITNESS:  That's when I started

24   reporting that I was basically having other people's

25   trailers weighed in as my trailers.  Yeah.

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                        Page 313

1    BY MS. SANTEN:

2            Q.    When do you first believe that they

3    misrepresented that you were an independent

4    contractor?

5                  MS. VAUGHN:   Object to form.

6    BY MS. SANTEN:

7            Q.    Was that day one also?

8            A.    That pretty much --

9                  MS. VAUGHN:   Object to form.

10   WITNESS CONTINUES:

11           A.    -- like I said, started, but seemingly

12   got worse than what I had experienced with other

13   integrators.   Other integrators just don't, pretty

14   much, lord over everything, you know?

15           Q.    When did that start with Perdue?   Day

16   one as well?

17           A.    Well, it went through the -- but

18   seemingly got worse, especially when I felt they

19   were starving me out at the end.

20           Q.    Well, when it did start?

21           A.    Like I said, on that part it was

22   different day one, but got worse after I found the

23   trailers that they were weighing from other growers

24   and putting it on mine.

25           Q.    That was 2015?

30(b)(6) Roger Dale Parker , Vol. II                        April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 314

1              A.    Yeah.

2              Q.    Okay.  So you testified earlier, and I

3     don't want to put words in your mouth, kind of day

4     one you felt -- with Perdue, because it was

5     different with other integrators, you felt you were

6     being treated like an employee.  Is that right?

7                   MS. VAUGHN:  Object to form.

8                   THE WITNESS:  I felt that they were --

9     well, they controlled pretty much everything that

10    they did.

11    BY MS. SANTEN:

12             Q.    So you felt you were treated as an

13    employee from day one.  Is that accurate?

14             A.    Like I said, it wasn't as bad at first.

15             Q.    My question was, did you --

16             A.    But it was still there.

17             Q.    My question -- okay.  So my question

18    was, did you feel like you were being treated as an

19    employee day one?

20                  MS. VAUGHN:  Object to form.

21                  THE WITNESS:  I don't know what it --

22    you know, what is all contributing to an employee

23    and what you mean by that.  But it's -- everybody is

24    an employee of somebody, I guess.

25    BY MS. SANTEN:

Page 317

1          Q.    And you're contending that Perdue pretty

2     much controlled everything.   Is that right?

3          A.    Other than when I went to bed.

4          Q.    Okay.   When did that start?   When did

5     they start pretty much controlling everything?

6          A.    I just -- I said twice now that it

7     started, unlike any other integrator I had, from day

8     one, but got worse when I thought I was helping and

9     telling them that I was getting -- you know, the

10    trailers were not -- those numbers that they were

11    counting as my weight was not my trailer.

12         Q.    And that was 2015 timeframe?

13         A.    In that timeframe, yeah.

14         Q.    Okay.   Did that impact your settlement

15    at that time?   The trailer weight issue, did that

16    impact how you got paid?

17         A.    Well, you know, I'm sure it did.   I

18    mean, if I have got somebody else's chickens from

19    another farm that was not my chickens that I grew, I

20    don't know where my chickens went.   So there is

21    another farmer that apparently -- I don't -- I don't

22    how they did that.   I don't know why they did that.

23         Q.    Did that result in you getting less

24    money?   Is that right?

25         A.    There again, I don't know what -- I

Page 318

1    don't know the weights.  I don't know anything.  I
2    don't know how they did it.  I don't know why they
3    did it.  I don't know the purpose for changing
4    trailers, as far as me getting somebody else's
5    trailer.
6         Q.   But do you believe that that damaged you
7    financially?
8         A.   Yeah.  I mean, I know that I had
9    growouts that I had disagreements, and I never --
10   and I growed since I was nineteen years old, I never
11   said anything about a growout to any integrator
12   until that -- until that one.  That was actually
13   eventually turned to USDA.  And USDA, they -- Perdue
14   did not want USDA to come and investigate it and
15   gave me $8,000.
16        Q.   Okay.  Let's go back to -- I'm going to
17   help here.  Let's go back to your breach of contract
18   claim.
19             Go to page 23 in your complaint.  Okay.
20   So here it seems -- and I don't want to put words in
21   your mouth, but I'm trying to figure out when all
22   this happened and why.  Paragraph 114, "Perdue
23   breached Parker's agreement by failing to treat him
24   as an independent contractor or allowing him to
25   utilize his independent judgment and skill."

Page 320

1    before and allowed you to use independent judgment

2    and skill before that?

3                   MS. VAUGHN:  Object to form.

4                   THE WITNESS:  As far as the

5    independence, it wasn't -- like I said, it was -- I

6    have said it before, it was never there in

7    comparison to where I had grown for other

8    integrators as 1099 employees.

9    BY MS. VAUGHN:

10          Q.   Do you believe Perdue ever allowed --

11   ever allowed you to use your independent judgment

12   and skill in the performance of your work?

13                  MS. VAUGHN:  Object to form.

14                  THE WITNESS:  Independent judgment and

15   skill.  They pretty much controlled everything, so I

16   don't guess.

17   BY MS. SANTEN:

18          Q.   So do you believe they ever allowed you

19   to use your independent judgment and skill --

20                  MS. VAUGHN:  Object to form.

21   BY MS. SANTEN:

22          Q.   -- the entire time you were a grower?

23                  MS. VAUGHN:  Object to form.

24                  THE WITNESS:  There again, compared to

25   other integrators that I have grown to -- that I had

Page 321

1    grown for, it was totally different in how they

2    treated and how they managed on a daily --

3    BY MS. SANTEN:

4          Q.   My question was, do you believe Perdue

5    ever allowed you to use your independent judgment

6    and skill when performing services for them at any

7    time, or did they never do that?

8                MS. VAUGHN:  Object to form.

9                THE WITNESS:  I guess not, not totally.

10   BY MS. SANTEN:

11         Q.   And that started in the beginning?

12         A.   Like I said, it was different from the

13   beginning, yes.

14         Q.   Okay.  Did Perdue subject -- in your

15   opinion, subject you to supervision over everything

16   from the beginning?

17               MS. VAUGHN:  Object to form.

18               THE WITNESS:  Supervision, they

19   supervise every aspect of it, yes.

20   BY MS. SANTEN:

21         Q.   And in what ways do you believe they

22   supervised you that led you to believe you were not

23   an independent contractor?

24         A.   Well, you want me to go through the

25   list?

Page 332

```
1              MS. VAUGHN:  Object to form.
2    BY MS. SANTEN:
3         Q.   All right.  Thank you.
4              We talked about negligent
5    misrepresentation.  Can you explain to me in what
6    ways you think Perdue misrepresented the
7    relationship?
8              MS. VAUGHN:  Object to form.
9              THE WITNESS:  I don't know, really, how
10   to answer that.
11   BY MS. SANTEN:
12        Q.   Okay.  What damages are you seeking in
13   this lawsuit?
14             MS. VAUGHN:  Object to form.
15             THE WITNESS:  I don't.  I don't
16   understand.
17   BY MS. SANTEN:
18        Q.   What relief are you seeking in this
19   lawsuit?  What money are you looking for?
20        A.   I haven't -- I haven't requested money,
21   that I know of.
22        Q.   So you don't believe you're seeking any
23   money from Perdue?
24        A.   I haven't asked for an amount.
25        Q.   What are you seeking in this lawsuit?
```

Page 333

1    Are you seeking to recover any money?

2          A.   No.  I'm seeking to help other farmers

3    not to go through what I went through.

4          Q.   So is it your testimony that you're not

5    asking Perdue for any money in this lawsuit?

6              MS. VAUGHN:  Object to form.

7              THE WITNESS:  I'm not saying that that

8    may not happen.  I'm not saying it won't happen, it

9    will or it won't, but it's not my goal.

10   BY MS. SANTEN:

11         Q.   Well, what money are you seeking from

12   Perdue?  What are you looking for in this lawsuit?

13         A.   I just said I'm not asking -- I haven't

14   asked for a dollar figure.  I'm asking for other

15   farmers to not have to go through what I went

16   through because it was not right.

17         Q.   What is your understanding of what

18   relief you're seeking in this lawsuit?

19         A.   What you do mean?  I told you.  I have

20   answered this three times.

21         Q.   Are you asking for overtime?  Are you

22   asking for unpaid benefits?

23         A.   I'm not -- I haven't -- I haven't put --

24         Q.   What are you asking for?

25         A.   I haven't put a number --

Page 334

1              MS. VAUGHN:  Object to form.
2     WITNESS CONTINUES:
3          A.    -- on that.  That was not my goal.
4          Q.   Well, is it your testimony, then, that
5     you're not asking for any money in this lawsuit?
6              MS. VAUGHN:  Object to form.
7              THE WITNESS:  It's not my testimony of
8     anything one way or the other on finances.  I
9     don't -- I'm not -- I'm not seeking -- it's not my
10    goal.
11    BY MS. SANTEN:
12         Q.   So are you not asking for any money?
13    I'm just trying to understand.
14         A.   I just told you.
15             MS. VAUGHN:  Object to form.
16    BY MS. SANTEN:
17         Q.   Okay.  So it looks -- if you go to page
18    26, this is the complaint that your lawyers filed on
19    your behalf.
20         A.   Okay.
21         Q.   It says, paragraph D, "Punitive
22    Damages."  There's a number of things listed, so I'm
23    just trying to understand what you're asking for as
24    part of this lawsuit.
25         A.   I don't have a number, if that will help

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 335

1    you.
2              Q.   Are you asking for money as part of this
3    lawsuit?
4              A.   I'm not -- I'm not saying that.  I'm
5    just saying I have told you the same answer four
6    times, and I'm trying to get you to see that that's
7    not my goal.
8              Q.   Well, I'm asking, are you not asking for
9    any money at all?
10             A.   This -- yeah.  I mean, I know I was done
11   wrong financially so -- I mean, that's not my
12   decision though.
13             Q.   But what are -- so what are you trying
14   to get in this lawsuit, that's what I'm asking you,
15   money?
16             A.   I want to help other farmers not go
17   through what I went through.
18             Q.   So what money are you asking for in this
19   lawsuit?
20             A.   I don't have a dollar figure, and I said
21   that.
22             Q.   Do you understand that you're seeking
23   overtime compensation as part of this lawsuit?
24             A.   It may be, but I'm not putting a number
25   on it.  I don't have that.

Page 337

1          A.   It's hard to -- you know, they -- things

2     weren't right.  I don't -- I can't understand -- I

3     don't understand damage and I don't understand

4     monetary, you know, this or that.  I just know that

5     things weren't right.

6          Q.   Okay.  So sitting here today you're not

7     able to tell me what money you're looking for from

8     this lawsuit?

9               MS. VAUGHN:  Object to form.

10              THE WITNESS:  I don't have dollar

11    figures, no.

12    BY MS. SANTEN:

13         Q.   Okay.  And sitting here today you're not

14    able to identify any other paragraph in your

15    contracts that you believe Perdue breached?

16              MS. VAUGHN:  Object to form.

17    BY MS. SANTEN:

18         Q.   And take your time.  This is not a --

19         A.   I don't -- where are we at now?  Are we

20    going back to the other thing?

21         Q.   No.  You have a breach of contract

22    claim, so I'm just trying to be sure I understand

23    every single paragraph you think Perdue breached.

24         A.   I don't have the answer to that because

25    I basically shared the story and, you know, with my

Page 338

1      attorneys, and they would have known what was

2      breached and what wasn't breached, not me.  I mean,

3      I don't know all that.

4              Q.  Well, then let's go in here.  Did you

5      review this complaint before it was filed?

6              A.  Yes, ma'am.

7              Q.  Okay.  So let's go back to the paragraph

8      of breach of contract just to make sure I understand

9      it all.

10             A.  But understanding everything a lawyer

11     wrote is different than reading something.

12             Q.  This was filed on your behalf, sir, so

13     I'm just trying to understand.

14             A.  I understand that.

15             Q.  Okay.  So we talked about 114.  We

16     talked about 115.  Do you believe that --

17             A.  114.

18             Q.  Okay.  So you say:  "Perdue, in breach

19     of the contract" -- this is paragraph 117 -- "Perdue

20     refused to provide Parker with accurate information

21     used to determine his compensation."  When did that

22     first happen?

23             A.  Let's see.  Now, 114, is that what you

24     said?

25             Q.  117.

Page 339

1          A.    Oh.   My bad.

2          Q.    "In breach of the contract, Perdue

3     refused to provide Parker with accurate information

4     used to determine Parker's compensation."  When did

5     that first happen?

6          A.    Yeah.  The pay seemed to be off.  And I

7     requested -- because the system they have, it is

8     impossible almost for a grower to figure because

9     you're going between feed, you're going between

10    amount of birds you get, and you're going between

11    type birds you get.  And then, you know, how many

12    days you grow versus someone else, but you're

13    supposed to compete with someone else and you get

14    money taken away from you.  And I -- I have tried to

15    get an understanding of how everything worked and

16    requested that I get information that I could figure

17    myself.

18         Q.    When did you first request that

19    information?

20         A.    That was -- Lord, that was probably in

21    2017, 2016, just guessing.

22         Q.    And so you believe the first time you

23    requested that information was 2017 or 2016, and

24    Perdue didn't give it to you.  Is that right?

25         A.    Well, they even -- they tried but it

Page 340

1      was -- it wasn't -- they couldn't because there was

2      too many factors.

3              Q.   My question is, was that the first time

4      that happened?  You have here that you believe they

5      breached the contract -- and I'm just right in your

6      complaint -- when they refused to provide you with

7      accurate information.  Is the first time that

8      happened 2016 or 2017?

9                   MS. VAUGHN:  Object to form.

10                  THE WITNESS:  It's in that timeframe.  I

11     just don't know when.  But if they couldn't show me

12     how to do it, how do they do it was my question.

13     BY MS. SANTEN:

14             Q.   Do you believe that Perdue breached the

15     contracts when allowing flock advisors to come onto

16     your farm?

17             A.   No.

18             Q.   Okay.  You indicate here that Perdue

19     didn't provide you with sufficient inputs for

20     raising chickens.  When do you believe that started?

21             A.   Say that again now.  They wouldn't --

22             Q.   Wouldn't provide you with sufficient

23     inputs for raising chickens.  When do you believe

24     that started?

25             A.    Inputs.  What number are we looking at?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 341

1          Q.    118.

2          A.    Well, that would be feed.  Birds.  Let

3    me think.  2000 -- when I started noticing things,

4    2016-ish.  I'm just -- I'm just guessing that

5    timeframe, really, because I don't really know the

6    exact date.

7          Q.    And is it your testimony that before

8    2016 Perdue provided sufficient inputs for you at

9    all times?

10         A.    Do what now?

11         Q.    Do you believe, prior to 2016, Perdue

12   did provide sufficient inputs to you at all times?

13         A.    I really don't know.  I don't know how

14   to -- it's just when I started realizing -- you

15   know, when I saw it, feed that they said was there

16   wasn't there.  You know, I can't -- it's just --

17   it's just things I started noticing.

18         Q.    And do you believe Perdue subjected you

19   to mandatory guidelines the entire time you were a

20   grower?

21         A.    I mean, yeah, the guidelines were

22   mandatory.  I don't think they were optional.

23         Q.    Okay.  And that started in 2006?

24         A.    Yes, ma'am.

25         Q.    Okay.  So in paragraph 119 you say:  "As

Page 360

1              THE COURT REPORTER:  I'm sorry.  Can you
2      say your answer again?
3              THE WITNESS:  Not when getting the
4      contract.  Sorry.
5      BY MS. VAUGHN:
6         Q.   And were the specific upgrades and
7      requirements more than you had expected when you
8      signed the contract?
9              MS. SANTEN:  Objection, vague.
10             THE WITNESS:  They was continually
11      adding things to do.  But no, I didn't expect it,
12      no.
13      BY MS. VAUGHN:
14         Q.   And when you say they were continually
15      adding things, were you referring to upgrades and
16      equipment they wanted you to have?
17         A.   Yes.
18         Q.   And when you say they were continually
19      adding things, was that over the course of your
20      relationship with Perdue or just in a specific time
21      period?
22         A.   No.  It started a couple months after I
23      bought the first farm.  Then they immediately had
24      to -- had to put in the cool cells and stuff.
25         Q.   How about after you called USDA, did the

Page 361

1    upgrades and equipment that they were requiring

2    change after that point?

3            A.    After USDA the -- they had given me a

4    quite extensive list of things they wanted done.

5            Q.    And was that list consistent with your

6    expectations on what they would require based on

7    your prior work with them, or was it different?

8                 MS. SANTEN:    Objection, vague.

9                 THE WITNESS:    No.  It was a good bit

10   different.

11   BY MS. VAUGHN:

12           Q.    In what way?

13           A.    It was thousands of dollars of stuff

14   that all of a sudden they wanted done.  And, you

15   know, and instead of normally allowing you time to

16   do that, I had no time.

17   BY MS. VAUGHN:

18           Q.    Let's turn to -- in this contract still

19   in Exhibit 23 from May 2007, if you could turn,

20   Mr. Parker, to the second page which, at the bottom,

21   says 2454.

22           A.    2454?

23           Q.    Uh-huh.

24           A.    Okay.  These are turned upside down.

25           Q.    It's in the same contract we were just

Page 362

1    in.

2              A.    Okay.   My bad.   2454.

3              Q.    The second page.

4              A.    Okay.   I thought we were changing

5    contracts.   Okay.   My bad.

6              Q.    All right.   And do you see the section

7    III there at the bottom that says "Other Terms"?

8              A.    Yes, ma'am.

9              Q.    All right.   And do you see letter A

10   under section III?

11             A.    Yes, ma'am.

12             Q.    Do you see where it says:   "Producer

13   shall perform the services hereunder using Perdue's

14   established procedures?"   Do you see that there?

15             A.    I do.

16             Q.    Now, at the time that you were given

17   this contract to sign were all of Perdue's

18   procedures laid out in this contract?

19             A.    I'm trying to think.   I don't think so.

20   I don't see that.

21             Q.    For example, did Perdue tell you the

22   specific temperature you had to keep your houses on?

23             A.    That was a continual change, different

24   temperatures, and every time -- yeah, that would

25   change all the time.

Page 363

1          Q.   And at the time you signed your first
2    contract with Perdue when they presented this
3    contract to you, did you expect that Perdue would
4    tell you specifically what sort of temperature, what
5    sort of lighting and things you had to have in your
6    houses?
7          A.   I never experienced that before, no.
8          Q.   And all of the requirements that Perdue
9    put on you, were they in other documents that Perdue
10   gave you over the years?
11         A.   Say at that again, please.
12         Q.   All the requirements that Perdue put on
13   you, were they in other documents that Perdue gave
14   you over the years?
15              MS. SANTEN:  Objection, vague.
16              THE WITNESS:  I don't -- I don't know.
17   I don't -- I don't think so.  I think the contracts
18   were different than -- they didn't really have some
19   of the things in it that they required.
20   BY MS. VAUGHN:
21         Q.   The contracts didn't have some of the
22   requirements in them?
23         A.   Right.
24         Q.   So when -- strike that.
25              Were there documents called, like,

Page 364

1    "never dos" and "always dos"?

2            A.    Yeah.  I think there were three of

3    those, never do, sometimes, and -- there was three

4    of them, anyway, and I can't remember them.

5            Q.    And did those documents have additional

6    requirements you had to follow under Perdue?

7                  MS. SANTEN:  Objection, vague.

8                  THE WITNESS:  Yeah.  I would have to

9    look at those again to -- to remember exactly what

10   they were.  But I do remember that was -- they had a

11   list of never dos, you know, and I remember that

12   list.

13   BY MS. VAUGHN:

14           Q.    And those lists, the never dos, that's

15   different from the contract you signed?

16                  MS. SANTEN:  Objection, vague.

17                  THE WITNESS:  It is.

18   BY MS. VAUGHN:

19           Q.    How about bio-security rules?  Did the

20   contracts lay out all of the specific bio-security

21   rules you had to follow?

22           A.    No.

23           Q.    Were those given to you in other

24   documents?

25           A.    Yeah.

Page 368

1     there.

2                A.   Exhibit 22.   Okay.   Thank you.

3                Q.   And it looks like there's two stapled

4     packets in Exhibit 22.   Is that what you have, two

5     different stapled packets?

6                A.   Statement?   That one?

7                Q.   Yes.   Okay.

8                So let's talk about the one that has the

9     Bates number at the bottom Parker 2551.

10               A.   Okay.

11               Q.   Do you see that one?

12               A.   Yes, ma'am.

13               Q.   All right.   And does this appear to be a

14    letter from Kathryn Mizell to you?

15               A.   It does.

16               Q.   And who was Kathryn Mizell?

17               A.   She was, like, over the flock

18    supervisors.   She was like a superintendent.

19               Q.   Okay.   And do you see here that this is

20    dated October 16, 2018?

21               A.   Yes.

22               Q.   Okay.   That's toward the end of your

23    time growing for Perdue?

24               A.   It was.

25               Q.   All right.   And about halfway down the

Page 369

1        page Ms. Mizell says:  "To be compliant with the

2        Poultry Producer Agreement, you need to complete the

3        following prior to the next placement is scheduled."

4        Do you see that?

5               A.   Yes.

6               Q.   All right.  And do you see a numbered

7        list there?

8               A.   I do.

9               Q.   So something like number 4:  "All

10       propane tanks are 70% full," is that a requirement

11       that Ms. Mizell put on you in 2018?

12              A.   Yes.  I had never seen that before.

13              Q.   That was a new requirement?

14              A.   It was.

15              Q.   All right.  You can put that aside.

16                   All right.  Going back for a moment to

17       Exhibit 23, and back to this December 2016 contract

18       with the Exhibit 4 sticker on the bottom --

19              A.   Okay.

20              Q.   -- and that's Bates Perdue 2295.  Are

21       you there?

22              A.   Yes.

23              Q.   Okay.  Turn to the third page in this

24       agreement from 2016.  And at the top there is a

25       letter N.  Do you see that on the Bates 2297?

Page 371

1     questions?

2            A.    "Inputs" meaning --

3            Q.    The feed, the medications.

4            A.    Okay.

5            Q.    The birds.  Do you remember those

6     questions?

7            A.    Yes.

8            Q.    At some point did you receive feed from

9     Perdue that had concrete chunks in it?

10           A.    I did.

11           Q.    And was that before or after you called

12    USDA?

13           A.    It was after.  If my memory serves me

14    right, I'm pretty sure.  Oh, yeah, it was after.

15           Q.    And in response to Ms. Santen's

16    questions about what your legal claims are in this

17    case, you noted that you're not a lawyer, so I want

18    to follow up on that for a minute.  Do you know the

19    legal definition of "negligent misrepresentation"?

20           A.    No.

21           Q.    So can you answer a question of when

22    Perdue may have legally negligently misrepresented

23    something?

24           A.    Well, not really.  I don't understand

25    the indepth of that.  I don't quite understand it.

Page 372

1          Q.   Do you know the legal definition of
2     "independent contractor" or -- do you know the legal
3     definition of "independent contractor"?
4          A.   Not legal, no.
5          Q.   Do you know the legal definition of an
6     employee?
7          A.   Not legally.
8          Q.   So can you answer a question of whether,
9     under the law, you were properly classified as an
10     independent contractor?
11               MS. SANTEN:   Object to form.
12               THE WITNESS:   No.
13     BY MS. VAUGHN:
14          Q.   Ms. Santen asked you if you had stated
15     in your deposition, today and yesterday, all of the
16     allegations that support your claims.   Do you
17     remember those questions?
18          A.   I do.
19          Q.   Mr. Parker, are you aware that the
20     parties have exchanged lots of documents in this
21     case?
22          A.   No.   But I'm assuming they did, but I
23     don't know what they are.
24          Q.   Have you reviewed some documents in this
25     case?

Page 374

1          Q.    Ms. Santen asked you about money or
2    financial damage that you suffered by Perdue.  Do
3    you remember those questions?
4          A.    Say that again.  I'm sorry.
5          Q.    Ms. Santen asked you about financial
6    damages you suffered from Perdue.  Do you remember
7    those questions?
8          A.    Yes.
9          Q.    At some point did Perdue tell you they
10   wouldn't place any more chickens on your farm?
11         A.    They did.
12         Q.    And at some point did Perdue also give
13   you a list of requirements for you to be able to
14   sell your farm?
15         A.    Yes.
16         Q.    Were you able to sell your farm if
17   Perdue refused to give the buyer a contract?
18         A.    On the other one, yeah.
19               I'm sorry.  Say that one more time.
20         Q.    Were you able to sell your farm if
21   Perdue refused to give the buyer a contract?
22         A.    Yes.
23         Q.    You were able --
24         A.    No, I wasn't.
25         Q.    -- to sell your farm?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 375

1          A.    No, I was not able to sell it unless I
2      had a contract.
3          Q.    And what happened to the Milledgeville
4      farm when you didn't have a contract on it?
5          A.    Well, are you talking about to sell it
6      or --
7          Q.    Yeah.
8          A.    I had to have a contract with Perdue, or
9      the houses are really worthless without a working
10     contract.
11         Q.    And did you try to sell it?
12         A.    I did.
13         Q.    Were you able to?
14         A.    No.  The upgrades that were required by
15     them -- actually, the realtor told me he had never
16     seen a list like it before.  But it was so
17     indepth -- if I remember, the quote was almost a
18     half million dollars, and they would not even
19     guarantee that.  Said it would be higher.  That was
20     a starting point for everything that was on the
21     list.
22         Q.    All right.  And I want to ask you some
23     things about what Ms. Santen asked you yesterday.
24              So first, Ms. Santen asked you early
25     yesterday about some things you did to prepare for

Page 403

1          A.   No.  I said another farmer said,
2     "Uh-oh."  And I heard him say that at one of the
3     meetings when he saw that I had him.  I don't even
4     know the guy's name.
5          Q.   Are you aware of any other growers who
6     Bradley gave more requirements -- or who Bradley
7     treated differently than you -- treated more
8     leniently than you?
9          A.   Well, from hearing this girl from South
10    Georgia talk, they had been in situations where he
11    was.  I'm not personally familiar with him, but
12    other growers were.
13         Q.   Okay.  So you have no personal knowledge
14    of --
15         A.   I do not, no.
16         Q.   Okay.  When is the first time Perdue
17    gave you worse inputs if you raised tare weights?
18         A.   I'm sorry.  I didn't hear that.
19         Q.   Your counsel asked about Perdue giving
20    you worse inputs if you raised tare weights.  Do you
21    recall that?
22         A.   Worse inputs.  I'm trying to get an
23    understanding of what that means.  Or what do you
24    mean by "worse inputs"?
25         Q.   Well, you answered the question before

Page 405

1     inputs that we are talking about.  And demands were

2     all of a sudden escalated and, you know, things all

3     the way across, growing for them, seemed to

4     multiply.

5             Q.    Okay.  And is it your testimony that you

6     were never subject to those inputs or demands before

7     this time period?

8             A.    No.  Not this way, no.

9             Q.    Okay.  What additional requirements did

10    Perdue put on you after you called USDA?

11            A.    Like I said, I have all these upgrades.

12    I have got things to -- you know, all of a sudden I

13    went from being able to -- they would give -- when a

14    farmer, instead of the bird suffering, they would

15    help farmers by giving them interest-free loans and

16    help them put in water lines and feed lines.  But

17    all of a sudden that was cut off after telling me

18    that -- telling me that I could have it.

19                  I wasn't treated as other farmers were

20    treated with that.

21                  And the excuse was I didn't put in my

22    water lines, when I did put in my water lines.  I

23    just couldn't afford a $6,000 bill.

24                  But prior to that it wasn't that.  It

25    was until I paid the loan off.  So those things --

Page 406

1          Q.    Okay.  So other than water lines, what

2     else?

3          A.    So those things.  The general oversight

4     was higher.  The field man was on me more.  He is

5     taking pictures that I have never seen done before.

6          Q.    Are you aware of the field man taking

7     pictures of any other grower?

8          A.    No.

9          Q.    Do you know, one way or the other,

10    whether he took pictures of any other grower?

11         A.    I have never had a field man take

12    pictures at my house.

13         Q.    Do you know of the amount of oversight

14    he was exercising over other growers?

15         A.    I don't know about other growers.

16         Q.    All right.  What else?

17         A.    I don't know.  It was obvious that I was

18    being, in my opinion, run out of business.  I had --

19         Q.    I'm asking you what specific things you

20    were subject to that other growers were not.

21              MS. VAUGHN:  Object to form.

22              THE WITNESS:  That I was -- I just went

23    through a few of them.

24    BY MS. SANTEN:

25         Q.    Anything else?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                        Page 407

1              A.   I mean that -- like I said, I went
2      through a few there.  I'm really trying to think.
3                   I have had them -- they showed up all of
4      a sudden.  Well, they showed up at catch more than I
5      had ever seen them before.
6              Q.   Are you aware of whether they showed up
7      at catch for other growers more than they showed up
8      for you at that point or the same amount?
9              A.   The only thing I know, I hadn't seen
10     them before during catch.  I guess that's it.
11             Q.   Okay.  Thank you.
12             A.   I'm sure I can think of something.  I
13     just can't think of it now.
14             Q.   When I asked you at length to discuss
15     all the facts that you believe support your claims,
16     you said that's all you could think of.  And your
17     counsel asked and said there are various
18     documents -- you said there are various documents
19     and emails.  Sitting here today, what documents or
20     emails do you believe support your claims?
21                  MS. VAUGHN:  Object to form.
22                  THE WITNESS:  I don't have all of them
23     that y'all have shared with each other, so I
24     don't -- it would be hard for me to --
25     BY MS. SANTEN:

30(b)(6) Roger Dale Parker , Vol. II                          April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 408

1          Q.   Well, which specific ones are you

2     referring to so I know?

3          A.   I don't know because I hadn't seen them.

4          Q.   Thank you.  That's good.

5               You talked about the never dos and

6     always dos.  Is that a Perdue-established procedure?

7               MS. VAUGHN:  Object to form.

8               THE WITNESS:  Then when I say I hadn't

9     seen, I hadn't seen what y'all shared.  That's what

10    I'm mean by that.

11    BY MS. SANTEN:

12         Q.   But I'm asking you to identify any

13    specific documents or emails.  You said you can't

14    today.  Is that right?

15         A.   I have seen --

16              MS. VAUGHN:  Object to form.

17              THE WITNESS:  I have seen, I think, all

18    the documents.  But, you know, I can't -- you know,

19    I don't know that I have.

20    BY MS. SANTEN:

21         Q.   Well, you can't name a specific

22    document, sitting here today?

23         A.   No, no, I can't name a specific one.

24         Q.   Okay.  I asked, the never dos and always

25    dos, is that a Perdue-established procedure?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 409

1              MS. VAUGHN:  Object to form.

2              THE WITNESS:  Yes, that I -- as far as

3     my knowledge, it is.

4     BY MS. SANTEN:

5          Q.   The different requirements that your

6     counsel asked you about, are those

7     Perdue-established procedures?

8              MS. VAUGHN:  Object to form.

9              THE WITNESS:  I don't -- as far as I

10    know, they control everything, yeah.

11    BY MS. SANTEN:

12         Q.   Okay.  So I have a few more questions

13    and then I'm done.

14         A.   It's all good.  It almost home time.

15         Q.   That's right.

16              Okay.  Did anyone with Perdue ever tell

17    you that you had to use First Financial Bank to

18    finance?

19              MS. VAUGHN:  Object to form.

20              THE WITNESS:  No.  I feel led that way,

21    though.

22    BY MS. SANTEN:

23         Q.   But no one told you that you had to use

24    them or you wouldn't be under contract with Perdue.

25    Correct?

# Errata and Acknowledgment of Deponent

*Parker v. Perdue Foods, LLC*, No. 5:22-cv-00268-TES

Deposition of Parker's Poultry Equipment and Plaintiff Roger Dale Parker, Vol. II
Deposition taken: April 24, 2025

| Page: | Line: | Reads Now: | Should Read: | Reason |
|-------|-------|------------|--------------|--------|
| 311 | 6 | "They misrepresented," | "They misrepresented—" | Typographical error |
| 324 | 25 | "trying to my" | "trying my" | Transcription error |
| 339 | 7 | "because the" | "because of the" | Transcription error |
| 339 | 11 | "type birds" | "type of birds" | Transcription error |
| 351 | 22 | "was the one that got rid of growers and was what" | "he was the one that got rid of growers was what" | Transcription error |
| 356 | 24 | "James North." | "James Norris." | Transcription error |
| 357 | 6 | "the day he told me that." | "that day if he'd told me that" | Transcription error |
| 371 | 25 | "indepth" | "in-depth" | Typographical error |
| 375 | 17 | "indepth" | "in-depth" | Typographical error |
| 399 | 20 | "1499s (sic)" | "1099s" | Misstatement |
| 414 | 19 | "crashed on the one that carries years ago" | "crashed, the one that carries those, years ago" | Transcription error |

*/s/ Roger Dale Parker* *                          _____ May 29, 2025 _____
Roger Dale Parker (*with permission)

# FARM ONLY BALANCE SHEET

| Name: | Roger D. & Linda G. Parker |
|---|---|
| Date: | 6/11/2013 |

| Current Assets | Account No. | Current Value | | Current Liabilities Due (less than one year) | | | |
|---|---|---|---|---|---|---|---|
| | | | | Creditor | Mo. Pmt | Rate | Balance |
| Checking/Savings/Cash | | | | | | | |
| Savings | | | | | | | |
| Earnest Money | | | | | | | |
| Stocks, Bonds, Mutual Funds, etc. | | | | | | | |

| Livestock & Commodities for Sale & Feed | | | | | | | |
|---|---|---|---|---|---|---|---|
| Description | No. | Unit Value | Total | | | | |
| Calves | 6 | $600 | $ 3,600.00 | | | | |
| Hay-rolls | 0 | $0 | $ – | | | | |
| Hay-square | 0 | $0 | $ – | Operating Loans | Due Date | Rate | Balance |
| Feed & grain on hand | | | $ – | | | | |
| Investments in growing crops | | | | | | | |
| Supplies on hand | | | | | | | $ – |
| | | | $ 3,600.00 | | | | $ – |

| Long Term Assets | | Current Value | | Intermediate Liabilities (1 to 7 years) | | | Balance |
|---|---|---|---|---|---|---|---|
| Breeding Livestock | No. | Unit Value | Total Value | Lender | Collateral | Due | Ann. Pmt | Rate | Balance |
| Cows | 20 | $1,200 | $ 24,000.00 | FFB | farm | a | $7,361 | | $ 23,659.00 |
| Bulls | 1 | $2,000 | $ 2,000.00 | FFB | unsec. | a | $3,742 | | $ 7,076.00 |
| Personal Vehicles | | | | | | | | | |
| Farm Equipment & Machinery | | | $ 42,000.00 | | | | | | |
| Tools and equipment | | | $ 85,000.00 | | | | | | |
| Camper | | | | | | | | | |
| ATV | | | | | | | | | |
| Securities | | | $ – | | | | | | |
| Retirement accounts, IRA, 401k, etc | | | $ – | | | | | | |
| Household Goods | | | $ – | | | | | | |
| | | | $ 153,000.00 | | | | | | $ 30,735.00 |

| Real Estate | | Present Value | | Long Term Liabilities (over 7 years) | | | | | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Description | | Present Value | | Lender | Collateral | Due | Ann. Pmt | Rate | Balance |
| 102 acres, 4 broiler houses, & home | | $ 1,135,000.00 | | FFB | farm | a | $117,470 | | $ 843,429.00 |
| 24 acres, MH, & 6 broiler houses | | $ 935,000.00 | | FFB | farm | a | $99,537 | | $ 843,585.00 |
| | | | | FFB | farm | a | $13,560 | | $ 76,310.00 |
| Non Farm Business | | | | | | | | | |
| Other Real Estate | | | | | | | | | |
| | | | | Total Long Term Liabilities | | | | | $ 1,763,324.00 |
| Total Real Estate Assets | | $ 2,070,000.00 | | Total Liabilities | | | | | $ 1,794,059.00 |

| Owners Equity | 19% | Debt/Worth Ratio | 4.15 |
|---|---|---|---|

| | 6/11/2013 | | 6/11/2013 |
|---|---|---|---|
| Signature | Date | Signature | Date |



