# **EXHIBIT C**

Page 1

1              UNITED STATES DISTRICT COURT

                MIDDLE DISTRICT OF GEORGIA

2

3       ROGER PARKER,

4            Plaintiff,

                                   CIVIL ACTION FILE

5            vs.

                                   NO. 5:22-cv-00268-TES

6       PERDUE FOODS LLC,

7            Defendant.

8

9              VIDEO 30(b)(6)DEPOSITION OF

10                  PERDUE FOODS LLC

11                  (CLAY COPELAND)

12                  April 29, 2025

13                    11:40 a.m.

14       Ogletree Deakins Nash Smoak & Stewart, PC

15              191 Peachtree Street NE

16                    Suite 4800

17       Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

18

19

20

21

22

23

24

25

30(b)(6) Clay Copeland                        April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 12

1    the written transcripts.

2         Q    Understood, but you sat in on the --

3         A    Yes.

4         Q    -- entirety of those depositions --

5         A    Uh-huh.

6         Q    If I could just finish my question.  We've

7    been doing pretty good thus far.

8              You sat in for the entirety of those two

9    depositions?

10        A    Yes.

11        Q    And that was part of your preparation for

12   today's corporate testimony?

13        A    Yes.

14        Q    I'm handing you what has been marked as

15   Plaintiff's Exhibit 11.

16             (Plaintiff's Exhibit 11 was marked for

17   identification.)

18   BY MR. KLORFEIN:

19        Q    Throughout today's deposition I'll refer

20   to what are called Bates stamps.  These are just

21   numbers to help us keep track of documents that have

22   been produced in this litigation.  And this

23   Exhibit 11 has Perdue 001611 at the bottom

24   right-hand corner.

25             Do you see that?

Page 13

```
 1          A     Yes.
 2          Q     So if I refer to Perdue 1611, that'll be
 3     what I'm referring to with the Bates stamp.
 4                Do you recognize this document?
 5          A     Yes.
 6          Q     What is it?
 7          A     The title is Poultry House Management
 8     Guidelines, but it's a recommendation.  It's more or
 9     less educational materials for growers who may be
10     new to the business or, you know, a starting point.
11          Q     And this document applies to all farmers
12     supplying the Perry, Georgia location?
13          A     Yes.
14          Q     Did this apply through -- from 2012
15     through 2019?
16          A     Yes, the revision date on it is 2010, so
17     it would have still been in place unless you have a
18     new revision, but...
19          Q     And if your counsel has not produced a
20     newer version --
21          A     No.
22          Q     -- then this would be the operative one?
23          A     Yes.
24          Q     Do you know if it still is today?
25          A     Yes.
```

Page 14

```
 1        Q    This was provided to plaintiff?
 2        A    Yes.
 3        Q    Do you know when it was provided to
 4   plaintiff?
 5        A    When he started his first flock.
 6        Q    And it's your testimony that these are not
 7   guidelines, they're recommendations?
 8        A    Yes.
 9        Q    It does not say "recommendations" on this
10   sheet, right?
11        A    That's right.
12        Q    And it says:  After a flock moves -- under
13   number 3 -- that growers are expected to remove all
14   caked litter form [sic] house and level remaining
15   litter.
16             Do you see that?
17        A    Yes.
18        Q    So that's a directive to remove the caked
19   litter?
20             MS. SANTEN:  Object to form.
21        A    It's the -- it's not a directive; it's,
22   again, a recommendation.  There's different ways of
23   doing it, and that's up to the grower how they want
24   to prepare their litter.  They could wind row it;
25   they could cake out.  That's -- that's up to them.
```

Page 15

1    BY MR. KLORFEIN:

2        Q    So you -- what was the first thing you

3    said besides caking out?

4        A    Wind row.

5        Q    What does that mean?

6        A    You pile the litter up, you run through

7    there with a machine, and you pile it up into

8    mounds, and it goes through a heat and kills

9    bacteria.

10       Q    Got it.

11            So a grower does not need to remove all

12   caked litter?

13       A    Sometimes they would wind row it.

14       Q    And do you know how many growers performed

15   that operation in Perry?

16            MS. SANTEN:  Objection, outside the scope.

17       A    I would say about 70 percent wind row, and

18   the other 30 percent cake out.

19   BY MR. KLORFEIN:

20       Q    Number 7 says:  Total cleanout, remove all

21   existing litter, in italics and bold and underlined.

22            Do you see that?

23       A    Yes.  Uh-huh.

24       Q    That's not required?

25       A    No.

30(b)(6) Clay Copeland                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 16

```
 1        Q    And Perdue does not require that there's a
 2   minimum of 3 to 4 inches of depth of either pine
 3   sawdust or dry peanut hulls?
 4        A    Yes, we would require 3 to 4 inches of
 5   pine sawdust --
 6        Q    Number 8 --
 7        A    -- if you cleaned out.
 8        Q    Got it.
 9             So those who did not clean out do not need
10   to do that?
11        A    Right.
12        Q    Do you know how many growers do not clean
13   out?
14        A    No.
15        Q    You don't assess that at all?
16        A    No.  It's up to them.  Sometimes they do a
17   total cleanout; some folks do annually because they
18   want the value of the fertilizer.  They sell the
19   litter and keep fertilizer -- or make money off
20   fertilizer.
21        Q    And you're not able to tell me what
22   percentage of growers do that in Perry?
23        A    No.
24        Q    Number 8 says:  Change water filters.
25        A    Yes.
```

Page 17

```
 1        Q    Is that required?
 2        A    At some point you have to change your
 3   water filters or they -- it restricts water to the
 4   growers -- I mean to the birds.  A water filter
 5   would become so clogged that the birds can't get
 6   water, and then, yes, it would be required because
 7   it would be an animal welfare issue.  We didn't
 8   monitor the frequency of those change-outs.
 9        Q    You do monitor water flow, though, right?
10        A    Yes.
11        Q    Number 9 says:  To check a generator, and
12   in italics and underlined, maintain generator log
13   weekly.
14             Do you see that?
15        A    Yes.
16        Q    Growers are required to maintain a
17   generator log weekly?
18        A    That's part of their audit-ready bonus.
19        Q    Got it.
20             So their pay might be impacted if they
21   didn't do this?
22        A    Yes.
23        Q    Their pay could be reduced if they didn't
24   do this?
25        A    Yes.
```

Page 18

1      Q     Number 10:  Cut grass prior to placement.

2      A     That's part of the audit-ready bonus.

3      Q     Similarly, pay could be impacted if they

4    didn't do this?

5      A     Yes.

6      Q     On the next page, it says:  48 Hours

7    Replacement.

8            Excuse me:  48 Hours Preplacement.

9            Do you see that?

10     A     Uh-huh.

11     Q     And it notes under 3:  Lower drinkers to

12   have nipples 4 inches off litter and level lines.

13           Do you see that?

14     A     Yes.

15     Q     Is that required?

16     A     It's not a -- I would not say it's a

17   requirement.  They have to -- the birds have to have

18   access to the water.  4 inches is no magic number or

19   anything like that.  It's just the birds have to be

20   able to reach the water.

21     Q     Got you.

22           So if it was 8 inches at preplacement,

23   would that be a problem?

24     A     I don't know if -- a bird could not reach

25   the water if it was 8 inches above the litter.  But

Page 19

```
 1    if it was 3 inches, that might be okay.
 2         Q    And 2?
 3         A    Maybe.  I'd have to see the size of the
 4    chicks when they come in.
 5         Q    Got you.
 6              And so if you determine that the chicks
 7    are too large for a 2-inch nipple level, would you
 8    instruct the grower to change that nipple level?
 9         A    Yes.
10         Q    And you would require them to do so?
11         A    I would --
12              MS. SANTEN:  Object to form.
13         A    I would require them -- the birds to have
14    access to water, and if it's not the right height,
15    they do not have access to water.
16    BY MR. KLORFEIN:
17         Q    And you're the one who determines that,
18    right?
19         A    I mean, it's a visual observation and --
20         Q    Made by Perdue?
21         A    And the grower.
22         Q    Right, but if you and the grower disagree,
23    and you've made that visual observation, you could
24    direct the grower to change the nipple level?
25         A    We could -- I mean, I've never told them
```

30(b)(6) Clay Copeland                                 April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 20

1    they had to change it.  I mean, they have an option

2    to change it.  We usually tell them to adjust it,

3    and then it's their discretion where it lands.  I

4    mean, you know, my opinion that it's high or low,

5    and then you adjust it.

6        Q    Have you encountered growers refusing to

7    take that advice?

8        A    No.

9        Q    Number 8 says:  Set

10   controllers/thermostats to maintain 90 degrees in

11   brood chamber.

12           Do you see that?

13       A    Uh-huh.

14           MS. SANTEN:  Say "yes" or "no."  I'm

15   sorry.

16       A    Yes.

17           MS. SANTEN:  Sorry.

18   BY MR. KLORFEIN:

19       Q    Does Perdue monitor the temperature that

20   growers set their grow houses to?

21           MS. SANTEN:  Object to form.

22       A    We would make a note of it in a flock

23   report.

