# **EXHIBIT D**

Page 1

1                  UNITED STATES DISTRICT COURT

                 MIDDLE DISTRICT OF GEORGIA

2

3        ROGER PARKER,

4            Plaintiff,

                                        CIVIL ACTION FILE

5            vs.

                                   NO. 5:22-cv-00268-TES

6        PERDUE FOODS LLC,

7            Defendant.

8

9                  VIDEO 30(b)(6)DEPOSITION OF

10                     PERDUE FOODS LLC

11                  (MICHAEL LEVENGOOD)

12                    April 29, 2025

13                      9:00 a.m.

14        Ogletree Deakins Nash Smoak & Stewart, PC

15              191 Peachtree Street NE

16                     Suite 4800

17        Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

18

19

20

21

22

23

24

25

Page 22

```
 1        Q    And it says:  Producer shall perform the
 2   services hereunder using the skill, knowledge, and
 3   discretion which producer possesses.
 4             Do you see that clause?
 5        A    Yes.
 6        Q    What is your understanding of what skills,
 7   knowledge, and discretion a producer possesses that
 8   they may use to perform services for Perdue?
 9        A    So the way we look at this is any time we
10   would be hiring an independent contractor, whether
11   it's a producer or a sanitation service or any -- I
12   can look at myself, if I was hiring a contractor for
13   my house, you would vet them.  You would want to go
14   and understand their knowledge, you would understand
15   their skills, and then we learned over the years to
16   be able to evaluate whether they would be a good
17   addition to the company.  Also, what they could
18   bring, even new skills to the company.
19             So you've got to understand that this
20   could be a farmer that's a grain farmer, he -- and
21   wants to diversify his operation; he could also have
22   other businesses.  So there's plenty of other skills
23   that he would be bringing to the table to get into
24   the chicken business.
25             We would also want to vet during this
```

Page 23

1    process that have they spent some time researching

2    what are they getting into, you know.  They want to

3    come be an independent contractor for us.  If they

4    come and said, Well, we just heard about it on the

5    news, and we thought we would just -- we would love

6    to get into this business, that would be a bit of a

7    red flag if they wouldn't spend any time trying to

8    investigate what it means.

9            And if we had a farmer come and go -- of

10   somebody that wanted to become an independent

11   contractor and said, You know, I spent time on

12   another poultry farm, and I really think this would

13   fit our business, this would fit our operation, that

14   would be a huge plus for us when they come to us.

15           So it's all those kind of vetting that we

16   spend a lot of time, and over the years has -- we're

17   a lot more successful when we have a contractor come

18   to us like that than we used to be.

19           I think we've just gained knowledge over

20   time that that vetting process is really, really

21   important, and that's the skills and knowledge

22   they're bringing to the company.

23           Just think, they -- a lot of these farmers

24   have their own businesses.  They can build -- they

25   can not only start with one farm, can add another

Page 24

1    farm.  They -- like I said before, they're

2    diverse -- they have an operation they want to

3    diversify, that's a really cool deal.  They have

4    other businesses, they're running other businesses.

5              So that gives you the sense that they

6    know -- they know finances; they're going to know

7    how to run the operation.  All of those kind of

8    skills and knowledge are hugely helpful for us to

9    know, Yeah, we should maybe take the next step

10   and -- and sign them up as an independent contractor

11   for us to raise chickens.

12        Q    And I appreciate that answer, and I want

13   to follow up with several of the things that you

14   just talked about, but I want to also ask you -- I

15   said skills, knowledge, and discretion.  Is that --

16   is "discretion" referring to what you just

17   described, or is "discretion" referring to something

18   else?

19              MS. SANTEN:  Objection, vague.

20        A    Can you be a little more specific in what

21   you mean?

22   BY MR. KLORFEIN:

23        Q    Sure.

24              This says that the producer, the person

25   who is growing the chickens, shall perform services

Page 25

1    using discretion, right?

2           A    Uh-huh.

3           Q    It says that?

4           A    Yeah.

5           Q    And my question is, what discretion is a

6    producer able to apply in this context?

7           A    So I think you got to go to their business

8    plan.  You know, we would ask them, What's your

9    business plan?  You know, How do you see this

10   poultry operation fitting into your business?

11               So that discretion would be, Well, we want

12   to build the houses, and, you know, we -- but we're

13   both going to work off.  Well, that could be a huge

14   red flag that that's -- we need somebody to take

15   care of the birds; who is going to do that?  So that

16   discretion of us picking them would depend a lot on

17   what their business plan is or, you know, of signing

18   a contract with them.

19               The other discretion is, you know, we

20   have -- and we talked about this before, we have how

21   they manage their week, you know, how long -- how

22   are they going to take care of the birds, and they

23   tell us that, Oh, you know, I'm adding this

24   diversification to the farm, and my spouse is going

25   to be the one managing the birds.  That's good.

Page 26

```
 1              Or, I'm going to build this farm, but I'm

 2      going to hire somebody, and they're the ones that

 3      are going to be watching the birds X number of days.

 4      All that kind of discretion would make us feel good

 5      that this could be a successful partnership that --

 6      if we did this.

 7              And also they're going to bring a lot of

 8      knowledge as it -- they come in and they're already

 9      a farmer, they know that farming changes, the

10      weather makes things change, the way they grow crops

11      today changes every day, the way we grow chickens

12      change every day.

13              So their ability to look at the birds and

14      make decisions on, I know this was the target you

15      mentioned, but I believe they should run warmer, or

16      they should run colder, that's the kind of -- I want

17      somebody to come in to have an opinion.  I want

18      somebody to come in to say, I believe this is what's

19      best for the bird.  That's somebody who is going to

20      be successful.

21              So we're looking for people that aren't

22      saying, Just give me -- just give me the basics how

23      to do it, and I'll do exactly what you say.  That's

24      probably another red flag.

25          Q    Okay.  I want to break down what your
```

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 27

1    answer was and follow up with specifics on what you

2    just said.

3              So correct me if I'm wrong, but I think

4    you just talked about the discretion.  You talked

5    about discretion in a variety of contexts.  One was

6    Perdue's discretion on whether or not to move

7    forward with a grower.  Is that one of the things

8    you described?

9         A    Yeah, that all comes back to that signing

10   up a farmer to be an independent contractor for us.

11        Q    Got you.

12             And so Perdue has discretion whether or

13   not to enter this agreement?

14        A    Yeah, I think the worst thing you can do

15   is have somebody sign up and they fail.

16        Q    And that's one of the things that this

17   discretion is referring to?

18        A    I take discretion in if -- when we're

19   looking at this, you know, that skills, knowledge,

20   and discretion, it all goes back to that original

21   when somebody calls up and says they want to come

22   raise birds for us, that -- there's discretion.

23   We're always going to use discretion there because

24   the worst thing we could do is sign somebody up and

25   they fail.

Page 28

1      Q    Okay.  And the next thing I believe you

2    said was discretion as to how a grower manages their

3    week.

