# **EXHIBIT E**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF GEORGIA
2                     MACON DIVISION

3

4    ROGER PARKER on his own
     behalf and on behalf of
5    all others similarly
     situated,                    CIVIL ACTION FILE
6
              Plaintiffs,     NO. 5:22-cv-00268-TES
7
     vs.
8
     PERDUE FOODS, LLC,
9
              Defendants.
10
11        VIDEO 30(b)(6) DEPOSITION OF
12            PERDUE FOODS, LLC
13         MICHAEL KEITH LEVINGOOD
14
15          November 14, 2023
16             9:02 a.m.
17
18            Suite 4800
         191 Peachtree Street, N.E.
19            Atlanta, Georgia
20
21      Tracy A. Warner, B-2168, RPR
22
         David Ramirez, Videographer
23
24
25

Page 21

1    time.

2        Q.    And I appreciate that answer, and I would

3    like to talk about those attachments.  But before we

4    get to the attachments, this agreement itself, which

5    ranges 1627 -- and please take a look through --

6        A.    It generally -- we don't change this very

7    often.

8        Q.    And I appreciate that answer.  I just --

9    can I get my question out first?  I know I paused.

10   But 1627 through 1639, before you get to the

11   attachments, this agreement is the same agreement

12   that y'all have been using -- that Perdue has been

13   using from June 2016 to the present?

14       A.    To the best of my knowledge, yes.

15       Q.    I appreciate that.  But as Perdue's

16   corporate representative regarding this contract, is

17   this the agreement that Perdue has used from June

18   2016 to the present?

19       A.    Yes.

20       Q.    And you referenced attachments changing

21   frequently.  How frequently would attachments change?

22       A.    They can change all the time.  They're the

23   pay schedules, and there's multiple pay schedules for

24   every location based on multiple factors:  bird

25   weight, bird age.  So they're all tied to the plant,

Page 22

1    the harvest plant, that the farmers are growing for.

2         Q.    Got it.  So all growers, with the

3    exception of Draper Valley and Pendulum Poultry,

4    would agree to this agreement but perhaps have

5    different attachments attached to it?

6         A.    They would have to have different

7    attachments to it.

8         Q.    And aside from pay schedules tied to

9    specific plants, are there any other attachments that

10   they would be signing on to?

11        A.    Yes, could be a new house agreement.

12        Q.    Anything else?

13        A.    It's -- yeah, these attachments would --

14   could have a difference in fuel payments.  We pay for

15   fuel; we don't pay for fuel.  They -- there's tiers

16   in there that they pay differently in different

17   locations, tier payments.  There -- some have audit

18   readiness bonuses on them.

19             So there's multiple more of those, if you

20   want me to keep adding them.  There's enrichment

21   payments in one.  There's loyalty bonus in a couple.

22   There's some performance bonuses in them.  They're

23   also -- some of them are flat rate.  Some of them are

24   competitive rate.  So all those are in -- that's how

25   the farmer is paid, and all those are attachments to

Case 5:22-cv-00268-TES    Document 118-8    Filed 07/14/25    Page 5 of 42
30(b)(6) Michael Keith Levingood            November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 26

1    within 2019, like an earlier agreement that was

2    still --

3         A.    Say that again.

4         Q.    Sure.  Are there any earlier agreements

5    with growers --

6         A.    Earlier when?

7         Q.    Pre-2016.

8         A.    I would need to see them.

9         Q.    Let me just finish my question.

10              Are there any earlier agreements pre-2016

11   that would have still been enforced in 2019?

12        A.    No.  This is the new agreement.

13        Q.    Right.  But did all growers re-sign in

14   June 2016 if they had an earlier agreement?

15        A.    Yes.

16        Q.    And this agreement, the one that's in

17   front of you, the June 2016, the present agreement,

18   growers who receive a variety of different types of

19   flocks would still be operating under this agreement?

20              MS. SANTEN:  Objection, vague.

21              THE WITNESS:  Everybody signs this

22        agreement, okay?  And then everybody signs an

23        attachment which is part of this agreement on

24        what they're going to get paid.  So what changes

25        is the payment agreements can change all the

Page 27

```
 1        time.  This is still in place since 2016.
 2   BY MR. KLORFEIN:
 3        Q.    Got it.  So large broilers, small
 4   broilers, they're all under that agreement, plus the
 5   attachment?
 6        A.    All 1300 farmers are under this agreement.
 7              (Plaintiffs' Exhibit 3 was marked for
 8              identification.)
 9   BY MR. KLORFEIN:
10        Q.    It will take a moment to get on your
11   screen, but if you wouldn't mind refreshing, I have
12   marked Plaintiffs' Exhibit 3, which is Perdue 3458
13   through 3657.  Do you see it on your screen?
14        A.    No.  I see the document, but I don't see
15   that number -- oh --
16        Q.    The first page does not have the Bates
17   stamp on it, but if you turn to the second page --
18        A.    You didn't -- you didn't ask that.
19              MS. SANTEN:  Counsel, this document, you
20         have to scroll left and right and up and down to
21         see.  I'll leave to it the witness, but it's
22         difficult for me to follow electronically.
23         Could we possibly get paper copies of this one
24         to review?
25              MR. KLORFEIN:  If you want to go off the
```

30(b)(6) Michael Keith Levingood          November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 29

1    BY MR. KLORFEIN:

2        Q.    If you would refresh your screen, you

3    should see Plaintiffs' Exhibit 4.  It's a 12-page

4    document.  And it ranges from Perdue 1580 through

5    1591.  Once you've got it in front of you and you've

6    had a chance to look at it, let me know.

