# **EXHIBIT I**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ROGER PARKER,<br><br>        Plaintiff,<br><br>v.<br><br>PERDUE FOODS, LLC,<br><br>        Defendant. | CIVIL ACTION<br>NO. 5:22-CV-00268-TES |

## DECLARATION OF WALTER "CLAY" COPELAND

I, Walter "Clay" Copeland, hereby declare and state under penalty of perjury as follows:

1. I am over the age of eighteen years and am competent to testify regarding the facts detailed herein.

2. I am not a party to the above-entitled matter and provide the following testimony without remuneration for the same.

3. I am currently a Live Production Manager for Perdue Foods LLC ("Perdue") supporting the Perry, Georgia production complex. I have held this position since approximately 2015. In this position, I am responsible for overseeing all of the live production operations in this region.

4. In connection with my position and my given experience with Perdue in my current and previous positions, I have personal knowledge of the nature of Perdue's relationship with independent contract poultry growers, as well as the types of general work typically performed by those growers or individuals on their behalf. I also have access to data regarding Perdue's payments to growers who have contracted with Perdue to support the Perry, Georgia complex, including data from July 2019 to the present for Plaintiff Roger Parker ("Parker").

5. Perdue consigns chickens to growers and the growers raise the chickens for Perdue until they are ready to be harvested. The date that the chickens are delivered to the grower's farm is often referred to as the "placement date" and the date the chickens are picked up from the grower's farm is often referred to as the "catch date."

6. The majority of the work performed by the growers, or individuals the growers may retain to perform services on their behalf, is performed between the placement date and the catch date, when the growers have the chickens on their farms.

7. When the growers do not have chickens on their farms, the work is much more limited.

8. Between the catch date and the next placement date, the growers' work will consist of preparing the litter in their chicken houses so that they are ready to receive the next flock. This involves turning the litter and then letting it rest for three or four days, and then repeating this cycle an additional two times. During the days when the litter is resting between turns, the growers cannot perform any work inside the chicken houses because of the ammonia inside. As a result, growers may have 12 to 14 days between a catch date and the next placement date when they cannot perform any work inside the chicken houses.

9. Growers, or individuals the growers hire to do the work on their behalf, may also perform limited routine maintenance relating to the upkeep of their own farms and equipment, such as mowing the grass around their chicken houses or checking that equipment is functional, during the time when they do not have chickens on their farms, all of which would be to prepare for the next flock and in connection with growing chickens.

10. However, none of this work following the catch date is necessary unless the grower will be receiving a new flock of chickens. If a new flock of chickens will not be placed with the

2

grower following the catch date for whatever reason, then there is simply no further work for the grower to do during this time period.

11.     As a grower, Plaintiff Roger Parker ("Parker") received a grower pay summary sheet, also called a settlement statement, for each flock he raised.

12.     Each settlement statement reflects the date the chickens were placed with Parker, the date they were moved from Parker's farm, and the pay Parker received for raising the chickens during that time period, which is made in a lump-sum payment, among other items.

13.     A true and correct copy of Parker's final settlement statement from Perdue is attached hereto as **Exhibit A**.

14.     As reflected on Exhibit A, the final flock of chickens raised by Parker for Perdue was placed with him on June 24, 2019, and collected from him on August 5, 2019, meaning the chickens were on Parker's farm for a period of six weeks.

15.     For that flock, Parker received gross pay of $41,001.95, and Perdue deducted $22,886.33 for expenses (including for payment to the bank, feed trays, bait station, chlorine dioxide, and other items), resulting in a net payment of $18,115.12 to Parker for his work in raising his final flock for this 6-week period. This equates to approximately $3,019.19 in net pay per week for this time period.

16.     While I have no personal knowledge of the hours actually worked by Parker, I am informed and believe that he testified he worked between 50 and 60 hours a week when he had chickens.

17.     Assuming Parker's testimony regarding his hours worked is accurate, he would have worked between 300 and 360 hours during the six weeks he had his last flock and his hourly

3

rate of pay for such period, assuming he was paid on an hourly basis, would be between $50.32 per hour and $60.38 per hour.

18. Upon information and belief, Parker was aware that he would not receive any additional flock(s) until he made various repairs to his chicken houses and, as such, there was no work for him to perform for Perdue after August 5, 2019, until those repairs were made. Parker never made all of the necessary repairs and never grew chickens for Perdue after August 5, 2019.

19. In connection with my position, I am informed and aware of the conditions at various growers' farms who support or supported Perry, either through my own personal observations, review of flock summary reports, discussions with growers themselves, or through discussions with the flock advisors. This included knowledge of the conditions at Hazel Lee farm operated by Parker in Milledgeville.

20. In or about the August 2019 time period, I met with Parker to discuss the terrible conditions at Hazel Lee and the repairs needed to various equipment in the chicken houses, including feeders and drinkers among other items. At that time and during this conversation, Parker acknowledged he needed to make these repairs.

21. I am aware that Parker made claims in this lawsuit that he received inferior chickens and/or received feed with foreign substances in it, such as concrete. Growers who settle in the same week receive the same source of chicks that go through the same quality control processes. Further, growers who settle in the same week also receive feed from the same batch of feed from the feed mill. This makes it practically impossible for Perdue to target Parker with bad feed or chicks. And, Perdue did not target Parker in any way with bad chicks, feed, or other inputs.

22. In or about the August 2019 time period, Parker's farm had the worst conditions of any Perdue farm in my area, including substantial equipment and repair problems. According to

4

documentation, including flock reports, photographs of Hazel Lee farm, and Parker's own admissions, Hazel Lee farm needed repairs and had repeated issues with fans not working, inadequate air ventilation, drinkers and feeders not properly working, and caking of litter in the house, among other things.

23. These substantial equipment and repair problems were raising animal welfare concerns that we could not leave unaddressed. If left unaddressed, these issues would have resulted in severe harm to the birds and even bird loss.

24. With new growers, Perdue now requires Tier 4 housing. Either the selling grower or the purchasing grower can make the repairs or upgrades to bring the houses to Tier 4.

25. In addition, I am aware that on or about January 3, 2017, Parker caused a major issue compromising animal welfare at his farm due to improper fan use.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct according to my personal knowledge and, if called as a witness, I could and would testify truthfully thereto.

Dated  7/14/2025

Signed by: *Walter "Clay" Copeland*
Walter "Clay" Copeland

**EXHIBIT A (BEING FILED UNDER SEAL)**