# **<u>EXHIBIT N</u>**

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE MIDDLE DISTRICT OF GEORGIA

3                        MACON DIVISION

4

5    ROGER PARKER, on his own behalf       CASE NO.

6    and on behalf of all others similar  5:22-CV-00268-TES

7    situated,

8                    Plaintiffs,

9           vs.

10   PERDUE FOODS, LLC,

11                   Defendant.

12

13

14

15

16       REMOTE VIDEO DEPOSITION OF KATHRYN MIZELL

17                   April 3, 2025

18

19

20

21

22   REPORTED BY:    Laura H. Nichols

23                   Certified Realtime Reporter,

24                   Registered Professional

25                   Reporter and Notary Public

Page 96

```
 1      I might could --
 2              Q.      Yeah.  I am just trying to
 3      understand, you know, aside from you said it was
 4      inconsistent, I just want to know whether or not he
 5      was a successful farmer.
 6              A.      I can't put an answer on that, I
 7      don't think.
 8              Q.      Okay.
 9              MR. KLORFEIN:  I am presenting what
10      has been previously marked as Plaintiffs' Exhibit
11      13, Bates Perdue 1395.
12                      (Plaintiffs' Exhibit 13, having been
13                      previously marked for identification,
14                      was referenced in this deposition.)
15              Q.      (BY MR. KLORFEIN:)  Do you recognize
16      this document, Ms. Mizell?
17              A.      Yes, looks to be a visitor log for
18      Hazel Lee.
19              Q.      And it shows that you visited on June
20      28th, 2019; do you see that?
21              A.      Yes.
22              Q.      Do you recall that visit?
23              A.      Not specifically.  I mean, no, not
24      specifically.  In my mind, no.
25              Q.      Fair enough.  It shows that you also
```

Page 97

1    visited on July 24th, 2019?

2            A.      Yes.

3            Q.      Did you have a habit of visiting

4    locations about once a month?

5            A.      That is -- it is kind of scattered.

6    I don't have a clear and -- process on when I visit

7    farms.

8            Q.      Got it.  You don't have like a

9    specific regular routine of when you visit farms?

10           A.      No.

11           Q.      Is it just as needed?

12           A.      It is, yes.  To some degree.  I mean

13   I will go to farms -- even if it is not needed, I

14   will go to the farms.

15           Q.      Just to check up on them?

16           A.      Well, to visit the farm.

17           Q.      Got it.  So your attendance on these

18   two dates isn't indicative of a problem one way or

19   the other?

20           A.      I'm not sure that I can -- that I

21   recall my reason for the visit.  I don't recall my

22   reason for the visit.

23           Q.      And I see under purpose of visit, it

24   just says visit.  Does that indicate anything to

25   you?

Kathryn Mizell                                April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 98

1          A.      That I was there to take a look at

2     the birds.

3          Q.      And this document shows fifteen

4     visits to Hazel Lee over the course of a little

5     over two months.  Do you see that?

6          A.      Yes.

7          Q.      Was that unusual to have that many

8     visits during that time frame?

9          A.      No.

10         Q.      It is common to have flock advisors

11    or other Perdue representatives visit farms on that

12    frequency?

13         A.      On a varying frequency, yes.

14         Q.      Got it.  So this isn't atypical to

15    see this many?

16         A.      It is not atypical.  It is typical to

17    see that many, yes.

18         Q.      That is much clearer.  But it doesn't

19    have to be this many?

20         A.      No.

21         Q.      All right.  This shows the first

22    visit in June.  Do you recall any details of the

23    second visit in July?

24         A.      Not offhand, no.  I don't remember

25    the specific dates of visits, no.

Page 99

1          Q.     Do you recall with specificity any

2     visits to Hazel Lee?

3          A.     Yes.  I remember the visits and --

4     but I don't know that I could correlate them to the

5     exact date.

6          Q.     Got you.  You have a memory of

7     visits, but you don't know --

8          A.     I do.  I do.  And I will say that I

9     did try to -- if I did visit -- if I did visit, to

10    discuss the visit with Dale.

11         Q.     You mean by text message or --

12         A.     Call, text message.

13         Q.     And aside from just a standard

14    visits, do you recall any specific events from

15    these visits with Hazel Lee?

16         A.     I mean I recall that there were some

17    fan issues with the fans not working on some

18    visits.  I feel like there might have been some

19    feeder issues, some large drinker line leaks in the

20    houses.  And I couldn't -- like I said, I can't

21    recall which day or which visit each one of those

22    might have been on.

23         Q.     Got it.  And this is not a memory

24    test.  I am just trying to understand, you know,

25    what you remember.

Kathryn Mizell                                        April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 139

1          Q.    But Mr. Parker was identifying that
2     issue here?
3          A.    He was -- I took this to say that
4     there was -- he saw a trailer that had no number on
5     it, and then he had a trailer with no ticket.  So
6     he had a trailer with no number, but again there's
7     multiple numbers on the trailer.  So it might not
8     have been the same number that he thought he should
9     be looking for, but he said there's a trailer with
10    no number, and then he has a trailer with no
11    ticket.
12               MR. KLORFEIN:  I am marking
13    Plaintiffs' Exhibit 24.  This is Perdue 8011
14    through 8017.
15               (Plaintiffs' Exhibit 24 was marked
16               for identification.)
17         Q.    (BY MR. KLORFEIN:)  Do you recognize
18    this document as a text exchange between you and
19    Mr. Parker, dated September 17th, 2018?
20         A.    I do, yes.
21         Q.    And you said:  We have eighteen
22    tickets.
23               Do you see that?
24         A.    Yes.
25         Q.    Does this refresh your recollection

Kathryn Mizell                         April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 147

1    So it is my understanding that you resent the

2    letter to Mr. Copeland about a month later.  Do you

3    agree with that?

4              A.    Yes.  Yes, I can agree with that.

5              Q.    And so between the time that you

6    first drafted that letter, two days after the tare

7    ticketing issue was raised again, about a month

8    later when you resent the draft letter to

9    Mr. Copeland.  Do you remember anything about that

10   time period?

11              MS. WOOTEN:  Object to form.

12              A.    I feel like there were communications

13   between Dale and I about, you know, the letter and

14   what we were needing to see for him to get --

15              Q.    (BY MR. KLORFEIN:)  Well, you hadn't

16   sent the letter, right?

17              A.    I don't recall when I sent the

18   letter.  But it kind of seems like I sent the

19   letter, but I don't recall when I sent the letter.

20              Q.    Sure.  But you are resending a copy

21   of the letter to Copeland, and you say:  I need to

22   send a letter.

23              A.    Yeah.  I mean I think I understand

24   what you are saying, and I guess it could read like

25   that.  But I'm not sure that I didn't attach it to

Page 150

1              for identification.)

2         Q.    (BY MR. KLORFEIN:)  I am marking

3    Plaintiffs' Exhibit 29 which is Bates Perdue 8026

4    through 8028.  Do you recognize this document as a

5    text exchange between you and Mr. Parker dated

6    October 18th, 2018?

7         A.    Yes.

8         Q.    So that is shortly after you had sent

9    that email to Mr. Copeland saying we need to send a

10   letter?

11        A.    Yes.

12        Q.    Two days afterwards?

13        A.    Yes.

14        Q.    And in this text, Mr. Parker says:  I

15   got your letter of upgrades.

16        A.    Yes.

17        Q.    Was that a yes?

18        A.    Yes, it was, sorry.

19        Q.    You are fine.  And does this refresh

20   your recollection whether or not you waited until

21   October to send the letter?

22        A.    No.

23        Q.    You just don't recall one way or the

24   other?

25        A.    I do not recall.  I do not.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 151

1          Q.     And you say:  Okay.  Should just be
2     repairs?
3          A.     Yes, I was clarifying that it was not
4     upgrades.
5          Q.     And he says:  Why do I need seventy
6     percent propane with fall weather that will not
7     need anywhere around that much?
8                 Do you recall that?
9          A.     Yes.
10         Q.     Do you recall in your letter you
11    required seventy percent propane?
12         A.     Yes.
13         Q.     Do you -- what does that refer to?
14         A.     Being prepared for a good flock.
15    Want to make sure we have got enough fuel out there
16    to make it through -- you have got to make it
17    through placement and on through the flock.  We
18    don't want to run out of gas and chickens get cold.
19         Q.     And he asks:  Why do I need seventy
20    percent propane with fall weather that will not
21    need anywhere around that much?
22                Do you see that?
23         A.     Yes.
24         Q.     And he asks:  Is everyone being made
25    to put seventy percent in their tank?

Page 152

1           A.      Uh-huh.  I see that.

2           Q.      You say:  We check all farms to make

3      sure they have propane.

4           A.      Yes.

5           Q.      Do you recall whether or not seventy

6      percent was the requirement imposed across the

7      board for all growers?

8                   MS. WOOTEN:  Object to form.  You can

9      answer.

10          A.      I don't recall what the -- what it

11     was.  I don't recall.

12          Q.      (BY MR. KLORFEIN:)  Do you recall if

13     there was a seventy percent minimum?

14          A.      I don't recall.

15          Q.      And you certainly don't say that

16     there is here?

17          A.      Right.  In fact, I say I might could

18     do fifty percent.

19          Q.      Got you.  So you might have gone

20     below seventy percent?

21          A.      Yes.

22          Q.      It wasn't a firm requirement?

23          A.      Yes.

24          Q.      And he says:  You didn't answer my

25     question.

Page 153

1                  Is he referring to whether or not

2        everybody is being made seventy percent?

3                  MS. WOOTEN:  Object to form.  Calls

4        for speculation.  You can answer if you know.

5              A.    No.  Again, we just make sure that

6        all farms have propane.

7              Q.    (BY MR. KLORFEIN:)  He asks:  Why is

8        this just a rule for me?

9              A.    I see that.

10             Q.    And you acknowledge it is a rule for

11       him, not everybody?

12                  MS. WOOTEN:  Object to form.  You can

13       answer.

14             A.    I don't know if "rule" is the right

15       word.

16             Q.    (BY MR. KLORFEIN:)  Well, you in your

17       letter say seventy percent, right?

18             A.    Yes.

19             Q.    And he asks whether or not that is

20       applied for everybody, right?

21             A.    Yes.

22             Q.    And you don't say, oh, it applies to

23       everybody?

24             A.    Yes.

25             Q.    You instead say:  In the past you

Kathryn Mizell                          April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 154

1    have run out.

2              A.      That's correct.

3              Q.      And so this is a rule that is applied

4    to him only?

