**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

ROGER PARKER,

      *Plaintiff*,

    v.

PERDUE FOODS LLC,

      *Defendant*.

Case No. 5:22-cv-00268-TES

**PLAINTIFF'S OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Conspicuously absent from its motion for summary judgment, ECF 118-1 ("Mem."), is any substantive argument that Parker was not Perdue's employee. Just as notably, Perdue never acknowledges that Parker's supervisor at Perdue was *recorded* admitting that Perdue retaliates against growers who question their treatment, and that Perdue would probably retaliate against Parker for doing the same. Nor does Perdue acknowledge that Perdue's own employees admitted that Perdue did, as promised, retaliate against Parker. These gaps in Perdue's narrative are just a few examples of the material facts Perdue ignores. But they illustrate why Perdue's motion fails.

Perdue moves for summary judgment on all of Parker's claims. Instead of challenging the merits of Parker's FLSA claims, Perdue raises two affirmative defenses, for which it bears the burden: that these claims are time-barred and that Parker's overtime claim is barred by an FLSA exemption. Yet, under binding law, both defenses run headlong into material factual disputes that preclude summary judgment. Perdue's remaining arguments—on breach of contract and negligent misrepresentation—mostly challenge the sufficiency of the evidence but do so only by omitting key facts. And Perdue's last defense to Parker's contract claim—that he, a chicken farmer, should have identified during his deposition the specific "paragraphs of the [contract] that he believes were breached," Mem. at 10-12—is utterly without legal support and would inject a new element no court has ever adopted. With one exception,[1] Perdue's motion should be denied in full.

## FACTUAL BACKGROUND

Perdue describes Parker as an independent entrepreneur who chose to take up growing chickens as one of many successful ventures to suggest Parker lived and died by his own hand. *See, e.g.*, Mem. at 1 (describing Parker as an "independent business owner"). To the contrary, the

---

[1] Parker agrees with Perdue that, because he is no longer employed by and faces no reasonable future prospect of being employed by Perdue, Perdue is entitled to summary judgment on this count.

record demonstrates that Perdue trapped Parker in a cycle of debt, controlled his day-to-day work beyond what it had represented, and then retaliated after he reported Perdue to the U.S. Department of Agriculture ("USDA"). Perdue's Statement of Undisputed Material Facts ("SUMF") hides the full story, which Parker outlines here.

Like all growers for Perdue, Parker owned his chicken farms—because his contract with Perdue required him to. Plaintiff's Statement of Disputed Material Facts ("PSMF") ¶ 1; ECF 118-5 at 411-25 (2016 Poultry Producer Agreement) § 1. By 2016, he was working only one farm, the Milledgeville farm, which he worked under the Poultry Producer Agreement ("PPA") he signed in December 2016, his last with Perdue. SUMF ¶ 50.[2] Perdue's control over Parker was total. Perdue controlled all the inputs: chicken, feed, and medicine. SUMF ¶ 5, PSMF ¶¶ 8-10. While Parker had Perdue's flocks on his farm, the company controlled everything from the height of the grass outside the barns, to the temperature of his chicken houses, to how often Parker had to walk each house to check the birds each day, to the number of times he had to confirm his generator was operable, to how he had to prepare and when he had to be on call for delivery and catch of birds—the list goes on (and on). PSMF ¶¶ 19-37, 39-58, 60, 65. Perdue controlled everything about Parker's work between flocks, too, from how he cleaned and sanitized his chicken houses, to how he smoothed his gravel driveway. PSMF ¶¶ 61-64. Perdue required Parker to put up its name and signage on his farm and controlled who could come visit and where he could go visit. *Id.* ¶¶ 38, 59. These many requirements kept Parker busy more than 8 hours a day, seven days a week. *Id.* ¶ 66.

---

[2] The other farm at which Parker grew chickens for Perdue, Hillsboro, was assigned to his son in 2015. In 2008, Perdue apparently thought so highly of Parker's skills that Perdue asked him to work another farm for the company, the Roosevelt Farm. ECF 118-5, at 158-59.

Despite this evidence, Perdue misleadingly suggests Parker had plenty of time to do other work and could govern his own schedule. SUMF ¶ 39. Wrong. Perdue's own supervisor admitted in a contemporaneous recorded statement that Parker had no free time. PSMF ¶ 66 (explaining growers "babysit them [birds] twenty-four hours a day" and once the chickens "move out . . . that's when the real work starts . . . [i]t's a never-ending cycle"). Perdue points out that Parker worked as a manager for a quail company, SUMF ¶ 47, but this was "early on" and only with Perdue's "permission," ECF 118-5, at 156-57. It was not while Parker was working farms full-time. Ex. D, Parker Decl., ¶ 23. Perdue also points to Parker's ownership of Parker's Poultry Equipment, an equipment installation company. But, again, Parker only took on this work (for Perdue farmers) after Perdue asked him to, ECF 118-5, at 66, 74; indeed, he was paid directly by Perdue, PSMF ¶ 102. And all the work for that company was done by a hired hand and his team—Parker's only role was to bid the work and invoice Perdue for payment. *Id*. Perdue also makes much of the fact that for a time until 2013, Parker had cows on his other farm, SUMF ¶ 43, yet, this also was passive, not labor-intensive, work, Parker Decl. ¶ 24. Perdue's suggestions that Parker controlled his schedule and had substantial free time is wrong.

Eventually, in about 2015, Parker grew concerned that the transport trucks that weigh the flocks before slaughter—which are numbered to be tracked and matched to the correct grower— were getting mixed up. PSMF ¶ 69; Parker Decl. ¶¶ 26-28. This was an important issue to resolve: bird weight directly impacted Parker's pay. *Id*. He raised his concern, but the issue persisted. PSMF ¶ 71.

On December 16, 2016, Parker signed his final PPA for the Milledgeville farm. *Id*. ¶ 1. At the time, Parker still owed over $600,000 on a mortgage on it, due in large part to upgrades Perdue had required Parker to install. PSMF ¶ 13. He had also recently accepted a $42,900 loan from

Perdue to install upgrades (that Perdue required). PSMF ¶ 14. Both were to be paid out from deductions from Parker's settlements payment—around $25,000 per flock. PSMF ¶¶ 12-15.

