IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ROGER PARKER,

     *Plaintiff*,

    v.

                          Case No. 5:22-cv-00268-TES

PERDUE FOODS LLC,

     *Defendant*.

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS

     Plaintiff provides below his statement of disputed material facts in support of his opposition to Defendant's motion for summary judgment. The below list of facts does not reflect all facts Plaintiff will offer in support of his claims at trial, but only those that are material to resolving Defendant's motion. Accordingly, Plaintiff reserves his right to present additional facts at trial.

## I.    PERDUE'S CONTRACTS WITH PARKER

     1.     Parker bought a farm in Milledgeville, Georgia in November 2009 for his grower operations as the Poultry Producer Agreement ("PPA") required. He took out loans to cover costs for purchase and did grower operations work for Perdue at the Milledgeville Farm. Exhibit A, Perdue 1252-1510, at Perdue 001265-1276 ("Assignment of Funds and Promissory Note"); Exhibit B, Security Agreement, Parker 000486-000489; Exhibit C, Excerpts and Exhibits of Deposition of Roger Parker of April 23-24, 2025 ("Parker Dep. II"), 51:8-22; ECF No. 118-5 at 413, § III.

2.      Parker signed a PPA for the Milledgeville farm in December 2016. ECF No. 118-5 at 411-425.

3.      Parker had no say in the terms of the PPA, which is a form contract that Defendant forces on all growers. Parker had to sign it. Exhibit D, Declaration of Roger Parker ("Parker Decl."), at ¶ 38; Exhibit E, Excerpts and Exhibits of Michael K. Levengood of April 29, 2025 ("Levengood Dep. II"), at 20:1-5; Parker Dep. II, at 375:8-10.

4.      There were no other integrators Parker could work for when he signed the 2016 PPA. Parker Decl. ¶ 38.

5.      Perdue contractually agreed to compensate Parker for the services he provided pursuant to the 2016 PPA and the Producer Payment schedule (Attachment A). ECF No. 118-5 at 411; Exhibit F, at Perdue 001511-1578 at -1511-1517 (Attachment A).

6.      Perdue contractually agreed to "provide [Parker] with an accounting of birds consigned and supplies." ECF No. 118-5 at 411.

7.      Perdue contractually agreed to provide Parker with the data and "statistical information" that it used to determine Parker's compensation. ECF No. 118-5 at 411.

8.      Perdue controlled inputs and required Parker to use "only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided." ECF No. 118-5 at 412; Parker Dep. II at 37:1-11, 199:23-200:6, 235:23-236:1, 240:15-240:22; Exhibit G, Excerpts and Exhibits of Deposition of Clay Copeland ("Copeland Dep."), at 25:9-18, 25:25-26:1.

9.      Perdue agreed to and was supposed to "provide and deliver to [Parker], ... feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned." ECF No. 118-5 at 411.

10.     Veterinary services; feed delivery labor and trucks; chick delivery labor and trucks; and instructions, management, training, and oversight of growing operations were provided and controlled by Perdue. *See* Copeland Dep. 25:9-18; Exhibit H, Excertps and Exhibits of Deposition of Michael K. Levengood of November 14, 2023 ("Levengood Dep. I"), 105:8-10; 161:4-8.

11.     Around 2008, Perdue asked Parker to takeover working another farm, Roosevelt Farm, for Perdue. Parker accepted this assignment. Parker Dep. II at 260:12-261:9.

## II.     PARKER'S FINANCIAL CONSTRAINTS

12.     At the time Parker signed his final Perdue contract on December 16, 2016, Perdue was deducting between approximately $21,000 to $26,000—about half of his pay—from each of Parker's flock payments to pay First Financial Bank for loans Parker had on the Milledgeville farm and to pay for upgrades and materials Perdue required, such as for propane, PLT, bait stations, and cool cell pads. Exhibit A, at Perdue 002507, -2511, -2515, -2519, -2523, - 2528.

13.     At the time Parker signed the 2016 PPA, he still owed over $600,000 on a mortgage on his Milledgeville farm. Exhibit I, at FFB00287 (owing $702,593 as of January 2016), FFB00294 (owing $540,000 as of December 2018).

