**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| ROGER PARKER, | |
| *Plaintiff*, | |
| v. | Case No. 5:22-cv-00268-TES |
| PERDUE FOODS, LLC, | |
| *Defendant*. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to M.D. Ga. L.R. 56, Plaintiff hereby responds to Defendant's Statement of Undisputed Material Facts (ECF No. 118-2) as follows:

1.    Perdue is an integrated poultry producer, also referred to in the industry as an "integrator," that contracts with chicken farmers (also known as "growers") to raise chickens for Perdue under a contract entitled a "Poultry Producer Agreement" ("PPA"). (*See* Exhibit A, Declaration of Michael Levengood ("Levengood Decl.") at ¶¶ 3-5, 10).

Response:

- Factually undisputed.

- However, the assertion is an unsupported factual position to the extent that certain provided citations are irrelevant to the assertion and do not establish the absence of a genuine dispute. *See* ECF 118-4, Ex. A, Levengood Decl. ¶¶ 5, 10.

- The assertion is not material to the claims asserted in the action; whether Perdue is an integrated poultry producer, referred to in the industry as an integrator, or the

1

contract is titled a "Poultry Producer Agreement" is irrelevant to establish or disprove the claims asserted.

2.    The PPAs entered into between growers and Perdue explicitly provide that the PPA is a "service contract and not a contract of employment" and that "PERDUE and PRODUCER are each independent contractors." (*See* Exhibit B, Excerpts and Exhibits from April 23-24, 2025, Deposition of Roger Dale Parker ("Parker Dep. II") at 277:2-278:1, Ex. 23, Section IV ¶ A at p. 3 [Perdue 002441], p. 10 [Perdue 002455], p. 17 [Perdue 002434], p. 24 [Perdue 002312], p. 33 [Perdue 002493], p. 50 [Perdue 002282], and p. 82 [Perdue 002299]).

Response:

- Undisputed.

3.    Growers, like Plaintiff in this case, who contract with Perdue own and provide the land, facilities, equipment and labor necessary to raise the chicks. (Levengood Decl. at ¶¶ 4, 10).

Response:

- Disputed. Growers do not own, nor do they provide, all of the equipment and labor necessary to raise chicks. *See* ECF No. 118-5 at 413 (Sec. II ¶ C). Under the PPA, Perdue is to "consign available birds to PRODUCER to be raised," and to "provide and deliver to PRODUCER . . . feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned." *Id*. Veterinary services, feed delivery labor and trucks, chick delivery labor and trucks, and instructions, management, training, and oversight of growing operations are also provided by Perdue. *See* Ex. G in Support of Plaintiff's Opposition to Motion for Summary Judgment ("to Opp."), Deposition of Clay Copeland ("Copeland Dep.") at 25:9-18; Ex. H to Opp., November 14, 2023 Deposition of Michael

Levengood ("Levengood Dep. I") at 105:8-10, 161:4-8; Ex. A to Opp. at Perdue 001510; Ex. L to Opp. at Perdue 001599; Ex. RR to Opp. at Perdue 003458-003520; Ex. GG to Opp. at Perdue 002032-55. The specifics of the land, facilities, equipment, and labor are provided at the direction of Perdue. Ex. L to Opp. at Perdue 001611-26; Ex. 9 to Ex. Q to Opp.; Ex. GG to Opp. at Perdue 002032-55. Perdue supervisors even directly adjust poultry housing equipment. *See, e.g.*, Ex. SS to Opp. at Perdue 005500, 005502, 005614; Ex. U to Opp. at Perdue 006652; Ex. TT to Opp. at Perdue 008097; Perdue 006652.

- The assertion is not material to the claims asserted in this action to the extent that whether growers who contract with Perdue, apart from Plaintiff, own and provide the land facilities, equipment, and labor necessary to raise the chicks, and to the extent the assertion relates to Perdue's relationship with growers other than Plaintiff, the assertion is irrelevant.

4.    Most integrators, such as Tyson Foods, Pilgrams Pride, Wayne Sanderson, Cook Foods, Mount Air, and Amick, operate under a similar business model to that used by Perdue, treat their growers as independent contractors, and this independent contractor treatment is recognized by the National Chicken Counsel. (Levengood Decl. at ¶¶ 5-8 and Att. 1).

<u>Response:</u>

- Disputed. Most integrators do not necessarily operate under a similar business model to that used by Perdue. *See*, *e.g.*, Ex. M to Opp., Deposition of Kathryn Mizell ("Mizell Dep.") at 107:9-21 ("Q. So this system is specific to Perdue? A. The stamp system is yes."); Ex. C to Opp., April 23-24, 2025, Deposition of Roger Dale Parker ("Parker Dep. II") at 32:13-33:23, 36:9-25, 280:23-283:8 ("[Y]ou

come to see how it works, you know, with your field man and understanding how,
you know, you -- how little options you have, I guess, on your end, because I wasn't
used to growing that way. Growing with two other integrators it was totally
different."), 307:9-12, 313:11-14 ("Other integrators just don't, pretty much, lord
over everything, you know?").

- The assertion is a statement of an issue or a legal conclusion, not a fact. Independent
  contractor designation is a legal determination.

- The assertion is an unsupported factual position to the extent that the National
  Chicken Council is implied to be an unbiased authority, as opposed to an industry
  group that "represents vertically integrated companies that produces and processes
  more than 95 percent of the chicken marketed in the United States" and
  "[r]epresentatives of all major poultry companies participate in these
  organizations." ECF 118-4, Ex. A, Levengood Decl. at ¶ 6.

- The assertion is not supported by admissible evidence. Levengood does not have
  personal knowledge or experience that qualifies him to testify on the business
  models of other integrators or their treatment of other growers to the extent that he
  has only testified to his work experience with Perdue. ECF 118-4, Ex. A,
  Levengood Decl. at ¶ 3; ECF 118-8, Levengood Dep. I, 10:24-11:23.

- The assertion is not material to the claims asserted in this action. The actions of
  other integrators are irrelevant to establishing or disproving the claims in this
  action. *See Wajcman v. Inv. Corp. of Palm Beach*, 2009 WL 465071, at *3 (S.D.
  Fla. Feb. 23, 2009) (excluding testimony from employees of other businesses
  within the industry); *see also Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 728,

741 (1981) (FLSA "not designed to codify or perpetuate [industry] customs and contracts . . . and any custom or contract falling short of the statute's purpose, . . . cannot be utilized to deprive employees of their statutory rights."); *Taylor v. NationsBank*, N.A., 365 Md. 166, 178 (2001) ("Maryland follows the objective law of contract interpretation and construction"); *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 507-08 (2021) (interpreting unambiguous contract language is "bounded by the four corners of the agreement" and interpreting ambiguous language turns on the "intention of the parties as expressed in their words and the paper which they sign").

5.      Under the PPA entered into between Perdue and growers (also referred to as "Producers"), Perdue agrees "[t]o consign available chicks to PRODUCER to be raised for PERDUE" (Parker Dep. II, Ex. 23, Section I ¶ A at p. 1 [Perdue 002430], p. 8 [Perdue 002453], p. 15 [Perdue 002432], p. 22 [Perdue 002310], p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]) and "[t]o provide and deliver to PRODUCER, or arrange to have provided and delivered to PRODUCER, feed, medications, vaccinations, and other supplies, which are necessary for the health and welfare of the birds consigned." (Parker Dep. II, Ex. 23, Section I ¶ B at p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]).

Response:

- Factually undisputed; additionally, by agreeing to the PPA, Perdue's obligations under this clause as "necessary for the health and welfare of the birds consigned" also included providing and delivering to Plaintiff *sufficient* inputs, including the quality of the chicks, feed, medications, vaccinations, and other supplies, to raise

5

chickens to the PPA's specifications. ECF 118-5 at 411 (Section I.A, Section I.B, Section II.B), 412 (Section II.C).

- However, the statement is an unsupported factual position to the extent that Perdue 002430 does not contain the above quoted assertion and does not establish the absence of a dispute.

6.    In exchange, the growers agree "[t]o use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for the health and welfare of the birds consigned." (Parker Dep. II, Ex. 23, Section II ¶ C at p. 30 [Perdue 002490], p. 47 [Perdue 002279], and p. 79 [Perdue 002269]).

Response:

- Disputed to the extent the assertion is "in exchange"; the assertion is a factual position unsupported by the cited evidence. ECF No. 118-5 at 411 (stating "Producer agrees" and not "in exchange"). Additionally, the assertion cannot be "in exchange" given that there was unequal bargaining power between the grower and Perdue. Ex. E to Opp., April 29, 2025 Deposition of Michael Levengood ("Levengood Dep. II") at 20:1-5 (stating the PPA is a standard contract used with all growers).

- The assertion is not material to the claims asserted in this action. Whether growers agree to the language in the assertion is irrelevant to Perdue's treatment of Plaintiff, Perdue's breach, or its misrepresentation. Plaintiff is also not required to prove his own performance under the contract. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Mem. in Opp."), Sec. II. B.

7.      The PPAs provide that growers have the responsibility to provide "necessary housing and equipment" and "to maintain such housing and equipment in a state of good repair and operable condition," among other things. (ECF 90 at ¶ 22-23; ECF 91 at ¶¶ 22-23; Parker Dep. II, Ex. 23, Section II B at p. 1 [Perdue 002430], p. 8 [Perdue 002453], p. 15 [Perdue 002432], p.22 [Perdue 002310], p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]; Levengood Decl. at ¶ 10).

Response:

- Factually undisputed.

- However, the assertion is an unsupported factual position to the extent that Perdue 002430 does not state such language.

- The assertion of what the PPA "provide[s] that growers have the responsibility to provide" is not material to the claims asserted in this action and is irrelevant to Perdue's treatment of Plaintiff, Perdue's breach, or its misrepresentation; Plaintiff is further not required to prove his own performance under the contract. Mem. in Opp., Sec. II. B.

8.      The "necessary housing and equipment" growers are required to provide include, in addition to the chicken houses themselves, items such as heaters, feed lines, hoppers (part of the control pans or feed system), feed trays, and fans. (*See* Exhibit C, Excerpts and Exhibits from Deposition of Walter Clay Copeland ("Copeland Dep.") at 76:14-79:24, Ex. 6 [Perdue 001669-001670]).

Response:

- Factually undisputed.

- The assertion of what PPA provides that growers have the responsibility to provide is not material to the claims asserted in this action and is irrelevant to Perdue's treatment of Plaintiff, Perdue's breach, or its misrepresentation; Plaintiff is further not required to prove their own performance under the contract. Mem. in Opp., Sec. II. B.

9.    If a grower fails to comply with their contractual obligations to provide the necessary housing and equipment in a state of good repair, which can lead to animal welfare issues, Perdue will generally give the grower a letter saying that the grower needs to fix certain things before Perdue will place more birds with the grower. (Levengood Decl. at ¶¶ 10, 12-13; *see* Exhibit D, Excerpts from April 29, 2025, Deposition of Michael Levengood ("Levengood Dep. II") at 31:20-33:14; Exhibit E, Excerpts and Exhibits from November 14, 2023, Deposition of Michael Levengood ("Levengood Dep. I") at 68:24-73:11).

Response:

- Disputed to the extent the assertion suggests that Perdue only "generally give[s] the grower a letter" if Perdue believes a grower fails to comply; Perdue also takes other actions if Perdue believes a grower fails to comply with their contractual obligations. Ex. M to Opp., Mizell Dep., 74:15-75:1, 80:25-81:5.

- The assertion is not material to the claims asserted in this action. Whether failure to comply with contractual obligations leads to animal welfare issues is irrelevant to the claims in this action.

10.    The PPA provides that "PRODUCER shall perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with

industry standards." (Parker Dep. II, Ex. 23, Section III ¶ A at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]).

Response:

- Undisputed.

11.    Growers can exercise this judgment and discretion in several ways, such as by hiring employees; growing other livestock (so long as it isn't poultry), which is referred to as "diversified farming"; operating outside businesses; owning and operating multiple farms; hiring employees; making housing and equipment improvements and upgrades; building additional chicken houses; and determining how to manage their day-to-day growing operations through discretion over things such as house ventilation, managing bird mortality, and of house walk throughs. (ECF 59-6 at ¶¶ 14-16, Att. 1 (containing survey of growers); Levengood Decl. at ¶¶ 4-8; Levengood Dep. II at 22:6-30:6; 103:10-107:5).

Response:

- Disputed to the extent that:

  o   Growers cannot exercise judgment and discretion by hiring employees, which requires Perdue's approval, and over which Perdue had veto power. Ex. Q to Opp., Nov. 9, 2023, Deposition of Roger Dale Parker ("Parker Dep. I"), at 146:12-147:2.

  o   Growers make housing and equipment improvements and upgrades per Perdue's requirements (see *supra* ¶¶ 8, 9; ECF 59-6 at ¶ 8) and are subject to equipment standards Perdue sets. *See, e.g.*, Ex. KK. To Opp. at Perdue 007008; Ex. C. to Opp., Parker Dep. II at 322:21-323:1.

- o Growers building of additional chicken houses is subject to Perdue's requirements. ECF 59-6 at ¶ 8.

- o Growers do not have discretion over how to manage their day-to-day growing operations such as house ventilation, managing bird mortality, and of house walk throughs; such operations are also impacted by Perdue's inputs. ECF 59-6 at ¶ 9 ("the type of bird may also impact the policies and procedures to which a grower is subject"); Ex. D to Opp., Declaration of Roger Dale Parker ("Parker Decl."), ¶¶ 7, 9-12, 13, 14, 17, Att. 1; Ex. U to Opp. at Perdue 006554; Ex. A to Opp. at Perdue 001400; Ex. L. to Opp. at Perdue 001606.

- The assertion is an unsupported factual position to the extent that:

  - o The declaration only supports the fact that a conducted survey found some growers for Perdue hired helpers; some growers own other businesses; and that growers are permitted to keep other livestock. The declaration does not support the assertion that "growers can exercise judgment and discretion" in doing any of the above. ECF 59-6 at ¶¶ 14-16.

  - o The cited attachment to the declaration does not contain the discussed survey and is irrelevant to the factual position. ECF 59-6, Att. 1.

  - o The citation to the Declaration is irrelevant to the asserted factual position. Levengood Decl. at ¶¶ 4-8.

- The assertion that growers can exercise judgment and discretion regarding operating outside businesses and growing other livestock (not Perdue's) is not material to the claims asserted in this action. The claims relate to Perdue's treatment

of Plaintiff as a grower for Perdue, and the ability to operate outside businesses is not exercising judgment and discretion in grower operations for Perdue.

12.    Growers can grow with other integrators without restriction by Perdue so long as they give Perdue a 90-day notice, which is required by law, that they have signed or will sign a contract with another integrator. (Levengood Dep. II at 92:2-93:23).

