# Exhibit C

Case 5:22-cv-00268-TES    Document 136-4    Filed 08/19/25    Page 2 of 138

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF GEORGIA

3                      MACON DIVISION

4      ROGER PARKER, ON HIS OWN

5      BEHALF AND ON BEHALF OF ALL      Case No. 5:22-cv-00268-TES

6      OTHERS SIMILARLY SITUATED,

7              Plaintiff,

8          vs.

9      PERDUE FOODS, LLC,

10             Defendant.

11

12                      VOLUME I

13      VIDEORECORDED 30(b)(6) AND INDIVIDUAL DEPOSITION OF

14         PARKER'S POULTRY EQUIPMENT AND ROGER PARKER,

15                 (Via Videoconference)

16

17     DATE:          Wednesday, April 23, 2025

18     TIME:          10:02 a.m.

19     LOCATION:      Ogletree Deakins Nash

                      Smoak & Stewart

20                    300 North Main Street

                      The Ogletree Building, Suite 500

21                    Greenville, South Carolina

22     TAKEN BY:      Counsel for the Defendant

23     REPORTED BY:   Elaine L. Grove-DeFreitas,

                      Independent Professional Reporter

24                    (Via Videoconference)

       VIDEOTAPED BY: Kevin Day

25                    (Via Videoconference)

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 32

1          Q.   Did you first start accepting flocks in
2     2006 or was there a period of time from when you
3     signed the agreement to when you first started
4     taking flocks?
5          A.   I know I met with them and we signed an
6     agreement.  And then I can't remember how long it
7     was, but after that.  It might have been a while, a
8     few months, you know, to close the loan or whatever.
9     I'm sure it was before I grew.
10         Q.   Before you were a grower with Perdue you
11    worked with ConAgra and Seaboard.  Is that right?
12         A.   Yeah.
13         Q.   I know we talked about this a little
14    before.  And you started growing with Seaboard in
15    the 1980s.  Is that right?
16         A.   I believe so, yeah.
17         Q.   Okay.  And I believe you testified
18    before that you were a 1099 independent contractor
19    with them at one point.  Is that right?
20         A.   I believe so, yeah.
21         Q.   Okay.  Did you sign a Poultry Producer
22    Agreement or similar Independent Contractor
23    Agreement with Seaboard when you were a 1099
24    independent contractor?
25         A.   I don't remember an Independent

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                        Page 33

1    Contractor Agreement.  I know I signed a contract.

2          Q.   Do you remember what provisions were in

3    the contract?

4          A.   Just growing -- you know, basically,

5    growing chickens.  I would grow chickens for them.

6          Q.   Were you required to comply with certain

7    biosecurity standards when you were a 1099

8    contractor with Seaboard?

9          A.   Biosecurity.  I don't remember them

10   saying anything about biosecurity back then.

11         Q.   Were you subject to any guidelines --

12   any animal welfare guidelines with Seaboard?

13         A.   I don't think so.  We took care of the

14   chickens, if that's what you're saying.  You know,

15   we --

16         Q.   Did you -- sorry.  Go ahead.

17         A.   I'm sorry.  No.

18         Q.   Do you recall getting any sort of

19   documents regarding animal care, equipment, housing,

20   when you were with Seaboard?

21         A.   Now, I met with the field people, but I

22   don't remember anything coming out, like do this or

23   do that, you know, with -- with Seaboard.

24         Q.   Okay.  When you were with Seaboard did

25   management visit your farm from time to time to

30(b)(6) Roger Parker , Vol.I                         April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 34

1      check on the chickens?

2              A.    Yes, ma'am.

3              Q.    How often did they do that?

4              A.    Sometimes once a month, sometimes twice

5      a month.  It's not -- you know, just different

6      times.

7              Q.    And what was your understanding of why

8      they were coming out to your farm?

9              A.    The field man come by and tested to see

10     how the birds were doing, as far as size and weight

11     and things like that.

12             Q.    If they discovered any issues as a

13     result of their visit, how were those handled?

14             A.    If they discovered any issues, normally

15     they would say something to me, you know, if there

16     was something -- I can't remember a time, but, you

17     know, I'm sure they did.

18             Q.    Do you recall having to make various

19     improvements to your houses back with Seaboard when

20     you were an independent contractor?

21             A.    No.  We grew for them a long time and I

22     don't think --

23             Q.    How many houses did you have when you

24     grew with them?

25             A.    We started with two and then later built

Page 35

1    two more.  So it's part of the time two, part of the

2    time four.

3              Q.   Okay.  How were you compensated when you

4    were an independent contractor grower with Seaboard?

5              A.   Yeah.  When I had a contract with them?

6              Q.   Uh-huh.  Yes.

7              A.   Say that again so I make sure I got the

8    question right.

9              Q.   Sure.  I can ask it differently if it

10   would help.

11             A.   All right.

12             Q.   Are you familiar with the term

13   "tournament system"?

14             A.   Yes.

15             Q.   Were you compensated under a similar

16   tournament system when you were with Seaboard?

17             A.   I don't -- I don't know that I was or

18   wasn't.  I don't think so.  It wasn't -- it wasn't

19   anything like Perdue has, I don't think.

20             Q.   Okay.  And at some point you became a

21   grower with ConAgra.  Is that right?

22             A.   Yes, ma'am.

23             Q.   Okay.  And before that, real fast, you

24   grew with Seaboard about ten years.  Is that right?

25             A.   Yeah.  I believe it was, yeah.

Page 36

```
 1              Q.   And then you were a grower with ConAgra
 2      for five or six years.  Is that right?
 3              A.   Yes, ma'am.
 4              Q.   How many flocks did you accept when you
 5      were with ConAgra?
 6              A.   Like per year?  Per --
 7              Q.   Per year.
 8              A.   Usually five to six, sometimes seven.
 9              Q.   Do you recall how you were compensated
10      when you were a grower with ConAgra?
11              A.   I believe, given a check.
12              Q.   Was it based on bird weight?  Or do you
13      recall what the basis for your check was?
14              A.   So much per pound is my understanding.
15              Q.   Did it work similar to your compensation
16      with Perdue?
17              A.   No, ma'am.
18              Q.   Okay.  How was it different?
19              A.   Well, with the tournament system
20      everything is different.  I don't remember ever
21      being pitted against anyone else to grow with them.
22                   And with the system that Perdue has
23      you're given baby birds, sometimes from an old hen
24      to a young hen, and that's a big difference on how
25      they perform.
```

Page 37

1              You're given different type birds that
2      you don't know what you're growing.  Some like air,
3      some don't like air.  All these factors are going to
4      come into how you grow.
5              Sometimes you're given more feed.  You
6      have got three types of feed, starter, finisher and
7      grower.  And sometimes if you're given -- because I
8      had two farms I could know how much feed of each one
9      was given.  Sometimes you would get better feed,
10     because you would get more of the better feed than
11     other times.
12             And then you were -- as you grew and the
13     birds got larger you then -- you know, it was
14     similar about the catch times and stuff like that
15     was, you know, almost the same, but the rest of it
16     was a good bit different.
17         Q.   Okay.  So my question was, were you
18     compensated similarly, and your answer is "No."  Is
19     that right?
20         A.   Yes, ma'am.
21         Q.   Did you operate as an independent
22     contractor grower with ConAgra?
23         A.   I had a contract with ConAgra.  I didn't
24     feel -- you know, I don't really know how to answer
25     that.  But I had a contract.

Page 38

1          Q.   Did you feel as though you were treated
2     as an independent contractor with ConAgra?
3               MS. VAUGHN:  Objection to form.
4               THE WITNESS:  Yeah, I don't think so.  I
5     mean, it's a total different field, two different
6     companies.
7     BY MS. SANTEN:
8          Q.   Okay.  And why do you feel like you
9     weren't treated as an independent contractor with
10    ConAgra?
11         A.   I didn't have the -- near the
12    regulations and oversight and daily, you know,
13    things to accomplish as far as the amount of stuff
14    that I needed done.
15         Q.   My question was, why did you feel like
16    you were not treated as an independent contractor
17    with ConAgra?
18         A.   Oh.  I thought you were comparing the
19    two.
20         Q.   No.  ConAgra.
21         A.   Say it again.  Independent contractor
22    with ConAgra.
23         Q.   Yeah.  You said you felt like you
24    weren't treated as an independent contractor with
25    ConAgra.

Page 39

1          A.   Oh.  With them.  With ConAgra.  My bad.
2     My bad.  I misunderstood the question.
3               Well, I didn't -- I guess without
4     comparing the two it's hard to get the answer
5     because it was just a different environment.
6          Q.   Do you believe you were not treated as
7     an independent contractor with ConAgra?
8          A.   I didn't feel that way.
9          Q.   Okay.  And with ConAgra only, why do you
10    feel like you weren't treated as an independent
11    contractor?
12         A.   Again, I didn't have somebody -- I
13    didn't have the same regimen, the same -- and back
14    in that situation I just didn't -- I just didn't
15    have anybody on -- you know, on me as far as
16    controlling every little thing, you know?
17         Q.   Okay.  My question is -- and please
18    listen carefully because I want to make sure you're
19    responding to my question -- why do you think you
20    were not treated as an independent contractor with
21    ConAgra?  We are not talking about Perdue.  With
22    ConAgra --
23         A.   With ConAgra, yeah.
24         Q.   -- why did you feel like you weren't
25    treated as an independent contractor?

Page 40

1          A.    Again, it's the oversight difference.    I

2    didn't have anybody on me every -- you know, like

3    boom, boom, boom.

4          Q.    So you didn't feel like you were treated

5    as an independent contractor with ConAgra because

6    you didn't have anybody over you?    Is that right?

7          A.    No.    I wasn't -- in comparison to the

8    two, looking back, I wasn't -- I didn't have

9    somebody -- if that's what you're saying, yes.

10          Q.    No.    My question is, why do you feel

11    like you weren't treated as an independent

12    contractor with ConAgra?    We are not talking about

13    Perdue.    We are not talking about comparing the two.

14          A.    I get that.

15          Q.    With ConAgra do you feel like you were

16    treated as an independent contractor?

17          A.    No.    And I don't -- I don't know how an

18    independent contractor is supposed to be treated in

19    the poultry industry, so that's why I'm having

20    trouble answering your questions.

21          Q.    Okay.    Did you ever bring a lawsuit

22    against ConAgra about the way you were treated?

23          A.    No.

24          Q.    Okay.    Were you required to comply with

25    ConAgra -- I'm not talking about Perdue.    When you

Page 41

1   were a grower with ConAgra were you required to
2   comply with any sort of animal welfare
3   specifications?
4        A.   They let you grow pretty much, I mean,
5   independently if you -- I mean, they would give you
6   suggestions as field people, you know, to help you,
7   but that was about it.  It wasn't -- it wasn't a
8   mandatory -- you know, it wasn't -- it was just
9   different.
10        Q.   Did you have management come visit your
11   farm when you were a grower with ConAgra?
12        A.   "Management" meaning a field supervisor?
13   Yes, ma'am.
14        Q.   Okay.  And how often did they do that?
15        A.   Once a month, maybe twice a month.
16        Q.   What was your understanding of the
17   purpose of their visits?
18        A.   To check on the birds, the sizes and,
19   you know, turn in numbers, you know, how -- they
20   would tell them how big the bird was going to be for
21   production.  You know -- you know, just general
22   oversight, I guess.  I don't know.
23        Q.   Did you ever have to make any
24   improvements to your houses when you were a grower
25   with ConAgra?

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 42

1          A.    I thought I answered that.
2          Q.    We were talking about Seaboard, I
3    believe.
4          A.    Okay.  ConAgra.  Okay.  We are up the
5    road now, then.  It was similar for both companies,
6    growing for them.  I don't think I ever had
7    mandatory upgrades, that I know of, that I can
8    remember right now.
9          Q.    Did you make voluntary upgrades to your
10   houses when you were a grower with ConAgra?
11         A.    If I saw something new coming out I
12   would do it, you know, on my own.
13         Q.    And why would you do that on your own?
14         A.    I tried to do a better job for them; you
15   know, make a better bird.
16         Q.    If you made a better bird would you get
17   compensated better?
18         A.    Well, I would have more pounds.  Yeah.
19         Q.    Okay.  If ConAgra saw an issue when they
20   were at your farm doing a visit, how would that be
21   handled?
22         A.    If they saw an issue?
23         Q.    If they saw something with the birds
24   would they discuss that with you?
25         A.    Normally, if there was something -- like

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 43

1    had disease or something inside the house they would

2    bring me medication and stuff for, you know,

3    whatever it was.

4                And issues inside the house, I don't

5    remember having issues inside the house.  But if

6    that did come up, I'm sure that they could have said

7    something to help me, you know?

8            Q.    Did you ever have to make any

9    improvements to your houses before they gave you any

10   additional flocks with ConAgra?

11           A.    No.  Never.

12           Q.    Okay.  So before you --

13           A.    We were their top grower.  I mean -- I'm

14   sorry.  Go ahead.

15           Q.    That's okay.

16                So before you came to work with Perdue

17   you had about fifteen years as a grower.  Is that

18   right?

19           A.    Somewhere in that line, yes.

20           Q.    And in your prior deposition you

21   testified that when you came to Perdue and purchased

22   the Hillsboro farm, the farm was in working order

23   when you took it over.  Is that right?

24           A.    The Hillsboro farm?

25           Q.    Uh-huh.  Correct.

Page 47

1    houses shortly after you purchased the farm.  What

2    upgrades did you have to make at that time?

3         A.   I had to extend the cool cell and

4    curtain and add -- if I'm remembering, I think it

5    was a fan, add a fan to the back, a 52-inch.

6              I'm trying to think of what else.  I was

7    thinking it was something else to do with

8    ventilation, but I just can't remember what all was

9    on that list.

10        Q.   Do you recall how much money you had to

11   spend in those upgrades?

12        A.   I would -- I'm thinking around 25,000.

13        Q.   And why did you make those upgrades?

14        A.   Perdue has -- had gone to tier 4 -- or

15   tier 3, I think.  I can't remember which tier.

16   Don't hold me to it.  And that was the only way to

17   get a raise.

18             When I got my first check it was $7,000

19   and didn't cover the gas, and so I had to do

20   something because I knew I was -- had no -- no other

21   income at the time.

22        Q.   So if you wanted to make more money, you

23   felt you had to go to tier 4.  Is that right?

24        A.   That was the only way with them.  Yeah.

25   I worked twelve years and we never had a

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 48

1      cost-of-living increase.

2              Q.    When you were a grower with Perdue could

3      you grow other livestock on your farm?

4              A.    Yes.

5              Q.    Okay.  Did you do that when you were a

6      grower?

7              A.    I had some cows.  Yes, I did.

8              Q.    Do you recall how long you did that?

9              A.    Four cows came -- or stayed with the

10     farm when the owner left.  And they just -- you

11     know, whatever they had, calves, and then it went

12     from there.  I never bought a cow.

13             Q.    Did you make income from the cows?

14             A.    From selling the cows, I believe we did

15     early on, yeah.

16             Q.    Do you recall how much you made from

17     that?

18             A.    No, ma'am.  It was just -- we would sell

19     them a few hundred dollars apiece, but I don't know

20     what was made.

21             Q.    Let me just look at one thing.  Well, we

22     will look at it later since I don't have it.

23                   Okay.  Did you ever add more houses to

24     the Hillsboro farm during the time that you owned

25     it?

30(b)(6) Roger Parker , Vol.I                        April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 49

1          A.    No.  I actually lost one.

2          Q.    And you lost that in -- was it a

3    tornado?

4          A.    Yeah.

5          Q.    Did you get disaster-relief pay in

6    connection with that one loss?

7          A.    No.  Because of the age of the house, I

8    guess it was -- the rest were new and that was a

9    little older house, I didn't be have that much

10   insurance on it.

11         Q.    Okay.  So you were the one responsible

12   for absorbing that loss when that house was gone?

13         A.    Yes.  Yes.

14         Q.    Okay.  Do you recall how much income you

15   lost as a result of that house?

16         A.    No, ma'am.  It was a small house.  But I

17   don't remember.

18         Q.    Okay.  Did you ever -- why did you

19   decide to not build any more houses on Hillsboro?

20         A.    At the time Perdue wouldn't allow me to

21   build back.

22         Q.    Did you ask them if you could build

23   back?

24         A.    Yeah.

25         Q.    And when did you ask them if you could

Page 50

```
 1    build back?
 2            A.   Well, whenever I -- whenever it fell
 3    they said, basically, if I remember right -- I don't
 4    remember all the conversation.  But basically, I was
 5    trying to build, if I remember right, two houses.
 6    Because it was going to cost so much, I couldn't
 7    afford the one to make it cash flow.  And if I
 8    remember -- if my memory serves me correct, that was
 9    the reason.
10            Q.   Who do you recall speaking with about
11    that?
12            A.   It would have been whoever was over
13    doing houses with Perdue at the time.  I don't -- I
14    just don't -- I can't remember who it was.
15            Q.   And what did they say to you,
16    specifically?
17            A.   If I remember, they wouldn't take over
18    any other new houses.  And I couldn't build back.
19    One wouldn't cash flow, the bank wouldn't do one,
20    and so I was in a deadlock.  I couldn't do anything
21    about it.
22            Q.   Did you submit a proposal to the bank to
23    try to get financing for one?
24            A.   Well, I talked to them.  I didn't do a
25    proposal.  And that was it.
```

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 51

1          Q.   What did the bank say to you?
2          A.   Well, they just looked at the numbers
3     and the cash flow and said it wouldn't cash flow.
4          Q.   Okay.  Did you try to get financing from
5     anywhere else?
6          A.   No.  I couldn't, not without refinancing
7     the whole farm.
8          Q.   Okay.  Then at some point you decided to
9     buy another farm.  Is that right?
10          A.   Yes.  Later, after doing upgrades on the
11     farm, the guy was about to lose the farm, I think.
12     Yeah.  I don't know for sure.  I don't know what the
13     stipulations were with him, but it's my
14     understanding he was -- he hadn't had it but a year
15     or so or two years and was about to lose -- you
16     know, lose the farm.
17          Q.   Did you buy the farm from him directly
18     or did you mortgage with a bank?
19          A.   I mortgaged with a bank.
20          Q.   Okay.  And that was in Milledgeville.
21     Right?
22          A.   Yes, ma'am.
23          Q.   Was that 2014 or 2015?  Is that right?
24          A.   No.  I think it was 2009, if I remember.
25     I don't know.  I'm thinking it was -- I don't know.

