# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

MACON DIVISION

| | |
|---|---|
| ROGER PARKER,<br><br>*Plaintiff*,<br><br>v.<br><br><br><br>PERDUE FOODS, LLC,<br><br>*Defendant*. | Case No. 5:22-cv-00268-TES |

### DECLARATION OF ROGER DALE PARKER

I, Roger Dale Parker, declare as follows:

1. I worked raising chickens on behalf of poultry companies for most of my life. For approximately 13 years, I worked as a grower for Perdue.

2. During the time I worked for Perdue, Perdue characterized me in my contracts with them as an independent contractor and paid me using IRS Form 1099s.

3. Before I started working for Perdue in 2006, I was previously a grower two other integrators, ConAgra and Seaboard. These integrators had policies and procedures applicable to my work. Both were similar in the freedom they provided me to grow chickens using my own judgment and experience.

1

4. When I signed my first contract with Perdue, I understood it had policies and procedures for biosecurity and other growing guidelines. Perdue did not provide the specific policies and procedures before I signed the contract, and it represented that I would be an independent contractor and free to use my own knowledge and judgment to grow birds. Based on these representations and my experiences with ConAgra and Seaboard, I expected Perdue's policies and procedures to be similar in how they applied to my work in that I still expected to use my independent judgment, skill, and experience.

5. After I started to grow for Perdue under the contract, however, Perdue controlled my work so much that I did not have the independence to grow chickens based on my own skill or judgment.

6. In addition, Perdue had not represented to me that its policies and procedures could change repeatedly and without warning, and on the whims of its managers, but they did.

7. This control differed from my prior experiences in several ways, including, but not limited to:

    a. Perdue's flock supervisors visited me at least once a week during a flock and gave me detailed instructions on things to do. ConAgra and Seaboard's flock advisors only visited approximately once per month and did not give me any detailed instructions.

    b. Perdue specified specific heights at which I needed to set my drinker and feeder lines. ConAgra and Seaboard let me determine when and how to set my feeder and drinker line height based on what I perceived the birds needed to reach it.

    c. Perdue specified the specific temperatures at which my houses had to be set and when. ConAgra and Seaboard allowed me to decide when to take steps to change the temperature in the houses by, for example, closing curtains and running fans.

    d.  Perdue tied particular upgrades to any opportunity to receive more pay. ConAgra and Seaboard did not do this.

    e.  Perdue limited who could visit my farm. ConAgra and Seaboard did not.

    f.  Perdue prohibited me from installing hummingbird feeders for my mother living on the farm. ConAgra and Seaboard never limited my ability to have things like bird feeders.

    g.  Perdue prohibited me from visiting Tractor Supply, a farm equipment store, if the store was selling chickens at the time. ConAgra and Seaboard never limited my ability to visit particular stores.

  8.  Perdue required that I perform various tasks as part of my contract, both when flocks were present on the farm as well as when flocks were not present. None were presented as optional.

  9.  My supervisors also would inform me of tasks and improvements to my facilities that Perdue required. My supervisors informed me of these obligations as if they were mandatory not optional.

  10.  I needed to check on the birds multiple times every day and dispose of the dead ones.

  11.  I checked and replaced rat bait and decontamination pans.

  12.  I also needed to follow Perdue's requirements for specifications such as lighting, fans, vents, tunnel machines, front curtains, temperatures, water consumption, timing for feed lines, feed control, and heaters. I would be at my computer every day and needed to change computer settings frequently to make sure they were set to Perdue's requirements.

  13.  Some of the tasks that I would do when flocks were present included repairing feed lines, water lines, feed trays, feed bins, and strings and cables for vents and feed lines;

administrative tasks, like logging generator checks and bird culls; and regular maintenance and installations, like changing the belts and replacing fuel on the generator.

14. Many of the tasks that I had to do for Perdue was work that I did when there were no flocks on the farm. This included tasks like windrowing and removing caked litter, clearing feeder pans, disinfecting houses, applying insecticide, applying PLT, cutting grass, setting up divider panels, flushing water lines, blowing off or washing ceiling dust, exterminating darkened beetles, reassembling feed lines, dredging the driveway, and other equipment maintenance and tasks, fill approximately 12 feed boxes per chicken house to provide an added source of feed in addition to the feedlines.

15. I did these tasks until my relationship with Perdue ended in September 2019.

16. I worked around 60 hours a week for Perdue.

17. Some of the work I was required to do for Perdue, and an estimate of how long each task took, is listed in Attachment 1.

