Page 1

1　　　　　　UNITED STATES DISTRICT COURT

　　　　　　　MIDDLE DISTRICT OF GEORGIA

2

3　　ROGER PARKER,

4　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　　CIVIL ACTION FILE

5　　　　vs.

　　　　　　　　　　　　　　　　　NO. 5:22-cv-00268-TES

6　　PERDUE FOODS LLC,

7　　　　Defendant.

8

9　　　　　　VIDEO 30(b)(6)DEPOSITION OF

10　　　　　　　　PERDUE FOODS LLC

11　　　　　　　　(MICHAEL LEVENGOOD)

12　　　　　　　　　April 29, 2025

13　　　　　　　　　　9:00 a.m.

14　　Ogletree Deakins Nash Smoak & Stewart, PC

15　　　　　　191 Peachtree Street NE

16　　　　　　　　　Suite 4800

17　　Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

Page 20

```
 1      A    It's the Poultry Producer Agreement signed
 2   by Mr. Parker.
 3      Q    And was this the standard form PPA that
 4   was used with growers during this time period?
 5           MS. SANTEN:  Object to form.
 6      A    For 2016, yes.
 7   BY MR. KLORFEIN:
 8      Q    Was it used in any other year besides
 9   2016?
10      A    There was -- there was one previous to
11   that, so 2004, that would have been used prior to
12   this one.  So, no, between 2004 and '16, no, this
13   would have been the PPA.
14      Q    Got you.
15           And so there was a standard form agreement
16   that was used in the 2004 to 2016 range?
17      A    Yes.
18      Q    And this agreement was initially used
19   beginning in 2016?
20      A    Correct.
21      Q    And how long was it used before a new
22   standard form agreement was used?
23      A    I think the next one was 2020 that was in
24   my last deposition.
25      Q    So aside from that 2020 agreement, this
```

Page 41

```
 1   policies that were in place at a later time period
 2   at your last deposition?
 3        A    Yes.
 4        Q    Do you recall any differences between the
 5   2012 to 2019 period versus the later time period
 6   that you previously testified to?
 7             MS. SANTEN:  Objection, compound.  It's
 8   not clear what policies you're talking about.  If
 9   you could show him, that might help.
10             MR. KLORFEIN:  If we could limit the
11   speaking objections.  I think if there's an
12   objection to form and then we can move on, I'd
13   appreciate it.
14        A    So, yeah, you need to show me, I -- what
15   policies you want me to look at.
16   BY MR. KLORFEIN:
17        Q    Handing you what has been previously
18   marked as Plaintiff's Exhibit 3.  Take a moment to
19   review, but I'll direct you to certain pages given
20   it's a pretty hefty manual.
21             (Plaintiff's Exhibit 3 was marked for
22   identification.)
23        A    Yeah, it -- I'm very familiar with this
24   manual, so.
25   BY MR. KLORFEIN:
```

30(b)(6) Michael Levengood  April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 42

```
 1        Q    What is that manual?
 2        A    It's the Poultry Care Process Verified
 3   Program.
 4        Q    And do you oftentimes refer to that as the
 5   "PVP"?
 6        A    Yes, sir.
 7        Q    Earlier in today's deposition -- just let
 8   me finish the question.
 9             Earlier in today's deposition, you
10   referenced wanting to look at a document to identify
11   the differences from a later version to an earlier
12   version.  Were you referring to this PVP document?
13        A    No, I didn't mention this one.
14        Q    You were referring to a different one?
15        A    Yeah.  I -- the ones I told you that I
16   looked at.
17        Q    Got it.
18             Did you review this PVP in preparation for
19   today's deposition?
20        A    No.
21        Q    Do you recall your testimony regarding
22   this document?
23        A    Not specifically.
24        Q    In your prior deposition, you testified
25   that the PVP program has been in place since March
```

