Page 1

1              UNITED STATES DISTRICT COURT

               MIDDLE DISTRICT OF GEORGIA

2

3      ROGER PARKER,

4           Plaintiff,

                                    CIVIL ACTION FILE

5           vs.

                                    NO. 5:22-cv-00268-TES

6      PERDUE FOODS LLC,

7           Defendant.

8

9              VIDEO 30(b)(6)DEPOSITION OF

10                  PERDUE FOODS LLC

11                 (CLAY COPELAND)

12                  April 29, 2025

13                   11:40 a.m.

14      Ogletree Deakins Nash Smoak & Stewart, PC

15              191 Peachtree Street NE

16                   Suite 4800

17      Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

18

19

20

21

22

23

24

25

30(b)(6) Clay Copeland                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 13

1        A    Yes.

2        Q    So if I refer to Perdue 1611, that'll be

3    what I'm referring to with the Bates stamp.

4             Do you recognize this document?

5        A    Yes.

6        Q    What is it?

7        A    The title is Poultry House Management

8    Guidelines, but it's a recommendation.  It's more or

9    less educational materials for growers who may be

10   new to the business or, you know, a starting point.

11       Q    And this document applies to all farmers

12   supplying the Perry, Georgia location?

13       A    Yes.

14       Q    Did this apply through -- from 2012

15   through 2019?

16       A    Yes, the revision date on it is 2010, so

17   it would have still been in place unless you have a

18   new revision, but...

19       Q    And if your counsel has not produced a

20   newer version --

21       A    No.

22       Q    -- then this would be the operative one?

23       A    Yes.

24       Q    Do you know if it still is today?

25       A    Yes.

Page 14

```
 1        Q    This was provided to plaintiff?

 2        A    Yes.

 3        Q    Do you know when it was provided to

 4   plaintiff?

 5        A    When he started his first flock.

 6        Q    And it's your testimony that these are not

 7   guidelines, they're recommendations?

 8        A    Yes.

 9        Q    It does not say "recommendations" on this

10   sheet, right?

11        A    That's right.

12        Q    And it says:  After a flock moves -- under

13   number 3 -- that growers are expected to remove all

14   caked litter form [sic] house and level remaining

15   litter.

16             Do you see that?

17        A    Yes.

18        Q    So that's a directive to remove the caked

19   litter?

20             MS. SANTEN:  Object to form.

21        A    It's the -- it's not a directive; it's,

22   again, a recommendation.  There's different ways of

23   doing it, and that's up to the grower how they want

24   to prepare their litter.  They could wind row it;

25   they could cake out.  That's -- that's up to them.
```

Page 17

1      Q    Is that required?

2      A    At some point you have to change your

3   water filters or they -- it restricts water to the

4   growers -- I mean to the birds.  A water filter

5   would become so clogged that the birds can't get

6   water, and then, yes, it would be required because

7   it would be an animal welfare issue.  We didn't

8   monitor the frequency of those change-outs.

9      Q    You do monitor water flow, though, right?

10     A    Yes.

11     Q    Number 9 says:  To check a generator, and

12  in italics and underlined, maintain generator log

13  weekly.

14          Do you see that?

15     A    Yes.

16     Q    Growers are required to maintain a

17  generator log weekly?

18     A    That's part of their audit-ready bonus.

19     Q    Got it.

20          So their pay might be impacted if they

21  didn't do this?

22     A    Yes.

23     Q    Their pay could be reduced if they didn't

24  do this?

