Page 1

```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF GEORGIA
                    MACON DIVISION


 ROGER PARKER on his own
 behalf and on behalf of
 all others similarly
 situated,                       CIVIL ACTION FILE

            Plaintiffs,     NO. 5:22-cv-00268-TES

 vs.

 PERDUE FOODS, LLC,

            Defendants.


           VIDEO 30(b)(6) DEPOSITION OF
                  PERDUE FOODS, LLC
              MICHAEL KEITH LEVINGOOD


                November 14, 2023
                    9:02 a.m.


                   Suite 4800
             191 Peachtree Street, N.E.
                 Atlanta, Georgia


          Tracy A. Warner, B-2168, RPR


           David Ramirez, Videographer
```

Case 5:22-cv-00268-TES    Document 136-8    Filed 08/19/25    Page 2 of 17
30(b)(6) Michael Keith Levingood    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 10

1         MS. SANTEN:  Objection, vague.
2         THE WITNESS:  Can you clarify?
3    BY MR. KLORFEIN:
4         Q.    Sure.  When you reviewed any documents,
5    did they refresh your recollection as to any facts
6    that wasn't already in your mind?
7         A.    Yes.
8         Q.    What were those documents?
9         A.    Contracts.
10        Q.    Contracts with growers?
11        A.    Yes.
12        Q.    Any other contracts?
13        A.    No.
14        Q.    And I should say if I refer to a grower or
15   a producer, can we have the understanding that I'm
16   referring to a chicken grower that has performed work
17   for Perdue?
18        A.    Yes.
19        Q.    And aside from contracts with growers, did
20   you review any other documents?
21        A.    No, not that I can think of.
22        Q.    Real briefly, can you just tell me your
23   job history with Perdue?
24        A.    Sure.  So I've been -- this is my fortieth
25   year with the company.  I started as a flock

1  supervisor.  I did that for six years, moved up
2  through the ranks when I did that.  I also -- then I
3  was three years working for corporate.  I was a
4  continuous improvement manager, so I got to travel
5  around the company and learn about the company.
6            And then I went into operations.  I went
7  into the Salisbury plant for three years, worked my
8  way up to plant manager.  I went to Milford,
9  Delaware, for --  we bought that facility, and I was
10 there 18 months.  We had bought -- we had built an
11 operation in Cromwell, Kentucky, and they asked me to
12 go out there and help fix that as the plant manager,
13 so I was out there three years.
14           Then I came back to Milford as a complex
15 manager.  And I did that from 2000 to 2006.  From
16 2006 to 2007, I had all the plants on the shore.  And
17 then in 2007, they created a new job, VP of live
18 production, live operations.  So I had all live
19 operations from 2007 to 2000 and -- end of '15.
20           And then start of '16, I got my current
21 role.  So I'm vice president, chief animal care
22 officer, and farmer relationship advocate for the
23 company.
24      Q.   What does that role entail?
25      A.   So I have nobody reporting to me.  So my

1  BY MR. KLORFEIN:
2      Q.    If you would refresh your screen, you
3  should see Plaintiffs' Exhibit 4.  It's a 12-page
4  document.  And it ranges from Perdue 1580 through
5  1591.  Once you've got it in front of you and you've
6  had a chance to look at it, let me know.
7            And my first question will be:  Do you
8  recognize this document?
9      A.    I recognize, yes.
10     Q.    What is it?
11     A.    So this is biosecurity, the never-evers
12 and dedicated-tos.  We also have the
13 government-specified line of separation and the
14 government-specified perimeter buffer area defined as
15 the government defines it.  We have biosecurity
16 footbaths that are used on the farm before entering
17 the line of separation, and then we also have the
18 broiler producer biosecurity Level 1, 2, and 3, which
19 are best management practices for our farmers, our
20 producers, to protect their birds.
21     Q.    We'll go through a couple of these one by
22 one, but one of the things that you said was that
23 there was a government-imposed kind of regulation.
24 Is that Bates 1581, that second page?
25           MS. SANTEN:  Objection, vague.

