# Exhibit M

Page 1

1               IN THE UNITED STATES DISTRICT COURT

2                FOR THE MIDDLE DISTRICT OF GEORGIA

3                         MACON DIVISION

4

5    ROGER PARKER, on his own behalf        CASE NO.

6    and on behalf of all others similarly  5:22-CV-00268-TES

7    situated,

8                    Plaintiffs,

9           vs.

10   PERDUE FOODS, LLC,

11                   Defendant.

12

13

14

15

16        REMOTE VIDEO DEPOSITION OF KATHRYN MIZELL

17                    April 3, 2025

18

19

20

21

22   REPORTED BY:    Laura H. Nichols

23                   Certified Realtime Reporter,

24                   Registered Professional

25                   Reporter and Notary Public

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 31

1          Q.     And did the flock advisors in your

2     purview document their visits?

3          A.     Yes.

4          Q.     Did they provide those documents to

5     you for your review?

6          A.     Yes.

7          Q.     And was that part of your

8     responsibility to take in those reports and review

9     them?

10         A.     Yes.

11         Q.     Did that include flock visitation

12    reports?

13         A.     Yes.

14         Q.     What was the purpose of flock

15    visitation reports?

16         A.     The purpose of the flock visitation

17    reports are to check the biosecurity and animal

18    welfare and also have an opportunity to share with

19    farmers practices that would help them improve

20    performance.

21         Q.     And why is it important for Perdue

22    that farmers comply with Perdue's biosecurity

23    guidelines?

24                MS. WOOTEN:   Object to form.  You can

25    answer.

Kathryn Mizell                                          April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 37

1          A.     Feed delivery tickets, I review those

2     to understand what feed types have gone to the

3     farm, and I would review them when farmers might

4     have questions about them.

5          Q.     Were those questions related to

6     whether or not they were accurate?

7          A.     Those questions were related to

8     understanding the format of the ticket.

9          Q.     And then I believe you also

10    referenced harvest tickets as well?

11         A.     Yes.

12         Q.     What is the purpose of a harvest

13    ticket?

14         A.     So a harvest ticket or a live haul

15    ticket is the receipt of sorts that a driver leaves

16    when they pick up -- when they catch the chickens

17    and take them to the plant.

18         Q.     And why would you review those

19    tickets?

20         A.     To make sure that the farm was

21    credited for all of the loads.

22         Q.     And I believe I skipped over this,

23    but what is the purpose of the farm visitor logs?

24         A.     It is a part of our biosecurity

25    program.

Kathryn Mizell                                                April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 38

1           Q.      To ensure compliance with that
2    program?
3           A.      Yes.
4           Q.      And I believe you referenced
5    reviewing the biosecurity program or other policies
6    in preparation for this deposition.  But in your
7    role as a grow-out manager, were you also expected
8    to be familiar with those policies?
9           A.      Yes.
10          Q.      And are you familiar with the term
11   "grower file"?
12          A.      Yes.
13          Q.      What is that?
14          A.      I am really not sure about your
15   question, to be honest.  I -- there's no official
16   term "grower file."  But we keep the contracts and
17   payment schedules and those things in a folder that
18   would be called a grower file.
19          Q.      Fair enough.  And that is organized
20   by grower?
21          A.      Yes.  Yes.  Well, it is organized by
22   farm actually.
23          Q.      Fair enough.  So there would be a
24   separate grower file for Hazel Lee versus Parker's
25   Poultry?

Page 42

1          Q.     What about programs related to

2     lighting?

3          A.     Animal welfare.

4          Q.     And I have seen, and we can go into

5     some examples later, but seasonal guidelines like a

6     winter or summer checklist?

7          A.     Are you asking about the guideline

8     themselves?  Or what are you asking?

9          Q.     My question is do those fall under

10    animal welfare, biosecurity or something else?

11         A.     The guidelines, the seasonal winter

12    and summer guidelines were intended to improve

13    farmer performance.  But at the same time, without

14    a guideline, the birds have to have temperature and

15    air to survive.  So there is, you know, somewhat --

16    I mean ventilation is required for animal welfare,

17    yes.

18         Q.     Got you.

19         A.     The guidelines themselves were

20    intended to improve farm performance.

21         Q.     Got it.  So if there's like a

22    temperature or a lighting range that is provided,

23    that would relate to animal welfare or biosecurity?

24         A.     Animal welfare and biosecurity, yes.

25         Q.     I have seen documents referring to

Kathryn Mizell                                            April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 48

1              MS. WOOTEN:   Thank you.

2         Q.    (BY MR. KLORFEIN:)  So I am now at

3    Perdue 3540.  It is titled "Producer/Caretaker

4    Poultry Care Training."  Are you familiar with this

5    type of training?

6         A.    Yes.

7         Q.    Again I see the version at the bottom

8    left-hand corner says February 1st, 2023.  Are you

9    aware of a program similar to this that was in

10   place from 2017 to 2019?

11        A.    Yes.

12        Q.    Do you know if that training was

13   provided to all growers during that time frame?

14        A.    Yes.

15        Q.    It was?

16        A.    Yes, it was.

17        Q.    And turning to Perdue 3549, it says

18   Litter Moisture/Ammonia at the top.  Do you see

19   that?

20        A.    I see that.

21        Q.    It says in that first bullet:

22   Written minimum ventilation and temperature program

23   must be on farm.

