# Exhibit N



# POSITION DESCRIPTION

## BACKGROUND POSITION INFORMATION

| | | | |
|---|---|---|---|
| **Position Title:** | **Field Technician** | **Job Code:** | |
| **Location:** | **Complex – Live Production** | **Department:** | **Grow Out** |
| **Supervisors Title:** | **Area Coordinator** | **Supervisor's Name:** | |

**Normal Work Schedule** Note: The hours and days of work are established as needed by operations and at the direction of management and, while generally as shown below, may be changed (increased or decreased) by management as required.

**Hours of Work**:   Generally  7:00 AM to 5:00 PM or as scheduled by management with a one (1) hour lunch period approximately mid shift.  Overtime may be scheduled as needed and directed by management.

**Days of Works**:   Normally Monday through Friday as scheduled by management and Saturday, Sunday and/or Holidays if needed by operations and approved by management.

## EDUCATION AND EXPERIENCE REQUIREMENTS

The minimum formal education preferred to be considered for this position is  (indicate level and years of  education and, if a degree is required, the major):

**Strong, reading, math, writing, communication skills (oral and written), analytical skills, a statistical background with a High School Diploma or GED equivalent required.**

Specialized or technical knowledge, credentials or  licensing required for the position include:

*License* – Must have a valid Drivers License with no points. Certified copy of State Driver's Record for the past seven (7) years required before being employed.

*Planning* – an ability to think ahead.

*Problem Solving* – ability to analyze and resolve problems at a functional level.

*Technical Skills* – knowledge of and ability to implement modern processes & techniques and quality improvement processes.

*Customer Satisfaction* – knowledge of and ability to provide a strong customer orientation.

*Communication* – ability to communicate to all levels of the organization including producers and a commitment to excellent interpersonal and communication skills.

*Commitment* – dedication and commitment to company values.

*Safety* – ability, knowledge and commitment to put safety of above everything else while achieving established goals.

The minimum number of years and/or months of prior and related experience preferred to be considered for this position is:

**Two (1) to two (2) years of previous work experience preferred.**

## PURPOSE OF THIS POSITION

The overall purpose of this position,  i.e., what  it accomplishes at Perdue and/or why it exists is:

**The purpose of this position is to provide field support to our growout and tech service departments to include field vaccination, collection of samples, perform tests, deliver supplies and to ensure compliance with bio-security, food safety and poultry welfare programs.**

## POSITION DIMENSIONS

| | |
|---|---|
| Number of Associates Supervised: | If Exempt, indicate the Annual Dollar Value of: |

**Perdue 006840**

| Salaried: | 0 | | Payroll Budget: | $ | 0.00 |
| Hourly: | 0 | | Operating Budget: | $ | 0.00 |
| Total: | 0 | | Assets Managed: | $ | 0.00 |
| | | | Other Financial Impact: | $ | 0.00 |

# PRINCIPAL POSITION RESPONSIBILITIES

**Describe below the four to six major responsibilities of this position which must be fulfilled with or without reasonable accommodation in order to achieve the essential purpose of this position.**

#1.  Pick up vaccines and supplies as needed for daily activities and coordinate vaccine inventory and usage with the Area Coordinator.

---------------------------------------------------------------------------------------------------------------------------------------

#2.  Properly handle, store, mix, administer and dispose of vaccines in prescribed manner.

---------------------------------------------------------------------------------------------------------------------------------------

#3.  Assess management and health of flock before vaccination.  Following assessment, determine if flock performance would require vaccination at that time or deferred to later.  Record and document findings.

---------------------------------------------------------------------------------------------------------------------------------------

#4.  Follow all prescribed S.O.P.s for all job task which include the following, but are not limited to:

- Health Monitoring
- Weighting
- Cecal Collection
- Rodent Control

- Pesticides Monitoring
- Flock Monitoring
- Vaccination

---------------------------------------------------------------------------------------------------------------------------------------

#5.  Recommend adjusting producer's equipment as necessary to accomplish vaccination properly.

---------------------------------------------------------------------------------------------------------------------------------------

#6.  Clean up vehicle and equipment daily and follow all appropriate bio-security procedures.

---------------------------------------------------------------------------------------------------------------------------------------

#7.  Communicate with Grow Out Management daily in regard to scheduling, vaccination or producer issues.  Prepare and submit weekly written report on field findings.

---------------------------------------------------------------------------------------------------------------------------------------

#8.  Act in a professional and courteous manner at all times upholding professional and positive work image for self and Perdue Farms.

---------------------------------------------------------------------------------------------------------------------------------------

#9.  Comply and follow company requirements regarding bio-security, food safety and poultry welfare programs and policies at all times.

---------------------------------------------------------------------------------------------------------------------------------------

#10.  Manage company vehicle and operate in a safe manner complying will all Perdue, state and federal requirements/policies and use only for work related purposes.

---------------------------------------------------------------------------------------------------------------------------------------

**Perdue 006841**

#11.   Maintain safe working environment. Work with and handle cutting utensils such as scissors and knives during sample collection.

## DECISION-MAKING RESPONSIBILITIES

**Describe the decision-making authority of this position, the nature and extent of supervision available and the point at which higher approval is required.**

Supervisor is available for decisions that are outside the normal daily position requirements.

## OTHER POSITION RESPONSIBILITIES

**This position spends___0___ % of a normal workweek supervising other associates.**
**This position spends___0___ % of a normal workweek training and developing other associates.**
**This position spends___10___ % of a normal workweek performing technical analyses and writing reports.**
**This position spends___90___ % of a normal workweek in production or maintenance-related activities.**

## ENVIRONMENTAL FACTORS AND PHYSICAL REQUIREMENTS

**The environment factors and/or physical requirements of this position include the following:**

Work environment includes, but not limited to, moving in an upright position and working on soil, wet, moist, dry, greasy floors which include concrete, metal and plastic grating surfaces with up to 4 hours in a single interval.  Must be able to lift, control, and carry 80 lbs.  Exposure to temperature ranges of <28 to 100 Fahrenheit with both ambient and 100% humidity. Exposure to noise ranges to <50 db to >100 db and light intensity range of <50 to >100 foot candles.   Bending, twisting, lifting, reaching, sitting and grasping varies in repetitions, distances, degrees, angles, weights, height, intervals of time, objects grasped and body positions depending upon the task being performed.  Exposure to chlorinated water <50ppm, ammonia vapors >5ppm, caustic detergents, lubricating oils, salt and other chemicals found in poultry processing.  Normal exposure to chemicals listed in MSDS sheets which are available in the Live Production Office.

**I confirm that I am able to perform the functions and requirements of this position as described herein and explained to me**.

_____          _____
              Applicant / Incumbent                                              Date

**I confirm that I have explained the major requirements and responsibilities of this position to the individual named above and have witnessed his/her signature.**

_____          _____
              Company Representative                                          Date

**Perdue 006842**



# POSITION DESCRIPTION

## BACKGROUND POSITION INFORMATION

| Position Title: | **Field Vaccine Technician** | Job Code: | |
| Location: | **Complex – Live Production** | Department: | |
| Supervisors Title: | | Supervisor's Name: | |

**Normal Work Schedule     Note:  The hours and days of work are established as needed by operations and at the direction of management and, while generally as shown below, may be changed (increased or decreased) by management as required.**

**Hours of Work**:     Generally  7:00 AM to 5:00 PM  or as scheduled by management with a one (1) hour lunch period approximately mid shift.  Overtime may be scheduled as needed and directed by management.

**Days of Works**:     Normally Monday through Friday as scheduled by management and Saturday, Sunday and/or Holidays if needed by operations and approved by management.

## EDUCATION AND EXPERIENCE REQUIREMENTS

**The minimum formal education preferred to be considered for this position is  (indicate level and years of  education and, if a degree is required, the major):**

**Strong, reading, math, writing, communication skills (oral and written), analytical skills, a statistical background with a High School Diploma or GED equivalent required.**

Specialized or technical knowledge, credentials or  licensing required for the position include:

*License* – Must have a valid Drivers License with no points. Certified copy of State Driver's Record for the past seven (7) years required before being employed.

*Planning* – an ability to think ahead.

*Problem Solving* – ability to analyze and resolve problems at a functional level.

*Technical Skills* – knowledge of and ability to implement modern processes & techniques and quality improvement processes.

*Customer Satisfaction* – knowledge of and ability to provide a strong customer orientation.

*Communication* – ability to communicate to all levels of the organization including producers and a commitment to excellent interpersonal and communication skills.

*Commitment* – dedication and commitment to company values.

*Safety* – ability, knowledge and commitment to put safety of above everything else while achieving established goals.

The minimum number of years and/or months of prior and related experience preferred to be considered for this position is:

**Two (1) to two (2) years of previous work experience preferred.**

## PURPOSE OF THIS POSITION

The overall purpose of this position,  i.e., what  it accomplishes at Perdue and/or why it exists is:

**Make assessments and determine the need to administer vaccines to flocks in the field through the use of pumps, medicators and/or sprayers as prescribed by Grow Out Management to maximize bird health and performance.  To provide the Grow Out Manager with a weekly report with regard to bird health and/or vaccination issues.**

## POSITION DIMENSIONS

**Perdue 006843**

| Number of Associates Supervised: | | If Exempt, indicate the Annual Dollar Value of: | |
|---|---|---|---|
| Salaried: | 0 | Payroll Budget: | $    0.00 |
| Hourly: | 0 | Operating Budget: | $    0.00 |
| Total: | 0 | Assets Managed: | $    0.00 |
| | | Other Financial Impact: | $    0.00 |

# PRINCIPAL POSITION RESPONSIBILITIES

**Describe below the four to six major responsibilities of this position which must be fulfilled with or without reasonable accommodation in order to achieve the essential purpose of this position.**

#1.  Pick up vaccines and supplies as needed for daily activities and coordinate vaccine inventory and usage with the Medication Department.

--------------------------------------------------------------------------------------------------------------

#2.  Properly handle, store, and dispose of vaccines in prescribed manner.

--------------------------------------------------------------------------------------------------------------

#3.  Assess management and health of flock before vaccination. Following assessment, determine if flock performance would require vaccination at that time or deferred to later. Record and document findings.

--------------------------------------------------------------------------------------------------------------

#4.  Properly mix and administer vaccines to flock in contract production houses.

--------------------------------------------------------------------------------------------------------------

#5.  Recommend adjusting producer's equipment as necessary to accomplish vaccination properly.

--------------------------------------------------------------------------------------------------------------

#6.  Clean up vehicle and equipment daily and follow all appropriate bio-security procedures.

--------------------------------------------------------------------------------------------------------------

#7.  Communicate with Grow Out Management daily in regard to scheduling, vaccination or producer issues. Prepare and submit weekly written report on field findings.

--------------------------------------------------------------------------------------------------------------

#8.  Act in a professional and courteous manner at all times upholding professional and positive work image for self and Perdue Farms.

--------------------------------------------------------------------------------------------------------------

#9.  Comply and follow company requirements regarding bio-security, food safety and poultry welfare programs and policies at all times.

--------------------------------------------------------------------------------------------------------------

#10.  Manage company vehicle and operate in a safe manner complying will all Perdue, state and federal requirements/policies and use only for work related purposes.

--------------------------------------------------------------------------------------------------------------

#11.  Maintain safe working environment.

# DECISION-MAKING RESPONSIBILITIES

**Describe the decision-making authority of this position, the nature and extent of supervision available and the point at which higher approval is required.**

Supervisor is available for decisions that are outside the normal daily position requirements.

## OTHER POSITION RESPONSIBILITIES

This position spends___0___% of a normal workweek supervising other associates.
This position spends___0___% of a normal workweek training and developing other associates.
This position spends___10___% of a normal workweek performing technical analyses and writing reports.
This position spends___90___% of a normal workweek in production or maintenance-related activities.

## ENVIRONMENTAL FACTORS AND PHYSICAL REQUIREMENTS

The environment factors and/or physical requirements of this position include the following:

Work environment includes, but not limited to, moving in an upright position and working on soil, wet, moist, dry, greasy floors which include concrete, metal and plastic grating surfaces with up to 4 hours in a single interval. Must be able to lift, control, and carry 80 lbs. Exposure to temperature ranges of <28 to 100 Fahrenheit with both ambient and 100% humidity. Exposure to noise ranges to <50 db to >100 db and light intensity range of <50 to >100 foot candles. Bending, twisting, lifting, reaching, sitting and grasping varies in repetitions, distances, degrees, angles, weights, height, intervals of time, objects grasped and body positions depending upon the task being performed. Exposure to chlorinated water <50ppm, ammonia vapors >5ppm, caustic detergents, lubricating oils, salt and other chemicals found in poultry processing. Normal exposure to chemicals listed in MSDS sheets which are available in the Live Production Office.

**I confirm that I am able to perform the functions and requirements of this position as described herein and explained to me**.


_____          _____
Applicant / Incumbent                                                     Date


**I confirm that I have explained the major requirements and responsibilities of this position to the individual named above and have witnessed his/her signature.**

_____          _____
Company Representative                                                   Date

PER/350                    **Perdue 006845**



# JOB DESCRIPTION

| Position Title: **FLOCK ADVISOR** | |
|---|---|
| Position Reports To: **GROWOUT MANAGER** | Department: **LIVE PRODUCTION/FEEDMILL** |
| | |

**SUMMARY**

The purpose of a Flock Advisor is to protect the Perdue Farms, Inc. brand name. Improve company profitability by serving as a representative overseeing the inventory of poultry on his/her route. In doing so the responsibilities will involve direct interaction with all departments of the company that are associated with our contract producers. The Flock Advisor is responsible for maintaining good communication and flow of information from the company to contract producers and vice versa. Responsibilities also include ensuring that all requirements are met or exceeded with include but not limited to current prescribed department and company initiatives.

**PRINCIPAL AND ESSENTIAL DUTIES AND RESPONSIBILITIES**

**Describe below the major responsibilities of this position which must be fulfilled with or without reasonable accommodations in order to achieve the essential purpose of this position.**

1. Maintain assigned route square footage to meet the demands established by sales to fulfill customer orders.

2. Work directly with assigned contract producers to improve company profitability and competitive position by implementing production programs and documenting producer compliance at each visit to the farm.

3. Maintain route compliance to Poultry Welfare, Food Safety, and Environmental "Best Management Practices" to maintain a strong brand image.

4. Support other departments within the company that are impacted by the producers on assigned route by maintaining good open lines of communication between all parties.

5. The ability to monitor chick placements, bird weights, flock movements, mortality and feed inventories. The ability to assess bird health, administer proper field vaccinations, prescribe treatment, and perform various testing on birds to identify disease and relay finding to management.

6. Demonstrate competency with poultry health and disease as it relates to poultry production.

7. Act in a professional and courteous manner at all times, upholding professional and positive work image for self and Perdue Farms.

8. Comply and follow company requirements regarding bio-security, food safety and poultry welfare programs and policies at all times.

9. Manage company vehicle and operate in a safe manner complying will all Perdue, state and federal requirements/policies and use only for work related purposes.

10. Maintain safe working environment.

**Perdue 006846**

# JOB DESCRIPTION

| Position Title:  FLOCK ADVISOR |
|---|

11. Other duties as requested.

**MINIMUM EDUCATION AND EXPERIENCE REQUIREMENTS (include any specialized or technical knowledge, certifications, credentials or licensing required for this position)**

**REQUIRED:**
Strong, reading, math, writing, communication skills (oral and written), analytical skills, a statistical background with a High School Diploma or GED equivalent required.

**Must have a valid Driver's License with no points. Certified copy of State Driver's Record for the past seven (7) years required before being employed.**

Planning – an ability to think ahead.

Problem Solving – ability to analyze and resolve problems at a functional level.

Technical Skills – knowledge of and ability to implement modern processes & techniques and quality improvement processes.

Customer Satisfaction – knowledge of and ability to provide a strong customer orientation.

Communication – ability to communicate to all levels of the organization including producers and a commitment to excellent interpersonal and communication skills.

Commitment – dedication and commitment to company values.

Safety – ability, knowledge and commitment to put safety of above everything else while achieving established goals.

**PREFERRED:**
Associate or Bachelor's Degree preferred with suggested major in the field of Poultry Science, Animal Science, or Agribusiness Management.

**DECISION-MAKING RESPONSIBILITIES**
**Describe the decision-making authority of this position, the nature and extent of supervision available and the point at which higher approval is required.**

Individuals in this position must possess the ability to be self-motivated and self-supervised in order to effectively perform their job duties.  Decisions associated with the job are limited to successful of the production programs.  Decisions that may have long term and far reaching effect on the company and the producer should be referred to the immediate supervisor.

**POSITION DIMENSIONS**

**Perdue 006847**



# JOB DESCRIPTION

| Position Title: FLOCK ADVISOR |
|---|

| Number of Associates Supervised | If Salaried, indicate the Annual Dollar Value of: |
|---|---|
| Salaried: | Payroll Budget: |
| Hourly: | Capital Budget: |
| Total: | Assets Managed: |
| | Other Financial Impact: |

**ENVIRONMENTAL FACTORS AND PHYSICAL REQUIREMENTS**

1. Work environment includes, but not limited to, moving in an upright position and working on soil.
2. Must be able to lift, control, and carry 70 lbs.
3. Exposure to temperature ranges of <28 to 100 Fahrenheit with both ambient and 100% humidity.
4. Exposure to noise ranges to <50 db to >100 db and light intensity range of <50 to >100 foot candles.
5. Bending, twisting, lifting, reaching, sitting and grasping varies in repetitions, distances, degrees, angles, weights, height, intervals of time, objects grasped and body positions depending upon the task being performed.
6. Exposure to ammonia vapors, dust and other chemicals found in poultry houses.
7. Normal exposure to chemicals listed in MSDS sheets which are available in the Live Production Office.

**Normal Work Schedule and AWS Eligibility**

☐ **Exempt (FLSA Status)**
As directed by Management

☐ **Non-Exempt (FLSA Status)**
Scheduled hours of work for non-exempt associates are determined by management to meet business needs. Overtime and/or on-call support may be scheduled as needed and only when approved by management.

☐ **AWS Compatible**

**DISCLAIMER**
The preceding job description is general in nature. It is not intended to be a comprehensive inventory of all duties and responsibilities of, and qualifications for, the job. Management, in its sole discretion, may amend any part of this job description at any time.

I confirm that I am able to perform the functions and requirements of this position, with or without reasonable accommodations, as described herein and explained to me.

_____

Applicant/Incumbent                                        Date

I confirm that I have explained the principal and essential duties and responsibilities of this position to the individual named above and have witnessed his/her signature.

Perdue 006848



# JOB DESCRIPTION

| Position Title: FLOCK ADVISOR | |
|---|---|
| Company Representative | Date |

**Perdue 006849**



# POSITION DESCRIPTION

## BACKGROUND POSITION INFORMATION

| | |
|---|---|
| **Position Title:    GROWOUT HOUSING MGR** | **Job Code:** |
| **Location:              Delmarva ( Salisbury)** | **Department:        Housing** |
| **Supervisors Title:  Director Of Live Production** | **Supervisor's Name:  Ron Darnell** |

**Normal Work Schedule    Note:  The hours and days of work are established as needed by operations and at the direction of management and, while generally as shown below, may be changed (increased or decreased) by management as required.**

**Hours of Work**:          Generally  7:00 AM to 5:00 PM  or as scheduled by management with a one (1) hour lunch period approximately mid shift.  Due to the nature and responsibilities of the position, hours may vary.  Certain job responsibilities may result in start and end times that vary based on environmental and industry demands.

**Days of Works**:         Normally Monday through Friday as scheduled by management and Saturday, Sunday and/or Holidays if needed by operations and approved by management.

## EDUCATION AND EXPERIENCE REQUIREMENTS

**The minimum formal education preferred to be considered for this position is  (indicate level and years of  education and, if a degree is required, the major):**

**Strong, reading, math, writing, communication skills (oral and written), analytical skills, a statistical background with a High School Diploma or GED equivalent required.   Associate or Bachelor's Degree preferred with suggested major in the field of Poultry Science, Animal Science, or Agribusiness Management.  Experience in Live Production, sales, or construction a plus.**

**Specialized or technical knowledge, credentials or  licensing required for the position include:**

*License* – Must have a valid Drivers License with no points. Certified copy of State Driver's Record for the past seven (7) years required before being employed.

*Planning* – an ability to think ahead.

*Problem Solving* – ability to analyze and resolve problems at a functional level.

*Technical Skills* – knowledge of and ability to implement modern processes & techniques and quality improvement processes.

*Customer Satisfaction* – knowledge of and ability to provide a strong customer orientation.

*Communication* – ability to communicate to all levels of the organization including producers and a commitment to excellent interpersonal and communication skills.

*Commitment* – dedication and commitment to company values.

*Safety* – ability, knowledge and commitment to put safety of above everything else while achieving established goals.

**The minimum number of years and/or months of prior and related experience preferred to be considered for this position is:**

**( 4 ) years of previous work experience preferred.**

## PURPOSE OF THIS POSITION

**The overall purpose of this position, i.e., what  it accomplishes at Perdue and/or why it exists is:**

**The purpose of a New House Construction Coordinator is to oversee and participate in the selling and construction of new poultry housing . This includes but is not limited to, Grow Out contracts, growing programs, new house supplements,**

**Perdue 006850**

**financing, cash flows, construction costs, etc. In addition, this person will manage activities for 1 associate,  track square footage availability and plan for the company's square footage needs on Delmarva. They will also develop relationships with bankers or other lenders to assist in the financial paperwork for potential producers to meet square footage needs of the company. Furthermore, this person will be responsible for coordinating advertising needs, open houses and all activities related to getting houses sold and built. This will include but not limited to such things as package buying, regulatory meeting involvement and keeping up with what our competitors are doing with contracts , new technology and new house construction.**

## POSITION DIMENSIONS

**Number of Associates Supervised:**                 **If Exempt, indicate the Annual Dollar Value of:**

| | | | |
|---|---|---|---|
| **Salaried:** | **1** | **Payroll Budget:** | $    60,000 |
| **Hourly:** | **0** | **Operating Budget:** | $    30,000 |
| **Total:** | **0** | **Assets Managed:** | $    15,000 (car) |
| | | **Other Financial Impact:** | $       0.00 |

## PRINCIPAL POSITION RESPONSIBILITIES

Describe below the  four to six  major responsibilities of this position which must be fulfilled with or without reasonable accommodation in order to achieve the essential purpose of this position.

