IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ROGER PARKER,<br><br> *Plaintiff*,<br><br>v.<br><br>PERDUE FOODS LLC,<br><br> *Defendant*. | CIVIL ACTION NO.<br>**5:22-cv-00268-TES** |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Unlike the Southern District of New York in 1960, defining what constitutes "chicken" isn't an issue before the Court in this case.[1] It does, however, call upon the Court to decide if a chicken farmer gets to take one of the largest chicken-processing companies in the country to trial in an attempt to fundamentally and forever alter the poultry-growing industry in the United States.

The company: Perdue Foods LLC.

The record in this case is incredibly dense and somewhat disorderly. There's no sugarcoating that.[2] It's also quite apparent that the legal teams representing the parties

---

[1] *Frigaliment Imp. Co. v. B.N.S. Int'l Sales Corp.*, 190 F. Supp. 116, 117 (S.D.N.Y. 1960).

[2] Rather than place full deposition transcripts on the record, the parties chose to only provide "excerpts" from each of their deponents. In doing so, the Court had to review several duplicative excerpts when it could've read *one*—likely lengthy, but complete—transcript for each deponent's deposition. This practice, certainly done to make the Court's job easier, potentially deprived it of full context in certain situations.

in this case have staunchly represented their clients. Sometimes, though, when cases are as hard fought as this one, case law interpretations and evidentiary assertions offered by one party might be called out by the other as wrong, or worse, misleading to the Court. When that happens, a court really has no other option but to clear its desk, tick every word on the record, digest every case cited, and assemble for itself—based on the evidence the parties have put before it—the underlying events and how those events fit within the law. Detailing the various claims the farmer asserts against Perdue might seem like an obvious or even optimal place to start, but because *why* things happened in this case the way they did is so heavily disputed, shelling out the claims this early and taking time to explain how they intertwine is going to be more daunting than helpful. For now, we need to begin with why this farmer sued Perdue in the first place.

## FACTUAL BACKGROUND

Our farmer, Roger Parker, raised broiler chickens for Perdue for 13 years, and right out of the gate, he quite shockingly says what Perdue is and what it does is "not material" and "irrelevant to establish or disprove the claims asserted" in this lawsuit.[3] As Joe Biden so "eloquently" put it, ". . . gimme a break, man. . . ."[4] Some minimal discussion about what the parties do must happen—if even for context. This is a prime

---

[3] [Doc. 136-2, ¶ 1].

[4] NBC News, http://www.nbcnews.com/politics/politics-news/biden-hurls-curse-word-worker-who-challenges-him-guns-n1154241 (last visited Mar. 18, 2026).

example of the unnecessarily confrontational stance that, at times, leaps from the pages of this record. Yes, the practice of law can be heavily nuanced, and clients undoubtedly deserve zealous advocation, but when cases are plagued with petty slights that don't have any real bearing on the overall outcome—such as Perdue's position that a proffered factual statement violates a local rule because it isn't "concise" enough in its opinion—a court's job becomes that much more difficult.[5] Gamesmanship to the nth degree is widespread from both sides, but enough on that.

Starting with Parker, he, again, raised broiler chickens for Perdue for 13 years. "Broilers" is just the industry's term for chickens that are raised for consumption and typically slaughtered around six weeks old. The ins and outs of the business relationship between Parker and Perdue are—notwithstanding Parker's nitpicky quip to the contrary—important, and rest assured, that discussion is coming. But, according to Parker's Amended Complaint, when Perdue initially approached him about the prospect of raising chickens, Perdue's recruitment materials claimed: "As a poultry farmer, you'll never punch a time clock, and you'll have the satisfaction of leading your own business." Not so, says Parker. Considering the level of control Parker says Perdue exercised over his farming operations as one of its chicken growers, he believes he's entitled to various benefits and wages he hasn't received. And that, in the most general of nutshells, is why Parker sued Perdue.

---

[5] *See, e.g.*, [Doc. 150-1, ¶¶ 101–02, 107].

Then, there's Perdue. Perdue is what's known as an integrated poultry company. Those within the industry would refer to Perdue as an "integrator." Perdue owns hatcheries and breeding flocks, and it consigns or "integrates" its baby chicks with independent farmers or "growers" who, on their own farms, are responsible for raising them to the desired weight. These business relationships are governed by contracts called Poultry Producer Agreements or PPAs for short. The PPAs for Perdue and its growers explicitly state that each agreement is a "service contract and not a contract of employment" and that Perdue and each grower "are each independent contractors."

While those may seem to be very broad descriptions of Parker and Perdue's obligations, they provide a fairly workable foundation on which to build the parties' disputes. If the Court were to address every single fact the parties offer and explain how the opposing party meticulously and painstakingly disputes the overwhelming majority of those facts, then you'd be at the beginning of what would assuredly become a mile-long missive telling you way more than you need to know. So, let's pretend there's a bag, and in that bag are puzzle pieces, each bearing one "fact" for this case. While Parker and Perdue obviously drew pieces from the same bag, they might, after looking at a drawn piece, have decided to put it back. You can see where this is going. Although the parties have the same bevy of facts at their disposal, they use different pieces and thus construct slightly different pictures of what matters in this case. Since

4

Perdue is the summary-judgment movant, the Court begins with its account.[6]

### A.    Perdue's Factual Background

Perdue contracts with chicken farmers to grow its chickens. The PPAs agreed to by Parker and Perdue state that the farmer must either be "the owner of the land, buildings, [and] equipment" or "in legal possession of said property" with the "right and authority to use the same for the purposes of" raising chickens.[7] Simply put, a grower *can* but he does not have to actually own a farm to raise chickens for Perdue. It is, however, the farmer's responsibility to provide the "necessary housing and equipment" and "to maintain such housing and equipment in a state of good repair and operable condition."

Housing aside, no matter how you want to phrase it, farmers, under a contract—well, under a PPA—have the right, the ability, or the choice to hire their own employees, and this hired help can perform all or some of the work that accompanies raising chickens. Farmers may also, in addition to raising chickens for Perdue, participate in diversified farming by growing other crops or livestock—so long as that other livestock isn't poultry. Then, on top of that, farmers may work at or operate an outside business and even own multiple farms to increase their profits. According to

---

[6] Unless otherwise noted, the following factual account comes from Perdue's brief in support of its summary-judgment motion. [Doc. 118-1, pp. 3–8].

[7] *See, e.g.*, [Doc. 118-5, pp. 336, 343, 350, 357, 364, 398].

Perdue, Parker took advantage of each of these additional opportunities. Okay, but how do these farmers get paid? Perdue pays them under a competitive tournament system, meaning greater compensation goes to farmers who grow birds more efficiently through tier upgrades to their chicken houses, effective bird husbandry, and other "best management practices."

Parker started working on his parents' farm when he was 19 years old, and around 1980 or 1981, when he was 22 or 23 years old, he started to raise chickens for poultry integrators.[8] The names of these poultry integrators aren't important—just know there were two companies for which Parker raised chickens prior to his dealings with Perdue, and all things considered, he was happy with the level of independence those companies gave him.[9] Beginning in June 2006, Parker, through his and his ex-wife's independent businesses, signed his first PPA that would allow him to start growing for Perdue.