FFB00307

# PERSONAL BALANCE SHEET

| Name: | Roger D. & Linda G. Parker |
|---|---|
| Date: | 6/11/2013 |

| CURRENT ASSETS - BOOK VALUE | | PRESENT VALUE | | CURRENT LIABILITIES - DUE WITHIN ONE YEAR | | | |
|---|---|---|---|---|---|---|---|
| Checking/Savings/Cash | | $ | 25,000.00 | Creditor | Mo. Pmt | Rate | Balance |
| Savings | | | | Credit cards | $337 | | $ 21,654.00 |
| Earnest Money | | | | | | | |
| Stocks, Bonds, Mutual Funds, etc. | | | | | | | |
| | | | | | | | |
| *Livestock & Commodities for Sale & Feed* | | | | | | | |
| Description | No. | Unit Value | Total | | | | |
| Calves | 6 | $600 | $ 3,600.00 | | | | |
| Hay-rolls | 0 | $0 | $ - | | | | |
| Hay-square | 0 | $0 | $ - | Operating Loans | Due Date | Rate | Balance |
| Feed & grain on hand | | | | | | | |
| Investments in growing crops | | | | | | | |
| Supplies on hand | | | | | | $ - |
| **TOTAL CURRENT ASSETS** | | $ | 28,600.00 | **TOTAL CURRENT LIABILITIES** | | | $ 21,654.00 |

| FIXED ASSETS - BOOK VALUE | | | | LONG TERM LIABILITIES - DUE IN 1-10 YEARS | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Breeding Livestock | No. | Unit Value | Total Value | Lender | Collateral | Due | Ann. Pmt | Rate | Balance |
| Cows | 20 | $1,200 | $ 24,000.00 | FFB | farm | a | $7,361 | | $ 23,659.00 |
| Bulls | 1 | $2,000 | $ 2,000.00 | FFB | unsec. | a | $3,742 | | $ 7,076.00 |
| | | | | Ally | truck | m | $12,048 | | $ 36,400.00 |
| Personal Vehicles | | | $ 105,000.00 | CULS | auto | m | $7,608 | | $ 36,700.00 |
| Farm Equipment & Machinery | | | $ 42,000.00 | | | | | | |
| Tools and equipment | | | $ 85,000.00 | | | | | | |
| Camper | | | $ 16,650.00 | | | | | | |
| ATV | | | $ 8,000.00 | | | | | | |
| Securities | | | $ - | | | | | | |
| Retirement accounts, IRA, 401k, etc | | | $ - | | | | | | |
| Household Goods | | | $ - | | | | | | |
| **TOTAL FIXED ASSETS** | | | $ 282,650.00 | **TOTAL LONG TERM LIABILITIES** | | | | | $ 103,835.00 |

| LONG TERM ASSETS - BOOK VALUE | | | | LONG TERM LIABILITIES - DUE IN 10+ YEARS | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Description | | | Present Value | Lender | Collateral | Due | Ann. Pmt | Rate | Balance |
| 102 acres, 4 broiler houses, & home | | | $ 1,135,000.00 | FFB | farm | a | $117,470 | | $ 843,429.00 |
| 24 acres, MH, & 6 broiler houses | | | $ 935,000.00 | FFB | farm | a | $99,537 | | $ 843,585.00 |
| | | | | FFB | farm | a | $13,560 | | $ 76,310.00 |
| | | | | | | | | | |
| Non Farm Business | | | | | | | | | |
| Other Real Estate | | | | | | | | | |
| **TOTAL LONG TERM ASSETS** | | | $ 2,070,000.00 | | | | | | $1,763,324.00 |
| | | | | **TOTAL LIABILITIES** | | | | | $1,888,813.00 |

| Owners Equity | 21% | Debt/Worth Ratio | 3.84 |
|---|---|---|---|

| Signature | 6/11/2013 | Signature | 6/11/2013 |
|---|---|---|---|
| | Date | | Date |

## USE OF LOAN PROCEEDS

| Name(s): | Roger D. & Linda G. Parker |
|---|---|
| Date: | 6/11/2013 |

| No./Type of Houses: | 10-40x500 Perdue broilers | Loan A | Loan B | Total |
|---|---|---|---|---|
| Buildings: | | | | $  - |
| Equipment: | Parker's Poultry | $ 187,510 | | $ 187,510 |
| Alarm System: | | $  - | $  - | $  - |
| Pads/Gravel: | | | $  - | $  - |
| Roads/Gravel: | | | $  - | $  - |
| Inside Plumbing & Electric: | | $  - | $  - | $  - |
| Generator Shed: | | $  - | $  - | $  - |
| Generator:  150 KW | | | $  - | $  - |
| Drill Well/Water hook-up fee: | | $  - | $  - | $  - |
| Water Storage/Pumps: | | $  - | $  - | $  - |
| Outside Plumbing & Electric: | | $  - | $  - | $  - |
| Utility Hook-Up (Outside): | | $  - | $  - | $  - |
| Propane/Gas hook-up fee: | | $  - | $  - | $  - |
| Stacking Shed/Composter: | | $  - | $  - | $  - |
| | | $  - | $  - | $  - |
| | | $  - | $  - | $  - |
| Misc: | | $ 9,506 | $  - | $ 9,506 |
| Misc: | | $  - | $  - | $  - |
| | sub-total | $ 197,016 | $  - | $ 197,016 |
| Construction Interest: Estimate | | | | $  - |
| Extraordinary Servicing Fee | 0.25% | $ 2,800 | | $ 2,800 |
| Appraisal | | $ 4,000 | | $ 4,000 |
| Tax Service Fee | | $ 78 | | $ 78 |
| Flood Certification Fee | | $ 22 | | $ 22 |
| SBA Guarantee Fee | | $ 29,270 | | $ 29,270 |
| Survey | | $  - | $  - | $  - |
| Environmental Permits or Fees | | $ 300 | $  - | $ 300 |
| Inspection Fee | | $  - | | $  - |
| 1st years Insurance | | $  - | $  - | $  - |
| 1st years Life Insurance | | $  - | $  - | $  - |
| 1st years Property Taxes | | $  - | $  - | $  - |
| Title Insurance/Attorney/Settlement Fees | | $ 2,500 | | $ 2,500 |
| Recording Fees | | $ 50 | $  - | $ 50 |
| Doc/Deed Stamps | | $  - | $  - | $  - |
| Mortgage Tax | | $ 4,800 | | $ 4,800 |
| Recording Fees | | $  - | $  - | $  - |
| Postage/FedEx/Courier Fee | | $  - | $  - | $  - |
| Future Recording Fees | | $  - | $  - | $  - |
| Misc: | | $  - | $  - | $  - |
| | sub-total | $ 43,820 | $  - | $ 43,820 |
| Purchase: | | $  - | | $  - |
| Refinance | FFB Loan #120027102 | $ 843,429 | | $ 843,429 |
| | FFB Loan #120032768 | $ 23,659 | | $ 23,659 |
| | FFB Loan #120033127 | $ 7,076 | | $ 7,076 |
| | | $  - | $  - | $  - |
| | | $  - | $  - | $  - |
| | sub-total | $ 874,164 | $  - | $ 874,164 |
| | TOTAL | $ 1,115,000 | $  - | $ 1,115,000 |

FFB00309

# PERSONAL BALANCE SHEET

| Name: | Roger D. & Linda G. Parker |
|---|---|
| Date: | 6/11/2013 |

| | | | | | Creditor | Mo. Pmt | Rate | Balance |
|---|---|---|---|---|---|---|---|---|
| Checking/Savings/Cash | | | $ | 25,000.00 | | | | |
| Savings | | | | | Credit cards | $337 | | $ 21,654.00 |
| Earnest Money | | | | | | | | |
| Stocks, Bonds, Mutual Funds, etc. | | | | | | | | |

| Livestock & Commodities for Sale & Feed | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | No. | Unit Value | | Total | | | | |
| Calves | 6 | $600 | $ | 3,600.00 | | | | |
| Hay-rolls | 0 | $0 | $ | - | | | | |
| Hay-square | 0 | $0 | $ | - | Operating Loans | Due Date | Rate | Balance |
| Feed & grain on hand | | | | | | | | |
| Investments in growing crops | | | | | | | | |
| Supplies on hand | | | | | | | | $ - |
| | | | $ | 28,600.00 | | | | $ 21,654.00 |

| Breeding Livestock | No. | Unit Value | Total Value | Lender | Collateral | Due | Ann. Pmt | Rate | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Cows | 20 | $1,200 | $ 24,000.00 | FFB | farm | a | $7,361 | | $ 23,659.00 |
| Bulls | 1 | $2,000 | $ 2,000.00 | FFB | unsec. | a | $3,742 | | $ 7,076.00 |
| | | | | Ally | truck | m | $12,048 | | $ 36,400.00 |
| Personal Vehicles | | | $ 105,000.00 | CULS | auto | m | $7,608 | | $ 36,700.00 |
| Farm Equipment & Machinery | | | $ 42,000.00 | | | | | | |
| ...ols and equipment | | | $ 85,000.00 | | | | | | |
| ...mper | | | $ 16,650.00 | | | | | | |
| ATV | | | $ 8,000.00 | | | | | | |
| Securities | | | $ - | | | | | | |
| Retirement accounts, IRA, 401k, etc | | | $ - | | | | | | |
| Household Goods | | | $ - | | | | | | |
| | | | $ 282,650.00 | | | | | | $ 103,835.00 |

| Description | Present Value | Lender | Collateral | Due | Ann. Pmt | Rate | Balance |
|---|---|---|---|---|---|---|---|
| 102 acres, 4 broiler houses, & home | $ 1,135,000.00 | FFB | farm | a | $117,470 | | $ 843,429.00 |
| 24 acres, MH, & 6 broiler houses | $ 935,000.00 | FFB | farm | a | $99,537 | | $ 843,585.00 |
| | | FFB | farm | a | $13,560 | | $ 76,310.00 |
| | | | | | | | |
| Non Farm Business | | | | | | | |
| Other Real Estate | | | | | | | |
| | $ 2,070,000.00 | | | | | | $1,763,324.00 |
| | | | | | | | $1,888,813.00 |

| Owners Equity | 21% | Debt/Worth Ratio | 3.84 |
|---|---|---|---|

| 6/11/2013 | | 6/11/2013 |
|---|---|---|
| ...nature | Date | Signature | Date |

FFB00310

# GLOBAL PROJECTED CASH FLOW

| Name(s): | Roger D. & Linda G. Parker |
|---|---|
| Date: | 6/11/2013 |

| CASH OPERATING EXPENSES | % OF EXPENSES TO TOTAL INCOME | TOTAL PLANNED EXPENSES | |
|---|---|---|---|
| Car & Truck expenses | 0.00% | $ | - |
| Chemicals | 0.00% | $ | - |
| Conservation Expenses | 0.00% | $ | - |
| Custom Hire (Machine) | 0.00% | $ | - |
| Depreciation | 26.66% | $ | 140,000 |
| Employee Benefit | 0.00% | $ | - |
| Feed Purchased | 0.00% | $ | - |
| Fertilizers & Lime | 0.00% | $ | - |
| Freight & Trucking | 0.00% | $ | - |
| Gasoline, Fuel, & Oil | 3.81% | $ | 20,000 |
| Insurance | 2.00% | $ | 10,500 |
| Interest | 18.09% | $ | 95,000 |
| Hired Labor | 7.62% | $ | 40,000 |
| Pension & Profit Sharing | 0.00% | $ | - |
| Rent or Lease | 0.00% | $ | - |
| Repairs & Maintenance | 6.67% | $ | 35,000 |
| Seed & Plants Purchased | 0.00% | $ | - |
| Storage & Warehousing | 0.00% | $ | - |
| Supplies Purchased | 4.29% | $ | 22,500 |
| Taxes | 1.43% | $ | 7,500 |
| Utilities/Propane | 14.28% | $ | 75,000 |
| Veterinary & Breeding | 0.00% | $ | - |
| Misc/Other | 4.29% | $ | 22,500 |
| Family Living Expense | 3.43% | $ | 18,000 |
| Exp/GFI | 44.38% | $ | 486,000 |

## Financial Summary of Typical Years Operation

| | | | |
|---|---|---|---|
| Non-Farm Income | | | - |
| Business Income | 2011 gross income | $ | 22,401 |
| Poultry Income | 2-yr. avg. on 10 existing houses | $ | 525,040 |
| Total Gross Income | | $ | 547,441 |
| TOTAL FARM EXPENSES | | $ | 486,000 |
| Net Cash Income | | $ | 61,441 |
| Cash Carryover | | $ | - |
| Loans and Other Credit | | $ | - |
| Interest (Capital debt only) | | $ | 95,000 |
| Depreciation | | $ | 140,000 |
| Total Available for Debt Repayment | | $ | 296,441 |
| Capital Expenditures | | $ | - |
| Balance Available to Debt Repayment | | $ | 296,441 |

## Debt Repayment

| TO WHOM OWED | Amount due First Year | Plan P & I | Date Due | Source of Funds |
|---|---|---|---|---|
| FFB--New loan | | $ 113,310.00 | annual | farm |
| FFB | | $ 99,537.00 | annual | farm |
| FFB | | $ 13,560.00 | annual | farm |
| Ally | | $ 12,048.00 | $1004 monthly | nonfarm |
| CULS | | $ 7,608.00 | $634 monthly | nonfarm |
| Credit cards | | $ 4,044.00 | $337 monthly | nonfarm |
| | | | | |
| | | | | |
| | | | | |
| | | $ - | | |
| SSI and Income Tax | | $ - | | |
| | Total | $ 250,107.00 | | |

| DEBT SERVICE MARGIN | | 119% | Remainder | $ 46,334.00 |
|---|---|---|---|---|

FFB00311

## FARM ONLY PROJECTED CASH FLOW

| Name(s): | Roger D. & Linda G. Parker |
| Date: | 6/11/2013 |

| CASH OPERATING EXPENSES | % OF EXPENSES TO TOTAL INCOME | TOTAL PLANNED EXPENSES | |
|---|---|---|---|
| Car & Truck expenses | 0.00% | $ | - |
| Chemicals | 0.00% | $ | - |
| Conservation Expenses | 0.00% | $ | - |
| Custom Hire (Machine) | 0.00% | $ | - |
| Depreciation | 28.68% | $ | 140,000 |
| Employee Benefit | 0.00% | $ | - |
| Feed Purchased | 0.00% | $ | - |
| Fertilizers & Lime | 0.00% | $ | - |
| Freight & Trucking | 0.00% | $ | |
| Gasoline, Fuel, & Oil | 3.81% | $ | 20,000 |
| Insurance | 2.00% | $ | 10,500 |
| Interest | 18.09% | $ | 95,000 |
| Hired Labor | 7.62% | $ | 40,000 |
| Pension & Profit Sharing | 0.00% | $ | - |
| Rent or Lease | 0.00% | $ | - |
| Repairs & Maintenance | 6.67% | $ | 35,000 |
| Seed & Plants Purchased | 0.00% | $ | - |
| Storage & Warehousing | 0.00% | $ | - |
| Supplies Purchased | 4.29% | $ | 22,500 |
| Taxes | 1.43% | $ | 7,500 |
| Utilities/Propane | 14.28% | $ | 75,000 |
| Veterinary & Breeding | 0.00% | $ | - |
| Misc/Other | 4.29% | $ | 22,500 |
| Family Living Expense | 0.00% | | |
| Exp/GFI | 44.38% | $ | 468,000 |

| Financial Summary of Typical Years Operation | | | |
|---|---|---|---|
| Non-Farm Income | | | |
| Business Income | | | |
| Poultry Income | 2-yr. avg. on 10 existing houses | $ | 525,040 |
| Total Gross Income | | $ | 525,040 |
| TOTAL FARM EXPENSES | | $ | 468,000 |
| Net Cash Income | | $ | 57,040 |
| Cash Carryover | | $ | - |
| Loans and Other Credit | | $ | - |
| Interest (Capital debt only) | | $ | 95,000 |
| Depreciation | | $ | 140,000 |
| Total Available for Debt Repayment | | $ | 292,040 |
| Capital Expenditures | | $ | - |
| Balance Available to Debt Repayment | | $ | 292,040 |

| Debt Repayment | | | | |
|---|---|---|---|---|
| TO WHOM OWED | Amount due First Year | Plan P & I | Date Due | Source of Funds |
| FFB--New loan | | $ 113,310.00 | annual | farm |
| FFB | | $ 99,537.00 | annual | farm |
| FFB | | $ 13,560.00 | annual | farm |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | $ - | | |
| SSI and Income Tax | | $ - | | |
| | Total | $ 226,407.00 | | |

| DEBT SERVICE MARGIN | 129% | Remainder | $ 65,633.00 |
|---|---|---|---|

FFB00312

| LOAN NUMBER | LOAN NAME | ACCT. NUMBER | AGREEMENT DATE | INITIALS |
|---|---|---|---|---|
| ▓7712 | ROGER DALE PARKER | | 12/07/18 | AG 62 |
| **NOTE AMOUNT** | **INDEX (w/Margin)** | **RATE** | **MATURITY DATE** | **LOAN PURPOSE** |
| $20,000.00 | Wall Street Journal Prime plus 0.750% | 6.000% | 12/07/28 | Agricultural |
| | | Creditor Use Only | | |

## COMMERCIAL LOAN AGREEMENT
Agricultural - Single Advance Term Loan

**DATE AND PARTIES.** The date of this Commercial Loan Agreement (Agreement) is December 7, 2018. The parties and their addresses are as follows:

**LENDER:**
 FIRST FINANCIAL BANK
 214 North Washington
 El Dorado, AR 71730

**BORROWER:**
 ROGER DALE PARKER
 897 HIGHWAY 24 E
 MILLEDGEVILLE, GA 31061

 LINDA GAIL PARKER
 897 HIGHWAY 24 E
 MILLEDGEVILLE, GA 31061

1. **DEFINITIONS.** For the purposes of this Agreement, the following terms have the following meanings.

 **A. Accounting Terms.** In this Agreement, any accounting terms that are not specifically defined will have their customary meanings under generally accepted accounting principles.

 **B. Insiders.** Insiders include those defined as insiders by the United States Bankruptcy Code, as amended; or to the extent left undefined, include without limitation any officer, employee, stockholder or member, director, partner, or any immediate family member of any of the foregoing, or any person or entity which, directly or indirectly, controls, is controlled by or is under common control with me.

 **C. Loan.** Loan refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

 **D. Loan Documents.** Loan Documents refer to all the documents executed as a part of or in connection with the Loan.

 **E. Pronouns.** The pronouns "I", "me" and "my" refer to every Borrower signing this Agreement, individually and together with their heirs, successors and assigns, and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this Agreement. "You" and "your" refers to the Loan's lender, any participants or syndicators, successors and assigns, or any person or company that acquires an interest in the Loan.

 **F. Property.** Property is any property, real, personal or intangible, that secures my performance of the obligations of the Loan.

2. **SINGLE ADVANCE.** In accordance with the terms of this Agreement and other Loan Documents, you will provide me with a term note in the amount of $20,000.00 (Principal). I will receive the funds from this Loan in one advance. No additional advances are contemplated, except those made to protect and preserve your interests as provided in this Agreement or other Loan Documents.

3. **MATURITY DATE.** I agree to fully repay the Loan by December 7, 2028.

4. **WARRANTIES AND REPRESENTATIONS.** I represent and warrant that I have the right and authority to enter into this Agreement. The execution and delivery of this Agreement will not violate any agreement governing me or to which I am a party.

 **A. Hazardous Substances.** Except as I previously disclosed in writing and you acknowledge in writing, no Hazardous Substance, underground tanks, private dumps or open wells are currently located at, on, in, under or about the Property.

 **B. Use of Property.** After diligent inquiry, I do not know or have reason to know that any Hazardous Substance has been discharged, leached or disposed of, in violation of any Environmental Law, from the property onto, over or into any other property, or from any other property onto, over into the property.

 **C. Environmental Laws.** I have no knowledge or reason to believe that there is any pending or threatened investigation, claim, judgment or order, violation, lien, or other notice under any Environmental Law that concerns me or the property. The property and any activities on the property are in full compliance with all Environmental Law.

 **D. Loan Purpose.** The purpose of this Loan is TO UPGRADE FAN MOTORS, PAY GAS BILL, FILL TANKS TO 50% PLUS PAY LOAN FEES AND CLOSING COST.

 **E. No Other Liens.** I own or lease all property that I need to conduct my business and activities. I have good and marketable title to all property that I own or lease. All of my Property is free and clear of all liens, security interests, encumbrances and other adverse claims and interests, except those to you or those you consent to in writing.

 **F. Compliance With Laws.** I am not violating any laws, regulations, rules, orders, judgments or decrees applicable to me or my property, except for those which I am challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its challenge should I lose.

ROGER DALE PARKER
Arkansas Commercial Loan Agreement
AR/4SGUTHRIE0000000000001828070N                              Wolters Kluwer Financial Services ®1996, 2018 Bankers Systems™

Initials 
Page 1





DEFENDANT'S
EXHIBIT
4
PARKER

FFB00467

Confidential

**G. Legal Disputes.** There are no pending or threatened lawsuits, arbitrations or other proceedings against me or my property that singly or together may materially and adversely affect my property, operations, financial condition, or business.

**H. Adverse Agreements.** I am not a party to, nor am I bound by, any agreement that is now or is likely to become materially adverse to my business, Property or operations.

**I. Other Claims.** There are no outstanding claims or rights that would conflict with the execution, delivery or performance by me of the terms and conditions of this Agreement or the other Loan Documents. No outstanding claims or rights exist that may result in a lien on the Property, the Property's proceeds and the proceeds of proceeds, except liens that were disclosed to and agreed to by you in writing.

**J. Solvency.** I am able to pay my debts as they mature, my assets exceed my liabilities and I have sufficient capital for my current and planned business and other activities. I will not become insolvent by the execution or performance of this Loan.

**5. FINANCIAL STATEMENTS.** I will prepare and maintain my financial records using consistently applied generally accepted accounting principles then in effect. I will provide you with financial information in a form that you accept and under the following terms.

**A. Certification.** I represent and warrant that any financial statements that I provide you fairly represents my financial condition for the stated periods, is current, complete, true and accurate in all material respects, includes all of my direct or contingent liabilities and there has been no material adverse change in my financial condition, operations or business since the date the financial information was prepared.

**B. Frequency.** I will provide to you on an annual basis my financial statements, tax returns, annual internal audit reports or those prepared by independent accountants as soon as available or at least within  days after the close of each of my fiscal years. Any annual financial statements that I provide you will be audited statements.

**C. SEC Reports.** I will provide you with true and correct copies of all reports, notices or statements that I provide to the Securities and Exchange Commission, any securities exchange or my stockholders, owners, or the holders of any material indebtedness as soon as available or at least within  days after issuance.

**D. Requested Information.** I will provide you with any other information about my operations, financial affairs and condition within 14 days after your request.

**6. COVENANTS.** Until the Loan and all related debts, liabilities and obligations are paid and discharged, I will comply with the following terms, unless you waive compliance in writing.

**A. Participation.** I consent to you participating or syndicating the Loan and sharing any information that you decide is necessary about me and the Loan with the other participants or syndicators.

**B. Inspection.** Following your written request, I will immediately pay for all one-time and recurring out-of-pocket costs that are related to the inspection of my records, business or Property that secures the Loan. Upon reasonable notice, I will permit you or your agents to enter any of my premises and any location where my Property is located during regular business hours to do the following.

   **(1)** You may inspect, audit, check, review and obtain copies from my books, records, journals, orders, receipts, and any correspondence and other business related data.

   **(2)** You may discuss my affairs, finances and business with any one who provides you with evidence that they are a creditor of mine, the sufficiency of which will be subject to your sole discretion.

   **(3)** You may inspect my Property, audit for the use and disposition of the Property's proceeds and proceeds of proceeds; or do whatever you decide is necessary to preserve and protect the Property and your interest in the Property.

After prior notice to me, you may discuss my financial condition and business operations with my independent accountants, if any, or my chief financial officer and I may be present during these discussions. As long as the Loan is outstanding, I will direct all of my accountants and auditors to permit you to examine my records in their possession and to make copies of these records. You will use your best efforts to maintain the confidentiality of the information you or your agents obtain, except you may provide your regulator, if any, with required information about my financial condition, operation and business or that of my parent, subsidiaries or affiliates.

**C. Business Requirements.** I will preserve and maintain my present existence and good standing in the jurisdiction where I am organized and all of my rights, privileges and franchises. I will do all that is needed or required to continue my business or activities as presently conducted, by obtaining licenses, permits and bonds everywhere I engage in business or activities or own, lease or locate my property. I will obtain your prior written consent before I cease my business or before I engage in any new line of business that is materially different from my present business.

**D. Compliance with Laws.** I will not violate any laws, regulations, rules, orders, judgments or decrees applicable to me or my Property, except for those which I challenge in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its appeal should I lose. Laws include without limitation the Federal Fair Labor Standards Act requirements for producing goods, the federal Employee Retirement Income Security Act of 1974's requirements for the establishment, funding and management of qualified deferred compensation plans for employees, health and safety laws, environmental laws, tax laws, licensing and permit laws. On your request, I will provide you with written evidence that I have fully and timely paid my taxes, assessments and other governmental charges levied or imposed on me, my income or profits and my property. Taxes include without limitation sales taxes, use taxes, personal property taxes, documentary stamp taxes, recordation taxes, franchise taxes, income taxes, withholding taxes, FICA taxes and unemployment taxes. I will adequately provide for the payment of these taxes, assessments and other charges that have accrued but are not yet due and payable.

**E. New Organizations.** I will obtain your written consent before organizing, merging into, or consolidating with an entity; acquiring all or substantially all the assets of another; materially changing the legal structure, management, ownership or financial condition; or effecting or entering into a domestication, conversion or interest exchange.

**F. Dealings with Insiders.** I will not purchase, acquire or lease any property or services from, or sell, provide or lease any property or services to, or permit any outstanding loans or credit extensions to, or otherwise deal with, any Insiders except as required under contracts existing at the time I applied for the Loan and approved by you or as this Agreement otherwise permits. I will not change or breach these contracts existing at Loan application so as to cause an acceleration of or an increase in any payments due.

**G. Other Debts.** I will pay when due any and all other debts owed or guaranteed by me and will faithfully perform, or comply with all the conditions and obligations imposed on me concerning the debt or guaranty.

FFB00468

Confidential

**H. Other Liabilities.** I will not incur, assume or permit any debt evidenced by notes, bonds or similar obligations, except: debt in existence on the date of this Agreement and fully disclosed to you; debt subordinated in payment to you on conditions and terms acceptable to you; accounts payable incurred in the ordinary course of my business and paid under customary trade terms or contested in good faith with reserves satisfactory to you.

**I. Notice to You.** I will promptly notify you of any material change in my financial condition, of the occurrence of a default under the terms of this Agreement or any other Loan Document, or a default by me under any agreement between me and any third party which materially and adversely affects my property, operations, financial condition or business.

**J. Certification of No Default.** On your request, my chief financial officer or my independent accountant will provide you with a written certification that to the best of their knowledge no event of default exists under the terms of this Agreement or the other Loan Documents, and that there exists no other action, condition or event which with the giving of notice or lapse of time or both would constitute a default. As requested, my chief financial officer or my independent accountant will also provide you with computations demonstrating compliance with any financial covenants and ratios contained in this Agreement. If an action, condition or event of default does exist, the certificate must accurately and fully disclose the extent and nature of this action, condition or event and state what must be done to correct it.

**K. Use of Loan Proceeds.** I will not permit the loan proceeds to be used to purchase, carry, reduce, or retire any loan originally incurred to purchase or carry any margin stock or otherwise cause the Loan to violate Federal Reserve Board Regulations U or X, or Section 8 of the Securities and Exchange Act of 1934 and its regulations, as amended.

**L. Dispose of No Assets.** Without your prior written consent or as the Loan Documents permit, I will not sell, lease, assign, transfer, dispose of or otherwise distribute all or substantially all of my assets to any person other than in the ordinary course of business for the assets' depreciated book value or more.

**M. No Other Liens.** I will not create, permit or suffer any lien or encumbrance upon any of my properties for or by anyone, other than you, except for: nonconsensual liens imposed by law arising out of the ordinary course of business on obligations that are not overdue or which I am contesting in good faith after making appropriate reserves; valid purchase money security interests on personal property; or any other liens specifically agreed to by you in writing.

**N. Guaranties.** I will not guaranty or become liable in any way as surety, endorser (other than as endorser of negotiable instruments in the ordinary course of business) or accommodation endorser or otherwise for the debt or obligations of any other person or entity, except to you or as you otherwise specifically agree in writing.

**O. No Default under Other Agreements.** I will not allow to occur, or to continue unremedied, any act, event or condition which constitutes a default , or which, with the passage of time or giving of notice, or both, would constitute a default under any agreement, document, instrument or undertaking to which I am a party or by which I may be bound.

**P. Legal Disputes.** I will promptly notify you in writing of any threatened or pending lawsuit, arbitration or other proceeding against me or any of my property, not identified in my financial statements, or that singly or together with other proceedings may materially and adversely affect my property, operations, financial condition or business. I will use my best efforts to bring about a favorable and speedy result of any of these lawsuits, arbitrations or other proceedings.

**Q. Other Notices.** I will immediately provide you with any information that may materially and adversely affect my ability to perform this Agreement and of its anticipated effect.

**R. Loan Obligations.** I will make full and timely payment of all principal and interest obligations, and comply with the other terms and agreements contained in this Agreement and in the other Loan Documents.

**S. Insurance.** I will obtain and maintain insurance with insurers, in amounts and coverages that are acceptable to you and customary with industry practice. This may include without limitation insurance policies for public liability, fire, hazard and extended risk, workers compensation, and, at your request, business interruption and/or rent loss insurance. At your request, I will deliver to you certified copies of all of these insurance policies, binders or certificates. I will obtain and maintain a mortgage clause (or lender loss payable clause) endorsement - naming you as the loss payee. If you require, I will also obtain an "additional insured" endorsement - naming you as an additional insured. I will immediately notify you of cancellation or termination of insurance. I will require all insurance policies to provide you with at least 10 days prior written notice to you of cancellation or modification. I consent to you using or disclosing information relative to any contract of insurance required by the Loan for the purpose of replacing this insurance. I also authorize my insurer and you to exchange all relevant information related to any contract of insurance required by any document executed as part of this Loan.

**T. Property Maintenance.** I will keep all tangible and intangible property that I consider necessary or useful in my business in good working condition by making all needed repairs, replacements and improvements and by making all rental, lease or other payments due on this property.

**U. Property Loss.** I will immediately notify you, and the insurance company when appropriate, of any material casualty, loss or depreciation to the Property or to my other property that affects my business.

**V. Life Insurance.** I will maintain all life insurance policies assigned to you as Property.

**W. Reserves.** You may set aside and reserve Loan proceeds for Loan interest, fees and expenses, taxes, and insurance. I grant you a security interest in the reserves.

No interest will accrue on any reserve Loan proceeds. Disbursement of reserves is disbursement of the Loan's proceeds. At my request, you will disburse the reserves for the purpose they were set aside for, as long as I am not in default under this Agreement. You may directly pay these reserved items, reimburse me for payments I made, or reduce the reserves and increase the Loan proceeds available for disbursement.

**X. Additional Taxes.** I will pay all filing and recording costs and fees, including any recordation, documentary or transfer taxes or stamps, that are required to be paid with respect to this Loan and Loan Documents.

**Y. Additional Covenants.** 1. To manage the operation according to prudent farm management practices, utilizing farm management advice from Integrator and Cooperative Extension Service to maximize farm productivity and profitability.

2. To provide the lender within 120 days after the close of the Borrower's fiscal year, annual balance sheets and income/expense statements. In addition to any and all financial reports and disclosures of any kind called for by these covenants or any other documents signed or provided by the Borrower to Lender, Borrower agrees to provide or cause to be provided to Lender any and all tax returns filed by Borrower or by any principal of Borrower or by any guarantor hereof (during the term hereof or the year preceding its execution) and to provide to Lender, at the time hereof and hereafter, original executed IRS forms enabling Lender to obtain such returns(or portions thereof or documents relating thereto) directly from the IRS (for said term and the preceding year) including but not limited to Form 2848, Form 4506, Form 4506-T and Form 8821 and replacements thereof and revisions thereto, as to which these covenants shall also serve as authorization to Lender to fill in any blanks or dates in such forms, as shall be necessary or desirable to complete said form or forms and make them useful for the purposes described herein. In the event Borrower fails to provide Lender with the

FFB00469

Confidential

required Tax Returns by the agreed date and Lender obtains them from the IRS, Borrower shall be responsible for any costs associated there-with and is authorized to recover those costs from Borrower's Escrow Account.

3.  To not sell any assets pledged as security to the lender without prior written consent from the lender.

4.  To not sell any capital assets without prior written consent from the lender.

5.  To maintain at least a 110% debt service margin. Borrower has made its own determination that its operation can produce that debt service margin, and has not relied on any statements or projections by lender in that regard.

6.  To not to assume the liabilities or obligations of others.

7.  To limit family living expenses to a reasonable amount, so as to not impair the operation's ability to pay its financial obligations as agreed.

8.  To carry all risk hazard insurance on all buildings and other improvements held as security by the lender for the term of the loan. This insurance must include collapse coverage for poultry, turkey, and hog facilities or other similar type confinement facilities. This insurance shall be in an amount equal to the appraised value of these items as established by the lender at the time of loan closing.

9.  To provide accounting of all collateral and collateral arrangements by agreeing to an annual collateral inspection or as often as the lender deems necessary.

10.  Salaries paid to entity members, hired labor, or consultants shall be reasonable and any increases  above what is projected in the cash flow shall be commensurate with the increase in borrower's cash flow so as to not impair the operation's ability to pay its financial obligations. Borrower has produced its own cash flow projections and acknowledges that projections of cash flow made by lender are for lender's own internal underwriting purpose and not for borrower's reliance. In fact, Lender's projections may be higher or lower than borrower's. , Borrower's decision as to how much to pay for the operation is its own, and borrower acknowledges that, if it has paid more than the appraised value for the operation, it has done so against the lender's advice.

11.  Withdrawals from the operation in case of joint operations and partnerships shall be reasonable and also commensurate with increases in the borrowers' cash flow so as to not impair the operations' ability to pay its financial obligations as agreed. Borrower will make its own decisions regarding such withdrawals and their impact on borrower's cash flow and the operation generally, and will not rely on the lender for any advice on such matters.

12. Borrower agree(s), if requested by Lender or its agent, to fully cooperate in the correction, if necessary
in the reasonable discretion of the Lender of any and all loan closing documents so that all documents accurately describe the loan between the undersigned parties and the Lender and thus allow the Lender to sell, convey, seek a guaranty or obtain insurance for, or market said loan to any purchaser, including but not limited to any investor or institution. All of the undersigned parties agree(s) to promptly comply with such requests by Lender. The undersigned agree(s) to assume all costs including by way of illustration and not limitation, actual expenses, legal fees and marketing losses incurred by lender  Borrower hereby appoints Lender as its attorney-in-fact to affect corrections in the loan documents. Such appointment is coupled with an interest and is irrevocable.
13. THIS AGREEMENT IS GOVERNED BY THE LAWS OF ARKANSAS, THE UNITED STATES OF AMERICA, AND TO THE EXTENT REQUIRED, BY THE LAWS OF THE JURISDICTION  WHERE THE PROPERTY IS LOCATED, EXCEPT TO THE EXTENT SUCH STATE LAWS ARE PREEMPTED BY FEDERAL LAW.

**7. DEFAULT.** I will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** I fail to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me or any co-signer, endorser, surety or guarantor of this Agreement or any other obligations I have with you.

**C. Death or Incompetency.** I die or am declared legally incompetent.

**D. Failure to Perform.** I fail to perform any condition or to keep any promise or covenant of this Agreement.

**E. Other Documents.** A default occurs under the terms of any other Loan Document.

**F. Other Agreements.** I am in default on any other debt or agreement I have with you.

**G. Misrepresentation.** I make any verbal or written statement or provide any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** I fail to satisfy or appeal any judgment against me.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** I change my name or assume an additional name without notifying you before making such a change.

**K. Property Transfer.** I transfer all or a substantial part of my money or property.

**L. Property Value.** You determine in good faith that the value of the Property has declined or is impaired.

**M. Erosion.** Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce or to make possible the production of an agricultural commodity, as provided by 7 CFR Part 12.

**N. Insecurity.** You determine in good faith that a material adverse change has occurred in my financial condition from the conditions set forth in my most recent financial statement before the date of this Agreement or that the prospect for payment or performance of the Loan is impaired for any reason.

**8. REMEDIES.** After I default, you may at your option do any one or more of the following.

ROGER DALE PARKER
Arkansas Commercial Loan Agreement
AR/4SGUTHRIE0000000000001828070N                              Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™                              Initials 
Page 4

C O 0 0 0 0 0 0 1 2 0 0 3 9 7 1 2 1 0 7 4 1 2 0 7 2 0 1 8

FFB00470

Confidential

**A. Acceleration.** You may make all or any part of the amount owing by the terms of the Loan immediately due. If I am a debtor in a bankruptcy petition or in an application filed under section 5(a)(3) of the Securities Investor Protection Act, the Loan is automatically accelerated and immediately due and payable without notice or demand upon filing of the petition or application.

**B. Sources.** You may use any and all remedies you have under state or federal law or in any Loan Document.

**C. Insurance Benefits.** You may make a claim for any and all insurance benefits or refunds that may be available on my default.

**D. Payments Made On My Behalf.** Amounts advanced on my behalf will be immediately due and may be added to the balance owing under the terms of the Loan, and accrue interest at the highest post-maturity interest rate.

**E. Attachment.** You may attach or garnish my wages or earnings.

**F. Set-Off.** You may use the right of set-off. This means you may set-off any amount due and payable under the terms of the Loan against any right I have to receive money from you.

My right to receive money from you includes any deposit or share account balance I have with you; any money owed to me on an item presented to you or in your possession for collection or exchange; and any repurchase agreement or other non-deposit obligation. "Any amount due and payable under the terms of the Loan" means the total amount to which you are entitled to demand payment under the terms of the Loan at the time you set-off.

Subject to any other written contract, if my right to receive money from you is also owned by someone who has not agreed to pay the Loan, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement.

Your right of set-off does not apply to an account or other obligation where my rights arise only in a representative capacity. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set-off against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**G. Waiver.** Except as otherwise required by law, by choosing any one or more of these remedies you do not give up your right to use any other remedy. You do not waive a default if you choose not to use a remedy. By electing not to use any remedy, you do not waive your right to later consider the event a default and to use any remedies if the default continues or occurs again.

**9. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, I agree to pay all expenses of collection, enforcement or protection of your rights and remedies under this Agreement or any other Loan Document. Expenses include, but are not limited to, reasonable attorneys' fees (as determined under Ark. Code Ann. §16-22-308), court costs, and other legal expenses. If not paid immediately, these expenses will bear interest from the date of the payment until paid in full at the same interest rate in effect as provided in the terms of this Loan. All fees and expenses will be secured by the Property I have granted to you, if any. In addition, to the extent permitted by the United States Bankruptcy Code, I agree to pay the reasonable attorneys' fees incurred by you to protect your rights and interests in connection with any bankruptcy proceedings initiated by or against me.

**10. APPLICABLE LAW.** This Agreement is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**11. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** My obligation to pay the Loan is independent of the obligation of any other person who has also agreed to pay it. You may sue me alone, or anyone else who is obligated on the Loan, or any number of us together, to collect the Loan. Extending the Loan or new obligations under the Loan, will not affect my duty under the Loan and I will still be obligated to pay the Loan. You may assign all or part of your rights or duties under this Agreement or the Loan Documents without my consent. If you assign this Agreement, all of my covenants, agreements, representations and warranties contained in this Agreement or the Loan Documents will benefit your successors and assigns. I may not assign this Agreement or any of my rights under it without your prior written consent. The duties of the Loan will bind my successors and assigns.