24   BY MR. KLORFEIN:

25       Q    To make that note you have to monitor it,

Page 21

```
 1   right?
 2           MS. SANTEN:   Same objection.
 3      A    Yes.
 4   BY MR. KLORFEIN:
 5      Q    And if Perdue determines that the
 6   temperature is not properly set, it can tell a
 7   grower to change that temperature?
 8      A    We always give the grower discretion to
 9   adjust for bird comfort.
10      Q    Are you able to tell me how many degrees
11   plus or minus the recommendation a grower is
12   permitted to change the temperature to?
13      A    They adjust for bird comfort.  As long as
14   the birds are comfortable, then they can adjust it
15   however much they want.
16      Q    Right, but there's an upper or lower limit
17   to that, right?
18      A    I mean, if you go too low or if you go too
19   high, the birds will not -- no longer be
20   comfortable, so there, you know -- there's obvious
21   limit based on what the birds look like.
22      Q    And that's, again, assessed by Perdue,
23   right?
24      A    And the grower.
25      Q    Right, but if the -- if Perdue disagrees
```

Page 22

1    with the grower's assessment, they will let the

2    grower know, right?

3        A    We will make a note that we disagree, and

4    then at the end of the flock if they perform poorly,

5    we would refer to that note.

6        Q    And so a grower's pay might be impacted?

7        A    No.  We're not going to deduct pay because

8    they didn't follow a temperature.  It might cause

9    them to perform poorly.

10        Q    And, again, if performance is poor over a

11    certain period of time, Perdue might terminate the

12    relationship?

13            MS. SANTEN:  Object to form.

14        A    We would -- we have a PIP program.  We

15    would follow the guidelines of that.

16            (Plaintiff's Exhibit 46 was marked for

17    identification.)

18    BY MR. KLORFEIN:

19        Q    I'm marking Plaintiff's Exhibit 46, which

20    begins Bates Perdue 1664.

21            Mr. Copeland, do you recognize this

22    document?

23        A    Yes.

24        Q    What is it?

25        A    It's a health plan signed by a

Page 43

1    ticket"?

2         A    Yes.

3         Q    What is a live haul ticket?

4         A    It's a record of the weight that we

5    catch -- that we catch from the farm.

6         Q    Have you seen that referred to as a

7    harvest delivery ticket, or is that something

8    different?

9         A    I've never heard of a harvest delivery

10   ticket.

11        Q    And live haul tickets use a numbering

12   system to track, what, a trailer?

13        A    Yes.

14        Q    So you know that the same trailer that

15   left is the same trailer that's coming back?

16        A    Yes.

17        Q    Is there a way to link that to the

18   grower's farm?

19        A    We can track them through GPS.

20        Q    You can track the trailer through GPS?

21        A    The truck.

22        Q    Is there a way to track the live haul

23   ticket to a farm?  Is there an identifier on the

24   live haul ticket that matches it to the farm that it

25   went to?

30(b)(6) Clay Copeland                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 44

1          A      They leave a copy on the farm, and then he
2     matches that ticket number when he gets his
3     settlement packet.
4          Q      Got you.
5                 So there's a numbering system that's left
6     with the grower?
7          A      Uh-huh.
8          Q      And so the grower checks to see if the
9     live haul ticket matches the trailer?
10         A      The loads on his settlement.
11         Q      And is there a way for the grower to link
12    that live haul ticket to the trailer that visited?
13    Is there an identifier for that truck?
14         A      Yes.
15         Q      That's listed on the live haul ticket?
16         A      Yes, there's a truck number.
17         Q      And is that live haul ticket then matched
18    at the plant to the truck number?
19         A      Yes.
20         Q      And there was testimony earlier that a
21    grower could observe the weighing that occurs at a
22    plant.
23         A      Yes.
24         Q      Do you agree with that?
25         A      Yes.

Page 45

1      Q    And that would require, though, the grower

2   actually go to the plant itself, right?

3      A    Yes.

4      Q    To leave their farm?

5      A    Uh-huh.

6      Q    Is that a yes?

7      A    Yes.

8      Q    So the only way to verify that this live

9   haul ticket measuring system was abided by is to

10  leave their farm, right?

11     A    Yes.

12     Q    Are you aware of inaccuracies as to the

13  live haul ticketing process matching up with

14  settlement?

15     A    It's happened rarely.

16     Q    What does "rarely" mean?

17     A    Maybe once a year.

18     Q    Once a year per grower, something else?

19     A    No.

20     Q    Once a year nationwide?

21     A    In the -- in the Perry facility.  I'm only

22  speaking for Perry.

23     Q    And you said that that's happened once per

24  year in Perry?

25          MS. SANTEN:  Objection, outside the scope.

30(b)(6) Clay Copeland                                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 46

1          A    I'm just speculating.

2     BY MR. KLORFEIN:

3          Q    Well, you are prepared to talk about the

4     compensation in Perry, right?

5          A    Yes.

6          Q    And part of that compensation involves

7     live haul tickets, right?

8          A    Yes, but I don't have an accurate number

9     as to how often mistakes occur.

10         Q    Got it.

11              You have not conducted an audit to see how

12    often those mistakes had occurred?

13         A    The plant does those audits.

14         Q    You have not reviewed those audits?

15         A    No.

16         Q    Not for today?

17         A    No.

18         Q    You have access to those audits?

19         A    Yes.

20         Q    Have you ever reviewed the audits?

21         A    Yes.

22         Q    When was the last time you reviewed those

23    audits?

24         A    If a grower said that the trailers don't

25    match up, we'd review them.

30(b)(6) Clay Copeland                                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 47

```
 1        Q    Got it.
 2             So it's dependent on the grower
 3   identifying a problem?
 4        A    Yes.
 5        Q    And are you aware of an inaccuracy for
 6   live haul tickets as it relates to plaintiff?
 7        A    There was one time where a tare weight was
 8   off.
 9        Q    When was that?
10        A    I don't know the exact date.
11        Q    Do you remember what year it was?
12        A    2018.
13        Q    And that was plaintiff bringing that to
14   your attention?
15        A    Yes.
16        Q    Any other instances that he raised this?
17        A    No.
18             MS. SANTEN:  Objection, vague.
19   BY MR. KLORFEIN:
20        Q    So the only time Perdue is aware of of
21   plaintiff raising this was in 2018?
22        A    I believe so.
23        Q    Are you aware of any amounts that were
24   withheld or deducted from plaintiff's pay as part of
25   the settlement process?
```

30(b)(6) Clay Copeland                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 48

1          MS. SANTEN:  Object to form.

2      A    If his cost was higher than average, then

3    there would be a deduction in his pay.

4    BY MR. KLORFEIN:

5      Q    Can you walk me through that process of

6    how Perdue assesses whether or not the cost for the

7    average is too high necessitating a reduction in

8    pay?

9      A    You -- there's a chick cost per chick, and

10   there's a set feed cost per pound of feed, and you

11   multiply the chick cost times the number of chicks,

12   the feed cost times the amount of feed pounds, and

13   you divide by the live pounds, and that gives you an

14   average cost -- or that gives you a cost for the

15   farm.  And it's compared to the average for the

16   week, and if your cost is lower than average for the

17   week, you get a premium, and if it's higher than

18   average for the week, you get a deduction.

19     Q    Deduction in pay?

20     A    Yes.

21     Q    Are you aware of that occurring to

22   plaintiff?

23     A    Both ways.

24     Q    So that's a yes, he --

25     A    Yes.

30(b)(6) Clay Copeland                                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 49

1          Q     -- has had his deducted -- his pay
2     deducted based on --
3          A     And he's had it increased based on that.
4          Q     Are you aware of plaintiff having a loan
5     with First Financial?
6          A     Yes.
7          Q     Can you walk me through the process for
8     how a grower obtains a loan with Perdue?
9                MS. SANTEN:  Object to form.
10         A     You mentioned First Financial, and you're
11    saying obtained a loan with Perdue.  Which one are
12    you talking about?
13    BY MR. KLORFEIN:
14         Q     Does -- well, let me back up.
15               In the Perry area, do you know what
16    percentage of growers have a loan with First
17    Financial?
18               MS. SANTEN:  Objection, outside the scope.
19         A     I would -- I don't know percentage-wise,
20    I'd have to do the math, but probably just a couple.
21    BY MR. KLORFEIN:
22         Q     Just a few?
23         A     Yes.
24         Q     Do the majority of growers use a different
25    financial institution?

Page 52

```
 1    everyone is interested in doing that business.

 2        Q    And those lenders have expertise in that

 3    area?

 4        A    Yes.

 5        Q    Does Perdue have approved lenders?

 6             MS. SANTEN:  Object to form.

 7        A    No.

 8    BY MR. KLORFEIN:

 9        Q    It does not have any position on which

10    lenders it's willing to work with or not?

11        A    Not at all.  Just tell us where to send

12    the check.

13             (Plaintiff's Exhibit 48 was marked for

14    identification.)

15    BY MR. KLORFEIN:

16        Q    Handing you what has been marked as

17    Plaintiff's Exhibit 48, begins Bates Perdue 1392.

18             Is this a grower pay summary for

19    plaintiff?

20        A    Yes.

21        Q    Have you seen this document before?

22        A    Yes.

23        Q    In preparation for today's deposition?

24        A    Yes.

25        Q    Under the Payments section under Base Pay
```

30(b)(6) Clay Copeland                        April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 53

1    it lists an amount.  Do you see that?