4      A    Sure.

5      Q    And so this is -- you believe that this

6    discretion in this sentence here refers to how a

7    grower structures their week?

8            MS. SANTEN:  Objection, vague.

9      A    It's a lot -- discretion is -- I agree

10    100 percent that's a vague thing, you know.  It's

11    about everything.  You know, that discretion is, is

12    it's the skills and knowledge.  So their skills and

13    knowledge is going to grow the more flocks they

14    have.

15            Their ability to go, I like to run my

16    birds warmer; I like to run my birds cooler, we're

17    fine with that because it's their farm, and they're

18    there 24 hours a day, 7 days a week.  They see the

19    birds.

20            It's like everybody has discretion how

21    they raise their children.  Everybody has issues

22    about how people raise their children; everybody has

23    opinions about it.  But the person raising the child

24    has the discretion, and I know my child, and this is

25    how I think it should operate.

30(b)(6) Michael Levengood                      April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 29

1          And at the end of that it -- for us, we
2     look at the bottom line cost, is at the end of the
3     day that farm performing well.  And if that farmer
4     made the discretion that he wants to run the program
5     a little different but he performs well, I'm
6     actually learning something from that.
7     BY MR. KLORFEIN:
8          Q    Let's stick with your hypothetical for a
9     second, the temperature issue.  It's your testimony
10    that a farmer has discretion on what temperature to
11    set the houses at.  Is that accurate?
12         A    We have targets to start with.  The
13    discretion is we have -- we have enough knowledge to
14    know that this is -- this is the target temperature,
15    and that target temperature, if that farmer says,
16    These birds are acting cold, I want to run it
17    warmer, that's his discretion.  He can make -- he or
18    she can make that call.
19         Q    Okay.  Is there a limit to that?
20              MS. SANTEN:  Objection, vague.
21         A    The limit to that would be animal welfare.
22    If -- so --
23    BY MR. KLORFEIN:
24         Q    Please continue.
25         A    So if that farmer goes, It's 22 degrees

Page 30

1    out, and I don't want to run my heaters today

2    because I don't want to burn propane, and those

3    birds are freezing to death and dying, yes, that's a

4    problem.  But the discretion to go higher or lower

5    in the temperature a few degrees, that's their call.

6    We're not -- and we're fine with that.

7         Q    So a flock advisor is the first point of

8    contact with a grower for Perdue, right?

9         A    Yes, sir.

10        Q    If a flock advisor tells a grower, This

11   barn is too cold, and it's creating an animal

12   welfare issue, is it Perdue's expectation that the

13   grower has to get in line and adjust the

14   temperature?

15             MS. SANTEN:  Objection, vague.

16        A    Generally the flock advisor visits one

17   hour a week.  He has only looked at that time.  So

18   if we came into the farm this week and it was

19   running a little cold, we -- the flock advisor would

20   probably write on the visitation, I think your

21   temperature is a little cold; the birds are acting

22   cold.  It's an educational deal.

23             Now, listen, if we came to the farm every

24   week over multiple flocks and his cost is bad, his

25   cost, he's not performing, and then the farmer says,

Page 31

1    Why am I not performing, the visitations are going

2    to say, Look at the things, you consistently run the

3    birds too cold.  And if you run the birds too cold,

4    then guess what happens, the birds eat feed to stay

5    warm.

6              If they eat feed to stay warm, that means

7    your bird's weight is not good enough, and what's

8    going to happen is when you settle against people

9    that are keeping their birds at the temperature the

10   birds want to be at, they're going to have a better

11   cost than you.

12             And that's why we're having the

13   conversation with you, Mr. and Mrs. Farmer, is these

14   are the things we observe that you're not -- that's

15   hurting your performance.  It's always going to be a

16   discussion about their performance.  We want them --

17   the better their performance, the more money they

18   make.

19   BY MR. KLORFEIN:

20        Q    Okay.  Let's stick again with the same

21   hypothetical.  The flock advisor goes to Mr. and

22   Mrs. Farmer and says, week after week, The birds are

23   too cold; birds are too cold; this is hitting your

24   cost; I am concerned this is an animal welfare

25   issue; is it Perdue's position that the grower has

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 32

1    to get in line at that point?

2        A    It's our position that we would probably

3    ask them to fix what the problem is.

4        Q    And if they decided not to do that, they

5    did not fix the problem, would Perdue contemplate

6    terminating that agreement?

7             MS. SANTEN:  Objection, outside the scope

8    of topics.

9        A    What we would generally do is give them a

10   letter saying, Fix these things, and we can keep

11   moving forward, trying to get the farmer's attention

12   to say that, The reason you're not making any money,

13   the reason you're not performing are these issues.

14   If you just fix those issues, we'll put birds back

15   in.  Because if we put birds back in, they're going

16   to be hurt.  They're not going to perform.

17             And, you know, if you knew that your wife

18   was going to have a baby in a dirty hospital, would

19   you -- would you do that?  Probably not.

20             So it's the same thing.  We're putting

21   baby chicks into a house that's not right on -- if

22   it's -- that consistently runs cold, I'll use your

23   example.

24             There could be a gazillion reasons, but

25   for your example, if we know we're going to put them

Page 33

1    in there, the birds are not going to perform, it's

2    going to be an animal welfare issue, just like it

3    says in the PPA, but we could have just dropped the

4    farm.  We could just say, By the contract, we're

5    done because you haven't -- you haven't fixed it.

6    But we try usually to tell fix these things, and

7    we'll put birds back in.

8    BY MR. KLORFEIN:

9        Q    And until that's fixed, birds will not be

10   placed?

11       A    According to a letter that we would give

12   them, according to Mr. Dale's letter, until those

13   things are fixed, we couldn't put birds back in

14   there.  It would be an animal welfare issue.

15       Q    And you mentioned animal welfare.  You

16   also mentioned week after week there could be an

17   animal cost issue, the inputs are wrong because of

18   how cold the house is, for example, to use your

19   example, right?

20       A    Yes, sir.

21       Q    Is there a limit with the amount of cost

22   that's been going into a flock that Perdue would

23   also consider withholding flock as a result of

24   failure to fix changes?

25           MS. SANTEN:  Objection, vague, outside the

Page 39

1    ends up hurting you in cost.

2         Q    And that cost concern that Perdue has,

3    that's determined in Perdue's sole discretion,

4    right?

5         A    It's determined by how you performed

6    against the other farmers that settle in the same

7    week, and then that average is struck that week, and

8    it's how you compare to that average.  So, yes, all

9    the growers are -- or all the input costs to the

10   growers are the same on every farm, and what happens

11   is who grew the best chickens that week.  So,

12   honestly, you're competing against other farmers.

13   You're not competing against Perdue.

14        Q    And, again, that assessment is made by

15   Perdue?

16        A    It's -- they sign the contract for the --

17   for the payment schedule, so they know what's

18   entailed.  They -- they control how the birds do,

19   not us.  They're the ones that made the discretion

20   on temperature; they're the ones that made the

21   discretion on running how much fan time; they're the

22   ones that decided, I'm going to walk my birds five

23   times a day versus two times a day.