7              And my first question will be:  Do you

8    recognize this document?

9        A.    I recognize, yes.

10       Q.    What is it?

11       A.    So this is biosecurity, the never-evers

12   and dedicated-tos.  We also have the

13   government-specified line of separation and the

14   government-specified perimeter buffer area defined as

15   the government defines it.  We have biosecurity

16   footbaths that are used on the farm before entering

17   the line of separation, and then we also have the

18   broiler producer biosecurity Level 1, 2, and 3, which

19   are best management practices for our farmers, our

20   producers, to protect their birds.

21       Q.    We'll go through a couple of these one by

22   one, but one of the things that you said was that

23   there was a government-imposed kind of regulation.

24   Is that Bates 1581, that second page?

25             MS. SANTEN:  Objection, vague.

Page 30

1              THE WITNESS:  What's Bates?

2    BY MR. KLORFEIN:

3         Q.    So when I refer to Bates, the Bates

4    number, I'm referring to that document on the bottom

5    right-hand corner of each page.

6         A.    Oh, okay.

7         Q.    That's when they're produced.  It's just a

8    number that allows us to refer to the same page, even

9    if it didn't originally have that page number.

10        A.    Okay.

11        Q.    So when I say Bates 1581, that's the

12   second page of this document.

13        A.    Yes, the line of separation and perimeter

14   buffer area.

15        Q.    Yes.  And I think you referenced

16   government-imposed line of separation?

17        A.    Government -- yes.

18        Q.    And so is this page drafted by Perdue?

19        A.    We took that out of their documentation

20   and put it on our page.

21        Q.    And aside from this page, is the rest of

22   the document drafted by Perdue?

23        A.    Yes.

24        Q.    And let's go back to Bates stamp 1580,

25   that first page.

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 31

1        A.     Okay.

2        Q.     The never-evers and dedicated-tos.

3        A.     Uh-huh.

4        Q.     What are the never-evers?  What does that

5    mean?

6        A.     So this document -- I'll get good at it --

7    Bates 1580 -- how about that?  Does that make me look

8    better?

9        Q.     You're looking great.

10       A.     Okay.  So farmers -- they're their farms,

11   right?  We place our birds on their farms.  And

12   there's standard business BMPs on -- based on what we

13   learn from universities, based on what we learned

14   from veterinarians, are the best ways to protect our

15   birds -- protect the birds.

16            So if you look at -- this is more of a

17   cultural thing, that if farmers read this and they

18   implemented this into their daily practices and this

19   became their culture, we wouldn't even need the other

20   pages because this just says if you never, ever visit

21   a live bird market, you reduce the risk of bringing

22   disease back to your farm.  If you own poultry, you

23   shouldn't go to a live bird market.  That's really

24   all that says.  You shouldn't -- you spend time on a

25   live bird market and you have poultry on your farm,

Page 32

1   you are a greater risk than somebody who never goes

2   to a live bird market to make their birds sick.

3          And so you can just go through each one of

4   those, and it's really letting them know if you add

5   this to how you operate your farm, you -- most

6   likely, you're going to reduce -- you're going to

7   reduce your chances of getting sick.  It's like

8   you -- if you do a good job washing your hands, you

9   should reduce the way you get sick.

10      Q.    Great.  And everyone should wash their

11  hands.

12      A.    Exactly.  And the dedicated-tos are the

13  next step, the same, okay?  So if you're going to do

14  the never-evers, then the dedicated-tos, if somebody

15  visits your farm, you should know who is visiting

16  your farm.  You should have the visitors comply with

17  the biosecurity BMPs that you've implemented on your

18  farm and we've recommended, you should implement

19  those.  You're the one -- you're there 24 hours a

20  day.  We're not, because it's your business and your

21  farm.

22          So you just go through each one of those,

23  farm dedicated shoes.  You know, you go down to the

24  local supermarket and you're wearing your chicken

25  shoes, what are you picking up on your shoes and what

30(b)(6) Michael  Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 33

1    are you bringing back to the farm?  If you only have

2    farm-dedicated shoes, what's the -- you have less

3    risk of bringing something into the house.  So this

4    is more of how they operate.  And you can see we've

5    added the line of separation.  That's the laws of the

6    chicken house.  That's what that is.

7              The perimeter buffer area, years ago

8    before the USDA came out with this, we used to just

9    protect your farm from the road.  Well, a lot of

10   these farms are right next to their dwelling house.

11   They have visitors come.  They're not thinking about

12   it.  You know, they say, oh, I'm protecting from the

13   road.  But the visitor wants to visit the chicken

14   house and they don't do any of this.  So we drew a

15   farm around the -- we drew a line around the

16   production area.

17             The government says, define your

18   production area, your BP -- PBA, your perimeter

19   buffer area, label that.  So we have a picture of

20   that, and we have a line drawn.  So in their head, in

21   their minds when they cross, they go, oh, I'm in the

22   PBA.  Never-evers, dedicated-tos, am I doing -- is my

23   farm plan the best?  And it's their farm plan.  They

24   have to rate the farm plan.