5                      MS. WOOTEN:  Object to form.

6              A.      This is something that I wanted him

7    to have so that way he was prepared and ready to

8    have a good flock.

9              Q.      (BY MR. KLORFEIN:)  That applies to

10   him only?

11             A.      Every farm has to have propane.

12             Q.      But the seventy percent you said in

13   the letter only applied to him?

14             A.      It seems that way in this, yes.

15             Q.      And you have no recollection to

16   dispute that?

17             A.      No.

18             Q.      In fact, you point to the past that

19   he has run out previously, right?

20             A.      Yes.

21             Q.      That is the justification you provide

22   for why imposing a seventy percent minimum for him?

23             A.      Yes.

24                     MS. WOOTEN:  Object to form.

25             A.      Yes.

Page 155

1          Q.      (BY MR. KLORFEIN:)  And he says:  I
2     have not run out.  When did this happen?
3          A.      I see that.
4          Q.      And you respond:  A couple of years
5     ago.
6          A.      Yes.
7          Q.      So a couple of years ago he ran out
8     of propane, and that is the justification you
9     provide for imposing a seventy percent minimum?
10                 MS. WOOTEN:  Object to form.
11         A.      Yes.
12         Q.      (BY MR. KLORFEIN:)  You don't provide
13    any other reason?
14         A.      It doesn't appear so.
15         Q.      Do you recall, sitting here today,
16    whether or not you have any other reason for why
17    you are imposing a seventy percent minimum on him
18    and nobody else?
19                 MS. WOOTEN:  Object to form.  You can
20    answer.
21         A.      I wanted to make sure that he had
22    enough propane to make it the entirety of the flock
23    so it didn't put him in a position to do poorly on
24    the flock.
25         Q.      (BY MR. KLORFEIN:)  Is that the only

Page 156

1    reason you provided that seventy percent minimum?

2                A.    Yes.

3                Q.    Based on something that happened two

4    years prior?

5                      MS. WOOTEN:  Object to form.

6                A.    Yes.

7                      MR. KLORFEIN:  I am marking

8    Plaintiffs' Exhibit 30, which is Bates Perdue 8030

9    through 8034.

10                     (Plaintiffs' Exhibit 30 was marked

11                     for identification.)

12                     MS. WOOTEN:  Jarred, I don't want to

13   interrupt and you can continue questioning, but

14   just when you get a chance for a break at some

15   point, it might be nice.  We have been going over

16   an hour.

17                     MR. KLORFEIN:  Great.  How about I

18   just finish this document and then we will take a

19   break, sound good?

20                     MS. WOOTEN:  No problem.

21              Q.    (BY MR. KLORFEIN:)  As I mentioned,

22   this is Plaintiffs' Exhibit 30, Bates Perdue 8030

23   through 8034.

24                     Ms. Mizell, do you recognize this as

25   an additional text exchange between you and

Kathryn Mizell                          April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 157

1      Mr. Parker dated October 22nd, 2018?

2              A.      Yes.  Yes.

3              Q.      Are you -- he emails you -- I'm

4      sorry.  He texts you:  I am a bit confused about

5      some of the things on my list and wanted to get you

6      to come by if possible.

7                      Do you see that?

8              A.      Yes.

9              Q.      And he references the list from your

10     October letter?

11             A.      Yes.

12             Q.      So he references that he disagrees

13     with some of the things that you have raised?

14             A.      Yes.

15             Q.      For example, Number 2:  I have

16     butterfly doors but no shutters.  I don't have any

17     missing or nonworking doors.  Please explain what I

18     need to do.

19                     Do you see that?

20             A.      Yes.

21             Q.      So he is disputing that Item 2 of

22     your list was actually a problem, right?

23             A.      He is definitely taking issue with

24     Item 2 on the list, yes.

25             Q.      And then he continues, Number 8:  I

Page 168

1          Q.      I am going to share with you what has

2     been previously marked as Plaintiffs' Exhibit 5.

3                  (Plaintiffs' Exhibit 5, having been

4                  previously marked for identification,

5                  was referenced in this deposition.)

6          Q.      (BY MR. KLORFEIN:)  Which is Bates

7     Perdue 1364 through 1379.  Do you see that on your

8     screen?

9          A.      Yes.

10         Q.      This is Plaintiffs' Exhibit 5.  I

11    will zoom out.  Does this document -- is this the

12    October 16th, 2018, letter that you sent to the

13    Parkers?

14         A.      It appears to be.

15         Q.      Does this refresh your recollection

16    as to whether or not you sent the letter in

17    September or October of 2018?

18         A.      Yes.  It seems to.

19         Q.      Did you send the letter, in fact, in

20    October of 2018?

21         A.      It sure looks like it.

22         Q.      No reason to doubt that?

23         A.      Was that a question?

24         Q.      No reason to doubt that this was when

25    you sent it?

Kathryn Mizell                                April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 169

1          A.     It looks signed, it looks like it.
2     It looks like I wrote on their file.  So it looks
3     like it probably went in October.
4          Q.     Just so I understand, you are
5     referring to that file copy at the bottom
6     right-hand corner?
7          A.     Yes.
8          Q.     Was it your practice to write
9     something on the file if you were saving it into
10    the grower's file?
11         A.     Yeah.  I would try to.  Not always
12    the best at it, but I would try to.
13         Q.     Fair enough.  Okay.
14              MR. KLORFEIN:  I am marking
15    Plaintiffs' Exhibit 31 which is Perdue Bates 2793
16    through 2800.
17              (Plaintiffs' Exhibit 31 was marked
18               for identification.)
19         Q.     (BY MR. KLORFEIN:)  Is this an email
20    from you to parkerspoultryfarm@gmail.com dated
21    February 13th, 2019?
22         A.     Yes.
23         Q.     This is after you sent that 2018
24    October letter?
25         A.     Yes.  I will say that the

Page 170

1       parkerspoultryfarm@gmail.com, which is what I

2       understood to be Dale's email address.

3                Q.      Understood.  You said that you were

4       attaching notes from Bradley's visit to check on

5       the progress of the list of items that you sent in

6       the October letter?

7                A.      Yes.  I attached -- looks like he

8       requested the letter, the producer agreement and

9       Bradley's notes.

10               Q.      Do you recall whether or not you also

11      visited the farm around that time?

12               A.      Around the time of this email or from

13      that --

14               Q.      Or Bradley's visit.  The attachment

15      says that Bradley's notes 2/5/19.

16               A.      I'm not sure of my visit schedule

17      during that time.

18               Q.      But Perdue did conduct an inspection

19      pursuant to the items it listed in the October 2018

20      letter, right?

21               A.      We went back to -- because the effort

22      was at that point to get birds back to his farm.

23      So we did want to see if he was able to complete

24      those items or where he was at, the status of those

25      items.

Page 181

1    sometimes they don't.

2         Q.    And related to the two issues that

3    Mr. Parker raised, are you aware of any

4    communications between Perdue and USDA regarding

5    those issues?

6         A.    I am not.  I don't recall and I don't

7    think I am.  I don't think I am aware.

8         Q.    Got you.

9         A.    But I don't have a clear

10   recollection.

11        Q.    Aside from what we have already

12   talked about, do you have any other additional

13   understandings as to the circumstances of

14   Mr. Parker reaching out to USDA?

15        A.    No.

16             MR. KLORFEIN:  I am marking

17   Plaintiffs' Exhibit 34, Bates Parker 0211 through

18   213.

19                  (Plaintiffs' Exhibit 34 was marked

20                  for identification.)

21        Q.    (BY MR. KLORFEIN:)  Do you recognize

22   this document as a letter from Dan Roberts to

23   Mr. Parker?

24        A.    I can't see it hardly.

25        Q.    Okay.  I will slowly scroll down.

Page 182

```
1        Just let me know when you are ready.
2                A.     Can you make it bigger?
3                       MS. WOOTEN:  Yeah, it is showing up
4        as like a half screen instead of a full screen,
5        Jarred.  I'm not sure why that is.
6                       THE VIDEOGRAPHER:  I think you were
7        sharing your desktop, Counselor, rather than the
8        document.
9                       MR. KLORFEIN:  Thank you.
10               Q.     (BY MR. KLORFEIN:)  How about now?
11               A.     Yes.
12                      MS. WOOTEN:  That is better.
13               Q.     (BY MR. KLORFEIN:)  Okay.
14               A.     I can see it.
15               Q.     All right.  And this is a letter
16       dated September 29th, 2019, from Mr. Dan Roberts.
17       Do you see that?
18               A.     Yes.
19               Q.     Do you recall a letter dated
20       September 2019 from Mr. Roberts to Mr. Parker?
21               A.     Yes.
22               Q.     Have you reviewed this document
23       before?
24               A.     Not lately.
25               Q.     Did you review it before it was sent
```

Page 183

1    out to Mr. Parker?

2              A.      It is possible.

3              Q.      Do you know why the letter came from

4    Mr. Roberts and not yourself?

5              A.      He is the housing manager, and he had

6    that role of outlining those -- outlining those

7    specifications and, you know, working with farmers

8    on how best to go about getting -- making changes.

9    So he had the best experience for that.

10             Q.      Got you.  Are you referencing the

11   fact that he is talking about upgrades for houses?

12             A.      Anytime that it dealt with houses and

13   housing and past repairs, I would defer to Dan.

14             Q.      Got you.

15             A.      Repairs would be current equipment.

16             Q.      And so this is a letter from

17   Mr. Roberts saying:  We have performed an

18   inspection of Hazel Lee and will offer to place

19   birds to an approved buyer once the following

20   conditions are met.

21             A.      Yes.

22             Q.      And he outlines those conditions?

23             A.      Yes.

24             Q.      Do you have any other recollection of

25   drafting this letter or being involved with this

Page 184

```
 1    letter?
 2              A.      I probably reviewed it.
 3              Q.      Okay.  Nothing else?
 4              A.      No.
 5              MR. KLORFEIN:  I am marking
 6    Plaintiffs' Exhibit 35.  This is Parker 0215,
 7    another letter from Mr. Roberts dated the same day,
 8    September 29th, 2019.
 9                      (Plaintiffs' Exhibit 35 was marked
10                      for identification.)
11              Q.      (BY MR. KLORFEIN:)  Do you recognize
12    this letter?
13              A.      It is not showing yet.
14              Q.      Oh.  How about now?
15              A.      Yes.
16              Q.      I will zoom out for you.  Do you
17    recognize this September 29th letter from
18    Mr. Roberts?
19              A.      Yes.
20              Q.      Did you also review this letter
21    before it went out?
22              A.      I probably saw that letter before it
23    went out.
24              Q.      And this is saying there are a number
25    of steps that need to be completed prior to
```

Page 185

1    providing another flock of birds, right?