In the summer of 2017, Parker again noticed a problem with the weighing of his birds. PSMF ¶ 72. This time, Parker learned from Kathryn Mizell, a Perdue supervisor, that growers can call the USDA when they have concerns about weights. Parker Decl. ¶ 28; Ex. AB at 2. Parker did so around October 1, 2017. SUMF ¶ 69. USDA informed Perdue supervisor Clay Copeland of the call. SUMF ¶ 71. Parker's Perdue supervisor, James Norris, informed Parker in a recorded conversation in December 2017 that Perdue was "upset" because calling the USDA was like calling the IRS on someone. PSMF ¶ 76. Norris then recounted how Perdue had made life miserable for another grower who had called USDA. *Id*. ¶ 77.

As Norris described, Perdue would make life miserable for Parker, too. First, shortly after calling the USDA, another Perdue supervisor, Dan Roberts, told Parker not to bid on an equipment installation for a Perdue grower through his equipment installation business, despite the grower asking Parker to bid. Parker Decl. ¶ 33; PSMF ¶ 79. Perdue went further in cutting off that business, too. While Perdue had listed it on its preferred vendor list for approximately 7 years, through at least August 2017, by the summer of 2018 Perdue had removed it. PSMF ¶ 101. That was despite Perdue asking Parker to work construction in the first place. *Id*. After that, Parker's equipment installation work dried up, because growers know they can only use the vendors Perdue prefer them to use. Parker Decl. ¶ 33. This left Parker even more dependent on growing chickens.

Unfortunately, like the grower Norris described, Parker soon began receiving significantly poorer inputs from Perdue at the Milledgeville farm. During a flock in April and May 2018, Perdue failed to timely deliver feed ten times. PSMF ¶ 81. At times Parker ran out of feed in all chicken

houses and sometimes over consecutive days, PSMF ¶ 81-83,[3] a situation that would directly affect Parker's compensation. In September 2018, Parker had approximately five feed outages. ECF No. 118-17 at 42. During a flock in May 2019, Perdue delivered feed with concrete chunks in it that broke 17 augers on his feed lines. PSMF ¶ 85. Perdue later used these broken feedlines as a basis to say Parker was failing at meeting his obligations. *Id*. ¶ 87.

In addition to poor inputs, Perdue also began imposing more requirements on Parker and requiring more upgrades. These included requirements that Perdue admitted in deposition testimony applied *solely* to Parker. For example, Mizell admitted that she required, as a condition of getting more birds in October 2018, that Parker alone was required to keep more propane on hand *than any other grower* under her purview. *Id*. ¶ 97. As another example, while Perdue had been fine to let Parker repair fans, feed lines, and water lines before while continuing to regularly give him flocks, PSMF ¶ 52, starting in 2018, Perdue began to threaten withholding flocks for the same repairs, SUMF ¶¶ 81-82. Further, in August 2019, right before Perdue gave Parker an impossible ultimatum (detailed below), Copeland for the first time told Parker it was not enough to repair his drinker and feed lines—Parker needed to replace them altogether. PSMF ¶¶ 99, 102. Showing just how atypical this demand was, Copeland kept having to correct himself in a recorded conversation because he kept slipping and saying Parker need only "fix" them to get more birds. *Id*. In the same conversation, Copeland informed Parker that he was imposing a new requirement that Parker use city water exclusively. PSMF ¶ 96. The only requirement on Parker before that was that he have two water sources. *Id*.

---

[3] Remarkably, Perdue responded that it would only compensate Parker for feed shortages *it caused*, if it happened *more* than ten times during a flock. PSMF ¶ 81 (Perdue 007976).

Moreover, while Perdue had regularly provided Parker with financing for repairs, *id.* ¶ 93, it now made it impossible for Parker to meet its new demands by finding pretexts to deny him the funding it had previously and regularly made available, *id.* ¶ 94. An example: After telling Parker it would finance the cost of new drinker lines once he paid off a prior loan he obtained from Perdue in 2016 for upgrades, Perdue subsequently refused to loan him money for drinker line replacement despite his repaying the prior 2016 loan. *Id.* ¶ 95. Perdue claimed it was because Parker had not been able to do all the upgrades Perdue demanded with the earlier loan, but this was directly contrary to what Perdue had told Parker previously. *Id.* Then, in 2019, Perdue used a new excuse not to finance Parker's replacement of water lines, even though it made it a condition precedent of receiving more birds. *Id.* ¶ 94, 96. This time, Copeland claimed Perdue would not finance the drinker lines because Parker had gone back to using well water. *Id.* As Copeland acknowledged, however, there was no requirement that growers use a particular source of water. *Id.* ¶ 96.

Finally, on September 29, 2019, Perdue gave Parker an ultimatum, demanding he either (1) make the costly and unnecessary upgrades Perdue had recently demanded, totaling over $162,000, or else he would get no more birds, or (2) that he make even more costly and unnecessary upgrades, totaling over $959,000 to sell his farm. PSMF ¶¶ 103-05. Perdue knew at the time of putting this decision to Parker that he could afford to do neither. Without an active contract, Parker's Milledgeville farm went from being worth $737,000 to $145,000, with the chicken houses not even worth their scrap. PSMF ¶ 107.. Parker filed for bankruptcy and the Milledgeville farm was foreclosed.

To rebut the destruction it wrought, Perdue claims working for Perdue raised Parker's net worth from $174,000 in 2014 to $1,740,000 in 2018. Mem. at 4. False. Perdue cites a 2018 balance sheet for his 2018 net worth, SUMF ¶ 52 (citing Ex. 5 to Dep. II, at FFB00294), but the only 1.74

number on it is Parker's debt-to-worth ratio (meaning his debt was 1.74 times his net worth), PSMF ¶13 (FFB00294). The deposition testimony Perdue cites does not support the claim either. The only person who asserted $1,740,000 was defense counsel. ECF 118-5 at 49.