14.     In 2016, before Parker signed his final Perdue contract on December 16, 2016, Perdue issued at least $48,491.60 in loans to Parker to fund the purchase of materials and upgrades. Perdue withheld funds from Parker's settlement sheets to repay these loans. Exhibit A, Perdue 001341, 1306, 1302-1305, 1393; Exhibit R, Perdue 002252-003124, at 2523, 2528, 2532, 2537, 2541, 2546, 2550, 2555, 2563, 2567, 2572, 2576, 2581, 2585. Perdue deducted a total of $31,434.10 from Parker's first payment under the December 2016 contract. Perdue 002532.

Perdue deducted between $22,886 and $31,434 from each of Parker's flock payments under the December 2016 contract, for a total of $342,195 over 13 flocks. Perdue 002531-2586; Perdue 001392-001393.

## III.    PERDUE'S CONTROL OF PARKER

15.    Parker worked for the integrators Seaboard and ConAgra before growing for Perdue. Parker Decl. ¶ 3; Parker Dep. II at 32:10-37:16, 40:24-43:11, 282:10-283:8.

16.    Based on Perdue's representations, Parker expected his work for Perdue to provide the same level of independence that he had at Seaboard and ConAgra. Instead, Perdue exercised more control than Parker expected based on his prior experience and Perdue's representations. Parker Dep. II at 32:10-33:23, 35:20-37:25, 38:8-40:9, 44:10-19, 280:23-283:8, 307:9-12, 308:19-309:2, 313:11-14; Parker Decl. ¶¶ 3-17.

17.    The 2016 PPA stated he would operate as an independent contractor using his own "skill, knowledge, and discretion." ECF No. 118-5 at 413, § III.A.

18.    In March 2018, the Office of Inspector General ("OIG") for the Small Business Administration ("SBA") issued a report that showed that poultry integrators like Perdue exercised so much control over growers that the growers could not be considered separate businesses in order to receive SBA loans. Report No. 18-13, *Evaluation of SBA 7(a) Loans Made to Poultry Farmers* (Mar. 6, 2018), *available at* t.ly/0vGUf.

19.    Perdue and the National Chicken Council ("NCC"), a "trade association that represents vertically integrated companies that produce and process more than 95 percent of the chicken marketed in the United States," have a strong relationship to the extent that Perdue is a member of the NCC and Perdue's employees, such as the CEO of Perdue's corporate parent, hold positions with the Council. Levengood Decl. ¶¶ 6-7;  http://bit.ly/4mqxZ2E.

4

20.     The NCC submitted comments challenging the SBA's findings in 2018. By 2021, NCC knew that the employment classification of growers was a "fight" that had "been brewing for some time," and that "if contractors are deemed to be 'employees' of a company, the liability issues are vast."  Exhibit J, NCC-3P-007605; NCC Comments on SBA Proposed Rule (Dec. 18, 2018), *available at* t.ly/IO0tv.

21.     The 2016 PPA required Parker to "adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock."  ECF No. 118-5 at 413.

22.     Under the 2016 PPA, Perdue required Parker to "be present or represented when birds are delivered and during the catching and movement of each flock and to be responsible for proper house preparation prior to chick placement and chicken catching and movement." ECF No. 118-5 at 411-425.

23.     Parker was required to be on call for delivery and catch of birds. The catching would often take multiple days. ECF No. 118-5 at 412; Parker Dep. II at 220:25-222:23, 225:19-21; Exhibit K, Perdue 005615 – Perdue 006375, at Perdue 005850, 006505.

24.     Perdue required Parker to "accept the birds when consigned" by Perdue and to "raise the birds until removed at PERDUE's direction" from his farm. ECF No. 118-5 at 411.

25.     Parker could not govern his own schedule, as it was dictated by the tasks Perdue required to be done. Parker Dep. II at 188:5-19, 194:10-197:16, 198:16-21, 201:25-202:21, 215:15-220:3, 223:10-16, 224:16-225:6.

26.     The PPA provided that Perdue "will determine," and therefore Perdue had absolute control over, "a. the breed of chickens PRODUCER will receive [;] b. the number and density of chickens in each flock delivered to PRODUCER's farm [;] c. the  size, weight and age of the

chickens to be produced [;] d. the time for processing of each flock; and [;] e. the date, time and estimated interval of placement for future flocks." ECF No. 118-5 at 414; Parker Dep. II at 36:22-25, 235:10-236:1.

27.    Perdue required Parker to "comply with any bio-security policies, audits, measures, or guidelines required by PERDUE." ECF No. 118-5 at 413.