Response:

- Disputed. Growers cannot grow with other integrators without restriction by Perdue. Growers cannot work for another integrator simultaneously. ECF 118-7, Levengood Dep. II, at 91:22-94:1. Growers are not permitted to grow poultry of other integrators on the farm. *Id*. at 93:24-94:1; ECF 59-6 ¶ 16 ("We allow growers to raise any other livestock or grow any other produce they want to on their farms . . . so long as they are not growing or raising other poultry for other integrators at the same time.")

- The assertion is an unsupported factual position. The citation does not establish the absence of genuine dispute that growers can grow for other integrators without restriction; the citation supports the assertion, supported by other evidence, that growers can grow with other integrators only if they are not simultaneously growing for Perdue. ECF 118-7, Levengood Dep. II at 93:11-93:23 ("the contract would be cancelled when he signs the other one").

13.    Under the PPA, growers also agree "[t]o comply with any bio-security policies, audits, measures or guidelines required by PERDUE" (Parker Dep. II, Ex. 23, Sec. II ¶ N at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]) and "[t]o provide care for

the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs." (Parker Dep. II, Ex. 23, Sec. II ¶ R at p. 80 [Perdue 002297]).

Response:

- Factually undisputed.

- The assertion as to what growers agree to is not material to the claims asserted in this action and is irrelevant to the Perdue's breach, misrepresentations, and treatment of Plaintiff. Mem. in Opp., Sec. II. B.

14.     These "bio-security policies, audits, measures or guidelines" include items such as the "Poultry Care Process Verified Program" (or "PVP"), which is part of a USDA verified audit program, based on guidelines and animal welfare standards issued by the National Chicken Counsel. This provides a series of standard operating procedures that growers are audited against pursuant to the USDA program. (ECF 62 at Attachment 3; Levengood Dep. I at 45:21-47:7, 48:2-49:9, 51:7-52:14; 54:4-25; 56:16-23; 181:23-183:5; Levengood Dep. II at 41:17-47:9). Perdue is "always looking at [its] recommendations for biosecurity" and "learn[s] all the time" "how to prevent high path [avian influenza] from getting in a house." (Levengood Dep. II at 59:5-61:8).

Response:

- Factually undisputed.

- The assertion is not material to the claims asserted in this action. Whether items are part of a USDA verified audit program, based on guidelines and animal welfare standards issued by the National Chicken Council, and are a series of standard operating procedures that growers are audited against pursuant to the USDA program, are irrelevant to establishing or disproving the claims in this action as the claims are dependent on Perdue's actions.

15.    These also include mandatory proper euthanasia techniques for animal welfare (Levengood Dep. II at 41:17-47:9, 57:23-58:12; Levengood Dep. I 59:25-60:2) and a document entitled "Never Evers and Dedicated Tos," which are recommended best management practices (or "BMP"). (Levengood Dep. I at 29:2-35:21, 40:7-42:17, Ex. 4 [Perdue 001580-1591]).

Response:

- Disputed. The document entitled "Never Evers and Dedicated Tos," are not "recommended" best management practices, but required. Ex. M. to Opp., Mizell Dep., 61:2-5, 62:1-63:1 ("You absolutely have to do these? A. Yes.").

- The assertion is an unsupported factual position to the extent that the deposition citations do not establish the fact that the PVPs include mandatory proper euthanasia techniques for animal welfare. *See* Levengood Dep. II at 41:17-47:9, 57:23-58:12; Levengood Dep. I 59:25-60:2.

- Unsupported factual position to the extent that the exhibit citation does not mention best management practices (or "BMP"). ECF 118-8 Levengood Dep. I, Ex. 4 [Perdue 001580-1591].

16.    The audits include the 14-step audit process growers are audited against by the government in the event their birds contract high-pathogen avian influenza if the grower wants to get indemnified. (Levengood Dep. I at 41:11-43:24). The "Never Evers and Dedicated Tos" are provided to assist growers in understanding and meeting the requirements of the government's 14-step audit process for indemnification. (Levengood Dep. I at 31:2-36:24, 40:16-43:24).

Response:

- Factually undisputed.

13

- However, the assertion is not material to the claims in the action. Whether audits include the 14-step process, and the assertion that the "Never Evers and Dedicated Tos" are provided to assist growers in understanding and meeting the requirements of the government's 14-step audit process for indemnification, are not material to the claims in this action. The reasoning behind why such a document has been provided is irrelevant to establishing or disproving the claims in this action as the claims are dependent on Perdue's actions.

17.     Perdue recommends that growers attempt to comply with all BMPs because doing so will both reduce the chance that the birds will contract high-path avian influenza in the first place and will ensure that the growers will meet the government's 14-step audit process for indemnification in the event that the birds do get sick. (Levengood Dep. I at 31:2-36:24, 40:16-43:2, 60:17-62:2).

<u>Response:</u>

- Disputed.

  o Perdue does not "recommend that growers attempt to comply," as compliance is mandatory. Ex. M. to Opp., Mizell Dep. 61:2-5, 62:1-63:1 ("You absolutely have to do these? A. Yes."); Ex. P. to Opp., Deposition of James Norris ("Norris Dep."), at 62:9-63:8; Ex. U to Opp. at Perdue 006654, Ex. K to Opp. at Perdue 005851.

- The assertion is not material to the claims in this action. The reasons why Perdue implements certain practices as "recommendations" or requirements, such as reducing the chance that the birds will contract high-path avian influenza and ensuring that the growers

will meet the government's 14-step audit process for indemnification, are not relevant to establishing or disproving the claims asserted.

18. Perdue pays growers an audit readiness bonus if they comply with these various items that are audited. (Levengood Dep. II at 82:5-14).

Response:

- Disputed to the extent that not all growers receive an audit readiness bonus for their compliance. The assertion is a factual position unsupported by the evidence. The citation only establishes that growers receive an audit readiness bonus "for their work," not if they comply with these various items that are audited. Levengood Dep. II at 82:5-14. The assertion does not contain any other citations to show that compliance with specific, "various items" that will provide growers an audit readiness bonus.

- The assertion is not material. Whether Perdue pays a grower a bonus for compliance with the various items that are audited is irrelevant to the claims asserted in the action.

19. While Perdue provides growers with a document entitled "Poultry House Management Guidelines," these are recommendations that are "more or less educational materials for growers who may be new to the business or...a starting point" for growers. (Copeland Dep. at 12:14-13:10, Ex. 11 at Perdue 001611). Growers have discretion to determine how to accomplish certain of these guidelines, such as whether they want to wind row litter or remove it, for example. (Copeland Dep. at 12:14-22:15, Ex. 11 at Perdue 001611-001616).

Response:

- Disputed.

15

- o The Poultry House Management Guidelines are not "recommendations" that are "more or less educational materials for growers who may be new to the business or ... a starting point" for growers. The Guidelines are applied as requirements and apply even if the grower is not new to the growing business, such as Plaintiff, for whom the Guidelines were operative at the time he was a grower. Plaintiff was provided this document to follow despite his extensive growing experience and years with Perdue. Ex. G. to Opp., Copeland Dep., at 13:7-14:5 (testifying that document applies to "all farmers" in the Perry, GA area, including Plaintiff, and is still operative today).

- o Disputed that growers have discretion to determine how to accomplish certain of these guidelines. Parker Decl. ¶¶ 8-15, 17, Att. 1. Growers are required to follow specific litter practices. Ex. T to Opp. at Perdue 001671.

- The assertion that the materials provided to growers are "more or less educational materials for growers" is not material. Whether the actions are more or less educational is irrelevant to whether they are requirements and material to the claims in this action.

- Unsupported to the extent that:

  - o The exhibit citation does not establish that growers have discretion to determine how to accomplish certain of these guidelines. ECF No. 118-6, Ex. 11 at Perdue 001611-001616.

o   The exhibit citation does not show that growers have discretion over whether to wind row litter or remove it. ECF No. 118-6, Ex. 11 at Perdue 001611-001616.

20.    Growers are paid under a competitive tournament system, under which they compete against other growers who settle flocks in the same week. This tournament system provides greater compensation to those who grow birds more efficiently through things like tier upgrades to their houses, effective bird husbandry, other best management practices, and lowering their costs through their own discretional day-to-day decisions. (ECF 59-6 at ¶¶ 17-20, Att. 1; Levengood Decl. at ¶ 9; Levengood Dep. II at 39:2-40:3, 80:14-81:14).

Response:

- Disputed.

- The tournament system does not necessarily provide greater compensation to those who grow birds more efficiently in practice. Inputs provided by Perdue and the requirements Perdue imposes mean that pay is not determined by maximum efficiency. ECF 59-6 ¶ 17 (showing other determining factors such as location, type of bird, tier payments, audit readiness, energy supplements, heating, and fuel); Ex. C to Opp., Parker Dep. II 235:8-236:9. Additionally, grower tournament pay includes the "total farm weight in pounds of birds," ECF 59-6 ¶ 18, which Perdue has inaccurately entered for Plaintiff (the reason he called USDA to ask for assistance), and which was not therefore due to the level of efficiency at which Plaintiff grew his birds. Ex. C. to Opp, Parker Dep. II 271:7-18; Ex. D to Opp., Parker Decl. at ¶¶ 26-31.

- The tournament system does not provide greater compensation based on "things" including "own discretional day-to-day decisions." Growers such as Plaintiff do not exercise individual discretion over their daily growing practices. Ex. C to Opp., Parker Dep. II 221:3-222:2; 235:10-22; 322:13-323:3; Ex. D. to Opp., Parker Decl. ¶¶ 8-15, 17, Att. 1; PSMF ¶¶ 19-64.

- The tournament system does not provide greater compensation "through things like tier upgrades to their houses." Growers had to put their own money in to upgrade their houses to a different tier, and they knew that even if they put the money to do the tier upgrades, "it wasn't going to come back to them"; for example, Plaintiff himself had "done the upgrades and made no more money." Parker Dep. II at 241:4-24; PSMF ¶ 109.

- The assertion is an unsupported factual position to the extent that the citations do not establish the absence of a dispute. ECF 59-6 at ¶¶ 17-20 and Att. 1 do not establish that the tournament system provides greater compensation to those who grow birds more efficiently, nor that the tournament system provides greater compensation based on own discretional day-to-day decisions.

21.     Under the PPA, Perdue agrees "[t]o provide to PRODUCER upon request thereby statistical information and data regarding PRODUCER and used by PERDUE to determine compensation paid to PRODUCER by PERDUE under this Agreement, other than information that is or relates to a trade secret." (Parker Dep. II, Ex. 23, Section I ¶ E at p. 1 [Perdue 002430], p. 8 [Perdue 002453], p. 15 [Perdue 002432], p. 22 [Perdue 002310], p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]).

    Response:

- Undisputed.

22.    The growers' pay terms are set forth in payment schedules, attached to and incorporated into the PPAs. (Levengood Dep. I at 21:20-22:7, 26:16-27:8; Levengood Dep. II at 76:22-77:25).

Response:

- Disputed to the extent that the pay terms set forth in the payment schedules are not the only terms that determine pay. The tournament system and input variation, as well as variances in Perdue's weighing practices, have a substantial impact on grower pay that growers cannot predict. Ex C. to Opp., Parker Dep. II at 235:10-236:9; Ex. D. to Opp., Parker Decl., ¶ 26; Ex V. to Opp; PSMF ¶ 9 (noting inputs are necessary to "health and welfare of the birds consigned").

23.    Growers' chicken houses are graded as Tier 1, 2, 3, or 4 based upon standards established by Perdue in separate tier documents. (Levengood Decl. at ¶ 12; Levengood Dep. II at 84:23-85:10, 91:8-21). Growers may increase their potential pay by "upgrading" their houses to a higher-level tier. (Levengood Decl. at ¶ 11; Levengood. Dep. I at 22:15-17, 100:3-5; Levengood Dep. II at 82:15-21, 84:23-85:10; see Exhibit F, Excerpts from Deposition of Linda Gail Burns ("Burns Dep.") at 17:17-18:2).

Response:

- Disputed. Upgrading houses to a higher-level tier does not necessarily entail that a grower may increase their potential pay. *See*, *e.g.*, Ex. C to Opp., Parker Dep. II 236:6-236:9; 239:3-240:22.

24.    Perdue provides loans to growers from time to time to assist with tier upgrades and repairs to existing equipment and houses. (Levengood Dep. II at 95:13-97:10).

Response:

- Factually undisputed.

- However, the assertion is an unsupported factual position to the extent that the citation only provides that loans are provided to for equipment and for houses. Levengood Dep. II at 97:95-97:10.

25.    Perdue may also deduct from a grower's pay repayments of money the grower borrowed from Perdue pursuant to these loans, the grower's mortgage payments if they authorized Perdue to deduct the payments and make the payments to the bank on their behalf, and the grower's portion of cost sharing programs related to equipment. (Levengood Dep. II at 86:5-89:13; Copeland Dep. at 52:16-55:20, Ex. 48 at Perdue 001393 [listing "DEDUCTIONS"]; Parker Dep. II at 62:9-99:12, Exs. 4-9).

Response:

- Disputed to the extent that if a grower has a mortgage payment, they are *required* to authorize Perdue to deduct the payments and make the payments to the bank on their behalf. Levengood Dep. II at 86:14-22.

26.    Plaintiff Roger Parker ("Plaintiff" or "Parker") is a former grower for Perdue who, individually or together with his then-wife, Linda Gail Parker (née Burns), executed several PPAs with Perdue beginning in June 2006, with the last two being executed on December 29, 2014 (the "2014 PPA") and December 16, 2016 (the "2016 PPA"). (*See* **Exhibit G**, Excerpts and Exhibits from November 9, 2023, Deposition of Roger Dale Parker ("Parker Dep. I") at 105:15-24; Parker Dep. II at 31:13-25, 277:2- 278:14, Ex. 23 at pp. 29-45 [Perdue 002489-002505], pp. 46-62 [Perdue 002278–002294], and pp. 78-92 [Perdue 002295-002309]).

Response:

- Factually undisputed.

- However, whether Plaintiff executed the PPAs individually or together with his then-wife, Linda Gail Parker (née Burns), is not material to the claims in this action and is irrelevant to establishing or disproving the claims based on Perdue's actions.

27. Prior to contracting with Perdue, Plaintiff had at least 15 years of experience as a grower with other integrators, including approximately 10 years as a grower with Seaboard, 5 or 6 years as a grower with Conagra, and approximately 3 years of running his parents' poultry farm. (Parker Dep. I at 57:4-14, 58:11-60:5, 60:18-63:4, 63:25-66:11; Parker Dep. II at 32:10-33:5, 34:18-35:2, 35:20-36:3, 37:21-41:22, 43:16-19; Burns Dep. at 9:5-17, 10:24-11:3, 68:16-18).

Response:

- Undisputed.

- The assertion is an unsupported factual position to the extent that certain citations are irrelevant to the assertion. ECF No. 118-9, Burns Dep. at 68:16-18.

28. From approximately 2006 to 2009, Plaintiff owned and operated a single farm in Hillsboro, Georgia, on which he grew chickens for Perdue and which he operated under the "doing business as" name of "Parker's Poultry." (Parker Dep. I at 71:24-72:17; Parker Dep. II at 31:13-25, 51:20-52:11, Ex. 23 at pp. 1-7 [Perdue 002439-002445], pp. 8-14 [Perdue 002453-002459], and pp. 15-21 [Perdue 002432- 002438]; Burns Dep. at 24:17-19, 33:8-11, 58:8-19).