Page 52

```
 1     I would have to go back and look at the dates.  I
 2     guess I'm confused on that.
 3            Q.   In your prior deposition you said that
 4     you purchased that around 2014 or 2015.
 5            A.   Yeah.  I don't -- I really, now that I
 6     look back at some of the dates, I think it might
 7     have been '9.
 8            Q.   Okay.  Did you sign a separate contract
 9     in connection with that purchase, a separate Poultry
10     Producer Agreement with Perdue?
11            A.   I believe it was, yeah.
12            Q.   Okay.  And how much did you buy the
13     Milledgeville farm for?
14            A.   I think it was 980-something.  980,000.
15     Right at a million dollars.
16            Q.   Did you finance that purchase with First
17     Financial Bank as well?
18            A.   I did.
19            Q.   Could you have financed that with
20     another bank if you wanted to?
21            A.   Possibly.  I didn't try.
22            Q.   If you had the cash, could you have
23     bought it with cash?
24            A.   Sure.
25            Q.   And that was a mortgage.  Right?  So you
```

30(b)(6) Roger Parker , Vol.I                         April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 53

1    were responsible for the payments and you were
2    responsible if there was a default.  Is that
3    correct?
4              A.    Yes.
5              Q.    Was that the same with the prior loan
6    you took?  It was like a mortgage, so you were
7    responsible for the payments.  Correct?
8              A.    Say that again now.  Prior --
9              Q.    With the Hillsboro house and the loan
10   you took to secure the Hillsboro house, you were
11   responsible for those payments.  Right?
12             A.    Yeah.  I was responsible for payment on
13   both.
14             Q.    Okay.  And if you defaulted, you were
15   responsible for whatever happened.  Is that right?
16             A.    Yes.
17             Q.    Okay.  Did you and Gail purchase both of
18   those farms, both Hillsboro and Milledgeville
19   together?
20             A.    Yes.
21             Q.    And when you purchased Milledgeville, I
22   think, before, you said there were six houses on
23   that property.  Is that right?
24             A.    There were.
25             Q.    Why did you decide to purchase a second

Page 54

1    farm?
2           A.   Well, if you -- there was -- like where
3    I had five or four houses and had an income, that
4    was six houses with less money to pay on the
5    payment.  So the income was, you know --
6    profit-to-loss ratio, I guess, was better on that
7    particular farm.
8           Q.   So you viewed it as a way to make some
9    additional money.  Right?
10          A.   Yes, I guess.  Yeah.  And -- well, you
11   have got to have equipment, and I had the equipment,
12   so I didn't have to buy that again.
13          Q.   So did you have the equipment from the
14   other farm?  Or what did you have the equipment
15   from?
16          A.   Yeah.  I had already equipment for both
17   farms.  I would bring it back and forth on my trip.
18          Q.   When you were deciding whether to buy
19   that farm, what factors were you considering?  Were
20   you looking at the potential profitability of that
21   farm and the cost to operate it?
22          A.   I guess just oversight, knowing that the
23   first farm was not making enough money to survive, I
24   was thinking that the other farm, by buying it --
25   being a better deal, I guess, if you want to put it

Page 55

1   that way, than the first farm, having six houses
2   versus four after that blew down and -- well, even
3   five.  Because five -- it was really like four and a
4   half houses when I bought it.  It would be -- it
5   would make it to where, you know, I wouldn't go
6   under.
7           Q.   Yeah, I asked, because you said you
8   thought about the profit/loss ratio.  So what did
9   you mean when you said you thought about the
10  profit/loss ratio?
11          A.   Six houses, versus the other farm having
12  less houses.  Of course six will bring more in.
13          Q.   When you said you already had the
14  equipment for both farms, why did you have equipment
15  for both farms when you just owned Hillsboro?
16          A.   I could take -- I put it in my truck and
17  go back and forth.  It was an hour's drive, but I
18  did it.
19          Q.   So you didn't have to reinvest.  So you
20  could use your same equipment from Hillsboro to
21  Milledgeville.
22          A.   Yes, ma'am.
23          Q.   And that was your decision, to go back
24  and forth versus buying new equipment.  Right?
25          A.   Yes, ma'am.  I couldn't afford it.

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 100

1      will be testifying as a representative of your
2      business for certain questions, which means that
3      whatever testimony you provide is binding on your
4      business.
5              A.   All right.  I remember.
6              Q.   Okay.  When you were a grower, you also
7      operated an outside business called Parker's Poultry
8      and Equipment.  Is that right?
9              A.   Yeah.  At the early months, yeah --
10     years.
11             Q.   Why did you start that business?
12             A.   I renovated a house.  And Perdue asked
13     me would I do further upgrades for the farms, and I
14     did because I had construction background.  And
15     that's why I did it.
16             Q.   Okay.  When did you start that business?
17             A.   It would have been when I was at
18     Hillsboro, so that would be 2000 -- I don't know.
19     2000, just guessing, 7 or 8, you know?
20             Q.   Okay.  Did you ever incorporate that
21     business or form a separate legal entity?
22             A.   No.
23             Q.   Okay.  How did you come up with the
24     business name?
25             A.   It was my name.

Page 101

```
 1              Q.   Did you have a separate business
 2      checking account?
 3              A.   From what?
 4              Q.   For Parker's Poultry and Equipment.
 5              A.   Yeah.  I think so, yeah.
 6              Q.   Okay.  Would you deposit any money that
 7      Parker's Poultry and Equipment made into the
 8      business checking account?
 9              A.   Yeah, I should have.
10              Q.   Okay.  Were you --
11              A.   I just -- I don't -- I can't remember if
12      I did it as a separate account.  I believe I did.  I
13      don't --
14              Q.   Okay.  Were you the only person involved
15      in that business, or did your son or wife do some
16      work in that business as well?
17              A.   I had a son that worked for me some.
18              Q.   Okay.  Did you have any other employees
19      for that business?
20              A.   I would -- yeah.  I had a guy that
21      worked for me that helped me do installs.
22              Q.   Okay.  What was his name?
23              A.   Robert Taylor.
24              Q.   How did you pay Mr. Taylor?
25              A.   We would go bid a job together, and then
```

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 102

1    when we were done he was paid.

2            Q.    Did you pay him by the hour or did you

3    pay a set amount?

4            A.    A set amount.

5            Q.    How did you determine that set amount?

6            A.    Just whatever he thought he needed to do

7    the install.

8            Q.    Would he tell you what price, or would

9    you give him a price that you would be willing to

10   pay?

11           A.    Usually it was common; you know, we

12   agreed on a price.

13           Q.    Did you pay him on a 1099?

14           A.    I believe so.

15           Q.    Okay.  Other than your son and

16   Mr. Taylor did anyone else work for you in your

17   Parker's Poultry and Equipment construction

18   business?

19           A.    I mean, day -- day labor, but I can't

20   remember them all.  You know, they would sometimes

21   give me a hand.

22           Q.    How did you find your day labor?

23           A.    It's just guys in the community usually.

24           Q.    Would you train them?

25           A.    Not necessarily needed training for what

Page 103

1    we were doing.

2          Q.    What work would you have them do?

3          A.    Just picking up; you know, clean up,

4    stuff like that.

5          Q.    And you mentioned you had a construction

6    background.  What was your construction background?

7          A.    I used to build spec houses, things.

8          Q.    Okay.  Do you remember how many years

9    you operated that business?

10         A.    Which business?

11         Q.    Parker's Poultry and Equipment.

12         A.    I don't.  I think maybe four, five

13   years.  I'm just guessing.

14         Q.    Okay.  Did you advertise for that

15   business?

16         A.    We had a -- I think we had a website,

17   but I didn't actually advertise.

18         Q.    Okay.  What do you recall about the

19   website?

20         A.    I just remember my son setting one up.

21         Q.    Did you review the website?

22         A.    I mean, I saw it before, yeah.

23         Q.    What was the purpose of the website?

24         A.    People could see what equipment we

25   carried and things like that.  But I didn't sell out

Page 104

1    of it.

2              Q.    So what business services did Parker's

3    Poultry and Equipment provide?

4              A.    Water lines, feed lines, those type.

5    You know, just poultry equipment for the inside of

6    the chicken house, and could build new homes if

7    needed.

8              Q.    How did you -- would you buy the poultry

9    equipment and then have some on inventory to sell?

10   Or how did that work?

11             A.    Say that again.  Inventory.

12             Q.    Yeah.  You said that you would sell

13   poultry equipment.

14             A.    Normally -- normally I bought -- had it

15   delivered to the farm.  I didn't carry much

16   inventory.

17             Q.    So you would buy poultry equipment for

18   other people and they would pay you?

19             A.    Yeah, for the farm, whatever job.

20             Q.    So you had a website.  And is it fair to

21   say the purpose of the website was to advertise for

22   business for Parker's Poultry and Equipment?

23             A.    I don't know as much advertisement.  It

24   was just knowledge of what I did carry.  But I guess

25   in a sense it was.

Page 105

```
 1            Q.   Okay.  Were you hoping that if people
 2      saw the website they would give you some business
 3      and call you?
 4            A.   I never answered a call through the
 5      website, so I don't -- don't -- not to my knowledge.
 6            Q.   Did you use business cards with your
 7      business?
 8            A.   I don't think so.  I might have, but I
 9      just don't -- I don't remember.
10            Q.   Okay.  I'm going to mark --
11                 MS. SANTEN:  Are we on Exhibit 10?
12                 THE COURT REPORTER:  Yes.
13      BY MS. SANTEN:
14            Q.   Okay.  Mark what we are -- mark what we
15      are going to call Exhibit 10.
16      (Defendant's Exhibit No. 10, Parker's Poultry
17      Equipment Website, was marked)
18      BY MS. SANTEN:
19            Q.   And do you recognize this as the website
20      you were referring to that your son set up?  It's a
21      copy, but does this look accurate?
22            A.   It looks -- I believe it is.  Yeah.  I
23      mean, it's some of the stuff that I carried, yeah.
24      I really don't remember what all it looked like, to
25      be honest, it has been so many years.
```

30(b)(6) Roger Parker , Vol.I                              April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 106

1          Q.   Did you prepare this Intro here?  The
2     Intro says:  "Offering more than 25 years experience
3     in the industry, Parker's Poultry Equipment is an
4     industry leader in the sales and installs of poultry
5     equipment.  There's no job too big or too small for
6     us, so give us a call today."  Did you prepare that?
7          A.   Yeah.  That's referring to Robert, but
8     yeah.
9          Q.   So you approved that language.
10         A.   I didn't do it personally.  I didn't --
11    I didn't write it.  I guess Simon wrote it.
12         Q.   Did you approve that language before it
13    was posted?
14         A.   No.  No.  I didn't even know.  He just
15    told me he had it set up.  I just went and looked at
16    it.
17         Q.   Okay.  But when you looked at it you
18    didn't tell -- you didn't see that and tell him to
19    take it down?
20         A.   I don't -- I don't remember ever seeing
21    it, really.
22         Q.   You just said you looked up the website.
23    So what did you look up when you pulled it up?
24         A.   I mean, I didn't read -- I didn't read
25    this.  I didn't -- I didn't -- I may have -- if I

Page 107

1    did read it, I didn't pay attention to it.

2         Q.    Okay.  But this was posted on behalf

3    your business Parker's Poultry Equipment.  Correct?

4         A.    Yes, it was, apparently.

5         Q.    Okay.  So go to Perdue 007224.  There is

6    a message here:  "Parker's Poultry Equipment March

7    11, 2014.  We have new 54" fans in stock.  Call" --

8    and then a phone number.  Is that your phone number

9    that's listed there?

10        A.    I guess he used it.  Yeah.

11        Q.    Okay.  And it's your testimony that your

12   son put this on your website on your behalf?

13        A.    I guess he did.

14        Q.    Okay.  You have no reason to believe

15   that's inaccurate?

16        A.    I don't know if I had 54-inch fans at

17   that time or not.  I would be guessing if I said it.

18   But, you know, if we put it in there I'm assuming

19   it's correct.

20             MS. SANTEN:  Okay.  Just one second.

21             Counsel, I will just note that this

22   testimony is directly relevant to topic 4 which you

23   had an obligation to prepare your client on.  So any

24   answers like "I'm guessing," are just simply not

25   adequate under topic 4.  I mean, certainly, this is

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 108

1    general advertising.  Advertise -- advertisements
2    includes sources, as Facebook is directly referenced
3    in topic 4.  It doesn't appear that he has been
4    prepped at all on the topics or that he even knew he
5    would be a corporate representative on the topics.
6                MS. VAUGHN:  We did prepare for this.
7    We cannot give him memories he does not have
8    anymore.  And I don't believe he is testifying to
9    anything other than he does not remember this.
10               MS. SANTEN:  Okay.  Well, we -- it's our
11   contention that the "I don't know" responses mean
12   that he is not adequately prepared on topic number
13   4.
14               MS. VAUGHN:  I'm happy to talk to you
15   about this off the record, but he is -- it was a
16   sole proprietorship.  He is testifying to what he
17   knows.  There is no one -- there's no records other
18   than what we have.
19               MS. SANTEN:  You have an obligation,
20   under the rules, to prepare him on topic 4 which
21   would include if he said to you, "my son set this
22   up," having him talk with his son to verify the
23   accuracy of this information.
24               MS. VAUGHN:  Can we go of the record?
25               THE VIDEOGRAPHER:  The time on camera is

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 109

1    approximately 1:26 and we are off the record.
2    (Off-Record Discussion)
3                THE VIDEOGRAPHER:  The time on camera is
4    approximately 1:27 p.m.  We are back on the record.
5                Counsel, you may proceed.
6    BY MS. SANTEN:
7        Q.   Okay.  Mr. Parker, did you ever call
8    your son to discuss this website or verify any of
9    this information?
10       A.   My son and I, since the divorce, have
11   not talked too much.
12       Q.   Okay.  But you didn't try to call him,
13   in connection with this advertisement, to verify
14   this.  Is that right?
15       A.   I can't.  There is a -- there is a
16   stay-away.  I can't if I wanted to.
17       Q.   Is there a restraining order between you
18   and your son?
19       A.   Yes.
20       Q.   Okay.  Where was that filed?
21       A.   I believe in Baldwin, Baldwin County.
22       Q.   Is that different than any restraining
23   order between you and your ex-wife?
24       A.   That is the one with my ex-wife.
25       Q.   It covers your son as well?

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Roger v. Perdue Foods, LLC

Page 110

1              A.    It does.
2              Q.    Okay.  Let's go down.  So did you draft
3      any of these posts or were these all your son
4      putting this on the website?
5                    So "New truckloads of LB white brooders
6      and oval 80 heaters" posting.
7                    The next posting:  "For the best parts
8      and installation, and service.  'Parker's Poultry'
9      quality is backed with 30+ years of experience in
10     the poultry industry."  Did you draft any of those
11     postings?
12             A.    I really don't think I did, but I don't
13     know.  I really don't know.
14             Q.    If you didn't draft them, would your son
15     have drafted them on your behalf?
16             A.    He -- I think -- I think he -- I know he
17     had access to it.  But as far as my knowledge, I
18     don't know who drafted them, though.
19             Q.    Who else had access to the website other
20     than your son?
21             A.    My ex -- my ex-wife, I think she had
22     access to it.  I'm not for sure.  I really don't
23     know who all did.  But I know he did and I did,
24     because he told me about it after he created it.
25                   And I know that some of it I did not do,

Page 111

1    because I never carried some of it, that I know of.

2         Q.    Was your son, or whoever posted this,

3    posting this on behalf of your business?

4         A.    I'm assuming so, yeah.  It's on this.

5         Q.    Were they authorized to post this on

6    behalf of your business?

7         A.    He started it.  I mean, he is the one

8    that created it.

9         Q.    Did you authorize him to post this on

10   behalf of your business?

11        A.    I don't -- not that I know of.  I didn't

12   tell him to go do it, no.

13        Q.    Okay.  But he posted this on Parker's

14   Poultry and Equipment webpage, which is your

15   business.  Right?

16        A.    Yes, apparently.

17        Q.    Okay.  Did you ever ask him not to post

18   anything on your website for Parker's Poultry

19   Equipment?

20        A.    I never looked at it.  Some of this

21   stuff is the first time I think I have seen this.

22        Q.    Is there anything on here that you do

23   not believe is accurate?

24             MS. VAUGHN:  Counsel, you have multiple

25   websites in this document.  Which website are you

Page 112

1      talking about?