18. While some of my expenses to fulfill my responsibilities as a grower were taken directly out of my settlements by Perdue, I had to pay for propane and electricity out of pocket.

19. In the summer, my propane bills could be, at minimum, hundreds of dollars per flock, and in the winter, could be thousands of dollars. In 2016, I had to take a loan from Perdue of more than $4,700 to help pay off propane bills. In 2019, I paid over $20,000 to the propane vendor.

20. In the summer, my electricity bill could be thousands of dollars per month and in the winter they could be hundreds of dollars per month.

21. After I had a water line installed to connect my farm to city water (I previously used well water), I had a water bill that was approximately $6,000, versus the free well water. Because

Perdue did not require me to use a particular source of water, but only to have two sources available, I went back to using well water.

22. Perdue shared with me that I was a good grower before I signed my last PPA in 2016. I was even a top 10 producer, for which Perdue presented me with an award.

23. For approximately one year when I had a Perdue contract, I worked as a manager for a quail company with permission from Perdue. This was early in my time working for Perdue and not while I worked at the Milledgeville farm full-time after the December 2016 PPA or at any of my other farms full-time.

24. While I had my other Hillsboro farm, I had some cows on that farm that I sold. It did not require a lot of labor or time. This was only until 2013.

25. When I was operating Parker's Poultry Equipment, I hired people to do the work and only handled bids and invoicing. It did not take away from working on my chicken farms for Perdue full-time.

26. Beginning in or around 2015, I noticed what I believed to be mistakes in how Perdue weighed the chickens I grew, specifically that Perdue was mixing up the trucks carrying various growers' birds so that particular flocks' weights were attributed to the wrong grower. The weight of the chickens was a central part of how Perdue calculated pay. I raised my concern to Perdue for the first time in 2015 or 2016.

27. The tare weight tickets were supposed to track the truck numbers assigned to each grower.

28. In 2017, after an especially egregious error, I called the USDA on the suggestion of Perdue employee Kathryn Mizell.

29.     I also contacted the Small Business Association hotline in 2017 and told them about the pressures and control that Perdue was putting on me and that if nothing changed, Perdue would run me out of business. The individual I spoke to said that I was not the first grower to tell them this.

30.     When I noticed the errors, I asked Perdue to give me the data to determine what went wrong. Perdue did not give me the tare weight tickets to evaluate the errors.

31.     Beginning from the time I first raised the weight concerns, and escalating after I called USDA, Perdue increased its control and scrutiny of me even beyond what it had been. Perdue began to take steps to ensure I could no longer grow for Perdue.

32.     Perdue only ever represented that its management of me would be determined by policies and procedures, and none of the policies and procedures it provided indicated that any of the requirements were conditioned on forgoing calling USDA with concerns. Perdue represented that it would provide necessary inputs, such as feed and chicks, and did not disclose that its provision of these items would turn on whether I called USDA.

33.     After I reported to USDA, Dan Roberts, another Perdue supervisor, told me not to bid on a new project for Perdue with Parker's Poultry Equipment. After that the construction work dried up and I was removed from the preferred vendor list. In my experience growing for Perdue, growers understand from Perdue that they can only use vendors on the list.

34.     After I contacted USDA in 2017, Perdue denied me further loans and lines of credit.

35.     On December 15, 2017, I recorded a conversation I had with my Perdue Flock Advisor James Norris. He told me that Perdue was upset about my contact with the USDA and told me about another former grower named A. W. Levitt who faced retaliation for contacting the USDA.

36. I recorded a conversation I had with A.W. Levitt, who confirmed what James Norris told me, that because he contacted USDA, he was given bad quality chickens.

37. In August 2019, I recorded a conversation I had with one of my Perdue managers, Clay Copeland. In this conversation he imposed new requirements on me I had not had before. Among other things, he told me that it was not enough to repair my drinker and feed lines, but that I had to replace them. He also told me I could only use only city water, despite Perdue having no requirement previously that I had to use a particular source.

38. When I signed the 2016 Poultry Producer Agreement, I still owed over $600,000 on my Milledgeville farm. I also had taken out a loan for $42,900 from Perdue for the upgrades it required. A lot of what I still owed at that time was because of the upgrades Perdue required me to make on the farm. Because of this, I had no choice but to sign the 2016 PPA as there were no other poultry integrators in the area I could have worked for and my chickens houses were not worth anything without a contract.

39. Under the 2016 PPA, Perdue offered increased payments if a grower upgraded the equipment on their farms. The highest tier, with the most advanced equipment, was Tier 4.