1    2011.
2             Do you recall that testimony?
3        A    Yes.
4        Q    Is that accurate?
5        A    So it's -- we list all of the changes that
6    we made, so it would definitely have been in place
7    for our 2012 to 2019.  It was definitely in place
8    during this time.
9        Q    Got you.
10            So just so we're on the same page, this
11   Plaintiff's Exhibit 3 was in place during the 2012
12   through 2019 time period?
13       A    Yes.
14       Q    And any changes to the PVP would have been
15   documented?
16       A    Yeah, we document them all on the first
17   couple pages of any changes that happen during that
18   time.
19       Q    Got it.
20            So if it's not referenced in this -- these
21   first few pages, there were not other changes?
22       A    No, sir.
23       Q    Now, you just testified regarding changes
24   to the actual policy in Plaintiff's Exhibit 3, like
25   how something might have been altered over time.  Is

```
 1   that fair?
 2        A    Yeah, then there's multiple ways it could
 3   have been altered.
 4        Q    Sure.
 5             And I don't want to ask about each
 6   specific change that's listed there, but I do want
 7   to know, aside from those changes that are listed,
 8   were there any changes at Perdue in terms of how
 9   this policy overall was implemented at the grower
10   level?
11             MS. SANTEN:  Objection, vague.
12        A    We get audited on this by USDA.  We
13   also -- it's an ISO 19001 process.  So we audit it
14   every year.  So as we audit it, we either -- there's
15   three ways that really I think that the changes can
16   be made in this.
17             One is NCC -- the base of this program was
18   the NCC welfare guidelines.  We talked about that
19   the last time.  Every couple years they update their
20   welfare guidelines.  So if they update anything in
21   the NCC welfare guidelines, we have to update our
22   program.  So that happens every couple years.
23             The second way is, the USDA auditors come
24   in, and they audit the program.  And as they're
25   auditing the program, they might interpret what's
```

1   written and say, We know what's written, and we
2   don't feel like your process matches what's written.
3   And it could be words in a -- you can see some of
4   these are really minor things, but that's -- we
5   would change the document.
6            But then some of them -- and a lot of them
7   never affect a farmer, but some of them would.  And
8   there's a perfect example in here of we said that
9   no -- in here it said that birds unfit for travel
10  shouldn't go put on a live haul truck because it's
11  unfair to that bird to travel to the plant to be
12  harvested.  The auditor came back and said so -- and
13  that the farmer should euthanize the bird within
14  24 hours.
15           So when you have an ISO program, they were
16  kind of like you can't -- there's no verification.
17  How do we know this is happening?  So we had to go
18  back to the farms -- farmers, come up with a
19  document that they would then list how many birds
20  were left, how many they euthanized within 24 hours,
21  and it was in our farm documents book, and they
22  would do that.  So we did that globally.
23           So that's a kind of change, but the
24  majority of these changes don't even affect the
25  farmer because it's with our hatcheries, our live

1  haul, our plants, our feed mills, so all of our --
2  so there's only a few sections in here, as you know,
3  that affect the farmer.  But that was an example of
4  a change that USDA and the auditors questioned on us
5  that then rolled back to the farmer, so we had to
6  implement that.
7  BY MR. KLORFEIN:
8       Q    Got you.
9            So some of the changes that were
10 implemented in the PVP would trickle down to the
11 farmer?
12      A    Correct.
13      Q    And some of those could be, Hey, you're
14 doing this already, but we need to verify, so fill
15 this verification page out, or something along those
16 lines?
17      A    That's what I just explained, yes.
18      Q    I just want to make sure that I'm
19 understanding what you're saying correctly.
20      A    Yeah.  No, no, that's fine.
21      Q    I think you referenced three different
22 changes:  NCC, USDA, and there could be a third
23 reason?
24      A    Could be us.  We -- we changed our policy.
25 We decided that we wanted to -- or our -- and