25     A    Yes.

Page 22

1    with the grower's assessment, they will let the
2    grower know, right?
3         A    We will make a note that we disagree, and
4    then at the end of the flock if they perform poorly,
5    we would refer to that note.
6         Q    And so a grower's pay might be impacted?
7         A    No.  We're not going to deduct pay because
8    they didn't follow a temperature.  It might cause
9    them to perform poorly.
10        Q    And, again, if performance is poor over a
11   certain period of time, Perdue might terminate the
12   relationship?
13             MS. SANTEN:  Object to form.
14        A    We would -- we have a PIP program.  We
15   would follow the guidelines of that.
16             (Plaintiff's Exhibit 46 was marked for
17   identification.)
18   BY MR. KLORFEIN:
19        Q    I'm marking Plaintiff's Exhibit 46, which
20   begins Bates Perdue 1664.
21             Mr. Copeland, do you recognize this
22   document?
23        A    Yes.
24        Q    What is it?
25        A    It's a health plan signed by a

Page 23

```
 1    veterinarian.
 2         Q     And that's Perdue's veterinarian?
 3         A     Yes.
 4         Q     So Perdue is the one who set this health
 5    plan?
 6         A     Yes.
 7         Q     And it applied to all growers, including
 8    plaintiff, that fed into Perry, Georgia?
 9         A     Yes.
10         Q     Does Perdue generally maintain a
11    veterinarian to provide health plans?
12         A     Yes.
13         Q     How long has that been in place that
14    Perdue has had such a veterinarian to do so?
15         A     We've always had a veterinarian.
16         Q     And has Perdue always provided health
17    plans from that veterinarian to growers?
18         A     Pretty sure this is a requirement of our
19    PVP that they -- that you have a written health plan
20    signed by a veterinarian, so that's what this
21    document is for.
22         Q     And this is in order to provide it to all
23    growers to have a health plan?
24         A     We -- we provide it to the growers, yes.
25         Q     And they're required to maintain it in
```

Page 25

1    doctor.

2         Q    Before --

3         A    We would give the vaccines at the

4    hatchery, so that would not really apply to a

5    grower.  That's more for the hatchery.

6         Q    Well, before we move past that one, this

7    is as prescribed by Perdue veterinarians, right?

8         A    Yes.

9         Q    Does Perdue allow its growers to use other

10   veterinarians?

11        A    No.

12        Q    So growers are required to use Perdue's

13   veterinarians?

14             MS. SANTEN:  Objection, asked and

15   answered.

16   BY MR. KLORFEIN:

17        Q    You can answer.

18        A    Yes.

19        Q    And they're also required to implement the

20   vaccination and medication programs that are

21   prescribed by those veterinarians?

22        A    I believe that's referring to hatchery

23   vaccines.  We don't vaccinate in the field, so that

24   would be done before they got to the farm.

25        Q    What about medication programs?

30(b)(6) Clay Copeland                                    April 29, 2025
Parker, Roger v. Perdue Foods, LLC

                                                                    Page 26

1        A    They cannot run any medications that are
2    not approved.
3        Q    And that's not limited to the hatcheries,
4    right?
5        A    Right.
6        Q    So this applies to growers too?
7        A    We have claims on our products that say
8    that you don't run antibiotics.
9        Q    Got you.
10            In order to be able to maintain that
11   claim, you need to require growers to follow this
12   program?
13       A    As far as medications.
14       Q    So that's a yes?
15       A    There's -- yes.  There's not -- there's
16   other products that they can run in the water to
17   treat the water that are not medications.
18       Q    If you look to the fourth bullet, that
19   begins:  Flock performance must be monitored.
20            You see that?
21       A    Uh-huh.
22       Q    A couple lines down says:  Twice daily
23   checks will be done to ensure that equipment is
24   operating properly.
25            Do you see that?

30(b)(6) Clay Copeland                                April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 40

1        A      He was our head veterinarian.

2        Q      And he sends an e-mail in May 2017 saying:

3   We fully implemented system-wide six-hour minimum

4   lights off resting periods.

5               Do you see that?

6        A      Yes.

7        Q      Do you know what he's referring to there?

8        A      He's referring to our lighting program.

9        Q      And what is Perdue's lighting program?

10       A      It varies.

11       Q      Was this a change in the lighting program?

12       A      It looks like it was.

13       Q      Was this the first time a lighting program

14  was implemented?