Case 5:22-cv-00268-TES   Document 136-8   Filed 08/19/25   Page 5 of 17
30(b)(6) Michael Keith Levingood   November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 32

1  you are a greater risk than somebody who never goes
2  to a live bird market to make their birds sick.
3           And so you can just go through each one of
4  those, and it's really letting them know if you add
5  this to how you operate your farm, you -- most
6  likely, you're going to reduce -- you're going to
7  reduce your chances of getting sick.  It's like
8  you -- if you do a good job washing your hands, you
9  should reduce the way you get sick.
10     Q.    Great.  And everyone should wash their
11  hands.
12     A.    Exactly.  And the dedicated-tos are the
13  next step, the same, okay?  So if you're going to do
14  the never-evers, then the dedicated-tos, if somebody
15  visits your farm, you should know who is visiting
16  your farm.  You should have the visitors comply with
17  the biosecurity BMPs that you've implemented on your
18  farm and we've recommended, you should implement
19  those.  You're the one -- you're there 24 hours a
20  day.  We're not, because it's your business and your
21  farm.
22           So you just go through each one of those,
23  farm dedicated shoes.  You know, you go down to the
24  local supermarket and you're wearing your chicken
25  shoes, what are you picking up on your shoes and what

1  are you bringing back to the farm?  If you only have
2  farm-dedicated shoes, what's the -- you have less
3  risk of bringing something into the house.  So this
4  is more of how they operate.  And you can see we've
5  added the line of separation.  That's the laws of the
6  chicken house.  That's what that is.
7           The perimeter buffer area, years ago
8  before the USDA came out with this, we used to just
9  protect your farm from the road.  Well, a lot of
10 these farms are right next to their dwelling house.
11 They have visitors come.  They're not thinking about
12 it.  You know, they say, oh, I'm protecting from the
13 road.  But the visitor wants to visit the chicken
14 house and they don't do any of this.  So we drew a
15 farm around the -- we drew a line around the
16 production area.
17          The government says, define your
18 production area, your BP -- PBA, your perimeter
19 buffer area, label that.  So we have a picture of
20 that, and we have a line drawn.  So in their head, in
21 their minds when they cross, they go, oh, I'm in the
22 PBA.  Never-evers, dedicated-tos, am I doing -- is my
23 farm plan the best?  And it's their farm plan.  They
24 have to rate the farm plan.
25          Q.   That's right.  And in your answer, I think

Case 5:22-cv-00268-TES    Document 136-8    Filed 08/19/25    Page 7 of 17
30(b)(6) Michael Keith Levingood    November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 52

1  in there that the way our third-party auditors are
2  looking at things and they discuss there's a
3  different way to audit, then she would go in and have
4  to make a change in a document, and then all those 11
5  locations would then have to follow that change.
6       Q.   And then the growers would also have to
7  follow the change?
8       A.   Only the things in here that apply to the
9  growers.  This is more than just our farmers.
10      Q.   Right.  But it includes guidelines for the
11 farmers as well?
12      A.   I'm just saying that what you said is,
13 only changes in here that apply to our farmers would
14 be what we would go and talk to our farmers about.
15      Q.   Let's talk about a couple of those.
16      A.   Sure.
17      Q.   Turning to Bates 3540.
18      A.   35 --
19      Q.   3540.  It's about 83 pages in.
20      A.   (Witness complies.)
21      Q.   The title page says "Producer Caretaker
22 Poultry Care Training."
23      A.   Yes.
24      Q.   Is this the training that would apply to
25 growers?

Case 5:22-cv-00268-TES   Document 136-8   Filed 08/19/25   Page 8 of 17
30(b)(6) Michael Keith Levingood   November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 53

1      A.    Yes.
2            MS. SANTEN:  Objection, vague.
3            THE WITNESS:  Yes.
4   BY MR. KLORFEIN:
5      Q.    Is it provided to all growers?
6      A.    Yes.
7      Q.    And growers are expected to follow these
8   instructions?
9            MS. SANTEN:  Objection, vague.
10           THE WITNESS:  We train them.
11  BY MR. KLORFEIN:
12     Q.    And Perdue trains with the expectation
13  that growers follow these trainings?
14     A.    Yes.
15           MS. SANTEN:  Same objection, vague.
16  BY MR. KLORFEIN:
17     Q.    And growers are required to follow the
18  guidance in these trainings?
19           MS. SANTEN:  Same objection, vague.
20           THE WITNESS:  We train them because we're
21     going to be audited on it.  And, yes, we want
22     them to follow them.
23  BY MR. KLORFEIN:
24     Q.    You require them to follow these
25  guidelines?