24        A.    I see that, yes.

25        Q.    Do you know what that means?

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 49

1        A.      Yes.  It says that there's a minimum
2    vent and temperature program that must be on the
3    farm.  So that would -- we typically use our
4    guideline to meet that expectation.
5        Q.      Understood.  And it says written.  Is
6    that that the minimum ventilation and temperature
7    program actually has to be posted on the farm?
8        A.      Yes.
9        Q.      And was this requirement in place in
10   2017 through 2019?
11       A.      Yes.
12       Q.      And what would happen if a grower
13   declined to post that program on their farm?
14       A.      We would have a deduction should we
15   have an audit from an outside party.
16       Q.      And would a deduction be just a
17   reduction in pay on the settlement sheet or
18   something else?
19       A.      Oh, no.  You misunderstood.  I said
20   we would have a deduction on an audit from an
21   outside third party.
22       Q.      My mistake.  So you are saying that
23   if there was an audit by a third party, that third
24   party would deduct from Perdue?
25       A.      Yes.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 52

1    postings at the farm and encourage farmers to

2    follow BMPs and understand the PVP expectations and

3    animal welfare and biosecurity.

4           Q.    (BY MR. KLORFEIN:)  Okay.  So they

5    are responsible for ensuring that Perdue's required

6    postings are at the farm?

7           A.    Yes.

8           Q.    And that a grower is following the --

9    did you say PVP?

10          A.    Best management practices.

11          Q.    The BMPs?

12          A.    Yes.  Yes.

13          Q.    Got it.  So breaking that down, flock

14   advisor is responsible for ensuring that the grower

15   is posting the proper postings on their farm?

16          A.    I'm sorry.  Were you done?

17          Q.    Yeah.

18          A.    The flock advisor posts the required

19   postings on the farm.

20          Q.    Got it.  They are the ones who

21   actually post it up on the farm?

22          A.    Yes.

23          Q.    That is helpful.  And their other

24   tasks aside from physically posting these

25   requirements on the farm is to work with the grower

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 53

1    to ensure the grower understands the BMPs?

2              A.      Yes.

3              Q.      Because Perdue wants its growers to

4    follow the BMPs?

5              A.      Following the BMPs is beneficial to

6    both Perdue and the farmer.

7              Q.      And if a flock advisor fails to

8    indicate a grower on the BMPs, that flock advisor

9    might need counseling by you?

10             A.      Yes.

11             Q.      Any other type of reprimand if it is

12   clear the flock advisor is not working with the

13   grower on the BMPs?

14             A.      Yes.

15             Q.      What are those other actions you

16   would take with the flock advisor?

17             A.      Well, at that point it would probably

18   start a process with HR, human resources.

19             Q.      For termination?

20             A.      It is possible.  But yeah, I mean

21   there's a few steps before that.

22             Q.      Got it.  But the end result could be

23   termination?

24             A.      It is one of the options, yes.

25             Q.      Moving to Perdue 3550, the next page,

Kathryn Mizell                                     April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 61

1     keep poultry or birds that are not Perdue.

2              Q.      Is it your understanding that these

3     Never Evers and Dedicated Tos are actually provided

4     to growers?

5              A.      Yes.

6              Q.      Are they supposed to be posted on the

7     farm?

8              A.      Yes.

9              Q.      Does the flock advisor put that up or

10    just the grower?

11             A.      The flock advisor.

12             Q.      And have you ever had a flock advisor

13    not put them up or a grower?

14             A.      No.

15             Q.      So every flock advisor that has ever

16    been under your purview has posted these Never

17    Evers or Dedicated Tos?

18             A.      To my knowledge, yes.

19             Q.      And it says "Never Ever," right, at

20    the top?

21             A.      Yes.

22             Q.      This is an instruction to growers to

23    never violate the bullet points below?

24                    MS. WOOTEN:  Object to form.  You can

25    answer.

Page 62

1          A.     I understand that Never Ever to be,

2     these are items that would lead to a disease

3     outbreak on the farm.  So they would be items that,

4     if you didn't do anything else to prevent disease,

5     that you wouldn't do these.

6          Q.     (BY MR. KLORFEIN:)  And I am just

7     trying to understand.  If you didn't do anything

8     else, you would do these?

9          A.     So like this is -- I understand this

10    to be the absolute minimum; if you don't do any

11    extra steps to prevent disease, these would be the

12    basic minimum things a farmer would do to prevent

13    disease.

14          Q.     Got it.  So this is kind of the

15    floor.  It is not the ceiling of what Perdue would

16    ask its growers to do?

17               MS. WOOTEN:  Object to form.  You can

18    answer.

19          A.     There are different levels of disease

20    prevention, depending on the environment.

21          Q.     (BY MR. KLORFEIN:)  Got you.  So

22    Perdue might ask its growers to do more than this?

23          A.     Yes.

24          Q.     But this is -- you absolutely have to

25    do these?

Kathryn Mizell                                April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 63

1          A.      Yes.

2          Q.      All right.  And if a grower decided

3     to start keeping wild birds on its property, what

4     action would you take at that point?

5          A.      What do you mean keeping wild birds?

6     I mean --

7          Q.      Well, let's use another one.  If you

8     determine that a grower started every weekend

9     visiting a live bird market, would you take any

10    action?