#1.    Provide oversight for the New House Construction Department on Delmarva .This includes directing one associate, coordinating activities that promote new house construction, running monthly housing and square footage  needs meeting. In addition, this person will also maintain updated housing specifications, generate and maintain prospect lists, track and report Delmarva target square footage versus actual, lost /gained square footage report and attend grow-out meetings on a regular basis.

-----------------------------------------------------------------------------------------------------------------------------------

#2.    Meet with lending institutions and equipment companies  to facilitate lending and affordable new housing This includes but is not limited to package buying .

-----------------------------------------------------------------------------------------------------------------------------------

#3.    Coordinate all advertising, open house and any other activities related to generating interest in New House Construction.

-----------------------------------------------------------------------------------------------------------------------------------

#4.     Maintain current and accurate cash flows for submission to prospects, bankers, and Perdue Management.

-----------------------------------------------------------------------------------------------------------------------------------

#5.    Communicate all necessary information to Perdue management that pertains to Live Production /New House Construction that may have either positive and negative implications on the company and or New House Construction on Delmarva..

-----------------------------------------------------------------------------------------------------------------------------------

#6.     Submit weekly and monthly progress reports to Perdue Management.

-----------------------------------------------------------------------------------------------------------------------------------

#7.    Act in a professional and courteous manner at all times upholding professional and positive work image for self and Perdue Farms.

-----------------------------------------------------------------------------------------------------------------------------------

#8.    Manage company vehicle and operate in a safe manner complying will all Perdue, state and federal requirements / policies and use only for work related purposes. Maintain safe work conditions at all times.

-----------------------------------------------------------------------------------------------------------------------------------------------------

#9.   Comply with the Perdue New House Construction requirements and present all exceptions to the LPSCfor approval.

## DECISION-MAKING RESPONSIBILITIES

**Describe the decision-making authority of this position, the nature and extent of supervision available and the point at which higher approval is required.**

Individuals in this position must possess the ability to be self-motivated , independent , self-supervised  and have vision. . Has the responsibility to evaluate character of new prospects to determine if they will make good producers while at the same time making decisions on lenders, vendors and cash flows. In addition ,this associate also has to possess the wisdom to recognize trends  and indicators that may warrant directional/ business changes .  Extraordinary circumstances to be referred to the Director of Live Production.

## OTHER POSITION RESPONSIBILITIES

**This position spends___20___ % of a normal workweek supervising other associates.**
**This position spends___5___ % of a normal workweek training and developing other associates and/or contract growers.**
**This position spends___60___ % of a normal workweek performing technical analyses and writing reports.**
**This position spends___40___ % of a normal workweek in production or maintenance-related activities.**

## ENVIRONMENTAL FACTORS AND PHYSICAL REQUIREMENTS

**The environment factors and/or physical requirements of this position include the following:**

Exposed to all seasonal weather conditions from sub zero to 100 degrees with humidities up to 100%.  Must be physically able to drive 500  miles per week, move through a 600 foot poultry house, climb 15 feet high, and lift up to 50 lbs.  Will e exposed to rough terrain of grass, weeds, fields, mud, etc., while staking out houses. In addition be able to work in an office for extended periods of time to include operating a computer, setting in meetings or performing presentations.

**I confirm that I am able to perform the functions and requirements of this position as described herein and explained to me.**

_____          _____

Applicant / Incumbent                                             Date

**I confirm that I have explained the major requirements and responsibilities of this position to the individual named above and have witnessed his/her signature.**

_____          _____

Company Representative                                            Date



# POSITION DESCRIPTION

## BACKGROUND POSITION INFORMATION

| | | | |
|---|---|---|---|
| **Position Title:** | **Grow Out Manager** | **Job Code:** | |
| **Location:** | **Complex – Live Production** | **Department:** | **Live Production** |
| **Supervisors Title:** | **Live Production Manager** | **Supervisor's Name:** | |

**Normal Work Schedule**    Note:  The hours and days of work are established as needed by operations and at the direction of management and, while generally as shown below, may be changed (increased or decreased) by management as required.

**Hours of Work**:        Generally  7:00 AM to 5:00 PM  or as scheduled by management with a one (1) hour lunch period approximately mid shift.  Overtime may be scheduled as needed and directed by management.

**Days of Works**:        Normally Monday through Friday as scheduled by management and Saturday, Sunday and/or Holidays if needed by operations and approved by management.

## EDUCATION AND EXPERIENCE REQUIREMENTS

The minimum formal education preferred to be considered for this position is  (indicate level and years of  education and, if a degree is required, the major):

**Strong, reading, math, writing, communication skills (oral and written), analytical skills, a statistical background with a High School Diploma or GED equivalent required.   Bachelor's Degree in Agriculture related field is preferred.**

Specialized or technical knowledge, credentials or  licensing required for the position include:

*License* – Must have a valid Drivers License with no points. Certified copy of State Driver's Record for the past seven (7) years required before being employed.

*Planning* – an ability to think ahead.

*Problem Solving* – ability to analyze and resolve problems at a functional level.

*Technical Skills* – knowledge of and ability to implement modern processes & techniques and quality improvement processes.

*Customer Satisfaction* – knowledge of and ability to provide a strong customer orientation.

*Communication* – ability to communicate to all levels of the organization including producers and a commitment to excellent interpersonal and communication skills.

*Commitment* – dedication and commitment to company values.

*Safety* – ability, knowledge and commitment to put safety of above everything else while achieving established goals.

The minimum number of years and/or months of prior and related experience preferred to be considered for this position is:

**Three (3) to five (5) years of previous work experience preferred.**

## PURPOSE OF THIS POSITION

The overall purpose of this position,  i.e., what  it accomplishes at Perdue and/or why it exists is:

**To provide leadership, training, and coaching to the Broiler Grow Out Department through, but not limited to, budgeting, goal setting, interviewing, hiring, growing programs, bird health and feeding programs to meet the company's goals and objectives.**

## POSITION DIMENSIONS

**Perdue 006853**

| Number of Associates Supervised: | | If Exempt, indicate the Annual Dollar Value of: | |
|---|---|---|---|
| Salaried: | 0 | Payroll Budget: | $ 0.00 |
| Hourly: | 0 | Operating Budget: | $ 0.00 |
| Total: | 0 | Assets Managed: | $ 0.00 |
| | | Other Financial Impact: | $ 0.00 |

# PRINCIPAL POSITION RESPONSIBILITIES

**Describe below the four to six major responsibilities of this position which must be fulfilled with or without reasonable accommodation in order to achieve the essential purpose of this position.**

#1.   The ability to travel to Grow Out facilities up to 1200 miles per week and travel throughout poultry houses up to 600' long to monitor house conditions such as but not limited to ventilation, litter condition, bird health, water and feed availability.

--------------------------------------------------------------------------------------------------------------------------------

#2.   Develop and monitor annual operating budgets, growing programs, vaccination programs, feed programs and other various measurements to ensure the success of the department in meeting company goals and objectives.

--------------------------------------------------------------------------------------------------------------------------------

#3.    Attract, train and develop competent Perdue associates as Flock Supervisors through interviews, hiring, training programs for new hires, training seminars on current programs and career development.

--------------------------------------------------------------------------------------------------------------------------------

#4.   Have the ability to provide leadership, training and coaching to all subordinates and producers to ensure all Perdue policies and growing programs are being met.  This will be accomplished through field visits and phone conversations.

--------------------------------------------------------------------------------------------------------------------------------

#5.    Ability to communicate and act as a mediator between subordinates, peers, management, producers and non-company personnel to ensure that all sides have a clear understanding of company policies and all disputes are handled fairly.

--------------------------------------------------------------------------------------------------------------------------------

#6.    Act in a professional and courteous manner at all times upholding professional and positive work image for self and Perdue Farms.

--------------------------------------------------------------------------------------------------------------------------------

#7.   Comply and follow company requirements regarding bio-security, food safety and poultry welfare programs and policies at all times.

--------------------------------------------------------------------------------------------------------------------------------

#8.   Maintain safe working environment.

# DECISION-MAKING RESPONSIBILITIES

**Describe the decision-making authority of this position, the nature and extent of supervision available and the point at which higher approval is required.**

**Perdue 006854**

Make all decisions concerning the daily operations of the department and growing allocating budget funds, hiring and resolving contract producer conflicts and cover these with management and seek advice on those extraordinary situations.

## OTHER POSITION RESPONSIBILITIES

**This position spends___60___ % of a normal workweek supervising other associates.**
**This position spends___10___ % of a normal workweek training and developing other associates.**
**This position spends___20___ % of a normal workweek performing technical analyses and writing reports.**
**This position spends___10___ % of a normal workweek in production or maintenance-related activities.**

## ENVIRONMENTAL FACTORS AND PHYSICAL REQUIREMENTS

**The environment factors and/or physical requirements of this position include the following:**

Exposed to all seasonal weather conditions as well as significant amount of airborne dust, feathers, humidity up to 100%, ammonia gas, and various chemical vaccines and regulations to be covered in MSDS and Hazardous Communication training. Ability to lift up to 60 lbs., climb to a height of 30' as well as significant amount of bending, lifting, and stooping.

**I confirm that I am able to perform the functions and requirements of this position as described herein and explained to me.**


_____          _____
Applicant / Incumbent                                                        Date


**I confirm that I have explained the major requirements and responsibilities of this position to the individual named above and have witnessed his/her signature.**


_____          _____
Company Representative                                                   Date

**Perdue 006855**

# Fairmark Partners, LLP

1001 G Street NW | Ste. 400 East
Washington, DC 20001 | *https://fairmarklaw.com*

April 03, 2024

***VIA OVERNIGHT DELIVERY***

National Chicken Council
1152 Fifteenth Street, NW, Suite 430
Washington, D.C. 20005

RE:    Subpoena
        *Parker v. Perdue Foods, LLC*, No. 5:22-cv-00268-TES

To Whom It May Concern:

    Fairmark Partners, LLP represents Roger Parker in the above-captioned matter. Enclosed you will find a subpoena to produce documents. The requested documents are outlined in Exhibit A, which is attached to the subpoena. Production can be made by mail, at the address on the subpoena, or by email, to jamie@fairmarklaw.com.

    Should you have any questions or wish to discuss this matter, please feel free to reach out to me via the above email address. We look forward to working with you to promptly receive the material requested in the attached.

Sincerely,

Jamie Crooks, Esq.
Managing Partner
FAIRMARK PARTNERS, LLP

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: | Date and Time: |
|---|---|
| | |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

_____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Perdue 006857**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                                *Server's signature*

                                                       _____
                                                                *Printed name and title*

                                                       _____
                                                                *Server's address*

Additional information regarding attempted service, etc.:

**Perdue 006858**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## DEFINITIONS AND INSTRUCTIONS

1.        "National Chicken Council," "you," or "your" refers to the National Chicken Council and any current or former parent, subsidiary, division, affiliate, predecessor entity, successor entity, or other associated corporation or entity, and any current and former officers, directors, employees, agents, attorneys, representatives, and any other person acting or purporting to act on behalf of the National Chicken Council.

2.        "Perdue" refers to Perdue Foods LLC and any current or former parent (including Perdue Farms, Inc.), subsidiary, division, affiliate, predecessor entity, successor entity, or other associated corporation or entity, and any current and former officers, directors, employees, agents, attorneys, representatives, and any other person acting or purporting to act on behalf of Perdue.

3.        "Guidelines" are recommendations, advice or requirements related to the raising of chickens or the facilities that chickens are raised in. Guidelines include but are not limited to the NCC Animal Welfare Guidelines and Audit Checklist that are defined on Your website at:

https://www.nationalchickencouncil.org/policy/animal-welfare/

4.        "Chicken growers" or "growers" are the individuals or families under contract with NCC members as defined on Your website at:

https://www.nationalchickencouncil.org/industry-issues/vertical-integration/

5.        "Document" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including but not limited to any written or recorded material of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations of any kind; and mechanical or electronic records or representations of any kind including tapes, cassettes, disks, records, electronic mail messages, electronic files stored on hard drives, hand held devices, or other

computer storage; text messages; and web posts on internet blogs or social media outlets such as Facebook, Twitter, LinkedIn, and Instagram.

6.     "<u>Communication</u>" means oral or written communications of any kind, including without limitation, electronic communications, e-mails, facsimiles, telephone communications, correspondence, exchanges of written or recorded information, or face-to-face meetings.

7.     <u>Organization</u>.  The documents produced in response to this request shall be marked and arranged in such a way as to indicate clearly the request to which each such document is responsive.

8.     <u>Privilege or Immunity from Production</u>.  To the extent that any documents are not produced on the basis of privilege or work product immunity, such documents shall be fully identified by date, author, location, and custodian, and an explanation of the privilege or immunity asserted shall be set forth.

9.     <u>Destroyed Documents</u>.  If any documents herein requested have been lost, discarded, or destroyed, the documents so lost, discarded, or destroyed shall be identified as completely as possible, including, without limitation, the following information:  date of disposal, manner of disposal, reason for disposal, person(s) authorizing the disposal, and person(s) disposing of the document.

10.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope.  The use of the singular form of any word includes the plural and vice versa.

## <u>DOCUMENTS REQUESTED</u>

1.     All communications between National Chicken Council and Perdue from July 22, 2016 to present, related to the recruitment, supervision, training, guidelines, and performance of/for chicken growers.

2

2.      All documents from July 22, 2016 to present, related to National Chicken Council meetings, conferences, conference calls, webinars, or board meetings that included a representative from Perdue and identifies which representatives from Perdue were present.

3.      All documents related to this litigation or to the plaintiff, Roger "Dale" Parker.

Perdue 006862

# Fairmark Partners, LLP

1001 G Street NW | Ste. 400 East
Washington, DC 20001 | *https://fairmarklaw.com*

May 3, 2024

**VIA OVERNIGHT DELIVERY**

First Financial Bank
Poultry Division
815 Washington Street
Gainesville, GA 30501

RE:    Subpoena
       *Parker v. Perdue Foods, LLC, No. 5:22-cv-00268-TES*

To Whom It May Concern:

Fairmark Partners, LLP represents Roger Parker in the above-captioned matter. Enclosed you will find a subpoena to produce documents. The requested documents are outlined in Exhibit A, which is attached to the subpoena. Production can be made by mail, at the address on the subpoena, or by email, to jamie@fairmarklaw.com.

Should you have any questions or wish to discuss this matter, please feel free to reach out to me via the above email address. We look forward to working with you to promptly receive the material requested in the attached.

Sincerely,

Jamie Crooks, Esq.
Managing Partner
FAIRMARK PARTNERS, LLP

Perdue 006863

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Roger Parker

*Plaintiff*

v.

Perdue Foods, LLC

*Defendant*

Civil Action No. 5:22-cv-00268-TES

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:     First Financial Bank
        815 Washington Street
        Gainesville, GA 30501

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: Caplan Cobb | Date and Time: |
| 75 Fourteenth Street, N.E., Suite 2700 | |
| Atlanta, Georgia 30309 | **June 4, 2024; 9:00am** |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  May 3, 2024

CLERK OF COURT

_____                    OR                    _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ___Roger Parker___ , who issues or requests this subpoena, are:

Jamie Crooks; Fairmark Partners, LLP; 1001 G St NW, Suite 400 East, Washington, DC 20001; jamie@fairmarklaw.com; 619.507.4182

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Perdue 006864

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:22-cv-00268-TES

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Perdue 006865

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

## DEFINITIONS AND INSTRUCTIONS

1.      "First Financial," "you," or "your" refers to First Financial Bank and any current or former parent, subsidiary, division, affiliate, predecessor entity, successor entity, or other associated corporation or entity, and any current and former officers, directors, employees, agents, attorneys, representatives, and any other person acting or purporting to act on behalf of First Financial.

2.      "Document" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including but not limited to any written or recorded material of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations of any kind; and mechanical or electronic records or representations of any kind including tapes, cassettes, disks, records, electronic mail messages, electronic files stored on hard drives, hand held devices, or other computer storage; text messages; and web posts on internet blogs or social media outlets such as Facebook, Twitter, LinkedIn, and Instagram.

3.      Organization.  The documents produced in response to this request shall be marked and arranged in such a way as to indicate clearly the request to which each such document is responsive.

4.      Privilege or Immunity from Production.  To the extent that any documents are not produced on the basis of privilege or work product immunity, such documents shall be fully identified by date, author, location, and custodian, and an explanation of the privilege or immunity asserted shall be set forth.

5.      Destroyed Documents.  If any documents herein requested have been lost, discarded, or destroyed, the documents so lost, discarded, or destroyed shall be identified as

completely as possible, including, without limitation, the following information: date of disposal, manner of disposal, reason for disposal, person(s) authorizing the disposal, and person(s) disposing of the document.

6.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope. The use of the singular form of any word includes the plural and vice versa.

## DOCUMENTS REQUESTED

1.    All documents and communications, either internal or external, in any way related to Roger "Dale" Parker or Hazel Lee Farm, including but not limited to communications between You and Perdue, communications between First Financial and any other poultry processing company, communications with realtors, communications with any government entity, and all documents and communications related to Parker or Hazel Lee Farms' loan files.

2.    All documents reflecting guidance provided by First Financial to its employees regarding the promotion, marketing, issuance, and administration of loans to poultry farms or farmers that were in effect from July 23, 2016 to present.

3.    All documents and communications between First Financial or its representatives and Perdue related to poultry farmers from July 23, 2016 to present.

4.    The complete loan files and related communications for all loans issued to any Perdue poultry farmers from July 23, 2016 to present.

Perdue 006868

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In Re Subpoena Issued to First Financial Bank | Miscellaneous Case No. |

## MOTION QUASH OR MODIFY SUBPOENA TO PRODUCE DOCUMENTS AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

Non-party, First Financial Bank, by undersigned counsel and pursuant to Fed. R. Civ. Proc. 45, files this motion to quash or modify subpoena, and would show the Court as follows:

### PROCEDURAL BACKGROUND

1.    On or about May 3, 2024, counsel for plaintiff, Roger Parker ("Mr. Parker"). issued a subpoena to First Financial Bank ("Subpoena"). A true and correct copy of the Subpoena is attached hereto as Exhibit A. Counsel for Mr. Parker subsequently advised that the return date for the Subpoena is June 11, 2024, rather than June 4, 2024.

2.    The subpoena issued from the case styled *Roger Parker, on his own behalf and behalf of all others similarly situated v. Perdue Foods, LLC,* Case No. 5.22-cv-00268-TES ("Issuing Case") pending in the United States District Court, Middle District of Georgia, Macon Division ("Issuing Court").[1] As the Subpoena directs the production of documents in Atlanta, Georgia, this motion to quash or modify is appropriately filed in the Northern District of Georgia ("Recipient Court"). *See* Fed. R. Civ. P. 45(d)(3)(A).

3.    In his class action complaint ("Complaint") [D.E. 1] filed with the Issuing Court, Mr. Parker asserted the following claims for relief: Federal Minimum Wage (Fair Labor Standards Act); Federal Overtime (Fair Labor Standards Act); Breach of Contract; Declaratory Judgment;

---

[1] The Subpoena is deficient in that it fails to identify the Issuing Court. However, the Issuing Court may be ascertained from the accompanying protective order.

{M0354519.1}
#102348237v1

Perdue 006869

Fraud; Negligent Misrepresentation; Unjust Enrichment and Unfair and Discriminatory Practices. On December 9, 2022, the Issuing Court entered its *Order Granting in Part and Denying in Part Defendants' Motion to Dismiss* ("Order on Motion to Dismiss") [D.E. 27] wherein it dismissed Mr. Parker's fraud and unfair and discriminatory practices claims. On March 14, 2022, the Issuing Court entered its *Order Denying Plaintiff's Motion for Conditional Certification and to Facilitate Notice* ("Order Denying Conditional Certification") [D.E. 77] wherein it denied conditional certification due to Plaintiff's failure to meet his burden of showing that there are a substantial numbers of growers who desire to opt into the FLSA collective action.

² True and correct copies of the Complaint, Order on Motion to Dismiss and Order Denying Conditional Certification are attached hereto as Exhibit B, C and D, respectively.

4.      On May 15, 2024, First Financial Bank timely served its responses and objections ("R&O") to the Subpoena upon counsel for Mr. Parker. A true and correct copy of First Financial Bank's R&O is attached hereto as Exhibit E.

## INCORPORATED MEMORANDUM OF LAW

5.      "Federal Rule of Civil Procedure 45 protects a subpoena recipient by requiring a subpoena issuer to 'take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena' and by setting out several mandatory and discretionary grounds for quashing a subpoena." *Jordan v. Comm'r, Miss. Dep't of Corrs.*, 947 F.3d 1322, 1329 (11ᵗʰ Cir.      2020)      (quoting      Fed.      R.      Civ.      P.      45(d)(1),      (3)). "While Rule 45 does not specifically identify irrelevance as a reason to quash a subpoena, it is generally accepted that the scope of discovery allowed under Rule 45 is limited by the relevancy requirement of the federal discovery rules." *Id.* "Thus, a subpoena issued under Rule 45 should

---

² In its Order Denying Conditional Certification, the Issuing Court noted that, after six months of discovery, only one of the 1300+ growers has expressed an interest in joining this suit.