Through a combination of investments and financing, Parker purchased two farms. The first, in Hillsboro, Georgia, and the second, a six-house farm in Milledgeville, Georgia. Seeking to increase his profits, Parker first made tier upgrades to the chicken houses on the Hillsboro farm but later determined that he could have a better "profit-to-loss ratio" with the purchase of a second farm—the one in

---

[8] [Doc. 118-5, Parker Depo., p. 32:14–16]; [Doc. 118-10, Parker Depo., pp. 57:11–14; 58:16–20; 58:25—59:14].

[9] [Doc. 118-10, Parker Depo., pp. 59:15–16; 64:11–14]; [Doc. 136-1, ¶ 16].

Milledgeville. When the need for additional upgrades or the purchase of equipment arose, Parker either refinanced or took out small-business loans to cover those costs.

From 2009, with on-again-off-again assistance from hired farmhands, Parker grew chickens on both farms—barely slowing down for a heart stent in 2014—until he handed the Hillsboro farm over to his son in 2015.[10] At that point, Parker only raised chickens at his farm in Milledgeville, and regardless of whether his daily labor pertained to maintenance work around the farm or had to do with the chicken houses themselves, Perdue says it was all either "directly related to the welfare and upkeep of the chickens" or "necessary to prepare for the next flock." In December 2016, Parker signed his final PPA with Perdue, and consistent with his obligations from his latter PPAs, he was contractually obligated to perform his services using his own "skill, knowledge, and discretion" as *informed* by Perdue's "established procedures and otherwise sound farming and growing practices in accordance with industry standards."[11] This included not only providing "necessary housing and equipment" to grow the chickens and maintaining the chicken houses "in a state of good repair and operable condition" but complying with any of Perdue's "bio-security policies, audits, measures, or guidelines" and adhering to its "Poultry Welfare and Bio-Security Programs." Perhaps most important to Perdue's defense against Parker's claims is that

---

[10] [Doc. 118-5, Parker Depo., pp. 205:4–5; 227:2–23]; [Doc. 118-9, Burns Depo., p. 36:11–19].

[11] *Compare*, [Doc. 118-5, pp. 335, 342, 349, 356, 364, 381, 398], *with* [Doc. 118-5, p. 413].

on the front page of his final PPA, in bold, underlined, italicized and capitalized font,

Parker agreed to the following, copied here exactly as it appears in the PPA:

> "*ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF PRODUCER DURING THE TERM OF THE AGREEMENT.*"

When Perdue, as permitted by the PPAs, would visit Parker's farm for flock

inspection throughout his last few years as a grower, it noticed that he repeatedly failed

to maintain his equipment and facilities in safe operating condition. These failures,

according to Perdue, amounted to a direct violation of Parker's PPA obligations, and

worse than that, led to significant animal welfare concerns. For example, in November

2014, Perdue observed issues with Parker's feed bins, water systems, and ammonia

levels in his chicken houses that could make it difficult for the chickens to breathe.[12]

Then, in January 2017, Perdue says that Parker's improper upkeep of the tunnel fans in

his chicken houses "caused a major issue compromising animal welfare."[13] In August

2017, something rather important transpired, and not to give too much away too

quickly, it's when Parker claims his and Perdue's business relationship began to take a

downhill turn. The details of this, while certainly essential to Parker's claims, are better

suited for Parker's factual account, not Perdue's.

Although there's a noticeable 27-month gap between Perdue's 2014 and 2017

---

[12] [Doc. 118-5, Roberts Decl., ¶ 12]; [Doc. 118-5, Parker Depo., p. 218:5–12].

[13] [Doc. 118-12, Copeland Decl., ¶ 25].

8

concerns, Perdue resorted to sending Parker a certified letter in October 2018 to discuss his obligations under his final PPA.[14] After reminding Parker of everything he agreed to, Perdue advised him that it would not place more chickens on his farm until he made the necessary repairs. Perdue says Parker acknowledged some of its concerns and indicated he'd make the necessary repairs. With nothing fixed, though, Perdue re-sent the certified letter in February 2019—this time via e-mail—along with some additional concerns regarding what it saw as "continuing" and "substantial" animal welfare issues.[15] Parker then completed some, but not all, of the repairs, and that led to Perdue thinking he'd "done enough" to ensure safe conditions for its chickens. So, in the spring of 2019, Perdue consigned two more flocks with Parker. Soon after delivering the chickens, though, Perdue saw that the once-thought fixed animal welfare concerns continued due to ineffective and inoperable equipment and poor ventilation and heating in Parker's chicken houses.

Even though Perdue clearly had its concerns, it tried placing one last flock with Parker in June 2019, but in less than a month, Perdue found itself, yet again, telling him that it would not place any additional flocks on his farm unless and until he made the necessary repairs. Parker, though, failed to make the repairs. He, of course, has his reasons, but as you've probably assumed, they come from the puzzle pieces he thinks

---

[14] *See, e.g.,* [Doc. 118-13, pp. 14, 30].

[15] [Doc. 118-13, pp. 23–46].

are important.

On August 5, 2019, Perdue ended up collecting that last flock, paid Parker what he was due, but it never placed any additional chickens on his farm. For all intents and purposes, it was fair to say Parker didn't perform any other work for Perdue after that date.[16] Approximately two months later, Perdue sent not one, but two, additional letters detailing the necessary repairs Parker needed to make if he wanted more chickens.[17] During what was opportunity after opportunity to make repairs so Perdue could humanely place chickens on Parker's farm, Perdue says his farm was in worse condition than any others in the area it dealt with. Claiming the repairs were either not necessary or too expensive, Parker, while also blaming the fact that he couldn't secure additional loans and Perdue's constantly shifting repair requirements, failed to get his farm in sufficient working condition consistent with what he agreed to in his final PPA.[18] In time, Parker defaulted on his loans, the Milledgeville farm went into foreclosure, and he filed for bankruptcy in July 2021. That's Perdue's account. Now, let's see which puzzle

---

[16] [Doc. 118-6, Copeland Depo., p. 135:15–18]; *but see* [Doc. 136-13, pp. 4–5 (discussing that a chicken farmer's "real work starts" *between* catch day and the next flock delivery)].

[17] Parker also had the option of selling the Milledgeville farm, but Perdue says, since 2015 it has required any *new* contract farmers to have Tier 4 chicken houses. When selling a farm, it makes no difference to Perdue whether the selling or purchasing farmer performs whatever upgrades are required, and it will even provide loans to help with those costs. On several occasions through their business relationship, Perdue gave Parker loan assistance, but when it came to providing a loan for upgrades to get the Milledgeville farm to Tier 4 for a new farmer, Perdue declined. According to Perdue, it had previously loaned Parker money to upgrade his chicken houses to Tier 4, but he didn't make the upgrade.

[18] Parker claims that some of the upgrades Perdue required were "unnecessary." [Doc. 150-1, ¶ 102].

pieces Parker uses to construct his picture of what matters in this case.[19]

### B.        Parker's Factual Background

In a rather dramatic summarization of what you just read, Parker says that

Perdue's account "hides the full story" and marks him as an independent entrepreneur

who took to raising chickens on top of other successful business ventures only to "live

and die by his own hand." Just like every other one of Perdue's growers, Parker says he

owned his chicken farms because Perdue required he be an owner. No, it didn't. As

discussed above, Perdue requires its growers to be "the owner of the land, buildings,

[and] equipment utilized" for the purposes of raising chickens "*or* . . . in legal

possession of said property" with the "right and authority to use the same[.]"[20] Perdue,

via the PPAs, does not require its growers to own farms, but growers who aren't tenant

farmers and own their own equipment are obviously going see higher net profits.[21] So,

it's completely logical that Parker would *want* to own his own farms.