**12. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing. This Agreement and the other Loan Documents are the complete and final expression of the understanding between you and me. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**13. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement.

**14. NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Borrower will be deemed to be notice to all Borrowers. I will inform you in writing of any change in my name, address or other application information. I will provide you any correct and complete financial statements or other information you request. I agree to sign, deliver, and file any additional documents or certifications that you may consider necessary to perfect, continue, and preserve my obligations under this Loan and to confirm your lien status on any Property. Time is of the essence.

**15. SIGNATURES.** By signing, I agree to the terms contained in this Agreement. I also acknowledge receipt of a copy of this Agreement.

ROGER DALE PARKER
Arkansas Commercial Loan Agreement
AR/4SGUTHRIE00000000001828070N    Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™    Initials _____ Page 5



C O 0 0 0 0 0 0 1 2 0 0 3 9 7 1 2 1 0 7 4 1 2 0 7 2 0 1 8

FFB00471

Confidential

**BORROWER:**

*Roger Dale Palmer*     Date _12-7-18_
ROGER DALE PARKER

*Linda Gail Parker*     Date _12-7-18_
LINDA GAIL PARKER

**LENDER:**

First Financial Bank

By _Allen G._     Date _12/7/18_
Allen Ginn, Vice President

ROGER DALE PARKER
Arkansas Commercial Loan Agreement
AR/4SGUTHRIE00000000001828070N    Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™    Initials 
Page 6

FFB00472

Confidential

| LOAN NUMBER | LOAN NAME | ACCT. NUMBER | AGREEMENT DATE | INITIALS |
|---|---|---|---|---|
| 120031421 | ROGER DALE PARKER | | 07/23/10 | JMU-062 |
| NOTE AMOUNT | INDEX (w/Margin) | RATE | MATURITY DATE | LOAN PURPOSE |
| $935,000.00 | Wall Street Journal Prime plus 2.000% | 5.000% | 07/23/23 | Agricultural |
| | | Creditor Use Only | | |

## COMMERCIAL LOAN AGREEMENT
Agricultural - Single Advance Term Loan

**DATE AND PARTIES.** The date of this Commercial Loan Agreement (Agreement) is July 23, 2010. The parties and their addresses are as follows:

LENDER:
  **FIRST FINANCIAL BANK**
  214 North Washington
  El Dorado, AR 71730

BORROWER:
  **ROGER DALE PARKER**
  288 GORDON ROAD
  HILLSBORO, GA 31038

  **LINDA GAIL PARKER**
  288 GORDON ROAD
  HILLSBORO, GA 31038

1. **DEFINITIONS.** For the purposes of this Agreement, the following terms have the following meanings.

   **A. Accounting Terms.** In this Agreement, any accounting terms that are not specifically defined will have their customary meanings under generally accepted accounting principles.

   **B. Insiders.** Insiders include those defined as insiders by the United States Bankruptcy Code, as amended; or to the extent left undefined, include without limitation any officer, employee, stockholder or member, director, partner, or any immediate family member of any of the foregoing, or any person or entity which, directly or indirectly, controls, is controlled by or is under common control with me.

   **C. Loan.** The Loan refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

   **D. Loan Documents.** Loan Documents refer to all the documents executed as a part of or in connection with the Loan.

   **E. Pronouns.** The pronouns "I", "me" and "my" refer to every Borrower signing this Agreement, individually or together. "You" and "your" refers to the Loan's lender.

   **F. Property.** Property is any property, real, personal or intangible, that secures my performance of the obligations of this Loan.

2. **SINGLE ADVANCE.** In accordance with the terms of this Agreement and other Loan Documents, you will provide me with a term note in the amount of $935,000.00 (Principal). I will receive the funds from this Loan in one advance. No additional advances are contemplated, except those made to protect and preserve your interests as provided in this Agreement or other Loan Documents.

3. **MATURITY DATE.** I agree to fully repay the Loan by July 23, 2023.

4. **WARRANTIES AND REPRESENTATIONS.** I represent and warrant that I have the right and authority to enter into this Agreement. The execution and delivery of this Agreement will not violate any agreement governing me or to which I am a party.

   **A. Hazardous Substances.** Except as I previously disclosed in writing and you acknowledge in writing, no Hazardous Substance, underground tanks, private dumps or open wells are currently located at, on, in, under or about the Property.

   **B. Use of Property.** After diligent inquiry, I do not know or have reason to know that any Hazardous Substance has been discharged, leached or disposed of, in violation of any Environmental Law, from the property onto, over or into any other property, or from any other property onto, over or into the property.

   **C. Environmental Laws.** I have no knowledge or reason to believe that there is any pending or threatened investigation, claim, judgment or order, violation, lien, or other notice under any Environmental Law that concerns me or the property. The property and any activities on the property are in full compliance with all Environmental Law.

   **D. Loan Purpose.** The purpose of this Loan is TO TERM OUT FFB CONSTRUCTION LOAN #120030744 PLUS PAY ALL LOAN FEES AND CLOSING COSTS.

   **E. No Other Liens.** I own or lease all property that I need to conduct my business and activities. I have good and marketable title to all property that I own or lease. All of my Property is free and clear of all liens, security interests, encumbrances and other adverse claims and interests, except those to you or those you consent to in writing.

   **F. Compliance With Laws.** I am not violating any laws, regulations, rules, orders, judgments or decrees applicable to me or my property, except for those which I am challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its challenge should I lose.

   **G. Legal Disputes.** There are no pending or threatened lawsuits, arbitrations or other proceedings against me or my property that singly or together may materially and adversely affect my property, operations, financial condition, or business.

FFB00378

Confidential

**H. Adverse Agreements.** I am not a party to, nor am I bound by, any agreement that is now or is likely to become materially adverse to my business, Property or operations.

**I. Other Claims.** There are no outstanding claims or rights that would conflict with the execution, delivery or performance by me of the terms and conditions of this Agreement or the other Loan Documents. No outstanding claims or rights exist that may result in a lien on the Property, the Property's proceeds and the proceeds of proceeds, except liens that were disclosed to and agreed to by you in writing.

**J. Solvency.** I am able to pay my debts as they mature, my assets exceed my liabilities and I have sufficient capital for my current and planned business and other activities. I will not become insolvent by the execution or performance of this Loan.

**5. FINANCIAL STATEMENTS.** I will prepare and maintain my financial records using consistently applied generally accepted accounting principles then in effect. I will provide you with financial information in a form that you accept and under the following terms.

**A. Certification.** I represent and warrant that any financial statements that I provide you fairly represents my financial condition for the stated periods, is current, complete, true and accurate in all material respects, includes all of my direct or contingent liabilities and there has been no material adverse change in my financial condition, operations or business since the date the financial information was prepared.

**B. Frequency.** In addition to the financial statements provided to you prior to closing, I will provide you with current financial statements on an annual basis, or as otherwise requested by you, until I have performed all of my obligations under the Loan and you terminate the Loan in writing.

**C. SEC Reports.** I will provide you with true and correct copies of all reports, notices or statements that I provide to the Securities and Exchange Commission, any securities exchange or my stockholders, owners, or the holders of any material indebtedness as soon as available or at least within days after issuance.

**D. Requested Information.** I will provide you with any other information about my operations, financial affairs and condition within 14 days after your request.

**6. COVENANTS.** Until the Loan and all related debts, liabilities and obligations are paid and discharged, I will comply with the following terms, unless you waive compliance in writing.

**A. Participation.** I consent to you participating or syndicating the Loan and sharing any information that you decide is necessary about me and the Loan with the other participants or syndicators.

**B. Inspection.** Following your written request, I will immediately pay for all one-time and recurring out-of-pocket costs that are related to the inspection of my records, business or Property that secures the Loan. Upon reasonable notice, I will permit you or your agents to enter any of my premises and any location where my Property is located during regular business hours to do the following.

   **(1)** You may inspect, audit, check, review and obtain copies from my books, records, journals, orders, receipts, and any correspondence and other business related data.

   **(2)** You may discuss my affairs, finances and business with any one who provides you with evidence that they are a creditor of mine, the sufficiency of which will be subject to your sole discretion.

   **(3)** You may inspect my Property, audit for the use and disposition of the Property's proceeds and proceeds of proceeds; or do whatever you decide is necessary to preserve and protect the Property and your interest in the Property.

After prior notice to me, you may discuss my financial condition and business operations with my independent accountants, if any, or my chief financial officer and I may be present during these discussions. As long as the Loan is outstanding, I will direct all of my accountants and auditors to permit you to examine my records in their possession and to make copies of these records. You will use your best efforts to maintain the confidentiality of the information you or your agents obtain, except you may provide your regulator, if any, with required information about my financial condition, operation and business or that of my parent, subsidiaries or affiliates.

**C. Business Requirements.** I will preserve and maintain my present existence and good standing in the jurisdiction where I am organized and all of my rights, privileges and franchises. I will do all that is needed or required to continue my business or activities as presently conducted, by obtaining licenses, permits and bonds everywhere I engage in business or activities or own, lease or locate my property. I will obtain your prior written consent before I cease my business or before I engage in any new line of business that is materially different from my present business.

**D. Compliance with Laws.** I will not violate any laws, regulations, rules, orders, judgments or decrees applicable to me or my Property, except for those which I challenge in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its appeal should I lose. Laws include without limitation the Federal Fair Labor Standards Act requirements for producing goods, the federal Employee Retirement Income Security Act of 1974's requirements for the establishment, funding and management of qualified deferred compensation plans for employees, health and safety laws, environmental laws, tax laws, licensing and permit laws. On your request, I will provide you with written evidence that I have fully and timely paid my taxes, assessments and other governmental charges levied or imposed on me, my income or profits and my property. Taxes include without limitation sales taxes, use taxes, personal property taxes, documentary stamp taxes, recordation taxes, franchise taxes, income taxes, withholding taxes, FICA taxes and unemployment taxes. I will adequately provide for the payment of these taxes, assessments and other charges that have accrued but are not yet due and payable.

**E. New Organizations.** I will obtain your written consent before organizing, merging into, or consolidating with an entity; acquiring all or substantially all the assets of another; materially changing the legal structure, management, ownership or financial condition; or effecting or entering into a domestication, conversion or interest exchange.

**F. Dealings with Insiders.** I will not purchase, acquire or lease any property or services from, or sell, provide or lease any property or services to, or permit any outstanding loans or credit extensions to, or otherwise deal with, any Insiders except as required under contracts existing at the time I applied for the Loan and approved by you or as this Agreement otherwise permits. I will not change or breach these contracts existing at Loan application so as to cause an acceleration of or an increase in any payments due.

**G. Other Debts.** I will pay when due any and all other debts owed or guaranteed by me and will faithfully perform, or comply with all the conditions and obligations imposed on me concerning the debt or guaranty.

**H. Other Liabilities.** I will not incur, assume or permit any debt evidenced by notes, bonds or similar obligations, except: debt in existence on the date of this Agreement and fully disclosed to you; debt subordinated in payment to you on conditions and terms acceptable to you; accounts payable incurred in the ordinary course of my business and paid under customary trade terms or contested in good faith with reserves satisfactory to me.

FFB00379

Confidential

**I. Notice to You.** I will promptly notify you of any material change in my financial condition, of the occurrence of a default under the terms of this Agreement or any other Loan Document, or a default by me under any agreement between me and any third party which materially and adversely affects my property, operations, financial condition or business.

**J. Certification of No Default.** On your request, my chief financial officer or my independent accountant will provide you with a written certification that to the best of their knowledge no event of default exists under the terms of this Agreement or the other Loan Documents, and that there exists no other action, condition or event which with the giving of notice or lapse of time or both would constitute a default. As requested, my chief financial officer or my independent accountant will also provide you with computations demonstrating compliance with any financial covenants and ratios contained in this Agreement. If an action, condition or event of default does exist, the certificate must accurately and fully disclose the extent and nature of this action, condition or event and state what must be done to correct it.

**K. Use of Loan Proceeds.** I will not permit the loan proceeds to be used to purchase, carry, reduce, or retire any loan originally incurred to purchase or carry any margin stock or otherwise cause the Loan to violate Federal Reserve Board Regulations U or X, or Section 8 of the Securities and Exchange Act of 1934 and its regulations, as amended.

**L. Dispose of No Assets.** Without your prior written consent or as the Loan Documents permit, I will not sell, lease, assign, transfer, dispose of or otherwise distribute all or substantially all of my assets to any person other than in the ordinary course of business for the assets' depreciated book value or more.

**M. No Other Liens.** I will not create, permit or suffer any lien or encumbrance upon any of my properties for or by anyone, other than you, except for: nonconsensual liens imposed by law arising out of the ordinary course of business on obligations that are not overdue or which I am contesting in good faith after making appropriate reserves; valid purchase money security interests on personal property; or any other liens specifically agreed to by you in writing.

**N. Guaranties.** I will not guaranty or become liable in any way as surety, endorser (other than as endorser of negotiable instruments in the ordinary course of business) or accommodation endorser or otherwise for the debt or obligations of any other person or entity, except to you or as you otherwise specifically agree in writing.

**O. No Default under Other Agreements.** I will not allow to occur, or to continue unremedied, any act, event or condition which constitutes a default , or which, with the passage of time or giving of notice, or both, would constitute a default under any agreement, document, instrument or undertaking to which I am a party or by which I may be bound.

**P. Legal Disputes.** I will promptly notify you in writing of any threatened or pending lawsuit, arbitration or other proceeding against me or any of my property, not identified in my financial statements, or that singly or together with other proceedings may materially and adversely affect my property, operations, financial condition or business. I will use my best efforts to bring about a favorable and speedy result of any of these lawsuits, arbitrations or other proceedings.

**Q. Other Notices.** I will immediately provide you with any information that may materially and adversely affect my ability to perform this Agreement and of its anticipated effect.

**R. Loan Obligations.** I will make full and timely payment of all principal and interest obligations, and comply with the other terms and agreements contained in this Agreement and in the other Loan Documents.

**S. Insurance.** I will obtain and maintain insurance with insurers, in amounts and coverages that are acceptable to you and customary with industry practice. This may include without limitation insurance policies for public liability, fire, hazard and extended risk, workers compensation, and, at your request, business interruption and/or rent loss insurance. At your request, I will deliver to you certified copies of all of these insurance policies, binders or certificates. I will obtain and maintain a mortgagee or lender loss payee endorsement for you when these endorsements are available. I will immediately notify you of cancellation or termination of insurance. I will require all insurance policies to provide you with at least 10 days prior written notice to you of cancellation or modification. I consent to you using or disclosing information relative to any contract of insurance required by the Loan for the purpose of replacing this insurance. I also authorize my insurer and you to exchange all relevant information related to any contract of insurance required by any document executed as part of this Loan.

**T. Property Maintenance.** I will keep all tangible and intangible property that I consider necessary or useful in my business in good working condition by making all needed repairs, replacements and improvements and by making all rental, lease or other payments due on this property.

**U. Property Loss.** I will immediately notify you, and the insurance company when appropriate, of any material casualty, loss or depreciation to the Property or to my other property that affects my business.

**V. Life Insurance.** I will maintain all life insurance policies assigned to you as Property.

**W. Reserves.** You may set aside and reserve Loan proceeds for Loan interest, fees and expenses, taxes, and insurance. I grant you a security interest in the reserves.

No interest will accrue on any reserve Loan proceeds. Disbursement of reserves is disbursement of the Loan's proceeds. At my request, you will disburse the reserves for the purpose they were set aside for, as long as I am not in default under this Agreement. You may directly pay these reserved items, reimburse me for payments I made, or reduce the reserves and increase the Loan proceeds available for disbursement.

**X. Additional Taxes.** I will pay all filing and recording costs and fees, including any recordation, documentary or transfer taxes or stamps, that are required to be paid with respect to this Loan and any Loan Documents.

**7. DEFAULT.** I will be in default if any of the following occur:

**A. Payments.** I fail to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me or any co-signer, endorser, surety or guarantor of this Agreement or any other obligations I have with you.

**C. Death or Incompetency.** I die or am declared legally incompetent.

**D. Failure to Perform.** I fail to perform any condition or to keep any promise or covenant of this Agreement.

**E. Other Documents.** A default occurs under the terms of any other Loan Document.

**F. Other Agreements.** I am in default on any other debt or agreement I have with you.

**G. Misrepresentation.** I make any verbal or written statement or provide any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** I fail to satisfy or appeal any judgment against me.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.


FFB00380

Confidential

**J. Name Change.** I change my name or assume an additional name without notifying you before making such a change.

**K. Property Transfer.** I transfer all or a substantial part of my money or property.

**L. Property Value.** You determine in good faith that the value of the Property has declined or is impaired.

**M. Erosion.** Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce or make possible the production of an agricultural commodity, as further explained by federal law.

**N. Insecurity.** You determine in good faith that a material adverse change has occurred in my financial condition from the conditions set forth in my most recent financial statement before the date of this Agreement or that the prospect for payment or performance of the Loan is impaired for any reason.

8. **REMEDIES.** After I default, you may at your option do any one or more of the following.

**A. Acceleration.** You may make all or any part of the amount owing by the terms of the Loan immediately due. If I am a debtor in a bankruptcy petition or in an application filed under section 5(a)(3) of the Securities Investor Protection Act, the Loan is automatically accelerated and immediately due and payable without notice or demand upon filing of the petition or application.

**B. Sources.** You may use any and all remedies you have under state or federal law or in any Loan Document.

**C. Insurance Benefits.** You may make a claim for any and all insurance benefits or refunds that may be available on my default.

**D. Payments Made On My Behalf.** Amounts advanced on my behalf will be immediately due and may be added to the balance owing under the terms of the Loan, and accrue interest at the highest post-maturity interest rate.

**E. Attachment.** You may attach or garnish my wages or earnings.

**F. Set-Off.** You may use the right of set-off. This means you may set-off any amount due and payable under the terms of the Loan against any right I have to receive money from you.

My right to receive money from you includes any deposit or share account balance I have with you; any money owed to me on an item presented to you or in your possession for collection or exchange; and any repurchase agreement or other non-deposit obligation. "Any amount due and payable under the terms of the Loan" means the total amount to which you are entitled to demand payment under the terms of the Loan at the time you set-off.

Subject to any other written contract, if my right to receive money from you is also owned by someone who has not agreed to pay the Loan, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement.

Your right of set-off does not apply to an account or other obligation where my rights arise only in a representative capacity. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set-off against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**G. Waiver.** Except as otherwise required by law, by choosing any one or more of these remedies you do not give up your right to use any other remedy. You do not waive a default if you choose not to use a remedy. By electing not to use any remedy, you do not waive your right to later consider the event a default and to use any remedies if the default continues or occurs again.

9. **COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after Default, to the extent permitted by law, I agree to pay all expenses of collection, enforcement or protection of your rights and remedies under this Agreement or any other Loan Document. Expenses include, but are not limited to, reasonable attorneys' fees (as determined under Ark. Code Ann. §16-22-308), court costs, and other legal expenses. If not paid immediately, these expenses will bear interest from the date of the payment until paid in full at the same interest rate in effect as provided in the terms of this Loan. All fees and expenses will be secured by the Property I have granted to you, if any. In addition, to the extent permitted by the United States Bankruptcy Code, I agree to pay the reasonable attorneys' fees incurred by you to protect your rights and interests in connection with any bankruptcy proceedings initiated by or against me.

10. **APPLICABLE LAW.** This Agreement is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

11. **JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** My obligation to pay the Loan is independent of the obligation of any other person who has also agreed to pay it. You may sue me alone, or anyone else who is obligated on the Loan, or any number of us together, to collect the Loan. Extending the Loan or new obligations under the Loan, will not affect my duty under the Loan and I will still be obligated to pay the Loan. You may assign all or part of your rights or duties under this Agreement or the Loan Documents without my consent. If you assign this Agreement, all of my covenants, agreements, representations and warranties contained in this Agreement or the Loan Documents will benefit your successors and assigns. I may not assign this Agreement or any of my rights under it without your prior written consent. The duties of the Loan will bind my successors and assigns.

12. **AMENDMENT, INTEGRATION AND SEVERABILITY.** This Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing and executed by you and me. This Agreement and the other Loan Documents are the complete and final expression of the understanding between you and me. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

13. **INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement.

14. **NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Borrower will be deemed to be notice to all Borrowers. I will inform you in writing of any change in my name, address or other application information. I will provide you any financial statement or information you request. All financial statements and information I give you will be correct and complete. I agree to sign, deliver, and file any additional documents or certifications that you may consider necessary to perfect, continue, and preserve my obligations under this Loan and to confirm your lien status on any Property. Time is of the essence.

15. **SIGNATURES.** By signing, I agree to the terms contained in this Agreement. I also acknowledge receipt of a copy of this Agreement.

Confidential

FFB00381

**ADDENDUM TO**
**COMMERCIAL LOAN AGREEMENT**
**LOAN #: 120031421**

This Addendum supplements the terms of the captioned Commercial Loan Agreement and the terms of each Loan Document (as defined in the Note and executed in conjunction therewith), all of which should be read together to provide to First Financial bank the greatest rights, security and remedies:

1. **WAIVERS AND CONSENT.** To the extent not prohibited by law, Borrower waives protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor.

   A. **Additional Waivers By Borrower.** In addition, Borrower and any party to this Note and Loan, to extent permitted by law, consent to certain actions set forth herein that Lender may take, and generally waive defenses that may be available based on these actions or based on the status of party to this Note, as follows:.

   (1) Lender may renew or extend payments on this Note, regardless of the number of such renewals or extensions.

   (2) Lender may release any Borrower, endorser, guarantor, surety, accommodation maker or any other co-signer.

   (3) Lender may release, substitute or impair any Property securing this Note.

   (4) Lender, or any institution participating in this Note, may invoke Lender's right of set-off.

   (5) Lender may enter into any sales, repurchases or participations of this Note to any person in any amounts and Borrower waive notice of such sales, repurchase or participations.

   (6) Borrower agrees that any person or entity signing the Note as a Borrower is authorized, alone or in concert, to modify the terms of the Note or any instrument securing, guarantying or relating to the note.

1321058.1

pp
LDP

FFB00383

Confidential

B. **No Waiver By Lender.** Lender's course of dealing, or Lender's forbearance from, or delay in, the exercise of any of Lender's rights, remedies, privileges or right to insist upon Borrower's strict performance of any provisions contained in this Note, or any other Loan Document, shall not be construed as a waiver by Lender, unless any such waiver is in writing and is signed by Lender.

2. **INTEREST.** Interest will accrue on the unpaid Principal balance of the Note at the rate of _5.00_% percent (Interest Rate) until _AUGUST 1, 2013_ after which time it may change, if and as described in a Variable Rate subsection.

   A. **Interest After Default.** If Lender declares a default under the terms of the Loan, including for failure to pay in full at maturity, interest will accrue on the unpaid Principal balance of this Note at the Interest rate in effect from time to time under the terms of the Loan, until paid in full.

   B. **Maximum Interest Amount.** Any amount assessed or collected as interest under the terms of this Note will be limited to the maximum lawful amount of interest allowed by state or federal law, which ever is greater. Amounts collected in excess of the maximum lawful amount will be applied first to unpaid Principal balance. Any remainder will be refunded to Borrower.

   C. **Statutory Authority.** The amount assessed or collected on this Note is authorized by the Arkansas usury laws provided such laws are not otherwise preempted by federal laws and regulations.

   D. **Accrual.** Interest accrues using an Actual/365 days counting method.

3. **ASSUMPTIONS.** Subject to conditions and Lender's written consent, someone buying the Property may be allowed to assume this Note. Without written consent, Lender may, at Lender's option, declare the entire balance of this Note to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of

1321058.1

FFB00384

Confidential

the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. An assumption fee may be assessed if Borrower requests, and Lender agrees, to transfer some or all of the Property to another party.

4. **COMMISSIONS.** Borrower understands and agrees that Lender (or Lender's affiliate) may earn commissions or fees on any insurance products, and may earn such fees on other services that Borrower buys through Lender or Lenders affiliate.

5. **ERRORS AND OMISSIONS.** Borrower agrees, if requested by Lender, to fully cooperate in the correction, if necessary, in the reasonable discretion of Lender, of any and all Loan closing documents so that all documents accurately describe the Loan between Lender and Borrower. Borrower agrees to assume all costs, including by way of illustration and not limitation, actual expenses, legal fees and marketing losses, for failing to reasonably comply with Lender's requests within thirty (30) days.


DATE:<u>JULY 23, 2010</u>


ROGER DALE PARKER

LINDA GAIL PARKER

Confidential

**PREPAYMENT ADDENDUM TO COMMERCIAL LOAN AGREEMENT**
**(LESS THAN 15-YEAR MATURITY)**
**LOAN #: 120031421**

Notwithstanding any provision in the Note or Loan Documents to the contrary, Borrower may prepay this Note.  Borrower may prepay 20% or less of the unpaid principal balance at any time without notice.  If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a.  Give Lender written notice;

b.  Pay all accrued interest; and

c.  If the prepayment is received less that 21 days from the date Lender receives the notice, pay an amount equal to 21 days interest from the date Lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

These requirements are in addition to any other provisions of the Loan Documents related to prepayment.

DATE:JULY 23, 2010

ROGER DALE PARKER

LINDA GAIL PARKER

Confidential

# Exhibits 5 - 9 to Parker II

# Deposition

# (Being Filed Under Seal)



897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

| | | | |
|---|---|---|---|
| Phone # | 706-819-2260 | poultryequipment@aol.com | |
| Fax # | 478-454-9032 | parkerspoultryequipment.com | |

**Date** 7/10/2017
**Invoice #** 10191

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
|---|---|
| 5/17/2017 | |

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| Analog Input C... | Replace card that was damaged with lightning | 3 | 350.00 | 1,050.00 |
| Digital Imput Ca... | Replace card that was damaged with lightning | 4 | 325.00 | 1,300.00 |

only 3 cards would have been charged but a new controller does not have this card,

| | |
|---|---|
| **Total** | $2,350.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $2,350.00 |

DEFENDANT'S EXHIBIT 13 PARKER PENGAD 800-631-0989



897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

| | | **Date** | 5/17/2017 |
| | | **Invoice #** | 10189 |

| Phone # | 706-819-2260 | poultryequipment@aol.com |
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
|---|---|
| 5/17/2017 | |

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| cpu | Rotem Platinum Plus CPU | 4 | 1,531.66 | 6,126.64 |
| Relay Card Set | Platinum Plus Standard Platinum Plus Relay Card Set | 6 | 279.92 | 1,679.52 |
| Display Screen | Platinum Plus Display Screen | 3 | 1,161.01 | 3,483.03 |
| Key Pad | Platinum Plus Key Pad with Monitor Power | 3 | 444.00 | 1,332.00 |
| auger sensor | Sensor relay for feed line | 4 | 275.00 | 1,100.00 |
| Labor | Install parts, Trace and replace bad wiring in feed drives, replace electrical Motors and test Rotem Platinum Plus Boxes for damage. | | 1,892.20 | 1,892.20 |
| 1 hp Motor | Mew Motor | 3 | 235.00 | 705.00 |

See Attached file for Explanation of parts used.

| | |
|---|---|
| **Total** | $16,318.39 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $16,318.39 |



Parker's
POULTRY EQUIPMENT
897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

| **Date** | 5/17/2017 |
|---|---|
| **Invoice #** | 10190 |

| Phone # | 706-819-2260 | poultryequipment@aol.com |
|---|---|---|
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
|---|---|
| 5/17/2017 | |

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| Rotem Controller | Install New controller after lightning strike. Install done with live birds in houses which is extremely more difficult. | 1 | 7,800.00 | 7,800.00 |
| Annalog output ... | House card was hit by lightning | 3 | 350.00 | 1,050.00 |
| Digital Imput Ca... | Cards were partially functioning due to lightning strike. | 3 | 325.00 | 975.00 |

| | |
|---|---|
| **Total** | $9,825.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $9,825.00 |



897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

**Date** 5/17/2017
**Invoice #** 10190

| | | | |
|---|---|---|---|
| Phone # | 706-819-2260 | poultryequipment@aol.com | |
| Fax # | 478-454-9032 | parkerspoultryequipment.com | |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
|---|---|
| 5/17/2017 | |

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| Rotem Controller | Install New controller after lightning strike. Install done with live birds in houses which is extremely more difficult. | 1 | 7,800.00 | 7,800.00 |

| | |
|---|---|
| **Total** | $7,800.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $7,800.00 |

Parker_002140



897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

| | |
|---|---|
| **Date** | 5/17/2017 |
| **Invoice #** | 10189 |

| | | | |
|---|---|---|---|
| Phone # | 706-819-2260 | poultryequipment@aol.com | |
| Fax # | 478-454-9032 | parkerspoultryequipment.com | |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
|---|---|
| 5/17/2017 | |

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| cpu | Rotem Platinum Plus CPU | 4 | 1,350.00 | 5,400.00 |
| Relay Card Set | Platinum Plus Standard Platinum Plus Relay Card Set | 6 | 250.00 | 1,500.00 |
| Display Screen | Platinum Plus Display Screen | 3 | 1,000.00 | 3,000.00 |
| Key Pad | Platinum Plus Key Pad with Monitor Power | 3 | 390.00 | 1,170.00 |
| auger sensor | Sensor relay for feed line | 4 | 250.00 | 1,000.00 |
| Labor | Install parts, Trace and replace bad wiring in feed drives, replace electrical Motors and test Rotem Platinum Plus Boxes for damage. | | 1,600.00 | 1,600.00 |
| 1 hp Motor | Mew Motor | 3 | 0.00 | 0.00 |
| Analog Input C... | | 3 | 350.00 | 1,050.00 |
| Digital Imput Ca... | | 3 | 325.00 | 975.00 |

See Attached file for Explanation of parts used.

| | |
|---|---|
| **Total** | $15,695.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $15,695.00 |

Parker_002142



**897 Ga Highway 24 E**
Milledgeville GA 31061

# Invoice

| | |
|---|---|
| **Date** | 5/17/2017 |
| **Invoice #** | 10190 |

| Phone # | 706-819-2260 | poultryequipment@aol.com |
|---|---|---|
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
|---|---|
| 6/21/2017 | |

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| Rotem Controller | Install New controller after lightning strike. Install done with live birds in houses which is extremely more difficult. | 1 | 7,800.00 | 7,800.00 |
| Inspect Generat... | Generator starting without command ,All lugs are tight an no hot connections found. | | 200.00 | 200.00 |

| | |
|---|---|
| **Total** | $8,000.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $8,000.00 |

Parker_002144

Message

---

**From:**       poultryequipment@msn.com [poultryequipment@msn.com]
**Sent:**       7/10/2017 12:54:42 PM
**To:**         ███████████████
**Subject:**    Invoice from Parker's Poultry


Dear Customer :

Your invoice is attached.  Please remit payment at your earliest convenience.

Thank you for your business - we appreciate it very much.

Sincerely,

Parker's Poultry
706-468-2676


**Parker's**
POULTRY EQUIPMENT
897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

**Date** 7/10/2017
**Invoice #** 10191

| Phone # | 706-819-2260 | poultryequipment@aol.com |
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
| --- | --- |
| 4/18/2017 | |

| Item | Description | Qty | Price | Amount |
| --- | --- | --- | --- | --- |
| Analog Input C... | Replace card that was damaged with lightning | 3 | 350.00 | 1,050.00 |
| Digital Imput Ca... | Replace card that was damaged with lightning | 4 | 325.00 | 1,300.00 |

only 3 cards would have been charged but a new controller does not have this
card,

| | |
| --- | --- |
| **Total** | $2,350.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $2,350.00 |



897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

**Date** 4/18/2017
**Invoice #** 10190

| Phone # | 706-819-2260 | poultryequipment@aol.com |
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
| --- | --- |
| 5/31/2017 | |

| Item | Description | Qty | Price | Amount |
| --- | --- | --- | --- | --- |
| Rotem Controller | Install New controller after lightning strike. Install done with live birds in houses which is extremely more difficult. | 1 | 7,800.00 | 7,800.00 |
| Inspect Generat... | Generator starting without command ,All lugs are tight an no hot connections found. | | 200.00 | 200.00 |

Claim #2017011132 (Addendum)

| | |
| --- | --- |
| **Total** | $8,000.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $8,000.00 |

Parker_002158



# Invoice

897 Ga Highway 24 E
Milledgeville GA 31061

**Date** 6/15/2017
**Invoice #** 10190

| Phone # | 706-819-2260 | poultryequipment@aol.com |
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
| --- | --- |
| 6/15/2017 | |

| Item | Description | Qty | Price | Amount |
| --- | --- | --- | --- | --- |
| Rotem Controller | Install New controller after lightning strike. Install done with live birds in houses which is extremely more difficult. | 1 | 7,800.00 | 7,800.00 |
| Inspect Generat... | Generator starting without command ,All lugs are tight an no hot connections found. | | 200.00 | 200.00 |

Claim #2017011132 (Addendum)

| | |
| --- | --- |
| **Total** | $8,000.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $8,000.00 |



897 Ga Highway 24 E
Milledgeville GA 31061

# Invoice

**Date** 7/10/2017
**Invoice #** 10191

| Phone # | 706-819-2260 | poultryequipment@aol.com |
| Fax # | 478-454-9032 | parkerspoultryequipment.com |

**Bill To**

Dennis Fitch
4587 H. D. Atha Road
Covington Ga 30014

| Due Date | Project |
| --- | --- |
| 7/10/2017 | |

| Item | Description | Qty | Price | Amount |
| --- | --- | --- | --- | --- |
| Analog Input C... | Replace card that was damaged with lightning | 3 | 350.00 | 1,050.00 |
| Digital Imput Ca... | Replace card that was damaged with lightning | 4 | 325.00 | 1,300.00 |

Claim #2017008373 (Addendum)

| | |
| --- | --- |
| **Total** | $2,350.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $2,350.00 |

Parker_002170

** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
|---|---|---|---|---|
| October 9, 2019 10:59:24 AM CDT | | 30 | 1 | Received |

Parker's Poultry Equipment-Hazel L Farm
897 Highway 24 E, Milledgeville, GA, 31061, USA

| CUSTOMER NAME | CUSTOMEI SO# | | QTY ORDEI | PRICE | SALES AMT | LAST MODIFIED |
|---|---|---|---|---|---|---|
| Parker's Poultry Equ | 81615086 | 1100877482 | 550.1 | 1.2323 | $ 677.89 | 4/6/2018 |
| Parker's Poultry Equ | 81615086 | 1100877487 | 364.8 | 1.2323 | $ 449.54 | 4/6/2018 |
| Parker's Poultry Equ | 81615086 | 1100877491 | 284 | 1.2323 | $ 349.97 | 4/6/2018 |
| Parker's Poultry Equ | 81615086 | 1100878424 | 450 | 1.2323 | $ 554.54 | 4/6/2018 |
| Parker's Poultry Equ | 81615086 | 1100878412 | 450 | 1.2323 | $ 554.54 | 4/6/2018 |
| Parker's Poultry Equ | 81615086 | 1100878405 | 466.5 | 1.2323 | $ 574.87 | 4/6/2018 |
| Parker's Poultry Equ | 81615086 | 1101583311 | 486.2 | 1.3263 | $ 644.85 | 6/4/2018 |
| Parker's Poultry Equ | 81615086 | 1101583308 | 481.7 | 1.3263 | $ 638.88 | 6/4/2018 |
| Parker's Poultry Equ | 81615086 | 1101583304 | 429.7 | 1.3263 | $ 569.91 | 6/4/2018 |
| Parker's Poultry Equ | 81615086 | 1101584301 | 450.1 | 1.3263 | $ 596.97 | 6/4/2018 |
| Parker's Poultry Equ | 81615086 | 1101584296 | 450 | 1.3263 | $ 596.84 | 6/4/2018 |
| Parker's Poultry Equ | 81615086 | 1101598183 | 450 | 1.3263 | $ 596.84 | 6/5/2018 |
| | | | 5313.1 | | $ 6,805.62 | |



# Exhibit 14 to Parker II Depo

# (Being Filed Under Seal)

# Exhibit 15 to Parker II Depo

# (Being Filed Under Seal)

# Exhibit 16 to Parker II Depo

# (Being Filed Under Seal)

# Exhibit 17 to Parker II Depo

# (Being Filed Under Seal)

Message

| | |
|---|---|
| **From:** | Roger Parker [poultryequipment@msn.com] |
| on behalf of | Roger Parker <poultryequipment@msn.com> [poultryequipment@msn.com] |
| **Sent:** | 2/10/2017 5:54:50 AM |
| **To:** | Susan Davis [sdavis@bigdutchmanusa.com] |
| **Subject:** | Re: Tax Exemption Certificate |

Here is my Ga tax exemption card.

## Georgia Agriculture Tax Exemption Certification

Roger Parker                                    DORAG5957
897 Highway 24 East
Milledgeville, GA  31061

Parker's Poultry / Hazel Lee Farm          Additional Users:
Issued: 12/6/2012                              Linda Parker
Expires: 12/31/2017                            Simon Parker
                                               Bradly Parker

**Gary W. Black, Commissioner**
**Georgia Department of Agriculture**

On Feb 9, 2017, at 4:09 PM, Susan Davis <sdavis@bigdutchmanusa.com> wrote:

> Good afternoon! I wanted to follow up regarding a current tax exemption certificate for you. The one
> we have is expired and, in order to not charge sales tax, we need a valid exemption certificate on
> file. Please submit your completed tax exemption certificate as soon as possible to avoid being charged
> sales tax.
>
> Thank you!
>
>
> **Susan L. Davis**                    Office: +1 616 582-4081
> *Accounting Associate*                Fax: +1 616 582-4118
>                                       E-Mail: sdavis@bigdutchmanusa.com
>
> **Big Dutchman, Inc.**
> 3900 John F. Donnelly Drive
> Holland, MI  49424
> www.bigdutchmanusa.com
>
> <image001.png>



**From:** Receivables
**Sent:** Monday, January 23, 2017 9:41 AM
**To:** Parker Poultry Equipment - Statements <poultryequipment@msn.com>
**Subject:** Tax Exemption Certificate

Good morning! The sales tax exemption certificate we have on file for you expired on 1/4/11. To avoid being charged sales tax on future orders, please submit a current sales tax exemption form for your state. A blank form is attached for your convenience. Please let us know if you have any questions.