2         A    Yes.

3         Q    And under APC Incentive it lists a number.

4    Do you see that?

5         A    Yes.

6         Q    What does "APC Incentive" mean?

7         A    As I've already mentioned, that's

8    comparing you to the average for the week, and your

9    pay is either deducted or it's increased based on

10   how your cost was compared to others.

11        Q    And in this case this was a deduction

12   based on that APC?

13        A    Yes.

14        Q    Do you know how often there was a

15   deduction versus a bonus for plaintiff based on the

16   APC?

17        A    From what I looked at in preparation, it

18   was probably 50-50.

19        Q    You don't remember year to year whether or

20   not it was more or less?

21        A    I remember when he first started growing,

22   it was always positive.

23        Q    Do you know when that changed?

24        A    No.

25        Q    Under the Total, it lists Total

30(b)(6) Clay Copeland                                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 54

1    Deductions?

2        A    Yes.

3        Q    Now, aside from the APC Incentive, can you

4    walk me through the other deductions that fed into

5    that Total Deductions line item?

6        A    His bank payment, bug spray, feed trays,

7    bait stations, and a demand note for chlorine

8    dioxide.

9        Q    And you've turned to the next page, Perdue

10   1393, right?

11       A    Yes.

12       Q    Under the bottom part of that page

13   Deductions column?

14       A    Yes.

15       Q    So you referenced First Financial.

16       A    No, I didn't, but they're included.

17       Q    Sorry, you referenced the bank payment.

18       A    Right.

19       Q    And that's what you were referring to?

20       A    I was referring to the bank payment on the

21   front page that said Magnolia State Bank.

22       Q    Got it.

23            Under Perdue Farms chlorine dioxide?

24       A    Yes.

25       Q    That was a deduction based on an amount

Page 55

```
 1    owed to Perdue for chlorine dioxide?
 2         A    For the promissory note for the chlorine
 3    dioxide system.  We paid for the product, and they
 4    paid for the system.
 5         Q    Got you.
 6              What is the chlorine dioxide system?
 7         A    It's a water sanitizer.
 8         Q    And how many growers in the Perdue area
 9    have a chlorine dioxide system?
10         A    Half.
11         Q    What do the other half use?
12         A    Nothing.
13         Q    And is there any bonus or incentive to
14    have a chlorine dioxide system?
15         A    We think you grow better chickens with it.
16         Q    Besides that?
17         A    No.
18         Q    Does that enable you to reach a certain
19    tier?
20         A    No.
21         Q    That's not factored into the tiering
22    requirements at all?
23         A    Can I see a copy of the payment schedule?
24         Q    Maybe at a break we can go to that, but I
25    guess my question is, do you know whether or not a
```

Page 57

```
 1            MR. KLORFEIN:  You can set that aside.
 2            (Plaintiff's Exhibit 50 was marked for
 3       identification.)
 4       BY MR. KLORFEIN:
 5            Q    Handed you what's been marked Plaintiff's
 6       Exhibit 50.  It begins Bates Perdue 7018.  Do you
 7       recognize this document?
 8            A    Yes.
 9            Q    What is it?
10            A    Housing specs.
11            Q    And if you turn to the 12th page of this,
12       which is Bates 7029, it references approved vendors.
13       Under that, it says Parker's Poultry for equipment
14       contractors.  Do you see that?
15            A    Yes.
16            Q    Have you seen this document before?
17            A    Yes.
18            Q    What is it?
19            A    It's a list of people that are in the
20       business of building chicken houses and constructing
21       new houses.
22            Q    And do you recall what years Parker's
23       Poultry was listed as an approved vendor?
24            A    I would say he was from 2010 to -- until
25       he stopped his business.  He continued some work
```

Page 58

1    with our farmers after he stopped growing.

2         Q    Is it your testimony that he was listed as

3    an approved vendor after his contract with Perdue

4    ended?

5         A    Yes.  Well, wouldn't have been listed as

6    an approved vendor, but he continued to do work.

7         Q    So maybe walk me through what constitutes

8    an approved vendor in Perdue's mind and why he would

9    be listed or not listed.

10        A    Just somebody that wanted -- that wanted

11   to be put on our list and asked us, Can I put you --

12   Will you put me on the list?  I remember Dale

13   specifically saying, Can I get on the list because I

14   want to be on call to, you know, handle repairs.

15        Q    He was removed from that list of approved

16   vendors?

17        A    He didn't live in the area anymore.

18        Q    And to your recollection, was that -- did

19   that coincide to when he was removed from the list?

20        A    I don't remember the exact date.

21        Q    Okay.

22             (Plaintiff's Exhibit 51 was marked for

23   identification.)

24   BY MR. KLORFEIN:

25        Q    Handed you what has been marked

30(b)(6) Clay Copeland                                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 71

1      Q     Same question as to other third parties

2   that Perdue might have communicated with, who did

3   you speak with in order to prepare for that topic?

4             MS. SANTEN:  Again, the topic is the types

5   of communications defendants may have had with third

6   parties regarding plaintiff's grower business.

7      A     I talked with -- you know, we talked with

8   Dan about a conversation he had with the Georgia

9   Department of Agriculture about a pit that was

10  uncovered.  I talked with Tim Little about a

11  conversation he had with Gail.  That's the one I

12  remember.

13            And talked with Kathryn about a

14  conversation she had with -- no.  Let's see.  No,

15  that was Dan had the conversation with the

16  Department of Ag, and I had a conversation with the

17  EMC, and I had a conversation with the USDA.  That's

18  it.

19  BY MR. KLORFEIN:

20     Q     Let's talk about that conversation you had

21  with the USDA.  When did that occur?

22     A     That would have been in 2017, I believe.

23     Q     What was the nature of that communication?

24     A     A representative from Packers and

25  Stockyards called me and said that Dale had filed a

Page 72

1    complaint and that he wanted me to look into Dale's

2    last flock.

3                    (Reporter clarification.)

4    BY MR. KLORFEIN:

5         Q    Do you recall when that occurred in 2017?

6         A    I don't remember the exact date.

7         Q    Do you remember what month it was?

8         A    I believe it was August.

9         Q    And what did you do in response to that

10   call?

11        A    I looked into the flock, and we ended up

12   paying him his six flock average.

13        Q    Aside from that call in around August 2017

14   with the USDA, did you have any other separate

15   conversations with the USDA about --

16        A    No.

17        Q    -- plaintiff?

18        A    I called him after we resolved it and told

19   him that we had paid Dale his six flock.

20        Q    Any subsequent communications with USDA?

21        A    No.

22        Q    Aside from -- setting you aside for a

23   moment, what about others at Perdue?

24        A    No.

25        Q    Did you interview witnesses in preparation

30(b)(6) Clay Copeland                                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 76

1        A    You know, in general the growers wanted to

2    get it from us.  They could get the rat bait or

3    other supplies from a poultry supply house, but our

4    cost was more competitive.  So, I mean, it was

5    supplies that they would generally use on a farm,

6    and we had the benefit of purchasing power.

7        Q    My question was slightly different.  It's

8    what determines whether or not Perdue would eat that

9    cost or not?

10             MS. SANTEN:  Object to form.

11       A    I think that's in the contract, maybe

12   Section 2, what we provide.

13   BY MR. KLORFEIN:

14       Q    Handing you what has previously been

15   marked as Plaintiff's Exhibit 6.

16             (Plaintiff's Exhibit 6 was marked for

17   identification.)

18   BY MR. KLORFEIN:

19       Q    Do you recognize this document?

20       A    Yes.

21       Q    What is it?

22       A    An equipment list.

23       Q    And was this document provided to growers?

24       A    Yes.

25       Q    What is the purpose of providing it to

Page 77

1    growers?

2         A    It's kind of like a grocery list of what

3    you would want if you were growing chickens, the

4    equipment you'd want in a house.

5         Q    Are certain things on this list something

6    that every grower needs?

7              MS. SANTEN:   Objection, vague.

8         A    Yes.

9    BY MR. KLORFEIN:

10        Q    So some of these things are required by

11   Perdue?

12        A    They're not required, but they're needed

13   to grow chickens.

14        Q    So if a grower did not have these things,

15   could it grow for Perdue?

16        A    No.  If they didn't have heaters, they

17   couldn't grow for Perdue.

18        Q    So that's required?

19        A    Absolutely.

20        Q    Okay.  Besides heaters, let's walk through

21   which other ones are required to grow for Perdue.

22   So --

23        A    Feed lines.

24        Q    Feed lines.  Which one is that?

25        A    Number 1.  Control pans are part of your

1    feed lines.  They activate your feed lines.  You

2    can't do without them.  Hoppers is part of your

3    control pans -- or your feed system.  You can't do

4    without it.