24             They're the ones that went out in the

25   middle of the night to make sure if they wanted to.

Page 40

1    I didn't tell them to.  They make all those

2    discretional day-to-day decisions to win at the end

3    to have the best cost.

4        Q    But if that cost increases to a level that

5    Perdue does not accept, Perdue decides that is not

6    okay?

7             MS. SANTEN:  Objection, vague.

8        A    We've already been down this road that as

9    their cost -- as their six flock average hits half a

10   cent, we would come out and start saying, We're

11   worried about your cost.

12   BY MR. KLORFEIN:

13       Q    And that could lead to termination?

14       A    Yes.

15       Q    Mr. Levengood, last time we spoke, we

16   talked about the various policies that Perdue had in

17   place that applied to growers.  Do you recall that

18   testimony?

19       A    Yes.

20       Q    You understand that you were designated

21   for policies, but for a wider time range?

22       A    Yes, the '12 to --

23       Q    2012 to 2019?

24       A    Yes, sir.

25       Q    And you reviewed your testimony about the

Page 41

1    policies that were in place at a later time period

2    at your last deposition?

3         A    Yes.

4         Q    Do you recall any differences between the

5    2012 to 2019 period versus the later time period

6    that you previously testified to?

7              MS. SANTEN:  Objection, compound.  It's

8    not clear what policies you're talking about.  If

9    you could show him, that might help.

10             MR. KLORFEIN:  If we could limit the

11   speaking objections.  I think if there's an

12   objection to form and then we can move on, I'd

13   appreciate it.

14        A    So, yeah, you need to show me, I -- what

15   policies you want me to look at.

16   BY MR. KLORFEIN:

17        Q    Handing you what has been previously

18   marked as Plaintiff's Exhibit 3.  Take a moment to

19   review, but I'll direct you to certain pages given

20   it's a pretty hefty manual.

21             (Plaintiff's Exhibit 3 was marked for

22   identification.)

23        A    Yeah, it -- I'm very familiar with this

24   manual, so.

25   BY MR. KLORFEIN:

Page 42

```
 1          Q     What is that manual?
 2          A     It's the Poultry Care Process Verified
 3    Program.
 4          Q     And do you oftentimes refer to that as the
 5    "PVP"?
 6          A     Yes, sir.
 7          Q     Earlier in today's deposition -- just let
 8    me finish the question.
 9                Earlier in today's deposition, you
10    referenced wanting to look at a document to identify
11    the differences from a later version to an earlier
12    version.  Were you referring to this PVP document?
13          A     No, I didn't mention this one.
14          Q     You were referring to a different one?
15          A     Yeah.  I -- the ones I told you that I
16    looked at.
17          Q     Got it.
18                Did you review this PVP in preparation for
19    today's deposition?
20          A     No.
21          Q     Do you recall your testimony regarding
22    this document?
23          A     Not specifically.
24          Q     In your prior deposition, you testified
25    that the PVP program has been in place since March
```

30(b)(6) Michael Levengood                     April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 43

1    2011.

2              Do you recall that testimony?

3        A    Yes.

4        Q    Is that accurate?

5        A    So it's -- we list all of the changes that

6    we made, so it would definitely have been in place

7    for our 2012 to 2019.  It was definitely in place

8    during this time.

9        Q    Got you.

10             So just so we're on the same page, this

11   Plaintiff's Exhibit 3 was in place during the 2012

12   through 2019 time period?

13       A    Yes.

14       Q    And any changes to the PVP would have been

15   documented?

16       A    Yeah, we document them all on the first

17   couple pages of any changes that happen during that

18   time.

19       Q    Got it.

20             So if it's not referenced in this -- these

21   first few pages, there were not other changes?

22       A    No, sir.

23       Q    Now, you just testified regarding changes

24   to the actual policy in Plaintiff's Exhibit 3, like

25   how something might have been altered over time.  Is

Page 44

1    that fair?

2         A    Yeah, then there's multiple ways it could

3    have been altered.

4         Q    Sure.

5              And I don't want to ask about each

6    specific change that's listed there, but I do want

7    to know, aside from those changes that are listed,

8    were there any changes at Perdue in terms of how

9    this policy overall was implemented at the grower

10   level?

11             MS. SANTEN:  Objection, vague.

12        A    We get audited on this by USDA.  We

13   also -- it's an ISO 19001 process.  So we audit it

14   every year.  So as we audit it, we either -- there's

15   three ways that really I think that the changes can

16   be made in this.

17             One is NCC -- the base of this program was

18   the NCC welfare guidelines.  We talked about that

19   the last time.  Every couple years they update their

20   welfare guidelines.  So if they update anything in

21   the NCC welfare guidelines, we have to update our

22   program.  So that happens every couple years.

23             The second way is, the USDA auditors come

24   in, and they audit the program.  And as they're

25   auditing the program, they might interpret what's

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 45

1    written and say, We know what's written, and we

2    don't feel like your process matches what's written.

3    And it could be words in a -- you can see some of

4    these are really minor things, but that's -- we

5    would change the document.

6             But then some of them -- and a lot of them

7    never affect a farmer, but some of them would.  And

8    there's a perfect example in here of we said that

9    no -- in here it said that birds unfit for travel

10   shouldn't go put on a live haul truck because it's

11   unfair to that bird to travel to the plant to be

12   harvested.  The auditor came back and said so -- and

13   that the farmer should euthanize the bird within

14   24 hours.

15            So when you have an ISO program, they were

16   kind of like you can't -- there's no verification.

17   How do we know this is happening?  So we had to go

18   back to the farms -- farmers, come up with a

19   document that they would then list how many birds

20   were left, how many they euthanized within 24 hours,

21   and it was in our farm documents book, and they

22   would do that.  So we did that globally.

23            So that's a kind of change, but the

24   majority of these changes don't even affect the

25   farmer because it's with our hatcheries, our live

Page 46

```
 1   haul, our plants, our feed mills, so all of our --
 2   so there's only a few sections in here, as you know,
 3   that affect the farmer.  But that was an example of
 4   a change that USDA and the auditors questioned on us
 5   that then rolled back to the farmer, so we had to
 6   implement that.
 7   BY MR. KLORFEIN:
 8        Q    Got you.
 9             So some of the changes that were
10   implemented in the PVP would trickle down to the
11   farmer?
12        A    Correct.
13        Q    And some of those could be, Hey, you're
14   doing this already, but we need to verify, so fill
15   this verification page out, or something along those
16   lines?
17        A    That's what I just explained, yes.
18        Q    I just want to make sure that I'm
19   understanding what you're saying correctly.
20        A    Yeah.  No, no, that's fine.
21        Q    I think you referenced three different
22   changes:  NCC, USDA, and there could be a third
23   reason?
24        A    Could be us.  We -- we changed our policy.
25   We decided that we wanted to -- or our -- and
```

Page 47

```
 1    generally most of those are going to end up being in

 2    our plants, we wanted to check something

 3    differently.  We found out that through our regional

 4    auditors that we really liked how the process was

 5    working at this location, we now want to put it in

 6    the whole manual, so we -- we would also be able to

 7    up anything --

 8         Q    Right --

 9         A    -- change.  They're the three.

10         Q    And sticking with that third category of

11    material, those changes could also impact the

12    growers?

13         A    They could.  I don't have a good -- one

14    example for that, we started doing free range --

15    this does not affect Perry, Georgia, okay.  So in an

16    operation that we -- we started marketing birds as

17    free range, means we let them outside.  We had doors

18    in the house, and they could go out into the

19    pasture.

20              We felt it was important to audit that

21    process, so we added that process to here, and we

22    had third-party auditors, customers that wanted to

23    be sure it was happening.  So there's some general

24    standards of how it should work.  We wrote that in,

25    and then the farmers had to document when the birds
```

30(b)(6) Michael Levengood                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 57

1    had "perimeter buffer area" added to the end.