25        Q.    That's right.  And in your answer, I think

Case 5:22-cv-00268-TES   Document 118-8   Filed 07/14/25   Page 12 of 42
30(b)(6) Michael Keith Levingood            November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 34

1   you used the term "BMP."  That's best management

2   practices?

3          A.    Yes.

4          Q.    And those are created by Perdue?

5                MS. SANTEN:  Objection, vague.

6                THE WITNESS:  We pulled them from a lot of

7          people that are experts and created our BMPs.

8   BY MR. KLORFEIN:

9          Q.    Gotcha.  So Perdue sourced the information

10  from an expert here, expert there, to create the

11  BMPs?

12         A.    The best BMPs.

13         Q.    The best BMPs.  And these -- are these

14  never-evers, for example, kind of, the top level

15  memorialization of the BMPs, or is it somewhere else?

16               MS. SANTEN:  Objection, vague.

17               THE WITNESS:  It's like I said earlier,

18         it's -- it's -- the farmer can read these, and

19         if the farmer adopts them as a cultural change

20         in their way they operate their farm, they're

21         going to lower their risks.

22  BY MR. KLORFEIN:

23         Q.    Gotcha.  And if a farmer completely

24  disregarded these never-evers and said, I'm not going

25  to comply with any of these, what would happen to

30(b)(6) Michael Keith Levingood                November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 35

1    that farmer?

2            MS. SANTEN:  Objection, calls for

3        speculation.

4    BY MR. KLORFEIN:

5        Q.    You can answer.

6        A.    We've never terminated anybody for not

7    following this.

8        Q.    You said "terminate."

9        A.    We've never dropped a farmer.  We -- you

10   know, we might suggest that you're doing things that

11   are going to increase the risk of your birds, which

12   could hurt your profitability.  But it's their farm.

13   You know, they're there 24 hours a day, 7 days a

14   week.  We're there 15 minutes in the house a week.

15   So all we can do is recommend.  They have to make

16   this part of their daily business.

17           So it's risk.  It's like buying insurance.

18   Some of them say, I'm not going to buy any insurance,

19   I'll take the risk.  They're taking the risk.  We

20   just said, if you do these, you have a better chance

21   to be more profitable.  That's all we said.

22       Q.    Got it.  But, again, if a -- and I said

23   "farmer."  But when I refer to "farmer," I --

24       A.    I gotcha.

25       Q.    And for the record, farmer equals --

30(b)(6) Michael Keith Levingood                November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 36

1        A.     I gotcha.

2        Q.     -- grower, right?

3        A.     Yes.

4        Q.     If a farmer or grower, again, after

5    Perdue's insistence disregards all of these

6    never-evers and said, I'm not going to comply with

7    them in any way, would Perdue cease sending flocks to

8    them?

9              MS. SANTEN:  Objection, calls for

10         speculation.

11              THE WITNESS:  My sense is probably not.

12   BY MR. KLORFEIN:

13       Q.     Perdue would continue to send flocks to a

14   farmer who completely disregards all of these

15   never-evers?

16              MS. SANTEN:  Same objection and outside

17         the scope.

18              THE WITNESS:  Yeah, because what would

19         happen is -- what would cause this to be

20         terminated, what would cause them to not grow

21         with us anymore, they get a flock sick.  They

22         get AI.  Now we see that they never did any of

23         the never-evers, maybe then.  But it's never

24         happened.  But --

25

Page 40

1          the record.  And to the extent it ever comes up,

2          whether this is testimony within his corporate

3          capacity or individual, we can handle it then.

4                MR. KLORFEIN:  I disagree, but I'll re-ask

5          my question.

6    BY MR. KLORFEIN:

7          Q.   So under the policies that we were just

8    referring to, does Perdue cease sending flocks to

9    farmers when they disregard the recommendations that

10   Perdue provides?

11               MS. SANTEN:  Objection, vague.

12               THE WITNESS:  Yeah, you need to be more

13         specific on what policies you're asking me

14         about.

15   BY MR. KLORFEIN:

16         Q.   So turning back to the document that we

17   are referring to -- this is Exhibit 4 -- I'm asking

18   about the never-evers right now.

19         A.   The never-evers, okay.  This is not a

20   policy.  This is a recommendation.  This is a BMP.

21   BMPs aren't policies.

22         Q.   And if farmers disregard these

23   recommendations --

24         A.   These BMPs, best management practices,

25   these recommendations -- go ahead.  I'm just trying

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 41

1    to make sure I understand.

2         Q.    Right.  In your previous answer, you

3    referred to BMPs as recommendations.  I'm asking:

4    These recommendations, if they are completely

5    disregarded, is there any impact on the grower?

6              MS. SANTEN:  Objection, vague.

7              THE WITNESS:  I don't know of any farm

8         that we've terminated because of not following

9         these.

10   BY MR. KLORFEIN:

11        Q.    And my question is slightly broader than

12   what your answer was.  I think you referred to the

13   term "terminated."  My question is broader than that.

14             If growers completely disregard these

15   never-evers, is there any impact on the grower?

16        A.    Oh, that's a different question.  If they

17   completely disregard these and their birds get sick,

18   they're going to lose money because they caused it.

19   That's their -- that's -- the farmer did that.  I had

20   nothing to do with that.