2              A.    Yes.

3              Q.    So until the items in this letter are

4    addressed, Perdue will not place birds on the farm?

5              A.    Yes.

6              Q.    Aside from counsel, have you

7    discussed this lawsuit with anyone?

8              A.    No.

9              Q.    Aside from discussions, have you

10   exchanged emails or text messages about this

11   lawsuit?

12             A.    No.

13                   MR. KLORFEIN:  I want to go off the

14   record.

15                   THE VIDEOGRAPHER:  Okay.  The time is

16   2:36 p.m.  We are off the record.

17                   (Whereupon, a break was had from 2:36

18                   p.m. until 2:48 p.m. EST)

19                   THE VIDEOGRAPHER:  The time is 2:49

20   p.m.  We are on the record.

21             Q.    (BY MR. KLORFEIN:)  Ms. Mizell, do

22   you have any understanding as to the circumstances

23   of why Mr. Parker stopped growing for Perdue?

24             A.    No.

25             Q.    No details or understanding at all?

Roger D. Parker & Linda G. Parker
dba Hazel Lee Farm
897 Hwy 24 East
Milledgeville, GA 31061

October 16, 2018

Dear Mr. & Mrs. Parker,

The purpose of this letter is to let you know that Perdue will place chickens at your farm, Hazel Lee Farm, as soon as certain repairs are made to the farm.

Flock visitation reports show that you were informed about issues with your fans at least three times, starting at placement. On September 11, your flock advisor checked the fans again. His findings indicate that 19 of your 54 fans were not working, dog houses are not sealed, there are holes in the tin that could allow chicks out or rodents in to houses. This is a short list of the findings from this flock and previous flocks. Unfortunately, your farm is not in a condition that is suitable for animal welfare.

On December 16, 2016 you signed the Poultry Producer Agreement. In Section II, part B you agree to the following:

> To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

A copy of the Poultry Producer Agreement is attached to this letter.

To be compliant with the Poultry Producer Agreement, you will need to complete the following prior to the next placement is scheduled.

1. Repair and/or replace any fan that is not working. All fans must work correctly prior to scheduling placement.
2. Repair and/or replace any broken or missing fan shutters. All fans must work correctly prior to scheduling placement.
3. Repair and/or replace any heater that is not working. All heaters must work correctly prior to placement.
4. All propane tanks are 70% full.
5. Replace the missing cool cell pads. The entire tunnel area should have cool cells.
6. Repair the tunnel doors in House 2.
7. The dog houses where the cool cells are, need to be sealed up.
8. Patch holes in houses that would allow chicks to get out or wild animals to get into houses.
9. Clean, disinfect, and flush drinker lines.

Your cooperation is appreciated. Once you have these items completed contact me 478-258-1165 to schedule an inspection.

Thanks,

*Kathryn L. Mizell*

Kathryn Mizell

Growout Manager

**Exhibit
P 0005**

File Copy

**Perdue 001364**

Biosecurity: Protect Your Livelihood

# Farm Visitor Log

Farm Name: _Howe l lee_
Date Placed: _____
Date Moved: _____

| VISITOR NAME | COMPANY | DATE | ENTERED HOUSE Y/N | PURPOSE OF VISIT |
|---|---|---|---|---|
| Bradley | Perdue | 5/28/19 | N | Feed recovery |
| Bradley | " | 6/5/19 | N | supplies |
| Bradley | " | 6/24/19 | Y | placement 1-4 |
| Bradley | " | 6/27/19 | N | visit |
| Kathryn | Perdue | 6/28/19 | Y | visit |
| Bradley/Sophie | " | 7/2/19 | Y | visit |
| Bradley/Sophie | " | 7/10/19 | Y | visit |
| Bradley | " | 7/17/19 | Y | visit |
| Brant | Bailey Ent. | 7/20 | No | Feed Bin A unloader replaced |
| Bradley/Matt | Perdue | 7/23/19 | Y | B + F |
| Kathryn | Perdue | 7/24/19 | Y | visit |
| Bradley | " | 7/26/19 | Y | visit |
| Bradley | " | 7/30/19 | Y | weigh birds / update #'s |
| Bradley | " | 8/2/19 | Y | Handoff / feed inv |
| Bradley | " | 8/4/19 | Y | |



PERDUE
A Family Commitment to Quality Since 1920™

**Exhibit**
P 0013

**EXHIBIT**
PX 13

2158

## POULTRY PRODUCER AGREEMENT

This AGREEMENT, made ___12/16/16___, between PERDUE FOODS LLC, a Maryland limited liability company, of Salisbury, Maryland, hereafter referred to as PERDUE, and Roger D. Parker & Linda G. Parker dba Hazel Lee Farm___ of 897 Hwy. 24 East Milledgeville, GA 31061_____, hereafter referred to as PRODUCER. In consideration of the mutual promises of PERDUE and PRODUCER, it is agreed as follows:

**PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS, REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

*ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.*

### I.  PERDUE AGREES:

A.  To consign available birds to PRODUCER to be raised for PERDUE.

B.  To provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned.

C.  To provide PRODUCER with an accounting of birds consigned and supplies provided under the terms of this Agreement.

D.  To compensate PRODUCER for services provided herein as provided for in the attached "PRODUCER PAYMENT SCHEDULE," set forth in **Attachment A.**

E.  To provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret.

### II. PRODUCER AGREES:

A.  To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm.

B.  To feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition.

POULTRY PRODUCER AGREEMENT
June 2016

**Perdue 001365**

C. To use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned.

D. To provide an alarm system to monitor electrical power failure and abnormal temperature levels within the poultry house(s) and to maintain the alarm system in operable condition at all times.

E. To provide for prompt and proper disposal of all dead and cull poultry resulting from normal mortalities and/or catastrophic loss in a manner meeting the requirements of federal, state, and local laws, regulations and codes.

F. To properly handle all used poultry litter in a manner meeting the requirements of federal, state and local laws, regulations and codes.

G. To keep all records and other information required for the efficient and proper care of the birds consigned hereby including, but not limited to, records of mortality, water readings, generator logs and other audit requirements.

H. To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises and to rid the farm of all birds left on the farm on the same day of the final movement of birds. Furthermore, PRODUCER and PRODUCER's employees will not maintain, own or care for any other flocks, birds or poultry on any other premises unless approved by PERDUE.

I. To notify PERDUE Flock Advisor immediately (within 24 hours) if any birds, for any reason, do not develop normally, or if there is any disease or parasitism noticeable within the flock, or if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock.

J. To notify PERDUE Flock Advisor within 48 hours of any damage to PRODUCER's poultry houses or poultry house equipment caused by PERDUE.

K. To sell or use any part of a flock only after a written agreement is reached between PERDUE and PRODUCER regarding any such sale.

L. To provide properly maintained roads free of surface or overhead obstructions from the nearest county or state maintained road to and around PRODUCER'S poultry house(s) and to assume responsibility for all costs incurred if roads are not maintained properly or free of obstructions.

M. To be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement, such preparation to include adequately raising or moving of equipment.



**Perdue 001366**

N. To comply with any bio-security policies, audits, measures or guidelines required by PERDUE.

O. To comply with any federal, state or local laws, regulations or codes applicable to PRODUCER, the services provided hereunder, the birds consigned and/or the property, buildings or equipment utilized in the performance of this Agreement.

P. To comply with any federal, state or local laws, regulations, or codes applicable to PRODUCER'S environmental management, including, without limitation, nutrient management plans, operating permits, bird mortality, water quality and air quality.

Q. To adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock.

R. To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs.

## III.    OTHER TERMS

A. PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards.

B. PRODUCER shall not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE. Specifically, PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE. If PERDUE incurs any loss, cost, expense or damage arising out of or related to PRODUCER's violation of this section, including, but not limited to expense of destroying live birds and the expense of recalling processed poultry meat PRODUCER will reimburse PERDUE for such loss, cost, expense or damage. Such damages may be offset against any payment due to PRODUCER by PERDUE.

C. PRODUCER is the owner of the land, buildings, equipment utilized in the performance of this Agreement or that PRODUCER is in legal possession of said property and has the right and authority to use the same for the purposes of this Agreement.

D. PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock,

Perdue 001367

or this Agreement has been terminated in accordance with its terms, PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit. In such event, PERDUE will be entitled to damages as set forth in Section III(B).

E.  If PERDUE enters upon the premises of the PRODUCER as permitted under D above, PERDUE may remove the flock, and/or undertake the maintenance, treatment, feeding, and care of the flock on the PRODUCER'S property, and/or do such other thing or things with reference to assuring the proper health and welfare of the flock as outlined by PERDUE'S established procedures.  PRODUCER shall assume the costs for any necessary disbursements to accomplish such purposes.

F.  Title to each flock shall remain in PERDUE.  PRODUCER shall not permit any lien, distraint, levy, or any other impairments to PERDUE'S title to the flock or flocks placed hereunder.  PERDUE shall have the right to sell each flock consigned under this Agreement at any time without any liens, distraint proceedings, or charges whatsoever of creditors of PRODUCER.

G.  PRODUCER or a designee of PRODUCER shall have the right to be present at the weighing by PERDUE of any birds raised by PRODUCER under this Agreement, be present at the weighing of feed delivered under this Agreement, and observe the weights and measures used by PERDUE to determine the compensation due to PRODUCER under this Agreement.

H.  PERDUE has a performance improvement program ("PIP") and PRODUCER is subject to the PIP as provided herein. The terms and the performance improvement guidelines of the PIP, including, without limitation, factors considered when placing PRODUCER in the PIP, factors considered in determining if and when the PRODUCER is removed from the PIP (and placed back in good standing), and when the Agreement will be terminated as a result of the PIP, are set forth in **Attachment B**.

I.  PRODUCER understands and agrees that PERDUE will determine, in its sole and absolute discretion:

   a.  the breed of chickens PRODUCER will receive;
   b.  the number and density of chickens in each flock delivered to PRODUCER's farm;
   c.  the size, weight and age of the chicken to be produced;
   d.  the time for processing of each flock; and
   e.  the date, time and estimated interval of placement for future flocks.

Perdue 001368

Notwithstanding the foregoing, if any situation exists which would have an adverse effect on the health or well-being of the flock or any part of the flock, PRODUCER shall notify the PERDUE Flock Advisor as set forth in Section II(1).