Instead of the false number Perdue offers, the cited balance sheet actually identifies Parker's net worth in 2018 as $831,000. Ex. 5 to Dep. II at FFB00294. And it makes clear that Plaintiff was only in the black because of the purported value of his Milledgeville chicken farm *while that farm was under contract* with Perdue. *Id*. As the other evidence in this case shows, the value came only from Parker's contract with Perdue and nothing else. PSMF ¶ 109. But that value disappeared when Perdue retaliated against Parker. PSMF ¶¶ 107-109.

## LEGAL STANDARD

A moving party is only entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1214 (11th Cir. 2024). A genuine dispute of material fact exists where "a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof." *Forsythe v. Starboard Yacht Group, LLC*, 730 F. Supp. 3d 1302, 1305 (S.D. Fla. 2024). "Courts must construe all facts and draw all inferences in the light most favorable to the nonmoving party." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013). "When factual conflicts arise, [courts] must credit the non-moving party's version." *Blanco v. Samuel*, 91 F.4th 1061, 1070 (11th Cir. 2024)(internal quotation marks omitted). "[E]ven if a court believes the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." *Id*. In addition, "[w]hen the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with

credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024).

## I.    PERDUE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PARKER'S FLSA CLAIM.

Perdue's motion for summary judgment on the FLSA claims—which does not argue Parker was not an employee—fails on multiple grounds. First, genuine disputes of material fact exist regarding whether Perdue willfully violated the FLSA, and if it did, a three-year (not a two-year) statute of limitations applies. Second, the statute of limitations should be equitably tolled due to Perdue's failure to post the required FLSA notice under 29 C.F.R. § 516.4. Third, material questions of fact preclude summary judgment on the agricultural exemption defense.

### A.    Genuine Disputes of Material Fact Exist as to Whether Perdue Acted Wilfully.

To establish a willful violation of the FLSA "the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162-63 (11th Cir. 2008). "The determination of willfulness is a mixed question of law and fact." *Ballehr v. Centers*, 2009 WL 10670050, at *11 (M.D. Fla. Nov. 10, 2009) ("The question of whether [Perdue] was reckless or unreasonable is a fact intensive issue that requires analysis into [Perdue's] state of mind."). Put differently, "[a]n employer willfully violates the Act if he should inquire as to whether his actions violate the Act, but fails to do so." *Davila v. Menendez*, 717 F.3d 1179, 1184 (11th Cir. 2013). The record contains sufficient evidence for "a reasonable jury [to find] that [Perdue] willfully violated the minimum wage laws"—meaning Perdue either "[knew its] conduct [was] prohibited or show[ed] reckless disregard for the minimum wage laws." *Id.* at 1185.

In March 2018—over a year before Parker's actionable period under the FLSA—the Small Business Administration ("SBA") issued a comprehensive evaluation of small business loans to poultry growers. Report No. 18-13, *Evaluation of SBA 7(a) Loans Made to Poultry Farmers* (Mar. 6, 2018) ("SBA Report"), *available at* t.ly/0vGUf. The Report concluded that poultry integrators like Perdue exercised so much control over their nominally "independent" growers that such growers could not qualify as separate businesses for the purpose of SBA loans. The OIG "found integrator control exercised through a series of contractual restrictions, management agreements, oversight inspections, and market controls . . . overcame practically all of a grower's ability to operate their business independent of integrator mandates." *Id.*

The evidence demonstrates Perdue was aware of this finding. First, Perdue was aware because this determination implicated a key source of financing for many of its growers (SBA loans)—which Perdue directly facilitated through payment withholdings, PSMF ¶ 48. Second, Perdue is intimately involved in the trade association, the National Chicken Council (NCC), that represents poultry integrators. Indeed, Randy Day, the former CEO of Defendant and its corporate (Perdue Farms Inc.), served concurrently in senior leadership roles at both organizations from 2017 through 2023.[4] Day was thus on the NCC Board of Directors when OIG published the SBA Report in 2018, immediately after which NCC responded by filing a comment with the agency "urg[ing] the SBA to reconsider its proposal" regarding farmers' eligibility for SBA loans. *See* NCC Comments on SBA Proposed Rule, at 1 (Dec. 18, 2018), *available at* t.ly/IO0tv.

In addition, internal NCC communications show that senior executives recognized the employment status of independent growers as "an issue [to] watch" because "the liability issues [were] vast," further characterizing the topic as a "fight" that had "been brewing for some time."

---

[4] *See Perdue Farms CEO Randy Day Announces Retirement*, NCC Washington Report (Apr. 21, 2023), *available at* t.ly/o1o5J.

PSMF ¶ 20. These same executives acknowledged that proposed Department of Labor guidance—which was never implemented—would have "ma[d]e it easier to classify workers as independent contractors," *id.*—an undeniable nod to the specious legal foundation underlying existing independent contractor designations.

This record evidence—the SBA Report, the industry council's response to it, and Perdue's intimate relationship to the NCC—viewed in the light most favorable to Parker, establishes that Perdue knew or recklessly disregarded clear indicators that it exercised such extensive control over its growers that they should have been classified as employees under the FLSA. *See, e.g.*, *Swan v. Nick Grp., Inc.*, 2013 WL 5200508, at *7 (N.D. Ga. Sept. 13, 2013) (denying summary judgment on willfulness where "the record showed that the employers were aware of the relevant wage and hour laws and did not investigate whether they had complied with the laws"). This evidence creates a genuine dispute of material fact as to Perdue's willfulness.