28.    Perdue's Poultry Producer Agreement required Parker to "adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock." ECF No. 118-5 at 413.

29.    Perdue required Parker to "always follow lighting guidelines" that were "recommended" by his Flock Supervisor. Exhibit K, Perdue Process Verified Program, Perdue 5615 – Perdue 6375, at Perdue 5643; Exhibit L, Perdue 001579 – Perdue 001626, at 001613.

30.    Perdue required that Parker "Never let anyone close to [his] chicken houses without knowing where they have previously been." Ex. L, at Perdue 001580.

31.    Perdue required that Parker "Never visit or associate with Live Bird Markets or the Live Bird Market System. Ex. L, at Perdue 001580.

32.    The PPA required Parker to "adhere to the PERDUE Poultry Welfare and Bio-Security Programs." ECF No. 118-5 at 413.

33.    Perdue required Parker to follow all health , vaccination, and medication programs prescribed by Perdue veterinarians. ECF No. 118-5 at 412; Levengood Dep. I at 83:16-4; Copeland Dep. at 22:19-23:24, Ex. 46.

34.    Perdue required that Parker maintain an exclusive relationship with Perdue as a poultry producer, prohibiting Parker or any employees he may have from "maintain[ing], own[ing]

or car[ing] for any other flocks, birds or poultry on any other premises unless approved by PERDUE." ECF No. 118-5 at 412.

35.    Under the PPA, Perdue required that Parker allow Perdue to "enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities" and if "PRODUCER is not satisfactorily performing PRODUCER'S obligations under the Agreement to care for, treat and maintain the flock," Perdue "shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit." ECF No. 118-5 at 413-414; Parker Dep. II at 285:16-286:2.

36.    Perdue, under the PPA, also required that if Perdue visited Parker's premises and undertook maintenance, treatment, feeding, or care of the flock on Parker's property, Parker would assume the costs of "any necessary disbursements." ECF No. 118-5 at 413-414.

37.    Perdue required Parker to have visitors logs that tracked each individual that was on Parker's farm. Exhibit M, Excerpts and Exhibits from Deposition of Kathryn Mizell ("Mizell Dep."), 37:22-38:3.

38.    Perdue required Parker to maintain his generator by running it regularly and maintaining weekly generator logs. Ex. L, at Perdue 001611; Parker Dep. II at 392:23-393:7; Parker Decl., Att. 1.

39.    After signing the 2016 PPA, Perdue increased its control over Parker and his finances. Parker Dep. II at 130:5-130:8, 336:13-22, 366:4-8.

40.    After Parker reported Perdue to the USDA, the control Perdue exerted over Parker's growing operations and finances significantly increased even more. Parker Dep. II at 119:5-19, 146:1-9, 343:14-16.

41.    In 2018 and in 2019, Perdue representatives visited at least 15 times in 10 weeks. Prior to that, Perdue supervisors would visit only approximately one time per week. Exhibit A, Perdue 001395; Exhibit N, Perdue 006448; Mizell Dep. at 98:3-6; Parker Decl. ¶ 7a.

42.    During visits to Parker's farm, Perdue representatives would track his compliance with their requirements using worksheets that recorded items such as: the exact temperature inside each chicken house (to the tenth of a degree), the ventilation tunnel run time (in seconds), the actual pressure, and the water flow rate (in milliliters/minute). Perdue representatives also tracked the height of his feeders, the height of his water lines, the functionality of his alarms, and several other metrics. Exhibit A, Perdue 001400; Mizell Dep. at 31:1-13.

43.    Perdue required that Parker record his daily water consumption. Perdue tracked the daily water usage in Parker's chicken house to the tenth of a gallon. Perdue required that, seven days before a flock catch, Parker "Run a PWT stock solution at a rate of 2 packs per 4 Gallons of Water" and after every flock catch, "Flush water lines with Proxy Clean using the Proportioner at a 3% solution." Ex. A, Perdue 001411; Exhibit O, at Perdue 007688; Exhibit L, at Perdue 001616; Exhibit P, Excerpts and Exhibits from Deposition of James Norris ("Norris Dep."), at 74:19-75:6.