Response:

- Disputed to the extent that Plaintiff operated a single farm in Hillsboro for more than three years, until around 2015 (it was Plaintiff's only farm in Hillsboro, as the other farm was located in Milledgeville). Ex. AAA to Opp. at FFB01239.

29.    Plaintiff's operation of the Hillsboro farm from 2006 to 2009 is not material to the claims asserted in this action. ECF No. 118-5 at 411-425 (showing Milledgeville 2016 PPA); Mem. in Opp., Sec. II. B. Shortly after purchasing his farm in Hillsboro, Plaintiff voluntarily decided to upgrade his existing chicken houses to the higher tier, at his own expense and as a way to "try to get a better income." (Parker Dep. II at 116:22-117:19). In total, Plaintiff invested approximately $1,300,000.00 to purchase this farm and took out one or more loans or paid cash to complete upgrades. (Parker Dep. I at 68:24-69:20; Parker Dep. II at 46:4-48:1, 116:22-117:19).

Response:

- Disputed. Plaintiff did not voluntarily decide to upgrade his existing chicken houses. Plaintiff's decision was coerced by lack of income from Perdue; Plaintiff's first paycheck with Perdue "didn't even cover the gas," he felt "he had to do something," and upgrading "was the only way to get a raise." Ex. C to Opp., Parker Dep. II, at 47:14-48:1.

- The assertion is an unsupported factual position to the extent that the citations do not establish the absence of dispute. *See* Parker Dep. I at 68:24-69:20.

30.    After approximately 3 years of growing for Perdue on his Hillsboro farm, Plaintiff and his ex-wife decided to purchase a second farm in Milledgeville, Georgia, in or about 2009, which had six existing chicken houses. (Parker Dep. II at 51:8-53:24; Burns Dep. at 21:2-20).

Response:

- Undisputed.

31.    Plaintiff did not think about adding any more houses to this farm because he didn't think it needed it; however, he acknowledged he could if he wanted to. (Parker Dep. II at 59:4-16).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent that Parker had additional reasons for not needing to add more houses—Parker bought this farm because it already had additional chicken houses (six to be exact), so "knowing that the first one was not making enough money to survive," he felt buying the second farm would be a "better deal" and was already adding more houses in his care. Ex. C. to Opp., Parker Dep. II, at 47:1-55:25.

- The assertion is not material to the action—whether Plaintiff did not think about adding more houses and the reasons why, as well as whether he "could" if he wanted to, are irrelevant to establishing or disproving the claims asserted. The claims turn on Perdue's actions, not Plaintiff's thinking process and hypotheticals.

32. Plaintiff decided to buy a second farm after determining the "profit-to-loss ratio" was better on the Milledgeville farm because it already had "six houses with less money to pay on the payment." (Parker Dep. II at 53:17-54:7).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent that the assertion only contemplates one simplified reason for why the profit-to-loss ratio was better on the Milledgeville farm. Plaintiff also considered other factors, such as "the first farm was not making enough money to survive," that he could use the same equipment for the two farms, as opposed to buying new equipment he couldn't

23

afford, and that "Perdue wouldn't allow [him] to build" any more houses on the first farm. Ex. C to Opp., Parker Dep. II, 49:18-21; 54:22-24; 55:19-25.

- The assertion is not material to the action—why Plaintiff decided to buy a second farm is irrelevant to establishing or disproving the claims asserted, as the claims turn on Perdue's actions, not Plaintiff's reasoning.

33.    Plaintiff viewed this purchase as a good way to make more money, because he already had the equipment from his other farm that he could use for both farms and because this farm had six houses and "[o]f course six [houses] will bring more in." (Parker Dep. II at 53:25-55:25).

Response:

- Factually undisputed.

- However, the assertion is not material to the claims in the action; how Plaintiff viewed his purchase of a second farm is irrelevant to establishing or disproving the claims asserted, as the claims turn on Perdue's actions, not Plaintiff's views on his farm purchases.

34.    Plaintiff and his ex-wife purchased the Milledgeville farm for around $980,000.00, financing this purchase with First Financial Bank while acknowledging he could have paid cash if he wanted to. (Parker Dep. II at 52:12-53:4).

Response:

- Disputed. The assertion is an unsupported factual position that does not establish the absence of dispute. Plaintiff did not acknowledge he could have paid cash if he wanted to. Plaintiff responded "sure" to the question of whether "*if* [*he*] *had the*

24

*cash*, could [he] have bought [the farm] with cash" (emphasis added). Ex. C to Opp., Parker Dep. II, at 52:22-24.

- The assertion of whether Plaintiff acknowledged he could have paid cash if he wanted to is not material to the claims in the action and is irrelevant to establishing or disproving the claims asserted, as the claims turn on Perdue's actions, not Plaintiff's hypothetical acknowledgements.

35.    Plaintiff understood he would be responsible for payment of the loans on both his Hillsboro farm and his Milledgeville farm and for any default. (Parker Dep. II at 52:3-53:16).

Response:

- Factually undisputed.

36.    Plaintiff also understood his loans for the Milledgeville farm were a mortgage, agreed that "if the property increased in value, [he] would gain the benefit of that increase in value" if he sold it, and explained "[t]hat could go either way on win or lose." (Parker Dep. II at 52:25-53:16, 65:14-66:19).

Response:

- Disputed to the extent that not all of Plaintiff's "loans for the Milledgeville farm" were mortgages. For example, Plaintiff had a loan of $4,710.35 for propane on the Milledgeville farm, which was not a mortgage. Ex. A to Opp. at Perdue 001306.

- The assertion of what Plaintiff understood his loans were and whether he agreed that there could be a profit or loss in the property value is immaterial to the claims in this action, which are based on the violations Perdue committed.

37.    Plaintiff assumed the potential of risk of loss or potential for profit. (Parker Dep. II at 66:2-19).

<u>Response:</u>

- Disputed. The statement is vague and does not specify the item for which Plaintiff assumed the potential of risk of loss or potential for profit.

- Additionally, Plaintiff did not know that he would be impeded by Perdue in making a profit through increasing control and inducing the large risk of loss as a result. Ex. C. to Opp, Parker Dep. II, at 280:23-283:8 ("Q. So you testified that they told you they would come out, show you everything. You had to abide by the rules. If something happened, you would get written up. If you didn't comply you would get cut off. So you began the relationship knowing that information. Correct? A. Yeah. A good bit of it, yeah. That -- I mean, some of it come with time but, you know, it's definitely an understanding, you work for them, no doubt. Q. What part of it came with time? A. Well, you know, you come to see how it works, you know, with your field man and understanding how, you know, you -- how little options you have, I guess, on your end, because I wasn't used to growing that way. Growing with two other integrators it was totally different."); Ex. M to Opp., Mizell Dep., 152:2-158:13 ("Q. Sure. In your letter, you said until you address all of these requirements, you will not place chickens? A. Yes. Q. So you imposed new requirements on him, right? A. The seventy percent number would be new, yes. Q. And until he addressed that new requirement, you would not place chickens? A. Yes.").

38.     From approximately 2009 until 2015, Plaintiff owned and operated both his Hillsboro, Georgia farm and his Milledgeville, Georgia farm, which operated under the "doing business as" name of "Hazel Lee Farms," and grew chickens for Perdue on both. (Parker Dep. I at

82:2-7; 148:10-23; Parker Dep. II at 51:8-52:11, 204:22-205:5, 246:12-247:12, Ex. 23 at pp. 22-28 [Perdue 002310-002316], pp. 29-45 [Perdue 002489-2505], and pp. 46-62 [Perdue 002278-002294]).

  Response:

- Undisputed.

39. As a grower, Plaintiff determined the hours he worked. (Parker Dep. I at 160:14-161:11; Parker Dep. II at 198:14-199:3).

  Response:

- Disputed. Plaintiff did not determine the hours he worked; Plaintiff was subject to the requirements on his schedule imposed by Perdue to mandate the hours he worked, including but not limited to catch times, placement times, pick up times, lighting, and supervisor visits. Ex. Q to Opp., Parker Dep. I, 168:19-22, 170:3-7, 188:13-22, 199:2-203:3; PSMF ¶ 25; Ex. D to Opp., Parker Decl., Att. 1.

- The assertion is an unsupported factual position. The citations to the evidence do not establish that the assertion is undisputed. *See* Parker Dep. I at 160:14-161:11; Parker Dep. II at 198:14-199:3.

40. From approximately 2009 until 2015, Plaintiff hired employees to operate one of his farms for him on a full-time basis, paying these employees a salary and giving them a place to live while he personally worked on the other farm with his then wife, Ms. Burns. (Parker Dep. I at 147:10-150:4, 178:8-13; Parker Dep. II at 204:22-208:4, 209:14-211:13; Burns Dep. at 21:2-24:16).

Response:

- Disputed to the extent that the assertion is misleading insofar as it does not note that Plaintiff's hiring of employees needed to be approved by Perdue and were subject to Perdue's control. Ex. C to Opp., Parker Dep. II, at 229:19-230:13.

- The assertion is an unsupported factual position. The citations to the evidence do not establish that the assertion is undisputed; the citations do not support the approximate years during which Plaintiff hired employees.

41.     This included, for example, hiring one guy named "Dewey" who ran the Hillsboro farm himself for about two years for Plaintiff. (Parker Dep. I at 178:8-13). Plaintiff paid him a salary and provided a place to live during that time. (Parker Dep. II at 209:14-210:16). During this time, Plaintiff and his ex-wife were operating the Milledgeville farm. (Parker Dep. II at 211:4-7). When Plaintiff was running the Hillsboro farm, "[i]t just reversed" with the employee working Milledgeville while Plaintiff ran the other Farms. (Parker Dep. II at 211:4-13).

Response:

- Disputed to the extent that "while Plaintiff ran the other Farms" indicates that Plaintiff had more than two farms, but Plaintiff only managed the Hillsboro and Milledgeville farm simultaneously. Ex. C to Opp., Plaintiff Dep. II, at 204:22-205:5.

- The assertion is not material to the claims asserted in this action. Whether Plaintiff hired one guy named Dewey, paid him, housed him, while Plaintiff and his ex-wife operated the other farm, has no bearing on establishing or disputing the claims asserted in this action, as the claims turn on Perdue's actions, not on Plaintiff's decision to hire.

42.    Plaintiff also hired other people to help him from time to time with his farms. (Parker Dep. I at 130:19-131:19, 132:14-19, 134:9-14, 137:18-138:1, 145:13-146:11, 150:5-20, 177:17-178:17; Parker Dep. II at 248:13-249:16; Burns Dep. at 24:2-10, 34:23-37:13, 38:18-41:20).

Response:

- Disputed to the extent that Plaintiff's hiring of employees needed to be approved by Perdue and were subject to Perdue's control. Ex. C to Opp., Parker Dep. II, at 229:19-230:13.

- The assertion is not material to the claims asserted in this action. Whether Plaintiff hired others has no bearing on establishing or disputing the claims asserted in this action, as the claims pertain to Perdue's actions, not Plaintiff's decision to hire.

43.    Plaintiff grew calves and cows on his Hillsboro farm for approximately two years and sold the cows for a profit of $24,000, while selling the bulls for a profit of $2,000. (Parker Dep. II at 59:17-62:7, Ex. 3)

Response:

- Factually undisputed.

44.    While he was a grower for a few years, Plaintiff also operated an outside poultry equipment business, named "Parker's Poultry and Equipment" or "Parker's Poultry Equipment." (Parker Dep. II at 99:13-104:19, 112:21-114:23, 117:20-24, 119:2-7, 141:17-25, 144:8-145:3, 153:7-154:16, 156:2-160:23; Burns Dep. at 33:12-21, 46:13-49:16; *see* Exhibit H, Excerpts of Plaintiff Roger Parker's Responses and Objections to Defendant's First Set of Interrogatories at p. 19, Response to Interrogatory No. 19).

Response:

- Disputed to the extent the assertion fails to note Plaintiff also operated an outside construction business. Ex. C to Opp., Parker Dep. II, 172:16-22; Ex. Q to Opp., Parker Dep. I, at 26:20-24.

- The assertion is not material to the claims in this action. Whether Plaintiff also operated an outside poultry equipment business is irrelevant to whether establishing or disputing the claims asserted in this action, as the claims pertain to Perdue's actions against Plaintiff, not Plaintiff's actions with his business.

45.    Parker's Poultry and Equipment performed equipment repair and maintenance services for growers with Perdue and other integrators, submitting bids for the work to them beforehand. (Parker Dep. II at 104:2-7, 140:3-9, 143:22-144:3, 147:15-148:5, 159:9-160:2, 263:19-265:6, Ex. 13; Burns Dep. at 46:13-49:16).

Response:

- Factually undisputed.

- However, the assertion is an unsupported factual position to the extent that the citations do not support the usage of "other integrators," but only one grower from one other integrator other than Perdue. *See* Parker Dep. II at 263:24-265:6.

- The assertion is not supported by admissible evidence to the extent that Gail Burns did not work for, nor had personal experience with the work of, Parker's Poultry and Equipment. Ex. C to Opp., Parker Dep. II, at 102:15-21, 101:14-17.

46.    For a period of time, Parker's Poultry and Equipment was listed as an approved vendor for equipment construction on Perdue's house specifications for Perry, Georgia. (Parker

Dep. II at 117:20-118:2; Copeland Dep. at 57:5-58:17, 137:4-138:15, Ex. 50 at Perdue 007018 and 007029 [listing "Parker's Poultry – Dale Parker" under "Equipment Contractors").

Response:

- Undisputed.

47.    For approximately one year while he was a grower for Perdue, Plaintiff was also employed as a full-time manager for a quail company and someone else – either his wife or someone Plaintiff hired – ran his farm for him on a full-time basis during this period. (Parker Dep. II at 257:16-260:11).

Response:

- Disputed. Plaintiff was employed one year at most for a quail company and during that time he, his ex-wife, and someone Plaintiff hired full-time ran his farm. Ex. C to Opp., Parker Dep. II, 259:1-17; 260:3-11; 349:20-23.

- The assertion is an unsupported factual position to the extent that the citations do not establish the statement as undisputed. Parker Dep. II at 257:16-260:11.

- The assertion is not material to the claims in this action. Whether Plaintiff was employed for a quail company is not relevant to establishing or refuting the claims in this action. Ex. C to Opp., Parker Dep. II, at 348:23-350:24, 258:21-25; Ex. D to Opp., Parker Decl. ¶ 23.

48.    In or about 2008 for several months, in addition to operating his own farm, Plaintiff "took [over another] farm for a short season," referred to as the "Roosevelt farm," that was owned by a third party. (Parker Dep. II at 260:12-261:9; Burns Dep. at 32:23-33:7; Ex. H, at p. 19, Response to Interrogatory No. 19). During this time, he hired someone to run the Roosevelt farm

for him, who he found online and who had "grown before" and determined what to pay him. (Parker Dep. II at 261:10-263:18.)