2                      MS. SANTEN:  I'm starting with the

3      Facebook one.

4                      THE WITNESS:  That's what I'm saying,

5      I'm trying to figure out even what this is.  This

6      one, Big Dutchman, it's not Parker's Poultry.

7      BY MS. SANTEN:

8           Q.    706-819-2260, is that your phone number?

9           A.    Yeah.  Yeah.  That was a number I had at

10     the time, yeah.

11          Q.    Okay.  And parker'spoultryequipment.com,

12     was that an email or a website that you used?

13          A.    Yeah.  I think it's the one he set up,

14     yeah.

15          Q.    Let's go to Perdue 007125.  Do you

16     recognize this document?

17          A.    215.

18          Q.    7215.

19          A.    Looking for 7215.  Yeah, this is, I

20     think, in reference to Robert, but yeah.

21          Q.    706-468-2676, was that a phone number

22     you used?

23          A.    It was one of the numbers we had, yeah.

24          Q.    Okay.  So that was connected to Parker's

25     Poultry and Equipment business?

30(b)(6) Roger Parker , Vol.I                     April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 113

1          A.   Yes, I think so.  I don't know.  It's
2    connected to this website, though.
3          Q.   But that is a number that you used for
4    your business.  Right?
5          A.   One of the numbers that I used, yes.
6          Q.   Okay.  How many different phone numbers
7    did you use for your business?
8          A.   I -- I don't -- I really don't -- can't
9    remember.  I know I had two or three phone numbers.
10         Q.   Okay.  This says that your business
11   employs a staff of approximately four.  Is that
12   correct?
13         A.   This is in reference to someone else,
14   but yes.
15         Q.   Who is that in reference to?
16         A.   Robert.  He did the installs.
17         Q.   Are saying that Robert owned the
18   business, or is this discussing your business?
19         A.   No.  Robert had been in the business for
20   thirty years.
21         Q.   Okay.  So are you saying Robert employed
22   a staff of four or did you employ a staff four?
23         A.   He had a crew that worked for him.
24         Q.   So you employed Robert.  And then how
25   many people did Robert employ?

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 114

```
 1          A.    I don't really know how many Robert
 2    employed.
 3          Q.    Did you tell him he could hire -- how
 4    did it work?  You employed Robert and then --
 5          A.    Well, on a 1099 he can hire as many as
 6    he wants.
 7          Q.    What would you ask Robert to do?  What
 8    jobs would Robert be performing?
 9          A.    All the installs.
10          Q.    So then it was up to Robert to hire
11    people, if he wanted to, to help with the installs?
12          A.    He did the installs.
13          Q.    Okay.  And he hired -- it sounds like he
14    hired some people.  Is that right?
15          A.    I'm assuming, yeah.  That's -- or if
16    it's -- according to how big it was.  According to
17    what he had to do, I guess.
18          Q.    Do you believe Robert put this website
19    together?
20          A.    No, I wouldn't think Robert did.
21          Q.    Who did you think put this website
22    together?
23          A.    My son built the website.
24          Q.    Okay.  This one looks to be different
25    than the one we just discussed.  It says monte or
```

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 115

1    mante, I can't tell, on top.
2             A.    Monte.
3             Q.    Do you believe your son put this
4    together?
5             A.    No, I don't think he did this.  I
6    wouldn't think he would have.
7             Q.    I'm looking at --
8             A.    It looks like somebody copied my
9    website, though.
10            Q.    I'm looking at Perdue 007215 at the
11   bottom.
12            A.    Okay.  215?
13            Q.    7215.
14                 MS. VAUGHN:  It's towards the back.
15                 THE WITNESS:  It's on the back?
16                 Okay.  Now I'm at the right one.
17   BY MS. SANTEN:
18            Q.    Do you know who put together this
19   website?
20            A.    I have no clue.  Manta, that is another
21   company.  It's not my company.
22            Q.    Okay.  This says that this company -- it
23   says:  "Current estimates show this company has an
24   annual revenue of 330,000."  Do you know where that
25   number came from?

Page 116

1          A.    It wasn't from me.

2          Q.    It says:  "Records show it was

3    established in 2010."  Was Parker's Poultry

4    Equipment established in 2010?

5          A.    No.  It was established earlier than

6    that, I believe.

7          Q.    When do you believe it was established?

8          A.    Well, about 2006, it will be -- I

9    think -- I think it was 2009.  It could have been

10   2010.

11         Q.    Okay.  And you mentioned you engaged in

12   no other advertising efforts on behalf of your

13   business.  Is that right?

14         A.    Yeah, no.  I didn't do these, so no.

15         Q.    Okay.  You mentioned that Perdue

16   suggested that you help with these installs.  How

17   did that conversation come about?  Who did you

18   discuss that with?

19         A.    I can't remember who was over the

20   building at the time, but they come inspected mine

21   and asked would I do others.

22         Q.    Okay.  And what, exactly, did they

23   inspect when they asked you if you did others?

24         A.    The upgrade that I did for my farm,

25   because I had just purchased it and then they

Page 117

```
 1    immediately had upgrades.  So I had to do my own.  I
 2    could not afford anything else.
 3         Q.   When you say you immediately had to do
 4    upgrades, was that to get tier 4 compensation?
 5         A.   Yeah.  To get more -- try to get a
 6    better income, yes.  That's the only way to do it,
 7    is invest, because there is no -- no increase.
 8         Q.   Okay.  But you made the decision to
 9    upgrade to try to get better income.  Is that
10    accurate?
11         A.   That would be.
12         Q.   Okay.  And when you did these upgrades,
13    you would take out loans from First Financial Bank
14    that we looked at the documents for.  Is that right?
15         A.   No.  Well, no, not every time.  You
16    know, I would -- but most of the time.
17         Q.   Okay.  Were there some upgrades that you
18    paid for out of pocket?
19         A.   Yes.  The smaller things I did, yes.
20         Q.   Okay.  So how did you get business for
21    Parker's Poultry and Equipment then?  Did you get
22    referrals from Perdue?
23         A.   Well, yes.  I was on their list of
24    installers.
25         Q.   Okay.  What list are you talking about?
```

Page 118

```
 1          A.   They made -- they have a list of who
 2    is -- who can do it and who can't.
 3          Q.   Who would the list go to?
 4          A.   What do you mean, "go to"?
 5               MS. VAUGHN:  Object to form.
 6    BY MS. SANTEN:
 7          Q.   Who would they send that list to?  All
 8    growers or growers in Perry?
 9               MS. VAUGHN:  Object to form.
10               THE WITNESS:  As far as I know, it's
11    stapled on every house at the chicken farm.
12    BY MS. SANTEN:
13          Q.   Okay.  And when you say, "every house,"
14    what geographic region for houses would it be
15    stapled on?
16               MS. VAUGHN:  Object to form.
17               THE WITNESS:  I have no -- I have no
18    clue where Perdue puts it.
19    BY MS. SANTEN:
20          Q.   Okay.  Well, you said it was stapled on
21    every house.
22          A.   Yeah.
23          Q.   Do you believe it was on every house in
24    Georgia or on every house beyond Georgia?
25          A.   I can't really answer because I don't
```

Page 119

1   know how far out they reached with that information.

2          Q.    Okay.  And Perdue -- you were allowed to

3   have this outside business.  Right?

4          A.    Outside business?

5          Q.    This Parker's Poultry and Equipment,

6   that was okay with Perdue for you to do?

7          A.    Yeah.  As far as I know, yeah.

8          Q.    Okay.  And they --

9          A.    For a while.

10         Q.    And was there ever a time when they told

11  you you could not do it?

12         A.    Yes.

13         Q.    When was that?

14         A.    It's after I had -- I believe it was

15  right after I had contacted the USDA.  They -- I had

16  a bid come in wanting me to bid a new poultry farm.

17  And I was contacted by Perdue and asked not to bid

18  that, even though the owner of the farm asked me to

19  bid it.

20         Q.    I'm asking you about doing equipment and

21  installs with Parker's Poultry and Equipment.

22         A.    That's what I'm answering.

23         Q.    Okay.  Who told you that you could not

24  bid the farm?

25         A.    If I remember correctly, it was Dan

Page 130

1          Q.   Before this -- before July of 2017 is it

2     your testimony that Perdue prevented you from doing

3     upgrades or other equipment for other growers?

4          A.   New houses are other equipment.

5          Q.   I'm saying before July 2017.  This is

6     dated July 2017.  Is it your testimony that Perdue

7     prevented you from doing work for other growers?

8          A.   I have already said yes.

9          Q.   Okay.  Let me show you one other

10    document and then we will go on.  Is it your

11    testimony that you didn't get any business because

12    of what Perdue was -- because of Perdue preventing

13    you from --

14          A.   Any business?

15               MS. VAUGHN:  Object to form.

16    BY MS. SANTEN:

17          Q.   Yes.

18          A.   I didn't say I didn't have any business,

19    that I know.  I don't -- okay.  No.

20          Q.   Do you know how many of these sheets you

21    were listed on as a preferred vendor?

22          A.   No.

23          Q.   Okay.  Let me show you Exhibit 12 and

24    see if you recognize this.

25    (Defendant's Exhibit No. 12, Perdue Farms, Inc.

Page 146

1          Q.   Do you know how many installs you did
2     per year with Parker's Poultry and Equipment?
3          A.   No, ma'am.
4          Q.   Do you know how many years you did
5     installs with Parker's Poultry and Equipment?
6          A.   Through -- most of them was through
7     Perdue.  And that went up until they -- up until my
8     call to USDA, I would say was when they really
9     started stopping.
10         Q.   You testified earlier that they started
11    not recommending you in July of 2017.  Is that your
12    testimony?
13              MS. VAUGHN:  Objection to form.
14    Misrepresents the testimony.
15    BY MS. SANTEN:
16         Q.   You indicated, when we looked at Exhibit
17    12, that they had stopped referring you for jobs.
18    Is that right?
19         A.   This job.
20         Q.   Okay.  When did they stop -- so you
21    agree -- do you testify that in July of 2017 they
22    had stopped recommending you for jobs?
23         A.   Yeah.  I don't know when they actually
24    stopped.  I just know they did.
25         Q.   But you believe it was around the time

Page 154

1     Milledgeville, which was what, 2000 --

2           A.    Yeah.   I mean, while I was at

3     Milledgeville.  I don't know what year.  I just

4     can't remember what year that all that -- about the

5     trailers and things came up and things started going

6     south.

7           Q.    I believe you testified before you

8     started with Milledgeville in 2014.  Does that sound

9     accurate?

10          A.    No.   I would have to go back and look at

11    my records.  I was thinking '9, but I may be wrong.

12    I will have to -- I will have to look and see the

13    years because I'm not good with years.

14                But there again, you have got me

15    wondering now which year it was.  But I thought I

16    said '9.  Maybe I'm wrong.

17          Q.    So how long after you got to

18    Milledgeville did you say your business died?

19          A.    When I started reporting the trailers

20    and stuff is when it really went south.  I would say

21    I was there at least, you know, a couple years,

22    probably whenever -- just say '10 or '11, '12.  You

23    know, there again, I don't know when the -- a lot of

24    these things transpired.  I didn't keep up with and

25    nor do I have a way to go back and get.

30(b)(6) Roger Parker , Vol.I                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 186

1    We were, I'm trying to remember, doing the upgrades.

2    I normally would put in like a fifty, sixty-hour

3    week in most of the weeks.

4              Q.   Well, let's talk about January.  So

5    January 2016, on a Monday what would you be doing?

6              A.   I have no clue.  You know I don't know.

7              Q.   Well, you gave me fifty to sixty hours a

8    week, so I'm trying to -- (cross-talking).

9              A.   I'm just guessing.  Yeah, I mean, I

10   would do fifty to sixty hours a week through the

11   growing of the entire -- you know, that's normal for

12   most growers.

13             Q.   Well, let's talk about how you get

14   there.  So on a Monday what would your typical

15   schedule be --

16             A.   Oh.  You mean daily?

17             Q.   -- in January of 2016?

18             A.   Well, I'm just looking back a daily

19   thing, no matter -- I don't know that date, but we

20   would get up and we would go to the chicken house,

21   that would be our first thing, to do a check on the

22   houses.  And after we got through checking them all

23   we would go back and walk them.  That's -- each

24   house is 500-foot long.  You have to walk them four

25   times, four -- four runaways in each house to pick

Page 188

1    bit every day on doing this stuff.

2            Q.    And for what purpose would you mow

3    acres?

4            A.    Huh?

5            Q.    For what purpose would you mow acres?

6            A.    Because the chicken houses are 500-foot

7    long you have got to mow in between them; you have

8    to mow the outsides, both sides.  And then you have

9    got to mow next to the stack house.  I mean, the

10   entire property, literally.  There is a certain

11   section you can bush hog, but the rest of it we

12   mowed weekly.

13           Q.    And did you mow it so that the chickens

14   would do better?  Or what was the purpose of mowing?

15           A.    Perdue, mandatory, made us mow and keep

16   our yards up.  If we didn't, we got wrote up.

17           Q.    And how did that help the chickens?

18                 MS. VAUGHN:  Objection to form.

19                 THE WITNESS:  I don't know that it did.

20   BY MS. SANTEN:

21           Q.    Okay.  So when would you wake up on a

22   Monday in 2016?  When would you start?

23           A.    Usually around 7 we would go out.

24           Q.    And then what time would you eat lunch?

25           A.    Usually about, just guessing, maybe 1.

30(b)(6) Roger Parker , Vol.I                     April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 192

1    week.  And I don't know about Monday on that day and
2    that time.  I mean, I'm just saying it's according
3    to what all the field man left us that had to be
4    done because, I mean, everything we did had to fall
5    under their guidelines.  We didn't do anything --
6            Q.   Well, you said you worked fifty, sixty
7    hours a week, so I'm trying to figure out how you're
8    able to say that.
9            A.   Yeah.
10           Q.   So when would you work on a Tuesday?
11           A.   Well, it was seven days a week.
12           Q.   Would you work from 6 a.m. to 8 p.m. --
13           A.   Even eight days is fifty-six, so let me
14   figure.
15           Q.   Well, let's go through each day.  I'm
16   asking, would you take time off for dinner on a
17   Monday?
18           A.   Sometimes I would eat, sometimes I
19   wouldn't eat.  I didn't have a -- it's according to
20   what all I had to get done.
21           Q.   Do you have any records of the hours you
22   would work?
23           A.   No, ma'am.
24           Q.   Okay.  And the maintenance work, you
25   said some of that was yardwork.  Others was

Page 194

1      Let's start at the beginning.
2              A.    It would be similar to Monday.
3              Q.    Okay.  When would you wake up and when
4      would you start?
5              A.    Same time.
6              Q.    All right.  What would you do?
7              A.    Same.  I would go to the chicken houses.
8      It's redundant.  I mean --
9              Q.    Well, talk me through it.
10             A.    It's every day, the same thing.
11             Q.    So you would go to the chicken houses.
12     What would you do?
13             A.    Whatever the field man had laid out for
14     us to do.
15             Q.    Which would include things like what?
16             A.    Picking up the birds, whatever they --
17     you know, when they came they would give us -- they
18     were over everything we did.  I mean, there was
19     nothing we did --
20             Q.    I'm asking what you did.  What you did,
21     was it all related to walking the chicken houses,
22     checking on the chickens?
23             A.    No.  It's all related to what Perdue
24     wants done.
25             Q.    I'm asking, was it related to the

30(b)(6) Roger Parker , Vol.I                                    April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 195

1    chicken houses?  Were you walking the chicken houses
2    and performing maintenance work regarding the
3    chicken houses when you were walking them?
4             A.    Not when I was walking them, no.
5             Q.    What were you doing when you were
6    walking the chicken houses?
7             A.    Picking up dead chickens.
8             Q.    Okay.  So you would walk them.  On a
9    Tuesday would you walk them four times?
10            A.    You walk them every day.
11            Q.    Okay.  And then what would you do after
12   you would walk the chicken houses on a Tuesday?
13            A.    You would go back and look at -- you
14   look at your list every day and see what they have
15   left you.  Sometimes they would come during the
16   night, when you're not there, and leave another
17   list.
18            Q.    But what sorts of things would you do on
19   a Tuesday after you would walk the chicken houses?
20            A.    Okay.  You had -- you had ten 52-inch
21   fans you had to keep running.  You had side fans
22   that had to run.  You had vent machines that opened
23   on the side of the house that were 500-foot long,
24   you had to keep cabling on those and ropes going to
25   them that wore out.

Page 196

1            You have overhead cables that held the
2    feed lines that broke.  You're continually having to
3    replace those that break.
4            You have ziggity -- you have nipples
5    that -- because my houses had age on them, the
6    drinkers had to -- I had to put new ones in if one
7    is leaking somehow.
8            Q.   So is this maintenance -- maintenance
9    work on the chicken houses?
10           A.   Yes.  That's what we are talking about,
11   yeah.  And then --
12           Q.   And then would you take lunch?
13           A.   And then -- I mean, we are way -- a long
14   way from all we had to do in the chicken house,
15   though.  I mean, you had overhead belts, they
16   control the vent machines, that break.
17           You have got the curtains that hold the
18   vent machines up that come loose.
19           You have got the doors that hold the
20   cool cells.  You have got those that the ropes would
21   break on those.
22           Cool cells, themselves, had to be taken
23   out and cleaned.  And we are talking 80-foot-long
24   cool cells on both sides had to be totally taken
25   out, washed down and put back in.