40. On September 29, 2019, I received two letters, one of which required me to fully upgrade my farm to Tier 4 before Perdue would be willing to enter a contract with any buyer, and the other contained the requirements Perdue was imposing on me to continue growing for Perdue.

41. I was never informed until Perdue gave me the letters that if I ever sold my farm, I, as the seller, would be required to upgrade it before Perdue would agree to enter a contract with a buyer.

42. The requirements and upgrades Perdue imposed on me to sell my farm to an approved buyer would have cost me much more than I could have afforded and required much more than Perdue had ever demanded of me in the past.

43. The requirements Perdue imposed on me to continue growing chickens would have cost me over $150,000.

44. The broker I hired to try to sell the farm, Todd Arline, commented to me that the list of required upgrades was more than he had ever seen.

45. These requirements made clear to me that I would not be able to afford growing with Perdue anymore and that I would not get a return on my investment in grower operations.

46. Without Perdue's approval of a buyer for my farm, and without spending heavily on upgrades, I was not able to sell my farm.

47. Perdue never provided any documentation to me or to post on my farm regarding the Fair Labor Standards Act or my rights under it.

48. I am not aware of any "major issue compromising animal welfare" on or about January 3, 2017, on my farm.

49. Perdue required that I post a sign on my farm identifying it as a Perdue farm.

50. Perdue also required that I have a designated mailbox for Perdue to leave tare weight tickets.

51. Before I called USDA, Perdue had never claimed or informed me that the need for repairs on equipment, such as feed lines, drink lines, fans, or heaters was a basis on which they would withhold further flocks.

Executed on August 15, 2025, in Abbeville, South Carolina.

_____
Roger Dale Parker

# ATTACHMENT 1

**GROWER JOBS AND RELATED TIMES**

| Activity/Job | Approximate Time |
|---|---|
| Morning walkthrough | 30 min per house/3 hours |
| Midday check | 15 min per house/1.5 hours |
| Evening watch | 15 min-30 min per house/3 hours |
| Dispose of dead birds | 30 minutes per day |
| Check/replace rat bait | 2-4 hours a week |
| Mow 10 acres | Entire day (8 hours), once per week |
| Weed-whacking around houses | 4-5 hours, once per week |
| Refill decontamination pans at entry of houses | 10 minutes per house/1 hour once per week |
| Replace water treatment mixture | 15 minutes per house/1 hour per day 20-25 day old birds; twice a day so 2 hours per day |
| Changing computer settings (lights, fans, vents, tunnel machines, front curtains, temperatures, read amount of water consumption, heaters, when feed lines would run, control feed coming in from bins) | 30 minutes to 1 hour after each walkthrough and check; 1.5-3 hours each day |
| Repairing feed lines | Minimum 30 minutes-1 hour if patch; maximum – all day (as needed) |
| Repairing water lines | Minimum 5 minutes (replace nipple); maximum – two hours (broken, leaking, replacement of regulators) |
| Repair of Strings/cables that hold feed line up | 20 minutes per string; 3-4 hours to repair broken cables |
| Repair vent cables | 20 minutes per cable, but if main trunk line is broken, 2 hours |
| Feed reports | 1-2 hours once per week |

1

| Generator check | 20-30 minutes per week |
| --- | --- |
| **Catch** | |
| Remove hoppers (to prep for raise feed time before catch) | one hour per house/6 hours per flock |
| Gather dead birds (between raise feed time and catch crew arrival) | 30 mins per house/3 hours per flock |
| Prepping houses while catch crew working (including above two tasks) | 16 hours per flock |
| **Between Flocks** | |
| Wind-rowing | 1.5-2 hours to gather into pile; 2-3 hours to spread it back out per house (5 hours total per house)/30 hours total |
| Blow dust out of every house | 1 hour per house/6 hours total |
| Put out insecticide | 30 minutes per house/3 hours total |
| Pick up PLT | 3-4 hours |
| Spread PLT | 30 min per house/3 hours total |
| Reassemble feed lines | 30 min per house/3 hours total |
| Running feed; hand fill | 2 hours per house/12 hours total |
| Mow 10 acres | (see above) Entire day (8 hours), once per week |
| Dredge driveway | 3-4 hours |
| Clean feed pans | 10 hours; sometimes into 2nd day if really dirty |
| Flush water lines/prep nipples | 30 min per house; 3 hours total |
| Set up divider panels | 30 min per house; 3 hours total |

2