Page 47

1 generally most of those are going to end up being in
2 our plants, we wanted to check something
3 differently. We found out that through our regional
4 auditors that we really liked how the process was
5 working at this location, we now want to put it in
6 the whole manual, so we -- we would also be able to
7 up anything --
8     Q    Right --
9     A    -- change. They're the three.
10    Q    And sticking with that third category of
11 material, those changes could also impact the
12 growers?
13    A    They could. I don't have a good -- one
14 example for that, we started doing free range --
15 this does not affect Perry, Georgia, okay. So in an
16 operation that we -- we started marketing birds as
17 free range, means we let them outside. We had doors
18 in the house, and they could go out into the
19 pasture.
20         We felt it was important to audit that
21 process, so we added that process to here, and we
22 had third-party auditors, customers that wanted to
23 be sure it was happening. So there's some general
24 standards of how it should work. We wrote that in,
25 and then the farmers had to document when the birds

1    had "perimeter buffer area" added to the end.
2    Remember we didn't know about that.  So I have a
3    sense that one was adjusted.
4              And then birds nesting was something that
5    was also discovered that if you have birds nesting
6    in your eaves, you're going to increase your chances
7    of high-path.
8              So those are the ones just reading it,
9    knowing my history of the company, that pop off the
10   page, but I could be missing something because I
11   don't have the original one in front of me.
12        Q    Got you.
13             There could be more changes?
14        A    Yeah, but nothing -- nothing here -- you
15   know, these are -- remember what we talked about,
16   these are cultural, these are things that as a
17   farmer you should just think about, these are
18   recommendations.  You know, if you -- these are like
19   your insurance policy, if you never ever do this,
20   and you're dedicated to do these things, you have a
21   better chance of not getting high-path.  That is
22   what this means.
23        Q    These BMPs are posted at every single
24   farm, right?
25        A    Correct, as a reminder, as saying, Listen,

```
 1   if you never ever, and you're dedicated to these,
 2   you have a better chance of not getting high-path
 3   than somebody that does some of these.
 4        Q    It's required to post this in every
 5   grower's farm, right?
 6        A    And it's also because it's part of the
 7   14-step process that we talked about, and when the
 8   state comes in and audits the farm so the farm could
 9   be indemnified if they got high-path, you've got to
10   have these biosecurity things posted.
11        Q    That's why it's required?
12        A    That's why it's required.
13        Q    And it was required to post these
14   throughout the 2012 through 2019 time period?
15        A    Yes.  I'm going to say yes because we've
16   always posted the Dedicated Tos and Never Evers, so
17   yes, I'm -- yes.
18        Q    But you're not -- are you certain or not
19   certain?
20        A    I'm 90 percent certain.
21        Q    And you haven't looked at the prior
22   version, so you can't line by line tell me --
23        A    I only looked at the very first version,
24   and it's not in front of me, so I -- that's why I'm
25   just saying based on my knowledge I believe I've got
```

Page 59

```
 1    most of it, but if there was a word that was -- we
 2    adjusted a word here or there, I -- and I have no
 3    recollection of version 2 through 5.  I'd have to
 4    see them.
 5        Q    And did Perdue change its policies in
 6    response to the H7N9 outbreak in 2017?
 7             MS. SANTEN:  Objection, vague.
 8        A    I'm just thinking.  Did we change our --
 9    our policies on what?
10    BY MR. KLORFEIN:
11        Q    Well, did Perdue -- was there an H7N9
12    outbreak in the United States in 2017, let's start
13    there?
14        A    I can't remember the -- if there was, I'm
15    not -- I don't know the actual date.  Like I said, I
16    remember there was a -- one in '14, and there was
17    one that could have been '17 or '18 was the latest
18    one.  There's another one currently going on, so I
19    don't know the exact -- I can't remember the exact
20    date.
21             So what policies are you wondering that we
22    would have changed?
23        Q    Okay.  Well, in response to an outbreak,
24    be it 2014 or 2018, does Perdue pop the hood and
25    look at its policies?
```