15       A      At the time we had multiple lighting

16  programs.

17       Q      Okay.  Is this one of them?

18       A      It looks like it was a new change.

19       Q      Do you know whether or not there is a

20  lighting program that predated this?

21       A      Again, it would have been different

22  amongst complexes depending on growing sizes.

23       Q      I understand.

24              But you're the corporate representative

25  for Perry, right?

30(b)(6) Clay Copeland                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 45

1        Q    And that would require, though, the grower
2    actually go to the plant itself, right?
3        A    Yes.
4        Q    To leave their farm?
5        A    Uh-huh.
6        Q    Is that a yes?
7        A    Yes.
8        Q    So the only way to verify that this live
9    haul ticket measuring system was abided by is to
10   leave their farm, right?
11       A    Yes.
12       Q    Are you aware of inaccuracies as to the
13   live haul ticketing process matching up with
14   settlement?
15       A    It's happened rarely.
16       Q    What does "rarely" mean?
17       A    Maybe once a year.
18       Q    Once a year per grower, something else?
19       A    No.
20       Q    Once a year nationwide?
21       A    In the -- in the Perry facility.  I'm only
22   speaking for Perry.
23       Q    And you said that that's happened once per
24   year in Perry?
25            MS. SANTEN:  Objection, outside the scope.

Page 46

```
 1        A    I'm just speculating.
 2   BY MR. KLORFEIN:
 3        Q    Well, you are prepared to talk about the
 4   compensation in Perry, right?
 5        A    Yes.
 6        Q    And part of that compensation involves
 7   live haul tickets, right?
 8        A    Yes, but I don't have an accurate number
 9   as to how often mistakes occur.
10        Q    Got it.
11             You have not conducted an audit to see how
12   often those mistakes had occurred?
13        A    The plant does those audits.
14        Q    You have not reviewed those audits?
15        A    No.
16        Q    Not for today?
17        A    No.
18        Q    You have access to those audits?
19        A    Yes.
20        Q    Have you ever reviewed the audits?
21        A    Yes.
22        Q    When was the last time you reviewed those
23   audits?
24        A    If a grower said that the trailers don't
25   match up, we'd review them.
```

30(b)(6) Clay Copeland                          April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 47

1        Q    Got it.

2             So it's dependent on the grower

3    identifying a problem?

4        A    Yes.

5        Q    And are you aware of an inaccuracy for

6    live haul tickets as it relates to plaintiff?

7        A    There was one time where a tare weight was

8    off.

9        Q    When was that?

10       A    I don't know the exact date.

11       Q    Do you remember what year it was?

12       A    2018.

13       Q    And that was plaintiff bringing that to

14   your attention?

15       A    Yes.

16       Q    Any other instances that he raised this?

17       A    No.

18            MS. SANTEN:   Objection, vague.

19   BY MR. KLORFEIN:

20       Q    So the only time Perdue is aware of of

21   plaintiff raising this was in 2018?

22       A    I believe so.

23       Q    Are you aware of any amounts that were

24   withheld or deducted from plaintiff's pay as part of

25   the settlement process?

30(b)(6) Clay Copeland                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 84

```
 1          Q    Who's responsible for filling it out?
 2          A    The person at the scale house.
 3          Q    Do you know who that is for Perry?
 4          A    I don't know who it is currently.  People
 5     change there.
 6          Q    Sure.  Do you know who that was at Perry
 7     for 2012 through 2019?
 8          A    Maybe Kadishe.  Kadishe March.
 9          Q    Anybody else?
10          A    Don't know.
11          Q    You can set that aside.
12               I've handed you what's been previously
13     marked as Plaintiff's Exhibit 17, Bates Perdue 7333.
14               (Plaintiff's Exhibit 17 was marked for
15     identification.)
16     BY MR. KLORFEIN:
17          Q    Do you recognize this e-mail?
18          A    Yes.
19          Q    Was this the six flock average paid due to
20     the tare weight error that you were referencing
21     earlier?
22          A    I think so.
23          Q    So what is your memory of what happened
24     after you were contacted by USDA?
25          A    I had the plant look into the weights; I
```