1   Q.   I noticed as you were flipping through
2 that you put these pages in different sections on the
3 table.  Was there a reason you did that?
4   A.   Yeah.  I wanted to separate them so when
5 you ask me the questions, I can see them.
6   Q.   And did you sort them into any type of
7 category?
8        MS. SANTEN:  Just object generally.  This
9        isn't covered by the topics at all.  If he wants
10       to respond in his individual capacity, he can.
11       MR. KLORFEIN:  This is squarely within the
12       policies that --
13       MS. SANTEN:  How he organized papers on a
14       table for purposes of being able to see
15       everything so he could respond to your question
16       is not covered by the topics at all.  I think he
17       just said he did it that way so he could see
18       everything so he could fully respond to your
19       questions.  And so that was his response.  I
20       don't think there's any further response needed.
21       MR. KLORFEIN:  Your objection is noted.
22 BY MR. KLORFEIN:
23   Q.   Did you categorize these on the table for
24 any particular reason?
25   A.   I wanted to pull out the euthanization.

1      Q.     And why did you do that?

2      A.     Because it's a requirement.

3      Q.     And I see a couple pages that you pulled

4  out related to euthanization.  Can you read the Bates

5  numbers for the pages that fall in that category?

6      A.     3548, 3544, and I also included the

7  hotline, 3544.

8      Q.     I got 3548, 3544.  I'm not sure I got the

9  last one.

10     A.     3547.  That's the euthanization.

11     Q.     And those are all requirements that Perdue

12 has for growers?

13     A.     Uh-huh.

14            MS. SANTEN:  Provide a yes or a no.

15            THE WITNESS:  Yes.

16 BY MR. KLORFEIN:

17     Q.     Aside from the euthanizing slides that we

18 just talked about, did you put any other slides into

19 another category of bucket on your table?

20     A.     There's -- yes.

21     Q.     And what was that category?

22     A.     Pretty much they were recommended ---

23 recommended that levels of production that match,

24 that we need to be sure the farmers understand that

25 these will be audited against, that -- you know, that

1  are the same on both of those, okay?  We have GAP,
2  Global Animal Partnership, that's a -- that's for
3  birds that you sell to Whole Foods.  That's for
4  birds -- all of our organic birds are Global Animal
5  Partnership Level 3 audited.  Then we also have --
6  all of our organic birds are also audited -- all
7  those farmers perform specific audits for GAP, and
8  they're audited to be organic-certified.
9           So all these audits -- plus, we have
10 customer audits.  There's some customers that want to
11 audit our programs.  So we have all these audits.
12 Generally, the audits follow the same basics of
13 what's in this, okay, some minor tweaks.  So we want
14 to be sure we're providing our customers what we say
15 we are with poultry care.
16          Not only this, we also have NAE, no
17 antibiotics ever, PVP.  Our farmers are tied into
18 that one, just because they can't be running any
19 antibiotics on their farm, or they're no longer NAE.
20 Now, that would be prescribed by our veterinarians.
21 So they don't -- but they also know on the contrary
22 they can't go buy it off the shelf and go run it on
23 their birds.  They would be out of the program then,
24 out of the program of NAE.
25          So it's -- all this training is so that we

1  provided, whether it uses the required, or who paid
2  for the signage, clothing.  Perdue requires that some
3  or all the growers have the same or similar
4  equipment, signage, or clothing."
5            Okay.  When I look at the signage, you've
6  got to tie some of these together.  So farm signs, we
7  put a sign at the end of the lane with the farmer's
8  name on it.  Why we do that is truck drivers are
9  delivering feed to the farm.  We want to make sure
10 the feed is delivered to the right farm, so they
11 look.  So we put these farms -- and we pay for that.
12           Biosecurity sign, it's in the biosecurity
13 list.  It's also audited for the 14 steps from the
14 government to be indemnified that we have to have a
15 biosecurity sign up.
16           The feed bin signage, we put numbers on
17 the bins.  When we deliver, there could be two or
18 three bins per house and A, B, and C.  And when they
19 order feed, they might want the feed to only go in
20 C bins, so you've got to identify the bins, so we do
21 that (indicating).
22      Q.   And I don't want to interrupt.  You can
23 continue, but I just wanted to note for the record
24 that you put your hand, when you were referring to
25 biosecurity, on Exhibit 3.

1      Q.   And are the flock supervisors trained on
2   all the forms?
3      A.   Just like I said, generally, all the forms
4   have the same information on them.  It's just the
5   multiple weeks -- really, the big difference is the
6   number of weeks.  A small bird is only going to be
7   four weeks.  A large bird is going to be eight weeks.
8   So the same information, it's just spread out over
9   eight weeks versus four weeks.
10          So there's not -- once you train them on,
11  here's the visitation, it's not a difference other
12  than you're going to visit a large bird eight
13  times -- at the max, eight times -- and a small bird
14  four times.  That's it.
15     Q.   Gotcha.  So there will be an extra sheet
16  for those extra weeks in the --
17     A.   Yeah, and they're supposed to visit once a
18  week, right, recommended to visit once a week.  So if
19  you visit and they're four-week-old chickens, you
20  would use the four-week-old visitation.  If
21  they're -- the next week, you would use the five-week
22  visitation.
23     Q.   And earlier in your testimony you said
24  that some flock advisors might skip a week.
25     A.   Correct.