11         A.      I would kind of have to be visiting

12    those markets, too, to know that they were going

13    there every weekend.  I don't -- I mean I --

14         Q.      Okay.  What about never allow an

15    animal to scavenge dead birds from your farm?

16         A.      Okay.

17         Q.      If you determined that a grower was

18    letting, you know, coyotes or something else

19    scavenge dead birds from their farm, would you take

20    any action?

21         A.      Yes.

22         Q.      What actions would you take?

23         A.      I would review my findings with the

24    farmer and discuss why that would be happening.

25    The times that it has occurred, it was just

Page 74

1          Q.     Change water filters?

2          A.     Yes.  A recommendation.

3          Q.     Maintain generator log weekly?

4          A.     Yes.

5          Q.     And I noted you said that these were

6     recommendations?

7          A.     That's correct.

8          Q.     So if a grower declines to change

9     their water filters, for example, would you take

10    any action at that point?

11         A.     Not past letting them know that they

12    should consider changing their water filters.

13         Q.     And if they also failed to take -- to

14    create generator log?

15         A.     The generator log is a part of their

16    PVP bonus, so it could affect their PVP bonus if

17    they declined to maintain a generator log weekly.

18         Q.     Got it.  And of these 1 through 10

19    guidelines, which of the ones relate to the PVP

20    bonus?

21         A.     9 and 10.

22         Q.     So just these last two?

23         A.     Yes.

24         Q.     And so if a grower failed to abide by

25    9 or 10, Perdue might withhold the PVP bonus?

Page 75

1          A.     Yes.

2          Q.     Aside from withholding the PVP bonus,

3    would you take any additional action if a grower

4    continuously violates 9 and 10?

5          A.     Can you ask the question again?

6          Q.     Sure.  For 9 and 10, you referenced

7    how Perdue would withhold the PVP bonus as a

8    potential consequence for failing to abide by 9 and

9    10, right?

10         A.     Uh-huh.

11         MS. WOOTEN:  Objection to the form to

12   the extent it misstates testimony.  You can answer,

13   Kathryn.

14         Q.     (BY MR. KLORFEIN:)  And aside from

15   withholding the PVP bonus, are there additional

16   actions that you would take if a grower continues

17   to fail to abide by 9 and 10?

18         A.     Typically -- it doesn't happen very

19   much, so I can't -- I don't have anything solid to

20   go off of other than removing the PVP.

21         Q.     Got it.  But it has happened?

22         A.     Not on a continuous basis for these

23   items, no.

24         Q.     Withholding the PVP usually does the

25   trick?

Kathryn Mizell                                April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 80

1      result in a PVP bonus being withheld?

2              A.      I have to point out the alarms again.

3      I can't remember if that is on there.  But other

4      than that, no.

5              Q.      And would any of -- would failing to

6      abide by any of these recommendations, as you put

7      it, result in an animal welfare issue if a grower

8      violated them?

9                      MS. WOOTEN:  Object to form.  You can

10     answer.

11             A.      The ammonia, if it is over

12     twenty-five PPM, we would ask that action occur to

13     reduce the ammonia.

14             Q.      (BY MR. KLORFEIN:)  And if after that

15     conversation occurred, the grower continued to fail

16     to abide by that guideline?

17                     MS. WOOTEN:  Objection to the extent

18     it calls for speculation.  You can answer.

19             A.      We would ask for a readjustment to

20     reduce the ammonia below twenty-five PPM.

21             Q.      (BY MR. KLORFEIN:)  But if they

22     continued to violate that guideline, that becomes

23     an animal welfare issue, right?

24             A.      Yes.

25             Q.      And if it becomes an animal welfare

Kathryn Mizell                                  April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 81

1    issue, eventually the repercussion is that you will

2    withhold flocks, right?

3              MS. WOOTEN:   Object to form.  You can

4    answer.

5         A.   I guess that would be possible, yes.

6         Q.   (BY MR. KLORFEIN:)  Same for set

7    lights to run full lights for seven days, if that

8    is violated continuously, would that become an

9    animal welfare issue?

10        A.   I can't speak to that because I think

11   we give them darkness starting the first --

12        Q.   And then the second -- I'm sorry.

13   Please continue.

14        A.   The first day I think they start

15   getting darkness, I think.

16        Q.   Well, it says:  After seven days you

17   must maintain at least four hours of darkness per

18   day.

19        A.   Well, again, this is from 2010, I

20   think, so --

21        Q.   Do you recall whether or not in 2017,

22   2019 the lighting requirements had changed?

23        A.   I don't -- I don't remember.  I just

24   know -- I feel like there was a one-hour dark

25   period in there in that first seven days.

Page 107

1          Q.     Please.

2          A.     So during the process of harvesting a

3    truck that left the plant with -- that was

4    originally intended to go to one farm may be

5    rerouted to another farm, at which point the ticket

6    on the -- the name on the ticket may be inaccurate.

7          Q.     It is the right ticket, just not for

8    the right person?

9          A.     Right.  Right.  But what -- so what

10   matters, though, is that the tickets that, when

11   they come back to the plant, they are stamped with

12   the farm that the birds belong to.

13         Q.     And had you encountered this in your

14   work prior to Perdue?

15         A.     We did not have a system like this in

16   my previous experience.