- 2 -

#102348237v1

**Perdue 006870**

be quashed to the extent it seeks irrelevant information." *Id.* Rule 45 also explicitly mandates that "the court ... must quash ... a subpoena that, "among other things," "requires discovery of privileged or protected matter, if no exception or waiver applies" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv).

6.    The instant Subpoena includes four document requests.    First Financial Bank has gathered and will produce all documents responsive to request no. 1 in advance of the June 11, 2024 return date. First Financial Bank has no documents responsive to request no. 2.

7.    Request no. 4 seeks "the complete loan files and related communication for all loans issued to any Perdue poultry farmers from July 23, 2016 to present." Request No. 3 is largely encompassed within request no. 4 and seeks "All documents and communications between First Financial or its representatives and Perdue related to poultry farmers from July 23, 2016 to the present."

8.    First Financial Bank has gathered and will produce all documents relating to Mr. Parker that are responsive to requests nos. 3 and 4 in advance of June 11, 2024 return date.

9.    As may be evidenced by the Declaration of Paula Davis (Exhibit F hereto), First Financial Bank has eighty (80) loans involving Perdue poultry farmers at present. Seventy-four (74) of these loans involve customers located outside the State of Georgia.

10.    First Financial Bank respectfully submits that it would be unduly burdensome for First Financial Bank to gather and produce the requested documents for the seventy-nine (79) non-party, customers other than Mr. Parker. The loan files are voluminous and include, *inter alia*, loan applications, financial statements, loan documents, payment records, correspondence with the obligors, correspondence with Perdue, any foreclosure records and any litigation records. Certain of these documents, such as the loan applications and financial statements, include personal identifiers and sensitive, private financial information. First Financial Bank does not

#102348237v1

Perdue 006871

have the consent of its customers to release such personal financial information. Moreover, to First Financial Bank's knowledge, the customers at issue did not receive the notice of the Subpoena as contemplated by O.C.G.A. § 7-1-360.

11.   It would require an extraordinary amount of time for First Financial Bank gather, review and produce the loan files for approximately seventy-nine (79) non-parties to this action. By way of example, First Financial Bank has gathered and intends to produce in excess of 1,600 pages of documents relating solely to Mr. Parker.

12.   Certain of the documents requested in the Subpoena, such as "communications between First Financial or its representatives and Perdue," would appear to be equally accessible from the defendant in this action as opposed to placing such a burden on a non-party. Mr. Parker could also seek this discovery directly from the non-parties to the extent appropriate.

13.   The requested documents also appear to be largely irrelevant to the remaining claims in the Issuing Case. Whether Perdue breached its contractual obligations, engaged in negligent misrepresentation or was unjustly enriched can be determined without the need to review the sensitive financial information of First Financial Bank's customers as included in, *inter alia*, the loan applications and financial reports.

14.   The undersigned counsel conferred with counsel for plaintiff, Mr. Parker, on multiple occasions in attempt to resolve this matter but was ultimately unable to reach a resolution.

WHEREFORE, First Financial Bank respectfully requests the entry of an order quashing or modifying the Subpoena and granting such other and further relief as the Court deems just and proper. In the unlikely event that production is allowed as to any non-parties, First Financial Bank respectfully requests that the Court require plaintiff to provide notice to such parties with an opportunity to object, including, without limitation, the notice contemplated by O.C.G.A. § 7-1-360.

- 4 -

Perdue 006872

Respectfully Submitted,           JONES WALKER LLP
*Attorneys for First Financial Bank*
3455 Peachtree Road NE
Suite 1400
Atlanta, GA 30326
Email: *sdrobny@joneswalker.com*
Telephone: (305) 679-5700
Facsimile: (305) 679-5710

By:   */s/ Stephen P. Drobny*
          Stephen P. Drobny
          Georgia Bar No. 430447

#102348237v1

**Perdue 006873**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via ECF or first-class U.S. Mail on the parties listed below on this 7th day of June, 2024.

/s/ *Stephen P. Drobny*
Stephen P. Drobny


**JAMIE CROOKS**
1825 7TH AVE NW STE 821
WASHINGTON, DC 20001
Email: jamie@fairmarklaw.com

**JARRED A KLORFEIN**
75 14TH ST NE STE 2700
ATLANTA, GA 30309
Email: jklorfein@caplancobb.com

**T BRANDON WADDELL**
75 FOURTEENTH ST NE
STE 2750
ATLANTA, GA 30309
Email: bwaddell@caplancobb.com

**KEVIN HISHTA**
191 PEACHTREE ST NE STE 4800
ATLANTA, GA 30303
Email: kevin.hishta@ogletree.com

**MARGARET SANTEN**
201 S COLLEGE ST
STE 2300
CHARLOTTE, NC 28244
Email: maggie.santen@ogletree.com

- 6 -

Perdue 006874

# EXHIBIT A

Perdue 006875



# Fairmark Partners, LLP
1001 G Street NW | Ste. 400 East
Washington, DC 20001 | *https://fairmarklaw.com*

May 3, 2024

**VIA OVERNIGHT DELIVERY**

First Financial Bank
Poultry Division
815 Washington Street
Gainesville, GA 30501

RE:    Subpoena
       *Parker v. Perdue Foods, LLC, No. 5:22-cv-00268-TES*

To Whom It May Concern:

Fairmark Partners, LLP represents Roger Parker in the above-captioned matter. Enclosed you will find a subpoena to produce documents. The requested documents are outlined in Exhibit A, which is attached to the subpoena. Production can be made by mail, at the address on the subpoena, or by email, to jamie@fairmarklaw.com.

Should you have any questions or wish to discuss this matter, please feel free to reach out to me via the above email address. We look forward to working with you to promptly receive the material requested in the attached.

Sincerely,

Jamie Crooks, Esq.
Managing Partner
FAIRMARK PARTNERS, LLP

**Perdue 006876**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

| | |
|---|---|
| Roger Parker | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 5:22-cv-00268-TES |
| Perdue Foods, LLC | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
First Financial Bank
815 Washington Street
Gainesville, GA 30501

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: Caplan Cobb <br> 75 Fourteenth Street, N.E., Suite 2700 <br> Atlanta, Georgia 30309 | Date and Time: <br><br> June 4, 2024, 9:00am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: May 3, 2024

| CLERK OF COURT | | |
|---|---|---|
| | OR | _signature_ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Roger Parker
, who issues or requests this subpoena, are:

Jamie Crooks; Fairmark Partners, LLP; 1001 G St NW, Suite 400 East, Washington, DC 20001; jamie@fairmarklaw.com; 619.507.4182

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Perdue 006877**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:22-cv-00268-TES

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____ .

_____    on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Perdue 006878

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply.
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or

  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Perdue 006879

## EXHIBIT A

## DEFINITIONS AND INSTRUCTIONS

1.      "First Financial," "you," or "your" refers to First Financial Bank and any current or former parent, subsidiary, division, affiliate, predecessor entity, successor entity, or other associated corporation or entity, and any current and former officers, directors, employees, agents, attorneys, representatives, and any other person acting or purporting to act on behalf of First Financial.

2.      "Document" refers to all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure, including but not limited to any written or recorded material of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise; notations of any sort of conversations, telephone calls, meetings or other communications; all graphic or oral records or representations of any kind; and mechanical or electronic records or representations of any kind including tapes, cassettes, disks, records, electronic mail messages, electronic files stored on hard drives, hand held devices, or other computer storage; text messages; and web posts on internet blogs or social media outlets such as Facebook, Twitter, LinkedIn, and Instagram.

3.      Organization. The documents produced in response to this request shall be marked and arranged in such a way as to indicate clearly the request to which each such document is responsive.

4.      Privilege or Immunity from Production. To the extent that any documents are not produced on the basis of privilege or work product immunity, such documents shall be fully identified by date, author, location, and custodian, and an explanation of the privilege or immunity asserted shall be set forth.

5.      Destroyed Documents. If any documents herein requested have been lost, discarded, or destroyed, the documents so lost, discarded, or destroyed shall be identified as

Perdue 006880

completely as possible, including, without limitation, the following information: date of disposal, manner of disposal, reason for disposal, person(s) authorizing the disposal, and person(s) disposing of the document.

6.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope. The use of the singular form of any word includes the plural and vice versa.

## DOCUMENTS REQUESTED

1.    All documents and communications, either internal or external, in any way related to Roger "Dale" Parker or Hazel Lee Farm, including but not limited to communications between You and Perdue, communications between First Financial and any other poultry processing company, communications with realtors, communications with any government entity, and all documents and communications related to Parker or Hazel Lee Farms' loan files.

2.    All documents reflecting guidance provided by First Financial to its employees regarding the promotion, marketing, issuance, and administration of loans to poultry farms or farmers that were in effect from July 23, 2016 to present.

3.    All documents and communications between First Financial or its representatives and Perdue related to poultry farmers from July 23, 2016 to present.

4.    The complete loan files and related communications for all loans issued to any Perdue poultry farmers from July 23, 2016 to present.

2

**Perdue 006881**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>PERDUE FOODS, LLC,<br><br>        Defendant. | Case 5:22-cv-00268-TES |

[PROPOSED] PROTECTIVE ORDER

Whereas, the parties to this Protective Order ("parties"), have stipulated that certain discovery material, including subpoenaed material that non-parties may produce or testify about during Discovery, is and should be treated as confidential, and have agreed to the terms of this order; accordingly, it is this 18 day of July 2023, ORDERED:

1. **Scope.** All documents produced in the course of discovery, all responses to discovery requests, all responses to subpoenas from non-parties[1], and all deposition testimony and deposition exhibits and any other materials which may be subject to discovery (from parties or non-parties) (hereinafter collectively "documents") shall be subject to this Order concerning confidential information as set forth below.

2. **Form and Timing of Designation.** Confidential documents shall be so designated by placing or affixing the word "CONFIDENTIAL" or "CONFIDENTIAL — ATTORNEYS' EYES ONLY" on the document in a manner which will not interfere with the legibility of the document and which will permit complete removal of the Confidential designation. Documents

---

[1] "Non-Parties" refers to third parties who may produce documents/information pursuant to a subpoena or provide testimony.

1

Perdue 006882

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 45 of 140
Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 15 of 104
Case 5:22-cv-00268-TES   Document 47   Filed 07/18/23   Page 2 of 14

shall be designated CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY prior

to, or contemporaneously with, the production or disclosure of the documents. If timely corrected,

an inadvertent failure to designate qualified information or items as CONFIDENTIAL or

CONFIDENTIAL—ATTORNEYS' EYES ONLY does not, standing alone, waive the Designating

Party's right to secure protection under this Order for such material. Upon timely correction of a

designation, the Receiving Party must make reasonable efforts to assure that the material is treated

in accordance with the provisions of this Order. The Receiving Party shall not be responsible for

any use or dissemination of such document which occurred prior to such correction but shall take

all reasonable steps necessary to retrieve any and all copies of such document or materials and

inform any individuals to whom the documents or materials were disclosed that they were disclosed

in error and are subject to the provisions of this Order.

    **3.**    **Documents Which May be Designated.**

        **a. Documents Which May be Designated Confidential.** Any party or non-party may

designate documents as CONFIDENTIAL but only after review of the documents

by an attorney who has, in good faith, determined that the documents contain

information protected from disclosure by statute, sensitive personal information,

trade secrets, or confidential research, development, or commercial information. The

certification shall be made concurrently with the disclosure of the documents, using

the form attached hereto at Attachment A which shall be executed subject to the

standards of Rule 11 of the Federal Rules of Civil Procedure. Information or

documents which are available in the public sector may not be designated as

confidential.

Perdue 006883

b. **Documents Which May be Designated Confidential Attorneys' Eyes Only.**
CONFIDENTIAL — ATTORNEYS' EYES ONLY classification, being more
highly protective of disclosure than the "CONFIDENTIAL" classification, governs
information that an attorney, in good faith, determines would materially damage or
adversely impact the business, financial, or commercial interests of the party, non-
party, or person producing such material if such information is disclosed to another
party or non-party. The certification shall be made concurrently with the disclosure
of the documents, using the form attached hereto at Attachment D which shall be
executed subject to the standards of Rule 11 of the Federal Rules of Civil Procedure.
Information or documents which are available in the public sector may not be
designated as confidential. Materials entitled to protection under CONFIDENTIAL
— ATTORNEYS' EYES ONLY designation may include, but are not limited to,
confidential research and development, financial, technical, marketing, sensitive
trade secret information, proprietary procedures, customer lists that have not been
published on the disclosing party's or non-party's website or otherwise publicly
disclosed, confidential information about the disclosing party's/non-party's
customers or employees, and documents that identify principals, customers, or
suppliers of the producing party, non-party, or person that have not been published
on the disclosing party's/non-party's website or otherwise publicly disclosed.
Information or documents that are available in the public sector, which do not meet
the description of CONFIDENTIAL, or which have been previously available to a
requesting party or which were authored by, intended for, or received by a requesting

3

**Perdue 006884**

party/non-party may not be designated as CONFIDENTIAL — ATTORNEYS'
EYES ONLY.

c.  **Documents Which May Be Designated CONFIDENTIAL— ATTORNEYS'
EYES ONLY CLASS INFORMATION.** If the Court certifies a class, Defendant
may designate documents CONFIDENTIAL -ATTORNEYS' EYES ONLY-
CLASS INFORMATION based on a determination through review by an attorney
or artificial intelligence that the document contains the information regarding class
members, including their names, business names, emails, or phone numbers.
Plaintiffs' counsel must treat documents designated CONFIDENTIAL -
ATTORNEYS' EYES ONLY- CLASS INFORMATION consistent with documents
designated CONFIDENTIAL-ATTORNEYS' EYES ONLY.

　　i.  Information or documents which are available in the public sector may not
be designated as confidential.

4.  **Depositions.** Portions of depositions shall be deemed confidential only if designated
as such when the deposition is taken, within twenty business days after receipt of the transcript, or
as soon as reasonably practicable before the close of discovery, whichever is shorter.  Such
designation shall be specific as to the portions to be protected. If timely corrected, an inadvertent
failure to designate qualified information or items does not, standing alone, waive the Designating
Party's right to secure protection under this Order for such material. Upon timely correction of a
designation, the Receiving Party must make reasonable efforts to assure that the material is treated
in accordance with the provisions of this Order. The Receiving Party shall not be responsible for
any use or dissemination of such document which occurred prior to such correction.

4

Perdue 006885

5.    **Protection of Confidential Material.**

a.  **General Protections.**    Documents    designated    CONFIDENTIAL    or
CONFIDENTIAL — ATTORNEYS' EYES ONLY under this Order shall not be
used or disclosed by the parties or non-parties or counsel for the parties or any other
persons identified below (¶ 5.b.) for any purposes whatsoever other than preparing
for and conducting the litigation in which the documents were disclosed (including
any appeal of that litigation). The parties, non-parties, and counsel shall not disclose
documents designated as confidential to putative class members not named as
plaintiffs unless and until one or more classes have been certified.

b.  **Limited Third Party Disclosures.** The parties, non-parties, and counsel for those
shall not disclose or permit the disclosure of any documents designated
CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY under the
terms of this Order to any other person or entity except as set forth in subparagraphs
(1)-(4) below, and then only after the person to whom disclosure is to be made has
executed an acknowledgment (in the form set forth at Attachment B hereto), that he
or she has read and understands the terms of this Order and is bound by it. Subject
to these requirements, the following categories of persons may be allowed to review
documents which have been designated CONFIDENTIAL pursuant to this Order:

i.  parties, non-parties, and employees of both to this Order but only to the
extent counsel shall certify that the specifically named individual party, non-

5

**Perdue 006886**

party, or employee's assistance is necessary to the conduct of the litigation in which the information is disclosed;[2]

ii.  court reporters engaged for depositions and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents;

iii. consultants, investigators, or experts (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation and trial of the lawsuit; and

iv. other persons only upon consent of the producing party or upon order of the court and on such conditions as are agreed to or ordered.

Subject to these requirements, only those persons described in paragraphs 5(b)(ii), (iii), and (iv) may be allowed to review confidential information or materials which have been designated as CONFIDENTIAL — ATTORNEYS' EYES ONLY pursuant to this Order.

c.  **Control of Documents.** Counsel for the parties and non-parties shall take reasonable efforts to prevent unauthorized disclosure of documents designated pursuant to the terms of this order. Counsel shall maintain a record of those persons who have reviewed or been given access to the documents along with the originals of the forms signed by those persons acknowledging their obligations under this Order.

---

[2] At or prior to the time such party, non-party, or employee completes his or her acknowledgment of review of this Order and agreement to be bound by it (Attachment B hereto), counsel shall complete a certification in the form shown at Attachment C hereto. Counsel shall retain the certification together with the form signed by the party, non-party or employee.

Perdue 006887

d. Copies. All copies, duplicates, extracts, summaries, or descriptions (hereinafter referred to collectively as "copies"), of documents or any portion of a document designated under this Order shall be immediately affixed with the designation "CONFIDENTIAL" or "CONFIDENTIAL — ATTORNEYS' EYES ONLY" if the words do not already appear on the copy. All such copies shall be afforded the full protection of this Order.

6.    **Filing of Confidential or Confidential Attorneys' Eyes Only Materials.** In the event a party or non-party seeks to file any material that is subject to protection under this Order with the Court, that party or non-party shall take appropriate action to insure that the documents receive proper protection from public disclosure including: (1) filing a redacted document with the consent of the party who designated the document as confidential; (2) where appropriate (e.g. in relation to discovery and evidentiary motions), submitting the documents solely for in camera review; or (3) where the preceding measures are not adequate, seeking permission to file the document under seal. Nothing in this Order shall be construed as a prior directive to the Clerk of Court to allow any document be filed under seal. The parties and non-parties understand that documents may be filed under seal only with the permission of the court. The party designating the material as subject to protection under this order retains the burden to demonstrate that any document filed with the Court should remain (in whole or in part) under seal.

7.    **Greater Protection of Specific Documents.** No party or non-party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party or non-party moves for an Order providing such special protection.

7

Perdue 006888

**8.    Challenges to Designation as Confidential or Confidential Attorneys' Eyes Only.** Any CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY designation is subject to challenge. The following procedures shall apply to any such challenge.

    a.  The burden of proving the necessity of a Confidential designation remains with the party or non-party asserting confidentiality.

    b.  A party or non-party who contends that documents designated CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY are not entitled to confidential treatment shall give written notice to the party or non-party who affixed the designation of the specific basis for the challenge. The party or non-party who so designated the documents shall have fifteen (15) days from service of the written notice to determine if the dispute can be resolved without judicial intervention and, if not, to move for an Order confirming the Confidential designation.

    c.  Notwithstanding any challenge to the designation of documents as confidential, all material previously designated CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY shall continue to be treated as subject to the full protections of this Order until one of the following occurs:

        i.  the party or non-party who claims that the documents are confidential withdraws such designation in writing;

        ii.  the party or non-party who claims that the documents are confidential fails to move timely for an Order designating the documents as confidential as set forth in paragraph 8.b. above; or

        iii.  the Court rules that the documents should no longer be designated as confidential information.

8

**Perdue 006889**

    **d.** Challenges to the confidentiality of documents may be made at any time and are not waived by the failure to raise the challenge at the time of initial disclosure or designation.

    9.    **Inadvertent Production of Privileged or Other Protected Material.** When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). Further, no party shall be held to have waived any right or legally-cognizable privilege or evidentiary protection by such inadvertent production, provided the requirements of Federal Rule of Evidence 502(b) are satisfied. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

    10.    **Treatment on Conclusion of Litigation.**

    **a. Order Remains in Effect.** All provisions of this Order restricting the use of documents designated CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY shall continue to be binding after the conclusion of the litigation unless otherwise agreed or ordered.

    **b. Return or Destruction of CONFIDENTIAL Documents.** Within thirty (30) days after the conclusion of the litigation, including conclusion of any appeal, all documents treated as CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY under this Order, including copies as defined above (¶5.d.) shall be either destroyed or returned to the producing party or non-party unless: (1) the

9

**Perdue 006890**

document has been entered as evidence or filed (unless introduced or filed under seal); (2) the parties stipulate to destruction in lieu of return; or (3) as to documents containing the notations, summations, or other mental impressions of the receiving party or non-party, that party or non-party elects destruction. Notwithstanding the above requirements to return or destroy documents, counsel may retain attorney work product.

11.    **No Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any specific document or item of information designated as CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY by counsel is subject to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as a document-specific ruling shall have been made.

12.    **Persons Bound.** This Order shall take effect when entered and shall be binding upon: (1) counsel for the parties and their respective law firms; (2) their respective clients; and (3) any non-parties and their counsel who receive a subpoena to produce documents or give testimony in this matter.

    **IT IS SO ORDERED.**

_____ 2023
Macon, Georgia

The Honorable Tilman E. Self III
United States District Court Judge

10

## ATTACHMENT A

### CERTIFICATION BY COUNSEL OF DESIGNATION OF INFORMATION AS CONFIDENTIAL

#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE MIDDLE DISTRICT OF GEORGIA
#### MACON DIVISION

| | |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PERDUE FOODS, LLC,<br><br>Defendant. | Case 5:22-cv-00268-TES<br><br>**CERTIFICATION BY COUNSEL OF DESIGNATION OF INFORMATION AS CONFIDENTIAL** |

Documents produced herewith [whose bates numbers are listed below (or) which are listed on the attached index] have been marked as CONFIDENTIAL subject to the Confidentiality Order entered in this action which Order is dated _____.

By signing below, I am certifying that I have personally reviewed the marked documents and believe, based on that review, that they are properly subject to protection under the terms of Paragraph 3 of the Confidentiality Order.

Check and complete one of the two options below.

❏    I am a member of the Bar of the United States District Court for the Middle District of Georgia. My District Court Bar number is _____.