Until his son took over the Hillsboro farm, Parker worked on both the Hillsboro

and Milledgeville farms.[22] But, in 2016, when Parker signed the final PPA with Perdue,

---

[19] Unless otherwise noted, the following factual account comes from Parker's response to Perdue's summary-judgment motion. [Doc. 136, pp. 2–8].

[20] [Doc. 118, p. 413 (emphasis added)].

[21] *See* [Doc. 118-5, Parker Depo., pp. 53:17—55:25 (Parker's discussion of the financial benefits of using personal equipment across multiple farms)].

[22] [Doc. 118-5, Parker Depo., p. 205:4–5].

he only worked at the farm in Milledgeville. Way beyond what Perdue represented when he first started raising its chickens in 2006, Parker says that "Perdue's control over [him] was total." The number of baby chicks placed on Parker's farm? Perdue's decision. The type of feed and feed amounts? Perdue's decision. The medicine and vaccinations administered to the chickens? Perdue's decision.[23]

When Parker had flocks of Perdue's chickens on his farm, he says Perdue controlled everything from the height of the grass around his barns; to the temperature of the chicken houses; to how many times he had to walk through the chicken houses each day to check on the birds; to how he had to euthanize culled birds, pick up dead ones, and record those deaths on a mortality chart; to the number of times he had to confirm his generator was operable; and to the preparations he had to undertake for the chickens to be delivered and caught.[24] Then, when it came to Parker's work schedule between flocks, he says Perdue had a regimen for that too.[25] Usually, within two days, from catch to delivery of the next placement of chickens, Perdue required Parker, on his own dime, to clean and sanitize the chicken houses by either "crusting" or "windrowing" the poultry litter to get rid of pathogen-spreading insects and harmful

---

[23] [Doc. 118-5, p. 412].

[24] [Doc. 136-4, Parker Depo., p. 199:10–19]; [Doc. 137-12, p. 39].

[25] [Doc. 118-5, Parker Depo., pp. 201:25—202:18].

ammonia-creating moisture.[26] And, on top of that, Perdue even had processes in place that made Parker clean out feeder pans and flush water lines for the next flock of incoming chickens.[27]

Parker insists that Perdue "misleadingly suggests [he] had plenty of free time to do other work and could govern his own schedule," despite his testimony that "[g]rowing is seven days a week."[28] Early on, yes, Parker took advantage of the fact that Perdue allows its growers to work outside of growing chickens by working as a manager for a quail company. In 2016, though, when he was working full-time at the Milledgeville farm, Parker says he typically worked around 50-60 hours per week.[29] Admittedly, even Parker's flock advisor—someone who actually works for Perdue—says growing chickens is a "never ending cycle" because "you babysit them [birds]" 24 hours a day.[30]

Now, recall the Court mentioned "something rather important" that occurred in August 2017. Well, that has to do with bird weight calculations. In the summer of 2017, Parker thought he noticed a problem with how Perdue weighed his birds, and this

---

[26] [Doc. 118-5, Parker Depo., pp. 215:13—227:1]; [Doc. 137-19, p. 46 (description listing "grower" under "who paid for it" with respect to "cake out machine or windrow machine")].

[27] [Doc. 118-5, Parker Depo., p. 220:4–24]; [Doc. 136-4, Parker Depo., p. 203:15–17].

[28] [Doc. 118-5, Parker Depo., p. 226:24].

[29] [Doc. 118-5, Parker Depo., pp. 185:20—186:3].

[30] [Doc. 136-11, Norris Depo., p. 13:13–18]; [Doc. 136-13, p. 4].

wasn't the first time he noticed it. About two years prior, Parker suspected that the transport trucks that haul the chickens from his farm to the processing plant were getting mixed up.[31] When a transport truck leaves a farm, it gets a number matched to that specific grower, but Parker says that the weight reflected for his chickens was "somebody else's chickens from another farm."[32] To put it bluntly, he thought Perdue was cheating him when it came to bird weight because weight directly impacts how much Perdue has to pay a grower. Less weight means less money paid out to a grower for a flock settlement.[33] Now, if it's a situation where Perdue can't trace the mistake, it'll "work something out with the farmer"—that is, by paying the farmer what's known as a six-flock average.[34] Now, you may be wondering what a six-flock average is, but beyond knowing it's a calculation that essentially accounts for a cost-to-weight ratio, all you need to know is that Perdue made it right with Parker.[35]

When Parker noticed the weight discrepancy in 2017, he, of course, mentioned his concerns to Perdue, but this time, he wanted to try and "get an understanding of how everything worked."[36] So, as the PPAs allowed, Parker requested the "statistical

---

[31] *See* [Doc. 118-6, Copeland Depo., p. 84:23–25].

[32] [Doc. 118-5, Parker Depo., p. 317:4–20]; [Doc. 118-7, Levengood Depo., pp. 99:3—100:15].

[33] *See* [Doc. 118-5, Parker Depo., p. 318:6–8].

[34] [Doc. 118-5, Parker Depo., pp. 317:12—318:15]; *see* [Doc. 118-7, Levengood Depo., pp. 100:16—102:1].

[35] [Doc. 118-7, Levengood Depo., pp. 101:14—102:1].

[36] [Doc. 118-6, Copeland Depo., p. 71:20–22]; [Doc. 136-4, Parker Depo., pp. 339:2—340:12].

information and data" Perdue relied upon "to determine [his] compensation."[37] While

Perdue apparently "tried" to provide that information, its efforts seemed to crumble

"because there was too many factors."[38] According to Perdue, its "tournament system

and input variations"—from "feed, medications, vaccinations, and other supplies"—"as

well as variances in [its] weighing practices" have a "substantial impact on grower pay

that growers cannot predict."[39] Good luck unravelling that.

It wasn't long until Parker ultimately ended up reaching out to the Packers and

Stockyards Division of the United States Department of Agriculture to address the

potential mix up in tracking his chickens.[40] A representative from the USDA contacted

Perdue, Perdue "looked into the flock," and like before, it "ended up paying [Parker]

his [six-flock] average."[41] That, however, wasn't the end of it. After Parker got the

USDA involved, he and his flock advisor had a conversation about a man in a position

not unlike Parker's—a man who got the USDA to pretty much "audit" how Perdue

implemented its tournament system.[42] Long story short, Parker's flock advisor told him

that man was "still . . . suffering" years later for calling Packers and Stockyards on

---

[37] [Doc. 118-5, p. 411].

[38] [Doc. 118-5, Parker Depo., pp. 339:22—340:2].

[39] [Doc. 136-2, ¶ 22]; [Doc. 136-4, Parker Depo., pp. 235:3—236:9]; [Doc. 150-1, ¶ 8].

[40] [Doc. 118-6, Copeland Depo., pp. 71:20—72:8]; *see, e.g.*, [Doc. 118-16, p. 2]; [Doc. 137-20, pp. 2–3].

[41] [Doc. 118-6, Copeland Depo., pp. 71:20—72:12].

[42] [Doc. 136-13, pp. 2–3]; [Doc. 136-14, p. 2].