Thank you,


**Accounts Receivable**
Office: 616-582-4081
Fax: 616-582-4118
E-mail: receivables@bigdutchmanusa.com

**Big Dutchman, Inc.**
3900 John F. Donnelly Drive
Holland, MI 49424
www.bigdutchmanusa.com

Parker_002120

## Georgia Agriculture Tax Exemption Certification

Roger Parker                                          DORAG5957
897 Highway 24 East
Milledgeville, GA  31061

Parker's Poultry / Hazel Lee Farm                     Additional Users:
Issued: 12/6/2012                                     Linda Parker
Expires: 12/31/2017                                   Simon Parker
                                                      Bradly Parker

### Gary W. Black, Commissioner
### Georgia Department of Agriculture

Parker_002124

✇ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
BALDWIN COUNTY, GEORGIA

**SUCV2020049620**
JJAATB
JUN 03, 2020 06:38 PM

Mitch Longino, Clerk
Baldwin County, Georgia

## IN THE SUPERIOR COURT OF BALDWIN COUNTY
### STATE OF GEORGIA

FIRST FINANCIAL BANK,     )
                             )
    Petitioner,          )
                             )
v.                          )     CIVIL ACTION
                           )     FILE NO._____
ROGER DALE PARKER and    )
LINDA GAIL PARKER,       )
                           )
    Respondents.       )

## REPORT OF SALE AND APPLICATION FOR
## CONFIRMATION AND APPROVAL OF SALE OF REAL ESTATE

Petitioner, First Financial Bank (the "Petitioner"), files this Report of Sale and Application for Confirmation and Approval of Sale of Real Estate against respondents, Roger Dale Parker and Linda Gail Parker ("Respondents"), respectfully showing as follows:

### Introduction

1.

In this Report and Application, Petitioner seeks confirmation and approval of the sale of real estate secured by security deeds executed by Respondents in favor of Petitioner.

2.

Specifically, the Petitioner seeks confirmation and approval of the May 5, 2020 foreclosure sale of real property located in Baldwin County, Georgia. The property was sold for $225,000.00 at foreclosure.

3.

Petitioner submits that the foreclosure sale brought the true market value or greater of the real property. Accordingly, the Petitioner requests that the Court confirm the sale.



DEFENDANT'S
EXHIBIT
20
PARKER

True and correct copies of the deed to secure debt (with future advance clause) and modification agreement are attached hereto as Exhibits 2 and 3, respectively.

9.

On March 4, 2010, Respondents executed and delivered to Petitioner a promissory note in the original principal amount of $92,000. A true and correct copy of the promissory note is attached as Exhibit 4. The promissory note was secured by that deed to secure debt given by Respondents to Petitioner dated March 4, 2010 and recorded on March 16, 2010, filed for record in Book 1016, Page 21, Baldwin County, Georgia Records. A true and correct copy of the security deed is attached hereto as Exhibit 5.

10.

On June 24, 2013, Respondents executed and delivered to Petitioner a promissory note in the original principal amount of $1,115,000.00. A true and correct copy of the promissory note is attached as Exhibit 6. The promissory note was secured by that deed to secure debt (with future advance clause) given by Respondents to Petitioner dated June 24, 2013 and recorded on July 15, 2013, filed for record in Book 1139, Page 229, Baldwin County, Georgia Records, and modified by that certain modification of deed to secure debt given by Respondents to Petitioner dated August 3, 2015 and recorded on November 2, 2015, filed for record in Book 1220, Page 370, Baldwin County, Georgia Records. True and correct copies of the security deed (with future advance clause) and modification are attached hereto as Exhibits 7 and 8, respectively.

11.

On December 7, 2018, Respondents executed and delivered to Petitioner a promissory note in the original principal amount of $20,000.00. A true and correct copy of the promissory note is attached as Exhibit 9. The promissory note was secured by that deed to secure debt given by

FFB00982

attached hereto as Composite Exhibit 11.

14.

On April 1, 2020, Petitioner served Respondents with a Notice of Sale Under Power scheduling the foreclosure sale of the Property for May 5, 2020. A true and correct copy of the Notice of Power Under Sale is attached as Exhibit 12.

15.

On April 10, 17, 24 and May 1 of 2020, the Notice of Sale Under Power was published in The Union-Recorder, the official legal newspaper of Baldwin County, Georgia. A true and correct copy of the Publisher's Affidavit is attached as Exhibit 13.

16.

On May 5, 2020, the Petitioner sold the Property at foreclosure. Petitioner was the purchaser and executed a Deed Under Power of Sale as attorney-in-fact for Respondent. A true and correct copy of the Deed Under Power of Sale is attached as Exhibit 13. The memorandum of sale is attached as Exhibit 14.

17.

The Petitioner was the highest bidder and purchased the Property for $225,000.00. The sale was made subject to all unpaid city, county, state, and ad valorem property taxes and assessments related to the Property.

18.

After the foreclosure sale of the Property, there is a deficiency under the Notes.

19.

The Property brought its true market value or greater at the foreclosure sale.

# EXHIBIT 1

FFB00986

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

Maturity: This Note will mature in 13 years from date of Note.

Repayment Terms: The initial interest rate is 5.00% per year for 3 years. The initial rate is the prime rate in effect on the first business day of the month in which SBA received the loan application, plus 1.75%. The interest rate on this Note will then begin to fluctuate as described below. The initial interest rate must remain in effect until the first change period begins.

Borrower must pay principal & interest payments of $ 99,537.00 every year, beginning twelve months from the month this Note is dated; payments must be made on the 23rd calendar day in the months they are due.

Lender will apply each installment payment first to interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted quarterly (the "change period").

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in the Wall Street Journal) in which SBA received the application, or any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate  will be 2.00% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The  change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20% or less of the unpaid principal balance at anytime without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a.  Give Lender written notice;
b.  Pay all accrued interest; and
c.  If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date Lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;

B. Defaults on any other loan with Lender;

C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;

D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;

E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;

F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;

G. Fails to pay any taxes when due;

H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;

I. Has a receiver or liquidator appointed for any part of their business or property;

J. Makes an assignment for the benefit of creditors;

K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;

L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or

M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;

B. Collect all amounts owing from any Borrower or Guarantor;

C. File suit and obtain judgment;

D. Take possession of any Collateral; or

E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;

C. Release anyone obligated to pay this Note;

D. Compromise, release, renew, extend or substitute any of the Collateral; and

E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

Wolters Kluwer Financial Services, St. Cloud, MN

10.  STATE-SPECIFIC PROVISIONS:

Page 5/6
Wolters Kluwer Financial Services, St. Cloud, MN

FFB00992

# EXHIBIT 2

FFB00994

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender. 

2. SECURED DEBTS AND FUTURE ADVANCES. The term "Secured Debts" includes and this Security Instrument will secure each of the following:

A. Specific Debts. The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 120030744, dated November 12, 2009, from Grantor to Lender, with a loan amount of nine hundred and thirty five thousand dollars and zero cents ($935,000.00) and maturing on May 12, 2010.

B. Future Advances. All future advances from Lender to Grantor under the Specific Debts executed by Grantor in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to Grantor either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Grantor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

C. All Debts. All present and future debts from Grantor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Grantor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose." as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

D. Sums Advanced. All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

3. PAYMENTS. Grantor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

4. WARRANTY OF TITLE. Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, bargain, transfer, convey and sell the Property to Lender, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

5. PRIOR SECURITY INTERESTS. With regard to any other mortgage, deed of trust, deed to secure debt, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Grantor agrees:

A. To make all payments when due and to perform or comply with all covenants.

B. To promptly deliver to Lender any notices that Grantor receives from the holder.

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SOUTHRIE0000000000235032110609N                    Wolters Kluwer Financial Services ©1996, 2009 Bankers Systems™              Initials
                                                                                                                                      Page 2

**M. Erosion.** Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce or make possible the production of an agricultural commodity, as further explained by federal law.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Grantor's financial condition from the conditions set forth in Grantor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**13. REMEDIES.** On or after default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Grantor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Grantor's default.

Subject to any right to cure, required time schedules or any other notice rights Grantor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of a default or anytime thereafter.

If there is a default, Lender may, in addition to any other permitted remedy, advertise and sell the Property as a whole or in separate parcels at public auction to the highest bidder for cash and convey absolute title free and clear of all right, title and interest of Grantor at such time and place as Lender designates. Lender will give notice of sale including the time, terms and place of sale and a description of the Property as required by the applicable law in effect at the time of the sale. Lender may purchase the Property.

Upon sale of the Property and to the extent not prohibited by law and after first paying all expenses, fees, charges and costs, Lender shall make and deliver a deed to the Property sold which conveys absolute title to the purchaser. Lender shall apply the proceeds of the sale in the following order: (a) to all expenses, fees, charges, and costs of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

Upon a sale pursuant to this section, Grantor, or any person holding possession of the Property through Grantor, will immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Grantor or such person will be a tenant holding over and may be dispossessed in accordance with applicable law.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**14. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after Default, to the extent permitted by law, Grantor agrees to pay all expenses of collection, enforcement or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Grantor agrees to pay expenses for Lender to inspect and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, attorneys' fees, court costs, and other legal expenses. If the Secured Debts are collected by or through an attorney after maturity, Grantor agrees to pay 15 percent of the principal and interest owing as attorneys' fees. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Grantor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Grantor.

**15. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA,

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR44SGUTHRIED0000000000235032110608N
Wolters Kluwer Financial Services ©1996, 2009 Bankers Systems™

Initials _AP_
Page 5

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**16. CONDEMNATION.** Grantor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor's name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, deed to secure debt, security agreement or other lien document.

**17. INSURANCE.** Grantor agrees to keep the Property insured against the risks reasonably associated with the Property. Grantor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Grantor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals will include a standard "mortgage clause" and, where applicable, "loss payee clause." If required by Lender, Grantor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Grantor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Grantor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Grantor will immediately notify Lender of cancellation or termination of insurance. If Grantor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Grantor will pay for the insurance on Lender's demand. Lender may demand that Grantor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Grantor, may be written by a company other than one Grantor would choose, and may be written at a higher rate than Grantor could obtain if Grantor purchased the insurance. Grantor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**18. ESCROW FOR TAXES AND INSURANCE.** As provided in a separate agreement, Grantor agrees to pay to Lender funds for taxes and insurance in escrow.

**19. CO-SIGNERS.** If Grantor signs this Security Instrument but is not otherwise obligated to pay the Secured Debts, Grantor does so only to convey Grantor's interest in the Property to secure payment of the Secured Debts and Grantor does not agree by signing this Security Instrument to be personally liable on the Secured Debts. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation.

**20. WAIVERS.** Except to the extent prohibited by law, Grantor waives all homestead and other exemption rights relating to the Property.

**21. CONSTRUCTION LOAN.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

**22. APPLICABLE LAW.** This Security Instrument is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**23. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Grantor's obligations under this Security Instrument are independent of the obligations of any other Grantor. Lender may sue each Grantor individually or

Wolters Kluwer Financial Services ©1996, 2009 Bankers Systems™

Initials 
Page 7

**SIGNATURES.** By signing under seal, Grantor agrees to the terms and covenants contained in this Security Instrument. Grantor also acknowledges receipt of a copy of this Security Instrument.

GRANTOR:

_____ (Seal)
ROGER DALE PARKER
Individually

Signed, sealed and delivered in the presence of:

_____
(Unofficial Witness)

_____
(Notary Public,          County, Georgia)

_____ (Seal)
LINDA GAIL PARKER
Individually

Signed, sealed and delivered in the presence of:

_____
(Unofficial Witness)

_____
(Notary Public,          County, Georgia)

GEORGIA INTANGIBLE TAX PAID
DATE 11-17-2009 $ 2,805
                    BALDWIN CO. GA.
CATHY FREEMAN TAX COMMISSIONER

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE000000000000235032110809N

Wolters Kluwer Financial Services ©1996, 2009 Bankers Systems™

Initials _____
Page 9

EXHIBIT "A"

All that tract or parcel of land lying and being in the 115th G.M. District, Baldwin County, Georgia, containing **24.095 ACRES** and further identified as having such shape, size, metes, bounds, courses and distance as are shown upon a plat thereof entitled "Austin M. Tran & Tiffany Le Tran" by James E. Smith, Jr., G.R.L.S. No. 1895, dated May 25, 2005, and recorded in Plat Book 29, Page 28, Clerk's Office, Baldwin County Superior Court. Reference is hereby made to said plat and incorporated herein for the purpose of a more particular and accurate description of the property herein conveyed.

Said conveyance is subject to all rights of way, easements, and restrictions of record.

This is the identical property described in that certain Warranty Deed from David J. Meeks to Austin Minh Tran and Tiffany Lee Tran, dated June 22, 2005, and recorded in Deed Book 776, Pages 303-304, Office of the Clerk of Superior Court of Baldwin County, Georgia.

FILED & RECORDED
CLERK, SUPERIOR COURT
BALDWIN CO.

2010 AUG -2 PH 12: 02

BY *[signature]*
ROSEMARY PHILLIPS, CLERK
*Deputy Clerk*

After recording return to:
Molly H. Watson
Haygood, Lynch, Harris,
Melton & Watson, LLP
87 North Lee Street
P.O. Box 657
Forsyth, Georgia 31029
Our File No. A58-17298



Doc ID:   000701580003 Type: GLR
Filed: 08/02/2010 at 12:02:50 PM
Fee Amt: $0.00 Page 1 of 3
Baldwin, Ga. Clerk Superior Court
Rosemary Phillips Clerk of Courts
BK 1029 PG 457-459

SPACE ABOVE FOR RECORDING PURPOSES ONLY

## MODIFICATION AGREEMENT

**STATE OF GEORGIA**

**COUNTY OF JASPER.**

For the purpose of conforming the same to the intention of the parties, and in consideration of the premises hereinafter set forth, it is agreed between the undersigned parties that the security deed heretofore made by **ROGER DALE PARKER and LINDA GAIL PARKER** to **FIRST FINANCIAL BANK** on **November 12, 2009**, recorded in **Deed Book 1006, Pages 273-283**, Baldwin County records, and recorded in **Deed Book 725, Pages 102-111**, Jasper County records, and securing collateral described in Exhibit "A" attached hereto, shall be amended and modified in the following particulars:

WHEREAS, said deeds to secure debt secure a certain indebtedness as described in said deeds, and also any other loans or advances subsequently made and any obligations which may exist between **Roger Dale Parker and Linda Gail Parker and First Financial Bank** until said deeds are cancelled; and

WHEREAS, First Financial Bank has this day extended, modified and renewed the original indebtedness secured by the above described security deeds so that this instrument is made to secure the payment of note(s) dated **July 23, 2010** due and payable on or before **July 23, 2023** (hereafter referred to as the "Note"), so that the principal indebtedness of the Borrower to the Lender is now **$935,000.00** secured by property described in the aforementioned deeds.

That said deeds to secure debt shall secure the additional advance, extension, modification, and renewal of indebtedness to the same extent as the original

3

## EXHIBIT "A"

### TRACT ONE:

All that tract or parcel of land lying and being in Land Lots 68, 69 and 93 of the 13th Land District, 365th G.M.D. of Jasper County, Georgia, and being shown as an **84.53 acre tract** as shown on that certain Plat of Survey for Allen Schrock and Lucinda Schrock prepared and certified by Linda H. Jordan, Jasper County Surveyor, said plat being dated June 27, 1997, and recorded in Plat Book 9, Page 387, Public Records of Jasper County, Georgia, and said plat by reference thereto being incorporated herein and made a part hereof for a more particular description of the captioned property.

**LESS AND EXCEPT:** All that tract or parcel of land lying and being in 365 GMD, Land Lot 93 of the 13th District of Jasper County, Georgia, containing **7.91 acres** shown on plat of survey entitled 'Survey for: Simon D. Parker' prepared by Jordan Engineering, Michael A. Lewis, RLS No. 2869, dated October 12, 2007, and recorded in Plat Book 11, Page 493-A, Clerk's Office, Jasper Superior Court, which plat is incorporated herein by reference thereto.

This is the identical property described in that certain Warranty Deed from Roger Dale Parker and Linda Gail Parker to Simon D. Parker dated December 17, 2007, and recorded in Deed Book 659, Page 299, Office of the Clerk of Superior Court of Jasper County, Georgia.

### TRACT TWO:

All that tract or parcel of land lying and being in Land Lots 61 and 68 of the 13th Land District, 365th G.M.D. of Jasper County, Georgia, and being shown as **30.80 acres**, more or less, as shown on that Plat of Survey prepared and certified by Linda H. Jordan, Jasper County Surveyor, and said plat being recorded in Plat Book 10, Page 309, Public Records of Jasper County, Georgia, and said plat by reference thereto being incorporated herein and made a part hereof for a more particular description of the captioned property.

This conveyance is made subject to all zoning ordinances, easements and restrictions of record affecting said bargained premises.

**Tracts One and Two** are the identical tracts described in that certain Joint Tenancy with Survivorship Warranty Deed from Allen R. Schrock and Lucinda H. Schrock to Roger Dale Parker and Linda Gail Parker, dated June 22, 2006, and recorded in Deed Book 585, Pages 23-24, Office of the Clerk of Superior Court of Jasper County, Georgia.

### TRACT THREE:

All that tract or parcel of land lying and being in the 115th G.M. District, Baldwin County, Georgia, containing **24.095 ACRES** and further identified as having such shape, size, metes, bounds, courses and distance as are shown upon a plat thereof entitled "Austin M. Tran & Tiffany Le Tran" by James E. Smith, Jr., G.R.L.S. No. 1895, dated May 25, 2005, and recorded in Plat Book 29, Page 28, Clerk's Office, Baldwin County Superior Court. Reference is hereby made to said plat and incorporated herein for the purpose of a more particular and accurate description of the property herein conveyed.

Said conveyance is subject to all rights of way, easements, and restrictions of record.

This is the identical property described in that certain Warranty Deed Creating Joint Tenancy With Survivorship from Austin Minh Tran and Tiffany Lee Tran to Roger Dale Parker and Linda Gail Parker, dated November 12, 2009, and recorded in Deed Book 1006, Pages 271-272, Office of the Clerk of Superior Court of Baldwin County, Georgia.



| LOAN NUMBER | LOAN NAME | ACCT. NUMBER | NOTE DATE | INITIALS |
|---|---|---|---|---|
| ▓▓▓1039 | ROGER DALE PARKER | | 03/04/10 | JMU-062 |
| NOTE AMOUNT | INDEX (w/Margin) | RATE | MATURITY DATE | LOAN PURPOSE |
| $92,000.00 | Wall Street Journal U.S. Prime Rate plus 4.500% | 7.750% | 03/04/20 | Agricultural |
| | | Creditor Use Only | | |

## PROMISSORY NOTE
### (Agricultural - Single Advance)

**DATE AND PARTIES.** The date of this Promissory Note (Note) is March 4, 2010. The parties and their addresses are:

LENDER:
FIRST FINANCIAL BANK
214 North Washington
El Dorado, AR 71730
Telephone: (870) 863-7000

BORROWER:
ROGER DALE PARKER
288 GORDON ROAD
HILLSBORO, GA 31038

LINDA GAIL PARKER
288 GORDON ROAD
HILLSBORO, GA 31038

1. **DEFINITIONS.** As used in this Note, the terms have the following meanings:

A. **Pronouns.** The pronouns "I", "me," and "my" refer to each Borrower signing this Note, individually and together. "You" and "Your" refer to the Lender.

B. **Note.** Note refers to this document, and any extensions, renewals, modifications and substitutions of this Note.

C. **Loan.** Loan refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction such as applications, security agreements, disclosures or notes, and this Note.

D. **Loan Documents.** Loan Documents refer to all the documents executed as a part of or in connection with the Loan.

E. **Property.** Property is any property, real, personal or intangible, that secures my performance of the obligations of this Loan.

F. **Percent.** Rates and rate change limitations are expressed as annualized percentages.

2. **PROMISE TO PAY.** For value received, I promise to pay you or your order, at your address, or at such other location as you may designate, the principal sum of **$92,000.00 (Principal)** plus interest from March 4, 2010 on the unpaid Principal balance until this Note matures or this obligation is accelerated.

3. **INTEREST.** Interest will accrue on the unpaid Principal balance of this Note at the rate of 7.750 percent (Interest Rate) until April 1, 2015, after which time it may change as described in the Variable Rate subsection.

A. **Post-Maturity Interest.** After maturity or acceleration, interest will accrue on the unpaid Principal balance of this Note at the Interest Rate in effect from time to time, until paid in full.

B. **Maximum Interest Amount.** Any amount assessed or collected as interest under the terms of this Note will be limited to the maximum lawful amount of interest allowed by state or federal law, whichever is greater. Amounts collected in excess of the maximum lawful amount will be applied first to the unpaid Principal balance. Any remainder will be refunded to me.

C. **Statutory Authority.** The amount assessed or collected on this Note is authorized by the Arkansas usury laws under Ark. Const. art. XIX, § 13(d)(i), provided such laws are not otherwise preempted by federal laws and regulations.

D. **Accrual.** Interest accrues using an Actual/365 days counting method.

E. **Variable Rate.** The Interest Rate may change during the term of this transaction.

(1) **Index.** Beginning with the first Change Date, the Interest Rate will be based on the following index: the base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks known as the Wall Street Journal U.S. Prime Rate.

The Current Index is the most recent index figure available on each Change Date. You do not guaranty by selecting this Index, or the margin, that the Interest Rate on this Note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers. If this Index is no longer available, you will substitute a similar index. You will give me notice of your choice.

(2) **Change Date.** Each date on which the Interest Rate may change is called a Change Date. The Interest Rate may change April 1, 2015 and every 5 years thereafter.

(3) **Calculation Of Change.** On each Change Date you will calculate the Interest Rate, which will be the Current Index plus 4.500 percent. Subject to any limitations, this will be the Interest Rate until the next Change Date. The new Interest Rate will become effective on each Change Date. The Interest Rate and other charges on this Note will never exceed the highest rate or charge allowed by law for this Note.

(4) **Effect Of Variable Rate.** A change in the Interest Rate will have the following effect on the payments: The amount of scheduled payments will change.

**GOVERNING AGREEMENT.** This Note is further governed by the Commercial Loan Agreement executed between you and as a part of this Loan, as modified, amended or supplemented. The Commercial Loan Agreement states the terms and

ROGER DALE PARKER
Arkansas Promissory Note
AR/4SGUTHRIE0000000000000601016030410N

Wolters Kluwer Financial Services ©1996, 2010 Bankers Systems™

Initials 
Page 1



FFB01010

and your successors and assigns and shall be binding upon and enforceable against me and my personal representatives, successors, heirs and assigns.

**15. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Note may not be amended or modified by oral agreement. No amendment or modification of this Note is effective unless made in writing and executed by you and me. This Note and the other Loan Documents are the complete and final expression of the agreement. If any provision of this Note is unenforceable, then the unenforceable provision will be severed and the remaining provisions will be enforceable. No present or future agreement securing any other debt I owe you will secure the payment of this Loan if, with respect to this loan, you fail to fulfill any necessary requirements or limitations of Sections 19(a), 32 or 35 of Regulation Z or if, as a result, this Loan would become subject to Section 670 of the John Warner National Defense Authorization Act for Fiscal Year 2007.

**16. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Note.

**17. NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Borrower will be deemed to be notice to all Borrowers. I will inform you in writing of any change in my name, address or other application information. I agree to sign, deliver, and file any additional documents or certifications that you may consider necessary to perfect, continue, and preserve my obligations under this Loan and to confirm your lien status on any Property. Time is of the essence.

**18. CREDIT INFORMATION.** I agree to supply you with whatever information you reasonably request. You will make requests for this information without undue frequency, and will give me reasonable time in which to supply the information.

**19. ERRORS AND OMISSIONS.** I agree, if requested by you, to fully cooperate in the correction, if necessary, in the reasonable discretion of you of any and all loan closing documents so that all documents accurately describe the loan between you and me. I agree to assume all costs including by way of illustration and not limitation, actual expenses, legal fees and marketing losses for failing to reasonably comply with your requests within thirty (30) days.

**20. SIGNATURES.** By signing, I agree to the terms contained in this Note. I also acknowledge receipt of a copy of this Note.

BORROWER:

Date 3/4/2010

ROGER DALE PARKER
Individually

Date 3/4/2010

LINDA GAIL PARKER
Individually

LENDER:

First Financial Bank

By _____    Date 3/4/2010
Jody Murphey, Vice President





Doc ID: 000651340010 Type: GLR
Filed: 03/16/2010 at 04:42:30 PM
Fee Amt: $0.00 Page 1 of 10
Baldwin, Ga. Clerk Superior Court
Rosemary Phillips Clerk of Courts
BK 1016 PG 21-30

FILED & RECORDED
CLERK. SUPERIOR COURT
BALDWIN COUNTY, GA

2010 MAR 16 PM 4: 42

BY
ROSEMARY PHILLIPS, CLERK
Deputy Clerk



When recorded return to AG Department, First Financial Bank-Georgia, 3030 McEver Rd Building 3-Suite 300,
Gainesville, GA 30501

---

Space Above This Line For Recording Data

## DEED TO SECURE DEBT

**DATE AND PARTIES.** The date of this Deed To Secure Debt (GA) (Security Instrument) is March 4, 2010. The
parties and their addresses are:

GRANTOR:
    ROGER DALE PARKER
    Husband
    288 GORDON ROAD
    HILLSBORO, GA 31038

    LINDA GAIL PARKER
    Wife
    288 GORDON ROAD
    HILLSBORO, GA 31038

GRANTEE (Lender):
    FIRST FINANCIAL BANK
    Organized and existing under the laws of Arkansas
    214 North Washington
    El Dorado, AR 71730

**1. SMALL BUSINESS ADMINISTRATION.** The Secured Debts secured by this lien were made under a United
States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business
owners. If the United States is seeking to enforce this Security Instrument, then under SBA regulations:

    A. When SBA is the holder of the Note, this Security Instrument and all documents evidencing or securing the
    Secured Debts will be construed in accordance with federal law.

    B. Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents,
    giving notice, *foreclosing* liens, and other purposes. By using these procedures, SBA does not waive any
    federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE0000000000000601I5030410N      Wolters Kluwer Financial Services ©1996, 2010 Bankers Systems™      Initials _____
     Page 1

R#16 2883   LDP

A. To make all payments when due and to perform or comply with all covenants.

B. To promptly deliver to Lender any notices that Grantor receives from the holder.

C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**7. CLAIMS AGAINST TITLE.** Grantor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Grantor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Grantor's payment. Grantor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Grantor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Grantor may have against parties who supply labor or materials to maintain or improve the Property.

**8. ASSUMPTIONS.** Subject to conditions and Lender's written consent, someone buying the Property may be allowed to assume this Security Instrument. Without written consent, Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

**9. WARRANTIES AND REPRESENTATIONS.** Grantor has the right and authority to enter into this Security Instrument. The execution and delivery of this Security Instrument will not violate any agreement governing Grantor or to which Grantor is a party.

**10. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Grantor will keep the Property in good condition and make all repairs that are reasonably necessary. Grantor will not commit or allow any waste, impairment, or deterioration of the Property. Grantor will keep the Property free of noxious weeds and grasses. Grantor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Grantor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Grantor will notify Lender of all demands, proceedings, claims, and actions against Grantor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Grantor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Grantor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender will give Grantor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property will be entirely for Lender's benefit and Grantor will in no way rely on Lender's inspection.

**11. AUTHORITY TO PERFORM.** If Grantor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Grantor appoints Lender as attorney in fact to sign Grantor's name or pay any amount necessary for performance. Lender's right to perform for Grantor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**12. ASSIGNMENT OF LEASES AND RENTS.** Grantor irrevocably assigns, grants, bargains, transfers, conveys to Lender as additional security all the right, title and interest in the following (Property):

A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to any extensions, renewals, modifications or replacements (Leases).

B. Rents, issues and profits, including but not limited to security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes,

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE00000000000601016030410N

Wolters Kluwer Financial Services ®1993, 2010 Bankers Systems™

Initials _____
Page 3

https://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=57472994&key1=1016&key2=21&county=5&countyname=BALDWIN&userid=441107&appId...    3/3

Grantor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**17. CONDEMNATION.** Grantor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor's name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, deed to secure debt, security agreement or other lien document.

**18. ESCROW FOR TAXES AND INSURANCE.** As provided in a separate agreement, Grantor agrees to pay to Lender funds for taxes and insurance in escrow.

**19. CO-SIGNERS.** If Grantor signs this Security Instrument but is not otherwise obligated to pay the Secured Debts, Grantor does so only to convey Grantor's interest in the Property to secure payment of the Secured Debts and Grantor does not agree by signing this Security Instrument to be personally liable on the Secured Debts. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation.

**20. WAIVERS.** Except to the extent prohibited by law, Grantor waives all homestead and other exemption rights relating to the Property.

**21. PERSONAL PROPERTY.** Grantor gives to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Grantor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term Property). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

**22. APPLICABLE LAW.** This Security Instrument is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**23. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Grantor's obligations under this Security Instrument are independent of the obligations of any other Grantor. Lender may sue each Grantor individually or together with any other Grantor. Lender may release any part of the Property and Grantor will still be obligated under this Security Instrument for the remaining Property. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Grantor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Grantor's consent. Such a change will not release Grantor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Grantor.

**24. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Grantor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

9

LENDER:

First Financial Bank

By _____ (Seal)
Jody Murphey, Vice President

Signed, sealed and delivered in the presence of:

_Barbara Fowler_
(Unofficial Witness)

_Sheila F. Diuff_
(Notary Public, __Banks__ County, Georgia)

Sheila F. Griffin
Notary Public, Banks County, Georgia
My Commission Expires October 19, 2013

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SOUTH/RE000000000000601016030410N

Wolters Kluwer Financial Services ©1996, 2010 Bankers Systems™

Initials ____
Page 9

# EXHIBIT 6

FFB01022

3. PAYMENT TERMS:

    Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

Maturity: This Note will mature in 15 years from date of Note.

Repayment Terms:

The interest rate is 5.80% Fixed per year.

Borrower must pay principal and interest payments of $113,310.00 every year, beginning twelve months from the month this Note is dated; payments must be made on the 24th calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Subsidy Recoupment Fee. When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date of initial disbursement, 5% of the total prepayment amount;

b. During the second year after the date of initial disbursement, 3% of the total prepayment amount; and

c. During the third year after the date of initial disbursement, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 15 years from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A.  All individuals and entities signing this Note are jointly and severally liable.

B.  Borrower waives all suretyship defenses.

C.  Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

D.  Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.

E.  Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.

F.  If any part of this Note is unenforceable, all other parts remain in effect.

G.  To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

11.  BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

Parker's Poultry
_____

Parker's Poultry
_____

_____          06/24/2013
Roger Dale Parker, Individually

_____          06/24/2013
Linda Gail Parker, Individually

_____          _____

_____          _____

# EXHIBIT 7

FFB01030

federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to the Secured Debts.

Any clause in this Security Instrument requiring arbitration is not enforceable when SBA is the holder of the Note secured by this Security Instrument.

**2. CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Grantor's performance under this Security Instrument, Grantor does hereby irrevocably grant, bargain, transfer, convey and sell to Lender, with power of sale, the following described property:

SEE ATTACHED EXHIBIT "A" LEGAL DESCRIPTION

The property is located in Baldwin County at 891 HWY 24 E, MILLEDGEVILE, GA 31061 AND IN JASPER COUNTY AT 288 GORDON ROAD, HILLSBORO, Georgia 31038.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**3. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 120034177, dated June 24, 2013, from Grantor to Lender, with a loan amount of one million one hundred and fifteen thousand dollars and zero cents ($1,115,000.00) and maturing on June 24, 2028.

**B. Future Advances.** All future advances from Lender to Grantor under the Specific Debts executed by Grantor in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to Grantor either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Grantor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

**C. All Debts.** All present and future debts from Grantor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Grantor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

ROGER DALE PARKER- DBA PARKER'S POULTRY
Georgia Deed To Secure Debt (GA)
AR/4SSUTHRIE00000000000865021052013N

Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™

Initials 
Page 2

290

Property in damaged condition, Grantor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Grantor will immediately notify Lender of cancellation or termination of insurance. If Grantor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Grantor will pay for the insurance on Lender's demand. Lender may demand that Grantor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Grantor, may be written by a company other than one Grantor would choose, and may be written at a higher rate than Grantor could obtain if Grantor purchased the insurance. Grantor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**19. ESCROW FOR TAXES AND INSURANCE.** Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

**20. WAIVERS.** Except to the extent prohibited by law, Grantor waives all homestead and other exemption rights relating to the Property.

**21. APPLICABLE LAW.** This Security Instrument is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**22. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Grantor's obligations under this Security Instrument are independent of the obligations of any other Grantor. Lender may sue each Grantor individually or together with any other Grantor. Lender may release any part of the Property and Grantor will still be obligated under this Security Instrument for the remaining Property. Grantor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Grantor's consent. Such a change will not release Grantor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Grantor.

**23. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Grantor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**24. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**25. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Grantor will be deemed to be notice to all Grantors. Grantor will inform Lender in writing of any change in Grantor's name, address or other application information. Grantor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Grantor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Grantor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Grantor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Grantor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**26. SECURITY DEED.** This Security Instrument is a deed passing legal title pursuant to the laws of the State of Georgia governing conveyances of property to secure debt and is not a mortgage.

---

ROGER DALE PARKER- DBA PARKER'S POULTRY
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE00000000O00665021062O13N

Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™

Initials 
Page 8

296

https://search.gsccca.org/Imaging/HTML5Viewer.aspx?id=62886157&key1=1139&key2=229&county=5&countyname=BALDWIN&userid=441107&appi...     1/4

LENDER:

First Financial Bank

By _____    Date _June 24 2013_ (Seal)
Jody Murphey, Vice President

Signed, sealed and delivered in the presence of:

_____ Date _6/24/13_
(Unofficial Witness)

_____ _____ County, Georgia)
(Notary Public,



ROGER DALE PARKER- DBA PARKER'S POULTRY
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE0000000000066021062013N                Wolters Kluwer Financial Services ®1996, 2013 Bankers Systems™        Initials ___ ___
                                                                                                                          Page 10

298

FFB01036

*/ /*

## EXHIBIT "A"

**TRACT ONE:**
All that tract or parcel of land lying and being in Land Lots 68, 69 and 93 of the 13th Land District, 365th G.M.D. of Jasper County, Georgia, and being shown as an **84.53 acre tract** as shown on that certain Plat of Survey for Allen Schrock and Lucinda Schrock prepared and certified by Linda H. Jordan, Jasper County Surveyor, said plat being dated June 27, 1997, and recorded in Plat Book 9, Page 387, Public Records of Jasper County, Georgia, and said plat by reference thereto being incorporated herein and made a part hereof for a more particular description of the captioned property.

**LESS AND EXCEPT:** All that tract or parcel of land lying and being in 365 GMD, Land Lot 93 of the 13th District of Jasper County, Georgia, containing **7.91 acres** shown on plat of survey entitled 'Survey for: Simon D. Parker' prepared by Jordan Engineering, Michael A. Lewis, RLS No. 2869, dated October 12, 2007, and recorded in Plat Book 11, Page 493-A, Clerk's Office, Jasper Superior Court, which plat is incorporated herein by reference thereto.

This is the identical property described in that certain Warranty Deed from Roger Dale Parker and Linda Gail Parker to Simon D. Parker dated December 17, 2007, and recorded in Deed Book 659, Page 299, Office of the Clerk of Superior Court of Jasper County, Georgia.

**TRACT TWO:**
All that tract or parcel of land lying and being in Land Lots 61 and 68 of the 13th Land District, 365th G.M.D. of Jasper County, Georgia, and being shown as **30.80 acres**, more or less, as shown on that Plat of Survey prepared and certified by Linda H. Jordan, Jasper County Surveyor, and said plat being recorded in Plat Book 10, Page 309, Public Records of Jasper County, Georgia, and said plat by reference thereto being incorporated herein and made a part hereof for a more particular description of the captioned property.

This conveyance is made subject to all zoning ordinances, easements and restrictions of record affecting said bargained premises.

**TRACTS ONE & TWO** are the identical tracts described in that certain Joint Tenancy with Survivorship Warranty Deed from Allen R. Schrock and Lucinda H. Schrock to Roger Dale Parker and Linda Gail Parker, dated June 22, 2006, and recorded in Deed Book 585, Pages 23-24, Office of the Clerk of Superior Court of Jasper County, Georgia.

**TRACT THREE:**
All that tract or parcel of land lying and being in the 115th G.M. District, Baldwin County, Georgia, containing **24.095 ACRES** and further identified as having such shape, size, metes, bounds, courses and distance as are shown upon a plat thereof entitled "Austin M. Tran & Tiffany Le Tran" by James E. Smith, Jr., G.R.L.S. No. 1895, dated May 25, 2005, and recorded in Plat Book 29, Page 28, Clerk's Office, Baldwin County Superior Court. Reference is hereby made to said plat and incorporated herein for the purpose of a more particular and accurate description of the property herein conveyed.

Said conveyance is subject to all rights of way, easements, and restrictions of record.

This is the identical property described in that certain Warranty Deed Creating Joint Tenancy With Survivorship from Austin Minh Tran and Tiffany Lee Tran to Roger Dale Parker and Linda Gail Parker, dated November 12, 2009, and recorded in Deed Book 1006, Pages 271-272, Office of the Clerk of Superior Court of Baldwin County, Georgia.