5           I don't care what kind of winches they

6    have, but you can't raise and lower equipment.  You

7    don't have to have hand cranks.  Some people use an

8    electronic drill, which is the next item.  You need

9    brood curtains to separate the brood chamber.  You

10    need feed bins or you would not have a place to

11    store your feed --

12    Q    It might be easier just to identify which

13    ones do you not need?  You've identified --

14           (Crosstalk.)

15    A    Chick mates.

16    Q    Number 10?

17    A    Yeah.  You don't -- there's not a set

18    number of feed trays.  You always have the -- the

19    latitude to do more or less, but that would affect

20    your tier pay.

21    Q    Got it.

22           So if you didn't have enough poly feed

23    trays, you might be bumped down to --

24    A    Yeah, your tier pay, uh-huh.

25    Q    Let me just finish my question.

30(b)(6) Clay Copeland                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 79

1          If you did not have the requisite number

2    of poly feed trays, you would not qualify for a

3    certain tier?

4          A    That's right.

5          Q    And presumably you couldn't have zero feed

6    trays?

7          A    No, you could not have zero feed trays.  I

8    mean, all this is if you -- if you don't have it,

9    you can't grow chickens, a lot of it is.  And I

10   don't understand your question.  I mean, it's not --

11   it's not that there's not leeway on this.  You can

12   buy what kind you want, you can buy the amount you

13   want, you can always go more, you can go less.

14         Q    Yeah, I'm just trying to understand --

15         A    Yeah.

16         Q    -- what is required here.  That's it.  And

17   it seems like a lot of these things are required.

18         A    Yeah.  Yeah.

19         Q    Okay.

20         A    You know, it says cone fans; you don't

21   have to have cone fans.  It says 6-inch

22   recirculating pads; you don't have to have 6-inch

23   recirculating pads.  You could have 4-inch.  I

24   mean...

25         Q    Are there any manuals that Perdue requires

Page 84

1        Q     Who's responsible for filling it out?

2        A     The person at the scale house.

3        Q     Do you know who that is for Perry?

4        A     I don't know who it is currently.  People

5    change there.

6        Q     Sure.  Do you know who that was at Perry

7    for 2012 through 2019?

8        A     Maybe Kadishe.  Kadishe March.

9        Q     Anybody else?

10       A     Don't know.

11       Q     You can set that aside.

12             I've handed you what's been previously

13   marked as Plaintiff's Exhibit 17, Bates Perdue 7333.

14             (Plaintiff's Exhibit 17 was marked for

15   identification.)

16   BY MR. KLORFEIN:

17       Q     Do you recognize this e-mail?

18       A     Yes.

19       Q     Was this the six flock average paid due to

20   the tare weight error that you were referencing

21   earlier?

22       A     I think so.

23       Q     So what is your memory of what happened

24   after you were contacted by USDA?

25       A     I had the plant look into the weights; I

Page 85

1    looked at the weights; we looked at the feed

2    tickets; we cross-referenced feed tickets that were

3    on his farm and weight tickets that were on his

4    farm.  We didn't find anything wrong, and that's why

5    we didn't do anything the first time that it refers

6    to.

7              Then after he called, looked into the --

8    we looked at the tare weights, and there was a tare

9    weight that was a little bit off, not enough to

10   throw up an alarm, but since P&S had called us, we

11   decided to pay him his six flock.

12        Q    Okay.  So the first time there was the

13   discrepancy brought to your attention, that was Dale

14   doing so?

15        A    I don't remember.

16        Q    Got you.

17              But you referenced there were two

18   independent times --

19        A    Yes.

20        Q    -- right?  And so the second time P&S had

21   called, right?

22        A    Yes.

23        Q    And P&S, just so we're clear, is --

24        A    Oh.  I didn't mean to interrupt you.  Go

25   ahead.

Page 86

1      Q    Sure.  Could you define P&S for me?

2      A    Packers and Stockyards.

3      Q    That's USDA?

4      A    Yes.

5      Q    And so the first time it was brought to

6    Perdue's attention before the USDA was involved,

7    Perdue did not adjust the calculation.

8      A    Yes.

9      Q    And then after the USDA was called and

10   reached out to you, Perdue made an adjustment to

11   that.

12     A    I don't know if it was Dale making a

13   complaint or if it was -- sometimes when a farm does

14   really bad we will figure their six flock, and then

15   we'll investigate it.  Just for the -- just to speed

16   things up we might tell them to look at -- to figure

17   the six flock in case we need to pay it, and then

18   we'll make the determination whether we pay it or

19   not.

20     Q    But Perdue did, in fact, make a

21   determination to pay the six flock average the

22   second time.

23     A    Yes.

24     Q    And that was after USDA contacted you.

25     A    Yes.

30(b)(6) Clay Copeland                         April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 87

```
 1        Q    Just so I understand, why would Perdue pay
 2   a six flock average instead of trying to
 3   understand -- fixing the one tare weight ticket
 4   issue?
 5             MS. SANTEN:  Objection, outside the scope.
 6        A    Not sure what you're asking.
 7   BY MR. KLORFEIN:
 8        Q    Sure.  If there's a tare weight ticket
 9   issue, there's an error, could Perdue address that
10   error?
11             MS. SANTEN:  Same objection, outside the
12   scope, vague.
13        A    There's no way to definitively prove what
14   the tare weight should have been if there's an
15   error, so you pay them their six flock.
16   BY MR. KLORFEIN:
17        Q    Got you.
18             So --
19        A    I can't make stuff up, or then I would be
20   in trouble with P&S.
21        Q    Understood.
22             Does Perdue maintain all tare weight
23   tickets just as part of its recordkeeping process?
24        A    Yes.
25        Q    For how long?
```

Page 88

1        A    I don't know the retention policy on tare

2    weight tickets.

3        Q    Is it more than a couple months?

4        A    Yes.

5        Q    So by this point in time y'all still had

6    the tare weight tickets, right?

7        A    Yes.

8        Q    So could you have gone back and looked at

9    the tare weight tickets to understand what the error

10   was and how to address that?

11       A    It's not transcribing a number.  It could

12   have been that the truck was not pulled onto the

13   scales.  There's no way to go back in time and tell

14   whether the truck was on the scales or not.

15       Q    Got you.

16            Aside from truck not being on the scales,

17   are there other ways for an error to be introduced

18   in the tare weight ticketing system?

19       A    It looked like to me in this situation the

20   driver might not have filled up with fuel before he

21   got back on the scales.

22       Q    And what led you to that conclusion?

23       A    Because it was a minor discrepancy on tare

24   weights.

25       Q    And how do you define "minor"?

30(b)(6) Clay Copeland                                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 89

1        A     Less than a thousand pounds.

2        Q     Got you.

3              So if it's less than a thousand pounds,

4    that might be a minor issue?

5        A     There's not a hard-and-fast rule.

6        Q     That's your rule?

7        A     The only reason we paid Dale six flock is

8    because P&S called.

9        Q     And when P&S calls, y'all act?

10       A     Yes.

11             MS. SANTEN:  Jarred, has this been marked,

12   is it 54?

13             MR. KLORFEIN:  It's previously marked 17.

14             MS. SANTEN:  It's not on our copy.

15             MR. KLORFEIN:  For whatever reason the

16   printed copies did not address that.  I will make

17   sure to identify each one as we hand them over.

18             MS. SANTEN:  Okay.  So 19 from what?

19             MR. KLORFEIN:  Prior depositions.  We've

20   numbered them consecutively, so if it's a prior

21   exhibit --

22             MS. SANTEN:  Because we're at, like, 54,

23   53.  So what would this be 19 to?

24             MR. KLORFEIN:  We picked up immediately

25   after the previous one, so depending on the cutoff,

Page 90

```
1    it would have been either the 30(b)(6), Mizell,

2    Roberts, but we have used a consistent numbering

3    scheme throughout.

4             MS. SANTEN:  I'm trying to figure out

5    we've used 52, 53, 54 for some today, so how are we

6    determining that this is 19?

7             MR. KLORFEIN:  Do you want to go off the

8    record for a moment?

9             THE VIDEOGRAPHER:  The time is 2:42 p.m.

10   We are off the record.

11            (Recess 2:42-3:06 p.m.)

12            THE VIDEOGRAPHER:  The time is 3:06 p.m.

13   We are back on video record.

14   BY MR. KLORFEIN:

15       Q    Mr. Copeland, I've handed you what's been

16   previously marked Plaintiff's Exhibit 19.

17       A    Yes.

18       Q    Bates Perdue 7373.

19            (Plaintiff's Exhibit 19 was marked for

20   identification.)

21   BY MR. KLORFEIN:

22       Q    Do you recognize this e-mail?

23       A    Yes.

24       Q    Is this referring to the decision to

25   make -- to use a six flock average for Mr. Parker?
```

Page 91

```
 1        A    Yes.
 2        Q    That was in -- November 17th that y'all
 3   made that decision?
 4        A    Yes.
 5        Q    Or potentially earlier?
 6        A    It was earlier.  This would have been
 7   subsequent flock.
 8        Q    Got it.
 9             (Plaintiff's Exhibit 20 was marked for
10   identification.)
11   BY MR. KLORFEIN:
12        Q    Handing you what has been previously
13   marked as Plaintiff's Exhibit 20.
14             MR. KLORFEIN:  Counsel, we've marked 20 on
15   that exhibit.  This is Bates Perdue 7380.
16   BY MR. KLORFEIN:
17        Q    Do you recognize this e-mail thread?
18        A    Yes.
19        Q    And you are e-mailing Ellen Dunn to pay
20   Hazel Lee the six flock average?
21        A    Yes.
22        Q    You reference the procedural error.  Is
23   this the same error that we were talking about
24   earlier?
25        A    This looks like it was the error with the
```

Page 92

1    tare weights that the USDA called about rather than

2    the first one.