2    Remember we didn't know about that.  So I have a

3    sense that one was adjusted.

4            And then birds nesting was something that

5    was also discovered that if you have birds nesting

6    in your eaves, you're going to increase your chances

7    of high-path.

8            So those are the ones just reading it,

9    knowing my history of the company, that pop off the

10   page, but I could be missing something because I

11   don't have the original one in front of me.

12       Q    Got you.

13            There could be more changes?

14       A    Yeah, but nothing -- nothing here -- you

15   know, these are -- remember what we talked about,

16   these are cultural, these are things that as a

17   farmer you should just think about, these are

18   recommendations.  You know, if you -- these are like

19   your insurance policy, if you never ever do this,

20   and you're dedicated to do these things, you have a

21   better chance of not getting high-path.  That is

22   what this means.

23       Q    These BMPs are posted at every single

24   farm, right?

25       A    Correct, as a reminder, as saying, Listen,

30(b)(6) Michael Levengood                        April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 58

1    if you never ever, and you're dedicated to these,

2    you have a better chance of not getting high-path

3    than somebody that does some of these.

4         Q    It's required to post this in every

5    grower's farm, right?

6         A    And it's also because it's part of the

7    14-step process that we talked about, and when the

8    state comes in and audits the farm so the farm could

9    be indemnified if they got high-path, you've got to

10   have these biosecurity things posted.

11        Q    That's why it's required?

12        A    That's why it's required.

13        Q    And it was required to post these

14   throughout the 2012 through 2019 time period?

15        A    Yes.  I'm going to say yes because we've

16   always posted the Dedicated Tos and Never Evers, so

17   yes, I'm -- yes.

18        Q    But you're not -- are you certain or not

19   certain?

20        A    I'm 90 percent certain.

21        Q    And you haven't looked at the prior

22   version, so you can't line by line tell me --

23        A    I only looked at the very first version,

24   and it's not in front of me, so I -- that's why I'm

25   just saying based on my knowledge I believe I've got

Page 59

1    most of it, but if there was a word that was -- we

2    adjusted a word here or there, I -- and I have no

3    recollection of version 2 through 5.  I'd have to

4    see them.

5         Q    And did Perdue change its policies in

6    response to the H7N9 outbreak in 2017?

7              MS. SANTEN:  Objection, vague.

8         A    I'm just thinking.  Did we change our --

9    our policies on what?

10   BY MR. KLORFEIN:

11        Q    Well, did Perdue -- was there an H7N9

12   outbreak in the United States in 2017, let's start

13   there?

14        A    I can't remember the -- if there was, I'm

15   not -- I don't know the actual date.  Like I said, I

16   remember there was a -- one in '14, and there was

17   one that could have been '17 or '18 was the latest

18   one.  There's another one currently going on, so I

19   don't know the exact -- I can't remember the exact

20   date.

21             So what policies are you wondering that we

22   would have changed?

23        Q    Okay.  Well, in response to an outbreak,

24   be it 2014 or 2018, does Perdue pop the hood and

25   look at its policies?

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 60

1           MS. SANTEN:  Objection, vague.

2       A   We always are looking at our

3   recommendations for biosecurity.  We learn all the

4   time.  The government is helping us all the time

5   learn how not -- how to prevent high-path from

6   getting in a house.

7           So we -- we continue to coach our farmers

8   to, you know, do a better job with the Never Evers

9   and Dedicated Tos, to also look at our level 1,

10  level 2, level 3 biosecurity processes that we have

11  out there, programs that we have out there, but I

12  cannot recall that we did anything special other

13  than remind farmers that high-path is in the area.

14          We do that all the time.  High-path is in

15  the area; make sure you're -- make sure you're

16  concentrating on your biosecurity.  That's generally

17  what we do.  We'll send them letters; we'll have the

18  flock supervisors talk to them, just remind them

19  high-path is in the area.

20          Because they know what to do.  It's their

21  farm.  They're controlling who goes in and out of

22  their house all through the week, 24 hours a day, 7

23  days a week.  So, you know, we are just reminding

24  them that, You've got to be the one protecting the

25  walls of your chicken house.  That's the LOS.

Page 61

1    You've got to do that.

2              And I think over the last 10 years,

3    farmers are starting to realize they have -- they

4    have to monitor that.  They just can't call up the

5    equipment company and say, Come fix a motor.  They

6    should be standing down there making sure the guy

7    that's fixing the motor followed their biosecurity

8    process.

9    BY MR. KLORFEIN:

10        Q    Got you.

11             So sitting here today, you can't tell me

12   what policy changes, if any, were made in response

13   to that 2017 outbreak?

14        A    You would have to give me the policies

15   that you've uncovered or show me them, and I could

16   say, Yes, they're the ones.

17             But on top of it we just asked farmers,

18   since this is -- every -- as all these outbreaks are

19   going and we learn more, it's why we adjusted the

20   Never Ever, Dedicated Tos; we may not -- we didn't

21   know about the LOS; we didn't know about the PVA,

22   the government told us that.

23             And then they told us other things that

24   you've got to implement like a farm action plan, and

25   it has to be on the farm, and we have learned a lot

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 76

1    helping how to identify and help that farmer with

2    their issue.

3          Q    And, again, for the 2012 to 2019 time

4    period, if Perdue wants more people to send over to

5    the farmer besides the grow-out manager and the

6    flock advisor, who would be the next step?

7                MS. SANTEN:  Objection, outside the scope.

8          A    It would just move up the chain.  If the

9    grow-out manager felt like there was -- they

10   would -- they would bring the live production

11   manager out because they also should possess a lot

12   more knowledge of, you know -- they have other

13   knowledge; they have other experiences that they

14   could help with the situation.

15   BY MR. KLORFEIN:

16         Q    And has the role of a live production

17   manager shifted from the period 2012 through 2019 to

18   later?

19         A    Generally, no.

20         Q    Nothing comes to mind?

21         A    Nothing comes to mind.

22         Q    Now, you, in your prior deposition, talked

23   about how compensation was calculated for growers.