21        Q.    Will Perdue take any action?

22        A.    I don't need to.  They made less money.

23        Q.    Right.  But -- so it's your testimony that

24   Perdue will not take any action?

25        A.    We might tell the farmer, do you

Case 5:22-cv-00268-TES    Document 118-8    Filed 07/14/25    Page 17 of 42
30(b)(6) Michael Keith Levingood                November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 42

1   understand why your birds were sick?  You didn't

2   follow the BMPs.  You should have followed the BMPs.

3   Your birds might not have gotten sick.  That's why

4   your birds got sick.  You're not following the BMPs.

5        Q.    Will Perdue take any other action besides

6   explaining to the farmer why the birds got sick?

7             MS. SANTEN:  Objection, vague, and to the

8        extent specific instances like that fall outside

9        the scope.

10            You can respond in your individual

11       capacity.

12            THE WITNESS:  Okay.  No.  We'll keep

13       trying to coach them that they should -- they

14       should try to change their culture because their

15       culture of following the never-evers and

16       dedicated-tos are going to help them make more

17       profit.

18  BY MR. KLORFEIN:

19       Q.    These are posted in barns?

20       A.    Absolutely.

21       Q.    All growers have to post them in barns?

22       A.    Yes, in one house on the farm.

23       Q.    Got it.  So it might not be if there are

24  multiple houses on a farm, but just one at each farm?

25       A.    Yes.

Page 43

1      Q.    And all growers again -- well, maybe --

2   this isn't cutting out Draper Valley or Pendulum

3   Poultry.  I mean, all growers, this has to be posted

4   in all farms?

5      A.    Yes.

6      Q.    And these recommendations apply to all

7   growers?

8           MS. SANTEN:  Objection, vague.

9           THE WITNESS:  They're BMPs, and they are

10          there to help them understand if they want to

11          protect their birds, their profit, that they

12          should follow these.

13  BY MR. KLORFEIN:

14     Q.    But the BMPs apply to all growers?

15     A.    These BMPs also help them that if they got

16  high-path AI, it's part of the government 14-step

17  process that this stuff needs to be posted.  These

18  farms need to understand biosecurity if they want to

19  get indemnified by the government.

20          So we're also doing this to help them to

21  be sure that if they ever got high path, they can

22  give -- they're not going to lose their total

23  profitability.  They're going to be indemnified by

24  the government, so we're also trying to protect them.

25     Q.    And by protecting them, that applies to

Page 45

1    BY MR. KLORFEIN:

2        Q.    We've turned back to Plaintiff's

3    Exhibit 3.  We now have a paper copy right in front

4    of you, if you wouldn't mind taking a moment to

5    review it.

6            But, again, my first question is:  Do you

7    recognize the document?

8        A.    Yes.

9        Q.    What is it?

10       A.    It's the Poultry Care Process Verified

11   Program.  Want me to explain?

12       Q.    That would be very helpful, please.

13           THE VIDEOGRAPHER:  One moment, please.

14       Let me go off the record.

15           The time is 10:13 a.m.  We are off video

16       record.

17           (Off-the-record discussion.)

18           THE VIDEOGRAPHER:  The time is 10:14 a.m.

19       We are back on video record.

20   BY MR. KLORFEIN:

21       Q.    Right before we went off the record, I

22   believe you were about to explain what the Poultry

23   Care Process Verified Program was.

24       A.    Okay.  So the process verified program is

25   actually a USDA program.  So the best way I always

30(b)(6) Michael Keith Levingood          November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 46

1   explain it to people is if you go into a restaurant

2   and you see the health score in a restaurant, that's

3   USDA -- it's called AMS also -- they actually perform

4   those audits in a restaurant and give them a health

5   score, okay?

6           So those same auditors, that department,

7   if you give them an audit instrument and you say,

8   here's our -- for this one, our poultry care program,

9   they will then come and audit it.  And on their

10  website, they'll go, it's a process verified program

11  audited by USDA.  So this is a USDA third-party

12  audited animal care program for Perdue.

13      Q.    And rather than repeatedly referring to

14  the program, can I refer to it as PVP?  Is that how

15  you --

16      A.    That's how we actually say it, so you're

17  catching on.

18      Q.    So this PVP, you said you submit to -- I

19  think you said USDA?

20      A.    Yes.

21      Q.    And then they audit this PVP?

22      A.    Yes.

23      Q.    And sign it off and say, this is

24  audited -- and you can then say it's audited?

25      A.    Yes.  It's also PAACO-verified, which

Page 47

1  means that's a group that will -- it's not poultry.

2  I forget the actual name of it, but you can look at

3  it.  It's PAACO.  So they certify audits to mean it

4  actually meets industry animal care standards.  And

5  this was the very first one.  This is the very first

6  broiler process -- this was the very first poultry

7  care program that PAACO certified.

8      Q.    Gotcha.  And on that first page, it says

9  "Version 10/9/23"?

10     A.    Yes.

11     Q.    So previous versions were issued; is that

12 accurate?

13     A.    Yes.  If you turn to the first page, we

14 list all the times that there was adjustments to it.

15     Q.    That's on -- beginning Bates 3459?

16     A.    Yes, sir.  And it goes all the way back

17 to -- you can see that the -- if you go to

18 Bates 3460, the very first one was 3/1/11.  So that

19 was -- since then, all those line items are

20 adjustments to the program.