J.  PRODUCER acknowledges and agrees that this Agreement will be retained by PERDUE in electronic file format only.

## IV. PRODUCER'S INDEPENDENT CONTRACTOR STATUS

A.  PRODUCER'S obligations outlined in this Agreement are for purposes of providing service with respect to PERDUE'S poultry. Therefore, this is a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors. Neither party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever.

B.  PRODUCER is exclusively responsible for the performance of PRODUCER'S obligations under this Agreement. The employment, compensation, and supervision of any persons by PRODUCER in the performance of such obligations is a matter of PRODUCER'S sole discretion and responsibility. PRODUCER accepts full and exclusive liability for payment of any and all applicable taxes for workers' compensation insurance, unemployment compensation insurance, or old age benefits or annuities now or hereafter imposed by any governmental agency, as to PRODUCER and all persons as PRODUCER may engage in the performance of this Agreement. Said taxes shall be paid directly by PRODUCER and shall not be chargeable to PERDUE. PRODUCER agrees to hold PERDUE harmless from any liability with respect to any such taxes or other charges.

## V.  TERM; TERMINATION

A.  For the convenience of not having to initiate a new Agreement after each flock, this Agreement shall continue until the Agreement is terminated by either PERDUE or PRODUCER as provided herein.

B.  Either party may terminate this Agreement at any time for any reason, including default, provided that at least ninety (90) days prior written notice be given to the other party. The parties further agree that once written notice of termination is provided, PERDUE shall not be required to deliver chicks to PRODUCER'S farm during the 90-day time period once a flock is removed from PRODUCER'S farm.

C.  Any termination as a result of a default by a party shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. In the event this contract is terminated by either PERDUE or PRODUCER, all amounts owing to PERDUE or PRODUCER will be payable immediately, or shall be paid as otherwise described in this Agreement. Notwithstanding any other provision of



Perdue 001369

this Agreement, the amounts due PRODUCER hereunder shall be the amounts calculated pursuant to the other provisions of this Agreement reduced by any and all amounts paid or advanced by PERDUE, at any time, to or on behalf of PRODUCER, and further reduced by any amounts chargeable to PRODUCER hereunder or owing from PRODUCER to PERDUE. Adjustments necessary because of such payments, advance, or amounts shall be made when appropriate.

D. This Agreement may be immediately terminated by PERDUE at any time upon written notice to PRODUCER for any of the following reasons:

    a. PRODUCER abandons a flock or neglects to provide feed, water, proper house management or care, which abandonment, neglect or failure to provide care threatens the health and welfare or existence of a flock;

    b. Death of PRODUCER;

    c. PRODUCER uses abusive or threatening language to any PERDUE representative or threatens or causes physical harm to any PERDUE representative, or in any other way impedes or interferes with PERDUE representatives in the performance of their duties;

    d. PRODUCER fails to comply with applicable federal, state or local laws, regulations or codes;

    e. PRODUCER terminates its business as a producer for PERDUE;

    f. PRODUCER transfers an ownership interest in its business without PERDUE's consent, has disposed of or attempted to dispose of a flock or attempts to encumber or mortgage a flock;

    g. PRODUCER uses any feed, medications, vaccinations or other supplies other than those provided by PERDUE in violation of Sections II(C) and/or III(B);

    h. PRODUCER becomes insolvent or has filed a voluntary petition for bankruptcy or an involuntary bankruptcy has been filed against PRODUCER, which petition has not been promptly discharged;

    i. PRODUCER makes any public statements or comments regarding PERDUE or its brands that are false or defamatory;

    j. PRODUCER's farm has been without chickens for more than one hundred eighty (180) days;



**Perdue 001370**

      k.  PRODUCER fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs;

      l.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks);

      m.  PRODUCER allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry; or

      n.  PRODUCER creating and/or contributing to a threatened and/or actual bio-security hazard.

E.  This Agreement may be immediately terminated by PRODUCER at any time upon written notice to PERDUE for any of the following reasons:

      a.  PERDUE uses abusive or threatening language towards any of PRODUCER's or threatens or causes physical harm to any of PRODUCER's representatives, or in any other way impedes or interferes with PRODUCER's representatives in the performance of their duties;

      b.  PERDUE fails to comply with applicable federal, state or local laws, regulations or codes related to the performance of this Agreement;

      c.  PERDUE makes any public statements or comments regarding PRODUCER that are false or defamatory; or

      d.  Economic necessity for either or both parties ("Economic necessity" includes, but is not limited to, threat of economic and/or financial harm, impending bankruptcy, bankruptcy, and/or disease outbreaks).

F.  PRODUCER shall have a right to cancel this Agreement until 12:00 Midnight of the third business day after the day on which PRODUCER signs this Agreement. Notice of cancellation under this Section V(F) shall be given in writing by PRODUCER to PERDUE by certified mail, return receipt requested, which shall be posted before termination of the right to cancel under this Section V(F) to the following address:

      Perdue Foods LLC
      Attn: Live Production /Grow-out Management
      PO Box 1537
      Salisbury, MD 21802-1537



Perdue 001371

## VI. COMPLAINT RESOLUTION PROCEDURE

A. The procedures in this Section VI shall govern any and all complaints or disputes between PERDUE and PRODUCER arising out of, as a consequence of, for or by reason of, resulting from, or relating in any way to the formation, execution, performance, termination, revocation, cancellation, or expiration of this Agreement or any provisions thereof, including, but not limited to, all common law, equitable and/or statutory claims. The Complaint Resolution Procedure is as follows:

Step 1:    The PRODUCER shall first present his or her complaint to the local PERDUE Flock Advisor within three (3) working days from the date of the alleged complaint or problem, or within three (3) working days from the date the PRODUCER becomes aware of an alleged compliant or problem, whichever occurs first. If the PERDUE Flock Advisor cannot immediately solve the problem, he or she will, in consultation with the Growout Manager and Live Production Manager, respond to PRODUCER'S complaint or problem within five (5) working days.

Step 2:    If a satisfactory result has not been concluded by the procedure followed in Step 1, the PRODUCER shall call the PERDUE Director of Live Operations within three (3) working days of the unsatisfactory response to discuss the problem, citing the provision of this Agreement, which PRODUCER believes has been violated. Within three (3) working days of contacting the PERDUE Director of Live Operations, the PRODUCER shall confirm, in writing, his/her conversation with the Director of Live Operations, citing the provision of this Agreement, which PRODUCER believes, has been violated. The PERDUE Director of Live Operations will respond in writing to PRODUCER'S complaint within five (5) working days upon actual receipt of the written complaint. If a satisfactory result has not been concluded by the procedure followed in this Step 2, proceed to Step 3, as applicable. For all other complaints or disputes, Section VI's complaint resolution procedure has been exhausted.

Step 3:    If a satisfactory result has not been concluded by the procedure followed in Step 2 **and** the dispute regards a **settlement or a payment pursuant to a settlement**, all complaints or problems regarding such settlement, payment pursuant to such settlement, and any documents utilized in support of the settlement, will be reviewed by a Peer Review Committee no later than ten (10) working days after the date of PERDUE'S response under Step 2. The Peer Review Committee shall consist of four (4) PERDUE producers who are situated in close geographical proximity to the aggrieved PRODUCER, and are not related to the aggrieved PRODUCER or otherwise interested in the finances under this Agreement. The Peer Review Committee members shall include two (2) PERDUE producers chosen by the aggrieved PRODUCER and two (2) PERDUE producers chosen by PERDUE. The Peer Review Committee shall make a non-binding written recommendation to PERDUE and the PRODUCER which will be distributed to PERDUE and the PRODUCER within three (3) working days of the meeting. PERDUE and the



**Perdue 001372**

PRODUCER will have five (5) working days to either accept or reject the Committee's recommendation. In the event the Committee does not agree on a recommendation, PERDUE Management will have the discretion to resolve the issue, taking into consideration the interests of both parties. If either PERDUE or the PRODUCER reject the Committee's recommendation or PERDUE Management's resolution, then the Parties have exhausted Section VI's complaint resolution procedure. Neither PERDUE nor the PRODUCER are required to accept the Committee's recommendation or PERDUE Management's resolution. If PERDUE and the PRODUCER agree upon the Committee's recommendation or PERDUE Management's resolution, such resolution of the complaint or dispute shall be reduced to writing and signed by PERDUE and the PRODUCER.

B. The purpose of the Complaint Resolution Procedure is to establish an effective mechanism for the fair and equitable resolution of complaints and disputes between the parties. Therefore, except in cases of undue hardship, PRODUCER agrees to participate as a Peer Review Committee member, as described in the Complaint Resolution Procedure, to resolve disputes regarding settlements or payments pursuant to settlements involving other PERDUE Producers situated in close proximity to PRODUCER.

## VII.  MISCELLANEOUS TERMS

A. Unless otherwise expressed in this Agreement, PERDUE and PRODUCER shall not be held responsible for damages to the other caused by delay or failure to perform hereunder when such delay or failure is due to fires, strikes, acts of God, legal acts of public authorities, or delays or defaults due to labor, feed, or fuel shortages, which are due to a natural disaster (including, but not limited to, fire, flood, windstorm, or hailstorm) which cannot be reasonable forecasted or protected against.

B. If any provision of this Agreement, or the application thereof, shall for any reason and to any extent, be found invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the maximum extend permissible under applicable law, so long as and to the extent that such enforceability does not materially adversely affect the mutual rights and obligations to the parties hereunder.

C. **Prior Agreements/Entire Agreement/Release.** This Agreement supersedes, voids and nullifies any and all previous Poultry Producer Agreements and all other previous agreements governing the relationship between PRODUCER and PERDUE. *THE PRODUCER AND PERDUE HEREBY RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S), PERFORMANCE OR LACK THEREOF, AND/OR REPRESENTATIONS MADE BEFORE, DURING OR AFTER ENTERING INTO ANY PREVIOUS POULTRY PRODUCER AGREEMENT.* This Agreement, and any Attachments hereto, constitute the entire

Perdue 001373

agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. PRODUCER acknowledges that in entering into this Agreement and/or its Attachments, he/she has not relied upon any statements that are not contained in this document, and/or the Attachments hereto.

D.  **No Modification Except in Writing.** The parties agree that this Agreement and the Attachments hereto may not be modified except in writing signed by both PERDUE and PRODUCER.

E.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Maryland except to the extent that doing so is prohibited. Any action or proceeding brought by either party hereto that is related to this Agreement shall be brought in the state or federal courts of the United States located in the county in which the PRODUCER'S farm is located.