**B.    The Statute of Limitations Should be Equitably Tolled Due to Perdue's Failure to Post Required Notice Explaining the FLSA.**

Based on this Court's precedents, Parker's FLSA claims were equitably tolled by Perdue's failure to post required notice under 29 C.F.R. § 516.4. In *Aly v. Butts County*, the court recognized that "failure to post required notice will equitably toll a limitations period . . . until such time as a plaintiff 'acquires general knowledge of his right[s] . . . or the means of obtaining such knowledge.'" 841 F. Supp. 1199, 1202 n.1 (M.D. Ga. 1994); *see also Cisneros v. Jinny Beauty Supply Co*., Inc., 2004 WL 524482, at *1 (N.D. Ill. Feb. 6, 2004) ("[A]n employer's failure to post the notice required by 29 C.F.R. § 516.4 tolls the FLSA statute of limitations until an employee acquires a general awareness of his rights under the FLSA."). Parker has declared under penalty of perjury that no FLSA notice was posted or provided in compliance with 29 C.F.R. § 516.4 and he did not learn of rights under the FLSA until 2022. Parker Decl. ¶ 47; ECF No. 107-2 ¶ 16. As

a result, Perdue denied Parker the basic statutory notice designed to inform employees of their rights under the FLSA—justifying the equitable tolling.

## C. There Remain Questions of Fact Regarding Which, if Any, of Parker's Overtime Work is Covered by the Agricultural Exemption.

There is a genuine dispute of material fact as to whether Perdue has met its burden of proving Parker's work qualifies for the FLSA's agricultural exemption, 29 U.S.C. § 213(b)(12), which excludes from the statute's overtime requirements "any employee employed in agriculture." *See Ramirez v. Statewide Harvesting & Hauling, LLC*, 997 F.3d 1356, 1359 (11th Cir. 2021); *Ares v. Manuel Diaz Farms, Inc.*, 318 F.3d 1054, 1056 (11th Cir. 2003). The exemption encompasses two distinct categories of work: *primary agriculture*, which includes, *inter alia* "the raising of livestock, bees, fur-bearing animals, or poultry," and *secondary agriculture*, which covers "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398 (1996). The employer must establish by a preponderance of the evidence that an employee is exempt from the FLSA's minimum wage and overtime requirements. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025).

While Parker agrees that his work directly related to raising Perdue's chickens was primary agriculture, *Holly Farms Corp.*, 517 U.S. at 399-400, there remains questions of fact as to whether: (1) Parker performed both exempt and non-exempt work in the same workweek, precluding the exemption; and (2) the overtime work Parker performed while not raising chickens—in between flocks—constitutes either primary or secondary agricultural work under 29 U.S.C. § 213(b)(12).

### 1. Record Evidence Demonstrates That While Raising Flocks, Parker Performed Non-Exempt Work in the Same Week as Exempt Work, Precluding Application of the Agriculture Exemption.

"Where an employee in the same workweek performs work which is exempt under one section of the Act and also engages in work to which the Act applies but is not exempt under some

11

other section of the Act, he is not exempt that week, and the wage and hour requirements of the Act are applicable." 29 C.F.R. § 780.11. Courts consistently apply the mixed-work doctrine to deny agricultural exemptions where employees perform both agricultural and non-agricultural functions. For example, in *Darowski v. Wojewoda*, the court held that the employer did not meet its burden of proving the exemption applied when it "fail[ed] to establish that [the employee's] agricultural and non-agricultural work occurred in different work weeks." 2016 WL 4179840, at *10 (D. Conn. Aug. 7, 2016); *see also Centeno-Bernuy v. Becker Farms*, 564 F. Supp. 2d 166, 179 (W.D.N.Y. 2008) ("Given the breadth of the non-exempt work performed … , there is a material question of fact as to whether, during any particular workweek, plaintiffs performed work which would preclude defendants from claiming an exemption'").

Here, the record demonstrates Parker regularly performed duties that clearly fall outside any reasonable definition of agricultural work while flocks were on site, including acting as a general contractor overseeing capital improvements to facilities, implementing biosecurity protocols, conducting maintenance, signposting, and administrative tasks. PSMF ¶¶ 19-65; Parker Decl. at ¶ 12, 14. These non-agricultural activities preclude application of the exemption, especially at summary judgment. *See, e.g.*, *Darowski*, 2016 WL 4179840, at *10.

### 2.    Overtime Work Performed by Parker When Flocks Were Not on Site, Do Not Fall into Either Category of the Agricultural Exemption.

Even if the mixed-work doctrine does not apply, the Supreme Court's decision in *Holly Farms* establishes a temporal requirement that precludes summary judgment for Perdue on this issue. The Court held that when an integrator like Perdue "contracts with independent growers for the care and feeding of [its] chicks, [its] status as a farmer engaged in raising poultry ends with respect to those chicks." 517 U.S. at 400. The Court further emphasized that Perdue "does not resume its status as 'farmer' with respect to those birds," once they have been collected from

Parker for "carriage to slaughter and processing." *Id*. That is, when the birds leave a farmer's possession (either to be grown by someone else or to be slaughtered), the farmer is no longer engaged in primary agriculture. *Id.* at 401.

Applying this logic, Parker was not engaged in "raising poultry" once a flock left his farm. So the only remaining question is whether work performed between flocks constitutes secondary agriculture—*i.e.*, work "performed by a farmer or on a farm as an incident to or in conjunction with [primary agriculture] operations." 29 U.S.C. § 213(b)(12). But when no birds are on site, no work can be performed "incident to or in conjunction with" those operations (*i.e.,* the raising of poultry). And Parker has alleged and provided evidence that Perdue required extensive labor during periods when no flocks were present. PSMF ¶¶ 61-64; Parker Decl. ¶ 12, 14. Therefore, material questions of fact exist regarding the nature and timing of Parker's work relative to active farming operations, and summary judgment on the agricultural exemption is inappropriate.

### D.    Perdue's Minimum Wage Analysis is Incorrect.

Finally, Perdue's minimum wage calculation misapplies FLSA principles by attributing the entire $18,115.12 payment to work performed solely while he had a flock. Mem. at 6-7. This ignores the preparatory work Parker did before and after the flock was on-site, which is compensable. *See, e.g.*, *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1371 (S.D. Ga. 2015). And even if the $18,115.12 represented Parker's net pay for a single flock after *Perdue* made deductions, it does not take into account Parker's other overhead and capital costs undertaken solely for Perdue's benefit. *See* 29 C.F.R. § 531.35 (requiring wage be "free and clear" of expenses that solely benefit employer).