44.    Perdue required Parker to follow a Daily Checklist which included ensuring "proper flow rates" based on Perdue's "Water Flow Chart," which listed rates within a 5 ml per minute range for the day of chick placement and for every 7 days after placement until flock pickup. Ex. L, at Perdue 001611-001618; Levengood Dep. I at 141:12-142:25; Copeland Dep. at 17:9-10; ECF No. 118-5 at 413.

45.    Perdue required Parker to turn lights on and off for a specific number of hours each day. Ex. K at Perdue 001620.

46.    During visits to Parker's farm, Perdue representatives would leave instructions for tasks he needed to complete. Exhibit K, Flock Visitation Sheets I, Perdue 005615 – Perdue 006375, at Perdue 006654, -6709, -6406; -6403, -6456, -6455, -6508, -6507.

47.    During a visit on July 30, 2015, a Perdue representative informed Parker that he was "nto [sic] pulling enough static pressure in min vent" and told him he needed to "cull more daily." Ex. K, Perdue 005656.

48.    During a visit on March 9, 2016, a Perdue representative directed that "[v]ents should open 2-inches till about 5-6 degrees above setpoint – see posted ventilation guide," "lights are on manual[,] [p]lease set to posted guidelines[,] [f]or intensity and hours of darkness." Exhibit K, Perdue 005800.

49.    During a visit on March 15, 2017, a Perdue representative directed Parker to increase his minimum runtime on his ventilation to "at least 125 secs to follow guideline." The representative also directed that Parker, "[m]ake the necessary changes on the controllers to run guideline." The representative also recorded whether the exact temperature of the chicken houses—to a tenth of a degree—matched the "target." Ex. K, Perdue 06122.

50.    During an August 28, 2018, visit, a Perdue representative instructed Parker, "like we discussed adjust the feedlines where the rim of the the [sic] pan is at the base of the neck," to "adjust the water lines so the birds look up to drink," and to "adjust the houses light intensity to follow house 1." Ex. K, Perdue 006604.

51.    During a visit on July 23, 2019, a Perdue representative wrote: "The grass needs to be cut and the generator log needs to be recorded [...] Three migration fences are required to be

9

placed in the houses by day 21 in order to get tier pay. This needs to be addressed today." Ex. A, at Perdue 001401.

52.    Before October 2017, Perdue supervisors noted needed repairs to equipment, including fans, heaters, feed lines, and water lines, but did not at any of those times claim to Parker those types of repairs required Perdue to withhold birds. Ex. K, at Perdue 005742-47, -5782, -5790, -5975, -6025, -6071, -6075, -6123, -5655; Parker Decl. ¶ 51.

53.    Perdue required that Parker walk through each chicken house at least twice per day and record chicken mortality and culls. During the first week after chick placement, Perdue instructed Parker to walk through the houses a minimum of 4-5 times every day. Ex. K, at Perdue at 001606, 001613; Parker Decl., Att. 1

54.    Perdue provided training of requirements to follow to Parker on the following topics, among others: Chick Delivery, Euthanasia/Culling, Litter Moisture/Ammonia, Lighting, House and Flock Inspection, Rodent/Vermin Control Program, Biosecurity, Emergency Back Up System. Ex. L, at Perdue 001599; Ex. A, at Perdue 001510; Mizell Dep. at 48:2-49:11; Levengood Dep. I at 52:21-53:22.

55.    Perdue required Parker to only use insecticide "recommended" by Parker's Perdue Flock Supervisor. Ex. L, at Perdue 001611.

56.    Perdue's "Daily Checklist" included requirements for Parker to: check the fill system and feed lines for proper operation and "[d]o not use a feed clock or time feed after the first week"; check that all lights are functioning properly; check ammonia levels and adjust timer fans; check temperatures; record daily water consumption; maintain proper drinker heigh and pressure; "[r]efer to Water Flow Charter for proper flow rates[;]" check litter conditions; check alarms and

adjust backups; and "[e]uthanize cull birds by approved methods, pick up dead and record on mortality charts daily." Ex. L, at Perdue 001616; Parker Dep. II at 195:13-17, 203:18-204:16.

57.     Perdue required Parker to smooth his gravel driveway. Ex. K, at Perdue 005743; Parker Decl. ¶ 14, Att. 1.

58.     Perdue required Parker to display a farm sign that Perdue provided that had Perdue's company name on it. Ex. K, at Perdue 001671; Parker Decl. ¶ 49.