Response:

- Disputed. Plaintiff did not take over another farm for a short season in addition to operating his own farm. Plaintiff was contacted by Perdue to run the Roosevelt farm, and he hired someone else to run that farm during that period. He did not do any work on the Roosevelt farm at that time. Ex. C. to Opp., Parker Dep. II, 260:12-262:16.

- The assertion is an unsupported factual position to the extent that the citations do not establish the assertion as undisputed.
  - o The citations do not support whether the time period was "for several months."
  - o The citations do not support that Plaintiff took over another farm for a short season in addition to operating his own farm.

- The assertion is not material to the claims in this action. Whether Plaintiff "took over" another farm in 2008 has no bearing on establishing or disputing the claims asserted in this action, which accrued long after 2008, and pertain to Perdue's actions against Plaintiff.

49.    Throughout the time Plaintiff owned and operated both his Hillsboro and Milledgeville farms, in addition to the loans for purchase of the houses themselves, he refinanced or took various loans for additional upgrades to his chicken houses for equipment like water lines. These were small business loans "made under a United States Small Business Administration nationwide program which uses tax dollars to assist small business owners." Plaintiff deducted the

payments on his tax returns. (Parker Dep. II at 66:20-70:9, 83:17-89:15, 90:10-94:19, Exs. 5-7 (containing documentation for loans in the amount of $92,000, $935,000, and $1.15 million)).

Response:

- Disputed. Plaintiff did not only take loans that were made under the Small Business Administration, and they were not only for additional upgrades for equipment. Plaintiff also had loans for the properties, repairs, supplies, and materials, and took loans from Perdue and from First Financial. Ex. XX to Opp.; Ex. YY to Opp.; Ex. ZZ to Opp.; Ex. A to Opp. at Perdue 001258-61, -1274-78, -1297-99, -1349-50, -1302-06.

- The assertion is an unsupported factual position as none of the citations provided establish that Plaintiff deducted the payments on his tax returns.

50. In or about 2015, Plaintiff assigned his Hillsboro farm to his son, who began operating it on his behalf under a lease purchase option; Plaintiff grew only at his Milledgeville farm, operating under the name Hazel Lee Farm, from that time forward. (Parker Dep. I at 148:10-23; Parker Dep. II at 204:22-205:5, 246:12-248:7; Burns Dep. at 36:11-23).

Response:

- Factually undisputed. However, the assertion is misleading to the extent that Plaintiff's son did not operate the Hillsboro farm on Plaintiff's behalf the entire period; Plaintiff's son "took it over" and obtained his own separate contract for the Hillsboro farm with Perdue. Ex. F to Opp. at Perdue 001546-Perdue 001557; Ex. R to Opp. at Perdue 002474-88, -2877-84; Ex. C to Opp., Parker Dep. II at 247:23-248:7.

- The assertion is an unsupported factual position to the extent that the citations to the record do not support the assertion and do not establish the absence of a dispute.

- The assertion is not material to the claims asserted in this action; whether Plaintiff's son began operating the Hillsboro farm under a lease purchase option is irrelevant to the claims asserted, which are based on Perdue's actions against Plaintiff.

51. Plaintiff at times performed above average in the tournament system and at other times fell below average. (Copeland Dep. at 47:23-49:3, 53:6-24).

Response:

- Factually undisputed.

- However, the assertion is misleading as Plaintiff's performance in the tournament system was heavily influenced by Perdue's control. Ex. C to Opp., Parker Dep. II 235:3-239:16, 272:15-25. For example, Perdue's errors in weighing birds directly affected Plaintiff's performance in the tournament system. Ex. C to Opp., Parker Dep. II at 235:8-236:5.

52.    Plaintiff represented on loan applications that he submitted to First Financial Bank's Agriculture Lending Division, under the penalty of perjury, that his net worth increased from $174,000 in 2014 to $1,740,000 in 2018 while he was a grower. (Parker Dep. II at 71:16-83:14, Ex. 5).

Response:

- Disputed. The assertion regarding Plaintiff's net worth is incorrect; $1,740,000 is explicitly stated as Parker's debt/worth ratio. Parker Dep. II, Ex. 5.

- The assertion is not material to the claims asserted in the action to the extent that Plaintiff representing a situation on his loan applications that were submitted to

First Financial Bank's Agriculture Lending Division is irrelevant to establishing or disproving the claims in this action.

53.    Plaintiff spent his time growing and taking care of Perdue's chickens and performed various maintenance work, such as work getting ready for new flocks, work weeding around the chicken houses, and work cutting the grass or putting rat bins to protect the chickens from rats entering. (Parker Dep. II at 186:7-191:12, 192:24-197:16, 199:5-202:21, 214:15-220:24, 266:13-269:16; Ex. 21).

Response:

- Disputed. Plaintiff also completed other tasks separate from "growing and taking care of Perdue's chickens," including repairs, replacements, and upgrades to equipment, checking generators, dredging the driveway, mowing, and replacing materials such as propane, bulbs, and water treatment mixtures. Ex. D to Opp., Parker Decl. ¶¶ 9, 11, 12-14, 17, Attachment 1; Ex. L to Opp. at Perdue 001611-13; Parker Dep. II 202:2-5 ("Perdue gave you a regimen of what you had to do when you didn't have chickens then.").
  - o  The list of tasks that Plaintiff spent his time on to grow and take care of Perdue's chickens is not exhaustive; the assertion does not state that the tasks were required by Perdue; and that the work was often left by Perdue supervisors as task lists for Plaintiff to complete. Ex. C to Opp., Parker Dep. II, at 190:22-25, 192:4-193:3, 195:13-25, 202:2-5; Ex. L to Opp. at Perdue 001616.

54.    Plaintiff also performed maintenance to the outside of the chicken houses, for things like repairing the roof, so that water wouldn't get into the chickens. (Parker Dep. II at 212:19-215:14).

Response:

- Undisputed.

55.    Plaintiff represented that he was engaged in farming to the IRS, filing "Profit or Loss from Farming" tax returns while deducting various business-related expenses, and obtained a Georgia Agricultural Tax Exemption Certificate from the State of Georgia. (Parker Dep. II at 163:17-171:25, 178:24-185:19, Exs. 14, 17, 19).

Response:

- Factually undisputed.

- However, the assertion is an unsupported factual position to the extent that the citations only show representation of a Georgia Agricultural Tax Exemption Certificate from the State of Georgia for 2012 to 2017. Ex. C to Opp., Parker Dep. II at Ex. 19.

- The assertion is not material to the claims asserted in the action. Whether Plaintiff represented that he was engaged in farming to the IRS, deducted business-related expenses, and obtained a Georgia Agricultural Tax Exemption Certificate are not material to establishing or disproving the claims in this action.

56.    Plaintiff admitted that by signing all of the PPAs, he agreed to all of the provisions in them. (Parker Dep. II at 283:9-298:1, Ex. 23 at pp. 29-45 [Perdue 002489-002505], pp. 46-62 [Perdue 002278-002294], and pp. 78-92 [Perdue 002295-002309]).

Response:

- Disputed to the extent that "all" is undefined. Plaintiff was shown specific PPAs and was asked whether those were his signatures. Plaintiff also responded to understanding he was agreeing to specific PPAs or specific, individual clauses within the PPAs he was shown. Parker Dep. II at 283:9-298:1.

57.    These provision included, for example, his agreement "[t]o feed, water, care for and otherwise manage the birds consigned, to provide the necessary housing, utilities, equipment, labor and supplies and to maintain such housing and equipment in a state of good repair and operable condition" (Parker Dep. II, Ex. 23, Sec. II ¶ B at p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]) and to "not take any action or refrain from taking any action that is likely to endanger the health and welfare of the birds consigned or otherwise result in food safety issues or concerns for PERDUE. (Parker Dep. II, Ex. 23, Sec. III ¶ B at p. 31 [Perdue 002491], p. 48 [Perdue 00280], and p. 80 [Perdue 002297]).

Response:

- Undisputed.

58.    The first page of the latest PPAs Plaintiff signed also provided:

> **PURSUANT TO THE TERMS OF THIS AGREEMENT PRODUCER AGREES, AMONG OTHER THINGS, TO PROVIDE THE NECESSARY HOUSING AND EQUIPMENT, AND TO MAINTAIN SUCH HOUSING AND EQUIPMENT IN A STATE OF GOOD REPAIR AND OPERABLE CONDITION, TO COMPLY WITH ALL APPLICABLE LAWS,**

**REGULATIONS, AND CODES, AND TO PERFORM ITS SERVICES IN ACCORDANCE WITH PERDUE PROCEDURES AND SOUND FARMING AND GROWING PRACTICES.**

***ADDITIONAL CAPITAL INVESTMENTS. ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT***.

(Parker Dep. II, Ex. 23 at p. 29 [Perdue 002489], p. 46 [Perdue 002278], and p. 78 [Perdue 002295]) (emphasis in original).

<u>Response:</u>

- Undisputed.

59.    By signing the PPAs, Plaintiff also agreed that the performance of his services would be "informed by" various policies of Perdue, and agreed:

(d) "[t]o perform the services hereunder using the skill, knowledge and discretion which PRODUCER possesses, informed by PERDUE's established procedures and otherwise sound farming and growing practices in accordance with industry standards." (Parker Dep. II, Ex. 23, Section III ¶ A at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]);

(d) "[t]o comply with any bio-security policies, audits, measures or guidelines required by PERDUE" (Parker Dep. II, Ex. 23, Section II ¶ N at p. 31 [Perdue 002491], p. 48 [Perdue 002280], and p. 80 [Perdue 002297]);

(d) "[t]o provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Programs" (Parker Dep. II, Ex. 23, Section II ¶ R at p. 80 [Perdue 002297]); and

(d) to comply with requirements regarding feed, proper culling of birds, vaccines, proper placement for chicks, alarm systems to monitor temperature levels, and water withdrawal times. (Parker Dep. II, Ex. 23, Section II ¶¶ C-E, G, M, O-Q at pp. 30-31 [Perdue 002490-002491], pp. 47-48 [Perdue 002279-002280], and pp. 79-80 [Perdue 002296-002297]).

Response:

- Factually undisputed to the extent that such language is included in the PPAs that Plaintiff signed but disputed to the extent that Perdue did not allow for Plaintiff's grower operations to be merely "informed by" Perdue's policies—Perdue required that grower operations be controlled by them. *See*, *e.g.*, Ex. M to Opp., Mizell Dep. 61:2-5, 62:1-63:1 ("You absolutely have to do these? A. Yes.").

60.    The last PPAs Plaintiff signed also provided the explicit right for Perdue to "[t]o enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities" and take various actions if the Producer was not "satisfactorily performing" his or her obligation "to care for, treat and maintain the flock." (Parker Dep. II, Ex. 23, Sec. III ¶ D at pp. 31-32 [Perdue 002491-002492], pp. 48-49 [Perdue 002280-002281], and p. 80-81 [Perdue 002297-002298]).

Response:

- Undisputed.

61.    The last PPAs that Plaintiff signed provided that:

> PRODUCER understands and agrees that
> PERDUE will determine, in its sole and absolute
> discretion:
>
> a. the breed of chickens PRODUCER will receive;
> b. the number and density of chickens in each flock
>    delivered to PRODUCER's farm;
> c. the size, weight and age of the chicken to be produced;
> d. the time for processing of each flock; and
> e. the date, time and estimated interval of placement for
>    future flocks.

(Parker Dep. II, Ex. 23, Sec. III ¶ I at p. 32 [Perdue 002492], p. 49 [Perdue 002281], and p. 81 [Perdue 002298]).

Response:

- Undisputed.

62.    Plaintiff agreed to these provisions as well by signing the PPAs. (Parker Dep. II, Ex. 23, Sec. III ¶ I at p. 32 [Perdue 002492], p. 49 [Perdue 002281], and p. 81 [Perdue 002298]).

Response:

- Undisputed.

63.    Under the PPAs signed by Plaintiff, he agreed that the PPAs were a "service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors" and that "[n]either party, nor their agents or employees, shall be considered to be the employees of the other for any purpose whatsoever. (Parker Dep. II, Ex. 23, Section IV ¶ A, at p.

3 [Perdue 002441], p. 10 [Perdue 002455], p. 17 [Perdue 002434], p. 24 [Perdue 002312], p. 33

[Perdue 002493], p. 50 [Perdue 002282], and p. 82 [Perdue 002299]).

    <u>Response:</u>

- Undisputed.

64.    Plaintiff agreed that he would be "exclusively responsible" for the performance of

his obligations under the Agreement and for the "employment, compensation, and supervision" of

any individuals he hired." (Parker Dep. II, Ex. 23, Section IV ¶ B, at p. 3 [Perdue 002441], p. 10

[Perdue 002455], p. 17 [Perdue 002434], p. 24 [Perdue 002312], p. 33 [Perdue 002493], p. 50

[Perdue 002282], and p. 82 [Perdue 002299]).

    <u>Response:</u>

- Factually undisputed.

- The assertion is misleading to the extent that Plaintiff was not in practice allowed
  to be "exclusively responsible." For example, Plaintiff was required to have his
  hires approved by Perdue. Ex. Q to Opp., Parker Dep. I at 146:12-147:2.

65.    The latest PPAs signed by Plaintiff also contained a clause entitled "Exclusion of

Incidental, Consequential, and Certain Other Damages," which provided that "TO THE

MAXIMUM EXTENT PERMITTED BYLAW, NEITHER PERDUE NOR PRODUCER SHALL

BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT,

NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES

WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT

AND/OR ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS

AGREEMENT AND/OR ATTACHMENTS." (Parker Dep. II, Ex. 23, Section VII ¶ N at p. 42

[Perdue 002502], p. 59 [Perdue 002291], and pp. 88-89 [Perdue 002305-002306]) (emphasis in original).

Response:

- Undisputed.

66.    At various times while Plaintiff was a grower, Perdue had concerns that Plaintiff was not maintaining his farm in a safe and operable condition for his chickens and documented these concerns in flock visit summaries, notes, and letters to him. (Parker Dep. II at 275:7-276:7, and Excerpts of Ex. 22 at Parker_002551; *see* **Exhibit I**, Declaration of Walter Clay Copeland ("Copeland Decl.") at ¶¶ 22-23; *see* **Exhibit J**, Declaration of Kathryn Mizell ("Mizell Decl.") at ¶¶ 8-19 and Exhibits C-F; *see* **Exhibit K**, Declaration of Bradley Bennett ("Bennett Decl.") at ¶¶ 5-8 and Exhibits A-C; *see* **Exhibit L**, Declaration of Daniel Roberts ("Roberts Decl."), at ¶¶ 5-7 and Exhibit A). This included in November 2014, when Perdue discovered equipment that was not kept in safe and good operable condition, and in January 2017 when Plaintiff's inattention to fans in his chicken houses created a serious animal welfare incident. (Roberts Decl., ¶ 12 and Exhibit C; Copeland Decl., ¶ 25 and Exhibit B).