Page 197

```
 1             I'm trying to think of what else we were
 2      doing.  Oh.  The control rooms had to be cleaned on
 3      a daily basis.  The field --
 4             Q.   Was that maintenance work regarding the
 5      chicken houses?
 6             A.   Yes.  The field man would make you do
 7      that.
 8                  You had to climb the feed bins every day
 9      to make sure that you had adequate feed for those
10      houses.  There again --
11             Q.   Is it your testimony that you would get
12      a list every single day of what you had to do on the
13      chicken houses?
14             A.   We would get one to two a week that
15      would pretty much cover everything we had to do or
16      could do, even.
17             Q.   What would that list look like?
18             A.   I don't know.  Perdue would make the
19      list and it would be left.
20             Q.   What would the list -- what would the
21      name of the list say?
22             A.   I don't -- I don't remember what they
23      put on it, honestly.
24             Q.   And what, exactly, would it have on it?
25             A.   It would just have stuff that we were
```

Page 198

1    supposed to do.

2          Q.    Would it cover what you were supposed

3    to -- would it give you a specific amount to do each

4    day?

5          A.    Do what now?

6          Q.    Would it give you specific items that

7    you had to do throughout the entire day?

8          A.    A breakdown of items per day, no, I

9    don't think it said that.

10               But you had to do it yourself.  You

11   know, you had to, you know, to be able to accomplish

12   it before they come back.  You had to -- you had to

13   do a daily regimen of it.

14         Q.    Did Perdue give you a schedule?

15         A.    A what now?

16         Q.    Did Perdue give you a schedule --

17   (cross-talking).

18         A.    That was the schedule.  That was the

19   schedule other than, you know, what they already

20   have on the contract that you had to do, which was a

21   daily -- you know, part of the daily regimen.

22         Q.    But they didn't give you a specific

23   schedule of hours you had to work each day.

24   Correct?

25               MS. VAUGHN:  Objection to form.

30(b)(6) Roger Parker , Vol.I                         April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 199

1              THE WITNESS:  Now, they -- they didn't
2      say:  Come in at 8 and leave at 8.  They didn't say
3      that, but you had to.
4      BY MS. SANTEN:
5              Q.   Okay.  So on a Tuesday what would you do
6      in the afternoon?
7              A.   Well, like I said, I tried to finish
8      what I -- maintenance that I had to do or whatever
9      needed done.
10             Sometimes you had -- you would have
11     times where there was chickens that were sick.  And
12     I have had that quite a few times.  They quit giving
13     them any antibiotics and all of a sudden we are --
14     you know, we are having sick chickens a lot and we
15     had a lot of dead.  And they make us cull -- those
16     that are not dead, basically you had to pull their
17     heads off.  And that was their right way of doing
18     it, they said.  The only way we could do it was
19     their way.
20             And you had to -- you know, to cull them
21     that way.  And that was the hardest part because
22     they were alive.
23             But then you -- if they were ever out of
24     feed and they brought feed back for any amount of
25     time -- one day I was out feed two days, and when

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 200

1    they come back they claw each other's back trying to
2    get to the feed, and then you have got real diseases
3    in there.  And you're picking up thousands.  I'm
4    talking bucket loads.  Because there's 30,000 you
5    would -- well, later went to 24, 25,000, but we
6    started with 30,000 to the house.
7              And you're picking up, you know,
8    thousands a day and you can't -- it's hard to keep
9    up with, as far as what you do like here and here
10   and here on a daily basis, because the chickens
11   declare what you have to do, versus -- and Perdue
12   declares, because they tell you, you can't just
13   leave the dead on the floor.  You know, you have got
14   to do what they say.
15             Q.   But your job was looking after the
16   chickens.  Right?
17             A.   Yeah, that's one of them.
18             Q.   What was another job?
19             A.   All the maintenance.
20             Q.   But that was regarding the chicken
21   houses too.  Right?
22             A.   Yeah, yeah.  Yeah.  But I mean, as far
23   as looking at the chickens versus -- and growing
24   them versus the maintenance, it's like -- I guess
25   it's the same but it's a little bit different.

Page 202

1      your schedule?

2              A.    Well, there -- you had to clean out

3      within two days.  It was mandatory.  Perdue gave you

4      a regimen of what you had to do when you didn't have

5      chickens then.

6              Q.    So you had to clean out the chicken

7      houses?

8              A.    Yeah.  You had to get all the cake and

9      wet places where they had pooped and used the

10     bathroom in every day and wet the floors.

11                  And sometimes their nipples drip and wet

12     the floor.

13                  You had to get all the wet cake out of

14     there and put it -- you had a machine that -- you

15     had to buy a machine that did that.  And you had to

16     put it in a stack house, which I had to have one

17     built while I was there because that farm didn't

18     have one.

19             Q.    And that was to prepare the house for

20     the next flock.  Right?

21             A.    Yes, ma'am.

22             Q.    Okay.  And how long would those days

23     last?

24             A.    Normally, if you just got a week between

25     growouts you really didn't have a day off.  But if

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 203

1    they go up to two weeks and three weeks, you know,

2    you could take, you know, a couple of days off.

3          Q.   How long would you work each day

4    during -- doing this cleanout work to get ready for

5    the next flock?

6          A.   I would work pretty much a normal day if

7    we had a week to a week and a half.  Usually seven

8    to fourteen days you have got to work every day.

9          Q.   And what hours were you working during

10   these cleanout days?

11         A.   Usually, you know, like an 8 to 8.  In

12   the summertime I worked more at night than day

13   because it was cooler.  I had to change my times up.

14   But usually it would take, you know, a good ten

15   hour -- ten hours.  Because you have these pans that

16   go under every drop, you had to wash those and dry

17   those, getting ready for the next batch.

18         Q.   And you said Perdue gave you a list of

19   things to do.  Where was that list?

20         A.   Well, some of the list was in the

21   contract, the original contract.  Some of the lists

22   would be on a weekly basis where they would give you

23   things.

24         Q.   And how would they give that to you?

25         A.   Well, they would leave it on House 1,

Page 204

1    usually on the clipboard.

2         Q.   What sorts of things would be on the

3    list?

4         A.   Well, just -- like if he saw a feed line

5    out or if he saw a water line out.

6              I remember once they had had a bunch of

7    chunks of concrete coming from the feed mill, and we

8    had seventeen feed breaks.  And to pull that line

9    took about three hours, and weld it and put it back

10   together, sometimes more because it's 250 foot long.

11        Q.   So if you had worked to fix the chicken

12   houses.

13        A.   Yeah.  It's whatever.  It's just

14   whatever he found wrong and wanted fixed.  And some

15   of it I would know about, some of it I wouldn't know

16   about.

17        Q.   So but those two weeks in between

18   flocks, you would get two weeks and then you would

19   get a new flock, would you ever get any time in

20   between that?

21        A.   No, ma'am.

22        Q.   Okay.  And you had two farms at one

23   point, so how did you determine -- you didn't

24   mention during here what farm you were doing what

25   on.  How did you determine who would work on which

30(b)(6) Roger Parker , Vol.I                           April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 212

1           A.    Yes, ma'am.

2           Q.    Okay.  And your wife was doing the same

3     kind of work, caring for your house, homemaker?

4           A.    Yeah.  She would normally help me pick

5     the birds up in the morning.  And sometimes she

6     would go back and -- like if I was in the middle of

7     something she would check them, you know, during the

8     other two checks, just sticking her head in the door

9     type thing.  And that's -- that's what -- I mean,

10    that's what she did.  She didn't do the maintenance.

11          Q.    But you testified before the break that

12    you did most of the work pertaining to the chickens.

13    Right?

14          A.    Well, as far as the maintenance, yes.

15          Q.    Okay.  And we discussed the different

16    types of maintenance you were doing before the break

17    as well?

18          A.    Yes, ma'am.

19          Q.    Okay.  Is there any other types of

20    maintenance work you were doing for the chickens

21    that we haven't discussed?

22          A.    Yeah.  I didn't make -- I didn't make it

23    all the way through.

24                On the outside of the chicken houses

25    sometimes the, like, screws in the roof, I would

Page 213

1    have to, you know, get up on the roof.  And the
2    nails would come out and stuff, the tin would be
3    loose, I have done that.
4           Q.   And was that so water wouldn't get in to
5    the chickens?
6           A.   Yes, ma'am.
7                Overhead, in the inside, there is a
8    piece of plastic that runs from end to end of the
9    chicken house, and these staples in that would get
10   loose.  They have got straps and staples in the
11   straps, and I have had to go in and hold those back
12   up because the roof starts coming down.
13          Q.   So that's to prevent the roof from
14   coming down on the chickens?
15          A.   Yes, ma'am.  The corrosiveness of a
16   chicken house -- it's very corrosive, and so we
17   are -- we are -- it's mandatory for any of these
18   things.  You know, we have to keep it up to
19   whatever -- no matter what the equipment is, you
20   know, it's got to be kept up to produce specs.
21          Q.   And is that so that the chickens aren't
22   exposed to rust?  Or what's the --
23          A.   No.  So the equipment will work itself
24   to whatever capacity, whether it be a vent machine,
25   tunnel machine -- vent machine, tunnel machine.  I

Page 214

1    mean, and you have got a computer that controls

2    everything inside the chicken house.

3         Q.   So the vent machine vents into the

4    chicken house.  Right?

5         A.   Yeah.  It opens up vents approximately

6    two -- a little over two foot wide, six inches tall.

7    It leans them in, let's them have air and then

8    closes back automatically.

9         Q.   And the tunnel, is that into the chicken

10   house also?

11        A.   It is.  The tunnel is the very end of

12   the house.  Ours was 5 foot tall, 80 foot long each

13   side and had tunnel doors.  And then right next to

14   that you have some curtains.

15        Q.   So what other maintenance work would you

16   be doing during the day that we haven't already

17   talked about?

18        A.   Let's see.  I think I have covered it.

19   I don't know if I covered water lines, feed lines.

20   I think I said those.  Vent machines, tunnel

21   machines.  I know I'm missing stuff, without a

22   doubt.  Yardwork.  Well, you said inside, though.

23        Q.   Inside or outside maintenance.

24        A.   Yeah.  Yardwork.  You know, feed bins.

25   And sometimes you would get a hole in a feed bin and

Case 5:22-cv-00268-TES    Document 136-4    Filed 08/19/25    Page 63 of 138

30(b)(6) Roger Parker , Vol.I                          April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 215

1    you would have to patch the hole.  I have had to put
2    whole new feed bins in before.  And I have done that
3    myself.
4           Q.    When you say "yardwork," is that what
5    you were talking about earlier?
6           A.    Mowing, weed eating, yeah.
7                 Just everything in the chicken -- I
8    mean, even the slide doors up front, I have had to
9    rebuild those before so they would open.  They would
10   come off track.  They would get rusted up.
11          Q.    So a lot of maintenance work related to
12   upkeep of the chicken houses?
13          A.    Yeah.  The house, 40 by 500 foot times
14   6, you know, that's -- it's just a lot of work.
15          Q.    Now, during a catch week what would you
16   all be doing?
17          A.    Well, you had to -- well, it was
18   according to what Perdue required.  Sometimes you --
19   they had a -- they had a system set and then they
20   controlled it.  Sometimes you could crust, which is
21   taking out the litter, and sometimes you had to
22   windrow.  W-I-N-D-R-O-W.
23                Windrow means that you go down and take
24   the chicken litter and pile it up in a pile, and
25   come back the other side and make one big pile of

Page 220

1    don't know.  I'm saying they all have equal eating

2    and drinking space, I would say.  That's the only

3    thing I can think of.

4            Q.   So during catch week you don't have

5    chickens, but you're doing a lot of things for

6    maintenance on the chicken houses to make the houses

7    more be efficient for when the chickens are

8    delivered.  Is that right?

9            MS. VAUGHN:  Objection to form.

10           THE WITNESS:  Not necessarily more

11   efficient.  It's just -- it's just what they have

12   you do.  But until the birds come you have got to

13   put out what they call PLT, Poultry Litter

14   Treatment, which is supposed to knock down ammonia

15   in the house for three days.

16   BY MS. SANTEN:

17           Q.   What we were talking about during catch

18   week, a lot of that stuff, though, was cleaning wash

19   pans for the chickens --

20           A.   Yeah.

21           Q.   -- feed lines for the chickens, boxes

22   for feed, dealing with heat and moisture issues for

23   the chickens, that sort of thing.  Right?

24           A.   Yes, ma'am.

25           Q.   And how many hours a day were you

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 221

1    working during catch week?

2            A.    Oh.   In catch week?   That's a whole

3    different story.   Well, I worked two days in a row

4    solid because it took them two days to catch my six

5    houses.   I would start that morning preparing.

6    There again, when I say they -- Perdue controls

7    every facet of that.   They give you when you start

8    the catch time and when you have got to raise your

9    feed time, when you're supposed to cut off your feed

10   time.   And you have got to have that done before the

11   first trailer gets there for them to start loading.

12   It usually started around 3:00 because the birds eat

13   out the feed when you cut them -- when you cut the

14   feed off, the bird then eats out the feed that's in

15   the pan so you're not raising feed up in the air.

16   And you then have to clear -- clear out what's in

17   the tubes and in the lines by cutting off the feed

18   bin, the big feed bin outside so you can run all

19   that feed out and give them a chance to eat that

20   before you raise it up.

21            And then you want to raise your -- they

22   have raised feed, which you raise your feed about

23   knee high.   That's the raise feed time.   But you

24   couldn't raise it all the way to the ceiling,

25   because if you raise it higher than knee high your

Page 222

1    chickens will no longer drink water.  They just lay

2    down.

3              So you leave your water lines down and

4    your feed lines knee high.  And then you -- then

5    they have -- you see the whites of the eyes of the

6    catcher's coming, that's when you put your feed

7    lines in the ceiling.  You cut your waters off and

8    give them a little while -- chickens a little while

9    to drink the waters, and then you put your water

10   lines in the ceiling.

11             And then you have to pick up all those

12   divider walls that you have put down between the

13   birds to keep them separated.  You have to pick

14   those up.

15             And then the catchers, you open a door

16   and the catchers come in and they start catching.

17   And after that starts, around 3:00, you know, they

18   will catch three houses, usually three and a half

19   the first night.  And then they finish that -- they

20   finish up usually about 7, 8:00.  You might get an

21   hour or two sleep, but then the next catch time

22   starts, raise feed time starts and all that for the

23   next day.

24             Q.   So real fast, you mentioned so you will

25   start at 3 a.m.  And Perdue gives you a list of what

Page 225

1    So I mean, I hope that helped.  I don't --

2            Q.    Yeah.  So they give a specific raise

3    feed time and they give you a specific catch time.

4            A.    Yeah.  And a cut time.

5            Q.    And a cut time.

6            A.    Time to cut it off.

7            Q.    And is a flock supervisor or advisor

8    there with you the entire time during catch days?

9            A.    I have had them there the entire time,

10   and I have had them where I didn't see them.  I have

11   had them both ways.

12           Q.    Were they there more often than not, or

13   was it about half and half when they were there

14   versus not there?

15           MS. VAUGHN:  Objection to form.

16           THE WITNESS:  I don't really remember.

17   I'm just guessing 50/50.  I didn't pay attention.

18   BY MS. SANTEN:

19           Q.    So how long would, kind of, the catch --

20   how many days would the catch process last?

21           A.    Two solid days.

22           Q.    Okay.  And then what would happen after

23   that?

24           A.    Well, you mandatory had two days, by

25   their rules, to get your houses caked after your

Page 229

```
 1              Q.   And you had someone running
 2     Milledgeville for you full-time when you were in
 3     Hillsboro.  Right?
 4              A.   Yeah, but I was on one or the other.
 5              Q.   If you wanted to hire someone to run
 6     both of them, you could do that, couldn't you?
 7                   MS. VAUGHN:  Objection to form,
 8     misstates --
 9                   THE WITNESS:  You couldn't.
10     BY MS. SANTEN:
11              Q.   Who told you, you couldn't do that?
12              A.   You just couldn't.  I mean, you couldn't
13     trust -- I wouldn't trust leaving somebody that --
14     it takes a long time to understand Perdue's rules of
15     regulation here and what you have got to do.  You
16     would come back to a mess.
17              Q.   I understand you didn't want to do that.
18              A.   I couldn't.
19              Q.   But did anyone with Perdue ever tell
20     you, you cannot hire someone to run the farm for
21     you?
22              A.   They had to be approved by Perdue.  Even
23     to the guys that just -- that run the farm, or just
24     even one guy that -- you know, that -- like any of
25     those guys had to sit before Perdue and be okayed,
```

30(b)(6) Roger Parker , Vol.I                                April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

                                                    Page 230

1       just like I did, and to be able to operate the farm.

2               Q.    But no one with Perdue ever told you

3       that you could not hire someone to run the farm for

4       you.  Right?

5               A.    No.  They told me I could not hire

6       somebody they didn't approve to run the farm.

7               Q.    Okay.  But if they had approved them,

8       you could hire someone to run the farm for you.

9       Right?

10              A.    If I could find someone, yes, that were

11      willing to do that type work --

12              Q.    Understood.

13              A.    -- for that amount of time.

14              Q.    What was the approval process?

15              A.    I guess they would meet with them.  You

16      know, like they did with me, I'm assuming that's how

17      they did.

18                    I know they talked with Brian.  I know

19      they talked with David.  I just can't remember, you

20      know, the extent of the conversation.  But they did

21      meet them.