1      MS. SANTEN: Objection, vague.
2      A    We always are looking at our
3  recommendations for biosecurity.  We learn all the
4  time.  The government is helping us all the time
5  learn how not -- how to prevent high-path from
6  getting in a house.
7           So we -- we continue to coach our farmers
8  to, you know, do a better job with the Never Evers
9  and Dedicated Tos, to also look at our level 1,
10 level 2, level 3 biosecurity processes that we have
11 out there, programs that we have out there, but I
12 cannot recall that we did anything special other
13 than remind farmers that high-path is in the area.
14          We do that all the time.  High-path is in
15 the area; make sure you're -- make sure you're
16 concentrating on your biosecurity.  That's generally
17 what we do.  We'll send them letters; we'll have the
18 flock supervisors talk to them, just remind them
19 high-path is in the area.
20          Because they know what to do.  It's their
21 farm.  They're controlling who goes in and out of
22 their house all through the week, 24 hours a day, 7
23 days a week.  So, you know, we are just reminding
24 them that, You've got to be the one protecting the
25 walls of your chicken house.  That's the LOS.

Page 82

1   It's -- you can look at the payment schedule and
2   figure it out, but I -- I didn't go figure out the
3   average cost per week.
4   BY MR. KLORFEIN:
5        Q    And could farmers receive certain bonuses
6   for their work?
7        A    Yes.
8        Q    A PVP bonus being one of them?
9        A    Yeah, audit readiness bonus.  That's
10  another way, it's audit -- yes, PVP, sorry.
11       Q    And just so I'm understanding, do you
12  equate the PVP bonus with the same thing as the
13  audit readiness bonus?
14       A    Yes.
15       Q    Aside from the audit readiness bonus, any
16  other bonuses that growers receive?
17            MS. SANTEN:  Object to form.
18       A    So there was the rest pay and space pay
19  were added as -- and there was also the tier
20  payments.  So depending on what -- if your houses
21  met the tier levels, you would get additional pay.
22  BY MR. KLORFEIN:
23       Q    Well, I want to talk about both those
24  types, the rest pay and space pay I think you said
25  first?

1  have pay deducted from their settlement?
2          MS. SANTEN:  Object to form.
3      A    Yes.
4  BY MR. KLORFEIN:
5      Q    And what are the reasons why Perdue would
6  deduct pay from a grower's settlement?
7      A    There's -- over the years there's been
8  various -- they could -- they could be struggling,
9  and they needed -- they needed some money earlier to
10 pay electric bill, so we would front them the money
11 for their electric bill, and then when they settled,
12 we would take it out of their settlement.  So we
13 would help them with those.
14          Of course, all of their mortgage payments,
15 the banks require us to deduct their bank loan, so
16 that's pretty much a requirement from the banks, so
17 that comes out first.  We don't really have -- it's
18 not our deal, that's between the farmer and the
19 bank, and they sign that up.  We just do that, and I
20 think the banks require generally all of the
21 industry, they're going to get their money first, so
22 we do that.
23          And then we've got some no-interest loans,
24 and the no-interest loans would be the other ones.
25          And then the only other category that

Page 91

```
 1        A     As far as I know, yes.
 2        Q     And does Perdue have specific requirements
 3   related to how their houses are set up and what
 4   equipment they need to use regardless of tier, like,
 5   even if they're in the lowest tier?
 6        A     Be more specific in your question, please.
 7        Q     Sure.
 8              So how many tiers are there?
 9        A     There's four tiers.  I think the 0 tier is
10   gone now, so just 1 through 4.
11        Q     Got you.
12              So at the lowest tier, are there still
13   requirements as to what needs to be in the grow
14   houses?
15        A     It would be spelled out in the tier
16   document.
17        Q     Any other sources for that information
18   besides the tier document?
19        A     No.  I think if you're talking about how
20   you determine which tier they're in, it's going to
21   be in there.
22        Q     And can a grower work for multiple
23   integrators at the same time, Perdue and another
24   integrator?
25        A     Be more specific in your question.
```