30(b)(6) Clay Copeland                         April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 85

```
 1    looked at the weights; we looked at the feed
 2    tickets; we cross-referenced feed tickets that were
 3    on his farm and weight tickets that were on his
 4    farm.  We didn't find anything wrong, and that's why
 5    we didn't do anything the first time that it refers
 6    to.
 7             Then after he called, looked into the --
 8    we looked at the tare weights, and there was a tare
 9    weight that was a little bit off, not enough to
10    throw up an alarm, but since P&S had called us, we
11    decided to pay him his six flock.
12        Q    Okay.  So the first time there was the
13    discrepancy brought to your attention, that was Dale
14    doing so?
15        A    I don't remember.
16        Q    Got you.
17             But you referenced there were two
18    independent times --
19        A    Yes.
20        Q    -- right?  And so the second time P&S had
21    called, right?
22        A    Yes.
23        Q    And P&S, just so we're clear, is --
24        A    Oh.  I didn't mean to interrupt you.  Go
25    ahead.
```

30(b)(6) Clay Copeland                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 86

1        Q    Sure.  Could you define P&S for me?

2        A    Packers and Stockyards.

3        Q    That's USDA?

4        A    Yes.

5        Q    And so the first time it was brought to

6    Perdue's attention before the USDA was involved,

7    Perdue did not adjust the calculation.

8        A    Yes.

9        Q    And then after the USDA was called and

10   reached out to you, Perdue made an adjustment to

11   that.

12       A    I don't know if it was Dale making a

13   complaint or if it was -- sometimes when a farm does

14   really bad we will figure their six flock, and then

15   we'll investigate it.  Just for the -- just to speed

16   things up we might tell them to look at -- to figure

17   the six flock in case we need to pay it, and then

18   we'll make the determination whether we pay it or

19   not.

20       Q    But Perdue did, in fact, make a

21   determination to pay the six flock average the

22   second time.

23       A    Yes.

24       Q    And that was after USDA contacted you.

25       A    Yes.

Page 87

```
 1        Q    Just so I understand, why would Perdue pay
 2   a six flock average instead of trying to
 3   understand -- fixing the one tare weight ticket
 4   issue?
 5            MS. SANTEN:  Objection, outside the scope.
 6        A    Not sure what you're asking.
 7   BY MR. KLORFEIN:
 8        Q    Sure.  If there's a tare weight ticket
 9   issue, there's an error, could Perdue address that
10   error?
11            MS. SANTEN:  Same objection, outside the
12   scope, vague.
13        A    There's no way to definitively prove what
14   the tare weight should have been if there's an
15   error, so you pay them their six flock.
16   BY MR. KLORFEIN:
17        Q    Got you.
18            So --
19        A    I can't make stuff up, or then I would be
20   in trouble with P&S.
21        Q    Understood.
22            Does Perdue maintain all tare weight
23   tickets just as part of its recordkeeping process?
24        A    Yes.
25        Q    For how long?
```

Page 88

1        A    I don't know the retention policy on tare

2   weight tickets.

3        Q    Is it more than a couple months?

4        A    Yes.

5        Q    So by this point in time y'all still had

6   the tare weight tickets, right?

7        A    Yes.

8        Q    So could you have gone back and looked at

9   the tare weight tickets to understand what the error

10  was and how to address that?

11       A    It's not transcribing a number.  It could

12  have been that the truck was not pulled onto the

13  scales.  There's no way to go back in time and tell

14  whether the truck was on the scales or not.

15       Q    Got you.

16            Aside from truck not being on the scales,

17  are there other ways for an error to be introduced

18  in the tare weight ticketing system?

19       A    It looked like to me in this situation the

20  driver might not have filled up with fuel before he

21  got back on the scales.