Case 5:22-cv-00268-TES   Document 136-8   Filed 08/19/25   Page 14 of 17
30(b)(6) Michael Keith Levingood   November 14, 2023
Parker, Roger v. Perdue Foods, LLC

Page 124

1      Q.    At their discretion with -- in conjunction
2   with their live production manager?
3      A.    Uh-huh.
4      Q.    Is that right?
5      A.    Yes.
6      Q.    What about on the flip side from the
7   grower?  If a grower is doing very well, can they
8   refuse to have visitation?
9      A.    No.
10     Q.    So turning back to this document, on Bates
11  1398.
12     A.    Yes.
13     Q.    It says "Broiler flock handoff to plant."
14     A.    Yes.
15     Q.    This is an inspection that occurs at the
16  handoff?
17     A.    This is -- no.  This -- you want me to
18  explain?
19     Q.    Sure.
20     A.    So depending on the -- this is done at
21  different ages.  Small birds, this would be done
22  during the third week.  On medium birds, this might
23  be done during the fifth week.  This sheet is filled
24  out by the flock advisor seven days before the birds
25  go to process.

1      A.    Yes.  A difference would be euthanization
2   and culling is pretty much every week you're going to
3   ask it, right?  If the bird is four weeks old, you
4   only ask until four weeks.  If the bird is eight
5   weeks old, you would ask eight times.
6            So it's the same -- but the other
7   questions like litter condition, ammonia, you
8   probably ask every week.  But, like, current lighting
9   program, it's not asked every week.  So it -- but the
10  gist of them all are asked, consolidated or spread
11  out.
12     Q.    Okay.  Now, production, that middle
13  category, is that similar or different to the other
14  two categories?
15     A.    They pretty much stay the same every week.
16  It doesn't matter.  They're the checks -- they're the
17  basic minimal checks that we're going to look at when
18  we come.  Every week, you're going to look at feeder
19  height.  So they're -- every week, they're the same.
20     Q.    And that's production -- these production
21  checks are consistent across all flocks?
22     A.    Yes.  The -- I'd have to look at them all.
23  But just to clarify on my part, water flow rate,
24  okay?  If you see water flow rate, it may change the
25  numbers on different weeks.  But they're still

1  looking at the flow rate.
2     Q.   Gotcha.
3     A.   If you looked at actual pressure that they
4  wrote that in -- so some of those, they write in.  So
5  they're recording what it actually is.  Yeah,
6  they're -- they're blocked, so they actually have to
7  put that data in.  So they are going to be -- they
8  look at it each week, but the flock advisor actually
9  puts in what's happening at that moment.  Does that
10 help?
11    Q.   So the criteria of whether or not they're
12 in compliance does not change.  The question is --
13 the change is what's the proper level?
14    A.   Right.
15    Q.   And so looking at this, it looks like
16 "minimum run time, actual pressure, water flow rate"
17 are written there?
18    A.   Yes.
19    Q.   So that question is going to be asked
20 every week?
21    A.   Correct.
22    Q.   But the answer that is adequate or not is
23 going to change because the flow might need to be
24 different based on the week?
25    A.   Yes.

1   Area."
2            So anybody who enters the farm is supposed
3   to sign in, except for the farmer.  It's their farm.
4   You don't make them sign in to their own farm.  Feed
5   mill, we know when we're delivering feed to the farm.
6   Live haul, we know when we're scheduling live haul.
7   And chick delivery, we know when we're scheduling
8   chick delivery.  Anybody else entering the farm
9   should sign in.
10           Its main purpose is tied to biosecurity
11  because we want to know if we had a disease outbreak,
12  we could look on here and see who was on that farm.
13  We could call them up and go, where else did you go
14  after this farm?  So, really, it's a log to help us
15  in case we got into a high-path situation to help us
16  stop the disease quicker, and that's really the
17  purpose of this.
18       Q.    And this applies to all growers?
19       A.    All growers have a mailbox.  All growers
20  have a visitation log.  But we -- they don't do
21  anything.  It's us.  We stick it in the box.  They
22  don't sign it.  So it's really -- we stick it on the
23  farm.  We collect it.
24       Q.    Got it.  And Perdue requires that it be
25  posted at the farm?