17         Q.     Got you.  So this system is specific

18   to Perdue?

19         A.     The stamp system is, yes.  The live

20   haul tickets is not specific to Perdue.  But the

21   stamp is specific to Perdue.

22         Q.     And your memory is that this stamp

23   issue was where it was improperly left at a

24   different farm?

25                MS. WOOTEN:  Object to form.  You can

Kathryn Mizell                                        April 3, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 123

1      in a slight bit just for me?

2                      MR. KLORFEIN:  Sure.

3                      MS. WOOTEN:  I think it might have

4      cut off.  Oh, there it goes.  Thank you.

5                      MR. KLORFEIN:  And just because I

6      zoomed in, I am going to begin at the earliest

7      email and I will scroll upwards.  But if at any

8      point in time you want me to scroll, Ms. Mizell,

9      just let me know.  Okay?

10                     A.     Okay.

11                     Q.     So Plaintiffs' Exhibit 20 is an email

12     from Mr. Copeland to Ellen Dunn, copying you,

13     subject "Hazel Lee."  Do you see that?

14                     A.     Yes.

15                     Q.     And on November 30th he says:  Please

16     pay Hazel Lee his six-flock average for Flock 48.

17     This is due to a procedural error with the tare

18     weights at the plant.  Let me know the calculation

19     as soon as possible.

20                     And he asks:  I need this to happen

21     today if at all possible.

22                     Do you see that?

23                     A.     Yes.

24                     Q.     So does this refresh your

25     recollection as to whether or not there was a tare

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 124

1    weight calculation issue for Hazel Lee?

2            A.      It looks like it was a tare weight

3    issue with Flock 48, yes.

4            Q.      And do you recall any details about

5    that issue?

6            A.      What I recall was Dale pointed out

7    something on his tickets, and I can't -- I can't

8    remember exactly what it was.  You know, it was

9    just something that didn't sit right with him, and

10   we could understand why that wouldn't sit right

11   with him.  And so as a result, you know -- I just

12   can't remember exactly what it was.  But as a

13   result, we did pay that six-flock average pay per

14   day on Flock 48.

15           Q.      I got you.  But Mr. Copeland was

16   identifying that there was a procedural error with

17   the calculation, right?

18           A.      Uh-huh.

19           Q.      Would that be the same type of ticket

20   issue that we described earlier where the incorrect

21   ticket was left at the wrong farm?

22                   MS. WOOTEN:  Object to form.  You can

23   answer.

24           A.      I don't know if they would be the

25   same.  I don't know -- I don't know that that was

Page 132

1    with, on there that it -- that is referring to the

2    Flock 46 being excluded.

3           Q.    Is this excluded -- is this Flock 46

4    excluded on the Excel chart?

5           A.    No, it doesn't appear to be.

6           Q.    Got it.  So you -- just to be clear,

7    the attachment does not reflect that 46 was

8    excluded?

9           A.    Correct.  It does not appear that

10   Flock 46 was excluded from this calculation.

11          Q.    Okay.  So going back to your email

12   again --

13          A.    Yeah.

14          Q.    -- do you see it here again?

15          A.    Yeah.  I see the email.

16          Q.    So when you say 7/30/2017 shows it

17   was excluded on the vertical, do you still believe

18   it was Flock 46 that was excluded or something

19   else?

20          A.    Yeah.  I think there's a good chance

21   I am pointing out that, hey, Flock 46 shouldn't be

22   on that calculation.

23          Q.    Got it.  You are saying this

24   calculation is wrong; we need to exclude Flock 46?

25          A.    Yeah, I mean that is kind of -- that

Kathryn Mizell                                      April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 133

1      is what I am thinking is, hey, just a heads-up, it

2      shows it was excluded on the vertical.

3                Q.      And what is the vertical?

4                A.      The vertical is the -- it is where we

5      can see each flock that sells or settles in a week,

6      and we can see by line the pounds sold, feed use,

7      number of chicks.  So we can just see all the farms

8      at one time for settlement.  So it is like the big

9      picture.

10               Q.      Got you.  So when you are looking at

11     the vertical, the big picture, you are saying, wait

12     a second, that is showing Flock 46 was excluded.

13     We should not be including it in this average?

14               A.      Yes.

15               Q.      Do you know whether or not this

16     change, your proposed change, was implemented?

17               A.      I'm not aware -- I don't recall the

18     results after the email.

19               Q.      Okay.

20                       MR. KLORFEIN:  I am marking

21     Plaintiffs' Exhibit 23, which is Perdue 8010.

22                       (Plaintiffs' Exhibit 23 was marked

23                       for identification.)

24               Q.      (BY MR. KLORFEIN:)  Do you recognize

25     this as a text message exchange between you and

Page 134

1      Mr. Parker, dated September 14th, 2018?

2             A.      Yes.

3             Q.      And this is about, I guess, a year

4      later from that earlier issue.

5             A.      Okay.

6             Q.      And he, in this text message, says:

7      I had two issues with catch.  I had one trailer

8      that was dropped that had no number on it.

9                     Do you see that message from him?

10            A.      Yes.

11            Q.      Did you understand this to be

12     Mr. Parker raising an additional ticketing issue?

13                    MS. WOOTEN:  Object to form.  You can

14     answer.