❏    I am not a member of the Bar of the United States District Court for the Middle District of Georgia but am admitted to the bar of one or more states. The state in which I conduct the majority of my practice is [state in which I practice most] where my Bar number is [that state's Bar #]. I understand that by completing this certification I am submitting to the jurisdiction of the United States District Court for the Middle District of Georgia as to any matter relating to this certification.

_____          _____          _____
Date                              Signature of Counsel            Printed Name of Counsel

**Perdue 006892**

## ATTACHMENT B

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated, | Case 5:22-cv-00268-TES |
| Plaintiff, | |
| v. | ACKNOWLEDGMENT OF UNDERSTAND AND AGREEMENT TO BE BOUND |
| PERDUE FOODS, LLC, | |
| Defendant. | |

The undersigned hereby acknowledges that he or she has read the Confidentiality Order dated _____, in the above captioned action, understands the terms thereof, and agrees to be bound by such terms. The undersigned submits to the jurisdiction of the United States District Court for the Middle District of Georgia in matters relating to the Confidentiality Order and understands that the terms of said Order obligate him/her to use discovery materials designated CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY solely for the purposes of the above-captioned action, and not to disclose any such confidential information to any other person, firm or concern.

The undersigned acknowledges that violation of the Stipulated Confidentiality Order may result in penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

Date: _____    Signature: _____

12

**Perdue 006893**

## ATTACHMENT C

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated, | Case 5:22-cv-00268-TES |
| Plaintiff, | |
| v. | **CERTIFICATION OF COUNSEL FOR ASSISTANCE OF PARTY/EMPLOYEE** |
| PERDUE FOODS, LLC, | |
| Defendant. | |

Pursuant to the Confidentiality Order entered in this action, most particularly the provisions of Paragraph 5.b.2., I certify that the assistance of _____ is reasonably necessary to the conduct of this litigation and that this assistance requires the disclosure to this individual of information which has been designated as CONFIDENTIAL or CONFIDENTIAL — ATTORNEYS' EYES ONLY.

I have explained the terms of the Confidentiality Order to the individual named above and will obtain his or her signature on an "Acknowledgment of Understanding and Agreement to be Bound" prior to releasing any confidential documents to the named individual and I will release only such confidential documents as are reasonably necessary to the conduct of the litigation.

The individual named above is:

☐      A named party;

☐      An employee of named party [employee of named party]. This employee's job title is [employee's job title] and work address is [employee's work address].

Date: _____      Signature:_____

13

**Perdue 006894**

### ATTACHMENT D
### CERTIFICATION BY COUNSEL OF DESIGNATION OF INFORMATION AS
### CONFIDENTIAL — ATTORNEYS' EYES ONLY

#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE MIDDLE DISTRICT OF GEORGIA
#### MACON DIVISION

| | |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PERDUE FOODS, LLC,<br><br>Defendant. | Case 5:22-cv-00268-TES<br><br>CERTIFICATION BY COUNSEL OF DESIGNATION OF INFORMATION AS CONFIDENTIAL — ATTORNEYS' EYES ONLY |

Documents produced herewith [whose bates numbers are listed below (or) which are listed on the attached index] have been marked as CONFIDENTIAL – ATTORNEYS' EYES ONLY subject to the Confidentiality Order entered in this action which Order is dated _____.

By signing below, I am certifying that I have personally reviewed the marked documents and believe, based on that review, that they are properly subject to protection under the terms of Paragraph 3 of the Confidentiality Order.

Check and complete one of the two options below.

❑  I am a member of the Bar of the United States District Court for the Middle District of Georgia. My District Court Bar number is _____.

❑  I am not a member of the Bar of the United States District Court for the Middle District of Georgia but am admitted to the bar of one or more states. The state in which I conduct the majority of my practice is [state in which I practice most] where my Bar number is [that state's Bar #]. I understand that by completing this certification I am submitting to the jurisdiction of the United States District Court for the Middle District of Georgia as to any matter relating to this certification.

_____        _____        _____
Date                                          Signature of Counsel                      Printed Name of Counsel

14

Perdue 006895

# EXHIBIT B

Perdue 006896

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA

ROGER PARKER, on his own behalf and
on behalf of all others similarly situated,

          *Plaintiff,*

v.

PERDUE FARMS, INC. and PERDUE
FOODS, LLC,

          *Defendants.*

CIVIL ACTION NO.

## CLASS ACTION COMPLAINT

1.    Plaintiff Roger Parker, on behalf of himself and all others similarly situated, brings this action against Defendants Perdue Farms, Inc. and Perdue Foods, LLC (collectively, "Perdue") for damages and other appropriate relief related to their misclassification of Parker as an "independent contractor." Despite inducing chicken farmers (known in the industry as "growers") to contract to raise chickens with Perdue through promises of independence, Perdue treated Parker and all of its growers as controlled employees under both federal and Georgia law. As an employee, Parker was entitled to various federal and state wages, benefits, and other payments that Perdue did not provide, even though Perdue knew that Parker should have been classified as an employee based on the level of control Perdue exercised over Parker's chicken growing operation. Perdue treats all of its growers across the country in the same fashion, using the same restrictive contracts and guidelines with all of them to dictate nearly every aspect of how they run their farms.

2.    Through this and other conduct described herein, Perdue violated various state and federal laws regarding the wages and benefits that it was obligated to offer its growers as

**Perdue 006897**

employees, and also defrauded its growers, breached the contracts it entered into with its growers, and unjustly enriched itself at its growers' expense.

3.      Perdue also terminated Parker's grower contract due to Parker contacting the U.S. Department of Agriculture ("USDA") about a potential violation by Perdue of the Packers & Stockyards Act ("PSA"). After Perdue became aware that Parker had contacted the USDA, his Perdue supervisor told him he should not have talked to the government and made clear that Perdue was angry with him for having done so. Perdue subsequently retaliated against Parker by, among other things, denying routine lines of credit while requiring him to make expensive and burdensome upgrades to his farm and, ultimately, terminating his contract by refusing to deliver him flocks. Because these actions were taken not because of Parker's performance as a grower but because he reported a potential violation of law to the appropriate authorities, Perdue's retaliation against Parker violated the PSA's prohibition against unfair, discriminatory, and unduly prejudicial treatment of farmers. Thus, Parker brings a claim under the PSA on behalf of himself for this wrongful conduct.

## PARTIES

4.      Plaintiff Roger Parker is a resident of Abbeville, South Carolina who worked under contract as a grower for Defendants Perdue Farms, Inc. and Perdue Foods, LLC in Milledgeville, Georgia.

5.      Defendant Perdue Farms, Inc. is a Delaware corporation with its principal place of business in Salisbury, Maryland.

6.      Defendant Perdue Foods, LLC is a limited liability company with its principal place of business in Salisbury, Maryland. Perdue Foods, LLC is a wholly owned subsidiary of Perdue Farms, Inc.

2

**Perdue 006898**

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because Plaintiff's federal wage claims and PSA claim arise under federal law. The Court has supplemental jurisdiction over Parker's state-law claims under 28 U.S.C. § 1367, because they arise out of the same transactions and occurrences as Parker's federal claims.

8.      Moreover, the Court has jurisdiction over this class action under 28 U.S.C. § 1332(d) (the Class Action Fairness Act), because the amount in controversy is greater than $5,000,000, and some members of the class (including Parker) are citizens of a different state than Perdue.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants transact business in, are found in, and/or have agents in this judicial district, and because some of the actions giving rise to this Complaint took place within this district.

10.     The Court has personal jurisdiction over both Perdue entities.  Defendants have transacted business and maintained substantial contacts in this judicial district, and much of the conduct underlying this controversy took place in this jurisdiction.

## FACTUAL BACKGROUND

11.     "Broilers" are chickens raised for meat consumption. Modern broilers are generally slaughtered when they are about six weeks old.

12.     After the 1950s, the U.S. broiler industry began to shift away from individual farmers raising chickens and selling them to live poultry dealers or poultry processors. Between 1950 and 1960, the percentage of independent poultry farmers relative to contract farmers (farmers under exclusive contracts with a single chicken processing company) dropped from 95% to 5%.

3

Perdue 006899

During this time, large companies known as "integrators" began to combine the various stages of production, a process known as vertical integration.

13.    Several decades ago, these contract growers were actually independent—they relied on their skills and knowledge to grow the most high-quality birds they could while managing their own input costs and growing conditions. When they delivered a premium product to the poultry processor they were rewarded with higher prices or bonuses. In sum, growers were fairly compensated for the skill, expertise, and labor they provided. Today, growers working for Perdue have a very different relationship.

14.    Perdue is the third largest broiler chicken company in the country. Perdue is highly vertically integrated, with its employees overseeing almost every aspect of the process. As discussed further below, this includes, among other things, growing the chicken feed, hatching the chicks, veterinary care, transportation, slaughtering, marketing, and selling of the final product.

15.    While Perdue now directly owns almost all of its broiler supply chain, it has generally not purchased the farms where its chicks are raised to full weight. Instead, Perdue outsources the process of raising birds to broiler growers that Perdue calls "independent farmers"—but in truth, the growers are anything but independent.

16.    Perdue's growers raise chickens that Perdue owns from shortly after hatching for about six weeks until they are large enough to slaughter. Perdue recruits growers by promising them independence and financial success. In recruitment materials, Perdue promises "independence" and claims: "As a poultry farm owner, you'll never punch a time clock, and you'll have the satisfaction of leading your own business[.]"

17.    But Perdue refuses to grant growers the independence they were promised or the compensation they are entitled to.

4

Perdue 006900

18.    In reality, Perdue controls virtually every aspect of growers' operations.  There is no "independence" for growers under contract with Perdue, despite the growers shouldering most of the financial risk—including the large investment necessary to build barns (to Perdue's specifications), and the risk of loss if a flock is lost due to a power outage or disease.  Indeed, this financial risk—and Perdue's unwillingness to compensate growers with the wages and benefits to which employees are entitled—is why Perdue falsely classifies its growers as "independent."  In reality, however, Perdue's growers are employees entirely under the control of Perdue.  Perdue knows the level of control it exercises over growers entitles them to treatment under the law as employees, but it does not treat them as such in order to boost its profits.

19.    Perdue requires growers to work exclusively for Perdue.  After the contract is signed, Perdue uses onerous guidelines to take this exclusivity to extreme lengths: for example, preventing growers and their "family members" from even *visiting* a farm associated with a different integrator.

20.    By misclassifying growers, Perdue offloads enormous capital costs and financial risks onto them.  Instead of being responsible for the cost of constructing chicken houses, upgrading equipment, managing waste, and potentially losing chickens to natural disasters or other unexpected circumstances, Perdue forces growers to bear these costs by deceptively classifying growers as independent contractors while meticulously controlling virtually every moment and every aspect of their work.

21.    Indeed, this offloading of the responsibility to incur financial liabilities and large, ongoing debt payments is not only a primary financial reason Perdue misclassifies its growers as "independent contractors"—Perdue also uses the investments it repeatedly obligates its growers to make to trap growers into continuing to work for Perdue even after they discover that they were

5

**Perdue 006901**

not given the independence they were promised. Having taken on large loans to pay for facilities and upgrades—and then being required to take on even more debt for further upgrades and equipment—growers have no meaningful choice but to continue growing for Perdue as long as Perdue permits them to.

22.    Put differently, Perdue has devised a scheme to saddle growers with risk and debt, while at the same time directing and controlling every aspect of the chicken growing process and refusing to compensate growers in the manner that federal law requires.

23.    Growers are a key part of Perdue's chicken business; without growers, Perdue's chicken business would not be able to function.

24.    To begin working as a grower, farmers like Parker must make large investments in barns and equipment, and then ultimately must make upgrades. A farmer must build "grow out" houses that will hold thousands of chickens. These houses are expensive to construct and maintain, often requiring growers to take out large loans to finance them.

25.    Perdue requires growers to build houses for the chickens to precise specifications dictated by Perdue. After the houses are built, Perdue forces growers to pay for costly, highly specific facility or equipment changes. Perdue threatens to sever grower contracts—which growers rely on to repay their significant loans—if a grower does not make the costly changes to Perdue's exact specifications. And whenever Perdue decides, those specifications change over time, requiring growers to make even more significant payments and often go further into debt.

26.    Perdue growers are not required to have experience as chicken growers when they enter into their first contract with Perdue. Perdue trains growers and monitors whether growers are following Perdue's guidelines.

6

Perdue 006902

27.    Perdue uses a form contract with its growers ("Poultry Producer Agreement") nationwide. The contract is not negotiated between Perdue and each grower, as would be expected in a business-to-business relationship. Instead, every grower must sign the same contract.

28.    The Poultry Producer Agreement attempts to assert that growers (referred to in the Agreement as "producers") are independent contractors, not employees. The Agreement states that it is "a service contract and not a contract of employment and PERDUE and PRODUCER are each independent contractors."

29.    The Poultry Producer Agreement states that growers will perform work "using the skills, knowledge, and discretion" that each grower "possesses." This is false, as becomes clear well after a grower signs the Poultry Producer Agreement.

30.    The Poultry Producer Agreement requires that growers "comply with any bio-security policies, audits, measures or guidelines required by PERDUE." But, notably, those Perdue "guidelines" and "biosecurity policies" are not provided until *after* a grower signs their contract with Perdue. In this way, Perdue entices growers with marketing materials and contractual language that promises them independence while knowing that Perdue will subsequently control every material aspect of these growers' work.

31.    The reason Perdue would like to classify growers as independent contractors and not employees is plain: money. Employees, unlike independent contractors, are entitled to prompt payment of certain financial benefits, such as a minimum wage. Employees are also entitled to compensation for costs and expenses their employers require them to undertake as part of their employment.

32.    While controlling the method, manner, and timing of growers' work, Perdue simultaneously forces growers to bear economic risks that are the result of Perdue's decisions.

7

Perdue 006903

Perdue controls all the inputs that contribute substantially to the size of the chickens (the type and quantity of feed, the breed and size of the chicks delivered and picked up, the temperature, medications, and the method and manner of raising chickens). But if those inputs controlled by Perdue result in smaller chickens, Perdue reduces growers' pay.

33.    Growers are often unable to make enough money for basic living expenses under the compensation scheme that Perdue has designed, indicating that Perdue's growers are often paid less than the minimum wage for their time worked.

34.    Rather than properly pay its growers, Perdue wants to have its cake and eat it too: have growers that function as controlled employees but compensate them as if they are independent contractors and force them to bear financial burdens that employees should not have to bear.

35.    Parker's experience is emblematic of Perdue growers. Parker's contract from Georgia is materially identical to a contract that Perdue used in North Carolina and South Carolina in 2016, but for a single provision in the latter restricting photography on the farm. On information and belief, Perdue has used and continues to use a uniform contract nationwide with all of its growers.

36.    Perdue assigns a supervisor to each grower. These supervisors are misleadingly called "Flock Advisors," rather than what they actually are: managers. In fact, Parker's supervisor states in his online resume that his title is "Grower Manager" – a much more accurate job title description than the one Perdue strategically has used in public-facing communications.[1]

---

[1] As discussed below, Perdue uses multiple titles for this position. Whatever title Perdue creates, these individuals act at all times as the manager of the individual growers under their supervision wherever they are located.

8

Perdue 006904

37.     These supervisors visit farms with chickens at least weekly to ensure growers are complying with Perdue's requirements. During these visits, the supervisor conducts an inspection and assigns tasks to the Perdue grower they manage.

38.     In an attempt to obfuscate the level of control the Poultry Producer Agreement gives Perdue over growers, Perdue hides many of its requirements in other guidelines—guidelines that are not provided to growers until *after* they sign the Poultry Producer Agreement. Perdue requires that growers "adhere to the PERDUE Poultry Welfare and Bio-Security Programs." It further contractually requires that growers "comply with any bio-security policies, audits, measures, or guidelines required by PERDUE." Perdue's supervisors evaluate and grade growers' compliance with the company's bio-security guidelines.

39.     The written guidelines issued to growers are incredibly detailed. Compliance with the guidelines requires following Perdue's directions about every aspect of the growing operation. And the Poultry Production Agreement states that "[i]n the event the grower is not fulfilling his/her obligations then this agreement may be terminated."

**I.     Perdue's Right to Control**

40.     Perdue exercised its right to control every aspect of the time, method, and manner of Parker's work, whose experience is typical of other Perdue growers. Using broad language and terms that are not defined for the grower, Perdue lays the groundwork for its scheme in the Poultry Producer Agreement:

> PRODUCER AGREES: To accept the birds when consigned and to raise the birds until removed at PERDUE's direction from the PRODUCER's farm...To comply with any bio-security policies, audits, measures or guidelines required by PERDUE...To provide care for the health and welfare of the flock in accordance with and adhere to the PERDUE Poultry Welfare and Bio-Security Program... PERDUE may enter upon the premises of the PRODUCER where the flock is or shall be located to inspect the flock or facilities. If PRODUCER is not satisfactorily performing

9

**Perdue 006905**

> PRODUCER'S obligation under the Agreement to care for, treat and maintain the flock.... PERDUE shall be fully authorized, without prejudice to any and all other legal rights and remedies it may have, to enter upon the premises of the PRODUCER where the flock is located, either to feed and care for the flock on PRODUCER's premises or to take immediate possession and to remove or dispose of said flock in such manner as PERDUE may see fit.

41.     After contract signing, Perdue then exercises control at a level that could never be anticipated by the contract, both through the use of "guidelines" that are not disclosed at the time of signing and through the use of managers, whose power over growers could not be anticipated by any reading of the Poultry Producer Agreement. Perdue's actual control over the methods, manner, and timing of growers' work is detailed below.

### a. Methods

42.     Perdue controls the methods used to raise chickens. Despite promises of independence in the Poultry Producer Agreement and marketing materials, Perdue controls the use of specific methods for raising chickens down to extreme levels of detail. It does this primarily through two mediums: extensive guidelines that are provided after contract signing and the Perdue managers who are assigned to growers after contract signing.

43.     On a day-to-day basis, Perdue exercises control over methods through each grower's manager. While the Perdue Poultry Producer Agreement misleadingly defines these supervisors as "Advisors," it becomes clear well after contract signing that it is not optional to accept their advice. These supervisors oversee, discipline, train, and manage growers like Parker. As noted above, supervisors are referred to as "Flock Advisors," but can also be called "Growout Managers," "Live Production Managers," or other similar terms. Perdue requires growers to report any issues with chickens to their supervisor within 24 hours and requires growers to produce records to their supervisor on demand.

10

Perdue 006906

44.    According to recent job listings in at least four states, a Perdue Flock Advisor "Works directly with assigned contract producers to improve company profitability and competitive position by implementing production programs and documenting producer compliance at each visit to the farm." Another job listing explains: "The purpose of a Flock Advisor is to protect the Perdue Farms, Inc. brand name. Improve company profitability by serving as a representative *overseeing the people, poultry and daily operations* on his/her route" (emphasis added.)

45.    A recent job listing by Perdue in Georgia for a "Growout Manager" provides even more detail:

> [A Growout Manager] Provides leadership, training and coaching to associates, as well as producers to ensure all company policies and programs are being met... Drives program compliance and competitive farm performance. In farm management, meets all facility operational plans to ensure scheduling of placements, harvest, health checks and accurate weight projections for bird movements. Reports on progress to include physical farm improvements, performance metrics and safety. As a Housing Manager, works with new prospects and existing growers to add the square footage needed to meet the needs of the complex. Manages the average service cost of the complex to not exceed the current average by strategically locating new farms as close as possible to the plant locations. Facilitates the construction of square footage by evaluating new sites, introducing prospects t[o] lenders, working with builders and equipment companies to provide quotes to prospects, arranging grading bids and manages the scheduling of contractors to attain the most equate footage in the least amount of time. Develops new grading contractors, builders, equipment vendors and electricians to facilitate the additional expansion. Works with lenders, zoning, university staff and extension to help facilitate the expansion project.

46.    Another recent job listing by Perdue for a "Housing Manager" in Indiana explains that in addition to working "directly with assigned contract producers to... implement[] production programs and document[] producer compliance at each visit to the farm," this position is heavily involved in overseeing growers' construction projects:

11

**Perdue 006907**

[A Housing Manager] acts as general contractor for new construction and renovation of existing structures. Monitors the day to day work of the contracted construction crews. Coordinates with the producers, vendors and subcontractors. Works with perspective [sic] farmers laying out the construction of new poultry houses and the renovation of aging houses ensuring that the environment provided to the flocks meets the requirements of the operation. Purchases an[d] transports local materials and equipment to the job sites. Provides estimates of the remodeled construction cost of existing poultry facilities.

47.     In addition to the day-to-day management by its supervisors, the other primary way that Perdue controls the methods of growers' work is through written guidelines disclosed after a grower signs a contract. The guidelines give Perdue wide-ranging, constant, and nearly unfettered control over virtually every aspect of its growers' work. Compliance with these guidelines is mandated by the Poultry Producer Agreement even though growers are not provided with the guidelines prior to signing.

48.     These guidelines are incredibly detailed and conveyed in written and verbal communication from Perdue. For example, Perdue issues temperature guidelines that provide the exact degree temperature at which the grow out houses should be kept. This requirement changes throughout the day and requires specific humidity levels and ammonia levels. Perdue further requires specific methods of operating fans and ventilation. Perdue requires specific heights for water drinkers and specific hours for operation of lighting. Indeed, Perdue even requires grass *outside* of chicken houses to be cut on a schedule controlled by Perdue's delivery of chicks and Perdue's supervisors.

49.     Perdue's guidelines require use of both specific methods for euthanizing chickens and specific timelines for identifying and removing dead chickens.

50.     Perdue's contract also requires growers to comply with Perdue's "Poultry Welfare and Bio-Security Programs" which contain detailed requirements on housing and feeding

12

Perdue 006908

chickens, including on issues not clearly related to animal welfare or bio-security. (Again, these guidelines are not provided to growers before signing the contract.) For example, growers are banned from visiting other farms, banned from allowing "unauthorized" visitors on their land (but must permit Perdue supervisors on their land), and required to post Perdue's biosecurity signs on their farm.