Perdue.[43] Parker, no doubt, called that man, and sure enough, he told Parker those "[j]oker[s]" at Perdue "[will] do anything."[44] For years, this man said he "got sorry, *sorry* chickens" after he complained about Perdue to the USDA—sometimes losing 300 chickens per chicken house, per night.[45]

As Parker's flock advisor predicted, Perdue would make life miserable for Parker, too. After he got the USDA involved, Parker says Perdue started giving him significantly poorer inputs. For example, in April and May 2018, he says Perdue failed to timely deliver chicken feed ten times which, at times, caused the chickens to go without food for days.[46] For a few months, all appeared to be going well on the feed-delivery front, but again, in September 2018, more outages. Well, why not go get some? He couldn't because the PPA required him "[t]o use only the feed" Perdue provided.[47] Again, as you can assume, when the chickens eat less, they weigh less, and that's less money Perdue has to pay out for a flock settlement.[48] Then, in May 2019, Parker says Perdue delivered feed with concrete chunks in it that damaged his feed lines. Naturally,

---

[43] [Doc. 136-13, pp. 2–3].

[44] [Doc. 136-14, p. 2].

[45] [Doc. 136-14, p. 2].

[46] *But see* [Doc. 136-4, Parker Depo., pp. 199:25—200:3 (Parker's testimony that "one day [he] was out of feed two days")].

[47] [Doc. 118-5, p. 412].

[48] *See* [Doc. 118-5, Parker Depo., p. 318:6–8].

Perdue vehemently disputes this accusation by saying "there's no way," with all the variables in place, to "target" or "select a specific variable to go to a specific grower."[49] Based on that, Perdue argues it "did not target Parker in any way with bad chicks, feed, or other inputs," but Parker, quiet clearly argues the opposite.[50]

In addition to poor feed-related inputs, Parker also says Perdue started to impose more requirements on him and demand more upgrades for his farm after he contacted the USDA. According to Parker, Perdue admitted those requirements and upgrades applied just to him. As an example, Parker points to a time in October 2018 where Perdue required him to keep more propane on hand than any other grower.[51] When Parker specifically asked whether the propane minimum "was a rule just for [him]," he didn't really get a straightforward answer.[52] The first reason given was because "[w]e really don't know what . . . the weather will be," but then, the reason shifted to Parker allegedly running out of propane "[a] couple years ago."[53] Additionally, prior to his reaching out to the USDA, Parker says Perdue had no problem placing flocks on his farm while he worked to make some necessary repairs. But then, after he got the USDA

---

[49] [Doc. 118-12, Copeland Decl., ¶ 21]; [Doc. 143-2, Stillwell Depo., p. 25:2–22]; [Doc. 150-1, ¶ 85].

[50] [Doc. 118-5, Parker Depo., p. 371:2–14]; [Doc. 118-12, Copeland Decl., ¶ 21].

[51] [Doc. 118-17, pp. 49–51].

[52] [Doc. 118-17, Mizell Depo., pp. 150:2—156:6]; [Doc. 118-17, pp. 49–51].

[53] [Doc. 118-17, Mizell Depo., pp. 155:21—156:6]; *but see* [Doc. 118-17, p. 50 (Parker's message stating, "I have not ran [*sic*] out. When?")].

involved, Parker says Perdue began threatening to withhold flocks for the same repairs. This, of course, aligns nicely with Perdue's timeline concerning the certified letter it sent to Parker in October 2018.

Stressing its concerns about animal welfare, Perdue told Parker that it would only place chickens on his farm if certain repairs were made and certain requirements were met.[54] Most notably, the letter highlighted Parker's flock advisor's observations "that 19 out of . . . 54 fans" throughout Parker's chicken houses were not working and that several holes needed to be patched—not only to keep the chickens inside but to keep rodents and other wild animals out.[55] Broadly speaking, the overall gist of the letter was essentially Perdue's way of telling Parker that the conditions of his farm were not compliant with his PPA obligations.[56] To this, Parker argues that what Perdue views as non-compliance "is not material to the elements" of the claims he brings against it and that "whether the letter advised [Parker that] he was in violation of . . . a [PPA] clause is not material to establishing or refuting the claims . . . in this action."[57] Seriously? The Court realizes it has yet to formally list the specific claims Parker asserts against Perdue, but for Parker to say that Perdue's reasons for threatening to withhold

---

[54] [Doc. 118-13, p. 14 (listing repairs and the minimum propane requirement)].

[55] [Doc. 118-13, p. 14].

[56] *See, e.g.*, [Doc. 118-13, p. 14].

[57] [Doc. 136-2, ¶ 82].

flocks have nothing to do with his claims or Perdue's defenses against them is nothing short of baseless. If that's the case, then what are we even doing here?

Moving on, in August 2019, Parker says Perdue suddenly changed its water requirements by requiring him to use city water instead of potentially bacteria-ridden well water.[58] Here, though, Parker's assertion is a tad misleading. At some point, definitely after he contacted the USDA, Parker got into a heated argument with Perdue about its water requirements.[59] Apparently, one of Parker's "well[s] was down," so he didn't have the required secondary water source for the chickens on his farm.[60] Rather than fix the well, Parker said he'd use city water despite his reservations about how expensive that was going to be for him.[61] To help with that expense, Perdue loaned Parker some money, and although he "put in 38,000 feet of water line" to run city water throughout his chicken houses, he also "got the well back up."[62] Parker said he only put in for the city-water loan as a means to "get two water sources," as required by Perdue's specifications, but Perdue saw its loan as a waste of money since he didn't end up using city water.[63] This whole debacle spawned a huge back-and-forth between Parker and

---

[58] [Doc. 136-15, p. 14].

[59] [Doc. 136-15, pp. 8, 14].

[60] [Doc. 136-15, p. 13]; [Doc. 137-5, p. 5].

[61] [Doc. 136-15, pp. 13–14].

[62] [Doc. 118-5, Parker Depo., p. 273:1–9]; [Doc. 136-15, pp. 10, 12–14].

[63] [Doc. 136-15, pp. 10, 14]; [Doc. 137-5, p. 5].

Perdue, but contrary to Parker's assertion, Perdue doesn't require city water.[64] On one hand, Perdue chalks it up to its hope that the loan—and thus, the use of city water—would get better quality water to Parker's farm, but on the other, Parker says this was just something else Perdue did to made his life difficult because of his conversation with the USDA about the disagreement with bird weight from 2017.[65]

Once upon a time, Perdue regularly provided financing for repairs Parker needed to make to his farm.[66] But, from the moment Parker enlisted the USDA to investigate his complaint about bird weight, he says Perdue found reason after reason to deny him funding it had, for years, made available to him.[67] Namely, Parker points to Perdue's erratic repair requests for his equipment and how those morphed into requirements for him to "start replacing equipment" that only needed to be repaired until the USDA's involvement.[68] Replacements that were, in Parker's opinion, "unnecessary."[69]

---

[64] [Doc. 136-15, p. 14].

[65] [Doc. 118-5, Parker Depo., p. 273:17–20]; [Doc. 136-15, p. 14]; [Doc. 150-1, ¶ 95].

[66] [Doc. 150-1, ¶ 93].

[67] As discussed above, though, there was one instance where Perdue gave Parker loan assistance to upgrade his chicken houses to Tier 4, but he didn't use the money for the designated use. [Doc. 118-13, pp. 11–12]; [Doc. 136-15, p. 9]; [Doc. 150-1, ¶ 95]; *see* n.17, *supra*.