299

2283

FILED & RECORDED
CLERK, SUPERIOR COURT
BALDWIN COUNTY, GA

2015 NOV -2 PM 4: 23



Filed and recorded _____ Oct. 26, 2015
at 2:45 P.M. in Deed Book _____ 898 p 171-174
_____
Superior Court, Jasper County, GA
Dan Jordan, Clerk

When recorded return to AG Department, First Financial Bank-Georgia, 3030 McEver Rd
Building 3-Suite 300, Gainesville, GA 30501

_____

Space Above This Line For Recording Data

_____

## MODIFICATION OF DEED TO SECURE DEBT

**DATE AND PARTIES.** The date of this Real Estate Modification (Modification) is August 3,
2015. The parties and their addresses are:

GRANTOR:
ROGER DALE PARKER- DBA PARKER'S POULTRY
Husband
288 GORDON ROAD
HILLSBORO, GA 31038



Doc ID: 001251090004 Type: GLR
Recorded: 11/02/2015 at 04:23:40 PM
Page 1 of 4
Baldwin, Ga. Clerk Superior Court
Rosemary Phillips Clerk of Courts
BK **1220** PG **370-373**

LINDA GAIL PARKER- DBA PARKER'S POULTRY
Wife
288 GORDON ROAD
HILLSBORO, GA 31038

GRANTEE (Lender):
FIRST FINANCIAL BANK
Organized and existing under the laws of Arkansas
214 North Washington
El Dorado, AR 71730

**1. BACKGROUND.** Grantor and Lender entered into a security instrument dated June 24, 2013
and recorded on July 01, 2013 (Security Instrument). The Security Instrument was recorded in
the records of Baldwin County, Georgia at Book 1139, Page 229-239 & Book 828, Page
289-299 in Jasper County, Georgia and covered the following described Property:

SEE ATTACHED EXHIBIT "A" LEGAL DESCRIPTION

$R^{2}$562412

ROGER DALE PARKER- DBA PARKER'S POULTRY
Georgia Real Estate Modification
AR/4ANNRISIN00000000009828012N                    Wolters Kluwer Financial Services ©1996, 2015 Bankers     Initials     Page 1
                                                  Systems™

171

*3*

**4. CONTINUATION OF TERMS.** Except as specifically amended in this Modification, all of the terms of the Security Instrument shall remain in full force and effect.

**SIGNATURES.** By signing under seal, Grantor agrees to the terms and covenants contained in this Modification. Grantor also acknowledges receipt of a copy of this Modification.

GRANTOR:

_____ (Seal)
ROGER DALE PARKER- DBA PARKER'S POULTRY

Signed, sealed and delivered in the presence of:

_____
(Unofficial Witness)

_____
(Notary Public,          )

_____ (Seal)
LINDA GAIL PARKER- DBA PARKER'S POULTRY

Signed, sealed and delivered in the presence of:

_____
(Unofficial Witness)

_____
(Notary Public,          )

ROGER DALE PARKER- DBA PARKER'S POULTRY
Georgia Real Estate Modification
AR/4ANNRISIND0000000006825012N

Wolters Kluwer Financial Services ©1996, 2015 Bankers
Systems™

Initials ___
Page 3

173

# EXHIBIT 9

FFB01044

(4) Effect Of Variable Rate. A change in the Interest Rate will have the following effect on the payments: The amount of scheduled payments will change.

**4. GOVERNING AGREEMENT.** This Note is further governed by the Commercial Loan Agreement executed between you and me as a part of this Loan, as modified, amended or supplemented. The Commercial Loan Agreement states the terms and conditions of this Note, including the terms and conditions under which the maturity of this Note may be accelerated. When I sign this Note, I represent to you that I have reviewed and am in compliance with the terms contained in the Commercial Loan Agreement.

**5. PAYMENT.** I agree to pay this Note in 10 payments. A payment of $2,717.94 will be due December 7, 2019, and on the same day each year thereafter. This scheduled payment amount may change to reflect changes in the Interest Rate as described in the Variable Rate subsection of this Note. A final payment of the entire unpaid balance of Principal and interest will be due December 7, 2028.

Payments will be rounded to the nearest $.01. With the final payment I also agree to pay any additional fees or charges owing and the amount of any advances you have made to others on my behalf. Payments scheduled to be paid on the 29th, 30th or 31st day of a month that contains no such day will, instead, be made on the last day of such month.

Each payment I make on this Note will be applied first to interest that is due, then to principal that is due, then to any charges that I owe other than principal and interest, and finally to any additional principal. If you and I agree to a different application of payments, we will describe our agreement on this Note. You may change how payments are applied in your sole discretion without notice to me. The actual amount of my final payment will depend on my payment record.

**6. PREPAYMENT.** I may prepay this Loan in full or in part at any time. Any partial prepayment will not excuse any later scheduled payments until I pay in full.

**7. LOAN PURPOSE.** The purpose of this Loan is TO UPGRADE FAN MOTORS, PAY GAS BILL, FILL TANKS TO 50% PLUS PAY LOAN FEES AND CLOSING COST.

**8. SECURITY.** The Loan is secured by separate security instruments prepared together with this Note as follows:

| Document Name | Parties to Document |
|---|---|
| Assignment Of Life Insurance Policy - | LINDA GAIL PARKER |
| Assignment Of Life Insurance Policy - | ROGER DALE PARKER |
| Security Agreement - ROGER DALE PARKER , LINDA GAIL PARKER | ROGER DALE PARKER , LINDA GAIL PARKER |
| Deed To Secure Debt (GA) - 897 HIGHWAY 24 E & 891 HIGHWAY 24 E, MILLEDGEVILLE, GA 31061 | ROGER DALE PARKER , LINDA GAIL PARKER |
| Deed To Secure Debt (GA) - 288 GORDON ROAD, HILLSBORO, GA 31038 | ROGER DALE PARKER , LINDA GAIL PARKER |

**9. ASSUMPTIONS.** Subject to conditions and your written consent, someone buying the Property may be allowed to assume this Note. Without written consent, you may, at your option, declare the entire balance of this Note to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable. An assumption fee may be assessed if I request, and you agree, to transfer some or all of the Property to another party.

**10. WAIVERS AND CONSENT.** To the extent not prohibited by law, I waive protest, presentment for payment, demand, notice of acceleration, notice of intent to accelerate and notice of dishonor.

    **A. Additional Waivers By Borrower.** In addition, I, and any party to this Note and Loan, to the extent permitted by law, consent to certain actions you may take, and generally waive defenses that may be available based on these actions or based on the status of a party to this Note.

        (1) You may renew or extend payments on this Note, regardless of the number of such renewals or extensions.

        (2) You may release any Borrower, endorser, guarantor, surety, accommodation maker or any other co-signer.

        (3) You may release, substitute or impair any Property securing this Note.

        (4) You, or any institution participating in this Note, may invoke your right of set-off.

        (5) You may enter into any sales, repurchases or participations of this Note to any person in any amounts and I waive notice of such sales, repurchases or participations.

        (6) I agree that any of us signing this Note as a Borrower is authorized to modify the terms of this Note or any instrument securing, guarantying or relating to this Note.

    **B. No Waiver By Lender.** Your course of dealing, or your forbearance from, or delay in, the exercise of any of your rights, remedies, privileges or right to insist upon my strict performance of any provisions contained in this Note, or any other Loan Document, shall not be construed as a waiver by you, unless any such waiver is in writing and is signed by you.

**11. COMMISSIONS.** I understand and agree that you (or your affiliate) will earn commissions or fees on any insurance products, and may earn such fees on other services that I buy through you or your affiliate.

**12. APPLICABLE LAW.** This Note is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**13. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** My obligation to pay the Loan is independent of the obligation of any other person who has also agreed to pay it. You may sue me alone, or anyone else who is obligated on the Loan, or any number of us together, to collect the Loan. Extending the Loan or new obligations under the Loan, will not affect my duty under the Loan and I will still be obligated to pay the Loan. This Note shall inure to the benefit of and be enforceable by you and your successors and assigns and shall be binding upon and enforceable against me and my personal representatives, successors, heirs and assigns.

**14. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Note may not be amended or modified by oral agreement. No amendment or modification of this Note is effective unless made in writing. This Note and the other Loan Documents are the



ROGER DALE PARKER
Arkansas Promissory Note
AR/4SGUTHRIE0000000001828070N

Initials 
Page 2

FFB01046

# EXHIBIT 10

FFB01048

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Grantor's performance under this Security Instrument, Grantor does hereby irrevocably grant, bargain, transfer, convey and sell to Lender, with power of sale, the following described property:

SEE ATTACHED LEGAL DESCRIPTION

The property is located in Baldwin County at 897 HIGHWAY 24 E & 891 HIGHWAY 24 E, MILLEDGEVILLE, Georgia 31061.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber including timber to be cut now or at any time in the future, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

3. **SECURED DEBTS.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, dated December 7, 2018, from Grantor to Lender, with a loan amount of twenty thousand dollars and zero cents ($20,000.00) and maturing on December 7, 2028.

**B. All Debts.** All present and future debts from Grantor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender, with respect to that other debt, fails to fulfill any necessary requirements or fails to conform to any limitations of the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property.

**C. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

4. **PAYMENTS.** Grantor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

5. **WARRANTY OF TITLE.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, bargain, transfer, convey and sell the Property to Lender, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE00000000000182807CN
                                        Wolters Kluwer Financial Services ©1996, 2018 Bankers    Initials __Br__ ~20
                                        Systems™                                                 Page 2



q

Lender's option. If Lender acquires the Property in damaged condition, Grantor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Grantor will immediately notify Lender of cancellation or termination of insurance. If Grantor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Grantor will pay for the insurance on Lender's demand. Lender may demand that Grantor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include lesser or greater coverages than originally required of Grantor, may be written by a company other than one Grantor would choose, and may be written at a higher rate than Grantor could obtain if Grantor purchased the insurance. Grantor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**19. ESCROW FOR TAXES AND INSURANCE.** Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

**20. WAIVERS.** Except to the extent prohibited by law, Grantor waives all homestead and other exemption rights relating to the Property.

**21. USE OF PROPERTY.** Grantor shall not use or occupy the Property in any manner that would constitute a violation of any state and/or federal laws involving controlled substances, even in a jurisdiction that allows such use by state or local law or ordinance. In the event that Grantor becomes aware of such a violation, Grantor shall take all actions allowed by law to terminate the violating activity.

In addition to all other indemnifications, obligations, rights and remedies contained herein, if the Lender and/or its respective directors, officers, employees, agents and attorneys (each an "Indemnitee") is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Security Instrument or the related property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use of such property, then the Grantor shall (to the extent permitted by applicable law) indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. To the extent permitted by applicable law, the within indemnification shall survive payment of the Secured Debt, and/or any termination, release or discharge executed by the Lender in favor of the Grantor.

Violation of this provision is a material breach of this Security Instrument and thereby constitutes a default under the terms and provisions of this Security Instrument.

**22. APPLICABLE LAW.** This Security Instrument is governed by the laws of Arkansas, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**23. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Grantor's obligations under this Security Instrument are independent of the obligations of any other Grantor. Lender may sue each Grantor individually or together with any other Grantor. Lender may release any part of the Property and Grantor will still be obligated under this Security Instrument for the remaining Property. Grantor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Grantor's consent. Such a change will not release Grantor from the terms of this

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE0000000001828070N

Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™

Initials _____
Page 9



**SIGNATURES.** By signing under seal, Grantor agrees to the terms and covenants contained in this Security Instrument. Grantor also acknowledges receipt of a copy of this Security Instrument.

**GRANTOR:**

Roger Dale Parker      Date _12/7/2018_      (Seal)
ROGER DALE PARKER

Signed, sealed and delivered in the presence of:

_Sheila F. Griff_
(Unofficial Witness)

_Sicki Brook_
(Notary Public, _Hall_      County, _12-7-18_

Linda Gail Parker      Date _12-7-18_      (Seal)
LINDA GAIL PARKER

Signed, sealed and delivered in the presence of:

_Sheila F. Griff_
(Unofficial Witness)

_Sicki Brook_
(Notary Public, _Hall_      County, _12-7-18_

VICKI BROOKS
NOTARY
PUBLIC
COMMISSION
EXPIRES
June 26, 2021
HALL COUNTY, GA

ROGER DALE PARKER
Georgia Deed To Secure Debt (GA)
AR/4SGUTHRIE000000000001828070N

Wolters Kluwer Financial Services ©1996, 2018 Bankers
Systems™

Initials_____
Page 11





## TRACT TWO:

All that tract or parcel of land lying and being in Land Lots 61 and 68 of the 13th Land District, 365th G.M.D. of Jasper County, Georgia, and being shown as **30.80 acres**, more or less, as shown on that Plat of Survey prepared and

certified by Linda H. Jordan, Jasper County Surveyor, and said plat being recorded in Plat Book 10, Page 309, Public Records of Jasper County, Georgia, and said plat by reference thereto being incorporated herein and made a part hereof for a more particular description of the captioned property.

This conveyance is made subject to all zoning ordinances, easements and restrictions of record affecting said bargained premises.

**TRACTS ONE & TWO** are the identical tracts described in that certain Joint Tenancy with Survivorship Warranty Deed from Allen R. Schrock and Lucinda H. Schrock to Roger Dale Parker and Linda Gail Parker, dated June 22, 2006, and recorded in Deed Book 585, Pages 23-24, Office of the Clerk of Superior Court of Jasper County, Georgia. LESS AND EXCEPT that certain 16.65 acres conveyed to Kevin H. Connell by Warranty Deed dated February 7, 2014, and recorded in Deed Book 848, Page 6, aforesaid records.

## BALDWIN COUNTY PROPERTY

All that tract or parcel of land lying and being in the 115th G.M. District, Baldwin County, Georgia, containing **24.095 ACRES** and further identified as having such shape, size, metes, bounds, courses and distance as are shown upon a plat thereof entitled "Austin M. Tran & Tiffany Le Tran" by James E. Smith, Jr., G.R.L.S. No. 1895, dated May 25, 2005, and recorded in Plat Book 29, Page 28, Clerk's Office, Baldwin County Superior Court. Reference is hereby made to said plat and incorporated herein for the purpose of a more particular and accurate description of the property herein conveyed.

Said conveyance is subject to all rights of way, easements, and restrictions of record.

This is the identical property described in that certain Warranty Deed Creating Joint Tenancy With Survivorship from Austin Minh Tran and Tiffany Lee Tran to Roger Dale Parker and Linda Gail Parker, dated November 12, 2009, and recorded in Deed Book 1006, Pages 271-272, Office of the Clerk of Superior Court of Baldwin County, Georgia.

# EXHIBIT 11

FFB01058

Mr. Roger Dale Parker and Ms. Linda Gail Parker
January 21, 2020
Page 2

Financial Bank will exercise all of its rights available under the above-referenced loan documents and pursuant to Georgia law, including, without limitation, its right to foreclose on the deed to secure debt and seek a judgment for any deficiency that may remain.

In addition, unless the amount due is paid in full within ten (10) days after you receive this correspondence, the provision for attorneys' fees in the loan documents will be enforced, as provided by Official Code of Georgia Annotated ("O.C.G.A.") Section 13-1-11, and you will be required to pay such stipulated attorneys' fees. The payment for attorneys' fees will be in addition to the obligation to pay the amounts due. If my client receives the amount due within ten (10) days after you receive this letter, you will not be required to pay the attorneys' fees. In other words, you can avoid the additional obligation of attorneys' fees if the amount due is fully paid within ten (10) days from receipt of this letter.

If you dispute the validity of the debt, the amount owed, or any portion thereof, and provide written notice of the dispute to me, written verification of the debt or the disputed portion will be provided; however, if you do not notify me of such dispute, I will assume that the amount stated above is correct. Notification to me of any dispute in the amount owed will not necessarily provide a grace period. **THIS LETTER IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED AS A RESULT OF THIS COMMUNICATION WILL BE USED FOR THAT PURPOSE.**

I trust that you will pay First Financial Bank the necessary amounts as set forth in this letter immediately.

Sincerely,

Stephen P. Drobny

{M1700054.1}

FFB01060



Stephen P. Drobny
D:      404.870.7539
F:      404.870.7562
sdrobny@joneswalker.com

January 23, 2020

**VIA FIRST CLASS U.S. MAIL AND CERTIFIED MAIL**

Roger Dale Parker
Linda Gail Parker
897 Highway 24 East
Midgeville, GA 31601

Re:     **Loan Number■1421**
SBA Note dated July 23, 2010, executed by Roger Dale Parker and Linda Gail
Parker in favor of First Financial Bank, in the original principal amount of
$935,000.00, as modified by an Extension Agreement dated August 18, 2011, as
modified by an Extension Agreement dated March 13, 2014, as further modified
by an Extension Agreement dated May 13, 2019, as evidenced by a Commercial
Loan Agreement dated July 23, 2010, executed by Roger Dale Parker and Linda
Gail Parker in favor of First Financial Bank, as secured by, among other security,
a Security Agreement dated July 23, 2010, executed by Roger Dale Parker and
Linda Gail Parker in favor of First Financial Bank, and by a Deed to Secure Debt
dated November 12, 2009, executed by Roger Dale Parker and Linda Gail Parker
in favor of First Financial Bank, as modified by a Modification Agreement dated
July 23, 2010, executed by Roger Dale Parker and Linda Gail Parker in favor of
First Financial Bank, which encumbers real property in Baldwin County, Georgia
commonly known as 891 Highway 24 East, Midgeville, Georgia 31061 (the
"Loan")

Dear Mr. and Ms. Parker:

My client First Financial Bank informs me that an event of default occurred under the
above-referenced Loan as a result of your default under other certain loans with First Financial
Bank, in violation of section 4(B) of the Note and in further violation of the respective insecurity
clauses contained in the Commercial Loan Agreement and Security Agreement.

First Financial hereby demands that it receive the entire balance due under the above-
referenced Loan on or before the close of business on the tenth (10th) day after the date of this
letter. As of January 21, 2020, the unpaid balance due under the above-referenced Loan is
$554,198.76, consisting of $530,732.18 in unpaid principal, and $23,466.58 in accrued interest,

{M1700630.1}

# EXHIBIT 12

FFB01071

Confidential

STATE OF GEORGIA

COUNTY OF JASPER

### NOTICE OF SALE UNDER POWER

By virtue of the power of sale contained in that certain deed to secure debt (with future advance clause) given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated November 12, 2009 and recorded on November 16, 2009, filed for record in Book 725, Page 102, Jasper County, Georgia Records, and modified by that certain modification agreement given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated July 23, 2010 and recorded on August 13, 2010, filed for record in Book 744, Page 52, Jasper County, Georgia Records, said security deed having been given to secure a promissory note in the original principal sum of Nine Hundred Thirty Five Thousand and 00/100 Dollars ($935,000.00), with interest at the rate stated in said promissory note on the unpaid balance until paid, and by virtue of that power of sale contained in that certain deed to secure debt given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated March 4, 2010 and recorded on March 15, 2010, filed for record in Book 733, Page 187, Jasper County, Georgia Records, said security deed having been given to secure a promissory note in the original principal sum of Ninety-Two Thousand and 00/100 Dollars ($92,000.00), with interest at the rate stated in said promissory note on the unpaid balance until paid, and by virtue of that deed to secure debt (with future advance clause) given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated June 24, 2013 and recorded on July 1, 2013, filed for record in Book 828, Page 289, Jasper County, Georgia Records, and modified by that certain modification of deed to secure debt given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated August 3, 2015 and recorded on October 26, 2015, filed for record in Book 898, Page 171, Jasper County, Georgia

{M1547840.1}

1

FFB01072

Confidential

Records, said security deed having been given to secure a promissory note in the original

principal sum of One Million One Hundred Fifteen Thousand and 00/100 Dollars

($1,115,000.00), with interest at the rate stated in said promissory note on the unpaid balance

until paid, and by virtue of that deed to secure debt given by Roger Dale Parker and Linda Gail

Parker dated December 7, 2018 and recorded on December 28, 2018, filed for record in Book

1008, Page 75, Jasper County, Georgia Records, said security deed having been given to secure a

promissory note in the original principal sum of Twenty Thousand and 00/100 Dollars

($20,000.00), with interest at the rate stated in said promissory note on the unpaid balance until

paid, there will be sold by the undersigned at public outcry to the highest bidder for cash before

the Courthouse door at Jasper County, Georgia, between the hours of 10:00 a.m. and 4:00 p.m.

on May 5, 2020, the following described property:

TRACT ONE:

All that tract or parcel of land lying and being in Land Lots 68, 69
and 93 of the 13th Land District, 365th G.M.D. of Jasper County,
Georgia, and being shown as an 84.53 acre tract as shown on that
certain Plat of Survey for Allen Schrock and Lucinda Schrock
prepared and certified by Linda H. Jordan, Jasper County
Surveyor, said plat being dated June 27, 1997, and recorded in Plat
Book 9, Page 387, Public Records of Jasper County, Georgia, and
said plat by reference thereto being incorporated herein and made a
part hereof for a more particular description of the captioned
property.

LESS AND EXCEPT: All that tract or parcel of land lying and
being in Land Lot 93 of the 13th District, 365th G.M.D. of Jasper
County, Georgia, containing 7.91 acres shown on plat of survey
entitled "Survey for: Simon D. Parker" prepared by Jordan
Engineering, Michael A. Lewis, RLS No. 2869, dated October 12,
2007, and recorded in Plat Book 11, Page 493-A, Clerk's Office,
Jasper Superior Court, which plat is incorporated herein by
reference thereto.

This is the identical property described in that certain Warranty
Deed from Roger Dale Parker and Linda Gail Parker to Simon D.

{M1547840.1}                                        2

Confidential

Parker dated December 17, 2007, and recorded in Deed Book 659, Page 299, Office of the Clerk of Superior Court of Jasper County, Georgia.

FURTHER, LESS AND EXCEPT: All that tract or parcel of land lying and being in Land Lot 93 of the 13th District, 365th G.M.D. of Jasper County, Georgia, containing 16.65 ACRES, according to that certain plat of survey entitled "PROPERTY DIVISION SURVEY FOR KEVIN H. CONNELL", dated January 29, 2014, prepared by Jordan Engineering, Robert O. Jordan, RLS No. 2902, and recorded in Plat Book 11, Page 679, Clerk's Office, Jasper Superior Court, which plat is incorporated herein by reference thereto.

This is the identical property described in that certain Warranty Deed from Roger Dale Parker and Linda Gail Parker to Kevin H. Connell, dated February 7, 2014, and recorded in Deed Book 848, Page 6, Office of the Clerk of Superior Court of Jasper County, Georgia.

TRACT TWO:

All that tract or parcel of land lying and being in Land Lots 61 and 68 of the 13th Land District, 365th G.M.D. of Jasper County, Georgia, and being shown as 30.80 acres, more or less, as shown on that Plat of Survey prepared and certified by Linda H. Jordan, Jasper County Surveyor, and said plat being recorded in Plat Book 10, Page 309, Public Records of Jasper County, Georgia, and said plat by reference thereto being incorporated herein and made a part hereof for a more particular description of the captioned property. This conveyance is made subject to all zoning ordinances, easements and restrictions of record affecting said bargained premises.

TRACTS ONE & TWO are the identical tracts described in that certain Joint Tenancy with Survivorship Warranty Deed from Allen R. Schrock and Lucinda H. Schrock to Roger Dale Parker and Linda Gail Parker, dated June 22, 2006, and recorded in Deed Book 585, Pages 23-24, Office of the Clerk of Superior Court of Jasper County, Georgia. LESS AND EXCEPT that certain 16.65 acres conveyed to Kevin H. Connell by Warranty Deed dated February 7, 2014, and recorded in Deed Book 848, Page 6, aforesaid records AND that certain 7.91 acres conveyed to Simon Parker by Warranty Deed dated December 17, 2007, and recorded in    Deed    Book    659,    Page    299,    aforesaid    records.

{M1547840.1}

3

FFB01074

Confidential

Said legal description being controlling; however, the property is located in Jasper County at **288 and 0 Gordon Road, Hillsboro, GA 31038.**

The debts secured by the herein described security deeds have been declared due because of, among other possible events of default, failure to make payment as agreed and violation of the insecurity clauses in the security deeds and commercial loan agreements between Roger Dale Parker and Linda Gail Parker and First Financial Bank. The debts remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, including attorneys' fees.

The entity that has full authority to negotiate, amend, and modify all terms of said security deeds with the debtor is First Financial Bank, Attention: Paula Davis, VP/Special Assets, First Financial Bank, 214 N. Washington, El Dorado, AR, (870) 875-8734. Please understand that the secured creditor is not required to negotiate, amend, or modify the terms of said security deeds.

Said property will be sold subject to: (a) any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), (b) unpaid water or sewage bills that constitute a lien against the property whether due and payable or not yet due and payable and which may not be of record, (c) the right of redemption of any taxing authority, (d) any matters which might be disclosed by an accurate survey and inspection of the property, and (e) any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Security Deed first set out above.

{M1547840.1}                                4

FFB01075

Confidential

This sale will be conducted subject to (1) confirmation that the sale is not prohibited under the U.S. Bankruptcy Code and (2) final confirmation and audit of the status of the loan with the holder of the Security Deed.

FIRST FINANCIAL BANK as
Attorney-in-Fact and Agent for Roger Dale Parker and Linda Gail Parker

Jones Walker LLP
1360 Peachtree Street, NE
Suite 1030
Atlanta, GA 30309
(404) 870-7500

THIS LAW FIRM MAY BE ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

FFB01076

Confidential

STATE OF GEORGIA

COUNTY OF BALDWIN

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee $

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage $

Total Postage and Fees $

Sent To  Sehroek
Street and Apt. No., or PO Box No.  116 Clark St
City, State, ZIP+4®  Covington GA 30014
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee $

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage $

Total Postage and Fees $

Sent To  Sehroek
Street and Apt. No., or PO Box No.  5969 Hwy 11 South
City, State, ZIP+4®  Hillsboro GA 31038
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee $

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage $

Total Postage and Fees $

Sent To  Arker
Street and Apt. No., or PO Box No.  215 Gordon Rd.
City, State, ZIP+4®  Hillsboro GA 31038
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

SALE UNDE

ntained in that

ker and Linda (

ovember 17, 20(

, and modified

Gail Parker to F

for record in B

aving been give

Thirty Five Thou

omissory note on

n that certain dee

Financial Bank d

1016, Page 21, B

ure a promissory

lars ($92,000.00),

ntil paid, and by

Dale Parker and L

uly 15, 2013, fil

modified by tha

inda Gail Parker

)15, filed for re

1

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

Total Postage and Fees

Sent To  Parker
Street and Apt. No., or PO Box No.  285 Gordon Rd
City, State, ZIP+4®  Hillsboro GA 31038
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

Total Postage and Fees

Sent To  Parker
Street and Apt. No., or PO Box No.  A Gordon Rd.
City, State, ZIP+4®  Hillsboro GA 31038
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instruction

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)      $
☐ Return Receipt (electronic)     $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required       $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage

Total Postage and Fees

Sent To  Kubota
Street and Apt. No., or PO Box No.  PO Box 2046
City, State, ZIP+4®  Grapevine TX 76099
PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

STATE OF GEORGIA

COUNTY OF BALDWIN

**SALE UNDER POWER**

...tained in that certain deed to secure debt (with future

...er and Lin...

...vember 17, ...

...and modif...

...ail Parker t...

...for record i...

...aving been ...

...hirty Five T...

...omissory no...

...that certain deed to secure debt given by Roger Dale

...inancial Bank dated March 4, 2010 and recorded on

...1016, Page 21, Baldwin County, Georgia Records, said

...re a promissory note in the original principal sum of

...s ($92,000.00), with interest at the rate stated in said

...til paid, and by virtue of that deed to secure debt (with

...e Parker and Linda Gail Parker to First Financial Bank

...y 15, 2013, filed for record in Book 1139, Page 229,

...odified by that certain modification of deed to secure

...la Gail Parker to First Financial Bank dated August 3,

...;, filed for record in Book 1220, Page 370, Baldwin

1

FFB01078

Confidential

# EXHIBIT 13

FFB01079

Confidential

# ᵀᴴᴱ UNION-RECORDER

165 Garrett Way, Milledgeville, GA 31061
www.unionrecorder.com (478) 452-0567

## Affidavit of Publication

### STATE OF GA
### COUNTY OF BALDWIN

I, Keith E. Barlow, do solemnly swear I am the Publisher of the Union Recorder (the "Newspaper"), the official organ for Baldwin County.

Said newspaper is printed and published at Milledgeville, in the State of GA, and that from references to files of said publication, the legal advertisement of

was inserted in legal advertisement space as follows:
Union Recorder: 04/10/20, 04/17/20, 04/24/20, 05/01/20.

AD# 381384

_____

Keith E. Barlow, publisher

Sworn to and subscribed before me, this day
05/01/2020

_____

Tiffany C. Duckworth, Notary Public
My commission expires 10/29/2021



STATE OF GEORGIA
COUNTY OF BALDWIN
NOTICE OF SALE UNDER POWER
By virtue of the power of sale contained in that certain deed to secure debt (with future advance clause) given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated November 12, 2009 and recorded on November 17, 2009, filed for record in Book 1006, Page 273, Baldwin County, Georgia Records, and modified by that certain modification agreement given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated July 23, 2010 and recorded on August 2, 2010, filed for record in Book 1029, Page 457, Baldwin County, Georgia Records, said security deed having been given to secure a promissory note in the original principal sum of Nine Hundred Thirty Five Thousand and 00/100 Dollars ($935,000.00), with interest at the rate stated in said promissory note on the unpaid balance until paid, and by virtue of that power of sale contained in that certain deed to secure debt given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated March 4, 2010 and recorded on March 16, 2010, filed for record in Book 1016, Page 21, Baldwin County, Georgia Records, said security deed having been given to secure a promissory note in the original principal sum of Ninety-Two Thousand and 00/100 Dollars ($92,000.00), with interest at the rate stated in said promissory note on the unpaid balance until paid, and by virtue of that deed to secure debt (with future advance clause) given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated June 24, 2013 and recorded on July 15, 2013, filed for record in Book 1139, Page 229, Baldwin County, Georgia Records, and modified by that certain modification of deed to secure debt given by Roger Dale Parker and Linda Gail Parker to First Financial Bank dated August 3, 2015 and recorded on November 2, 2015, filed for record in Book 1220, Page 370, Baldwin County, Georgia Records, said security deed having been given to secure a promissory note in the original principal sum of One Million One Hundred Fifteen Thousand and 00/100 Dollars ($1,115,000.00), with interest at the rate stated in said promissory note on the unpaid balance until paid, and by virtue of that deed to secure debt given by Roger Dale Parker and Linda Gail Parker dated December 7, 2018 and recorded on December 26, 2018, filed for record in Book 1346, Page 556,

Baldwin County, Georgia Records, said security deed having been given to secure a promissory note in the original principal sum of Twenty Thousand and 00/100 Dollars ($20,000.00), with interest at the rate stated in said promissory note on the unpaid balance until paid, there will be sold by the undersigned at public outcry to the highest bidder for cash before the Courthouse door at Baldwin County, Georgia, between the hours of 10:00 a.m. and 4:00 p.m. on May 5, 2020, the following described property:
All that tract or parcel of land lying and being in the 115th G.M. District, Baldwin County, Georgia, containing 24.095 ACRES and further identified as having such shape, size, metes, bounds, courses and distance as are shown upon a plat thereof entitled "Austin M. Tran & Tiffany Le Tran" by James E. Smith, Jr., G.R.L.S. No. 1895, dated May 25, 2005, and recorded in Plat Book 29, Page 28, Clerk's Office, Baldwin County Superior Court.
Reference is hereby made to said plat and incorporated herein for the purpose of a more particular and accurate description of the property herein conveyed. Said conveyance is subject to all rights of way, easements, and restrictions of record.
This is the identical property described in that certain Warranty Deed from David J. Meeks to Austin Minh Tran and Tiffany Lee Tran, dated June 22, 2005, and recorded in Deed Book 776, Pages 303-304, Office of the Clerk of Superior Court of Baldwin County, Georgia.
Said legal description being controlling; however, the property is located in Baldwin County at **897 Highway 24 East, Milledgeville, GA 31061.**
The debts secured by the herein described security deeds have been declared due because of, among other possible events of default, failure to make payment as agreed and violation of the insecurity clauses in the security deeds and commercial loan agreements between Roger Dale Parker and Linda Gail Parker and First Financial Bank. The debts remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, including attorneys' fees.
The entity that has full authority to negotiate, amend, and modify all terms of said security deeds with the debtor is First Financial Bank, Attention: Paula Davis, VP/Special Assets, First Financial Bank, 214 N. Washington, El Dora-

FFB01080

Confidential

AD# 381384

do, AR, (870) 875-8734. Please understand that the secured creditor is not required to negotiate, amend, or modify the terms of said security deeds.

Said property will be sold subject to: (a) any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), (b) unpaid water or sewage bills that constitute a lien against the property whether due and payable or not yet due and payable and which may not be of record, (c) the right of redemption of any taxing authority, (d) any matters which might be disclosed by an accurate survey and inspection of the property, and (e) any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Security Deed first set out above. This sale will be conducted subject to (1) confirmation that the sale is not prohibited under the U.S. Bankruptcy Code and (2) final confirmation and audit of the status of the loan with the holder of the Security Deed.

FIRST FINANCIAL BANK as Attorney-in-Fact and Agent for Roger Dale Parker and Linda Gail Parker
Jones Walker LLP
[M1547840.1] 4
1360 Peachtree Street, NE
Suite 1030
Atlanta, GA 30309
(404) 870-7500
THIS LAW FIRM MAY BE ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.
4/10, 4/17, 4/24, 5/1

FFB01081

Confidential

April 14th, 2017

Dale Parker DBA Hazel Lee Farm
897 Highway 24 East
Milledgeville, GA 31061

Dear Mr. Parker:

This letter serves to inform you of your current level of performance, and to make you aware that your farm has been placed into Perdue's Performance Improvement Program ("PIP"). Your farm, known to Perdue as Hazel Lee Farm, located in Baldwin County, currently has a six flock adjusted prime cost rating ("Six Flock Average") of a -.0058 at the conclusion of the last flock (flock 44).

Our current level for contract termination is at a -.0075 Six Flock Average. If your Six Flock Average falls below -.0075 cents per pound your farm will be placed on a one flock performance notice. Once placed on one flock performance notice, the flock then in your care or thereafter placed in your care (the "Notice Flock") will have to meet one or more of the following criteria:

1. Settle at an adjusted prime cost ("APC") rating of -.0025 or better (greater);
2. Settle so that the Six Flock Average improves to better (greater) than a -.0075; or
3. Settle so that at least three (3) of the last six (6) average an APC of zero (.0000) or better (greater).

Failure to meet one or more of the above criteria will result in the termination of your Poultry Producer Agreement in accordance with the Perdue Performance Improvement Program.

Clay Copeland has discussed with you your farm's performance and plans for improvement. Please contact Clay Copeland or myself if you have additional questions.

Sincerely,

Tim Little
Live Production Manager
Perdue Foods LLC

cc:      Director of Live Operations



Roger D. Parker & Linda G. Parker
dba Hazel Lee Farm
897 Hwy 24 East
Milledgeville, GA 31061

September 19, 2018

Dear Mr. & Mrs. Parker,

This letter is to inform you that Perdue will not place chickens at your farm, Hazel Lee Farm, until certain repairs are made to the farm.

Flock visitation reports show that you were informed about issues with your fans at least three times, starting at placement. On September 11, your flock advisor checked the fans again. His findings indicate that 19 of your 54 fans were not working, dog houses are not sealed, there are holes in the tin that could allow chicks out or rodents in to houses. This is a short list of the findings from this flock and previous flocks. Unfortunately, your farm is not in an operable condition.

On December 16, 2016 you signed the Poultry Producer Agreement. In Section II, part B you agree to the following:

> To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

A copy of the Poultry Producer Agreement is attached to this letter.

To be compliant with the Poultry Producer Agreement, you will need to complete the following prior to the next placement is scheduled.

1. Repair and/or replace any fan that is not working. All fans must work correctly prior to scheduling placement.
2. Repair and/or replace any broken or missing fan shutters. All fans must work correctly prior to scheduling placement.
3. Repair and/or replace any heater that is not working. All heaters must work correctly prior to placement.
4. Replace the missing cool cell pads. The entire tunnel area should have cool cells.
5. Repair the tunnel doors in House 2.
6. The dog houses where the cool cells need to be sealed up.
7. Patch holes in houses that would allow chicks to get out or wild animals to get into houses.
8. Clean, disinfect, and flush drinker lines.

Your cooperation is appreciated. Once you have these items completed contact me to schedule an inspection.


Thanks,


Kathryn Mizell

Growout Manager

Roger D. Parker & Linda G. Parker
dba Hazel Lee Farm
897 Hwy 24 East
Milledgeville, GA 31061

October 16, 2018

Dear Mr. & Mrs. Parker,

The purpose of this letter is to let you know that Perdue will place chickens at your farm, Hazel Lee Farm, as soon as certain repairs are made to the farm.

Flock visitation reports show that you were informed about issues with your fans at least three times, starting at placement. On September 11, your flock advisor checked the fans again. His findings indicate that 19 of your 54 fans were not working, dog houses are not sealed, there are holes in the tin that could allow chicks out or rodents in to houses. This is a short list of the findings from this flock and previous flocks. Unfortunately, your farm is not in a condition that is suitable for animal welfare.

On December 16, 2016 you signed the Poultry Producer Agreement. In Section II, part B you agree to the following:

> To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

A copy of the Poultry Producer Agreement is attached to this letter.

To be compliant with the Poultry Producer Agreement, you will need to complete the following prior to the next placement is scheduled.

1. Repair and/or replace any fan that is not working. All fans must work correctly prior to scheduling placement.
2. Repair and/or replace any broken or missing fan shutters. All fans must work correctly prior to scheduling placement.
3. Repair and/or replace any heater that is not working. All heaters must work correctly prior to placement.
4. All propane tanks are 70% full.
5. Replace the missing cool cell pads. The entire tunnel area should have cool cells.
6. Repair the tunnel doors in House 2.
7. The dog houses where the cool cells are, need to be sealed up.
8. Patch holes in houses that would allow chicks to get out or wild animals to get into houses.
9. Clean, disinfect, and flush drinker lines.