3         Q    Does this refresh your recollection as to

4    whether or not it was a vehicle not fully on the

5    scale or some other issue?

6         A    No, I don't have any way of knowing that.

7         Q    No recollection about what the cause of

8    that error was?

9         A    There's no way to know that.

10        Q    You couldn't look back at the tare

11   weights?

12             MS. SANTEN:  Objection, asked and

13   answered.

14        A    There's no way to know.  I mean, you

15   could -- you might see that a tare weight looked

16   off, but there's no way to know what happened.  It

17   could be right.

18   BY MR. KLORFEIN:

19        Q    You already testified that Perdue

20   maintains the tare weight tickets for a certain

21   period of time, right?

22        A    Yes.

23        Q    Why does it do that?

24        A    In case you need to refer back to it for

25   settlements.

Page 93

1      Q    And did you refer back to the tare weights

2    in this instance?

3      A    Yes.

4      Q    And you were unable to determine what the

5    problem was?

6           MS. SANTEN:  Objection, asked and

7    answered.

8      A    You can only see that there was a problem.

9    You cannot tell what the problem was.

10   BY MR. KLORFEIN:

11     Q    And you saw there was a problem here?

12     A    Yes.

13     Q    But you don't know what procedural error

14   you're referring to?

15     A    No.

16     Q    Then you ask for the calculation as soon

17   as possible, today if possible.

18     A    Yes.

19     Q    This is November 30th?

20     A    Yes.

21     Q    So several weeks went by after you made

22   the decision to pay him the flock -- six flock

23   average?

24          MS. SANTEN:  Objection, misstates the

25   exhibits.

Page 94

```
 1        A     Sure.  Yes.

 2   BY MR. KLORFEIN:

 3        Q     Now, these issues that arose with USDA,

 4   this was all occurring in 2017, right?

 5        A     There was only one issue.

 6        Q     Right, but Mr. Parker had identified an

 7   error earlier than when the USDA had brought it to

 8   your attention, right?

 9        A     Yes.

10        Q     That all occurred in 2017?

11        A     Yes.

12        Q     Do you recall in 2017 any other instance

13   where Mr. Parker brought to Perdue's attention

14   additional errors with the tare weight tickets?

15        A     Dale thought -- he was always looking for

16   a reason to say that something was wrong, and we

17   could -- in general we could never find anything

18   wrong.  There was no issues with the tare weight

19   tickets.  He was making excuses for his poor

20   performance.

21        Q     Well, we can agree that at least one of

22   the times that he brought it to your attention --

23        A     Yes.

24        Q     -- he was right.

25        A     Yes.
```

Page 95

```
 1        Q    Do you recall any other time in 2017 that

 2   he brought a tare weight ticket to Perdue's

 3   attention?

 4             MS. SANTEN:  Objection, outside the scope.

 5        A    There was two times --

 6   BY MR. KLORFEIN:

 7        Q    In 2017 that we already discussed?

 8        A    -- that we already covered.

 9        Q    No other times besides those?

10        A    He probably complained before then, but he

11   was incorrect.  If we found something, we were

12   obviously willing to correct it.

13        Q    Well, this was after the USDA had reached

14   out to you, right?

15        A    We didn't find it until they reached out

16   to us.

17             (Plaintiff's Exhibit 24 was marked for

18   identification.)

19   BY MR. KLORFEIN:

20        Q    Handing you what has been previously

21   marked as Plaintiff's Exhibit 24, Bates Perdue 8011.

22             Do you recognize this as a text exchange

23   between Dale Parker and Kathryn Mizell?

24        A    Yes.

25        Q    And on the second page, Bates 8012,
```

30(b)(6) Clay Copeland                                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 97

```
1          Q     When did she bring it to your attention?

2          A     I do not know.

3          Q     Do you recall how she brought it to your

4     attention?

5                MS. SANTEN:  Same objection just to this

6     line of inquiry generally.

7          A     No.

8     BY MR. KLORFEIN:

9          Q     Do you recall what you did in response to

10    that?

11         A     No.

12         Q     Do you remember any other details about an

13    issue that Mr. Parker raised regarding tare weight

14    tickets in September 2018?

15               MS. SANTEN:  Same objection, outside the

16    scope of topics.

17         A     As I said before, he was always trying to

18    scheme and trying to figure out a way to make

19    excuses for his poor performance.  This is obviously

20    his word against ours.  Does he have -- he says he's

21    got a video.  Do you have it?

22    BY MR. KLORFEIN:

23         Q     Do you recall any details about this

24    incident?

25         A     Yes.
```

30(b)(6) Clay Copeland                        April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 98

1        Q    What are the details you remember?

2        A    I remember Dale was always complaining to

3    make excuses for his poor performance, and we could

4    never find any errors.

5        Q    Well, you found at least one error, right?

6        A    We found two, and we corrected them.

7        Q    Well, we talked about two errors in 2017.

8        A    Yes.

9        Q    You corrected the second one.

10        A    We corrected both of them.  He was paid

11    six flock average for flock 46 and 48.

12        Q    And that was after the USDA brought it to

13    your attention?

14        A    One was after Dale brought it to our

15    attention; the other was after USDA.

16        Q    Well, you corrected that first issue after

17    USDA brought it to your attention.

18             MS. SANTEN:  Objection, asked and

19    answered.

20        A    Corrected the first one after Dale brought

21    it to our attention.

22    BY MR. KLORFEIN:

23        Q    Both of those occurred after USDA had

24    reached out.

25             MS. SANTEN:  Objection, misstates

Page 99

1    testimony.

2        A    We only corrected one that the USDA asked

3    about.  The other was at Dale's request.

4    BY MR. KLORFEIN:

5        Q    You did not --

6        A    We did not find an error in the one from

7    USDA when Dale mentioned it; we found it later.

8        Q    But you did, in fact, find a procedural

9    error, right?

10       A    A tare weight was off.

11       Q    You found a procedural error, yes?

12       A    Yes.

13       Q    But you don't recall any further details

14   about investigating this issue in September 2018?

15            MS. SANTEN:  Same objection, outside the

16   scope of topics.

17       A    We investigate every flock that someone

18   complains about.

19   BY MR. KLORFEIN:

20       Q    You just don't remember the details of

21   this investigation?

22       A    I mean, I knew about the text message of

23   Dale saying the numbers did not match, but, again,

24   he had no proof.  If he had a video, he didn't show

25   us.

Page 101

```
 1    BY MR. KLORFEIN:
 2         Q    Do you recall receiving a draft letter
 3    from Ms. Mizell two days later describing
 4    requirements that were being imposed on Mr. Parker?
 5         A    I believe it was a repair list, and
 6    regarding what you just said, we never terminated
 7    Mr. Parker's contract.  He could still be growing
 8    today if he would fix the repairs.
 9         Q    Got you.  But that draft letter was sent
10    to you two days after this issue was raised?
11         A    Coincidence.
12         Q    Do you recall asking Ms. Mizell for that
13    letter?
14         A    No, I don't.
15         Q    Do you believe that she drafted it on her
16    own initiative?
17         A    Yes.
18         Q    You had no discussions about that letter
19    prior to her sending it to you?
20         A    It was based on visits she had made on the
21    farm prior to that flock settling.
22         Q    Do you remember having a discussion with
23    her about such a letter before she sent you a draft?
24         A    She may have told me that she was going to
25    type a letter, but I wouldn't know what was in it.
```

Page 106

```
 1        A     I didn't know about this text message.

 2        Q     So that's a no, you did not investigate

 3   that issue?

 4        A     No.

 5              (Plaintiff's Exhibit 54 was marked for

 6   identification.)

 7   BY MR. KLORFEIN:

 8        Q     I'm marking Plaintiff's Exhibit 54, Bates

 9   7767.

10              Do you recognize this e-mail chain?

11        A     Yes.

12        Q     Do you see the e-mail from Roger Parker on

13   May 9th to Kathryn Mizell?

14        A     Yes.

15        Q     He references an issue with the fans in

16   that e-mail?

17        A     Yes.

18        Q     At the end he says:  Please help me?

19        A     Yes.

20        Q     And Ms. Mizell forwards that e-mail to

21   you, correct?

22        A     Yes.

23        Q     This is in May 2019.  Do you see that?

24        A     Yes.

25        Q     Did you conduct any investigation to
```

30(b)(6) Clay Copeland                        April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 109

1    turn.

2         Q    Ms. Mizell responds:  Clay and I will meet

3    with you next week.