24              Do you recall that testimony?

25         A    Yes.

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 77

1          Q     Was that consistent in the 2012 through

2     2019 time period?

3          A     Generally, yes, nothing has changed other

4     than -- the only thing that could have changed

5     through that time is your payment schedules.  They

6     continually change all the time, and they would sign

7     a new contract for that.  So during that time I'm

8     sure there was some changes to the payment schedule,

9     and there may have been some additional things added

10    to the payment schedule during that time, yes.  So,

11    yes, there -- but it would all be spelled out in the

12    payment schedule.

13         Q     Got you.

14               So aside from the payment schedule

15    changes, was the tournament system largely the same?

16         A     Yes.

17         Q     And that was the means by Perdue

18    calculating compensation for plaintiff in this

19    matter?

20         A     Yes.

21         Q     Any deviations that you're aware of?

22         A     Other than changes in the -- there were

23    some things added to the payment schedules during

24    that time, but they were additions or pay increases.

25    Could have been.  They're the things.

Page 80

1    in each contract, each payment schedule each week,

2    and we had to -- we had to find farmers that we will

3    place those.  Generally they stay on the same one,

4    but that's not -- but that's not necessary in

5    Georgia when you're running two contracts or three

6    or whatever they were running during that time.

7    BY MR. KLORFEIN:

8         Q    And when calculating pay generally, Perdue

9    compares different growers' flocks against one

10   another; is that accurate?

11        A    You got to be a little more specific in

12   how you ask me that.

13        Q    Sure.

14             Several growers in the Perry Complex have

15   flocks in the same time period.  The weight of those

16   birds, are those compared one to another?

17        A    So per the payment schedule is anybody

18   from -- that settles from 12 midnight on Saturday to

19   12 midnight the following Saturday, they're

20   considered the settlement week, and that's who is

21   compared.  They're compared against -- you strike an

22   average, and then you compare everybody to the

23   average, and then the payment schedule is followed.

24        Q    Does Perdue have data as to the average

25   summit week, week to week?

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 81

1              MS. SANTEN:  Objection, vague.

2        A    I don't know what -- ask me again.

3    BY MR. KLORFEIN:

4        Q    Sure.

5              You referred to -- that the cutoff time

6    period is a summit week.  Is that accurate?

7        A    Yes.  Settlement week.

8        Q    Settlement week.  I'm sorry.  The

9    settlement week average is taken.

10       A    Correct.

11       Q    Of the weight of the birds.

12       A    Of the cost of the birds.

13       Q    Cost.

14       A    It's the cost.  There's your cost.

15       Q    And does Perdue track the average cost

16   week to week for each settlement week?

17             MS. SANTEN:  Object to form.

18       A    Yeah, of course we know what the cost was

19   this week and the week prior.

20   BY MR. KLORFEIN:

21       Q    And were you able to calculate in

22   preparation for today's deposition the average

23   payment to growers for Perry week to week?

24             MS. SANTEN:  Objection, outside the scope.

25       A    No, I didn't look at that locally.

30(b)(6) Michael Levengood                         April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 82

 1    It's -- you can look at the payment schedule and
 2    figure it out, but I -- I didn't go figure out the
 3    average cost per week.
 4    BY MR. KLORFEIN:
 5         Q    And could farmers receive certain bonuses
 6    for their work?
 7         A    Yes.
 8         Q    A PVP bonus being one of them?
 9         A    Yeah, audit readiness bonus.  That's
10    another way, it's audit -- yes, PVP, sorry.
11         Q    And just so I'm understanding, do you
12    equate the PVP bonus with the same thing as the
13    audit readiness bonus?
14         A    Yes.
15         Q    Aside from the audit readiness bonus, any
16    other bonuses that growers receive?
17              MS. SANTEN:  Object to form.
18         A    So there was the rest pay and space pay
19    were added as -- and there was also the tier
20    payments.  So depending on what -- if your houses
21    met the tier levels, you would get additional pay.
22    BY MR. KLORFEIN:
23         Q    Well, I want to talk about both those
24    types, the rest pay and space pay I think you said
25    first?

Page 84

```
 1    looked like it was, if I'm remembering the dates --
 2    if I had the PPAs in front of me, I could show you
 3    exactly.  Do you have them?
 4         Q    Well, do you want to start with Exhibit 42
 5    in front of you?
 6              MS. SANTEN:  I think he said payment
 7    schedules.
 8         A    Payment schedules.
 9    BY MR. KLORFEIN:
10         Q    Okay.
11         A    If you have --
12         Q    You didn't say PPA?  I'm sorry, my
13    mess-up.
14         A    No.  No.  I might have.  But if you had
15    the payment schedules, I could show you exactly.  I
16    believe it was -- but I would rather look through
17    his and go, There it is, it was added, he signed the
18    contract there.  And the same for the rest pay, it
19    was added.  Same for the audit, you could look at
20    his payment schedules and see when it was added to
21    the PPA.  The -- the payment schedules, sorry.
22         Q    Appreciate the clarification.
23              Tier payments, that's if the grower
24    upgrades the farm to meet certain tiers; is that
25    accurate?
```

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 85

1        A    Yes.

2        Q    And who decides whether or not a farm is

3    eligible for moving up to a new tier?

4        A    So we have a list of requirements.  So

5    then it would be the -- the flock advisor and the

6    grow-out manager would be sure that they're meeting

7    those requirements, and then they would up their

8    tier.  The flock advisor would most likely be the

9    first person, but I'm sure there's verifications

10   after that.

11       Q    We just talked about bonuses.  I want to

12   talk about the flip side of that, withholdings or

13   deductions from a grower's pay.

14            Are you familiar with those?

15       A    Yes.

16       Q    Are you aware that payments were deducted

17   from plaintiff's pay?

18       A    No.

19            MS. SANTEN:  Objection, vague.

20       A    No.

21   BY MR. KLORFEIN:

22       Q    You're not aware of that?

23       A    No.  That's local.

24       Q    Got you.

25            But you are aware generally growers may

Page 86

1    have pay deducted from their settlement?

2              MS. SANTEN:   Object to form.

3        A    Yes.

4    BY MR. KLORFEIN:

5        Q    And what are the reasons why Perdue would

6    deduct pay from a grower's settlement?

7        A    There's -- over the years there's been

8    various -- they could -- they could be struggling,

9    and they needed -- they needed some money earlier to

10   pay electric bill, so we would front them the money

11   for their electric bill, and then when they settled,

12   we would take it out of their settlement.  So we

13   would help them with those.

14             Of course, all of their mortgage payments,

15   the banks require us to deduct their bank loan, so

16   that's pretty much a requirement from the banks, so

17   that comes out first.  We don't really have -- it's

18   not our deal, that's between the farmer and the

19   bank, and they sign that up.  We just do that, and I

20   think the banks require generally all of the

21   industry, they're going to get their money first, so

22   we do that.

23             And then we've got some no-interest loans,

24   and the no-interest loans would be the other ones.