21     Q.    Understood.  So the PVP has been in place

22 in some form or fashion since March 1, 2011?

23     A.    Yes, sir.

24     Q.    And all the changes to the PVP are

25 memorialized in these notations?

Case 5:22-cv-00268-TES    Document 118-8    Filed 07/14/25    Page 22 of 42
30(b)(6) Michael  Keith Levingood                November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 48

1        A.      Yes.

2        Q.      But I think you said only the most recent

3   version of the PVP has been signed off on by that

4   organization?

5        A.      No.  The whole thing has been signed off.

6   It gets signed off every year.  So they look at it

7   every year.  So when it was first signed off every

8   year, PAACO keeps saying, yep, they get a check box,

9   and USDA audit uses this instrument to audit us.

10       Q.      Gotcha.  And when I say "you are

11   submitting to USDA," I'm referring to Perdue.  Can we

12   have that understanding?

13       A.      Yes, sir.

14       Q.      And although the USDA certifies this is

15   audited, Perdue is the one drafting the words in this

16   PVP?

17       A.      Yes, plus the NCC Broiler Welfare

18   Guidelines are our base.  So we use the National

19   Chicken Council Broiler Welfare Guidelines as a base.

20   And then an example would be lighting.  And the

21   lighting, we do a little more than the NCC

22   guidelines.  So this program is a little stricter on

23   lighting than, say, NCC.  But the base of this

24   program is National Chicken Council Broiler Welfare

25   Guidelines.  And they change every couple of years,

Page 49

1    so some of the changes would be because NCC changed

2    their requirements.

3         Q.    Understood.  So the NCC would maybe set a

4    floor for certain guidelines?

5         A.    Absolutely.

6         Q.    And Perdue would say, we want to be a

7    little bit higher than that, so our guidelines are

8    above that?

9         A.    Yes.

10        Q.    If you turn to Bates 3468.

11        A.    (Witness complies.)

12        Q.    See the table of contents on the far

13   left-hand side, and below that there are a list of

14   locations with alphanumeric numbers to the right of

15   them?

16        A.    Yes.

17        Q.    What are those locations?

18        A.    They are harvest plants.

19        Q.    And does the PVP apply to all the growers

20   that feed into these harvest plants?

21        A.    Yes.

22        Q.    And are these all of the harvest plants

23   that Perdue maintains?

24        A.    For broilers, yes.

25        Q.    And for other chicks?

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 51

1   new person that is in charge of this program.

2        Q.    And what is her role?

3        A.    Her role is -- I don't know her exact

4   title, but it's quality -- quality is in her title

5   of -- she's the food safety quality for live

6   production.

7        Q.    And I believe you noted in your earlier

8   testimony that a revision might occur based on the

9   NCC guidelines changing?

10       A.    Yes.

11       Q.    Are there any other reasons why PVP would

12  be revised?

13       A.    Sure, that we could -- we may make a

14  decision to up our level of standards and it would be

15  revised, or she could find something in the

16  documents -- because it's our program -- it's NCC

17  plus our program that we hand to USDA, correct?  So

18  she could find some new -- as she's going out

19  auditing -- she audits every one of the facilities

20  once a year.  USDA audits them once a year.  We have

21  a poultry care officer at every live location and a

22  poultry care officer at every harvest plant.  And

23  they audit it the other ten months of the year.

24            This is an ISO 140001 process of auditing.

25  So what happens with that is if she finds something

1   in there that the way our third-party auditors are

2   looking at things and they discuss there's a

3   different way to audit, then she would go in and have

4   to make a change in a document, and then all those 11

5   locations would then have to follow that change.

6          Q.     And then the growers would also have to

7   follow the change?

8          A.     Only the things in here that apply to the

9   growers.  This is more than just our farmers.

10         Q.     Right.  But it includes guidelines for the

11  farmers as well?

12         A.     I'm just saying that what you said is,

13  only changes in here that apply to our farmers would

14  be what we would go and talk to our farmers about.

15         Q.     Let's talk about a couple of those.

16         A.     Sure.

17         Q.     Turning to Bates 3540.

18         A.     35 --

19         Q.     3540.  It's about 83 pages in.

20         A.     (Witness complies.)

21         Q.     The title page says "Producer Caretaker

22  Poultry Care Training."

23         A.     Yes.

24         Q.     Is this the training that would apply to

25  growers?

30(b)(6) Michael Keith Levingood              November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 54

```
 1              MS. SANTEN:  Same objection, vague.

 2              THE WITNESS:  We want them to follow them.

 3   BY MR. KLORFEIN:

 4       Q.    Perdue requires growers to follow these

 5   trainings?

 6              MS. SANTEN:  Same objection, asked and

 7        answered.

 8              THE WITNESS:  We ask them to follow these

 9        recommendations.

10   BY MR. KLORFEIN:

11       Q.    I'm asking, Perdue requires growers to

12   follow the training?

13              MS. SANTEN:  He's responded.  I know you

14        don't like his response, but he's responded now

15        twice.  Asked and answered.

16   BY MR. KLORFEIN:

17       Q.    You can answer.

18       A.    Follow them.

19       Q.    I understand that you asked them to follow

20   these trainings.  I'm asking a slightly different

21   question:  that Perdue requires growers to follow

22   these trainings?

23       A.    The thing we require in here out of this

24   training that we require is that they euthanize

25   chickens properly.
```

Page 56

1             MS. SANTEN:  He's testified they do not

2        require them to follow these, that they ask.  So

3        I object to the form of the question.

4             THE WITNESS:  I need you to ask the

5        question again.