F.  By executing this Agreement PRODUCER represents and warrants that he/she has read and acknowledged the terms of this Agreement and has been afforded the opportunity to consult with third-parties including, but not necessarily limited to, attorneys, financial advisors, and family, before entering into this Agreement and Attachments. By signing this Agreement, PRODUCER represents, warrants and agrees that he/she has made an informed decision with respect to the Agreements and Attachments hereto.

G.  An electronic copy of this Agreement (such as a PDF version), when signed by the PRODUCER and PERDUE, will be considered an "original" document for all purposes.

H.  This Agreement is personal to the PRODUCER and is not transferable or assignable by PRODUCER without the written consent of PERDUE. Should PRODUCER sell or lease an ownership interest in his or her business, this Agreement will automatically terminate, unless PERDUE has consented to the assignment of this Agreement, and PRODUCER will make no representation that PERDUE will continue to supply the new owner or lessee with flocks. PERDUE will be under no obligation to supply PRODUCER's successor(s), assign(s), lessee(s) or new owner(s) with flocks. PERDUE may require, as a condition of the approval of the transfer of PRODUCER's farm, by sale, lease or other assignment, that this Agreement is assigned and accepted by PRODUCER's transferee.

I.  Each party agrees that it will not make use of the Confidential Information except in the performance of this Agreement, and will not disclose any of the Confidential Information. Further, each party will take all necessary and appropriate measures to protect and maintain the Confidential Information disclosed to it. As used herein, "Confidential Information" shall mean any and all oral or written information relating to PERDUE's or PRODUCER's processes, methodologies, financial and cost



**Perdue 001374**

information, and other related information and data. Confidential Information shall
not include (i) information which at the time of disclosure is in the public domain,
and (ii) after disclosure becomes part of the public domain through no violation of
this section, or (iii) is acquired by the receiving party from a third person, provided
that the receiving party does not know or have reason to know that such information
was acquired by such third person under an obligation of secrecy involving the
disclosing party or (iv) information required to be disclosed by court order or by law,
or (v) information independently developed by a party. These obligations shall
survive the termination of this Agreement.

J.    If more than one person is identified as the PRODUCER, the obligations of each such
person hereunder shall be joint and several.

K.    **Liability and Indemnity of PRODUCER.**  PRODUCER agrees to indemnify,
defend, and hold PERDUE, its officers, employees, agents, and representatives
harmless against any and all claims, damages, liabilities, losses, actions, and
expenses, including injury to any employee of or to any property of PERDUE,
proximately caused by negligent acts or omissions of PRODUCER or his agents,
employees, sub-contractors or parties under its control, in the performance of
PRODUCER's duties hereunder.  PRODUCER further agrees to indemnify, defend
and hold PERDUE harmless from and against any and all losses, claims, damages,
and actions, including federal, state, or local administrative actions, rulings and all
other actions of any nature whatsoever which are in any manner caused by or which
result from the presence of the birds on the premises of PRODUCER, including, but
not necessarily limited to matters involving emission complaints, disposal complaints,
or pollution complaints, violation of law, and any negligent acts or omissions of
PRODUCER in the performance of its obligations under this Agreement.

L.    **Liability and Indemnity of PERDUE.**  PERDUE agrees to indemnify, defend, and
hold harmless the PRODUCER from and against any claims, damages, liabilities,
losses and expenses for personal injury or property damage (to property other than
chicks or feed) proximately caused by negligent acts or omissions of PERDUE in the
performance of its obligations under this Agreement.

M.    **THIRD PARTY PRODUCTS.  PERDUE PROVIDES ANY THIRD PARTY
PRODUCTS, SUCH AS MEDICINES AND VACCINES, "AS IS" AND
DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS
FOR A PARTICULAR PURPOSE AS TO THOSE ITEMS, EXCEPT TO THE
EXTENT PROVIDED BY MANUFACTURER.**

N.    **Exclusion of Incidental, Consequential, and Certain Other Damages.  TO THE
MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR
PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL,
INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY
OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF**



Perdue 001375

<u>OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ATTACHMENTS.</u>

O.    <u>DISCLAIMER AND WAIVER OF EXTRAORDINARY CLAIMS. SUPPLIER AND PRODUCER MUTUALLY DISCLAIM AND WAIVE THE RIGHT TO PURSUE AGAINST ONE ANOTHER ANY CLASS ACTION CLAIMS OR CAUSES OF ACTION OF WHATEVER NATURE OR KIND. SUPPLIER AND PRODUCER AGREE THAT EACH WILL PURSUE ANY CLAIMS OR CAUSES OF ACTION AGAINST THE OTHER ON AN INDIVIDUAL BASIS, AND WILL NOT LEAD, JOIN, OR SERVE AS A MEMBER OF A CLASS OR GROUP OF PERSONS BRINGING SUCH A CLAIM OR CAUSES OF ACTION.</u>

P.    <u>Choice of Venue</u>. Any and all litigation between the parties that may be brought, or arise out of, in connection with or by reason of this Agreement and/or its Attachments shall be decided solely and exclusively in the state or federal courts of the United States located in the county in which the farm is located.

Perdue 001376



Q. **JURY WAIVER. IF ANY MATTERS IN DISPUTE ARE TRIED, THEY WILL BE TRIED BY A JUDGE. THE PARTIES WAIVE TRIAL BY JURY AND CONFIM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this Agreement on the day and year first above written.

PERDUE FOODS LLC

By: _____ (Seal)
Director of Live Operations

WITNESS
_____

WITNESS
_____

_____ (Seal)
Producer

_____ (Seal)
Producer

Perdue 001377

## ATTACHMENT B

### PERFORMANCE IMPROVEMENT PROGRAM

The Producer is subject to the following requirements:

1.  Producer may be placed under the Performance Improvement Program ("PIP") if Producer's flocks fail to achieve Company's minimum standards of competitiveness.

2.  For purposes of evaluating Producer competitiveness, Company will use the average of the Producer's Adjusted Prime Cost ("APC") calculation from the Producer's last six (6) consecutive flocks (the "Six Flock Average"). For purposes of clarification a Six Flock Average is determined before a Producer settles six (6) consecutive flocks. Specifically a Producer must have settled a minimum of three (3) consecutive flocks before a Six Flock Average is calculated and the Six Flock Average calculation is based on the average of the Producer's APC for such three (3) consecutive flocks. Thereafter, and until the Producer settles its sixth flock, an additional flock will be added to the calculation of the Six Flock Average. After the Producer reaches six (6) settled flocks, and thereafter, the Six Flock Average will be calculated based on Producer's last six (6) consecutive flocks.

3.  When a Producer settles a flock and as a result reaches a Six Flock Average of a -0.0050 or worse (lower), the Producer will be placed in the PIP and be given a performance notice regarding Producer's placement into the PIP. Performance notices will be provided by Perdue's Grow Out staff at a meeting with the Producer and explaining Producer's current APC cost. Such meeting is an opportunity for the Producer in discussion with Perdue Grow Out to identify necessary actions for future flocks that may help to improve Producer's cost and flock performance and therefore may assist Producer in being removed from the PIP. These recommendations may include, if appropriate, new or upgraded equipment and other matters which may improve performance. After the meeting the Grow-out Manager and/or Live Production Manager will follow up with a certified letter to the Producer confirming Producer's placement into the PIP.

4.  When a Producer settles a flock and as a result reaches a Six Flock Average of -0.0075 or worse (lower), the Producer will receive notice by certified letter stating that the Producer must meet one or more of the following criteria in order to maintain a Poultry Producer Agreement with Perdue:

    a.  Settle the notice flock with an APC of -0.0025 or better (greater);

    b.  Settle the notice flock so as to improve the Six Flock Average to better (greater) than a -0.0075; or

    c.  Settle the notice flock so that at least three (3) of the flocks within Producer's Six Flock Average settled with an APC of zero or better (greater).

*10*

**Perdue 001378**

5.   Producer will be subject to termination if Producer fails to meet one or more of the criteria set forth in Paragraph 4 above. All settlements, records, and communications will be reviewed by the Director of Live Operations for the applicable complex before the Agreement is terminated pursuant to the PIP.

6.   Producer will be removed from the PIP when Producer settles a flock and as a result reaches a Six Flock Average better (greater) than -0.0050.

7.   Factors that are considered to be beyond the Producer's control may be reviewed and may not be considered when calculating a Producer's Six Flock Average standing with Perdue. Notwithstanding, any Producer that had a preventable disaster will be held accountable for the flock cost in the Six Flock Average calculation. In addition, and notwithstanding anything to the contrary in the Agreement or the PIP, a certified letter will be sent stating that if another preventable disaster occurs on the Producer's farm within 12 months of the above-referenced preventable disaster, the Poultry Producer Agreement will be terminated.

-2-

Perdue 001379



Chat with "Dale Parker" <+14783633830> and another address on September 17, 2018

+█████
   Dale Parker <+███████████>
   Unknown
   Dale Parker <+█
   KATHRYN MIZELL <+1███████████>
   Kathryn ███████████>

Earliest item: 2018-09-17 12:56:29
Latest item: 2018-09-17 18:02:28

**Monday 17 September 2018**

Instant Message : Native Messages
12:56:29
From
   KATHRYN MIZELL <+1███████>

We have 18 tickets.

Instant Message : Native Messages
12:57:46
From
   KATHRYN MIZELL <+1███████>

Did you have any feed outages over 10 hours this Flock?

I have an outage for houses 3&4 at harvest.

Instant Message : Native Messages
12:58:22
From
   Dale Parker <+1███████>

The last day

Instant Message : Native Messages
12:59:38
From
   Dale Parker <+███████>

I had 4 other outages and one was long. I have them all written down. But were at the hospital in surgery

Instant Message : Native Messages
13:00:59
From
   Dale Parker ███████>

House 3&4

Instant Message : Native Messages
13:01:15
From
   KATHRYN MIZELL <+███████>

I understand. Can you send them this afternoon? I need to include them before we can do the settlement.

Instant Message : Native Messages
13:02:09
From
   Dale Parker <███████>

Yes. The birds looked good and we didnt have much dead. How did they average

Instant Message : Native Messages

Perdue 008011

EXHIBIT
PX 24

13:10:06

From

KATHRYN MIZELL <+_____>

4.35 on 1.657

Worse than average

We will do a 6 flock average pay per day adjustment and exclude it from your average. Because of the incident at placement.