## II.    PERDUE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PARKER'S BREACH OF CONTRACT CLAIM.

To establish a breach of contract, Parker must "prove that the defendant owed the plaintiff

a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). With the facts and law properly understood, Parker has met his burden of asserting a contract breach case that should go to the jury.

    **A.**    **On the Factual Record, a Jury Could Find Perdue Breached the PPA.**

    Perdue asserts Parker cannot "establish that Perdue, in fact, breached any provision of the PPA." Mem. at 14. But Perdue ignores relevant law, record evidence, and its own admissions.

    The weakness of Perdue's arguments on this front is immediately apparent from its request that the Court impose a new hurdle to surviving summary judgment: that a plaintiff recite during his deposition the specific provisions of a contract that were breached. Mem. at 10 ("Parker's breach claim fails because, *on deposition*, he was unable to point to a contractual obligation that Perdue breached." (emphasis added)). As an initial matter, as discussed further below and as a matter of black-letter-law, the duty of good faith and fair dealing is not tied to particular contractual provisions. More importantly, there is no support for Perdue's position. Perdue does not cite a single case limiting the legal or factual basis for breach of contract claims to a plaintiff's own testimony. The caselaw Perdue does cite stands for the unremarkable proposition that such claims require evidence of a contractual obligation that was violated. *See, e.g.*, *id*. at 10 (citing *Taylor*, 365 Md. at 175). For example, in *Taylor*, to determine if there was sufficient evidence to survive summary judgment, the court did not look to whether the plaintiff could answer an issue-spotting question; it looked to the language of the relevant contract and the defendant's particular conduct in contravention of it. 365 Md. at 179. Perdue also misleadingly quotes colloquial language in *Wootton Enters. v. Subaru of Am., Inc.*, in which the court said the plaintiff had to "point to" particular contract provisions. Mem. at 11 (citing 134 F. Supp. 2d 698, 703 (D. Md. 2001)). But Perdue ignores that court's actual analysis, which examined the contract language itself to

determine whether it imposed obligations that had been violated. 134 F. Supp. 2d at 703-13. Whether Parker, a layperson, could answer Perdue's questions about whether a specific provision of the contract was breached is not the standard.

Moreover, there is plenty of evidence in the record on which a jury could find for Parker. First, the PPA obligated Perdue to treat Parker as an "independent contractor." ECF 23-1 ("PPA"), at 5 (§ IV). Under Maryland contract law, this means he was to "retain control over the manner of performing the services provided." *Hancock v. Mayor of Balt.*, 480 Md. 588, 606 (2022) (internal quotation marks omitted) (an "independent contractor" is "[s]omeone who is entrusted to undertake a specific project but who is left free to do the assigned work and to choose the method for accomplishing it," citing *Black's Law Dictionary* 920 (11th ed. 2019)). The term has a legal meaning and consequences. *Hancock*, 480 Md. at 606. Here, breaching this provision had consequences for Parker's pay and financial risk. *See, e.g.*, Md. Code Ann., Lab. & Empl., § 3-413(c) (2014) (setting minimum wage under Maryland law); *id.* § 3-503 (limiting deductions from pay for expenses); *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 242 (D. Md. 2012) ("The MWHL is the State parallel to the FLSA and the requirements of that provision mirror those of the federal law." (cleaned up)). Perdue ignores the "independent contractor" provision and instead focuses only on a related provision that allowed Parker to use his "skill, knowledge, and discretion," which it claims was cabined by its policies and procedures allowing the control Parker alleges to be a breach.[5] Mem. at 14 (quoting SUMF ¶¶ 10, 59)). But courts do not interpret contractual language in isolation. *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 506-07 (2021). The contract

---

[5] Really, Perdue's arguments that the contract's various provisions did not actually allow Parker to use his independent skill is an admission that Perdue intended to and did treat Parker as an employee. *See* Mem. at 14 (reviewing all the ways the contract allowed Perdue to control Parker). The only evidence Perdue proffers to support its claim that Parker had "significant independent judgment and discretion" is that Parker hired employees himself. *Id.* at 15. But he did not hire any employees on his Milledgeville farm during the relevant period. Instead, he worked 60 hours per week for Perdue, which exercised total control. PSMF ¶¶ 19-64, Parker Decl. ¶¶ 7-17, Att. 1.

promised an independent contractor relationship and its promise to allow Parker to use his "knowledge, skill, and discretion" has meaning in that context. Since Perdue concedes "there may be genuine issues of material fact under the economic realities test" as to whether Parker was, in fact, an independent contractor or an employee, Mem. at 2 n.4, Perdue cannot argue that it is entitled to summary judgment on Parker's breach claim on these grounds.

Second, Perdue acknowledges the PPA obligated it to provide birds and feed, SUMF ¶ 5, but asserts Parker's breach claim concerns the quality of those things and that the contract imposes no quality obligations, Mem. at 12, 15. This misses the mark. The record includes documented instances when Perdue failed to provide feed as needed. PSMF ¶¶ 81-83, 85. Moreover, while Perdue claims "sole and absolute discretion over the chicks consigned," Mem. at 12, the discretion granted only covered breed, number, and timing—not quality. PPA § III.I. Further, Maryland law implies a duty of good faith and fair dealing that "prohibit[s] one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 265 (4th Cir. 2024). Removing this implied duty, as Perdue requests, would allow it to deliver gravel labeled as "feed" or visibly infirm chicks with impunity. That is not the law. The record evidence demonstrates that Perdue delivered feed with concrete chunks in it, PSMF ¶ 85, and, as Perdue acknowledges in its brief, Parker testified he also did not always receive healthy chicks, Mem. at 12. Perdue is free to argue these failures were not a violation of its duty of good faith and fair dealing, but that is a jury question.