59.     Parker could not exercise full judgment and discretion in hiring farm hands for his grower operations, which required Perdue approval. Ex. Q, Excerpts and Exhibits from Deposition of Roger Parker of November 9, 2023 ("Parker Dep. I"), at 146:12-147:2; Parker Dep. II at 229:19-230:13.

60.     Parker was required to, and performed significant labor between flocks, according to Perdue requirements, including windrowing and removing caked litter, clearing out feeder pans, disinfecting houses, applying insecticide, applying PLT, cutting grass, setting up divider panels, flushing water lines, and other equipment maintenance and task necessary to prep for chick arrival. Ex. K, at Perdue 001611-001613; Parker Decl. ¶¶ 14, 17, Att. 1.

61.     Perdue's agent, Flock Supervisor James Norris, recognized that Parker's work as a grower was a "never-ending cycle," refuted the idea that time between flocks was a "vacation," and asserted that after a flock is picked up, "that's when the real work starts." Ex. S, Transcript of Conversation with James Norris of December 15, 2017 ("Norris Tr."), at 3-4.

62.     Perdue required Parker and all growers to use—on the growers' dime—a cake out machine or windrow machine to prepare litter material between flocks before the next placement. Ex. T, Perdue 001627 – Perdue 001711, at Perdue 001671.

63.     Perdue tracked some of Parker's work between flocks on a worksheet with a section titled "Post Movement Requirements," where Flock Advisors assessed the completeness and quality of his work on cakeout/windrow, ventilation, and water line flushing. Ex. U, Perdue 006376 – Perdue 006839, at Perdue 006554.

64.     When flocks were present, Parker performed work that included acting as a general contractor overseeing capital improvements to facilities, implementing biosecurity protocols, and conducting maintenance, signposting, and administrative tasks. Parker Dep. II at 202:2-5; 212:19-215:14; Parker Decl. ¶ 13.

65.     Parker worked around 60 hours a week for Perdue, and often seven days a week Parker Decl. ¶ 16; Parker Dep. II at 186-1-3, 192:6-11, 202:22-203:8, Norris Tr. at 3-4 (explaining growers "babysit them [birds] twenty-four hours a day" and once the chickens "move out . . . that's when the real work starts . . . [i]t's a never-ending cycle").

66.     Perdue represented to Parker that its control would be based on written policies and procedures as provided in the contract. ECF No. 118-5 at 413;  Parker Decl. ¶ 4.

67.     Perdue's  requirements for Parker changed frequently. Parker Dep. II at 370:6-21; Copeland Dep. at 40:2-18; Parker Decl. ¶ 6.

**IV.     Perdue inaccurately calculated Parker's pay and failed to provide data to confirm it when asked.**

68.     Parker noticed that the transport trucks that weigh the flocks before slaughter, which should be numbered and matched to the correct grower, were different from the weight of the birds he observed and the documents he had. Ex. V, Perdue 00811 – Perdue 00812, at Perdue 008012; Parker Decl. ¶ 26-27.

69.     Perdue erroneously calculated Parker's payment on multiple occasions. Copeland Dep. at 84:12-89:10, 98:2-99:12; Mizell Dep. at 123:11-20; Parker Decl. ¶¶ 26-28;

70.     Parker had alerted Perdue regarding the issue prior to going to USDA, but the errors continued. Mizell Dep. at 135:9-137:15; Parker Decl. ¶¶ 26-28.

71.     In the summer of 2017, Parker again noticed an issue with the weighing of his birds. Kathryn Mizell, a Perdue supervisor, told Parker that growers can call the USDA when they have concerns about weights. Norris Tr. at 2-3; Parker Decl. ¶¶ 28-29.

72.     After Parker noticed discrepancies in his weights, Parker asked for documentation showing how his pay was calculated, including the weight tickets showing which trucks carrying chicks from farms to slaughter were attributed to him, but Perdue did not provide it. Parker Dep. II at 339:25-340:2; Parker Decl. ¶¶ 27-30.

## V.     Perdue retaliates against growers and told Parker it would retaliate against him for calling USDA.

73.     Perdue employees admitted that they retaliated against Parker for contacting USDA. Mizell Dep. at 156:7-167:10; Mizell Dep., Ex. 30; Parker Dep. II at 343:14-16, 360:25-367:23; Norris Tr. at 1-2.