Response:

- Disputed that:

    o    Perdue discovered equipment that was not kept in safe and good operable condition. Neither the November 2014 letter nor the Roberts declaration states that any equipment created unsafe conditions. Roberts Decl., ¶ 12 and Exhibit C.

    o    In January 2017 Plaintiff's inattention to fans created a "serious animal welfare incident." Ex. D to Opp., Parker Decl., ¶ 48.

o Plaintiff was inattentive to fans in his chicken houses and that it created a serious animal welfare incident. That assertion is misleading insofar as it suggests these were the sole cause of these failures, as opposed to the failures also resulting Defendant's own conduct regarding the inputs it provided Parker. Ex. D to Opp., Parker Decl. at ¶¶ 31, 34, 37; Ex. C to Opp., Parker Dep. II at 272:15-25.

- The assertion is also misleading to the extent that Plaintiff also performed exceptionally on multiple occasions as a grower under Perdue's standards and which Perdue noted as well. Ex. C to Opp., Parker Dep. II at 237:7-20; Ex. WW to Opp. at Parker_000208.

- The assertion is not material to the claims asserted in this action. Whether conditions created a serious animal welfare incident is not relevant to establishing or refuting the claims asserted in this action, which do not pertain to animal welfare.

67.    In or about August 2017, Plaintiff believed Perdue misrepresented the weights of two flocks he raised (flocks 46 and 48) on his live-haul tickets, resulting in underpayments to him. (ECF 1 at ¶¶ 95, 166; ECF 90 at ¶ 88; Parker Dep. II at 317:4-318:15; Copeland Dep. at 71:20-72:19, 84:12-85:11, 90:15-95:16, 98:1-15, Ex. 17 [Perdue 007333], Ex. 19 [Perdue 007373], Ex. 20 [Perdue 007380]).

Response:

- Factually undisputed.

- However, the assertion misleading to the extent that the statement asserts that "Plaintiff believed." Perdue did in fact misrepresent the weight of the two flocks he

raised on his live-haul tickets, resulting in underpayments to him, which Perdue has

admitted. Ex. M to Opp., Mizell Dep. at 123:11-124:18.

68.    Live-haul tickets are a record of the weight of the chickens that Perdue catches from

the growers farm, which use a numbering system to track the trucks picking up the chickens.

(Copeland Dep. at 43:3-5, 11-44:19).

Response:

- Undisputed to the extent that the assertion is misleading to the extent it implies the live-
  haul tickets are always an accurate record, when in practice the live-haul tickets are not
  always an accurate record of the weight of the chickens that Perdue catches from the
  growers farm. *See*, *e.g.*, Ex. M to Opp., Mizell Dep. 123:11-124:3.

  - The assertion is not material to the claims asserted in the action. Whether live-haul
    tickets are a record of the weight of the chickens, and the use of a numbering
    system, is irrelevant to establishing or disproving the claims asserted.

69.    In or about August 2017, Plaintiff called the Stockyards and Packers division of the

USDA (also referred to as "P&S") and made a complaint against Perdue regarding these flock

weights and alleged underpayments. (ECF 90 at ¶ 88; Parker Dep. II at 146:4-147:6, 318:6-15;

Burns Dep. at 62:19-65:1; Copeland Dep. at 71:20-72:19, 86:1-4). Plaintiff also emailed the USDA

regarding his prior complaint on October 1, 2017. (**Exhibit M**, October 1, 2017, Email from

Plaintiff to USDA, Subject: Hazel Lee Batch 46 [Parker_000784]).

Response:

70.    Undisputed.

71.    While Plaintiff had noticed wrong trailer numbers from the 2015 timeframe on, he "d[idn]t know why they did that," "[didn]t know the weights," and "never said anything about a grow out to any integrator until that—until that one." (Parker Dep. II at 317:6-318:5).

Response:

- Disputed. Plaintiff knew enough information that the weights were misrepresented, which is why he contacted USDA. Ex. C to Opp., Parker Dep. II at 271:7-18.

- The assertion is not material to the claims in this action—whether Plaintiff said or didnt say anything to any integrator and "why they did that" is irrelevant to whether the actions of misrepresenting weights and underpayment were happening in practice and to establishing or disproving the claims asserted. Moreover, whether Plaintiff had knowledge of wrong trailer numbers previous to 2017 is immaterial to the claims asserted in the action.

72.    The USDA called Perdues employee, Clay Copeland, in or about August 2017 and advised him that Plaintiff had filed a complaint. (Copeland Dep. at 71:20-72:19).

Response:

- Undisputed.

73.    Inaccuracies as to the live haul ticketing process matching up with the growers settlement have "happened rarely" and "[m]aybe once a year…in the Perry facility." (Copeland Dep. at 45:12-46:10). Perdue's plant maintains audits, which are reviewed whenever a grower raises an issue as to the trailers matching up. (Copeland Dep. at 46:11-25).

Response:

- Disputed that live haul ticketing inaccuracies happened rarely and "maybe once a year." Identifying inaccuracies is "dependent on a grower identifying the problem."

Copeland Dep. at 47:2-3. If inaccuracies occur rarely but the audits are reviewed only when a grower raises an issue, then inaccuracies could also be occurring when a grower does not raise an issue, which means more inaccuracies may actually occur without review. Copeland Dep. at 46:22-47:4.

- The assertion is an unsupported factual position based on explicit speculation. Copeland Dep. at 45:12-46:25.

- The assertion is not supported by admissible evidence. Clay Copeland does not have personal knowledge that was established that he reviewed audits nor created them as "the plant does those audits." Clay Copeland also clearly mentions in the excerpt cited above that he's "just speculating" and that he doesn't "have an accurate number as to how often mistakes occur." Copeland Dep. at 45:12-46:25.

- The assertion is not a material fact. Whether inaccuracies in the live haul ticketing process generally happen rarely or "maybe once a year" is not material to establishing or disproving the claims in this action which are specifically against Plaintiff.

74.    Perdue investigated Plaintiff's claims and, while it could not identify any wrongdoing, Perdue elected to pay Plaintiff his six-flock average for both flocks in order to resolve the dispute. (Copeland Dep. at 71:20-72:19, 84:12-85:11, 86:12-25, 89:7-8, 90:15-94:11, 98:1-99:18, Exs. 17 [Perdue 007333], 19 [Perdue 007373], and 20 [Perdue 007380]; Levengood Dep. II at 99:6-102:1).

Response:

- Disputed. Perdue could identify wrongdoing because there was an error, which Perdue admitted was an error, in that the weights were misrepresented. Ex. G to

46

Opp., Copeland Dep. at 94:12-94:25; Ex. M to Opp., Mizell Dep. at 123:15-124:3, Ex. 20.

- The assertion is misleading to the extent that Perdue only investigated Plaintiff's claims because Plaintiff contacted USDA. Ex. G to Opp., Copeland Dep. at 46:22-47:4.

- The assertion is not material to the claims asserted in this action. Whether Perdue elected to pay Plaintiff his six-flock average is not relevant to establishing or disproving the claims asserted in this action.

75.    There was no way for Perdue to definitively prove what the tare weight should have been or what caused the error. (Copeland Dep. at 87:8-20, 88:5-89:1, 92:3-17, 93:4-9). Perdue paid Plaintiff the six-flock average accordingly. (Copeland Dep. at 87:8-20).

    Response:

- Disputed. Perdue could have, and may have, proven that the tare weight was an error and in fact explicitly stated it was a procedural error. Ex. M to Opp., Mizell Dep. at 123:11-20 ("This is due to a procedural error with the tare weights at the plant."), 132:3-133:14.

76.    Other than the incident set forth above, Perdue could not find any other errors with weight tickets following any other complaints by Parker. (Copeland Dep. at 94:3-25, 95:1-12, 97:12-99:25).

    Response:

- Disputed. Further errors were brought to Perdue's attention following other complaints by Plaintiff. *See* Copeland Dep. at 95:20-97:11, Ex. 24 [Perdue 008011].

77.     On September 17, 2018, Plaintiff requested, via text message to Kathryn Mizell, that Perdue provide financing for new water lines in five of his houses to Tier 4, stating: "I also really hate not performing well. My floors are wet. I'm wanting to replace them before i place back. Will y'all still finance them for me in 5 houses?" (*See* Mizell Decl., ¶¶ 6-7 and Exhibit B, p. 1; **Exhibit N**, Excerpts and Exhibits from Deposition of Kathryn Mizell ("Mizell Dep.") at 139:12-20, Ex. 24 (Perdue 008014-008015).

Response:

- Undisputed.

78.     Ms. Mizell informed Plaintiff that Perdue would not provide additional financing because it had loaned Plaintiff money to be used for completing the Tier 4 upgrade, but Plaintiff failed to complete the upgrade. (Mizell Decl., ¶¶ 6-7 and Exhibit B; Mizell Dep. at 139:12-20, Ex. 24 Perdue 008014-008017).

Response:

- Factually undisputed. However, misleading to the extent that Plaintiff's inability to complete the upgrades were also due to Perdue's increased requirements on him. x. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp. at Perdue 008031-008033; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10. Perdue also had looked at the equipment, which were upgrades to Tier 4, given him approval for Tier 4 motors, which were a "bad batch" "unknowing to either [Plaintiff or Perdue]." *See* Copeland Dep., Ex. 54 at Perdue 007767.

79.     Plaintiff acknowledged the Tier 4 upgrade was not completed (Mizell Dep. Ex. 24 at Perdue 008016).

Response:

- Factually undisputed. However, misleading to the extent that Plaintiff's inability to complete the upgrades were also due to Perdue's increased requirements on him. Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp. at Perdue 008031-008033; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10. Perdue also had looked at the equipment, which were upgrades to Tier 4, given him approval for Tier 4 motors, which were a "bad batch" "unknowing to either [Plaintiff or Perdue]." *See* Copeland Dep., Ex. 54 at Perdue 007767.

80.    Plaintiff admitted he "[didn]'t know how many [farmers] [Perdue] gave [feed and water lines] to." (Parker Dep. II at 276:8-20).

Response:

- Factually undisputed.

- The assertion is immaterial to the claims asserted in this action. Plaintiff's knowledge of the exact number of farmers Perdue gave feed and water lines to is irrelevant to the claims asserted in this action, as the claims are about Perdue's actions against Plaintiff, not other growers, and the fact that Plaintiff "admitted" is not material.

81.    In or around August-September 2018, Perdue identified additional issues with Plaintiff's equipment in his chicken houses in the flock visitation reports. (Bennett Decl., ¶ 5 and Exhibit A, pp. 2-4). These issues included fans not working, ventilation issues, feeder and water lines not being adequately raised, and tunnel doors not opening. (*Id.*) These were problems, that if left unaddressed, could result in animal welfare issues. (Bennett Decl., ¶ 9).

Response:

49

- Factually undisputed.

- However, the assertion is misleading to the extent that such issues existed because of Perdue's control over Plaintiff's operations, finances, and insufficient inputs. ECF 59-6 ¶ 17 (showing other determining factors such as location, type of bird, tier payments, audit readiness, energy supplements, heating, and fuel); Ex. C to Opp., Parker Dep. II 235:8-236:9, 340:18-341:2.

- The assertion is an unsupported factual position. The cited evidence (Bennett Decl. ¶ 9) does not exist.

- The assertion is not material to the claims asserted in this action. Whether the problems, if left unaddressed, could result in animal welfare issues is irrelevant to the claims asserted. The claims are regarding Perdue's actions against Plaintiff, not animal welfare issues.

82.    On or about October 16, 2018, Perdue sent a letter to Plaintiff via certified mail advising him that Perdue would only place chickens with him if certain repairs were made and noting that "Flock visitation reports show that you were informed about issues with your fans at least three times, starting at placement." The letter also advised Plaintiff that he was in violation of Section IIB, or his obligation to:

> To feed, water, care for and otherwise manage
> the birds consigned, to provide the necessary housing,
> utilities, equipment, labor and supplies and to maintain
> such housing and equipment in a state of good repair
> and operable condition.

The letter also provided a number of repairs Plaintiff had to make before the next placement of birds. (Mizell Dep. at 168:1-169:12, Ex. 5 at Perdue 001364; Mizell Decl., ¶ 8 and Exhibit C; Parker Dep. II at 275:7-15, Excerpts of Ex. 22 at Parker_002551).

Response:

- Disputed. The letter was not just repairs. It also included the requirements that "All propane tanks are 70% full." Ex. A to Opp. at Perdue 001353.

- The assertion is not material to the elements in the claims to the extent that whether the letter advised Plaintiff he was in violation of such a clause in the contract is not material to establishing or refuting the claims asserted in this action.

83.    The issues identified in the October 16, 2018, letter were repairs that were needed, not upgrades. (Mizell Decl., ¶ 8 and Exhibit C; Mizell Dep. at 150:2-151:4, Ex. 29 at Perdue 008026 (stating the letter "should just be repairs" in response to Plaintiff calling it a "letter of upgrades"); *see also* Mizell Dep., Ex. 5 at Perdue 001364 ("The purpose of this letter is to let you know that Perdue will place chickens at your farm, Hazel Lee Farm, as soon as certain repairs are made to the farm.").

Response:

- Factually undisputed.

- The assertion is misleading to the extent that Perdue later told Plaintiff that repairs are insufficient and actual replacements are required. Ex. Y to Opp., Copeland Tr. at 18. Copeland suggested and explicitly stated that Parker would need to replace various pieces of equipment on his farm with new equipment, and that fixing the existing equipment is insufficient. Ex. Y to Opp., Copeland Tr. at 18-20. Copeland also suggests that Parker utilizing two different (approved) brands of feeder trays

is improper, which is false and not found in any of Parker's contracts. Ex. Y to Opp., Copeland Tr. at 2-3, 5, 6, 15.

- The assertion is immaterial to the claims asserted in this action to the extent that whether the issues identified in the letter were repairs and not upgrades is not relevant to the claims asserted in this action.

84.    The letter's requirement that the necessary repairs be made before additional birds were placed at Plaintiff's farm was Perdue's standard procedure when repair or equipment failures pose risks for the welfare of the birds. (Mizell Decl., ¶ 8 and Exhibit C; Mizell Dep., Ex. 5 at Perdue 001364; Levengood Decl. at ¶¶ 12-13; Burns Dep. at 54:23-55:19).

Response:

- Factually undisputed.

- The assertion is misleading in that any issues were also the result of Perdue's withholding of appropriate inputs and financing that were not previously withheld. Ex. A to Opp. at Perdue 001297-001299; Ex. C to Opp., Parker Dep. II, at 405:9-406:18.

- The assertion is immaterial to the claims asserted because whether the letter's requirement is Perdue's standard procedure when posing risks for the welfare of birds is irrelevant to the claims asserted in this action.

85.    On October 22, 2018, Plaintiff sent numerous text messages to Ms. Mizell in response to her October 16, 2018, letter, acknowledging that various items in the October 16, 2018, letter were accurate and needed to be completed. (Mizell Dep. at 156:21-157:11, Ex. 30 at Perdue 008031-008034.