22              Q.    How did you come to understand that

23      there was an approval process for people you hired?

24              A.    Well, because they had people running --

25      you know, that was working on the farm.  And Perdue

Page 235

1    mean, I didn't really -- because I 1099'd them and

2    they did their thing, you know?

3         Q.   Tell me how you were compensated as a

4    grower.  How did that work?

5         A.   I was compensated as a grower?  A lot of

6    factors in the money you make, if that's what you're

7    asking.

8         Q.   Yeah.  So it was a tournament system, so

9    what factors impacted the money you made?

10        A.   Oh, Lord.  That controlled everything.

11   That controlled the baby birds that you got.  I

12   mean, if you got baby birds -- just say you have got

13   a young flock of hens that are laying these eggs and

14   then an older flock that had been there and

15   seasoned, the older flock, those baby chickens would

16   produce a lot better than the younger flock so

17   they -- you know, even getting the birds you get

18   different -- in other words, even though it's

19   competition, you're at battle with each other, you

20   know, I guess.  And it goes through -- all the way

21   through everything that's controlled inside the

22   house to -- there is -- there is no end.

23             Like I said, if I get more -- better

24   feed, you know, in one house than I do another farm,

25   that throws the competition off.  But you're paid by

Page 236

1    that -- you know, competition system.

2              Q.    So are you paid by bird weight?

3              A.    You're paid by bird weight.  But you get

4    money taken away from you because of the

5    competition.

6              Q.    So if you have more houses, you can make

7    more money.  Right?

8              MS. VAUGHN:  Objection to form.

9              THE WITNESS:  Not necessarily.

10   BY MS. SANTEN:

11             Q.    Would you agree that in Milledgeville

12   you had six houses and you viewed that as a way to

13   make more money?

14             A.    I looked at that initially as a way to

15   make -- to do better, yeah, because I was -- I

16   was -- I knew I was going under in the other with

17   the -- the way everything was headed.

18             Q.    And you could make upgrades?  Like you

19   testified earlier, you upgraded one to tier 4 to

20   make more money.  Right?

21             A.    Yeah.  That's the only way to get a

22   raise with Perdue.  I mean, it's like, literally,

23   twelve years I grew that I never got a regular

24   raise.

25             Q.    If you had upgrades to your house in a

Page 239

1          A.   I don't know.  I don't know.  I really
2     don't understand the tournament system at all.
3          Q.   But you agree, if you have more houses
4     you can make more money.  Right?
5               MS. VAUGHN:  Objection to form,
6     misstates --
7               THE WITNESS:  Not necessarily.  The
8     amount of houses, if you can do good in more houses
9     you can -- you can make -- and I did better at
10    Hillsboro.  You know, and up until things started
11    going south in Milledgeville, I was okay there.
12    BY MS. SANTEN:
13         Q.   And why did you do better in Hillsboro?
14         A.   I don't know.  You don't control that.
15    I mean, really, that system is not controlled by the
16    grower.  And other than him doing his daily thing.
17    And I did the same.
18         Q.   So is it your testimony that you got the
19    same amount of money each week?
20         A.   I didn't get paid by the week.
21         Q.   Well, is it your testimony you got the
22    same amount each flock?
23         A.   Each flock, no.  I didn't get the same
24    amount each flock, no.  It's according to the -- I
25    mean, you know, they -- if you don't -- if you don't

30(b)(6) Roger Parker , Vol.I                      April 23, 2025
Parker, Rogerv. Perdue Foods, LLC

Page 240

1    produce according -- according to their standards,
2    you don't -- you know, they take money away from you
3    and give it to this other guy over here.
4            Or if you do good then they will take
5    money from that other guy and give it to you.
6        Q.    And what do you mean by "do good"?
7        A.    Or if you do something -- if you do
8    something -- well, the thing is you don't control
9    "good."  That's the problem.
10       Q.    Well, you said you do good.  What are
11   you referring to?
12       A.    If you do good during the growout.  And
13   I'm talking about at your settlement.  If you do
14   good, you know, when you get your settlement.
15       Q.    And what -- how -- what do you mean by
16   doing good with your settlement?  You have --
17       A.    You get more.  In other words, if you --
18   if you rank high.  In other words, if you could grow
19   a chicken that weighed five pounds and used zero
20   feed, then you would do real good.  But you don't
21   control all that.  They control all that.  But
22   you're still pitted against each other.
23       Q.    Okay.  So is it your testimony that
24   Perdue controls everything that impacts your
25   compensation?

Page 241

1          A.    No, not everything.  I mean, you have

2     got to do stuff yourself.  But they control a lot of

3     it.

4          Q.    Did you have the opportunity to upgrade

5     your houses from time to time to get more

6     compensation under various payment schedules?

7          A.    You mean talking about tiers?

8          Q.    Uh-huh.  Yes.

9          A.    They offered to everyone that wants to

10    put out, you know -- what, 30, 40,000, I don't know,

11    just according to whatever the growout -- going from

12    one to the other cost you.  But when you weigh it

13    out, I mean, some farmers didn't do any.  They

14    stayed tier 2.  And because they knew that they had

15    put the money out, that it wasn't going to come back

16    to them.

17         Q.    But that was an option you had, to make

18    upgrades as a way to potentially make more money?

19         A.    Well -- well, according to them you're

20    supposed to make more money.  But, in fact, I have

21    done the upgrades and made no more money.

22               But as far as this tier, the pay scale

23    raises per bird, per pound in each tier.

24         Q.    So you can make more if you upgrade to a

25    different tier?

Page 245

1          Q.   Were the -- were your two farms or just
2     one ultimately foreclosed on by the bank?
3          A.   It's my understanding, my youngest son
4     still has the other farm.  But I bankrupt against --
5     had to bankrupt against both.  Both farms was my
6     understanding, and I had to do it.
7          Q.   Okay.  And when you say you had to
8     bankrupt against both farms, what do you mean?
9          A.   That's what the lawyer said.
10         Q.   Okay.  Why did you file for bankruptcy?
11         A.   Because Perdue cut me off.  I couldn't
12    grow any more birds.
13         Q.   Do you believe that your properties were
14    foreclosed on because Perdue cut you off?
15         A.   Yeah.  I mean, if they would have
16    allowed me to keep growing I could have continued to
17    make payments.
18         Q.   What have you done since you stopped
19    your relationship with Perdue?
20         A.   Basically, I found that I had congestive
21    heart failure and I no longer -- basically, I just
22    get Social Security now.  I'm 66.
23         Q.   Do you recall ever seeing this document
24    that we have marked as Exhibit 20?
25              MS. VAUGHN:  Counsel, it looks like it's

Page 253

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE MIDDLE DISTRICT OF GEORGIA
 3                        MACON DIVISION
 4     ROGER PARKER, ON HIS OWN          Case
 5     BEHALF AND ON BEHALF OF ALL       No. 5:22-cv-00268-TES
 6     OTHERS SIMILARLY SITUATED,
 7              Plaintiff,
 8         vs.
 9     PERDUE FOODS, LLC,
10              Defendant.
11     _____
12                        VOLUME II
13     CONTINUATION OF VIDEORECORDED
14     30(b)(6) AND PERSONAL
15     DEPOSITION OF:   PARKER'S POULTRY EQUIPMENT
16                      AND ROGER DALE PARKER,
17                      (Via Videoconference)
18     DATE:            Thursday April 24, 2025
19     TIME:            9:04 a.m.
20     LOCATION:        Ogletree Deakins Nash
                        Smoak & Stewart
21                      300 North Main Street
                        The Ogletree Building, Suite 500
22                      Greenville, South Carolina
       TAKEN BY:        Counsel for the Defendant
23     REPORTED BY:     Elaine L. Grove-DeFreitas,
                        Independent Professional Reporter
24                      (Via Videoconference)
       VIDEOTAPED BY:   Kevin Day
25                      (Via Videoconference)
```

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 260

 1     had someone else actually operating the farm at the

 2     time.

 3              Q.   How many hours were you working on the

 4     farm during that time?

 5              A.   I would come in and work in the evenings

 6     usually and weekends.  But I -- I was probably doing

 7     maybe twenty -- twenty hours a week maybe during

 8     that season.

 9              Q.   During the time you were a manager with

10     the quail company?

11              A.   Yeah, during -- yeah, during that time.

12              Q.   I saw in your interrogatories you had

13     referenced Roosevelt farm.  What's Roosevelt farm?

14              A.   That's a farm in -- I'm trying to think

15     of the name of the little town.  They made Fried

16     Green Tomatoes there, the movie, but I can't

17     remember the name of it.

18                   Anyway, Perdue had contacted me.  The

19     lady that owned the farm, her and her husband, she

20     was -- worked for the government.  And she was an

21     IRS person.  And I was told by them that they

22     basically didn't want to mess with her and asked me,

23     would I consider taking over that farm for them

24     to -- for a while to get it to where -- I think,

25     basically, they was going to shut the farm down.

Page 261

1    And they didn't want to shut it down and deal with

2    her, and so I took the farm for a short season.  And

3    I think that was way early, though.  I can't

4    remember the exact years we were there, but it was

5    when I had -- I didn't have both farms then, I don't

6    think.

7              Q.   Okay.  So you think you just had one

8    farm during that time?

9              A.   Yeah, the Hillsboro.

10             Q.   And how did you manage the Roosevelt

11   farm while you had the Hillsboro farm?

12             A.   Someone ran the farm.

13             Q.   Did you hire someone to run the

14   Roosevelt farm for you?

15             A.   Yes, ma'am.

16             Q.   Okay.  How did you find that person?

17             A.   If I remember right it was online, a

18   guy, that particular guy.  And I can't remember,

19   they were from -- I know they were from Tennessee,

20   but I can't -- I do not remember their name.

21             Q.   Were you getting the income from the

22   Roosevelt farm during that time?  How did that work?

23             A.   Yeah.  It done good to break even, but

24   yeah.  I kept it in -- I can't -- can't remember the

25   length of tenure that I had it, but it was long

Page 270

1    the -- I mean, some of the things that -- basically,

2    if I had had the feed lines I wouldn't have trouble

3    with the feed.  And I basically asked to do feed

4    lines and I could not -- I mean, they -- they would

5    not help me, toward the end, at all.

6              They would rather -- it seemed like they

7    would rather see them suffer, and that's what they

8    did.

9         Q.   Are you aware of any other growers who

10   were allowed -- who were treated differently than

11   you in terms of given more favorable treatment on

12   some of this stuff?

13        A.   Oh, yeah.  I had a -- I know people that

14   got water lines and got feed lines and -- yeah.  I

15   mean, quite a few farmers, actually, you know, that

16   I had seen get the same things I was asking for.

17        Q.   Well, on some of these items here that

18   you say they were using to push you out, are you

19   aware of any growers who had these items who didn't

20   have them listed on a Flock Visitation report?

21        A.   Well, I don't know about other growers.

22   I mean, I don't know what they wrote down on

23   their --

24        Q.   And you testified that as of this date,

25   which is July 2nd, 2019, you felt sure they were

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 271

1    trying to push you out.  Is that right?

2         A.    Without a doubt, yeah.

3         Q.    And why -- why did you feel sure at that

4    time that they were trying to push you out?

5         A.    Well, I had gone through a couple of

6    years at that time of, you know, no help.

7              I mean, when I started reporting the

8    trailers coming in, it seems like that started the

9    stuff.

10             And I was really just trying to help

11   them to realize that they were bringing basically

12   a -- they was coming into my farm with an empty

13   trailer, let's say trailer one, and they would stamp

14   a tare weight ticket and put it in my box.  And they

15   would go weigh that truck -- when they left my farm

16   full of chickens and weighed the truck, the truck

17   number then was different on what I sold versus what

18   I was growing.  And I knew we had issues.

19        Q.    So you said this happened a few years --

20   this started happening a few years before 2019.

21   Right?

22        A.    Yeah, it did.

23        Q.    When did it -- when did this treatment

24   start happening that you felt was unfair?

25        A.    I started noticing trailers around 2015,

Page 272

1    '16, right in there.

2         Q.    So do you believe they were starting to

3    push -- they were trying to start to push you out

4    around 2015 or 2016?

5         A.    When I started -- no.  I was genuinely

6    trying to help them find -- because the trailer

7    numbers weren't matching what I was getting.

8    Apparently it was -- they were -- we would grow big

9    birds and little birds.  Apparently I was -- I was

10   getting somebody else's loads added to my pay scale

11   and I didn't -- I didn't know why.  And I didn't

12   know it was that at the time.  I just knew the

13   trailer number was different.

14        Q.    Well, you said they --

15        A.    But when I started reporting it -- when

16   I started reporting it to them that's -- that's

17   when, you know, I saw everything change.

18             I mean, I went from getting baby birds

19   from older hens to younger hens.  I started getting,

20   it seemed like, lesser feed.

21             They weren't helping me at all when it

22   come to -- they give interest-free loans for people

23   to do their upgrades on feed lines and water lines.

24   And I needed feed lines and water lines, but they

25   were -- they would not help me.

Page 273

1            They told me they would do that.  They
2    said they would -- I bought water lines.  But I had
3    asked for the pipe to buy the water lines to put in
4    city water so that after I paid for that I could
5    then get feed lines or water lines because they
6    didn't want two loans at a time on your -- I get
7    that.  But after I paid it off then they turned
8    around and changed the story and wouldn't give me
9    feed lines even then or water lines.
10           Q.   You said that things started to change
11   when you started reporting it to them.  When did you
12   start reporting it to them?
13           A.   I thought I said 2015 or '16.
14           Q.   Okay.  So that's when you believe the,
15   quote, different treatment started happening,
16   different treatment of you.  Is that right?
17           A.   Well, that's when I noticed it, yes.
18   And it started -- in my opinion, that was the start.
19   But it really -- after I contacted USDA it seemed to
20   elevate.  And that's -- this guy, I believe this
21   particular person that did this report was -- was
22   looked at by growers as the hitman that shut farms
23   down.
24           Q.   Okay.  So you said that they wouldn't
25   give you feed lines or water lines.  Is it your

30(b)(6) Roger Dale Parker , Vol. II                     April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 274

1    testimony, under oath, that you never got any feed
2    lines or water lines or assistance from Perdue with
3    the same?
4              MS. VAUGHN:  Object to form, vague as to
5    time.
6              THE WITNESS:  I didn't -- I didn't get
7    feed lines or water lines that I asked for, it if
8    that's what you're asking.
9    BY MS. SANTEN:
10        Q.   Is it your testimony that they never
11   helped you with feed lines or water lines?
12             MS. VAUGHN:  Object to form.
13             THE WITNESS:  I didn't get new feed
14   lines and water lines.  I don't know how else to
15   answer it.
16   BY MS. SANTEN:
17        Q.   Were there times when they did give you
18   feed lines or water lines?
19        A.   I don't remember the time when they did.
20   I mean, if they did I can't -- I do not remember
21   them helping me.
22             Now, they -- you know, feed trays that
23   go under the lines, yeah, they -- they would help
24   with those, but not necessarily the feed line that
25   goes through the chicken house.

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 275

1          Q.   Okay.  When -- were there times when
2     Perdue visited the farm and noticed some issues and
3     after that point you would get letters?  Would that
4     occur from time to time?
5          A.   Yeah, towards the end, especially when
6     they shut me down.
7          Q.   Okay.  Let me hand you what we will mark
8     as Exhibit 22.
9     (Defendant's Exhibit No. 22, 4-14-17 Letter, 9-19-18
10    Letter, and 10-16-18 Letter, was marked)
11    BY MS. SANTEN:
12         Q.   Do you recognize this document -- this
13    set of documents?
14         A.   Yeah.  Yeah, I think it's something that
15    I got.
16         Q.   Were these examples of letters that you
17    received from Perdue noting different issues that
18    they found on the farm?
19         A.   Yeah.  Like I said, after -- it is.  I
20    mean --
21         Q.   Do you have any reason to believe you
22    didn't receive these letters?
23         A.   Let me see.  I don't -- let me look at
24    all of them.
25              Yeah.  It was -- I felt it was a

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 276

1    starveout.  You know, if they wait long enough they
2    know that -- that you have got to have these things,
3    especially with a system, and they -- if they don't
4    help you do it, then eventually you're going to --
5    and basically, instead of trying to help me like
6    they did other farmers, I got no help and wound up
7    in this issue.
8            Q.   Are you aware of any other farmers who
9    had the kinds of issues that Perdue noted who were
10   not provided with letters like this?
11           A.   I'm not -- I don't know about other
12   farmers, no.
13               I know other farmers got feed lines and
14   water lines.
15           Q.   Okay.  Which farmers got feed lines and
16   water lines?
17           A.   Well, I mean, I don't know how many they
18   gave them to, but I knew they got feed lines and
19   water lines.  I know -- I just -- I mean, I have
20   actually put them in for them.
21           Q.   Okay.  Is that the only instance you can
22   think of, of other farmers who were treated
23   differently?
24           A.   Say that again now, to make sure I
25   understand.

Page 280

1          Q.   Okay.  Who said -- who suggested to you
2     to use the name Parker's Poultry?
3          A.   It was just agreed to in that meeting
4     that day.
5          Q.   Which person with Perdue suggested that
6     you should use the word Parker's Poultry?
7          A.   I can't remember which one it was.
8          Q.   Okay.  Let's go to the second agreement,
9     then, if you don't believe that one was in place.
10              This one is Perdue 002453 through 2459.
11    And it's dated May 18, 2007.  Does this contain your
12    signature?
13         A.   It does.
14         Q.   Okay.  Do you believe this is the first
15    agreement that governed the relationship between you
16    and your ex-wife and Perdue?
17         A.   It's one of them.  Like I said, they
18    continually changed it.
19         Q.   I said the first agreement.
20         A.   Oh.  I don't know.  I wouldn't think --
21    I think the first one should be the lesser of the
22    dates, but it's not.
23         Q.   Okay.  Well, what do you -- what do you
24    remember about them telling you -- when you first
25    sat down to sign an agreement with Perdue, what did

Page 281

1    they tell you about how the relationship would work?

2         A.    As in -- what do you mean

3    "relationship"?

4         Q.    What did they explain to you about how

5    it would work?  Did they explain you would be an

6    independent contractor?

7         A.    No.  They basically told me that they

8    would come out and show us everything to do; what to

9    do, how to do it.  And we had to abide by the rules

10   that they had.

11              And whenever we were -- you know, we

12   would -- you know, if something happened, you know,

13   you get written up.  And if you didn't comply,

14   basically, you got cut off.  Of course that wasn't

15   my case, but --

16        Q.    So it's your testimony that they told

17   you that at the very beginning of the relationship?

18        A.    Yeah.  That was -- that was -- I mean,

19   they were up front with telling us, you know, we had

20   everything -- you know, we had to follow the

21   guidelines and, you know, everything they said for

22   daily working the birds and everything, yeah.

23        Q.    Okay.  What else did they tell you when

24   you sat down and first discussed how things would

25   work?

30(b)(6) Roger Dale Parker , Vol. II                  April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 282

1          A.    I was just trying to get a loan for the

2     bank.  You know, it's -- that's pretty much -- you

3     know, do what we say and when we say to do it and

4     everything will be good, you know?

5          Q.    What else do you remember Perdue telling

6     you when you first sat down with them to discuss

7     becoming a grower with them?

8          A.    (Cell phone interruption).

9                I'm sorry.  That bothered me.

10         Q.    What else did Perdue -- you remember

11    Perdue talking with you about when you first sat

12    down with them about the opportunity to be a grower?

13         A.    Like I said, just what I said.  I don't

14    think there is -- there is anything else.  The field

15    man would come out and look at everything every week

16    and tell us what to do.

17         Q.    So you testified that they told you they

18    would come out, show you everything.  You had to

19    abide by the rules.  If something happened, you

20    would get written up.  If you didn't comply you

21    would get cut off.  So you began the relationship

22    knowing that information.  Correct?

23         A.    Yeah.  A good bit of it, yeah.  That --

24    I mean, some of it come with time but, you know,

25    it's definitely an understanding, you work for them,

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                            Page 283

1     no doubt.

2          Q.   What part of it came with time?

3          A.   Well, you know, you come to see how it

4     works, you know, with your field man and

5     understanding how, you know, you -- how little

6     options you have, I guess, on your end, because I

7     wasn't used to growing that way.  Growing with two

8     other integrators it was totally different.

9          Q.   Let's go through the -- let's go through

10    this 2007 Agreement a little bit.  So you see

11    paragraph II it says:  "Producer Agrees" on the

12    first page?

13         A.   Oh.  Paragraph VII?

14         Q.   Paragraph II, Producer Agrees.  It's

15    section II.  It says:  "Perdue Agrees" and then it

16    says "Producer Agrees."

17         A.   Yes, ma'am.

18         Q.   Do you recall reviewing this Agreement

19    before you signed it and these provisions that you

20    were agreeing to?

21         A.   Yeah.  But there are some things they

22    didn't put in here.  But yeah.

23         Q.   So you were agreeing to, if you look at

24    paragraph B:  Feed, water, care for and otherwise

25    manage the chicks consigned to and provide necessary

Page 284

1    housing, equipment, supplies to maintain equipment

2    and housing, utilities, labor to maintain such

3    housing and equipment in a good a state of repair --

4    or state of good repair and operable condition.

5              You understood that would be part of the

6    agreement?

7         A.   Yeah.  They also said that there was

8    interest-free loans that was available to do that

9    with.

10        Q.   Okay.  But you understood paragraph B

11   was part of the agreement?

12        A.   Yeah.  We had to do that.

13        Q.   Okay.  Did you understand that you were

14   to only use the feed medications, vaccinations and

15   other supplies which Perdue provided under paragraph

16   C?

17        A.   Yes, ma'am.

18        Q.   Okay.  Did you understand under -- or

19   did you understand the rest of these?  So D talks

20   about minders.  E talks about disposal of birds.

21             Did you understand that you would be

22   required to comply with the rest of these

23   paragraphs, so A through M?  And that's section IIA

24   through M on Perdue 002543 to 002534, Producer

25   Agrees.

Page 285

1              A.    Yeah, they -- they said that.  But, you
2      know, like I said, they offered help in some of it
3      too.
4              Q.    Okay.  And under IIIA, "Other Terms," it
5      says:  Producer shall perform the services hereunder
6      using Perdue's established procedures and otherwise
7      sound farming and growing practices in accordance
8      with industry standards.  Did you understand that
9      would be one of your obligations under the
10     agreement?
11             A.    Oh, yeah, definitely, you had to do what
12     they said under their guidelines for sure.
13             Q.    Okay.  And go to the next page.  This is
14     Perdue 002455.  You see paragraph D there, it says:
15     Perdue may enter upon the premises of the producer
16     where flock is and shall be located to inspect the
17     flock or facilities.  If producer is not
18     satisfactorily performing producer's obligations
19     under the agreement to care for, treat and maintain
20     the flock, or if this agreement has been terminated
21     in accordance with its terms, Perdue may enter upon
22     the premises of producer where the flock is located.
23                   Did you understand, under this
24     paragraph, that they would be entitled to come onto
25     your farm to inspect the flock or the facilities?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 286

1          A.    Yeah.   The field man came every week,
2     sometimes twice.
3          Q.    Okay.   Did you understand the remaining
4     obligations set forth in paragraph E and F on this
5     page, Perdue 002455?
6          A.    Yeah, they -- they allow you to do the
7     weight, but it was an impossibility, really.   You
8     can't be in two places at once.
9          Q.    And did you understand that under
10    paragraph IVA that the agreement provided that you
11    were to be an independent contractor?
12         A.    It may read that, but it didn't seem --
13    it didn't seem that way at all.
14         Q.    Okay.   We will talk about that in a
15    minute.
16         A.    Okay.
17         Q.    Let's go to -- just so I'm clear, do you
18    believe that this June 2006 Agreement was the first
19    one you signed?
20         A.    I would think it would have been before
21    I got my loan.   And this would have to be after.   I
22    mean, I really don't -- the earlier date would make
23    more sense if she had signed it.   But she didn't
24    sign it.
25               The first time I met with them and the

Page 299

1              MS. VAUGHN:  Object to form.

2      WITNESS CONTINUES:

3              A.    Unfair -- I mean, basically, I was ran

4      out of business, I feel.

5                   And it seems, too, that I had upset

6      Perdue and then I was pretty much starved out.

7      That's how I feel.

8              Q.    And you testified yesterday that you

9      believe that that's what -- that this treatment by

10     Perdue is what caused you to file bankruptcy.  Is

11     that right?

12             A.    Yes.  Yeah.  Yeah.  Some of it, yeah.  I

13     mean, it's -- yeah.

14             Q.    Okay.  So let's go through your

15     different claims.  When is -- you are claiming that

16     Perdue breached its contract with you.  When did you

17     first believe Perdue breached a contract with you?

18             MS. VAUGHN:  Object to form.

19             THE WITNESS:  Well, even going back to

20     some of these I notice that -- where it talks about

21     they would place chickens -- we are on the system

22     that if they -- you know, if I don't get the same

23     kind of bird the next farmer does and we are

24     competing against each other, if I get a lesser

25     bird, there is a lot of control in that that they

Page 304

1    BY MS. SANTEN:

2         Q.    You have a breach of contract claim, so

3    I'm trying to understand the basis for your breach

4    of contract claim.

5         A.    Well --

6              MS. VAUGHN:   Object to form.

7              THE WITNESS:   -- the -- I'm not -- I'm

8    not a lawyer, so I don't know a lot of the lingo or

9    whatever that, you know, would define that.  So I

10   mean, I could go back -- and we could go back and if

11   you give me a chance to talk with -- you know, with

12   my counsel, I can have a better answer --

13   (cross-talking).

14   BY MS. SANTEN:

15        Q.    I'm just trying to -- you have brought a

16   breach of contract claim in your lawsuit.

17        A.    Yeah.

18        Q.    So I'm trying to understand when you

19   first felt Perdue breached your contract and how.

20             MS. VAUGHN:   Object to the form.

21             THE WITNESS:   Well, like I said, I'm not

22   a lawyer in this.  But the contract was breached by

23   not -- I mean, we didn't have a fair system, in my

24   opinion.

25   BY MS. SANTEN:

Page 305