Page 92

```
 1        Q    Sure.
 2             So can a grower grow for Perdue and then
 3   after that flock is gone decide to grow for one of
 4   your competitors?
 5        A    So that means he would go to this contract
 6   and give us a 90-day notice that he's quitting based
 7   on the contract, and most likely we allow people
 8   just to -- they don't want to be with us, so we
 9   would just allow them to go grow for that company.
10        Q    After the contract is terminated, correct?
11        A    After the birds move out of the house
12   because generally that's when they're going to tell
13   us.
14        Q    Right, but you won't let them grow until
15   the contract is terminated, right?
16        A    You're going to have to ask that again.
17        Q    Sure.
18             A farmer grows for Perdue --
19        A    Right.
20        Q    -- Perdue does not let that farmer grow
21   for one of Perdue's competitors until that agreement
22   with Perdue has been terminated?
23             MS. SANTEN:  Objection, outside the scope.
24        A    No, you're not asking the question right,
25   no.  That makes -- it's all about when birds are in
```

Page 93

1   the house.
2   BY MR. KLORFEIN:
3       Q    Got you.
4            So the PPA can still be in place, not
5   terminated, and a grower that has a contract with
6   Perdue is permitted to then grow for one of your
7   competitors?
8       A    And the minute he would go -- he's
9   obligated by the government to give us 90-day notice
10  that he signed another contract.
11           So if a grower had birds with us, he moved
12  birds today, but tomorrow he's going to sign a
13  contract with a competitor, he would call us and
14  give us his 90-day notice.  And generally we're
15  fine, Go grow with the other -- go grow with the
16  other company because you don't want to be with us,
17  we're not putting birds back in your house during
18  that 90-day period because you left us.
19      Q    Got you.
20           So Perdue would permit that grower to grow
21  for the other competitor within that 90-day period?
22      A    Yes, because the contract would be
23  canceled when he signs the other one.
24      Q    Can a grower use the same grow house that
25  it uses for Perdue chickens for other animals?

Page 94

```
 1         A    No, it's in the contract.
 2         Q    We marked Plaintiff's Exhibit 44, which
 3    begins Bates Perdue 1511.
 4              (Plaintiff's Exhibit 44 was marked for
 5    identification.)
 6    BY MR. KLORFEIN:
 7         Q    Do you recognize this document?
 8         A    Yes, sir.
 9         Q    And what is it?
10         A    Producer payment schedules for the Perry,
11    Georgia Complex.
12         Q    I believe you said earlier that this is
13    the document that you would want to look to to
14    understand when certain bonuses had been
15    implemented; is that accurate?
16         A    Yes.
17         Q    So a document or an earlier version of
18    this is what we turn to to understand kind of what
19    that change was?
20         A    When --
21         Q    When.
22         A    -- to be accurate to your question.
23         Q    And were payment schedules such as these
24    used throughout 2012 through 2019?
25         A    Yes.
```

1    different size birds, how many flocks to pay it
2    back, all that is spelled out.  So he's a smaller
3    guy, so he would pay this 5,000 back over seven
4    flocks.
5         Q    And regardless of whether or not it's
6    minor or major, is this generally equipment for the
7    houses or something else?
8         A    Generally.
9         Q    Anything else besides equipment?
10        A    I -- I think it's all equipment.
11        Q    Are you familiar with the term "harvest
12   delivery ticket"?
13        A    It's used -- harvest delivery ticket.  I
14   have not heard that terminology before.
15        Q    What about "live haul ticket"?
16        A    Oh, yeah, I've heard that, yes.  If
17   they're the same thing -- it could be a local -- way
18   they call it locally, but live haul ticket is what
19   I'm more -- to my opinion, they mean the same.
20        Q    And let's just use your definition for a
21   moment of live haul tickets, how are those used in
22   calculating compensation for growers?
23        A    Weight.  Farm weight.
24        Q    So the live haul tickets measure the
25   weight at what point in time?