22       Q    And what led you to that conclusion?

23       A    Because it was a minor discrepancy on tare

24  weights.

25       Q    And how do you define "minor"?

30(b)(6) Clay Copeland                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 89

1          A    Less than a thousand pounds.

2          Q    Got you.

3               So if it's less than a thousand pounds,

4     that might be a minor issue?

5          A    There's not a hard-and-fast rule.

6          Q    That's your rule?

7          A    The only reason we paid Dale six flock is

8     because P&S called.

9          Q    And when P&S calls, y'all act?

10         A    Yes.

11              MS. SANTEN:  Jarred, has this been marked,

12    is it 54?

13              MR. KLORFEIN:  It's previously marked 17.

14              MS. SANTEN:  It's not on our copy.

15              MR. KLORFEIN:  For whatever reason the

16    printed copies did not address that.  I will make

17    sure to identify each one as we hand them over.

18              MS. SANTEN:  Okay.  So 19 from what?

19              MR. KLORFEIN:  Prior depositions.  We've

20    numbered them consecutively, so if it's a prior

21    exhibit --

22              MS. SANTEN:  Because we're at, like, 54,

23    53.  So what would this be 19 to?

24              MR. KLORFEIN:  We picked up immediately

25    after the previous one, so depending on the cutoff,

30(b)(6) Clay Copeland                     April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 92

1    tare weights that the USDA called about rather than
2    the first one.
3         Q    Does this refresh your recollection as to
4    whether or not it was a vehicle not fully on the
5    scale or some other issue?
6         A    No, I don't have any way of knowing that.
7         Q    No recollection about what the cause of
8    that error was?
9         A    There's no way to know that.
10        Q    You couldn't look back at the tare
11   weights?
12             MS. SANTEN:  Objection, asked and
13   answered.
14        A    There's no way to know.  I mean, you
15   could -- you might see that a tare weight looked
16   off, but there's no way to know what happened.  It
17   could be right.
18   BY MR. KLORFEIN:
19        Q    You already testified that Perdue
20   maintains the tare weight tickets for a certain
21   period of time, right?
22        A    Yes.
23        Q    Why does it do that?
24        A    In case you need to refer back to it for
25   settlements.

Page 93

1      Q    And did you refer back to the tare weights

2   in this instance?

3      A    Yes.

4      Q    And you were unable to determine what the

5   problem was?

6           MS. SANTEN:  Objection, asked and

7   answered.

8      A    You can only see that there was a problem.

9   You cannot tell what the problem was.

10  BY MR. KLORFEIN:

11     Q    And you saw there was a problem here?

12     A    Yes.

13     Q    But you don't know what procedural error

14  you're referring to?

15     A    No.

16     Q    Then you ask for the calculation as soon

17  as possible, today if possible.

18     A    Yes.

19     Q    This is November 30th?

20     A    Yes.

21     Q    So several weeks went by after you made

22  the decision to pay him the flock -- six flock

23  average?

24          MS. SANTEN:  Objection, misstates the

25  exhibits.

Page 94

1         A     Sure.  Yes.

2    BY MR. KLORFEIN:

3         Q     Now, these issues that arose with USDA,

4    this was all occurring in 2017, right?

5         A     There was only one issue.

6         Q     Right, but Mr. Parker had identified an

7    error earlier than when the USDA had brought it to

8    your attention, right?

9         A     Yes.

10        Q     That all occurred in 2017?

11        A     Yes.

12        Q     Do you recall in 2017 any other instance

13   where Mr. Parker brought to Perdue's attention

14   additional errors with the tare weight tickets?

15        A     Dale thought -- he was always looking for

16   a reason to say that something was wrong, and we

17   could -- in general we could never find anything

18   wrong.  There was no issues with the tare weight

19   tickets.  He was making excuses for his poor

20   performance.