15            A.      Yeah, I see him -- he is definitely

16     raising an issue with, you know what -- you know, a

17     concern of his that, hey, this is what is going on,

18     yeah.

19            Q.      (BY MR. KLORFEIN:)  Got you.  So this

20     is about a year later that he raised an additional

21     issue with the tickets, right?

22            A.      Uh-huh.

23            Q.      And after he raised it the first

24     time, Perdue reviewed it, right?

25            A.      Uh-huh.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 135

1           Q.      Is that a yes?

2           A.      Yes, sorry.

3           Q.      No, you are fine.

4                   Made a change to give him the

5      six-flock average, right?

6           A.      Yes.

7           Q.      Due to that ticketing error?

8           A.      Yes.

9           Q.      Do you recall after providing that

10     change to Mr. Parker whether Perdue made any other

11     changes to address that procedural error?

12          A.      Can you simplify that question?

13          Q.      Sure.  After you changed his pay --

14          A.      Yes.

15          Q.      -- in November 2017, right --

16          A.      Yes.

17          Q.      -- did Perdue make any additional

18     changes to ensure that the ticketing error wouldn't

19     happen again?

20          A.      I don't -- I think I stated that I

21     didn't recall the exact specifics other than there

22     was a tare error.  But I don't recall -- I don't

23     recall what changes were made at the plant.

24          Q.      Got you.  I think you anticipated my

25     next question.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 136

1              You can't testify whether or not

2       there were any changes made as a result of that

3       error back in 2017?

4              A.      Right.  That's correct.

5              Q.      And this is September 2018, almost a

6       year after that pay adjustment was made, right?

7              A.      Correct.

8              Q.      And he is raising an additional error

9       with the tare tickets?

10             A.      Well, I guess let me try to clarify

11      what I am understanding is the first issue was a

12      tare weight issue.  And this is a trailer number

13      concern that he had.

14             Q.      Got it.  But those trailer numbers

15      relate to the tickets, right?

16             A.      I don't have one of those tickets in

17      front of me, but I'm pretty sure there's a trailer

18      number on the tickets.

19             Q.      Got you.  So if there's a trailer

20      number on the ticket, that still relates to the

21      tickets?

22             A.      Yeah, definitely issues with --

23      possible issues with the tickets, yes.

24             Q.      And you actually respond:  How many

25      tickets did you get?

Page 137

1          A.      Yes.

2          Q.      Because you were concerned that there

3    was an additional ticket issue?

4          A.      I like to start with the tickets,

5    yeah.  That's just -- generally when they start

6    with an issue at catch, I start with the tickets.

7          Q.      Got you.  So you would agree with me

8    that about a year later after he identified the

9    first problem with Perdue, Mr. Parker is

10   identifying an additional issue, or actually two

11   issues in this text message?

12             MS. WOOTEN:  Object to form.  You can

13   answer.

14         A.      He is definitely bringing something

15   to our attention.

16         Q.      (BY MR. KLORFEIN:)  Do you recall

17   what you did in response to this besides asking for

18   the tickets?

19         A.      I feel like I took a look at the

20   tickets to try to learn because I am pretty sure it

21   is -- it is one of those things where I hadn't

22   really looked at the numbers on the trailers.  And

23   so I mean I investigated it, just to see what I

24   could learn about the process and the tickets and

25   to see if I could identify that same issue.  Yeah.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 150

1                        for identification.)

2              Q.     (BY MR. KLORFEIN:)  I am marking

3     Plaintiffs' Exhibit 29 which is Bates Perdue 8026

4     through 8028.  Do you recognize this document as a

5     text exchange between you and Mr. Parker dated

6     October 18th, 2018?

7              A.     Yes.

8              Q.     So that is shortly after you had sent

9     that email to Mr. Copeland saying we need to send a

10    letter?

11             A.     Yes.

12             Q.     Two days afterwards?

13             A.     Yes.

14             Q.     And in this text, Mr. Parker says:  I

15    got your letter of upgrades.

16             A.     Yes.

17             Q.     Was that a yes?

18             A.     Yes, it was, sorry.

19             Q.     You are fine.  And does this refresh

20    your recollection whether or not you waited until

21    October to send the letter?

22             A.     No.

23             Q.     You just don't recall one way or the

24    other?

25             A.     I do not recall.  I do not.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 151

1          Q.     And you say:  Okay.  Should just be

2     repairs?

3          A.     Yes, I was clarifying that it was not

4     upgrades.

5          Q.     And he says:  Why do I need seventy

6     percent propane with fall weather that will not

7     need anywhere around that much?

8                 Do you recall that?

9          A.     Yes.

10         Q.     Do you recall in your letter you

11    required seventy percent propane?

12         A.     Yes.

13         Q.     Do you -- what does that refer to?

14         A.     Being prepared for a good flock.

15    Want to make sure we have got enough fuel out there

16    to make it through -- you have got to make it

17    through placement and on through the flock.  We

18    don't want to run out of gas and chickens get cold.

19         Q.     And he asks:  Why do I need seventy

20    percent propane with fall weather that will not

21    need anywhere around that much?

22                Do you see that?

23         A.     Yes.

24         Q.     And he asks:  Is everyone being made

25    to put seventy percent in their tank?

Kathryn Mizell                                          April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 152

1              A.      Uh-huh.  I see that.

2              Q.      You say:  We check all farms to make

3       sure they have propane.