51.     Perdue required Parker to report "within 24 hours" to his supervisor "if any birds, for any reason, do not develop normally..." Each flock includes thousands of birds. Therefore, on information and belief, this extraordinarily broad requirement is often practically impossible to comply with and serves as both a method of controlling growers like Parker and as a pretext for termination.

52.     Even after it picks up its chickens, Perdue mandates that growers adhere to guidelines for cleaning, maintenance, and preparation for a future delivery of chickens.

53.     Per the Poultry Producer Agreement, growers "can be immediately terminated by PERDUE" for failure of "proper house management or care." On information and belief, determination of "proper house management or care" is entirely at Perdue's discretion and can be used to terminate growers for almost any reason, which is not disclosed to growers at contract signing.

54.     Despite the promises made in the Poultry Producer Agreement, growers are not permitted to use their own "skills, knowledge, and discretion" to implement methods that would improve the growth of the chickens. For example, lighting changes that Parker believed would improve the growth and welfare of the chickens were barred by Perdue's guidelines.

13

**Perdue 006909**

### b. Manner

55.    Perdue controls the manner of raising chickens too. Most obviously it does this by controlling all the inputs used to raise chickens, including the chicks themselves. Perdue requires the use of specific feed, medication, vaccinations, and "other supplies"—all of which are provided by Perdue and which growers cannot substitute for inputs of their own choosing. Perdue dictated that Parker only use approved specific types of feed and medication, and Parker "[could] be immediately terminated" by Perdue for using unapproved feed or medication.

56.    According to the Perdue Poultry Producer Agreement, "PERDUE will determine in its sole and absolute discretion: a. the breed of chickens PRODUCER will receive; b. the number and density of chickens in each flock delivered to PRODUCER's farm; c. the size, weight and age of the chicken to be produced; d. the time for processing each flock; and e. the date, time and estimated interval of placement for future flocks." As discussed further below, Perdue's sole and absolute control of the type, timing, and health of chickens is not only a clear manifestation of its right to control Parker and other growers but also has significant impact on the compensation of growers.

57.    Parker, like all Perdue growers, had to use feed provided by Perdue. The Poultry Producer Agreement states that growers must "adhere to the instructions provided by PERDUE regarding feed and water withdrawal times prior to the catching of the flock." Again, growers learned how much control that provision gave Perdue only after signing their contracts. Growers have no control over the timing of feed deliveries, which can and often do happen in the middle of the night. Growers must be present at the time of the deliveries and have no right to refuse delivery of feed or to reschedule deliveries. Perdue also controls the type of feed growers receive, including its nutritional content and which type of feed should be used at different points of the growth cycle.

14

**Perdue 006910**

58.     As is typical for Perdue growers, Perdue controlled the type of materials Parker was allowed to use, down to the type of cleaning supplies, and insisted that use of any chemicals "in or around" barns be approved in writing by Perdue. According to the Poultry Producer Agreement, "PRODUCER shall not administer or allow to be administered any substance to the flock, including, without limitation, use of any medication, vitamins, minerals, vaccines, disinfectant, insecticide, pesticide, rodenticide, fungicide, herbicide or other chemicals in or around the poultry houses unless authorized and instructed to do so in writing by PERDUE."

59.     For example, Perdue's written instructions to Parker in late September 2019 included specific brands of drinkers to install along with down-to-the-inch requirements on the spacing of water nipples. Similarly, in May 2019, a Perdue supervisor wrote an email to Parker after a visit to his farm with a litany of changes Perdue required him to make on issues as specific as the number of fans, the height of water lines, and location of feeders.

60.     Perdue requires growers to pay for expensive changes to their chicken houses to comply with Perdue-specific specifications on equipment and facilities. This includes mandating specific models or brands of equipment to be used. Forcing growers to work inside facilities that are effectively designed for Perdue is another way that Perdue controls the methods and manner of growers' work.

61.     These changes usually require growers to take out large loans. These loans further tie the growers to Perdue because a continuing contract is often a requirement of the loan and because of the close relationship between Perdue and banks that lend to its growers. For example, Perdue automatically deducted payments from Parker's compensation to pay the bank on his behalf, despite Perdue ostensibly not being a party to the loan.

15

Perdue 006911

62.    When events outside of a grower's control (like extreme weather) impact a farm, Perdue exercises control over the response to those events. For example, Perdue dictated to Parker that a barn damaged by extreme weather must be demolished instead of repaired and Perdue insisted that a bulldozer level the barn and crush the live chickens inside over Parker's objections.

63.    Perdue even retains the authority to take over a grower's farm at Perdue's discretion. Growers are required to assume the cost of Perdue taking over their own farm. Even without invoking that authority, Perdue and Perdue's designated supervisors acted as though they were entitled to exercise broad control over Parker's farm. For example, after an unannounced visit to his farm in 2019, Parker's supervisor from Perdue wrote an email to Parker with a detailed list of eleven changes that needed to be made.

c.    Time

64.    Perdue controls the schedule of its growers' work at every phase of the chicken growing process.

65.    First, Perdue controls the timing for delivery of chicks. Perdue insists growers have to be available to accept birds "when consigned" and have to "be present or represented when birds are delivered and during the catching and movement of each flock." While not detailed in the contract, supervisors make clear to growers that having feed, water, heat, and ventilation to Perdue's specific specifications at the time of placement of chicks is mandatory. In its guidelines, provided after contract signing, Perdue details an extensive list of requirements to be completed on a specific schedule before chick placement (the timing of which is determined by Perdue). For example, temperature monitoring requirements begin "48 hours prior to" Perdue's arrival and air measurements must be done at a specific time.

16

Perdue 006912

66.     Second, Perdue controls the timing of work after it delivers chicks through its detailed guidelines that are provided only after the contract signing. For example, Perdue dictates ammonia, temperature, and humidity levels must be checked "daily." Birds must be culled by "approved methods" daily. Charts on bird mortality must be updated "daily." Alarms must be checked every day. Fan guidelines change by the week. Inspection of the exterior of houses is on a set schedule. Bait pads must be "check[ed] weekly." During the first week after placement, it mandated that growers walk up and down and inspect each barn a minimum of "4-5 times per day." Chicken houses are hundreds of feet long with tens of thousands of chickens, meaning these requirements are a mandate for a significant number of hours worked during this specific phase.

67.     Perdue controls the timing of feed deliveries, which can often happen in the middle of the night.

68.     Additionally, growers are expected to be present whenever their Perdue supervisor desires them to be present. Perdue also insists that it has the right to enter the grower's property at any time. In Parker's case, as with many other Perdue growers, this often happened without prior notice. Growers are expected to be on-call for Perdue 24 hours a day.

69.     Perdue's supervisors often require growers to complete tasks on a specific schedule —either in a certain number of days or by the next time the supervisor visits.

70.     Perdue requires growers to report "within 24 hours" to their supervisor "if *any* birds, for *any* reason, do not develop normally…" (emphasis added.) Because of the broad nature of this requirement and the timeline for reporting to supervisors, this requirement results in forcing growers to inspect every one of thousands of birds at least every 24 hours.

17

**Perdue 006913**

## II.    Exclusive Work Arrangement

71.    Under the Poultry Producer Agreement, Perdue requires that growers enter into an exclusive work agreement.

72.    The Poultry Producer Agreement specifies that growers agree "To allow or maintain no other poultry, fowl, wild birds, exotic or domestic pet birds, caged or free running, on the premises" and states that growers "[could] be immediately terminated" for "allowing or maintaining poultry, fowl, wild birds, and/or exotic birds on the farm other than PERDUE's poultry." The Agreement even bans growers or those working for growers from maintaining, owning, or caring for any birds or poultry "on any other premises" unless approved by Perdue.

73.    After the contract is signed, Perdue takes this exclusivity to extreme and unanticipated lengths. In guidelines provided only after the contract is signed, Perdue bans growers from even *visiting* farms associated with other integrators: "Growers should not visit other poultry producers farms or have contact with any other fowl." Perdue then extends this broad prohibition to "family members" of the grower—even though those family members may not have been party to the original contract.

74.    Parker, like many Perdue growers, was required by Perdue to place a sign with a Perdue logo at the entrance to his land. He was also required by Perdue to place signs and documents inside his barns, including documents with Perdue's logo.

## III.    Supplies and Equipment

75.    Under the Poultry Producer Agreement, Perdue provides supplies to Perdue growers. The Agreement requires that growers "use only the feed, medications, vaccinations, and other supplies, which PERDUE has provided, or has arranged to be provided, to PRODUCER for

18

Perdue 006914

the health and welfare of the birds consigned." Using supplies "other than those provided by PERDUE" is grounds for terminating the contract.

76.    Instead of allowing growers to shop for the supplies that they believe would be best for their operations, virtually all supplies are provided by Perdue and the cost of those supplies is then automatically deducted from growers' compensation.

77.    Perdue mandates that growers undergo training provided by Perdue through its supervisors, guidelines, and other materials.

78.    While Perdue requires growers to build their own grow out houses (to Perdue's exact specifications) and pay for upgrades to those facilities (that Perdue demands be implemented), growers take on extensive debt on their own behalf in order to do so. And that is precisely why Perdue falsely holds growers out to be independent contractors—so that Perdue does not have to bear this financial liability.

## IV.    At Will Employment

79.    Under the Poultry Producer Agreement and in practice, growers are functionally employed at will.

80.    The Agreement claims that either party can terminate the contract on 90 days written notice. It also allows only Perdue to terminate if "PRODUCER's farm has been without chickens for more than one hundred eighty (180) days." And Perdue retains the right in its sole discretion to decide whether or not to provide a grower with chickens. In other words, this provision allows Perdue to simply stop providing chickens and then fire growers for not having been provided chickens.

19

Perdue 006915

81.     The Agreement allows Perdue to terminate a grower who "fails to comply with the PERDUE Poultry Welfare and Bio-Security Programs." On information and belief, Perdue uses its animal welfare and bio-security programs as pretext to terminate growers for almost any reason.

82.     As described previously, the Agreement allows Perdue to terminate growers for lack of "proper house management or care." On information and belief, determination of "proper house management or care" is entirely at Perdue's discretion and is used to terminate growers for almost any reason.

83.     Furthermore, as explained above, Perdue requires growers to report "within 24 hours" to their supervisor "if *any* birds, for *any* reason, do not develop normally..." (emphasis added.) Each flock includes thousands of birds and "normally" is not defined, making this requirement extremely broad and often impossible to genuinely comply with. On information and belief, this unreasonable requirement can be used as a pretext to terminate growers for any reason.

84.     As experienced by Parker, Perdue's supervisors make clear that failure to follow their instructions would also result in termination.

V.     **Payment**

85.     Despite being controlled as employees, growers do not receive an hourly wage. Instead, they are paid based on what is known as the "tournament system."

86.     All growers are guaranteed a level of base pay by contract. This base pay is not tied in any way to the number of hours growers must work to keep their facilities up to Perdue's specifications, and indeed fails to provide a basic wage for the time Perdue's requirements obligate growers to work. And this "guaranteed" pay is not actually guaranteed: Perdue often docks this base pay based on factors outside growers' control, like the type and amount of chemicals, supplies, or materials Perdue mandates that the grower use and pay for.

20

**Perdue 006916**

87.     Growers are also eligible for a performance bonus under the tournament system. The performance bonus is based on the average size of the chickens when Perdue picks them up.

88.     These supposed performance-based bonuses, however, have nothing to do with growers' skills and expertise. Perdue controls all of the inputs, including the quality of the chicks themselves, the amount and nutritional quality of feed, and medications, as well as dictating all of the conditions the chickens must be kept in, including temperature and light. As a Perdue grower in South Carolina told an investigative reporter in 2020: "You're penalized if you don't perform and it's not your fault. You listen to your flock supervisor throughout and then do poorly. Why am I at fault if I do everything they want me to do?"

89.     The "bonuses" are also a misnomer—the reason it is called the tournament system is that growers are pitted against each other, and the "bonuses" paid to certain growers come at the expense of other nearby growers, whose compensation is reduced by the extra amount the "winning" grower is paid.

90.     In addition to the hours of work required to complete Perdue's requirements and assignments, Parker was required by Perdue to be on call 24 hours a day while its chickens were being raised. On information and belief, this is typical of all Perdue growers' experience.

91.     For example, one of Perdue's supervisors told Parker: "I told my wife, I don't mind working for Perdue but I sure wouldn't want to own one of those chicken houses. I mean I can kind of forget about it for a few hours a day or over the weekend, something, but you are babysitting 24 hours a day. And then once them chickens move out, I told people that don't know anything about chickens, I say, well, they move out the birds and then they got 20 days, 14, 16 days. They go, 'Oh, they got 2 weeks vacation.' I said, no, that's when the real work starts. It's a never-ending cycle."

21

Perdue 006917

92.    Perdue also routinely and unilaterally docks growers pay for expenses it deems necessary for the work to be conducted in the manner it requires. For example, an August 2019 settlement report for Parker indicates that Perdue deducted hundreds of dollars for feed trays, bait stations, and chlorine. These deductions, which are at Perdue's sole discretion, further contribute to compensation that is uncorrelated with skill or hours worked.

## VI.    Additional Facts Regarding the Named Plaintiff

93.    Parker worked as a grower for Perdue through 2019. As a result of Perdue's fraud, Parker continued through at least September 2019 to make significant payments and incur financial obligations in order to make improvements to Perdue's specifications, purchase equipment required by Perdue, and otherwise provide the kinds of equipment necessary for Perdue's processes that, had he been properly classified, would have been the responsibility of Perdue.

94.    Perdue also worked to hide the full scope of its control over Parker's work and the full scope of financial obligations it would force him to incur until well after signing of the contract. Even throughout 2019, Perdue was adding new levels of control and financial requirements onto Parker; Parker did not and could not have discovered the full scope of Perdue's fraud in the exercise of reasonable diligence prior to those new levels of control and financial requirements. On information and belief, this pattern of Perdue withholding the level of control at the beginning of the contractual relationship only to slowly increase control after growers had incurred significant debt and were therefore locked into their contracts was uniform among all Perdue growers.

95.    After developing evidence that Perdue was misrepresenting the weight of chickens he raised on flock settlement reports in summer 2017, Parker spoke to an official at the USDA Packers and Stockyards Division to ask about his rights under the law.

22

**Perdue 006918**

96.     Shortly afterwards, Parker emailed some of his Perdue settlement records to the USDA official.

97.     Perdue later found out that Parker had spoken to a USDA official. A supervisor from Perdue expressed displeasure that Parker had communicated with the USDA.

98.     A different Perdue supervisor also visited Parker's farm around this time. This Perdue supervisor compared the USDA investigation to an IRS audit that Perdue "[doesn't] want." The supervisor stated to Parker: "Perdue doesn't want Stockers and Packers [sic] thinking that they have that reputation, 'We better check them, they do wrong or they make mistakes.' They want to be 'let's fix it between the grower and Perdue,' they don't want Stockers and Packers [sic] ever even being mentioned or on the radar, you know?"

99.     Prior to speaking to the USDA, Parker generally received high scores from Perdue's "tournament system."

100.    After Perdue became aware of Parker's communication with the USDA, Perdue demanded expensive improvements and changes to Parker's chicken barns while refusing to issue Parker lines-of-credit as it had previously and as it continued to do for other farmers. Eventually, in late 2019, Perdue communicated in writing that it would not provide additional chickens to Parker unless he made a list of specific upgrades. The list of upgrades would require more funds than Parker had and a local farm real estate agent told Parker he had never seen such an extensive list of upgrade demands. On information and belief, Perdue knew that these upgrade demands were unworkable and used them as a pretext to terminate Parker. Eventually, Parker was forced to declare bankruptcy.

23

**Perdue 006919**

## CLASS ALLEGATIONS

101.   Parker brings this action on behalf of himself and all others similarly situated[2] under

Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), as representatives of a class (the

"Proposed Class") defined as follows:

> All individuals nationwide who worked as broiler chicken growers for Perdue
> Farms, Inc. or Perdue Foods, LLC at any time between July 21, 2016 and the
> present.

102.   <u>Numerosity</u>: The class is composed of thousands of class members, the joinder of

whom in one action is impractical. The class is ascertainable and identifiable from Defendants'

records and documents.

103.   <u>Commonality</u>:   Questions of law and fact common to the class exist as to all

members of the class and predominate over any questions affecting only individual members of

the class. These common issues include, but are not limited to:

a.   Whether class members are/were employees of Perdue;

b.   Whether Perdue is liable to Parker and class members for breach of contract;

c.   Whether Perdue is liable to Parker and class members for damages for breach of
contract;

d.   Whether Perdue intentionally withheld information about the level of control it
would exercise over growers until after they signed contracts, thereby defrauding
class members;

e.   Whether Perdue unjustly enriched itself at the class members' expense by forcing
class members to incur massive debts for equipment, upgrades, and improvements
that should, in equity, have been paid for by Perdue, as class members' employer;

f.   Whether Perdue is liable to Parker and the class for compensatory damages or other
legal or equitable relief;

g.   Whether entry of a declaratory judgment that Parker and the class are/were
employees of Perdue at all relevant times is appropriate.

---

[2]   While the Poultry Producer Agreement purported to bar class action claims, Perdue may
not enforce that clause due to a recent class action settlement.

24

**Perdue 006920**

104.    Typicality: Parker's claims are typical of the claims of the other class members. Parker and the other class members have been injured by the same wrongful practices, and performed work for Perdue under identical or materially identical contracts (the Poultry Producer Agreement). Parker's claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

105.    Adequate Representation: Parker will fully and adequately assert and protect the interests of the other class members. In addition, Parker has retained class counsel who are experienced and qualified in prosecuting class-action cases. Neither Parker nor his attorneys have any interests conflicting with class members' interests.

106.    Predominance and Superiority: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

107.    Injunctive Relief: The prosecution of the claims of the putative class as a class action pursuant to Rule 23(b)(2) is appropriate because Perdue has acted, or refused to act, on grounds generally applicable to the putative class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the putative class as a whole.

25

Perdue 006921

108.    Issue class:  In the alternative, a class should properly be certified with regard to one or more material issues of fact or law herein pursuant to Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

## COUNTS

### COUNT ONE: FEDERAL MINIMUM WAGE
### (Fair Labor Standards Act (FLSA) 29 U.S.C. § 201 *et seq.*)
### (On Behalf of the Class)

109.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

110.    Parker and the other growers in the putative class were employees of Perdue.

111.    The Fair Labor Standards Act (FLSA) requires Perdue to pay its employees at least the federal minimum wage of $7.25 per hour.

112.    Perdue did not pay Parker what it was required to under the FLSA.  Similarly, it has not paid other members of the putative class what it was required to under the FLSA.

113.    Parker has earned less than the minimum wage due to Perdue's low pay combined with the deductions Perdue automatically took from Parker's pay for expenses Perdue required him to cover, like upgrades to chicken houses and supplies chosen by Perdue.

114.    Plaintiff Parker often worked over 60 hours per week.  He was expected to be on call 24 hours a day.  After paying for expenses, Parker was making a fraction of the minimum wage per hour worked.  This experience was typical of all the growers in the putative class.

115.    Perdue's violations were willful.  As described above, Perdue knew that Parker and its other growers were not independent contractors and were instead employees, and that Perdue should have been paying growers the federal minimum wage required by the FLSA.

26

Perdue 006922

116.     Parker, on behalf of himself and other members of the affected class seeks damages under the FLSA in an amount equivalent to the difference between what Perdue paid and what it should have paid to its growers had they been properly classified, as well as any other damages that are appropriate.

117.     Parker asks that the Court conditionally certify an opt-in class of growers to pursue this claim. *See* 29 U.S.C. § 216(b).

### COUNT TWO: FEDERAL OVERTIME
### (Fair Labor Standards Act (FLSA) 29 U.S.C. § 201 *et seq.*)
### (On Behalf of the Class)

118.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

119.     Parker and the other growers in the putative class were employees of Perdue.

120.     The Fair Labor Standards Act (FLSA) requires Perdue to pay its employees at least one-and-one half times the federal minimum wage for all hours worked in a given week over forty hours. 29 U.S.C. § 207.

121.     Perdue did not pay Parker what it was required to under the FLSA's overtime provision. Similarly, it has not paid other members of the putative class what it was required to under the FLSA's overtime provision.

122.     Parker and the other members of the putative class were regularly required by Perdue to work in excess of forty hours a week. For example, Parker was often required by Perdue to work over 60 hours per week. He was expected to be on call 24 hours a day. This experience was typical of all the growers in the putative class.

123.     While Parker and the other members of the putative class worked in agriculture as the FLSA defines that term, they were not "employed by a farmer" as that term is defined in the

27

Perdue 006923

FLSA's overtime exemption. *See* 29 U.S.C. § 113(b)(13). For purposes of the work Perdue required Parker and the other members of the putative class to perform, Perdue was the growers' employer but Perdue was not a "farmer" because it did not own the farms or facilities on which the work was performed.

124.    Perdue's violations were willful. As described above, Perdue knew that Parker and its other growers are not independent contractors and were instead employees, and that Perdue should have been paying growers the federal overtime wages required by the FLSA.

125.    Parker, on behalf of himself and other members of the affected class seeks damages under the FLSA in an amount equivalent to the overtime Perdue should have paid to its growers had they been properly classified, as well as any other damages that are appropriate.

126.    Parker asks that the Court conditionally certify an opt-in class of growers to pursue this claim. *See* 29 U.S.C. § 216(b).

### COUNT THREE: BREACH OF CONTRACT
#### (On Behalf of the Class)

127.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

128.    Parker and Perdue entered into a contract entitled "Poultry Production Agreement." The other growers in the class entered into identical or materially identical Poultry Production Agreements with Perdue. Those contracts were binding and enforceable and were uniform in all material respects among all class members.