[68] [Doc. 150-1, ¶ 99 (citing [Doc. 136-15, p. 19])]; *but see* [Doc. 136-15, p. 9 (comment by Perdue regarding its assessment of the condition of Parker's farm in Milledgeville, "[t]his is 2019[,] this is stuff like I used to see in 2000. You know, [20] years ago.")].

[69] [Doc. 150-1, ¶ 102].

In September 2019, Parker says Perdue gave him an ultimatum. He could replace *what Perdue* says needs replacing, and then it would "place birds back" on his farm, or he could make nearly one million dollars' worth of upgrades to sell it.[70] While that may be how Parker understood it, given his selected puzzle pieces for what matters in this case, those that remain in the bag show that one of Perdue's representatives explicitly told Parker that his farm was "sellable now" and that a buyer could purchase it and make "any repairs that are needed."[71] But, to credit Parker's understanding, if a buyer wasn't willing to pump money into the upgrades Perdue says were drastically needed on his farm, he'd "have to do it" himself.[72] Parker says both he and Perdue knew he couldn't afford to do anything because Perdue had essentially "cut [him] off."[73]

Parker puts it like this. After he complained to the USDA, Perdue stopped loaning him money and foisted a laundry list of requirements on him that made it financially unattainable for him to continue to grow chickens or even think about selling his farm. Each of these things, stacked on top of one another, culminated in his properties being foreclosed on and him having to file for bankruptcy.

---

[70] [Doc. 136-15, p. 19].

[71] [Doc. 136-15, p. 5]; *but see* [Doc. 136-21, Arline Decl., ¶ 6 (real estate broker's opinion that "it would be extremely difficult to find a buyer for Parker's [farm] . . . if the buyer of the farm could not obtain a . . . contract for . . . growing . . . chickens at that location")].

[72] [Doc. 136-15, p. 22].

[73] [Doc. 118-5, Parker Depo., p. 245:11].

**DISCUSSION**

These accounts from each party's selected puzzle pieces bear out the important facts of this case. As the Court said at the outset of this opinion, this record is incredibly dense. There's no doubt there are some things that have gone undiscussed, some stones that have been left unturned, and some immaterial intricacies that didn't make the final cut. At least now, though, you can see there are plenty of instances where Parker and Perdue's overall timeline for what transpired lines up rather perfectly. Where the parties part ways, however, concerns the "why" things transpired the way they did. Parker says Perdue did everything it could to make his life miserable and essentially ousted him as one of its growers by withholding chickens unless he made costly—and in his opinion, completely unnecessary—upgrades to his farm.[74] Perdue counters by saying the condition of Parker's farm had to be addressed for animal welfare concerns and that it gave him chance after chance to continue to growing with it.[75]

To right Perdue's alleged wrongs, Parker asserts the following claims in his Amended Complaint. Relying on an allegation that he was one of Perdue's employees rather than an independent contractor, Parker proceeds under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for minimum wage and overtime violations.[76] He

---

[74] [Doc. 150-1, ¶ 102].

[75] [Doc. 136-15, p. 16].

[76] [Doc. 90, ¶¶ 95–96, 104].

22

claims the FLSA required Perdue to pay him the federal minimum wage of $7.25 per hour, and it did not.[77] 29 U.S.C. § 206(a)(1)(C). Then, based on the FLSA's requirement that employers pay their employees at least one-and-a-half times the federal minimum wage for all hours worked over 40 hours per week, Parker seeks overtime pay.[78] 29 U.S.C. § 207(a)(1). According to Parker, from 2009 to 2019, he regularly put in 50-60 hours every week, but Perdue did not pay him as required by the FLSA's overtime provision.[79]

Next, based on his belief that he has been misclassified as an independent contractor during the time he grew chickens for Perdue, Parker also seeks a declaration from this Court under the Federal Declaratory Judgement Act, 28 U.S.C. § 2201(a), deeming him an employee and forcing Perdue to treat him as such.[80] Since filing his Amended Complaint, however, Parker concedes that Perdue is entitled to summary judgment on this claim.[81] With Parker no longer growing chickens for Perdue, he admits he cannot "satisfy the threshold 'case or controversy' requirement" for declaratory relief, so the Court **GRANTS** summary judgment to Perdue on this claim.

---

[77] [Doc. 90, ¶¶ 96–97].

[78] [Doc. 90, ¶¶ 103–104].

[79] [Doc. 90, ¶¶ 105–106]; [Doc. 118-5, Parker Depo., pp. 186:2–3; 226:20–24].

[80] [Doc. 90, ¶¶ 122, 124].

[81] [Doc. 136, p. 2 n.1].

*Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).

Lastly, considering Perdue's PPA obligations when it comes to chicken feed amounts, medications, and vaccinations; its failure to fully provide Parker with an accurate "how to" for determining his flock settlements under Perdue's tournament system; and Perdue's unexpected, out-of-left-field level of control and oversight over his day-to-day farming operations, Parker asserts state law claims for breach of contract and negligent misrepresentation.[82] Earlier in this case, the Court determined that Maryland law would apply for Parker's claim for breach of contract and that Georgia law would govern his claim for negligent misrepresentation.[83] By way of a roadmap, the Court addresses Perdue's summary-judgment arguments as they relate to Parker's claims under the FLSA before turning its attention to Perdue's arguments against his claims under state law.

### A.    <u>Legal Standard</u>

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks*

---

[82] [Doc. 90, ¶¶ 111, 113, 115, 126–131].

[83] [Doc. 87, pp. 14, 20–22].

24

*Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the [district] court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A). "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove [his] case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does

not satisfy his burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Rule 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Judges cannot "weigh the evidence and determine the truth of the matter," their only job is "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And, "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to

the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## B.   Perdue's Motion for Summary Judgment

Through his FLSA claims and claims for breach of contract and negligent misrepresentation, Parker clearly seeks to overhaul the entire domestic poultry-growing industry by changing how growers are viewed when it comes to employment classification and wages. Before getting down to brass tacks, the Court notes one *major* concession from Perdue—one that is, mind you, strictly limited to its summary-judgment motion.

When it comes to this all-important classification, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947). While Perdue firmly believes it would be improper to classify Parker as an employee under the FLSA, it recognizes that, "given this record," there may be genuine issues of material fact under the economic-realities test that prevent a determination one way or the other.[84] *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013). So, easily enough, Perdue doesn't seek any summary-judgment determination dubbing Parker as an employee or an independent contractor. Instead, it argues that regardless of his classification, he simply filed his FLSA claims too late.[85]

---

[84] [Doc. 118-1, p. 3 n.4].

[85] [Doc. 118-1, pp. 22–23].

### 1.    Parker's FLSA Claims

Federal law says that "every . . . action" "for unpaid minimum wages [and] unpaid overtime compensation . . . shall be forever barred unless commenced within two years after the cause of action accrued." 29 U.S.C. § 255(a). However, if claims "for unpaid minimum wages [and] unpaid overtime compensation" arise "out of a willful violation" of the FLSA, the employee gets another year to file those claims. *Id.* To establish that a violation of the FLSA was willful and extend the limitations period from two to three years, "the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162–63 (11th Cir. 2008) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

Parker fails to meet that burden. August 5, 2019—that's the operative date. That's the day Perdue collected its last flock of chickens from Parker's farm. Now, Parker attempted to dispute that *his* work ended on that date because a farmer's "real work starts" when the chickens "move out," but that's only when the "cycle" continues— when more birds are going to be placed on a farm.[86] Try as he might to show that's not the last day he performed work for Perdue, he doesn't provide what the correct date

---

[86] [Doc. 136-13, pp. 4–5 (discussing that a chicken farmer's "real work starts" *between* catch day and the next flock delivery—that "[i]t's a never-ending cycle")].

might be.[87] Without some alternative date, August 5, 2019, lies undisputed for purposes of determining the start of the FLSA's limitations period. Post-August 5, 2019, Perdue never placed another chicken on Parker's farm, so when applying the two-year limitations period from the FLSA, his minimum wage and overtime claims are "forever barred" since he filed this lawsuit on July 22, 2022. 29 U.S.C. § 255(a); [Doc. 1-3, p. 1].