Your cooperation is appreciated. Once you have these items completed contact me 478-258-1165 to schedule an inspection.

Thanks,

Kathryn L. Mizell

Kathryn Mizell

Growout Manager

File Copy

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made __6/27/06__, between PERDUE FARMS INCORPORATED, a Maryland corporation, of Salisbury, Maryland, hereafter referred to as PERDUE, and ___Dale Parker_____ of ___Parker's Poultry_____, hereafter referred to as PRODUCER.

In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

I. __PERDUE AGREES:__

    A. To consign available chicks to PRODUCER to be raised for PERDUE.

    B. To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the raising of the chicks consigned.

    C. To provide PRODUCER with an accounting of chicks consigned and supplies provided under the terms of this Agreement.

    D. To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE."

    E. To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

II. __PRODUCER AGREES:__

    A. To accept the chicks when consigned and to raise the chicks until removed at PERDUE's direction from the PRODUCER'S farm.

    B. To feed, water, care for and otherwise manage the chicks consigned and to provide the necessary housing, equipment, supplies to maintain equipment and housing, utilities and labor and to maintain such housing and equipment in a state of good repair and operable condition.

    C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the raising of the chicks consigned.

    D. To provide curtain minders and an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the curtain minders and system in operable condition at all times.



DEFENDANT'S
EXHIBIT
23
PARKER    4/24/25
PENGAD 800-631-6989

Perdue 002439

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local regulations and codes.

F. To keep records of mortality and other information for the efficient and proper care of the chicks consigned hereby.

G. To keep no other fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds.

H. To notify PERDUE Flock Supervisor immediately (within 24 hours) if any chicks, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

I. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

J. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

K. To be present or represented when chicks are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.

L. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the chicks consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

M. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

## III. OTHER TERMS:

A. PRODUCER shall perform the services hereunder using PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the chicks consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or otherwise provide any substance, including, without limitation, pesticides and rodenticides, to the flock unless pre-approved by PERDUE.

Perdue 002440

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock, or this Agreement has been terminated in accordance with its terms, PERDUE may enter upon the premises of the PRODUCER where the flock is located.

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

F. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any chicks raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS:

A. PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry stock. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B. PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

Perdue 002441

**V. TERM; TERMINATION:**

    A.  For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

    B.  Either party may terminate this Agreement at any time for any reason as of the date of movement of the flock then under PRODUCER'S care, provided that written notice be given to the other party not later than two (2) weeks prior to the movement of such flock.

    C.  This Agreement may be immediately terminated by either party at any time by written notice to the other in event of any default by the other party. Any such termination shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

    D.  Unless waived in writing by PRODUCER at the time of signing this Agreement, PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement or until chicks have been placed with PRODUCER, whichever occurs first. Notice of cancellation under this Section V.D. shall be given in writing by PRODUCER to PERDUE by certified mail or statutory overnight delivery, return receipt requested, which shall be posted before termination of the right to cancel under this Section V.D. to the following address:

_____

_____

_____

**VI. COMPLAINT RESOLUTION PROCEDURE:**

    A.  The procedures in this Section VI and Section VII below shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims. The Complaint Resolution Procedure is as follows:

Step 1:    The PRODUCER shall first present his or her complaint to the local PERDUE Flock Supervisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock

Perdue 002442

Supervisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

*Step 2:*     If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Complex Manager within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Complex Manager, the PRODUCER shall confirm, in writing, his/her conversation with the Complex Manager, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Complex Manager will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3 or Section VII below, as applicable.

*Step 3:* If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. For all other complaints or disputes, proceed to Section VII. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, the matter shall be taken up as outlined in Section VII below. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B.   The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

Perdue 002443

VII.  **ARBITRATION:**

    A.  If the complaint or dispute has not been resolved pursuant to the procedures set forth in Section VI above, then the matter shall be exclusively submitted to bilateral arbitration between PERDUE and PRODUCER.  In no event will the failure to utilize any or all of the Steps in Section VI above constitute a waiver of the mandatory arbitration procedures set forth in this Section VII.  Multiparty arbitration may be utilized only with the express written consent of both parties.  Arbitration pursuant to this Agreement shall be handled in the following manner:

        1.  Arbitration shall be conducted by and under the commercial arbitration rules of the American Arbitration Association.

        2.  One (1) arbitrator uninterested in the finances under this Agreement will be appointed to resolve complaints or disputes pursuant to this Section of the Agreement and in accordance with the rules of the American Arbitration Association.

        3.  The decision of the arbitrator shall be final and binding upon both parties hereto.

        4.  The expenses of the arbitrator shall be shared equally by the parties.  Each party shall make arrangements for, and pay the expenses of, witnesses who are called by them.

    B.  It is agreed that the complaint and arbitration procedures outlined in Sections VI and VII of this Agreement shall be the final means of resolving all complaints and disputes by and between PRODUCER and PERDUE (irrespective of whether the complaint or dispute arises out of, as a consequence of, for or by reason of, results from, or relates in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims), and any disagreement between PERDUE and PRODUCER over the scope of these Sections shall be resolved in favor of Complaint Resolution Procedure and/or arbitration, as the case may be.

VIII.  **MISCELLANEOUS TERMS:**

    A.  Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

    B.  If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

**Perdue 002444**

C. This written Agreement and the then current Producer Payment Schedule constitute the entire agreement between PERDUE and PRODUCER, and no representations or statements made by either party or their agents not contained herein shall be in any way binding on either party. This Agreement shall be freely assignable by PERDUE, and shall be assignable by PRODUCER only with PERDUE's prior written consent.

This Agreement shall be binding upon the respective heirs, executors, administrators, successors and assigns of PERDUE and PRODUCER. By executing this Agreement PRODUCER represents and warrants that he, she or it has been afforded the opportunity to have the Agreement reviewed outside the business premises of PERDUE or PERDUE'S agents by an attorney or adviser of PRODUCER'S choosing for at least three business days prior to such execution.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FARMS INCORPORATED

By _____ (Seal)
James A. Perdue
Chairman

WITNESS:

_____ (Seal)
Producer (Husband)

WITNESS:

_____ (Seal)
Producer (Wife)


## WAIVER

PRODUCER HEREBY IRREVOCABLY WAIVES HIS, HERS OR ITS RIGHT TO CANCEL THIS AGREEMENT AS SPECIFICALLY PROVIDED FOR IN SECTION V.D. ABOVE.

WITNESS:

_____
Producer (Husband)

WITNESS:

_____
Producer (Wife)

Perdue 002445

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made ___5-18-07___, between PERDUE FARMS INCORPORATED, a Maryland corporation, of Salisbury, Maryland, hereafter referred to as PERDUE, and _Roger D. Parker & Linda G. Parker DBA Parkers Poultry_ of _283 Gordon Rd. Hillsboro, Ga. 31038_____, hereafter referred to as PRODUCER.

In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

### I. PERDUE AGREES:

A. To consign available chicks to PRODUCER to be raised for PERDUE.

B. To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the raising of the chicks consigned.

C. To provide PRODUCER with an accounting of chicks consigned and supplies provided under the terms of this Agreement.

D. To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE."

E. To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

### II. PRODUCER AGREES:

A. To accept the chicks when consigned and to raise the chicks until removed at PERDUE's direction from the PRODUCER'S farm.

B. To feed, water, care for and otherwise manage the chicks consigned and to provide the necessary housing, equipment, supplies to maintain equipment and housing, utilities and labor and to maintain such housing and equipment in a state of good repair and operable condition.

C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the raising of the chicks consigned.

D. To provide curtain minders and an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the curtain minders and system in operable condition at all times.

Perdue 002453

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local regulations and codes.

F. To keep records of mortality and other information for the efficient and proper care of the chicks consigned hereby.

G. To keep no other fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds.

H. To notify PERDUE Flock Supervisor immediately (within 24 hours) if any chicks, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

I. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

J. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

K. To be present or represented when chicks are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.

L. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the chicks consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

M. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

**III. OTHER TERMS:**

A. PRODUCER shall perform the services hereunder using PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the chicks consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or otherwise provide any substance, including, without limitation, pesticides and rodenticides, to the flock unless pre-approved by PERDUE.

Perdue 002454

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock, or this Agreement has been terminated in accordance with its terms, PERDUE may enter upon the premises of the PRODUCER where the flock is located.

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

F. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any chicks raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS:

A. PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry stock. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B. PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

Perdue 002455

## V. <u>TERM; TERMINATION:</u>

A. For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B. Either party may terminate this Agreement at any time for any reason as of the date of movement of the flock then under PRODUCER'S care, provided that written notice be given to the other party not later than two (2) weeks prior to the movement of such flock.

C. This Agreement may be immediately terminated by either party at any time by written notice to the other in event of any default by the other party. Any such termination shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D. Unless waived in writing by PRODUCER at the time of signing this Agreement, PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement or until chicks have been placed with PRODUCER, whichever occurs first. Notice of cancellation under this Section V.D. shall be given in writing by PRODUCER to PERDUE by certified mail or statutory overnight delivery, return receipt requested, which shall be posted before termination of the right to cancel under this Section V.D. to the following address:

Perdue Farms, Inc.

133 Industrial Park Court

Forsyth, GA 31029

## VI. <u>COMPLAINT RESOLUTION PROCEDURE:</u>

A. The procedures in this Section VI and Section VII below shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims. The Complaint Resolution Procedure is as follows:

<u>Step 1:</u>    The PRODUCER shall first present his or her complaint to the local PERDUE Flock Supervisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock



Perdue 002456

Supervisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Step 2:    If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Complex Manager within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Complex Manager, the PRODUCER shall confirm, in writing, his/her conversation with the Complex Manager, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Complex Manager will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3 or Section VII below, as applicable.

Step 3: If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement,** all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. For all other complaints or disputes, proceed to Section VII. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the matter, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, the matter shall be taken up as outlined in Section VII below. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B.  The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

Perdue 002457

VII.  **ARBITRATION:**

    A.  If the complaint or dispute has not been resolved pursuant to the procedures set forth in Section VI above, then the matter shall be exclusively submitted to bilateral arbitration between PERDUE and PRODUCER. In no event will the failure to utilize any or all of the Steps in Section VI above constitute a waiver of the mandatory arbitration procedures set forth in this Section VII. Multiparty arbitration may be utilized only with the express written consent of both parties. Arbitration pursuant to this Agreement shall be handled in the following manner:

        1.  Arbitration shall be conducted by and under the commercial arbitration rules of the American Arbitration Association.

        2.  One (1) arbitrator uninterested in the finances under this Agreement will be appointed to resolve complaints or disputes pursuant to this Section of the Agreement and in accordance with the rules of the American Arbitration Association.

        3.  The decision of the arbitrator shall be final and binding upon both parties hereto.

        4.  The expenses of the arbitrator shall be shared equally by the parties. Each party shall make arrangements for, and pay the expenses of, witnesses who are called by them.

    B.  It is agreed that the complaint and arbitration procedures outlined in Sections VI and VII of this Agreement shall be the final means of resolving all complaints and disputes by and between PRODUCER and PERDUE (irrespective of whether the complaint or dispute arises out of, as a consequence of, for or by reason of, results from, or relates in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims), and any disagreement between PERDUE and PRODUCER over the scope of these Sections shall be resolved in favor of Complaint Resolution Procedure and/or arbitration, as the case may be.

VIII.  **MISCELLANEOUS TERMS:**

    A.  Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

    B.  If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

Perdue 002458

C. This written Agreement and the then current Producer Payment Schedule constitute the entire agreement between PERDUE and PRODUCER, and no representations or statements made by either party or their agents not contained herein shall be in any way binding on either party. This Agreement shall be freely assignable by PERDUE, and shall be assignable by PRODUCER only with PERDUE's prior written consent.

This Agreement shall be binding upon the respective heirs, executors, administrators, successors and assigns of PERDUE and PRODUCER. By executing this Agreement PRODUCER represents and warrants that he, she or it has been afforded the opportunity to have the Agreement reviewed outside the business premises of PERDUE or PERDUE'S agents by an attorney or adviser of PRODUCER'S choosing for at least three business days prior to such execution.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FARMS INCORPORATED

By _James A. Perdue_ (Seal)
James A. Perdue
Chairman

WITNESS:
_Keith D. Small_

WITNESS:
_Keith S. Small_

_Roger D. Parker_ (Seal)
Producer (Husband)

_Linda L. Parker_ (Seal)
Producer (Wife)

WAIVER

PRODUCER HEREBY IRREVOCABLY WAIVES HIS, HERS OR ITS RIGHT TO CANCEL THIS AGREEMENT AS SPECIFICALLY PROVIDED FOR IN SECTION V.D. ABOVE.

WITNESS:

_____

_____
Producer (Husband)

WITNESS:

_____

_____
Producer (Wife)

Perdue 002459

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made ___7·3·07___, between PERDUE FARMS INCORPORATED, a Maryland corporation, of Salisbury, Maryland, hereafter referred to as PERDUE, and ___Roger D. Parker & Linda G. Parker DBA Parkers Poultry___ of ___283 Gordon Rd.  Hillsboro, Ga. 31038___, hereafter referred to as PRODUCER.

In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

### I.  PERDUE AGREES:

A. To consign available chicks to PRODUCER to be raised for PERDUE.

B. To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the raising of the chicks consigned.

C. To provide PRODUCER with an accounting of chicks consigned and supplies provided under the terms of this Agreement.

D. To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE."

E. To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

### II. PRODUCER AGREES:

A. To accept the chicks when consigned and to raise the chicks until removed at PERDUE's direction from the PRODUCER'S farm.

B. To feed, water, care for and otherwise manage the chicks consigned and to provide the necessary housing, equipment, supplies to maintain equipment and housing, utilities and labor and to maintain such housing and equipment in a state of good repair and operable condition.

C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the raising of the chicks consigned.

D. To provide curtain minders and an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the curtain minders and system in operable condition at all times.

Perdue 002432

E.  To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local regulations and codes.

F.  To keep records of mortality and other information for the efficient and proper care of the chicks consigned hereby.

G.  To keep no other fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds.

H.  To notify PERDUE Flock Supervisor immediately (within 24 hours) if any chicks, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

I.  To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

J.  To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

K.  To be present or represented when chicks are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.

L.  To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the chicks consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

M.  To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

## III. OTHER TERMS:

A.  PRODUCER shall perform the services hereunder using PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B.  PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the chicks consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or otherwise provide any substance, including, without limitation, pesticides and rodenticides, to the flock unless pre-approved by PERDUE.

Perdue 002433

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock, or this Agreement has been terminated in accordance with its terms, PERDUE may enter upon the premises of the PRODUCER where the flock is located.

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

F. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any chicks raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS:

A. PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry stock. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B. PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

Perdue 002434

## V. TERM; TERMINATION:

A. For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B. Either party may terminate this Agreement at any time for any reason as of the date of movement of the flock then under PRODUCER'S care, provided that written notice be given to the other party not later than two (2) weeks prior to the movement of such flock.

C. This Agreement may be immediately terminated by either party at any time by written notice to the other in event of any default by the other party. Any such termination shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D. Unless waived in writing by PRODUCER at the time of signing this Agreement, PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement or until chicks have been placed with PRODUCER, whichever occurs first. Notice of cancellation under this Section V.D. shall be given in writing by PRODUCER to PERDUE by certified mail or statutory overnight delivery, return receipt requested, which shall be posted before termination of the right to cancel under this Section V.D. to the following address:

Perdue Farms, Inc.

133 Industrial Park Court

Forsyth, GA 31029

## VI. COMPLAINT RESOLUTION PROCEDURE:

A. The procedures in this Section VI and Section VII below shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims. The Complaint Resolution Procedure is as follows:

Step 1:      The PRODUCER shall first present his or her complaint to the local PERDUE Flock Supervisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock

Perdue 002435

Supervisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Step 2:    If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Complex Manager within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Complex Manager, the PRODUCER shall confirm, in writing, his/her conversation with the Complex Manager, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Complex Manager will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3 or Section VII below, as applicable.

Step 3: If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement,** all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. For all other complaints or disputes, proceed to Section VII. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, the matter shall be taken up as outlined in Section VII below. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B.  The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

Perdue 002436

## VII.    ARBITRATION:

A. If the complaint or dispute has not been resolved pursuant to the procedures set forth in Section VI above, then the matter shall be exclusively submitted to bilateral arbitration between PERDUE and PRODUCER. In no event will the failure to utilize any or all of the Steps in Section VI above constitute a waiver of the mandatory arbitration procedures set forth in this Section VII. Multiparty arbitration may be utilized only with the express written consent of both parties. Arbitration pursuant to this Agreement shall be handled in the following manner:

   1. Arbitration shall be conducted by and under the commercial arbitration rules of the American Arbitration Association.
   2. One (1) arbitrator uninterested in the finances under this Agreement will be appointed to resolve complaints or disputes pursuant to this Section of the Agreement and in accordance with the rules of the American Arbitration Association.
   3. The decision of the arbitrator shall be final and binding upon both parties hereto.
   4. The expenses of the arbitrator shall be shared equally by the parties. Each party shall make arrangements for, and pay the expenses of, witnesses who are called by them.

B. It is agreed that the complaint and arbitration procedures outlined in Sections VI and VII of this Agreement shall be the final means of resolving all complaints and disputes by and between PRODUCER and PERDUE (irrespective of whether the complaint or dispute arises out of, as a consequence of, for or by reason of, results from, or relates in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims), and any disagreement between PERDUE and PRODUCER over the scope of these Sections shall be resolved in favor of Complaint Resolution Procedure and/or arbitration, as the case may be.

## VIII.    MISCELLANEOUS TERMS:

A. Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B. If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

Perdue 002437

C. This written Agreement and the then current Producer Payment Schedule constitute the entire agreement between PERDUE and PRODUCER, and no representations or statements made by either party or their agents not contained herein shall be in any way binding on either party. This Agreement shall be freely assignable by PERDUE, and shall be assignable by PRODUCER only with PERDUE's prior written consent.

This Agreement shall be binding upon the respective heirs, executors, administrators, successors and assigns of PERDUE and PRODUCER. By executing this Agreement PRODUCER represents and warrants that he, she or it has been afforded the opportunity to have the Agreement reviewed outside the business premises of PERDUE or PERDUE'S agents by an attorney or adviser of PRODUCER'S choosing for at least three business days prior to such execution.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FARMS INCORPORATED

By _____ (Seal)
James A. Perdue
Chairman

WITNESS:

_____ (Seal)
Producer (Husband)

WITNESS:

_____ (Seal)
Producer (Wife)

## WAIVER

PRODUCER HEREBY IRREVOCABLY WAIVES HIS, HERS OR ITS RIGHT TO CANCEL THIS AGREEMENT AS SPECIFICALLY PROVIDED FOR IN SECTION V.D. ABOVE.

WITNESS:

_____        _____
                                Producer (Husband)

WITNESS:

_____        _____
                                Producer (Wife)

Page 7 of 7
POULTRY PRODUCER AGREEMENT
July 1, 2004

Perdue 002438

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made __08-18-09__, between PERDUE FARMS INCORPORATED, a Maryland corporation, of Salisbury, Maryland, hereafter referred to as PERDUE, and __Roger D & Linda G. Parker  dba Hazel Lee Farm__ of __288 Gordon Rd     Hillsboro  GA  31038__, hereafter referred to as PRODUCER.

In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

### I.  PERDUE AGREES:

A.  To consign available chicks to PRODUCER to be raised for PERDUE.

B.  To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the raising of the chicks consigned.

C.  To provide PRODUCER with an accounting of chicks consigned and supplies provided under the terms of this Agreement.

D.  To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE."

E.  To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

### II.  PRODUCER AGREES:

A.  To accept the chicks when consigned and to raise the chicks until removed at PERDUE's direction from the PRODUCER'S farm.

B.  To feed, water, care for and otherwise manage the chicks consigned and to provide the necessary housing, equipment, supplies to maintain equipment and housing, utilities and labor and to maintain such housing and equipment in a state of good repair and operable condition.

C.  To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the raising of the chicks consigned.

D.  To provide curtain minders and an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the curtain minders and system in operable condition at all times.

Page 1 of 7
POULTRY PRODUCER AGREEMENT
July 1, 2004



EXHIBIT
2

Perdue 002310

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local regulations and codes.

F. To keep records of mortality and other information for the efficient and proper care of the chicks consigned hereby.

G. To keep no other fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds.

H. To notify PERDUE Flock Supervisor immediately (within 24 hours) if any chicks, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

I. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

J. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

K. To be present or represented when chicks are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.

L. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the chicks consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

M. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

## III. OTHER TERMS:

A. PRODUCER shall perform the services hereunder using PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the chicks consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or otherwise provide any substance, including, without limitation, pesticides and rodenticides, to the flock unless pre-approved by PERDUE.

Perdue 002311

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock, or this Agreement has been terminated in accordance with its terms, PERDUE may enter upon the premises of the PRODUCER where the flock is located.

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

F. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any chicks raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS:

A. PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry stock. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B. PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

Perdue 002312

## V. TERM: TERMINATION:

A. For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B. Either party may terminate this Agreement at any time for any reason as of the date of movement of the flock then under PRODUCER'S care, provided that written notice be given to the other party not later than two (2) weeks prior to the movement of such flock.

C. This Agreement may be immediately terminated by either party at any time by written notice to the other in event of any default by the other party. Any such termination shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D. Unless waived in writing by PRODUCER at the time of signing this Agreement, PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement or until chicks have been placed with PRODUCER, whichever occurs first. Notice of cancellation under this Section V.D. shall be given in writing by PRODUCER to PERDUE by certified mail or statutory overnight delivery, return receipt requested, which shall be posted before termination of the right to cancel under this Section V.D. to the following address:

Perdue Farms, Inc.
133 Industrial Park Court
Forsyth, GA 31029

## VI. COMPLAINT RESOLUTION PROCEDURE:

A. The procedures in this Section VI and Section VII below shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims. The Complaint Resolution Procedure is as follows:

Step 1:    The PRODUCER shall first present his or her complaint to the local PERDUE Flock Supervisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock

Perdue 002313

Supervisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Step 2:     If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Complex Manager within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Complex Manager, the PRODUCER shall confirm, in writing, his/her conversation with the Complex Manager, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Complex Manager will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3 or Section VII below, as applicable.

Step 3: If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. For all other complaints or disputes, proceed to Section VII. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, the matter shall be taken up as outlined in Section VII below. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B. The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

Perdue 002314

VII.   **ARBITRATION:**
  A.  If the complaint or dispute has not been resolved pursuant to the procedures set forth in Section VI above, then the matter shall be exclusively submitted to bilateral arbitration between PERDUE and PRODUCER.  In no event will the failure to utilize any or all of the Steps in Section VI above constitute a waiver of the mandatory arbitration procedures set forth in this Section VII.  Multiparty arbitration may be utilized only with the express written consent of both parties.  Arbitration pursuant to this Agreement shall be handled in the following manner:
  1.  Arbitration shall be conducted by and under the commercial arbitration rules of the American Arbitration Association.
  2.  One (1) arbitrator uninterested in the finances under this Agreement will be appointed to resolve complaints or disputes pursuant to this Section of the Agreement and in accordance with the rules of the American Arbitration Association.
  3.  The decision of the arbitrator shall be final and binding upon both parties hereto.
  4.  The expenses of the arbitrator shall be shared equally by the parties.  Each party shall make arrangements for, and pay the expenses of, witnesses who are called by them.
  B.  It is agreed that the complaint and arbitration procedures outlined in Sections VI and VII of this Agreement shall be the final means of resolving all complaints and disputes by and between PRODUCER and PERDUE (irrespective of whether the complaint or dispute arises out of, as a consequence of, for or by reason of, results from, or relates in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law and statutory claims), and any disagreement between PERDUE and PRODUCER over the scope of these Sections shall be resolved in favor of Complaint Resolution Procedure and/or arbitration, as the case may be.


VIII.  **MISCELLANEOUS TERMS:**
  A.  Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

  B.  If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

Perdue 002315

C. This written Agreement and the then current Producer Payment Schedule constitute the entire agreement between PERDUE and PRODUCER, and no representations or statements made by either party or their agents not contained herein shall be in any way binding on either party. This Agreement shall be freely assignable by PERDUE, and shall be assignable by PRODUCER only with PERDUE's prior written consent.

This Agreement shall be binding upon the respective heirs, executors, administrators, successors and assigns of PERDUE and PRODUCER. By executing this Agreement PRODUCER represents and warrants that he, she or it has been afforded the opportunity to have the Agreement reviewed outside the business premises of PERDUE or PERDUE'S agents by an attorney or adviser of PRODUCER'S choosing for at least three business days prior to such execution.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FARMS INCORPORATED

By _____ (Seal)
James A. Perdue
Chairman

WITNESS: _____

_____ (Seal)
Producer (Husband)

WITNESS: _____

_____ (Seal)
Producer (Wife)

WAIVER

PRODUCER HEREBY IRREVOCABLY WAIVES HIS, HERS OR ITS RIGHT TO CANCEL THIS AGREEMENT AS SPECIFICALLY PROVIDED FOR IN SECTION V.D. ABOVE.

WITNESS:

_____

WITNESS:

_____

_____
Producer (Husband)

_____
Producer (Wife)

Page 7 of 7
POULTRY PRODUCER AGREEMENT
July 1, 2004

Perdue 002316

0716

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made December 29, 2014, between PERDUE FOODS LLC, a Maryland limited liability company, of Salisbury, Maryland, hereafter referred to as PERDUE, and Roger D. Parker & Linda G. Parker dba Parker's Poultry of 897 Hwy 24 E  Milledgeville GA 31061, hereafter referred to as PRODUCER. In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

**PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

*__ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.__*

### I. PERDUE AGREES:

A. To consign available birds to PRODUCER to be raised for PERDUE.

B. To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned.

C. To provide PRODUCER with an accounting of birds consigned and supplies provided under the terms of this Agreement.

D. To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE," set forth in **Attachment A**.

E. To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

### II. PRODUCER AGREES:

A. To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm.

B. To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

Perdue 002489

C.  To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned.

D.  To provide an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the alarm system in operable condition at all times.

E.  To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local laws, regulations and codes.

F.  To properly handle all used poultry litter in a manner meeting the requirements of federal, state and local laws, regulations and codes.

G.  To keep all records and other information required for the efficient and proper care of the birds consigned hereby including, but not limited to, records of mortality, water readings, generator logs and other audit requirements.

H.  To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds. Furthermore, PRODUCER and PRODUCER's employees will not maintain, own or care for any other flocks, birds or poultry on any other premises unless approved by PERDUE.

I.  To notify PERDUE Flock Advisor immediately (within 24 hours) if any birds, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

J.  To notify PERDUE Flock Advisor within 48 hours of any damage to PRODUCER's poultry houses or poultry house equipment caused by PERDUE.

K.  To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

L.  To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

M.  To be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.



Perdue 002490

N. To comply with any bio-security policies, audits, measures or guidelines required by PERDUE.

O. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the birds consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

P. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

Q. To adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock.

R. To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare Program.

## III.   OTHER TERMS

A. PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE. If PERDUE incurs any loss, cost, expense or damage arising out of or related to PRODUCER's violation of this section, including, but not limited to expense of destroying live birds and the expense of recalling processed poultry meat PRODUCER will reimburse PERDUE for such loss, cost ,expense or damage. Such damages may be offset against any payment due to PRODUCER by PERDUE.

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock,

Perdue 00249

or this Agreement has been terminated in accordance with its terms, PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit. In such event, PERDUE will be entitled to damages as set forth in Section III.B.

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to assuring the proper health and welfare of the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes.

F. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

G. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any birds raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

H. PERDUE has a performance improvement program ("PIP") and PRODUCER is subject to the PIP as provided herein. The terms and the performance improvement guidelines of the PIP, including, without limitation, factors considered when placing PRODUCER in the PIP, factors considered in determining if and when the PRODUCER is removed from the PIP (and placed back in good standing), and when the Agreement will be terminated as a result of the PIP, are set forth in **Attachment B**.

I. PRODUCER understands and agrees that PERDUE will determine, in its sole and absolute discretion:

    a. the breed of chickens PRODUCER will receive;
    b. the number and density of chickens in each flock delivered to PRODUCER's farm;
    c. the size, weight and age of the chicken to be produced;
    d. the time for processing of each flock; and
    e. the date, time and estimated interval of placement for future flocks.

J. PRODUCER understands and agrees that taking photographs, images, audio and/or video recordings of the chickens and/or PERDUE representatives is strictly prohibited.



Perdue 002492

Furthermore, the transmission or posting of images/recordings of the chickens and/or PERDUE representatives via the internet including, but not limited to, email, picture or video messaging and/or use of social networking or photo sharing websites is strictly prohibited.

K. PRODUCER acknowledges and agrees that this Agreement will be retained by PERDUE in electronic file format only.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS

A. PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B. PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

## V. TERM; TERMINATION

A. For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B. Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party. The parties further agree that once written notice of termination is provided, PERDUE shall not be required to deliver chicks to PRODUCER'S farm during the 90-day time period once a flock is removed from PRODUCER'S farm.

C. Any termination as a result of a default by a party shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of

Perdue 002493

this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D.  This Agreement may be immediately terminated by PERDUE at any time upon written notice to PRODUCER for any of the following reasons:

    a.  PRODUCER abandons a flock or neglects to provide feed, water, proper house management or care, which abandonment, neglect or failure to provide care threatens the health and welfare or existence of a flock;

    b.  Death of PRODUCER;

    c.  PRODUCER uses abusive or threatening language to any PERDUE representative or threatens or causes physical harm to any PERDUE representative, or in any other way impedes or interferes with PERDUE representatives in the performance of their duties;

    d.  PRODUCER fails to comply with applicable federal, state or local laws, regulations or codes;

    e.  PRODUCER terminates its business as a producer for PERDUE;

    f.  PRODUCER transfers an ownership interest in its business without PERDUE's consent, has disposed of or attempted to dispose of a flock or attempts to encumber or mortgage a flock;

    g.  PRODUCER uses any feed, medications, vaccinations or other supplies other than those provided by PERDUE in violation of Sections II(C) and/or III(B);

    h.  PRODUCER becomes insolvent or has filed a voluntary petition for bankruptcy or an involuntary bankruptcy has been filed against PRODUCER, which petition has not been promptly discharged;

    i.  PRODUCER makes any public statements or comments regarding PERDUE or its brands that are false, defamatory or disparaging in nature;

    j.  PRODUCER's farm has been without chickens for more than one hundred eighty (180) days;

    k.  PRODUCER takes photographs, images, audio and/or video recordings of the chickens and/or PERDUE representatives and/or transmits or posts



images/recordings of the chickens and/or PERDUE representatives via the internet including, but not limited to email, picture or video messaging, social networking or photo sharing websites in violation of Section III(I);

l.  PRODUCER fails to comply with the PERDUE Poultry Welfare Program;

m. Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks);

n.  PRODUCER allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry; or

o.  PRODUCER creating and/or contributing to a threatened and/or actual bio-security hazard.

E.  PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement.  Notice of cancellation under this Section V.E. shall be given in writing by PRODUCER to PERDUE by certified mail, return receipt requested, which shall be posted before termination of the right to cancel under this Section V.E. to the following address:

> Perdue Foods LLC
> Attn: Live Production /Grow-out Management
> PO Box 1537
> Salisbury, MD 21802-1537

## VI. COMPLAINT RESOLUTION PROCEDURE

A.  The procedures in this Section VI and Section VII below (except to the extent PRODUCER declines arbitration), shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law, equitable and/or statutory claims. The Complaint Resolution Procedure is as follows:

> Step 1:    The PRODUCER shall first present his or her complaint to the local PERDUE Flock Advisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first.  If the PERDUE Flock Advisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Perdue 002495

Step 2:    If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Director of Live Operations within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Director of Live Operations, the PRODUCER shall confirm, in writing, his/her conversation with the Director of Live Operations, citing the provision of this Agreement, which PRODUCER believes, has been violated.  The PERDUE Director of Live Operations will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint.  If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3 or Section VII below, as applicable.

Step 3:    If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2.  For all other complaints or disputes, proceed to Section VII.  The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement.  The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE.  The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting.  PERDUE and the PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation.  In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties.  If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, the matter shall be taken up as outlined in Section VII below.  Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution.  If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B.  The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties.  Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.



Perdue 002496

VII.    ARBITRATION:

A.  EXCEPT AS PROVIDED HEREIN, IF THE COMPLAINT OR DISPUTE HAS
    NOT BEEN RESOLVED PURSUANT TO THE PROCEDURES SET FORTH
    IN SECTION VI ABOVE THEN THE MATTER SHALL BE EXCLUSIVELY
    SUBMITTED TO ARBITRATION BETWEEN PERDUE AND PRODUCER.
    IN NO EVENT WILL THE FAILURE TO UTILIZE ANY OR ALL OF THE
    STEPS IN SECTION VI ABOVE CONSTITUTE A WAIVER OF THE
    MANDATORY ARBITRATION PROCEDURES SET FORTH IN THIS
    SECTION VII.  ARBITRATION PURSUANT TO THIS AGREEMENT
    SHALL BE HANDLED IN THE FOLLOWING MANNER:

    1.  THE COMPLAINT OR DISPUTE SHALL BE SUBMITTED TO BINDING
        ARBITRATION CONDUCTED BY A SINGLE ARBITRATOR TO BE
        SELECTED BY THE PARTIES.  IF THE PARTIES CANNOT AGREE ON
        A SINGLE ARBITRATOR, THEN THE SINGLE ARBITRATOR SHALL
        BE SELECTED IN THE FOLLOWING MANNER: (I) THE
        ARBITRATION SHALL BE CONDUCTED BY THE AMERICAN
        ARBITRATION ASSOCIATION ("AAA"); (II) A SINGLE ARBITRATOR
        SHALL BE SELECTED FROM A LIST OF AT LEAST 7 INDIVIDUALS
        PROVIDED BY THE AAA; (III) THE PARTY DEMANDING
        ARBITRATION SHALL MAKE THE FIRST, THIRD AND FIFTH
        STRIKES FROM THE LIST; (IV) THE SECOND PARTY SHALL MAKE
        THE SECOND, FOURTH AND SIXTH STRIKES; AND (V) THE
        REMAINING INDIVIDUAL FROM THE ORIGINAL LIST OF SEVEN
        SHALL BE THE ARBITRATOR.

    2.  BECAUSE THE CONTRACT AND/OR ATTACHMENTS HERETO AND
        THE RELATIONSHIP BETWEEN PRODUCER AND PERDUE
        EVIDENCE A TRANSACTION INVOLVING INTERSTATE
        COMMERCE, PRODUCER AND PERDUE AGREE THAT THESE
        ARBITRATION PROVISIONS SHALL BE GOVERNED BY AND BE
        ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT.

    3.  EITHER PARTY (PERDUE OR PRODUCER) SHALL DEMAND
        ARBITRATION IN WRITING WITHIN ONE HUNDRED TWENTY (120)
        DAYS AFTER THE ALLEGED COMPLAINT OR DISPUTE WAS
        KNOWN OR REASONABLY SHOULD HAVE BEEN KNOWN BY
        SERVING A COPY OF THE WRITTEN DEMAND TO THE OTHER
        PARTY.  IF THE PERDUE DEMANDS ARBITRATION, THE WRITTEN
        DEMAND SHALL BE PROVIDED TO THE PRODUCER.  IF THE
        PRODUCER DEMANDS ARBITRATION, THE WRITTEN DEMAND
        SHALL BE PROVIDED TO PERDUE BY MAIL TO HERBERT D.
        FRERICHS, JR., GENERAL COUNSEL, 31149 OLD OCEAN CITY
        ROAD, SALISBURY, MD 21804. PERDUE AGREES TO PAY (OR
        REIMBURSE PRODUCER) THE AAA'S INITIAL FILING FEE

POULTRY PRODUCER AGREEMENT
April 1, 2014

Perdue 002497

ASSOCIATED WITH EITHER PARTY FILING AN ARBITRATION
DEMAND.

4. THE PARTIES HEREBY AGREE THAT THE ARBITRATOR
SELECTED SHALL BE A NEUTRAL AND IMPARTIAL ARBITRATOR.

5. THE ARBITRATOR SHALL BE A PERSON HAVING KNOWLEDGE OF
OR EXPERIENCE WITH RESPECT TO THE POULTRY INDUSTRY.

6. EXCEPT AS PROVIDED ABOVE, EACH PARTY SHALL BEAR ITS
OWN ARBITRATION COSTS AND EXPENSES, AND THE COSTS AND
EXPENSES OF THE ARBITRATOR SHALL BE SHARED JOINTLY AND
EQUALLY BETWEEN THE PARTIES.

7. THE ARBITRATION HEARING SHALL BE HELD WITHIN THE
SPECIFIED VENUE OR AN AGREED-TO LOCATION. AT LEAST
TWENTY (20) DAYS ADVANCE NOTICE OF THE HEARING DATE,
TIME AND LOCATION SHALL BE PROVIDED TO BOTH PARTIES.

8. DISCOVERY SHALL BE PERMITTED IN CONNECTION WITH THE
ARBITRATION ONLY TO THE EXTENT, IF ANY, EXPRESSLY
AUTHORIZED BY THE ARBITRATOR UPON A SHOWING OF
SUBSTANTIAL NEED BY THE PARTY SEEKING DISCOVERY.