4         A    Okay.

5         Q    Do you recall that meeting?

6         A    Yes.

7         Q    What was the nature of that meeting?

8         A    We went out there to discuss the repairs

9    that he had done.

10        Q    And was Perdue at any point in time in

11   August 2019 waiting until those repairs were done

12   before it would place chickens?

13        A    Yes.

14        Q    So at this point in time, Perdue was not

15   placing chickens at Hazel Lee?

16        A    Again, this e-mail thread is -- he thought

17   he was supposed to be on earlier than he was.

18   You're asking me about this e-mail.  He thought he

19   was supposed to place back that week, and he was

20   not.

21        Q    Setting aside this text.  By August 2019,

22   Perdue was withholding chickens, correct?

23        A    We paused placement until he had repairs

24   done.  I don't know if it was that exact week or the

25   following week.

30(b)(6) Clay Copeland                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 110

1          Q     And the following week you did meet with

2     Mr. Parker?

3          A     Yes.

4          Q     Who else attended that meeting?

5          A     Kathryn.

6          Q     Anybody else?

7          A     Maybe his farm worker.

8          Q     But you couldn't say one way or the other?

9          A     Pretty sure his farm worker was there.

10         Q     Do you recall who that was?

11         A     No.  They hire the farm workers.  I don't

12    know who they are.

13         Q     And what did you communicate at this

14    meeting?

15         A     We walked the farm, and repairs hadn't

16    been made.

17         Q     So at that point did you determine not to

18    place chickens on the farm?

19         A     We told him once the repairs were made, we

20    would place chickens on the farm.

21         Q     So that's a no, Perdue was not placing

22    chickens on the farm at that time?

23               MS. SANTEN:  Objection, asked and

24    answered.

25         A     We paused placing chickens until the

30(b)(6) Clay Copeland                                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 111

1    repairs were made.

2    BY MR. KLORFEIN:

3         Q    Mr. Parker continues referencing how he

4    replaced the motors after being told the fans was

5    all that you wanted.  Do you recall that

6    communication?

7         A    He replaced the motors with used motors

8    that were defective.  He references this in your

9    prior e-mail.  He admits that there were 13 fans

10   that weren't working.

11        Q    Do you know who supplied those fans?

12        A    No.  He bought them from wherever --

13   probably bought them from a used -- a farm that he

14   worked on for Harrison or some other company.

15        Q    But you don't know?

16        A    No, I don't know.

17        Q    Did you go to Hazel Lee to meet with

18   Mr. Parker before this time in Plaintiff's Exhibit

19   33?

20        A    It says we went the following week, or we

21   were planning on going the following week.

22        Q    Sure.  Prior to that time, did you have a

23   meeting with Ms. Mizell and Mr. Parker at Hazel Lee?

24        A    I don't know the --

25             MS. SANTEN:  Objection, vague.

Page 118

1    an issue with the tare weight ticket, what is the

2    process that you respond to; what's the typical

3    process?

4         A    Usually they show up at our door, and they

5    say that they're there to go through our records,

6    and they ask for specific weeks, and they sit in our

7    office and go through all the accounting records for

8    that -- for those weeks, and they don't tell us who

9    registered the complaint.

10        Q    It's anonymous?

11        A    Yes.

12        Q    You're also the corporate representative

13   designated to discuss defendant's decision to cease

14   providing flocks to plaintiff, correct?

15        A    Yes.

16        Q    So walk me through Perdue's decision to

17   cease providing flocks to plaintiff.

18        A    We never ceased providing flocks to him.

19   He could still be growing today had he completed the

20   repairs.

21        Q    Okay.  Walk me through the decision-making

22   process to pause placing chickens on his farm.

23        A    Kathryn went out to the farm, and there

24   was -- in my opinion it was criminal animal abuse

25   going on on the farm.  He didn't have adequate

Page 119

1    ventilation, he did not have adequate feed or water,

2    and he needed repairs to be done.  So she made a

3    list of repairs, we presented it to Dale and told

4    him when he finished repairs, he could get chickens

5    back, and he never finished the repairs.

6         Q    When did Kathryn first begin compiling

7    this list of repairs?

8         A    In October of 2019.

9         Q    And you don't recall whether or not that

10   was at your direction or on her own initiative?

11        A    It was on her own.

12        Q    Any other reasons for the decision to

13   pause placing chickens on his farm?

14        A    No.

15             MR. KLORFEIN:  Why don't we go on a break.

16             THE VIDEOGRAPHER:  The time is 3:47 p.m.

17   We are off video record.

18             (Recess 3:47-3:57 p.m.)

19             THE VIDEOGRAPHER:  The time is 3:57 p.m.

20   We are back on video record.

21   BY MR. KLORFEIN:

22        Q    Earlier in today's deposition, you talked

23   about suggestions as part of the policies for what a

24   grower was supposed to do on a daily basis.

25             Do you recall that testimony?

Page 134

1    certain growers, before this case was limited to

2    Mr. Parker's individual allegations only, whether

3    they would be willing to speak with us?

4         A    Yes, that was in the interrogatories.

5         Q    Okay.  Let me ask a question about kind of

6    2018-2019 time period.  Opposing counsel had asked

7    you what date the list of repairs was sent to

8    Parker, and you said October of 2019.  Was that

9    actually October of 2018?

10        A    Yes.

11        Q    Okay.  Can you talk me through what

12   happened from those list of repairs from October

13   2018 through the time of August 2019 when was the

14   last time we decided to withhold flocks pending

15   repairs, can you talk me through that timeline?

16        A    Yes.  We sent Dale the equipment list, and

17   I went out and talked to him, and then he did some

18   repairs, and visually it looked like that everything

19   would be fine, so -- and he wanted to place

20   additional flocks so that he could sell the farm.

21             So we placed additional flocks.  I believe

22   he got two additional flocks, and they were pretty

23   bad.  Again, animal welfare issues, fans not

24   working, stuff that you couldn't see until you put

25   it under load.

Page 135

1          So at his we placed two additional flocks
2     and then stopped again for him to make more
3     permanent repairs.
4          Q    When you said you stopped again for him to
5     make more permanent repairs, approximately what time
6     frame was that?
7          A    That would have been the spring of 2019
8     would probably begin the flock.
9          Q    So when is the last time you recall
10    placing flocks with Mr. Parker?
11         A    Spring of 2019.
12         Q    When is the last time you recall him
13    having any birds on his farms?
14         A    I guess it would have been July of 2019.
15         Q    Okay.  So is it fair then to say he did
16    not perform any other work for Perdue following July
17    or August 2019?
18         A    No, he did not.
19         Q    Okay.  When he didn't have birds -- I know
20    we talked about hours worked.  When he didn't have
21    birds at the farm, what sorts of things would
22    Mr. Parker be responsible for doing?
23         A    When he didn't have birds at the farm, he
24    would prepare his litter for the next flock, which
25    would take a day, and then there would be a period

30(b)(6) Clay Copeland                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 137

1      Q    Are those all -- are those all things that
2    growers are expected to do personally?
3      A    No, they can hire someone to do it.
4      Q    Okay.  There was some testimony about
5    Parker's Poultry & Equipment, which was Mr. Parker's
6    outside business, being removed as an approved
7    vendor from a house equipment specification listing.
8           Do you recall that testimony?
9      A    Yes.
10     Q    And do you recall why Mr. Parker's
11   business might have been removed from that list?
12     A    During the break we contacted Dan Roberts,
13   and he clarified that there were some issues with
14   farms that Parker had worked on, some grower
15   complaints from the work that he had done, and also,
16   like I said, he did not have any employees to work
17   anymore.
18          So we had a complaint from Larry Scott
19   about hanging the cool cells incorrectly.  I think
20   he had to have that work redone.  We had a complaint
21   from Rusty Blackston again about hanging cool cells
22   incorrectly, and we had William Hensley.  Gail --
23   Dale put in drinker -- drinker lines in the
24   wintertime, and he put the pipes really close
25   together, so when the -- during the summertime as

Page 138

1    the pipes expanded they separated and warped the

2    pipes, and he had to have completely new drinkers.

3              Out at Hammock's farm he -- the control

4    boxes have knockouts on the side and on the bottom

5    side that you're supposed to put electrical fittings

6    in and run your wires in through the side or through

7    the bottom.  Dale just drilled holes in the top,

8    which is a no-no because water, condensation,

9    whatever, dust can be pulled in through the top, and

10   he didn't use proper fittings.

11             So it was a lot of just shoddy work.  And

12   word of mouth -- it was a relatively small

13   community, and word of mouth got around, and no one

14   was using him, and he had to let people go, and Brad

15   and Simon were no longer there, so yeah.

16        Q    We talked about various things you did to

17   prepare for your topics to testify today, and one of

18   the topics was the types of communications that

19   Perdue had with third parties, including lenders.

20        A    Uh-huh.

21        Q    You mentioned that you spoke with various

22   people.  Did you speak with anyone else in

23   accounting about the types of communications that

24   Perdue might have had with Parker's lenders, for

25   example?

Page 143

1    Clay Copeland c/o

     Maggie Santen, Esq.