25             And then the only other category that

Page 87

1    really strikes me is if we were going out with a new

2    program that's cost sharing, that we would, you know

3    -- we would put the equipment in or they would put

4    their equipment in their house, and then they would

5    owe us X amount of money over X number of flocks.

6    They, you know -- either it was cost-free or there

7    was some cost-share program that we rolled out

8    across all farmers.

9             So generally those programs are -- some

10   are -- some are local, but most of them are across

11   the board.

12       Q    Sticking with that last example first, the

13   cost sharing program, what type of equipment would

14   be subject to that?

15       A    It could be -- it could be that we were

16   able to go purchase fans at a -- at a decreased rate

17   because we could buy five truckloads of them, and

18   then the farmers could say, Yeah, I need three fans

19   thanks for getting it lower price.  We send them the

20   fans and then deduct it.

21            We haven't done a lot of the cost share

22   ones in a long time, but when we went to tunnel

23   ventilation, that was way back for a time that we

24   set a program out that if you move to tunnel, we'll

25   pay you this much money.  So that -- those kind of

30(b)(6) Michael Levengood                      April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 88

1    things.

2         Q    And just so I understand you correctly,

3    you are talking -- that tunnel program was pre-2012?

4         A    Yes, sir.

5         Q    Were there any programs that were

6    implemented in the 2012 to 2019 period of new

7    equipment rolling out?

8              MS. SANTEN:  Objection, outside the scope.

9         A    I can't think of any.

10   BY MR. KLORFEIN:

11        Q    You also referenced mortgage payments

12   earlier in this answer?

13        A    Uh-huh.

14        Q    Perdue has a direct relationship with the

15   bank to pay that bank these mortgage payments from

16   the settlement?

17             MS. SANTEN:  Object to form.

18        A    No, the bank pretty much tells the

19   farmer -- it's between the bank and the farmer, and

20   then it's -- we're going to get a notice to say,

21   Since their -- you are their integrator, you need to

22   send us the check each time they settle.  We have

23   nothing to do with however the farmer and that bank

24   negotiate.

25   BY MR. KLORFEIN:

Page 89

```
 1        Q    Fair point, but that letter that you just
 2   described, the notice --
 3        A    Yeah, the notice.
 4        Q    -- that comes from the bank?
 5        A    Comes from the bank.  I -- honestly, I
 6   can't answer that.  I don't know whether it's the
 7   bank or the farmer sends it to us.  I just know that
 8   we get it, and then our accounting department has to
 9   be whatever -- whatever is in that notice.
10             So I can't -- I can't sit here and go that
11   it always comes from the farmer or it always comes
12   from the bank.  I just know that we've got to pull
13   it out and send it to whatever bank asks for it.
14        Q    Got it.
15             Has Perdue ever made mistakes in
16   determining a grower's pay?
17             MS. SANTEN:  Objection, outside the scope.
18        A    Absolutely we've -- you know, everybody is
19   human.  Everybody -- yeah, absolutely we've had
20   mistakes before.
21   BY MR. KLORFEIN:
22        Q    What kind of mistakes are you familiar
23   with?
24             MS. SANTEN:  Same objection, outside the
25   scope of topics.
```

30(b)(6) Michael Levengood                           April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 91

1          A      As far as I know, yes.

2          Q      And does Perdue have specific requirements

3     related to how their houses are set up and what

4     equipment they need to use regardless of tier, like,

5     even if they're in the lowest tier?

6          A      Be more specific in your question, please.

7          Q      Sure.

8                 So how many tiers are there?

9          A      There's four tiers.  I think the 0 tier is

10    gone now, so just 1 through 4.

11         Q      Got you.

12                So at the lowest tier, are there still

13    requirements as to what needs to be in the grow

14    houses?

15         A      It would be spelled out in the tier

16    document.

17         Q      Any other sources for that information

18    besides the tier document?

19         A      No.  I think if you're talking about how

20    you determine which tier they're in, it's going to

21    be in there.

22         Q      And can a grower work for multiple

23    integrators at the same time, Perdue and another

24    integrator?

25         A      Be more specific in your question.

30(b)(6) Michael Levengood                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 92

1      Q     Sure.

2            So can a grower grow for Perdue and then

3      after that flock is gone decide to grow for one of

4      your competitors?

5      A     So that means he would go to this contract

6      and give us a 90-day notice that he's quitting based

7      on the contract, and most likely we allow people

8      just to -- they don't want to be with us, so we

9      would just allow them to go grow for that company.

10     Q     After the contract is terminated, correct?

11     A     After the birds move out of the house

12     because generally that's when they're going to tell

13     us.

14     Q     Right, but you won't let them grow until

15     the contract is terminated, right?

16     A     You're going to have to ask that again.

17     Q     Sure.

18           A farmer grows for Perdue --

19     A     Right.

20     Q     -- Perdue does not let that farmer grow

21     for one of Perdue's competitors until that agreement

22     with Perdue has been terminated?

23           MS. SANTEN:  Objection, outside the scope.

24     A     No, you're not asking the question right,

25     no.  That makes -- it's all about when birds are in

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 93

1    the house.

2    BY MR. KLORFEIN:

3        Q    Got you.

4             So the PPA can still be in place, not

5    terminated, and a grower that has a contract with

6    Perdue is permitted to then grow for one of your

7    competitors?

8        A    And the minute he would go -- he's

9    obligated by the government to give us 90-day notice

10   that he signed another contract.

11            So if a grower had birds with us, he moved

12   birds today, but tomorrow he's going to sign a

13   contract with a competitor, he would call us and

14   give us his 90-day notice.  And generally we're

15   fine, Go grow with the other -- go grow with the

16   other company because you don't want to be with us,

17   we're not putting birds back in your house during

18   that 90-day period because you left us.

19       Q    Got you.

20            So Perdue would permit that grower to grow

21   for the other competitor within that 90-day period?

22       A    Yes, because the contract would be

23   canceled when he signs the other one.

24       Q    Can a grower use the same grow house that

25   it uses for Perdue chickens for other animals?