6    BY MR. KLORFEIN:

7        Q.    Sure.  The reasons for poultry care

8    training, these are some of the reasons why Perdue

9    requires growers to abide by these trainings?

10            MS. SANTEN:  Same objection, assumes facts

11       not in evidence, misstates prior testimony.

12            You can respond.

13            THE WITNESS:  Okay.  And you're only

14       asking about Page 642 currently?

15   BY MR. KLORFEIN:

16       Q.    542.

17       A.    542.  So these are not requirements.

18   These are farmer understandings to make sure they

19   understand that the chickens do -- we believe the

20   chickens feel pain, and this is more of us educating

21   them to make sure they understand that chickens feel

22   pain.  These aren't requirements.  These are

23   education.

24       Q.    Right.  But the training -- the entire

25   training is required, right?

Page 59

1          Q.     I noticed as you were flipping through

2     that you put these pages in different sections on the

3     table.  Was there a reason you did that?

4          A.     Yeah.  I wanted to separate them so when

5     you ask me the questions, I can see them.

6          Q.     And did you sort them into any type of

7     category?

8               MS. SANTEN:  Just object generally.  This

9          isn't covered by the topics at all.  If he wants

10          to respond in his individual capacity, he can.

11               MR. KLORFEIN:  This is squarely within the

12          policies that --

13               MS. SANTEN:  How he organized papers on a

14          table for purposes of being able to see

15          everything so he could respond to your question

16          is not covered by the topics at all.  I think he

17          just said he did it that way so he could see

18          everything so he could fully respond to your

19          questions.  And so that was his response.  I

20          don't think there's any further response needed.

21               MR. KLORFEIN:  Your objection is noted.

22     BY MR. KLORFEIN:

23          Q.     Did you categorize these on the table for

24     any particular reason?

25          A.     I wanted to pull out the euthanization.

Page 60

1        Q.    And why did you do that?

2        A.    Because it's a requirement.

3        Q.    And I see a couple pages that you pulled

4   out related to euthanization.  Can you read the Bates

5   numbers for the pages that fall in that category?

6        A.    3548, 3544, and I also included the

7   hotline, 3544.

8        Q.    I got 3548, 3544.  I'm not sure I got the

9   last one.

10       A.    3547.  That's the euthanization.

11       Q.    And those are all requirements that Perdue

12  has for growers?

13       A.    Uh-huh.

14             MS. SANTEN:  Provide a yes or a no.

15             THE WITNESS:  Yes.

16  BY MR. KLORFEIN:

17       Q.    Aside from the euthanizing slides that we

18  just talked about, did you put any other slides into

19  another category of bucket on your table?

20       A.    There's -- yes.

21       Q.    And what was that category?

22       A.    Pretty much they were recommended ---

23  recommended that levels of production that match,

24  that we need to be sure the farmers understand that

25  these will be audited against, that -- you know, that

Page 61

1    these are the standard operating procedures that they

2    should target.  It doesn't mean they can hit them all

3    the time, but they are going to be audited against

4    them.

5              And they have the responsibility to

6    actually try to maintain these.  Do they do it all

7    time?  It's not possible in live operations to do it

8    all the time, but that's what we want them to shoot

9    for.

10        Q.    And for the record, I'm just going to ask

11   you to read off the Bates numbers so we know, in the

12   record, what slides you're referring to for this

13   category.

14        A.    Sure.  3549, 3550, 3551, 3552, and 3553.

15        Q.    And for this category, Perdue expects

16   growers to abide by these recommendations?

17        A.    This is educating farmers on our targets

18   that we want them to try to maintain.

19        Q.    So we talked about the required category

20   materials.  We talked about the targets just now.

21   Any other categories that you sorted these pages on

22   on your table?

23        A.    The only pages that are left are more

24   educational.

25        Q.    To inform growers?

30(b)(6) Michael Keith Levingood          November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 62

1        A.      Just to make sure that they're aware, to

2    educate.

3                MS. SANTEN:  And could you state those

4        Bates numbers just so we're clear?

5                Sorry, Jarred.  I thought that was helpful

6        before.

7                MR. KLORFEIN:  Sure.

8                THE WITNESS:  3555, 3554, 3542, 3543, and

9        3546.

10   BY MR. KLORFEIN:

11       Q.      Any other buckets that you sorted?

12       A.      No, unless you want me to -- well, we

13   might as well just include all the pages.  So 3540

14   was the title page, and 3541 was the agenda.  Now you

15   have all the pages.

16       Q.      Very helpful.  Turning back to your bucket

17   of informational -- I think that's on your left-hand

18   side, 355 -- excuse me -- 3543, it says "Abuse of our

19   chickens will not be tolerated under any

20   circumstances."

21       A.      Yes, I have it.

22       Q.      That was for the informational bucket?

23       A.      Uh-huh.

24       Q.      Is that right?

25       A.      Yes.

1    ability to go, Jarred, you know, you're a plus

2    grower.  You're doing great.  I'm not going to come

3    see you this week because I don't need to.  You got

4    it.  I'm going to go spend time with farmers that are

5    asking for my help and need help.