Instant Message : Native Messages
13:10:32
From

Dale Parker <+1_____>

I texted you also when we caught about a 2 trailers that had no ticket matching . 1 had no numbers at all that i seen. I videoed going around it. The other had a number that did not match anything i had on tear weight papers turned in to me. I didn't get a reply.

Instant Message : Native Messages
13:11:40
From

KATHRYN MIZELL <+_____>

I got the text and asked you how many tickets you had.

Instant Message : Native Messages
13:11:58
From

Dale Parker <+_____>

I didnt see it sorry

Instant Message : Native Messages
13:12:13
From

Dale Parker <+_____>

My bad

Instant Message : Native Messages
13:12:37
From

KATHRYN MIZELL <+1_____>

It's ok. You told me you had 4 tickets.

Instant Message : Native Messages
13:13:27
From

Dale Parker <+_____>

The rest matched the loads that went out.

Instant Message : Native Messages
13:15:33
From

Dale Parker <+_____0>

I had a driver say that the number on the ticket does not actually mean the number on the trailer.

Instant Message : Native Messages
13:16:21

From
KATHRYN MIZELL <+

What does it mean?

Instant Message : Native Messages
13:20:55
From
Dale Parker

The number that was bold on his trailer didnt match the ticket so i stopped him and told him. He took and showed me a small letter under dirt that matched the ticket. Then he said that when the scales sees the small 4 digit number they change it to the longer number automatically.

Instant Message : Native Messages
13:22:07
From
Dale Parker <                    >

I didn't understand it either.

Instant Message : Native Messages
13:23:00
From
KATHRYN MIZELL <+                    >

Oh

Instant Message : Native Messages
13:23:31
From
Dale Parker <+1                    >

One trailer had no visible number that i could find. Me and the girl washing down couldnt find it.

Instant Message : Native Messages
13:24:12
From
Dale Parker <+                    >

I got the tag number.

Instant Message : Native Messages
13:24:35
From
Dale Parker <+                    >

A 6 flock average still takes money out of my check for being a negative grower doesnt it?

Instant Message : Native Messages
13:25:50
From
Dale Parker <+                    >

Did i get the PVP?

Instant Message : Native Messages
13:26:29
From
KATHRYN MIZELL <+                    >

We have 18 loads. They are all in line with each other.

It looks like it does on the pay summary but then you will see an adjusted pay where Money is added

Perdue 008013

back. So you will be paid your average pay per day based on your 6 flock average.

Instant Message : Native Messages
13:26:45
From
KATHRYN MIZELL <+ ▮▮▮▮▮ >

Yes I think so.

Instant Message : Native Messages
13:28:29
From
Dale Parker <+ ▮▮▮▮▮ >

Ok

Instant Message : Native Messages
13:29:35
From
Dale Parker <+ ▮▮▮▮▮ >

These trailer numbers are jacked up to say the least. Its impossible to keep up with them easily.

Instant Message : Native Messages
13:30:06
From
KATHRYN MIZELL <+ ▮▮▮▮▮ >

I'll let the plant know.

Instant Message : Native Messages
13:31:32
From
Dale Parker <+ ▮▮▮▮▮ >

I don't think the bank is going to help me. I have it half paid off and i guess they might want it back.

Instant Message : Native Messages
13:33:56
From
Dale Parker <+ ▮▮▮▮▮ >

Clay talked with them and the power company last week.

Did they give a reason?

Instant Message : Native Messages
13:36:52
From
Dale Parker <+ ▮▮▮▮▮ >

I just finished paying off my loan with yall that was 3,500 a flock last growout.

Instant Message : Native Messages
16:40:15
From
Dale Parker <+ ▮▮▮▮▮ >

The bank it seems is going to give me all this check to pay the bill.

I also really hate not performing well. My floors are wet. Im wanting to replace them before i place back. Will yall still finance them for me in 5 houses?

Instant Message : Native Messages

16:40:20
From
KATHRYN MIZELL <+ ▮▮▮▮▮ >

I'm driving with Do Not Disturb While Driving turned on. I'll see your message when I get where I'm going.

Instant Message : Native Messages
16:40:20
From
KATHRYN MIZELL <+ ▮▮▮▮▮ >

(I'm not receiving notifications. If this is urgent, reply "urgent" to send a notification through with your original message.)

Instant Message : Native Messages
17:08:45
From
KATHRYN MIZELL <+ ▮▮▮▮▮ >

What is it that you want financed?

Instant Message : Native Messages
17:09:03
From
Dale Parker <+1 ▮▮▮▮▮

Water lines

Instant Message : Native Messages
17:09:25
From
Dale Parker <+ ▮▮▮▮▮

Im on 17" centers

Instant Message : Native Messages
17:14:29
From
KATHRYN MIZELL <+1 ▮▮▮▮▮ >

No. We will not finance them. Perdue loaned you money for Tier 4 but it was not finished.

Instant Message : Native Messages
17:15:26
From
Dale Parker <+1 ▮▮▮▮▮

Can you give me a reason it has changed?

Instant Message : Native Messages
17:16:02
From
KATHRYN MIZELL <+ ▮▮▮▮▮ >

Perdue loaned you money for Tier 4 but it was not finished.

Instant Message : Native Messages
17:22:02
From
Dale Parker <+ ▮▮▮▮▮ >

I was told i could get them when my loan was paid in full.

CONFIDENTIAL                                        Perdue 008015

The upgrade is paid in full.

Yall know i had a heart attack and later a pace maker then my heart function was 5-8% but now is 25%. This is why i didnt get it done.

Instant Message : Native Messages
17:24:26
From
    Dale Parker <+█████████>

I have that message that i could.

Instant Message : Native Messages
17:24:36
From
    Dale Parker <+█████████>

Also

Instant Message : Native Messages
17:25:10
From
    Dale Parker <█████████>

What changed

Instant Message : Native Messages
17:25:35
From
    KATHRYN MIZELL <+█████████>

The tier 4 upgrade was not finished.

Instant Message : Native Messages
17:27:14
From
    Dale Parker <+█████████>

I didnt have them done when i was told i could after i paid them off. While in the middle of my heart issue.

Instant Message : Native Messages
17:27:32
From
    Dale Parker <+█████████>

What changed

Instant Message : Native Messages
17:31:52
From
    Dale Parker <+█████████>

Do yall want me to not compete? Im on 17" centers between nipples competeing with 8" and 10" centers on the lines. Plus the new ziggitys they're leaking.

Instant Message : Native Messages
17:33:59
From
    Dale Parker <+█████████>

If i get my production up i can pay my bills and be able to survive

Instant Message : Native Messages

CONFIDENTIAL

Perdue 008016



18:02:13
From
Dale Parker <+▮▮▮▮▮▮▮>

Did you get my messages?

Instant Message : Native Messages
18:02:28
From
KATHRYN MIZELL <▮▮▮▮▮▮▮

Yes.

**End Thread**

Thread Statistics

**Instant Message Count**

51

CONFIDENTIAL



Chat with "Dale Parker" <█████████████> and another address on October 18, 2018

Dale Parker <+█████████████>
Unknown
Dale Parker <+█████████>
KATHRYN MIZELL <+████████████>
Kathryn <█████████████>

Earliest item: 2018-10-18 00:02:43
Latest item: 2018-10-18 20:10:08

**Thursday 18 October 2018**

Instant Message : Native Messages
00:02:43
From
Dale Parker <+███████████>

Im just leaving snd have signal.

Instant Message : Native Messages
19:46:08
From
Dale Parker <+█████████>

I got your letter of upgrades.

Instant Message : Native Messages
19:50:04
From
KATHRYN MIZELL <+█████████>

Ok. Should just be repairs.

Instant Message : Native Messages
19:50:15
From
KATHRYN MIZELL <███████████>

Not upgrades

Instant Message : Native Messages
19:52:12
From
Dale Parker <+█████████>

Why do i need 70% propane with fall weather that will not need anywhere around that much.

Instant Message : Native Messages
19:55:00
From
KATHRYN MIZELL <+██████████>

I understand. We really don't know what the the weather will be so let's start with it and if you don't use it you will have it for you next flock.

Instant Message : Native Messages
19:55:07
From
KATHRYN MIZELL <+██████████>

Your

Instant Message : Native Messages
19:56:14
From
Dale Parker <+█████████>

CONFIDENTIAL

Perdue 008026

**EXHIBIT**
**PX 29**

Is everyone being made to out 70% in their tank?

**Instant Message : Native Messages**
19:59:31
From
KATHRYN MIZELL <+

We check all farms to make sure they have propane. Also we no longer pay for propane like we have in the past so I don't want to get into that situation.

If you get the other items fixed we can come back to the propane. I might could do 50% this flock.

**Instant Message : Native Messages**
20:05:42
From
Dale Parker <+

You didn't answer my question. I haven't heard from my field-man that perdue was making it mandatory to have any given amount.

**Instant Message : Native Messages**
20:07:26
From
Dale Parker <+                >

Thats why i ask if it was a rule just for me.

**Instant Message : Native Messages**
20:07:58
From
KATHRYN MIZELL <+                >

In the past you have run out. I have to make sure that doesn't happen.

**Instant Message : Native Messages**
20:08:11
From
KATHRYN MIZELL <+

How much do you have?

**Instant Message : Native Messages**
20:08:24
From
Dale Parker <+                >

I have not ran out. When?

**Instant Message : Native Messages**
20:09:16
From
KATHRYN MIZELL <+                >

A couple years ago.

**Instant Message : Native Messages**
20:09:41
From
KATHRYN MIZELL <+

How much do you have?

**Instant Message : Native Messages**
20:10:08

Perdue 008027

From

Dale Parker

Im thinking 40%. I will look

**End Thread**

Thread Statistics

Instant Message Count

17



Chat with "Dale Parker" <+███████ and another address on October 22, 2018
+███████
Dale Parker <+███████>
Unknown
Dale Parker <+███████
KATHRYN MIZELL <+███████
Kathryn +███████

Earliest item: 2018-10-22 00:00:03
Latest item: 2018-10-22 01:42:15

**Monday 22 October 2018**

Instant Message : Native Messages
00:00:03
From

KATHRYN MIZELL <+███████>

I don't know anything about a meeting.

Instant Message : Native Messages
00:00:21
From

KATHRYN MIZELL <+███████

Oh for the route meeting. Come to another one.

Instant Message : Native Messages
00:00:54
From
Dale Parker <+1███████

Are they all this week?