Third, the PPA obligated Perdue to "[p]rovide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation." PPA § I.E. Record evidence demonstrates that Perdue did not do this. PSMF ¶ 72; Parker Decl. at ¶ 25. Perdue downplays this evidence by claiming Parker testified that Perdue

"'tried' to provide this information to him, but 'it is impossible almost for a grower to figure' 'because there [are] too many factors.'" SUMF ¶ 127. This amalgamation of various quotes from Parker's testimony—arranged out of order by Perdue—is misleading. Parker actually testified that, "I requested—because the system [for pay] they have, it is impossible almost for a grower to figure." ECF No. 118-5 at 217. Parker then testified that after he requested the information, Perdue "tried but it was—it wasn't—*they couldn't* because there was too many factors." *Id*. at 217-18 (emphasis added). Perdue conveniently omits the testimony that it did not provide the information, PSMF ¶ 72; Parker Decl. at ¶ 25, from which a jury could reasonably find a breach.

Fourth, the duty of good faith and fair dealing applies equally to the PPA's provision that "additional large capital investments may be required." PPA at 1. The contract does not identify which party may "require" additional investments, but it includes language placing responsibility for housing and equipment in Parker's hands. *Id*. Under this reading, Perdue's attempt to impose its own capital improvements requirements would clearly be a breach. Moreover, even to the extent the contract places the right to require capital investments in Perdue's hands, it could not enforce that provision in a manner that made it impossible for Parker to perform. *Kim*, 116 F.4th at 265. Yet, that is exactly what the record evidence shows Perdue did. *E.g.*, PSMF ¶¶ 102-09.[6]

The record contains sufficient evidence to preclude summary judgment because genuine disputes exist regarding whether Perdue breached its contractual obligations—including the duty of good faith and fair dealing under the December 2016 PPA.[7]

---

[6] Perdue argues Parker cannot prove it required more of him than other growers. Mem. at 16. But how Perdue treated other growers compared to Parker does not go to whether it breached contractual expectations it had with *him*.

[7] Finally, Perdue asserts that sending flock supervisors onto Parker's farm is not a breach. Mem. at 15. But Parker does not allege this was a breach; instead, the flock advisors' constant presence on his farm and detailed feedback are evidence that Perdue did not treat Parker as an independent contractor. PSMF ¶¶ 46-51.

**B.**    **The Allegations in this Case Do Not Require Parker to Prove His Own Compliance with the Contract.**

Perdue claims an element of a breach of contract claim under Maryland law is that the claimant must prove their own performance under the contract. Mem. at 13. As outlined in *Taylor*, 365 Md. at 175, it is not. Instead, the courts in the cases on which Perdue relies found this requirement where performance by the defendant depended on plaintiff's performance. *See, e.g. Collins/Snoops Assocs v. CJF, LLC*, 190 Md. App. 146, 161-64 (2010) (finding subcontractor had to show timely performance before it could prove contractor was not entitled to terminate on that basis); *Hubler Rentals, Inc. v. Roadway Exp. Inc.*, 637 F.2d 257, 260-61 (4th Cir. 1981) (finding vehicle provider could not recover for wrongful termination of the contract where it had not shown it provided vehicles as required). Indeed, the very language Perdue quotes establishes that "one who sues for the breach of a contract which requires him to perform certain acts *before he becomes entitled to demand* that for which he sues, must allege and prove performance on his part." *See Johnson & Higgins v. Simpson*, 163 Md. 574, 581 (1933) (emphasis added)). Here, none of the breaches identified above relied on any particular acts by Parker. Moreover, whether Parker was in breach by failing to comply with retaliatory demands is a question of fact for the jury. *See, e.g.* PSMF ¶¶ 85, 87 (concrete in feed breaking feedlines and Perdue using these broken feedlines as excuse for refusing flock placements).

**C.**    **Parker Does Not Have to Prove Damages to Establish His Breach of Contract Claim.**

Perdue claims it is entitled to summary judgment on breach of contract because Parker has not "provided any proof of recoverable damages." Mem. at 15, 16. But it is black-letter law, cited in a case on which Perdue relies for other propositions, that a plaintiff does not have to prove damages to prove a breach of contract. *Taylor*, 365 Md. at 175. In any event, there are several

categories of damages Parker can prove at trial: the loss of pay because his flocks were hindered by poor inputs, the expenses of upgrades undertaken in reliance on Perdue fulfilling its implied duties of good faith, and the value the ongoing contract brought to the farm. Lewis Rep. at 41-42.

Perdue claims the liability waiver in the PPA bars recovery nonetheless. Mem. at 17. First, the waiver does not address general damages and those are the damages Parker seeks. *See, e.g.*, *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 407 (2012) (general damages are "the loss in the value to him of the other party's performance caused by its failure or deficiency"); *Addressograph-Multigraph Corp. v. Zink*, 273 Md. 277, 286 (1974) (general damages are those "which may fairly and reasonably be considered as arising naturally from the breach"). Perdue's agent recognized that the expected value of a contract with Perdue to a grower is the equity in the related farm. PSMF ¶ 109. Second, such waiver clauses are unenforceable for intentional harms or where they are the product of unequal bargaining power. *Wolf v. Ford*, 335 Md. 525, 531-32 (1994). Here, evidence demonstrates that Perdue intentionally breached the contract in retaliation for Parker calling USDA. Perdue cannot now be rewarded for that by enforcing a liability waiver it imposed on Parker. Moreover, in addition to being a contract of adhesion, PSMF ¶ 3, Parker had no choice but to sign the December 2016 PPA. At the time, due to upgrades Perdue required Parker to pay for and the remaining mortgage on the Milledgeville farm, Parker had over $600,000 in debt on it. ECF No. 118-5, Ex. 5 at FFB00287 & -294 (showing outstanding mortgage on farm was $702,593 in January 2016 and $540,191 in December 2018). Perdue was withholding over half of each flock settlement to pay off these debts. PSMF ¶ 12. With no other integrators in the area, PSMF ¶ 4, this was not a circumstance of unequal bargaining power—it was a circumstance of no bargaining power. Maryland law does not countenance the waiver in this case.

**D.      Parker's Breach of Contract Claim is Not Time-Barred.**

Perdue asserts that any breach of contract claim based on the allegation that the PPA required Perdue to treat Parker as an "independent contractor," "allowing him to utilize his independent judgment and skill," is time-barred "to the extent" his claim is based on "incidents arising prior to July 2016." Mem. at 9-10. By qualifying its arguments "to the extent" evidence supports it demonstrates that Perdue cannot meet its burden on this affirmative defense and Perdue's motion fails on this basis alone. In any event, Perdue cannot show the absence of a genuine dispute.