74.     Parker texted Mizell it was clear that he's being "singled out for punishment" for contacting USDA, and Mizell did not respond to that statement; she admitted that she did not have any issue with him claiming that he was being retaliated against. Mizell Dep. at 156:7-167:10, Ex. 30; Ex. W, Perdue 00830 – Perdue 00834, at Perdue 008032.

75.      Parker's supervisor, James Norris, told Parker Perdue was "upset" and said it was because calling the USDA was like "the IRS coming in and auditing you," and that "Perdue doesn't

want Stockers & Packers thinking that they already have that reputation" of causing errors. Norris Tr. at 1-3.

76.    Norris also told Parker in that same conversation that Perdue had made life miserable for another grower who had called USDA and that "he still was suffering for years from it." Norris Tr. at 1-3.

77.    Parker then spoke to the grower who Norris had told him about and Parker recorded the conversation that he had with him. The grower explains to Parker that "when I settled, I was missing a load of chickens, and they charged me twice for the same load of feed, and I couldn't get them [Perdue] to do anything about it, so I contacted Packers and Stockyards on it. Parker was told that the grower was receiving "sorry, sorry chickens" for four years, and sometimes he was losing 300 chickens per house. Exhibit X, Transcript of Conversation with A. W. Levitt ("Levitt Tr."), at 1.

78.    When Clay Copeland, another one of Parker's supervisors, visited Parker at his farm in 2019, Parker recorded a conversation with him. Copeland told Parker in that conversation that Copeland was "well within his rights" to shut Parker's farm down, and that he could "drop your contract," "say, we don't need this farm anymore," and "you [Parker] couldn't sell it." Exhibit Y, Transcript of Conversation with Clay Copeland of August 2019 ("Copeland Tr."), at 15.

79.    Another supervisor of Parker's, Dan Roberts, told Parker not to bid on an equipment installation for a Perdue grower through his equipment installation business, despite the grower asking Parker to bid. Parker Decl. ¶ 33; Parker Dep. II at 119:10-18.

80.    Perdue represented to Parker that is policies and procedures would dictate how it managed him, not that its management and control would be determined by whether Parker reported Perdue to the USDA. Perdue represented it would provide feed and chicks for Parker to

grow. This representation did not include that its provision of sufficient inputs would turn on whether Parker called USDA. Parker Decl. ¶ 32.

**VI.    Perdue provided insufficient inputs after Parker called USDA**

81.    Perdue regularly gave insufficient feed to Parker, causing Parker to run out of feed entirely for substantial periods of time; in one instance, even 10 times. This worsened from 2017 onwards. Exhibit Z, Perdue 007976 – Perdue 007978, at Perdue 007976-77; Ex. V, at Perdue 008011; Ex. BB, at Perdue 008068; Parker Dep. II at 199:25-200:14.

82.    Parker often suffered consecutive days with no feed. Parker Dep. II at 199:25-200:14.

83.    In September 2018, Parker had approximately five feed outages. ECF No. 118-17 at 42.

84.    In September 2018, Perdue caused an incident at delivery of the birds that impacted Parker's flock. Ex. V, at Perdue 008011.

85.    In 2019, Perdue delivered to Parker feed that had chunks of concrete and bolts in it, which damaged his auger equipment--it broke 17 augers on his feed lines. Exhibit CC, Parker 000361, at Parker 000361; Exhibit DD, Perdue 008067, at Perdue 008067; Parker Dep. II at 204:6-10, 371:8-14; Copeland Tr. at 3.

86.    The damage from the concrete and bolts impaired Parker's ability to properly feed the chickens. Parker Dep. II at 340:18-341:2.

87.    Perdue told Parker that it would not provide more chicks until he repaired the damage that Perdue's concrete-filled feed had caused. Copeland Tr. at 3.

88.     Perdue used the requirements they imposed on Parker as a basis to withhold chickens from him. Copeland Dep. 102:8-18; Mizell Dep. at 156:7-163:24; Mizell Dep. Ex. 30; Exhibit EE, Perdue 007729, at Perdue 007729; Copeland Tr. at 3-5, 14.

89.     These requirements included: repairing/replacing fans, fan shutters, heaters, and tunnel doors, and replacing the feed and water lines. Ex. EE, at Perdue 007729; Copeland Tr. at 3-5, 14.