Response:

- Disputed. Plaintiff did not send numerous text messages to Ms. Mizell acknowledging that various items in the letter were accurate. In fact, Plaintiff directly disputed, and Ms. Mizell acknowledged, that Plaintiff "references that he disagrees with some of the things [Ms. Mizell] had raised," such as, "I have butterfly doors but no shutters. I don't have any missing or nonworking doors." Mizell Dep. at 157:9-159:19, Ex. 30 at Perdue 008031-008033.

- The assertion is an unsupported factual position to the extent that the cited evidence does not establish the assertion as undisputed. *See* Mizell Dep. at 157:9-159:19, Ex. 30.

86.    In addition, Gail Burns, Plaintiff's ex-wife, also testified that Hazel Lee Farm had multiple issues in 2018, that the farm needed repairs during this time period, and that Plaintiff never completed the repairs. (Burns Dep. at 54:23-56:12).

Response:

- Disputed. Gail Burns testified specifically in response to recalling receiving a letter from Perdue regarding some repairs that needed to be made on the farm and testified "I don't recall all of the things that it [the letter] needed." Burns Dep. at 55:6-8.

  - The assertion is not supported by admissible evidence.

    o Gail Burns did not have sufficient knowledge to testify regarding the repairs that needed to be made on the farm as she was not present at the farm at that time. Burns Dep 56:10-16 ("Q Do you know if the repairs that were discussed were ever completed on the farm? A They were not. Q Do you have any knowledge of the -- the work that Mr. Parker was doing on the

farm after you left? A I don't. I'm assuming there was none, or they would have continued growing."). Moreover, Gail Burns is not credible to the extent that she offered biased testimony in favor of Perdue. Ex. VV to Opp. at Perdue 003937.

- The assertion is misleading to the extent that if it is found repairs had been needed on the farm at that time, it was also because of Perdue's retaliation. Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp. at Perdue 008031-33; Ex. Y to Opp., Copeland Tr. at 18-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

87.    Plaintiff's October 22, 2018, text messages asserted that the October 16, 2018, letter and the repairs identified were retaliation against him for his complaints to the USDA. (Mizell Dep., Ex. 30 at Perdue 008032 [under Plaintiff's item 9)].

Response:

- Undisputed.

88. Plaintiff "[didn]'t know about" other farmers who had similar kinds of repair issues who were not provided with these kinds of letters. (Parker Dep. II at 276:8-12).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent Plaintiff did not have such repair issues established as fact in the first place that could be considered "similar" to other farmers. Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp. at Perdue 008031-008033; Ex. Y to Opp., Copeland Tr. at 18-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II, at 272:15-273:9, 275:1-6, 356:13-357:10.

- The assertion is immaterial to the claims asserted in this action. Whether Plaintiff knew about other farmers' repair issues and the letters they specifically received are irrelevant to the claims asserted, which are regarding Perdue's actions against Plaintiff, not other farmers.

89.    On February 4, 2019, flock advisor Bradley Bennett observed the conditions at Hazel Lee Farm and created a list of notes concerning issues with fans, heaters, ventilation, cool cells, and holes in the growing houses. (Bradley Decl., ¶ 6 and Exhibit B).

Response:

- Disputed that Bennett observed conditions that in fact existed and necessarily were concerning issues and that they needed repairs. Ex. M to Opp., Mizell Dep. at 157:2-167:10; Ex. W to Opp. at Perdue 008031-008033.

- The assertion is immaterial to the claims asserted, as whether Bradley Bennett created such a list on February 4, 2019 is irrelevant.

90.    On February 13, 2019, Perdue re-sent the October 16, 2018, letter to Plaintiff, along with additional notes from Mr. Bennett regarding the equipment issues, including that multiple fans and heaters in his houses were not working. (Mizell Dep. at 169:14-170:9, Ex. 31 at Perdue 001356- 001379; Mizell Decl. at ¶¶ 9-10 and Exhibit E; Bennett Decl. at ¶ 6 and Exhibit B).

Response:

- Disputed to the extent that the assertion implies the equipment issues were an accurate representation of the issues occurring on Plaintiff's farm and that they were the result of only Plaintiff's actions, since if those issues were accurate, they would have stemmed from Perdue's retaliation and withholding of funds and proper materials.  Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp. at Perdue

008031-33; Ex. Y to Opp., Copeland Tr. at 18-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

- The assertion is an unsupported factual position to the extent that the citation "Mizell Dep. Ex. 31 at Perdue 001356- 001379" does not exist.

91.    On March 19, 2019, Bennett again observed the conditions in the growing houses at Hazel Lee Farm and noted remaining issues and repairs needed. (Bennett Decl., ¶ 7 and Exhibit C).

Response:

- Disputed that Bennett observed conditions that in fact existed and necessarily were remaining issues and that they needed repairs. Mizell Dep. at 157:2-167:10, Ex. 30 at Perdue 008031-008033.

- The assertion is misleading to the extent that any issues and repairs "needed" were due solely to Plaintiff's issues as a grower; it was also because of Perdue's retaliation and increased requirements. Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp. at Perdue 008031-33; Ex. Y to Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

92.    Perdue subsequently believed Plaintiff had made enough of the repairs to ensure safe conditions for the birds and placed two additional flocks with him. (Copeland Dep. at 118:21-119:14,134:5-135:18; Copeland Decl. at ¶ 14; Mizell Decl. at ¶¶ 11-19).

Response:

- Factually undisputed.

- However, the assertion is immaterial to the claims asserted in this action. Whether the determination of sufficient repairs was to ensure safe conditions for the birds is irrelevant to the claims asserted, which turn on Perdue's actions against Plaintiff.

93.    Once the birds were in the houses, it became apparent to Perdue that all necessary repairs had not been made. (Copeland Dep. at 118:21-119:5, 134:5-135:18; Mizell Decl. at ¶¶ 11-19 and Exhibit F; Bennett Decl., ¶ 8 and Exhibit A).

Response:

- Disputed.

    o   Perdue had determined that Parker had done repairs and determined "everything would be fine." Copeland Dep. at 134:18-19. *See also id.*, Ex. 54, at Perdue 007767 ("When we started this growout 29 days ago Perdue had gone over the fans three times and knew that 100% of fans were working properly with new belts and tensioners where needed.").

    o   Disputed that the repairs were "necessary" and the lack of context for which the repairs were "necessary." Perdue kept changing the requirements for what it deemed necessary for Plaintiff to rectify, including changing repairs to replacements. Ex. Y to Opp., Copeland Tr. at 18-20.

- The assertion is an unsupported factual position as the cited evidence does not establish the absence of a dispute. The cited evidence does not establish that Plaintiff did not make all "necessary repairs," only that Perdue allegedly observed "issues" in 2019.

94.    In late April 2019 and into May 2019, Bennett noted additional issues in the flock visitation reports for Hazel Lee Farm, including issues with feed, cool cells and fans not working, and wet spots in the houses. (Bennett Decl., ¶ 5 and Exhibit A, pp. 6-14).

Response:

- Factually undisputed.

  - However, the assertion is misleading to the extent that: The assertion omits that these issues were also the result of Perdue's own actions regarding lack of provisions. Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

95.    Plaintiff admitted he had "13 fans out in 29 days" and that he had a "bad batch of motors." He also asked for Perdue's help in replacing the motors. (Copeland Dep., Ex. 54 at Perdue 007767; *see also* Copeland Dep. 106:5-24, 111:3-14).

Response:

- Factually undisputed.

- However, the assertion is misleading as Plaintiff also states that Perdue had looked at the equipment, which were upgrades to Tier 4, given him approval for the motors, which were a "bad batch" "unknowing to either [Plaintiff or Perdue]." *See* Copeland Dep., Ex. 54 at Perdue 007767.

96.    During subsequent visits in June-August 2019, Bennett noted issues in the flock visitation reports for Hazel Lee Farm, including those involving fans, water lines, tunnel doors, and others. (Bennett Decl., ¶ 5 and Exhibit A, pp. 17-26).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent that the assertion omits that these issues were also the result of Perdue's own actions regarding lack of provisions. Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

- The assertion is not material as Bennett's noting of issues in the flock visitation reports are not relevant to the claims asserted in this action.

97.    On or about June 28, 2019, Mizell also observed the conditions at Hazel Lee Farm. (Mizell Decl., ¶ 11).

Response:

- Factually undisputed.

- The assertion is not material, because whether Mizell observed the conditions at Hazel Lee is irrelevant to the claims asserted in the action.

98.    This included issues such as fans not working, drinkers and feeders not working properly, back-ups not working, and grass not being mowed, which can cause animal welfare issues if not addressed. (Mizell Decl., ¶¶ 12-18).

Response:

- Disputed that these issues were observed by Mizell. The issues in the assertion as to what Mizell observed is an unsupported factual position to the extent that the citations to the evidence do not support that Mizell observed these conditions. The citations only detail the notes Bennett had in his flock reports. Mizell Decl., ¶¶ 12-18.

- The assertion that the issues can cause animal welfare issues if not addressed is hypothetical and irrelevant to the claims asserted in this action, which involve the actions of Perdue against Plaintiff.

99.    In or about July 2019, Perdue advised Plaintiff that it would pause placing any additional flocks with him until all necessary repairs were made. (Copeland Dep. at 109:2-111:1, 118:16-20; Mizell Dep. at 96:9-99:22, 147:5-14, Ex. 13; Mizell Decl. at ¶¶ 11-19; Copeland Decl. at ¶¶ 18-23).

<u>Response:</u>

- Disputed to the extent that Perdue did not advise Plaintiff on all "necessary" repairs. According to the provided citations, Perdue only told Plaintiff that "once the repairs were made, we would place chickens on the farm." Copeland Dep. 110:19-20.

- The assertion is an unsupported factual position to the extent that the provided citations to Copeland Dep. at 109:2-111:1, 118:16-20; Mizell Dep. at 96:9-99:22,145:5-14, Ex. 13, do not establish the absence of a dispute.

100.    When Perdue visited Plaintiff's farm again in August 2019, Plaintiff had failed to complete the repairs. (Copeland Dep. at 109:2-111:1, 118:16-20).

<u>Response:</u>

- Disputed that Plaintiff had failed to complete "the repairs," because Perdue itself frequently changed the repairs it wanted from Plaintiff, making it impossible for Plaintiff to meet Perdue's requirements.  Ex. X to Opp., Copeland Tr. at 19-20 ("I can fix things but I can't replace them. I don't have the money and you know that. I can fix things. Copeland: Well, I'm sorry. I keep saying "fix." "Replace." That's the only way you're gonna get the drinkers on the right center. That's the only way you're gonna stop these feed leaks."). Clay Copeland suggests and explicitly states that Parker would need to replace various pieces of equipment on his farm with new equipment, and that fixing the existing equipment is insufficient. Copeland also

suggests that Parker utilizing two different (approved) brands of feeder trays is improper, which is false and not found in any of Parker's contracts. Ex. Y to Opp., Copeland Tr. at 2-3, 5, 6, 15.

- The assertion is an unsupported factual position. The citations to the evidence do not establish the absence of a dispute, that when Perdue visited Plaintiff's farm again in August 2019, Plaintiff failed to complete the repairs. The citations are irrelevant to the assertion.

101.    The last flock consigned to Plaintiff was placed with him on June 24, 2019, and collected from him on August 5, 2019, a period of six weeks. (Copeland Decl. at ¶¶ 5, 13-14, 18).

Response:

- Undisputed.

102.    Plaintiff performed no further work for Perdue after the last flock was collected on August 5, 2019. (Copeland Dep. at 135:15-18; Copeland Decl. at ¶¶ 5-14, 18).

Response:

- Disputed. Plaintiff performed work for Perdue after August 5, 2019, as his work for Perdue did not end if there were no chickens on the farm. Ex. D to Opp., Parker Decl. at ¶ 15; Ex. S to Opp., Norris Tr. at 3-4 (explaining growers "babysit them [birds] twenty-four hours a day" and once the chickens "move out . . . that's when the real work starts . . . [i]t's a never-ending cycle").

103.    Plaintiff received a net payment for his last flock of $18,115.12. (Copeland Decl. at ¶¶ 14-15).

Response:

- Undisputed.

104.    On September 29, 2019, Perdue sent two additional letters to Plaintiff regarding necessary repairs if he wanted to receive more birds or necessary upgrades if he wanted to sell his farm. (Mizell Dep. at 181:16-185:5, Exs. 34-35; Roberts Decl. at ¶¶ 5-11 and Exhibits A and B).

Response:

- Undisputed.

105.    Since at least 2015, Perdue has required new contract growers to have Tier Four growing houses, which either the selling or purchasing grower can perform the upgrades for. (Roberts Decl. at ¶ 10; Copeland Decl. ¶ 24; Parker Dep. I at 68:24-70:1; Parker Dep. II at 44:1-9).

Response:

- Disputed. Parker was unable to sell the farm if Perdue refused to give the buyer a contract, and giving the buyer a contract required that the farm have Tier Four growing houses. Ex. C to Opp., Parker Dep. II at 374:12-375:21. The enforcement meant that no buyer would buy Plaintiff's farm without the upgrades, so Plaintiff would have been forced to perform the upgrades in order to sell the farm. Ex. C to Opp., Parker Dep. II at 375:11-21; Ex. QQ to Opp., Arline Decl. ¶ 5, 6.

- The assertion is an unsupported factual position to the extent that Ex. C to Opp., Parker Dep. I 68:24-70:1 directly contradicts the assertion that the purchasing grower can perform the upgrades, as it supports the statement that the seller, "the prior owner of it, might have done the upgrades before [Plaintiff] even took over the farm." It also does not establish that new contract growers have Tier Four growing houses.

106.    In the June-August 2019 time period, Plaintiff's Milledgeville farm, Hazel Lee, was

in worse condition than any other grower's farm in the Perry, Georgia growing area. (Mizell Decl. at ¶ 11; Copeland Decl. at ¶ 22).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent that any issues in the condition of the farm were due to Perdue's retaliation, withholding of inputs and financing, and shifting requirements imposed on Plaintiff. Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. W to Opp., Perdue 008031-008033; Ex. C to Opp., Parker Dep. II at 360:6-361:16; Ex. Y to Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3.

107. Perdue determined that it could not place additional birds with Plaintiff until the repair and equipment issues were fixed. (Copeland Dep. at 109:21-111:10, 118:16-119:5, 134:11-135:18; Copeland Decl. at ¶¶ 20-22; Levengood Dep. II at 31:20-33:14; Levengood Decl. at ¶¶ 12-13; Mizell Decl. at ¶¶ 11-19; Roberts Decl. at ¶¶ 5-7.).

Response:

- Disputed to the extent that the repair and equipment requirements that needed to be fixed were ambiguous and imposed changing, additional requirements to be fixed. *See* Ex. M to Opp., Mizell Dep. at 157:2-167:1, Ex. W to Opp., Perdue 008031-008032; Ex. C to Opp., Parker Dep. II at 360:6-361:16; Ex. Y to Opp., Copeland Tr. at 8-20.