```
 1            Q.    What provision in the contract do you
 2       believe that breached?
 3                  MS. VAUGHN:   Object to form.
 4                  THE WITNESS:   I would have to read the
 5       contract.
 6       BY MS. SANTEN:
 7            Q.    You can take your time.
 8                  MS. VAUGHN:   Maggie, you're asking him
 9       to make legal conclusions about what this contract
10       required.
11                  MS. SANTEN:   I'm asking --
12                  MS. VAUGHN:   And if you have factual
13       questions about what he believes --
14                  MS. SANTEN:   He has a breach of contract
15       claim.  I'm entitled to explore what paragraph he
16       thinks was breached.
17                  MS. VAUGHN:   You're asking him to
18       interpret legal provisions of a contract.
19                  MS. SANTEN:   No.  He has a breach
20       contract claim.  I'm just asking him to identify
21       which provision was breached.  This is his lawsuit.
22                  MS. VAUGHN:   He is trying to answer --
23                  MS. SANTEN:   This is his claim.
24                  MS. VAUGHN:   He is trying answer your
25       questions factually about what he thinks Perdue did
```

Page 306

1      wrong.  But asking him to interpret a contract

2      provision is a legal question that he is not capable

3      of --

4                  MS. SANTEN:  No.  Asking him to say how

5      Perdue breached the agreement is his very claim.

6                  MS. VAUGHN:  And he is explaining that

7      to you.

8                  MS. SANTEN:  I'm entitled to ask him

9      that.  He is looking through the Agreement and he is

10     going to provide an answer.

11                 THE WITNESS:  On E, where they -- one

12     thing to provide us the information, but in my

13     opinion it's something else to pretty much dictate

14     everything you do in every way.  And other than when

15     you wake up and when you go to sleep you're pretty

16     much under --

17     BY MS. SANTEN:

18          Q.   What provision -- my question is, what

19     provision do you believe that breached?

20                 MS. VAUGHN:  Object to form, calls for a

21     legal conclusion.

22                 THE WITNESS:  I don't know what you

23     would lay it under.  I really don't know.  I'm just

24     saying this is something I dealt with, though,

25     that --

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 307

1   BY MS. SANTEN:

2        Q.   So when is the first time that you dealt

3   with that?

4        A.   -- I didn't deal with it with other

5   integrators.

6        Q.   When is the first time you dealt with

7   that, what you're referring to?

8             MS. VAUGHN:  Object to form.

9             THE WITNESS:  Well, pretty much, you

10  know, it was different; definitely different day

11  one, unlike, you know, anything I had experienced

12  through other integrators.

13  BY MS. SANTEN:

14       Q.   So do you believe you were not treated

15  as an independent contractor from day one?

16            MS. VAUGHN:  Object to form.

17            THE WITNESS:  No.  I mean, it was more

18  like an employee situation.  That there is the way

19  it felt.

20  BY MS. SANTEN:

21       Q.   And when do you believe that started?

22       A.   Pretty much in the first part of growing

23  I sensed that.

24       Q.   And so that would have been what, 2007

25  when you believe you were an employee?

Page 308

```
1              A.   Yeah.  I mean, it seemed to get more and
2         more through the years.
3              Q.   So did you feel like you were treated as
4         an employee the entire time you were a grower with
5         Perdue?
6              A.   More so than any other integrator I had.
7              Q.   Okay.  So is that a yes?
8              A.   Yes.
9              MS. VAUGHN:  Object to form.
10        BY MS. SANTEN:
11             Q.   And do you believe that you should have
12        been paid as an employee the entire time, then, as
13        well?
14             MS. VAUGHN:  Object to form.
15             THE WITNESS:  I'm not -- I don't -- I'm
16        not -- paid, what do you mean as an employee?  Like
17        daily?  Are you talking about working daily?
18        BY MS. SANTEN:
19             Q.   Well, you said you felt like you were an
20        employee.  So are you -- do you believe you should
21        have been paid like an employee as well?
22             A.   Should have, probably.
23             Q.   And is that from day one also?
24             A.   I would -- I would say it goes back --
25        like I said, it was definitely different than any
```

Page 309

1    other integrator that I had grown for.  They didn't
2    dictate everything.
3            Q.   Well, I'm trying to get a sense.  So
4    would you agree, then, that you believe you should
5    have been paid as an employee from day one also?
6                 MS. VAUGHN:  Object to form.
7                 THE WITNESS:  I really don't know the
8    answer to it other than I definitely wasn't
9    independent.
10   BY MS. SANTEN:
11           Q.   Okay.  And you felt that from day one?
12           A.   Like I said, more so than anywhere else
13   I had been.
14           Q.   And your lawsuit alleges that you
15   believe that breached the agreement.  Is that right?
16                MS. VAUGHN:  Object to form.
17                THE WITNESS:  I don't have a clue what
18   all it alleges.
19   BY MS. SANTEN:
20           Q.   Okay.  Well, your agreement said you
21   would be treated as an independent contractor.
22   Right?
23           A.   What now?
24           Q.   Your agreement provides you would be
25   treated as an independent contractor.  Correct?

Page 310