21        Q     Well, we can agree that at least one of

22   the times that he brought it to your attention --

23        A     Yes.

24        Q     -- he was right.

25        A     Yes.

Page 95

```
 1        Q    Do you recall any other time in 2017 that
 2   he brought a tare weight ticket to Perdue's
 3   attention?
 4             MS. SANTEN:  Objection, outside the scope.
 5        A    There was two times --
 6   BY MR. KLORFEIN:
 7        Q    In 2017 that we already discussed?
 8        A    -- that we already covered.
 9        Q    No other times besides those?
10        A    He probably complained before then, but he
11   was incorrect.  If we found something, we were
12   obviously willing to correct it.
13        Q    Well, this was after the USDA had reached
14   out to you, right?
15        A    We didn't find it until they reached out
16   to us.
17             (Plaintiff's Exhibit 24 was marked for
18   identification.)
19   BY MR. KLORFEIN:
20        Q    Handing you what has been previously
21   marked as Plaintiff's Exhibit 24, Bates Perdue 8011.
22             Do you recognize this as a text exchange
23   between Dale Parker and Kathryn Mizell?
24        A    Yes.
25        Q    And on the second page, Bates 8012,
```

30(b)(6) Clay Copeland                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 96

1    towards the top of the page there's a text from Dale

2    Parker beginning:  I texted you also.

3              You see that?

4        A    Yes.

5        Q    He says:  I texted you also when we caught

6    about a two trailers that had no ticket matching.

7              See that?

8        A    Yes.

9        Q    This is September of 2018 that he's

10   texting it?

11             MS. SANTEN:  Just objection generally it's

12   outside the scope of topics.

13       A    Yes.

14   BY MR. KLORFEIN:

15       Q    He's referencing a tare ticket matching

16   issue?

17       A    Yes.

18       Q    Did Kathryn Mizell bring this issue to

19   your attention?

20             MS. SANTEN:  Same objection, outside the

21   scope of topics for the corporate deposition.

22             You can respond in your individual

23   capacity.

24       A    Yes.

25   BY MR. KLORFEIN:

Page 97

1      Q    When did she bring it to your attention?

2      A    I do not know.

3      Q    Do you recall how she brought it to your

4  attention?

5           MS. SANTEN:  Same objection just to this

6  line of inquiry generally.

7      A    No.

8  BY MR. KLORFEIN:

9      Q    Do you recall what you did in response to

10 that?

11     A    No.

12     Q    Do you remember any other details about an

13 issue that Mr. Parker raised regarding tare weight

14 tickets in September 2018?

15          MS. SANTEN:  Same objection, outside the

16 scope of topics.

17     A    As I said before, he was always trying to

18 scheme and trying to figure out a way to make

19 excuses for his poor performance.  This is obviously

20 his word against ours.  Does he have -- he says he's

21 got a video.  Do you have it?

22 BY MR. KLORFEIN:

23     Q    Do you recall any details about this

24 incident?

25     A    Yes.

Page 98

1      Q    What are the details you remember?

2      A    I remember Dale was always complaining to

3  make excuses for his poor performance, and we could

4  never find any errors.

5      Q    Well, you found at least one error, right?

6      A    We found two, and we corrected them.

7      Q    Well, we talked about two errors in 2017.

8      A    Yes.

9      Q    You corrected the second one.

10      A    We corrected both of them.  He was paid

11  six flock average for flock 46 and 48.

12      Q    And that was after the USDA brought it to

13  your attention?

14      A    One was after Dale brought it to our

15  attention; the other was after USDA.

16      Q    Well, you corrected that first issue after

17  USDA brought it to your attention.

18          MS. SANTEN:  Objection, asked and

19  answered.

20      A    Corrected the first one after Dale brought

21  it to our attention.

22  BY MR. KLORFEIN:

23      Q    Both of those occurred after USDA had

24  reached out.

25          MS. SANTEN:  Objection, misstates

Page 99

1    testimony.

2         A    We only corrected one that the USDA asked

3    about.  The other was at Dale's request.