4              A.      Yes.

5              Q.      Do you recall whether or not seventy

6       percent was the requirement imposed across the

7       board for all growers?

8                      MS. WOOTEN:  Object to form.  You can

9       answer.

10             A.      I don't recall what the -- what it

11      was.  I don't recall.

12             Q.      (BY MR. KLORFEIN:)  Do you recall if

13      there was a seventy percent minimum?

14             A.      I don't recall.

15             Q.      And you certainly don't say that

16      there is here?

17             A.      Right.  In fact, I say I might could

18      do fifty percent.

19             Q.      Got you.  So you might have gone

20      below seventy percent?

21             A.      Yes.

22             Q.      It wasn't a firm requirement?

23             A.      Yes.

24             Q.      And he says:  You didn't answer my

25      question.

Page 153

1              Is he referring to whether or not
2     everybody is being made seventy percent?
3              MS. WOOTEN:  Object to form.  Calls
4     for speculation.  You can answer if you know.
5         A.    No.  Again, we just make sure that
6     all farms have propane.
7         Q.    (BY MR. KLORFEIN:)  He asks:  Why is
8     this just a rule for me?
9         A.    I see that.
10        Q.    And you acknowledge it is a rule for
11    him, not everybody?
12             MS. WOOTEN:  Object to form.  You can
13    answer.
14        A.    I don't know if "rule" is the right
15    word.
16        Q.    (BY MR. KLORFEIN:)  Well, you in your
17    letter say seventy percent, right?
18        A.    Yes.
19        Q.    And he asks whether or not that is
20    applied for everybody, right?
21        A.    Yes.
22        Q.    And you don't say, oh, it applies to
23    everybody?
24        A.    Yes.
25        Q.    You instead say:  In the past you

Kathryn Mizell                                           April 3, 2025
Parker, Roger v. Perdue Foods, LLC

                                                              Page 154

 1    have run out.

 2              A.      That's correct.

 3              Q.      And so this is a rule that is applied

 4    to him only?

 5                      MS. WOOTEN:  Object to form.

 6              A.      This is something that I wanted him

 7    to have so that way he was prepared and ready to

 8    have a good flock.

 9              Q.      (BY MR. KLORFEIN:)  That applies to

10    him only?

11              A.      Every farm has to have propane.

12              Q.      But the seventy percent you said in

13    the letter only applied to him?

14              A.      It seems that way in this, yes.

15              Q.      And you have no recollection to

16    dispute that?

17              A.      No.

18              Q.      In fact, you point to the past that

19    he has run out previously, right?

20              A.      Yes.

21              Q.      That is the justification you provide

22    for why imposing a seventy percent minimum for him?

23              A.      Yes.

24                      MS. WOOTEN:  Object to form.

25              A.      Yes.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 155

```
 1          Q.    (BY MR. KLORFEIN:)  And he says:  I
 2    have not run out.  When did this happen?
 3          A.    I see that.
 4          Q.    And you respond:  A couple of years
 5    ago.
 6          A.    Yes.
 7          Q.    So a couple of years ago he ran out
 8    of propane, and that is the justification you
 9    provide for imposing a seventy percent minimum?
10                MS. WOOTEN:  Object to form.
11          A.    Yes.
12          Q.    (BY MR. KLORFEIN:)  You don't provide
13    any other reason?
14          A.    It doesn't appear so.
15          Q.    Do you recall, sitting here today,
16    whether or not you have any other reason for why
17    you are imposing a seventy percent minimum on him
18    and nobody else?
19                MS. WOOTEN:  Object to form.  You can
20    answer.
21          A.    I wanted to make sure that he had
22    enough propane to make it the entirety of the flock
23    so it didn't put him in a position to do poorly on
24    the flock.
25          Q.    (BY MR. KLORFEIN:)  Is that the only
```

Page 156

1    reason you provided that seventy percent minimum?

2            A.      Yes.

3            Q.      Based on something that happened two

4    years prior?

5                    MS. WOOTEN:  Object to form.

6            A.      Yes.

7                    MR. KLORFEIN:  I am marking

8    Plaintiffs' Exhibit 30, which is Bates Perdue 8030

9    through 8034.

10                   (Plaintiffs' Exhibit 30 was marked

11                   for identification.)

12                   MS. WOOTEN:  Jarred, I don't want to

13   interrupt and you can continue questioning, but

14   just when you get a chance for a break at some

15   point, it might be nice.  We have been going over

16   an hour.

17                   MR. KLORFEIN:  Great.  How about I

18   just finish this document and then we will take a

19   break, sound good?

20                   MS. WOOTEN:  No problem.

21           Q.      (BY MR. KLORFEIN:)  As I mentioned,

22   this is Plaintiffs' Exhibit 30, Bates Perdue 8030

23   through 8034.

24                   Ms. Mizell, do you recognize this as

25   an additional text exchange between you and

Kathryn Mizell                                          April 3, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 157

1         Mr. Parker dated October 22nd, 2018?

2              A.    Yes.  Yes.

3              Q.    Are you -- he emails you -- I'm

4    sorry.  He texts you:  I am a bit confused about

5    some of the things on my list and wanted to get you

6    to come by if possible.

7                    Do you see that?

8              A.    Yes.

9              Q.    And he references the list from your

10   October letter?

11             A.    Yes.

12             Q.    So he references that he disagrees

13   with some of the things that you have raised?