129.    The Poultry Production Agreement repeatedly provides that Perdue will treat growers a independent contractors, capable of exercising independent judgment and utilizing their skills as farmers.

28

**Perdue 006924**

130.    But Perdue breached Parker's and all class members' agreement by failing to treat growers such as Parker as "independent contractors" or allowing them to utilize their independent judgment and skill in the performance of their work as the Poultry Producer Agreement promises they will.

131.    Perdue's breach of the uniform contracts it entered into with the class members was itself uniform: after entering into Poultry Production Agreements with Parker and each member of the class, Perdue then subjected Parker and members of the class to guidelines and supervision by Perdue managers that amounted to virtually unfettered control over the time, method, and manner of their work. Perdue's oversight amounts to supervision, management, direction, and control of growers' day-to-day operations.

132.    Perdue did so by subjecting Parker and members of the class to exhaustive, mandatory guidelines that the dictated nearly every aspect of their day-to-day work.

133.    Perdue also obligated Parker and all members of the class to permit supervisors onto their farms at any time Perdue decided, and these supervisors exerted even greater control over the work of Parker and members of the class.

134.    On information and belief, this experience is typical of all Perdue growers, each of whom is regularly visited by a supervisor.

135.    Perdue's breach of its obligations to treat Parker and the class members as independent contractors and allow them to exercise their judgment, experience, and expertise as farmers as it agreed to do in the uniform Poultry Production Agreements it executed with them directly and proximately caused damages to Parker and the class members. As a result of these breaches, Parker and the putative class have lost money and property as a result of Perdue's breaches of the Poultry Producer Agreement, including but not limited to the benefits of

29

Perdue 006925

employment and capital outlays they made that Perdue, had it properly operated as their employer, would otherwise be required to pay.

## COUNT FOUR: DECLARATORY JUDGMENT
### (Federal Declaratory Judgment Act 28 U.S.C. § 2201(a), et seq.)
### (On Behalf of the Class)

136.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

137.    Parker and class members are or were employees of Perdue.

138.    Parker and class members have been misclassified by Defendant throughout the relevant period. Perdue continues to misclassify its growers as independent contractors rather than employees today.

139.    This creates a controversy, both as to Parker and as to each class member, regarding the nature of their rights and Perdue's ensuing obligations.

140.    Parker and class members are entitled to a declaration that they are or were employees of Perdue and must be treated as such. Perdue would then be free to either modify their business practices to provide independence to future growers or to modify their policies to provide employee pay and benefits to future growers.

## COUNT FIVE: FRAUD
### (On Behalf of the Class)

141.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

142.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would perform work "using the skills, knowledge, and discretion" that each grower "possesses."

30

**Perdue 006926**

143.    At the time Perdue represented that growers would perform work using the skills, knowledge, and discretion that each grower possesses, the representations were false.

144.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would be treated as independent contractors.

145.    At the time Perdue represented that growers would be treated as independent contractors, the representations were false.

146.    At the time it executed contracts with Parker and the class members, Perdue knew that it would exercise substantial control over Parker and Parker and the class members but withheld that information in order to induce Parker and the class members to execute Poultry Producer Agreements with Perdue.

147.    Perdue deliberately withheld many of the stringent obligations contained in separate handbooks and guidelines and dictated by supervisors that Perdue would ultimately obligate Parker and class members to abide by refusing to disclose those handbooks, guidelines, and other requirements from Parker and the class members until after they signed their contracts with Perdue.

148.    Perdue made these representations and deliberately withheld this information with the intent to deceive Parker and class members and with the intent to induce Parker and class members to agree to the Poultry Producer Agreement.

149.    Parker and class members reasonably relied on Perdue's misrepresentations in deciding to agree to the Poultry Producer Agreement.

150.    Perdue's misrepresentations proximately caused damages to Parker and class members.

31

**Perdue 006927**

## COUNT SIX: NEGLIGENT MISREPRESENTATION
### (On Behalf of the Class)

151.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

152.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would perform work "using the skills, knowledge, and discretion" that each grower "possesses."

153.    At the time Perdue represented that growers would perform work using the skills, knowledge, and discretion that each grower possesses, the representations were false.

154.    In the Poultry Producer Agreement, Perdue represented to Parker and class members that growers would be treated as independent contractors.

155.    At the time Perdue represented that growers would be treated as independent contractors, the representations were false.

156.    At the time it made these representations, Perdue was at the very least negligent or reckless with respect to the falsity of these representations to Parker and class members, who Perdue knew or should have known would foreseeably rely upon them.

157.    Perdue was also at least negligent or reckless in failing to provide Parker and class members with the stringent obligations contained in separate handbooks and guidelines and in instructions from supervisors that Perdue would ultimately obligate Parker and the class members to follow, and which would render false the independence that Perdue ostensibly promised them under their agreements.

158.    Parker and class members reasonably relied on Perdue's misrepresentations and material omissions in deciding to agree to the Poultry Producer Agreement.

32

Perdue 006928

159.    Perdue's misrepresentations proximately caused injury to Parker and class members.

### COUNT SEVEN: UNJUST ENRICHMENT
### (On Behalf of the Class)

160.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

161.    Parker and class members conferred benefits on Perdue. These benefits included the undertaking of loans and making payments to provide facilities, improvements, and equipment for Perdue's growing operation.

162.    If Parker and the class members had been properly informed of the true relationship that Perdue would establish with Parker and the class members (*i.e.*, an employment relationship), Perdue would have been obligated to bear the costs of providing facilities, improvements, and equipment necessary for Perdue's growing operation.

163.    Permitting Perdue to retain the benefits that Parker and the class members provided without just compensation would be inequitable.

164.    Equity requires that Perdue compensate Parker and class members for the benefits Parker and class members conferred on Perdue.

### COUNT EIGHT: UNFAIR AND DISCRIMINATORY PRACTICES
### (Packers & Stockyards Act, 7 U.S.C. § 192)
### (On Behalf of Parker)

165.    Plaintiff hereby incorporates the allegations set forth in paragraphs 1 through 108 as if they were fully set forth herein.

166.    In the summer of 2017, Perdue inaccurately weighed broiler chickens that Parker grew for Perdue, thereby adversely affecting his compensation.

33

**Perdue 006929**

167. In response to Perdue's conduct, in September and October 2017, Parker contacted the USDA's Packers and Stockyards Division (the "Division") to report a potential violation of the Packers and Stockyards Act and its implementing regulations. *See, e.g.*, 9 C.F.R. § 201.55.

168. It is unknown whether the Division took any action in response to Parker's complaint. But Perdue learned of Parker's complaint and subsequently retaliated against him for having filed it.

169. Several months after Parker's complaint was filed, Parker's Flock Supervisor told him that Perdue was displeased with his communication with the Division and that Perdue, "don't want Stockers and Packers [sic] ever even being mentioned or on the radar."

170. On a separate occasion, another supervisor from Perdue expressed displeasure that Parker had communicated with the Division.

171. In response to Parker's complaint, Perdue terminated his contract by demanding unreasonably expensive and unnecessary changes to his facilities and then failing to give him new flocks. On information and belief, and based on Parker's conversation with his Flock Supervisor and other Perdue officials, Perdue would not have terminated Parker's contract had Parker not filed his complaint with the Division. Prior to Perdue's retaliation, Parker was generally ranked high in Perdue's "tournament system."

172. Terminating Parker in retaliation for filing a complaint to the Division was an unfair, unjustly discriminatory, and deceptive practice.

173. Terminating Parker in retaliation for filing a complaint to the Division also unduly and unreasonably prejudiced and disadvantaged Parker.

174. Because of Perdue's unlawful actions, Parker was harmed in his business and property.

34

**Perdue 006930**

## JURY DEMAND

175.    Pursuant to Federal Rule of Civil Procedure 38, Parker demands a trial by jury on

all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Parker prays that this Court enter judgment on his behalf and that of the

Proposed Class by adjudging and decreeing that:

A.    This Court certify the Proposed Class, designate the named plaintiff as class representative and the undersigned counsel as class counsel, and order that Parker and class members have trial by jury;

B.    The Court enter judgment against Perdue in favor of Parker and the class;

C.    The Court award Parker and the class compensatory damages in an amount to be determined at trial;

D.    The Court award Parker and the class restitution;

E.    The Court award Parker and the class punitive damages;

F.    The Court award Plaintiff and the class their costs and expenses of suit, and reasonable attorneys' fees as provided by law;

G.    The Court award Parker and the class pre- and post-judgment interest;

H.    The Court enter declaratory judgment affirming that Parker and the other class members are/were employees under the relevant state and federal laws, and not independent contractors;

I.    The Court award equitable, injunctive, and declaratory relief, including a judicial determination of the rights and responsibilities of the parties; and

J.    For such other and further relief as the Court may deem just and proper.

[signature on following page]

35

**Perdue 006931**

Jamie Crooks*
D.C. Bar No. 156005
**FAIRMARK PARTNERS, LLP**
1825 7th St NW, #821
Washington, DC 20001
(617) 721-3587
jamie@fairmarklaw.com
*Pro Hac Vice* applications forthcoming

/s/ T. Brandon Waddell
T. Brandon Waddell
Ga. Bar No. 252639
Jarred A. Klorfein
Ga. Bar No. 562965
**CAPLAN COBB LLC**
75 Fourteenth Street, NE,
Suite 2700
Atlanta, Georgia 30309
(404) 596-5600
(404) 596-5604 (fax)
bwaddell@caplancobb.com
jklorfein@caplancobb.com

*Counsel for Plaintiffs and the Putative Class*

Perdue 006932

# EXHIBIT C

**Perdue 006933**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 96 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 66 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 1 of 17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ROGER PARKER,

    *Plaintiff,*

v.

PERDUE FARMS, INC., *et al.,*

    *Defendants.*

CIVIL ACTION NO.
**5:22-cv-00268-TES**

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS

Before the Court is Defendants' Partial Motion to Dismiss Plaintiff's Complaint [Doc. 15]. After Defendants filed the instant Motion, Plaintiff voluntarily dismissed Perdue Farms, Inc., leaving only Perdue Foods, LLC as a named defendant. *See* [Doc. 19]; [Doc. 20].[1]

### BACKGROUND

On July 22, 2022, Plaintiff filed his Complaint [Doc. 1] alleging Perdue misclassified him — and others similarly situated — as independent contractors instead of employees. [Doc. 1, ¶ 1]. Because of that misclassification, Plaintiff seeks relief under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*; Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), *et seq.*; and Packers & Stockyards Act, 7 U.S.C. § 192, *et seq.*; along with

---

[1] Because Perdue Foods, LLC is the only remaining Defendant, the Court refers to it as Perdue.

**Perdue 006934**

Case 5:22-cv-00268-TES     Document 136-10     Filed 08/19/25     Page 97 of 140
Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 67 of 104
Case 5:22-cv-00268-TES     Document 27     Filed 12/09/22     Page 2 of 17

state law claims of fraud, breach of contract, unjust enrichment, and negligent misrepresentation. *See generally* [Doc. 1].

Plaintiff's Complaint alleges that Perdue Foods—the third largest broiler chicken company in the country—outsources "the process of raising birds to broiler growers," like Plaintiff, and considers them "independent farmers." [Doc. 1, ¶¶ 14–15]. In the recruiting process, Plaintiff alleges that Perdue promises these farmers "independence and financial success." [*Id.* at ¶ 16]. However, Plaintiff contends that Perdue controls "virtually every aspect of [the] growers' operations." [*Id.* at ¶ 18]. To be sure, Plaintiff contends that Perdue requires these farmers to agree to an exclusive contract—a Poultry Producer Agreement ("PPA")—with Perdue, which prohibits any visits to other farms associated with another integrator and requires construction of their farms in conformity with specific instructions from Perdue. [*Id.* at ¶¶ 19–25]. Perdue also monitors and trains these farmers throughout their time under the contract. [*Id.* at ¶ 26]. Perdue also utilizes supervisors who visit farms "at least weekly" to ensure compliance with Perdue's requirements. [*Id.* at ¶ 37]. Perdue also controls the timing, delivery, and number of birds in each flock. [*Id.* at ¶ 56]. Likewise, Perdue controls the medications, feed, and other supplies that farmers can use in the operation. [*Id.* at ¶¶ 55–58].

Plaintiff complains that he, and farmers like him, have absolutely no control over their own farming operations other than being left to pay the bills that Perdue runs up. Plaintiff alleges that Perdue requires precise specifications, often makes changes to

2

Perdue 006935

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 98 of 140

Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 68 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 3 of 17

those required plans, and expects the farmers to pay for it. [*Id.* at ¶ 93].

Perdue filed the instant Motion on September 19, 2022, asking the Court to partially dismiss Plaintiff's Complaint. Namely, Perdue asks the Court to dismiss Plaintiff's FLSA claims, state-law class action claims, state-law fraud and negligent misrepresentation claims, and Packers & Stockyards Act claims. *See* [Doc. 15-1]. The Court addresses each in turn.

## LEGAL STANDARD

Perdue Foods seeks to dismiss Plaintiff's action against it for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). First, to state a claim for relief, a plaintiff must provide a "short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). To do so, a plaintiff need only provide a "prima facie case of jurisdiction." *Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1214 (11th Cir. 1999). Indeed, the plaintiff need only provide affidavits or other evidence when the defendant files affidavits challenging personal jurisdiction. *Id.* Otherwise, the Court must accept as true the facts alleged in the plaintiff's complaint. *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir. 1990).

When ruling on a 12(b)(6) motion, district courts must accept the facts set forth in the complaint as true. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 572 (2007). A complaint survives a motion to dismiss only if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley,* 907 F.3d

3

**Perdue 006936**

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 99 of 140
Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 69 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 4 of 17

1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). In fact, a well-pled complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted).

Although Federal Rule of Civil Procedure 8 does not require detailed factual allegations, it does require "more than [ ] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *McCullough*, 907 F.3d at 1333 (citation omitted). To decide whether a complaint survives a motion to dismiss, district courts are instructed to use a two-step framework. *Id.* The first step is to identify the allegations that are "no more than mere conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* (citation omitted). After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Furthermore, a complaint attacked by a 12(b)(6) motion is subject to dismissal when it fails to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. "A plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (internal quotations omitted); *see also Twombly*, 550 U.S. at 555. "To be sure, a plaintiff may use legal conclusions to structure his complaint, but

4

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 100 of 140

Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 70 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 5 of 17

legal conclusions 'must be supported by factual allegations.'" *McCullough*, 907 F.3d at

1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must

take all of the factual allegations in the complaint as true; they are not bound to accept a

legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must

"identify conclusory allegations and then discard them — not 'on the ground that they

are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to

the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss is not whether the

claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence

to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other*

*grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The factual allegations in a complaint

"must be enough to raise a right to relief above the speculative level" and cannot

"merely create[] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at

545, 555. Finally, complaints that tender "'naked assertion[s]' devoid of 'further factual

enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, the

complaint must allege enough facts "to raise a reasonable expectation that discovery

will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

5

Perdue 006938

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 101 of 140
Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 71 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 6 of 17

## DISCUSSION

### I.   FLSA Claims

Perdue first asks the Court to dismiss Plaintiff's FLSA claims "on behalf of putative plaintiffs outside of Georgia" because the Court "lacks jurisdiction over Defendant[] with regard to those claims." [Doc. 15-1, p. 5]. Second, Perdue contends that even if Plaintiff—and others similarly situated—were misclassified as independent contractors, they are covered by the FLSA's agriculture exemption. *See* 29 U.S.C. § 213(b)(12).

### a.   Collective Action

In response to Perdue's Motion, Plaintiff argues that Perdue's personal jurisdiction argument is premature. As of the date of this Order, no out-of-state growers have opted into the action. Therefore, Plaintiff argues, and the Court agrees, that any personal jurisdiction determination over potential plaintiffs who aren't yet official parties to the case is premature.

Personal jurisdiction requires a claim-by-claim analysis. *Turner v. Regions Bank,* 770 F.Supp.2d 1244, 1248 (M.D. Ala. 2011) (citing *Seiferth v. Helicopteros Atuneros, Inc.,* 472 F.3d 266, 274 (5th Cir. 2006)). The cases cited by Perdue also agree with this notion. *See Vallone v. CJS Solutions Grp., LLC,* 9 F.4th 861, 865 (8th Cir. 2021) ("Personal jurisdiction must be determined on a claim-by-claim basis."). That is why courts cannot base "jurisdiction on hypotheticals." *General Pump & Well, Inc. v. Martix Drilling Prods.*

6

**Perdue 006939**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 102 of 140

Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 72 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 7 of 17

*Co.*, No. CV608-045, 2009 WL 812340, at * 3 n.4 (S.D. Ga. Mar. 26, 2009) (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)). Instead, courts must review each claim by each party to determine if general or specific jurisdiction exists. *See Fischer v. Fed. Express Corp.*, 42 F.4th 366, 372 (3rd Cir. 2022) ("[P]otential plaintiffs must still demonstrate personal jurisdiction over the defendant with respect to their own claims.").

For that reason, the cases cited by Perdue were all at a different procedural posture. Namely, the courts were reviewing class certification or potential plaintiffs already trying to opt into the action, requiring the court to review each's assertion of jurisdiction. *See Vallone*, 9 F.4th at 864;[2] *Fischer*, 42 F.4th at 370 ("Two out-of-state former FedEx employees . . . submitted notices of consent."); *Canaday v. Anthem Co., Inc.*, 9 F.4th 392, 395 (6th Cir. 2021) ("Dozens of nurses opted into the action by filing written consent forms with the federal court.").

Indeed, numerous other courts reached the same conclusion—it is premature to decide personal jurisdiction over putative class members before any such members attempt to join the action. *See Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 297 (D.C. Cir. 2020) ("Absent class certification, putative class members are not parties before a court, rendering the defendant's motion premature."); *Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020) (holding that unnamed class members didn't need to

---

[2] *See also* Memorandum and Order, *Vallone v. CJS Solutions Grp., LLC*, No. 0:19-CV-1532 (D. Minn. Feb. 5, 2020), ECF No. 49 ("[E]ight additional individuals have already filed consents to participate in the collective action.").

7

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 103 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 73 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 8 of 17

demonstrate personal jurisdiction); *King v. Wise Staffing Svcs., Inc.,* No. 2:18-cv-01731-RDP, 2020 WL 5110758, at *7 n.4 (N.D. Ala. Aug. 31, 2020) ("The court . . . does not base its rulings on anticipated conduct.").

Even Perdue's primary case—*Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. 1773 (2017)—recognized the individualized nature of specific jurisdiction. There, more than 600 plaintiffs sued in California state court. But most of the plaintiffs were not residents of California. In order to determine whether jurisdiction was proper, the United States Supreme Court held that the court should have determined if there was specific jurisdiction between each plaintiff's claim and the forum state, meaning the claim needed to have arisen out of the defendant's conduct in or related to the forum. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.,* 137 S. Ct. 1773, 1780 (2017). Such a determination necessarily requires an individualized analysis of each potential claim.

Perdue also contends that the Court lacks jurisdiction because of a forum selection clause contained in each PPA that requires growers to bring suit "in the state or federal courts of the United States located in the county in which the farm is located." [Doc. 23-1, p. 12]. Even though Plaintiff acknowledges that all growers sign a similar, if not the same, version of the PPA, it is not possible to know, for purposes of this motion, that each PPA contains the exact same forum-selection clause without inspecting each particular one. [Doc. 1, ¶ 27]. Even so, the proper enforcement of a forum-selection

8

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 104 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 74 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 9 of 17

clause is a motion to transfer to the proper district or state court via 28 U.S.C. § 1404(a),

not a motion to dismiss. *See Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,

571 U.S. 49, 59–60 (2013); *see also Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285

(11th Cir. 1998). If and when there are opt-in plaintiffs, the Court will cross that

procedural bridge.

### b.   Agriculture Exemption

Perdue next argues that even if Plaintiff was misclassified, he falls under the

"agriculture exemption" of the FLSA. [Doc. 15-1, p. 14 (referencing 29 U.S.C. §

213(b)(12))]. Perdue is correct that poultry farming generally falls within this

exemption. *See* 29 U.S.C. § 203(f); *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996).

However, Plaintiff is correct that FLSA exemptions are fact specific, and under the facts

alleged in his Complaint that the Court must accept as true, Perdue's arguments are

"premature at the motion to dismiss stage." *Cartwright v. M2R, Inc.*, No. 5:14-cv-02213-

SGC, 2016 WL 3181402, at *1 (N.D. Ala. June 8, 2016).

The ultimate burden of proving an employee is exempt rests on the employer.

*See Pioch v. IBEX Eng'g Svcs., Inc.*, 825 F.3d 1264, 1268 (11th Cir. 2016). That burden is

carried by a fact-intensive inquiry that can only be handled at the motion to dismiss

stage in limited circumstances. Indeed, the application of the agriculture exemption

involves "facts not apparent from the fact of the [c]omplaint." *Herman v. Cont'l Grain

Co.*, 80 F.Supp.2d 1290, 1293 (M.D. Ala. 2000); *see also Naftel v. Toucan Cap. Fund II, LP*,

9

**Perdue 006942**

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 105 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 75 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 10 of 17

No. 1:09-cv-1066-BBM, 2009 WL 10668454, at *7 (N.D. Ga. Dec. 3, 2009) (collecting cases

denying motions to dismiss based on FLSA exemptions as premature). This case doesn't

fit in the category that Perdue urges. Instead, the Court will simply need more facts in

order to answer that question.

First, the parties disagree over which exemption possibly applies to this case.

*Compare* [Doc. 1, ¶ 123 (arguing that 29 U.S.C. § 213(b)(13) applies)], *with* [Doc. 15-1, p.

15 (arguing that 29 U.S.C. § 213(b)(12) applies)]. Second, Plaintiff argues that even if

Perdue's preferred exemption does apply, Plaintiff was involved in both exempt and

non-exempt work, such that the exemption wouldn't cover him. *See* 29 C.F.R. 780.11.