In trying to bring his FLSA claims under the three-year period, Parker cites to a *web address* for a memorandum from the United States Small Business Administration and argues that the memorandum is enough to put Perdue on notice that its practices violated the FLSA.[88] Perdue, however, tells the Court that this memorandum wasn't even produced in discovery and shouldn't be considered at summary judgment.[89]

While the Court's inclined to agree and throw the memorandum out on procedural grounds, consideration of its substance doesn't change the outcome. *See Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) ("Rule 37 allows [a] district court to exclude [evidence] as a sanction for a Rule 26 violation.").[90] Based on Perdue's heavy involvement within the industry, Parker argues that Perdue necessarily

---

[87] *See, e.g.*, [Doc. 136-2, ¶ 102].

[88] [Doc. 136, pp. 9–11].

[89] [Doc. 150, p. 3].

[90] Rule 37(c)(1) states that when "a party fails to provide information . . . as required by [Rules] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009).

29

had to know about this memorandum—a contention Perdue very much disputes.[91]

Even if Perdue knew about it—which, it's fair to assume it did, *see Anderson*, 477 U.S. at

255, *supra*—the memorandum deals with specific SBA loan programs and how growers

like Parker receive financial assistance through government-guaranteed loans—not

about whether integrator-grower relationships run afoul of the FLSA.[92] One portion of

the memorandum favorable to Parker discusses how integrator control "overcame" a

grower's "ability to operate their business independent of integrator mandates." This,

according to Parker, clearly speaks to the economic-realities test, which Perdue

concedes, may present genuine issues of material fact.[93]

Regardless of any factual issues about "the nature and degree of [Perdue's]

control" over Parker, even if Perdue unreasonably failed to interpret the SBA's findings

in the memorandum as a potential red flag that its business relationship with Parker

violated a separate federal law handled by a different governmental agency, that's still

not enough to prove willfulness. *Scantland*, 721 F.3d at 1312; *Allen v. Bd. of Pub. Educ. for*

*Bibb Cnty.*, 495 F.3d 1306, 1324 (11th Cir. 2007) ("If an employer acts unreasonably but

not recklessly in determining its legal obligation under the FLSA, then its actions should

---

[91] [Doc. 136, p. 10]; [Doc. 150, p. 3].

[92] Of course, it goes without saying that the United States Small Business Administration has absolutely no authority to define, interpret, or enforce the provisions of the FLSA. Congress assigned those tasks to the Department of Labor.

[93] [Doc. 118-1, p. 3 n.4].

not be considered willful[,] and the two-year statute of limitations should be applied."). Far too much speculation underlies Parker's efforts to meet his burden of proof on willfulness, and "[s]peculation does not create a *genuine* issue of fact[,] . . . it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931–32 (7th Cir. 1995)); *Alvarez Perez*, 515 F.3d at 1162–63; *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50); *Allen*, 121 F.3d at 646.

Moreover, extensive commentary from the National Chicken Council in 2022 further undercuts any attempt to show that Perdue knew or somehow disregarded that its conduct was prohibited by the FLSA.[94] *See Alvarez Perez*, 515 F.3d at 1162–63. As the non-profit trade association that represents integrators like Perdue, the National Chicken Council discussed at length in correspondence to the Department of Labor how farmers have "long operated and been recognized as independent contractors" without the slightest hint that integrator-grower relationships aren't in compliance with the FLSA.[95] Detailing much of what comprises the economic-realties test, the National Chicken Council urged the Department of Labor "to confirm" "decades of precedent"— "that independent chicken farmers *continue* to be properly classified as independent

---

[94] [Doc. 118-14, pp. 7–11 (which was produced in discovery)].

[95] [Doc. 118-14, p. 7].

contractors."[96] *See Scantland,* 721 F.3d at 1312.

In fact, as best the Court can tell, this case may very well be one of the first to make a real attempt to turn the chicken-processing industry on its head. This specific record, though, just doesn't allow the Court to see how a reasonable jury might find that Perdue could've known or recklessly disregarded that its long-standing relationship with Parker—one that had gone unchallenged by him (or any other grower)—wasn't in compliance with the FLSA. Put simply, Parker failed to come forward with any evidence that might allow a reasonable jury to conclude that Perdue had some sort of notice that the practices it has used for many, many years with growers like him might have actually violated the FLSA.

With no evidence of willfulness to extend the FLSA's limitations period to three years, Parker failed to carry his burden of proof on this issue, and his FLSA claims for minimum wage and overtime are "forever barred." 29 U.S.C. § 255(a). Consequently, the Court **GRANTS** summary judgment to Perdue on Parker's FLSA claims.

In one last-ditch effort to save his FLSA claims, Parker contends that the limitations period ought to be equitably tolled due to Perdue's failure to post the notice required by 29 C.F.R. § 516.4 that explains the FLSA's provisions.[97] Yes, *employers* are obligated to post the explanatory notice for their *employees*—which, of course, lends to

---

[96] [Doc. 118-14, pp. 8–11 (emphasis added)].

[97] [Doc. 136, pp. 11–12].

the classification determination the Court hasn't been asked to make—but under the doctrine of equitable tolling, the party seeking to toll a limitations period must show that he has been pursuing his rights diligently and that "some extraordinary circumstance stood in his way and prevented timely filing." 29 C.F.R. § 516.4; *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (en banc). The Supreme Court has stressed that equitable tolling "is an extraordinary remedy which should be extended only sparingly." *Irwin v. Dep't of Veterans Aff.*, 498 U.S. 89, 96 (1990). Generally, "equitable tolling is reserved for cases involving some affirmative misconduct or deception on the part of the adverse party." *Zamudio v. Haskins*, 775 F. App'x 614, 616 (11th Cir. 2019) (citing *Lawrence v. Florida*, 421 F.3d 1221, 1226 (11th Cir. 2005)). There's no evidence of that here.

In his Declaration, Parker says that Perdue never gave him anything to post on his farms regarding his rights under the FLSA and never provided any documentation to him that might help him better understand those rights.[98] Parker's Declaration, however, is unsworn.[99] "Unsworn statements may not be considered by a district court in evaluating a motion for summary judgment." *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2024) (citation omitted). "An unsworn statement is incompetent to raise a fact issue precluding summary judgment." *Id.* Since none of the statutory requirements for the

---

[98] [Doc. 136-5, Parker Decl., ¶ 47].