9. THE ARBITRATOR SHALL HAVE NO POWER TO AWARD NON-
MONETARY OR EQUITABLE RELIEF OF ANY SORT. THE
ARBITRATOR SHALL ALSO HAVE NO POWER TO AWARD (A)
DAMAGES INCONSISTENT WITH ANY APPLICABLE AGREEMENT
BETWEEN THE PARTIES OR (B) PUNITIVE DAMAGES OR ANY
OTHER DAMAGES NOT MEASURED BY THE PREVAILING PARTY'S
ACTUAL DAMAGES, AND THE PARTIES EXPRESSLY WAIVE THEIR
RIGHT TO OBTAIN SUCH DAMAGES IN ARBITRATION OR IN ANY
OTHER FORUM.

10. THE ARBITRATOR SHALL HEAR THE EVIDENCE AND TESTIMONY
OFFERED BY THE PARTIES, AND THE ARBITRATION HEARING
SHALL BE CONCLUDED WITHIN TEN (10) DAYS FROM ITS
STARTING DATE UNLESS OTHERWISE ORDERED BY THE
ARBITRATOR. THE ARBITRATOR WILL MAKE A DECISION
WITHIN THIRTY (30) DAYS FROM THE COMPLETION OF THE
HEARING. EITHER PARTY MAY ASK FOR A REASONED AWARD IN
WRITING, WHICH SHALL BE PROVIDED TO THE PARTIES. BOTH
PARTIES SHALL BE ALLOWED A PERIOD OF TIME TO SUBMIT
POST-HEARING BRIEFS WITHIN A PERIOD OF TIME DESIGNATED
BY THE ARBITRATOR. ANY AWARD RENDERED BY THE
ARBITRATOR SHALL BE FINAL AND BINDING ON ALL PARTIES
EXCEPT AS PROVIDED BY LAW. SUCH JUDGMENT OR AWARD
RENDERED BY THE ARBITRATOR MAY BE RECORDED OR
ENTERED BY EITHER PARTY IN ANY COURT HAVING
JURISDICTION PURSUANT TO THIS AGREEMENT.

11. THE PARTIES STIPULATE THAT THE PROVISIONS HEREOF SHALL
BE A COMPLETE DEFENSE TO ANY SUIT, ACTION, OR

-10-
POULTRY PRODUCER AGREEMENT
April 1, 2014




Perdue 002498

**PROCEEDING INSTITUTED IN ANY FEDERAL, STATE OR LOCAL COURT OR BEFORE ANY ADMINISTRATIVE TRIBUNAL. THE ARBITRATION PROVISIONS HEREOF SHALL, WITH RESPECT TO ANY CONTROVERSY OR DISPUTE, SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT AND/OR ATTACHMENTS.**

12. **NOTHING HEREIN CONTAINED SHALL BE DEEMED TO GIVE THE ARBITRATOR ANY AUTHORITY, POWER, OR RIGHT TO ALTER, CHANGE, AMEND, MODIFY, ADD TO OR SUBTRACT FROM ANY OF THE PROVISIONS OF THIS AGREEMENT AND/OR ATTACHMENTS.**

13. **FAILURE BY EITHER PARTY TO PARTICIPATE IN THE ARBITRATION PROCESS SHALL PRECLUDE THAT PARTY FROM OBJECTING TO THE ARBITRATION PROCEEDINGS.**

14. **PRODUCER MAY DECLINE TO BE BOUND BY ARBITRATION BY COMPLETING THE INFORMATION AND PLACING HIS OR HER SIGNATURES ON PAGE 15 OF THE AGREEMENT.  IF PRODUCER ELECTS NOT TO BE BOUND BY THIS ARBITRATION SECTION, PRODUCER AND PERDUE CAN NEVERTHELESS AGREE TO ARBITRATE ANY AND ALL CLAIMS BETWEEN THEMSELVES ARISING OUT OF OR RELATING IN ANY WAY TO THE EXECUTION, INTERPRETATION AND PERFORMANCE OF THIS AGREEMENT AND/OR ATTACHMENTS BY CONSENTING TO ARBITRATION IN WRITING AFTER THE CLAIM(S) ARISE.**

B. **EXCEPT AS PROVIDED HEREIN, IT IS AGREED THAT THE COMPLAINT AND ARBITRATION PROCEDURES OUTLINED IN SECTIONS VI AND VII OF THIS AGREEMENT SHALL BE THE FINAL MEANS OF RESOLVING ALL COMPLAINTS AND DISPUTES BY AND BETWEEN PRODUCER AND PERDUE (IRRESPECTIVE OF WHETHER THE COMPLAINT OR DISPUTE ARISES OUT OF, AS A CONSEQUENCE OF, FOR OR BY REASON OF, RESULTS FROM, OR RELATES IN ANY WAY TO THE FORMATION, EXECUTION, PERFORMANCE, TERMINATION, REVOCATION, CANCELLATION, OR EXPIRATION OF THIS AGREEMENT OR ANY PROVISIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, ALL COMMON LAW AND STATUTORY CLAIMS), AND ANY DISAGREEMENT BETWEEN PERDUE AND PRODUCER OVER THE SCOPE OF THESE SECTIONS SHALL BE RESOLVED IN FAVOR OF COMPLAINT RESOLUTION PROCEDURE AND/OR ARBITRATION, AS THE CASE MAY BE.**

## VIII.   MISCELLANEOUS TERMS

A. Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are

Perdue 002499

due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B.  If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

C.  **Prior Agreements/Entire Agreement/Release.**  This Agreement supersedes, voids and nullifies any and all previous Poultry Producer Agreements and all other previous agreements governing the relationship between PRODUCER and PERDUE. ***THE PRODUCER AND PERDUE HEREBY RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S), PERFORMANCE OR LACK THEREOF, AND/OR REPRESENTATIONS MADE BEFORE, DURING OR AFTER ENTERING INTO ANY PREVIOUS POULTRY PRODUCER AGREEMENT.*** This Agreement, and any Attachments hereto, constitute the entire agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. PRODUCER acknowledges that in entering into this Agreement and/or its Attachments, he/she has not relied upon any statements that are not contained in this document, and/or the Attachments hereto.

D.  **No Modification Except in Writing.**  The parties agree that this Agreement and the Attachments hereto may not be modified except in writing signed by both PERDUE and PRODUCER.

E.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland except to the extent that doing so is prohibited. Any action or proceeding brought by either party hereto that is related to this Agreement shall be brought in a Federal court located in the Federal judicial district in which the PRODUCER'S farm is located.

F.  By executing this Agreement PRODUCER represents and warrants that he/she has read and acknowledged the terms of this Agreement and has been afforded the opportunity to consult with third-parties including, but not necessarily limited to, attorneys, financial advisors, and family, before entering into this Agreement and Attachments.  By signing this Agreement, PRODUCER represents, warrants and agrees that he/she has made an informed decision with respect to the Agreements and Attachments hereto.



Perdue 002500

G.    An electronic copy of this Agreement (such as a PDF version), when signed by the PRODUCER and PERDUE, will be considered an "original" document for all purposes.

H.    This Agreement is personal to the PRODUCER and is not transferable or assignable by PRODUCER without the written consent of PERDUE. Should PRODUCER sell or lease an ownership interest in his or her business, this Agreement will automatically terminate, unless PERDUE has consented to the assignment of this Agreement, and PRODUCER will make no representation that PERDUE will continue to supply the new owner or lessee with flocks. PERDUE will be under no obligation to supply PRODUCER's successor(s), assign(s), lessee(s) or new owner(s) with flocks. PERDUE may require, as a condition of the approval of the transfer of PRODUCER's farm, by sale, lease or other assignment, that this Agreement is assigned and accepted by PRODUCER's transferee.

I.    Each party agrees that it will not make use of the Confidential Information except in the performance of this Agreement, and will not disclose any of the Confidential Information. Further, each party will take all necessary and appropriate measures to protect and maintain the Confidential Information disclosed to it. As used herein, "Confidential Information" shall mean any and all oral or written information relating to PERDUE's or PRODUCER's processes, methodologies, financial and cost information, and other related information and data. Confidential Information shall not include (i) information which at the time of disclosure is in the public domain, and (ii) after disclosure becomes part of the public domain through no violation of this section, or (iii) is acquired by the receiving party from a third person, provided that the receiving party does not know or have reason to know that such information was acquired by such third person under an obligation of secrecy involving the disclosing party or (iv) information required to be disclosed by court order or by law, or (v) information independently developed by a party. These obligations shall survive the termination of this Agreement.

J.    If more than one person is identified as the PRODUCER, the obligations of each such person hereunder shall be joint and several.

K.    **Liability and Indemnity of PRODUCER.** Subject to the provisions for arbitration as herein provided, PRODUCER agrees to indemnify, defend, and hold PERDUE, its officers, employees, agents, and representatives harmless against any and all claims, damages, liabilities, losses, actions, and expenses, including injury to any employee of or to any property of PERDUE, proximately caused by negligent acts or omissions of PRODUCER or his agents, employees, sub-contractors or parties under its control, in the performance of PRODUCER's duties hereunder. PRODUCER further agrees to indemnify, defend and hold PERDUE harmless from and against any and all losses, claims, damages, and actions, including federal, state, or local administrative actions, rulings and all other actions of any nature whatsoever which are in any manner caused by or which result from the presence of the birds on the premises of

Perdue 002501

PRODUCER, including, but not necessarily limited to matters involving emission complaints, disposal complaints, or pollution complaints, violation of law, and any negligent acts or omissions of PRODUCER in the performance of its obligations under this Agreement.

L.   **Liability and Indemnity of PERDUE.**  Subject to the provisions for arbitration as herein provided, PERDUE agrees to indemnify, defend, and hold harmless the PRODUCER from and against any claims, damages, liabilities, losses and expenses for personal injury or property damage (to property other than chicks or feed) proximately caused by negligent acts or omissions of PERDUE in the performance of its obligations under this Agreement.

M.   **THIRD PARTY PRODUCTS.  PERDUE PROVIDES ANY THIRD PARTY PRODUCTS, SUCH AS MEDICINES AND VACCINES, "AS IS" AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE EXTENT PROVIDED BY MANUFACTURER.**

N.   **Exclusion of Incidental, Consequential, and Certain Other Damages.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ATTACHMENTS.**

O.   **DISCLAIMER AND WAIVER OF EXTRAORDINARY CLAIMS. SUPPLIER AND PRODUCER MUTUALLY DISCLAIM AND WAIVE THE RIGHT TO PURSUE AGAINST ONE ANOTHER ANY CLASS ACTION CLAIMS OR CAUSES OF ACTION OF WHATEVER NATURE OR KIND. SUPPLIER AND PRODUCER AGREE THAT EACH WILL PURSUE ANY CLAIMS OR CAUSES OF ACTION AGAINST THE OTHER ON AN INDIVIDUAL BASIS, AND WILL NOT LEAD, JOIN, OR SERVE AS A MEMBER OF A CLASS OR GROUP OF PERSONS BRINGING SUCH A CLAIM OR CAUSES OF ACTION.**

P.   **IF ANY MATTERS IN DISPUTE ARE REQUIRED TO BE SETTLED BY LITIGATION IN A COURT OF LAW, SUCH TRIALS WILL BE DECIDED BY A JUDGE.  THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.**



Q.    **Right to Decline Arbitration.**  A poultry grower, livestock producer or swine production contract grower has the right to decline to be bound by the arbitration provisions set forth in this Agreement.  A poultry grower, livestock producer or swine production contract grower shall indicate whether or not it desires to be bound by the arbitration provisions by signing one of the following statements; failure to choose an option will be treated as if the poultry grower, livestock producer or swine production contract grower declined to be bound by the arbitration provisions set forth in this Agreement:

I decline to be bound by the arbitration provisions set forth in this Agreement:

_____

I accept the arbitration provisions as set forth in this Agreement:

_____

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FOODS LLC

By: _____ (Seal)
(Director of Live Operations

WITNESS
_____

WITNESS
_____

_____ (Seal)
Producer

_____ (Seal)
Producer

**ATTACHMENT B**

PERFORMANCE IMPROVEMENT PROGRAM

The Producer is subject to the following requirements:

1.   Producer may be placed under the Performance Improvement Program ("PIP") if Producer's flocks fail to achieve Company's minimum standards of competitiveness.

2.   For purposes of evaluating Producer competitiveness, Company will use the average of the Producer's Adjusted Prime Cost ("APC") calculation from the Producer's last six (6) consecutive flocks (the "Six Flock Average"). For purposes of clarification a Six Flock Average is determined before a Producer settles six (6) consecutive flocks. Specifically a Producer must have settled a minimum of three (3) consecutive flocks before a Six Flock Average is calculated and the Six Flock Average calculation is based on the average of the Producer's APC for such three (3) consecutive flocks. Thereafter, and until the Producer settles its sixth flock, an additional flock will be added to the calculation of the Six Flock Average. After the Producer reaches six (6) settled flocks, and thereafter, the Six Flock Average will be calculated based on Producer's last six (6) consecutive flocks.

3.   When a Producer settles a flock and as a result reaches a Six Flock Average of a -0.0050 or worse (lower), the Producer will be placed in the PIP and be given a performance notice regarding Producer's placement into the PIP. Performance notices will be provided by Perdue's Grow Out staff at a meeting with the Producer and explaining Producer's current APC cost. Such meeting is an opportunity for the Producer in discussion with Perdue Grow Out to identify necessary actions for future flocks that may help to improve Producer's cost and flock performance and therefore may assist Producer in being removed from the PIP. These recommendations may include, if appropriate, new or upgraded equipment and other matters which may improve performance. After the meeting the Grow-out Manager and/or Live Production Manager will follow up with a certified letter to the Producer confirming Producer's placement into the PIP.

4.   When a Producer settles a flock and as a result reaches a Six Flock Average of -0.0075 or worse (lower), the Producer will receive notice by certified letter stating that the Producer must meet one or more of the following criteria in order to maintain a Poultry Producer Agreement with Perdue:

     a.   Settle the notice flock with an APC of -0.0025 or better (greater);

     b.   Settle the notice flock so as to improve the Six Flock Average to better (greater) than a -0.0075; or

     c.   Settle the notice flock so that at least three (3) of the flocks within Producer's Six Flock Average settled with an APC of zero or better (greater).

5.      Producer will be subject to termination if Producer fails to meet one or more of the criteria set forth in Paragraph 4 above.  All settlements, records, and communications will be reviewed by the Director of Live Operations for the applicable complex before the Agreement is terminated pursuant to the PIP.

6.      Producer will be removed from the PIP when Producer settles a flock and as a result reaches a Six Flock Average better (greater) than -0.0050.

7.      Factors that are considered to be beyond the Producer's control may be reviewed and may not be considered when calculating a Producer's Six Flock Average standing with Perdue. Notwithstanding, any Producer that had a preventable disaster will be held accountable for the flock cost in the Six Flock Average calculation.  In addition, and notwithstanding anything to the contrary in the Agreement or the PIP, a certified letter will be sent stating that if another preventable disaster occurs on the Producer's farm within 12 months of the above-referenced preventable disaster, the Poultry Producer Agreement will be terminated.

-2-

Perdue 002505

2158

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made December 29, 2014____, between PERDUE FOODS LLC, a Maryland limited liability company, of Salisbury, Maryland, hereafter referred to as PERDUE, and Roger D. Parker & Linda G. Parker dba Hazel Lee Farm____ of 897 Hwy 24 E  Milledgeville GA 31061_____, hereafter referred to as PRODUCER. In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

**PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

*ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.*

## I.  PERDUE AGREES:

A.  To consign available birds to PRODUCER to be raised for PERDUE.

B.  To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned.

C.  To provide PRODUCER with an accounting of birds consigned and supplies provided under the terms of this Agreement.

D.  To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE," set forth in **Attachment A**.

E.  To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

## II.  PRODUCER AGREES:

A.  To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm.

B.  To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

EXHIBIT
3

Perdue 002278

C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned.

D. To provide an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the alarm system in operable condition at all times.

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local laws, regulations and codes.

F. To properly handle all used poultry litter in a manner meeting the requirements of federal, state and local laws, regulations and codes.

G. To keep all records and other information required for the efficient and proper care of the birds consigned hereby including, but not limited to, records of mortality, water readings, generator logs and other audit requirements.

H. To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds. Furthermore, PRODUCER and PRODUCER's employees will not maintain, own or care for any other flocks, birds or poultry on any other premises unless approved by PERDUE.

I. To notify PERDUE Flock Advisor immediately (within 24 hours) if any birds, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

J. To notify PERDUE Flock Advisor within 48 hours of any damage to PRODUCER's poultry houses or poultry house equipment caused by PERDUE.

K. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

L. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

M. To be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.



-2-
POULTRY PRODUCER AGREEMENT
April 1, 2014

Perdue 002279

N. To comply with any bio-security policies, audits, measures or guidelines required by PERDUE.

O. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the birds consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

P. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

Q. To adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock.

R. To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare Program.

## III.   OTHER TERMS

A. PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE.  Specifically, PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE. If PERDUE incurs any loss, cost, expense or damage arising out of or related to PRODUCER's violation of this section, including, but not limited to expense of destroying live birds and the expense of recalling processed poultry meat PRODUCER will reimburse PERDUE for such loss, cost ,expense or damage. Such damages may be offset against any payment due to PRODUCER by PERDUE.

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities.  If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock,

or this Agreement has been terminated in accordance with its terms, PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit. In such event, PERDUE will be entitled to damages as set forth in Section III.B.

E.  If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to assuring the proper health and welfare of the flock as outlined by PERDUE'S established procedures.  PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes.

F.  Title to each flock shall remain in PERDUE.  PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder.  PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

G.  PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any birds raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

H.  PERDUE has a performance improvement program ("PIP") and PRODUCER is subject to the PIP as provided herein. The terms and the performance improvement guidelines of the PIP, including, without limitation, factors considered when placing PRODUCER in the PIP, factors considered in determining if and when the PRODUCER is removed from the PIP (and placed back in good standing), and when the Agreement will be terminated as a result of the PIP, are set forth in **Attachment B**.

I.  PRODUCER understands and agrees that PERDUE will determine, in its sole and absolute discretion:

    a.  the breed of chickens PRODUCER will receive;
    b.  the number and density of chickens in each flock delivered to PRODUCER's farm;
    c.  the size, weight and age of the chicken to be produced;
    d.  the time for processing of each flock; and
    e.  the date, time and estimated interval of placement for future flocks.

J.  PRODUCER understands and agrees that taking photographs, images, audio and/or video recordings of the chickens and/or PERDUE representatives is strictly prohibited.



Perdue 002281

Furthermore, the transmission or posting of images/recordings of the chickens and/or PERDUE representatives via the internet including, but not limited to, email, picture or video messaging and/or use of social networking or photo sharing websites is strictly prohibited.

K. PRODUCER acknowledges and agrees that this Agreement will be retained by PERDUE in electronic file format only.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS

A. PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B. PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

## V. TERM; TERMINATION

A. For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B. Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party. The parties further agree that once written notice of termination is provided, PERDUE shall not be required to deliver chicks to PRODUCER'S farm during the 90-day time period once a flock is removed from PRODUCER'S farm.

C. Any termination as a result of a default by a party shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of



this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D. This Agreement may be immediately terminated by PERDUE at any time upon written notice to PRODUCER for any of the following reasons:

   a. PRODUCER abandons a flock or neglects to provide feed, water, proper house management or care, which abandonment, neglect or failure to provide care threatens the health and welfare or existence of a flock;

   b. Death of PRODUCER;

   c. PRODUCER uses abusive or threatening language to any PERDUE representative or threatens or causes physical harm to any PERDUE representative, or in any other way impedes or interferes with PERDUE representatives in the performance of their duties;

   d. PRODUCER fails to comply with applicable federal, state or local laws, regulations or codes;

   e. PRODUCER terminates its business as a producer for PERDUE;

   f. PRODUCER transfers an ownership interest in its business without PERDUE's consent, has disposed of or attempted to dispose of a flock or attempts to encumber or mortgage a flock;

   g. PRODUCER uses any feed, medications, vaccinations or other supplies other than those provided by PERDUE in violation of Sections II(C) and/or III(B);

   h. PRODUCER becomes insolvent or has filed a voluntary petition for bankruptcy or an involuntary bankruptcy has been filed against PRODUCER, which petition has not been promptly discharged;

   i. PRODUCER makes any public statements or comments regarding PERDUE or its brands that are false, defamatory or disparaging in nature;

   j. PRODUCER's farm has been without chickens for more than one hundred eighty (180) days;

   k. PRODUCER takes photographs, images, audio and/or video recordings of the chickens and/or PERDUE representatives and/or transmits or posts



Perdue 002283

images/recordings of the chickens and/or PERDUE representatives via the internet including, but not limited to email, picture or video messaging, social networking or photo sharing websites in violation of Section III(I);

l.  PRODUCER fails to comply with the PERDUE Poultry Welfare Program;

m.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks);

n.  PRODUCER allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry; or

o.  PRODUCER creating and/or contributing to a threatened and/or actual bio-security hazard.

E.  PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement. Notice of cancellation under this Section V.E. shall be given in writing by PRODUCER to PERDUE by certified mail, return receipt requested, which shall be posted before termination of the right to cancel under this Section V.E. to the following address:

> Perdue Foods LLC
> Attn: Live Production /Grow-out Management
> PO Box 1537
> Salisbury, MD 21802-1537

## VI. COMPLAINT RESOLUTION PROCEDURE

A.  The procedures in this Section VI and Section VII below (except to the extent PRODUCER declines arbitration), shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law, equitable and/or statutory claims. The Complaint Resolution Procedure is as follows:

> Step 1:  The PRODUCER shall first present his or her complaint to the local PERDUE Flock Advisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock Advisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Perdue 002284

Step 2:    If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Director of Live Operations within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Director of Live Operations, the PRODUCER shall confirm, in writing, his/her conversation with the Director of Live Operations, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Director of Live Operations will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3 or Section VII below, as applicable.

Step 3:    If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. For all other complaints or disputes, proceed to Section VII. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, the matter shall be taken up as outlined in Section VII below. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B.    The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.



Perdue 002285

VII.  ARBITRATION:

A.  EXCEPT AS PROVIDED HEREIN, IF THE COMPLAINT OR DISPUTE HAS
NOT BEEN RESOLVED PURSUANT TO THE PROCEDURES SET FORTH
IN SECTION VI ABOVE THEN THE MATTER SHALL BE EXCLUSIVELY
SUBMITTED TO ARBITRATION BETWEEN PERDUE AND PRODUCER.
IN NO EVENT WILL THE FAILURE TO UTILIZE ANY OR ALL OF THE
STEPS IN SECTION VI ABOVE CONSTITUTE A WAIVER OF THE
MANDATORY ARBITRATION PROCEDURES SET FORTH IN THIS
SECTION VII.  ARBITRATION PURSUANT TO THIS AGREEMENT
SHALL BE HANDLED IN THE FOLLOWING MANNER:
1.  THE COMPLAINT OR DISPUTE SHALL BE SUBMITTED TO BINDING
ARBITRATION CONDUCTED BY A SINGLE ARBITRATOR TO BE
SELECTED BY THE PARTIES.  IF THE PARTIES CANNOT AGREE ON
A SINGLE ARBITRATOR, THEN THE SINGLE ARBITRATOR SHALL
BE SELECTED IN THE FOLLOWING MANNER: (I) THE
ARBITRATION SHALL BE CONDUCTED BY THE AMERICAN
ARBITRATION ASSOCIATION ("AAA"); (II) A SINGLE ARBITRATOR
SHALL BE SELECTED FROM A LIST OF AT LEAST 7 INDIVIDUALS
PROVIDED BY THE AAA; (III) THE PARTY DEMANDING
ARBITRATION SHALL MAKE THE FIRST, THIRD AND FIFTH
STRIKES FROM THE LIST; (IV) THE SECOND PARTY SHALL MAKE
THE SECOND, FOURTH AND SIXTH STRIKES; AND (V) THE
REMAINING INDIVIDUAL FROM THE ORIGINAL LIST OF SEVEN
SHALL BE THE ARBITRATOR.
2.  BECAUSE THE CONTRACT AND/OR ATTACHMENTS HERETO AND
THE RELATIONSHIP BETWEEN PRODUCER AND PERDUE
EVIDENCE A TRANSACTION INVOLVING INTERSTATE
COMMERCE, PRODUCER AND PERDUE AGREE THAT THESE
ARBITRATION PROVISIONS SHALL BE GOVERNED BY AND BE
ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT.
3.  EITHER PARTY (PERDUE OR PRODUCER) SHALL DEMAND
ARBITRATION IN WRITING WITHIN ONE HUNDRED TWENTY (120)
DAYS AFTER THE ALLEGED COMPLAINT OR DISPUTE WAS
KNOWN OR REASONABLY SHOULD HAVE BEEN KNOWN BY
SERVING A COPY OF THE WRITTEN DEMAND TO THE OTHER
PARTY.  IF THE PERDUE DEMANDS ARBITRATION, THE WRITTEN
DEMAND SHALL BE PROVIDED TO THE PRODUCER.  IF THE
PRODUCER DEMANDS ARBITRATION, THE WRITTEN DEMAND
SHALL BE PROVIDED TO PERDUE BY MAIL TO HERBERT D.
FRERICHS, JR., GENERAL COUNSEL, 31149 OLD OCEAN CITY
ROAD, SALISBURY, MD 21804. PERDUE AGREES TO PAY (OR
REIMBURSE PRODUCER) THE AAA'S INITIAL FILING FEE

Perdue 002286

ASSOCIATED WITH EITHER PARTY FILING AN ARBITRATION DEMAND.

4. THE PARTIES HEREBY AGREE THAT THE ARBITRATOR SELECTED SHALL BE A NEUTRAL AND IMPARTIAL ARBITRATOR.

5. THE ARBITRATOR SHALL BE A PERSON HAVING KNOWLEDGE OF OR EXPERIENCE WITH RESPECT TO THE POULTRY INDUSTRY.

6. EXCEPT AS PROVIDED ABOVE, EACH PARTY SHALL BEAR ITS OWN ARBITRATION COSTS AND EXPENSES, AND THE COSTS AND EXPENSES OF THE ARBITRATOR SHALL BE SHARED JOINTLY AND EQUALLY BETWEEN THE PARTIES.

7. THE ARBITRATION HEARING SHALL BE HELD WITHIN THE SPECIFIED VENUE OR AN AGREED-TO LOCATION. AT LEAST TWENTY (20) DAYS ADVANCE NOTICE OF THE HEARING DATE, TIME AND LOCATION SHALL BE PROVIDED TO BOTH PARTIES.

8. DISCOVERY SHALL BE PERMITTED IN CONNECTION WITH THE ARBITRATION ONLY TO THE EXTENT, IF ANY, EXPRESSLY AUTHORIZED BY THE ARBITRATOR UPON A SHOWING OF SUBSTANTIAL NEED BY THE PARTY SEEKING DISCOVERY.

9. THE ARBITRATOR SHALL HAVE NO POWER TO AWARD NON-MONETARY OR EQUITABLE RELIEF OF ANY SORT. THE ARBITRATOR SHALL ALSO HAVE NO POWER TO AWARD (A) DAMAGES INCONSISTENT WITH ANY APPLICABLE AGREEMENT BETWEEN THE PARTIES OR (B) PUNITIVE DAMAGES OR ANY OTHER DAMAGES NOT MEASURED BY THE PREVAILING PARTY'S ACTUAL DAMAGES, AND THE PARTIES EXPRESSLY WAIVE THEIR RIGHT TO OBTAIN SUCH DAMAGES IN ARBITRATION OR IN ANY OTHER FORUM.

10. THE ARBITRATOR SHALL HEAR THE EVIDENCE AND TESTIMONY OFFERED BY THE PARTIES, AND THE ARBITRATION HEARING SHALL BE CONCLUDED WITHIN TEN (10) DAYS FROM ITS STARTING DATE UNLESS OTHERWISE ORDERED BY THE ARBITRATOR. THE ARBITRATOR WILL MAKE A DECISION WITHIN THIRTY (30) DAYS FROM THE COMPLETION OF THE HEARING. EITHER PARTY MAY ASK FOR A REASONED AWARD IN WRITING, WHICH SHALL BE PROVIDED TO THE PARTIES. BOTH PARTIES SHALL BE ALLOWED A PERIOD OF TIME TO SUBMIT POST-HEARING BRIEFS WITHIN A PERIOD OF TIME DESIGNATED BY THE ARBITRATOR. ANY AWARD RENDERED BY THE ARBITRATOR SHALL BE FINAL AND BINDING ON ALL PARTIES EXCEPT AS PROVIDED BY LAW. SUCH JUDGMENT OR AWARD RENDERED BY THE ARBITRATOR MAY BE RECORDED OR ENTERED BY EITHER PARTY IN ANY COURT HAVING JURISDICTION PURSUANT TO THIS AGREEMENT.

11. THE PARTIES STIPULATE THAT THE PROVISIONS HEREOF SHALL BE A COMPLETE DEFENSE TO ANY SUIT, ACTION, OR



Perdue 002287

PROCEEDING INSTITUTED IN ANY FEDERAL, STATE OR LOCAL COURT OR BEFORE ANY ADMINISTRATIVE TRIBUNAL. THE ARBITRATION PROVISIONS HEREOF SHALL, WITH RESPECT TO ANY CONTROVERSY OR DISPUTE, SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT AND/OR ATTACHMENTS.

12. NOTHING HEREIN CONTAINED SHALL BE DEEMED TO GIVE THE ARBITRATOR ANY AUTHORITY, POWER, OR RIGHT TO ALTER, CHANGE, AMEND, MODIFY, ADD TO OR SUBTRACT FROM ANY OF THE PROVISIONS OF THIS AGREEMENT AND/OR ATTACHMENTS.

13. FAILURE BY EITHER PARTY TO PARTICIPATE IN THE ARBITRATION PROCESS SHALL PRECLUDE THAT PARTY FROM OBJECTING TO THE ARBITRATION PROCEEDINGS.

14. PRODUCER MAY DECLINE TO BE BOUND BY ARBITRATION BY COMPLETING THE INFORMATION AND PLACING HIS OR HER SIGNATURES ON PAGE 15 OF THE AGREEMENT. IF PRODUCER ELECTS NOT TO BE BOUND BY THIS ARBITRATION SECTION, PRODUCER AND PERDUE CAN NEVERTHELESS AGREE TO ARBITRATE ANY AND ALL CLAIMS BETWEEN THEMSELVES ARISING OUT OF OR RELATING IN ANY WAY TO THE EXECUTION, INTERPRETATION AND PERFORMANCE OF THIS AGREEMENT AND/OR ATTACHMENTS BY CONSENTING TO ARBITRATION IN WRITING AFTER THE CLAIM(S) ARISE.

B. EXCEPT AS PROVIDED HEREIN, IT IS AGREED THAT THE COMPLAINT AND ARBITRATION PROCEDURES OUTLINED IN SECTIONS VI AND VII OF THIS AGREEMENT SHALL BE THE FINAL MEANS OF RESOLVING ALL COMPLAINTS AND DISPUTES BY AND BETWEEN PRODUCER AND PERDUE (IRRESPECTIVE OF WHETHER THE COMPLAINT OR DISPUTE ARISES OUT OF, AS A CONSEQUENCE OF, FOR OR BY REASON OF, RESULTS FROM, OR RELATES IN ANY WAY TO THE FORMATION, EXECUTION, PERFORMANCE, TERMINATION, REVOCATION, CANCELLATION, OR EXPIRATION OF THIS AGREEMENT OR ANY PROVISIONS THEREOF, INCLUDING, BUT NOT LIMITED TO, ALL COMMON LAW AND STATUTORY CLAIMS), AND ANY DISAGREEMENT BETWEEN PERDUE AND PRODUCER OVER THE SCOPE OF THESE SECTIONS SHALL BE RESOLVED IN FAVOR OF COMPLAINT RESOLUTION PROCEDURE AND/OR ARBITRATION, AS THE CASE MAY BE.

VIII.  MISCELLANEOUS TERMS

A.  Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are



Perdue 002288

due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B. If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

C. <u>Prior Agreements/Entire Agreement/Release</u>. This Agreement supersedes, voids and nullifies any and all previous Poultry Producer Agreements and all other previous agreements governing the relationship between PRODUCER and PERDUE. ***THE PRODUCER AND PERDUE HEREBY RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S), PERFORMANCE OR LACK THEREOF, AND/OR REPRESENTATIONS MADE BEFORE, DURING OR AFTER ENTERING INTO ANY PREVIOUS POULTRY PRODUCER AGREEMENT.*** This Agreement, and any Attachments hereto, constitute the entire agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. PRODUCER acknowledges that in entering into this Agreement and/or its Attachments, he/she has not relied upon any statements that are not contained in this document, and/or the Attachments hereto.

D. <u>No Modification Except in Writing</u>. The parties agree that this Agreement and the Attachments hereto may not be modified except in writing signed by both PERDUE and PRODUCER.

E. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland except to the extent that doing so is prohibited. Any action or proceeding brought by either party hereto that is related to this Agreement shall be brought in a Federal court located in the Federal judicial district in which the PRODUCER'S farm is located.

F. By executing this Agreement PRODUCER represents and warrants that he/she has read and acknowledged the terms of this Agreement and has been afforded the opportunity to consult with third-parties including, but not necessarily limited to, attorneys, financial advisors, and family, before entering into this Agreement and Attachments. By signing this Agreement, PRODUCER represents, warrants and agrees that he/she has made an informed decision with respect to the Agreements and Attachments hereto.



Perdue 002289

G.    An electronic copy of this Agreement (such as a PDF version), when signed by the PRODUCER and PERDUE, will be considered an "original" document for all purposes.

H.    This Agreement is personal to the PRODUCER and is not transferable or assignable by PRODUCER without the written consent of PERDUE. Should PRODUCER sell or lease an ownership interest in his or her business, this Agreement will automatically terminate, unless PERDUE has consented to the assignment of this Agreement, and PRODUCER will make no representation that PERDUE will continue to supply the new owner or lessee with flocks. PERDUE will be under no obligation to supply PRODUCER's successor(s), assign(s), lessee(s) or new owner(s) with flocks. PERDUE may require, as a condition of the approval of the transfer of PRODUCER's farm, by sale, lease or other assignment, that this Agreement is assigned and accepted by PRODUCER's transferee.

I.    Each party agrees that it will not make use of the Confidential Information except in the performance of this Agreement, and will not disclose any of the Confidential Information. Further, each party will take all necessary and appropriate measures to protect and maintain the Confidential Information disclosed to it. As used herein, "Confidential Information" shall mean any and all oral or written information relating to PERDUE's or PRODUCER's processes, methodologies, financial and cost information, and other related information and data. Confidential Information shall not include (i) information which at the time of disclosure is in the public domain, and (ii) after disclosure becomes part of the public domain through no violation of this section, or (iii) is acquired by the receiving party from a third person, provided that the receiving party does not know or have reason to know that such information was acquired by such third person under an obligation of secrecy involving the disclosing party or (iv) information required to be disclosed by court order or by law, or (v) information independently developed by a party. These obligations shall survive the termination of this Agreement.

J.    If more than one person is identified as the PRODUCER, the obligations of each such person hereunder shall be joint and several.

K.    **Liability and Indemnity of PRODUCER.**  Subject to the provisions for arbitration as herein provided, PRODUCER agrees to indemnify, defend, and hold PERDUE, its officers, employees, agents, and representatives harmless against any and all claims, damages, liabilities, losses, actions, and expenses, including injury to any employee of or to any property of PERDUE, proximately caused by negligent acts or omissions of PRODUCER or his agents, employees, sub-contractors or parties under its control, in the performance of PRODUCER's duties hereunder.  PRODUCER further agrees to indemnify, defend and hold PERDUE harmless from and against any and all losses, claims, damages, and actions, including federal, state, or local administrative actions, rulings and all other actions of any nature whatsoever which are in any manner caused by or which result from the presence of the birds on the premises of

Perdue 002290

PRODUCER, including, but not necessarily limited to matters involving emission complaints, disposal complaints, or pollution complaints, violation of law, and any negligent acts or omissions of PRODUCER in the performance of its obligations under this Agreement.

L.    <u>Liability and Indemnity of PERDUE</u>.  Subject to the provisions for arbitration as herein provided, PERDUE agrees to indemnify, defend, and hold harmless the PRODUCER from and against any claims, damages, liabilities, losses and expenses for personal injury or property damage (to property other than chicks or feed) proximately caused by negligent acts or omissions of PERDUE in the performance of its obligations under this Agreement.

M.    <u>THIRD PARTY PRODUCTS</u>.  <u>PERDUE PROVIDES ANY THIRD PARTY PRODUCTS, SUCH AS MEDICINES AND VACCINES, "AS IS" AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE EXTENT PROVIDED BY MANUFACTURER.</u>

N.    <u>Exclusion of Incidental, Consequential, and Certain Other Damages</u>.  <u>TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ATTACHMENTS.</u>

O.    <u>DISCLAIMER AND WAIVER OF EXTRAORDINARY CLAIMS. SUPPLIER AND PRODUCER MUTUALLY DISCLAIM AND WAIVE THE RIGHT TO PURSUE AGAINST ONE ANOTHER ANY CLASS ACTION CLAIMS OR CAUSES OF ACTION OF WHATEVER NATURE OR KIND. SUPPLIER AND PRODUCER AGREE THAT EACH WILL PURSUE ANY CLAIMS OR CAUSES OF ACTION AGAINST THE OTHER ON AN INDIVIDUAL BASIS, AND WILL NOT LEAD, JOIN, OR SERVE AS A MEMBER OF A CLASS OR GROUP OF PERSONS BRINGING SUCH A CLAIM OR CAUSES OF ACTION.</u>

P.    <u>IF ANY MATTERS IN DISPUTE ARE REQUIRED TO BE SETTLED BY LITIGATION IN A COURT OF LAW, SUCH TRIALS WILL BE DECIDED BY A JUDGE. THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.</u>



Perdue 002291

Q.  **Right to Decline Arbitration.**  A poultry grower, livestock producer or swine production contract grower has the right to decline to be bound by the arbitration provisions set forth in this Agreement.  A poultry grower, livestock producer or swine production contract grower shall indicate whether or not it desires to be bound by the arbitration provisions by signing one of the following statements; failure to choose an option will be treated as if the poultry grower, livestock producer or swine production contract grower declined to be bound by the arbitration provisions set forth in this Agreement:

I decline to be bound by the arbitration provisions set forth in this Agreement:

_____

I accept the arbitration provisions as set forth in this Agreement:

_____

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FOODS LLC

By: _____ (Seal)
(Director of Live Operations)

WITNESS

_____

WITNESS

_____

_____ (Seal)
Producer

_____ (Seal)
Producer

Perdue 002292

**ATTACHMENT B**

PERFORMANCE IMPROVEMENT PROGRAM

The Producer is subject to the following requirements:

1.  Producer may be placed under the Performance Improvement Program ("PIP") if Producer's flocks fail to achieve Company's minimum standards of competitiveness.