2

3                                          May 8, 2025

4    RE: Parker, Roger v. Perdue Foods, LLC

5        4/29/2025, 30(b)(6) Clay Copeland (#7341899)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   litsup-ga@veritext.com

16       Return completed errata within 30 days from

17   receipt of testimony.

18       If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22               Yours,

23               Veritext Legal Solutions

24

25

Page 144

1    Parker, Roger v. Perdue Foods, LLC

2    30(b)(6) Clay Copeland (#7341899)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE__51__ LINE__5__ CHANGE_Add "on the growers' behalf" to end._

8    _____

9    REASON___Clarification_____

10   PAGE_135__ LINE_1__ CHANGE_Add "request" after his and before we_

11   _____

12   REASON__Error in Transcription_____

13   PAGE_125__ LINE_18-19_ CHANGE___Change "youth recognize" to "euthanize"_

14   _____

15   REASON__Error in transcription_____

16   PAGE_126__ LINE_3__ CHANGE__Change NTC to NCC_____

17   _____

18   REASON__Error in transcription_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    __6/4/24_____

24   30(b)(6) Clay Copeland                      Date

25

30(b)(6) Clay Copeland                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 145

1    Parker, Roger v. Perdue Foods, LLC

2    30(b)(6) Clay Copeland (#7341899)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, 30(b)(6) Clay Copeland, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____        6/4/25
                                     _____

12   30(b)(6) Clay Copeland                    Date

13   *If notary is required

14              SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   __4__ DAY OF __June_____, 20__25__

16

17              _Beth Norris_____

18              NOTARY PUBLIC

19

20

21

22

23

24

25

# Exhibit 6 and 11 to Copeland Deposition

# (Being Filed Under Seal)

**From:**     Copeland, Walter [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
          (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6615A90D256941A395D2793919E5AD66-WALTER COPE]
**Sent:**     10/9/2017 1:10:00 PM
**To:**       Mizell, Kathryn [kathryn.mizell@perdue.com]; Dunn, Ellen [ellen.dunn@perdue.com]
**Subject:**  FW: Hazel Lee
**Attachments:**  201710090903.pdf

**Importance:**   High


I approve

-----Original Message-----
From: Dunn, Ellen
Sent: Monday, October 09, 2017 9:06 AM
To: Copeland, Walter <walter.Copeland@Perdue.com>
Subject: Hazel Lee
Importance: High

Attached are the settlement & 6 flk pay per day calculated for Hazel Lee's 46th flk settled back on
7/30/17.  I guess we discussed possibly paying him but decided not to  - I had the 6 flk pay per day done
already.  Please let me know if you approve & I'll get the check request done.  Thanks!

Ellen Dunn
DMV North & GA Settlement Coordinator
Perdue Foods LLC
Phone 410-543-3403
Fax 410-341-2106



PLAINTIFF'S
EXHIBIT
17
tabbies

Perdue 007333

**From:**      Mizell, Kathryn [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1A2053C6B02F4954B39BD60994E0BE77-KATHRYN MIZ]
**Sent:**      11/17/2017 2:18:13 PM
**To:**        Dunn, Ellen [ellen.dunn@perdue.com]
**CC:**        Copeland, Walter [walter.copeland@perdue.com]
**Subject:**   Hazel Lee

Ellen,
Hazel Lee will be in the settlement next week with Flock 48.

I need to get his Flock 46 excluded from his 6 flock avg.  I think it was about -.015.

Can you help me with that?

Kathryn Mizell
Grow Out
Perdue Foods
Office  478-994-7832
Mobile  478-258-1165



PLAINTIFF'S
EXHIBIT

19

exhibit

Perdue 007373

**From**: Copeland, Walter [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6615A90D256941A395D2793919E5AD66-WALTER COPE]
**Sent**: 11/30/2017 8:58:09 PM
**To**: Mizell, Kathryn [kathryn.mizell@perdue.com]
**Subject**: FW: Hazel Lee
**Attachments**: Hazel Lee 6 flk pay flk 48.xlsx

**From:** Dunn, Ellen
**Sent:** Thursday, November 30, 2017 3:50 PM
**To:** Copeland, Walter <Walter.Copeland@Perdue.com>
**Subject:** RE: Hazel Lee

Clay,

See if this is what you were expecting.  I'll do the check request while you review the attached.  Just let me know if we're going with it ☺



*Ellen Dunn*
*DMV North & GA Settlement Coordinator*
*Perdue Foods LLC*
*Phone 410-543-3403*
*Fax 410-341-2106*

**From:** Copeland, Walter
**Sent:** Thursday, November 30, 2017 12:41 PM
**To:** Dunn, Ellen <Ellen.Dunn@Perdue.com>
**Cc:** Mizell, Kathryn <Kathryn.Mizell@perdue.com>
**Subject:** Hazel Lee

Please pay Hazel Lee his six flock average pay per day for flock 48.  This is due to a procedural error with the tare weights at the plant.  Let me know the calculation as soon as possible.  I need this to happen today if at all possible.

**Clay Copeland**
**Live Production Manager**
**Perdue Foods**
**(c) 478-973-7034**
**(o) 478-994-7821**
**(f) 478-994-9966**



PLAINTIFF'S
EXHIBIT
20

CONFIDENTIAL

Perdue 007380

Chat with "Dale Parker" <+████████████> and another address on October 22, 2018

+████████
Dale Parker <+████████████>
Unknown
Dale Parker <+████████████>
KATHRYN MIZELL <+████████████>
Kathryn <████████████>
Earliest item: 2018-10-22 00:00:03
Latest item: 2018-10-22 01:42:15

**Monday 22 October 2018**

Instant Message : Native Messages
00:00:03
From
KATHRYN MIZELL <+████████████>

I don't know anything about a meeting.

Instant Message : Native Messages
00:00:21
From
KATHRYN MIZELL <+████████████>

Oh for the route meeting. Come to another one.

Instant Message : Native Messages
00:00:54
From
Dale Parker <+████████████>

Are they all this week?

Instant Message : Native Messages
00:02:13
From
KATHRYN MIZELL <+████████████>

If you can't make it because you have plans then it's ok. It will be a good demonstration. Yes they'd are others but this will be the closest one. The next closest one is in Roberta. On Tuesday.

Instant Message : Native Messages
00:04:04
From
Dale Parker <+████████████>

I will try to reschedule it to leave Friday.

Instant Message : Native Messages
00:05:01
From
KATHRYN MIZELL <+████████████>

There is one south of Reynolds Thursday morning. Not exactly on the way but the right direction.

Instant Message : Native Messages
00:05:34
From
Dale Parker <+████████████>

Im a bit confused about some of the things on my list and wanted to get you to come by if possible.

Instant Message : Native Messages
00:06:06
From
Dale Parker <+████████████>

PLAINTIFF'S
EXHIBIT
30

CONFIDENTIAL

Perdue 008030

Ok on roberta.

**Instant Message : Native Messages**
00:07:16

From

KATHRYN MIZELL <+ ▮▮▮▮▮▮

Unfortunately I I am out of town on Tuesday. Monday it's hard for me to get out of the office because of settlements. Wednesday is the chicken sale. It would have to be later. Bradley should be able to answer any questions.

**Instant Message : Native Messages**
00:29:58

From

KATHRYN MIZELL <+1 ▮▮▮▮▮

I can meet Friday or next week sometime.

Instant Message : Native Messages
00:36:44

From

Dale Parker <+▮▮▮▮▮▮▮

Your list

#1. Fans, I wanted to remind you about the motor issue i had Talked Previously with you about,the fans. We talked at the end of the flock and I also had already told you i would make sure i had good motors on before placement. The flock advisers did not have the same fans out every time. I had purchased $8,000 worth of 1.5 hp motors and installed them with new pulleys as approved by

Dan to establish tier. I had 4. The motors run fine a few flocks but then started going out. I contacted the company and was told that i could unhook the soft start and they should be ok. That again worked a while and then the motors started blowing start capacitors and some motors went out totally. This is not neglect but an issue with new motors. I have worked daily trying to keep motors running.

#2 i have butterfly doors but no shutters. i don't have any missing or non working doors. Please explain what i need to do.

3. Like every year all farmers have issues with forced air furnaces. We have had 90plus degree weather so far. Me like every other farmer will need to check our heaters. At the end of last winter every heater was working as James ran them all.

4. Propane,

Every farmer has ran out of gas at some time. I don't ran out because i keep a spare 500 gallon tank on the farm for backup. A couple of years ago Perdue did help me with my payment but at any time did i run out because i was on auto fill where the gas company has units on the tanks that tell them when to refill. This time of year we wont come close to using 700 gallons or 70% either as we discussed when we talked.

5. I do have Your list

#1. Fans, I wanted to remind you about the motor issue i had Talked Previously with you about,the fans. We talked at the end of the flock and I also had already told you i would make sure i had good motors on before placement. The flock advisers did not have the same fans out every time. I had purchased $8,000 worth of 1.5 hp motors and installed them with new pulleys as approved by

Dan to establish tier. I had an indipenant fan survey done and had nowhere near the amount out as you reported. 4. The motors ran fine a few flocks but then started going out. I contacted the company and was told that i could unhook the soft start and they should be ok. That again worked a while and then the motors started blowing start capacitors and some motors went out totally. This is not neglect but an issue with new motors. I have worked daily trying to keep motors running. I told you at the end of the flock i would put 1hp motors back on.