Page 95

```
 1        Q    And I see you pointed to the bottom of the
 2   document?
 3        A    They're all listed on the bottom, the
 4   dates that they're effective.
 5        Q    Got it.
 6             (Plaintiff's Exhibit 45 was marked for
 7   identification.)
 8   BY MR. KLORFEIN:
 9        Q    I've marked Plaintiff's Exhibit 45, which
10   is Bates Perdue 1297.
11             Have you seen this document before?
12        A    No.
13        Q    Is this the type of document that you were
14   referring to earlier where Perdue might provide some
15   type of equipment or something to the grower and
16   then deduct that pay over time?
17             MS. SANTEN:   Object to form.
18        A    So this, this reading what it says,
19   Negotiable Demand Promissory Note-Minor, that title
20   lets me know that this is the note we used with
21   zero-cost loans.
22   BY MR. KLORFEIN:
23        Q    Got you.
24             And so this would be the zero-cost loan
25   that Perdue would use to deduct pay over time to pay
```

30(b)(6) Michael Levengood                           April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 96

```
 1   off --
 2        A    To pay off --
 3             MS. SANTEN:  Object to form.
 4        A    -- to pay off the loan -- to pay off the
 5   note.
 6   BY MR. KLORFEIN:
 7        Q    And that would be for equipment
 8   implemented at the house or something else?
 9        A    There is a list of what is considered
10   minor and major, and the live production group
11   manages that, and they decide what's on the list and
12   what's off.  And then the farmer would say, Hey, I
13   need -- according to this one, I need cool cell
14   pads.  So I'm sure it's on the list, so he was able
15   to borrow money to put cool cell pads in at no cost
16   versus going to the bank.  That's what it's there
17   for, to help the farmer.
18        Q    Got you.
19             And you said that there's a list for no
20   cost, and then there's a list for --
21        A    No, no, there's a minor and major.  Like,
22   minor is less than 5,000 per house.  I don't know
23   off the top of my head what the -- what is for a
24   major.  It's more than 5-, but the loans have
25   different requirements of -- like, you can see the
```

Page 97

1    different size birds, how many flocks to pay it

2    back, all that is spelled out.  So he's a smaller

3    guy, so he would pay this 5,000 back over seven

4    flocks.

5         Q    And regardless of whether or not it's

6    minor or major, is this generally equipment for the

7    houses or something else?

8         A    Generally.

9         Q    Anything else besides equipment?

10        A    I -- I think it's all equipment.

11        Q    Are you familiar with the term "harvest

12   delivery ticket"?

13        A    It's used -- harvest delivery ticket.  I

14   have not heard that terminology before.

15        Q    What about "live haul ticket"?

16        A    Oh, yeah, I've heard that, yes.  If

17   they're the same thing -- it could be a local -- way

18   they call it locally, but live haul ticket is what

19   I'm more -- to my opinion, they mean the same.

20        Q    And let's just use your definition for a

21   moment of live haul tickets, how are those used in

22   calculating compensation for growers?

23        A    Weight.  Farm weight.

24        Q    So the live haul tickets measure the

25   weight at what point in time?

Page 99

```
 1    of what -- how much weight has been added to the

 2    truck?

 3          A    Yeah, how -- well, no, that is determined

 4    what the birds -- pounds of birds come into the

 5    plant.

 6          Q    And do those -- the live haul tickets have

 7    trailer numbers on them?

 8          A    Yes.  Some -- I'm going to say yes, but

 9    they could have a -- they could just have a ticket

10    number.  It could -- there's local differences, but

11    we know it's with that truck because the truck and

12    trailer go -- are sent to that farm by live haul,

13    scheduled to come back to the plant, so it's very

14    important that that process is we get a true weight

15    for that farm.

16          Q    And I think you said that there might

17    be -- it might not be a trailer number, but it's

18    some identifying number for --

19          A    Yes.

20          Q    -- the ticket --

21          A    Yes.

22          Q    -- is that accurate?

23          A    Yes.  For that farm.  And there will be

24    multiple tickets, not one.

25          Q    And it breaks down -- why are there
```

Page 100

1    multiple tickets for one farm?

2          A    So if a farm had 20,000 birds on it, you

3    can only put about 5,000 birds on the truck.  You

4    got to meet the state requirements of weight going

5    up and down the road; you got to make sure the

6    animal welfare is consistent on the truck, we're not

7    smothering birds on -- there's a lot of reasons.  So

8    you need multiple trucks to move all the birds to

9    the plant.

10          Q    Got it.

11               And one ticket per truck?

12          A    And one ticket per truck.

13          Q    And what if the ticket number doesn't

14    match when it gets back to the plant?

15          A    That would be a problem.

16          Q    Have you encountered that before?

17          A    There's been issues over the time where

18    something doesn't look right or something went

19    wrong, yeah.

20          Q    And what does Perdue do at that point?

21          A    It depends on the scenario, but generally

22    we're going to investigate, and we're going to

23    ensure that the farmer gets the right weight if

24    possible.  If we can't, we'll work something out

25    with the farmer.  We might pay them their six flock.

Page 101

1    We might do something to say, Listen, we -- we can't

2    figure it out, but it doesn't feel right, so we're

3    going to pay you your six flock or we'll make it

4    right.

5              Because -- but, you know, we're talking

6    thousands and thousands and thousands of trucks over

7    time, you know, there could be a -- this one

8    instance happened somewhere.  So we've got a

9    longstanding relationship with the independent

10   contractor, we're going to make it -- we're going to

11   try to do the right thing.

12        Q    And when you say "six flock," you mean the

13   average weight over the course of six flocks?

14        A    So you've got a -- six flock average is

15   cost.  Six flock average is what their APC, adjusted

16   prime cost, is, and that six flock is -- so that

17   means I've been a half a cent plus grower over the

18   last six flocks, this flock came to the plant, maybe

19   it was worse than average, and we felt like this

20   ticket was a problem.

21             And if it was brought to our attention,

22   and we look at it and go, Well, you're normally a

23   half cent plus grower, and we'll just pay you for

24   your six flock because that -- this is not normal

25   for you to have a bad cost, and we've got this

Page 102

1    issue, so that's how we would look at that.

2              MR. KLORFEIN:  Why don't we go off the

3    record.

4              THE VIDEOGRAPHER:  Stand by.  The time is

5    11:12 a.m.  We are off video record.

6              (Recess 11:12-11:12 a.m.)

7              THE VIDEOGRAPHER:  The time is 11:12 a.m.

8    We are back on video record.

9    BY MR. KLORFEIN:

10       Q    Mr. Levengood, subject to needing to

11   revisit any testimony after Mr. Copeland testifies,

12   I think I'm done for today.  With that reservation I

13   am turning you over to your counsel.

14       A    Thank you, Jarred.

15                   CROSS-EXAMINATION

16   BY MS. SANTEN:

17       Q    Mr. Levengood, I have just a few follow-up

18   questions.

19              We had -- pull up what we've marked as

20   Exhibit 3, what opposing counsel marked as

21   Exhibit 3.  It's the PVP, or Poultry Care Process

22   Verified Program.

23              We discussed earlier certain documents

24   that you reviewed in preparation for your testimony.

25   Did you, in fact, review this document in

Page 103

1    preparation for your testimony today?

2        A    Yes.  When Jarred asked me that question,

3    it was the fact that we just looked at the dates

4    that -- it was all documented in here, so I just

5    kind of misunderstood.  We -- we talked about all

6    the changes between '12 and '19 here, and the answer

7    was yes, and that's -- so this covered that time

8    frame.  So we did look at it yesterday, but it was

9    just the changes.

10       Q    And pull up, if you would, the document

11   marked as Exhibit 43, and that's the Poultry

12   Producer Agreement dated December 16th, 2016,

13   between Mr. Parker and Perdue that governed the

14   Milledgeville, Georgia farm.

15           We had discussed earlier paragraph 3A and

16   various ways that the producer can perform services

17   using skill, knowledge, and discretion.  You

18   mentioned several types of discretion that growers

19   might have when performing services under the

20   agreement.