6        Q.    Right.  But you would agree with me that

7    flock advisors provide feedback even if growers

8    aren't asking for it?

9        A.    They fill out their visitation report,

10   correct.

11       Q.    And if the farmer does not abide by the

12   recommendations in that visitation report, the flock

13   advisor can withhold chickens, right?

14       A.    No.

15       Q.    The flock advisor cannot withhold chickens

16   from a grower?

17       A.    No.

18       Q.    A flock advisor doesn't have authority to

19   do that?

20            MS. SANTEN:  Objection, vague.

21            THE WITNESS:  Yes, a flock advisor does

22       not have authority to hold chickens.

23   BY MR. KLORFEIN:

24       Q.    Does somebody above the flock advisor have

25   authority to withhold chickens?

1      A.    They could, yes.

2      Q.    And who is the person who has that

3  authority?

4      A.    Generally, it's going to go up multiple

5  levels.

6      Q.    Okay.  But who at Perdue has the authority

7  to withhold flocks from farmers?

8      A.    I'll give you some titles.  A live

9  production manager would generally be the person.

10      Q.    And so the live production manager -- or

11  let's call them similar roles, maybe a different

12  title -- can withhold flock from growers?

13          MS. SANTEN:  Objection, vague.

14          THE WITNESS:  I would say the live

15      production manager is the person -- so a live

16      production manager is responsible for all the

17      farmers under his -- like, we'll pick a

18      location.  We'll pick Perry location.

19          So under Perry, there's one live

20      production manager.  The live production manager

21      reports to a vice president.  I'm sure, I'm very

22      positive, surely, that that live production

23      manager is going to inform the vice president if

24      he's going to withhold chickens.

25

Page 70

1    BY MR. KLORFEIN:

2        Q.    So the live production manager will inform

3    the vice president but then authorize the withholding

4    of flock from the grower?

5        A.    Yes.

6        Q.    And what are the reasons why a live

7    production manager would withhold flocks from

8    growers?

9        A.    There's multiple reasons.

10       Q.    What are they?

11       A.    So cost is probably the biggest one.  You

12   know, that they're just not performing.  There could

13   be multiple reasons they're not performing.  One is

14   they're not spending any time with the birds.  The

15   farmer may just, you know -- just not even -- you

16   know, they're there 24 hours a day.  And if we go

17   there once a week for an hour every week, that's our

18   only snapshot of what's going on.  So we don't always

19   know.

20            But you can eventually figure out that,

21   you know, the litter is wet.  His ventilation isn't

22   good.  His ventilation isn't good because his

23   equipment is not working, but the driver isn't -- the

24   driver, they're the -- that's what's causing the cost

25   to be bad.

Case 5:22-cv-00268-TES    Document 118-8    Filed 07/14/25    Page 35 of 42
30(b)(6) Michael  Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 71

1           But what generally is going to drive a

2    farmer to withhold chickens is two things:  It's

3    either going to be their cost, and most likely,

4    they're going to go through our PIP program for that

5    to happen; or it's going to be that it's an animal

6    welfare issue and if we place the birds, it's a

7    detriment to the birds.  So an animal welfare issue

8    can happen quicker than probably a cost issue.

9           Q.    Okay.  We just talked about the cost

10   issue.  Let's talk about the animal welfare issue for

11   a second.

12          So if a live production manager determines

13   that there is an animal welfare issue at a grower's

14   facility, that live production manager can withhold

15   flocks from going to the grower, right?

16          A.    Yes.

17          Q.    And failing to maintain proper

18   ventilation, is that an animal welfare issue?

19          A.    Yes, that could be.

20          Q.    And that's based on Perdue's standards of

21   what is an appropriate amount of ventilation?

22          A.    Yes.

23          Q.    And, similarly, if the -- I think you said

24   the pallet is wet or the sod is wet?

25          A.    The litter.

30(b)(6) Michael  Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 72

1      Q.    The litter is wet, that would also be --

2      A.    That's an indicator.  If the litter is

3    wet, why?  A flock advisor is going to spend all

4    their time going:  Issue, why?  Cause, why?  And then

5    work with the farmer and go, I believe this could be

6    the issue, you know, let's try it.

7           A lot of it is trial and error.  These are

8    live animals.  So between the farmer's experience of

9    their farm -- the farmer knows their house better

10   than any flock advisor, so we're going to listen to

11   the farmer.  But we're going to say, your litter --

12   you know, as an example, your little is really wet,

13   your ventilation is not good.  Birds need to breathe.

14   They don't need to breathe ammonia.  You need to --

15   that's hurting your performance, which is hurting

16   your cost, which is why you're not making enough

17   money.  So if you want to make more money, I can help

18   you.  Here's my knowledge of some things that could

19   work.  Try it.

20          But you still -- you the farmer, Jarred,

21   could go, I don't believe you.  Okay.  It's your

22   decision.  It's your house.  It's your farm.  It's

23   your cost.

24     Q.    Right.  But I think we already talked

25   about cost.  I was asking about animal welfare.