Instant Message : Native Messages
00:02:13
From

KATHRYN MIZELL <███████

If you can't make it because you have plans then it's ok. It will be a good demonstration. Yes they'd are others but this will be the closest one. The next closest one is in Roberta. On Tuesday.

Instant Message : Native Messages
00:04:04
From
Dale Parker <+1███████

I will try to reschedule it to leave Friday.

Instant Message : Native Messages
00:05:01
From

KATHRYN MIZELL <+███████

There is one south of Reynolds Thursday morning. Not exactly on the way but the right direction.

Instant Message : Native Messages
00:05:34
From
Dale Parker <+1███████

Im a bit confused about some of the things on my list and wanted to get you to come by if possible.

Instant Message : Native Messages
00:06:06
From
Dale Parker <+1███████

CONFIDENTIAL

Perdue 008030

**EXHIBIT**

**30**

Ok on roberta.

Instant Message : Native Messages
00:07:16

From

KATHRYN MIZELL <+ ████████

Unfortunately I I am out of town on Tuesday. Monday it's hard for me to get out of the office because of settlements. Wednesday is the chicken sale. It would have to be later. Bradley should be able to answer any questions.

Instant Message : Native Messages
00:29:58

From

KATHRYN MIZELL <+ ████████

I can meet Friday or next week sometime.

Instant Message : Native Messages
00:36:44

From

Dale Parker <+ ████████

Your list

#1. Fans, I wanted to remind you about the motor issue i had Talked Previously with you about,the fans. We talked at the end of the flock and I also had already told you i would make sure i had good motors on before placement. The flock advisers did not have the same fans out every time. I had purchased $8,000 worth of 1.5 hp motors and installed them with new pulleys as approved by

Dan to establish tier. I had 4. The motors run fine a few flocks but then started going out. I contacted the company and was told that i could unhook the soft start and they should be ok. That again worked a while and then the motors started blowing start capacitors and some motors went out totally. This is not neglect but an issue with new motors. I have worked daily trying to keep motors running.

#2 i have butterfly doors but no shutters. i don't have any missing or non working doors. Please explain what i need to do.

3. Like every year all farmers have issues with forced air furnaces. We have had 90plus degree weather so far. Me like every other farmer will need to check our heaters. At the end of last winter every heater was working as James ran them all.

4. Propane,

Every farmer has ran out of gas at some time. I don't ran out because i keep a spare 500 gallon tank on the farm for backup. A couple of years ago Perdue did help me with my payment but at any time did i run out because i was on auto fill where the gas company has units on the tanks that tell them when to refill. This time of year we wont come close to using 700 gallons or 70% either as we discussed when we talked.

5. I do have Your list

#1. Fans, I wanted to remind you about the motor issue i had Talked Previously with you about,the fans. We talked at the end of the flock and I also had already told you i would make sure i had good motors on before placement. The flock advisers did not have the same fans out every time. I had purchased $8,000 worth of 1.5 hp motors and installed them with new pulleys as approved by

Dan to establish tier. I had an indipenant fan survey done and had nowhere near the amount out as you reported. 4. The motors ran fine a few flocks but then started going out. I contacted the company and was told that i could unhook the soft start and they should be ok. That again worked a while and then the motors started blowing start capacitors and some motors went out totally. This is not neglect but an issue with new motors. I have worked daily trying to keep motors running. I told you at the end of the flock i would put 1hp motors back on.

CONFIDENTIAL

#2 i have butterfly doors but no shutters. i don't have any missing or non working doors. Please explain what i need to do.

3. Like every year all farmers have issues with forced air furnaces. We have had 90plus degree weather so far. Me like every other farmer will need to check our heaters but you are holding only me back for this. At the end of last winter every heater was working as James ran them all. Im not understanding why my placement has been held back when we have had only hot weather. Youre holding me to a total different standard than others. Am i the only grower that is being held back until the heaters are 100% checked by perdue? Did Brad test them and find them bad or am i being singled out on things that i have had no issues with.

4. Propane,

I had no clue perdue Mandatory regulated the amount of propane we have in the tanks previous to placement. I don't ran out because i keep a spare 500 gallon tank on the farm for backup. A couple of years ago Perdue did help me with my payment but at any time did i run out because i was on auto fill where the gas company has units on the tanks that tell them when to refill. This time of year we wont come close to using 700 gallons or 70% either as we discussed when we talked.

5. I do have 3 cool cells off and a board to replace. I will get that done.

6. I have nothing wrong with my tunnel door in house 2. It was not down when the birds sold. i will run it to make double sure.

7. I will patch the areas where needed.

8. I do not have any holes in the houses. The birds got out when i failed to put the screws in the rear doors and the wind got up which made a gap. You were here when the truck got here at 4 pm and it was 5 am when we got finished when the delivery truck with dead baby chicks coming out from under the roll up doors. We separated chicks chickens all night. Instead of us sitting in the houses waiting on the moffit we helped. I paid another man to help also. This is how the door screws got overlooked and the birds got out.

9. We have been cleaning Water lines and will do it again. Im a little confused as to why this is on the list unless you want me to do something different.

Like i told you once before. A perdue employee told me that when i called stockyard and packers that i would be on the chopping block like another farmer that had to do it. The majority of these things will only apply to me so its very clear i am singled out for punishment. With you sending this by registered mail and taking pictures of things i will be terminated as a grower as soon as you get your case built enough. The list you made are mostly things that we have addressed or standard procedures. Some i have no clue as nothing is wrong to my knowledge. Please help me to understand what you want done and i will do it.

When i tell you my issue its like i say nothing. Instead of helping me to do a better job Different people have done everything in their power to stop me from making these repairs. Then pile things on my list that no one else is held back for and putting things on me to make me have more downtime. i have been condemned without a chance to defend myself with what happened at the end of my grow-out. Not the first call. Had i not had proof of my innocence i wouldn't have much to say. Then they go straight to finish me off. I have been called names that are not true, talked about for it and not as much as one consideration as to what their actions are doing to my life.

Although the effort is clear that you wish to disqualify me as a grower, I will continue to do my best to improve. If i fail i will be homeless so i will do my best if possible to satisfy.

Your last words to me while you were here on my farm was "keep me posted about when you get the power back on." If only that was what would have happened. 3 cool cells off and a board to replace. I will get that done.

6. I have nothing wrong with my tunnel door in house 2. It was not down when the birds sold. i will run it to make double sure.

7. I will patch the areas where needed.

8. I do not have any holes in the houses. The birds got out when i failed to put the screws in the rear doors and the wind got up not made a gap. Dont forget the fact that the truck got here at 4 pm and it was 5 am when we got finished when the delivery truck with dead baby chicks coming out from under the roll up door. You were here and we had to seporate chickens all night. Instead of us sitting in the houses waiting on the moffit we helped. I paid another man to help also. This is how the door screws got overlooked.

9. We have been cleaning them and will do it again.

A lot of things has gone from standard procedure to mandatory before i can place. Why is this happening to me?

I will continue to do my best to improve. If i fail i will be homeless so i will do my best to satisfy you. If you think i need to sell my farm then i will. If you cut me off then i loose everything i have. Hope you understand.

Thanks.

Instant Message : Native Messages
00:37:29
From
    Dale Parker <+

I will ask Brad about the houses.

Instant Message : Native Messages
01:14:16
From
    KATHRYN MIZELL <+

Thank you for your response to the letter. I'll look it over tomorrow and clarify each time for you.

Instant Message : Native Messages
01:14:25
From
    KATHRYN MIZELL <+

Each item

Instant Message : Native Messages
01:23:27
From
    Dale Parker <+

I dont doubt it being put down i was just letting you know the purpose of why things that are escalated. Thing are all of a sudden mandatory before placement and sending things certified. If youre cutting me off please just say were done and allow me time to sell.

Instant Message : Native Messages
01:25:54
From
    KATHRYN MIZELL <+

It's not a cut off letter. I am asking you to prepare your farm so it will be competitive.

Instant Message : Native Messages
01:26:39
From
    Dale Parker <+

You could have done that by telling me.

Instant Message : Native Messages
01:29:54

CONFIDENTIAL

From
    Dale Parker <█████████

I was told that this is what happens when you want to disqualify a grower.

I feel the pressure is from above you with things that has happened to me since catch.

Instant Message : Native Messages
01:33:33
From
    Dale Parker <█████████

I have worked my life for what i have. Its not that much but i dont want to die and not have taken care of Gail. Im in heart failure as you know and wont live a long life.

Instant Message : Native Messages
01:34:30
From
    Dale Parker <+█████████

Would you sell if you were me?

Instant Message : Native Messages
01:42:15
From
    KATHRYN MIZELL <+█████████

I don't mean to be short. I have to get started early tomorrow. Can pick this up tomorrow?

| End Thread | |
|---|---|
| Thread Statistics | Instant Message Count |
| 21 | |

Perdue 008034

**Mizell, Kathryn**

| | |
|---|---|
| **From:** | Mizell, Kathryn |
| **Sent:** | Wednesday, February 13, 2019 4:15 PM |
| **To:** | ▮▮▮▮▮▮▮@gmail.com' |
| **Subject:** | The documents you requested |
| **Attachments:** | Letter and producer agreement.pdf; Bradley's notes 2.5.19.pdf |

Dale,

Attached is the letter and producer agreement that was sent back in October. Also attached is the notes from Bradley's visit to check the progress of the list shown in the letter from October. Please let me know when you get this email.

Kathryn Mizell
Grow Out
Perdue Foods
1 Industrial Park Ct Suite D
Forsyth GA 31029
Office  4▮▮▮▮▮
Mobile ▮▮▮▮▮▮

1

**Perdue 002793**

**EXHIBIT**

31

Perdue 002794

## Mizell, Kathryn

**From:** Bennett, Bradley
**Sent:** Tuesday, February 05, 2019 9:37 AM
**To:** Mizell, Kathryn
**Subject:** Notes from the visit to Hazel Lee on 2/4/19
**Attachments:** Hazel Lee visit notes 2-4-19.docx

Attached are the notes from yesterday's visit at Hazel Lee.

1

Perdue 002795

2 of 6

**Perdue 002796**

In house #1 here is the information;

Fans
Tunnel fan 1 runs
Tunnel fan 2 runs but needs a bearing because the blade wobbles in the housing
Tunnel fan 3 runs but the base is rusted out
Tunnel fan 4 runs
Tunnel fan 5 doesn't work missing fan blade and belt
Tunnel fan 6 runs
Tunnel fan 7 runs but needs new bearings because the blade wobbles in the housing, and the base is rusted out
Tunnel fan 8 runs but needs new bearings because the blade wobbles in the housing and the shutter won't close
Tunnel Fan 9 runs

Heaters
Could not check heater in this house because there was no gas in the tank for the house.