First, Perdue's argument ignores the allegations of the Amended Complaint and the evidence. The PPA at issue was executed on December 16, 2016, PPA at 1, within the six-year statute of limitations. Parker alleges, and evidence exists sufficient for a jury to conclude, that Perdue breached *this* contract, and that it did so not only by refusing to treat Parker as an independent contractor but, as outlined above, in many other ways, all of which Perdue ignores in its limitations argument. *See* PSMF ¶¶ 81-105; SUMF ¶ 127 (admitting as undisputed material fact that Perdue begin refusing to provide pay data in 2016 or 2017). To the extent Perdue suggests the statute began to run on these post-2016 breaches when Perdue breached similar provisions of earlier PPAs, Mem. at 9, Perdue provides no legal support. Because Perdue's obligations were separable as to each flock, the statute began to run with each successive breach. *See S. Telecom, Inc. v. Level 3 Communs., LLC*, 295 Ga. App. 268, 273 (2008).

Moreover, Parker has proof sufficient for a jury to reasonably conclude that Perdue went to even further extremes of control, beyond whatever baseline it had set before, after Parker called the USDA. *E.g.*, PSMF ¶¶ 19-64. Indeed, the very fact that Perdue imposed even a single additional requirement as retaliation is itself a violation of the implied duty of good faith. And nowhere does

the PPA condition Parker's use of his own "skill, knowledge, and discretion" on Parker's wavier

of his right to accurate pay or his promise not to alert the responsible federal authorities.

## III.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM.

To establish negligent misrepresentation, Parker must demonstrate (1) "the defendant's

negligent supply of false information"; (2) Parker's "reasonable reliance upon that false

information"; and (3) "economic injury proximately resulting." *Hardaway Co. v. Parsons,*

*Brinckerhoff, Quade & Douglas*, 267 Ga. 424, 426 (1997). Parker does not have to prove Perdue

knew its statements were false. *Bowden v. Med. Ctr.*, 309 Ga. 188, 199 n.11 (2020). Perdue argues

it is entitled to summary judgment because (1) the representations on which Parker relied are not

actionable; (2) Parker's claim is time-barred; and (3) Parker cannot double recover damages for

breach of contract and negligent misrepresentation. Each argument fails.[8]

### A.    Perdue's Documented Misrepresentations Constitute Actionable Statements Upon Which Parker Justifiably Relied.

The record contains sufficient evidence for a jury to find that Perdue made several

actionable misrepresentations. First, Perdue represented that Parker could exercise independent

judgment. PSMF ¶ 17. In reality, Perdue maintained extensive control, removing all independence.

Second, Perdue represented that its policies and procedures would not eliminate Parker's

independence, but, when finally disclosed after Parker signed up, they did, and they changed

constantly and in unpredictable ways. *Id*. ¶ 67, ¶¶ 81-105. Third, Perdue represented that it would

have policies and procedures but not that its enforcement or implementation of these would turn

on whether Parker reported suspected misconduct to the USDA. *Id*. ¶ 80. According to Perdue,

---

[8] In a footnote, Perdue claims, "[n]or can Plaintiff show the reasonable reliance necessary to sustain this claim." Mem. at 21. Perdue says nothing more. It has thus forfeited this argument. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019). In any event, Perdue has never argued (let alone provided evidence) that growers would be unreasonable to rely on its representations to them.

none of these representations are actionable because they are (1) mere "broken promises, unfulfilled predictions or erroneous conjecture as to future events," Mem. at 19, (2) statements about how the law might apply to the parties' relationship, *id*. at 20, or (3) only omissions, *id*. at 21. Perdue is incorrect.

First, Perdue does not identify which representations it believes are mere "broken promises, unfulfilled predictions or erroneous conjecture as to future events." Mem. at 20 (citing *C&C Family Trust v. AXA Equitable Life Ins.*, 44 F. Supp. 3d 1247, 1256 (N.D. Ga. 2014)). And none are. Courts dismiss statements about future events and hopes as inactionable "puffery," but such statements are not present here. *See, e.g.*, *Tavistock Freebirds LLC v. Coca-Cola Co.*, 366 Ga. App. 443, 448 (2023); *King v. Codisco Inc.*, 217 Ga. App. 704, 705 (1995); *Next Century Communs. Corp. v. Ellis*, 318 F.3d 1023, 1028-29 (11th Cir. 2003). Perdue's statements were specific representations about how it managed growers and the only evidence is that Perdue knew they were false or were negligent in not knowing.[9]

Second, Perdue misapplies the law with respect to its claim that erroneous opinions about the law's effect or application cannot be deemed a negligent misrepresentation. Mem. at 20. While Perdue is correct that misrepresenting the status of applicable law—such as the zoning status of a property being sold—cannot be the basis for such a claim, this point is wholly irrelevant to the matter at hand. Perdue's misrepresentations were not about what the law required, they were about the level of control it would exert—a factual, not a legal question. Unlike the plaintiff purchaser in *Gignilliat v. Borg*—the only case Perdue cites in support of this proposition—Parker did not

---

[9] Perdue raises an entirely separate claim, in a footnote, that any "breach of duty growing out of a contractual relation . . . must be shown to have been a breach of duty imposed by statute or a duty imposed by a recognized common law principle." Mem. at 20 n.24. Perdue does not develop this argument. And the only case it cites in support does not even involve a negligent misrepresentation claim—indeed, it involves no identified common law claim at all, just a vague reference to "a tort." *Deacon v. Deacon*, 122 Ga. App. 513 (1970). In any event, Parker's negligent misrepresentation claim *is* based on a recognized (and actionable) common law duty. *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 250 Ga. 680, 681-82 (1983).

have an "equal opportunit[y] for knowing the truth" of Perdue's representations as one might public laws. 131 Ga. App. 182, 183 (1974). The only party that could know was Perdue.