90.     Defendant's failure to provide sufficient and proper feed impacts bird growth, and, accordingly, Parker's ability to grow birds for Perdue and perform under his contract and make appropriate compensation. Parker Dep. II at 340:18-341:2.

91.     Perdue also gave Parker birds that were worse in health and age than he had previously received. Parker Dep. II at 199:10-19, 272:15-25.

92.     The tournament system and input variation substantially impacted Parker's pay in a way that he could not predict. Parker Dep. II at 235:10-236:9.

**VII.    Perdue refused financing it had regularly made available after Parker called USDA.**

93.     Before Parker called USDA, Perdue regularly extended interest-free lines of credit to Parker and represented to Parker early in their relationship that Perdue would make these loans available to him.  Parker Dep. II at 283:9-284:9; Ex. A at Perdue 001258-60, Perdue 001274-78, Perdue 001297-99, Perdue 001302-05, Perdue 001306, Perdue 001341, Perdue 001349-50.

94.     After Parker contacted USDA in 2017, he was repeatedly denied new lines of credit by Perdue. Parker Dep. II at 270:24-273:2, 405:9-25,.

95.     Perdue told Parker it would finance the cost of new drinker lines once he paid off a prior loan he had obtained from Perdue for upgrades, but then in 2018—after Parker's complaint

to the USDA—Perdue changed its position and refused to loan him money. Mizell Dep. Ex. 24 at Perdue 008015; Parker Dep. II at 272:2-273:9; Copeland Tr. at 8-14.

96. After Parker contacted USDA, Perdue told Parker that he could not get another loan from Perdue because he was using well water, not city water. The requirement to use city water was not previously communicated to Parker nor documented in any Perdue policies. Parker did have the ability to use either city water or well water, in line with Perdue's requirements, but opted to use well water given the significant expense of city water. Ex. FF, at Perdue 007713-007722; Parker Dep. II at 272:15-273:9.; Copeland Tr. at 8-14.

97.     After Parker contacted USDA, Perdue imposed a requirement, only on Parker, that he have his propane tanks at least 70% full before Perdue would place new chicks on his farm. The requirement was both new to Parker and one that did not apply to other growers, despite Perdue's representation that it was required for compliance with the Poultry Producer Agreement. Ex. GG, Perdue 001919 – Perdue 002251, at Parker 002251; Mizell Dep. at 150:2-156:6, 161:8-163:24; Parker Dep. II 368:8-369:14.

98.     Propane was expensive for Parker. Parker Decl. ¶ 19.

99.     Parker's supervisor, Clay Copeland, also required that Parker start replacing equipment that were previously sufficient to only be repaired, such as his drinker and feed lines. Copeland Tr. at 19-20. Copeland kept slipping when telling Parker about this new requirement, saying Parker need only "fix" them to get more birds, then correcting himself to say "replace." *Id*.at 18-20.

100.     Perdue did not represent to Parker that its requirements would increase if Parker reported concerns to the USDA. Parker Dep. II at 357:11-358:5; Parker Dep. II at 357:11-24; ECF No. 118-5 at 411-425.

**VIII.  Perdue's other actions against Parker after he called USDA**

101.     After Parker contacted USDA, his business Parker's Poultry Equipment was removed from Perdue's list of recommended equipment contractors. Parker's Poultry Equipment had previously been listed as a recommended contractor since at least 2014. Parker started the business after Perdue asked him to equipment installations for other Perdue growers, and Perdue paid him directly for the work he did for Perdue growers under the business. Parker's work for the company was mostly to bid the work and invoice for payment. Parker Dep. II at 100:11-15, 172:16-22; Parker Decl. ¶ 33; Ex. HH, Perdue 007710-22; Ex. II, Perdue 007565-77; Ex. JJ, at Perdue 007514-26; Ex. KK, Perdue 007005-17; Ex. LL, Perdue 006992-704; Ex. MM, Perdue 0007620 (list of approved vendors for July 2017, in which Parker's Poultry is listed), *compared to* Ex. F, at Perdue 007721 (list of approved vendors for August 2018, from which Parker's Poultry Equipment is missing).

102.     Perdue required Parker to make unnecessary upgrades contrary to its prior requirements after Parker called USDA. For example, in August 2019, Perdue's Clay Copeland visited Parker's farm and informed him that he needed to make several substantial replacements, instead of repairs, on the farm before Perdue would place more chickens with him, and that Perdue would not finance any of the investments. Parker was previously unaware of the requirements Copeland was imposing, such as brand new, rather than repaired, water lines, augers and feed pipes. Perdue was aware that Parker could not afford the required investments without additional loans. Copeland Tr. at 3, 8-13, 18-20.