- The assertion is also misleading to the extent that Perdue's determination to place additional birds was due to its own efforts to retaliate against Plaintiff, including withholding of inputs and financing, and shifting the repair/replacement

requirements imposed on Plaintiff. Ex. M to Opp., Mizell Dep. at 157:2-167:10; Ex. W to Opp., Perdue 008031-008033; Ex. Y to Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10, at 360:6-361:16.

108.    Plaintiff did not complete the repairs because he could not afford them; if he had done so, he could still be receiving flocks and growing for Perdue. (Copeland Dep. at 109:2-111:1, 118:16-20). Plaintiff also did not sell his farm because the cost of the upgrades was too high. (Parker Dep. II at 375:3-21).

Response:

- Disputed.

  o  Plaintiff completed certain repairs required of him by Perdue. *See* Ex. W to Opp., Perdue 008031-008032. To the extent that repairs were not completed, they were either because Perdue's requirements of the repairs kept shifting, such as requiring completed repairs to become replacements, and because Perdue's retaliatory conditions decreased financial sources previously available to Plaintiff. Ex. Y to Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

  o  Had Plaintiff completed the repairs, based on past experience and the trajectory of events, Perdue may still have retaliated against him and found further issues that required repair and withheld flocks. Ex. M to Opp., Mizell Dep. at 157:2-167:10, Ex. 30 at Perdue 008031-008033; Ex. Y to

Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp.,

Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

o   The assertion is hypothetical, speculative, and not a statement of fact.

o   Plaintiff was unable to sell his farm not because the cost of the upgrades

was too high but because Plaintiff tried to sell his farm, but was unable to

unless the buyer had a contract with Perdue. 374:16-375:21. Perdue would

not offer the buyer a contract unless the upgrades were completed to Tier 4

specifications. Ex. D to Opp., Parker Decl at ¶ 41-46; ECF 118-15, Roberts

Decl. at ¶¶ 5, 8. And Plaintiff could not complete the upgrades required

because he was unable to afford the upgrades, as Perdue had ceased

providing flocks, required extensive equipment upgrades and repairs, and

withheld previously available financial resources. Ex. C to Opp., Parker

Dep. 405:9-406:18.

- The assertion is an unsupported factual position to the extent that the assertion that

had Plaintiff done the repairs he could still be receiving flocks and growing for

Perdue is hypothetical, based on speculation, and cannot be proven.

- The assertion that if Plaintiff had completed the repairs required of him, he could

still be receiving flocks and growing for Perdue, is not material to establish or

disprove the claims asserted in this action. The claims entail Perdue's actions

against Plaintiff, not hypothetical scenarios regarding Plaintiff's actions.

109.   Plaintiff subsequently defaulted on his loans and his Milledgeville farm was

foreclosed on. (Parker Dep. I at 138:14-140:3, Ex. 14 at p. 10 [Parker_000082]; Parker Dep. II at

19:10-22, 245:1-17, Ex. 20; Burns Dep. at 60:7-22).

Response:

- Undisputed.

110.    At this time, Plaintiff was under court order to continue poultry operations at his farm, obtain a business appraisal, sell the farm for the highest amount possible, and split any profit with his wife. (Burns Dep. at 59:20-61:2; *see* **Exhibit O***, Final Divorce Decree and Amended Final Divorce Decree Filed in *Parker v. Parker*, C.A. No. SUCV2018049099 (Super. Ct. Baldwin County, Georgia) [Parker_000365-000372 and Parker_002535-002543] at Parker_000370-000371 and Parker_002539-002542). In December 2019, when Plaintiff's ex-wife was granted a court order to take control of the farm, but she could not list it for sale because of its condition. (*Id.*)

Response:

- Disputed.
    - o  Plaintiff was under court order to be "allowed to retain" the farm to operate poultry operations at his farm. Ex. AA to Opp., Parker_002539.
    - o  Plaintiff as well as his ex-wife were under court order "to obtain a business appraisal to determine the fair market value" of the farm. *Id*.
    - o  Plaintiff was under court order to list the farm for sale if the farm was without a flock for ninety (90) days. Ex. AA to Opp., Parker_002541.
- The assertion is not material to the claims asserted. What Plaintiff was under court orders relating to his divorce to do, and what his ex-wife could and could not do, are irrelevant to establishing or disproving the claims asserted in this action, which are about Perdue's actions towards Plaintiff and not about his divorce.

111.    Plaintiff filed for Chapter 7 bankruptcy on July 29, 2021, approximately two years after he stopped growing for Perdue, receiving a discharge in bankruptcy of more than $1.3 million. (Parker Dep. I at 138:14-140:3, Ex. 14; ECF 104-7).

Response:

- Undisputed. However, misleading to the extent that Perdue in part caused Plaintiff's bankruptcy by retaliating against Plaintiff, including withholding of inputs and financing, and shifting the repair/replacement requirements imposed on Plaintiff; and making it unable for Plaintiff to sell his farm. Ex. M to Opp., Mizell Dep. at 157:2-167:10; Ex. W to Opp., Perdue 008031-008033; Ex. Y to Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10, at 360:6-361:16; Ex. D to Opp., Parker Decl. at ¶¶ 31-38, 40-46.

112.    On deposition, when asked about his understanding of what he is claiming in this lawsuit, Plaintiff testified: "Unfair -- I mean, basically, I was ran out of business, I feel. And it seems, too, that I had upset Perdue and then I was pretty much starved out. That's how I feel." (Parker Dep. II at 298:23-299:7). He also testified: "…I'm not a lawyer in this. But the contract was breached by not—I mean, we didn't have a fair system, in my opinion." (Parker Dep. II at 304:21-24).

Response:

- Factually undisputed that Parker made this testimony on deposition.

- The assertion is an unsupported factual position to the extent that it does not establish the absence of a dispute, because Plaintiff also testified that because he is not a lawyer, he doesn't know "the legal definition of negligent misrepresentation,"

"the legal definition of an employee," nor the legal definition of "independent contractor." Ex. C to Opp., Parker Dep. II at 371:18-372:18.

- The assertion is not material. The fact that Plaintiff could not identify a particular contract provision that was breached is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

113.    When asked if his lawsuit "alleges that [he] believe[s] that [being treated like an employee] breached the agreement," he testified: "I don't have a clue what all it alleges." (Parker Dep. II at 309:14-18; *see also* Parker Dep. II at 308:3-309:13).

Response:

- Factually undisputed that Parker made this testimony on deposition.

- The assertion is an unsupported factual position to the extent that it does not establish the absence of a dispute, as Plaintiff also testified that because he is not a lawyer, he "doesn't know a lot of the lingo" including what "would define [breach]." Ex. C to Opp., Parker Dep. II at 304:2-9.

- The assertion is not material to the claims asserted. The fact that Plaintiff testified that he does not himself understand employment law when asked a question is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

114.    When asked about the paragraphs of the PPA that he believes Perdue breached, Plaintiff testified: "I don't have the answer to that because I basically shared the story and, you know, with my attorneys, and they would have known what was breached and what wasn't breached, not me. I mean, I don't know all that." (Parker Dep. II at 337:21-338:3).

Response:

- Factually undisputed that Parker made this testimony on deposition.

- The assertion is an unsupported factual position to the extent that it does not establish the absence of a dispute, as Plaintiff also testified that because he is not a lawyer, he "doesn't know a lot of the lingo" and what "would define [breach]." Ex. C to Opp., Parker Dep. II at 304:2-9.

- The assertion is not material. The fact that Plaintiff could not identify a particular contract provision that was breached is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

115.    Plaintiff believed the PPA was breached through Perdue not consigning birds to him of sufficient quality, which "seemed to start in the early -- just 2015-ish area." (Parker Dep. II at 300:25-301:23). In response to what provision of the contract he believes was breached, Plaintiff testified: "To consign available chicks to a producer to be raised, but when we get them, they are not -- I mean, they are not worthy to be even put in the house." (Parker Dep. II at 301:9-14). Plaintiff also believed Perdue breached the Agreement with him "[w]hen [he] started finding the trailer issues… in that area then [of 2015]," (Parker Dep. II at 302:9-25) and because "they were consigning available birds to him, but the birds … had lack in quality" and that "didn't seem fair to [him]." (Parker Dep. II at 303:1-303:13). Plaintiff believed this violated the contract because "[he] was growing under a … contract that wasn't – didn't been to be fair." (Parker Dep. II at 301:24-302:2).

Response:

- Disputed. The quotations are in response to counsel asking Plaintiff questions with legal terms of art; it is an unsupported factual position to the extent that it does not establish the absence of a dispute, as Plaintiff also testified that because he is not a lawyer, he "doesn't know a lot of the lingo" and what "would define [breach]." Ex. C to Opp., Parker Dep. II at 304:2-9.

- The assertion is not material. The fact that Plaintiff could not identify a particular contract provision that was breached is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

- The assertion is a statement of legal conclusion, not fact.

116.    Plaintiff believed Perdue violated the agreement by not treating him as an independent contractor and that he "didn't feel that way" from day one. (Parker Dep. II at 309:24-310:10). He also claimed Perdue gave him "lesser quality in feed, in chickens," which made it hard for him to make money. (Parker Dep. II at 310:11-19).

   <u>Response:</u>

- Disputed. The assertion is an unsupported factual position to the extent that it does not establish the absence of a dispute, as the cited testimony is in response to the questions regarding the terms "independent contractor," and how Plaintiff thought Perdue "breached the agreement," Ex. C to Opp., Parker Dep. II at 309:24-310:19. However, Plaintiff also testified that because he is not a lawyer, he "doesn't know a lot of the lingo," what "would define [breach]," "the legal definition of negligent misrepresentation," "the legal definition of an employee," and the legal definition

of "independent contractor." Ex. C to Opp., Parker Dep. II at 304:2-9, 371:18-372:18.

- The assertion is not material. The fact that Plaintiff testified when asked a question is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

- The assertion is a statement of legal conclusion, not fact.

117.   Plaintiff testified that, during the entire time he was a grower for Perdue, he was never fully able to exercise his skill and independent judgment and that "[t]hey pretty much controlled everything" and they "supervise[d] every aspect of it" from the beginning. (Parker Dep. II at 320:10-321:19).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent that it omits that Plaintiff additionally testified that different treatment and increased control "really started to elevate" after he contacted USDA. Ex. C to Opp., Parker Dep. II at 273:10-20.

118.   Plaintiff testified that Perdue showed and told him what to do from the time he first sat down to sign an agreement in 2006, claiming: "[t]hey basically told [him] that they would come out and show [him] everything to do; what to do, how to do it. And [he] had to abide by the rules [Perdue] had …[and] if [he] didn't comply, basically, [he] got cut off." (Parker Dep. II at 280:23-281:15).

Response:

- Factually undisputed.

- However, the assertion is misleading to the extent that it omits that Plaintiff additionally testified that different treatment and increased control "really started to elevate" after he contacted USDA. Ex. C to Opp., Parker Dep. II at 273:10-20.

- The assertion is not material to the claims asserted. The fact that Plaintiff testified is irrelevant to the claims asserted in this action.

119.    Plaintiff confirmed this happened "at the very beginning of the relationship" in 2006, that Perdue was "up front with telling [him]… [h]e had to follow the guidelines and…everything [Perdue] said for daily working the birds and everything," that "[h]e had to abide by the rules that [Perdue] had," and "pretty much – you know, do what we say and when we say to do it and everything will be good." (Parker Dep. II at 281:4-282:4).

<u>Response:</u>

- Factually undisputed.

- However, the assertion is misleading to the extent that it omits that Plaintiff additionally testified that different treatment and increased control "really started to elevate" after he contacted USDA. Ex. C to Opp., Parker Dep. II at 273:10-20.

- The assertion is not material to the claims asserted. Whether Plaintiff confirmed certain statements happened is not material to establishing or disproving the claims asserted in this action.

120.    Plaintiff also testified that Perdue subjected him to "supervision over everything from the beginning" (Parker Dep. II at 321:14-19), including mandatory guidelines beginning in 2006 through the time he was a grower. (Parker Dep. II at 341:18-24).

<u>Response:</u>

- Factually undisputed.

- However, the assertion is misleading to the extent that it omits that Plaintiff additionally testified that different treatment and increased control "really started to elevate" after he contacted USDA. Parker Dep. II at 273:10-20. Plaintiff also was subject to increased control, supervision, and requirements in his last three years. Ex. D to Opp., Parker Declaration at ¶¶ 31-33, 37, 40-44.

- The assertion is not material. The fact that Plaintiff testified is irrelevant to the claims asserted in this action.

121.    Plaintiff is not aware of any other growers who had the kinds of issues that Perdue noted he had who were not provided with repair letters like he received, responding "I'm not—I don't know about other farmers, no." (Parker Dep. II at 275:7-276:12).

Response:

- Disputed. Plaintiff did not have such repair issues established as fact in the first place that could be the kinds of issues Perdue noted he had.  Mizell Dep. at 157:2-167:10, Ex. 30 at Perdue 008031-008033. However, the assertion is misleading to the extent that other growers were not facing retaliation from Perdue that would cause such issues such that could be considered "similar" to other farmers. Ex. W to Opp., Perdue 008031-008032; Ex. Y to Opp., Copeland Tr. at 8-20; Ex. S to Opp., Norris Tr. at 1-3; Ex. C to Opp., Parker Dep. II 272:15-273:9, 275:1-6, 356:13-357:10.

- Misleading to the extent that Plaintiff also stated immediately after the asserted testimony that he did know that farmers did in fact get "feed lines and water lines" that he did not receive and that he "had actually put them in [or installed them] for them." Parker Dep. II at 276:13-25.

- The assertion is immaterial to the claims asserted in this action. Whether Plaintiff knew about other farmers' repair issues and the letters they specifically received are irrelevant to establishing the claims asserted in this action, which turn on Perdue's actions against Plaintiff, not Plaintiff's awareness of other growers.

122.    Plaintiff admitted he "[didn't] know about other growers. I mean, I don't know what they wrote down on their [flock visit reports]." (Parker Dep. II at 270:17-23).

Response:

- Disputed. Plaintiff knew about other growers who were treated differently than him in terms of "more favorable treatment." *See* Parker Dep. II 270:9-16. ("Q. Are you aware of any other growers who were allowed -- who were treated differently than you in terms of given more favorable treatment on some of this stuff? A. Oh, yeah. I had a -- I know people that got water lines and got feed lines and -- yeah. I mean, quite a few farmers, actually, you know, that I had seen get the same things I was asking for."). He also knows of another grower against whom Perdue retaliated. Ex. X to Opp., Levitt Tr. at 1; Mizell Dep. at 158:14-25, Ex. 30 at Perdue 008031-008033.

- The assertion is immaterial to the claims asserted in this action. Whether Plaintiff knew about other farmers and what he knew about them are irrelevant to establishing the claims asserted in this action, which turn on Perdue's actions against Plaintiff, not Plaintiff's knowledge about other growers.