```
 1          A.   Well, yes, I think that's what it says,
 2     yeah.
 3          Q.   But you don't agree that you were from
 4     day one.  Correct?
 5          A.   I didn't feel that way.
 6          Q.   Okay.  And you felt they violated the
 7     agreement in that way from day one.  Is that right?
 8          A.   Yeah.  I mean, that's one of the things
 9     that didn't feel right about growing, the difference
10     in the growing.
11          Q.   What other ways do you think Perdue
12     breached the agreement with you?
13               MS. VAUGHN:  Object to form.
14               THE WITNESS:  Breached the agreement.
15     See, I don't know what all the agreement -- because
16     to me, giving me chickens that I can grow and make
17     them money was the goal for me.  But when I'm
18     getting lesser quality in feed, in chickens, and
19     they controlled all of that, it made it hard for me.
20     BY MS. SANTEN:
21          Q.   So do you understand in this lawsuit you
22     also claim that Perdue negligently misrepresented
23     the nature of your relationship?
24          A.   I don't understand that.
25               MS. VAUGHN:  Object to form.
```

Page 313

1    BY MS. SANTEN:

2            Q.    When do you first believe that they

3    misrepresented that you were an independent

4    contractor?

5                  MS. VAUGHN:  Object to form.

6    BY MS. SANTEN:

7            Q.    Was that day one also?

8            A.    That pretty much --

9                  MS. VAUGHN:  Object to form.

10   WITNESS CONTINUES:

11           A.    -- like I said, started, but seemingly

12   got worse than what I had experienced with other

13   integrators.  Other integrators just don't, pretty

14   much, lord over everything, you know?

15           Q.    When did that start with Perdue?  Day

16   one as well?

17           A.    Well, it went through the -- but

18   seemingly got worse, especially when I felt they

19   were starving me out at the end.

20           Q.    Well, when it did start?

21           A.    Like I said, on that part it was

22   different day one, but got worse after I found the

23   trailers that they were weighing from other growers

24   and putting it on mine.

25           Q.    That was 2015?

Page 322

1              MS. VAUGHN:  Object to form.

2    BY MS. SANTEN:

3         Q.    Things we haven't talked about to date.

4              MS. VAUGHN:  Object to form.

5              THE WITNESS:  Well, they control when

6    you get -- of course when you get birds, you start.

7    They tell you when you're going to get them.  Of

8    course that's common.  But then you -- you have to

9    have a certain amount of things done, like for the

10   PVP program or they will take that money away from

11   you.  I have never experienced that before.  And you

12   have got to have all that done prior to.

13              After you start growing they control the

14   lights.  They control the water.  I mean, how much

15   water you put into them, the level of water.  How

16   much consumption -- you know, how much pressure is

17   on the water line.  How much feed is put down.  They

18   monitor all these things, how much air comes in

19   through a side vent, how much -- how many fans you

20   can run normally at a time into the growout.

21              They control and maintain that you have

22   to have a certain airflow when the bird gets larger.

23              They control how high off the ground the

24   feed lines are, how high off the ground the water

25   lines are.  What kind of equipment you use to do

Page 323

1      that with, it has to be approved.

2                How your grass is mowed.  Bait stations.

3      And I'm sure I'm missing stuff.

4           Q.   And you believe all of those things

5      support your contention that you were an employee

6      and not an independent contractor?

7                MS. VAUGHN:  Object to form.

8                THE WITNESS:  You just asked me what

9      they controlled and what they was over.  That's some

10     of it.

11     BY MS. SANTEN:

12          Q.   In your lawsuit you say that they

13     breached the contract because they controlled

14     various things, so I'm just trying to understand

15     your claim.

16          A.   They controlled all of it.

17               MS. VAUGHN:  Object to form.

18     BY MS. SANTEN:

19          Q.   And did they control all that from the

20     beginning?

21          A.   Pretty much, yeah.  Well, like I said,

22     things progressed as the years gone by.

23          Q.   Did they control all that from the

24     beginning, what you just mentioned?

25               MS. VAUGHN:  Object to form, asked and

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 335

1    you.

2         Q.    Are you asking for money as part of this

3    lawsuit?

4         A.    I'm not -- I'm not saying that.  I'm

5    just saying I have told you the same answer four

6    times, and I'm trying to get you to see that that's

7    not my goal.

8         Q.    Well, I'm asking, are you not asking for

9    any money at all?

10        A.    This -- yeah.  I mean, I know I was done

11   wrong financially so -- I mean, that's not my

12   decision though.

13        Q.    But what are -- so what are you trying

14   to get in this lawsuit, that's what I'm asking you,

15   money?

16        A.    I want to help other farmers not go

17   through what I went through.

18        Q.    So what money are you asking for in this

19   lawsuit?

20        A.    I don't have a dollar figure, and I said

21   that.

22        Q.    Do you understand that you're seeking

23   overtime compensation as part of this lawsuit?

24        A.    It may be, but I'm not putting a number

25   on it.  I don't have that.

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 336

1              Q.    How many years do you think you should

2         get overtime compensation for?

3              A.    That's not mine to decide.

4              Q.    I'm asking.  You filed this lawsuit.

5              A.    I don't -- I don't know.  I don't know.

6              Q.    The whole time you were a grower?  Do

7         you think you were financially damaged the whole

8         time you were a grower?

9              A.    More so through the backside, but yeah.

10        I mean, it was different growing for Perdue the

11        entire time.

12             Q.    So you believe you were damaged --

13             A.    But it was worse as we were -- toward

14        the -- you know, after -- I didn't know I was -- if

15        I had to go over Perdue -- I wouldn't have said

16        anything, but I was getting somebody else's trailer

17        on my check, and I felt --

18             Q.    In 2015.

19             A.    -- and I felt they needed to know that.

20             Q.    That was 2015?

21             A.    It was in that timeframe, 2016, yeah

22        right in there.

23             Q.    And I'm asking whether you felt you are

24        financially damaged at all from 2006 to 2015 from

25        Perdue.

Page 337

1          A.   It's hard to -- you know, they -- things

2     weren't right.  I don't -- I can't understand -- I

3     don't understand damage and I don't understand

4     monetary, you know, this or that.  I just know that

5     things weren't right.

6          Q.   Okay.  So sitting here today you're not

7     able to tell me what money you're looking for from

8     this lawsuit?

9               MS. VAUGHN:  Object to form.

10              THE WITNESS:  I don't have dollar

11    figures, no.

12    BY MS. SANTEN:

13         Q.   Okay.  And sitting here today you're not

14    able to identify any other paragraph in your

15    contracts that you believe Perdue breached?

16              MS. VAUGHN:  Object to form.

17    BY MS. SANTEN:

18         Q.   And take your time.  This is not a --

19         A.   I don't -- where are we at now?  Are we

20    going back to the other thing?

21         Q.   No.  You have a breach of contract

22    claim, so I'm just trying to be sure I understand

23    every single paragraph you think Perdue breached.

24         A.   I don't have the answer to that because

25    I basically shared the story and, you know, with my

Page 338

1    attorneys, and they would have known what was
2    breached and what wasn't breached, not me.  I mean,
3    I don't know all that.
4            Q.   Well, then let's go in here.  Did you
5    review this complaint before it was filed?
6            A.   Yes, ma'am.
7            Q.   Okay.  So let's go back to the paragraph
8    of breach of contract just to make sure I understand
9    it all.
10           A.   But understanding everything a lawyer
11   wrote is different than reading something.
12           Q.   This was filed on your behalf, sir, so
13   I'm just trying to understand.
14           A.   I understand that.
15           Q.   Okay.  So we talked about 114.  We
16   talked about 115.  Do you believe that --
17           A.   114.
18           Q.   Okay.  So you say:  "Perdue, in breach
19   of the contract" -- this is paragraph 117 -- "Perdue
20   refused to provide Parker with accurate information
21   used to determine his compensation."  When did that
22   first happen?
23           A.   Let's see.  Now, 114, is that what you
24   said?
25           Q.   117.

Page 339

1          A.   Oh.  My bad.

2          Q.   "In breach of the contract, Perdue

3     refused to provide Parker with accurate information

4     used to determine Parker's compensation."  When did

5     that first happen?

6          A.   Yeah.  The pay seemed to be off.  And I

7     requested -- because the system they have, it is

8     impossible almost for a grower to figure because

9     you're going between feed, you're going between

10    amount of birds you get, and you're going between

11    type birds you get.  And then, you know, how many

12    days you grow versus someone else, but you're

13    supposed to compete with someone else and you get

14    money taken away from you.  And I -- I have tried to

15    get an understanding of how everything worked and

16    requested that I get information that I could figure

17    myself.

18         Q.   When did you first request that

19    information?

20         A.   That was -- Lord, that was probably in

21    2017, 2016, just guessing.

22         Q.   And so you believe the first time you

23    requested that information was 2017 or 2016, and

24    Perdue didn't give it to you.  Is that right?

25         A.   Well, they even -- they tried but it

Page 340

1    was -- it wasn't -- they couldn't because there was

2    too many factors.

3            Q.    My question is, was that the first time

4    that happened?  You have here that you believe they

5    breached the contract -- and I'm just right in your

6    complaint -- when they refused to provide you with

7    accurate information.  Is the first time that

8    happened 2016 or 2017?

9                MS. VAUGHN:  Object to form.

10               THE WITNESS:  It's in that timeframe.  I

11   just don't know when.  But if they couldn't show me

12   how to do it, how do they do it was my question.

13   BY MS. SANTEN:

14           Q.    Do you believe that Perdue breached the

15   contracts when allowing flock advisors to come onto

16   your farm?

17           A.    No.

18           Q.    Okay.  You indicate here that Perdue

19   didn't provide you with sufficient inputs for

20   raising chickens.  When do you believe that started?

21           A.    Say that again now.  They wouldn't --

22           Q.    Wouldn't provide you with sufficient

23   inputs for raising chickens.  When do you believe

24   that started?

25           A.    Inputs.  What number are we looking at?

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 341

1              Q.    118.
2              A.    Well, that would be feed.  Birds.  Let
3       me think.  2000 -- when I started noticing things,
4       2016-ish.  I'm just -- I'm just guessing that
5       timeframe, really, because I don't really know the
6       exact date.
7              Q.    And is it your testimony that before
8       2016 Perdue provided sufficient inputs for you at
9       all times?
10             A.    Do what now?
11             Q.    Do you believe, prior to 2016, Perdue
12      did provide sufficient inputs to you at all times?
13             A.    I really don't know.  I don't know how
14      to -- it's just when I started realizing -- you
15      know, when I saw it, feed that they said was there
16      wasn't there.  You know, I can't -- it's just --
17      it's just things I started noticing.
18             Q.    And do you believe Perdue subjected you
19      to mandatory guidelines the entire time you were a
20      grower?
21             A.    I mean, yeah, the guidelines were
22      mandatory.  I don't think they were optional.
23             Q.    Okay.  And that started in 2006?
24             A.    Yes, ma'am.
25             Q.    Okay.  So in paragraph 119 you say:  "As

Page 342

1    a result of Perdue's breach of the Producer

2    Agreement, Parker has lost money and property,

3    including but not limited to benefits of employment

4    and capital outlays that Parker made that Perdue,

5    had it properly operated as his employer, would

6    otherwise be required to pay."

7                I'm trying to determine what money

8    you're seeking here.

9          A.    It's not that I'm seeking funds.  It's

10   life.  They have taken away my life, in general.

11   Because of the pressures that I had, it led up to

12   many things in my life.

13               And my -- you know, when I reported to

14   USDA I didn't know I was making them so mad, really,

15   and I --

16         Q.    My question was, what money are you

17   seeking?

18         A.    Well, let me finish.  They -- they --

19         Q.    You need to respond to my question.

20   What money are you seeking?

21         A.    I can't answer it?

22         Q.    You can answer and then you can explain.

23         A.    They -- they have taken my very life --

24         Q.    What money are you seeking?  And then

25   you can explain that.

Page 343

1        A.    -- away from me, and I'm trying to
2    explain how they did it.
3        Q.    Well, what money are you seeking, and
4    then you're welcome to explain your answer.
5        A.    I'm not seeking a dollar figure, and I
6    have said that.
7        Q.    Okay.  Thank you.
8        A.    And they went on to put pressure on me
9    in every way that led to a stressful life.  In 2018,
10   after being married forty years, got the best of --
11   in my opinion, got the best of that.  That year my
12   son had to move out, and he committed suicide.
13       Q.    I'm sorry to hear that.
14       A.    I went through -- Perdue put me through
15   the ringers after I called the USDA.  They took my
16   life away from me --
17       Q.    Sir, I understand.  I'm asking --
18       A.    -- in every way.
19       Q.    -- what money -- I'm asking what money
20   you're seeking from them.
21       A.    I'm not --
22       Q.    This might be the only time we talk.
23       A.    You keep interrupting me.  And I told
24   you I'm not seeking money.  You keep asking.
25       Q.    Okay.  Okay.  I will move on.

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 344

1          A.   Let me finish.

2          Q.   That's fine.

3          A.   Let me finish.

4          Q.   I appreciate your response.

5               MS. VAUGHN:  Let her finish.

6     BY MS. SANTEN:

7          Q.   I appreciate your response.

8               We talked last time about a bankruptcy

9     that you had filed.  Since your last deposition have

10    you tried to amend your bankruptcy petition at all?

11         A.   Since my last petition?

12         Q.   Since your last deposition.

13         A.   No.

14         Q.   Okay.  I think I just have a few more

15    things.

16              MS. VAUGHN:  We have been going a little

17    over an hour.  Would now be a good time for quick

18    break?

19              MS. SANTEN:  Sure.  That's fine.

20              THE VIDEOGRAPHER:  The time on camera is

21    approximately 11:11.  We are off the record.

22    (Break In Proceedings)

23              THE VIDEOGRAPHER:  The time on camera is

24    approximately 11:27 a.m.  We are back on the record.

25              Counsel, you may proceed.

Page 345

1    BY MS. SANTEN:

2          Q.    Okay, Mr. Parker.  We are back from a

3    short break.  Do you understand you're still under

4    oath?

5          A.    Yes, ma'am.

6          Q.    Okay.  Is there anything in your

7    testimony from prior to the break that you need to

8    clarify or change?

9          A.    Well, I was giving thought to one thing.

10   I guess -- well, not guess.  I am seeking, you know,

11   something out of this.  I just can't -- I mean, I

12   don't know what you put a number on -- how you put a

13   number on what I have gone through.  And -- well,

14   it's not mine to do anyway.

15         Q.    Well, when -- what time period do you

16   think Perdue owes you money for?

17         A.    Well, I don't -- I don't quite know how

18   to answer that, because you have got factors there

19   on independent contractor versus when they got upset

20   with me and did away with me; you know, not putting

21   birds back, telling me -- but, you know, I don't --

22   I really don't have an answer to that.

23         Q.    So you don't know what -- I mean, you

24   just clarified, after a break, that you are seeking

25   money.  I'm asking, what financial damage did

Page 356

```
1              MS. SANTEN:  Objection, vague.
2              THE WITNESS:  No.  I wasn't told that
3      directly, no.
4      BY MS. VAUGHN:
5         Q.   And at the time you were entering
6      contracts with Perdue, when they presented these
7      contracts to you, did anyone at Perdue ever tell you
8      that they would impose additional requirements on
9      you if you raised questions about the tare weights?
10        A.   No.
11             MS. SANTEN:  Objection, vague.
12     BY MS. VAUGHN:
13        Q.   At the time that Perdue presented you
14     with these contracts to have you sign them, did
15     anyone at Perdue ever tell you that they would give
16     you lesser inputs if you called the USDA with
17     questions about Perdue?
18             MS. SANTEN:  Objection, vague.
19             THE WITNESS:  Yes.
20     BY MS. VAUGHN:
21        Q.   Someone did tell you that?
22        A.   Yes.
23        Q.   Who told you that?
24        A.   James North.
25        Q.   Did he tell you that at the time you
```

Page 357

1      were signing these agreements?

2              A.    No.

3              Q.    Did he tell you that after you signed

4      the agreement?

5              A.    Yeah.  Yeah, I wouldn't sign an

6      agreement the day he told me that.

7              Q.    And did he tell you that after you had

8      called USDA?

9              A.    Yes.  Well, he suggested I call USDA,

10     and then I did.

11             Q.    And at the time that you signed these

12     agreements you looked over in Exhibit 23, though, at

13     the time you were looking at these and filling them

14     out did anyone at Perdue inform you at that time

15     that if you called USDA, Perdue would give you

16     lesser inputs?

17             A.    No.

18             Q.    Did anyone -- at the time that you were

19     presented with these agreements and signed them, did

20     anyone at Perdue tell you at that time that they

21     would put additional requirements on you if you

22     called USDA about Perdue?

23                  MS. SANTEN:  Objection, vague.

24                  THE WITNESS:  When I signed this, no.

25     BY MS. VAUGHN:

Page 358

1          Q.    How about when you signed the one in
2     2016, did anyone tell you at that time?
3                MS. SANTEN:   Same objection.
4                THE WITNESS:   No.   No.   I wasn't told
5     that on any signing of contracts.
6     BY MS. VAUGHN:
7          Q.    All right.   Ms. Santen asked you
8     specifically, too, about section IIA on these
9     contracts.   Do you see section II, Producer Agrees,
10    on the page that's the Bates Perdue 2453?
11         A.    Yes.
12         Q.    All right.   And look at paragraph IIB
13    there.   Do you see paragraph IIB?
14         A.    IIB.   Okay.
15         Q.    And do you see where it says:   "To feed,
16    water, care for and otherwise manage the chicks
17    consigned and to provide the necessary housing,
18    equipment, supplies to maintain equipment and
19    housing, utilities and labor and to maintain such
20    housing and equipment in a state of good repair and
21    operable condition," do you see that there?
22         A.    I do.
23         Q.    Did this contract tell you that Perdue
24    would have specific upgrades and equipment it wanted
25    you to use in your houses?

Page 359

1              MS. SANTEN:  Object to form.

2              THE WITNESS:  No, it had no specifics.

3        BY MS. VAUGHN:

4              Q.   And at the time that you signed this

5        agreement, in 2007 when Perdue presented this

6        agreement to you, did they also tell you all of the

7        specific upgrades and equipment they would require

8        you to have over the years?

9              A.   No.

10             Q.   How about when you signed the agreement

11       in 2014, when they gave that agreement to you at

12       that time did they give you a list of the specific

13       upgrades and equipment that they would require you

14       to have over the years?

15             A.   No.

16             Q.   How about when you signed the 2016

17       agreement, did they give you, at that time when they

18       presented that contract, a list of the specific

19       upgrades and equipment they would require you to

20       have over the years?

21             MS. SANTEN:  Objection, vague.

22             THE WITNESS:  Not when getting the

23       contract.

24       BY MS. VAUGHN:

25             Q.   All right.  Turn to --

Page 360