4    BY MR. KLORFEIN:

5         Q    You did not --

6         A    We did not find an error in the one from

7    USDA when Dale mentioned it; we found it later.

8         Q    But you did, in fact, find a procedural

9    error, right?

10        A    A tare weight was off.

11        Q    You found a procedural error, yes?

12        A    Yes.

13        Q    But you don't recall any further details

14   about investigating this issue in September 2018?

15             MS. SANTEN:  Same objection, outside the

16   scope of topics.

17        A    We investigate every flock that someone

18   complains about.

19   BY MR. KLORFEIN:

20        Q    You just don't remember the details of

21   this investigation?

22        A    I mean, I knew about the text message of

23   Dale saying the numbers did not match, but, again,

24   he had no proof.  If he had a video, he didn't show

25   us.

30(b)(6) Clay Copeland                              April 29, 2025
Parker, Roger v. Perdue Foods, LLC

Page 102

1          Q      You don't recall any details about that

2      conversation?

3          A      Not until I got the letter.

4          Q      Now, in that list of -- did you say it was

5      upgrades or improvements, I'm sorry?

6          A      Repairs.

7          Q      Repairs.

8                 In that list of repairs, did you indicate

9      that Perdue would withhold flocks if those repairs

10     were not made?

11         A      If it was an animal welfare issue that

12     the -- and the repairs had to be done prior to

13     chickens coming in or it would be -- cause the death

14     of chickens and problems with the flock.

15         Q      So is that a yes, Perdue indicated it

16     would not place chickens until those repairs were

17     made?

18         A      Yes.

19                (Plaintiff's Exhibit 30 was marked for

20     identification.)

21     BY MR. KLORFEIN:

22         Q      Handing you what has been previously

23     marked as Plaintiff's Exhibit 30, Perdue 8030.  This

24     is an October 2018 text message between Mr. Parker

25     and Ms. Mizell, correct?

                                                    Page 106

1         A    I didn't know about this text message.

2         Q    So that's a no, you did not investigate

3    that issue?

4         A    No.

5              (Plaintiff's Exhibit 54 was marked for

6    identification.)

7    BY MR. KLORFEIN:

8         Q    I'm marking Plaintiff's Exhibit 54, Bates

9    7767.

10             Do you recognize this e-mail chain?

11        A    Yes.

12        Q    Do you see the e-mail from Roger Parker on

13   May 9th to Kathryn Mizell?

14        A    Yes.

15        Q    He references an issue with the fans in

16   that e-mail?

17        A    Yes.

18        Q    At the end he says:  Please help me?

19        A    Yes.

20        Q    And Ms. Mizell forwards that e-mail to

21   you, correct?

22        A    Yes.

23        Q    This is in May 2019.  Do you see that?

24        A    Yes.

25        Q    Did you conduct any investigation to

30(b)(6) Clay Copeland
Parker, Roger v. Perdue Foods, LLC

April 29, 2025

Page 134

1    certain growers, before this case was limited to

2    Mr. Parker's individual allegations only, whether

3    they would be willing to speak with us?

4         A    Yes, that was in the interrogatories.

5         Q    Okay.  Let me ask a question about kind of

6    2018-2019 time period.  Opposing counsel had asked

7    you what date the list of repairs was sent to

8    Parker, and you said October of 2019.  Was that

9    actually October of 2018?

10        A    Yes.

11        Q    Okay.  Can you talk me through what

12   happened from those list of repairs from October

13   2018 through the time of August 2019 when was the

14   last time we decided to withhold flocks pending

15   repairs, can you talk me through that timeline?

16        A    Yes.  We sent Dale the equipment list, and

17   I went out and talked to him, and then he did some

18   repairs, and visually it looked like that everything

19   would be fine, so -- and he wanted to place

20   additional flocks so that he could sell the farm.

21             So we placed additional flocks.  I believe

22   he got two additional flocks, and they were pretty

23   bad.  Again, animal welfare issues, fans not

24   working, stuff that you couldn't see until you put

25   it under load.