14             A.    Yes.

15             Q.    For example, Number 2:  I have

16   butterfly doors but no shutters.  I don't have any

17   missing or nonworking doors.  Please explain what I

18   need to do.

19                    Do you see that?

20             A.    Yes.

21             Q.    So he is disputing that Item 2 of

22   your list was actually a problem, right?

23             A.     He is definitely taking issue with

24   Item 2 on the list, yes.

25             Q.    And then he continues, Number 8:  I

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 158

1    do not have any holes in the houses.
2                     Do you see that?
3            A.    Yes.
4            Q.    But he is also disputing your
5    letter's contention that there are holes in the
6    houses, right?
7            A.    Yes.
8            Q.    Same with cleaning water lines in
9    Number 9?
10           A.    Yes.
11           Q.    He is disputing a number of things in
12   your letter, right?
13           A.    Yes.
14           Q.    And then he raises:  Like I told you
15   once before, an employee told me that when I called
16   stockyard and packers that I would be on the
17   chopping block like another farmer that had to do
18   it.
19                    Do you see that?
20           A.    I see that statement.
21           Q.    He continues:  The majority of these
22   things will only apply to me, so it's very clear I
23   am singled out for punishment.
24                    Do you see that?
25           A.    I see that.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

                                                    Page 159

1           Q.     So not only is he saying not only do

2    I disagree with some of these repairs that your

3    letter references, but I think I am being singled

4    out for punishment for reaching out to the USDA,

5    right?

6                  MS. WOOTEN:   Objection to form.

7           A.     Yes.

8           Q.     (BY MR. KLORFEIN:)  And USDA is

9    United States Department of Agriculture, right?

10          A.     Yes, it is.

11          Q.     And so by this point in time, were

12   you aware that he had reached out to the United

13   States Department of Agriculture?

14          A.     I do not recall when I was made

15   aware.

16          Q.     But you do -- but you were made aware

17   that he had reached out to the United States

18   Department of Agriculture?

19          A.     Yes, in fact -- yes.

20          Q.     And just so we are clear, if I use

21   "USDA," you understand that I am referring to

22   United States Department of Agriculture?

23          A.     I do understand that.

24          Q.     And he then continues:  It is clear

25   you want to disqualify me as a grower.

Kathryn Mizell                                            April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 160

 1          A.      Yes, I see that.

 2          Q.      And so not only is he taking issue

 3   with the items in your letter, he is saying you are

 4   retaliating against me for having reached out to

 5   USDA, right?

 6                  MS. WOOTEN:   Objection to form.

 7          A.      I'm sorry.  Could you ask that one

 8   again?

 9          Q.      (BY MR. KLORFEIN:)  He is claiming

10   that, one, the items in your letter are not

11   accurate, right?

12          A.      He takes issue with some of the

13   items, yes.

14          Q.      And he says that he is being

15   retaliated against for reaching out to USDA.

16                  MS. WOOTEN:   Objection to form.

17          A.      Yes, that is what he is saying.

18          Q.      (BY MR. KLORFEIN:)  And so you

19   respond:  Thank you for your response to the

20   letter.  I'll look it over tomorrow and clarify

21   each item for you [sic].

22          A.      Yes.

23          Q.      So he reiterates that all of a sudden

24   mandatory requirements that are imposed only on me,

25   right?

Kathryn Mizell                                      April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 161

1              MS. WOOTEN:  Objection to the extent
2     it misstates the content of the text message.  She
3     can answer.
4              MR. KLORFEIN:  Counsel, I would like
5     to limit the speaking objections.  You can object
6     to form and move on but not coach the witness as to
7     her response.
8         Q.    (BY MR. KLORFEIN:)  Ms. Mizell, you
9     can just read the text.
10        A.    So what was the question?
11        Q.    He is saying that Perdue has now
12    placed sudden mandatory issues that he has to
13    rectify before chickens are placed.  Do you see
14    that?
15        A.    Yes.
16        Q.    And you respond:  It's not a cutoff
17    letter.
18        A.    That's right.  I am asking you to
19    prepare your farm so it will be competitive.
20        Q.    That is your only response to these
21    new imposition of requirements?
22        A.    Yes.
23        Q.    You don't provide any other
24    explanation for why now you sent that letter that
25    requires him to address all those issues?

Page 162

1              MS. WOOTEN:  Object to form.

2         A.      The letter indicated the reasons why

3    which was, based on the farm visitation reports,

4    there were items that needed to be taken care of.

5         Q.      (BY MR. KLORFEIN:)  Right.  But you

6    are also imposing new requirements such as the

7    seventy percent propane requirement, right?

8         A.      Yes.  I can see where that would be a

9    new requirement.

10        Q.      And that was only imposed after he

11   reached out to the USDA?

12        A.      I don't know when he reached out to

13   the USDA.

14        Q.      Well, he is referencing to reaching

15   out to the USDA, right, in this text exchange?

16        A.      He is telling me that he reached out

17   to the USDA.

18        Q.      And he again reiterates:  I was told

19   this is what happens when you want to disqualify a

20   grower?

21        A.      That is what it says, yes.

22        Q.      And you would agree with me that in

23   your letter, until he addressed the issues that you

24   identified, you will not place chickens?