Therefore, the question of the applicability of the exemption is not ripe for review at this

stage.

Accordingly, the Court **DENIES** Perdue's Motion as it relates to Plaintiff's FLSA

claims.

## II.   State-Law Claims

### a.   Fed. R. Civ. P. 9(b)

Perdue argues that Plaintiff fails to satisfy the heightened pleading standard

required under Fed. R. Civ. P. 9(b) for both negligent misrepresentation and fraud.

[Doc. 15-1, p. 27]. "When alleging fraud or mistake, a plaintiff must state with

particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

"Particularity means that a plaintiff must plead facts as to time, place, and substance of

10

**Perdue 006943**

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 106 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 76 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 11 of 17

the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006).

"The 'particularity' requirement 'serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'" *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. Appx. 81, 86 (11th Cir. 2008) (quoting *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). "[F]air notice is perhaps the most basic consideration underlying Rule 9(b)," *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997).

### 1.   Negligent Misrepresentation

First, for negligent misrepresentation, courts are split on applying the heightened pleading standards of Fed. R. Civ. P. 9(b) to such claims. *See In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 371 F. Supp. 3d 1150, 1177 (N.D. Ga. 2019) ("[T]he heightened pleading standards of Rule 9(b) do not apply to claims of negligent misrepresentation."); *Higgins v. Bank of Am., N.A.*, No. 1:15-cv-01119-ELR-JFK, 2015 WL 12086083, at *4 (N.D. Ga. Sept. 22, 2015); *Kingdom Ins. Grp., LLC v. Cutler & Assoc., Inc.*, No. 7:10-cv-85(HL), 2011 WL 2144791, at *5 (M.D. Ga. May 31, 2011); *Meredian Holdings Grp., Inc. v. Pereira*, No. 1:16-cv-124(WLS), 2018 WL 11431527, at *9 (M.D. Ga. May 23, 2018).

11

**Perdue 006944**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 107 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 77 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 12 of 17

This discrepancy arises from the underlying question of whether, under Georgia law, negligent misrepresentation sounds in tort or fraud. Clearly, if it sounds in fraud, then Plaintiff must satisfy the heightened pleading standards. *See United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1305 (11th Cir. 2002). However, under Georgia law, negligent misrepresentation sounds in tort. *See Baker v. GOSI Enters., Ltd.*, 830 S.E.2d 765, 769 (Ga. Ct. App. 2019). Therefore, Rule 9(b)'s heightened pleading standards do not apply to negligent misrepresentation arising under Georgia tort law. *Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1340 (N.D. Ga. 2021). Accordingly, the Court need not evaluate Plaintiff's negligent misrepresentation claim under Rule 9(b)'s pleading standard.

### 2.    **Fraud**

Unlike Plaintiff's negligent misrepresentation claim, his fraud claim does fall under Rule 9(b)'s requirement. In explaining the specifics of the rule, the Eleventh Circuit stated:

> Rule 9(b) may be satisfied if the complaint sets forth: (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants 'obtained as a consequence of the fraud.'

*Brooks*, 116 F.3d at 1370-71.

In reviewing Plaintiff's fraud claim, he alleges that Perdue's language in the PPA

12

Perdue 006945

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 108 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 78 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 13 of 17

"represented to Parker and class members that growers would perform work 'using the skills, knowledge, and discretion' that each grower 'possesses.'" [Doc. 1, ¶ 142]. Further, Plaintiff alleges that Perdue represented that he and the class members would be "treated as independent contractors." [*Id.* at ¶ 143]. Additionally, Plaintiff contends that Perdue "deliberately withheld . . . information with the intent to deceive [Plaintiff] and class members[.]" [*Id.* at ¶ 148]. Reliance on these representations then led Plaintiff to decide to agree to the PPA. [*Id.* at ¶ 149]. In the end, Plaintiff alleges that Perdue's representations resulted in him making "significant payments" and incurring "financial obligations in order to make improvements to Perdue's specifications, purchase equipment required by Perdue, [etc.]." [*Id.* at ¶ 93]. All the while, Plaintiff alleges that Perdue profited off the misclassification of Plaintiff and other growers and got the benefit of the improvements each grower made at their own expense. [*Id.* at ¶ 18].

Taking those allegations as true, Plaintiff meets most of the *Brooks* factors. He (1) outlines *some* the statements (and omissions) in the PPA that he alleges were fraudulent,[3] (2) alleges that Perdue drafted the PPA and was responsible for its language, and (3) contends that Perdue profited from the alleged fraud and — in turn — sufficiently alleges that Perdue's misrepresentations and material nondisclosures proximately resulted in his damages.

However, Plaintiff does not allege exactly who he discussed the PPA with, and

---

[3] However, Plaintiff does not cite specifically to those provisions.

13

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 109 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 79 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 14 of 17

which—if any—of these representations were made by that individual. Instead, Plaintiff rests solely on the existence of the PPA. However, if Plaintiff contends that Perdue's employees made these representations (or omissions), he needs to allege facts sufficient to support those allegations. Further, Plaintiff's Complaint fails to outline exactly how and when he and Perdue executed the PPA(s). Indeed, Plaintiff broadly references the PPA's language, but does not cite to specific portions which he alleges is fraudulent. Plaintiff's general and generic allegations do not—as they stand—meet the required pleading standards of Rule 9(b).

Accordingly, the Court **GRANTS** Perdue's Motion as it relates to Plaintiff's fraud claim (count 5). However, that does not end Plaintiff's fraud claim. When a plaintiff makes "conclusory allegations of fraud . . . [he] is entitled to one chance to amend the complaint and bring it in compliance with Rule 9(b)." *Cooper v. Blue Cross Blue Shield of Fla., Inc.*, 19 F.3d 562, 568–69 (11th Cir. 1994); *Clausen*, 290 F.3d at 1308 ("[T]he plaintiff was entitled to one chance to amend the complaint and bring it into compliance with the rule.") (internal quotations omitted). Therefore, Plaintiff's fraud claim is **DISMISSED without prejudice**, but that dismissal is accompanied with the Court's leave to amend the deficient pleading consistent with the Court's discussion above. *See VC Macon, GA LLC v. Va. Coll. LLC*, No. 5:18-cv-00388-TES, 2020 WL 5079165, at *7 (M.D. Ga. Aug. 27, 2020).

Perdue 006947

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 110 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 80 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 15 of 17

### b.   **Standing**

Perdue also asks the Court to dismiss Plaintiff's state-law claims to the extent "he

seeks to assert claims on behalf of growers in states other than Georgia for the simple

reason that he lacks standing to assert them." [Doc. 15-1, p. 20]. Similar to Defendants

FLSA collective action arguments, the state-law standing arguments are also premature.

Class certification has not occurred in this case. Before class certification, the only

question is whether "at least one named class representative has [standing]."[4] *Griffin v.*

*Dugger,* 823 F.2d 1476, 1482 (11th Cir. 1987). To be sure, Plaintiff correctly asserts that all

of Perdue's cited cases sat at a later procedural posture—namely, class certification. *See,*

*e.g., Wooden v. Bd. of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262 (11th Cir. 2001); *Prado-*

*Steiman ex rel. Prado v. Bush,* 221 F.3d 1266 (11th Cir. 2000). We are not there yet.

Even more, "whether a class members' claims fall under another state's laws is a

Rule 23 matter and not a standing issue." *In re Zantac (Ranitidine) Prod. Liab. Litig.,* No.

21-10335, 2022 WL 16729170, at *5 (11th Cir. Nov. 7, 2022). To be sure, "all circuits which

have addressed whether a plaintiff can represent unnamed class members whose claims

fall under different states' laws have concluded that it is a question that concerns Rule

12(b)(6) or Rule 23—not Article III." *Id.* at *6. While Perdue is correct that at least one

member of the class must have standing over each subclaim, Plaintiff's Complaint

---

[4] Perdue does not dispute that Plaintiff has standing to bring his state law claims on his own behalf. *See* [Doc. 15-1].

**Perdue 006948**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 111 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 81 of 104
Case 5:22-cv-00268-TES    Document 27    Filed 12/09/22    Page 16 of 17

meets that standard at this stage. *See Prado,* 221 F.3d at 1279.

Accordingly, Perdue's arguments are premature, and the Court **DENIES**

Perdue's Motion as it relates to standing for Plaintiff's state-law claims.

### III.    Packers & Stockyards Act

Plaintiff concedes that current Eleventh Circuit precedent precludes his Packers

& Stockyards Act, 7 U.S.C. § 192, claim because he fails to allege harm to competition.

[Doc. 18, p. 35]; *see also Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272 (11th Cir. 2005);

*London v. Fieldale Farms Corp.,* 410 F.3d 1295 (11th Cir. 2005). Aside from this concession,

Plaintiff's only substantive argument is that the Eleventh Circuit's cases "misinterpret

the statute," by reading additional requirements into the text. [Doc. 18, p. 35]. As

Plaintiff acknowledges, the Court is bound by the Eleventh Circuit decisions. According

to that precedent, he needed to allege the requisite relevant product market, geographic

market, and Perdue's market power to create the basis for an alleged harm to

competition. [Doc. 15-1, pp. 22–27]; *Pickett,* 420 F.3d at 1279. Plaintiff's Complaint fails

to do that. Plaintiff's arguments are—as he recognizes—better suited for review by the

Eleventh Circuit. Therefore, based on binding precedent, the Court **GRANTS in part**

Perdue's Motion and **DISMISSES** Plaintiff's § 192 claim.

### CONCLUSION

Based upon the foregoing, the Court **GRANTS in part** and **DENIES in part**

Perdue's Partial Motion to Dismiss [Doc. 15]. Accordingly, the Court **GRANTS**

16

Perdue 006949

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 112 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 82 of 104
Case 5:22-cv-00268-TES   Document 27   Filed 12/09/22   Page 17 of 17

Perdue's Motion as it relates to Plaintiff's state-law fraud claim (count 5)[5] and his

Packers & Stockyards Act claim (Count 8). Thus, the Court **DISMISSES** those claims.

The Court **DENIES** Perdue's Motion as to Plaintiff's other claims.

SO ORDERED, this 8th day of December, 2022.

S/Tilman E. Self, III

TILMAN E. SELF, III, JUDGE
UNITED STATES DISTRICT COURT

---

[5] Again, Plaintiff may, if he chooses, amend his Complaint to attempt to bring his fraud claim into compliance under Rule 9(b).

17

Perdue 006950

# EXHIBIT D

Perdue 006951

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 114 of 140

Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 84 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 1 of 12

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ROGER PARKER, *on his own behalf and on behalf of all others similarly situated,*<br><br>　　*Plaintiff,*<br><br>v.<br><br>PERDUE FOODS, LLC,<br><br>　　*Defendant.* | CIVIL ACTION NO.<br>5:22-cv-00268-TES |

## ORDER DENYING PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION AND TO FACILITATE NOTICE

Plaintiff Roger Parker ("Parker") filed this Fair Labor Standards Act ("FLSA")

collective action on June 22, 2022, alleging that Defendant Perdue Foods, LLC

("Perdue"), violated the FLSA. [Doc. 1]. Opt-in Plaintiff Barbara Tripp ("Tripp") joined

this action on July 25, 2024, by filing an opt-in consent form. [Doc. 49]. On December 6,

2023, following six months of discovery, Parker and Tripp ("Plaintiffs") filed this

Motion seeking conditional certification of this collective action. [Doc. 52]; *see* [Doc. 45,

pp. 3–4]. Perdue objects on the grounds that Plaintiffs have failed to demonstrate that

other similarly situated employees desire to opt-in to this lawsuit. [Doc. 59, p. 14]. The

Court agrees that Plaintiffs have failed to meet their burden and **DENIES** their Motion

for Conditional Certification [Doc. 52].

**Perdue 006952**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 115 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 85 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 2 of 12

### FACTUAL BACKGROUND

Perdue, "the third largest boiler chicken company in the country," contracts with approximately 1,300 so-called "growers"—farmers who raise chickens for Perdue— nationwide. [Doc. 52-1, p. 9]. Parker worked as one of Perdue's growers in Georgia for several years, "from approximately December 2016 through September 2019." [*Id.*]. During that time, Parker claims that he "often worked over 60 hours per week," "was expected to be on call 24 hours a day," and that, "after paying for expenses, [he] was making a fraction of the" federal minimum wage. [Doc. 1, pp. 26–27, ¶¶ 111, 114, 121].

Parker filed this lawsuit on June 22, 2022, seeking relief under the FLSA related to Perdue's alleged misclassification of Parker and other growers nationwide as independent contractors ("IC"). [*Id.* at p. 1, ¶ 1]; [Doc. 52-1, p. 7]. Parker claims that Perdue's extensive control over its growers makes them de jure employees rather than ICs. [Doc. 52-1, pp. 7, 9–12]. Therefore, Parker argues, growers are entitled to at least the federal minimum wage and overtime pay, which Perdue does not pay them. [*Id.* at p. 13].

The Parties agreed to and "engaged in six months of targeted discovery on conditional certification issues, including extensive written discovery, a 30(b)(6) deposition, and depositions" of Parker and the only opt-in plaintiff, Barbara Tripp. [Doc. 59, p. 5]; *see* [Doc. 49].

2

Perdue 006953

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 116 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 86 of 104
Case 5:22-cv-00268-TES   Document 77   Filed 03/14/24   Page 3 of 12

## LEGAL STANDARD

An "employee" affected by an employer's FLSA violations may use the opt-in

mechanism provided in § 216 of the FLSA to bring an action on behalf of himself "and

other employees similarly situated." 29 U.S.C. § 216(b). In analyzing collective action

cases under § 216(b), the Eleventh Circuit suggests a two-step approach. *See Hipp v.*

*Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1218–19 (11th Cir. 2001).

First, in the "notice stage, the district court makes a decision—usually based on

the pleadings and any affidavits which have been submitted—whether notice of the

action should be given to potential class members." *Id.* at 1218. At this stage, plaintiffs

must show that the individuals in the proposed collective (1) "desire to opt-in" to the

collective action and (2) are "similarly situated." *Dybach v. State of Fla. Dep't of Corrs.*, 942

F.2d 1562, 1567 (11th Cir. 1991).

A plaintiff must provide a "reasonable basis" for showing that conditional

certification should be granted through "detailed" and "substantial allegations."

*Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (citing *Hipp*, 252 F.3d at 1217–

19). Unsupported assertions are not enough to clear this hurdle. *See Haynes v. Singer Co.,*

*Inc.*, 696 F.2d 884 (11th Cir. 1983) (affirming the district court's refusal to conditionally

certify a class and require notice where the district "judge had before him only counsel's

unsupported assertions that FLSA violations were widespread and that additional

plaintiffs" would opt-in).

3

Perdue 006954

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 117 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 87 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 4 of 12

Because the evidence at the notice stage is typically "only the pleadings and any affidavits which have been submitted," the district court's decision whether to create an opt-in class under § 216(b) is normally subject to "a fairly lenient standard." *Hipp*, 252 F.3d at 1219; *see Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir. 1995), *overruled on other grounds* by *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). As the litigation progresses and the parties conduct discovery, however, the standard may become less lenient. *See Anderson*, 488 F.3d at 953 (citing *Hipp*, 252 F.3d at 1217–19).

In any case, the decision is ultimately "soundly within the discretion of the district court." *Hipp*, 252 F.3d at 1219. If the court conditionally certifies the action, the putative class members are given notice and an opportunity to opt into the action, and it "proceeds as a representative action throughout discovery." *Id.* at 1218.

The second stage of the certification process is "typically predicated by a motion for 'decertification' by the [employer] usually filed after discovery is largely complete and the matter is ready for trial." *Id.* At this stage, there is a more extensive and detailed factual record, and the standard for determining similarity is "less lenient." *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008). At this juncture, the law places a heavier burden on the plaintiff to satisfy the "similarly situated" determination. *Id.* If the record shows that the opt-in plaintiffs are not similarly situated, then the collective action becomes decertified, and the opt-in plaintiffs are dismissed without prejudice. *Hipp*, 252 F.3d at 1218. If they are similarly situated, the collective action

4

Perdue 006955

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 118 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 88 of 104
Case 5:22-cv-00268-TES   Document 77   Filed 03/14/24   Page 5 of 12

proceeds to trial. *Id.*

## DISCUSSION

Plaintiffs seek to conditionally certify a proposed collective that includes at least 1,300 growers "who . . . grew chickens for Perdue under a Perdue Poultry Producer Agreement" in the past three years. [Doc. 52-1, pp. 7, 9]. Plaintiffs also seek the Court's approval for a proposed notice to be sent to potential class members who meet this definition, as well as Perdue's disclosure of a list of individuals in the potential class so that the notice can be sent. [*Id.* at pp. 7–8]. At this stage, Plaintiffs bear the burden of showing that the individuals in the proposed collective (1) "desire to opt-in" to the collective action and (2) are "similarly situated." *Dybach*, 942 F.2d at 1567. Perdue objects to conditional certification on the grounds that, among other things, Plaintiffs "failed to provide sufficient evidence to show that other growers in the nationwide class [they] seek[] to represent . . . wish to opt in." [Doc. 59, pp. 15–16]. Plaintiffs argue that the opt-in consent filed by the only opt-in plaintiff "indicates that other growers desire to join this suit and would join if given notice," and "one or two opt-in plaintiffs are sufficient to permit conditional certification" in the Eleventh Circuit. [Doc. 52-1, pp. 16, 19].

The Court addresses the merits of Perdue's objection on the first prong of the *Dybach* analysis, and, because the Court finds that Plaintiffs fail to meet their "burden of demonstrating a reasonable basis for crediting their assertions that aggrieved

5

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 119 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 89 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 6 of 12

individuals exist[] in the broad class that they proposed," the Court does not reach issue
of whether members of the proposed class are similarly situated. *Haynes*, 696 F.2d at
887.

First, a somewhat heightened standard of scrutiny is appropriate in this case
because the Parties have already engaged in six months of discovery focused on
conditional certification. A court's decision whether to create an opt-in class under §
216(b) is normally subject to "a fairly lenient standard" because the evidence at the
notice stage is typically "only the pleadings and any affidavits which have been
submitted." *Hipp*, 252 F.3d at 1219. However, because the rationale for the lenient
standard disappears once a plaintiff has had an opportunity to conduct discovery, the
standard may become less lenient as the litigation progresses. *See Green v. Atlas Senior
Living, LLC*, 2022 WL 2007398, at *5 (S.D. Ga. June 6, 2022); *Anderson*, 488 F.3d at 953
(citing *Hipp*, 252 F.3d at 1217–19).

As agreed, the Parties engaged in six months of discovery focused on conditional
certification—the very issue before the Court in this Motion. *See* [Doc. 45]. This
discovery included extensive written discovery, a 30(b)(6) deposition, and depositions
of Parker and Tripp (the one opt-in plaintiff). [Doc. 59, p. 5]; *see* [Doc. 49]. In their
Response, Plaintiffs urge that the only effect of discovery at this stage "is that the Court
may now look beyond the pleadings and affidavits in deciding whether notice is
appropriate." [Doc. 70, p. 7]. But even the cases Plaintiffs provide suggest that engaging

6

Perdue 006957

Case 5:22-cv-00268-TES     Document 136-10     Filed 08/19/25     Page 120 of 140

Case 1:24-mi-99999-UNA     Document 1814     Filed 06/07/24     Page 90 of 104
Case 5:22-cv-00268-TES     Document 77     Filed 03/14/24     Page 7 of 12

in discovery raises the level of scrutiny at the conditional certification stage.

For example, in *Mason v. Atlanta Beverage Co.*, the Northern District of Georgia found that because "the discovery period was open for four months . . . a heightened standard of scrutiny [was] necessary." No. 1:17-CV-2293-TWT, 2018 WL 3655374, at *2 (N.D. Ga. Aug. 2, 2018). The court went on to note that, "[w]hile certain district courts have applied a stricter standard at the notice stage than the one articulated in *Hipp*, it does not appear a court has articulated the exact standard of proof applicable to a motion for conditional certification filed after extensive discovery has taken place." *Id.* (quoting *Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1292 (N.D. Ga. 2014)). The court declined to "define precisely where along the continuum of proof th[at] case l[ay]" because the height of the standard depends "on the amount of discovery that has taken place in a given action." *Id.* (first quoting *Pickering v. Lorillard Tobacco Co., Inc.*, No. 2:10-CV-633-WKW, 2012 WL 314691, at *9 (M.D. Ala. Jan. 30, 2012); and then quoting *Ide*, 32 F. Supp. 3d at 1292 n.5). Because the Parties have had the opportunity to conduct discovery focused on conditional certification, the Court will apply a somewhat higher standard.

Second, Plaintiffs fail to meet their burden of showing show that a substantial number of individuals in the proposed class "desire to opt-in" to the collective action— even under a lenient standard. *Dybach*, 942 F.2d at 1567. On this prong of the *Dybach* analysis, "[t]he evidence provided, including the number of plaintiffs who have already

7

Perdue 006958

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 121 of 140
Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 91 of 104
Case 5:22-cv-00268-TES   Document 77   Filed 03/14/24   Page 8 of 12

opted-in or names of people who have indicated interest in joining the suit, must be considered in light of the size of the proposed class and the publicity of the suit at the time of the motion for conditional certification." *Mason*, 2018 WL 3655374, at *6. To be clear, as this Court has said, "there is no 'magic number' of other employees that must come forward before [the Court] will conditionally certify a FLSA collective action" like this one. *Gouldie v. Trace Staffing Solutions, LLC.*, No. 5:21-CV-00088-TES, 2021 WL 4944800, at *5 n.2 (M.D. Ga. Oct. 22, 2021). But the number of opt-ins required to justify conditional certification necessarily depends on many factors—including the size of the class plaintiff seeks to represent. *See id.* at *5.