[99] *See, e.g.*, [Doc. 136-5, Parker Decl., p. 10].

exception to traditional sworn statements are met, the Court **SUSTAINS** Perdue's objection with respect to Parker's Declaration.[100] *Id.* at 1347–48. While Parker did "date and sign the document," he failed to "subscribe its content as 'true,' . . . under 'penalty of perjury'" or under some substantially similar language. *Id.* at 1347 (citing 28 U.S.C. § 1746(2)). Without that verbiage, the contents of his Declaration cannot be considered, and even still, the three extraordinary circumstances identified by the Eleventh Circuit to determine whether equitable tolling is permissible are not present in this case. *See Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993). While Parker pretty much signals his contact with the USDA as the day his business relationship with Perdue began to sour, the crux of his FLSA claims—that Perdue didn't treat him like a "real" independent contractor—well, that's been on the table since the get-go, since 2006, when he filed his first PPA.

Bottom line, Parker just filed his FLSA claims too late.

### 2. Parker's Claims for Breach of Contract and Negligent Misrepresentation

Parker also asserted two state law claims against Perdue: one for breach of contract and the other for negligent misrepresentation. While Parker is absolutely free to plead inconsistent theories of liability, when it comes to state law claims that are, at their core, related to wages and overtime and "rely on proof of the same facts," the

---

[100] The Court also notes that after Perdue took issue with the fact that Parker's Declaration was unsworn, he never asked the Court for leave to correct it by filing one sworn under the penalty of perjury.

34

FLSA remains the exclusive remedy. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Bule v. Garda CL Se., Inc.*, No. 14–21898–CIV, 2014 WL 3501546, at *3 (S.D. Fla. July 14, 2014). "Where a state law claim depends on the finding of a violation of the FLSA and requires the same proof as is required to prove a violation of the FLSA, and the state law claim is only invoked to expand a plaintiff's remedies, the state law claim is preempted by the FLSA." *Johnson v. WellPoint, Inc.*, No. 1:06-CV-2430-ODE, 2009 WL 8753325, at *22 (N.D. Ga. Mar. 30, 2009) (citing *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007)); *cf. Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1348 (11th Cir. 1994) (holding that the FLSA does not preempt state law claims where a contract "expressly incorporates the FLSA['s] rules on hours worked and determination of overtime").

Without a doubt, some aspects of Parker's state law claims—no matter how artfully pled they may be—are dependent on the exact facts that comprise his FLSA claims and are "invoked merely as a source of additional remedies for FLSA violations." *WellPoint, Inc.*, 2009 WL 8753325, at *3 (citing *Sara Lee Corp.*, 508 F.3d at 193–94). Therefore, the time-bar implications from Parker's claims under the FLSA trickle down into various facets of his state law claims as well.

From here, simple sliding-scale calculations reveal the timeframe Parker can potentially recover for acts related to an alleged breach of contract and allegations of negligent misrepresentation that *do not* have to do with wages or overtime—whatever

35

those may be. Since it's unclear which of Parker's allegations for his state law claims do not concern his time-barred attempt to recover damages related to wages and overtime under the FLSA, the Court affords him with an opportunity to provide clarification for those claims with deference to three provisions from the final PPA he and Perdue agreed to in 2016.

Although Maryland law governs the *substance* of Parker's claim for breach of contract, Georgia law determines the applicable statute of limitations because of its conflict-of-law rules for courts sitting in diversity.[101] *Beal v. Hartford Fire Ins. Co.*, No. 20-14854, 2021 WL 2935338, at *2 (11th Cir. July 13, 2021). Under Georgia law, the statute of limitations for a breach-of-contract claim "begins to run at the time of its alleged breach." *Wallace v. Bock*, 620 S.E.2d 820, 823 (Ga. Ct. App. 2005). That said, the applicable 20-year limitations period provided by O.C.G.A. § 9-3-23 for contracts made under seal does not bar Parker's breach-of-contract claim.[102] However, with respect to *specific* allegations surrounding Parker's claim for breach of contract—that are not connected to any allegations about wages and overtime—he is limited to the following period. Again, copied exactly as it appears in the final PPA, on December 16, 2016, Parker and Perdue agreed to:

"***RELEASE AND EXTINGUISH ANY AND ALL CLAIMS THAT THEY***

---

[101] [Doc. 87, pp. 14, 20–22].

[102] [Doc. 118-5, p. 423 ("IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this [PPA] on the day and year first above written.")].

36

*MAY HAVE AGAINST EACH OTHER UNDER OR ARISING OUT OF OR RELATED TO ANY AND ALL PREVIOUS POULTRY PRODUCER AGREEMENT(S)."*[103]

So, as a result of this release, whatever these remaining state law breach-of-contract claims may be, if any, they must fall between December 16, 2016—the date of the final PPA—and August 5, 2019—the day Perdue collected its last flock of chickens from Parker's farm. Bear in mind, however, the final PPA further provides:

"*TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PERDUE NOR PRODUCER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, NOMINAL, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ITS ATTACHMENTS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ITS ATTACHMENTS.*"[104]

Notwithstanding this waiver, it seems that Parker's claim for breach of contract—as far as Maryland law is concerned—rests on two overarching theories when considering a duty of good faith and fair dealing. *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 265 (4th Cir. 2024). First, of course, is Parker's position that Perdue treated him like an employee when it should've engaged in practices more along the lines of treating him like an independent contractor. All of that, however, is FLSA-related and time-barred. Second, there's the issues with poor feed-related inputs, seemingly spontaneous

---

[103] [Doc. 118-5, p. 419].

[104] [Doc. 118-5, pp. 421–22].

37

propane requirements, disagreements about problems with the tunnel fans in his chicken houses, inputs related to the quality of the chicks[105] Perdue placed with Parker, and lastly, the elusive statistical information for compensation.

Parker will, no doubt, produce a more exhaustive list, but these things represent a decent packaging of how he claims Perdue breached its contractual agreements. Given the release of claims and waiver just discussed, the Court wants to know *what* Parker's damages really are—other than damages related to some fact connected to his time-barred FLSA claims. When it comes to a claim for breach of contract, what would Parker have done differently if allowed to use his "skill, knowledge, and discretion" as a longtime chicken farmer—unfettered[106] by Perdue's or other "industry standards"?[107] This, of course, is just another way of asking the obvious: What would Parker have done differently that would have allowed him to make more money and how much more money would he have made? Parker certainly can't tell a jury he would've made more money had he been allowed to "do it" his way without providing some detailed calculations for the jurors' consideration. Parker needs to explain what's left since his FLSA claims are time-barred and since there are clauses in the final PPA that clearly

---

[105] *But see* [Doc. 118-5, p. 414 (Parker's contractual understanding that Perdue "will determine, in its sole and absolute discretion[,]" the "number," "size, weight, and age" of the chickens consigned to him)].

[106] Or, to use the PPA's phrasing, as "informed by" Perdue's "established procedures and otherwise sound farming and growing practices in accordance with industry standards." [Doc. 118-5, p. 413].

[107] [Doc. 118-5, p. 413].

limit his damages.

Finally, as to any allegations that may be relevant to Parker's claim for negligent misrepresentation—again, that are wholly unconnected with his time-barred concerns about wages and overtime—Georgia law proscribes a four-year limitations period. O.C.G.A. § 9-3-31. This statute of limitations necessarily limits Parker's claim for negligent misrepresentation, if there is one, to the period between July 22, 2018—four years before he filed this lawsuit—and August 5, 2019—the day Perdue collected its last flock of chickens.