2.  For purposes of evaluating Producer competitiveness, Company will use the average of the Producer's Adjusted Prime Cost ("APC") calculation from the Producer's last six (6) consecutive flocks (the "Six Flock Average"). For purposes of clarification a Six Flock Average is determined before a Producer settles six (6) consecutive flocks. Specifically a Producer must have settled a minimum of three (3) consecutive flocks before a Six Flock Average is calculated and the Six Flock Average calculation is based on the average of the Producer's APC for such three (3) consecutive flocks. Thereafter, and until the Producer settles its sixth flock, an additional flock will be added to the calculation of the Six Flock Average. After the Producer reaches six (6) settled flocks, and thereafter, the Six Flock Average will be calculated based on Producer's last six (6) consecutive flocks.

3.  When a Producer settles a flock and as a result reaches a Six Flock Average of a -0.0050 or worse (lower), the Producer will be placed in the PIP and be given a performance notice regarding Producer's placement into the PIP. Performance notices will be provided by Perdue's Grow Out staff at a meeting with the Producer and explaining Producer's current APC cost. Such meeting is an opportunity for the Producer in discussion with Perdue Grow Out to identify necessary actions for future flocks that may help to improve Producer's cost and flock performance and therefore may assist Producer in being removed from the PIP. These recommendations may include, if appropriate, new or upgraded equipment and other matters which may improve performance. After the meeting the Grow-out Manager and/or Live Production Manager will follow up with a certified letter to the Producer confirming Producer's placement into the PIP.

4.  When a Producer settles a flock and as a result reaches a Six Flock Average of -0.0075 or worse (lower), the Producer will receive notice by certified letter stating that the Producer must meet one or more of the following criteria in order to maintain a Poultry Producer Agreement with Perdue:

    a.  Settle the notice flock with an APC of -0.0025 or better (greater);

    b.  Settle the notice flock so as to improve the Six Flock Average to better (greater) than a -0.0075; or

    c.  Settle the notice flock so that at least three (3) of the flocks within Producer's Six Flock Average settled with an APC of zero or better (greater).

Perdue 002293

5.  Producer will be subject to termination if Producer fails to meet one or more of the criteria set forth in Paragraph 4 above. All settlements, records, and communications will be reviewed by the Director of Live Operations for the applicable complex before the Agreement is terminated pursuant to the PIP.

6.  Producer will be removed from the PIP when Producer settles a flock and as a result reaches a Six Flock Average better (greater) than -0.0050.

7.  Factors that are considered to be beyond the Producer's control may be reviewed and may not be considered when calculating a Producer's Six Flock Average standing with Perdue. Notwithstanding, any Producer that had a preventable disaster will be held accountable for the flock cost in the Six Flock Average calculation. In addition, and notwithstanding anything to the contrary in the Agreement or the PIP, a certified letter will be sent stating that if another preventable disaster occurs on the Producer's farm within 12 months of the above-referenced preventable disaster, the Poultry Producer Agreement will be terminated.

-2-

Perdue 002294

0716

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made  December 16, 2016 , between PERDUE FOODS LLC, a Maryland
limited liability company, of Salisbury, Maryland, hereafter referred to as PERDUE, and
 Simon Parker & Casey Parker dba Parker's Poultry          of
 288 Gordon Road  Hillsboro, GA. 31038                        , hereafter referred to as PRODUCER.
In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

**PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG
OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO
MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND
OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS,
AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE
PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

***ADDITIONAL CAPITAL INVESTMENTS.  ADDITIONAL LARGE CAPITAL INVESTMENTS
MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.***

### I.  PERDUE AGREES:

A.  To consign available birds to PRODUCER to be raised for PERDUE.

B.  To provide and deliver to PRODUCER, or arrange to have provided and delivered to
    PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary
    for the health and welfare of the birds consigned.

C.  To provide PRODUCER with an accounting of birds consigned and supplies provided
    under the terms of this Agreement.

D.  To compensate PRODUCER for services provided herein as provided for in the attached
    "PRODUCER PAYMENT SCHEDULE," set forth in **Attachment A**.

E.  To provide to PRODUCER upon request thereby statistical information and data
    regarding PRODUCER and used by PERDUE to determine compensation paid to
    PRODUCER by PERDUE under this Agreement, other than information that is or relates
    to a trade secret.

### II.  PRODUCER AGREES:

A.  To accept the birds when consigned and to raise the birds until removed at PERDUE's
    direction from the PRODUCER's farm.

B.  To feed, water, care for and otherwise manage the birds consigned, to provide the
    necessary housing, utilities, equipment, labor and supplies and to maintain such housing
    and equipment in a state of good repair and operable condition.

**Perdue 002474**

C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned.

D. To provide an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the alarm system in operable condition at all times.

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local laws, regulations and codes.

F. To properly handle all used poultry litter in a manner meeting the requirements of federal, state and local laws, regulations and codes.

G. To keep all records and other information required for the efficient and proper care of the birds consigned hereby including, but not limited to, records of mortality, water readings, generator logs and other audit requirements.

H. To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds. Furthermore, PRODUCER and PRODUCER's employees will not maintain, own or care for any other flocks, birds or poultry on any other premises unless approved by PERDUE.

I. To notify PERDUE Flock Advisor immediately (within 24 hours) if any birds, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

J. To notify PERDUE Flock Advisor within 48 hours of any damage to PRODUCER's poultry houses or poultry house equipment caused by PERDUE.

K. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

L. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

M. To be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.



Perdue 002475

N. To comply with any bio-security policies, audits, measures or guidelines required by PERDUE.

O. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the birds consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

P. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

Q. To adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock.

R. To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs.

## III.   **OTHER TERMS**

A. PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE. If PERDUE incurs any loss, cost, expense or damage arising out of or related to PRODUCER's violation of this section, including, but not limited to expense of destroying live birds and the expense of recalling processed poultry meat PRODUCER will reimburse PERDUE for such loss, cost ,expense or damage. Such damages may be offset against any payment due to PRODUCER by PERDUE.

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock,

Perdue 002476

or this Agreement has been terminated in accordance with its terms, PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit. In such event, PERDUE will be entitled to damages as set forth in Section III(B).

E. If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to assuring the proper health and welfare of the flock as outlined by PERDUE'S established procedures. PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes.

F. Title to each flock shall remain in PERDUE. PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder. PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

G. PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any birds raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

H. PERDUE has a performance improvement program ("PIP") and PRODUCER is subject to the PIP as provided herein. The terms and the performance improvement guidelines of the PIP, including, without limitation, factors considered when placing PRODUCER in the PIP, factors considered in determining if and when the PRODUCER is removed from the PIP (and placed back in good standing), and when the Agreement will be terminated as a result of the PIP, are set forth in **Attachment B**.

I. PRODUCER understands and agrees that PERDUE will determine, in its sole and absolute discretion:

   a. the breed of chickens PRODUCER will receive;
   b. the number and density of chickens in each flock delivered to PRODUCER's farm;
   c. the size, weight and age of the chicken to be produced;
   d. the time for processing of each flock; and
   e. the date, time and estimated interval of placement for future flocks.



Notwithstanding the foregoing, if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock, PRODUCER shall notify the PERDUE Flock Advisor as set forth in Section II(I).

J.  PRODUCER acknowledges and agrees that this Agreement will be retained by PERDUE in electronic file format only.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS

A.  PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry.  Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors.  Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B.  PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement.  The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility.  PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement.  Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE.  PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

## V.  TERM; TERMINATION

A.  For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B.  Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party. The parties further agree that once written notice of termination is provided, PERDUE shall not be required to deliver chicks to PRODUCER'S farm during the 90-day time period once a flock is removed from PRODUCER'S farm.

C.  Any termination as a result of a default by a party shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement.  Notwithstanding any other provision of

Perdue 002478

this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE.  Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D.  This Agreement may be immediately terminated by PERDUE at any time upon written notice to PRODUCER for any of the following reasons:

    a.  PRODUCER abandons a flock or neglects to provide feed, water, proper house management or care, which abandonment, neglect or failure to provide care threatens the health and welfare or existence of a flock;

    b.  Death of PRODUCER;

    c.  PRODUCER uses abusive or threatening language to any PERDUE representative or threatens or causes physical harm to any PERDUE representative, or in any other way impedes or interferes with PERDUE representatives in the performance of their duties;

    d.  PRODUCER fails to comply with applicable federal, state or local laws, regulations or codes;

    e.  PRODUCER terminates its business as a producer for PERDUE;

    f.  PRODUCER transfers an ownership interest in its business without PERDUE's consent, has disposed of or attempted to dispose of a flock or attempts to encumber or mortgage a flock;

    g.  PRODUCER uses any feed, medications, vaccinations or other supplies other than those provided by PERDUE in violation of Sections II(C) and/or III(B);

    h.  PRODUCER becomes insolvent or has filed a voluntary petition for bankruptcy or an involuntary bankruptcy has been filed against PRODUCER, which petition has not been promptly discharged;

    i.  PRODUCER makes any public statements or comments regarding PERDUE or its brands that are false or defamatory;

    j.  PRODUCER's farm has been without chickens for more than one hundred eighty (180) days;



Perdue 002479

    k. PRODUCER fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs;

    l. Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks);

    m. PRODUCER allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry; or

    n. PRODUCER creating and/or contributing to a threatened and/or actual bio-security hazard.

E. This Agreement may be immediately terminated by PRODUCER at any time upon written notice to PERDUE for any of the following reasons:

    a. PERDUE uses abusive or threatening language towards any of PRODUCER's or threatens or causes physical harm to any of PRODUCER's representatives, or in any other way impedes or interferes with PRODUCER's representatives in the performance of their duties;

    b. PERDUE fails to comply with applicable federal, state or local laws, regulations or codes related to the performance of this Agreement;

    c. PERDUE makes any public statements or comments regarding PRODUCER that are false or defamatory; or

    d. Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks).

F. PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement. Notice of cancellation under this Section V(F) shall be given in writing by PRODUCER to PERDUE by certified mail, return receipt requested, which shall be posted before termination of the right to cancel under this Section V(F) to the following address:

    Perdue Foods LLC
    Attn: Live Production /Grow-out Management
    PO Box 1537
    Salisbury, MD 21802-1537

Perdue 002480

## VI. COMPLAINT RESOLUTION PROCEDURE

A.  The procedures in this Section VI shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law, equitable and/or statutory claims. The Complaint Resolution Procedure is as follows:

   Step 1:     The PRODUCER shall first present his or her complaint to the local PERDUE Flock Advisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first.  If the PERDUE Flock Advisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

   Step 2:     If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Director of Live Operations within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Director of Live Operations, the PRODUCER shall confirm, in writing, his/her conversation with the Director of Live Operations, citing the provision of this Agreement, which PRODUCER believes, has been violated.  The PERDUE Director of Live Operations will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint.  If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3, as applicable. For all other complaints or disputes, Section VI's complaint resolution procedure has been exhausted.

   Step 3:     If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2.  The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement.  The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE.  The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting.  PERDUE and the



Perdue 002481

PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, then the Parties have exhausted Section VI's complaint resolution procedure. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B. The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements·or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

## VII.  **MISCELLANEOUS TERMS**

A.    Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B.    If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

C.    **Prior Agreements/Entire Agreement/Release.** This Agreement supersedes, voids and nullifies any and all previous Poultry Producer Agreements and all other previous agreements governing the relationship between PRODUCER and PERDUE. ***THE PRODUCER AND PERDUE HEREBY RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S), PERFORMANCE OR LACK THEREOF, AND/OR REPRESENTATIONS MADE BEFORE, DURING OR AFTER ENTERING INTO ANY PREVIOUS POULTRY PRODUCER AGREEMENT.*** This Agreement, and any Attachments hereto, constitute the entire

Perdue 002482

agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. PRODUCER acknowledges that in entering into this Agreement and/or its Attachments, he/she has not relied upon any statements that are not contained in this document, and/or the Attachments hereto.

D.   **No Modification Except in Writing.** The parties agree that this Agreement and the Attachments hereto may not be modified except in writing signed by both PERDUE and PRODUCER.

E.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland except to the extent that doing so is prohibited. Any action or proceeding brought by either party hereto that is related to this Agreement shall be brought in the state or federal courts of the United States located in the county in which the PRODUCER'S farm is located.

F.   By executing this Agreement PRODUCER represents and warrants that he/she has read and acknowledged the terms of this Agreement and has been afforded the opportunity to consult with third-parties including, but not necessarily limited to, attorneys, financial advisors, and family, before entering into this Agreement and Attachments. By signing this Agreement, PRODUCER represents, warrants and agrees that he/she has made an informed decision with respect to the Agreements and Attachments hereto.

G.   An electronic copy of this Agreement (such as a PDF version), when signed by the PRODUCER and PERDUE, will be considered an "original" document for all purposes.

H.   This Agreement is personal to the PRODUCER and is not transferable or assignable by PRODUCER without the written consent of PERDUE. Should PRODUCER sell or lease an ownership interest in his or her business, this Agreement will automatically terminate, unless PERDUE has consented to the assignment of this Agreement, and PRODUCER will make no representation that PERDUE will continue to supply the new owner or lessee with flocks. PERDUE will be under no obligation to supply PRODUCER's successor(s), assign(s), lessee(s) or new owner(s) with flocks. PERDUE may require, as a condition of the approval of the transfer of PRODUCER's farm, by sale, lease or other assignment, that this Agreement is assigned and accepted by PRODUCER's transferee.

I.   Each party agrees that it will not make use of the Confidential Information except in the performance of this Agreement, and will not disclose any of the Confidential Information. Further, each party will take all necessary and appropriate measures to protect and maintain the Confidential Information disclosed to it. As used herein, "Confidential Information" shall mean any and all oral or written information relating to PERDUE's or PRODUCER's processes, methodologies, financial and cost



Perdue 002483

information, and other related information and data. Confidential Information shall not include (i) information which at the time of disclosure is in the public domain, and (ii) after disclosure becomes part of the public domain through no violation of this section, or (iii) is acquired by the receiving party from a third person, provided that the receiving party does not know or have reason to know that such information was acquired by such third person under an obligation of secrecy involving the disclosing party or (iv) information required to be disclosed by court order or by law, or (v) information independently developed by a party. These obligations shall survive the termination of this Agreement.

J.    If more than one person is identified as the PRODUCER, the obligations of each such person hereunder shall be joint and several.

K.    **Liability and Indemnity of PRODUCER.**  PRODUCER agrees to indemnify, defend, and hold PERDUE, its officers, employees, agents, and representatives harmless against any and all claims, damages, liabilities, losses, actions, and expenses, including injury to any employee of or to any property of PERDUE, proximately caused by negligent acts or omissions of PRODUCER or his agents, employees, sub-contractors or parties under its control, in the performance of PRODUCER's duties hereunder.  PRODUCER further agrees to indemnify, defend and hold PERDUE harmless from and against any and all losses, claims, damages, and actions, including federal, state, or local administrative actions, rulings and all other actions of any nature whatsoever which are in any manner caused by or which result from the presence of the birds on the premises of PRODUCER, including, but not necessarily limited to matters involving emission complaints, disposal complaints, or pollution complaints, violation of law, and any negligent acts or omissions of PRODUCER in the performance of its obligations under this Agreement.

L.    **Liability and Indemnity of PERDUE.**  PERDUE agrees to indemnify, defend, and hold harmless the PRODUCER from and against any claims, damages, liabilities, losses and expenses for personal injury or property damage (to property other than chicks or feed) proximately caused by negligent acts or omissions of PERDUE in the performance of its obligations under this Agreement.

M.    **THIRD PARTY PRODUCTS.  PERDUE PROVIDES ANY THIRD PARTY PRODUCTS, SUCH AS MEDICINES AND VACCINES, "AS IS" AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE EXTENT PROVIDED BY MANUFACTURER.**

N.    **Exclusion of Incidental, Consequential, and Certain Other Damages.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF**

Perdue 002484

**OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ATTACHMENTS.**

O.    **DISCLAIMER AND WAIVER OF EXTRAORDINARY CLAIMS. SUPPLIER AND PRODUCER MUTUALLY DISCLAIM AND WAIVE THE RIGHT TO PURSUE AGAINST ONE ANOTHER ANY CLASS ACTION CLAIMS OR CAUSES OF ACTION OF WHATEVER NATURE OR KIND. SUPPLIER AND PRODUCER AGREE THAT EACH WILL PURSUE ANY CLAIMS OR CAUSES OF ACTION AGAINST THE OTHER ON AN INDIVIDUAL BASIS, AND WILL NOT LEAD, JOIN, OR SERVE AS A MEMBER OF A CLASS OR GROUP OF PERSONS BRINGING SUCH A CLAIM OR CAUSES OF ACTION.**

P.    **Choice of Venue**.  Any and all litigation between the parties that may be brought, or arise out of, in connection with or by reason of this Agreement and/or its Attachments shall be decided solely and exclusively in the state or federal courts of the United States located in the county in which the farm is located.



Perdue 002485

Q.    <u>**JURY WAIVER. IF ANY MATTERS IN DISPUTE ARE TRIED, THEY WILL BE TRIED BY A JUDGE. THE PARTIES WAIVE TRIAL BY JURY AND CONFIM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.**</u>

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FOODS LLC

By:_____(Seal)

Director of Live Operations

WITNESS

_____  ,  _____(Seal)

Producer

WITNESS

_____  ,  _____(Seal)

Producer

-13-

POULTRY PRODUCER AGREEMENT

June 2016

Perdue 002486

**ATTACHMENT B**

PERFORMANCE IMPROVEMENT PROGRAM

The Producer is subject to the following requirements:

1.  Producer may be placed under the Performance Improvement Program ("PIP") if Producer's flocks fail to achieve Company's minimum standards of competitiveness.

2.  For purposes of evaluating Producer competitiveness, Company will use the average of the Producer's Adjusted Prime Cost ("APC") calculation from the Producer's last six (6) consecutive flocks (the "Six Flock Average"). For purposes of clarification a Six Flock Average is determined before a Producer settles six (6) consecutive flocks. Specifically a Producer must have settled a minimum of three (3) consecutive flocks before a Six Flock Average is calculated and the Six Flock Average calculation is based on the average of the Producer's APC for such three (3) consecutive flocks. Thereafter, and until the Producer settles its sixth flock, an additional flock will be added to the calculation of the Six Flock Average. After the Producer reaches six (6) settled flocks, and thereafter, the Six Flock Average will be calculated based on Producer's last six (6) consecutive flocks.

3.  When a Producer settles a flock and as a result reaches a Six Flock Average of a -0.0050 or worse (lower), the Producer will be placed in the PIP and be given a performance notice regarding Producer's placement into the PIP. Performance notices will be provided by Perdue's Grow Out staff at a meeting with the Producer and explaining Producer's current APC cost. Such meeting is an opportunity for the Producer in discussion with Perdue Grow Out to identify necessary actions for future flocks that may help to improve Producer's cost and flock performance and therefore may assist Producer in being removed from the PIP. These recommendations may include, if appropriate, new or upgraded equipment and other matters which may improve performance. After the meeting the Grow-out Manager and/or Live Production Manager will follow up with a certified letter to the Producer confirming Producer's placement into the PIP.

4.  When a Producer settles a flock and as a result reaches a Six Flock Average of -0.0075 or worse (lower), the Producer will receive notice by certified letter stating that the Producer must meet one or more of the following criteria in order to maintain a Poultry Producer Agreement with Perdue:

    a.  Settle the notice flock with an APC of -0.0025 or better (greater);

    b.  Settle the notice flock so as to improve the Six Flock Average to better (greater) than a -0.0075; or

    c.  Settle the notice flock so that at least three (3) of the flocks within Producer's Six Flock Average settled with an APC of zero or better (greater).

5.      Producer will be subject to termination if Producer fails to meet one or more of the criteria set forth in Paragraph 4 above. All settlements, records, and communications will be reviewed by the Director of Live Operations for the applicable complex before the Agreement is terminated pursuant to the PIP.

6.      Producer will be removed from the PIP when Producer settles a flock and as a result reaches a Six Flock Average better (greater) than -0.0050.

7.      Factors that are considered to be beyond the Producer's control may be reviewed and may not be considered when calculating a Producer's Six Flock Average standing with Perdue. Notwithstanding, any Producer that had a preventable disaster will be held accountable for the flock cost in the Six Flock Average calculation. In addition, and notwithstanding anything to the contrary in the Agreement or the PIP, a certified letter will be sent stating that if another preventable disaster occurs on the Producer's farm within 12 months of the above-referenced preventable disaster, the Poultry Producer Agreement will be terminated.

-2-

Perdue 002488

2158

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made 12/16/16 , between PERDUE FOODS LLC, a Maryland limited liability company, of Salisbury, Maryland, hereafter referred to as PERDUE, and Roger D. Parker & Linda G. Parker dba Hazel Lee Farm of 897 Hwy. 24 East Milledgeville, GA 31061 , hereafter referred to as PRODUCER. In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

**PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

*ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.*

### I.  PERDUE AGREES:

A.  To consign available birds to PRODUCER to be raised for PERDUE.

B.  To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned.

C.  To provide PRODUCER with an accounting of birds consigned and supplies provided under the terms of this Agreement.

D.  To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE," set forth in **Attachment A.**

E.  To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

### II.  PRODUCER AGREES:

A.  To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm.

B.  To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

POULTRY PRODUCER AGREEMENT
June 2016


EXHIBIT
4

Perdue 002295 

C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned.

D. To provide an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the alarm system in operable condition at all times.

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local laws, regulations and codes.

F. To properly handle all used poultry litter in a manner meeting the requirements of federal, state and local laws, regulations and codes.

G. To keep all records and other information required for the efficient and proper care of the birds consigned hereby including, but not limited to, records of mortality, water readings, generator logs and other audit requirements.

H. To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds. Furthermore, PRODUCER and PRODUCER's employees will not maintain, own or care for any other flocks, birds or poultry on any other premises unless approved by PERDUE.

I. To notify PERDUE Flock Advisor immediately (within 24 hours) if any birds, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

J. To notify PERDUE Flock Advisor within 48 hours of any damage to PRODUCER's poultry houses or poultry house equipment caused by PERDUE.

K. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

L. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

M. To be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.

Perdue 002298

N. To comply with any bio-security policies, audits, measures or guidelines required by PERDUE.

O. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the birds consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

P. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

Q. To adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock.

R. To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs.

## III.    OTHER TERMS

A. PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE.  Specifically, PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE. If PERDUE incurs any loss, cost, expense or damage arising out of or related to PRODUCER's violation of this section, including, but not limited to expense of destroying live birds and the expense of recalling processed poultry meat PRODUCER will reimburse PERDUE for such loss, cost ,expense or damage. Such damages may be offset against any payment due to PRODUCER by PERDUE.

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities.  If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock,

Perdue 002397

or this Agreement has been terminated in accordance with its terms, PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit. In such event, PERDUE will be entitled to damages as set forth in Section III(B).

E.  If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to assuring the proper health and welfare of the flock as outlined by PERDUE'S established procedures.  PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes.

F.  Title to each flock shall remain in PERDUE.  PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder.  PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

G.  PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any birds raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

H.  PERDUE has a performance improvement program ("PIP") and PRODUCER is subject to the PIP as provided herein. The terms and the performance improvement guidelines of the PIP, including, without limitation, factors considered when placing PRODUCER in the PIP, factors considered in determining if and when the PRODUCER is removed from the PIP (and placed back in good standing), and when the Agreement will be terminated as a result of the PIP, are set forth in **Attachment B**.

I.  PRODUCER understands and agrees that PERDUE will determine, in its sole and absolute discretion:

  a.  the breed of chickens PRODUCER will receive;
  b.  the number and density of chickens in each flock delivered to PRODUCER's farm;
  c.  the size, weight and age of the chicken to be produced;
  d.  the time for processing of each flock; and
  e.  the date, time and estimated interval of placement for future flocks.

Perdue 002298

Notwithstanding the foregoing, if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock, PRODUCER shall notify the PERDUE Flock Advisor as set forth in Section II(I).

J.  PRODUCER acknowledges and agrees that this Agreement will be retained by PERDUE in electronic file format only.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS

A.  PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B.  PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

## V.  TERM; TERMINATION

A.  For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B.  Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party. The parties further agree that once written notice of termination is provided, PERDUE shall not be required to deliver chicks to PRODUCER'S farm during the 90-day time period once a flock is removed from PRODUCER'S farm.

C.  Any termination as a result of a default by a party shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of

Perdue 002299

this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D. This Agreement may be immediately terminated by PERDUE at any time upon written notice to PRODUCER for any of the following reasons:

    a.  PRODUCER abandons a flock or neglects to provide feed, water, proper house management or care, which abandonment, neglect or failure to provide care threatens the health and welfare or existence of a flock;

    b.  Death of PRODUCER;

    c.  PRODUCER uses abusive or threatening language to any PERDUE representative or threatens or causes physical harm to any PERDUE representative, or in any other way impedes or interferes with PERDUE representatives in the performance of their duties;

    d.  PRODUCER fails to comply with applicable federal, state or local laws, regulations or codes;

    e.  PRODUCER terminates its business as a producer for PERDUE;

    f.  PRODUCER transfers an ownership interest in its business without PERDUE's consent, has disposed of or attempted to dispose of a flock or attempts to encumber or mortgage a flock;

    g.  PRODUCER uses any feed, medications, vaccinations or other supplies other than those provided by PERDUE in violation of Sections II(C) and/or III(B);

    h.  PRODUCER becomes insolvent or has filed a voluntary petition for bankruptcy or an involuntary bankruptcy has been filed against PRODUCER, which petition has not been promptly discharged;

    i.  PRODUCER makes any public statements or comments regarding PERDUE or its brands that are false or defamatory;

    j.  PRODUCER's farm has been without chickens for more than one hundred eighty (180) days;

Perdue 002000

    k.  PRODUCER fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs;

    l.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks);

    m. PRODUCER allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry; or

    n.  PRODUCER creating and/or contributing to a threatened and/or actual bio-security hazard.

E.  This Agreement may be immediately terminated by PRODUCER at any time upon written notice to PERDUE for any of the following reasons:

    a.  PERDUE uses abusive or threatening language towards any of PRODUCER's or threatens or causes physical harm to any of PRODUCER's representatives, or in any other way impedes or interferes with PRODUCER's representatives in the performance of their duties;

    b.  PERDUE fails to comply with applicable federal, state or local laws, regulations or codes related to the performance of this Agreement;

    c.  PERDUE makes any public statements or comments regarding PRODUCER that are false or defamatory; or

    d.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks).

F.  PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement. Notice of cancellation under this Section V(F) shall be given in writing by PRODUCER to PERDUE by certified mail, return receipt requested, which shall be posted before termination of the right to cancel under this Section V(F) to the following address:

    Perdue Foods LLC
    Attn: Live Production /Grow-out Management
    PO Box 1537
    Salisbury, MD 21802-1537

Perdue 002301

## VI. COMPLAINT RESOLUTION PROCEDURE

A.  The procedures in this Section VI shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law, equitable and/or statutory claims. The Complaint Resolution Procedure is as follows:

Step 1:     The PRODUCER shall first present his or her complaint to the local PERDUE Flock Advisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock Advisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Step 2:     If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Director of Live Operations within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Director of Live Operations, the PRODUCER shall confirm, in writing, his/her conversation with the Director of Live Operations, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Director of Live Operations will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3, as applicable. For all other complaints or disputes, Section VI's complaint resolution procedure has been exhausted.

Step 3:     If a satisfactory result has not been concluded by the procedure followed in Step 2 **and the dispute regards a settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the

Perdue 002302

,PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, then the Parties have exhausted Section VI's complaint resolution procedure. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B.  The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

VII.  <u>MISCELLANEOUS TERMS</u>

A.  Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B.  If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

C.  <u>Prior Agreements/Entire Agreement/Release</u>.  This Agreement supersedes, voids and nullifies any and all previous Poultry Producer Agreements and all other previous agreements governing the relationship between PRODUCER and PERDUE. ***THE PRODUCER AND PERDUE HEREBY RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S), PERFORMANCE OR LACK THEREOF, AND/OR REPRESENTATIONS MADE BEFORE, DURING OR AFTER ENTERING INTO ANY PREVIOUS POULTRY PRODUCER AGREEMENT***. This Agreement, and any Attachments hereto, constitute the entire

Perdue 002303

agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. PRODUCER acknowledges that in entering into this Agreement and/or its Attachments, he/she has not relied upon any statements that are not contained in this document, and/or the Attachments hereto.

D.   **No Modification Except in Writing.** The parties agree that this Agreement and the Attachments hereto may not be modified except in writing signed by both PERDUE and PRODUCER.

E.   . This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland except to the extent that doing so is prohibited. Any action or proceeding brought by either party hereto that is related to this Agreement shall be brought in the state or federal courts of the United States located in the county in which the PRODUCER'S farm is located.

F.   By executing this Agreement PRODUCER represents and warrants that he/she has read and acknowledged the terms of this Agreement and has been afforded the opportunity to consult with third-parties including, but not necessarily limited to, attorneys, financial advisors, and family, before entering into this Agreement and Attachments.  By signing this Agreement, PRODUCER represents, warrants and agrees that he/she has made an informed decision with respect to the Agreements and Attachments hereto.

G.   An electronic copy of this Agreement (such as a PDF version), when signed by the PRODUCER and PERDUE, will be considered an "original" document for all purposes.

H.   This Agreement is personal to the PRODUCER and is not transferable or assignable by PRODUCER without the written consent of PERDUE. Should PRODUCER sell or lease an ownership interest in his or her business, this Agreement will automatically terminate, unless PERDUE has consented to the assignment of this Agreement, and PRODUCER will make no representation that PERDUE will continue to supply the new owner or lessee with flocks. PERDUE will be under no obligation to supply PRODUCER's successor(s), assign(s), lessee(s) or new owner(s) with flocks. PERDUE may require, as a condition of the approval of the transfer of PRODUCER's farm, by sale, lease or other assignment, that this Agreement is assigned and accepted by PRODUCER's transferee.

I.   Each party agrees that it will not make use of the Confidential Information except in the performance of this Agreement, and will not disclose any of the Confidential Information. Further, each party will take all necessary and appropriate measures to protect and maintain the Confidential Information disclosed to it. As used herein, "Confidential Information" shall mean any and all oral or written information relating to PERDUE's or PRODUCER's processes, methodologies, financial and cost

Perdue 002304

information, and other related information and data. Confidential Information shall not include (i) information which at the time of disclosure is in the public domain, and (ii) after disclosure becomes part of the public domain through no violation of this section, or (iii) is acquired by the receiving party from a third person, provided that the receiving party does not know or have reason to know that such information was acquired by such third person under an obligation of secrecy involving the disclosing party or (iv) information required to be disclosed by court order or by law, or (v) information independently developed by a party. These obligations shall survive the termination of this Agreement.

J.  If more than one person is identified as the PRODUCER, the obligations of each such person hereunder shall be joint and several.

K.  **Liability and Indemnity of PRODUCER.**  PRODUCER agrees to indemnify, defend, and hold PERDUE, its officers, employees, agents, and representatives harmless against any and all claims, damages, liabilities, losses, actions, and expenses, including injury to any employee of or to any property of PERDUE, proximately caused by negligent acts or omissions of PRODUCER or his agents, employees, sub-contractors or parties under its control, in the performance of PRODUCER's duties hereunder. PRODUCER further agrees to indemnify, defend and hold PERDUE harmless from and against any and all losses, claims, damages, and actions, including federal, state, or local administrative actions, rulings and all other actions of any nature whatsoever which are in any manner caused by or which result from the presence of the birds on the premises of PRODUCER, including, but not necessarily limited to matters involving emission complaints, disposal complaints, or pollution complaints, violation of law, and any negligent acts or omissions of PRODUCER in the performance of its obligations under this Agreement.

L.  **Liability and Indemnity of PERDUE.**  PERDUE agrees to indemnify, defend, and hold harmless the PRODUCER from and against any claims, damages, liabilities, losses and expenses for personal injury or property damage (to property other than chicks or feed) proximately caused by negligent acts or omissions of PERDUE in the performance of its obligations under this Agreement.

M.  **THIRD PARTY PRODUCTS.  PERDUE PROVIDES ANY THIRD PARTY PRODUCTS, SUCH AS MEDICINES AND VACCINES, "AS IS" AND DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE EXTENT PROVIDED BY MANUFACTURER.**

N.  **Exclusion of Incidental, Consequential, and Certain Other Damages.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF**

Perdue 002305

<u>OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR
ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES
UNDER THIS AGREEMENT AND/OR ATTACHMENTS.</u>

O.     <u>DISCLAIMER AND WAIVER OF EXTRAORDINARY CLAIMS. SUPPLIER
AND PRODUCER MUTUALLY DISCLAIM AND WAIVE THE RIGHT TO
PURSUE AGAINST ONE ANOTHER ANY CLASS ACTION CLAIMS OR
CAUSES OF ACTION OF WHATEVER NATURE OR KIND. SUPPLIER
AND PRODUCER AGREE THAT EACH WILL PURSUE ANY CLAIMS OR
CAUSES OF ACTION AGAINST THE OTHER ON AN INDIVIDUAL BASIS,
AND WILL NOT LEAD, JOIN, OR SERVE AS A MEMBER OF A CLASS OR
GROUP OF PERSONS BRINGING SUCH A CLAIM OR CAUSES OF
ACTION.</u>

P.     <u>Choice of Venue</u>.  Any and all litigation between the parties that may be brought, or
arise out of, in connection with or by reason of this Agreement and/or its Attachments
shall be decided solely and exclusively in the state or federal courts of the United
States located in the county in which the farm is located.

Perdue 002306



Q.    <u>JURY WAIVER. IF ANY MATTERS IN DISPUTE ARE TRIED, THEY WILL BE TRIED BY A JUDGE. THE PARTIES WAIVE TRIAL BY JURY AND CONFIM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.</u>

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FOODS LLC

By: _____ (Seal)
        Director of Live Operations

WITNESS

_____ (Seal)
        Producer

WITNESS

_____ (Seal)
        Producer

-13-
POULTRY PRODUCER AGREEMENT
June 2016

Perdue 002307

**ATTACHMENT B**

PERFORMANCE IMPROVEMENT PROGRAM

The Producer is subject to the following requirements:

1.    Producer may be placed under the Performance Improvement Program ("PIP") if Producer's flocks fail to achieve Company's minimum standards of competitiveness.

2.    For purposes of evaluating Producer competitiveness, Company will use the average of the Producer's Adjusted Prime Cost ("APC") calculation from the Producer's last six (6) consecutive flocks (the "Six Flock Average"). For purposes of clarification a Six Flock Average is determined before a Producer settles six (6) consecutive flocks. Specifically a Producer must have settled a minimum of three (3) consecutive flocks before a Six Flock Average is calculated and the Six Flock Average calculation is based on the average of the Producer's APC for such three (3) consecutive flocks. Thereafter, and until the Producer settles its sixth flock, an additional flock will be added to the calculation of the Six Flock Average. After the Producer reaches six (6) settled flocks, and thereafter, the Six Flock Average will be calculated based on Producer's last six (6) consecutive flocks.

3.    When a Producer settles a flock and as a result reaches a Six Flock Average of a -0.0050 or worse (lower), the Producer will be placed in the PIP and be given a performance notice regarding Producer's placement into the PIP. Performance notices will be provided by Perdue's Grow Out staff at a meeting with the Producer and explaining Producer's current APC cost. Such meeting is an opportunity for the Producer in discussion with Perdue Grow Out to identify necessary actions for future flocks that may help to improve Producer's cost and flock performance and therefore may assist Producer in being removed from the PIP. These recommendations may include, if appropriate, new or upgraded equipment and other matters which may improve performance. After the meeting the Grow-out Manager and/or Live Production Manager will follow up with a certified letter to the Producer confirming Producer's placement into the PIP.

4.    When a Producer settles a flock and as a result reaches a Six Flock Average of -0.0075 or worse (lower), the Producer will receive notice by certified letter stating that the Producer must meet one or more of the following criteria in order to maintain a Poultry Producer Agreement with Perdue:

   a.  Settle the notice flock with an APC of -0.0025 or better (greater);

   b.  Settle the notice flock so as to improve the Six Flock Average to better (greater) than a -0.0075; or

   c.  Settle the notice flock so that at least three (3) of the flocks within Producer's Six Flock Average settled with an APC of zero or better (greater).

Perdue 002308

5.    Producer will be subject to termination if Producer fails to meet one or more of the criteria set forth in Paragraph 4 above. All settlements, records, and communications will be reviewed by the Director of Live Operations for the applicable complex before the Agreement is terminated pursuant to the PIP.

6.    Producer will be removed from the PIP when Producer settles a flock and as a result reaches a Six Flock Average better (greater) than -0.0050.

7.    Factors that are considered to be beyond the Producer's control may be reviewed and may not be considered when calculating a Producer's Six Flock Average standing with Perdue. Notwithstanding, any Producer that had a preventable disaster will be held accountable for the flock cost in the Six Flock Average calculation. In addition, and notwithstanding anything to the contrary in the Agreement or the PIP, a certified letter will be sent stating that if another preventable disaster occurs on the Producer's farm within 12 months of the above-referenced preventable disaster, the Poultry Producer Agreement will be terminated.

Perdue 002309