CONFIDENTIAL

#2 i have butterfly doors but no shutters. i don't have any missing or non working doors. Please explain what i need to do.

3. Like every year all farmers have issues with forced air furnaces. We have had 90plus degree weather so far. Me like every other farmer will need to check our heaters but you are holding only me back for this. At the end of last winter every heater was working as James ran them all. Im not understanding why my placement has been held back when we have had only hot weather. Youre holding me to a total different standard than others. Am i the only grower that is being held back until the heaters are 100% checked by perdue? Did Brad test them and find them bad or am i being singled out on things that i have had no issues with.

4. Propane,

I had no clue perdue Mandatory regulated the amount of propane we have in the tanks previous to placement. I don't ran out because i keep a spare 500 gallon tank on the farm for backup. A couple of years ago Perdue did help me with my payment but at any time did i run out because i was on auto fill where the gas company has units on the tanks that tell them when to refill. This time of year we wont come close to using 700 gallons or 70% either as we discussed when we talked.

5. I do have 3 cool cells off and a board to replace. I will get that done.

6. I have nothing wrong with my tunnel door in house 2. It was not down when the birds sold. i will run it to make double sure.

7. I will patch the areas where needed.

8. I do not have any holes in the houses. The birds got out when i failed to put the screws in the rear doors and the wind got up which made a gap. You were here when the truck got here at 4 pm and it was 5 am when we got finished when the delivery truck with dead baby chicks coming out from under the roll up doors. We separated chicks chickens all night. Instead of us sitting in the houses waiting on the moffit we helped. I paid another man to help also. This is how the door screws got overlooked and the birds got out.

9. We have been cleaning Water lines and will do it again. Im a little confused as to why this is on the list unless you want me to do something different.

Like i told you once before. A perdue employee told me that when i called stockyard and packers that i would be on the chopping block like another farmer that had to do it. The majority of these things will only apply to me so its very clear i am singled out for punishment. With you sending this by registered mail and taking pictures of things i will be terminated as a grower as soon as you get your case built enough. The list you made are mostly things that we have addressed or standard procedures. Some i have no clue as nothing is wrong to my knowledge. Please help me to understand what you want done and i will do it.

When i tell you my issue its like i say nothing. Instead of helping me to do a better job Different people have done everything in their power to stop me from making these repairs. Then pile things on my list that no one else is held back for and putting things on me to make me have more downtime. i have been condemned without a chance to defend myself with what happened at the end of my grow-out. Not the first call. Had i not had proof of my innocence i wouldn't have much to say. Then they go straight to finish me off. I have been called names that are not true, talked about for it and not as much as one consideration as to what their actions are doing to my life.

Although the effort is clear that you wish to disqualify me as a grower, I will continue to do my best to improve. If i fail i will be homeless so i will do my best if possible to satisfy.

Your last words to me while you were here on my farm was "keep me posted about when you get the power back on." If only that was what would have happened. 3 cool cells off and a board to replace. I will get that done.

6. I have nothing wrong with my tunnel door in house 2. It was not down when the birds sold. i will run it to make double sure.

7. I will patch the areas where needed.

CONFIDENTIAL

Perdue 008032

8. I do not have any holes in the houses. The birds got out when i failed to put the screws in the rear doors and the wind got up which made a gap. Dont forget the fact that the truck got here at 4 pm and it was 5 am when we got finished when the delivery truck with dead baby chicks coming out from under the roll up door. You were here and we had to seporate chickens all night. Instead of us sitting in the houses waiting on the moffit we helped. I paid another man to help also. This is how the door screws got overlooked.

9. We have been cleaning them and will do it again.

A lot of things has gone from standard procedure to mandatory before i can place. Why is this happening to me?

I will continue to do my best to improve. If i fail i will be homeless so i will do my best to satisfy you. If you think i need to sell my farm then i will. If you cut me off then i loose everything i have. Hope you understand.

Thanks.

Instant Message : Native Messages
00:37:29
From
    Dale Parker <+ ████████

I will ask Brad about the houses.

> Instant Message : Native Messages
> 01:14:16
> From
>     KATHRYN MIZELL <+ ████████
>
> Thank you for your response to the letter. I'll look it over tomorrow and clarify each time for you.

> Instant Message : Native Messages
> 01:14:25
> From
>     KATHRYN MIZELL <+ ████████
>
> Each item

Instant Message : Native Messages
01:23:27
From
    Dale Parker <+ ████████

I dont doubt it being put down i was just letting you know the purpose of why things that are escalated. Thing are all of a sudden mandatory before placement and sending things certified. If youre cutting me off please just say were done and allow me time to sell.

> Instant Message : Native Messages
> 01:25:54
> From
>     KATHRYN MIZELL <+ ████████
>
> It's not a cut off letter. I am asking you to prepare your farm so it will be competitive.

Instant Message : Native Messages
01:26:39
From
    Dale Parker <+ ████████

You could have done that by telling me.

Instant Message : Native Messages
01:29:54

CONFIDENTIAL

From
    Dale Parker <█████████████

I was told that this is what happens when you want to disqualify a grower.

I feel the pressure is from above you with things that has happened to me since catch.

Instant Message : Native Messages
01:33:33
From
    Dale Parker <+█████████████

I have worked my life for what i have. Its not that much but i dont want to die and not have taken care of Gail. Im in heart failure as you know and wont live a long life.

Instant Message : Native Messages
01:34:30
From
    Dale Parker <+█████████████

Would you sell if you were me?

Instant Message : Native Messages
01:42:15
From
    KATHRYN MIZELL <█████████████

I don't mean to be short. I have to get started early tomorrow. Can pick this up tomorrow?

End Thread

Thread Statistics                                                    Instant Message Count

21

CONFIDENTIAL

# Exhibit 48 and 50 to Copeland Deposition

# (Being Filed Under Seal)

| | |
|---|---|
| **From:** | Mizell, Kathryn [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1A2053C6B02F4954B39BD60994E0BE77-KATHRYN MIZ] |
| **Sent:** | 5/10/2019 3:17:46 PM |
| **To:** | Copeland, Walter [walter.copeland@perdue.com]; Roberts, Dan [dan.roberts@perdue.com] |
| **Subject:** | Fwd: [EXTERNAL] Re: Hazel Lee visit 5/3 |

Sent from my iPhone

Begin forwarded message:

**From:** Roger Parker <poultryequipment@msn.com>
**Date:** May 9, 2019 at 22:10:34 EDT
**To:** "Mizell, Kathryn" <Kathryn.Mizell@perdue.com>
**Subject: [EXTERNAL] Re: Hazel Lee visit 5/3**

Although you were here yesterday i saw where you sent Brad back today for a fan outage count. When we started this growout 29 days ago Perdue had gone over the fans three times and knew that 100% of fans were working properly with new belts and tensioners where needed.

Can we go back where we started with this fan issue.
I ask and was approved to go from 1hp motors to 1.5 and change the drive pulley to get to the windspeed desired. Perdue got back with me and approved changing all the motors to 1.5 for the upgrade.

About a year later I reported to perdue that the 1.5 hp motors that were approved to bring me to tier 4 were going out all at once. I ask for help but was denied. Then i was accused of using used motors and insinuated that i was lying about not using used motors. Then upper management remembered looking at the pallet of 55, 1.5 motors on a pallet in house 1. Instead of help i was shut down for months.

Now With all the fans running at the beginning of the flock and having 13 fans out in 29 days do you believe me now? Unknowing to either of us I had installed a bad batch of motors when doing the upgrade. This amount of loss in 13 fans is far greater than normal for any grow out.
I will ask again for Perdue to help me get these upgrade motors replaced to stop this issue?

Please help me
Dale

On May 3, 2019, at 10:33 AM, Mizell, Kathryn <Kathryn.Mizell@perdue.com> wrote:

I visited the farm this morning. Below is what I found.

Hazel Lee 5/3

1- calling for 5 fans only 3 running, no migration fences, front right drinker line has no water, feed leak on the front left

2- 2 drinker lines in the back have no water. Backs ups 20 over set temp. Water leaks

**PLAINTIFF'S EXHIBIT**
tabbies®
54

3- no feed in one line. Calling for 4 fans only 2 on. No fences. Drinker line height

4- calling for 4 fans only 2 on. No fences. 2 feed lines with no feed

5-calling for 4 fans only 2 on.

6- birds not migrated. No fences. No feed in the back right. The auger is running and there is feed in the hopper but no feed is going to the pans.

All houses-
backups are set too high.

drinker lines are all over the place when it comes to heights. drinker lines are too high AND too low.

Feeders are still in flood and are too low.

No migration fences because the birds are not migrated because there are multiple feed and water line issues.

Water and feed leaks in multiple houses.


Sent from my iPhone

This communication, including attachments, may contain confidential, privileged, copyrighted or other legally protected information. If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please immediately re-send this communication to the sender and delete the original message and any copy of it, including all attachments, from your computer system.

CONFIDENTIAL

Perdue 007768