21           Are there any other types of discretion

22   that we didn't discuss that you believe growers have

23   when determining how to perform services under the

24   agreement?

25       A    Yes.  I was -- I got really focused on the

Page 104

1    day-to-day stuff, and so as we're working -- you

2    know, these guys are -- have the ability to buy a

3    farm; they have the ability to add a house -- buy --

4    add a new house; they have the ability to own other

5    businesses; they have the ability to upgrade their

6    houses if they want above any basic minimal --

7    minimum requirements we have or minimal standards

8    that we have for housing.  So they have that ability

9    that if they saw something, you know, in a magazine

10   that they thought would be -- give them a

11   competitive advantage and they want to add it, we

12   have no issue with that.

13           They have the ability to go to the bank

14   and work with the bank on lending and future loans.

15   That's all their discretion to do that.  As long as

16   they're solvent, we're -- we're fine with how they

17   run their business.

18           So -- so there were some of the, you know,

19   we're fine if they -- and I think I did mention this

20   one, if they diversify, you know what I mean?

21           You asked me a question about, Can they

22   have other animals in their poultry house?  Well,

23   the answer I said was no, but they could have other

24   animals -- they could have swine on their farm.

25   It's a whole different company, a whole different

Page 105

1   species.  So they could run a swine operation and a

2   poultry operation on the same -- that's their

3   discretion on how they want to diversify their

4   business.

5             So I just wanted to add that because I

6   felt like I spent a lot of time on how we would --

7   we would bring them into the process, not exactly

8   what they had -- what their discretions would be of

9   how they could make decisions about their business,

10  so I wanted to clarify.

11       Q    Can growers determine whether to hire

12  employees to perform work for them on the farm?

13       A    Yes.  If they decide to hire somebody,

14  that's completely their discretion.  We don't -- we

15  will train them on biosecurity, but it's their

16  discretion on who they hire.  And we have farmers

17  that buy farms and hire somebody and we don't even

18  see the owner because they've hired somebody to run

19  the farm.  That's completely their discretion.

20  We're fine with that.

21       Q    We had discussed bank loans.  Does Perdue

22  require growers to take loans or mortgages from any

23  particular financial institution?

24       A    No, it's completely their discretion who

25  they work with.

Page 106

1          You know, generally the banks in a growing

2     area like Perry are familiar with the integrated

3     system.  So it's really whoever the farmer wants to

4     get their loan with.  We don't.

5          Q    And how do growers determine what hours

6     they're going to work each day?

7          A    It's completely their discretion.  You

8     know, we -- we -- to me that's their biggest

9     discretion.  They can decide what time they pick the

10    mortality up; they can decide what time of day

11    they -- they walk through the houses and how many

12    times they walk through the houses.

13          Like we did talk about, they have the

14    discretion that are targets on how to manage the

15    bird; they have the discretion to, as you and I

16    discussed, Jarred, of the flexibility based on the

17    birds because they are -- they're looking at the

18    birds, they see the birds, and they go, Man, they're

19    just hot today.  I'm going to run the temperature

20    lower.

21          So they have all that discretion in the

22    targets, the ventilation, all those basic -- if we

23    say, Let's run some preventive medication on a farm,

24    that we -- that this will be good for them, they

25    have the discretion when they start it.  You know,

30(b)(6) Michael Levengood                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 107

1    we might drop it off, but they have the discretion

2    when to start it.

3              So they have all those decisions to fit

4    their work schedule.  We really don't tell them how

5    to operate their work schedule at all.

6         Q    And final question, we talked about some

7    deductions from pay.  Are those kind of deductions

8    from the grower settlement, is that what we were

9    referring to there?

10        A    Yes.

11        Q    One such deduction was for a mortgage.

12   Could that include a mortgage for a house that a

13   grower actually lives on?

14        A    I am going to be pretty sure that, no, we

15   would not be deducting for a house mortgage, but I'm

16   not a hundred percent sure if the chicken houses and

17   a trailer were put on a farm and it was all rolled

18   up into it, I would have to go and research every

19   one.  But we're -- we're -- majority of the time the

20   banks are just sending us the note that we've got to

21   pull out, so how they work that out with the bank is

22   up to them.

23             But if they had a loan with -- I put it to

24   you this way, if they had a poultry facility growing

25   with us, and they decided they wanted to go buy a

30(b)(6) Michael Levengood                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 114

1  Michael Levengood c/o

   Maggie Santen, Esq.

2

3                                    May 8, 2025

4  RE: Parker, Roger v. Perdue Foods, LLC

5      4/29/2025, 30(b)(6) Michael Levengood (#7341899)

6      The above-referenced transcript is available for

7  review.

8      Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10 any changes, the witness should note those with the

11 reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13 Deponent and Errata and return to the deposing attorney.

14 Copies should be sent to all counsel, and to Veritext at

15 litsup-ga@veritext.com

16     Return completed errata within 30 days from

17 receipt of testimony.

18     If the witness fails to do so within the time

19 allotted, the transcript may be used as if signed.

20

21

22              Yours,

23              Veritext Legal Solutions

24

25

30(b)(6) Michael Levengood                         April 29, 2025
Parker, Roger v. Perdue Foods, LLC

```
                                                    Page 115

 1    Parker, Roger v. Perdue Foods, LLC

 2    30(b)(6) Michael Levengood (#7341899)

 3                    E R R A T A   S H E E T

 4    PAGE___90___ LINE___24___ CHANGE_____

 5     "Yes" to "Yes, when they are growing for us."_____

 6    REASON____Clarification_____

 7    PAGE__94___ LINE__1____ CHANGE__"No, it's in the contract" to "No, not

 8     when they are growing for Perdue.  It's in the contract"_____

 9    REASON____Clarification_____

10    PAGE_110___ LINE__3____ CHANGE_"180 days" to "90 days"._____

11    _____

12    REASON____Clarification_____

13    PAGE_110___ LINE__4____ CHANGE__"180 days " to "90 days"._____

14    _____

15    REASON____Clarification_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____          6/3/2025
                                          _____

24    30(b)(6) Michael Levengood                    Date

25
```

Page 116

1    Parker, Roger v. Perdue Foods, LLC

2    30(b)(6) Michael Levengood (#7341899)

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, 30(b)(6) Michael Levengood, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____          6/3/2025
                                              _____

12   30(b)(6) Michael Levengood                          Date

13   *If notary is required

14                          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   ____3rd____ DAY OF _____June_____, 20__25__.

16

17                  _Michele N Scott_

18   _____

19   NOTARY PUBLIC

20   My Commission Expires:  January 22, 2029

21

22                          STATE
                            OF
23                          TENNESSEE
                            NOTARY
                            PUBLIC
         MICHELE N SCOTT
24   Notarial Act Pe                  ual communication
         COUNTY OF DAVIDSON

25