30(b)(6) Michael  Keith Levingood            November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 73

1        A.    Same for animal welfare.  If there's no --
2    if the ventilation is not there and we're going to
3    put birds in and there's no oxygen in the house, or
4    we know we're going into winter and there's big holes
5    in the wall and we're not going to be able to heat
6    the house, why would I put baby chicks in there to
7    suffer?  But if you fixed it, I'll put the baby
8    chicks in.
9        Q.    Right, because animal welfare is
10   important?
11       A.    Animal welfare is greatly important.
12       Q.    And if a grower does not follow the
13   recommendations related to animal welfare, Perdue can
14   withhold flocks, right?
15            MS. SANTEN:  Objection, vague, asked and
16        answered.
17            THE WITNESS:  It's not that cut and dry.
18        You're asking me to tell you that we're going to
19        not put birds in because of animal welfare.
20        We're not going to -- we're going to build up to
21        that point.  We're going to try to help you as a
22        farmer, since it's your farm, you're providing
23        the labor, you're working this.  We want you to
24        make more money.  We're giving you the
25        suggestions.

30(b)(6) Michael Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 100

1    list, so I don't -- I'm struggling on the purpose.

2    But there's -- we have minimum requirements for

3    building a new house.  We have minimum requirements

4    to be at different tier levels in the payment

5    schedules.  So I don't know where you got it.  I

6    don't know what location.  I don't know -- it doesn't

7    say enough at the top to tell me -- or at the

8    bottom -- what it was used for.

9         Q.    Okay.  And I don't want you to guess on

10   which of those two things it is, but it could be used

11   for one of two things; is that accurate?

12        A.    It could be used for multiple -- all I

13   know is this is an equipment list for 40' x 500'

14   broiler house.  I don't -- from that point, I can't

15   tell from this document why they made this list.  I

16   just can't tell why they made this list.

17        Q.    If this was produced by Perdue in this

18   litigation, would you have any reason to dispute that

19   this would be used by Perdue?

20        A.    I can't dispute that it wouldn't be used

21   for Perdue, but I don't know what location is using

22   it or what their purpose is for it, other than it's a

23   list of equipment for 40' x 500' broiler house.

24   That's all I can discern from this list.  I can't --

25   I don't know understand -- you know, we have plenty

30(b)(6) Michael  Keith Levingood                    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 181

1    to go in the anteroom and just get the mortality and

2    I didn't walk through the houses.  That would be

3    perfectly fine.

4         Q.    Yeah, he doesn't -- Bradley, assuming that

5    he's the flock advisor, doesn't need to list out the

6    purpose of the visit?

7         A.    No.

8         Q.    Does Bradley even need to have a reason to

9    visit if he decides in his own judgment to visit?

10        A.    Sure.  That is his partner.  He's -- that

11   farmer is our partner.  If Bradley knows that you

12   have trouble the third week, the second week in past

13   flocks, why wouldn't I come and look at your birds a

14   couple of times during the second week to help you or

15   give you some recommendations how to make more money?

16        Q.    You can set that document aside.

17        A.    (Witness complies.)

18        Q.    Earlier, you talked about -- I think it

19   was NCC guidelines, the National -- can you finish

20   that?  I just --

21        A.    National -- it's the National Chicken

22   Council.

23        Q.    National Chicken Council.  And are these

24   national guidelines?

25        A.    Yes, they post them.  Well, they have

Page 182

1    developed the National Broiler Chicken Welfare

2    Guidelines for the broiler industry.  There's no --

3    they don't demand you to use them.  They just produce

4    them and put them out there.  So not every company

5    uses them, but I would say the majority of companies

6    do.

7        Q.    Perdue uses them?

8        A.    We do.

9        Q.    And so when NCC issues a nationwide

10   guideline, Perdue will implement that guideline

11   across all chickens?

12       A.    So you're going back to the Poultry Care

13   Verified Program; is that correct?

14       Q.    Well, I'm just trying to understand the

15   NCC guidelines.

16       A.    Right.  So they have put out these

17   guidelines.  We have used these guidelines to produce

18   our PVP program as the base of the program.  And,

19   honestly, it's the majority of our program.  There's

20   very few differences today from 2011 on this program,

21   okay?

22            So anytime they make a change to their

23   program, because it's the base of our poultry care

24   program, we have to change our audit program.  We

25   have to change our process verified program.  So a

Page 183

1    lot of those line items we talked about earlier were

2    because NCC changed their guidelines.

3         Q.     Gotcha.  So the line item will be edited

4    to accommodate the NCC guidelines?

5         A.     Yes.

6              MS. KLORFEIN:  All right.  With the

7         recognition that during Phase 2 we would reopen

8         this deposition and with the understanding that

9         there's been an amendment that I think counsel

10        is going to be going into, we're going to leave

11        the deposition open for that purpose.

12             I do not have any further questions.

13             MS. SANTEN:  And I just want to say when

14        you say "reopen this deposition," we have not

15        agreed to reopen this deposition for the purpose

16        of the noticed topics for today.

17             If there's a Phase 2 deposition, we

18        understand you might take an additional

19        30(b)(6), but it wouldn't be to rehash topics

20        that were specifically agreed to for today.

21             MR. KLORFEIN:  I object to that

22        characterization.  And we will, I guess, take it

23        up at the appropriate time in the future.  But I

24        understand that you are reserving your rights as

25        we are.  Fair?

# **EXHIBIT 4 (BEING FILED UNDER SEAL)**