The doors need to be sealed all the way around the house. There are holes along the base of the walls where birds can get out and predators can get in at. The cool cells are falling in on the left-hand side of the house. The tunnel doors need to be tightened and the material that is covering the tunnel opening on the house where the cool cells haven't been extended to needs to be free of holes. The sidewalls toward the rear of the house has holes in them.


House #2

Fans

Tunnel fan 1 is not working correctly because the shutter will not open, fan would come on
Tunnel fan 2 runs
Tunnel fan 3 runs, base is rotted out
Tunnel fan 4 not running
Tunnel fan 5 runs
Tunnel fan 6 runs
Tunnel fan 7 runs
Tunnel fan 8 runs
Tunnel fan 9 runs

Heaters

The fifth heater from the front of the house is not working and heater #4 in the rear of the house is not working. All heaters need to be blown out and adjusted.

There are multiple lights out in the rear of the house causing a drastic difference from the front of the house and the rear of the house. Vent machine and tunnel machine are working but the tunnel doors need to be adjusted to close completely. The vents need to be gone through because there are some with broken hinges.

The tunnel doors need to be tightened and the material that is covering the tunnel opening on the house where the cool cells haven't been extended to needs to be free of holes. The doors need to be sealed all the way around the house. There are holes along the base of the walls where birds can get out and predators can get in at.

House 3

Fans

Tunnel fan 1 runs but the shutter doesn't close
Tunnel fan 2 runs but the shutter doesn't close
Tunnel fan 3 doesn't run properly because the shutter is stuck close
Tunnel fan 4 runs but the shutter doesn't close
Tunnel fan 5 doesn't run properly because the shutter is stuck close
Tunnel fan 6 doesn't work
Tunnel fan 7 runs
Tunnel fan 8 doesn't work
Tunnel fan 9 runs

Heaters

Heater 5 in the rear of the house is not working, all heaters need to be blown out and adjusted.

The tunnel cable was broken in this house. The tunnel doors need to be tightened and the material that is covering the tunnel opening on the house where the cool cells haven't been extended to needs to be free of holes. The dog house needs to be sealed up completely and the cool pads do not need to be falling out. The doors need to be sealed all the way around the house. The vents need to be gone through because there are some with broken hinges.

House 4

Fans

Tunnel fan 1 runs but doesn't close
Tunnel fan 2 runs
Tunnel fan 3 doesn't work
Tunnel fan 4 doesn't work properly because the shutter is stuck
Tunnel fan 5 doesn't work
Tunnel fan 6 doesn't work
Tunnel fan 7 runs but needs new bearings
Tunnel fan 8 runs
Tunnel fan 9 runs

Heaters

Perdue 002798

Heaters 4&5 in the rear of the house do not work properly. Heaters 1&2 have a broken cable that holds them up from the ceiling. All heaters need to be blown out and adjusted.

There is tin coming off the roof in the front of the house. There is a decent size hole in the ceiling on a seam by the control room where insulation is starting to come down at. The attic access needs to be sealed up. One of the tunnel cable were broken as well. The vents need to be gone through because there are some with broken hinges. The tunnel doors need to be tightened and the material that is covering the tunnel opening on the house where the cool cells haven't been extended to needs to be free of holes.

House 5

Fans

Tunnel fan 1 doesn't work properly because the shutter doesn't open
Tunnel fan 2 runs
Tunnel fan 3 doesn't work
Tunnel fan 4 doesn't work
Tunnel fan 5 doesn't work, base is rusted out
Tunnel fan 6 runs
Tunnel fan 7 runs
Tunnel fan 8 runs but needs new bearings
Tunnel fan 9 runs

Heaters

Heaters 4&5 are not working properly, the house is missing the second heater from the front of the house. The heater need to be blown out and adjusted as well.

The vents need to be gone through because there are some with broken hinges. The tunnel doors need to be tightened and the material that is covering the tunnel opening on the house where the cool cells haven't been extended to needs to be free of holes.  The tunnel cable is broken in the front of the house. Also, there is tin off the roof midway down the house behind the feed bins.

House #6

Fans
Tunnel fan 1 not working properly because the shutter won't open
Tunnel fan 2 doesn't work and tripped the breaker
Tunnel fan 3 runs but needs new bearings
Tunnel fan 4 doesn't work properly it barely spinning the blade
Tunnel fan 5 runs but the shutter doesn't close
Tunnel fan 6 doesn't work
Tunnel fan 7 runs
Tunnel fan 8 runs
Tunnel fan 9 runs

5 of 6

Perdue 002799

Heaters

Heater #4 doesn't work and the first heater in the front of the house doesn't work. All the heaters need to be blown out and adjusted.

The tunnel machine doesn't work and tunnel doors need to be tightened and the material that is covering the tunnel opening on the house where the cool cells haven't been extended to needs to be free of holes. The sidewall vents need to be adjusted so they close completely and properly. There is a water leak on the far side of the house near the cool cell it appears to be a supply line to the houses where it froze.

Perdue 002800

September 29, 2019

We feel it is important for a producer to have the best opportunity to compete and be successful. Upgrading houses to our tier four specifications removes one of the obstacles that could keep a producer from being successful. We have performed an inspection of the Hazel Lee farm and have decided that we will offer to place birds on this farm to an approved buyer once the following conditions have been met:

**Tier Four Housing Specifications:**

- 700 feet per min. based on the CFM capacity ratings of 48" or larger fans at a .10 static pressure for tunnel ventilation. **The farm needs 250,000 CFM to meet the requirement.**
- Tunnel ventilation with 6" recirculation pad sized correctly. **The farm needs 400 ft2 of cool pad on each side.**
- Properly sized cool cell opening.
- 200 amp service or electrical service that draws no more than 75% of the main breaker capacity.
- Controller with static pressure alarm or controller with stand alone static pressure alarm. (6 sensor controller preferred)
- Water Meter
- Solid sidewall
- Auto transfer generator
- Must be able to pull .15 static pressure with one 48" fan or two 36" fans in negative ventilation. **The houses currently do not meet the .15 static pressure requirement.**
- Forced air heat with stirring fans or radiant heat
- "Year round" use of 3 Migration fences (wood frame or plastic coated shelving)
- Box lids with Chick Mate feeders 9/1000 birds
- Control pan lights mounted at the control pan. **The farm must install a feed pan light on each end control pan.**
- Brood light minimum of 3 f/c (measured bird height at the bulb)
- Ability to have at least .5 f/c for growout lights using LED Bulbs (may require a dimmer) (measured bird height at the bulb).

Parker_000211

**EXHIBIT**

34

**In addition to the tier four requirements we will also require the following:**

- Install the Agralarm system.
- Install new drinkers in each house.  Ziggity or Valco preferred.
  The drinkers must be on an 8" spacing throughout the house.
  Ziggity – Max 3 Green Pin Nipple
  Valco – Val VR 150 Roaster Nipple or Val VQ 150 Quencher Nipple
- Install new feeders in each house.
  Install 4 – 240' feed lines.  Choretime or Cumberland preferred.
  4 pans per 9 foot section – Cable free suspension system (rope) on Rod and Strap system
- Replace the fill system pipe on each house.
- Install clear boots on the feed bins at 1&2 B&C, 3&4 B and 5&6 AB&C.
- Replace the tunnel fans on each house.  Install 250,000 CFM's of fans on each house to meet the tier 4 requirements.
- Install two rows of brood lights on 20' centers in the brood section of each house.  The brood lights and growout lights will alternate on 10' centers.
  LED Specs:
  A. Minimum of 900 lumens
  B. 5000 Kelvin light color
  C. Dimmer must be LED lighting approved
- The insulation has shifted in the attic of each house.  Add enough insulation in the attic to meet a R21 value, blown fiberglass can be used or use fiberglass batts.
- Add R11 insulation, and 3/8" plywood or 7/16" OSB to the sidewall in each house, with a vaper barrier.
- Install tin over the old curtain material on each house.
- Screw down the roof metal on each house in areas where the nails are loose.
- Install the following windows in each house.
  22 – 46" x 36" Anderson Silverline 2950 Series Fixed Picture Window Low E Glass No Grilles
  4 - 46" x 23.75" Anderson Silverline 2950 Series Fixed Picture Window Low E Glass No Grilles
  Note: Perdue will supply a layout for the window installation.  Windows must be installed with closures.
- Remove the old chicken litter in the courtyard.
- The courtyard and feed bin lane between the houses has several holes.  Add dirt and rock to these areas.

- Add rock to the front entrance of each house.
- The feed bin lane between the houses must be graded so water drains off the lane and away from the houses.
- Install a Chlorine Dioxide water treatment system (Dutrion system) in each house.
- Electrical survey of the farm by a qualified electrician.
- Inspection of the electrical and generator system.  Should not draw more than 75% of the main breaker capacity, the transfer switch capacity or the generator capacity.
- All existing equipment must be in good working condition.

Once the prospective buyer has meet with Perdue and completed the necessary required upgrades Perdue will sign a Poultry Producer Agreement and a Payment Schedule for our small straight run growing program.  A placement date will be scheduled after I inspect the farm and approve it for placement.

If you have any questions concerning any of the above items, give me a call at (478) 235-2588.

Sincerely,

Dan Roberts
Growout Manager / Housing Manager
Perdue Foods, LLC.

September 29, 2019

The following must be completed before the placement of the next flock of birds.

- Install new drinkers in each house.  Ziggity or Valco preferred.
  The drinkers must be on an 8" spacing throughout the house.
  Ziggity – Max 3 Green Pin Nipple
  Valco – Val VR 150 Roaster Nipple or Val VQ 150 Quencher Nipple
- Install new feeders in each house.
  Install 4 – 240' feed lines.  Choretime or Cumberland preferred.
  4 pans per 9 foot section – Cable free suspension system (rope) on Rod and Strap system
- Replace the clear boot on the feed bin at 1&2 B.
- The houses currently do not meet the .15 static pressure requirement of tier 3.  The static pressure will be checked in each house at placement.  The tier payment will be adjusted accordingly.
- All existing equipment must be in good working condition.

A placement date will be scheduled after I inspect the farm and approve it for placement.

If you have any questions concerning any of the above items, give me a call at (478) 235-2588.

Sincerely,

Dan Roberts
Growout Manager / Housing Manager
Perdue Foods, LLC.

Parker_000215

**EXHIBIT**

35