For similar reasons, Perdue's arguments that misclassification as an independent contractor cannot provide a basis for negligent misrepresentation claims are misplaced. Mem. at 21. Again, Perdue's designation of Parker as an "independent contractor" in name is not Parker's basis for his misrepresentation claim and not the evidence on which he relies. That Perdue's treatment engendered an employer-employee relationship under the FLSA is incidental to the facts giving rise to his negligent misrepresentation claim.[10] The cases on which Perdue relies for this argument are inapposite as well. First, the court in *Accord Trucking, Inc. v. FedEx Ground Package System, Inc.* was only addressing whether the trial record provided sufficient evidence for a jury verdict in plaintiff's favor. 2024 WL 4602133, at *26 (Ariz. App. Oct. 29, 2024). It said nothing of whether negligent misrepresentation claims are categorically barred for misclassification. And in *Debnam v. FedEx Home Delivery*, the only representation at issue was the legal designation of the plaintiff as an "independent contractor." 2011 WL 1188437, at *1 (D. Mass. Mar. 31, 2011).

Third, and finally, Perdue is wrong that material omissions are not actionable as negligent misrepresentation claims. They are. *See Greenwald v. Odom*, 314 Ga. App. 46, 60 (2012). The cases Perdue cites merely affirm the principle that reliance is not justified where a plaintiff could fill in the missing pieces with their own due diligence. Mem. at 21. As noted above, there is no evidence Parker could have done that here.

---

[10] In fact, a jury could find Perdue liable for negligent misrepresentation under one of Parker's theories while simultaneously determining that Parker doesn't qualify as an employee under the economic realities test. These are distinct legal inquiries with different standards.

**B.     Parker's Negligent Misrepresentation Claim Is Not Time-Barred**.

The statute of limitations began to run on Parker's negligent representation claim only from the time his "economic loss [as a result of the misrepresentation] is *actually* sustained." *Coe v. Proskauer Rose, LLP*, 314 Ga. 519, 526 (2022). Moreover, although "it may have been *foreseeable*, or *even likely*, that [Parker] would lose money due to [the misrepresentation]," his claim did not accrue until he "suffer[ed] *actual* 'pecuniary loss.'" *Hardaway Co.*, 267 Ga. at 427. "Even if there were some evidence put forth . . . that [Parker] suffered actual economic loss before [July 2018], at most this would . . . creat[e] an unresolved issue of fact, making summary judgment in favor of [Perdue] on statute of limitations ground inappropriate." *Id.* at 427 n.8.

Perdue, bearing the burden on this defense, does not offer any evidence that Parker suffered non-speculative and certain economic loss before 2018. Mem. at 19. Instead, Perdue relies entirely on deposition fragments where Parker acknowledged growing suspicious that Perdue may have induced his agreement to the PPA based on misrepresentations. *Id*.

The evidence missing from Perdue's brief and related papers shows that Parker's actual pecuniary loss from Perdue's misrepresentation occurred in September 2019. This was when Perdue's micromanagement and retaliatory requirements and upgrades stripped him of the value of the investments he made in reliance on those representations. Lewis Rep. at 41-42. By Perdue's own admission, Parker had a positive net worth, despite his debts, while Perdue was supplying chickens. Mem. at 4 (citing his increased net worth). When faced with a similar question regarding the accrual date for a negligent misrepresentation claim, the court in *Mbigi v. Wells Fargo Home Mortgage Co.* held that not even negative amortization on a mortgage loan (the total loan balance grows because the periodic payments don't fully cover accumulated interest) triggered the statute of limitations until it led to foreclosure. 336 Ga. App. 316, 324-26 (2016). Here, as in *Mbigi*,

Parker's efforts to stave off harm within the confines of a coercive relationship do not preclude his right to pursue relief once the inevitable financial downfall materializes.[11]

Because Perdue has proffered no evidence supporting a chronology that places Parker's non-speculative economic loss before 2018, and any evidence raised in its reply would merely underscore a genuine dispute of material fact, the Court cannot grant Perdue's motion for summary judgment on statute of limitations grounds.

## C.    Perdue's Double Recovery Arguments are Premature.

Lastly, Perdue argues that Parker cannot pursue both breach of contract and negligent misrepresentation claims because he cannot recover under both theories. Mem. at 21. Not so. As the only case Perdue cites makes clear, Parker need not choose "between inconsistent remedies prior to the verdict." *UIV Corp. v. Oswald*, 139 Ga. App. 697, 699 (1976). The law only requires Parker be given "an opportunity to make an election [between the two theories] prior to the formulation and entry of judgment." *Id*.

## CONCLUSION

For the foregoing reasons, Perdue's motion for summary judgment must be denied.

---

[11] To the extent Perdue argues in its reply that the pleaded FLSA damages constitute the first non-speculative loss, this argument would also fail because FLSA misclassification is not the representation on which Plaintiff's negligent misrepresentation relies.

Dated: August 18, 2025                    Respectfully submitted,

                                          */s/ Jamie Crooks*
                                          T. Brandon Waddell
                                          Ga. Bar No. 252639
                                          Jarred A. Klorfein
                                          Ga. Bar No. 562965
                                          Emily C. Snow
                                          Ga. Bar No. 837411
                                          **CAPLAN COBB LLC**
                                          75 Fourteenth Street NE
                                          Suite 2700
                                          Atlanta, Georgia 30309
                                          (404) 596-5600
                                          (404) 596-5604 (fax)
                                          bwadell@caplancobb.com
                                          jklorfein@caplancobb.com
                                          esnow@caplancobb.com

                                          Jamie Crooks (admitted *pro hac vice*)
                                          D.C. Bar No. 156005
                                          Kritika Deb (admitted *pro hac vice*)
                                          Amanda R. Vaughn (admitted *pro hac vice*)
                                          D.C. Bar No. 90033556
                                          **FAIRMARK PARTNERS, LLP**
                                          400 7th Street NW, Suite 304
                                          Washington, D.C. 20004
                                          jamie@fairmarklaw.com
                                          kritika@fairmarklaw.com
                                          amanda@fairmarklaw.com

                                          *Counsel for Plaintiff Roger Parker*