103.     In August 2019, Perdue's Clay Copeland told Parker that Perdue could end Parker's contract on the spot, and if Copeland decided that Perdue no longer needed Parker's farm, then Parker would not be able to sell his farm. Copeland Tr. at 15.

104.    In September 2019, Perdue's Dan Roberts informed Parker of several new investments, that would have cost approximately $162,765, that he would need to make before Perdue would place chickens with him again. Ex. NN, at Parker 000215; Ex. OO, Excerpts and Exhibits of Mark Lewis ("Lewis Dep."), at 137:12-18; Lewis Dep., Ex. 1 ("Lewis Report") at 35. These went beyond prior requirements, as Parker was not previously required to install brand new water lines in order to grow, and in fact was told by his supervisors that he only needed to clean them previously. Mizell Dep., Ex. 30, at Perdue 008032; Copeland Tr. at 3, 8-13, 18-20.

105.    In September 2019, Perdue's Dan Roberts informed Parker of even more substantial investments, totaling approximately $959,393, that he would need to make before Perdue would approve of any buyer for Parker's farm.  Ex. PP at Parker 000211; Lewis Dep., Ex. 1 at 41; Parker Dep. II at 374:12-375:21. Once Perdue informed him of these additional requirements, Parker realized he could not afford to grow with Perdue anymore.  Parker Dep. II at 374:12-375:21; Parker Decl. ¶ 45.

106.    A broker Parker hired to help sell his farm in 2019 determined that the list of upgrades that Perdue required was extensive, and that without an integrator contract, it would be "extremely difficult" to find a buyer for Parker's farm near the broker's recommended sale price. Ex. QQ, Declaration of Todd. R. Arline ("Arline Decl."), ¶¶ 4, 6; Ex. R at Parker 002670-002671; Parker Decl. ¶ 44.

107.    The requirements Perdue imposed on Parker in September 2019 before Parker could sell his farm to an approved buyer were so substantial, they made Parker's poultry houses effectively worthless because the costs to upgrade would have exceeded the market value, and the salvage value of the houses would have been offset by the cost of demolition. Without a contract with Perdue, the farm significantly diminished in value; with a contract, the farm is estimated to

have been valued at $737,000, but without Perdue's contract offer to a buyer, the value decreased to $145,000. Parker Dep. II at 374:12-375:10; Parker Decl. ¶¶ 42-46; Arline Decl. ¶ 5; Lewis Dep. at 44:14-49:20; Lewis Report.

108.    Parker's farm was foreclosed because he could not find a buyer without an active integrator contract and he could not afford the upgrades Perdue required of him to keep growing. Parker Dep. II at 299:8-13, 245:1-17.

109.    Parker's supervisor, James Norris, acknowledged the only value to a contract with Perdue was the equity in a farm. Norris Tr. at 4.

Dated: August 18, 2025                        Respectfully submitted,

                                              */s/ Jamie Crooks*
                                              T. Brandon Waddell
                                              Ga. Bar No. 252639
                                              Jarred A. Klorfein
                                              Ga. Bar No. 562965
                                              Emily C. Snow
                                              Ga. Bar No. 837411
                                              **CAPLAN COBB LLC**
                                              75 Fourteenth Street NE
                                              Suite 2700
                                              Atlanta, Georgia 30309
                                              (404) 596-5600
                                              (404) 596-5604 (fax)
                                              bwadell@caplancobb.com
                                              jklorfein@caplancobb.com
                                              esnow@caplancobb.com

                                              Jamie Crooks (admitted *pro hac vice*)
                                              D.C. Bar No. 156005
                                              Kritika Deb (admitted *pro hac vice*)
                                              Amanda R. Vaughn (admitted *pro hac vice*)
                                              D.C. Bar No. 90033556
                                              **FAIRMARK PARTNERS, LLP**
                                              400 7th Street NW, Suite 304
                                              Washington, D.C. 20004
                                              jamie@fairmarklaw.com
                                              kritika@fairmarklaw.com
                                              amanda@fairmarklaw.com

*Counsel for Plaintiff Roger Parker*