123.    Plaintiff has no personal knowledge of other growers who Bradley treated more leniently than him. (Parker Dep. II at 403:5-15).

Response:

- Factually undisputed.

- The assertion is not material to the claims asserted in this action. Whether Plaintiff has personal knowledge specifically of Bradley Bennett's treatment other growers is irrelevant to establishing the claims asserted in this action, which turn on Perdue's actions against Plaintiff, not Plaintiff's personal knowledge of Bradley's treatment of other growers.

124.    After his complaint to the USDA, Perdue required Plaintiff to keep his propane tanks at least 70% full, which Perdue requested because Plaintiff previously ran out of propane. (Parker Dep. II at 368:3-369:14, Excerpts of Ex. 22 at Parker_002551; Mizell Dep. at 150:2-155:24, Ex. 29 at Perdue 008027).

Response:

- Disputed. Perdue required Plaintiff to keep his propane tanks at least 70% full to penalize Dale for contacting USDA. Ex. M to Opp., Mizell Dep. at 151:5-156:6, 162:5-167:10 ("the 70 percent number would be new, yes...Q. Any issue about him claiming that he was being retaliated against? A. No."); Ex. W to Opp., Perdue 008031-008033.

125.    Plaintiff has no knowledge of what requirements other growers had in their letters or what oversight the "field man" exercised over other growers. (Parker Dep. II at 270:17-23, 403:5-15, 405:9-407:10).

Response:

- Disputed. Plaintiff knew about other growers who were treated differently than him in terms of "more favorable treatment." *See* Parker Dep. II 270:9-16. ("Q. Are you

aware of any other growers who were allowed -- who were treated differently than

you in terms of given more favorable treatment on some of this stuff? A. Oh, yeah.

I had a -- I know people that got water lines and got feed lines and -- yeah. I mean,

quite a few farmers, actually, you know, that I had seen get the same things I was

asking for."). Plaintiff also knew that another grower who was retaliated against by

requiring that he grow with insufficient inputs. Ex. X to Opp., Levitt Tr. at 1.

- The assertion is immaterial to the claims asserted in this action. Whether Plaintiff
  knew about other farmers' letters or the oversight the "field man" exercised over
  growers and what he knew about them are irrelevant to establishing the claims
  asserted in this action, which turn on Perdue's actions against Plaintiff, not
  Plaintiff's knowledge of other growers' letters or supervision.

126.    Plaintiff admitted that the "Dedicated Tos and Never Evers" (which Plaintiff

referred to as "always dos and never dos") and other "bio-security rules" and "bio-security

policies," temperature and lighting guidelines for houses, and "all the requirements that Perdue put

on [him]" are "Perdue established procedures," which he understood that he agreed to comply with

in the PPAs. (Parker Dep. II at 283:9-286:13, 362:12-364:25, 408:24-409:10).

<u>Response:</u>

- Factually undisputed.

- However, misleading to the extent that Plaintiff did not have all the biosecurity
  procedures when he signed the PPA. Ex. C to Opp., Parker Dep. II at 370:2-21 ("Q.
  And it says: "To comply with any bio-security policies, audits, measures or
  guidelines required by Perdue." Do you see that? A. Yes. Q. So at the time you were
  presented with this agreement in 2016 -- in December of 2016 to sign, did this

agreement also include all of the bio-security policies, audits, measures or guidelines you would be subject to?  MS. SANTEN: Objection. The document speaks for itself. Vague. THE WITNESS: They had a separate bio-security policies pack, if I remember right. Yeah.  BY MS. VAUGHN: Q. And did they inform you about all of those bio-security policies at the time you signed this on December 16, 2016? A. No. They -- they were continually changing.").

- The assertion is immaterial to the claims asserted in the action. Whether Plaintiff admitted to a statement and whether he understood a certain assertion is irrelevant to establishing the claims asserted in this action, which turn on Perdue's actions against Plaintiff, not Plaintiff's admissions or his state of mind being that of "understanding."

127.    Plaintiff does not believe Perdue breached the PPA when allowing supervisors to come onto his farm. (Parker Dep. II at 340:14-17).

Response:

- Disputed. The assertion is an unsupported factual position to the extent that it does not establish the absence of a dispute, as Plaintiff also testified that because he is not a lawyer, he "doesn't know a lot of the lingo" or what "would define [breach]." Ex. C to Opp., Parker Dep. II at 304:2-9.

- The assertion of Perdue breaching the PPA is a statement of legal conclusion.

- The assertion is not material. The fact that Plaintiff believed or did not believe a certain assertion is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

128.    In 2016 or 2017, Plaintiff requested Perdue provide him with information from which he could calculate his compensation and Perdue "tried" to provide this information to him, but "it is impossible almost for a grower to figure" "because there [are] too many factors." (Parker Dep. II at 338:18-340:12).

Response:

- Disputed. Plaintiff "tried to get an understanding of how everything worked and requested that [he] get information that [he] could figure [him]self." Plaintiff actually testified that, "I requested—because the system [for pay] they have, it is impossible almost for a grower to figure," ECF No. 118-5, Parker Dep. II at 339:6-8. Plaintiff then testified that after he requested the information, Defendant "tried but it was—it wasn't—they couldn't because there was too many factors." *Id*. at 339:25-340:2.

- The assertion is an unsupported factual position that does not establish the absence of a dispute. The cited evidence only establishes that Perdue could not provide the information. Parker Dep. II at 339:25-340:2.

- The assertion is immaterial to the claims asserted in this action. Whether Perdue tried to provide this information to Plaintiff is irrelevant.

129.    Plaintiff "started noticing things [in] 2016-ish regarding insufficient inputs," (Parker Dep. II at 340:18-341:17) but Perdue never targeted Plaintiff with bad feed or chicks. (Copeland Decl. at ¶ 21; Burns Dep. at 65:3-66:8; Copeland Decl. at ¶ 21).

Response:

- Disputed. Plaintiff was provided both with bad feed and chicks. Parker Dep. II at 340:18-341:2.

- The assertion is an unsupported factual position to the extent that the cited evidence does not establish the absence of a dispute. The citations directly contradict each other. Parker Dep. II at 340:18-341:2; Copeland Decl. at ¶ 21.

- Unsupported factual position to the extent that the citation; Burns Dep. at 65:3-66:8 is irrelevant to the assertion.

130.    Plaintiff began to notice Perdue "exerting even more strenuous controls, such as with the maintenance and upgrade of his chicken houses" (ECF 90 at ¶ 118) in 2015 or 2016. (Parker Dep. II at 273:10-17).

Response:

- Disputed. Plaintiff began to notice Perdue exerting even more strenuous controls after he contacted USDA, which was in 2017. Parker Dep. II 273:10-20; Ex. D to Opp., Parker Decl. at ¶ 31.

131.    When asked if he could explain the ways he thinks Perdue misrepresented the relationship, Plaintiff testified: "I don't know, really, how to answer that." (Parker Dep. II at 332:4-10). Plaintiff also testified "I don't understand that" and "I'm not a lawyer, so I'm having trouble with it" when asked whether he was contending Perdue misrepresented the nature of the relationship. (Parker Dep. II at 310:22-311:7). Nonetheless, Plaintiff testified that he first believed that Perdue misrepresented that he was an independent contractor on "day one" and "from day one" but he especially felt this way in 2015. (Parker Dep. II at 312:3-314:1, 317:1-13).

Response:

- Disputed. The assertion is an unsupported factual position to the extent that it does not establish the absence of a dispute. Plaintiff cannot testify to how Perdue mispresented the relationship or when Perdue misrepresented that he was an

independent contractor since he doesn't know "the legal definition of negligent misrepresentation," "the legal definition of an employee," nor the legal definition of "independent contractor." Ex. C to Opp., Parker Dep. II at 371:18-372:18.

- The assertion is not material. The fact that Plaintiff testified is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

- The assertion is a statement of legal conclusion, not fact.

132.    Plaintiff testified that Perdue's misrepresentations "got worse" in 2015 or 2016, when Plaintiff alleges Perdue made misrepresentations by "weighing [trailers] from other growers and putting it on [Plaintiff's settlement]," and continued in 2017 when Perdue allegedly misrepresented the weights of chickens Plaintiff raised on flock settlement reports. (Parker Dep. II at 313:2-314:1).

Response:

- Disputed.

- The assertion is an unsupported factual position as the cited evidence does not establish the absence of a dispute. Plaintiff also testified that the misrepresentations "got worse" after Plaintiff contacted the USDA, and after he signed the 2016 PPA. Ex. C to Opp., Parker Dep. II 273:10-20, 366:4.

- The assertion is not material to the claims asserted. The fact that Plaintiff testified to something is irrelevant to the claims asserted in this action, as is whether Plaintiff is able to recite the legal claims in this lawsuit. Mem. in Opp., Sec. II. A.

133.    On deposition, Plaintiff's lawyers also elicited testimony that he does not know the "legal definition" of certain terms, including "negligent misrepresentation," "independent contractor," and "employee." (Parker Dep. II at 371:15-372:7).

Response:

- Factually undisputed with respect to Parker's testimony; disputed to the extent "Plaintiff's lawyers also elicited testimony" suggests coaching of the witness, which did not occur.

    - The assertion is not material to the claims asserted in this action as the position that "Plaintiff's lawyers also elicited testimony" to a point, even if it were undisputed, is irrelevant to establishing or disproving the claims, which do not turn on Plaintiff's lawyer's actions.

134.    Plaintiff generally worked 50-60 hours per week when he had chickens. (Parker Dep. II at 185:20-186:12, 226:20-229:4).

Response:

- Disputed. The assertion is misleading to the extent that it omits that Plaintiff also worked hours for Perdue when he did not have chickens, and that the provided citation says that Parker worked that many hours for Perdue "in most of the weeks" which would necessarily include weeks in which Parker did not have chickens. Parker Dep. II at 186:1-3; Ex. D to Opp., Parker Decl. at ¶¶ 14, 17, Attachment 1; Ex. S to Opp., Norris Tr. at 3-4 (explaining growers "babysit them [birds] twenty-four hours a day" and once the chickens "move out . . . that's when the real work starts . . . [i]t's a never-ending cycle").

135.    When asked what damages he is seeking in this lawsuit, Plaintiff testified "I haven't -- I haven't requested money, that I know of" and, when asked if he was seeking to recover money,

responded "No. I am seeking to help other farmers not to go through what I went through." He also said, "it's not my goal" to seek money and that he "do[es]n't have a dollar figure." (Parker Dep. II at 332:12-335:21).

Response:

- Disputed. The assertion is an unsupported factual position to the extent that the cited evidence does not establish the absence of a dispute. Plaintiff also testified that he may be seeking money, overtime compensation, and that he suffered financial damages based on the inability to sell his farm. Ex. C to Opp., Parker Dep. II at 308:11-309:2, 335:22-25, 345:6-25, 374:4-375:21. Moreover, damages is a legal term, and Plaintiff is "not a lawyer" and does not know "a lot of the lingo," offering evidence such that the assertion cannot supported without dispute. Ex. C to Opp., Parker Dep. II at 304:7-12, 371:18-372:18.

- To the extent that the statement is establishing the damages Plaintiff is seeking, the assertion is a statement of issue or legal conclusion and not a material fact.

- The assertion is not material to the claims asserted in this action; the position that "Plaintiff testified" to a point, "said" a certain phrase, or "responded" to a question asked, even if it were undisputed, is irrelevant to establishing or disproving the claims.

136.    Plaintiff also testified that it "may be" that he is seeking overtime compensation but he's "not putting a number on it" because he "do[esn't] have that." (Parker Dep. II at 335:22-25).

Response:

- Factually undisputed.

- However, to the extent that the assertion seeks to establish the claims Plaintiff seeks and the damages, the assertion is a statement of issue or legal conclusion, not a material fact.

- The assertion is not material to the claims asserted in this action; the assertion that Plaintiff testified, even if it were undisputed, is irrelevant to establishing or disproving the claims asserted.

137.    Plaintiff also testified:

> Q. Okay. So, sitting here today you're not able to tell me what money you're looking for from this lawsuit?
>
>         ...
>
> THE WITNESS: I don't have dollar figures, no.

(Parker Dep. II at 337:6-11).

<u>Response:</u>

- Factually undisputed.

- However, the assertion is misleading and an unsupported factual position to the extent that the cited evidence does not establish the absence of a dispute. Plaintiff also testified that he may be seeking money, overtime compensation, and that he suffered financial damages based on the inability to sell his farm. Ex. C to Opp., Parker Dep. II at 335:22-25, 345:6-25, 374:5-375:21.

- To the extent that the statement is establishing the damages Plaintiff is seeking, the assertion is a statement of issue or legal conclusion and not a material fact.

- The assertion is not material to the claims asserted in this action; the assertion that Plaintiff testified is irrelevant to establishing or disproving the claims asserted.

138.    Plaintiff later testified that he is seeking damages for the Milledgeville farm becoming "worthless without a working contract" with Perdue. (Parker Dep. II at 374:1-375:10).

<u>Response:</u>

- Disputed.

- The assertion is an unsupported factual position to the extent that the cited evidence does not establish the absence of a dispute. Plaintiff testified that "I had to have a contract with Perdue, or the houses are really worthless without a working contract" in the context of "what happened to the Milledgeville farm when [he] didn't have a contract on it[.]" Parker Dep. II at 375:3-10.

- The assertion is misleading to the extent that it does not mention other damages that Plaintiff is seeking. ECF 94 at ¶¶ 90-136.

- To the extent that the assertion seeks to establish the claims asserted in this action and the damages sought, the assertion is a statement of issue or legal conclusion and is not a material fact.

- The assertion is not material to the claims asserted in this action; the position that "Plaintiff later testified" to an assertion is irrelevant to establishing or disproving the claims.

Dated: August 18, 2025                    Respectfully submitted,

                                          */s/*Jamie Crooks
                                          T. Brandon Waddell
                                          Ga. Bar No. 252639
                                          Jarred A. Klorfein
                                          Ga. Bar No. 562965
                                          Emily C. Snow
                                          Ga. Bar No. 837411
                                          **CAPLAN COBB LLC**
                                          75 Fourteenth Street NE
                                          Suite 2700
                                          Atlanta, Georgia 30309
                                          (404) 596-5600
                                          (404) 596-5604 (fax)
                                          bwadell@caplancobb.com
                                          jklorfein@caplancobb.com
                                          esnow@caplancobb.com

                                          Jamie Crooks (admitted *pro hac vice*)
                                          D.C. Bar No. 156005
                                          Kritika Deb (admitted *pro hac vice*)
                                          Amanda R. Vaughn (admitted *pro hac vice*)
                                          **FAIRMARK PARTNERS, LLP**
                                          400 7th Street NW, Suite 304
                                          Washington, D.C. 20004
                                          (617) 721-3587
                                          jamie@fairmarklaw.com
                                          kritika@fairmarklaw.com
                                          amanda@fairmarklaw.com

                                          *Counsel for Plaintiff*