```
 1              THE COURT REPORTER:  I'm sorry.  Can you
 2      say your answer again?
 3              THE WITNESS:  Not when getting the
 4      contract.  Sorry.
 5      BY MS. VAUGHN:
 6          Q.   And were the specific upgrades and
 7      requirements more than you had expected when you
 8      signed the contract?
 9              MS. SANTEN:  Objection, vague.
10              THE WITNESS:  They was continually
11      adding things to do.  But no, I didn't expect it,
12      no.
13      BY MS. VAUGHN:
14          Q.   And when you say they were continually
15      adding things, were you referring to upgrades and
16      equipment they wanted you to have?
17          A.   Yes.
18          Q.   And when you say they were continually
19      adding things, was that over the course of your
20      relationship with Perdue or just in a specific time
21      period?
22          A.   No.  It started a couple months after I
23      bought the first farm.  Then they immediately had
24      to -- had to put in the cool cells and stuff.
25          Q.   How about after you called USDA, did the
```

Page 361

1     upgrades and equipment that they were requiring

2     change after that point?

3          A.    After USDA the -- they had given me a

4     quite extensive list of things they wanted done.

5          Q.    And was that list consistent with your

6     expectations on what they would require based on

7     your prior work with them, or was it different?

8                MS. SANTEN:  Objection, vague.

9                THE WITNESS:  No.  It was a good bit

10    different.

11    BY MS. VAUGHN:

12         Q.    In what way?

13         A.    It was thousands of dollars of stuff

14    that all of a sudden they wanted done.  And, you

15    know, and instead of normally allowing you time to

16    do that, I had no time.

17    BY MS. VAUGHN:

18         Q.    Let's turn to -- in this contract still

19    in Exhibit 23 from May 2007, if you could turn,

20    Mr. Parker, to the second page which, at the bottom,

21    says 2454.

22         A.    2454?

23         Q.    Uh-huh.

24         A.    Okay.  These are turned upside down.

25         Q.    It's in the same contract we were just

Page 362

1    in.

2            A.    Okay.  My bad.  2454.

3            Q.    The second page.

4            A.    Okay.  I thought we were changing

5    contracts.  Okay.  My bad.

6            Q.    All right.  And do you see the section

7    III there at the bottom that says "Other Terms"?

8            A.    Yes, ma'am.

9            Q.    All right.  And do you see letter A

10   under section III?

11           A.    Yes, ma'am.

12           Q.    Do you see where it says:  "Producer

13   shall perform the services hereunder using Perdue's

14   established procedures?"  Do you see that there?

15           A.    I do.

16           Q.    Now, at the time that you were given

17   this contract to sign were all of Perdue's

18   procedures laid out in this contract?

19           A.    I'm trying to think.  I don't think so.

20   I don't see that.

21           Q.    For example, did Perdue tell you the

22   specific temperature you had to keep your houses on?

23           A.    That was a continual change, different

24   temperatures, and every time -- yeah, that would

25   change all the time.

Page 363

1          Q.   And at the time you signed your first
2     contract with Perdue when they presented this
3     contract to you, did you expect that Perdue would
4     tell you specifically what sort of temperature, what
5     sort of lighting and things you had to have in your
6     houses?
7          A.   I never experienced that before, no.
8          Q.   And all of the requirements that Perdue
9     put on you, were they in other documents that Perdue
10    gave you over the years?
11         A.   Say at that again, please.
12         Q.   All the requirements that Perdue put on
13    you, were they in other documents that Perdue gave
14    you over the years?
15              MS. SANTEN:  Objection, vague.
16              THE WITNESS:  I don't -- I don't know.
17    I don't -- I don't think so.  I think the contracts
18    were different than -- they didn't really have some
19    of the things in it that they required.
20    BY MS. VAUGHN:
21         Q.   The contracts didn't have some of the
22    requirements in them?
23         A.   Right.
24         Q.   So when -- strike that.
25              Were there documents called, like,

Page 364

1      "never dos" and "always dos"?

2              A.    Yeah.  I think there were three of

3      those, never do, sometimes, and -- there was three

4      of them, anyway, and I can't remember them.

5              Q.    And did those documents have additional

6      requirements you had to follow under Perdue?

7                    MS. SANTEN:  Objection, vague.

8                    THE WITNESS:  Yeah.  I would have to

9      look at those again to -- to remember exactly what

10     they were.  But I do remember that was -- they had a

11     list of never dos, you know, and I remember that

12     list.

13     BY MS. VAUGHN:

14             Q.    And those lists, the never dos, that's

15     different from the contract you signed?

16                   MS. SANTEN:  Objection, vague.

17                   THE WITNESS:  It is.

18     BY MS. VAUGHN:

19             Q.    How about bio-security rules?  Did the

20     contracts lay out all of the specific bio-security

21     rules you had to follow?

22             A.    No.

23             Q.    Were those given to you in other

24     documents?

25             A.    Yeah.

Page 365

1          Q.   And were those more extensive than you

2     expected based on the contract?

3               MS. SANTEN:   Objection, vague.

4               THE WITNESS:   Yes, they were.   They -- I

5     never expected I couldn't have a hummingbird feeder

6     or anything like that.   You know, never could go to

7     the store a certain time of year.

8     BY MS. VAUGHN:

9          Q.   And did the requirements, over the

10    course of your relationship with Perdue, change over

11    time?

12         A.   Yes.

13         Q.   Did they stay about the same or did they

14    become more onerous?

15              MS. SANTEN:   Objection, asked and

16    answered.

17              THE WITNESS:   Through the years they

18    progressively got more and more demanding on their

19    requirements and things, as I testified earlier.   A

20    lot of -- a lot of -- I mean, a lot of on-hands.   It

21    was hard to keep up with sometimes.

22    BY MS. VAUGHN:

23         Q.   And Ms. Santen showed you a contract

24    that you signed in December 2016 for your

25    Milledgeville farm.   That's the document with the

Page 366

1       Exhibit 4 sticker at the bottom.

2               A.    Okay.   4 sticker?  Yeah, I see it now

3       right here.   Okay.

4               Q.    When you're talking about the

5       requirements becoming more and more over time, did

6       that trend continue after you signed this 2016

7       agreement?

8               A.    Yeah, it seemed to.  Well, these

9       contracts were coming at us numerous times.  You

10      know, sometimes it felt back to back to back, this

11      or the one agreement that we had like on each bird

12      size and had an agreement for each bird size and

13      everything like that.  We were continually being

14      given stuff, basically just sign it, you know, and

15      you give it back to them.

16              Q.    How about after you called USDA, did the

17      requirements on you change in any way after that?

18              MS. SANTEN:   Objection, asked and

19      answered.

20              THE WITNESS:   Yeah, things were

21      different.  I mean, definitely different after that.

22      BY MS. VAUGHN:

23              Q.    In what way?

24              A.    Well, I went from -- I was noticing more

25      of the seemingly -- you know, finding more of the

Page 367

1    trailers that were supposed to be on another farm,

2    in my farm, in some of those times.

3              After that they gave me -- basically

4    gave me the guy that was considered to be the

5    hitman.  But when I had him, all of a sudden I was

6    getting not just a field man, but I was having

7    somebody come take photos and do things that I have

8    never seen before.

9         Q.   After you called USDA did Perdue also

10   put new requirements on you as far as how you

11   maintain your chicken farm and raise the chickens?

12             MS. SANTEN:  Objection to form.

13             THE WITNESS:  Say that again now.  I'm

14   trying understand.

15   BY MS. VAUGHN:

16        Q.   After -- after you called USDA did you

17   also start to get new requirements from Perdue

18   related to the maintenance of your chicken farm and

19   raising chickens?

20        A.   Yeah.  I mean, I had a list of things

21   that they were basically demanding.  And I had --

22   all of a sudden they went from helping the farmer to

23   rejecting being able to help me.

24        Q.   Let's take a look at what Ms. Santen

25   showed you in Exhibit 22.  I have a couple followups

Page 368

1    there.

2              A.    Exhibit 22.  Okay.  Thank you.

3              Q.    And it looks like there's two stapled

4    packets in Exhibit 22.  Is that what you have, two

5    different stapled packets?

6              A.    Statement?  That one?

7              Q.    Yes.  Okay.

8              So let's talk about the one that has the

9    Bates number at the bottom Parker 2551.

10             A.    Okay.

11             Q.    Do you see that one?

12             A.    Yes, ma'am.

13             Q.    All right.  And does this appear to be a

14    letter from Kathryn Mizell to you?

15             A.    It does.

16             Q.    And who was Kathryn Mizell?

17             A.    She was, like, over the flock

18    supervisors.  She was like a superintendent.

19             Q.    Okay.  And do you see here that this is

20    dated October 16, 2018?

21             A.    Yes.

22             Q.    Okay.  That's toward the end of your

23    time growing for Perdue?

24             A.    It was.

25             Q.    All right.  And about halfway down the

Page 369

1    page Ms. Mizell says:  "To be compliant with the

2    Poultry Producer Agreement, you need to complete the

3    following prior to the next placement is scheduled."

4    Do you see that?

5         A.   Yes.

6         Q.   All right.  And do you see a numbered

7    list there?

8         A.   I do.

9         Q.   So something like number 4:  "All

10   propane tanks are 70% full," is that a requirement

11   that Ms. Mizell put on you in 2018?

12        A.   Yes.  I had never seen that before.

13        Q.   That was a new requirement?

14        A.   It was.

15        Q.   All right.  You can put that aside.

16             All right.  Going back for a moment to

17   Exhibit 23, and back to this December 2016 contract

18   with the Exhibit 4 sticker on the bottom --

19        A.   Okay.

20        Q.   -- and that's Bates Perdue 2295.  Are

21   you there?

22        A.   Yes.

23        Q.   Okay.  Turn to the third page in this

24   agreement from 2016.  And at the top there is a

25   letter N.  Do you see that on the Bates 2297?

Page 370

```
 1            A.   Yes.
 2            Q.   And it says:  "To comply with any
 3     bio-security policies, audits, measures or
 4     guidelines required by Perdue."  Do you see that?
 5            A.   Yes.
 6            Q.   So at the time you were presented with
 7     this agreement in 2016 -- in December of 2016 to
 8     sign, did this agreement also include all of the
 9     bio-security policies, audits, measures or
10     guidelines you would be subject to?
11                 MS. SANTEN:  Objection.  The document
12     speaks for itself.  Vague.
13                 THE WITNESS:  They had a separate
14     bio-security policies pack, if I remember right.
15     Yeah.
16     BY MS. VAUGHN:
17            Q.   And did they inform you about all of
18     those bio-security policies at the time you signed
19     this on December 16, 2016?
20            A.   No.  They -- they were continually
21     changing.
22            Q.   All right.  You can put that aside.
23                 Ms. Santen asked you several questions
24     about when you thought the inputs were changed that
25     you were given by Perdue.  Do you remember those
```

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

Page 371

1    questions?

2          A.    "Inputs" meaning --

3          Q.    The feed, the medications.

4          A.    Okay.

5          Q.    The birds.  Do you remember those

6    questions?

7          A.    Yes.

8          Q.    At some point did you receive feed from

9    Perdue that had concrete chunks in it?

10         A.    I did.

11         Q.    And was that before or after you called

12   USDA?

13         A.    It was after.  If my memory serves me

14   right, I'm pretty sure.  Oh, yeah, it was after.

15         Q.    And in response to Ms. Santen's

16   questions about what your legal claims are in this

17   case, you noted that you're not a lawyer, so I want

18   to follow up on that for a minute.  Do you know the

19   legal definition of "negligent misrepresentation"?

20         A.    No.

21         Q.    So can you answer a question of when

22   Perdue may have legally negligently misrepresented

23   something?

24         A.    Well, not really.  I don't understand

25   the indepth of that.  I don't quite understand it.

Page 372

1          Q.   Do you know the legal definition of
2     "independent contractor" or -- do you know the legal
3     definition of "independent contractor"?
4          A.   Not legal, no.
5          Q.   Do you know the legal definition of an
6     employee?
7          A.   Not legally.
8          Q.   So can you answer a question of whether,
9     under the law, you were properly classified as an
10    independent contractor?
11              MS. SANTEN:   Object to form.
12              THE WITNESS:   No.
13    BY MS. VAUGHN:
14          Q.   Ms. Santen asked you if you had stated
15    in your deposition, today and yesterday, all of the
16    allegations that support your claims.  Do you
17    remember those questions?
18          A.   I do.
19          Q.   Mr. Parker, are you aware that the
20    parties have exchanged lots of documents in this
21    case?
22          A.   No.  But I'm assuming they did, but I
23    don't know what they are.
24          Q.   Have you reviewed some documents in this
25    case?

30(b)(6) Roger Dale Parker , Vol. II                     April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 373

1            A.    Yeah.

2            Q.    Are you aware that there are things like

3       emails and text messages?

4            A.    Yeah, I'm sure there were.

5            Q.    And are you aware that there are

6       documents like your settlement sheets?

7            A.    Yes.

8            Q.    And do documents like that that you have

9       reviewed, do they also support all the allegations

10      that support -- excuse me.  Do they also support

11      your claims?

12                 MS. SANTEN:  Objection, vague.  Please

13      answer this question.  You're just putting words in

14      his mouth.

15                 THE COURT REPORTER:  I didn't get his

16      answer.

17                 THE WITNESS:  I'm sorry.  Which one?

18      BY MS. VAUGHN:

19           Q.    The documents that you have reviewed in

20      this case, are they also documents that you believe

21      support your allegations in this case?

22           A.    Yes.

23                 MS. SANTEN:  Same objection.

24                 THE WITNESS:  Yes.

25      BY MS. VAUGHN:

30(b)(6) Roger Dale Parker , Vol. II                April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 374

1            Q.   Ms. Santen asked you about money or
2      financial damage that you suffered by Perdue.  Do
3      you remember those questions?
4            A.   Say that again.  I'm sorry.
5            Q.   Ms. Santen asked you about financial
6      damages you suffered from Perdue.  Do you remember
7      those questions?
8            A.   Yes.
9            Q.   At some point did Perdue tell you they
10     wouldn't place any more chickens on your farm?
11           A.   They did.
12           Q.   And at some point did Perdue also give
13     you a list of requirements for you to be able to
14     sell your farm?
15           A.   Yes.
16           Q.   Were you able to sell your farm if
17     Perdue refused to give the buyer a contract?
18           A.   On the other one, yeah.
19                I'm sorry.  Say that one more time.
20           Q.   Were you able to sell your farm if
21     Perdue refused to give the buyer a contract?
22           A.   Yes.
23           Q.   You were able --
24           A.   No, I wasn't.
25           Q.   -- to sell your farm?

30(b)(6) Roger Dale Parker , Vol. II                    April 24, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 375

1           A.   No, I was not able to sell it unless I
2    had a contract.
3           Q.   And what happened to the Milledgeville
4    farm when you didn't have a contract on it?
5           A.   Well, are you talking about to sell it
6    or --
7           Q.   Yeah.
8           A.   I had to have a contract with Perdue, or
9    the houses are really worthless without a working
10   contract.
11          Q.   And did you try to sell it?
12          A.   I did.
13          Q.   Were you able to?
14          A.   No.  The upgrades that were required by
15   them -- actually, the realtor told me he had never
16   seen a list like it before.  But it was so
17   indepth -- if I remember, the quote was almost a
18   half million dollars, and they would not even
19   guarantee that.  Said it would be higher.  That was
20   a starting point for everything that was on the
21   list.
22          Q.   All right.  And I want to ask you some
23   things about what Ms. Santen asked you yesterday.
24               So first, Ms. Santen asked you early
25   yesterday about some things you did to prepare for

Page 392

1          Q.   Did you have some kind of

2     decontamination pans at the doors to your chicken

3     farms?

4          A.   I did.

5          Q.   Was there any work you had to do related

6     to those when you had chickens?

7          A.   You had to clean them once a week and

8     put fresh stuff in them.  It was a white powder that

9     you bought from Perdue to put in it, or they

10    supplied, I can't remember which.  But we got it

11    from them.  And you would -- every chicken house

12    door you had to step in it.  And then you had to

13    have one going into the chicken house and coming out

14    of the control room.  So you had two per house.

15         Q.   So how much time each week would you

16    spend doing things related to those decontamination

17    pans?

18         A.   I had -- it would take probably, you

19    know, thirty minutes a house, sometimes -- I mean,

20    you know, it's according to --

21         Q.   Once a week?

22         A.   Yeah.  Yeah.

23         Q.   And did you have to do anything related

24    to your generator when you had chickens?

25         A.   Yeah.  You had to -- it was mandatory to

Page 393

1   do a weekly log.  It was mandatory that the

2   generator run weekly.  And you had to visually

3   inspect the generator running weekly for thirty

4   minutes.  And, you know, and then -- and then log

5   that to make sure -- you needed to make sure it ran

6   and make sure that you logged the meter time on --

7   they had a checklist.

8           Q.   And about how much time would you spend

9   doing that every week when you had chickens?

10          A.   It would take -- usually take an hour or

11  so to go through the -- you know, sometimes longer.

12               And sometimes you had -- I mean, you had

13  to do maintenance on the generator too, so you had

14  to change belts.  Just like a chicken house, you had

15  to go through and do everything to the generator to

16  keep it going.  The fuel level, I had to go buy

17  fuel, put fuel in the fuel tank.  It held

18  500 gallons.

19          Q.   And all the tasks you went through with

20  Ms. Santen and me, were those all done to meet

21  Perdue's requirements?

22          A.   Yes.

23          Q.   Were there any tasks that you walked us

24  through that you just did of your own accord,

25  separate from anything Perdue told you?

Page 405

1    inputs that we are talking about.  And demands were

2    all of a sudden escalated and, you know, things all

3    the way across, growing for them, seemed to

4    multiply.

5            Q.    Okay.  And is it your testimony that you

6    were never subject to those inputs or demands before

7    this time period?

8            A.    No.  Not this way, no.

9            Q.    Okay.  What additional requirements did

10   Perdue put on you after you called USDA?

11           A.    Like I said, I have all these upgrades.

12   I have got things to -- you know, all of a sudden I

13   went from being able to -- they would give -- when a

14   farmer, instead of the bird suffering, they would

15   help farmers by giving them interest-free loans and

16   help them put in water lines and feed lines.  But

17   all of a sudden that was cut off after telling me

18   that -- telling me that I could have it.

19                I wasn't treated as other farmers were

20   treated with that.

21                And the excuse was I didn't put in my

22   water lines, when I did put in my water lines.  I

23   just couldn't afford a $6,000 bill.

24                But prior to that it wasn't that.  It

25   was until I paid the loan off.  So those things --

Page 406

```
 1          Q.   Okay.  So other than water lines, what
 2     else?
 3          A.   So those things.  The general oversight
 4     was higher.  The field man was on me more.  He is
 5     taking pictures that I have never seen done before.
 6          Q.   Are you aware of the field man taking
 7     pictures of any other grower?
 8          A.   No.
 9          Q.   Do you know, one way or the other,
10     whether he took pictures of any other grower?
11          A.   I have never had a field man take
12     pictures at my house.
13          Q.   Do you know of the amount of oversight
14     he was exercising over other growers?
15          A.   I don't know about other growers.
16          Q.   All right.  What else?
17          A.   I don't know.  It was obvious that I was
18     being, in my opinion, run out of business.  I had --
19          Q.   I'm asking you what specific things you
20     were subject to that other growers were not.
21               MS. VAUGHN:  Object to form.
22               THE WITNESS:  That I was -- I just went
23     through a few of them.
24     BY MS. SANTEN:
25          Q.   Anything else?
```