25        A.      I'm sorry.  Say that question again.

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 163

1          Q.     Sure.  In your letter, you said:

2     Until you address all of these requirements, you

3     will not place chickens.

4          A.     Yes.

5          Q.     So you imposed new requirements on

6     him, right?

7                 MS. WOOTEN:  Object to form.

8          A.     The seventy percent number would be

9     new, yes.

10          Q.     (BY MR. KLORFEIN:)  And until he

11     addressed that new requirement, you would not place

12     chickens?

13          A.     Yes.

14          Q.     And that was only imposed after he

15     reached out to the USDA?

16                 MS. WOOTEN:  Object to form.

17          A.     I don't know when he reached out to

18     the USDA.

19          Q.     (BY MR. KLORFEIN:)  He had by this

20     point in time in this text message, right?

21                 MS. WOOTEN:  Object to form.

22          A.     It appears so because that is what he

23     is saying in there, that he reached out to the

24     USDA.

25          Q.     (BY MR. KLORFEIN:)  And this is

Page 164

1    October 22nd, right?

2                A.      Yes.

3                Q.      And then you end the text exchange by

4    saying:  I don't mean to be short.  I have to get

5    started early tomorrow.  Can pick this up tomorrow,

6    question mark?

7                A.      Yes.

8                Q.      So you -- you said you would respond,

9    right?

10               A.      Yes.

11               Q.      You would address his allegations

12   that he is being singled out for reaching out to

13   the USDA.

14                     MS. WOOTEN:  Object to form.

15               A.      Wait a minute.  Go back.  What was

16   that?

17               Q.      (BY MR. KLORFEIN:)  Sure.  He is

18   saying that he is being targeted for having reached

19   out to the USDA, right?

20               A.      Yes.

21               Q.      And you say you are going to respond?

22               A.      I said that we could pick this up

23   tomorrow.

24               Q.      Well, going back up, you say:  Thank

25   you for your response to the letter.  I'll look it

Kathryn Mizell                                    April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 165

1      over tomorrow and clarify each -- in your initial

2      text, you say each time for you.

3                      And then you clarify each item,

4      right?

5              A.      Yes.

6              Q.      So in this text exchange, you are

7      saying I will respond to each item in your list of

8      issues?

9              A.      In the response to the letter, yes.

10             Q.      Well, a part of his response is:

11     Y'all are targeting me for having reached out USDA.

12                     MS. WOOTEN:  Object to form.

13             A.      Could you scroll back up?

14             Q.      (BY MR. KLORFEIN:)  Sure.

15             A.      Keep going.

16             Q.      Like I told you once before, and he

17     references stockyard and packers.  Do you know what

18     stockyard and packers is?

19             A.      Yes, I do.

20             Q.      Is that affiliated with USDA?

21             A.      Yes.

22             Q.      So he is saying that the effort is

23     clear that you wish to disqualify me as a grower,

24     yes?

25             A.      That is what he says, yes.

Page 166

1          Q.     And in response to that text

2     exchange, you say after that:  Thank you for your

3     response to the letter.  I'll look it over tomorrow

4     and clarify each item with you?

5          A.     Yes.

6          Q.     Now, in this text exchange you don't

7     respond line by line to his allegations that he is

8     being targeted for reaching out to USDA?

9          A.     No, I do not.

10          Q.     Do you recall whether or not you ever

11     responded to that allegation?

12          A.     I do not recall ever responding to

13     that allegation.

14          Q.     In any format, text, email or

15     otherwise?

16          A.     I don't recall.

17          Q.     So sitting here today, you can't

18     confirm whether or not you ever addressed his

19     issues that he raised in this text message?

20                 MS. WOOTEN:  Object to form.

21          A.     Not with those concerns of the USDA,

22     no.

23          Q.     (BY MR. KLORFEIN:)  Or any of the

24     items that he referenced in his text?

25          A.     No.  I feel like there was probably

Kathryn Mizell                                              April 3, 2025
Parker, Roger v. Perdue Foods, LLC

Page 167

1     discussions about the repairs after that, yeah.

2               Q.    Okay.  So you might have discussed

3     the repairs that were at issue?

4               A.    Yeah.

5               Q.    Anything else?

6               A.    I don't recall any more than that

7     right now.

8               Q.    Any issue about him claiming that he

9     was being retaliated against?

10              A.    No.

11                    MR. KLORFEIN:  Okay.  Are y'all ready

12    for a break?  Let's go off the record.

13                    MS. WOOTEN:  Yeah, a break would be

14    great, yeah.

15                    THE VIDEOGRAPHER:  Okay.  The time is

16    1:38 p.m.  We are off the record.

17                    (Whereupon, a lunch break was had

18                    from 1:38 p.m. 2:10 p.m. EST)

19                    THE VIDEOGRAPHER:  The time is 2:10

20    p.m.  We are on the record.

21              Q.    (BY MR. KLORFEIN:)  Good afternoon,

22    Ms. Mizell.  First question, during any of the

23    breaks, have you discussed with anyone changing

24    your testimony?

25              A.    No.

# EXHIBIT 20 TO MIZELL DEP. (FILED UNDER SEAL)

# EXHIBIT 24 TO MIZELL DEP. (FILED UNDER SEAL)

# EXHIBIT 30 TO MIZELL DEP. (FILED UNDER SEAL)