The Court gave Plaintiffs six months to conduct discovery and gather evidence to justify conditional certification, and the only evidence suggesting that other growers desire to opt into this case is the single opt-in by Barbara Tripp and statements from Parker and Tripp that "they believe that other growers would be interested in joining the class were the Court to send out Plaintiffs' requested Notice." [Doc. 52-1, p. 20].

One opt-in is insufficient to show substantial interest in this proposed class of over 1,300 individuals in 11 locations in nine states across the country, even under the most lenient of standards. *See* [Doc. 59, pp. 17–18]. Parker and Tripp constitute less than 0.2% of the proposed class, and courts in this Circuit routinely decline to conditionally certify and send notice when plaintiffs show a much higher level of interest. *See, e.g., Linscheid v. Natus Med. Inc.*, No. 3:12-CV-67-TCB, 2012 WL 12861603, at *2 (N.D. Ga.

8

Perdue 006959

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 122 of 140

Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 92 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 9 of 12

Nov. 15, 2012) (holding that 16% of proposed class was insufficient). The "extensive

precedent" on which Plaintiffs rely fails to support their position that a single opt-in is

enough in this case, or as they would argue, any case at all. *See* [Doc. 70, p. 15].

Plaintiffs direct the Court's attention to *Gouldie*, where this Court noted that "a

formal consent to join . . . of just one other employee could have tipped the outcome of

Plaintiff's motion in his favor." [*Id.* (citing *Gouldie*, 2021 WL 4944800, at *5 n.2)]. That

was true under the facts of *Gouldie*, where the potential class size was only 56 people.

*Gouldie*, 2021 WL 4944800, at *3. However, the Court also noted in *Gouldie* that "a

plaintiff can satisfy the . . . 'desire to opt-in' requirement . . . by filing a *substantial*

*number* of consents from other employees claiming to be similarly situated." *Id.* at *5

(quoting *Montford v. Forestry Mgmt. Serv., LLC*, No. 5:18-CV-19-MTT, 2018 WL 3715719,

at *3 (M.D. Ga. Aug. 3, 2018)) (emphasis added). That phrase—"a substantial number of

consents"—doesn't draw a neat, bright line as Plaintiffs suggest. *See id.*

The other cases Plaintiffs highlight are also unpersuasive. [Doc. 70, p. 15]. For

example, although the Northern District of Georgia noted in *Bailey v. Southern Therapy*

*Services* that "[one opt-in] alone could demonstrate that other employees wish to opt

into this lawsuit," that is dicta, and it is not a proposition for which *Bailey* stands. [*Id.*

(citing No. 1:20-CV-02445-SDG, 2022 WL 16951683, at *2 (N.D. Ga. Mar. 28, 2022))]. In

fact, the *Bailey* court cited *Stevenson v. Great American Dream, Inc.* as authority for that

proposition. 2022 WL 16951683 at *2 (citing No. 1:12-CV-3359-TWT, 2013 WL 4217128,

9

**Perdue 006960**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 123 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 93 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 10 of 12

at *2 (N.D. Ga. Aug. 14, 2013)). In *Stevenson*, the Northern District of Georgia found that

one opt-in was enough *where the proposed class was quite limited*: entertainers who

worked in a single nightclub in Decatur, Georgia. 2013 WL 4217128, at *2. Plaintiffs also

cite *Brown v. Refuse Materials, Inc.*, where the court found that the single opt-in was "not

necessarily an insignificant number" because the proposed class was a small group of

floor installers who worked a company that employed only 30–40 floor installers. [Doc.

70, p. 15 (citing No. 7:13-cv-37-HL, 2013 WL 2387750, at *3 (M.D. Ga. May 30, 2013))]; *see*

*Brown*, 2013 WL 2387750, at *3; Motion to Certify Class, *Brown v. Refuse Materials, Inc.*,

7:13-cv-37-HL (M.D. Ga. Aug. 1, 1985), ECF No. 4-1. According to Plaintiffs, "Perdue

provides no reason for the Court to depart from these cases." [Doc. 70, p. 16]. The

burden rests on Plaintiffs, and they have failed to demonstrate that the cases they

provided should determine the outcome here. *See Dybach*, 942 F.2d at 1567.

Further, the declarations filed by Parker and Tripp stating that "they believe that

other growers would be interested in joining the class were the Court to send out

Plaintiffs' requested Notice" are speculative and thus insufficient. [Doc. 52-1, p. 20]. It is

well-settled that speculative statements that others might wish to opt-in are insufficient

to justify conditional certification. *See Haynes*, 696 F.2d at 887–88. Plaintiffs argue that

they "belie[ve] that other growers desire to join . . . based on their extensive experience

growing, their conversations with other growers, and their visits to other growers'

farms." [Doc. 70, p. 16 (first citing [Doc. 52-4, Parker Decl., ¶¶ 7–8]; and then citing

Perdue 006961

Case 5:22-cv-00268-TES   Document 136-10   Filed 08/19/25   Page 124 of 140

Case 1:24-mi-99999-UNA   Document 1814   Filed 06/07/24   Page 94 of 104
Case 5:22-cv-00268-TES   Document 77   Filed 03/14/24   Page 11 of 12

[Doc. 52-5, Tripp Decl., ¶¶ 7–9])]. Yet, in their depositions, both Parker and Tripp conceded that they weren't aware of *any* growers who wish to join this action. [Doc. 59-2, Parker Depo., p. 180:2-3 ("Ain't nobody told me that they wanted to join as saying yes, I want to join.")]; [*id.* at p. 45:5-8 (stating that he was unable to identify any other growers who wish to join the action)]; [Doc. 59-3, Tripp Depo., pp. 33:21–34:1 (stating that she is unaware of any grower who wishes to join this action)]. Their beliefs are unsupported by facts, and that kind of speculation can't satisfy Plaintiffs' burden to show that other growers desire to join this action. *See Haynes*, 696 F.2d at 887–88.

Plaintiffs have had more than six months to try to gin up interest from the more than 1300 growers they seek to represent and that they claim may be interested in joining this suit. And, in all that time, one additional grower has signed up. Bottom line: two out of 1300 just isn't enough for the Court to conditionally certify this would-be collective action.

The Court now turns to opt-in Plaintiff Barbara Tripp's claims. "Generally, when conditional certification of a collective action is denied, existing opt-in plaintiffs are dismissed from the lawsuit without prejudice and the matter proceeds on the named plaintiff's individual claims." *Mickles on behalf of herself v. Country Club Inc.,* 887 F.3d 1270, 1280 (11th Cir. 2018) (first citing *Fox v. Tyson Foods, Inc.,* 519 F.3d 1298, 1301 (11th Cir. 2008); and then citing *Hipp*, 252 F.3d at 1218). Finding no reason to deviate from the general rule in this case, the Court **DISMISSES** opt-in Plaintiff Barbara Tripp from this

11

**Perdue 006962**

Case 5:22-cv-00268-TES    Document 136-10    Filed 08/19/25    Page 125 of 140
Case 1:24-mi-99999-UNA    Document 1814    Filed 06/07/24    Page 95 of 104
Case 5:22-cv-00268-TES    Document 77    Filed 03/14/24    Page 12 of 12

lawsuit **without prejudice**. *See id.*

## CONCLUSION

Because Plaintiffs failed to meet their burden of showing that there are a substantial number of growers who desire to opt into this FLSA collective action, the Court DENIES Plaintiffs' Motion for Conditional Certification [Doc. 52]. *See Hipp*, 252 F.3d at 1218–19; *Dybach*, 942 F.2d at 1567. The Court then **DISMISSES** opt-in Plaintiff Barbara Tripp from this lawsuit **without prejudice** and, accordingly, DENIES Perdue's Motion to Dismiss Opt-In Plaintiff Barbara Tripp's FLSA Claims [Doc. 58] **as moot**. *See Mickles*, 887 F.3d at 1280.

Plaintiff Parker will proceed on his individual claims. Upon the issuance of this Order, the Parties will move on to Phase 2 of discovery, which will last five months. [Doc. 51, pp. 1–2]. "Any motions for summary judgment shall be filed on or before 60 days following . . . the end of discovery." [Doc. 45, p. 7].

SO ORDERED, this 14th day of March, 2024.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

12

Perdue 006963

# EXHIBIT E

Perdue 006964

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| ROGER PARKER, on his own behalf and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>v.<br><br>PERDUE FOODS, LLC,<br><br>                     Defendant. | Case No. 5:22-cv-00268-TES |

## OBJECTIONS TO SUBPOENA TO PRODUCE DOCUMENTS

First Financial Bank, by undersigned counsel, hereby objects to the subpoena issued by the plaintiff, Roger Dale Parker on May 3, 2024 ("Subpoena") on the following grounds.

### Objections

**Document Request No. 1:**

All documents and communications, either internal or external, in any way related to Roger "Dale" Parker or Hazel Lee Farm, including but not limited to communications between You and Perdue, communications between First Financial and any other poultry processing company, communications with realtors, communications with any government entity, and all documents and communications related to Parker or Hazel Lee Farms' loan files. **Objections to Document Request No. 1:**

First Financial Bank objects to this document request to the extent that is seeks confidential documents relating to a non-party obligor/customer.  First Financial Bank further objects to this request to the extent that the propounding party has failed to comply with the notice requirements set forth in O.C.G.A. § 7-1-360 as to the non-party obligor/customer.  First Financial Bank further objects to this request to the extent that production is prohibited by the

#102297066v1

Perdue 006965

Federal Gramm-Leach -Bliley Act.  First Financial Bank further objects to this request to the extent the Subpoena was not properly served in compliance with Federal Rule of Civil Procedure 45(b).  First Financial Bank is not waiving its right to insist upon proper service by serving these objections.  First Financial Bank objects to this request to the extent that it seeks documents protected by the attorney-client and/or work-product privileges.  No privileged documents will be produced.  First Financial Bank further objects to the request for communications with poultry processing companies other than Perdue, realtors, and government entities on the grounds that such documents are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  First Financial Bank further objects to this request to the extent that it seeks documents that are confidential and/or proprietary.

**Document Request No. 2:**

All documents reflecting guidance provided by First Financial to its employees regarding the promotion, marketing, issuance, and administration of loans to poultry farms or farmers that were in effect from July 23, 2016 to the present.

**Objections to Document Request No. 2:**

First Financial Bank objects to this request on the grounds that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Without waiving and subject to these objections, First Financial Bank advises that it has no responsive documents.

**Document Request No. 3:**

All documents and communications between First Financial or its representatives and Perdue related to poultry farmers from July 23, 2016 to the present.

**Objections to Document Request No. 3:**

First Financial Bank objects to this request on the grounds that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence (especially prior to

- 2 -

**Perdue 006966**

certification of any class-action claims). First Financial Bank further objects to this request on the ground that it is overbroad and unduly burdensome. First Financial Bank currently has approximately eighty (80) separate loans involving Perdue poultry farmers. First Financial Bank objects to this document request to the extent that is seeks confidential documents relating to non-party obligors/customers. First Financial Bank further objects to this request to the extent that the propounding party has failed to comply with the notice requirements set forth in O.C.G.A. § 7-1-360 as to the non-party obligors/customers. First Financial Bank further objects to this request to the extent that production is prohibited by the Federal Gramm-Leach -Bliley Act. First Financial Bank further objects to this request to the extent the Subpoena was not properly served in compliance with Federal Rule of Civil Procedure 45(b). First Financial Bank is not waiving its right to insist upon proper service by serving these objections. First Financial Bank objects to this request to the extent that it seeks documents protected by the attorney-client and/or work-product privileges. No privileged documents will be produced. First Financial Bank further objects to this request on the ground that it is an inappropriate attempt to effectively procure discovery of absent class members in advance of certification. First Financial Bank further objects to this request to the extent it is being utilized for recruitment purposes.

**Document Request No. 4:**

The complete loan files and related communication for all loans issued to any Perdue poultry farmers from July 23, 2016 to present.

**Objections to Document Request No. 4:**

First Financial Bank objects to this request on the grounds that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence (especially prior to certification of any class-action claims). First Financial Bank further objects to this request on the ground that it is overbroad and unduly burdensome. First Financial Bank currently has

#10229 7065v1

Perdue 006967

approximately eighty (80) separate loans involving Perdue poultry farmers. First Financial Bank objects to this document request to the extent that is seeks confidential documents relating to non-party obligors/customers. First Financial Bank further objects to this request to the extent that the propounding party has failed to comply with the notice requirements set forth in O.C.G.A. § 7-1-360 as to the non-party obligor/customer. First Financial Bank further objects to this request to the extent that production is prohibited by the Federal Gramm-Leach -Bliley Act. First Financial Bank further objects to this request to the extent the Subpoena was not properly served in compliance with Federal Rule of Civil Procedure 45(b). First Financial Bank is not waiving its right to insist upon proper service by serving these objections. First Financial Bank objects to this request to the extent that it seeks documents protected by the attorney-client and/or work-product privileges. No privileged documents will be produced. First Financial Bank further objects to this request on the ground that it is an inappropriate attempt to effectively procure discovery of absent class members in advance of certification. First Financial Bank further objects to this request to the extent it is being utilized for recruitment purposes. First Financial Bank further objects to this request to the extent that it seeks documents that are confidential and/or proprietary.

First Financial Bank reserves the right to supplement and/or amend these objections.

Respectfully Submitted,          JONES WALKER LLP
                                 *Attorneys for First Financial Bank*
                                 3455 Peachtree Road NE
                                 Suite 1400
                                 Atlanta, GA 30326
                                 Email: *sdrobny@joneswalker.com*
                                 Telephone: (305) 679-5700
                                 Facsimile: (305) 679-5710

                                 By:  */s/ Stephen P. Drobny*
                                         Stephen P. Drobny
                                         Georgia Bar No. 430447

#102297066v1

Perdue 006968

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email and first-class U.S. Mail as set forth below on this 15th day of May, 2024.

/s/ *Stephen P. Drobny*
Stephen P. Drobny

**JAMIE CROOKS**
1825 7TH AVE NW STE 821
WASHINGTON, DC 20001
Email: jamie@fairmarklaw.com

**JARRED A KLORFEIN**
75 14TH ST NE STE 2700
ATLANTA, GA 30309
Email: jklorfein@caplancobb.com

**T BRANDON WADDELL**
75 FOURTEENTH ST NE
STE 2750
ATLANTA, GA 30309
Email: bwaddell@caplancobb.com

- 5 -

**Perdue 006969**

# EXHIBIT F

Perdue 006970

## UNITED STATES DISTRICT COURT
## NORTHER DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In Re Subpoena Issued to First Financial Bank | Miscellaneous Case No. |

## DECLARATION OF PAULA DAVIS IN SUPPORT OF MOTION TON MODIFY OR QUASH SUBPOENA TO PRODUCE DOCUMENTS

I, Paula M. Davis, hereby submit this declaration pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.    I am a Vice President, Special Assets at First Financial Bank. I am over the age of eighteen, of sound mind, capable of giving an oath, and fully authorized to make and swear to the statements contained in this declaration.

2.    I am the individual at First Financial Bank primarily responsible for addressing the subpoena issued by counsel for plaintiff, Roger Dale Parker, in the above-captioned action (the "Subpoena"). Due to my job responsibilities and position, I have been designated as the corporate representative for First Financial Bank. In my capacity as corporate representative, I have educated myself as to the knowledge and information possessed by First Financial Bank, and I have examined First Financial Bank's relevant books, records, and documents relating to the Subpoena. As such, I make this affidavit based upon the personal knowledge of First Financial Bank and upon my own personal knowledge so obtained as its corporate representative.

{M635-1519.1}
#102346173v1

Perdue 006971

3.    The Subpoena seeks, *inter alia*, "the complete loan files and related communication for all loans issued to any Perdue poultry farmers from July 23, 2016 to present." First Financial Bank has eighty (80) loans involving Perdue poultry farmers at present. Seventy-four (74) of these loans involve customers located outside the State of Georgia.

4.    The loan files are voluminous and include, *inter alia*, loan applications, financial statements, loan documents, payment records, correspondence with the obligors, correspondence with Perdue, any foreclosure records and any litigation records. Certain of these documents, such as the loan application and financial statements, include personal identifiers and sensitive, private financial information. First Financial Bank does not have the consent of its customers to release such personal financial information. Moreover, and to the best of my knowledge, the customers at issue did not receive the notice of the Subpoena as contemplated by O.C.G.A. § 7-1-360.

5.    I believe that it would be unduly burdensome for First Financial Bank to gather and produce the requested documents of customers other than Mr. Parker. By way of example, First Financial Bank has gathered and intends to produce in excess of 1,600 pages of documents relating solely to Mr. Parker. It would require an extraordinary amount of time to gather, review and produce the loan files for seventy-nine (79) non-parties to this action.

6.    Certain of the documents requested in the Subpoena, such as "communications between First Financial or its representatives and Perdue," would appear to be equally accessible from the defendant in the issuing action as opposed to placing such a burden on a non-party.

7.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that this declaration, is to the best of my information and belief, true and correct.

Paula M. Davis
Vice President, Special Assets
First Financial Bank

#102346173v1

- 2 -

**Perdue 006972**



**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704-342-2588
Facsimile: 704-342-4379
www.ogletree.com

Margaret Santen
704-405-3119
maggie.santen@ogletree.com

December 4, 2023

**<u>Via Email and FedEx</u>**

Fairmark Partners, LLP
14825 7th Street NW, #821
Washington, DC  20001

      **Roger Parker, et al. v. Perdue Foods, LLC; pending in U.S.D.C. S.D.GA.; 5:22-cv-
00268-TES**

Dear Sir/Madam:

As you know, this firm represents Defendant Perdue Foods, LLC in the above-referenced matter.
As part of its defense to this litigation, Defendant needs certain records in your custody or
control.

The Subpoena requires production of the requested documents by December 18, 2023.  **<u>In lieu of
producing the documents in person for inspection and copying, please provide a copy of the
responsive documents to us along with the completed Declaration of Custodian of Records.</u>**
Please feel free to provide physical copies to the address above, or electronic copies to
Maggie.santen@ogletree.com.

We understand that there may be fees associated with this request and are prepared to pay for all
reasonable costs. Please do not hesitate to contact me at the telephone number listed above
should you have any questions.

      Sincerely,

      Margaret Santen

MS:mr

cc:    Jarred A. Klorfein, Jamie Crooks, Brandon Waddell (Counsel for Plaintiff)

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Perdue 006973

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the Middle District of Georgia

Roger Parker, et al.
*Plaintiffs,*

v.

Perdue Foods, LLC
*Defendant.*

Case No.  5:22-cv-00268-TES

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Fairmark Partners, LLP
1825 7th Street NW, #821
Washington, DC  20001

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Attachment "A"

| Place: Ogletree, Deakins, Nash, Smoak and Stewart, P.C. 1909 K Street, NW, Suite 1000 Washington, DC  20006 | Date and Time: December 18, 2023   by 5:00 PM |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  December 4, 2023

CLERK OF COURT

OR

_____
*Signature of Clerk of Deputy Clerk*

_____
*Attorney's signature*

**Notice to the person who issues or requests this subpoena**

The name, address, e-mail address, and telephone number of the attorney representing Perdue Foods, LLC who issues or requests this subpoena, are Maggie Santen, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 201 South College Street, Suite 2300, Charlotte, NC 28244, Maggie.santen@ogletree.com, 704-342-2588.

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Perdue 006974**

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:22-cv-00268-TES

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for (*name of individual and title, if any*)_____

on (*date*) _____

I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (date) _____; or

I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also

tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$_____

My fees are $ _____ for travel and $ _____ for service, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                                              *Server's signature*

                                                                    _____
                                                                              *Printed name and title*

                                                                    _____
                                                                              *Server's address*

Additional information regarding attempted service, etc.:

**Perdue 006975**

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition*. A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery*. A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions*. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required*. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required*. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted*. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative*. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information*. These procedures apply to producing documents or electronically stored information:

(A) *Documents*. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified*. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form*. The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information*. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

(A) *Information Withheld*. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced*. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(1) Committee Note (2013)

**Attachment "A"**

Please produce the following records in your possession, custody, or control: all emails, communications, correspondence, documents, notes, memos, letters, text messages, or any other written correspondence or writings of any kind, either typed or handwritten, between: (1) any representative of Fairmark Partners, LLP and any representative of RAFI-USA, including but not limited to Benny Bunting, from January 22, 2022 to the present; and (2) any current or former grower with Perdue other than Roger Parker or Barbara Tripp from May 22, 2022 to the present.

## DECLARATION OF RECORDS CUSTODIAN

I, the undersigned, being duly sworn according to law, say that I am a duly authorized custodian of records for **FAIRMARK PARTNERS, LLP** with authority to certify said records, and I hereby certify to the following:

1.　　The records attached hereto are true and correct copies of the records in my custody that have been requested in the subpoena for Records issued by Ogletree, Deakins, Nash, Smoak & Stewart, P.C. and

2.　　That, including this certification, all records which are in my custody have been copied in my presence, at my direction and/or under my supervision.

3.　　That unless qualified in paragraph 5, all records produced in my presence were prepared in the ordinary course of business by authorized persons or personnel at or near the time of the act, condition or event; and

4.　　I attest to the following (**initial one**):

　　　　_____ A careful search has been made by me or at my direction for records responsive to the above-referenced subpoena and the records produced constitute all of the records requested.

**OR**　　　　_____ A careful search has been made by me or at my direction for records that have been requested in the subpoena for Records issued by Ogletree, Deakins, Nash, Smoak & Stewart, P.C.; and the records to be produced **do not exist** for the following reason(s): _____

_____

_____.

5.　　Additional comments: _____

_____. **(Please enter the word "none" if there are none.)**

Pursuant to 28 U.S.C. § 1746, I, _____, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____
　　　　　　　　　(Date)

Signed by: _____
　　　　　　　　(Name)