To establish negligent misrepresentation under Georgia law, Parker understands that he must demonstrate how Perdue negligently supplied false information, how he reasonably relied upon that false information, and how that reliance proximately caused him economic injury.[108] *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas*, 479 S.E.2d 727, 729 (Ga. 1997). He also contends that he does not have to prove he knew that Perdue's statements were false.[109] When it comes to the "misrepresentation," Parker contends (without any clear reference to a specific time) that Perdue represented he could exercise his independent judgment when it came to raising its chickens.[110] That was, after all, something Parker looked for (and may have even expected) given the

---

[108] [Doc. 136, p. 22].

[109] [Doc. 136, p. 22 (citing *Bowden v. Med. Ctr.*, 845 S.E.2d 555, 564 n.11 (Ga. 2020))].

[110] [Doc. 136-1, ¶¶ 16–17].

39

level of independence he had with his previous two companies.[111]

"Whether a plaintiff's reliance on a defendant's alleged misrepresentations was reasonable is generally a jury question," but the existence of a merger clause "alters th[e] analysis." *Vah v. Platinum Marietta, Inc.*, 918 S.E.2d 100, 106 (Ga. Ct. App. 2025). The final PPA signed in 2016 also provides:

> This [PPA], and any [a]ttachments hereto, constitute the entire agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. [Parker] acknowledges that in entering into this [PPA] and/or its [a]ttachments, [he] has not relied upon any statements that are not contained in this document, and/or the [a]ttachments hereto.[112]

This merger clause operates as a disclaimer. *Jimenez v. Houseboats on Lanier, Inc.*, 899 S.E.2d 334, 338 (Ga. Ct. App. 2024). Under Georgia law, it establishes that the written agreement "completely and comprehensively represents" what Parker and Perdue agree to. *Id.* "It has long been the law in Georgia that if the parties have reduced their agreement to writing, all oral representations made *antecedent to* execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties." *First Data POS, Inc. v. Willis*, 546 S.E.2d 781, 784 (Ga. 2001) (emphasis added). Put more simply, "if the contract contains a merger clause, a party cannot argue [he] relied upon representations other than those contained in the contract." *Jimenez*, 899

---

[111] [Doc. 136-1, ¶ 16].

[112] [Doc. 118-5, pp. 419–20].

S.E.2d at 338. Further, Georgia's courts "ha[ve] consistently held that disclaimers in contracts prevent justifiable reliance on other representations purportedly made by the parties." *W.R. Grace & Co.-Conn. v. Taco Tico Acquisition Corp.*, 454 S.E.2d 789, 791 (Ga. Ct. App. 1995) (citing *Copeland v. Home Savings of Am.*, 433 S.E.2d 327, 329 (Ga. Ct. App. 1993)). Thus, the sheer presence of a merger clause in a contract renders reliance "upon representations other than those contained in the contract" unreasonable as a matter of law. *Jimenez*, 899 S.E.2d at 338–39.

The relied upon representations about Parker's ability to use his independent judgment when it came to raising Perdue's chickens—those more likely than not had to be made in 2006 when Parker first started as one of its growers. Needless to say, depending on what Parker puts forth to support his claim for negligent misrepresentation, the Court is highly skeptical that it can survive when applying § 9-3-31's four-year limitations period. There is, however, the fact that the final PPA Parker and Perdue agreed to on December 16, 2016, contains that "skill, knowledge, and discretion" language that could arguably renew Perdue's representations of independence.[113] The presence of a merger clause in that PPA means Parker would *typically* be precluded from suing for misrepresentations made prior to its execution based on some very broad, very unspecific "Perdue's misrepresentations about

---

[113] [Doc. 118-5, p. 413]; [Doc. 136-1, ¶ 17].

independence enticed me into growing chickens for it" theory.[114] *EMAA, LLC v. Century Communities of Ga.*, No. 1:19-CV-3687-AT, 2023 WL 9051453, at *27 (N.D. Ga. Mar. 15, 2023) (citing *Advanced Polymer Tech. Corp. v. Textile Mgmt. Assocs., Inc.*, No. 4:08-CV-18-HLM, 2009 WL 10669412, at *4–5 (N.D. Ga. July 10, 2009). The keyword there, of course, is "typically."

Where a claim for negligent misrepresentation arises from some representation made *in the contract itself*—within its four corners—a merger clause might not bar the claim even though what underlies the tort claim is the same as what underlies the claim for breach of contract. *Id.* at *28 (quoting *Conway v. Romarion*, 557 S.E.2d 54, 58 (Ga. Ct. App. 2001)); *Smiley v. S & J Invs., Inc.*, 580 S.E.2d 283, 290 (Ga Ct. App. 2003). A claim for negligent misrepresentation may be established if—in addition to violating a contractual obligation—something said or something done also violates a duty owed to a plaintiff independent of the contract. *Abalene Pest Control Serv., Inc. v. Orkin Exterminating Co.*, 395 S.E.2d 867, 874 (Ga. Ct. App. 1990) ("It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to [a] plaintiff independent of contract to avoid harming him."). Again, though, the Court must ask: What are Parker's *recoverable* damages for his claim of

---

[114] *See, e.g.*, [Doc. 90, ¶ 127 ("At the time Perdue represented that Parker would perform work using the skills, knowledge, and discretion that he possesses, the representations were false.")]; *see also* [Doc. 136-1, ¶¶ 16–17].

negligent misrepresentation that are unrelated to wages and overtime and aren't caught by the release of claims and the waiver and merger clauses in the 2016 PPA?

Thus, as to Parker's state law claims for breach of contract and negligent misrepresentation, the Court **GRANTS** summary judgment to Perdue to the extent either claim seeks recovery related to wages and overtime, but it **DENIES** summary judgment to the point Parker seeks damages unrelated to wages and overtime given the competing factual narratives that exist on this record. *See Sconiers*, 946 F.3d at 1263.

The Court recognizes that even with its permission for the parties to exceed the page limitations set by its local rules on their summary-judgment briefing, much of their arguments regarding the Court's concerns may have been significantly curtailed. To hopefully remedy that, the Court provides Parker with ***10 days*** to present his clarified allegations on his state law claims for breach of contract and negligent misrepresentation to the Court for consideration—claims that are not intertwined with issues related to wages and overtime under the FLSA. Parker should also, as set out above, clarify his measure and the method at which he arrives at his damages. Upon review, the Court may order supplemental briefing to determine whether either state law claim presents genuine issues of material fact necessitating a trial.

### CONCLUSION

For now, though, the Court **GRANTS in part** and **DENIES in part** Perdue's summary-judgment efforts. The Court **GRANTS** summary judgment to Perdue on

Parker's claim for declaratory relief and his claims under the FLSA. With respect to Parker's state law claims for breach of contract and negligent misrepresentation, the Court **GRANTS** summary judgment **in part** as set out above.[115] Given the substance of the reports from Parker and Perdue's respective expert witnesses, the Court **DENIES** their efforts to exclude certain testimony **without prejudice** based upon Parker's forthcoming clarifications regarding his remaining state law claims, if any.[116] Should the Court require further briefing on what remains of those claims, the parties may renew their efforts to exclude certain testimony as they see fit.

      **SO ORDERED**, this 20th day of March, 2026.

                                        *S/ Tilman E. Self, III*
                                        **TILMAN E. SELF, III**
                                        **UNITED STATES DISTRICT JUDGE**

---

[115] Perdue's efforts to dismiss Parker's claims based on lack of standing and judicial estoppel are **DENIED**. [Doc. 104].

[116] [Doc. 124]; [Doc. 125].